UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROBERT KORNBERG,
Plaintiff,

v.

MILFORD BOARD OF EDUCATION and
CONNECTICUT STATE BOARD OF EDUCATION,
Defendants.

Civil Action No. 3:25-cv-02030 (OAW)

November 12, 2026

**PLAINTIFF'S MOTION TO CORRECT AND SUPPLEMENT THE ADMINISTRATIVE RECORD AND FOR LEAVE TO FILE A FURTHER MOTION AFTER ACCESS TO THE COURT-FILED RECORD**

Plaintiff Robert Kornberg, proceeding pro se, respectfully moves pursuant to 20 U.S.C. § 1415(i)(2)(C), Federal Rules of Civil Procedure 6(b) and 16(b)(4), and the Court's October 5, 2026 Scheduling Order to correct and supplement the administrative record with the materials identified below, to the extent those materials are absent from the record actually filed with the Court.

Plaintiff also requests that Defendant Milford Board of Education explain and correct discrepancies between the administrative-record materials and the revised index it supplied on October 28, 2026. Specifically, the revised index lists the June 12, 2025 Due Process Complaint as Item 101, at MBOE AR 1846–1872, and the October 16, 2025 Motion for Stay of Proceedings

as Item 102, at MBOE AR 1873–1888, but neither document appears in the administrative-record file supplied to Plaintiff.

Because Plaintiff remains unable to inspect the complete administrative record filed at ECF Nos. 31, 32, and 33, Plaintiff further requests an express order permitting a further motion to correct or supplement after obtaining access. This motion does not withdraw or replace Plaintiff's pending Motion to Modify Scheduling Order, for Access to the Filed Administrative Record, and for Interim Extension of Deadlines, ECF No. 35.

In support, Plaintiff states:

## I. PROCEDURAL BACKGROUND AND LIMITATIONS ON PLAINTIFF'S REVIEW

1. On October 5, 2026, the Court granted Plaintiff's Motion to Amend Scheduling Order, ECF No. 28, and entered the Scheduling Order at ECF No. 29.
2. The Scheduling Order provides: "Any motion to supplement the record shall be filed within 21 days after Defendant files the administrative record."
3. The Scheduling Order further provides that dispositive motions shall be filed within thirty days after the supplementation deadline, responses within twenty-one days after a dispositive motion is filed, and replies within fourteen days after a response is filed.
4. On November 2, 2026, Defendant filed the administrative record under seal at ECF Nos. 31, 32, and 33.
5. On October 28, 2026, Defendant's counsel previously provided Plaintiff a link to administrative-record materials, including an index bearing the heading "INDEX

ADMINISTRATIVE RECORD," with the filename "Index Administrative Record (revised)."

6. Plaintiff's present review is limited to the administrative-record materials made available through that link and the accompanying revised index. A copy of that index is attached as Exhibit A.
7. Plaintiff has been unable to access the complete court-filed administrative record through his existing CM/ECF account. When Plaintiff attempts to open the restricted record, CM/ECF displays: "You do not have permission to view this document."
8. On November 3, 2026, Plaintiff filed ECF No. 35, seeking access to the complete court-filed record, modification of the supplementation deadline, and interim suspension of the affected deadlines.
9. In ECF No. 35, Plaintiff explained that he could not verify whether the October 28 materials were identical to the record actually filed with the Court and that his limited review had identified discrepancies between documents and corresponding index entries.
10. On November 5, 2026, the Court referred the motions at ECF Nos. 30, 34, and 35 to a United States Magistrate Judge for disposition.
11. As of this filing, Plaintiff remains unable to inspect the complete court-filed administrative record, and the access and scheduling relief requested in ECF No. 35 remains unresolved.
12. Plaintiff submits this motion now to identify the omissions and discrepancies found in the supplied materials. Plaintiff does not assume that the pending request for access and scheduling relief, or the order referring that request to a magistrate judge, has extended the existing deadline for moving to supplement the record.

13. Plaintiff distinguishes throughout this motion between the administrative-record file Defendant supplied on October 28 and the administrative record actually filed with the Court. Plaintiff has reviewed the supplied materials but cannot yet verify whether the same omissions or discrepancies exist in the inaccessible court-filed record.

## II. IDENTIFIED OMISSIONS AND DISCREPANCIES

### A. Omitted Motion for Stay of Proceedings dated October 16, 2025

14. The revised index supplied by Defendant lists:

> Item 7: “Ruling re motion for stay of proceedings”
>
> MBOE AR 967.

15. The ruling denying the stay is included in the supplied administrative-record file at MBOE AR 967.
16. The revised index separately lists:

> Item 102: “Motion for Stay of Proceedings 10/16/25”
>
> MBOE AR 1873–1888.

17. The October 16, 2025 Motion for Stay of Proceedings is missing from the administrative-record file Defendant supplied to Plaintiff on October 28, 2026, even though the accompanying revised index lists that motion as Item 102, at MBOE AR 1873–1888.
18. Because Plaintiff cannot access the complete administrative record actually filed at ECF Nos. 31, 32, and 33, he cannot verify whether the same omission exists in the court-filed record.

19. Plaintiff requests that Defendant identify whether the October 16, 2025 Motion for Stay of Proceedings is included in the court-filed record and, if so, provide its exact ECF attachment and administrative-record page location. If that motion is omitted, Plaintiff requests that the Court order its inclusion and any necessary correction of the index or page references.

20. Plaintiff attaches his copy of the October 16, 2025 Motion for Stay of Proceedings as Exhibit B.

**B. Omitted ruling denying the motion for written findings**

21. The revised index supplied by Defendant lists:

> Item 6: "Motion written findings case 25-0686"
>
> MBOE AR 965–966.

22. The motion for written findings is included in the supplied administrative-record file at MBOE AR 965–966, but the corresponding ruling denying that motion is missing.

23. Plaintiff cannot yet verify whether the same omission exists in the court-filed record. Plaintiff requests that Defendant identify whether the ruling is included in that record and, if so, provide its exact ECF attachment and administrative-record page location. If omitted, Plaintiff requests its inclusion.

24. A copy of the ruling denying the motion for written findings is attached as Exhibit C.

25. This request concerns the ruling corresponding to the motion at MBOE AR 965–966. It is separate from the motion and ruling concerning specific findings on impartiality identified in subsection E below.

**C. Omitted motion to reconsider exclusion of Exhibit P41 and corresponding ruling**

26. The following documents are missing from the supplied administrative-record file: a. The motion to reconsider exclusion of Exhibit P41, identified in Plaintiff's files as "Motion_to_Reconsider_Exhibit_P41_Case_No_25-0686"; and b. The corresponding ruling denying reconsideration concerning the P41 audio file.
27. Copies are attached as Exhibits D and E, respectively.
28. These documents concern Plaintiff's request for reconsideration of an evidentiary exclusion and the hearing officer's disposition of that request.
29. Plaintiff requests their inclusion if absent from the court-filed record so that the request, objection, and corresponding ruling may be reviewed.

**D. Omitted formal objection concerning impartiality and corresponding ruling**

30. The following documents are missing from the supplied administrative-record file: a. The formal objection concerning impartiality, identified in Plaintiff's files as "Objection_Impartiality_Case_No_25-0686"; and b. The corresponding ruling overruling that objection.
31. Copies are attached as Exhibits F and G, respectively.
32. These documents reflect the impartiality concerns raised during the administrative proceedings and the hearing officer's response. Plaintiff requests their inclusion if absent from the court-filed record.

**E. Omitted motion for specific findings concerning impartiality and corresponding ruling**

33. The following documents are missing from the supplied administrative-record file: a. The motion for specific findings of fact and conclusions of law concerning impartiality, identified in Plaintiff's files as "Motion_Impartiality_Oct20_Case_25-0686"; and b. The corresponding ruling denying that motion.

34. Copies are attached as Exhibits H and I, respectively.

35. These documents concern Plaintiff's request for express findings addressing impartiality and the hearing officer's disposition of that request. Plaintiff requests their inclusion if absent from the court-filed record.

**F. Omitted Parents' Formal Motion to Object to Continuation and corresponding ruling**

36. The following documents are missing from the supplied administrative-record file: a. "Parents' Formal Motion to Object to Continuation," identified in Plaintiff's files as "Motion_Objection_Lack_of_Impartiality_Case_No_25_0686"; and b. The corresponding ruling denying that motion.

37. Copies are attached as Exhibits J and K, respectively.

38. These documents reflect the objection to continuation of the administrative proceedings and the hearing officer's disposition of that objection. Plaintiff requests their inclusion if absent from the court-filed record.

**G. Omitted scheduling notice concerning anticipated continuation dates**

39. The scheduling notice entitled "Anticipated Continuation Dates Post-November 4th," concerning Case No. 25-0686, is missing from the supplied administrative-record file.

40. A copy is attached as Exhibit L.

41. This notice concerns the anticipated continuation of the administrative proceedings and provides context for the related procedural motions and objections. Plaintiff requests its inclusion if absent from the court-filed record.

**H. Omitted correspondence concerning the failed resolution meeting**

42. The July 23, 2025 email exchange between Plaintiff and Hearing Officer Kennedy, entitled "Re: Update Regarding Failed Resolution Meeting - Docket #25-0686," is missing from the administrative-record file supplied to Plaintiff.
43. A copy is attached as Exhibit M.
44. The corresponding documents referenced in Plaintiff's email are already included in the supplied administrative-record file as Parent's Exhibits 69–72, listed in the revised index as Items 91–94, at MBOE AR 1821–1829. Plaintiff does not request duplicate inclusion of those documents.
45. Plaintiff requests inclusion of the email exchange itself, if absent from the court-filed record, to document Plaintiff's communication to the hearing officer and the hearing officer's response concerning the attachments and the scheduling of the pre-hearing conference.

**I. Omitted Due Process Complaint dated June 12, 2025**

46. The revised index supplied by Defendant lists:

> Item 101: "Due Process Complaint dated 6/12/25"
>
> MBOE AR 1846–1872.

47. The June 12, 2025 Due Process Complaint is missing from the administrative-record file Defendant supplied to Plaintiff on October 28, 2026, even though the accompanying revised index lists that complaint as Item 101, at MBOE AR 1846–1872.

48. Because Plaintiff cannot access the complete administrative record actually filed at ECF Nos. 31, 32, and 33, he cannot verify whether the same omission exists in the court-filed record.

49. Plaintiff requests that Defendant identify whether the complaint is included in the court-filed record and, if so, provide its exact ECF attachment and administrative-record page location. If omitted, Plaintiff requests that the Court order its inclusion and any necessary correction of the index or page references.

50. Plaintiff attaches his copy of the June 12, 2025 Due Process Complaint as Exhibit N.

## III. BASIS FOR CORRECTION AND SUPPLEMENTATION

51. Under 20 U.S.C. § 1415(i)(2)(C)(i), the Court "shall receive the records of the administrative proceedings."

52. The identified complaint, motions, objections, rulings, scheduling notice, and correspondence formed part of the administrative proceedings. Plaintiff requests their inclusion to the extent they are absent from the administrative record filed with the Court.

53. The identified materials concern the initiation and procedural conduct of the administrative case, including the due process complaint, requests for a stay and written findings, reconsideration of an evidentiary exclusion, impartiality objections, continuation of proceedings, and events concerning the resolution meeting.

54. A record containing a ruling without the motion it resolves, or a motion without its corresponding ruling, may present an incomplete account of the request, the grounds asserted, and the hearing officer's disposition.

55. The omission of the June 12, 2025 Due Process Complaint would likewise leave the record without that identified complaint, notwithstanding its express listing in the revised index.

56. This motion concerns the completeness and accuracy of the administrative record. Nothing in this motion changes Plaintiff's position concerning sealing or redaction, or withdraws or waives Plaintiff's existing objections to blanket sealing.

## IV. REQUEST FOR A FURTHER MOTION AFTER ACCESS TO THE COURT-FILED RECORD

57. This motion identifies omissions and discrepancies in the materials supplied to Plaintiff on October 28, 2026. Without access to the complete administrative record filed at ECF Nos. 31, 32, and 33, Plaintiff cannot verify whether those materials match the court-filed record or whether additional omissions or discrepancies exist.

58. Plaintiff requests leave to file a further motion to correct or supplement within twenty-one days after the later of (a) entry of an order granting that opportunity or (b) the date the complete court-filed administrative record, including all transcripts, exhibits, attachments, and indexes, becomes available for Plaintiff to view and download through his existing CM/ECF account. Any further motion would identify the additional omissions or discrepancies, explain their relevance, and specify the requested correction or supplementation.

59. Good cause supports this request because Plaintiff promptly sought access and related scheduling relief in ECF No. 35, which remains pending, and is identifying known problems while unable to verify the complete court-filed record. This filing does not withdraw or replace ECF No. 35 or represent completion of Plaintiff's review.

60. Plaintiff also requests that the Court preserve the scheduling intervals established by ECF No. 29, measured from the revised supplementation deadline. The existing supplementation deadline is November 23, 2026, based on Defendant's November 2, 2026 filing and the twenty-one-day period established by ECF No. 29, unless modified by a subsequent Court order.

**REQUESTED RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Grant this motion to correct and supplement the administrative record with the materials identified in Section II, to the extent they are absent and properly part of the administrative proceedings;

B. Direct Defendant Milford Board of Education to identify the specific ECF attachment and administrative-record page location of any identified document it contends is already included; reconcile the revised index entries for the June 12, 2025 Due Process Complaint (Item 101, MBOE AR 1846–1872) and the October 16, 2025 Motion for Stay of Proceedings (Item 102, MBOE AR 1873–1888) with the court-filed record and include either document if omitted; and file a corrected or supplemental index reflecting any corrections or additions and their corresponding administrative-record page references;

C. Grant access to the complete court-filed administrative record as requested in ECF No. 35;

D. Permit Plaintiff to file a further motion to correct or supplement within twenty-one days after both the Court grants that opportunity and the complete administrative record filed at ECF Nos. 31, 32, and 33, including all transcripts, exhibits, attachments, and indexes, becomes available for Plaintiff to view and download through his existing CM/ECF account;

E. Extend the remaining case deadlines to preserve the scheduling intervals established by ECF No. 29, measured from the revised supplementation deadline; and

F. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Robert Kornberg
Robert Kornberg
Plaintiff, pro se
4 2nd Avenue
Shelton, CT 06484
rob1267@verizon.net

**EXHIBIT INDEX**

| Exhibit | Description |
|---|---|
| A | Index Administrative Record, provided by Defendant with the administrative-record materials made available to Plaintiff on October 28, 2026 (filename: “Index Administrative Record (revised)”) |
| B | Motion for Stay of Proceedings dated October 16, 2025 |
| C | Ruling denying the motion for written findings corresponding to the motion at MBOE AR 965–966 |
| D | Motion to Reconsider Exclusion of Exhibit P41 |
| E | Ruling denying reconsideration concerning Exhibit P41 |
| F | Formal objection concerning impartiality |
| G | Ruling overruling the formal objection concerning impartiality |
| H | Motion for specific findings of fact and conclusions of law concerning impartiality, identified as “Motion_Impartiality_Oct20_Case_25-0686” |
| I | Ruling denying the motion for specific findings concerning impartiality |
| J | Parents’ Formal Motion to Object to Continuation |
| K | Ruling denying Parents’ Formal Motion to Object to Continuation |
| L | Scheduling notice: “Anticipated Continuation Dates Post-November 4th,” Case No. 25-0686 |
| M | Email chain: “Re: Update Regarding Failed Resolution Meeting - Docket #25-0686” |
| N | Due Process Complaint dated June 12, 2025, identified in the revised index as Item 101, MBOE AR 1846–1872 |

# Exhibit A

**INDEX ADMINISTRATIVE RECORD**

| NO. | DESCRIPTION | BATES NUMBER |
|---|---|---|
| 1. | September 24, 2025 RK v. Milford BOE-CT | MBOE AR 001-070 |
| 2. | Hearing v2 October 17, 2025 | MBOE AR 071-420 |
| 3. | Hearing v3 October 21, 2025 | MBOE AR 421-766 |
| 4. | Hearing Transcript October 27, 2025 | MBOE AR 767-960 |
| 5. | Dismissal RK v. Milford | MBOE AR 961-964 |
| 6. | Motion written findings case 25-0686 | MBOE AR 965-966 |
| 7. | Ruling re motion for stay of proceedings | MBOE AR 967 |
| 8. | Ruling re motion for clarification and reconsideration | MBOE AR 968 |
| 9. | RK BOE motion for clarification | MBOE AR 969-990 |
| 10. | Ruling re recusal 2nd motion | MBOE AR 991 |
| 11. | Kornberg second motion for recusal | MBOE AR 992-1017 |
| 12. | Parents Updated Witness List | MBOE AR 1018-1019 |
| 13. | Notice of PPT 5/8/25 | MBOE AR 1020-1022 |
| 14. | Notice of PPT 4/28/25 | MBOE AR 1023-1025 |
| 15. | Kornberg_Supplemental_Statement_Oct5_2025 | MBOE AR 1026-1036 |
| 16. | Kornberg_Motion_for_Recusal_Case_BOE_25-0686 | MBOE AR 1037-1050 |
| 17. | Kornberg_Reply_to_Objection_Motion_for_Recusal_BOE | MBOE AR 1051-1057 |
| 18. | Milford BOE Objection to Motion to Recuse, Case No. 25-0686 | MBOE AR 1058-1078 |
| 19. | Exhibits & Witness List - Case No. 25-0686 | MBOE AR 1079-1418 |
| 20. | Prehearing conference memo--RK vs Milford | MBOE AR 1419-1420 |
| 21. | Robert_Kornberg_Amended_Complaint_7-29-2025 | MBOE AR 1421-1447 |
| 22. | Motion_for-reconsideration_Kornberg_Case_No_25-0686 | MBOE AR 1448-1472 |
| 23. | Ruling re recusal--RK vs Milford | MBOE AR 1473-1474 |
| 24. | Ruling re motion for reconsideration--RK vs Milford | MBOE AR 1475 |

| | | |
|---|---|---|
| 25. | Parent's Exhibit 1 email | MBOE AR 1476 |
| 26. | Parent's Exhibit 2 email | MBOE AR 1477 |
| 27. | Parent's Exhibit 3 email | MBOE AR 1478 |
| 28. | Parent's Exhibit 4 email | MBOE AR 1480-1481 |
| 29. | Parent's Exhibit 5 email | MBOE AR 1482-1484 |
| 30. | Parent's Exhibit 6 email | MBOE AR 1485 |
| 31. | Parent's Exhibit 7 email | MBOE AR 1486-1487 |
| 32. | Parent's Exhibit 8 email | MBOE AR 1488 |
| 33. | Parent's Exhibit 9 email | MBOE AR 1489-1493 |
| 34. | Parent's Exhibit 10 email | MBOE AR 1494-1495 |
| 35. | Parent's Exhibit 11 email | MBOE AR 1496 |
| 36. | Parent's Exhibit 12 email | MBOE AR 1497 |
| 37. | Parent's Exhibit 13 email | MBOE AR 1498-1500 |
| 38. | Parent's Exhibit 14 email | MBOE AR 1501-1502 |
| 39. | Parent's Exhibit 15 email | MBOE AR 1503-1522 |
| 40. | Parent's Exhibit 16 email | MBOE AR 1523-1546 |
| 41. | Parent's Exhibit 17 email | MBOE AR 1547-1550 |
| 42. | Parent's Exhibit 18 email | MBOE AR 1551-1567 |
| 43. | Parent's Exhibit 19 email | MBOE AR 1568-1569 |
| 44. | Parent's Exhibit 20 email | MBOE AR 1570-1572 |
| 45. | Parent's Exhibit 21 email | MBOE AR 1573-1574 |
| 46. | Parent's Exhibit 22 email | MBOE AR 1575-1581 |
| 47. | Parent's Exhibit 23 email | MBOE AR 1582-1593 |

| | | |
|---|---|---|
| 48. | Parent's Exhibit 24 email | MBOE AR 1594-1598 |
| 49. | Parent's Exhibit 25 email | MBOE AR 1599 |
| 50. | Parent's Exhibit 26 email | MBOE AR 1600 |
| 51. | Parent's Exhibit 27 email | MBOE AR 1601 |
| 52. | Parent's Exhibit 28 email | MBOE AR 1602 |
| 53. | Parent's Exhibit 29 email | MBOE AR 1603-1606 |
| 54. | Parent's Exhibit 30 email | MBOE AR 1607-1608 |
| 55. | Parent's Exhibit 31 email | MBOE AR 1609-1611 |
| 56. | Parent's Exhibit 32 email | MBOE AR 1612-1613 |
| 57. | Parent's Exhibit 33 email | MBOE AR 1614 |
| 58. | Parent's Exhibit 34 email | MBOE AR 1615-1616 |
| 59. | Parent's Exhibit 35 email | MBOE AR 1617-1622 |
| 60. | Parent's Exhibit 36 email | MBOE AR 1623-1629 |
| 61. | Parent's Exhibit 37 email | MBOE AR 1630-1634 |
| 62. | Parent's Exhibit 38 email | MBOE AR 1635-1640 |
| 63. | Parent's Exhibit 39 email | MBOE AR 1641 |
| 64. | Parent's Exhibit 40 email | MBOE AR 1642-1643 |
| 65. | Parent's Exhibit 41 email | MBOE AR 1644-1646 |
| 66. | Parent's Exhibit 42 email | MBOE AR 1647-1650 |
| 67. | Parent's Exhibit 43 email | MBOE AR 1651-1656 |
| 68. | Parent's Exhibit 44 email | MBOE AR 1657-1666 |
| 69. | Parent's Exhibit 45 email | MBOE AR 1667-1669 |
| 70. | Parent's Exhibit 46 email | MBOE AR 1670-1673 |
| 71. | Parent's Exhibit 47 email | MBOE AR 1674-1677 |
| 72. | Parent's Exhibit 48 email | MBOE AR 1678-1682 |

| | | |
|---|---|---|
| 73. | Parent's Exhibit 49 email | MBOE AR 1683-1685 |
| 74. | Parent's Exhibit 50 Weekly Highlight and Behavior Forms | MBOE AR 1686-1690 |
| 75. | Parent's Exhibit 51 Consent to Conduct Initial Evaluation 1/26/23 | MBOE AR 1691-1692 |
| 76. | Parent's Exhibit 52 Notice PPT 12/17/24 (duplicate?) | MBOE AR 1693-1695 |
| 77. | Parent's Exhibit 53 Notice PPT 12/17/24 | MBOE AR 1696-1698 |
| 78. | Parent's Exhibit 54 IEP 1/16/25 | MBOE AR 1699-1719 |
| 79. | Parent's Exhibit 55 IEP 3/6/25 | MBOE AR 1720-1742 |
| 80. | Parent's Exhibit 56 IEP 5/21/25 | MBOE AR 1743-1766 |
| 81. | Parent's Exhibit 57 Columbia-Suicide Severity Rating Scale | MBOE AR 1767-1768 |
| 82. | Parent's Exhibit 58 Student Log Entries | MBOE AR 1769-1770 |
| 83. | Parent's Exhibit 59 Student Log Entries | MBOE AR 1771-1772 |
| 84. | Parent's Exhibit 60 Milford Schools Data Collection Incidents Form | MBOE AR 1773-1775 |
| 85. | Parent's Exhibit 61 email | MBOE AR 1776-1789 |
| 86. | Parent's Exhibit 64 Correspondence from Kornberg re submission of state complaint | MBOE AR 1790-1793 |
| 87. | Parent's Exhibit 65 email | MBOE AR 1794 |
| 88. | Parent's Exhibit 66 email | MBOE AR 1795-1807 |
| 89. | Parent's Exhibit 67 email | MBOE AR 1808-1817 |
| 90. | Parent's Exhibit 68 Report Card 2024-2025 | MBOE AR 1818-1820 |
| 91. | Parent's Exhibit 69 email | MBOE AR 1821-1823 |
| 92. | Parent's Exhibit 70 email | MBOE AR 1824-1826 |
| 93. | Parent's Exhibit 71 email | MBOE AR 1827-1828 |

| | | |
|---|---|---|
| 94. | Parent's Exhibit 72 Confidentiality Agreement July 10, 2025 | MBOE AR 1829 |
| 95. | Parent's Exhibit 73 Milford Schools' Behavior Intervention Plan | MBOE AR 1830-1833 |
| 96. | Parent's Exhibit 74 11/29/24 office note Dr. Brone re: school placement Parent's | MBOE AR 1834 |
| 97. | Parent's Exhibit 75 email | MBOE AR 1835-1838 |
| 98. | Parent's Exhibit 76 email | MBOE AR 1839-1840 |
| 99. | Parent's Exhibit 77 Correspondence from State to BOE and Kornberg dated 5/9/25 | MBOE AR 1841-1843 |
| 100. | Exhibit 78 email | MBOE AR 1844-1845 |
| 101. | Due Process Complaint dated 6/12/25 | MBOE AR 1846-1872 |
| 102. | Motion for Stay of Proceedings 10/16/25 | MBOE AR 1873-1888 |

# Exhibit B

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert Kornberg, Pro Se
v.
Milford BOE

Case No. 25-0686

October 16, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert Kornberg
4 2nd Ave
Shelton, CT 06484
Rob1267@verizon.net

# Motion for Stay of Proceedings

## I. Procedural Due Process Violations

1. The Father in the above-captioned matter respectfully moves for a stay of proceedings due to serious procedural due process violations and unresolved concerns regarding impartiality.
2. On September 11, 2025, the Hearing Officer advised the Father via email that exhibits and witness lists should be submitted "at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony." This guidance made no mention of cross-examination. The Father relied on this instruction in preparing materials and reasonably understood that the deadline applied to exhibits used in presenting his own case.
3. However, during the hearing on September 24, the Hearing Officer imposed a stricter interpretation, stating for the first time that the five-day deadline applied to all uses of exhibits, including cross-examination. This change was not communicated in advance and contradicted the original guidance. As a result, the Father was barred from using exhibits to cross-examine the District's witness, despite having complied with the stated deadline.
4. The Father did not prepare cross-examination materials for the first day of hearing because he reasonably understood, based on the Hearing Officer's scheduling guidance, that the District would present its case first and that the Father's testimony would occur later. The procedural shift — including the enforcement of exhibit deadlines in a manner that barred the use of exhibits for cross-examination — created a prejudicial surprise and impaired the Father's ability to challenge the District's case.
5. When the Father indicated that the witness would be recalled during his own case, the Hearing Officer later stated — in his written denial of the Father's motion for recusal — that the District would not be required to produce the witness again due to what he described as the Father's "deliberate, bad-faith refusal" to file exhibits. This characterization was unsupported by the record and raises serious concerns about impartiality and fairness. The accusation of "deliberate, bad-faith refusal" was made without any supporting evidence and ignored the Father's reliance on the Hearing Officer's original guidance.
6. In his written denial of the Father's recusal motion, the Hearing Officer stated that he had ruled the Father was not required to file exhibits until five business days before the hearing in which he intended to use them, including using them for purposes of cross-examination. However, this language does not appear in the September 11 email, and the inclusion of cross-examination was introduced for the first time during the hearing. This retroactive reinterpretation misrepresents the procedural record and further undermines the fairness of the proceedings.
7. These actions constitute violations of procedural due process under the Individuals with Disabilities Education Act (IDEA), including the right to present evidence, confront and cross-examine witnesses, and receive a fair hearing before an impartial officer. The contradictory procedural guidance, the denial of cross-examination, and the unsupported accusation of bad faith undermine the fairness of the hearing.

## II. Irreparable Harm and the Need for a Stay

8. On September 24, 2025, the Father submitted a written request for clarification regarding the ability to recall the District's witness, Ms. Truscello, during his own case presentation. The request was made in good faith following the Hearing Officer's statement during the hearing that the Father would not be permitted to question the witness about exhibits introduced during his own case. No response has been received.
9. The absence of a response further impairs the Father's ability to prepare and present his case, reinforcing the need for a temporary stay to address these unresolved procedural issues. The inability to cross-examine the District's witness and present responsive exhibits has already impaired the fairness of the proceedings. A stay is necessary to prevent further prejudice and to ensure the Father's due process rights are protected.
10. Continuing the hearing under these compromised conditions would cause irreparable harm to the Father's right to a fair and impartial adjudication. The denial of cross-examination and the inability to present exhibits directly affect the integrity of the evidence and the ability to challenge testimony. Once the hearing proceeds under these constraints, the damage to the record and the fairness of the process cannot be reversed. This procedural breakdown directly impairs the Father's ability to challenge the District's evidence, which in turn compromises the child's right to a Free Appropriate Public Education (FAPE).

## III. Relief Requested

11. This motion seeks a temporary stay to allow for resolution of procedural concerns that directly affect the fairness and integrity of the hearing. It is not intended to delay proceedings, but to preserve judicial economy and avoid the risk of reversal or remand due to unresolved due process violations.
12. The Father respectfully submits that the requested stay meets the standard for temporary relief, including the presence of irreparable harm, serious procedural violations, and the need to preserve the integrity of the hearing process. Ensuring a fair hearing process serves not only the Father's rights but the public interest in protecting a child's access to a Free Appropriate Public Education.
13. Accordingly, the Father respectfully requests that proceedings be stayed pending resolution of the procedural objections raised in this motion. While the Hearing Officer retains authority to rule on motions, the Father submits that the issues raised — including the denial of cross-examination and the accusation of bad faith — warrant review by an impartial authority outside the current hearing. The Father intends to seek review of these concerns through appropriate channels, including the Connecticut State Department of Education's complaint resolution process or judicial review under the Individuals with Disabilities Education Act, if necessary. A temporary stay is essential to preserve the integrity of the hearing and prevent further prejudice.

## Attached for Review

- **Exhibit A –** Emails from Hearing Officer (Sept 11–12, 2025) regarding exhibit deadlines and anticipated scheduling
- **Exhibit B** – Transcript Excerpt (September 2025 Hearing) This excerpt documents the procedural contradiction regarding exhibit deadlines, the denial of cross-examination, and the Father's stated intent to recall the witness.
- **Exhibit C** – Denial of the Father's motion for recusal, including the accusation of bad faith, which raises impartiality concerns.
- **Exhibit D** – September 24, 2025 letter requesting clarification regarding witness recall, showing the Father's good-faith effort to resolve procedural uncertainty.

This motion is submitted respectfully and in good faith to preserve the integrity of the hearing process

Respectfully submitted,

Robert Kornberg.

# Re: [redacted] vs Milford BOE 25-0686

From: plkennedyesq@aol.com (plkennedyesq@aol.com)

To: hrosen@berchemmoses.com; klm3208@yahoo.com; rob1267@verizon.net

Date: Tuesday, September 16, 2025 at 08:47 PM EDT

The regulation only bars exhibits from being used if they are not produced five business days in advance of the specific date that they are to be used. The attorneys as a matter of courtesy and administrative efficiency generally do a full exhibit exchange in advance of the hearing. Since the District is presenting first I would allow it to have the same right as parties going first in other types of legal proceedings to present rebuttal evidence after the Parents conclude their case.

Patrick L. Kennedy
Hearing Officer

> On Saturday, September 13, 2025 at 11:30:40 AM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Attorney Rosen,
> >
> > Based on guidance from Hearing Officer Kennedy and the applicable regulations—34 C.F.R. § 300.512 and Conn. Agencies Regs. § 10-76h-12—exhibits must be submitted at least five business days prior to the hearing date on which they will be used.
> >
> > Since I will not be presenting my case or testimony until the October hearing date, and I do not intend to introduce exhibits during the district's presentation, my submission deadline will be calculated from that October date.
> >
> > If you believe otherwise, I welcome clarification from the Hearing Officer.
> >
> > Robert Kornberg.
> >
> > On Sat, Sep 13, 2025 at 11:12 AM, Herbert Z. Rosen <hrosen@berchemmoses.com> wrote:
> >
> > > Good Morning,
> > >
> > > The District expects that it will require three days to present its case. However, we expect to receive the Complainants' exhibits at least five days prior to September 24, pursuant to 34 C.F.R. Sec. 300.512 and Regs. Conn. State Agencies Sec. 10-76h-12.

Although we will be presenting witnesses first, our understanding is that the Complainants would not be permitted to introduce any of their own evidence through cross-examination of our witnesses if we do not receive those exhibits in advance of the hearing. Further, it would be prejudicial towards the District's good faith attempts to mount a defense to the Complainant' claims if we were unable to view any of the records or exhibits that the Complainants are basing their claims on in advance.

Respectfully submitted,
Herbie Rosen

BERCHEM MOSES PC

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460

(203) 783-1200 • www.berchemmoses.com

hrosen@berchemmoses.com

Rated by Super Lawyers 2025
visit SuperLawyers.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

---

**From:** plkennedyesq@aol.com <plkennedyesq@aol.com>
**Sent:** Friday, September 12, 2025 5:17 PM
**To:** Karen Michelson <klm3208@yahoo.com>; Herbert Z. Rosen <hrosen@berchemmoses.com>; Robert <rob1267@verizon.net>
**Subject:** Re: [redacted] vs Milford BOE 25-0686

I think it unlikely that the district will take less than a day to present its case but, again, I suggest that you consult with the district's attorney concerning anticipated scheduling.

Patrick L. Kennedy
Hearing Officer

On Friday, September 12, 2025 at 05:07:15 PM EDT, Robert <rob1267@verizon.net> wrote:

> At the prehearing conference, you indicated that the respondent will present their case first. Given that the hearing begins on September 24, could you please confirm whether that day is expected to be dedicated entirely to the respondent's presentation?
>
> Understanding this will help me determine when I am likely to begin presenting my case and ensure

that my exhibits are submitted in accordance with the five-business-day rule.

Thank you for your guidance,

Robert

On Fri, Sep 12, 2025 at 5:00 PM, plkennedyesq@aol.com
<plkennedyesq@aol.com> wrote:

> I cannot. The parties may wish to confer on how long they expect their respective cases to take.
>
> Patrick L. Kennedy
> Hearing Officer
>
> On Thursday, September 11, 2025 at 06:03:24 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > I understand the other party will present their case first on September 24. Could you please confirm which hearing date I'll be scheduled to begin presenting my case and providing testimony? I want to make sure my exhibits are submitted at least five business days in advance of that date.
> >
> > Thank you.
> >
> > Robert.
> >
> > On Thu, Sep 11, 2025 at 5:06 PM, plkennedyesq@aol.com
> > <plkennedyesq@aol.com> wrote:
> >
> > > If you are using the US Postal Service you should send my copies to PO Box 8078, Manchester, CT 06040-0078. If you are using a private courier that cannot deliver to a postal mail box you may send them to 132 Strawberry Lane, Manchester, CT. You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony. (This usually means a week, but keep in mind that Columbus Day would push back the deadline for the following hearing one more day.)
> > >
> > > Patrick L. Kennedy
> > > Hearing Officer
> > >
> > > On Thursday, September 11, 2025 at 04:49:11 PM EDT, Robert
> > > <rob1267@verizon.net> wrote:
> > >
> > > > I understand your preference for hard copies during the hearing, and I will submit a hard copy packet of my exhibits directly to you. Could you please confirm the appropriate mailing address for delivery, as well as the deadlines for both the hard copy and electronic submissions?
> > > >
> > > > I'd also like to confirm whether it would be acceptable to provide the opposing party

with the exhibits in electronic format only, rather than hard copy. I want to ensure I'm complying with all procedural requirements while also streamlining the process for all parties.

Please let me know if this arrangement is acceptable or if hard copies must be provided to both parties.

On Thu, Sep 11, 2025 at 4:37 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

I really need the hard copies as I sometimes have some computer problems with large files and toggling through exhibits gets in the way of running the hearing. (If we were having an in-person hearing I would not have a computer there at all, only a notepad.) You may want to consider whether you have too many exhibits, particularly if the exhibits go back long before the events which are the subject of the complaint.

Patrick L. Kennedy
Hearing Officer

On Thursday, September 11, 2025 at 04:11:34 PM EDT, Robert <rob1267@verizon.net> wrote:

Dear Officer Kennedy,

I've prepared all of my exhibits as individual PDF files and organized them with an index, as required for electronic submission. Because of the substantial volume of documents involved, preparing and submitting hard copies presents a significant challenge. I'd like to respectfully request an exemption from the hard copy submission requirement.

If this modification is acceptable, I will submit the full set of exhibits electronically in a ZIP file, clearly labeled and indexed, and confirm receipt with all parties. I believe this approach would maintain clarity and accessibility while ensuring timely delivery.

Thank you very much for your time and consideration, and please let me know how best to proceed.

Robert.

On Thu, Sep 11, 2025 at 3:48 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

Mr Kornberg, Ms Michelson & Attorney Rosen,

Attached please find a set of guidelines for zoom hearings.

Patrick L. Kennedy
Hearing Officer

-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests

that you wire or otherwise transfer funds to any party, you must confirm the request and any corresponding instructions via telephone before you initiate any wire or other transfer. PLEASE CONFIRM BY CALLING THE ORIGINATOR OF THE EMAIL, USING PREVIOUSLY KNOWN CONTACT INFORMATION, PRIOR TO WIRING OR OTHERWISE TRANSFERRING FUNDS.

That's your testimony?

A. Correct.

Q. So, would you consider his behaviors -- when you use the term "behavior," would you consider that a negative thing?

A. No.

ATTORNEY ROSEN: Objection. Relevance?

THE WITNESS (Truscello): I'm sorry.

THE HEARING OFFICER: I don't really -- I'll sustain the objection.

I didn't really understand that question.

ROBERT KORNBERG: Well, we received an e-mail from Ms. Truscello that -- a communication from her that when we use the term "behavior," it's not a negative thing.

ATTORNEY ROSEN: Objection. This is testimony and argumentative.

THE HEARING OFFICER: Yeah. Yeah, that's sustained.

ROBERT KORNBERG: Okay. So, that -- that will come up in the future, understanding that.

ATTORNEY ROSEN: I just want to note this Witness is made available now. So, to say this comes up in the future, the Witness is here today for cross-examination.

ROBERT KORNBERG: Well, as well, too, when I have my --

when it comes to our testimony I'm going to have more questions and I'm going to need the Witness, too. So, it doesn't just --

THE HEARING OFFICER: No, that's not how it works. See, that -- and anything, anything you wanted to cross-examine, and anything you wanted to use for cross-examination, that's why you should have had it in five days ago.

ROBERT KORNBERG: But you told us specifically in an e-mail, for the record, Mr. Officer Kennedy, that we wouldn't be testifying today.

I'm just cross-examining.

THE HEARING OFFICER: Well, yeah. But --

ROBERT KORNBERG: (Unintelligible) --

THE HEARING OFFICER: Sir?

ROBERT KORNBERG: But I'm being cut off, sir. (Unintelligible) --

THE HEARING OFFICER: Sir?

ROBERT KORNBERG: Can I be -- please --

THE HEARING OFFICER: Let me --

ROBERT KORNBERG: Sir, I'm being cut off. Can I please not be cut off, please, sir? I would like to get this on the record.

We have an e-mail from you specifically stating that, no, you're not going to be getting

your testimony in, especially the first day. We have that because the District will be going and then our testimony will be coming up.

So, if this is considered the testimony, that's not what we were told in the e-mail from you prior to that. So, that's why the exhibits --

THE HEARING OFFICER: Sir?

ROBERT KORNBERG: -- were not sent. It's five days before --

THE HEARING OFFICER: Sir?

ROBERT KORNBERG: -- we present. I'm not presenting my case now, sir.

THE HEARING OFFICER: Sir, that includes, if you want to use exhibits, that includes for any purpose, including cross-examination, that you know, and you chose not to have them in by five days before --

ROBERT KORNBERG: So, you're saying I can't use my exhibits to bring all this into evidence?

THE HEARING OFFICER: No, not today.

ROBERT KORNBERG: Well, not today. But then in the future then I can bring them?

THE HEARING OFFICER: You can, but she won't. But you know she won't be here to cross-examine, so.

ROBERT KORNBERG: But they can still come in as

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING RE MOTION FOR RECUSAL**

VIA E-MAIL

Date: October 3, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Robert Kornberg
4 2nd Avenue
Shelton, CT 06484
rob1267@verizon.net

Ms Karen Michelson
22 Kendall Green Drive
Milford, CT 06461
klm3208@yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

This ruling is directed to the Motion for Recusal filed by the Father in the above-captioned case on September 29, 2025.

The motion asserts three grounds for recusal. The first is that, when the Father became unruly and insisted on talking over the Hearing Officer, he was reminded that his case could be dismissed with prejudice as a sanction.[1] Thereafter, the Father's conduct improved somewhat and the hearing was able to continue without any dismissal needing to be issued. The administrative hearing process could not function if hearing officers did not use the tools at their disposal to curb the disruptive behavior of pro se litigants (or attorneys).

The other two grounds are mere disagreements with procedural rulings. The undersigned Hearing Officer ruled that the Father was not required to file exhibits until five business days prior to the hearing in which he intended to use them, including using them for purposes of cross-examination. The Father apparently disagrees with the second part of the preceding sentence.[2] When the Father was limited in his ability to cross-examine the District's witness because he not filed the exhibits that he needed to, he indicated that he would recall the witness for his own case. The undersigned Hearing Officer indicated that the District would not be required to produce a witness, with its attendant disruption of the school system, based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them.

---

[1] It should be noted that administrative hearing officers, unlike judges, do not have contempt powers.

[2] The District disagrees with the first part.

Disagreement with procedural rulings or other matters involving the conduct of hearings is not grounds for recusal, it is grounds for appeal. If the ultimate ruling is not in the Parents' favor, they can file an administrative appeal with the appropriate court.[3] The Father has not alleged that the undersigned Hearing Officer has any personal of financial interest in the outcome of this case or has any friends or relatives involved in it. If there is no true conflict of interest, a demand for recusal is not proper based on mere disagreement with rulings.

Finally, it appears that the Father filed a recusal motion against a prior hearing officer in this case. Moving to disqualify one hearing officer after another until a litigant cherry-picks the one that he wants undermines the integrity of the process. Recusal also has a disruptive effect, particularly in a case, such as this one, where the evidentiary hearing has begun. As a new hearing officer could not make credibility determinations on a cold transcript, the hearing would need to start from scratch. Allowing recusal on specious grounds under such circumstances would allow a party to reboot a case that was not going well, further undermining the integrity of the process.

Therefore, the Motion for Recusal is denied.

[3] As can the District if the ruling is not in the District's favor.

Exhibit D

# Clarification Request from Today's Hearing

From: Robert (rob1267@verizon.net)

To: plkennedyesq@aol.com

Cc: klm3208@yahoo.com; hrosen@berchemmoses.com

Date: Wednesday, September 24, 2025 at 08:29 PM EDT

Dear Hearing Officer Kennedy,

I would like to respectfully document a point from today's hearing and to seek clarification for the record.

During the hearing I asked, referring to when my time comes to present my case, if once I submit my exhibits I would be able to question Ms. Truscello about the exhibits I put in. You responded, "Nope."

I asked this in good faith, trying to understand the process and ensure I am following the correct procedures. I understand that cross-examination is limited to the scope of the district's presentation. However, I believe that the opportunity to question a witness about exhibits submitted during one's own case presentation is an essential part of the hearing process and a fundamental aspect of procedural due process. The exhibits I intend to introduce are directly relevant to my case, and my ability to question Ms. Truscello about those exhibits is essential to presenting a complete and meaningful defense.

Therefore, I respectfully request confirmation that I will be permitted to recall the district's witness or witnesses relevant to my case and to question them about the exhibits I submit during my time to present my case. My intent is not to re-litigate issues raised in the district's case, but to develop evidence directly related to my claims.

Thank you for your attention to this important matter.

Sincerely,

Robert Kornberg

# Exhibit C

## Re: Request for Written Findings - Motion Denials (Case No. 25-0686.)

From: plkennedyesq@aol.com (plkennedyesq@aol.com)
To: rob1267@verizon.net
Cc: dueprocess.sde@ct.gov; hrosen@berchemmoses.com; klm3208@yahoo.com
Date: Friday, October 17, 2025 at 08:57 AM EDT

Denied.

Patrick L. Kennedy
Hearing Officer

> On Thursday, October 16, 2025 at 06:09:43 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Dear Hearing Officer Kennedy,
> >
> > Please find attached a formal motion titled *Motion for Written Findings of Fact and Conclusions of Law Regarding Denials of Previous Motions* for Case No. 25-0686.
> >
> > This motion requests written findings regarding the denials of two motions submitted on October 15 and 16, 2025.
> >
> > Thank you for your attention to this filing.
> >
> > Respectfully,
> >
> > Robert Kornberg.

Motion_Written_Findings_Case_25-0686..pdf
205.5 kB

# Exhibit D

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert Kornberg, Pro Se
v.
Milford BOE

Case No. 25-0686

October 19, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert Kornberg
4 2nd Ave
Shelton, CT 06484
Rob1267@verizon.net

# MOTION TO RECONSIDER EXCLUSION OF EXHIBIT P41 – AUDIO RECORDING OF MARCH 6, 2025 PPT MEETING

The Father respectfully submits this motion requesting reconsideration of the Hearing Officer's ruling excluding Exhibit P41—the audio recording of the March 6, 2025 PPT meeting—from evidence in this hearing. The ruling was issued verbally during the October 17, 2025 hearing. The Father respectfully requests that the Hearing Officer reconsider this ruling in light of the recording's clear relevance, reliability, and the foundational testimony available to support its admission for specific, limited purposes.

## I. Legal Standard for Admissibility and Purpose of the Recording

This recording is not offered for general documentation. Rather, it is being offered for specific and limited purposes, which are highly relevant and necessary for a fair and accurate record:

### A. Legal Authority for Admission

The audio recording must be admitted because it constitutes relevant evidence necessary for a full and fair determination of the facts. This is supported by:

1. **Rule of Completeness:** The recording is the **best evidence** of the meeting's content and is necessary to ensure the record is complete and not selectively presented by the District.
2. **Administrative Law:** Under the Connecticut Uniform Administrative Procedure Act, evidence in an administrative hearing is admissible if it is relevant to the issues under consideration. The hearing officer must receive all relevant evidence but may exclude evidence that is irrelevant, immaterial, or unduly repetitious. The parties have the right to conduct cross-examinations to ensure a full and true disclosure of the facts. The audio recording at issue is directly relevant and material under C.G.S. § 4-178 and should be admitted, subject to the hearing officer's determination of its authenticity, legality of acquisition, and probative value.
3. **Impeachment:** To challenge the accuracy of Ms. Amy Rizzo's sworn testimony regarding Ms. Michelson's participation, which is a material matter of credibility.

### B. Specific Purposes

- **Procedural FAPE Documentation:** To provide objective, contemporaneous evidence of the District's **procedural conduct during the PPT,** specifically to demonstrate a **denial of Procedural FAPE** through **obstructive or dismissive handling** of critical parental questions regarding **transition goals,** which are a material component of a compliant IEP.

## II. Specific Basis for Impeachment

During the hearing on October 17, 2025, Ms. Amy Rizzo gave the following testimony when questioned by District Counsel:

- District Counsel asked whether Ms. Michelson had offered any comments, critiques, or requests of the school team regarding the IEP or educational programming during the March 6, 2025 PPT meeting.
- Ms. Rizzo testified that Ms. Michelson had not.
- District Counsel further inquired whether Ms. Michelson had played a role at all during the March 6 2025 PPT meeting.
- Ms. Rizzo again testified that she had not participated during the PPT.

Later, during cross-examination by the Father, the following exchange occurred:

Father: “Ms. Rizzo, was it your testimony earlier, when asked the question if Ms. Michelson participated at the March 6th PPT meeting, your testimony was no. Is that correct?” Ms. Amy Rizzo: “I believe that was my answer.”

The audio recording of the March 6, 2025 meeting directly contradicts this testimony. The recording captures statements by Ms. Michelson and verbal exchanges with school staff during the meeting, demonstrating that Ms. Michelson actively participated by making comments, requests, and raising issues during the March 6, 2025 PPT meeting.

Accordingly, the recording constitutes critical impeachment evidence, demonstrating that Ms. Rizzo’s prior testimony was inaccurate on a material point, as evidenced by the contents of the audio recording offered as Exhibit P41.

## III. Foundation for Reliability and Authenticity

The March 6, 2025 PPT meeting was attended by multiple District representatives, including Ms. Amy Rizzo herself. She and the other attendees are in a position to authenticate the recording as a true and accurate reflection of the meeting’s events. The voices, sequence of discussion, and subject matter are all recognizable to those who were present.

Because this was an official PPT meeting convened and conducted by the District, the District personnel are best positioned to confirm the recording’s authenticity. Their ability to identify their own voices and recollect the content of the discussion provides an independent and objective foundation for reliability. The existence of multiple witnesses capable of authenticating the recording satisfies the foundational requirement for its admission.

## IV. Proper Submission and Procedural Compliance

The Father sought guidance from the Hearing Officer regarding the proper procedure for submitting the audio recording as an exhibit and specifically inquired whether an MP3 format would be acceptable. In response, the Hearing Officer confirmed that an MP3 format is acceptable. This exchange, included here as Exhibit A, demonstrates that the Father acted in good faith and followed the proper procedure for submitting Exhibit P41. The subsequent exclusion of the exhibit was not based on any procedural defect in its submission.

## V. Prejudice and Due Process Violation

Excluding this recording severely prejudices the Father's ability to challenge the credibility of a key District witness and to present a full and accurate record. Without the recording, unchallenged testimony remains on the record that is **directly contradicted by objective, contemporaneous evidence.**

The testimony of Ms. Rizzo is material to the District's narrative regarding parental involvement and cooperation. By excluding the audio, the Hearing Officer is effectively **shielding the District's key witness from challenge** and allowing inaccurate testimony regarding participation and procedural conduct to remain in the record, which undermines the integrity of the hearing.

The Hearing Officer retains full discretion to determine the weight to be given to the evidence after considering it. However, excluding the recording outright deprives the Father of the opportunity to present critical impeachment evidence necessary to preserve the fairness of the process and uphold the integrity of the hearing. Denying this exhibit risks leaving significant contradictions in the record, constituting a clear **procedural error** that fundamentally affects the fairness and completeness of the hearing record.

## VI. Conclusion and Request

For the reasons stated above, the Father respectfully requests that the Hearing Officer:

- Reconsider the prior ruling excluding Exhibit P41;
- Admit Exhibit P41 for the limited purposes stated in **Section I**; and
- If the motion is denied, that the Father's objection be formally preserved for the record and for any appeal, as the exclusion of this exhibit constitutes a procedural error that affects the fairness and completeness of the hearing record.

Respectfully submitted,

Robert Kornberg.

# Re: Submitting March 6 PPT Audio into Evidence

From: plkennedyesq@aol.com (plkennedyesq@aol.com)

To: rob1267@verizon.net

Cc: klm3208@yahoo.com; hrosen@berchemmoses.com

Date: Monday, September 29, 2025 at 09:38 AM EDT

An MP3 format is acceptable but whether or not the exhibit is admissible would have to be separately ruled on.
Patrick L. Kennedy
Hearing Officer

> On Thursday, September 25, 2025 at 03:33:17 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Could you please advise on the proper procedure for submitting this type of file? Specifically if an MP3 format is acceptable?
> >
> > Thank you
> >
> > Robert Kornberg.
> >
> > On Thu, Sep 25, 2025 at 3:00 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:
> >
> > > When any exhibits are submitted we will see if they can be admitted by stipulation. If not, I will rule on any objection if they are introduced at the hearing.
> > >
> > > Patrick L. Kennedy
> > > Hearing Officer
> > >
> > > On Wednesday, September 24, 2025 at 04:32:35 PM EDT, Robert <rob1267@verizon.net> wrote:
> > >
> > > > Subject:
> > > >
> > > > Dear Hearing Officer Kennedy,
> > > >
> > > > I have the complete audio recording from the March 6, 2025 PPT meeting and would like to submit it into evidence for the hearing. Please advise on the proper procedure for doing so.
> > > >
> > > > Thank you,
> > > >
> > > > Robert Kornberg

# Exhibit E

# Re: Submission of Motion to Reconsider Exclusion of Exhibit P41 Audio file. (Case No. 25-0686 )

From: plkennedyesq@aol.com (plkennedyesq@aol.com)

To: rob1267@verizon.net

Cc: dueprocess.sde@ct.gov; hrosen@berchemmoses.com; klm3208@yahoo.com

Date: Monday, October 20, 2025 at 11:34 AM EDT

Denied.

Patrick L. Kennedy
Hearing Officer

> On Sunday, October 19, 2025 at 01:31:28 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Dear Hearing Officer Kennedy,
> >
> > Please find attached my Motion to Reconsider the Exclusion of Exhibit P41 — the audio recording of the March 6, 2025 PPT meeting — along with Exhibit A, which contains the email correspondence regarding the proper procedure for submitting the audio recording.
> >
> > This motion respectfully requests that the Hearing Officer reconsider the prior ruling excluding Exhibit P41, based on the procedural compliance demonstrated in the attached correspondence and the foundational testimony presented in the motion.
> >
> > Thank you for your time and consideration of this important matter.
> >
> > Respectfully submitted,
> >
> > Robert Kornberg.

# Exhibit F

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert Kornberg, Pro Se
v.
Milford BOE

Case No. 25-0686

October 19, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert Kornberg
4 2nd Ave
Shelton, CT 06484
Rob1267@verizon.net

## FORMAL OBJECTION FOR THE RECORD: CONCERNS REGARDING IMPARTIALITY

The Father respectfully submits this Formal Objection for the Record regarding a comment made by the Hearing Officer at the conclusion of the hearing session on October 17, 2025.

### I. The Basis of the Objection

The Father formally objects to the Hearing Officer's full comment: **"We'll put Ms. Rizzo in for combat pay for enduring this the whole day."**

### II. The Legal Implication of Bias

This comment, in the Father's view, is highly inappropriate and represents a clear instance of the improper assignment of sympathy and emotional value to a District witness. The remark implies that:

1. The Hearing Officer viewed the Father's fundamental right to conduct **cross-examination and impeachment** as improper, excessive, or harassing.
2. The Hearing Officer has **improperly pre-judged** the witness, Ms. Rizzo, by treating her as a victim of the legal process.
3. The comment suggests the Hearing Officer is not maintaining the requisite **impartiality and neutrality** when evaluating the Father's advocacy efforts or the credibility of the witness's sworn testimony.

The fundamental requirement of Due Process in any contested case is that the decision-maker remains impartial and neutral. This statement, entered onto the record, calls into question the Hearing Officer's ability to maintain that neutrality, particularly when ruling on the Father's efforts to challenge the veracity of District witnesses.

### III. Request for Action

The Father requests that the Hearing Officer formally **note this Objection on the record** and provide an explicit statement confirming that the impartiality and neutrality required of the Hearing Officer will be maintained throughout the remainder of the proceeding.

The Father asserts that his right to challenge witness credibility, which is essential to protecting his child's rights, cannot be chilled or curtailed by the perception of bias against his advocacy efforts. This Objection is made solely to preserve the integrity of the record.

Respectfully submitted,

Robert Kornberg.

# Exhibit G

# Re: Formal objection for the record – concerns regarding impartiality (Case No. 25-0686)

From: plkennedyesq@aol.com (plkennedyesq@aol.com)

To: rob1267@verizon.net

Cc: dueprocess.sde@ct.gov; hrosen@berchemmoses.com; klm3208@yahoo.com

Date: Monday, October 20, 2025 at 11:35 AM EDT

Objection overruled.

Patrick L. Kennedy
Hearing Officer

> On Sunday, October 19, 2025 at 03:52:02 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Dear Hearing Officer Kennedy,
> >
> > This email serves as the formal filing of the attached document: (Formal Objection for the Record: Concerns Regarding Impartiality).
> >
> > This objection is filed in advance of the next hearing session and addresses the statement made by the Hearing Officer at the conclusion of the session on October 17 2025.
> >
> > The Father respectfully requests that this document be entered into the official hearing record.
> >
> > Thank you for your time and consideration.
> >
> > Sincerely,
> >
> > Robert Kornberg.

# Exhibit H

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert Kornberg, Pro Se
v.
Milford BOE

Case No. 25-0686

October 20, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert Kornberg
4 2nd Ave
Shelton, CT 06484
Rob1267@verizon.net

**MOTION FOR SPECIFIC FINDING OF FACT AND CONCLUSION OF LAW REGARDING APPEARANCE OF JUDICIAL IMPARTIALITY**

The Father respectfully moves the Hearing Officer for a specific Finding of Fact and corresponding Conclusion of Law regarding the Hearing Officer's conduct during the October 17, 2025 hearing. Specifically, the Father seeks a ruling on whether the Hearing Officer's unsolicited procedural guidance to the opposing party and commentary regarding a potential witness created an appearance of impropriety and compromised the standard of judicial impartiality.

## STATEMENT OF FACTS AND GROUNDS

1. The Father notified the Hearing Officer of his intent to issue a subpoena for Ms. Jennifer Stewart, a key third-party witness and former District employee of the Milford Public Schools.

2. During the second day of the hearing on October 17, 2025, while discussing the Father's right to secure Ms. Stewart's testimony, the Hearing Officer intervened to provide unsolicited procedural guidance and reassurance to opposing counsel. Although Ms. Stewart was not present at the hearing, the Hearing Officer made statements on the record concerning her anticipated response to the subpoena.

3. The Father asserts that the Hearing Officer made the following statements on the record:

    - "If she gets served and files a motion to quash, that would be up to her..."
    - "...But I don't think that's really the Milford school district's issue."

4. These statements, made without prompting or request, created an appearance of partiality by:

    - Volunteering a specific legal strategy (i.e., filing a motion to quash) to be considered by a potential witness not present;
    - Reassuring the opposing party that the burden of responding to the subpoena did not fall on them.

5. This intervention minimized the legal effort required of the opposing side while increasing the procedural hurdles for the Father, thereby compromising his right to a fundamentally fair hearing before a truly impartial decision-maker.

6. The Father submits this Motion to compel the Hearing Officer to acknowledge the facts of his own intervention and rule upon the resulting appearance of impropriety, for the purpose of preserving the record on appeal.

7. Attached as **Exhibit A** is a true and accurate copy of the email correspondence between the Father and the Hearing Officer from September 19 to September 29, 2025. These communications demonstrate that the Hearing Officer never raised the issue of a motion

to quash in response to the Father's multiple inquiries regarding the subpoena of Ms. Stewart. The Hearing Officer's first mention of a motion to quash occurred during the October 17, 2025 hearing, further supporting the Father's claim that the suggestion was unsolicited and prejudicial.

## PRAYER FOR RELIEF

WHEREFORE, the Father respectfully requests that the Hearing Officer:

1. Enter a Finding of Fact that the statements quoted in Paragraph 3 were made on the record;
2. Enter a Conclusion of Law determining whether those statements violated the standard of judicial impartiality by creating an appearance of impropriety;
3. Preserve this issue for appellate review by including the above findings in the official record.

**Respectfully submitted,**
The Father, Pro Se
Robert Kornberg

Exhibit A

# Re: Inquiry Regarding Subpoena

From: plkennedyesq@aol.com (plkennedyesq@aol.com)
To: rob1267@verizon.net
Cc: klm3208@yahoo.com; hrosen@berchemmoses.com
Date: Monday, September 29, 2025 at 09:40 AM EDT

I am not aware of any reason that a subpoena cannot be served at a place of employment outside the area of consumer debt collection but if you have any concerns you should contact your own attorney for legal advice.

Patrick L. Kennedy
Hearing Officer

> On Thursday, September 25, 2025 at 03:39:40 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Can you please confirm whether her place of employment is an acceptable location for service of a subpoena?
> >
> > Thank you
> >
> > Robert Kornberg.
> >
> > On Thu, Sep 25, 2025 at 2:58 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:
> >
> > > We will take up any subpoenas when you file your witness list.
> > >
> > > Patrick L. Kennedy
> > > Hearing Officer
> > >
> > > On Wednesday, September 24, 2025 at 04:30:19 PM EDT, Robert <rob1267@verizon.net> wrote:
> > >
> > > > Dear Hearing Officer Kennedy,
> > > >
> > > > I'm following up on my request from yesterday regarding the subpoena of Jennifer Stewart. She is currently employed at Greenwich Public Schools. Please confirm whether she can be subpoenaed at her current place of employment.
> > > >
> > > > Thank you,
> > > >
> > > > Robert Kornberg
> > > >
> > > > On Tue, Sep 23, 2025 at 4:56 PM, Robert <rob1267@verizon.net> wrote:

For what it's worth, I found out that Jennifer Stewart is currently working at Greenwich Public Schools as a Special Education Coordinator.

I've asked Mr. Rosen how many hearing days the district plans to use, but again, he only responded to my question about Ms. Stewart not being employed. He didn't answer how many days he expects to use to present the district's case. Can you please get this information from him?

I need to know the district's schedule so I can plan when I'll begin presenting my case and determine when to request the subpoena. I believe her testimony will be important to my case. Also, can she be subpoenaed at her current place of employment?

Thank you,

Robert Kornberg

On Tue, Sep 23, 2025 at 4:35 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

I doubt that the district would be allowed to release confidential information from its personnel files on current or former employees. You could hire an investigator if you felt that her testimony was important enough to warrant the expense. Although we need some lead time I do not need to know right now when you wish to have her testify. The subpoena can be issued when we are closer to the hearing.

Patrick L. Kennedy
Hearing Officer

On Tuesday, September 23, 2025 at 04:09:56 PM EDT, Robert <rob1267@verizon.net> wrote:

Dear Hearing Officer Kennedy,

Thank you for your response regarding the subpoena for Ms. Stewart.

I do not have Ms. Stewart's current address. As she is no longer employed by the district, I would need to obtain her contact information through Mr. Rosen or the district in order to proceed. I respectfully request your assistance in obtaining her mailing address so that the subpoena can be issued.

Additionally, I am still awaiting clarification on the district's expected schedule for presenting its case. I previously asked how many hearing days the district anticipates using, so I can determine when I will begin presenting my case and schedule Ms. Stewart's testimony accordingly. Mr. Rosen responded that Ms. Stewart is no longer employed by the district, but he did not answer my question about the district's schedule — as I indicated in my last email to you (see below in this email chain).

At this point, I do not know how many days the district intends to use, and I am unable to determine how many days I will need to present my case until I have that information. Without it, I cannot provide a specific date for Ms. Stewart's appearance.

Regarding the written communications, I do have the emails and attachments exchanged with Ms. Stewart during the relevant time period. If those are sufficient for the record, I'm fine proceeding without requesting additional documents from her.

Once I receive confirmation of the district's schedule and Ms. Stewart's contact

information, I will be in a position to finalize the subpoena request. I appreciate your guidance and look forward to your direction on these two outstanding items.

Sincerely,

Robert Kornberg.

On Tue, Sep 23, 2025 at 11:08 AM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

> I can issue the subpoena and the department can have it served. An ex-employee would not have access to the district's email system so I would not issue a subpoena duces tecum. If the emails were exchanged with you I would presume that you already have them. I would need Ms Stewart's address and the date that you would be having her testify.
>
> Patrick L. Kennedy
> Hearing Officer
>
> On Monday, September 22, 2025 at 06:20:41 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Dear Hearing Officer Kennedy,
> >
> > Following your advice, I contacted Mr. Rosen to coordinate the testimony of Jennifer Stewart. He responded that Ms. Stewart is no longer a Milford Public School employee.
> >
> > I would like to formally request that a subpoena be issued for Ms. Stewart to testify at the upcoming due process hearing. Her involvement in the events under review makes her testimony necessary.
> >
> > I also request that Ms. Stewart be instructed to bring all written communications exchanged with me between August 16, 2024, and July 11, 2025, including any email attachments sent or received. These materials are relevant to the issues under review.
> >
> > Additionally, I had asked Mr. Rosen how many hearing days the district expects to use for its presentation of testimony, but he did not respond to that question. I would appreciate clarification on this point so I can determine exactly which date I will begin presenting my case.
> >
> > Please let me know whether you will issue the subpoena or advise me on the appropriate procedure to ensure Ms. Stewart’s appearance and the production of documents, as well as confirm the district’s expected hearing schedule.
> >
> > Sincerely,
> >
> > Robert Kornberg
> >
> > On Mon, Sep 22, 2025 at 5:48 PM, Herbert Z. Rosen <hrosen@berchemmoses.com> wrote:

Good Afternoon,

Ms. Stewart is no longer a Milford Public School employee. If you have further questions, we can discuss with Hearing Officer Kennedy.

Respectfully,

Herbie Rosen

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460
(203) 783-1200 • www.berchemmoses.com
hrosen@berchemmoses.com

Rated by Super Lawyers 2025
visit SuperLawyers.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

---

**From:** Robert <rob1267@verizon.net>
**Sent:** Friday, September 19, 2025 6:20 PM
**To:** Herbert Z. Rosen <hrosen@berchemmoses.com>
**Cc:** Karen Michelson <klm3208@yahoo.com>
**Subject:** Re: Inquiry Regarding Subpoena

Mr. Rosen,

I’m requesting that Jennifer Stewart be made available to testify in the upcoming due process hearing. Her direct involvement in the events at issue makes her testimony necessary.

Jennifer Stewart does not appear on the witness list submitted for the

Milford Board of Education, yet her role is central to the matters under review. As advised by Hearing Officer Kennedy, I'm contacting you to coordinate her testimony.

Additionally, I request that Jennifer Stewart bring all written communications exchanged with me between August 16, 2024 and July 11, 2025, including any and all email attachments sent and received. These materials are relevant to the issues under review and should be available during her testimony.

Please let me know how many hearing days the district expects to use for its presentation of testimony, so I know exactly which date I will begin presenting my case. I'd like to ensure I'm prepared to call Ms. Stewart accordingly.

Please confirm whether Ms. Stewart will be made available, and that she will bring all written correspondence exchanged with me during the specified time period, including any and all email attachments.

Robert Kornberg.

On Fri, Sep 19, 2025 at 5:06 PM, plkennedyesq@aol.com

<plkennedyesq@aol.com> wrote:

> School districts will generally produce school employees for testimony without the need for a subpoena.  Please talk to Attorney Rosen to work that out.
>
> Patrick L. Kennedy
>
> Hearing Officer
>
> On Friday, September 19, 2025 at 02:19:10 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Dear Hearing Officer Kennedy,
> >
> > I'm writing to confirm whether you are the appropriate contact for issuing a subpoena for a witness from the school district in relation to my case.
> >
> > Please let me know if you handle such requests or if I should direct this inquiry elsewhere.
> >
> > Thank you for your time. I look forward to your guidance.
> >
> > Sincerely,
> >
> > Robert Kornberg

-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests that you wire or otherwise transfer funds to any party, you must confirm the request and any corresponding instructions via telephone before you initiate any wire or other transfer. PLEASE CONFIRM BY CALLING THE ORIGINATOR OF THE EMAIL, USING PREVIOUSLY KNOWN CONTACT INFORMATION, PRIOR TO WIRING OR OTHERWISE TRANSFERRING FUNDS.

# Exhibit I

# Re: Motion for Specific Findings of Fact and Conclusions of Law Re: Judicial Impartiality | Case No. 25-0686

From: plkennedyesq@aol.com (plkennedyesq@aol.com)
To: rob1267@verizon.net
Cc: dueprocess.sde@ct.gov; klm3208@yahoo.com; hrosen@berchemmoses.com
Date: Monday, October 20, 2025 at 11:36 AM EDT

Denied.

Patrick L. Kennedy
Hearing Officer

> On Monday, October 20, 2025 at 09:21:00 AM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Dear Hearing Officer Kennedy
> >
> > Please find attached the Petitioner's formal filing: Motion for Specific Findings of Fact and Conclusions of Law Regarding Appearance of Judicial Impartiality.
> >
> > This Motion is filed today to preserve the record concerning statements made on October 17, 2025.
> >
> > Thank you for your attention to this matter.
> >
> > Respectfully Submitted,
> >
> > Robert Kornberg

# Exhibit J

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert Kornberg, Pro Se
v.
Milford BOE

Case No. 25-0686

October 20, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert Kornberg
4 2nd Ave
Shelton, CT 06484
Rob1267@verizon.net

PARENTS' FORMAL MOTION TO OBJECT TO CONTINUATION

The Parents formally move for an objection to the continuation of this proceeding. We object on the grounds of a demonstrated lack of impartiality on the record.

The issue of prejudgment is clear:

First, the Hearing Officer displayed prejudgment when stating to the Parents, 'The problem, quite frankly, with pro se's a lot of the time it's more about bad blood than what's really going to happen with the kid.

Second, the Hearing Officer is now actively suppressing the P41 exhibit of the March 6 2025 PPT Audio, which is necessary to prove the perjury of the District's witness.

Finally, the Hearing Officer's stated intent to put the witness, Ms. Rizzo, in for 'combat pay' constitutes direct evidence that the Tribunal has abandoned its impartial role and is actively shielding the District from the consequences of the evidence the Parents seek to introduce. To the Parents, this statement reflects that the Hearing Officer is rewarding a witness rather than maintaining neutrality.

We do not feel comfortable continuing, but we are compelled to continue the hearing under a formal, standing objection that these proceedings lack the requisite impartiality required for Due Process.

WHEREFORE, the Parents move that this entire document be entered into the official record of the hearing.

Respectfully Submitted,

Robert Kornberg
Pro Se Father.

# Exhibit K

# Re: PARENTS' FORMAL MOTION TO OBJECT TO CONTINUATION (Case No. 25-0686)

From: plkennedyesq@aol.com (plkennedyesq@aol.com)

To: rob1267@verizon.net

Cc: dueprocess.sde@ct.gov; klm3208@yahoo.com; hrosen@berchemmoses.com

Date: Tuesday, October 21, 2025 at 08:13 AM EDT

Denied.

Patrick L. Kennedy
Hearing Officer

> On Monday, October 20, 2025 at 09:16:22 PM EDT, Robert <rob1267@verizon.net> wrote:
>
> > Dear Hearing Officer Kennedy,
> >
> > Please accept the attached document as formal written notice that the Parents are filing a Motion Objecting to the Continuation of the Proceedings on the Grounds of Lack of Impartiality.
> >
> > Respectfully submitted,
> >
> > Robert Kornberg.

# Exhibit L

# SCHEDULING NOTICE: Anticipated Continuation Dates Post-November 4th (Case No.25-0686)

From: Robert (rob1267@verizon.net)

To: plkennedyesq@aol.com

Cc: dueprocess.sde@ct.gov; klm3208@yahoo.com; hrosen@berchemmoses.com

Date: Tuesday, October 21, 2025 at 09:51 PM EDT

Dear Hearing Officer Kennedy,

This is a formal scheduling notice regarding the continuation of the due process hearing.

As discussed at today's October 21st hearing, we anticipate that the scheduled November 4th date will not be sufficient to conclude the hearing, and additional days will be required to finish the presentation of testimony, evidence, and witnesses.

I am writing to advise the Hearing Officer that I will be unavailable for all subsequent scheduling dates immediately following November 4th through the end of November. This unavailability is due to a pre-existing, mandatory commitment.

I am fully committed to concluding this matter and confirm that all future continuation dates must begin in December. We look forward to coordinating the December schedule, which will, of course, be subject to the schedules of the Hearing Officer and opposing counsel.

Sincerely,

Robert Kornberg, Pro se Father

# Exhibit M

# Re: Update Regarding Failed Resolution Meeting - Docket #25-0686

From: plkennedyesq@aol.com (plkennedyesq@aol.com)
To: rob1267@verizon.net
Cc: hrosen@berchemmoses.com; klm3208@yahoo.com
Date: Wednesday, July 23, 2025 at 11:08 AM EDT

I am not opening any attachments containing potential exhibits at this time. If this goes to hearing, potential exhibits may be submitted in accordance with normal procedures. However, records of any settlement discussions or proposed settlement agreements should not be offered as evidence as those are inadmissible and should not be reviewed by the person hearing the case.

July 29 at 10 am is still available to me and we will plan to have the PHC at that time.

Patrick L. Kennedy
Hearing Officer

On Wednesday, July 23, 2025 at 10:34:37 AM EDT, Robert <rob1267@verizon.net> wrote:

Dear Hearing Officer Kennedy,

This email is to provide you with important information regarding the resolution meeting in Docket #25-0686, which was previously scheduled for July 10, 2025.

For your full review and understanding of the procedural history of this case, I have attached the following documents:

- **Exhibit 1: Key Correspondence Re: Resolution Meeting Procedural Issues**
- **Exhibit 2: Direct Communications with District Re: Confidentiality & Recording Conditions (Chain 1 of 2)**
- **Exhibit 3: Direct Communications with District Re: Meeting Cancellation & Reinstatement (Chain 2 of 2)**
- **Exhibit 4: Proposed Confidentiality Agreement**

These exhibits include key email exchanges between the parties and the prior Hearing Officer regarding the failed resolution meeting, as well as direct correspondence with the district outlining the conditions they imposed (including recording and confidentiality). The proposed Confidentiality Agreement itself is also attached.

Thank you for your review of this information in advance of our pre-hearing conference.

Sincerely,

Robert Kornberg

# Exhibit N

**Student Name**: [redacted]
**Date of Birth:**[redacted]
**School**: John F. Kennedy Elementary School
**Address of School**: 404 West Avenue, Milford, CT 06461
**Point of Contact for School District**: Jennifer Stewart, Director of Pupil Personnel Services

**Parent(s):**

**Parent 1 Name**: Robert Kornberg
**Address**: [redacted]
**Phone Number**: [redacted]

**Parent 2 Name**: Karen Michelson
**Address**: [redacted]
**Phone Number**: [redacted]

## Due Process Complaint: In Re: [redacted]

I am formally requesting a due process hearing based on Milford Public Schools' ongoing and significant failure to provide my son, [redacted] ("[redacted] with the Free Appropriate Public Education (FAPE) to which he is entitled under the Individuals with Disabilities Education Act (IDEA). This request arises from a sustained and well-documented pattern of procedural and substantive violations — including the denial of critical services, failure to address his individualized emotional and behavioral needs, exclusion from meaningful IEP planning, and retaliation against protected parental advocacy.

Despite repeated efforts to resolve these issues collaboratively, the district has engaged in a troubling pattern of misconduct, including inappropriate disciplinary actions, emotional mistreatment by staff, and a systemic lack of transparency. These failures have had a serious and lasting negative impact on [redacted] well-being, educational progress, and psychological safety.

Given the district's demonstrated inability to provide [redacted] with FAPE in accordance with federal law, we are now seeking immediate, legally enforceable remedies — including an out-of-district placement fully funded by the Milford Public Schools and a formal determination that the district has violated its obligations under IDEA.

## Statement of Facts

[redacted] educational experience within the Milford School District has been characterized by a troubling decline in appropriate support, culminating in what appears to be a clear and documented pattern of adverse actions following parental attempts to secure proper services and accountability. The factual chronology is critical to understanding the district's failures:

## I. Initial Misrepresentation, Unmet Needs, and Reactive Interventions (January - September 2023)

1. **January 26, 2023:** Ms. Adinolfi and Ms. Giannattasio, representatives of the Milford School District, explicitly stated that the autism program at Mathewson school would "not be appropriate" and was "not recommended" for [redacted] They further asserted that [redacted] "currently has and will continue to have access to everything he needs." This assertion is directly contradicted by the district's later attempts to place [redacted] in this very program, suggesting either a misdiagnosis of needs or a later strategic shift in response to parental advocacy.
2. **March 4, 2023:** A communication from [redacted] teacher revealed significant issues: [redacted] had missed half of his learning sessions over the last month. More critically, the teacher documented [redacted] stating that he was her "worst student" and that "she (the teacher) hates him." This alarming statement by [redacted] directly indicates a profoundly damaging teacher-student relationship and an environment detrimental to his emotional well-being and learning.
3. **April 18, 2023:** Ms. Adinolfi, [redacted] special education teacher, sent a communication confirming a deeply distressing incident. She reported that [redacted] said she no longer liked him, cried the entire time, asked if being kept from lunch was his "punishment," and cried for a significant 30 minutes. This self-reported incident by Ms. Adinolfi demonstrates her inability to manage [redacted] emotional distress or provide appropriate intervention for a student with a disability.
4. **April 27, 2023:** At a PPT meeting, [redacted] parents raised their "growing concern" that [redacted] needs were not being met, advocating for a different approach given the failure of previous behavioral intervention plans and increased time with the school psychologist. Parents specifically complained about his special education teacher, Ms. Adinolfi, and how she handled things with [redacted] specifically citing the 30-minute crying incident with no intervention.
5. **May 1, 2023:** Parents sent a communication indicating they would be working on a detailed communication regarding their recent concerns from the PPT meeting.
6. **May 1, 2023:** In immediate response to the parents' expressed concerns at the PPT, the district reacted by implementing a "ticket system." This was a reactive measure, initiated after parental complaints, rather than a proactive, individualized solution based on comprehensive assessment.
7. **May 2, 2023:** Parents sent a detailed communication regarding the PPT meeting and the issues they had with his special education teacher, Charlotte Adinolfi, outlining how their son was being handled. The team reacted instead of being proactive, implementing a ticket system.
8. **May 5, 2023:** Interim Principal Brenda Anziano replied, stating: "We agree that our communication needs to improve in order to keep you more informed about [redacted] progress." She confirmed they reacted and implemented a token system. She also promised to establish a weekly communication plan to communicate his successes and challenges.
9. **May 5, 2023:** In the same communication, Ms. Anziano stated, "Mrs. Aspinwell has been out for two days. I have checked on [redacted] both days and he is doing great! Earning a lot

of tickets and completing his work." This statement implies positive progress was being made shortly after the parents' complaints, potentially to mitigate concern.

10. **May 20, 2023:** Parents sent a communication expressing dissatisfaction that the promised weekly communication from the school psychologist, Ms. Davis, had not materialized.
11. **May 20, 2023:** Parents reported inappropriate conduct [redacted] experienced from his special education teacher, Ms. Adinolfi. Based on what [redacted] told them, he relayed that Ms. Adinolfi said to him: "Do not go home and tell your daddy that I was eating peanut butter and apple in class ever again!" Parents reported that they no longer felt safe with [redacted] being around her any longer.
12. **May 24, 2023:** Brenda Anziano responded to the report regarding Ms. Adinolfi's conduct by deflecting responsibility and shifting blame onto [redacted] characterizing his legitimate responses as misbehavior. This effectively excused the teacher's inappropriate actions and minimized [redacted] concerns.
13. **May 29, 2023:** Parents formally replied, stating, "[redacted] mom and I feel it would not be in his best interests to continue with Ms. Adinolfi as his Special Education teacher, And as previously shared, we do not feel comfortable with Ms. Adinolfi around our son and cannot be held responsible if we do not trust what we are being told."
14. **July 19 - August 2, 2023:** During communications with Special Education Supervisor Andrea Giannattasio regarding a change in [redacted] special education teacher for Fall 2023, parents outlined further details about Ms. Adinolfi making [redacted] cry in class and why it happened: "Regarding the crying incident. [redacted] then opened up and informed us that he was working on his math, which he does struggle with and needs help in. He went to Ms. Adinolfi to ask for help on a hard math problem that he was struggling with. He informed us that she was busy looking on her cell phone. When he asked for help, instead of helping [redacted] he informed us that Ms. Adinolfi grabbed his math work out of his hand and gave him a book and kept repeatedly insisting for him to read repeating the same phrase, "just keep reading" And this is why [redacted] was crying. He informed us that he was very upset because he just needed help with his math."
15. **May 8 - June 8, 2023:** The communication logs received during this period, outlining progress and behaviors, were "extremely successful and very helpful" to the parents.
16. **September 1, 2023:** A communication from the new special education teacher revealed the complete removal of the previously very successful ticket system with no alternative plan in place. Parents currently assert that the ticket system was removed in retaliation for their previous complaints about the prior special education teacher. In addition, despite previously admitting their communications needed to improve regarding [redacted] progress, they also dismantled and pulled the communication logs, ending the promised weekly updates. Parents currently assert this appears to be a retaliatory move for reporting and complaining about his teachers.
17. **September 29, 2023:** A communication from BCBA Courtney Carrano stated: "I wanted to update you on my observations as well as the data taken on [redacted]. He has made a nice transition back to school. During my observations, [redacted] did not exhibit any behaviors that his peers did not also exhibit nor did they occur more frequently than his peers. The data taken day to day by the school staff also support this. I will continue to monitor [redacted] behavior and collaborate with the school team in order to maintain low rates of behavior." Parents currently assert this statement turned out to be false as [redacted] behaviors, according to the team, later escalated substantially, and there was no

collaboration with the school team to maintain low rates of behaviors as promised. Parents currently assert they left [redacted] vulnerable and started accusing him of things he did not even do in retaliation for parents reporting and complaining about his teachers. This approach also demonstrated a deeply concerning and reactive mindset — one that chose to observe [redacted] without support to see what problems might arise, rather than taking proactive steps to ensure his success. This left [redacted] needlessly vulnerable and further illustrates the district's ongoing pattern of responding only after problems escalate, rather than maintaining effective supports or preventing foreseeable setbacks.

## II. Punitive Isolation, Shaming, and Escalating Emotional Harm (November 2023 - April 2025)

18. **Behavioral and Punitive Measures (2023–2024):** One incident involved [redacted] repeating inappropriate content shown to him by another classmate on a school Chromebook during class. Instead of addressing the supervision failure, the district punished [redacted] by isolating him and requiring him to use the nurse's bathroom for the remainder of the year. Parents raised concerns about the lack of monitoring and website blocking, especially given [redacted] autism and echolalia. The district responded only after the fact — promising to block websites and monitor students more closely — a reactive measure that failed to address the harm already caused. Despite [redacted] expressing that he wanted to be like the other children and use the regular bathroom, the district outright denied this request rather than consider how to support him appropriately. This action was an overly restrictive and inappropriate disciplinary measure.
19. **March 2024:** At a parent-teacher conference, behaviors such as fidgeting with items on walls and accidentally ripping one page in a book were reported. Parents offered to replace the book, but received no response. Instead of keeping the successful ticket system in place, parents assert the school chose to leave him vulnerable.
20. **March 2024:** The teacher stated, "We would also express that when we use the term 'behavior' it is not a negative situation, but actions that we address to help shape and reinforce appropriate behaviors. As a reference, behavior, as defined by the BIP, is 'Behavior(s) which are presenting as problematic to the student's learning and which the planning and placement team has identified to reduce or extinguish.'" They also claimed that when there are "big behaviors," they contact both parents, which parents state is not true.
21. **March 2024:** Parents currently assert that the behaviors reported are manifestations of [redacted] disability.
22. **April 15, 2024:** Parents stated, "we do realize this and understand [redacted] is different than the rest of the General ed classmates. It's just the way it is. This doesn't make him a bad person. We understand this may be frustrating at times for his teachers." They also requested weekly updates.
23. **May 13, 2024:** After not hearing back for a month, parents reached out regarding updates and stated, "As per our request below, we would appreciate if you could please send us a written update on [redacted] progress. Including his math, academic, and overall progress. We requested this every few weeks and a big help to us to hear from the team as a way to

help support [redacted] In addition, [redacted] had said that he would like to start using the regular boys restroom again like all the other children. He feels left out."

24. **May 10, 2024:** The school responded with a favorable update regarding his behaviors and progress.
25. **May 15, 2024:** Parents reached out as [redacted] reported that he asked to use the regular bathroom and Ms. Truscello said to him the reason he cannot use the regular bathroom is because he "can't be trusted." Parents documented this.
26. **May 17, 2024:** Ms. Dougherty reported that [redacted] made a self-harm comment. The school failed to give parents a copy of the C-SSRS at that time. This lack of response was concerning.
27. **May 17, 2024:** When parents questioned his progress, they received a response: "Nothing is at a standstill and I provided you with the current goals and objectives he is working on. He is making progress with these goals at this time. I would not say he is at a 'standstill', as you called it, but these goals we created are for a year's worth of learning, are specific to his learning needs and at this time he is making progress towards mastering them."
28. **May 22, 2024:** [redacted] reported that Ms. Truscello continued to tell him he "can't be trusted" and "to not go home and tell his dad." Parents documented this.
29. **May 27, 2024:** [redacted] reported that he asked his classroom teacher, Ms. Curria, if he could use the regular bathroom, and she told him he "can never use it again" and threatened to send him to the principal's office if he did. Parents documented this.
30. **June 3, 2024:** Parents reported that Ms. Curria told [redacted] "Ms. Curria is mean." When asked what happened, [redacted] said Ms. Curria came up to him and said, "[redacted] do you 2nd grade math!" when he was in fourth grade. Parents assert this comment caused him low self-esteem and was damaging to him, marking the beginning of a documented pattern of what we believe to be emotional maltreatment and neglect of [redacted] social-emotional needs. Parents currently assert this was retaliation for previously reporting what Ms. Curria said to him.

## III. Pressured Placement Change and Continued Obstruction (May - August 2024)

31. **May 30, 2024:** On Thursday, May 30, 2024, parents received a communication from Amy Rizzo, school principal, insisting on holding a meeting regarding [redacted] programming and placement on Monday, June 3rd. Parents note that [redacted] programming and placement had already been thoroughly discussed at the February 2024 PPT meeting. This communication also failed to provide the legally required 5 school days' notice.
32. **May 30, 2024:** Parents currently believe this meeting to change his programming, based on **baseless allegations about work becoming increasingly difficult,** was fueled solely by retaliation for reporting inappropriate behavior conducted by several of his teachers. They questioned how everything was appropriate in February, but not a week before school ended.
33. **June 3, 4, & 5, 2024:** Ms. Rizzo and her team consistently pressured parents for a PPT meeting regarding [redacted] beginning on May 30th and continuing relentlessly on June 3rd, June 4th, and June 5th.

34. **June 2024:** Parents never received any responses back from the incidents they reported in May through June.
35. **June 2024:** After back and forth, parents were informed the school wanted to discuss placing [redacted] in the Mathewson program (autism program) they previously stated was "not recommended nor appropriate." This abrupt shift, made without any data-driven justification, suggests that the district was reacting to a crisis rather than thoughtfully planning for [redacted] long-term educational needs.
36. **June 10, 2024:** When parents had questions regarding their motives about the meeting, the school responded, “We have been sharing the increase in behaviors we have seen with [redacted] through the emails since the parent-teacher conferences in March. We have repeatedly asked for meetings with you to discuss these behaviors. You have repeatedly declined meeting with us.” Parents state this was not true; they consistently asked for these communications to back up her claims, but she refused and never provided them.
37. **June 10, 2024:** conflicting statements from district staff raised serious concerns about the accuracy of the district’s assessment of [redacted] needs and the adequacy of their educational response. On that date, Ms. Rizzo stated in a communication that “as previously stated, our communication about an increase in behaviors since the February PPT due to work becoming increasingly difficult resulted in the team considering options to better support [redacted] This statement is inaccurate. The parents had repeatedly requested documentation of these prior communications, which Ms. Rizzo failed or refused to provide.
38. **June 10, 2024:** Moreover, the district’s assertion that [redacted] academic work had become “increasingly difficult” directly contradicts a May 16, 2024 email from his special education teacher, Ms. Truscello, who assured the parents that “nothing is at a standstill.” She confirmed that [redacted] is actively working toward his current IEP goals, is making progress, and that the goals in place are appropriately designed for a full year of instruction and tailored to his individual needs. If [redacted] is indeed making meaningful progress toward appropriately designed goals, the suggestion that his academic demands have become unmanageable — to the point of considering a change in placement — calls into question the accuracy of the district’s evaluation and the appropriateness of its recommendations. Conversely, if the district genuinely believes [redacted] is struggling due to increased academic and behavioral demands, its refusal to recommend academic instruction as part of his Extended School Year (ESY) services is both inconsistent and negligent. These conflicting narratives — one indicating stability and progress, the other implying decline and unmet needs — reveal a significant lack of coherence in the district’s assessment and planning. Taken together, these contradictions underscore the district’s failure to adequately address [redacted] evolving educational and behavioral needs, constituting a denial of his right to a Free Appropriate Public Education (FAPE) under the Individuals with Disabilities Education Act (IDEA).
39. **July 13, 2024:** Parents received a response stating, “I think we can agree that we all want him to have a successful 5th grade year.”
40. **July 13, 2024:** Parents asked for answers to all their questions and concerns. The school failed to and continually refused to provide them. Parents also asked, “What makes you think throwing [redacted] out of JFK and tossing him into the Autism Program at Mathewson in a self-contained classroom (That is what this PPT meeting is about, isn't it?) where you're going to have a lot more behaviors, a lot more nonverbal students and a lot more

students who are much more below his level than he is, is going to be appropriate for him and provide him with a successful 5th grade year? What gives you that idea? Please address these questions via email."

41. **August 2, 2024:** The school responded in a separate communication that it was all a "misunderstanding and miscommunication," when parents assert it clearly wasn't.
42. **August 9, 2024:** Parents responded, outlining questions and concerns to address, including contradictory statements about meeting dates: On June 5th, the school wrote: "we will hold this meeting in the fall"; on June 10th, they wrote: "Our staff will not be available to meet this summer for a PPT," and "we will be reconvening a PPT in the fall"; then on July 10th, they wrote: "We hope to schedule a PPT in September"; then on August 2nd, "out of the clear blue sky," they insisted on holding this PPT meeting in August during parents' summer vacation with [redacted] This demonstrated contradictory and inconsistent scheduling.
43. **August 9, 2024:** Ms. Stewart refused and never responded to the parents' outline of contradictory scheduling.

## IV. Obstruction of Records, Escalating Emotional Harm, and Hostile Interactions (August 2024 - March 2025)

44. **August 16 - September 10, 2024:** Parents received a communication from Jennifer Stewart "backpedaling" about holding a meeting. There was back and forth, and parents repeatedly requested to have all of their questions and concerns answered. The school refused.
45. **September 5, 2024:** Parents made a formal FERPA request for [redacted] records.
46. **September 10, 2024:** Parents wrote: "I received a VM from the school nurse Jacqueline this morning that she dropped my Son's records off at the Milford Department of Health. Then I received a call from the Milford Department of Health, that the records are there for pick up. Why would she do that and send them there? Makes absolutely no sense. I made a FERPA request in the past. The school nurse never dropped off my sons records at the department of health. Please have the school nurse pick up my son's file from the Department of Health and bring them back so they could be with all the other documents when you have them ready."
47. **September 11, 2024:** Jennifer Stewart emailed, "I will have the medical records sent to the PPS office. Do you prefer to pick up the records at the PPS office or JFK?"
48. **September 11, 2024:** Parents assert that [redacted] mother was not required to sign a release for records, while the father was made to do so at the Department of Health, despite Jennifer Stewart previously stating she would have the records sent to the PPS office. Communication between the father and Ms. Stewart reflects ongoing concerns about inconsistencies in record handling. In an email exchange, the father requested alternative delivery options for the records sent directly to his residence, but Ms. Stewart reiterated that the records would be available for pickup at PPS or JFK. The father also highlighted that [redacted] mother was never contacted by the school nurse regarding a hand-delivery of her FERPA-requested records to the Department of Health, raising concerns about differential treatment. Then, on **September 15, 2024**, Stewart **contradicted her earlier statement**, claiming that the **PPS office did not have the medical records** and that the **health office had sent the father a release form to sign**

**before he could obtain them**. However, when the father contacted the health office directly, he **confirmed that no such form had ever been sent**. This contradiction, combined with the unnecessary requirement imposed on the father while [redacted] mother was able to receive records without signing a release, further **supports the parents' assertion that Ms. Stewart's actions were obstructive and retaliatory**.

49. **September 16, 2024:** Parents emailed Ms. Stewart and the team about Ms. Truscello yelling at [redacted] as he reported to them. Parents kindly requested that she be kind to him and treat him with respect.
50. **September 18, 2024:** Parents sent another communication to the school outlining what [redacted] told them: how Ms. Truscello was blaming him for things he did not do and he reported to them that she was "mean and a witch," and threatened to send him to Mathewson permanently! Parents asked that she cease and desist from making any more comments to [redacted] and requested to have Ms. Quinn work with him so he could be away from Ms. Truscello. This statement deeply frightened him.
51. **September 25, 2024:** Parents received a communication from Ms. Koosa claiming [redacted] was now pushing students in the back with a scooter and misbehaving, claiming he was not completing work and mimicked staff and made faces, etc. Parents currently believe the staff were triggering his behaviors in retaliation for parents reporting the staff's behavior towards him and complaining about staff. Parents state these behaviors were completely out of character for [redacted] Parents spoke with [redacted] who said he accidentally bumped into a classmate in gym, felt overwhelmed, asked for a break, and was denied.
52. **On September 30, 2024** On September 30, 2024, parents received a voicemail indicating [redacted] had made another self-harm comment, directly after reporting ongoing mistreatment from his teachers. Despite this serious concern and the parents' efforts to outline [redacted] emotional challenges, the school failed to provide a copy of the Columbia-Suicide Severity Rating Scale (C-SSRS) or any meaningful follow-up. This communication also included a cease and desist order related to what parents believed constituted emotional abuse. [redacted] disclosed that he was forced to call home against his will on four occasions, leaving voicemails for both parents and being instructed to say things he had not done. In one of these calls, a teacher can be heard in the background telling [redacted] to say, "No, that you put your hands on another child." Because [redacted] has echolalia, he repeated the statement rather than expressing his own experience. These calls had no legitimate educational or therapeutic purpose and appeared to be used as punishment for minor behavioral incidents. The district neither obtained parental consent nor included this practice in any structured behavior plan, raising serious legal and ethical concerns. Parents assert that this treatment was not in line with any positive behavioral intervention strategy, as required under IDEA, but instead constituted emotional abuse in retaliation for their reports, with staff targeting [redacted]
53. **October 24, 2024:** Parents received a communication from Amy Rizzo riddled with what parents describe as "baseless allegations against [redacted] in response to their reported incidents. Instead of addressing the concerns raised, the district responded by portraying [redacted] in a negative light, further exacerbating his struggles.
54. **October 30, 2024:** Parents replied, pointing out Ms. Rizzo's inconsistencies and falsehoods.

55. **September 30 - October 28, 2024:** Parents describe ongoing conversations about medical records with Jennifer Stewart, in which she was, in their view, being dishonest and refused to answer questions honestly.
56. **October 16, 2024:** Jennifer Stewart insisted on holding a PPT meeting, but this followed a claim that the previous attempt to transfer [redacted] out of his current program was a "misunderstanding and miscommunication," which parents dispute. Parents assert that the school **fabricated** an excuse to hold the meeting. They requested that the team address their questions and concerns before setting a date, but the school refused to provide transparency or respond to their inquiries beforehand..
57. **October 23, 2024:** Parents responded, emphasizing discrepancies in how medical records were handled for [redacted] mother versus his father. Despite Jennifer Stewart initially stating that the father's records would be transferred to the PPS office or mailed to him, she later **falsely claimed** that he **needed to sign a release and pick them up from the Department of Health**—a requirement that was **never actually necessary**. [redacted] mother was able to receive her records **without this demand**. Additionally, on **September 23rd, Ms. Stewart falsely claimed** that [redacted] mother had **not yet made a request for medical records**, even though she had **submitted an identical FERPA request on September 6th**. This contradiction was further highlighted when, on **October 21st,** [redacted] **mother directly refuted Ms. Stewart's claim**, stating she had **already made the request but had not received her records, and asked that they be mailed to her immediately**. Parents argued that these shifting requirements and false statements were **intentionally obstructive and retaliatory**, unnecessarily creating difficulties for the father while allowing [redacted] mother to bypass the same demands. Additionally, they rejected accusations that they had refused anything, reiterating their **long-standing requests for transparency, answers to their concerns, and cooperation**—requests that had gone ignored since August. Given **Ms. Stewart's inconsistent explanations, misleading claims, and refusal to engage in good faith**, parents asserted that her actions **created unreasonable obstacles for the father** and were **not in** [redacted] **best interest**.
58. **October 26, 2024:** Parents sent a communication to Ms. Rizzo requesting information regarding the inappropriate staff behavior of forcing [redacted] to call home against his will.
59. **November 6, 2024:** Despite multiple follow-ups, a formal FERPA request, and assurances that the data would be provided, the requested information regarding [redacted] was never sent. Jennifer Stewart repeatedly failed to fulfill her commitment, withholding the data entirely and failing to respond.
60. **November 19, 2024:** On multiple occasions, parents reached out to the school team and Ms. Rizzo to clarify which staff member was responsible for forcing [redacted] to call home against his will. Parents received what they describe as a "dismissive response" from Ms. Rizzo. Ms. Rizzo's response attempts to minimize the seriousness of the concerns by reframing the staff's actions as supportive rather than coercive, despite clear evidence that [redacted] who has echolalia, was repeating what he was instructed to say rather than expressing his own experience. She dismisses the impact of these incidents and fails to acknowledge the emotional distress caused by the school's handling of the situation. Parents responded accordingly on November 20, 2024.

61. **Detailed Accounts of Emotional Maltreatment**: By fall 2024, [redacted] emotional distress escalated significantly due to interactions with his special education teacher, **Ms. Truscello**, as detailed in communications from September 16th and 18th. He frequently came home crying, recounting instances where she yelled at him and threatened him with permanent placement at Mathewson, which deeply frightened him. [redacted] also reported being unfairly blamed for incidents he did not cause, intensifying his feelings of distress and isolation. Despite being made aware of these escalating concerns, the district failed to take appropriate corrective action or investigate. This period also saw [redacted] subjected to the distressing disciplinary practice of being **forced to call home against his will** on four separate occasions, as reported on September 30th. These calls, lacking any legitimate educational or therapeutic purpose, served solely as punishment for minor behavioral incidents and were implemented without parental consent or inclusion in a structured behavior plan, raising serious legal and ethical concerns. Instead of addressing the issues, the district responded by portraying [redacted] negatively, as seen in the October 24th communication, further exacerbating his struggles. A cease-and-desist letter eventually halted what we believe to be emotional abuse, but significant emotional damage had already occurred, reflecting a systemic disregard for [redacted] emotional well-being despite clear warning signs.
62. **Self-Harm Comments and Lack of Response (Spring – Fall 2024)** shortly after [redacted] reported troubling comments from his teachers, he made a self-harm statement at school. While the district reportedly administered the C-SSRS, they failed to provide a copy or follow up meaningfully with the family. This same pattern repeated in fall 2024, including the incident on September 30, when [redacted] again reported mistreatment and made another self-harm comment. Despite the serious emotional risk, the district again failed to share the C-SSRS or take any meaningful steps to address [redacted] emotional needs. During this period, [redacted] began reporting daily crying episodes and feelings of being unfairly blamed for incidents he did not cause, further underscoring the emotional toll of the district's inaction and mistreatment.
63. **Throughout the Fall of 2024**: Parents continued to request documentation and clarification from the district regarding various incidents and [redacted] records, as exemplified by their formal FERPA request on September 5th, subsequent communication on September 10th regarding medical records, and ongoing discussions documented between September 30th and October 28th. The district frequently failed to provide requested records and documentation, forcing parents to follow up multiple times, including the unfulfilled request on November 6th. When records were finally received, they were often incomplete, leading parents to question the district's transparency and honesty.
64. **March 2025:** A parent PPT meeting was requested to address long-standing, unanswered concerns. The meeting quickly became hostile, with the father frequently interrupted, cut off mid-sentence, and prevented from asking critical questions. The district refused to address key concerns, dismissed them as irrelevant, and actively sidestepped accountability. When the father persisted in seeking answers, district staff—including Ms. Stewart—raised their voices, became confrontational, and threatened to terminate the meeting entirely. Records of this meeting serve as direct evidence of the district's conduct, capturing the interruptions, dismissals, raised voices, and factual inconsistencies in statements made by staff. The behaviors exhibited—dismissiveness, obstruction,

deflection, and outright refusal to answer questions—directly hindered the father's ability to advocate for [redacted] educational needs. Parents were repeatedly accused of "misinterpreting" district communications, despite quoting them verbatim. When attempting to reference prior communications—which were directly relevant—Ms. Stewart attempted to shut down the discussion, stating, "Do you have any other questions that do not pertain to emails?" This deliberate avoidance of accountability and refusal to engage in transparent discussion made it impossible to advocate effectively for [redacted]

## V. Continued Procedural Violations, Outplacement Denial, and Documentation Issues (December 2024 - April 2025)

65. **December 10, 2024:** Parents sent a communication to the team and district to request outplacement for [redacted] asserting they have failed to meet his needs and violated his FAPE.
66. **December 10, 2024:** Communications with the district showed the school administration repeatedly misrepresented the situation by falsely claiming that the parents refused multiple meeting requests while failing to address their ongoing concerns and requests for transparency. Their responses deflected accountability, disregarded the impact of restrictive placement decisions, and failed to provide the requested documentation, undermining trust in the process.
67. **December 10, 2024:** The school unilaterally scheduled [redacted] annual PPT meeting without parental input, disregarding their role in determining a mutually agreed-upon date. The response pressured parents to accept the meeting time while misrepresenting the school's willingness to engage and failing to acknowledge their request for transparency.
68. **December 12, 2024:** After initially requesting access to records, the school completely ignored the request, forcing a follow-up to obtain the documentation. This continued failure to provide critical records, including those related to the C-SSRS assessment, obstructed the right to access essential information regarding [redacted] well-being.
69. **January 16, 2025:** Despite repeated parental requests for separate meetings to discuss [redacted] outplacement and annual review, the District disregarded this input and unilaterally scheduled a combined meeting. The failure to acknowledge the parents' availability and proposed dates demonstrates a lack of collaboration and transparency.
70. **January 16, 2025:** The District insisted on combining the meetings for administrative convenience, ignoring the distinct nature of these discussions. This decision violated the parents' legal rights under IDEA to have these matters addressed independently.

**Request for Documentation and Procedural Violations (2024 – 2025)**

71. The District repeatedly ignored requests for documentation, requiring multiple follow-ups to obtain records—often met with silence. In December 2024, parents formally requested an outplacement starting in 6th grade and asked for separate meetings to discuss outplacement and the annual review. The District refused and combined the meetings. Despite assurances of a substantial discussion about outplacement, no meaningful conversation took place.

72. At the conclusion of the annual PPT meeting on January 16, 2025, the district stated its intent to place [redacted] in the Harborside program heavily suggesting predetermination. Ten days later, we received a finalized IEP and a second PPT notice that retroactively added "transition planning" language, which had not been present in the original December notice. This post-hoc change constituted a procedural violation.
73. In September 2024, we submitted FERPA and FOIA requests for records and emails related to [redacted] education. In January 2025, I had to again request copies of the Columbia assessments. The district responded by falsely claiming that all documentation had already been provided. However, after we challenged this, additional records were produced — a pattern that repeated itself and revealed a disturbing lack of transparency and accountability in the district's handling of essential documentation.
74. Furthermore, the district promised a "substantial discussion" with respect to the request for outplacement. There was "absolutely no substantial discussion whatsoever."
75. **August 2024 onwards:** Since August 2024, Ms. Stewart repeatedly acknowledged the existence of data regarding [redacted] academic and behavioral performance and assured parents it would be provided. Despite multiple formal requests and continued follow-up, this data was not delivered as promised. Instead, the District consistently claimed that all records had already been provided—statements later proven false when missing documents, including the May 17, 2024 Columbia Risk Assessment, were only produced after repeated good-faith efforts. This ongoing pattern of denial, delay, and misinformation reflects a clear failure to comply with access to information and has impeded parents' ability to make informed decisions.
76. **January 20 - 28, 2025:** This correspondence outlines parents' formal disagreement with the district's denial of outplacement for [redacted] and documents ongoing concerns regarding the district's failure to meet his educational and emotional needs. Despite repeated requests and documented incidents of emotional harm, including two self-harm statements, the district has taken a reactive approach and failed to provide a proactive, supportive environment. Parents reaffirmed their request for an out-of-district placement beginning September 2025.
77. **January 29 - March 6, 2025:** These communications reveal a clear pattern of the district's failure to respond directly, transparently, and in a timely manner to critical concerns about [redacted] IEP. Despite repeated requests, the district has not provided any documentation of alleged outreach to schedule a PPT meeting, nor have they explained or substantiated the increase in paraeducator support prior to the January 16 meeting. Instead, they've avoided questions, responded inconsistently, and failed to address serious concerns raised months earlier about [redacted] emotional well-being. This ongoing lack of accountability and meaningful engagement has disrupted [redacted] support and denied full participation in the IEP process. The district only claimed they reached out "last spring" (May of 2024) for a PPT regarding an increase in paraeducator support in response to parents' inquiry on September 18, 2024, requesting [redacted] spend more time with his paraeducator. The district reached out in May of 2024 to switch placement to a previously deemed "not recommended and not appropriate" autism program starting in 5th grade.
78. **January 29, 2025:** Both parents requested an Independent Educational Evaluation (IEE). The District's response constituted significant procedural violations, as they sidestepped the father, falsely stated the mother had sole educational decision-making authority when

she does not, and unilaterally interpreted a court order, which they have no right to do. Furthermore, the District failed to provide the promised list of IEE providers, and did not initiate their own due process hearing to justify denying the request. This represents a direct contravention of IDEA procedural safeguards. When these grave concerns were raised with the State's Bureau of Special Education through a formal complaint (Complaint Report 25-0409), the Bureau's response was equally concerning and indicative of a lack of impartial oversight. While the Bureau explicitly stated it lacked authority to interpret parenting plans, it paradoxically accepted the District's unilateral interpretation and found no violation, thereby enabling the District's illegal bypass of due process requirements. Moreover, despite being the complainant and a legal custodial parent, I was never interviewed during the Bureau's investigation, raising serious questions about the fairness and integrity of their fact-finding process. Repeated requests for written clarification and documentation of these critical inconsistencies were met with refusals, with the Bureau opting only for verbal communication, which undermines principles of transparency and accountability. This demonstrates a systemic failure within the administrative review process to address the District's fundamental procedural violations, thereby necessitating this impartial due process hearing to ensure [redacted] rights are protected under IDEA.

79. **March 10, 2025:** A formal written complaint was submitted to the district, outlining serious procedural violations following the March 6th PPT meeting. Despite the passage of over two months, no written response or acknowledgment from the district has been received. This unreasonable delay, combined with repeated refusals to address concerns via email since August 2024, demonstrates a clear failure to engage in meaningful, good-faith communication, directly violating IDEA rights.
80. **March 31, 2025:** A formal request was submitted for the district to remove an improper prefatory statement in the parent/student input section of the IEP. Jennifer Stewart, the Director of Pupil Personnel, refused to remove it, falsely claiming for a second time that the mother had the authority to make educational decisions. This demonstrates ongoing misinformation and a refusal to properly document parental input.
81. **March - April 2025:** Parents repeatedly sought clarification from the district about their failure to provide timely written notice that transition planning would be discussed at the January 16 PPT meeting—a clear violation of procedural safeguards. Despite claims from Ms. Stewart that a revised invitation had been sent, it was only created retroactively after the IEP was finalized, with the transition box checked on the day of the meeting. The district's conflicting explanations, refusal to answer direct questions, and retroactive document changes reveal a troubling pattern of non-transparency and procedural evasion, denying meaningful participation in a critical part of [redacted] educational planning and violating procedural safeguards.
82. **April 8, 2025:** Parents submitted two formal communications detailing unresolved procedural concerns, including the retroactive alteration of IEP notices, unexplained discrepancies in behavioral incident logs, and vague or contradictory explanations regarding [redacted] alleged conduct. Despite the gravity of these concerns, the district failed to respond substantively or correct the inconsistencies. Of particular concern is the manipulation of data in incident logs—entries were added months after the fact, relevant records were omitted without explanation, and [redacted] name was replaced with

ambiguous pronouns, which obscured the identity of the student referenced and compromised accountability.

83. **83. March 10, 2025 – Present: Ongoing Failure to Comply with Records Request** On March 10, 2025, a formal records request was submitted under the Freedom of Information Act (FOIA). As of the date of this complaint—well beyond the 45-day statutory deadline—the district has failed to produce a complete or legally sufficient response. Key records remain outstanding, and the district has not provided a definitive timeline for compliance. This is part of a documented pattern. In response to a prior FERPA request, the district provided 84 pages that were entirely redacted, 198 pages of duplicated content, and 113 blank pages. This raises serious concerns regarding the district's adherence to its obligations under federal records access laws.As a result of the continued failure to comply, a formal FOIA complaint has been filed with the appropriate oversight body. The district's conduct reflects a sustained lack of compliance with federal requirements and has impeded access to educational records relevant to the due process proceedings.
84. **Throughout 2024-2025:** Despite being aware of [redacted] sensory regulation needs, the district failed to implement a sensory diet, which could have meaningfully helped him manage focus and behavior. This neglect is yet another example of the district's failure to proactively address [redacted] unique needs.
85. **January 2025 (Annual PPT):** At the time, the IEP explicitly marked "No" for ESY eligibility, despite no documented discussion or evaluation of [redacted] ESY needs. If ESY truly wasn't discussed, then the district had no basis to make that determination at all—meaning they either arbitrarily denied services without proper review or failed to follow the required process. The district later attempted to retroactively correct this error by producing a revised IEP that states "Yes" for ESY eligibility, but this does not erase the original procedural violation. Their delay caused financial hardship and scheduling conflicts for the family, further demonstrating a lack of procedural integrity and transparency.
86. **January 2025 (Post Annual PPT):** Based on the district's documented decision in January that ESY was not required, parents made financial commitments and enrolled [redacted] in summer camp, relying on their official stance. Now, after failing to discuss ESY at the appropriate time, the district is attempting to reverse its position, disregarding the financial hardship and scheduling conflicts their actions have created. Their failure to follow proper procedures has placed an undue burden on our family, further demonstrating their lack of procedural integrity and transparency in educational planning.
87. **January 2025 (Post Annual PPT):** The district's four-month delay in properly addressing ESY represents a serious violation of timely decision-making, which IDEA requires to ensure students receive appropriate services without disruption. This delay not only denied meaningful parental participation but also potentially prevented [redacted] from receiving necessary summer supports, which could directly impact his educational progress.
88. **May 4, 2023:** We received a communication from the district which stated: "We agree that our communication needs to improve in order to keep you more informed about [redacted] progress." This acknowledgment is critical, as it reflects the district's admission of communication failures regarding [redacted] progress. Despite this agreement, the district has continued to fail in maintaining clear and consistent communication. This

failure has exacerbated the issues surrounding [redacted] educational planning and the denial of FAPE. The district's inability to follow through on its commitment has contributed to a persistent lack of transparency and an ongoing failure to address the educational and emotional needs we have repeatedly raised.

**VI. Ongoing Procedural Irregularities in PPT Notices and Documentation (March – May 2025)**

This section outlines multiple procedural inconsistencies and omissions regarding Planning and Placement Team (PPT) notices for [redacted], specifically surrounding meetings scheduled in April and May 2025. These inconsistencies raise significant concerns about transparency, accuracy, and compliance with notification requirements under the Individuals with Disabilities Education Act (IDEA) and Connecticut state law.

## A. Dual Notices Issued on March 31, 2025

**89.** On March 31, 2025, we received two separate PPT meeting notices, issued nine minutes apart, for the same PPT meeting scheduled on April 10, 2025. These notices were only posted on the CT-SEDS website, which itself raises accessibility and timely notice concerns.

**90.** The first notice, timestamped 2:42 PM, listed the following participants:

- Sara Collette – Instructional Supervisor, Special Education (Middle School)
- Sarah Stanley – Special Education Teacher
- [redacted] – Student
- Nadine Macklin – Instructional Supervisor, Special Education

**91.** The second notice, timestamped 2:51 PM, showed the following significant changes:

- Sara Collette's title was changed, removing the "Middle School" designation; she is now listed only as "Instructional Supervisor, Special Education"
- Sarah Stanley's role changed, now listed as "Special Education Teacher (Harborside Representative)"
- [redacted] the student, was completely removed from the notice
- Nadine Macklin was also removed from the list of participants

**92.** These rapid, unexplained changes to both the participant list and their roles within minutes of each other are concerning and confusing, and they undermine the consistency and credibility of the documentation. Furthermore, the first PPT notice (2:42 PM) is completely omitted from the CT-SEDS system, despite having been received and clearly timestamped. This suggests either a deletion or failure to archive an official record, which is a violation of proper documentation protocol and potentially a breach of FERPA record-keeping regulations.

## B. CT-SEDS Upload on April 28, 2025: May 6, 2025 PPT Meeting

**93.** On April 28, 2025, a new notice was uploaded to the CT-SEDS portal indicating a PPT meeting scheduled for May 6, 2025. This new notice contains additional changes:

- Jennifer Stewart, previously listed on prior documentation, has now been removed with no explanation.
- Nadine Macklin, who was removed in the second March 31 notice, has now been added back.
- Sarah Stanley's designation has changed again, now listed as: "Special Education Teacher (Daily Living Middle School Program Representative)," which differs from her earlier "Harborside Representative" title.

**93a.** That same day, on April 28, 2025, we sent a written notice to the district, clearly stating that we did not consent to the proposed placement and objected to the scheduled meeting.

**93b.** Despite this clear and direct communication, the district failed to acknowledge the parents' notice or amend their meeting plans accordingly. Instead, the PPT remained scheduled on CT-SEDS as if consent had been granted, indicating a disregard for parental input and procedural requirements under IDEA.

**93c.** In addition, the district failed to provide proper written notice of both the April 10 and May 6 PPT meetings in accordance with federal and state regulations. The notices were only uploaded to CT-SEDS without sending physical or electronic written notification to the parents. This practice violates 34 C.F.R. § 300.503 and Connecticut state law, which require timely and accessible written notice of PPT meetings to allow for meaningful parental participation.

**93d.** On the same day, Jennifer Stewart responded by stating:

"During [redacted] annual review, the PPT did not discuss whether or not [redacted] was eligible for Extended School Year services... Just a reminder: [redacted] Extended School Year (ESY) services have not yet been planned."

This admission contradicts the finalized IEP, which already indicated "No" for ESY services. If the matter was never discussed, it was a violation of parental participation rights to finalize that determination without parental input. The district's stated intention to hold a retroactive meeting to determine ESY eligibility—months after finalizing the IEP—demonstrates an improper attempt to cure prior procedural violations rather than engage in lawful planning. Moreover, Stewart's email indicated that the district would proceed with the May 6 PPT unless the parents proposed an alternate date, despite having already received the parents' written objection. This amounts to a predetermined action and shows a disregard for procedural safeguards under IDEA.

## C. Summary of Procedural Irregularities

**94.** Issuance of two conflicting PPT notices on the same date with unexplained personnel and role changes
**95.** Removal of the student ([redacted]) from the second PPT notice without justification

**96.** Omission of the 2:42 PM March 31 notice from the CT-SEDS system entirely
**97.** Continuous shifting of staff titles and program affiliations without clarification
**98.** Lack of clarity or documentation explaining removal of Jennifer Stewart
**99.** District proceeded with plans for a PPT meeting after receiving clear written notice of parental non-consent
**100.** Failure to provide proper written notice of the April 10 and May 6 PPT meetings in violation of IDEA and state law
**101.** Improper attempt to retroactively discuss and revise ESY eligibility after it was finalized in the IEP without parental input

These discrepancies not only violate the procedural safeguards guaranteed under IDEA but also impair the parents' ability to prepare meaningfully for the PPT meetings. They raise serious concerns about transparency, legal compliance, and the school district's overall documentation and notification practices.

**Procedural Violations and Denial of Parental Participation in the Development of [redacted] Kornberg's IEP**

**Failure to Incorporate Parent Input into the IEP**

On May 29, 2025, we submitted a written request explicitly requiring that our full parent input statement be inserted directly and verbatim into the "Parent and/or Student Input" section of [redacted] IEP. This request was necessary to ensure that our concerns—including the context surrounding our non-participation in the May 21, 2025 PPT meeting—were accurately documented in the IEP itself. We clearly stated that simply attaching an email to the student's file was not acceptable and that the input must be included without edits.

Despite this, the district failed to comply with our request. Ms. Stewart responded on June 4, 2025, stating only that "the email will be added to the file"—a response that did not meet our legal request. We followed up with a formal demand for written confirmation and a copy of the fully updated IEP, requiring a response by June 9, 2025 (7 business days from our original May 29 letter). As of today, the district has failed to provide the updated IEP as specifically requested and required. This ongoing failure to comply with our specific and legally mandated request for accurate IEP documentation constitutes a further and continuing procedural violation.

This failure to properly document parental input violates IDEA's requirements for meaningful parental participation. Parent concerns are not optional; they must be reflected in the IEP itself—not stored separately—so that transparency and full participation are ensured in the special education process.

**Misrepresentation of Parent Participation & Predetermination of Services**
Before May 21, 2025, we had formally and repeatedly notified the district that we did not consent to the proposed placement at Harborside Middle School, and that we would not attend

further PPT meetings about that placement. We made this position clear in our April 28, 2025 letter and again in follow-up emails on May 14 and May 16. We explicitly informed the district that we intended to resolve ongoing issues—including placement and ESY eligibility—through due process, not additional meetings.

Despite this, the district proceeded to hold a PPT meeting on May 21, 2025, and recorded in the IEP notes that "Ms. Michelson and Mr. Kornberg did not attend the PPT," omitting all relevant context. This documentation misleadingly suggests disinterest or disengagement, when in fact we had already explained our non-attendance and provided clear legal reasoning. This misrepresentation directly undermines the transparency and integrity of the IEP process. Compounding this issue, the IEP already included a decision of "No" for Extended School Year (ESY) services at the time of that meeting—even though the district admitted that ESY eligibility had never been discussed by the IEP team. This constitutes clear predetermination in violation of IDEA, which requires such determinations to be made by the full team with parental involvement. The district's later attempt to retroactively "convene" a discussion on ESY cannot cure the initial procedural violation. While the district later revised the IEP to reflect ESY eligibility, this retroactive correction came only after our objections were raised and does not negate the initial procedural failure or its impact on [redacted] right to timely and appropriate services.

**Failure to Maintain Accurate Historical Parent Input**
In addition to the district's failure to integrate our May 29, 2025 statement, it also failed to carry over prior parent input from earlier IEPs, despite our explicit request. This omission erased critical historical context and disregarded longstanding parental concerns that remain unresolved. The IEP must function as a living document that reflects the full scope of team input, including a complete record of parental concerns across time.

**Conclusion: Pattern of Procedural Noncompliance**
The district has engaged in a persistent pattern of procedural noncompliance, including:
• Misrepresentation of parent participation in the IEP record;
• Denial of meaningful opportunity for parental input;
• Predetermination of placement and services;
• Failure to include previously submitted parent input; and
• Attempted retroactive correction of procedural violations.

These procedural violations, taken together, have significantly impeded our ability to participate meaningfully in [redacted] educational planning and have resulted in a denial of a Free Appropriate Public Education (FAPE) as required under IDEA.

**Improper School Interference with Parental Rights and Retaliation**

In early June 2025, school personnel unjustifiably inserted themselves into a private parental matter regarding my son's yearbook, resulting in emotional distress to my child and a direct

infringement on my parental rights. Despite my son expressing a clear desire to bring the yearbook home with me during my scheduled parenting time, his teacher confiscated it and stated it would go home with his mother—based on a preemptive email request made a full week earlier by the other parent. I formally requested the yearbook at school and was denied, even though the school later claimed it was not their decision where the yearbook would go.

On May 27, 2025, I reviewed email correspondence between [redacted] mother, Karen Michelson, and his teacher, Ms. Stuart, in which Ms. Stuart explicitly acknowledged that she would hold [redacted] yearbook at school for Karen to retrieve. This confirms that the teacher had prearranged a plan to honor one parent's request by withholding the yearbook from the other, despite it being during the father's scheduled parenting time. However, when I later raised concerns, Principal Amy Rizzo claimed that "Mrs. Stuart encouraged [redacted] and other students to keep their yearbooks at school yesterday so that they would have them available for today's yearbook signing." This statement directly contradicts Ms. Stuart's prior communication and raises serious concerns about the school's honesty, neutrality, and handling of sensitive family matters. The inconsistency suggests an effort to obscure the school's role in enforcing one parent's request over the other, contrary to the child's stated wishes and the principles of equitable parental involvement.

My son was also inappropriately involved by the principal during this interaction, who attempted to pressure him to comply with a predetermined plan, despite his visible distress. I raised concerns professionally; yet shortly afterward, the district's Director of Security, Mr. Nielsen, sent me a retaliatory email implying that my behavior was disruptive—without citing any documented incident or providing a factual basis. This message came after I had informed the principal that I intended to file for due process, underscoring its retaliatory nature.

Furthermore, Mr. Nielsen made these accusations without contacting me for my account of the events or conducting any fair inquiry—a profound denial of basic due process. His vague allegations, coupled with threats of potential "access restrictions," created a hostile and intimidating environment wholly inconsistent with professional or lawful conduct. These actions were not isolated but part of a broader pattern of retaliation, intimidation, and unequal treatment that has followed my protected advocacy for my child, in violation of both the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act.

## The District's Unreliable and Contradictory Assessment of [redacted] Behavioral and Social-Emotional Needs

The District's approach to assessing and reporting [redacted] behavioral and social-emotional progress has been alarmingly inconsistent and unprofessional, raising serious questions about the school's capacity to accurately understand and meet his needs within the current environment. This fundamental flaw in assessment directly impedes the provision of a Free Appropriate Public Education (FAPE).

During the school year, progress reports concerning [redacted] presented a bewilderingly contradictory picture. On one hand, he was described in glowing terms: "a sweet, kind and enthusiastic boy," a "pleasure to have in my fifth grade classroom," who "enjoys sharing his

answers to our social emotional questions," and whose "classmates are very supportive and caring towards him." These positive affirmations paint a picture of a well-adjusted and engaged student.

Yet, juxtaposed immediately with these positive descriptors were equally strong, but vaguely defined, negative observations. [redacted] was simultaneously depicted as demonstrating "refusal to listen to adults," leading to a stated "safety issue" for himself and his classmates. He was noted for "inappropriate interactions with his classmates," an "increased negative attitude," and being "very disrespectful to those around him who are trying to support him." These concerning labels, particularly "safety issue" and "disrespectful," were presented without any specific, objective examples of the behavior itself. The reports offered no details on what constituted "inappropriate interactions" or how his "refusal to listen" manifested, leaving the District's claims unsubstantiated and impossible to verify or address effectively. Furthermore, despite these serious concerns, the school's proposed interventions were limited to vague "reminders and discussions," failing to outline specific, individualized strategies or professional support being implemented to address behaviors explicitly labeled as a "safety issue."

The unreliability of these assessments was thrown into even sharper relief by [redacted] final report card for the school year. Received on June 11, 2025, this final report offers an overwhelmingly positive and unqualified assessment: "[redacted] is a wonderful boy, and I am happy to have had him in my class. I know you will be very successful in middle school." The dramatic and unexplained shift from significant behavioral concerns (including stated safety risks and disrespect towards adults) to such unequivocal praise, without any documented interventions or measurable progress noted, undermines the integrity of the District's entire evaluation process. It demonstrates a profound lack of consistency and professionalism in how [redacted] needs are identified, monitored, and reported.

This pattern of inconsistent and unreliable assessment by the District directly impacts its ability to provide [redacted] with FAPE. If the school cannot accurately and objectively identify his challenges, document his progress, and implement targeted, data-driven interventions, it cannot genuinely meet his unique needs. This fundamental flaw in assessment contributes significantly to the unsuitability of the current public school environment for [redacted] highlighting the necessity of outplacement to ensure he receives a consistent, professionally evaluated, and appropriate education.

# Summary of Concerns and Violations

The Milford School District has unequivocally failed to provide [redacted] with a Free Appropriate Public Education (FAPE) and has committed several, material procedural violations under the Individuals with Disabilities Education Act (IDEA), directly impacting [redacted] educational benefit and the parents' ability to participate meaningfully in the IEP process.

## A. Denial of FAPE – Substantive Harms

The district's actions and inactions have directly resulted in a lack of meaningful educational benefit for [redacted] causing emotional distress, regression, and impeding his academic and social-emotional development.

**Failure to Address Emotional and Behavioral Needs Appropriately:**

- **Teacher Misconduct and Emotional Harm:** Ms. Adinolfi's documented verbal abuse ("worst student," "hates him," "doesn't like him anymore") and punitive actions (keeping him from lunch, grabbing his work, instructing him to "just keep reading" while on her phone) caused significant emotional distress and interfered with his learning environment (**Points 2, 3, 4, 14**). Ms. Curria's "2nd grade math!" comment (**Point 30**) similarly caused low self-esteem. Ms. Truscello's repeated yelling, blaming, and threats of permanent placement at Mathewson deeply frightened [redacted] and caused him to come home crying (**Point 50**). The district's failure to adequately address this misconduct and its dismissive responses (e.g., Ms. Anziano attempting to "flip the script" without denying the teacher's conduct - **Point 12**; Ms. Rizzo minimizing forced calls - **Point 60**) demonstrate a profound lack of understanding of, or disregard for, [redacted] emotional vulnerability and the impact of staff behavior on a student with a disability.
- **Inappropriate Behavioral Interventions and Shaming:** The district's approach to [redacted] behaviors has been punitive and counterproductive. The isolation to the nurse's station for the remainder of the year and denial of regular bathroom access (**Point 18**) constitutes an overly restrictive placement change without proper process. Teachers repeatedly telling [redacted] he "can't be trusted" (**Points 25, 28, 29**) are shaming tactics, not therapeutic interventions, directly violating principles of positive behavioral supports.
- **Forced Coercion and Emotional Abuse:** [redacted] being "forced to call home against his will" on four separate occasions and "instructed to say things he did not do" (**Points 52, 61**) is a serious concern of emotional abuse and directly contrary to any positive behavioral support strategy. The district did not obtain parental consent or include this practice in a structured behavior plan, raising serious legal and ethical concerns. The district's subsequent attempt to "minimize the seriousness" (**Point 60**) of these incidents demonstrates a complete failure of responsibility and accountability.
- **Neglect of Self-Harm Statements:** The repeated failure to provide the C-SSRS after [redacted] self-harm comments (**Points 26, 52, 62**) is a serious procedural violation and demonstrates a profound disregard for [redacted] safety and mental health needs, leaving him vulnerable and unsupported. This lack of response was concerning, particularly as these comments occurred after he reported continuing mistreatment.
- **Failure to Implement Sensory Diet:** The district's failure to implement a sensory diet, despite being aware of [redacted] sensory regulation needs, demonstrates a neglect to proactively address his unique needs and contribute to his overall well-being and ability to manage focus and behavior (**Point 84**).

**Inadequate Educational Benefit and Progress:**

- The district's claims of "increasingly difficult" work leading to escalating behaviors (**Points 36, 37**) directly contradict their own prior positive academic updates (**Point 27**) that [redacted] was "making progress towards mastering" his IEP goals. This inconsistency

undermines the credibility of the district's assessment of [redacted] academic needs and suggests a pretext for changing his placement.

- The abrupt and unilateral dismantling of the highly successful ticket system and discontinuation of communication logs (**Point 16**) directly removed effective supports and vital parental oversight, impeding [redacted] progress and the district's ability to monitor his needs. This lack of proactive support directly contributed to [redacted] reported escalation of behaviors.
- The complete lack of a support plan for [redacted] during the BCBA's baseline data collection in September 2023, ignoring previously proven effective strategies, left him vulnerable and demonstrated a reactive, rather than proactive, approach to his needs (**Point 17**).
- The district's failure to recommend academic services as part of [redacted] Extended School Year (ESY) programming, despite claiming growing academic difficulties in May 2024, further reinforces their failure to provide adequate support and appropriate planning (**Point 85**).
- The continued reports of [redacted] missing learning sessions (**Point 2**) and the alleged triggering of "out-of-character" behaviors (**Point 51**) demonstrate an environment not conducive to learning and a failure to provide robust academic and social-emotional support aligned with FAPE.

## B. Denial of FAPE – Procedural Violations (Materiality and Impact)

Numerous procedural violations have occurred, which are not merely technical infractions but have materially interfered with [redacted] right to FAPE and his parents' right to meaningful participation in the IEP process.

**Failure to Provide Records and Violations of Parental Access Rights:**

- Jennifer Stewart's repeated refusal to provide requested data, including the Columbia Risk Assessment (Points 59, 68, 75), despite multiple formal requests and assurances that "all records had already been provided," significantly obstructed and delayed parental access to critical information, impeding timely decision-making. This obstruction directly impacted parental ability to make informed decisions about [redacted] education and well-being.
- The discriminatory demand for the father to sign an unnecessary release form, while not making the same demand of the mother (**Points 48, 57**), is a clear act of discriminatory practice, creating undue burden on a parent exercising their rights.
- The failure to meet deadlines for providing a complete response to record requests (**Point 83**), including outstanding meeting notes and a clear timeline for fulfillment, demonstrates a systemic failure in upholding transparency and procedural safeguards.
- The district has failed to maintain accurate, consistent, and transparent documentation of incidents involving [redacted] as evidenced by conflicting log entries, delayed disclosures, vague language in place of [redacted] name, and the absence of supporting materials (**Point 82**). This undermines trust in the integrity of the documentation and suggests possible fabrication or exaggeration of events.

- **Omission of Official Records from CT-SEDS:** The complete omission of a formal PPT notice (March 31, 2025, 2:42 PM) from the CT-SEDS system, despite having been officially sent and received, represents a clear failure to maintain proper educational records and ensure accurate archiving, directly impacting transparency and accountability (**Point 92**).

**Denial of Meaningful Parental Participation:**

- **Unilateral Scheduling of PPTs and Inadequate Notice:** The district unilaterally scheduled [redacted] annual PPT meeting without parental input (**Point 67**), and repeatedly pressured parents to meet (**Point 33**), violating their right to a mutually agreed-upon time. The insistence on a meeting with less than 5 school days' notice (**Point 31**) is a direct procedural violation.
- **Combined PPT Meetings and Lack of Substantial Discussion:** The district disregarded repeated parental requests to hold separate meetings for outplacement and annual review, instead unilaterally scheduling a combined meeting (**Points 69, 70**). This decision ignored the distinct nature of these discussions and violated the parents' legal rights under IDEA to have them addressed independently. Furthermore, the district promised a "substantial discussion" regarding outplacement at the January 16 PPT but failed to deliver any such discussion (**Point 74**).
- **Failure to Provide Proper Notice for Transition and Retroactive Documentation:** The district failed to provide timely written notice that transition planning would be discussed at the January 16 PPT, and later retroactively altered documents to cover this violation (**Points 72, 81**). This prevented meaningful parental input on a legally required component of the IEP.
- **Improper IEP Documentation:** Jennifer Stewart's refusal to remove an improper prefatory statement in the parent/student input section of the IEP, falsely claiming the mother had sole educational decision-making authority (**Point 80**), constitutes a clear procedural violation that misrepresents parental input and undermines their role.
- **Hostile PPT Environment:** The hostile atmosphere at the March 2025 PPT meeting, characterized by interruptions, dismissals of concerns, raised voices, and threats to terminate the meeting (**Point 64**), directly hindered the father's ability to advocate effectively and denied meaningful parental participation. The refusal to engage in transparent discussion and the accusations of "misinterpreting" communications further highlight this obstruction.
- **Failure to Address ESY Services Appropriately:** The district's arbitrary marking of 'No' for ESY eligibility without documented discussion or evaluation of his needs at the January 2025 PPT constitutes a significant procedural violation (**Point 85**). Their subsequent attempt to retroactively correct this error by proposing a new meeting does not erase the initial violation and has created financial hardship and scheduling conflicts for the family, **demonstrating** a lack of procedural integrity and transparency (**Points 86, 87**).
- Additionally, on April 28, 2025, the district acknowledged in writing that [redacted] ESY eligibility had not been discussed during his annual review and proposed a new PPT meeting for May 6, 2025, to retroactively address the matter. However, [redacted] finalized IEP already listed "No" for ESY services—an official determination that should not have

been made without parental input. The district's stated intention to hold a meeting after the IEP was completed, in order to revisit a key eligibility decision, reflects an improper attempt to cure an earlier procedural violation. This retroactive approach does not comply with IDEA's requirements for timely and participatory planning. Moreover, the parents explicitly rejected the proposed May 6 meeting in writing, stating that no further PPTs were warranted and that any unresolved matters would be addressed through due process. Despite this clear objection, the district proceeded to maintain the meeting in CT-SEDS and implied it would move forward regardless of consent. This conduct demonstrates a disregard for parental input and violates the procedural safeguards required by IDEA.

- **Inconsistent PPT Notices and Documentation:** The issuance of multiple conflicting PPT notices for the same meeting, rapid and unexplained changes to participant lists and roles (including the removal of the student's name), and continuous shifting of staff titles without clarification (**Points 89, 90, 91, 93, 94, 95, 97, 98, 99**) directly undermine the parents' ability to understand who will be at the meeting and what roles they will play, thereby impairing meaningful preparation and participation in the IEP process.

**Failure to Respond to Complaints and Lack of Transparency:**

- The district consistently refused to answer parental questions and concerns via email (**Points 34, 43, 44, 56, 59, 63, 64, 66, 69, 71, 73, 77**), demonstrating a pattern of non-responsiveness and undermining the collaborative spirit of IDEA.
- The failure to provide a written response or acknowledgment to a formal written complaint within two months (**Point 79**) is a clear procedural violation and demonstrates a systemic failure to engage in good-faith communication and accountability.
- The district's shifting and inconsistent explanations regarding incident logs, missing entries, and belated surfacing of allegations (**Points 76, 77**) demonstrate a severe lack of transparency and undermine the accuracy and reliability of [redacted] official records.
- The initial acknowledgment of communication shortcomings in May 2023 (**Point 88**) is a critical admission, yet the district has consistently failed to follow through on its commitment, exacerbating issues surrounding [redacted] educational planning and FAPE denial.

**Denial of Independent Educational Evaluation (IEE):**

- The district's sidestepping of the father's IEE request by falsely claiming the mother had sole educational decision-making authority (**Point 78**), coupled with their failure to provide a list of providers or file for due process to challenge the IEE, is a direct and egregious violation of a parent's right to an independent assessment. This denied [redacted] the opportunity for an independent assessment of his needs and reflects a pattern of overriding parental rights.

**Unilateral Change of Placement:**

- The punitive isolation of [redacted] to the nurse's station and the denial of access to the regular bathroom for the remainder of the year (**Point 18**) constituted a significant change in his educational placement and environment without proper notice, PPT meeting, or

parental consent, a clear procedural violation that fundamentally altered his access to the general education environment. This action was taken only after the fact, despite concerns about lack of monitoring and website blocking.

## C. Systemic Pattern of Reactive, Negligent, and Retaliatory Conduct

The issues detailed above expose a pervasive and deliberate pattern of neglect, retaliation, and legal noncompliance by Milford Public Schools. This is not a matter of accidental mistakes or bureaucratic disorganization — it is a systemic failure to meet [redacted] educational, emotional, and behavioral needs as required under the Individuals with Disabilities Education Act (IDEA). The district has repeatedly acted only after harm occurred, rather than proactively providing the supports necessary to prevent it, as the law mandates.

**Parents currently assert that the evidence strongly suggests a pervasive pattern of retaliation by the Milford School District against [redacted] and his parents for their consistent and diligent advocacy on his behalf. This retaliation has manifested as:**

- **Teacher Misconduct and Shaming:** Ms. Adinolfi's statement ("Do not go home and tell your daddy that I was eating peanut butter and apple in class ever again!") immediately following parental complaints (**Point 11**), Ms. Curria's humiliating "2nd grade math!" comment (**Point 30**) after previous reports against her, and Ms. Truscello's repeated yelling, blaming, and threats of permanent placement at Mathewson (**Point 50**) are direct examples of actions **currently asserted by parents as retaliation** designed to punish [redacted] for his parents' actions and to induce fear. Ms. Truscello's repeated admonitions to "not go home and tell his dad" (**Point 28**) are also indicative of an attempt to conceal inappropriate interactions.
- **Systemic Program Changes and Undermining Support:** The abrupt and unilateral removal of the highly successful ticket system and communication logs (**Point 16**) directly after complaints about Ms. Adinolfi, and the sudden, aggressive push for a placement in the Mathewson autism program (previously deemed inappropriate) (**Points 32, 35**), are **currently asserted by parents as adverse actions** taken in response to protected parental activity. The district's fabricated explanations for this shift (**Points 36, 37**) and dismissal of concerns by attributing changes to a "miscommunication and misunderstanding" (**Point 41**) further support a retaliatory motive.
- **Discriminatory Treatment in Record Requests:** Jennifer Stewart's discriminatory demand for the father to sign an unnecessary release form for records, while not requiring the same from the mother (**Points 48, 57**), is **currently asserted by parents as a clear act of retaliation** against a specific parent advocate, designed to create obstacles and deny equal access to information.
- **Forced Coercion and Fabricated Allegations:** The alleged triggering of new, "out-of-character" behaviors (**Point 51**) after parental complaints, coupled with [redacted] being forced to make false phone calls home (**Points 52, 61**), are **currently asserted by parents as severe forms of retaliation** designed to create a false, negative narrative about [redacted] behavior and to deter further advocacy. Ms. Rizzo's unfounded allegations (**Point 53**) against [redacted] in response to parental reports further solidify this pattern. The

district's subsequent portrayal of [redacted] in a negative light exacerbated his struggles (**Point 53**).

- **Obstruction of Information and Communication:** The consistent refusal to provide records, answer questions, and respond to formal complaints (**Points 34, 43, 44, 56, 59, 63, 64, 66, 69, 71, 73, 77, 79**) serves to impede parental oversight and participation, and is **currently asserted by parents as a punitive response** to persistent advocacy. The retroactive creation/alteration of documents (**Points 72, 75, 81**) is a deliberate attempt to cover up procedural failures in response to scrutiny.
- **Hostile PPT Environment and Discrediting Tactics:** The district's conduct at the March 2025 PPT, including interruptions, dismissals, raised voices, and attempts to discredit the father's valid concerns by accusing him of "misinterpreting" communications and trying to limit discussion to only non-email related topics (**Point 64**), are **asserted by parents as retaliatory tactics** aimed at silencing and frustrating parental advocacy. The subsequent ignoring of the father's email outlining concerns further demonstrates a lack of accountability following this hostile interaction (**Point 64**).

The districts escalating violations — including delayed and incomplete responses, falsified and **inconsistent** documentation, exclusion of parental participation, retaliation against advocacy, and the failure to implement established supports — reflect a deeply rooted disregard for IDEA's procedural safeguards and substantive requirements. The district's actions have caused [redacted] significant and lasting harm. Immediate, decisive intervention is required to address these ongoing violations and to ensure [redacted] receives the Free Appropriate Public Education (FAPE) to which he is legally entitled.

**Requested Relief**

We request an out-of-district placement as the central and necessary remedy for the district's ongoing failure to provide [redacted] with a Free Appropriate Public Education (FAPE) as required under the Individuals with Disabilities Education Act (IDEA).

- **Outplacement:** An order for an appropriate out-of-district placement for [redacted] beginning in 6th grade, as the current placement has failed to meet his educational, behavioral, and emotional needs. We further request that the Milford School District fully fund all tuition and transportation costs associated with this placement. The district has demonstrated a clear and ongoing inability to provide [redacted] with FAPE within its current structure, as evidenced by a documented pattern of misconduct, retaliation, and inadequate support.
- **Compliance with IDEA Following Outplacement:** A directive ensuring that the Milford School District complies with all procedural and substantive IDEA requirements related to [redacted] transition to and continued education in the out-of-district placement. This includes appropriate transition planning, meaningful parental participation in the development and review of [redacted] IEP at the new placement, and full adherence to all procedural safeguards to ensure his rights remain fully protected.

- **Finding of FAPE Violation:** A formal determination that the Milford School District has failed to provide [redacted] with FAPE, in violation of IDEA, due to persistent procedural violations, retaliatory actions, and failure to meet his individualized educational needs.

**Conclusion**

The Milford School District's actions demonstrate a systematic and profound failure to provide [redacted] with FAPE. This failure is evidenced by substantive inadequacies in addressing his emotional and behavioral needs, a clear and documented pattern of material procedural violations that have undermined parental rights, and a disturbing trajectory of direct retaliation against a vulnerable student and his advocating family. The district's consistent lack of transparency, refusal to engage in good-faith communication, and the harm inflicted upon [redacted] necessitate the full scope of the requested relief to safeguard his legal right to a Free Appropriate Public Education and to ensure accountability for these egregious IDEA violations.

Dated: June 12, 2025

Respectfully
Robert Kornberg