CERTIFIED COPY

**In The Matter Of:**

[redacted] *vs. Milford Board of Education*

---

**HEARING**

*September 24, 2025*

---

*A Plus Reporting Service LLC*
*55 Whiting Street, Suite 1A*
*Plainville, CT 06062*
*203.269.9976*

*This page left intentionally blank*

CONNECTICUT STATE DEPARTMENT OF EDUCATION
SPECIAL EDUCATION HEARING

In Re: [redacted] Complainant
vs.
MILFORD BOARD OF EDUCATION, Respondent

Doc. No.: 25-0686

HELD BEFORE:
PATRICK KENNEDY, ESQ., THE HEARING OFFICER

DATE: September 24, 2025
TIME: 10:05 a.m.
PLACE: (Via Teams Teleconference)

Reporter: Robert G. Dixon, CVR-M #857



A P P E A R A N C E S:

For MILFORD BOARD OF EDUCATION:
BERCHEM MOSES, PC
75 Broad Street
Milford, Connecticut 06460
By: HERBERT Z. ROSEN, ESQ.
HRosen@berchemmoses.com
203.783.1200

Also for MILFORD BOARD OF EDUCATION:
NADINE MACKLIN,
Special Education Supervisor

For [redacted]
ROBERT [redacted] (pro se)
KAREN [redacted] (pro se)



(Begin: 10:05 a.m.)

THE HEARING OFFICER: We'll go on the record, and we'll start with identification.
I'm Hearing Officer Patrick Kennedy.
ATTORNEY ROSEN: Good morning. This is Herbie Rosen, attorney for Berchem Moses, attorney for the Milford Board of Education.
With me on behalf of the Board is a district representative, Nadine Macklin, Special Education Supervisor.
We also have our first witness here Tara Truscello. I understand if we discuss logistics you may want her to step out, and she can, but she is here, ready as our first witness, a special education teacher with the District.
THE HEARING OFFICER: Okay.
And others present in the hearing room?
ROBERT [redacted] Robert [redacted] father of [[redacted]
THE HEARING OFFICER: Okay. Let's see.
KAREN [redacted] Karen [redacted] [[redacted]s mother.
THE HEARING OFFICER: All right. So, I think everybody has been identified. Okay.
So, the hearing will please come to order. My name is Patrick Kennedy, Hearing Officer



appointed by the Connecticut State Board of Ed to preside over this special education hearing. We are here to inquire to the case of [redacted] versus the Milford Board of Ed.
As Hearing Officer, I have the authority to confirm, modify, or reject the identification, evaluation, or educational placement of, or the provision of a free appropriate public education to the student to determine the appropriateness of a unilateral placement, or to prescribe alternate special education programs for the student.
The purpose of this hearing is to gain the facts related to this case and to provide the parties with an opportunity to place on the record evidence that is relevant to the issues. Both parties will be given reasonably sufficient time to present such evidence. I may question either of the parties or their respective witnesses at any time. This is a formal hearing and closed to anyone not relevant to the case.
Each party shall be afforded the opportunity to present expert witnesses and to cross-examine other parties, interveners and witnesses, and to present evidence and arguments on all issues involved. Information collected throughout the

course of this hearing will be reviewed and a decision will mailed to both parties on or before -- and let's see. I thought I had the -- okay. Actually, we never extended it -- before the mailing date set by law of October 10, 2025.

And I mean, since we have hearings that go beyond that and we're on the record, does anyone want to make a request to extend the mailing date?

ATTORNEY ROSEN: I would request to extend the mailing date beyond the final hearing date that's scheduled in this matter to afford appropriate time for the post-hearing briefs, if necessary, and the Hearing Officer's determination.

THE HEARING OFFICER: Okay. I mean, I can only do 30 days at a time, but I'll issue an extension for 30 days and then extend as necessary after that.

Okay. All right. So, everybody has actually identified themselves for the record. I'll enter --

ROBERT [redacted] (Unintelligible) --

THE HEARING OFFICER: What's that?

ROBERT [redacted] Mr. Kennedy, if I could just ask a question? Because I know you made a comment about cross-examination. According to our e-mails you stated that the District will present their



testimony today, and I had requested from the District's attorney and I also reached out to you about how many days they're going to be using to present their testimony, as I have not submitted the exhibits yet, as you had confirmed that it's five days before we present our testimony.

And you had said that in an e-mail that most likely that they're going to be using this whole day themselves. So, we haven't submitted anything yet because -- which would be sometime in October, and wanted to find out how many days they're going to be using for their testimony and everything, so this way we can submit our exhibits on time.

We haven't got any answers to that.

THE HEARING OFFICER: I think, actually the District's attorney sent an e-mail where he estimated three days, but I mean -- I suppose that that's not set in stone. Is that correct?

ATTORNEY ROSEN: Yes. And may I speak to this? I'd like to address just the witness list and the exhibits as a whole, if I can, with just some concerns from the District?

THE HEARING OFFICER: Uh-huh?

ATTORNEY ROSEN: So, at this point -- and I understand there was some back-and-forth correspondence, some



of which took place when I was out in observance of Rosh Hashauna for yesterday. At this point the Board does believe it respectfully asserts that there's a violation of State Statute 10-76h, Section C, Subsection 2, with respect to the disclosure of witnesses and documentary evidence.

I understand on September 11th of this year Mr. [redacted] e-mailed both myself and Hearing Officer Kennedy saying that he had prepared all of his exhibits as individual PDF files and organized them with an index. Later that day, Hearing Officer Kennedy I understood you stated he could submit exhibits and witness lists at least five business days before the hearing in which he wished to submit the exhibits or provide the testimony.

When asked for clarification of our case timing, I replied on September 13th in an e-mail to both Hearing Officer Kennedy and the parents stating that we expected and anticipated/estimated that it would require three days to present our case.

I did note that we expected to receive all the exhibits at least five days prior to today, the commencement of the hearing. I explained my



concern about how not having any of the parents' documentary evidence prior to today, the commencement of the hearing, would prejudice the Board's efforts to mount a good-faith defense.

I understand Hearing Officer Kennedy responded on September 16th stating that the regulation only bars exhibits from being used if they're not produced five business days in advance of the specific date they are to be used. However, respectfully, the Board disagrees with that holding in light of the language of the actual statute which governs.

Statute 10-76h, Section C, Subsection 2 specifically states, and I quote, each party to the hearing shall disclose not later than five business days prior to the date the hearing commences; A, documentary evidence such party plans to present at the hearing and a list of witnesses such party plans to call at the hearing; and B, all completed evaluations and recommendation based on the offering party's evaluation that the party intends to use at the hearing.

Except for good cause shown, the Hearing Officer shall limit each party to such documentary

evidence and witnesses as were properly disclosed and are relevant to the issues and dispute.

The hearing officer may bar any party who fails to comply with the requirements concerning disclosure of evaluations and recommendations from introducing any undisclosed evaluation or recommendation at the hearing without the consent of the other party.

That's the end of the quote.

Now, the regulation states, and I quote, at least five business days prior to a hearing date scheduled and conducted pursuant to Section 10-76h(7) of the regulations of Connecticut state agencies each party shall disclose to the other party all documentary evidence including evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing, end quote.

Note, it does not say, evidence that the party intends to use at that specific hearing date. The hearing has commenced. This is the beginning of the hearing.

While I understand that pro se litigants do get some leeway as to the due process hearing



unfolds, and while I understand that a party could of course supplement their exhibits and witness lists as the hearing proceeds, I've never been part of a due process case where one party was required to disclose all their witnesses and exhibits in advance while another party was permitted to sit, wait, and provide all their witnesses and exhibits at a later time.

I have reviewed all due process decisions for the last several years, the last six years. I haven't found an instance where parties were not ordered to at least disclose their exhibits and witnesses at the same time.

The Board understands that it bears the burden in this case to prove that it provided a free appropriate public education and can provide a free appropriate public education to the student in this case in the least restrictive environment possible.

And the Board, we believe, can meet that burden, but to expect the Board to present all of its witnesses and have them talk about all of our exhibits without being permitted to see any of the evidence that the parents plan to rely on prejudices our case and renders it difficult for



us to provide a good-faith defense. I can't think of a legal process where this setup would be permitted.

We're making our witnesses available, and so the parents are given adequate notice that these witnesses are going to be here. So, we should be free to fully examine our witnesses and then have the parents fully cross-examine them.

To permit the permit the parents to just call our own witnesses again when they are separately ready days after hearing testimony, days after having an opportunity to review our exhibits to continue and put on their case unnecessarily prolongs this case. It's not judicially efficient. It continues to remove educators from their classroom and post multiple times to be here at the hearing.

Meanwhile, this case carries on. While we have a student in a stay-put situation that admittedly nobody is happy with, we're not disputing what the stay-put is, but the parents want an outplacement and the Board wants an appropriate setting in the District.

Merely permitting a party the right to call rebuttal witnesses will not cure the prejudice we



experience from not having a full disposure of the parents' exhibits and witness lists at the commencement of this hearing.

Further, in the past two days Mr. [redacted] has e-mailed me several times to ask if I intend to object to an undefined array of e-mail communications with certain district personnel. I, on behalf of the Board, cannot possibly provide an opinion on behalf of the Board without being given the right to review the possible exhibits in advance. We can't give categorical agreements or objections without actually seeing the documents.

Further, Mr. [redacted] is e-mailing us repeatedly about a variety of witnesses he may be interested in calling including former district employees, and now state personnel as of this morning. To understand why Mr. [redacted] is seeking to call these individuals and to form an opinion about whether or not the Board can object, we require an offer of proof as to why those individuals are relevant to this case, or to introducing evidence. We can't possibly make an informed opinion without the ability to see the parents' anticipated exhibits and witness lists.

Further, Mr. [redacted] is referring to

witnesses to talk about e-mails exchanged with him. If these are e-mails exchanged with him, presumably he is the person who can introduce these e-mails and discuss.

To cure the defect that we think has occurred we're respectfully requesting an order that all parties disclose at least five business days before the next hearing date, which I believe is October 17th, a list of witnesses and documentary evidence that they intend to produce. This should not cause any prejudice to the parents.

Mr. [redacted] already stated in his September 11th e-mail he has his exhibits prepared. They're indexed as individual PDF files, and he essentially now has three more weeks to ensure hard-copy deliveries. But it's going to prejudice the Board's efforts further if we're further unable to view the anticipated exhibits and witnesses while we're expected to still put on a full comprehensive defense to their allegations.

We'd also, again, respectfully request that, Hearing Officer Kennedy, you order the parents to submit an offer of proof for any witnesses they believe require a subpoena.

I appreciate the chance to be heard.



Thank you.

THE HEARING OFFICER: All right. Do you have any case law on this question?

ATTORNEY ROSEN: In terms of the exchange of exhibits, I cited to the statute which I think is pretty self-explanatory.

THE HEARING OFFICER: Uh-huh.

ATTORNEY ROSEN: I would, of course, explore it further if I needed to on a post-hearing brief, but I think the statute speaks to itself. It specifically says, prior to the commencement of the hearing.

THE HEARING OFFICER: All right --

ROBERT [redacted] I'm going to officially object to Attorney Rosen's opinions on this matter. If I -- When I have a chance to speak I would like to speak.

THE HEARING OFFICER: Can I ask you something basic? I mean, the attorneys usually cooperate with each other as a matter of courtesy and don't get in this situation. Is there any reason -- if you've got your exhibits ready, is there any reason you can't just provide them?

ROBERT [redacted] I am not fully done. After the -- the witnesses that I want to subpoena, other



things came up and I have to still go through all of my files and provide other e-mails and other things that I want to put into evidence.

In addition, it would prejudice me to have the District have my files a month in advance to be able to prepare when I only had five days with their exhibits here. And according to your e-mail, Hearing Officer Kennedy, you did specifically state that it's five days before we plan on providing our testimony, and that is the law and from what you had told us, and I am respecting that.

So, I do object to Attorney Rosen's interpretation of what he thinks is fair. It's not fair to us, and it certainly is abiding by what you had told us. I am going to be submitting our evidence five days before we present our testimony and that's why I reached out, and Attorney Rosen had not answered any of my questions in the e-mail as far as how many days he is using to provide this, his testimony. That's a question he did not answer.

I had reached out to you. I had sent the communications and I had not gotten an official word on that, so this way I know when I can



provide everything. And I know when we expect, you know, to subpoena Jennifer Stewart, and I had reached out to Attorney Rosen. I have not heard back about getting e-mails into evidence.

I requested to have Ms. Kousa testify so I can question her. And I had also requested other individuals from the Milford school District to appear as well. So, I have not heard back from Attorney Rosen and I don't believe Attorney Rosen needs to see anything in advance to determine whether, you know, their testimony is going to be relevant.

It basically has to do with getting my e-mails into evidence. I would like to subpoena these individuals or have them testify if, you know, either by subpoena or have them come down on their own free will because that is my right to have questioned, to be able to question them about those communications to present my case, because it's relevant to all the facts that's stated in my original complaint.

As you stated in the brief --

THE HEARING OFFICER: Instead of engaging in litigation Armageddon, I mean, have you ever actually sat down, both sides ever sat down and talked to a

mediator about trying to resolve this?
ROBERT [redacted] Well, the District did not even want to. I reached out as far as IDA as far as having a hearing as far as having the resolution meeting, and that's something that I will be discussing when our testimony comes up.
But the District had not even -- they're supposed to within, I believe --
THE HEARING OFFICER: All right. Well, we're not --
ROBERT [redacted] (Unintelligible) --
THE HEARING OFFICER: I'm not going to get into that. I mean, it's just a question of, you know. I mean, there's a lot of skirmishing over --
ROBERT [redacted] They were not interested in (unintelligible) --
THE HEARING OFFICER: There's a lot of skirmishing over procedure and, you know. Probably, you could -- probably if people actually sat down and talked with a third party then they might actually come up with a solution that worked and was in the best interests of the child -- but all right.
I mean --
ROBERT [redacted] We were open to that but the District wasn't. We wanted the --
THE HEARING OFFICER: All right. All right.



ROBERT [redacted] -- a prehearing. You know, we wanted a resolution meeting and they --
THE HEARING OFFICER: Yeah, I don't want to get -- whatever happened with the resolution meeting. Okay? It didn't happen. I mean, that we're way past --
ROBERT [redacted] Well, that is a violation and that's something that we're going to brining up during the hearing.
I submitted e-mail (unintelligible) --
THE HEARING OFFICER: I was just throwing it out that if no one has ever mediated the case, it wouldn't necessarily be a terrible idea. But --
ROBERT [redacted] There should have been a resolution meeting, but there wasn't and that's (unintelligible) --
THE HEARING OFFICER: All right. Yeah --
ROBERT [redacted] -- my testimony.
THE HEARING OFFICER: Okay. I mean --
ROBERT [redacted] That's the law. The law is the law.
ATTORNEY ROSEN: Hearing Officer Kennedy, if you'd like the Board's perspective on this issue, I'm happy to share. I don't really want to opine on, you know, confidential attempts to try and mediate or resolve the matter.



THE HEARING OFFICER: Sure. Yeah, yeah.
ATTORNEY ROSEN: I mean, we are here.
THE HEARING OFFICER: I'm just suggesting it might not be a terrible idea now to, you know.
ATTORNEY ROSEN: We hear you, and if we thought it was --
THE HEARING OFFICER: I mean, the problem -- quite frankly, the problem is when with pro se's, I mean, a lot of the time it's more about bad blood than what's really going to happen with the kid.
That's why, you know (unintelligible) --
ROBERT [redacted] Respectfully, we disagree. It's not about bad blood.
THE HEARING OFFICER: Sir, I'm just saying --
ROBERT [redacted] It's about my son's rights being violated --
THE HEARING OFFICER: Sir, will you please --
ROBERT [redacted] And it's also --
THE HEARING OFFICER: Will you please listen to me? I'm saying that when, basically when people are represented by attorneys they tend to -- these things tend to go more smoothly. And often, even if they don't reach a settlement, at least they cooperate with each other on procedure.
And I mean, these types of skirmishes are



just unheard of in cases where there's attorneys on both sides. I mean, no parent attorney would ever try to subpoena people from the State. I mean, that's just absurd.
ROBERT [redacted] Well, I believe it's important. If it's --
THE HEARING OFFICER: All right.
ROBERT [redacted] -- we don't need a subpoena are I can get the e-mails into evidence and all their communications, then I won't need to subpoena them or have them testify.
And I'd also like to comment on Attorney Rosen's comment about the school district and his opinion, provided a free and appropriate public education. My view on it, they have not. This is what this whole hearing is about. It's not about bad blood. It's about my son's rights being violated --
THE HEARING OFFICER: All right.
ROBERT [redacted] -- and my rights being violated across the board. And I do have proof of all those violations, and I believe that this hearing is necessary. I don't even believe a mediation at this point would solve anything. It would be fruitless at this point.

THE HEARING OFFICER: Well, okay. I hear what Attorney Rosen is saying. And I mean, I think that the problem is the attorneys usually just provide all their exhibits at the beginning of the hearing.

I just read the regulation said -- it doesn't actually say that. And I don't necessarily think the regulation is inconsistent with the state statute. I think it's a clarification, maybe not the right one, but -- and there doesn't seem to be any courts that have ruled on this. But --

ROBERT [redacted] Again, that would prejudice us because he would have a full month to be able to prepare and we only had five days. So, that is a big prejudice upon on us there.

THE HEARING OFFICER: Well, I mean, here's the thing. I think really this is when the legislature passes things without giving them 30 seconds of consecutive thought.

But the original statutes and regulations were set when the parents went first, I mean, because the parents brought the action. So, unless it was like an independent evaluation case, up until a couple years ago the parents went first, which actually makes a lot more sense.

But for some reason they passed a law saying,



well, now the District goes first, even though they didn't bring the case, which is sort of unheard of in a legal procedure. And it's creating situations that didn't exist, didn't exist before.

But they haven't updated -- unfortunately, they haven't updated the regulations or statutes to really deal with that change in the statute -- but you know what? I mean, you can -- for now we're just going to go, go forward. You can e-mail me your positions on this, and if I decide I have the authority to order the parents to produce by some date certain what they have anyway, then I'll consider it.

I'm just not -- I'm not convinced yet, so.

ROBERT [redacted] (Unintelligible) receive an e-mail from you (unintelligible) --

ATTORNEY ROSEN: If I may note just for the record?

ROBERT [redacted] (Unintelligible) first. I started talking.

THE HEARING OFFICER: Let me --

ROBERT [redacted] (Unintelligible) Attorney Rosen.

THE HEARING OFFICER: Sir -- yeah, let me hear from Attorney Rosen. What were you saying?

ATTORNEY ROSEN: You'll note that as Mr. [redacted] was



referring to the exhibits I was seeking, you know, to subpoena witnesses about, he kept saying my e-mails, my e-mails. And he has again represented to us that these e-mails are prepared.

There's nothing in our exhibits that have been produced, although he had five business days, that he had not already received through the CT-SEDS profile in the education records of the student.

So, for me to now, in a moment, call Ms. Truscello, the special education teacher, talk through our whole explanation of what occurred in our understanding, and then to possibly subject her to cross-examination without any documents or information of which we can ground ourselves in the same level of understanding as to the parents' perspective, I just don't know how we can interpret any answers she may give as a good faith defense.

So, we're prepared to move forward. We don't want to unnecessarily delay this matter.

THE HEARING OFFICER: Uh-huh?

ATTORNEY ROSEN: But the bulk of our case is going to be presented in at least two more days and that's almost a month from now, given that the, you know,



as you said, you know, that the idea that the exhibits should be exchanged beforehand, it makes sense. This isn't show me mine and then I'll show you yours. It says in the statute, an exchange. It's not first and then later.

So, we would respectfully again request an order that at least by the second hearing date we have a copy of all exhibits as the hearing has today commenced, and we think will cure the defect. I understand the position and we'll proceed. We're prepared to proceed, but I just want to note, again I have advised how many days I thought that the District would need. I have that in e-mail.

Mr. [redacted] sent me numerous e-mails during the day where he received an away message and knew that I was not there. So, I don't think we should be faulted for not responding to asking if we would agree to e-mail communications that we haven't seen or agree to subpoena witnesses that we don't understand the reason for calling.

THE HEARING OFFICER: Yeah. And I mean --

ROBERT [redacted] I'd like to comment on this?

THE HEARING OFFICER: Folks, the one thing is that if you submit your exhibits, we'll go over them and

see what the District can stipulate to. I mean, and that's really what we usually do at the beginning of the hearing is both sides submit their exhibits and each side says what they can stipulate to. A lot of time they just -- everyone just stipulates to everything.

ROBERT [redacted] Well, Hearing Officer Kennedy, if I could respond to that? According to your e-mail, it was five days before we plan on providing our testimony, and I did reach out to Attorney Rosen. He claims that he was away from on -- regarding Rosh Hashanah. But when I e-mailed him before that he did respond back about how Jennifer Stewart is no longer with the District, but he didn't answer my other questions in the e-mail.

So, that really is irrelevant about his claims about him not being on Rosh Hashanah. He could have answered those e-mails. And I had reached out to you a couple of times and I still haven't gotten -- received any answers, because according to your e-mail that we have is that it is -- it was clear, crystal clear five days before we present our testimony and that's --

THE HEARING OFFICER: That's the way I read the regulation then, but --



ROBERT [redacted] And that's what I was --

THE HEARING OFFICER: What it's usually really been is that people just in the way -- in terms of the way it works, which is, again, you know it's beneficial to have attorneys on both sides who know how things really work, but you --

ROBERT [redacted] But I am abiding by the law.

THE HEARING OFFICER: Sir, just don't interrupt me.

What people usually do is they just exchange a binder of exhibits at the beginning. And then usually what they do five days in advance of the next hearing is if they think there's other things they should produce, then they file them as supplements. They basically file additions to the exhibits, but it is unheard of just not to file anything.

And again, it goes back to the attorneys always cooperate with each other. You really should try to just be cooperative in some of these procedural things. I mean, how long have we taken? Thirty-three minutes and we haven't started hearing the case yet. I mean --

ROBERT [redacted] I would like to comment on that --

THE HEARING OFFICER: If you really want a good result for your child, I mean, at some point --



ROBERT [redacted] We aren't being cooperative? The insinuation that we're not being cooperative is just it's unfounded, Hearing officer Kennedy. Because according to your e-mail it was five days before we provide our testimony. When I e-mailed you, you said you would have to reach out to the District. When I did he failed to answer me.

THE HEARING OFFICER: All right. Well --

ROBERT [redacted] And when I reached to you if could please provide that information, I have not heard back from you. So as of this moment, we are unclear as when we're going to provide our testimony. It is five days before that. That was exactly what we received from you, and we are respecting what you had told us regarding this issue.

Now this is becoming another issue where it's making us sound that we're not being cooperative when we certainly are, because again that would also prejudice us to give the -- the District gave us the exhibits five days before. We expect to give us -- give our exhibits five days before that.

THE HEARING OFFICER: All right. Let's just move on. We've taken enough time on this.



ROBERT [redacted] But I feel like --

THE HEARING OFFICER: Right now the ruling is that we're just going to go forward, and if you want to do a full memorandum on this, then I'll consider it -- but it is what is normally done. I don't necessarily think it's required by the regulations, so.

ROBERT [redacted] If it's not required by the regulations, then we are abiding by the regulations --

THE HEARING OFFICER: Okay. Well, then I'm saying that's my --

ROBERT [redacted] (Unintelligible) if he's trying to get us to go outside of the regulations for his benefit --

THE HEARING OFFICER: (Unintelligible) --

ROBERT [redacted] Please don't -- to get the exhibits a month in advance, that that prejudices us.

He gave us the exhibits five days before. He didn't give us --

THE HEARING OFFICER: Yeah. Right --

ROBERT [redacted] -- month before. We expected the same in turn.

THE HEARING OFFICER: I mean, can you stop interrupting every time I say something?

ROBERT [redacted] No. I was talking first. I apologize if you thought I was interrupting. I do, but I was talking first.
THE HEARING OFFICER: Yeah. I mean, now it's 35 minutes. That's my ruling right now. You can, you know, based on what I have before me, if the attorney wants to do a motion with a memorandum, then I'll look at it and you can respond, but for now we're just going to go forward.
So, I'll enter as an exhibit the request for hearing into the record, and mark it as Hearing Officer 1.

(Hearing Officer Exhibit Number 1, marked for identification and noted in index.)

THE HEARING OFFICER: Issues submitted by the parties are, did the District commit procedural violations amounting to a denial of FAPE for the 2023/'24 school year?
Did the District fail to implement the IEP of the student for the 2023/'24 school year?
Did the District fail to provide the student with an appropriate program for the 2024/'25 school year?



Did the District commit procedural violations amounting to denial of FAPE for the 2024/'25 school year?
Did the District fail to implement the IEP of the student for the 2024/'25 school year?
If the District has committed any violations should an outplacement at Woodhouse Academy or Hope Academy be ordered?
All right. So, now we're up to the actual exhibits. And as we've gone on about ad nauseam, the Board has submitted exhibits; the parent hasn't. So, the Board has submitted Exhibits 1 through 38.
Does the parent want to stipulate to any of the exhibits that the Board has filed?
ROBERT [redacted] Well, in looking over the exhibits it's basically just a bunch of -- I see his behavioral intervention plan, I see his IEPs, and I can't say that I object to them.
But at the pre-hearing hearing conference we specifically stated that -- and just to get in for the record, that the IEP that was generated which we discussed at the pre-hearing conference, that it does look robust on paper, but it's based on, you know, them not -- the school district not



implementing it correctly and everything that my son had, what transpired with the District.
In my -- basically my complaint speaks for itself.
THE HEARING OFFICER: All right. Yeah. But I mean --
ROBERT [redacted] So, I'm not disputing the IEP --
THE HEARING OFFICER: Well, we've just said the statement of issues, that failure to implement the IEP is definitely -- for the years in question is the issue, or is an issue. And you know you couldn't really determine that without actually having the IEP, so.
I mean, so, you don't really --
ROBERT [redacted] Well, it looks robust on paper, but again that's what we said at the pre-hearing conference.
THE HEARING OFFICER: We're just talking about admissibility, and just so we don't have to go through the tedious process of, like a court hearing where you would introduce things one at a time with testimony, and delay this to three years from now.
If you're looking at it and say, yeah, there, I mean, there's nothing really that I object to coming in as evidence; I've got my own arguments I



want to make concerning that -- but just in terms of allowing them into evidence, you're not objecting to any of them. Right? They're pretty much (unintelligible) --
ROBERT [redacted] No, and that's why I wanted to get on record what we talked about the prehearing, at the pre-hearing conference then --
THE HEARING OFFICER: No, I understand.
ROBERT [redacted] Yeah. That, you know, it does look robust but it was about all the procedural violations and everything my son experienced, and a violation against his being appropriate, and then my Violations of my rights as a parent on (unintelligible) --
THE HEARING OFFICER: Right now I'm very narrowly focused on that, not the (unintelligible) --
ROBERT [redacted] No, I don't have any objection. I don't have any objections to the exhibits coming in.
THE HEARING OFFICER: Exhibits Board 1 through 38 are admitted by agreement.

(Board Exhibit Numbers 1 through 38, marked for identification and noted in index.)

THE HEARING OFFICER: All right. Okay. First, we'll hear testimony by the District and its respective witnesses, and that will be followed by testimony by representatives of the parents and their respective witnesses. Each party may make opening and closing statements.

All right. Other than what we talked about for a half hour, are there any other preliminary matters that we have to talk about concerning this case?

ROBERT [redacted] Well, what you just said -- today, you're talking about our testimony coming in? I was under the assumption the District goes first. So, that's where the confusion lies.

I just want to be clear for the record for me and [redacted]s mother, to be fair, that this day and how many, you know, that they're going to be using -- this is for their testimony. And we don't present our case until sometime in October until I find out exactly how many days they're going to present their testimony.

And that's according to --

THE HEARING OFFICER: Yeah, what I just said about hearing of testimony is essentially how the order of procedure across the entire however many days



of hearing. It doesn't -- it isn't really realistic that we would get to you today.

ROBERT [redacted] I understand. Okay.

THE HEARING OFFICER: Yeah. And my statement actually has a little bit different wording because it was done before the Legislature changed the rules on this, but -- all right.

So, if we have nothing else about any other preliminary matters then we'll --

ATTORNEY ROSEN: Two logistical points?

THE HEARING OFFICER: Sure.

ATTORNEY ROSEN: One is for scheduling purposes. When it comes time for, you know, when we're breaking for lunch or sometime, I want to note, in case Ms. Truscello is still on the stand, we anticipate there's going to be bell interruptions at the school that she's present, which would pause testimony anyway.

THE HEARING OFFICER: Uh-huh.

ATTORNEY ROSEN: So I believe that's -- we expect that to be around one o'clock. So, if we are taking a break we would advise just logistically, you know, 12:45, or so. You Know, whatever the parties want we just wanted to forewarn so we can avoid unnecessary delay.



And just a point of clarification? My understanding is both parents have brought this due process complaint, and per the guidelines for virtual hearing all cameras should be uncovered and everybody who is participating should be visual.

So, I just wanted to confirm that Ms. [redacted] is also participating as a party in this case?

KAREN [redacted] Yes, I am. I also would like to add that I believe that it is a half day today and that my son will be returning home. So, I will have to, like, just unmute -- not unmute, but I will have to mute myself, so.

THE HEARING OFFICER: That's fine. I mean, you should probably be mute when you're not speaking, anyways. So, that's fine. Yeah. So -- well, I mean, this is Zoom. You may get dog interruptions, too. So, all right. So that, that's fine.

All right. Is there anything else in terms of preliminary matters?

(No response.)



THE HEARING OFFICER: If not, we'll commence with testimony. I'll allow -- before we do actual calling of witnesses, do you want to make an opening statement?

ATTORNEY ROSEN: Yes. Briefly, please.

So, if you're ready I'll go ahead.

THE HEARING OFFICER: Sure.

ATTORNEY ROSEN: Good morning. So, throughout this hearing the Milford Board of Education can and will explain and demonstrate how it believes that [redacted] the student at subject here, can be instructed, supported, and provided with an appropriate and public educational experience in the least restrictive environment possible at Milford Public School's Harborside Middle School, while also demonstrating how the Board has been providing [redacted] with an appropriate public educational experience up to the date of the parents' due process complaint.

For way of background, [redacted] is a twelve-year-old sixth-grade student. He's currently attending West Shore Middle School through his stay-put placement. He is currently eligible for special education and related services under the classification of [redacted]

Page 37

The record will show that throughout the past two academic years [redacted] was provided services and specialized instruction in the areas of reading, writing, math, daily living skills, social skills, communication, behavior, and counseling. Additionally, throughout the past academic year [redacted] was being provided with increased paraprofessional support throughout his day to further meet his needs while also providing a balance between the support he needed and the time with non-disabled peers.

With respect to the 2023-2024 school year you're going to hear how the planning and placement team, the PPT, met for [redacted]s annual review and designed services that could appropriately be provided at his elementary school, JFK Elementary.

You're going to hear that [redacted] started to demonstrate the need for further supports in the months that followed, yet when the District tried to convene a PPT meeting, tried to further meet to further plan for [redacted] and possibly explore a change in placement, the parents refused to come to a meeting.

Ultimately, you'll hear how the school team

Page 38

continued to appropriately support [redacted] at JFK for the remainder of the 2023-2024 school year and into the '24-2025 school year. They did not change his placement in any way, also trying to involve the parents in discussions about how to further plan for him.

As for the 2024-2025 school year you'll hear from our witnesses how they tried to include the parents in determining what were appropriate supports and settings for [redacted] including multiple invitations for PPT meetings which the parents refused to attend; culminating in an annual review in January of 2025, all parties were present where the father, Mr. [redacted] in particular, requested a six-year placement at an out-of-district school.

You'll hear how the school team believed that an outplacement was not appropriate, believed it could continue to support [redacted] at JFK for the remainder of his fifth-grade year, the '24-'25 school year, and how the school team wanted to start discussing what middle school [redacted] should attend for the following year, this school year, the 2025-2026 school year.

Unfortunately, as you'll hear from our witnesses, much of the conflict in this matter

Page 39

stemmed from the parents disagreements with school practices and the steps board personnel were taking in order to best determine how to provide [redacted] with a free appropriate public education.

Notably, throughout the past two years the parents, Mr. [redacted] in particular, have refused to meet with the school team members, insisting instead that the terms of [redacted]s education be dictated through e-mail correspondence, or insisting you must answer my questions first before we come to a meeting; when the team felt that meetings would be more efficient in terms of determining what the recommendations are and how to best support [redacted] and how to communicate that to all parties and engage and allow for meaningful participation in education decision-making.

This has led to disagreement and confusion from the parents about what the district team is trying to do to support [redacted] We maintain that the Board has always sought to collaboratively plan for [redacted]s education with his parents, but while the parents are entitled to disagree and ultimately utilize their procedural safeguards in response to board recommendations, as they did here, the parents' disagreement does not mean that

Page 40

the Board has violated the student's right to a free appropriate public education.

Further, the Board has found it difficult to explain to the parents that just because there are disagreements on educational recommendations that does not mean that the Board is trying to undermine Parents or provide anything other than what is in [redacted]s best interest.

It, admittedly, has been difficult for the past two years for the Board to make recommendations or even communicate with the parents when every outreach to the parents, mostly with respect to Mr. [redacted] has been met and responded to with accusations, conclusory allegations, and identification of the Board as being the parents' foes. Rather, the Board is trying to put forth what it believes is an appropriate program for [redacted]

Unfortunately, when it came time to formally recommend a placement for [redacted] for this school year you'll hear that the parents decided to not attend that discussion and that PPT meeting, rejecting the offer to meaningfully participate in planning for the '25-2026 school year based on their displeasure that their previous outplacement

request was previously denied, and their categorical denial of Harborside without partaking in the actual formal process of the District making the recommendation and having an exchange of back-and-forth conversations before the District finalized their recommendation.

Moving forward, you'll hear from our witnesses how we hope to continue to support [redacted] in an appropriate placement within the Board, which will balance out meeting his individualized needs and providing him time with non-disabled peers. We want to work in partnership with the parents and we understand the parents have the right to meaningfully participate in deciding their child's education, but that right to meaningfully participate does not mean that they unilaterally get to dictate the terms that contradict the Board's evidence and reasoning behind our recommendations for the betterment of [redacted]s education.

We appreciate the chance to be heard and we're hoping to try and adjudicate this as efficiently as we can in [redacted]s best interests, and to present all the evidence so that all parties have a complete and thorough understanding



of each other's positions and that we may put forward a good faith defense.

Thank you.

THE HEARING OFFICER: All right. I'll hear from the parent?

ROBERT [redacted] Yes. A few things is that Attorney Rosen had said that we refused meetings. We didn't outright refuse meetings. We had requested some information because we were told things that were -- like, the end of the school year they all -- they wanted to change our son's placement out of the clear blue sky and to put him into a program they previously deemed not recommended and inappropriate. And then they later on, a month later said that it was just a misunderstanding, a miscommunication, and we wanted to find out where this is stemming from.

They made accusations that my son, you know, his behaviors increased because due to his academics becoming increasingly difficult. We asked for these communications and we said, once you provide them we can sit down and have a meeting. They refused to provide them. So, he's misrepresenting the facts in his opening statement.



Also, he says that the District always wanted to come together having a meaningful discussion. That isn't true because on March 6th we requested a PPT meeting to discuss because they refused to provide these, you know, e-mail communications. We requested, you know, some things before we agreed to have a PPT meeting.

They wanted to solely focus on, in the end of May, to put him into Matthewson, a program that they previously deemed inappropriate and not recommended. So, that's why they wanted to hold a meeting. Then a month later, like I said, they changed their stance and said it was just a whole misunderstanding, a miscommunication, when it clearly wasn't.

And then in June I received e-mail communications from the school principal saying that they reached out to us claiming that we repeatedly declined these meetings. They reached out to us. I said, please provide these communications. They refused to provide them.

And we finally had a meeting on March 6th of 2025, a parent meeting where they basically took over the whole meeting. And I would -- also, that's another thing is I want to find out about



getting that audio into evidence to show that the District did not hold anything on good faith, how I wanted to get those.

They demand -- that they claim they want to come together and they, you know, rather than -- basically, so what they're saying is that I want to discuss everything in an e-mail, and they want to come together because, according to them, it's better to have a conversation.

All right. I tried it and it totally failed because of them how I was treated at that meeting, and I would like to also request to get that audio into evidence so you can hear. It's about 56 minutes long. There are things that they had said to us that were conflicting with, you know, when I tried to question the District. They completely deflected everything. They threatened to end the meeting. They didn't want to answer any questions.

And I have proof of this showing that when we came together in good faith -- they kept saying to us, we want to meet. We want to meet. We finally agreed to meet. We asked. Okay. Now we're trying to get, you know, where is this? Where are these communications regarding his increasing

Page 45

behaviors due to his academics becoming increasingly difficult? And where are all these communications about reaching out to us about these behaviors and us declining these meetings, which were completely fabricated?

They didn't even answer our questions. They wanted to shut me down. They wanted to silence me. They talked over my voice. And that shows that when I came together in good faith, you know, to have a meeting, that they basically hijacked the whole meeting.

And also, when they wanted to hold a meeting in May of this year about, you know, his -- about my son's placement, no, we didn't come to that meeting based on the previous meeting of how they treated us as parents. That meeting speaks for itself and I reached out to the District in an e-mail summarizing that whole March 6th meeting, you know, about their actions and behaviors towards me as a parent.

And then I also had -- like I said, it's recorded because we agreed to record it. So, it's legally recorded and I would like also to submit that evidence to show that the District is misrepresenting all the facts that will clearly

Page 46

show my evidence speaks for itself.

And so, that's basically -- there was no -- he claims that there's a confusion. There is no confusion. Like again, the facts speak for themselves. Those -- everything at that meeting, I wanted my questions answered. I respectfully asked and I was basically just sidelined. I was basically being accused of things, that they were basically accusing me of things that they were guilty of.

And when they wanted to hold a meeting, I did reach out and back -- I think it was in January or -- no, it was basically after that meeting. There's another communication I had where I explained exactly why I wouldn't come together for another meeting because of they wanted to hold another meeting to clarify something else about claiming about my son's behaviors. They fabricated a whole treasure trove of exhibits, you know, basically behaviors that my sons were exhibiting when they weren't. And I questioned them in e-mail. They refused to answer my questions. They wanted to hold a meeting about it.

And I said, well, due to your actions and

Page 47

behaviors we would not agree to a meeting. And based upon that March 6th PPT meeting is why I would not hold another in-person meeting with them because of how they treated me.

Prior to that, over the last years before this I -- we have engaged. Me and his mother, Ms. [redacted] have gone to meetings, have always engaged with them, never declined any meetings. So, Attorney Rosen is misrepresenting the facts regarding our behaviors when it's the District's behaviors. And when it comes time to my testimony, I will show that, that what he's saying is certainly not true and not the facts. I have the facts to back it up.

So again, that's something else that I guess we need, you know, I need confirmation on how to get that March 6th audio into evidence. That will show clearly how I wanted to -- they wanted to hold a meeting, I agreed to it, and how I was treated as a parent.

So, this is exactly that they are not -- there's basically, you know, they're not showing any good faith at all. They were basically, you know, silencing me during that meeting. Anytime I did -- they talked over my voice and I couldn't

Page 48

even speak about things. They were deflecting everything. How I was treated shows that at that meeting. So, that's important to get in that full audio so you can grasp the concept of, you know, rather than he said/she said, it's the facts are, you know, in that audio file of that meeting.

So, I came together in good faith, me and Ms. [redacted] and they just sidelined me, and just I felt even disrespected after the meeting. None of my questions were answered and this is exactly why I don't even feel comfortable having meetings with them, you know, on how I'm being treated.

And not only that, but they can answer questions in an e-mail. They have the capability to. They just don't want to because they don't want anything documented, which is my right to have it documented. To hide documentation is not showing good faith. If they have nothing to hide they certainly can answer these questions via e-mail.

You know, apparently from my communications with them, you know, I could see that they have a lot to hide based upon my communications and my evidence, which again, that will be provided at the time during my testimony.

So, I just, you know, like I said, I think it's important for the record, you know, to get this in, so I can definitely refute everything that the district attorney is claiming, that they can provide my son with a free and appropriate public education when they haven't.

You know, my son was in fear. I have all these communications about how he came home crying. He was afraid of the teacher. He made two suicide comments. Normally, that is out of character for him. This is all going to be coming up in my testimony, but that's not providing a free and appropriate public education.

You know, his behaviors became originally from just having [redacted] and everything related to his [redacted] to all of a sudden having these violent behaviors, throwing kids down, twisting arms. These are the things that they're accusing me of -- she accused my son of in an e-mail.

As soon as I reported the teachers and as soon as I, you know, complained about the teachers, they retaliated and all of the sudden claimed he was making, you know, he was doing all these things when he wasn't, you know. And I have those and, you know, this is exactly why



Ms. Stewart needs to testify and, you know, so I can show everything she sent me, how she's -- how deflecting my concerns, it's very important.

So, every witness that I'm asking to come to the stand besides these state -- because I think if my e-mails can come in evidence I really don't need to have Ms. Jones or Ms. Matz testify, because those communications and their final, you know, decision of my complaint speaks for itself.

But in regards to the school district, you know, having Ms. Kousa and having the other representatives that I requested to have come in is important to my case. So, that's why these things can't be overlooked, because if I can't submit the audio file, then whose word is it? It's their word against mine.

This clearly will show that, you know, this is what's going on. You know they're claiming good faith and I can show there isn't any good faith, absolutely none in any way, shape or form. They wouldn't be interrupting me at the meeting. They wouldn't be deflecting, accusing me of piecing together pieces of a narrative that isn't true. That was, you know, stated from the principal Ms. Rizzo.



Other things -- she says, you're reading it incorrectly. You know, for, you know, for a term I have to use, I felt that was basically gaslighting me, I have to say. And I can show that audio file is a perfect example of how the District -- how they treated me as a parent is exactly how my son had been treated. It's a reflection on how my son has been treated all along. They have not provided a free and appropriate public education and they're incapable of providing a free and appropriate public education.

Over these last two years, basically my complaint speaks for itself. Starting in January of 2023 up until the, you know, up until I filed my complaint it tells, it tells a story, a true story of how my son was denied this. You know, being autistic, you know, he was basically deprived of his educational, you know, he could have been excelling in education, but they remain laser-focused on providing an environment that was very exclusive to him, you know, a very intimidating environment.

Based upon everything, my son came home crying to me. He didn't want to come to school



anymore. He was afraid. I reached out to the District. They ignored my communications, and then they're claiming that they're doing everything in good faith, it's certainly misrepresenting all the facts.

And like I said, I can prove all this with all of my exhibits, with all of my testimony, and especially that March 6th meeting which will seal the deal on Attorney Rosen's claim that the District, you know, can provide that free and appropriate public education and they want to come together in good faith.

There is no partnership. It's basically because the District took it upon themselves, you know, not to provide that partnership. You know, I had made -- I had reported, you know, the staff, their, you know, their behaviors on how they treated my son, and I had to send a letter in to cease and desist of what we believe to be emotional abuse to get it to stop. And then it finally, I guess, it stopped. My son didn't really come home complaining, but that doesn't excuse the fact of what he has been through.

So, you know, everything. Sure, everything, the IEP, everything they submitted, I am not, you

know, like I said, I'm not objecting to any of the evidence that's coming in from the District. On paper, yeah, sure. It looks great. I said that at the pre-hearing conference, but the reality was completely different than what's written there -- so the District can successfully claim that they provided this free and appropriate public education.

They violated my son's rights, my rights as a parent under IDA, interpreted a court order that the State said that they, they're not allowed to interpret. And this is based upon years of, you know, my son -- so, the time for my son was with JFK up until, you know, the very end.

After I made these complaints and I requested an independent educational evaluation, they falsely claim that the mother had sole educational decision-making authority. They can't cherry pick and use when she has it and when she doesn't. She doesn't have it, you know, as -- and one of these exhibits is on B1.

You know, that specifically states assigned to consent, to consent to conduct an initial evaluation re-evaluation. I signed that on January 26, 2023, as one of his exhibits. Yes, I



signed it. If the mother truly had sole educational decision-making authority, I wouldn't have had to sign it. You know, and there's not one from her.

That's another thing, is that according to this, if she had sole educational, where is her copy? But they wouldn't certainly need my authorization for this, you know. So, when we requested together jointly an independent educational evaluation, I filed a complaint with the State. This is why it's important to have those e-mail communications and the final decision of my complaint with their findings of the complaint, because it just doesn't hold any water. It doesn't make any sense.

And I can show that, you know, during this due process hearing, I can, you know, show with all the facts, all my testimony how, you know, to refute everything. So, I think it's important to get that in for the record.

And like I said, you know, I need your advice how to move forward with that audio so you can hear it yourself, because it speaks for itself.

THE HEARING OFFICER: Okay. You're done. Right?

ROBERT [redacted] I'm done, sir. Thank you.



THE HEARING OFFICER: So, the District can call its first witness.

ATTORNEY ROSEN: Sure. If I just may briefly respond? Mr. [redacted] statement is just illustrative of the fact that we need to see the exhibits that he's talking about. He has repeatedly made requests and says, I will produce, you know, witnesses, but we have not seen a witness list. So, we don't know whether or not we can object. He refers to, I have proof, I have proof. How can I possibly --

THE HEARING OFFICER: At this point, you know, you don't have to object --

ROBERT [redacted] I object. I object to his characterization.

THE HEARING OFFICER: Well, wait, wait, wait --

ROBERT [redacted] That is not what the Hearing Officer told us.

THE HEARING OFFICER: Wait, wait.

ROBERT [redacted] He's trying to make his own narrative --

THE HEARING OFFICER: Sir?

ROBERT [redacted] -- just to make a point that's invalid.

THE HEARING OFFICER: Sir, I just -- at this point,



we're only in opening argument. I'm not ruling on, you know. The only exhibits I've ruled on are the binder that the District submitted, which was admitted without objection.

Attorney Rosen knows this, but I'll just point out to the parents that opening statements and closing statements are not actual evidence. Opening statements are basically a summary of what the attorneys or pro se parties think the evidence will show. And then closing, closing statements are a summation of evidence. So, just sort of a spoiler alert. If you don't put in evidence on something, you can't introduce it at the first time when you get to closing arguments.

So, just that arguments are just that, they're just arguments, so. And actually, I mean, opening is really just kind of a statement, just sort of a preview of what's going to be shown, so.

ROBERT [redacted] Just for the record --

THE HEARING OFFICER: Yeah, sir --

ROBERT [redacted] We are going to submit our witness list.

THE HEARING OFFICER: Yeah.

ROBERT [redacted] Everything that we're looking for.

THE HEARING OFFICER: Okay. Sir --

ROBERT [redacted] (Unintelligible) submitting all our exhibits at the time when we present our testimony, but we have to find out when we're going to start it and we still don't even know.
THE HEARING OFFICER: All right. We're not going to go around on this again.
Let me just have the District call its first witness.
ATTORNEY ROSEN: Sure. I was just noting our concern for the record.
So, I'm calling Ms. Tara Truscello, special education teacher from Milford Board of Education.
THE HEARING OFFICER: All right. Ma'am, would you raise your right hand?
T A R A T R U S C E L L O,
called as a witness, being first duly sworn by the THE HEARING OFFICER, was examined and testified under oath as follows:

THE HEARING OFFICER: Okay. Thank you.
All right. You can proceed.
ATTORNEY ROSEN: Thank you.
Good morning, Ms. Truscello.



DIRECT EXAMINATION (of T. Truscello)

BY ATTORNEY ROSEN:
Q. Could you again state your name for the record, please?
A. Sure. My name is Tara Truscello.
Q. And Ms. Truscello, could you state for the record who your employer is?
A. My employer is Milford Public Schools.
Q. Okay. And I'm going to show you what has been marked as Exhibit B-37 in evidence. I'm going to attempt now to share the page here.
Okay. Ms. Truscello, can you see and -- pardon me? Just one moment.
(Pause.)
Okay. Let's try that again.
So, again, Ms. Truscello, I'm sharing what's been marked, excuse me, as Exhibit B-38 in evidence. Do you see that in front of you right now?
A. I do.
Q. Okay. So this is two pages. You see that full document?
A. Uh-huh, yes.
Q. And what do you recognize this document to be?



A. This document is my resume.
Q. And does this resume document both your professional history and educational history within the realm of special education?
A. Yes, it does.
Q. Okay. And can you clarify for all of us what is your current position with Milford Public Schools?
A. I'm currently a special education teacher at John F. Kennedy Elementary School.
Q. Okay. And how long have you been a special education teacher with Milford Public Schools?
A. This will be my seventh school year with Milford Public Schools.
Q. Okay. Before we discuss your responsibilities as a special education teacher, can you tell me what degrees you have and where you received them from?
A. Sure. So, I got my undergrad degree from Southern Connecticut State University, and that was a dual certification of special education and general education teacher. I got my master's from the University of New



England, focusing on the inclusion education. And then my sixth-year degree was just an advanced learning degree, which also came through the University of New England.
Q. Can I ask, when it says, master of education, dash, inclusion education, what does inclusion education mean per your understanding?
A. Inclusion education is how we support students who have special needs and how they can be included within the general education setting, as well as getting the supports they need to be successful in other locations such as the resource room.
Q. How do you make that determination?
A. Based on the students' current performance, any evaluations we may do, and observations of the students while performing here at school.
Q. Okay. And, pardon me. There was a little bit of a lag on my end, so I just wanted to confirm. You said evaluations and present levels of performance. Is that right?
A. Yes, and then any observations we have of students while here at school.

Q. Okay. Now, do you have certifications in the realm of education?

A. Yes, I have an Orton-Gillingham certification, which that's more of a reading certification. And -- sorry. And then my -- I have my teacher certification as well.

Q. Okay. What is Orton-Gillingham? You said reading certification. What does that mean?

A. It's a specific learning strategy for students who struggle with their ability to decode and encode words, and Orton-Gillingham is a multi-sensory approach which allows for more instruction to help these students with those needs.

Q. Okay. And tell me about your responsibilities as a special education teacher with Milford Public Schools.

A. As a special education teacher, I am responsible for providing the instruction that is listed through their IEPs. I work with a wide range of students in the resource room. So, typical instruction is pull-out instruction with students to the resource room, and I also work collaborate -- collaboratively with classroom teachers in



order to ensure when they're in the general education classroom that they're getting the most that they can from their learning.

Aside from just instruction, I am also responsible for -- for setting up PPTs, for running the PPTs and, as case manager to students, I am also responsible for finalizing the documents that go along with student records.

Q. Tell me about the learning profiles of the students you work with. What do their learning profiles look like?

What does the array look like?

A. Here, there's a wide range. Some students have just learning disabilities. So, it might just be in the area -- a student can have a disability in just math. They can have a disability in just reading. I also have students who have dyslexia, which is where the Orton-Gillingham training comes in, and these students have more focus on their decoding instruction.

I might have students who are academically capable but struggle in behavior abilities. So, they might have some time in



the resource room just to work in a smaller group setting to build up their tolerance to learning.

I have students who are on the [redacted] spectrum and may need a different variety of learning tools, and we follow their FBAs and their BIPs. I also have had students with intellectual disabilities, and these students are the ones who struggle most with their academic learning.

Q. Okay. In the course of being a special education teacher with Milford Public Schools, have you ever received any professional awards or recognition for your work?

A. Yes. So, last year I was JFK's teacher of the year.

Q. Great. Well, congratulations.

That's excellent.

A. Thank you.

Q. So, I'm going to take off Exhibit 38 at this point. Just give me a moment.

In your role as a special education teacher at JFK Elementary, did you ever become familiar with a Milford Public School



student named [redacted]

A. Yes.

Q. How did you become familiar with him?

A. At the beginning of his fourth-grade year, so it was the 2024 school year. He was assigned under my caseload as students that I would be working with.

Q. Okay. Let me just back up for a second. So, you said fourth-grade year and then the '24 school year. That could mean, in my understanding, two different things.

Could you clarify what school year did you first start working with [redacted]

A. Sure. I started working with him in September of, or August of the 2023-2024 school year.

Q. Okay. So, 2023 and 2024 school year.

That's his fourth-grade year?

A. That is his fourth-grade year.

Q. And did you continue working with him the next school year, the 2024-2025 school year, his fifth-grade year?

A. Yes, I continued as his case manager.

Q. Okay. So, were you a case manager and instructor?

A. Yes.
Q. Okay. And what area -- to clarify, you were providing his special education instruction?
A. Correct.
Q. Okay. Now, when he first got on your caseload, are you provided any information when the student appears for the first time on your caseload before that academic year begins?
A. Yes. So, I am provided with the student's IEP, and -- and typically we meet as a group and just discuss students who I technically inherit from the previous person, as I typically teach fourth and fifth grade here.
Q. Okay. So, I'm going to share with you what's been marked as Exhibit B-2 in evidence.
Now can you see Exhibit B-2? It's approximately -- it's 18 pages.
A. Yes.
Q. Okay. I just want to start and just kind of go page by page. When you said IEP that you're presented with about the student who's being put on your caseload, for [redacted] is this the IEP that you were given?
A. Yes, I believe so. It's a little small.



That's why I'm --
Q. Let me just zoom in just, so we're clear.
Okay.
A. Yes.
Q. So, this April 27, 2023, that was the IEP in effect at the time that [redacted] came onto your caseload?
A. Correct.
Q. And is it through this that you derive an understanding of what his needs are and what you're going to be working on with him?
A. Yes, it is the document that I build my instruction off of.
Q. Okay. And so, per this IEP, what was [redacted]s primary disability as you understood it?
A. His primary disability was [redacted]
Q. Okay. And I see a next reevaluation date, June 4, 2024. What does it mean by next reevaluation date?
A. Every three years a student who has been identified with a disability is eligible for a triennial review, which is where we would redo evaluations that had been done to track any progress, or any deficits, or areas of need, that a student might need.



Q. Okay. And it says over to the left, current grade three. So this was an IEP put into place when he was in third grade?
A. Correct.
Q. But it carries over to at least the beginning of his fourth-grade year?
A. Correct, yes.
Q. Okay. And let me just go through who's listed here. I see, and I know you weren't at this meeting, but who do you understand Robert [redacted] to be?
A. That is [redacted]s father.
Q. And Karen [redacted]
A. That is [redacted]s mother.
Q. And Charlotte Adinolfi?
A. Yeah, Adinolfi. She was his current case manager at the time of this PPT.
Q. Okay. And she was the special education teacher?
A. She is also a special education teacher, yeah.
Q. Okay. So, was it her role that you were then -- you were replacing her role going into the '23-'24 school year?
A. Correct.



Q. Okay. Scrolling now to page 2 of 18 on Exhibit B-2, is this the document that you referred to to determine what services [redacted] needed as part of his IEP?
A. Yes. So, at the beginning of every year, we create a schedule and I work off of this document in order to schedule the times that [redacted] would be meeting with me specifically for the reading, writing, math, and executive functioning listed.
Q. Okay. And would you just explain under services what each of these lines mean in terms of what [redacted] was going to be receiving?
A. Sure. So, reading 5 times 30 weekly means that there would be 5 times a week for 30 minutes that he would be pulled out into the resource room to address the specific goals and objectives that were created for him in this IEP. The same thing goes for writing and math. So, it's written that way to try to spread consistently throughout each of the five days of the week that we are here.
And then his executive functioning, it was felt, I guess, that he did not require it every day. So, it was 4 times 30 a week to

meet those needs.
Q. And do you recall, is that pull-out support or push-in support when he's in the general education classroom? A mix?
A. It's -- all of the academic instruction is all pull-out, and so was his executive functioning at the time.
Q. Okay. And what does speech mean?
A. That is the speech and language pathologist services. So, that states that she was seeing him 3 times a week for 30 minutes.
Q. Uh-huh. And what does it mean by counseling?
A. Counseling could be provided by one of our mental health staff members, which could be the school psychologist or the school social worker. And he was meeting with them, it says, for a total of 2 hours and 45 minutes for the week. They just wrote it differently than the rest of us as it gives them flexibility within their schedule of when the times would be scheduled for him.
Q. Okay. It says on the second to last line here, ESY, colon, social skills.
What is ESY?
A. ESY is extended school year, and other --



otherwise known as summer school.
Q. Uh-huh. And when did you --
A. And then, social -- sorry, social skills is a program opportunity for students over the summer to be in a class where all the students are working on their social skills.
Q. And how did determinations get made? I see here it says [redacted] needs extended school year services for social skills. I know you weren't at this meeting, but how do typically teams determine whether a student needs extended school year services?
A. So, over the course of the year, we're tracking their data all depending on the students. Specifically with [redacted] it's not only academics that get tracked for him, but also behavioral and input from the social skills teachers as well as the school psychologist, or the social worker.
And then there is a team discussion about what program that we have here in Milford Public Schools would be most appropriate to meet the needs that he would need for that extended school year program.
Q. Uh-huh?



A. Some students do not qualify for the extended school year program, and that is if we feel that they will not regress over the summer.
So, based on suggestions such as this, it would be that the school feels that he could have social regression if he's not with peers and in a program for the summer.
Q. Now, this meeting took place in April 27, 2023. So, that's roughly -- what? About a month and a half before school is going to end, about two months. Is that right?
A. Correct.
Q. Okay. So, was this an annual review, according to this IEP, that you're looking at here?
A. It was not.
Q. Okay.
A. Just --
Q. When -- go on.
A. Sorry. This was a review or revise of an IEP.
Q. When an IEP says review or revise the IEP, what do you take that to mean?
What's your understanding of that term?
A. So, that means it is not an annual review, so



that we would not be providing all new IEP goals and objectives during this time. But there was some area of the IEP that needs to be addressed and either reviewed with the family or needed to be revised based on something that may have changed, or observations.
Q. When an IEP is listed, or the purpose of the meeting is review or revise, does that mean for sure the IEP is going to be revised?
Or it's open for conversation?
A. It does not mean that an IEP is going to be revised. It is open for discussion. It may just be that, for example, the family might just want to review what the goals are and the current performance, and that is sufficient for that meeting.
Q. And so, here as part of the April 27th PPT meeting, which isn't an annual review, I see there's a determination that he is going to get social skills. Is that right?
A. Yes, for the summer program.
Q. So, that was made closer to the end of the 2022-2023 school year?
A. Correct.

Page 73

Q. Okay. Now I see at the top it says the PPT recommends the following. The parents requested a change of placement and the school team felt he could be appropriately educated at his home school.
I know you weren't at the meeting. I'm not asking you to opine on the decision, but what did you understand that IEP meant by appropriately educated at his home school?
A. What I understand is that the team had made those service recommendations and the ESY recommendation, and felt that JFK can offer him the type of programming that he would need to be successful.
Q. Okay. When you have been part of decisions about a placement, are you talking about the student, what you anticipate the student is going to need some time in advance?
Or are you looking at the student as they present right at that moment of the time of the decision?
A. When we make these recommendations, it's what we're seeing at that moment and that is what the recommendation is based on.
Q. So, it's your understanding that at the

Page 74

moment of this PPT meeting, that team believes that he could be appropriately educated at JFK?
A. Correct.
Q. Okay. Now -- so, this IEP lays out the services that you're going to be responsible for implementing for [redacted] for the '23-'24 school year?
A. Correct.
Q. Were you provided with a progress report for [redacted] that closed out the '22-'23 school year, so you had an idea of where and how he was performing?
A. Yes. When I become the case manager, I have access to all of those documents through, at that time it was CT-SEDS.
Q. Okay. So, I'm going to shift for a moment and put in front of you what's been marked into evidence as Exhibit B-3. Just give me one moment as I maneuver.
Now, can you see B-3 in front of you on your screen?
A. Yeah. Can you make it a little bigger, please?
Q. Yes, I will.

Page 75

A. Thank you.
Q. How's that?
A. Yeah, that's better.
Q. Okay. I can do a little bit more, but I don't want to.
So, when we were talking about the progress report that you received, is this the progress report from June 13, 2023, that summarizes where he was at, at the close of the '22-'23 school year?
A. Yes, it is.
Q. Okay. And let me just ask just so we can understand the terms that are listed. So, when it says, annual goal, there's a goal area for reading and then the annual goal.
What, you know, in your understanding, are the goals that are being referred to and how are they determined?
A. Yes. So, this lets me know that this is the area of reading, and that this will -- the goals that follow and objectives that follow should address specifically the needs that [redacted] has in order to help him increase those areas.
Q. Okay. And then, the objectives, what's the

Page 76

difference between objectives and goals?
A. A goal is the overlying umbrella goal of what you would want him to do. So, specifically here, this one is speaking about building his comprehension skills. And then each objective is there to break down how a teacher will do specific tasks or reach specific goals, which are labeled objectives, in order to overall increase his comprehension skills.
Q. And where it says, current status, this column right over here next to the objective, what does it mean when next to an objective it says satisfactory progress?
A. That means that the person who put it in feels that at the time [redacted] is making sufficient progress towards mastery of this goal or objective.
Q. Okay. And at the bottom there I see an objective has been marked as limited and minimal progress.
A. Uh-huh.
Q. Why does that get listed as a progress marker or description?
A. Based on data, if a student isn't showing

that they are able to do what is listed in the objective and they're not making that sufficient progress going on, we put in limited or minimal progress to just explain that we aren't seeing the progress we had expected or hoped for for this objective or throughout the annual period.
Q. Now you just said, based on data.
A. Uh-huh.
Q. What do you mean when you're referring to data?
A. So, in each objective we specify student accuracy or a percentage and we are, as special ed teachers, are required to go through each, each of the objectives and we track the data, so the student's ability to complete certain tasks.
And we take that percentage of data and we enter it here on a progress report for their -- what their current score is and what we hope their target score would be.
Q. So, do I understand you that the progress report itself is a summary of the data collected demonstrating whether or not [redacted] fulfilled a specific goal or objective?



A. Correct.
Q. Is this the primary means by which you share data collected on a student?
A. Correct. This is how we share the data.
Q. Okay. And how often are progress reports shared with parents or guardians of students with special education needs?
A. Progress reports are shared at the same time as general education progress reports, which is three times a year in elementary school.
Q. Typically, how are progress reports sent home or communicated to parents and guardians?
A. So this, specifically, our special ed progress reports have changed a little bit over the course of the past few years. We adopted this new program, CT-SEDS, and that is where all of our IEPs, progress reports, and information have to go.
So parents, we are -- we have been transitioning to, over the past two years, have all parents access their progress reports through their CT-SEDS login. If we get a specific request from a parent asking for a copy sent home, we're more than happy to print it and send it, but this is similar



to what they do for their general education progress reports through PowerSchool.
Q. Okay. So, you've explained you have the IEP for [redacted] you have the progress report at the close of the school year as to how he was performing. I know we're talking about some time ago, but could you just walk me through at the beginning of the 2023-2024 school year, what did it look like when you were instructing [redacted] What was a typical, you know, service day? What did that look like?
A. Sure. So typically, he would start his day in the general education classroom always, because they would always start the day off with morning meetings. So, that was something for him to participate with. He would follow his class to specials.
And then when it came time to academics, that is when I would pick him up for his specific instruction. So, if math were to start, he would get a half an hour of that allotted math time with me. I would pick him up and bring him to the resource room.
He would typically be with a couple other students. The grouping varied based on



my whole caseload. And as we would begin, he would have his first-next-then chart with him, and we would fill out what his expectations for our session would be. And we would work together.
Every student, obviously, who comes to the IEP has their own specific goals and objectives. So, at time I might have given him an independent task to work on while I address other students and vice versa. But all together the students were there and he was following along with expectations, and the same would happen in reading and writing.
Q. And when you say the first-next-then approach, why were you using that approach with [redacted]
A. I was specifically using that approach because that is what was listed within his behavior intervention plan as a tool and strategy that he can use.
Q. Okay. And the behavior intervention plan, is that incorporated as part of the IEP as an accommodation?
A. Yes.
Q. Okay. We'll talk about that a little later,

but when you were working with him at the beginning of the 2023-2024 school year, did you see, like, the weaknesses that had been described in the previous IEP provided to you?

A. Yes. So, it was -- it was clear that math was an area of difficulty for [redacted] He was -- is a phenomenal decoder and encoder, but after reading those passages perfectly he had a lot of difficulty understanding exactly what it was. He was reading down to the basic levels of who, what, where was going on in the story.

And then writing was also a difficult task. Although he can spell accurately, coming up and generating ideas was something that was difficult for him.

Q. And what did you find was the best way to support him in improving upon those areas of deficit?

A. So, breaking down tasks into very small chunks seemed to be most appropriate for [redacted] And he also benefited from having choice time after completing tasks. So, this is where, as he got through the expectations,



that he would be provided with a time where he can have a choice, which would last about three minutes, and then he would come back and start up his next task that we would do with the first-next-then.

Q. Okay. And how did you come to that approach and that strategy?

A. Again, that was something that was suggested, suggested on the BIP.

Q. Okay. And by BIP, you mean behavior intervention plan?

A. Correct.

Q. Okay. What was it like working with [redacted] at first in terms of his demeanor and your relationship at the beginning of the '23-'24 school year?

A. At the beginning of the year, there were no behavioral challenges. At times he would do some of his, like, rocking or stimming behaviors, but those are all a part of his disability. But those were not things that at the time interfered with his academic learning at the beginning of that school year.

He was not vocalizing often at that



time, and he was compliant with -- with teacher requests.

Q. So, the setting that you were working with him at the beginning of the '23-'24 school year, the pullout into the resource room with a small group or individual, that, in your opinion, was that an appropriate setting to work in goals and objectives for your services?

A. That was appropriate at that time.

Q. Okay. Were you in contact with [redacted]s parents at the beginning of the '23-'24 school year? Were you letting them know how things were going?

A. Yeah. So, I sent a couple e-mails at the beginning of the year just sharing with them some times that [redacted] had excelled while he was in the resource room, just to build up that relationship and allow them to hear how great he was doing at the beginning of that school year.

Q. Okay. Did you have a PPT meeting prior to the annual review for [redacted] during the '23-'24 school year?

A. Yes. So, at the beginning of the school



year, there was a parent request for a PPT.

Q. Okay. I'm going to share what's been marked as Exhibit B-4 with you now.

Can you see the document right now, individualized education program at the top?

A. Yes.

Q. Okay. So, I see the meeting date here is November 30, 2023. So, that's during the '23-'24 school year. Is this the PPT meeting that you were referring to that took place before the annual review?

A. Yes.

Q. Okay. And I have to note, it says Case Manager Charlotte Adinolfi.

A. Yes.

Q. I think it said that you were the case manager for the '23-'24 school year.

Is that a typo that her name is listed?

A. It was, yes.

Q. Okay. And the program that you used to create the IEPs, is that the CT-SEDS program?

A. That is the CT-SEDS.

Q. Okay. Was 2023-2024 the first year that the District was using the CT-SEDS program?

A. No. I believe the previous year was the

first year.
Q. Okay.
A. More of like a start -- it was towards the end of the year, it was start transitioning your IEPs into this new system. And this was the first full year that from beginning to end all IEPs were required to be in CT-SEDS.
Q. How was the transition to using CT-SEDS?
A. It's not an easy transition. I believe our district is still working out some of the kinks. There are just little things such as where to find, how to change the case manager was coming up. They were still working on things, as you could see, also school next year.
We finally got a directive at the end of last year, how to make sure that the school next year will roll over as the District was figuring all these things out with CT-SEDS.
Q. Okay. At the time of the November 30, 2023, meeting, you mentioned previously you'd been in contact with the parents.
A. Yes.
Q. So, was it your understanding that they knew you were the special education teacher



working with [redacted] at the time of this meeting?
A. Yes.
Q. And the case manager as well?
A. Correct.
They requested the meeting through me.
Q. Okay. So, what was the purpose of this meeting? You mentioned the parents have requested it.
A. Yes. It was just more of an opportunity for everybody to get to know each other, since this was a very new team to [redacted] I was new to him. Our principal was new to our school at the time, so. And I think the teacher leader was there as well, and she was new to our school.
So, it was an opportunity for us to all be on the same page about this student.
Q. Okay. You mentioned there was a new principal. Is that Amy Rizzo who's listed as the administrator or designee?
A. Yes, she was our new principal for that school year.
Q. Okay. And I see both parents were in attendance. Is that right?



A. Correct.
Q. Okay. And just real quick, just to clarify, what was your understanding of the relationship of the parents? Were they together? Married? Separated?
A. My understanding was that they were divorced.
Q. Okay. But they were both present at the PPT meeting on November 30, 2023?
A. Correct.
Q. And were they both active participants during that meeting?
A. Yes.
Q. Okay. So, I see here the team recommendations that no modifications need to be made to the IEP. The IEP will continue to be implemented as written. To the best of your recollection, can you tell me about what happened at the November 30, 2023, PPT meeting? What was discussed?
A. To the best of my recollection, we -- we went over what his current goals are, what his --
[Interruption.]
Sorry. What his -- sorry. What his current performance was, how things (inaudible) --



Q. I'm just going to stop for a moment.
A. Sorry.
ATTORNEY ROSEN: At least on my side, I'm getting a little feedback and a little delay.
THE HEARING OFFICER: I think the Witness actually kind of froze on the screen.
ATTORNEY ROSEN: Yeah, yeah. I think first --
THE HEARING OFFICER: So, let's go back a little.
BY ATTORNEY ROSEN:
Q. Yeah. So, let me just -- Ms. Truscello, I'm going to ask the question again, and I apologize if you already started answering.
But my question was, what happened at the November 30, 2023, PPT meeting? What do you recall discussing?
A. Yeah. So, I just recall discussing currently how he was doing, how his transition into fourth grade was, and any of my specific noticings which, at the time, [redacted] was doing a great job transitioning from his classroom to the resource room. And, yeah. So, it was just an update and more of a get to know you as a whole for [redacted]
Q. Do you recall, did the parents have any questions or concerns that they wanted

addressed by the team?
A. Not that I can recall.
Q. Were the parents afforded an opportunity to meaningfully participate, give updates and their impressions as to how things are going?
A. Yes, they were. At this meeting it was a very nice back-and-forth conversation, and everyone seemed to end on a positive note for this PPT.
Q. Okay. Just scrolling down here, we've talked about the parents being -- providing meaningful, you know, having the opportunity to meaningfully participate. This section here under present levels of academic achievement annual goals, parent and/or student input, what's the purpose of this section of the IEP?
A. Sure. So, it's an area where we can reflect any questions, concerns, or any positive notings that a parent speaks about at a PPT.
Q. Okay. And is this statement that the parents express their understanding of the academic expectations for [redacted] at this time, they're happy he is making personal growth, goes to the academics, to the best of your



recollection, is that an accurate reflection of the input that they shared with the team?
A. Yes.
Q. Okay. I'm going to scroll down just for a moment.
There's also a portion here, this is page 8 of 18 of Exhibit B-4, where under functional performance it says, parent and/or student input. What's the difference between the parent and/or student input section that we just talked about and this one listed here by functional performance?
A. At the top, it's more geared towards their feelings towards the student's academic progression. Functional performance is more based on behavioral or social needs, which is also why those areas such as communication and counseling goals fall underneath that area, because that's what we are speaking specifically towards.
Q. Uh-huh. Okay. And was this statement that the first-next-then chart also helped keep consistency with routines at home, is that an accurate depiction of your conversation during the November 30, 2023, PPT meeting?



A. Yes. So, as I had mentioned, the first-next-then was very successful at that time, so I had run out real fast just to grab both parents a copy, a laminated copy of that with dry erase markers in the hopes that we could have some carryover of what has been successful for [redacted] at school and they could do it at home as well.
Q. Was it common for you and other service providers to share tools that worked at school that could be then applied at home?
A. We would verbally share the tools. We don't always provide the actual tool to the parents.
Q. Okay. Why would that be to not provide the actual tool?
A. Depending on what the tool might be, it might be something that would be difficult to replicate to share at home. But the way that I had created this tool, it was something that I replicated easily and provided to all staff members in the building who work with [redacted] and I had extras. So, it was easy to share with the family as well.
Q. Okay. Was a prior written notice issued



after this meeting?
A. I believe so.
Q. What, to your understanding, is a prior written notice?
A. A prior written notice is kind of the final written notification that the IEP has been finalized and whether or not there were any specific requests that were approved or denied during the PPT meeting.
Q. Okay. So, I'm going to just show you what's been marked as Exhibit 5 in evidence.
So, the date listed here on this prior written notice it says, November 30 of 2023. Is this the prior written notice that you were referring to that was sent out after that meeting?
A. It should be.
Q. When it says, continue the services and support as described in this IEP document, why -- was this prior written notice reflective of the PPT's decision that the services [redacted] was then receiving were appropriate at that time?
Is that what that means?
A. Correct, that his goals and objectives were

appropriate at the time as well as the services that were going to be provided.
Q. And --
A. The service times, sorry.
Q. And what information do you use outside of an annual review when you meet as part of a PPT meeting? What information do you use to make that determination that the services and support in the IEP are currently appropriate?
A. We use current performance, any data that has been collected by multiple members of the team. And we also work with parent input as well to see what their feelings are about progression as -- as well.
Q. And again, how is that data reported to the parents?
A. That data is presented through the -- the progress reports three times a year at the -- the given trimesters.
Q. And would it also be reflected in the IEP and the present levels of performance listed in the IEP?
A. Yes.
Q. Okay. Now, you mentioned progress reports sent out three times during the year. To



your recollection, was the District sending out progress reports at least three times during the 2023-2024 school year?
A. Correct.
Q. Okay. So, I just want to share with you now what's been marked in evidence as Exhibit B-6. So, this progress report, the date, it says November progress report, but I see at the top 12/14/2023. So, is this one of the progress reports that is sent out, one of the three that you said was sent out during the school year?
A. Correct. So, the discrepancy between November and the December is that a trimester ends in November, but the actual processing of the progress report happened on December 14.
Q. I see. But this is reporting back on his progress during that time, during that trimester?
A. Correct.
Q. Okay. They don't make it easy for you, do they?
A. They don't.
Q. So, on the progress report, so this was the



reading comprehension goal that we revisited earlier.
A. Uh-huh.
Q. And so, when it says mastered, can you just explain your understanding of what that means?
A. Sure. That means that the student met the parameters of the objectives that have been created on the IEP.
Q. Okay. So, at this time [redacted] mastered his, many of his objectives for reading comprehension skills?
A. Yes.
Q. Okay. And so, scrolling down, the progress report, does it break down -- it summarizes the data for each area that you're working on with [redacted]
A. Yes, each objective that is being worked on.
Q. So, this annual goal two, improving writing abilities; all data you have on how he was improving his writing abilities would be encompassed in these reports on his objective?
A. Correct.
Q. Okay. And I just want to scroll down to when



a student is struggling with an objective based on your data. So, for example, the objective of correctly identifying the place value of a given number within 10,000 for 8 out of 10 problems across three opportunities, I see here limited minimal progress. Do you provide an explanation in the present levels of performance as to what, you know, what area is being focused on?
A. Yeah. On the IEP, it -- it would reflect that we are working on coins and understanding of coins.
Q. And I see a description here that he continues to struggle of identifying place value?
A. Correct.
Q. So, when an objective is -- there's limited progress on objective, what do you do in response to that? Are you ignoring that objective, or do you continue working on it?
A. I don't ignore it. I continue to work on it. I try to find different strategies to -- to see if there's something that helps him better understand the topic being taught.
Q. When a student is making limited or minimal

progress, is that reason to believe that a provision or a section of the IEP should be modified to try and address that limited progress?
A. Yeah, we can do that.
Q. Okay. Now, I see some limited and minimal progress objectives with respect to math computation skills. And I understand you said that that was a weakness of [redacted]s that he exhibited prior to you working with him.
Right?
A. Correct.
Q. Okay. Looking -- and I know we're just doing a brief scan of the markers here, but at the time that this progress report was shared, December 14, 2023, did you as the special education teacher working with [redacted] think, well, the program we're providing right now at JFK is appropriate?
A. At that time, yes.
Q. Okay. So, you would use the progress reports as the primary indicators as to whether a student is making progress or not?
A. Correct.
Q. Okay. Now, do you recall when [redacted]s last



triennial review was?
A. Yeah. So, it was in the spring of that school year. So, February of 2024.
Q. Okay. So what, in your words, is a triennial review? What's the purpose?
A. The purpose is to get a deeper understanding of students' current performance. We do it every three years, and it is also used as a determination of continued eligibility for special education services.
Q. Okay. And prior to your involvement, were you aware as to whether or not the parents had consented to triennial evaluations to be done during the course of the '23-'24 school year?
A. Yes, I was told that we did have consent.
Q. Okay. I am just sharing this with you now. This is Exhibit B-1. When you referred to the consent for the evaluations, this two-page document, it says dates in January 26, 2023, and signed February 2, 2023.
Is this the consent form that you're referring to?
A. Correct.
Q. And I see that this was signed by



Mr. [redacted] Correct?
A. Yes, it is signed by him.
Q. Were you given any indication at the time that you received [redacted] and prior to conducting his triennial review, so whether there was any disagreement from either of the parents on the types of evaluations that were going to be applied?
A. No, nobody said anything like that.
Q. Okay. And so, specifically here I see a few areas of evaluations listed. The academic evaluation, was that an evaluation that was going to be within your purview?
A. Yes.
Q. Okay. Now, this Exhibit B-1 refers to, I see a few different entries for a school psychologist. I see adaptive behavior, intellectual and cognitive functioning. The last -- second-to-last line there is behavioral, social, emotional.
A. Uh-huh.
Q. Was that all areas that were to be assessed by a school psychologist?
A. Correct.
Q. Now, you're a member at this -- at the



'23-'24 school year, you're a member of [redacted]s planning and placement team. Right?
A. Correct.
Q. So, did you see evaluations that were completed by other evaluators or service providers for [redacted] in addition to your own?
A. Yes, they were shared with me and I was there as the other providers reported out on them to the family.
Q. Is that -- when you say, reported out on to them, is that something, a conversation that took place at the triennial review?
A. Yes, at the triennial annual PPT is when we go through our evaluations and findings.
Q. Okay. So, I want to show you what has been put into evidence as Exhibit B-7. So -- I'm sorry, it's not sharing. One moment.
So, this is the psychological evaluation. I see evaluation dates for January, throughout January 2024. Would this have been one of the evaluations that was shared with you as the case manager and special education teacher for [redacted]
A. Correct.
Q. Okay. And this was conducted by your school

psychologist. Is that right?
A. Yes, by Jen Davis.
Q. Now, did you contribute to any of the rating scales that were listed here? I see there's teacher form. Was that you, or would that have been the classroom teacher who would have filled those?
A. That's his -- yeah, that's his classroom teacher.
Q. Okay. But were the reports and the observations shared with you in your capacity as a special education teacher?
A. Yes.
Q. So, I want to direct you to page 7 of 10 here. So, I'm going to scroll down.
Now, there's a section here reporting on, I believe, entries from the social responsiveness scale. And the description here is that [redacted]s teacher and mother report that [redacted] demonstrates moderate to severe difficulty in his ability to pick up on social cues, to interpret social cues once he picks up on them, and with his expressive social communication.
Now, I know you're not the school



psychologist. I know you didn't do this assessment, but you worked with [redacted] fairly often as a service provider on his IEP.
Right?
A. Correct.
Q. Would you agree with this description of [redacted] as provided through the psychological report?
A. I would agree with it.
Q. What did difficulty look like on picking up social cues when you were working with him at this time in the '23-'24 school year?
A. So, picking up on social cues would happen. I would see more when he is in a larger setting. So, if I were going in to pick him up from class or dropping him off, [redacted] often didn't know how to appropriately engage with his peers. So, he might say something funny or he may do something funny. And these are the ways that he was trying to gain attention based on people's perspective. So, at times he may be redirected, and he felt that he was getting in trouble for the redirection.
His misinterpretation of redirections often led to him having a feeling that someone was upset or angry with him.



Although this might not be it, it's just a simple, if the class is working right now it's not the right time to try to engage your peer.
Q. Okay. And was this then an area that was focused in for the subsequent IEP to support [redacted]
A. It was. The social worker and -- and I added --
Q. Okay.
A. -- some social skills, yeah.
Q. Let me just go down to page 9 of 10, so this summarizing the conclusion. And we're not going to get into each and every rating. I think the document speaks for itself, but I wanted to ask a question on the third paragraph here, the results of the NEPSY-II.
A. Okay.
Q. Now, per the psychological evaluation, it says [redacted] has difficulty categorizing and shifting between concepts, shifting to a new and complex set of stimuli, maintaining his attention while both inhibiting previously learned responses and correctly responding to new stimuli. It then goes to say that he had



difficulty maintaining his auditory attention over time, as well as planning and organization.
Are these descriptions that you would agree with based on your experience working with [redacted] at this time?
A. I do. I would.
Q. And it later says that, this second to last sentence in the third paragraph, [redacted]s ability to understand that others have their own thoughts, ideas, and feelings that may be different from his own and his understanding of figurative language as well below -- was well below the expected level.
In most cases, he was unable to predict what others could be thinking or feeling. You talked about earlier seeing his struggles with picking up on social cues. Is this description about perspective taking, is that something that you saw when you were working with [redacted]
A. It was something that I increasingly saw begin to happen, where there he had a lot more misinterpretations of what expectations are and his understanding of what it was that

he was supposed to do.
Q. Okay. And these are observations that you saw around the January 2024 time, or that, you know, partway through the '23-'24 school year?
A. Yes. So, attention had always been a difficulty for [redacted] like honing in on his --
Q. Ms. Truscello, just --
A. (Unintelligible) --
Q. Sorry. Just --
A. -- first-next-then was something that (unintelligible) because attending for long (inaudible) --
Q. Ms. Truscello --
A. I know. My Internet is not good here.
Q. Yeah. I'm sorry, Ms. Truscello, just real quick, if you could just pause for a moment? Let's make sure that you're back with us.
I think you were frozen a little bit.
A. Yeah.
Q. Can you hear me clearly?
A. Okay.
Q. You can hear me?
A. Yeah. So, something's popping up about bandwidth on my thing. When that happens --



I can hear you. Can you hear me?
Q. Yes.
A. I can hear you.
Q. Okay. Can you hear me now?
A. Yes.
Q. Okay. Thank you. So, I'm just going to ask you to repeat your answer, because I think it got broken up and I couldn't hear.
A. Okay.
Q. Let me know if you need the question again.
A. No. So, this was something in terms of his attention that was seen -- it's saying low network bandwidth.
Can you guys still hear me?
Q. Yes.
A. Okay. That was seen over the course of the year from the beginning of the year, which is why I utilized the first-next-then to have smaller chunks of learning happening for him. But his perspective taking was something that we did see was difficult for him to understand what his peers' interests were, what's the expectation that adults are giving him as well.
And as the school year progressed



towards the end, it became clear that it was a little more difficult for him.
Q. Okay. We've talked about -- and I'm just going back to Exhibit B-1. So, there was the psychological evaluation that was done. There was also a speech and language evaluation. Was that shared with you in your capacity as [redacted]s case manager?
A. Correct.
Q. Okay. So, let me briefly just pull up.
Okay. Can you see what's listed as the special education speech-language reevaluation report?
A. Yes.
Q. And is this the speech-language evaluation that you recognize or recall being shared with you in your capacity as a case manager?
A. Yes.
Q. Okay. I want to -- and I see there was a series of assessments completed. I want to go down right now to the conclusion section. It's the conclusion section, I assume, that's reported out verbally during planning and placement team meetings in your understanding or practice?



A. Yeah, sometimes providers will go through each area. Sometimes they will just go off of the summary at the end.
Q. Okay. Looking at this summary, per the speech-language evaluation, there's descriptions of deficits in receptive and expressive language area, difficulties with attention, which you alluded to earlier, and that [redacted] often required redirection to tasks along with visual support, repetition, and cueing. I think you talked about this a little bit with your first-then board.
Is that in line with what you were seeing and the type of support he needed when you were working with him?
A. Yes.
Q. The next sentence in this conclusion paragraph says, [redacted] continues to demonstrate weaknesses with critical thinking and verbal reasoning. Did you see this in the context of working with him?
A. Yes, this is what's impacting his comprehension and understanding of things such as math concepts.
Q. Okay. And the last -- the second-to-last

line here says, finally [redacted]s weaknesses and social pragmatic areas impact his ability to interact appropriately with others. He continues to require structured practice and monitoring for expected behavior when interacting with others and to develop social problem-solving skills.

When it says, he continues to require structured practice and monitoring, was that a need that you also saw in the context of working with him?
A. Yes.
Q. Okay. Now, we've gone through two evaluations I know you didn't conduct, but these were members of [redacted]s teams identifying areas of need that now you've said you saw as well in the context of working with him. Right?
A. Correct.
Q. And you completed the educational evaluation for [redacted]
A. I did.
Q. Okay. So, I'm going to put before you what's been marked into evidence as B-11.

Ms. Truscello, do you recognize this as



your educational evaluation?
A. I do.
Q. Okay. This is the evaluation you completed in January of 2024?
A. Correct.
Q. Now, what assessments did you use as part of your evaluation?
A. I used an evaluation called the Why-ett [phonetic], I call it. Some people may refer to it as the Wee-ott [phonetic].
Q. And what is the WIAT?
A. Okay. It is an educational assessment which looks at a student's reading, writing, math skills, as long as -- along with some of their receptive and expressive vocabulary.
Q. Okay. And why did you choose to use the WIAT as part of your evaluation?
A. So, the WIAT doesn't only do a quick glimpse of things. It digs deeper. So, for example, for reading we get an understanding of a student's phonological awareness skills. So, this is their ability to manipulate sounds within their brain and be able to produce answers. They also have the opportunity to read words and passages, so we can see what



their decoding ability is.

After that, they also are able to answer comprehension questions, both listening comprehension and reading comprehension, so we can get a gauge of whether it's decoding or not decoding that might impact any issues they have with comprehension.
Q. Okay.
A. It's similar to writing and math. So, writing gets to break things down on a word spelling level, sentence level, paragraph level. Math also breaks down to a student's math facts skills, compute -- ability to compute, and also their problem solving.
Q. Did you feel a need to use any additional academic assessments as part of your evaluation?
A. I did not. I feel like this was an accurate representation of [redacted]s current academic skills.
Q. Okay. So, at this time, the reading composite, I see it says below average.
A. Uh-huh.
Q. But then there's a lot of average scores with regards to coding. So, does that go to what



you were talking about, decoding being a relative strength of his?
A. Yeah. So, all the average areas were areas where he was just required to read something aloud to me.
Q. Okay. And scrolling down for a moment on the scores of below average with regards to written expression, you mentioned written expression was a weakness of his. And so, were these the scores that you were using to gauge kind of where he was at, at that time?
A. Yes.
Q. Okay. And likewise, with respect to -- what is orthographic processing?
A. So, that's -- that's a little bit more into a tool that we use with students who have dyslexia where they struggle more with their ability to recall high-frequency words, but also their ability to spell things. So, it's -- it's more in that realm of the reading for a learner.
Q. So, you were testing to see if that was a present deficit?
A. Or a strength.
Q. Okay.

A. Something to show that this is an area that [redacted] is good at.
Q. I see. And then you mentioned math was an area of struggle, so I assume this --
A. Yes.
Q. -- these results confirmed that it was still an area of struggle for him at that time?
A. Correct.
Q. Okay. Do you believe that the WIAT was -- did you use it as -- is it a technically sound instrument for assessing the student's academic ability?
A. It is.
Q. And did you believe that your assessment was selected and administered in a way likely to yield accurate information about what [redacted] could do and was able to do academically?
A. I did. So, yeah, we did -- I did it in small chunks, knowing that his attention cannot maintain long periods of time. And it was individually administered, just me and him in a room.
Q. Okay. And did you have the requisite knowledge and training to administer that evaluation?



A. I did.
Q. So, we talked about this was in preparation for a triennial review where the parents noticed that the triennial review was going to take place.
A. They were.
Q. Sorry. Just one second.
So, I'm going to just put forward what has been marked as Exhibit B-10.
So, this notice here dated February 1, 2024, for a date for February 8, 2024; is this the notice you were referring to for both the annual review and the triennial review?
A. Yes.
Q. Okay. Did you have any -- did you receive any communication from the parents as to any concern about the timing of that meeting or whether or not they'd be able to make it?
A. Not that I can recall.
Q. Okay. It lists here with the meeting that there were going to be -- who was going to be in attendance or who was invited. I see here BCBA. Can you tell me what BCBA is?
A. Sure. That she is a certified behavioral



analysis person who supports our district. She has -- she -- she is the one who collects the data that we are tracking on a student, and she compiles it and updates the behavior intervention plan.
Q. To your knowledge, is Ms. Carano still employed by the District?
A. No, she's not.
Q. Okay. Now you mentioned previously that [redacted] had a behavior intervention plan. Is it Ms. Carano who was responsible for overseeing and helping revise the proposed revisions to that plan?
A. Yes.
Q. So, I'm going to share what's been marked as Exhibit B-8. Is this the behavior intervention plan that you recall being in existence or proposed in February of 2024?
A. Yes.
Q. You've got four pages here. Okay. Now I see you're listed as the special education teacher. Did you also provide input that led to any revisions in the behavior intervention plan?
A. Yes. So, after Ms. Carano took the data from



us and did observations, we would speak as to how the first-next-then, in how that process is working and whether or not [redacted] is being successful with it.
Q. Okay. Now these target behaviors that are listed, these are target behaviors, I assume, which were present before you started working with [redacted]
A. Correct.
Q. Elopement, was that something that you were seeing for [redacted] at this time in the 2023-2024 school year?
A. At the beginning of the school year, no, we weren't seeing any of that.
Q. What about calling out and making noises?
A. It -- it was not -- at times, again, due to his disability, he might have a little stim or noise, but no, it was not a common occurrence that was happening.
Q. What about misuse of materials?
A. He was not misusing materials.
Q. And what about work refusal at that time?
A. At that time, he was not refusing to do the work. He was complying within the parameters.

Q. Okay. And as a member of the special education team for [redacted] were you then provided this list of intervention strategies that's encompassed on page 2 and 3?
A. Yes.
Q. Okay. And were these strategies that the team was expected to utilize with [redacted] during the provision of educational services?
A. Yes.
Q. Okay. Now, to your understanding, were the parents provided a copy of this behavioral intervention plan as well as copies of the evaluations that we reviewed prior to the triennial PPT meeting in 23'-24?
A. Yes, they were provided them.
Q. Okay. And were the parents provided also with a progress report as to how [redacted] was performing on his goals and objectives?
A. Yes. So, this is the one time of year that outside of the triennial or tri -- trimester dates that a parent receives a finalized progress report that does a final encompassing report on how the student achieved with the goals and objectives.
ATTORNEY ROSEN: Okay. Before I continue, I'm



cognizant of the fact that we've been going since 11:04. I just wanted to check in. I still have a good amount of information that we need to get through, and I'm cognizant that we've been here for over an hour and 15 minutes on the examination.
Ms. Truscello, do you need a break? Or could we perhaps go until -- I defer to Hearing Officer Kennedy. I just don't -- I don't think I'll have my complete direct examination done by the time we need to take a break, and I just want to identify when is an appropriate time and also the comfort of the Witness.
THE HEARING OFFICER: Well, you want to go until 12:30. That will --
BY ATTORNEY ROSEN:
Q. I would defer to, Ms. Truscello. Are you able to go to at least 12:30?
A. Yes. Then, just so that you -- so, the dismissal will happen. At around 1:20 the announcements will start, and they won't end until about 1:40.
ATTORNEY ROSEN: So --
THE HEARING OFFICER: So, why don't we go until 12:45 then.



KAREN [redacted] Can I just -- can I ask if we can take, like, a five-minute break just so I can run to the ladies room?
THE HEARING OFFICER: All right. We'll be off the record for five minutes.
KAREN [redacted] Thanks.
ATTORNEY ROSEN: Thank you, all.
I'll see you back in five minutes.
THE REPORTER: Pausing the record.

(Pause: 12:16 p.m. to 12:24 p.m.)

THE HEARING OFFICER: All right. Everyone all set to go back on the record?
THE REPORTER: Ready to go on the record.
THE HEARING OFFICER: Okay. We can proceed with your examination.
ATTORNEY ROSEN: Sure.
Oh, I see Mr. [redacted] Okay. Great.
BY ATTORNEY ROSEN:
Q. So, Mr. Truscello, you mentioned that this was separate from the time that students would receive -- or that parents would receive progress reports with the regular grading record. So, a progress report was



shared with the family before this triennial review.
I'm showing you what's been marked as Exhibit B-9. Is this the progress report you were referring to that was shared before the triennial review?
A. Correct.
Q. Okay. So, with respect to the areas that you were working on with [redacted] I see that he -- that the goal itself is not mastered, but many of the objectives were.
A. Correct.
Q. Based on the -- and I see with writing the goal have has listed as mastered.
Is that right?
A. Yes.
Q. And math not mastered, but with several objectives mastered?
A. Correct.
Q. From your academic perspective at this time, did you feel like revisions were needed to [redacted]s IEP to further support him?
A. I did feel that he did need revisions to the services that we were providing him.
Q. Okay. So, the triennial review took place,

Page 121

and were both parents present?
A. Yes, they were.
Q. Okay. I'm showing you what's been marked as Exhibit B-13. This says here at the top, the meeting date, February 8, 2024. Is this the IEP from the annual review and the triennial review that we've been discussing?
A. Yes.
Q. Okay. And I see both parents are present here as attendees?
A. Yes.
Q. And you were present as well?
A. Correct.
Q. Okay. Talk to me about what you recall with regards to the annual and triennial review. What was discussed? How did it go?
A. So, we began by providing the -- the evaluations and the team all had an opportunity to go through and express or share what the new findings were with -- in respect to his academics, to speech and language, and to all of those evaluations that we just saw that the counseling staff did.
Once we reviewed all of those

Page 122

evaluations, we had a discussion about what the current progress was and how these evaluations can help guide us to building [redacted]s new IEP. The team then gave suggestions for the proposed goals and objectives for the remainder of that school year and into the beginning of fifth-grade school year, as well as the proposal of services.
Q. Was there any question as to his eligibility? Was that at issue? Was there a determination that he was still eligible for special education?
A. Yes. So, the team did discuss eligibility. This test result also came out on Ms. Davis' that [redacted] does have an intellectual disability. So, the team was discussing what is the best label to put it under because the State of Connecticut only allows us to identify one disability on the IEP as a student's primary disability.
And overall, with his difficulties with social interaction, academics, behavior, we felt that the best primary label was to remain as [redacted]

Page 123

Q. And in order to make that determination, did you use there, like, a state worksheet or any form to determine that [redacted] was the primary classification, or most appropriate classification?
A. I believe the school psychologist did an [redacted] checklist.
Q. Looking at Exhibit 13, the pages here, page 21, page 22, and page 23, is this the checklist that was completed reflecting a finding that he met the criteria for classification under [redacted]
A. Yes.
Q. Okay. And you talked about revisions to the IEP. I'm going up right now to the service grid description --
A. Okay.
Q. -- in the individualized education plan. And can you talk to me as to what you recall, what were the revisions that this team was making in response to the results of the evaluations, the aspects of [redacted]s performance that you described to me and agreed with me that were described in the evaluations?

Page 124

A. Yes. So, again for his reading, although [redacted] is a phenomenal decoder, he does struggle with his comprehension greatly. So, this was an area that is very important. You need comprehension in order to understand almost all aspects of education, of life. If you're not understanding what people are saying to you, it's difficult. So, I felt that it was important that we increase his reading services from 30 minutes a day to 60 minutes a day.
His math skills were also an area that showed well below grade level and expectations and something that he did not master in his old IEP, and that more attention needed to be addressed for this. So, he was given an hour a day for those, for his math instruction.
We also spoke a lot about how his social perspective, through the speech evaluation, through his -- through the cognitive evaluation and how social skills really is -- is a main area of difficulty for [redacted] So, we added social skills and this was something that the -- that I worked alongside the

Page 125

school social worker so that we created a specific social skills group and goals for his needs as well as some other students' needs.

And then activities of daily living. So, when I was explaining a lot of my goals and objectives and our new understanding of [redacted]s intellectual disability, Mom had also mentioned that she wanted his work to be a little bit more functional. So, we did -- I did create some daily living goals and objectives; so, his ability to be able to function more appropriately with some of the skills that I'm teaching him through the reading and math instruction.

Q. Okay. So, when you were talking about increasing the time that he was spending with regards to the reading instruction and math instruction, is that increasing the time that he is away from his general ed peers, and increasing the time he's in a smaller setting, the resource room setting?

A. Yes, it was increasing.

Q. So, that's technically a more restrictive environment. So, why? Why did you recommend

Page 126

a more restrictive environment in this situation?

A. So, knowing fourth- and fifth-grade curriculum, since I started working here at JFK I have worked in fourth and fifth grade. I knew what was coming. So, at the beginning of the school year, for example, in math, [redacted] was able to have a little bit more participation with peers because they were still on topics such as adding and subtracting.

Yes, their topics were much more complex than the addition and subtraction that [redacted] was doing, but there was an entry point for him. There was a little bit of understanding something he can grasp on to.

As the year is going to progress, I knew that we were going to start getting into multiplication and division, which were concepts that were -- that he, I knew he was not ready for, and he has not shown me that he was ready for those.

So, I felt that instead of him sitting in a classroom where we were hoping that he was listening and catching on, that being in

Page 127

a smaller group setting where I can address his needs more specifically was more beneficial and what [redacted] needed at that time.

Q. Okay. Now you mentioned that the parents had given input. I think you mentioned Ms. [redacted] talked about, you know, some input that shaped the goals and objectives for daily living skills.

Going up to the portion of the IEP that talks about functional performance there was discussion. This says here, Ms. [redacted] and Mr. [redacted] reported they're happy to see [redacted] is independent with his at-home daily living activities such as getting dressed, starting to make his meals as well.

Is that representative of some of the input that they shared at the PPT meeting?

A. It was.

Q. And then going up to the page with regards to academic performance and the section for parent input, a discussion. It says here on page 2 of 25, the parents report they see [redacted] having difficulty getting words out at times when he's at home, fixation on things, changes in plans that are difficult for him.

Page 128

They also feel that having resources to support a cognitive level of functioning will be important for the family. They're happy to hear there's a good plan in place with supportive goals to help [redacted] be successful.

Do you believe that that is an accurate reflection of input that the parents shared during this triennial review?

A. Yes, I do.

Q. What were the parents' concerns? I assume -- were the parents given an opportunity to provide input and ask questions of the team?

A. Yeah. So, as far as I can recall, I don't remember any specific goal-related. I do remember Ms. [redacted] did ask if this means that he'll spend more time in the resource room because that was something she felt was necessary, which I told her I was doing.

Some of that at-home stuff like getting him more into the community and everything, we did hook them up with our community outreach person. Her name is Mary Kate, Mary Kate Williamson, if I remember her last name correctly, who reached out to the family in order to help them find more appropriate

out-of-school help or any kind of activities that he could be a part of.
Q. Okay. And were there any concerns or disagreements from the parents with respect to recommendations being made by the school team at this time?
A. No, there were no disagreements.
Q. So, at this time this IEP is designed for implementation at JFK?
A. Correct.
Q. So, was it the position of the district team that at this moment in February of 2024 [redacted] could be educated appropriately at JFK Elementary School?
A. Correct. With the increase in services we felt that we could do it here at JFK.
Q. And you based that off of the progress reports and present levels of performance and evaluations?
A. Correct.
Q. Okay. And a prior written notice was issued after this planning and placement team meeting?
A. Correct.
Q. Okay. And I see here I'm looking at the



prior written notice. So this, the first page reflects that the finding that he is still eligible under the classification of [redacted] Is that correct?
A. Correct.
Q. And going down here to page 3, that this is discussing the implementing of the services and supports described in the IEP?
A. Correct.
Q. And it states the description of each evaluation procedure, assessment record, or written report the school used as a basis for the proposed action.
That's the listing of the teacher reports, evaluation and parent input?
A. Correct.
Q. Okay. Now, you continued to work with [redacted] and support him through the remainder of the 2023-2024 school year. Correct?
A. Correct.
Q. Okay. And were progress reports provided to the parents through the remainder of the '23-'24 school year?
A. Yes.
Q. Looking at what is marked as Exhibit B-15, so



this is a progress report I see for March 20, 2024. So, would this have been one of the progress reports issued during that time?
A. Yes, it would have.
Q. Okay. And you mentioned there were regular intervals for progress reports.
Was a progress report shared towards the end of the school year as well?
A. There was one for June.
Q. Okay. Looking at what is marked as B-16 in evidence, you mentioned a June progress report. Is it this one here, 16 pages, dated June 10, 2024?
A. Yes.
Q. Okay. After the triennial and annual review that took place, how -- was there any difference in how Ted was responding to your instruction compared to the instruction compared at the beginning of the year?
A. Yeah. So [redacted] started to --
Q. I'm sorry. I referred to Ted. I apologize. I'm referring to a student named [redacted] I apologize. I have another matter going on with respect to a student named Ted.
So, my apologies.



So, with respect to [redacted] let me rephrase.
A. Uh-huh?
Q. In terms of how [redacted] was responding to your instruction, was there any change towards the end of the year from what you were seeing at the beginning of the year?
A. Yes. Towards the end of the year, things became a little bit more difficult. We saw an increase in some of those behaviors we previously had discussed that were on his BIP. He started to be more vocal in class and these, this time the vocalizations weren't necessarily just the utterances or, like, noises that we know as his stimming that he does. But instead, they were more words or phrases that he would call out, kind of provoking attention.
Something I had done all year in the classroom when he wasn't working with me, he had a binder of work that was in the class that he was working on when it was independent work time, when he couldn't keep up with the specific gen ed curriculum, but at the beginning of the year he was more than

willing to do this with the teacher.
By the end of the year I was getting more reports of refusal, him feeling that this was baby work, and that's where an increase of overall refusal to work seemed to have stemmed from.
Q. Okay. What you're describing in terms of the increase of behaviors, was that based primarily on school team observations during the remainder of the '23-'24 school --
A. Correct. It was -- yes, it was based on observations, and it was tracked through the interval data that we collected for his -- for his BIP.
Q. And would that have been data reflected in the progress report shared as well towards the end of the year with regards to his social, emotional, and behavioral goals?
A. That specific data from that, the interval data would not have been reflected in there.
What was reflected in there was his achievement towards the goals specifically written for those areas.
Q. Okay. But there are goals with respect to his behavioral, social, and emotional



functioning?
A. Correct.
Q. Okay.
A. Yeah.
Q. And as this increase was being observed by school team members, was there any feeling -- I mean, you're a member of the school team.
Was there any feeling that there's any need to revise the IEP that was put in place in February 2024?
A. Yes, we felt that some kind of change needed to happen.
Q. When you say, some kind of change, did you have any idea of what that might need to be?
A. Sure. So, we -- there are many options of what needs to happen. So, it could have been that goals and objectives need to be revised. It could be that service hours need to be revised, or we could be thinking of environments that might be more conducive to his learning.
Q. Okay. And is it common to have an annual review, or is it possible that having an annual review in February 2024, and three months later there may be -- there could be a



difference in performance or needs of a student?
A. Yes.
Q. In your opinion, can a district request a PPT meeting when they believe revisions are needed for a student's IEP?
A. Yes. I --
Q. Even if it's not -- let me just finish the question.
A. Okay.
Q. Even if we're not in the regular annual review or triennial time, can a PPT -- can the District recommend a PPT as it deems needed to revise the student services or IEP?
A. Yeah. So, in my opinion, yes. And it is actually something that we are encouraged to do because no student's learning or behavior is ever stagnant. It's not something that just exists for their whole academic career.
And those changes can happen at any point. It could be due to an outside factor that we don't know about. It could be due to changes within the environment in school, but no matter what that reason is, if we notice a child is not achieving what they need to be



achieving through their IEP goals and objectives, we have a responsibility to ask for a PPT to review and revise.
Q. And did you or a member of your team reach out to the parents to try and schedule a PPT meeting towards the end of the '23-'24 school year?
A. Yes.
Q. Okay. And was, to the best of your understanding, an anticipated purpose of the meeting shared with the parents?
A. To the best of my understanding, I do believe they were informed of the purpose of the meeting.
Q. Okay. And what did you anticipate may be a recommendation provided by the school team at a PPT meeting towards the end of the '23-'24 school year?
A. I anticipated that we would have a discussion around whether another increase in supports is what would be most beneficial for [redacted] or if we would need to be exploring alternative programming or placements within the District in order to best meet his needs.
Q. Did you yourself have any personal opinion as

Page 137

to a recommendation and a change of placement for [redacted] at the end of the '23-'24 school year?
A. I didn't have one way or the other that I felt was necessary.
I just knew that some kind of change needed to happen to help him be successful.
Q. Did other school team members have any thoughts as to whether a change of placement was needed? And if so, did they identify one in internal conversations?
A. If we spoke about putting him into an alternate program that's here within the District, it was -- there was a specific location that was discussed.
Q. And what was that specific location?
A. That location would have been one of our programs at Matthewson Elementary School.
Q. And what's the difference between what is offered at Matthewson compared to what is offered at JFK?
A. So, the program classrooms within Milford offer more of a home base for students who struggle academically, behaviorally, and socially. The benefit to this is that his

Page 138

home base is in a smaller group setting with a special ed teacher as the instructor for a majority of that day. And then it allows them the opportunity to also integrate them into the gen ed setting as much as the student is capable of doing. So, this minimizes transitions.
Specifically for [redacted] it's difficult for him to transition from classroom to resource room to classroom to special to service provider. So, it was felt that a program that provides that home location would help him with that situation.
Q. Okay. So, this was an option that you wanted to bring to the PPT to discuss with the parents?
A. Correct.
Q. Okay. And was that possible option of discussing Matthewson as a placement communicated to the parents, to the best of your understanding, when trying to schedule the planning and placement team meeting?
A. As far as I know, I believe it was told to them that Matthewson was an option.
Q. Okay. Now, when you say Matthewson was an

Page 139

option, was it your opinion that the team was coming in saying he must go to Matthewson?
Or are you coming in trying to raise possibilities as how to further support [redacted]
A. Yes, we were coming into the meeting hoping we can have a discussion of, is that program most appropriate? Or if he was to stay here at JFK, what does his day here need to look like in order for him to be successful?
Q. Okay. So, is it your understanding, though, that the parents again were communicating that we want to discuss the possibility of Matthewson?
A. Correct.
Q. Okay. But this was not a predetermination that he was going to go to Matthewson at the conclusion of the PPT meeting?
A. No, there was no predetermination.
Q. When you talk about change of placement with families, is it common that a school team is going to go in with a recommendation that's open for conversation?
A. Yes, we -- we would always have an idea in our minds.
Q. Okay. And so, my understanding is there were

Page 140

members of the team that had the thought that we should discuss Matthewson as a proper placement?
A. Correct.
Q. Okay. Now, you mentioned that there was reach out to the parents to schedule this PPT meeting. Did the parents, to the best of your understanding, be receptive to having the meeting?
A. They were not receptive to having the meeting.
Q. What is your understanding as to why?
A. I believe what I was told was that one of the reasons was Mr. [redacted] was saying that we had an annual review, so there's no need for another meeting. Then, also that they refused to have him move to a different program for -- for the fifth grade, and that they don't need to have a meeting because, no matter what, he's staying at JFK for fifth grade.
Q. And again, was the school team -- my understanding is you wanted to talk about Matthewson as a possibility, not a foregone conclusion?

A. Correct.
Q. Okay. And who, to your understanding, was having the communications with the parents about scheduling this meeting?
A. I believe -- so, I may have offered some of the first meeting opportunities, but then when we were getting a level of resistance, it went to my administration. And I believe Amy Rizzo was the one who was doing most of the contacting for that, for the meeting setups at that time.
Q. And that's the JFK principal?
A. That's the JFK principal.
Q. Okay. So, before the end of the 2023-2024 school year, was there any meeting held with the parents?
A. Unfortunately, there was not.
Q. Okay. At that time was [redacted] still making progress based on the services he was receiving at JFK?
A. At that time he was making minimal progress. So, we were still seeing some progress in the resource room, but not to the extent that we would expect him to be making by that time in the year.



Q. Did you believe that there could be revisions to the IEP to make JFK an appropriate setting for [redacted]
A. Yes. Our main concern was about his services that would be provided to him. It was felt that he needs more direct instruction throughout his day, whether it be from a special ed teacher or from a paraprofessional, in order to address his needs since his academics were beginning to be so far off from common curricula provided to the -- to his peers.
Q. When you say, so far off, can you elaborate? What does that mean?
A. Sure. So, he -- the books that the students were reading in class, for example, again, he can decode those books, but he could not keep up with conversation within the classroom. He could not express who characters were. So, he had no entry point to actively and appropriately participate in -- in the classroom.
So, what he was doing was sitting there and trying to look like other students, but what we needed from [redacted] was to have more



time to do actual learning at his appropriate reading level, which was more of a first-grade level; the same thing with math.
Q. And was it your belief that perhaps Matthewson could provide that environment to support on that, in that on those goals.
A. Yes, and it -- I felt my personal opinion of it was that if he were in a program like that, there were other students who were more similar to his learning styles and learning needs. So, then he would have peers that he can appropriately communicate with.
Because even in the resource room, I was starting to notice a larger discrepancy between where he was learning compared to what the other students in the resource room were learning as well.
Q. Alternatively, was there a way that you sought for to revise the IEP at JFK to meet his needs?
A. Yes. So, the alternative way was to have a paraprofessional working with me in the resource room so that I can create the type of curriculum or the type of lessons that he would be completing. And the



paraprofessional could be in the resource room with me, or implementing it. At the beginning of the year, though, we weren't able to fulfill this. So --
Q. So, let me stop there because when you say, beginning of the year, you're starting to talk about the '24-'25 school year?
A. Yes.
Q. Okay. But real fast, before we get to the '24-'25 school year, at any point was a PPT held to discuss a change of placement to Matthewson without the parents?
A. No, there was no meeting held.
Q. Was [redacted]s placement ever changed during the '23-'24 school year from JFK?
A. No.
Q. So, there were no formal recommendations or changes to his placement that took place during the '23-'24 school year without the parents?
A. No, there were none.
ATTORNEY ROSEN: Okay. I know we're at 12:53. We had talked about being at 12:45. We've concluded our portion with respect to the '23-'24 school year. And just in terms of the natural flow of

Page 145

introducing information, I'm wondering if the parties and the Hearing Officer would want to identify now as a possible break?

THE HEARING OFFICER: Yeah, that had actually occurred to me, too. I figured you were coming up on the end of 2023-'24.

ATTORNEY ROSEN: Yeah.

THE HEARING OFFICER: All right. So, does 1:45 give everyone enough time? It gets us past sort of the witching hour of all the bells going off.

Does that sound good?

THE WITNESS (Truscello): Yes.

KAREN [redacted] Sounds good.

THE HEARING OFFICER: All right.

ATTORNEY ROSEN: Oh -- I'm sorry. I think Mr. [redacted] is trying to speak, and I see that he's muted.

ROBERT [redacted] Oh, yeah. No, I'm sorry. I just wanted to say something. I just noticed that the stenographer just logged on.

But during Mr. Truscello's testimony, it was on mute and his video wasn't there. Was it still being recorded?

THE REPORTER: Yes, it was.

I was doing that to -- I was getting some staticky audio, and one thing I do is cut the

Page 146

video so I have more bandwidth, but I have captured it all.

ROBERT [redacted] Okay. I just want to make sure when I didn't see your video or audio, I was assuming that maybe it's not being recorded. But as long as it was, then that's all.

THE HEARING OFFICER: Yeah, they do that sometimes, especially if people are having problems with like, they're breaking up or freezing or whatever.

All right. So we'll take --

ROBERT [redacted] Will we be able to cross-examine Ms. Truscello today? Or that comes up, you know, when we present our case?

THE HEARING OFFICER: Whenever he's done with the directs. So, we'll see.

ROBERT [redacted] Okay.

THE HEARING OFFICER: You'll get a chance to cross. It's just I'm not sure exactly when you're going to start. So, okay. We'll take a break now and get together around 1:45.

So, have a good lunch.

THE REPORTER: Pausing the record.

(Pause: 12:55 p.m. to 1:45 p.m.)

Page 147

THE HEARING OFFICER: Everybody is here. Okay. So, we can resume the questioning of the Witness by the District.

ATTORNEY ROSEN: Thank you.

THE REPORTER: Back on the record.

BY ATTORNEY ROSEN:

Q. Okay. Mr. Truscello, so where we left off was the conclusion of the '23-'24 school year where my understanding was you explained that Matthewson was suggested as a possibility for a change in placement, but no PPT occurred to take place, to change his placement.

Correct?

A. Correct.

Q. And the school team would not have tried to unilaterally change placement without trying to involve the parents. Is that right?

A. Correct.

Q. And you mentioned that, you know, you saw a way forward to make JFK continue to be the appropriate setting for the student's programming.

In light of the resistance from the parents and disagreement with the suggested possibility of Matthewson, did the JFK school

Page 148

team feel -- was it prepared to implement [redacted]s IEP as it was written for the commencement of the 2024-2025 school year?

A. Yes. We were prepared to implement it the way it was written.

Q. Was there any interest by you or members of the school team in having a PPT meeting with the parents to discuss further revising the IEP for [redacted] at JFK?

A. Yes, there was.

Q. Why?

A. We wanted to increase the para support for [redacted] if it were that he was staying here at JFK. It was felt that independently he was not successful in the gen ed setting, and he required a little bit more adult support in order to be successful.

Q. And were attempts made by you or members of the school team to have the parents meet during the first few weeks or months of the 2024-2025 school year to discuss possible revisions to the IEP?

A. Yes.

Q. And to your understanding, what was the response of the parents with respect to

Page 149

requests to meet for a PPT meeting during the first few months of the 2024-'25 school year?

A. As far as I know, they refused any of the dates that were offered and did not provide a better date or time that would work for them.

Q. Were there any requests that you were being made aware of from the parents that were standing in the way of coming together for a PPT meeting?

A. Not that I know of. I know they did mention a time of day that may be better. So, we tried some that were during a timeframe Mr. [redacted] had mentioned, which was around lunchtime. We tried towards the end of the day, which is something that Ms. [redacted] had always said she preferred. So, we tried to accommodate the times the best we could.

Q. Were you aware of any exchange with parents and district administrators asking questions and demanding that questions be answered prior to a PPT meeting being held?

A. I was aware that those demands were being sent.

Q. Do you have any recollection as to what those kinds of demands were?

Page 150

A. Often, they were questions in regards to e-mails that may have been sent in the past, but unfortunately there's such a spiral of e-mails often that it's really hard to answer them in that way.

So, the team felt if we came together we can have a better discussion.

Q. What do you mean by, spiral of e-mails often? Could you clarify?

A. Sure. So, if -- if I were to send an e-mail about a behavior, or if anybody within our team sent an e-mail about behavior, there would be accusations about what they're assuming, I guess I would say, of what happened. And then if we tried to clarify, it's like another e-mail about the clarification, how what we're stating in the clarification isn't true.

And then it turns into a consistent spiral that when an event might have happened -- for example, this is just I don't -- I don't have the exact date. Say, something happened in January. The ending e-mail may still be happening in March or April, which is not helpful to the child.

Page 151

It's not helpful to the team and it's not helpful to the parents to understand what happened and deal with it in a timely manner.

Q. Was it your feeling or members of the team that in-person meetings were a more efficient way of communicating with the parents?

A. Yes, because then one team, like, one person can speak and another person can answer, and there can be a back-and-forth conversation that happens in less time than weeks or days of lengthy e-mails that have to be sifted through to find understanding.

Q. Did you feel that there was some level of understanding lost in between both the parents and the school team in terms of what each party wanted in the exchanges?

A. In the e-mail exchanges?

Q. Yeah.

A. Yes. I feel like it just -- it's hard to decipher what the starting point was at a certain point.

Q. Okay. Was there an intention by you and the team to involve the parents in decision-making as to [redacted]s education?

A. Yes.

Page 152

Q. And what did you think was the most effective way to ensure meaningful parent participation so that the District understood what was being requested and the District clearly responded to parent requests?

A. It would have been through a PPT where it all would have been recorded legally and prior written notices can be made based on requests and denies, and such.

Q. And is it your contention that throughout the beginning of the '24-'25 school year, the fall of 2024 efforts were made to schedule PPT meetings with the parents?

A. Yes, we did make efforts.

Q. During this time, did you continue communication with the parents about what happened during the school day or if there was an event that you thought warranted their attention?

A. Yes. So, whenever there were significant events, someone, depending on who was with him at the time of the event, would send an e-mail to the parents to relay that information.

Q. And could an event mean, like, something that

happened to [redacted] that day, or some action he took during that day?
A. Yes, something that required parental understanding or knowledge.
Q. And while you were attempting to get and schedule PPT meetings, were you continuing to work with [redacted] as outlined in his IEP?
A. Yes, I was.
Q. And did the parents continue to receive progress reports summarizing the data and information about how [redacted] was performing on his goals and objectives?
A. Yes, they did.
Q. I'm going to show you what's been marked as Exhibit B-17.
Can you see the document clearly at the top?
A. Yes.
Q. Okay. Is this a progress report that was sent out during the '24-2025 school year?
A. Yes, it was.
Q. And it outlines how [redacted] was performing on his goals and objectives?
A. Yes, it does.
Q. Now, you were authoring many of the entries



into this progress report. Right?
A. Yeah. Under the academics, yes.
Q. Okay. So, going down towards academics, with respect to reading --
A. Okay.
Q. What was your understanding as to why [redacted] is listed here as making limited progress on his reading goal?
A. It was more due to behavioral situations that were happening. [redacted] in the resource room was not as compliant as he had been in the past. So, it was hard to have a larger period of time to address the goals and objectives that needed to be addressed.
He started to be resistant to the first-and-next-then, which caused confrontation, but that was the expectation for the lessons that we were doing.
Q. Okay. And with respect to the math goal with regards to money identification, an area that we had discussed as being a weakness in the previous academic year, it says limited minimal progress. It talks about an increase in behavior.
Can you describe, is that the similar



behavior that you were discussing with respect to the reading goal?
A. Yes, it was similar behaviors of refusal to continue with the task. He would try to get through it really fast and just say anything to think that we would just end the session if he just gives the answer. So, he became increasingly defiant towards answering and participating in the learning.
Q. Okay. Now you mentioned that there was a belief, or your belief that he required increased paraprofessional support.
Is that right?
A. Correct.
Q. Was that one of the recommendations that you were trying to discuss with the parents in the attempts to convene a PPT meeting in the fall of 2024?
A. Yes, it -- it was one of the recommendations we were going to suggest.
Q. Okay. And during -- did there come a time during the 2024-2025 school year where the parents agreed to meet for a planning and placement team meeting?
A. Yes, they agreed to meet. Well, first,



towards the end of December there was a request for outplacement. So, there was a desire from the family to meet to discuss the outplacement, but at the same time his annual review was due. So, that was a time that they were also willing to participate when it was an annual review.
Q. Now, when you say, a request for outplacement was received in December, who submitted the request for outplacement to the best of your understanding?
A. I believe the e-mail came from Mr. [redacted] but was signed by Mr. [redacted] and Mrs. [redacted]
Q. And was there any explanation or description of the type of outplacement the parents were seeking?
A. Not -- not that I remember in that e-mail, but I can't recall.
Q. Okay. So, in response to the request for an outplacement, the team was prepared to meet and respond to the parents' request?
A. Yes.
Q. And is it my understanding you said because his annual review was coming up, you thought

that you could handle both the parents' requests and the annual review at the same time?

A. Yes, we felt it would be best to do both at the same time.

Q. Okay. And was a notice issued to the parents with respect to the annual review?

A. Yes.

Q. Okay. I'm showing you what's been marked in evidence as B-18.

Do you see this here?

A. Yeah, it's up.

Q. So, this notice, this was sent out December 17, 2024?

A. Yeah.

Q. Okay. For a PPT meeting to be held on January 16, 2025?

A. Correct.

Q. Now, I want to discuss the purpose of the meeting. First, here this says, conduct an annual review. So, this refers to the annual review you said was needed to be scheduled, and then parent request.

Does parent request reflect the fact that the parents were requesting a PPT to



discuss outplacement?

A. Correct.

Q. Now was there any resistance, to the best of your understanding, from the parents to meet to both discuss the annual review and the parent request for outplacement at the same meeting?

A. Not that I'm aware of, no.

Q. Would it make sense, in your opinion, to meet separately first to discuss an outplacement request, and then to have the annual review at a separate meeting for the student?

A. No, it -- it makes sense to have them together, because we will be discussing his current progress and how he is academically, socially, emotionally doing. And information like that is vital when a team is trying to make a decision on whether an outplacement, or separate program, or increase in para support is necessary.

Q. Okay. So, in a sense you'd have to conduct an annual -- the equivalent of an annual review anyway to discuss whether an outplacement was appropriate?

A. Correct.



Q. Okay. Now, this notice that we're looking at, is this the original notice that went out prior to the January 16, 2025, meeting?

A. It's not.

Q. Okay. So, I want to focus in on the last two lines here on this notice. The team will develop, review, or revise transition goals and objectives, in parens, transition planning; agency representatives not appropriate to be invited to attend to assist in transition planning.

Were these lines on the original notice that was sent out before the January 16, 2025, PPT meeting?

A. They weren't.

Q. Okay. Is there an explanation, without going into it now, but is there an explanation as to why they were added retroactively onto this notice?

A. There is.

ATTORNEY ROSEN: Okay. We're going to come back to that explanation, because I want to fully understand why that's there on the notice. But --

THE HEARING OFFICER: Just to clarify, the student is in fourth or fifth grade. Right? Okay.



THE WITNESS (Truscello): Correct.

ATTORNEY ROSEN: Yes, yes. Well, I can delve into it now if that's easier for the Hearing Officer to understand.

BY ATTORNEY ROSEN:

Q. So, when a notice or an IEP says transition planning, Ms. Truscello, what do you understand transition planning to mean?

A. Transition planning is, from what I understand, is typically something that is done with students who are older than 14 years old, who are transitioning through the secondary part of their education.

Transition planning is not something we typically do at the elementary level for students, even though they are transitioning into middle school.

Q. Okay. Was transition planning discussed at the actual annual review on January 16, 2025?

A. Yeah. So, transition planning did come up during that PPT.

Q. Was it raised by a district representative or was there an area or issue raised by the parents at that meeting?

A. It was raised by a district representative.

Page 161

Q. Okay. And how so? Give me the context.
A. As we were discussing his performance and we were bringing up things for next year, it was brought up that something that's available to us on an IEP is the transition planning, which are more targeted goals specifically to help a student transition as they're getting older.
So, it was brought up that this might possibly be something that could be beneficial to -- to help with [redacted]
Q. Okay. Was there any information shared by the parents that fell under the realm of what would be considered transition planning, like aspirations as to, or hopes for [redacted]s future?
A. During that PPT, it was brought up that there is a hope that in the future he would -- it's the independence again, that he will be a more independent person and be able to be independent as an adult.
Q. Okay. So, in response to that kind of aspiration that's been shared with the team, did the team in good faith attempt to draft some transition goals and objectives in

Page 162

response --
A. Correct.
Q. -- to that input from the parents?
A. Sorry. Yes, correct.
Q. Okay. Now if you edit an IEP on CT-SEDS under the area of transition, is there -- and you mentioned this transition planning notation, it wasn't on the original notice that went out in advance of the January 16, 2025, meeting.
Is there some kind of reason that now, when we look at this notice, it lists transition planning retroactively?
A. Yes. So, the way CT-SEDS work, it's -- and I'm not an expert at the transition area, but in order to access the area which allows input for transition goals, it had to have been put onto the invite. The invite is through CT-SEDS, what populates my ability to access the transition planning goal area.
Q. Okay. So, if you -- even if a notice is sent out that says no transition planning --
A. Uh-huh?
Q. And then because of what happens during the meeting in an effort to document comments

Page 163

from the parents and suggested goals from the team, you entered that into the transition section, and CT-SEDS automatically generates a revised notice with the heading for transition planning?
A. So, kind of the opposite way. I have to go in and link it on the invite in order for it to open on my -- on my CT-SEDS area.
Q. Okay. We're going to come back to this because I want to revisit about whether, you know, what it looked like in terms of the participation and the discussion of the transition conversation.
A. Okay.
Q. But prior to the actual annual review, was a revised behavior intervention plan shared with the family?
A. That, that was shared at this PPT.
Q. Okay. So, I'm looking right now at what's B-19. Do you see that here?
A. Yes.
Q. Okay. So, B-19, which I have it as the behavior intervention plan, I see the date revised at January 2025. Now you, as the special education teacher, help provide input

Page 164

that related to the revision for the behavior intervention plan?
A. Correct.
Q. Talk to me about the target behaviors. When we spoke about [redacted]s present levels of performance at the time of his last annual review, you talked about you were seeing limited elopement, or calling out, making noises, misuse of materials.
What were you seeing in terms of the level of behaviors at this point in time, at the time of the annual review in January 2025?
A. Okay. So, we saw an increase in all areas, some more than others. The elopement, I know often people think of elopement as, like, running out of a building or out of a classroom, but in his case, it's leaving the area that he is expected to be without adult permission, so meaning when he was asked to maybe be in a group somewhere in the room, he was roaming around the classroom. Or when asked to move to a different location within the room to work with a para, he might have refused to go there or had drifted off. So,

we did see a little bit more elopement in that way.

The calling out, so that one he -- he began to be more vocal. So, if a class was in session he would yell random words. It was not the stimming. One of the more common words that he was saying often was "tuna." So, that would be something that he would often say in the middle of classes or sessions as a way of gaining attention.

Misuse of material, that wasn't something that was -- that I noticed happening too often, but -- so, I can't really speak to that one.

But then, work initiation, so he had to start within the 15 seconds after being given a demand. And because of the refusal or him telling an adult, like, no, I'm not going to do it, the work refusal was the area that we noticed a lot more increase for him.

Q. Okay. And prior -- or prior, during the PPT meeting, was an updated progress report shared as to where [redacted] stood with respect to his goals and objectives?

A. Yes, there would have been another finalized



progress report.

Q. Okay. So, looking at what's been marked as Exhibit B-20, this progress report dated January 9, 2025, is this the progress report on the goals and objectives that were shared with the parents in advance of the annual review?

A. Correct.

Q. Okay. Now, does this progress report encompass the data collected by the school team to inform everyone as to how [redacted] is making or not making progress on his goals and objectives?

A. Correct, that's what this progress report is for.

Q. Okay. So, were you in attendance at the annual review in January 2025?

A. Yes, I was.

Q. Okay. So, we're now looking at Exhibit B-21.

Excuse me. I'll zoom in so you can see clearly here.

So, is this document -- is this the IEP from the annual review that occurred on January 16, 2025?

A. Yes.



Q. Okay. And I see -- were both parents in attendance?

A. Yes, they were.

Q. Okay. And the majority of the school team and service providers were in attendance as well?

A. Correct.

Q. Okay. So, with respect to -- and I was in attendance there. Is that right?

A. Yes, you were.

Q. Do you recall why I was in attendance for the PPT meeting?

A. Yes, because --

Q. Or your understanding -- let me rephrase. What was your understanding as to why I was present at that PPT meeting?

A. You were present because the family had brought a support specialist in order to support them, and when families bring additional supports, we typically call for you.

Q. Okay. Now, with respect to the PPT meeting, did the school team provide updates about [redacted]s then-present levels of performance?

A. Yes.



Q. Did the parents have the opportunity to ask questions of every service provider about [redacted]s present levels of performance?

A. Yes.

Q. Okay. For example, did you provide an update as to where [redacted] was performing with respect to his academic goals and objectives?

A. Yes, I did.

Q. Was there time given for either parent or their advocate to ask you questions?

A. Yes, typically after we give an update we ask, do you have any specific questions for us?

Q. Do you recall, did you get any specific questions about your updated present levels of performance from either parent or their advocate?

A. No, not that I recall.

Q. Okay. Did the parents express any disagreement, to your recollection, about the report from the school team as to [redacted]s present levels of performance, as to how he was presenting in front of them?

A. No.

Q. Did the team provide updates about [redacted]s

Page 169

goals and objectives, including any proposed new goals and objectives?
A. Yes, we went through all new proposed.
Q. And did the parents and their advocate have an opportunity to ask about the proposed goals and objectives?
A. They had the opportunity.
Q. Okay. Did they have the opportunity to -- or did the parents or their advocate disagree with any revisions to the goals and objectives, or any new proposed goals and objectives?
A. Not that I can recall, no.
Q. So, for example, we discussed transition planning came up.
Who on the school team suggested the exploration of transition planning goals?
A. Jen Stewart.
Q. Was there any disagreement -- and can you tell me who Jen Stewart is?
A. Sure. She was the director of PPS for last -- in the last school year and the school year before.
Q. What do you mean, PPS?
A. Pupil personnel services, special education.

Page 170

Q. Okay. And she was an administrator with the District?
A. She was an administrator with the District, yes.
Q. Okay. Is she currently employed by the District now, to your understanding?
A. She is not.
Q. Okay. So, with respect to the proposal of exploring transition goals and objectives, when that was raised, was there any disagreement from either the parents or their advocate about including transition goals and objectives into the IEP?
A. No.
Q. Okay. Was there any questioning, or pushing back that transition goals and objectives were not needed?
A. No, there was not.
Q. And was Ms. Stewart's suggestion in response to input provided by the parents as to aspirations of what they hoped for [redacted] from the future?
A. Yes, that is why she suggested it.
Q. Now [redacted] is not 14. So, this is not standard practice to add transition goals and

Page 171

objectives in any way. Correct?
A. No, it's not.
Q. Okay. But did it in any way violate -- or did it in any way prevent him from accessing his other services, or goals, or making progress on his other goals and objectives in the IEP?
A. No, it didn't impact him at all.
Q. Okay. It was just responsive to some input from the parents?
A. Correct.
Q. Was there discussion about the student's accommodations in the IEP?
A. Yes, I believe we went through the accommodations.
Q. Okay. Accommodations were revised?
A. To be honest, I can't remember specifically if there were any revisions that had to happen.
Q. Uh-huh. Well, was there an opportunity given to the parents to provide an opinion on the accommodations?
A. Yes.
Q. And did the team discuss a revision of services as part of this IEP?

Page 172

A. Yes, we -- we did a big revision to the services.
Q. And what do you mean by big revision? Could you please describe so we're clear as to what change was made?
A. Sure. So, a lot of the academics did remain the same, but a lot of -- we also added an increased amount of para support for him. [redacted] needed assistance when he was in specials. He needed help if he was ever in the gen ed classroom, but we also felt that he would get more learning opportunities if a paraprofessional was working with him in the resource room on the academic goals and objectives, rather than him being in the classroom.
The reason we felt it was more important for the para to work with him in the resource room was because at -- at the beginning of the school year, although we couldn't get a meeting on the books, we did feel that additional support was necessary. So, a para was with [redacted] in the gen ed classroom for pretty much what is reflected in this IEP, only none of it was pull-out by the

paraprofessional at that time.

Once we were finally at the PPT and had the opportunity to share this with the family, we felt that it would best benefit him if those times that the para was with him be here in the resource room in a smaller, quieter environment, rather than in a table in the gen ed classroom, because [redacted] wasn't responsive to that at the time.

Q. So, you had trialed an increase in para support?

A. Correct.

Q. Okay. And when --

A. And it still --

Q. Go on?

A. Yeah, it still just wasn't -- we felt it still wasn't sufficient to what his needs were by just having a para in the classroom.

Q. And so, this revision that was made, did this make -- in your opinion, the services being provided, they were appropriate for the JFK setting?

A. The new services reflected here in this IEP?

Q. Yes.

A. Yes, those were.



Those were reflective of that.

Q. Okay. Now, the discussion about the increase in the paraprofessional support, this was had with the parents present at this PPT meeting.

Correct?

A. Correct.

Q. Did the parents have an opportunity to ask questions about the services being recommended and the revisions being recommended?

A. They did.

Q. And was there any questions from the parents or their advocate as to the revision increasing paraprofessional support in both the general ed setting and the resource room setting?

A. I -- I don't know. I can't recall exactly, but I -- I do feel that there was a feeling of that this would be beneficial for him, because the family did know of the paraprofessional that was working with [redacted] and felt that she was a good working person with him, and that he was successful with her.

Q. So, there was no disagreement to the revision



of services?

A. There was no disagreement.

Q. Now, were the parents given, or their advocate given an opportunity to provide input or statements at the beginning of the PPT meeting?

A. Yes.

Q. And what do you recall was shared by the parents during that time?

A. During that time is when -- if I remember correctly, this was a little while ago. I believe this is when the parent request for the outplacement came.

It was kind of, I believe, Mr. [redacted] spoke most of the time during this request and outlined his -- his grievances and what he was upset about, and that he felt that the outplacement was the most appropriate placement.

Q. What do you recall were his grievances that were shared, if at all?

A. I believe some of them had to do with e-mail correspondences that were going on between him and some members of the staff. He says that -- or it was his implication that we



mistreat [redacted] while he's here at school, pretty much.

Q. Did you understand what the basis was behind that allegation?

A. Yes. So, often when information gets sent home about a behavior or what's going on, we'll often get an e-mail of their perspective of the events that happened.

So, in his mind I do believe he thinks that there could have been bad treatment towards his son, but this is based off of his hearings of situations that happened directly from [redacted] not from staff members, as we've never really had the chance to talk about any of them.

Q. And you said that when the situation occurs, staff members have provided an explanation or at least a narration of what occurred?

A. Correct.

Q. Now, with respect to the reasoning for the outplacement, was there any critique or criticism of the goals and objectives in effect for [redacted] or being proposed for [redacted] as part of this IEP?

A. No, there was no objection.

Q. Was there any critique of the services being provided to [redacted]
A. No.
Q. Was there any critique of the accommodations being provided to [redacted]
A. No.
Q. Was there -- the request for outplacement, was it for right at that moment, like he wanted placement, outplacement during the remainder of the '24-'25 school year?
A. No, he actually demanded that [redacted] stay at JFK for the remainder of the school year, and he only wanted the outplacement to start from sixth grade for the remainder of his educational career in Milford.
Q. The remainder of his educational career in Milford?
A. Yes.
Q. Am I to understand that means for, like, until he would, like, graduate high school?
A. Yes. Until he graduates high school, yes.
Q. So, he's essentially asking for a six-year outplacement?
A. Correct.
Q. Did he identify an outplacement?



A. He had brought up two schools.
Q. Do you recall which schools?
A. I -- I remember one is called Hope Academy. The other one, I'm drawing a little bit of blank. It's wood-something, I believe. It starts with a "W."
Q. With respect to his request for outplacement, at that time, given the services that were being recommended for the continuation of JFK, did you or the school team believe that he required an outplacement at that time?
A. No, we did not.
Q. Now, I'm to understand he's asking for outplacement for the following academic year and beyond. Right?
A. Correct.
Q. So, this meeting took place in January of 2025?
A. Uh-huh.
Q. The school year ends in June of 2025?
A. Yes.
Q. So, he was asking for an outplacement that he believed was necessary, you know, almost six months from that, from this meeting?
A. Correct.



Q. At that time, did the school team, based on how [redacted] was presenting at that moment in January of 2025, believe it had enough information to determine that an outplacement was appropriate starting in June 2025?
A. No, we did not have enough information.
Q. In terms of your -- so, you've been a special education teacher with Milford Public Schools for at least seven years. Right?
A. Yes.
Q. And so, have you seen your students transition from elementary school to middle school --
A. Yes.
Q. -- repeatedly, I assume?
A. Yes. Since I have been doing fifth grade I have seen many transitions.
Q. Are you familiar with the middle school special education options available at each district middle school?
A. I am aware of what Harborside has to offer and what West Shore has to offer.
Q. Okay. And so, those are two different middle schools in the District?
A. Correct.



Q. What, to your understanding, is [redacted]s neighborhood school, like, where he would regularly go based on his zoning?
A. Yeah, so that would be West Shore Middle School. They are a resource model just as JFK is. When I transition students to the middle school, it's very different than what it looks like here.

So, there is an eight-block sequence that students have to rotate through while they are there. So, for example, in elementary school we have a combined science social studies time that is about 40 minutes in total per day. When a student transitions over to the middle school, they now have a 53-minute block of social studies, a 53-minute block of science, a 53-minute block of reading.

So, knowing [redacted]s profile and his difficulties with comprehension, that right there alone lets me know that he's going to struggle through the ELA portion of the day.

And then, from what I understand of social studies, it is a literacy-based lesson where a student will have to read grade-level

Page 181

curriculum, understand these topics that are not common for someone like -- for someone like [redacted] to know the history of the United States and things like that.

So, overall, I feel like moving from the class to class would be difficult. So, then the only option would be similar to what we did here at JFK, which would be that he would spend a majority of his time in the resource room which, again, is not ideal for someone like [redacted] Because again, he's not going to be with peers who are typical to him.

He's going to be in a resource room for a majority of the time working with either a paraprofessional or a special education teacher, and he's not going to have that time for good social interaction. Not to mention the maturity level of a middle schooler is vastly different from the social maturity level that we know [redacted] is at.

Q. Now, with respect to discussing the next academic year, what his sixth-grade year would look like, did the team have any discussion of what could be a possible placement for [redacted] for his sixth-grade year?

Page 182

A. Yes, we -- we mentioned that our district does have a program, as we call it, in Harborside Middle School, which is more of a self-contained model where the students have a home base, a homeroom. And this is where they do spend a majority of their academic time, but still have the opportunity to be able to go out with their peers and socialize with their same grade-age-level peers.

But again, the benefit, like I had mentioned about Matthewson, is that there are peers that -- with typical strengths or typical needs, or similar needs as [redacted] has, which allows for more social interactions and ability to converse about learning at more of their level, rather than everyone always having difficulty finding that connection with [redacted]

Q. Now, this annual review took place in January 2025. Did the team intend to make a decision at this meeting where [redacted] it would be for his sixth-grade year, the 2025-2026 school year?

A. No, we were not going to make a final decision.

Page 183

Q. And why is that?

A. Again, the level of increase in para support into the resource room is a vast difference from the last IEP, and we needed to give this IEP time to see if that alone is what [redacted] needs.

Does he just need to have that para all day long and just have that para in the resource room providing him with that being the least restrictive environment? Or are we going to see that, like, maybe that wasn't what was working, and we have to make different adjustments to better meet his needs?

Q. When you have students transitioning, from moving from a fifth-grade school to a school where they'll get sixth grade -- because JFK doesn't offer sixth grade. Right?

A. Correct.

Q. Is it common to have that meeting with the possible middle school being recommended closer towards the end of the school year?

A. Yes, we always tried to do that. Even with my students who are -- who don't have such large IEPs and large service hours, a lot of

Page 184

times I have the teachers from West Shore coming to represent West Shore at the PPT meetings so that the families get to know them, and they can better explain what a day looks like since they're the ones who live with it.

Q. Okay. And was that explanation shared with the family of, we want to explore what -- which middle school would be appropriate at a later date in this school year?

A. Yes.

Q. Okay. But at the time the parents were requesting for an answer on their request for outplacement for the remainder of his educational career. Correct?

A. Correct.

Q. And so, what was the school team's response to that request?

A. The request was denied by the school team for outplacement for sixth grade.

Q. Okay. And knowing what you knew of the middle school options and understanding that you'd want an updated level of understanding towards the end of the year of [redacted]s present levels of performance, did you anticipate

Page 185

that [redacted] would require an outplacement beyond the District?

A. At the -- no, I don't. I didn't anticipate that at the time.

Q. Okay. Was extended school year services discussed at this annual review meeting in January?

A. It was not discussed at the January meeting.

Q. Why not?

A. Honestly, with all of the requests and everything, we did hit the end of the time that we had available. The end of the day was happening, so we had to dismiss for actual dismissal of the class, of the school.

So, we did not get to talk about that in a meaningful way, so we were trying to wait since we knew we would be addressing sixth grade towards the end of the year.

Q. And did it make more sense to discuss whether or not the student needed extended school year services towards the end of the year, as opposed to January 2025 when substantial revisions were being made to the IEP?

A. Yes, it -- it would have been better to do it then when we have an updated progress of how

Page 186

he's performing to make a decision of what we would recommend, because -- and this year we did end up recommending something different than just social skills.

So, it would have been something that is worth the discussion with -- with everybody involved.

Q. Okay. Were prior written notices issued after this annual review?

A. Yes.

Q. Okay. So, looking at what's been marked as Exhibit B-22, this January 16, 2025, prior written notice, this reflects the denial of the request for the out-of-district placement?

A. Correct.

Q. Now, I want to look at page 3 of 4 here with regards to proposing to implement the services and supports as described in the IEP document. I'm a little confused, because I look in the top right corner with regards to the date; I think it says, February 14, 2024.

Is that a typo?

A. That is a clerical error, yes.

Q. Okay. Any idea how that occurred?

Page 187

A. Yes. So, again, the system is not perfect and it was an oversight on my part and other people who checked over the document. But the date when you click to create a prior written notice auto populates, and I just missed it on this one. So, it auto populates to what was finalized on the previous year.

Q. Now with respect to the description of the procedure, or assessment, or record, or written reports used as a basis for the proposed or refused action, I see you list here teacher reports, January 16, 2025; parent input, January 16, 2025.

So, is that correct, references to the information that was the basis of your prior written notice?

A. Yes, those are correct.

Q. And were the parents provided a copy of the finalized IEP?

A. Yes.

Q. And at any point after that, did the parents, either parents share e-mailed concerns about the January 16, 2025, PPT meeting?

A. Yes, we got e-mails stating that they felt that it wasn't ample time to do both, and

Page 188

there was a parent request for a follow-up PPT meeting.

Q. What do you mean by, ample time to do both?

A. From the beginning, it was felt by the family through the e-mails that they sent that these two meetings needed to be separate.

So, they were not --

Q. What do you mean by --

A. Sorry. Go ahead.

Q. I'm sorry. Just, what do you mean by, these two meetings?

A. Sorry. They -- it was felt by the family that the parent request for outplacement should have been one PPT meeting, and that the annual review should have been a separate PPT meeting.

The soonest we could get together with a consistent date was the 16th, and then the options that we were given by the family for dates for the annual review were actually dates that went beyond the annual review timeline. So, we couldn't even do that if we wanted to.

We had to hold the annual review PPT on January 16.

Q. And my understanding is you said you essentially need to conduct an annual review when determining if an outplacement was appropriate. Right?
A. Correct.
Q. And is that what happened at the January 16th meeting? You did all the updates and then used that information to make a determination as to whether outplacement was appropriate?
A. Correct. So, the parents gave their request for the outplacement, and at that time the team then went through all of their current levels. And then at the end we said, based on those current levels and where we are and his new service hours, we do feel that we are going to deny the outplacement request.
Q. Now, the subsequent communication from the parents taking issue at the January 16, 2025, PPT meeting, did any criticism have to do with the actual goals and objectives that were in effect?
A. No, none of it did.
Q. Were there any criticism with respect to the actual services in effect as part of the IEP?
A. No, none of it was.



Q. Was there any criticism or arguments about the accommodations in effect as part of the IEP?
A. No.
Q. So, the criticism, did it -- correct me if I'm wrong. This boiled down to the scheduling of the meeting and not having a separate meeting to discuss outplacement prior to an annual review?
A. So, that was part of it, yes. And then the other part was that the family had a few other grievances, things to do with, like, documents that they felt were manipulated or left out of the FERPA request that were brought to us during that, during that March 6th meeting.
Q. Okay. So, before we talk about March 6th, so you said -- you had said that the parents, after the January 16th meeting, they requested another PPT?
A. Correct.
Q. Okay. And did the school team agree to have another PPT with the parents?
A. Yes, we did.
Q. Okay. And were attempts made at scheduling?



A. Yeah, and we landed on the March 6th.
Q. Okay. Was a PPT notice for a date prior, before March 6th was then selected?
A. I don't recall.
Q. As to your recollection?
A. No. I -- honestly, like, it's so hard to keep it all straight. I'm -- I'm not sure when dates and times and invites were created.
Q. Let me just clarify. So, looking at this here, this is marked in the evidence as B-23. This is a scheduling date of February 3, 2025. Was there a PPT meeting on February 13, 2025?
A. No.
Q. Okay. So, was this a notice that was sent out an attempt to schedule a PPT meeting in response to parent requests for a meeting?
A. Correct.
Q. Do you know why the meeting didn't happen on February 13th?
A. I believe this was another one of the -- the times where the requests, there were certain requests demanded in an e-mail, and if the e-mail was not answered, the family would not



attend the meeting.
Q. Okay. Was --
A. If I remember correctly.
Q. And then looking at Exhibit B-24, so this is dated February 26th for a meeting on March 6, 2025, one of the reasons being parent requests. Is this the notice for the PPT meeting that actually did occur in response to the parents' request?
A. Yes.
Q. Okay. So, a PPT meeting was held on March 6, 2025?
A. Correct.
Q. Okay. Was an IEP generated after that meeting?
A. It was finalized with no revisions.
Q. Okay. So, looking here at Exhibit B-25, the date on this says March 6, 2025. This is the IEP from your March 6th meeting?
A. Correct.
Q. Okay. Now, both parents were in attendance. Correct?
A. Correct.
Q. And you were in attendance as well?
A. I was.

Q. Okay. You said earlier that the IEP wasn't revised. What was discussed at the March 6th meeting? What occurred?

A. Since it was a parent request, we allowed the family to start the meeting off. There were different things that were -- were complaints about the way that documents were given to them through the FERPA, from what I understand, from just sitting in the meetings.

There was a document that was printed from PowerSchool where one date was left off. That was a point of conversation, but this was something that someone on our team pulled up and showed that we don't, like, we don't know what that's about. So, really, it was a lot of grievances of stuff that I think most of our team were not privy to, because a lot of it went through conversations with Mr. [redacted] and administration.

Q. With respect -- so that, my understanding is the parents made a FERPA request prior to this meeting?

A. Correct.

Q. With respect to the documents that they felt



that either information was not there, was there any discussion as to how or why the lack of clarity in documents would have prevented meaningful participation in the education process and the education decision-making process?

A. There was -- there was really no discussion around that. It was more of just complaints with it. Again, I -- I didn't put together that, the FERPA document, so I am not sure as to certain things that he was referring to during this time.

But no, I don't think any of those things that were missing impact any decision-making ability.

Q. And to your understanding, regular progress reports were provided as to the student's progress on IEP goals and objectives throughout the academic year?

A. Correct.

Q. And the parents had had plenty of opportunity to discuss the goals, objectives, services, accommodations at the previous planning and placement team meeting in January. Correct?

A. Correct.



Q. Was there any discussion or criticism by the parents of the goals and objectives that were in effect at the March 2025 meeting?

A. No, there was no discussion around that.

Q. Was there any discussion or criticism about the services that were in effect at the March 2025 PPT meeting?

A. There was no discussion around that.

Q. Was there any criticism or arguments from the parents about the accommodations that were in effect at the March 6, 2025, PPT meeting?

A. No, there were no discussions.

Q. What was the mood of the parents at the March 6, 2025, meeting?

A. At that meeting, Mr. [redacted] was very angry. He -- he read from his list of things that he was upset about.

And during that time, also, Mrs. [redacted] was very quiet during that PPT. She didn't participate much with it.

Q. Was there any discussion or request from the parents to revise the IEP that was in effect at that time?

A. There was no request to revise the IEP.

Q. Okay. Was there any -- so, my understanding



is, were you basically giving the parents free rein to share any topics or issues they wanted to discuss with the team?

A. Correct.

Q. Okay. So, besides questions about documents, was there any discussion about outplacement again from the parents?

A. It was brought up again, but in a way of one of -- because one of the things that was upsetting to Mr. [redacted] was that he had brought a letter from an outside psychologist and it wasn't uploaded. So it came, again, in that way just in a discussion that, here's the letter that was never uploaded to CT-SEDS.

Q. And was that letter later uploaded to CT-SEDS?

A. It was.

Q. What's your understanding of what that letter entailed?

A. It was a recommendation -- or I don't even know if it was a recommendation. It was a letter from their outside psychologist that sees [redacted] stating that he had looked at Hope Academy online and feels that it could be a

possibly -- a possibility for [redacted] in the future.
Q. Had the psychologist ever attended a planning and placement team meeting for [redacted] during the time that you worked with him?
A. No, he never did.
Q. Has this psychologist spoken with any members of the school team as to how [redacted] was presenting or performing?
A. No, he never has spoken to us that I know of.
Q. Are you aware of any release where the school team was asked to send education records to this psychologist?
A. I don't believe there is one. I did not -- I never signed for one.
Q. Did the school team provide any clarity, if at all, with respect to suggestions for considering a middle school for next year?
A. Yes. So, Harborside did come up again a little as -- as something that we can discuss going further in the future.
Am I cutting out?
Q. Yeah, one second, Ms. Truscello.
A. Can you hear me okay?
Q. Let's just let our camera settle one second.



A. Okay.
Q. All right. Can you hear me okay?
A. Yeah, the notice is on for my computer.
Q. Why don't you tell me again what you were saying about Harborside?
A. Sure. So, we brought it up again as a program that we have within district that we know is an option and something that we would like to discuss further. We even said that we would like to meet again in May so that we can have a better discussion around -- around Harborside.
And this way we can invite representation from the program so that the parents can ask as many questions as they need to get a better understanding of the program, and they can go and visit whenever they would want.
Q. Now, my understanding was you mentioned there were two middle schools [redacted] could go to, Harborside with the specialized program and West Shore. Was it the intention of the school team to invite representatives from West Shore to the next PPT meeting as well?
A. Yes, and we did. We had representation from



both middle schools.
Q. But not at the March 6th meeting. Right?
A. Oh, no. Not at the March 6th meeting.
Sorry.
Q. So, was it explained to the parents this is what we want to do? We want to bring in people from West Shore and Harborside at another meeting to talk about the next academic year?
A. Yes, because I work on transitions, but it's best to hear from the people who live the programs and the -- the school to have a better understanding of what's available.
Q. Okay. How did the March 6th meeting conclude?
A. If I remember correctly, this one was, again, at the end of the day and I think it -- it might have ended in that way. It might have been that people -- everyone was getting a little heated with the conversation. So, we just kind of tried to end it.
Q. Were the parents able to share their opinions that they had requested being able to share at the March 6th meeting?
A. Yeah. So, it started off with the family.



We tried to address as many of the concerns as we could in that moment. And then we asked if there were any final questions or concerns from them. Mr. [redacted] had a chance at the end again to speak, and then the meeting was ended.
Q. Okay. Were there any issues that Mr. [redacted] was prevented from speaking about?
A. Not that I'm aware of.
Q. Were there situations where Mr. [redacted] asked a question and disagreed with the district team's answer?
A. Yes.
Q. Would he then continue to ask about that same topic?
A. Yes. This is similar to the spiral e-mails I was referring to that we do get asked questions. We try to answer them the most clear that we can, but then if it's not the answer that seems -- that he seems to be looking for, we do get re-questioned on that same topic.
Q. Did you feel that the school team answered all the questions asked by the parents?

A. To the best that we could in that moment, yes. There were some things that did have to get looked into after, but yes.
Q. Okay. But again, none of the questions or critique were about the actual IEP itself?
A. No, they were not.
Q. Or the provision of a free appropriate public education?
A. No, they were not.
Q. Okay. When you mentioned offering the parents an opportunity to visit Harborside, to your understanding, did either parent ever visit or tour Harborside Middle School?
A. Yes, Ms. [redacted] toured the middle school and the program.
Q. Okay. And approximately when did that occur?
A. After the meeting, Ms. [redacted] asked if there was a way that we would be able to arrange that. So, the team told her that I would be reaching out to her when we could set that up.
I believe I e-mailed the next day in correspondence with it, and we set it up for, it was either the following week or the week after it. I don't know the exact date.



Q. After the March meeting?
A. After the March meeting, we went.
Q. And so, when you say, we went, you went with Ms. [redacted] to tour Harborside?
A. Yes, I was with her, and our middle school instructional supervisor Sara Collette was with us as well.
Q. Okay. And what happened during the visit?
How did the visit go?
A. The visit went actually really well. We were able to go in. Ms. [redacted] was able to meet the assistant principal there as we walked in the door. As we were touring the lower level one of the mental health staff was there, and she got to meet that person and we went into their classroom to see it.
Then Mrs. Collette took us upstairs where there were two separate programs, program rooms. We went into one room where we were able to ask the resource -- or the special ed teacher there, questions about the room. Ms. [redacted] seemed pleased with the teacher. There was a trampoline and everything in the room, which were things that she has always expressed are beneficial



to [redacted]
After we left that one specific room, we went over to the other program room where she was able to see that classroom as well, meet that teacher. She saw some students in there who were working with a para.
After that, we went back down and it was dismissal time for middle school. So, we did end up leaving after that.
Q. And did Ms. [redacted] have anything to say, any input or questions or concerns about the Harborside program during your visit or after?
A. No concerns. She did say that she liked some of the things she saw, like I said, having the break option with the trampoline and hearing that he's not only stuck in a resource room or in a special ed classroom all the time.
She did mention how other members of her family have attended Harborside Middle School, so she knows that it is a positive learning environment.
Q. Did she express any reservations about the Harborside program?



A. Not to me.
Q. Did she say anything about whether her or Mr. [redacted] intention to attend another PPT meeting to discuss middle school placement for [redacted]
A. So, not on that day. She and I had spoken a little bit later on and she did express that she feels that Mr. [redacted] is not going to agree to another meeting to have this discussion.
Q. And did you or a member of the school team attempt to schedule a PPT meeting to formally discuss extended school year services and the placement that [redacted] would have for the '25-'26 school year?
A. Yes. We tried to reach out to set up that meeting in May, which is what we had told them at previous PPTs would be the plan for the end of the school year.
Q. Okay. So, pulling up Exhibit B-27.
I see here this notice was sent out on March 31, 2025, for a date of April 10th. To your understanding, what was the purpose behind sending out this notice for a PPT meeting on April 10th?

Page 205

A. It was to do these discussions. We knew that getting dates were a little tricky, and after Ms. [redacted] and I had toured the school this was a date that she had given to me that she was available for a PPT.
Q. And when you sent out this notice for April 10th, did you get any response from the parents as to their intention to attend the PPT meeting on April 10th?
A. If I recall the e-mails correctly, I do believe at first it was that they would. But then when it came closer to the time, I believe this might have been the one where Ms. [redacted] said her mom was having a medical procedure and that they wouldn't be able to attend this PPT.
Q. Were other attempts made to accommodate the parents' schedules and schedule a PPT meeting to discuss middle school placement?
A. Yes, the team understood that things happened and she had other engagements that had to happen. So, we had asked for other dates and times; we offered dates and times.
None of them were accepted.
Q. So, looking at B-28, this is a notice with

Page 206

respect to April 28, 2025, for a meeting on May 6, 2025. Was this another notice that was sent out in an attempt to schedule a PPT meeting?
A. It was, because the last day of school, I believe it was May 10th. So, we were running out of time and this was a very important meeting as [redacted] would not be coming back to JFK in the following school year, and this was something that needed to happen in order to put him in the most appropriate environment for his sixth-grade year.
Q. Sorry. You said May 10th was the last day of school? Or did you mean June 10th?
A. Oh, sorry. I'm -- yeah, June 10th. Sorry.
Q. Okay. Looking at Exhibit B-29, this notice sent out on May 8, 2025, was this another attempt to schedule the PPT at a time or date that could work for the parents?
A. It was another attempt, yeah.
Q. And what was the response, if at all, from the parents with respect to a notice of a PPT meeting on May 21, 2025?
A. Around this time, I believe some of what was in the e-mails was that it was we had an

Page 207

annual review.
There's no need for another meeting.
Q. Was there communication, to the best of your understanding, to the parents that we need to make a formalized recommendation for a middle school placement for the '25-'26 school year?
A. Yes, I was not sending the e-mail communications at that, this point, but I do believe that's the message our administration was trying to get across.
Q. And are you aware of what the response was from the parents with respect to being made aware that we need to have a discussion and formally recommend a middle school placement?
A. I think it was just more of, we don't feel the meeting is -- is necessary, and they just deny coming to them.
Q. So, it's your understanding the parents were aware that the meeting was occurring and electing not to attend?
A. Correct.
Q. Okay. Looking at Exhibit B-30, was a PPT meeting held to discuss the transition -- or I should say, the middle school placement of [redacted] for the '25-'26 school year?

Page 208

A. Yes.
Q. And is this the IEP from that meeting?
A. Yes, it is.
Q. Okay. Who was in attendance at that meeting?
A. It was our school-based staff, Sarah Collette came, who was, again, the middle school PPS supervisor, and Nadine Macklin was there as representation for our elementary special ed supervisor.
And then we also had other staff members from the school. So Carrie Minar is a representative from West Shore Middle School, and then we had representation for Harborside as well, which was Sara --
Q. So, you had both -- so, you had representatives from both middle schools in attendance?
A. Correct.
Q. Okay. And did the parents attend this PPT meeting on May 21, 2025?
A. They did not attend.
Q. Was there any reason to believe they were not aware that the meeting was taking place on May 21, 2025?
A. No, they were aware, and they had sent

e-mails stating that they are not coming.
Q. Okay. And why was it necessary to meet as part of this PPT meeting on May 21, 2025?
A. Yeah. So, as -- as I just said, it -- it was extremely important at this point because we did need to come to a final decision on whether it's home school with high levels of resource support, or if Harborside would have been the best location for his sixth-grade year, and this was the time we had to do that.
Q. Okay. And was this the opportunity that was given to the parents to come and share their input and analysis as to what they thought would be the appropriate placement for [redacted] for the '25-'26 school year?
A. Yes, they would have had that opportunity as well.
Q. Okay. And did the school team review present levels of performance for [redacted] and his progress on goals and objectives?
A. Yes, we went over current levels.
Q. And did representatives from both middle schools share their opinions as to whether they thought they could provide appropriate



programming for [redacted] in their school settings?
A. Yes, all of the staff members went over what a day looks like at their school and whether they felt it would be appropriate or not.
Q. With respect to the actual recommendation that was made, what was the recommendation for [redacted]s placement for the 2025-2026 school year?
A. Based on hearing what was -- what they had to offer at Harborside, the team felt that the best location for [redacted] to be successful for his sixth-, seventh-, and eighth-grade years would be to go to the program at Harborside.
Q. And why was the Harborside program, in your opinion, appropriate?
A. So, the program at Harborside has a big social, emotional, and daily living programming that goes on throughout the day. So, they're able to integrate all of the areas of academics into hands-on activities that he's able to do there.
For example, like, there's a breakfast cart that he would be able to work at where he gets to learn about money, but also social



interaction with adults.
Q. Did you have reason to believe that the hands-on activity was the way that [redacted] learned best, as opposed to the programming that could have been offered in West Shore?
A. Yes, and we did our best to do it here at JFK. So, I always had fake money out. I even bought money that looks very realistic. We had items that he was buying and selling, like, getting money back for.
Hands-on activities were what he needed most, but when we tried to replicate it in a resource room it doesn't feel as real as the opportunities that Harborside can provide for him.
Q. Okay. Were there any conversations or concerns from the school team that an outplacement would be warranted, as opposed to a program being offered at Harborside?
A. No, we did not. We didn't discuss about an outplacement because it was felt that the Harborside location would have been the best option for [redacted] for his sixth-grade year.
Q. And the Harborside program and this IEP proposed for the '25-'26 school year, was it



the position of you and the school team that this was an appropriate IEP?
A. Yes, with the revised hours --
Q. Okay.
A. -- in order to fit the school day, yes.
Q. Do you believe the Harborside setting was the least restrictive environment being proposed?
A. Yes, I do.
Q. Now, you mentioned -- with regards to the time he spends in a self-contained room within the Harborside program, to your understanding, could his experience differ from another peer? Is the determination as to how often a student is in the self-contained room, is that individualized based on the student's needs?
A. Yes, it's all individualized so they get to know the student a little better, and they see which areas he might still excel in if he goes out into the gen ed classrooms. It's all case-by-case basis of the students who are in there.
But again, this just gives a more firm homeroom in comparison to all of the other students who are now navigating working with

at least, at minimum, eight adults when you get to the middle school.

Q. Okay. And was this IEP finalized and shared with the parents along with prior written notices?

A. It was.

Q. Finally, was a progress report shared with the parents at the close of the 2024-2025 school year detailing how [redacted] was performing on his goals and objectives?

A. Yes, that progress report was updated.

Q. Okay. Looking at Exhibit B-32, is this progress report dated June 11, 2025, is that reflective of how [redacted] was performing on his goals and objectives at the close of the 2024-2025 school year?

A. Yes, it was.

ATTORNEY ROSEN: Just a moment.

Thank you, Ms. Truscello. Right now, I have no further questions at this time.

However, I would like to request, as we are at the close of direct examination, just a five-minute break, if I could, for all of us before Mr. [redacted] or Ms. [redacted] starts their cross-examination?



THE HEARING OFFICER: All right. It's 3:02, so we'll take a five-minute break and then come back.

ATTORNEY ROSEN: Thank you.

THE REPORTER: Pausing the record.

(Pause: 3:02 p.m. to 3:07 p.m.)

THE HEARING OFFICER: We will come back on the record.

All right. So, at this point the parents can cross-examine the Witness. The thing that I need to emphasize is cross-examination is asking questions. If the Witness gives an answer that you disagree with, it's not for you to start arguing and saying, no, that didn't happen; this happened. You'll have a chance to testify when you put on your own case, but that's a little ways away.

So, do the parents wish to cross-examine?

ROBERT [redacted] Yes, I'll do the best I can. I took notes kind of on the fly. So, I guess, I'm going to be crossing, you know, I'm going to be having questions and then Ms. [redacted] will also be having her set of questions. So, I guess I'll go first.

I have, you know, several questions regarding



her testimony.

THE HEARING OFFICER: Go ahead.

ROBERT [redacted] Okay, we're ready? Okay.

CROSS-EXAMINATION (of T. Truscello)

BY R. [redacted]

Q. Okay. Ms. Truscello, you testified that we had a PPT annual in 2024, in February of 2024. Is that correct?

A. Correct.

Q. Okay. And you testified during -- well, your testimony, you did admit that we've attended PPT meetings in the past and we were cooperative. Is that correct?

Was that your testimony?

A. Correct.

Q. Okay. So, in February of 2024 at the annual PPT meeting, we had -- it was the annual, and there was -- was there anything mentioned to us about possibly Matthewson for the school year, starting in sixth grade? Was there any mention to that at that PPT meeting?

A. No.

Q. No, there wasn't? Okay. Thank you.



Okay. So, during that meeting -- so, we did participate in that meeting. Correct? Me and Ms. [redacted] We had asked questions and we were participating. Correct?

A. Correct.

Q. Okay. And then, you testified one of the things that was really -- which I want to question about, is that you had mentioned that about [redacted] you said that he just sits there and looks like other students as if -- on the outside he looks like a normal student, but on the inside it's a totally different person, almost like a camouflage.

What did you mean exactly by, he just sits there looking like other students, if you can explain?

A. Sure. So, I did say that he sits there looking like students. I didn't make any alluding to him internally or externally being different, that those were your words.

But what I mean is that when he's in the classroom and he's unable to attend to the learning, he's not sitting there as an active learning participant. He's sitting there just hearing what's going on around him, but

it's not using the time that we have him here in school in the best manner when he could be in the resource room or with an adult and having more one-on-one interaction or -- for his learning.
Q. Did you read -- during the February PPT meeting did you bring this up to our attention that he sits there and looks like other students, and what you just testified to? Was that brought to our attention at the meeting?
ATTORNEY ROSEN: Objection. Asked and answered.
ROBERT [redacted] That part was not.
THE HEARING OFFICER: That probably wasn't. Overruled. You can answer the question.
THE WITNESS (Truscello): I don't recall if I said those specifics in that meeting.
ROBERT [redacted] Okay. Because they were never mentioned.
ATTORNEY ROSEN: Objection. I'm sorry --
THE HEARING OFFICER: Yeah. Remember, if you want to tell me something like that, it's for when you're --
R. [redacted] Oh, okay. I understand that all.
THE HEARING OFFICER: -- placed under oath, testifying.



Yeah, so.
ROBERT [redacted] No problem. Sure. Okay. A bunch of other things here.
During -- after the February -- so, let me ask you, [[redacted]s behaviors prior to the start of the -- the start of fifth grade. He was in fourth grade at the time. So, before he started fifth grade was there any behaviors reported that, like any violent behaviors reported about pushing other children down or hitting?
Or were his behaviors more in line with his, like, [redacted] You had mentioned his repeating words or saying -- blurting things out like tuna. These are the things he does when he's -- when he sees things or --
THE HEARING OFFICER: You're (unintelligible) --
ROBERT [redacted] -- part of his condition. So, I question --
THE HEARING OFFICER: You've lost -- you've completely lost the thread of your question. Why don't you go back and ask a clear question?
BY R. [redacted]
Q. Okay. So, okay. So, my question would be that, were there any violent behaviors? Were there any concerns with violent behaviors



prior to the start of the fifth grade?
A. There were no violent behaviors prior to fifth grade.
Q. Okay. Thank you. And did we reach out to you in, I believe it was, April or May of 2024 to get an update about his progress, his behaviors, and his overall academic progress, and did you provide that to us?
A. I don't -- I can't remember a specific e-mail.
Q. Okay.
A. I'm not sure.
Q. Okay. So, were there any concerns after the February 2024 meeting up until May 30th that he just wasn't, you know, academically capable of continuing in JFK?
A. I never said that.
Q. Well, I'm just asking you.
A. He -- so, during that time, as I said before, the academics started to become much more challenging within the general education classroom, which made it a lot more difficult for [[redacted] to be able to participate meaningfully within the general education classroom, which is why I suggested we have a



PPT in order to discuss a different setting for his academic learning.
Q. Does [[redacted] have an IEP that's tailored to his -- specifically tailored to him, specifically?
A. Yes.
Q. Was he, at that point in around May of 2025, was he mastering his goals and objectives around that time?
A. May of 2025?
Q. Around or so, I would say, between -- well, I'll give you a timeframe. Around from, I guess, the PPT meeting to around May of 2025, when we received an update, was he mastering his goals and objectives around, you know, around that time?
A. He was not mastering his goals and objectives and, as reported on his progress report, he was making limited progress towards those goals and objectives.
Q. So, he wasn't on his way to mastering them. That's what you're -- that would -- that's your testimony?
A. Yes, he was struggling with them, which is why we wanted to call a PPT to review and

Page 221

revise his IEP.
Q. Did you reach out to me or Ms. [redacted] at any point -- what you just testified about, he was struggling, that you wanted to hold a PPT meeting specifically, to address this specifically?
A. Yes, we reached out to you to hold a PPT to discuss his current progress and the struggles we're seeing him have, and create an IEP that would better support him for fifth grade.
Q. When did you exactly reach out to us?
When was the outreach?
A. I don't know the exact date off the top of my head, but we started to reach out around, I believe it was April after parent-teacher conferences to try to have you guys in for a meeting.
Q. Okay. You also testified, too, that you claim that you reached out to us, and before Ms. Rizzo, because you were concerned about his academics and behaviors.
Is that correct?
A. So, again, yes, I reached out for our team to have a PPT with you. As the case manager I

Page 222

was the person sending the e-mail, but these are not solely my decision, or my feelings. The whole -- there, our school-based team as a whole felt that he wasn't making the progress that we thought he would by this time, and we wanted to have a PPT in order to review and revise.
Q. So, as of February 2024 at the annual meeting, during that meeting and as we had that meeting, was there any concerns about that then?
Or did it occur only after the meeting.
A. Yes. So, at the annual PPT I created an IEP that I thought was going to be exactly what he needs. When I realized that he needed something different we called a PPT to try to review and revise, because we saw that what was put in place was not what he needed in order to be successful.
Q. So, the annual PPT meeting we had in February, which is his annual in February of 2024, everything was appropriate then.
Correct?
A. For the way he was learning and his behaviors at that time, correct.

Page 223

Q. Okay. And the outreach that we received at the end of the school year, which was May 30th, do you recall reaching out to us to hold that meeting on May 30th?
A. I don't know if I was the one who specifically did it, but we had tried to reach out for meetings over a course of a couple months with -- to set up a meeting.
Q. You did? Can you produce those communications that you did specifically with --
ATTORNEY ROSEN: Objection.
ROBERT [redacted] I don't -- I believe it's relevant.
THE HEARING OFFICER: Well --
ROBERT [redacted] There were no e-mails to support. If there's no e-mails to support, then it's -- if she did reach out to us, then we would like to see those e-mails.
ATTORNEY ROSEN: Objection. This is not the time for document requests.
THE HEARING OFFICER: No, it really isn't.
But (unintelligible) --
ROBERT [redacted] Well, if it's not at the school maybe --
THE HEARING OFFICER: -- and part of the problem is you

Page 224

haven't put in your own documents.
Yeah, that I mean --
ROBERT [redacted] Okay. So, we have to put in our own documents first for that? Okay. If that's -- that's fair enough. Okay. So, there's -- moving forward.
Oh, okay.
BY R. [redacted]
Q. You -- were there any -- did you reach out to us? You testified that you wanted to increase power educator support the end of -- right about a week before school ended. You wanted to increase power educator support going forward. I would say around May 30th of 2024 you testified that you wanted to hold a meeting because you wanted to increase power educator support.
Did you let us know, me or Ms. [redacted] that this is the reason why you wanted to hold a meeting, because you were concerned that you wanted to increase his power educator support?
A. So, I don't -- oh, sorry. We good?
I don't believe that I was the one who sent that e-mail. And the e-mail came from

Page 225

administration at that point, and it was stated that we wanted to talk about what the next steps are for [[redacted] whether that would be creating a better plan for him here at JFK or whether that would be looking into Matthewson.
So, yes. You were informed by, not me directly -- by administration that was e-mailing with you.
Q. So, the administration reached out to us about holding the meeting, because they did -- so, they mentioned that in their e-mail about the power educator support. That's where I'm trying to clear up that confusion.
That's what they reached out to us?
A. From my understanding, yes, that is what they reached out to you with.
Q. Okay. Then moving forward, Ms. Truscello, let's get into the January 2025 meeting for his annual that happened on, I believe, January 16th. Did me and Ms. [redacted] did we reach out because we wanted to separate the two meetings, meaning the annual and then having an outplacement meeting?

Page 226

Did we make that clear in several e-mails our desire to hold separate meetings?
A. Yes.
Q. Okay. Did the District honor our reasonable requests.
A. No, we felt that in order to speak to an outplacement that it's important to go through present levels and current standing of where he is in order to make a well-rounded decision about whether outplacement is appropriate.
Q. Was that mentioned to us in the e-mail when we requested to hold separate meetings? The reason you just gave, was that documented in an e-mail?
A. I don't know. I didn't send the e-mails.
Q. Okay. But you were CC'd on all of them.
Was that correct?
A. I don't know.
Q. Oh, you don't know? Okay.
Now, do you remember receiving an e-mail specifically in December, I would say around 10th or the 12th, that me and Ms. [redacted] were requesting outplacement for [[redacted] in December?

Page 227

A. You sent that e-mail, yes.
Q. Yes. So, you were aware of that? Okay.
And also, let me get back to around October of 2025. Do you remember receiving a communication from me and Ms. [redacted] that we didn't feel comfortable with how [[redacted] was being treated by you, and we requested -- or actually, Ms. Stewart, but you were CC'd on it that we requested to have [[redacted] work with his power educator.
Do you remember receiving that CC?
THE HEARING OFFICER: Just to clarify one thing, are you talking about October of 2024?
ROBERT [redacted] I'm sorry. October of 2024, yes. Uh-huh. Around October 18th -- I'm sorry. Hold on a minute. So, I'm sorry. No, September 18th of 2024. Let me correct that. I'm sorry.
ATTORNEY ROSEN: I'm sorry.
Could the question be repeated?
BY R. [redacted]
Q. Okay. In September 18th of 2024, do you remember being CC'd on an e-mail that was addressed to Ms. Stewart that we didn't feel comfortable with your behaviors towards [[redacted] and we requested that [[redacted] work with his power educator more?

Page 228

A. I believe you sent that e-mail, yes.
Q. Right. So, we brought up the power ed -- right. Okay. Moving on.
Has the District ever been reactive to any of our e-mails, or our anything that we brought up to the, you know, regarding, you know, whether it's the, actually, the behavior of the staff? Or anything that we were not happy with regarding [[redacted]s education?
ATTORNEY ROSEN: Objection. Calls for speculation.
THE HEARING OFFICER: Yeah. I mean, you're going to have to narrow down your question. I don't really -- I don't think it's answerable the way you asked it.
ROBERT [redacted] Okay. Let me try to ask it another way here.
BY R. [redacted]
Q. Okay. Are IEPs documented in writing? Or are they verbal?
ATTORNEY ROSEN: Objection.
ROBERT [redacted] I believe it's relevant.
ATTORNEY ROSEN: Did you ask if the IEPs are FERPA?
ROBERT [redacted] No, the IEPs --

THE HEARING OFFICER: No, no, no. What he asked was whether they're written or verbal. I mean, you know the answer is kind of obvious, but I'll allow her to answer it.
THE WITNESS (Truscello): IEPs are written.
BY R. [redacted]
Q. May I ask why they're written and they're just not verbal? Why is it important to document these things in writing?
A. It's important so we a have record of it, and it's a state mandate.
Q. Okay. So, you just testified it's important, so you have record of it. You mentioned many -- several times in our -- it's hard to count how many times that my e-mail seemed to spiral, that I prefer, you know, that I document in e-mails.
Wouldn't you -- in your opinion, do you feel that having documented e-mails are protecting me, just as I -- just as documenting IEPs protect the District, having documentation written documentation?
I think it's a valid question.
ATTORNEY ROSEN: Objection. Calls for speculation as to Mr. [redacted] mindset.



THE HEARING OFFICER: Yeah, I don't think any -- I don't think that's really relevant.
ROBERT [redacted] But she had -- Ms. Truscello testified on my mindset.
THE HEARING OFFICER: Sustained. Sustained.
R. [redacted] Ms. Truscello testified on my mindset during her testimony, I think in Mr. [redacted] mind --
THE HEARING OFFICER: Plus it's argumentative. Sustained. Ask your next question.
ATTORNEY ROSEN: Okay. And moving forward.
BY R. [redacted]
Q. You testified that we refused to hold -- we refused to have a PPT meeting with you at the end of May when we were first notified of the meeting. Is that correct?
A. Correct.
Q. And do you know why we refused to have the meeting?
A. I'm not a hundred percent sure what your reasoning behind it was, but in e-mails it was stated that we've already had an annual review, so there's no need for another meeting.
I'm not sure why you wouldn't want to



participate with the PPT.
Q. Are you referring to May 30th? Or are you referring to May 30th of 2024? Or you're talking about May of 2025?
ATTORNEY ROSEN: I'm going to object. I don't --
R. [redacted] I believe it's relevant because that the dates are important, because what I think Ms. Truscello just testified with that, that would be referring to something later on.
ATTORNEY ROSEN: I'll withdraw my objection.
If she knows, she knows.
THE WITNESS (Truscello): Okay.
THE HEARING OFFICER: Well, I think it's clear that, just the testimony that what he's referring to, she testified about May of 2025.
So, you can answer it.
THE WITNESS (Truscello): Okay. So, yes we reached out with multiple dates and times, trying to offer opportunities for you guys to let us know when the best date would be for us to hold a PPT to discuss what fifth grade would look like, and any reviews or revisions that we need to make to the IEP.
And you did not agree to come into any of the PPTs.



BY R. [redacted]
Q. Is this referring to 2025, or May of 2024? May 30th of 2024?
A. 2024, at the end of his fourth-grade year we tried to get you in for a meet, for PPTs, and we offered multiple dates and all of them were denied.
We were available on all the dates and times we offered.
Q. Okay. In those e-mail communications that we were sent, we were offered to meeting you. So, you reach out to us, so we were -- so, again, if I asked this question I apologize, but were you the one to reach out to us about that? Or was it another somebody else to reach out about the meeting?
ATTORNEY ROSEN: Objection. This was asked and answered.
ROBERT [redacted] So, if it was asked, if I had asked that question, like I said -- okay. If that was already answered? Okay. And again, like I said that --
THE HEARING OFFICER: I didn't -- you can answer it. I don't think it was completely. I don't think that identical question was asked answered.

Page 233

So, you can answer it.
THE WITNESS (Truscello): Okay. At the beginning I was the one who was contacting the family on behalf of our school-based team trying to set up meetings when it got to a point where the responses weren't going well for us to set up a meeting.
It went to my administration and they began to send the e-mails.
BY R. [redacted]
Q. Okay. So, during the January 16th PPT meeting, which was his annual, would you consider outplacement a transition? Talking about outplacement, would that be considered a transition?
A. I'm not sure what you mean by that.
Q. Just as I stated, we -- so, you testified that you are aware that we sent an e-mail in December of 2024 that we were looking for outplacement. Then, moving forward into January of 2025, when we had the annual meeting, January 16th to be exact, and we touched on, you know, the outplacement, that we wanted that. Would you consider that a transition, talking about outplacement?
A. Talking about outplacement is considered

Page 234

speaking about outplacement. So, no.
Q. Is that considered a transition?
A. No.
Q. Okay. During the March 6th meeting, in March 6th of 2025, do you recall when I asked what -- do you recall when I had -- do you recall telling me that outplacement would be transition? Do you recall telling me that?
A. I don't recall saying that.
Q. Okay. You also testified that Ms. [redacted] didn't participate in the January -- no, I'm sorry, the March 6, 2025 parent request meeting, which was basically to have our questions and concerns answered, but you did testify that she didn't participate.
Is that correct?
A. I didn't say she didn't participate. I said she was quiet during that meeting.
Q. I just have to look over my notes. I believe you did, but let me see.
(Pause.)
I believe you did testify in your own words that, that she didn't participate. Those were your words that you testified to?
ATTORNEY ROSEN: Objection. Argumentative, and asked

Page 235

and answered.
THE HEARING OFFICER: Well, I'll go along with -- I'll also add the fact that that's wrong. She did say that Ms. [redacted] was quiet. That's the specific language she used.
So, sustained. Ask another question.
BY R. [redacted]
Q. Okay. During the -- do you recall why we requested the PPT meeting in March 6th of 2025?
A. As I said, I believe it was to go over some things that you felt weren't done appropriately, and that you wanted to speak about with the team. So, we felt a PPT, your request for a PPT was appropriate to cover those areas.
Q. Okay. And do you recall at that meeting, because you did testify to what it was about, that one of the first things that I had mentioned was that I called this meeting because I wanted to have our parent note set, the parent note section of the IEP updated?
Do you recall that?
A. Now that you say it, yes.
Q. Okay. And do you know why we wanted the

Page 236

parent note section updated, what we wanted in there specifically?
A. I believe there was a written statement that you created that you wanted us to upload into the parent input section.
Q. Okay. Moving on. Okay. Earlier you had testified that you became [redacted]s special education teacher in August-September of -- starting the, I believe, starting in fourth grade, in September of -- the end of August, begin September of 2023. Is that correct?
A. Correct.
Q. Do you know why you became a special teacher -- why Ms. Adinolfi was no longer his special education teacher?
A. I became his special education teacher because I case managed for all fourth- and fifth-grade students.
Q. Do you recall receiving any communication that we were unhappy with Ms. Adinolfi, why we requested a change in his special education teacher? Do you recall that?
A. I -- I wasn't a part of the team while she was his case manager.
Q. So, you don't know the reasons why you

Page 237

became -- right. So, you don't. You testified you don't know the reasons why you became a special --

ATTORNEY ROSEN: Objection. Relevance? The school years at issue are 2023 through 2024, and 2024 to 2025.

ROBERT [redacted] Right.

THE HEARING OFFICER: Yeah.

ROBERT [redacted] And this is 2023, '23 to '24, and '24 to '25. This is what I'm referring to.

THE HEARING OFFICER: Was there anything about Ms. Adinolfi in your complaint?

ROBERT [redacted] Oh, yes it was.

THE HEARING OFFICER: All right. Because it's fairly substantial. Well, she's testified that she doesn't know, so.

ROBERT [redacted] Okay.

THE HEARING OFFICER: We'll take that as her answer.

BY R. [redacted]

Q. Okay. In your testimony you had mentioned that JFK, you would be able to meet [[redacted]s needs at JFK. Is that correct?

A. At what point?

Q. The point in your testimony you testified that we can meet his needs at JFK.

Page 238

A. If we were able to hold PPTs in order to increase the services as we feel was needed in order to support him? Then, yes, we would be able to.

But anytime that I might feel that those changes need to be increased or changed, I needed to call a PPT to try to make those changes.

Q. Okay. Moving on.

(Pause.)

Okay. You also testified that you sent us a PPT notice on December 17th that was just for para request and annual.

Is that correct?

A. I don't recall if that was the exact date, but if that was the document that was brought up, then yes.

Q. But wasn't your testimony that during an annual PPT meeting, during, you know, the annual PPT meeting that when you bring up a transition that you go back and, retroactive, add it to the PPT notice after a PPT meeting?

A. Correct.

Q. You said you noticed an increase in [[redacted]s behaviors. When did you notice this increase

Page 239

in [[redacted]s behaviors -- started noticing an increase in his behaviors?

A. It was around March-April-ish of the -- of 2024.

Q. What kind of behaviors did you notice, exactly?

A. As I stated before, it was more of the verbal outbursts that were happening. His avoidance of tasks, refusal of tasks.

Q. And would you say those verbal behaviors, would you tie them to his [redacted] and his -- which is basically a manifestation of his disabilities?

A. No, because [redacted] is when someone speaks and the person repeats what they said right away. He was not repeating the words verbatim for what someone was stating to him.

He was saying random words.

Q. But you did send us an e-mail in May of 2025, saying that he had an outburst at the assembly and repeated -- something that he actually heard on YouTube was, I'm half crazy. And do you recall sending us that e-mail?

A. I do recall, and my purpose of sending that

Page 240

e-mail was not about the words that he said out loud, but the fact that we had the behavior of him going up in front of the entire assembly and feeling that it was the appropriate time to yell anything. It didn't matter what the words were that he said.

So, we just wanted to make you aware that we were having an assembly and that was something that he did.

Q. Right. Were these behaviors before, of before that incident, were these behave -- were the same type of behaviors in line with other concerns, especially like in his behavioral intervention plan that he has these, you know, he repeats things or he says things? Were these types of behaviors a concern for the District prior to May of 2024 when you sent us that e-mail?

ATTORNEY ROSEN: Objection. That was just a compound question. I'd appreciate it if it could be --

THE HEARING OFFICER: Yeah, it's indecipherable. And was it May of twenty -- I thought she testified this was in May of 2025, or at least the question that elicited he (unintelligible) --

ROBERT [redacted] No, May of 2024.

THE WITNESS (Truscello): No.
ROBERT [redacted] So, the question that I --
THE HEARING OFFICER: All right. You know what? I think you asked the question wrong, but I guess she knew what you were talking about. Okay.
But, yeah. Ask a focused question this time.
BY R. [redacted]
Q. So, prior to May of 2024, were the -- did the District have concerns about, or the teachers, however you want to put it, have concerns about, you know, having these, like, calling out? So, that's I'm trying to get at.
So, his calling out was a concern for the District that has been an ongoing concern, not just in May of 2024, but that has been the ongoing concern about his calling out. Is that correct?
ATTORNEY ROSEN: I'm going to renew my objection.
THE HEARING OFFICER: Yeah. You're going to have to ask us in a way that she can answer it.
ROBERT [redacted] Okay. I'm trying to be specific. I'll try it again.
BY R. [redacted]
Q. Before May of 2024, with the concerns of [[redacted]



calling out, were those concerns that you had with [[redacted] of his calling out? Or did they just start in May of 2024?
A. So, we hadn't noticed a large amount of the calling out prior to the time that we had contacted you guys.
Q. So, that happened, the time you contacted us exactly when? So, this way I know.
A. I don't have the exact date.
Q. What month was it?
A. I don't -- we began to, like I said, we began talking to you guys about these behaviors that were becoming more prevalent around March or April. They had always -- yes, they have always been behaviors of [[redacted]s as they have been in his FBA and BIP since, I believe, as far back as first grade, as far as I know.
So, they have always been existent, but a lot of times students can have dormant behaviors that don't always spike, but there was something that had led to the spiking of his behaviors around that time and we noticed it more often.
Q. So, you were concerned about his behaviors.



That's your testimony?
A. Correct.
Q. So, would you consider his behaviors -- when you use the term "behavior," would you consider that a negative thing?
A. No.
ATTORNEY ROSEN: Objection. Relevance?
THE WITNESS (Truscello): I'm sorry.
THE HEARING OFFICER: I don't really -- I'll sustain the objection.
I didn't really understand that question.
ROBERT [redacted] Well, we received an e-mail from Ms. Truscello that -- a communication from her that when we use the term "behavior," it's not a negative thing.
ATTORNEY ROSEN: Objection. This is testimony and argumentative.
THE HEARING OFFICER: Yeah. Yeah, that's sustained.
ROBERT [redacted] Okay. So, that -- that will come up in the future, understanding that.
ATTORNEY ROSEN: I just want to note this Witness is made available now. So, to say this comes up in the future, the Witness is here today for cross-examination.
ROBERT [redacted] Well, as well, too, when I have my --



when it comes to our testimony I'm going to have more questions and I'm going to need the Witness, too. So, it doesn't just --
THE HEARING OFFICER: No, that's not how it works. See, that -- and anything, anything you wanted to cross-examine, and anything you wanted to use for cross-examination, that's why you should have had it in five days ago.
ROBERT [redacted] But you told us specifically in an e-mail, for the record, Mr. Officer Kennedy, that we wouldn't be testifying today.
I'm just cross-examining.
THE HEARING OFFICER: Well, yeah. But --
ROBERT [redacted] (Unintelligible) --
THE HEARING OFFICER: Sir?
ROBERT [redacted] But I'm being cut off, sir. (Unintelligible) --
THE HEARING OFFICER: Sir?
ROBERT [redacted] Can I be -- please --
THE HEARING OFFICER: Let me --
ROBERT [redacted] Sir, I'm being cut off. Can I please not be cut off, please, sir? I would like to get this on the record.
We have an e-mail from you specifically stating that, no, you're not going to be getting

Page 245

your testimony in, especially the first day. We have that because the District will be going and then our testimony will be coming up.

So, if this is considered the testimony, that's not what we were told in the e-mail from you prior to that. So, that's why the exhibits --

THE HEARING OFFICER: Sir?

ROBERT [redacted] -- were not sent. It's five days before --

THE HEARING OFFICER: Sir?

ROBERT [redacted] -- we present. I'm not presenting my case now, sir.

THE HEARING OFFICER: Sir, that includes, if you want to use exhibits, that includes for any purpose, including cross-examination, that you know, and you chose not to have them in by five days before --

ROBERT [redacted] So, you're saying I can't use my exhibits to bring all this into evidence?

THE HEARING OFFICER: No, not today.

ROBERT [redacted] Well, not today. But then in the future then I can bring them?

THE HEARING OFFICER: You can, but she won't. But you know she won't be here to cross-examine, so.

ROBERT [redacted] But they can still come in as

Page 246

evidence and I can still explain it then? I can still --

THE HEARING OFFICER: Yeah, sure. You can put them into evidence on your own case, but you can't cross-examine from documents that aren't in evidence. And --

ROBERT [redacted] Right. So when my documents come into evidence --

THE HEARING OFFICER: And you didn't put them into evidence for today.

ROBERT [redacted] Because you advised us that it would be five days before we provide our testimony.

THE HEARING OFFICER: What I said is for you to use them in a hearing. You can't --

ROBERT [redacted] No, we did -- we have an e-mail --

THE HEARING OFFICER: Sir, you can't use --

ROBERT [redacted] Hearing officer Kennedy --

THE HEARING OFFICER: Sir.

ROBERT [redacted] -- we do have an e-mail.

THE HEARING OFFICER: Sir?

ROBERT [redacted] I'm being cut off.

THE HEARING OFFICER: Do you want me to just dismiss the case? You cannot use --

ROBERT [redacted] Sir, are you threatening me? Are you threatening us to dismiss the case --

Page 247

THE HEARING OFFICER: You cannot use --

ROBERT [redacted] -- because I'm trying to get my evidence into the record?

THE HEARING OFFICER: -- (unintelligible) in any way.

ROBERT [redacted] I don't believe you should be threatening to dismiss the case, sir.

THE HEARING OFFICER: Yes, if you're going to be unruly, then --

ROBERT [redacted] I'm not being unruly, sir.

I'm sorry you feel that way.

THE HEARING OFFICER: I'll dismiss it with prejudice now. You cannot use the exhibits in any way including cross-examination, unless you've put them in five business days before.

ROBERT [redacted] That's what we plan on doing then.

THE HEARING OFFICER: (Unintelligible) you can -- you can ask her questions, but you just have no documents, except for the ones that the District has put in to cross examine her from. Simple as that.

ROBERT [redacted] So, then when our testimony happens in the future --

THE HEARING OFFICER: Those are the tradeoffs.

ROBERT [redacted] Okay. So, when we present our case, I can put them into evidence.

Page 248

That's what you're saying?

THE HEARING OFFICER: Yes. Yeah. But --

ROBERT [redacted] Okay. I thought you were just telling us --

THE HEARING OFFICER: But she'll be off the stand. I mean, you're not -- you know there that it's nothing you can use in her cross-examination, but you can put them in on your direct to the case.

ROBERT [redacted] Okay. So, I could use them. My understanding was from what you just told me, I thought I couldn't even put them into evidence. That was my understanding of it, and I did not understand that --

THE HEARING OFFICER: Well, people can put things into evidence in the course of cross-examination, but you know you have nothing to put into evidence in the course of cross-examination, and you can't cross examine from documents not in evidence.

So, your --

ROBERT [redacted] But so, if they were in evidence --

THE HEARING OFFICER: All I'm saying is, without having put documents into evidence your ability to cross-examine is a bit limited, but you chose to do it that way. So, you can still ask --

ROBERT [redacted] Well, I'm going by what you told us,

because we're not --
THE HEARING OFFICER: You can still -- sir?
ROBERT [redacted] We're not presenting our case today.
THE HEARING OFFICER: Sir?
ROBERT [redacted] Yeah?
THE HEARING OFFICER: Sir, you can still ask questions. That's really what you're supposed to be doing now. So, ask your next question.
ROBERT [redacted] So, I can't ask questions about something that is not technically into evidence then. I can't?
THE HEARING OFFICER: You can't. You can't cross-examine from documents not in evidence.
ROBERT [redacted] So, then when we present our case --
THE HEARING OFFICER: You can ask her --
ROBERT [redacted] -- that's what I'm --
THE HEARING OFFICER: You can ask her questions.
ROBERT [redacted] That's why I'm trying to, you know, get this cleared up. Because once we submit all our documentation, which will be when we present our case -- because we're not presenting our case today. This is the District, and you did say that it was the District presenting our case.
THE HEARING OFFICER: Yeah.
ROBERT [redacted] So, that's why (unintelligible) --



THE HEARING OFFICER: And you're cross-examining. You're cross examining, and can ask questions.
ROBERT [redacted] I'm cross-examining based upon her testimony with Mr. Rosen, but I didn't get to question --
THE HEARING OFFICER: Well, you can ask questions about her testimony. You can ask questions about the exhibits that the District has put in, but you haven't put it in any --
ROBERT [redacted] Oh, right. But I can't ask questions -- right. But when my time comes, I'm trying to understand is that once I submit my exhibits that I won't be able to question her about the exhibits I put in?
THE HEARING OFFICER: No.
ROBERT [redacted] Okay. But I can put them in and then they would be.
THE HEARING OFFICER: They would be in. You can testify yourself as to anything you want to say about them. But, yeah, they --
ROBERT [redacted] I just want it to be that they're going to be submitted and they're not going to be objected -- what I'm saying is that (unintelligible) --
THE HEARING OFFICER: Well, I mean, that doesn't mean



they won't be objected to. They can still be objected to. But --
ROBERT [redacted] Would that be based on --
THE HEARING OFFICER: Not on the basis of the five-day rule, if you've met it.
ROBERT [redacted] Would it be objected on the other case?
THE HEARING OFFICER: There still may be other objections that the District may (unintelligible) --
ROBERT [redacted] Would that be based on the hearsay rule, or no?
THE HEARING OFFICER: I'm not going to speculate on what -- I mean, the hearsay rule really isn't invoked. It's certainly not -- it's not invoked for introduction of documents, for the most part. I mean, because you know we basically have put in a bunch of educational records and business records that we haven't spent days setting a foundation for.
But, yeah, they can object for relevance or, yeah, there are other legal grounds. But you know I can't speculate on that, because I don't know what you're putting in, so.
ROBERT [redacted] Right. But I'm saying about the



hearsay rule by saying, well --
THE HEARING OFFICER: All right. Sir?
ROBERT [redacted] -- we don't have these exhibits --
THE HEARING OFFICER: I mean, we're wasting a lot of time. Will you just ask her --
ROBERT [redacted] No. I'm just trying to ask a question that I think --
THE HEARING OFFICER: Just ask the next -- will you just ask your next question?
ROBERT [redacted] Yes. If I could just get this one thing clarified since we were talking. I have one additional question for you.
Based upon those e-mails, I -- my concern is that to be objected to based on hearsay being that, well, she can't come here. She's not allowed back in to verify those e-mails.
As long as I can put them in, then I really don't have a problem. So, that --
THE HEARING OFFICER: These are e-mails that are e-mails between you and other people. You can testify about them.
ROBERT [redacted] Me and Ms. Truscello.
THE HEARING OFFICER: You are the foundation. You can. You know you can introduce those. I don't think that's going to -- you know that's not really

Page 253

going to be the issue.
ROBERT [redacted] Even if it's between me and Ms. Truscello, they could still come in then?
THE HEARING OFFICER: Sure, yeah. Yeah.
ROBERT [redacted] Okay. I was unclear about that. Okay.
Let me see if I have any other questions, and I'm going to allow Ms. [redacted] to cross-examine.

(Pause.)

ROBERT [redacted] Okay. I'm going to -- at this point I'm going to let Ms. [redacted] provide her questioning, so.
THE HEARING OFFICER: Okay. Do you have any questions, ma'am?
ROBERT [redacted] Karen? Oh, you have to unmute yourself.
KAREN [redacted] Oh, hi.

CROSS-EXAMINATION (of T. Truscello)

BY K. [redacted]
Q. I would like to know in the prior years how come his, [[redacted]s paraprofessional hours were

Page 254

not increased?
A. Sure. So, every year since I had [[redacted] on my caseload, I have increased his para hours.
KAREN [redacted] Okay. Because I'm -- I just wanted to share that within previous years, there's been --
THE HEARING OFFICER: Well, yeah. I mean, it's not time to testify. You can only ask questions.
KAREN [redacted] Okay. So, Harborside. I just -- I don't know. This may be I should wait for my testimony. I just wanted to say my main concern.
THE HEARING OFFICER: Yeah, that's something you have to say in your testimony.
KAREN [redacted] Okay. Then I'll share that for the testimony regarding Harborside, then.
THE HEARING OFFICER: Okay. Do you have any redirect?
ATTORNEY ROSEN: Yes, briefly -- oh, I'm sorry, Ms. [redacted] Were you done with your cross-examination?
THE HEARING OFFICER: Oh, I thought she was. I'm sorry.
KAREN [redacted] Yes. No, I am.
THE HEARING OFFICER: Okay.
ATTORNEY ROSEN: I have some brief redirect.
THE HEARING OFFICER: Sure.

Page 255

REDIRECT EXAMINATION (of T. Truscello)

BY ATTORNEY ROSEN:
Q. Mr. Truscello, Mr. [redacted] asked you in cross-examination about a statement that he wanted added to the IEP from January 2025. He described raising it at the March 6, 2025, meeting.
Do you recall the statement he's referring to?
A. Can you just restate that? Sorry.
My volume went out.
Q. No problem. Can you hear me now?
A. Yes, I can hear you now.
Q. Okay. Mr. [redacted] on cross-examination, asked you about a statement that he wanted reviewed and discussed at the March 6, 2025, meeting. Do you recall that statement?
A. I do remember him bringing it in, yes.
Q. What exactly did he want done about that statement?
A. So, he had written a statement. I would say it was about a page long of his personal feeling, him and Ms. [redacted] personal feelings about the team and how everything

Page 256

was going.
And he had requested that we take that statement and copy and paste it into the parent input portion of the IEP.
Q. Of which IEP?
A. I believe it was the IEP, the annual review IEP.
Q. From January of 2025?
A. Yes, that's where he wanted the document to be -- or that's where he wanted us to copy and paste it in.
Q. So, retroactively adding the statement to a document that recounted a meeting from January 2025?
A. Yes.
Q. Did the team add the statement to the actual IEP itself?
A. I don't believe we did. We just uploaded it as a parent document to CT-SEDS.
Q. So, it was still maintained as an educational record?
A. It was.
Q. But the IEP itself, the January 2025 IEP had been finalized. Correct?
A. Correct.

Page 257

Q. Now, the statement, to the best of your recollection, did it have any critique or arguments against the goals and objectives in the January 2025 IEP?
A. Not that I can recall.
Q. Do you recall any critique or arguments about the services described in the January 2025 IEP?
A. I don't believe it did.
Q. Okay. Do you recall any critique or arguments against the accommodations in the January 2025 IEP?
A. No, it did not.
Q. With respect to the PPT notice, notice for the January 2025 meeting, you mentioned that it was retroactively revised?
A. Correct.
Q. Can you, again, explain why it had to be retroactively revised?
A. Sure. In order -- it's -- it's a systematic problem, really. It's something with CT-SEDS where I can't access and then finalize the document if the -- if the invitation does not reflect the areas that are being talked about through the IEP.

Page 258

Q. Okay. And was the revised notice sent to the family?
A. It was with the finalized IEP.
Q. So, the District was transparent with the change that had been made?
A. Correct.
Q. And was the explanation provided as to why the change had been made?
A. I believe we spoke about it. I tried to explain it at the March 6th meeting when it was brought up when the family saw it, yes.
ATTORNEY ROSEN: Okay. I have no further questions. Thank you.
THE HEARING OFFICER: All right. You can recross. You can recross the Witness if you want, but it's only on the testimony she just gave on just, really just on one issue, that statement in the March IEP. Do you want to recross or not?
ROBERT [redacted] The March -- oh, the updated IEP in the March? For March?
THE HEARING OFFICER: Yeah, that was the only subject of the redirect. So, you can recross within the scope of redirect. Do you have any questions you want to ask, or not?
ROBERT [redacted] Not that I can think of now. We

Page 259

haven't even done our testimony, but as of right now I don't -- I can't think of anything right now.
THE HEARING OFFICER: Okay. And I take it the mother doesn't really have any more questions either. Right?
KAREN [redacted] No, I don't.
THE HEARING OFFICER: Okay. All right. So, we're basically almost at four o'clock. So, obviously, it's not really time to start, start another witness. So, we'll adjourn the evidentiary hearing for now, and we've got other dates set. So, we'll pick up then.
And I have a request to extend the mailing date. So, I'll act on that.
ROBERT [redacted] We'd like to find out when -- how many more days the District plans on using for their testimony so then we can present our case? We haven't got a direct answer from anybody yet.
ATTORNEY ROSEN: Mr. [redacted] that isn't true. We had an e-mail on September 13th where I told you we anticipated three days. You have gotten the response. I can't further opine without seeing any additional evidence or information.
You have not shared any witness lists, and

Page 260

your request to me each time asking if I'm going to object to e-mails, I will not be able to provide an opinion without seeing the e-mails. I will not be able provide an opinion about possible witnesses without seeing a witness list. I (unintelligible) --
ROBERT [redacted] Well, what I'm saying is that I want to make sure the e-mails -- so, for instance, I do have a list of, like, for Ms. Adinolfi, Ms. Anziano, Ms. Giannatasio. I do have e-mail communications from them that I would like coming into evidence.
And if you're going to object based on hearsay, then I'm going to have to subpoena them. That is the thing. And so, you're actually getting (unintelligible) --
THE HEARING OFFICER: Here's the thing. I mean, you're basically --
ROBERT [redacted] -- you don't have it because I'm letting you know.
THE HEARING OFFICER: You're basically saying, well, you know, I don't have to. I don't have to produce the evidence by the first day of hearing.
Well, fine. I mean, he doesn't really have to give you a hard-and-fast answer as to when he

thinks he's going to finish his case.

I mean, this --

ROBERT [redacted] Okay. So, when -- so, my --

THE HEARING OFFICER: This is kind of -- I mean, lawyers extend courtesies and so forth and work with each other because what goes around comes around, and this is kind of what you're seeing.

ROBERT [redacted] Well, he doesn't seem like to be working with me on anything, anyway.

But in any event -- I do want to mention this, too. If he objects to them saying about the hearsay rule, I will have the opportunity at that point to say, okay. Well, then I think we're going to have to extend another day because I need to subpoena these people. That's what I want to understand, this. So, if he objects based on the hearsay rule --

THE HEARING OFFICER: You know what? That's way premature. We can just take it up when it happens.

ROBERT [redacted] So, my concern is I would just like this --

THE HEARING OFFICER: If you want to start filing your exhibits now, it would probably help.

ROBERT [redacted] Well, I do not think it's fair to



give him a month notice. We didn't have a month. We only had five days, to be exact, to look over all his exhibits. Why should he get a month?

That prejudices us.

THE HEARING OFFICER: Before they relatively recently changed the law, the parents and the District always routinely filed all their exhibits up front. But then the parents went first, and you know. I mean, so, the District was sort of in the same position you are.

ROBERT [redacted] Well, they wouldn't (unintelligible) resolution --

THE HEARING OFFICER: And then -- sir?

ROBERT [redacted] (Unintelligible) --

THE HEARING OFFICER: Sir, I have to tell you, no one really thought much of it, so.

ROBERT [redacted] Well, we did receive the e-mail that it's due --

THE HEARING OFFICER: This is just -- I mean, this is just something that attorneys never get into, so.

ROBERT [redacted] So, October. So, the next day would be October 17th. They're going to continue. And then the next day after that, I believe is the 24th. Right?

THE HEARING OFFICER: I think so. I don't have it



right in my --

ROBERT [redacted] So, there would be two more days and then our exhibits are, like, due five days before we start, which would be --

THE HEARING OFFICER: Remember, it's five business days.

ROBERT [redacted] Right, five business days. Exactly right. So, they have two more days of full testimony.

THE HEARING OFFICER: And here's the other thing. I'm not sure exactly how it falls in with hearings, but somewhere in there Columbus Day falls, and Columbus Day is not a business day. So, that's something to keep in mind, too.

KAREN [redacted] I have some questions. When are the next dates that we're meeting? I just -- because I know it's been a while since we've discussed.

THE HEARING OFFICER: Yeah. Let's see. I don't have my --

ATTORNEY ROSEN: In our calendar we have October 17th as the next hearing date, followed by October 21st.

THE HEARING OFFICER: So, is it the 21st? Let me see what I've got.

KAREN [redacted] The 17th, 21st, and then November



4th, I think.

ATTORNEY ROSEN: The fourth day is October 27th, and then we have a date in November. The fifth date is November 4th.

ROBERT [redacted] So, that only gives us two days to present our testimony. We're going to need more days than that. If the District gets the 17th and the 21st to complete their testimony and everything, and we start on the 27th, we are going to need the 27th, the 4th and there's going to have to be another date because we have substantial, you know (unintelligible).

THE HEARING OFFICER: Yeah, I mean -- you know what? We can -- if we run out of dates, we can set new ones, you know, that (unintelligible) --

ROBERT [redacted] Okay. So, our understanding now is that (unintelligible) --

THE HEARING OFFICER: That's not really an issue.

ROBERT [redacted] Right. Our exhibits and witness list is going to be due five days before, business days before the 27th, according to your e-mail. That's what you told us.

This is exactly what the District -- also according, you know, to your e-mail, they abided by the five-day rule, five days before they

presented their testimony. That's what we're going to abide by, too. So, they can't say that we're being unreasonable. They abided to it and we're going to abide to the same rule. So, it's like rules for the, you know, they're not for me. It doesn't work like that. So, that's why.

So, on the 27th, five business days before the 27th, we're going to provide. They will -- you will have our exhibits. (Unintelligible.)

THE HEARING OFFICER: And then just hope we don't wrap up the case in two days, because they're not bound by that either, so.

ROBERT [redacted] I'm sorry?

THE HEARING OFFICER: And then just don't hope that they don't wrap up their case in two days, because they're not bound by that either. Yeah, just as (unintelligible) --

ROBERT [redacted] What do you mean by that?

THE HEARING OFFICER: He's not bound by his estimate of how long it's going to take him. So --

ROBERT [redacted] So, he can say that he's done on the 17th?

THE HEARING OFFICER: What is the rule? What is the rule that requires him to, you know --

ROBERT [redacted] Well, what I'm asking you -- so, that



means he could say that we're done on the 17th. Then, if he says, well, then the parents will be starting on the 21st, thinking that it's the 27th and they're saying, oh, we didn't get his exhibits yet. And, you know, that's going to be getting (unintelligible) --

THE HEARING OFFICER: So --

ROBERT [redacted] That's not going to -- it's going to prejudice us. We'd like to know.

THE HEARING OFFICER: You really should just put your exhibits in sooner rather later.

ROBERT [redacted] I will give them five business days, just like we had five business days, sir.

THE HEARING OFFICER: All right.

ROBERT [redacted] I feel like that's --

THE HEARING OFFICER: You can make your --

ROBERT [redacted] -- preferential treatment to the District and we're getting, you know, the short end of the stick. They submitted -- they didn't give us our exhibits. We knew we were going to have this due process hearing. But, you know, you came on the case what? The end of July.

We didn't get the exhibits a month before. We got them five business days before, and we're going to -- we're going to stick by that rule and



we're going to give them five business days before we plan on doing our testimony.

So, we plan on providing our testimony starting on the 27th. If the District says they're done on the 17th and they're saying, oh, we didn't get them, they're going to start the 21st, then we're not going to be able to. That's not going to be fair to us.

So, we're going to know --

THE HEARING OFFICER: Well --

ROBERT [redacted] So, they're going to use two more days. We're going to note as of the 27th, for the record, we will provide our exhibits five business days before the 27th, including our witness list. That's the date we have. The District testified that they're going to use another two day (unintelligible) --

THE HEARING OFFICER: If it's ready to go to your case and you're not ready, then --

ROBERT [redacted] Well, then that means we can't get our exhibits. So, if you said it's not (unintelligible) --

THE HEARING OFFICER: Yeah, and then -- well, then you couldn't put on a case, so.

ROBERT [redacted] That would prejudice us.



THE HEARING OFFICER: You know, I mean, you're playing -- you're playing with fire to say, no, we're going to wait until --

ROBERT [redacted] I don't believe I'm playing with fire.

THE HEARING OFFICER: -- what we think the last minute is, but --

ROBERT [redacted] They got five business days, sir. We're just looking for the same. We're looking for the same respect, five business days.

THE HEARING OFFICER: Like any lawyer, you can make your tactical choices and if they go sideways, they go sideways.

ROBERT [redacted] I don't see anything is going sideways.

THE HEARING OFFICER: We've talked about this long enough. You know --

ROBERT [redacted] Well, I don't feel that's being fair to us as pro se parents because I have to say for the record, because, you know, if you're -- if the District got the five business days, we would expect to get the five business days, too.

And now you're saying, well, you know, if they cut their testimony short, then, yeah. You're basically saying, well, then you're out of

luck. No, that's not (unintelligible) --

THE HEARING OFFICER: All right.

ROBERT [redacted] That's going to prejudice us.

THE HEARING OFFICER: You are out of luck. So, anyway --

ROBERT [redacted] We shouldn't be out of luck. That's not even a fair statement to make, sir.

THE HEARING OFFICER: No, it's your choice.

So, anyway --

ROBERT [redacted] No, it's not my choice (unintelligible) --

THE HEARING OFFICER: -- we're done. We're done with today's hearing. We'll reconvene at the next one.

ATTORNEY ROSEN: Thank you.

THE HEARING OFFICER: So, have a good day, everybody.

KAREN [redacted] Thank you.

THE REPORTER: Off the record.

(End: 4:05 p.m.)



STATE OF CONNECTICUT
[Hartford County]

I, ROBERT G. DIXON, a Certified Verbatim Reporter for the State of Connecticut, do hereby certify that I took the above 269 pages of proceedings of the STATE OF CONNECTICUT, DEPARTMENT OF EDUCATION, SPECIAL EDUCATION HEARING In Re: [redacted] COMPLAINANT, VS. MILFORD BOARD OF EDUCATION, RESPONDENT, Docket Number: 25-0686; HELD BEFORE: PATRICK KENNEDY, ESQ., THE HEARING OFFICER, on September 24, 2025 (via Teams teleconference).

I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of computer assisted transcription; and I further certify that said deposition is a true and accurate record of the testimony given in these proceedings.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and seal the 9th day of October, 2025.

Robert G. Dixon, N.P., CVR-M No. 857

My Commission Expires 6/30/2025



INDEX


| WITNESS | PAGE |
|---|---|
| Tara Truscello | 57 |
| Direct Examination by Attorney Rosen | 58 |
| Cross-Examination by R. [redacted] | 215 |
| Cross-Examination by K. [redacted] | 253 |
| Redirect Examination by Attorney Rosen | 255 |


HEARING OFFICER EXHIBITS


| NUMBER | | PAGE |
|---|---|---|
| 1 | Request for hearing | 29 |


BOARD EXHIBITS


| NUMBER | | PAGE |
|---|---|---|
| 1 | 1/26/'23 Consent form (2 pages) | 32, (98) |
| 2 | 4/27/'23 IEP (18 pages) | 32, (65) |
| 3 | 6/13/'23 Progress report | 32, (75) |
| 4 | 11/30/'23 PPT Meeting (18 pages) | 32, (84) |
| 5 | 11/30/'23 Prior written notice | 32, (92) |
| 6 | 12/14/'23 Progress report | 32, (94) |
| 7 | Jan/2024 Psych evaluation (10 pgs) | 32, (100) |
| 8 | Feb/2024 BIP (4 pages) | 32, (115) |
| 9 | Pre-triennial review prog report | 32, (120) |
| 10 | 2/1/'24 Review notice | 32, (114) |
| 11 | Jan/2024 Educational evaluation | 32, (110) |
| 12 | | 32 |
| 13 | 2/8/'24 IEP From reviews (25 pages) | 32, (121) |
| 14 | | 32 |
| 15 | 3/20/'24 Progress report | 32, (130) |
| 16 | 6/10/24 Progress report (16 pages) | 32, (131) |
| 17 | '24-'25 Progress report | 32, (153) |
| 18 | 12/17/'24 PPT Meeting notice | 32, (157) |
| 19 | Jan/2025 BIP | 32, (163) |
| 20 | 1/9/'25 Progress report | 32, (166) |
| 21 | 1/16/'25 Annual review IEP | 32, (166) |
| 22 | 1/16/'25 Prior notice (4 pages) | 32, (186) |
| 23 | 2/3/'25 PPT Scheduling | 32, (191) |
| 24 | 3/6/'25 PPT Meeting notice | 32, (192) |
| 25 | 3/6/'25 IEP | 32, (192) |
| 26 | | 32 |
| 27 | 3/31/'25 PPT Notice | 32, (204) |




INDEX (cont'd)

BOARD EXHIBITS (cont'd)


| NUMBER | | PAGE |
|---|---|---|
| 28 | 4/28/'25 PPT Notice | 32, (206) |
| 29 | 5/8/'25 PPT Notice | 32, (206) |
| 30 | 5/21/'25 Placement PPT/IEP meeting | 32, (207) |
| 31 | | 32 |
| 32 | 6/11/'25 Progress report | 32, (213) |
| 33 | | 32 |
| 34 | | 32 |
| 35 | | 32 |
| 36 | | 32 |
| 37 | | 32 |
| 38 | T. Truscello resume (2 pages) | 32, (59) |


All exhibits retained by Counsel.

CONNECTICUT STATE DEPARTMENT OF EDUCATION
SPECIAL EDUCATION HEARING

| | |
|---|---|
| In Re: [redacted] Complainant vs. MILFORD BOARD OF EDUCATION, Respondent | Doc. No.: 25-0686 |

HELD BEFORE:
PATRICK KENNEDY, ESQ., THE HEARING OFFICER

DATE: October 17, 2025
TIME: 10:05 a.m.
PLACE: (Via Teams Teleconference)

Reporter: Robert G. Dixon, CVR-M #857

A P P E A R A N C E S:

For MILFORD BOARD OF EDUCATION:

BERCHEM MOSES, PC
75 Broad Street
Milford, Connecticut 06460
By: HERBERT Z. ROSEN, ESQ.
HRosen@berchemmoses.com
203.783.1200

For the Complainant ([redacted]

ROBERT [redacted] (pro se)
and
KAREN [redacted] (pro se)

Also Present:

NADINE MACKLIN,
Milford Board of Education
Special Education Supervisor

(Begin: 10:05 a.m.)

THE HEARING OFFICER: Okay. On the record.

So, my name is Patrick Kennedy, the Hearing Officer appointed by the Connecticut State Board of Education to preside over the special education hearing. We're here to inquire into the case of [redacted] versus the Milford Board of Education. This is a continued hearing in this matter.

And at this point, I'd ask all those present in the hearing room to identify themselves for the record and sign in -- well, not sign in. We're in a virtual hearing, but identify themselves for the record.

ATTORNEY ROSEN: Hi. Good morning. Herbie Rosen, attorney for the Milford Board of Education.

And I'll go ahead and introduce Nadine Macklin, who's a special education supervisor for the Milford Board of Education. We also have present with us Amy Rizzo, the Principal of JFK Elementary School, an elementary school in -- the Milford Board of Education's elementary school.

ROBERT [redacted] I'm Robert [redacted] [[redacted]s dad.

KAREN [redacted] Karen [redacted] [[redacted]s mother.

THE HEARING OFFICER: Okay. Thank you.

So, we've got some exhibits that were submitted prior to just -- hold on one second. I've got some background noise.

(Pause.)

THE HEARING OFFICER: Okay. Sorry about that.

All right. So we have a number of exhibits that were submitted between the two hearings, basically. What we've had is Parents 1 through 78 submitted. At this time, I'll ask the District if there's any that they're willing to stipulate to?

ATTORNEY ROSEN: Sure. We do have a series of objections we'd like to raise, but just real --

THE HEARING OFFICER: All I'll do right now is what you're stipulating to. Anything that you want to object to we'll just, you know, if there's a motion to introduce it at the hearing, I'll rule on the admissibility then. So, if there's anything that we can just let in without your objection, then I'm just --

ATTORNEY ROSEN: Sure. Yeah. It's a limited list, but I can go ahead. No objection to P-12, P-13. No objection to P-20. No objection to P-21, again, assuming that foundation will be provided for each of these exhibits.

THE HEARING OFFICER: Well, actually, I mean, I'm

trying to sort of bypass that. Just, you know?

ATTORNEY ROSEN: Sure.

THE HEARING OFFICER: If you're stipulating to them, they're just full exhibits.

ATTORNEY ROSEN: Okay. Sure, that that's fine. And P-21 and then P-22.

THE HEARING OFFICER: Okay?

ATTORNEY ROSEN: P-29, P-30, P-34, P-35, P-37, P-38, P-forty -- excuse me, P-42, P-43, P-44 -- excuse me, P-45. We are objecting to P-44.

P-45, P-46 and P-47.

We also do not -- we'll stipulate to P-52, P-65, P-68, P-76. And those are the exhibits we'll stipulate to.

THE HEARING OFFICER: All right. So those are all admitted as full exhibits by stipulation.

(Parent Exhibit Numbers 12, 13, 20, 21, 22, 29, 30, 34, 35, 37, 38, 42, 43, 45, 46, 47, 52 65, 68, and 76, marked for identification and noted in index.)

ROBERT [redacted] Hearing Officer Kennedy, I'd like to respond. These are regarding my exhibits. I would like to object to the District's objection

about my exhibits.

I recall in your own words, on the record, you emphasized the importance of courtesy and compromise between the parties. I did not object to any of the District's exhibits, even though I had grounds to. I extended that courtesy to the District in good faith based on what you stated about the expectation, expectation to compromise.

The District is now attempting to object to my exhibits, demonstrating a failure to reciprocate the expected courtesy and compromise. I assert that the District should not be permitted to benefit from the courtesy I extend while simultaneously using a technical objection to silence or suppress my evidence, and I respectfully request that all of my exhibits come into evidence.

THE HEARING OFFICER: All right.

ROBERT [redacted] They are relevant to the record and they have to do with this case.

THE HEARING OFFICER: I'm not ruling on any. I'm not ruling on any exhibits right now. I'm just establishing which ones are agreed to. And so, all those -- all those exhibits are admitted as full exhibits by agreement.

As the hearing goes on, if you want to do any of the ones they haven't agreed to, you can move to have admitted. The District can object and I can just rule on the objection or admissibility of the exhibit. We would do that in the course of the hearing.

What we're really doing is saying which exhibits we don't even have to go through that on. So, they provided a number that they're just willing to stipulate to and you don't have to really move to enter them as exhibits. They're already admitted. So, all right.

ROBERT [redacted] So, Hearing Officer Kennedy, I'd like to address something from last time, if I can please?

THE HEARING OFFICER: Go ahead.

ROBERT [redacted] Okay. There was a specific statement that was entered into the record during the last hearing on September 24th. The Witness for the School District, Ms. Truscello, made a statement regarding my thoughts and beliefs. The statement which can be found in the transcript on page 176, line 9 states, in his mind I do believe he thinks.

Hearing Officer Kennedy, as a pro se party representing myself, I must object to this

specific testimony. The Witness has no way of knowing what I think or believe. The statement is pure speculation on the part of the Witness and is not based on their personal knowledge or observation of facts.

A witness cannot testify to another person's state of mind. Therefore, I respectfully request that this speculative testimony be stricken from the record. It is inappropriate for the record to contain testimony regarding my supposed thoughts and beliefs, as it is based on conjecture and could be unfairly prejudicial.

My request is that the record be corrected to reflect only factual testimony, not personal unfounded speculation about my thought process.

THE HEARING OFFICER: All right. Well, to object to testimony, you have to object at the time. But I mean, I think that's a fair observation concerning the weight that should be given to that testimony. So, it may wind up kind of amounting to the same thing.

All right. So, with that, we'll move on to the taking of evidence. So, does the District want to call its first witness?

ATTORNEY ROSEN: Yeah. Just a moment of clarification.

I understand that -- if I understand correctly, you'd prefer to address Mr. [redacted] exhibits as they come in, but there were a few collection of exhibits that we thought just had a blanket reason that it should not be included from the get-go with respect to this hearing. Would you want to hear the Board's perspective on that now, or address it as it comes in?

I'm just trying to streamline the process so we can cut down on breaks during testimony as we move forward.

THE HEARING OFFICER: I'll address it as it comes in. Now, if I rule on one thing and then it's sort of observed that this is pretty much the same thing, then that's fine. I don't think there has to be extended argument on each, each one.

But for now, I'm just going to rule on things as they come in because not everything may wind up being offered that happens. All right?

ATTORNEY ROSEN: Okay. Under --

ROBERT [redacted] I would like to just quickly respond to Mr. Rosen's comment. Like I stated, my exhibits are about this hearing and they are very vital to my testimony and to this hearing. These should -- none of them should be objected to.

I should not be unfairly silenced. I did not silence the District. I was respectful. And even though there were some exhibits I would consider objecting to, which I did, I did not, because I gave the courtesy and I expect the courtesy in return. That's all I'm, you know. That's all I have to say about that.

THE HEARING OFFICER: All right. So, Mr. Rosen, you can proceed.

ATTORNEY ROSEN: Sure. And will there be a time to discuss the parents' proposed witnesses?

THE HEARING OFFICER: If there's any that you object to, we can do that now.

ATTORNEY ROSEN: Yes, I'm sorry. I don't mean to hold up. I just don't want to interrupt testimony as we proceed.

With respect to the proposed witnesses that are listed, I just want to note for the record that Jennifer Stewart and Brenda Anziano are both former employees of the District. So, we cannot make them available, as is the case with Courtney Carrano, a former employee, and Andrea Giannattasio.

I would suggest if those witnesses are in some way being called, that an offer proof be put

in by Mr. [redacted] as to why their involvement is necessary for testimony when the District is able to make its current employees available for testimony and has provided notice that it has a list of its witnesses available.

I want to raise objection to the proposal of including Charlotte Adinolfi, a special education teacher. We would require an offer of proof as to why she needs to be a witness. She was the special education teacher for the student at issue during the 2022-2023 school year. That is not a school year that's at issue in this due process hearing.

This due process hearing is with respect to the District's provision of a free appropriate public education for the '23-'24 and '24-'25 school year. Ms. Adinolfi would not have any testimony as to whether the District fulfilled its obligation to provide a free appropriate public education during the school years at issue.

I can continue with our objection for witnesses, unless you'd like to stop right there with respect to Ms. Adinolfi.

ROBERT [redacted] I would like to respond to that after you --

THE HEARING OFFICER: Yeah. Why don't you respond to Ms. Adinolfi, because I think she was a special education teacher outside the period that's covered by the hearing.

ROBERT [redacted] Me, sir?

THE HEARING OFFICER: Yeah.

ROBERT [redacted] Okay. First, I want to make a comment. Mr. Rosen did say she was involved between the '22 and '23 school year, and then in the same sentence, he says this here, this is in respect to the '23 school year and moving forward. So, yes, she is a relevant witness because my exhibits had mentioned -- I have exhibits from her, which I would require that she be able to testify to them.

And as far as the objection to Ms. Jennifer Stewart, I did find out that she is working for the Greenwich School District. We had e-mail conversations, and she is the front and center of a lot of these -- most of these allegations and issues that this due process hearing is about, the violations that have occurred, and it's important that Ms. Stewart be made available.

As far as Ms. Giannattasio and also Courtney Carrano, if I can get in e-mail evidence, which I

have, where if the District objects to e-mails from Ms. Giannattasio and Miss, you know, Courtney Carrano, then I would definitely have to have them come in to verify those e-mails. That would be the only reason I would need some of those witnesses, and I put them on the list. So, that would -- since they come from, you know, school e-mails, I don't see why they would be objected to based on the hearsay rule. That was my concern.

But as far as Ms. Stewart and Ms. Adinolfi, I believe they are, you know, witnesses that do need to come in that play an important part of these, of this hearing, you know, for my case.

THE HEARING OFFICER: All right. I mean, if you want to file a subsequent offer of proof on Charlotte Adinolfi, you know you can and I'll consider it. But right now, it seems like she was special ed before the period, the special ed teacher before the period in question, the school years that are the subject of this issue.

I believe during the entire time, the Witness who testified last time was the special ed teacher for the entire time. So, I don't really see at this point where she should be, where the District should have to produce her.

Jennifer Stewart, I mean, you talked about a subpoena. You can get me -- oh, I know the name, the specific business address, because that's probably where she would have to be served, and the exact date that you're going to need her. And I could forward that on, forward that on to the Department for service.

I mean, I know that I -- because her name had come up, I did see that she was present at a lot of the PPTs, so I think that makes her a valid witness. If she gets served and files a motion to quash, that would be up to her, but I don't think that's really the Milford School District's issue.

So, Jennifer Stewart, I'm inclined to allow and inclined to issue a subpoena for her to come in. Charlotte Adinolfi, I think, is before the period in question, so I don't think she has anything to testify to, so.

ROBERT [redacted] Well, as far as the e-mails from Ms. Adinolfi, I think -- well, since it does state from, you know, the '23 year to the present, those e-mails would be relevant. So, if Ms. Adinolfi doesn't come in to testify, that I could still use those e-mails and it wouldn't be objected based on the hearsay rule? That was my concern, especially

with Ms. Adinolfi, as far as providing relevant testimony.

It would be basically just in case the school, you know, the District decides to take the hearsay route, that I could show those e-mails came from her. And I can, you know, put them into evidence because I'm showing a pattern of behaviors. I'm showing a pattern.

You know, when my testimony comes up I will explain that, but I'm showing starting, you know, in the '23 school year up to the, you know, when I filed for due process, which is the timeframe. So, she was --

THE HEARING OFFICER: If you -- I mean, it sounds like there are two parties to these e-mails. So, you can testify to the authenticity of them. And you know they're in the Milford school system's --

ROBERT [redacted] Their business records.

THE HEARING OFFICER: -- e-mail, yeah. So, I'd be inclined to overrule any objection on those grounds, but the District's objections may be more in the nature of relevance or something else. So, I don't see the need to bring her in just over that.

ROBERT [redacted] Fair enough.

THE HEARING OFFICER: But -- yeah, Jennifer Stewart was at the PPTs. I mean, I've seen enough already to determine that. So, all right.

If we're done with that, why don't we move on to evidence?

ATTORNEY ROSEN: Well, I apologize. There are still a few witnesses we need to just raise objections to. And I just want to clarify for the record, it's not the calendar year 2023 that is at issue. It is the school year 2023-2024, which starts in July of 2023. So --

THE HEARING OFFICER: Yeah. No, I understand that. And I think Charlotte Adinolfi predates that. Yeah, you're right. We always go by school years.

ATTORNEY ROSEN: Yeah.

THE HEARING OFFICER: And Charlotte Adinolfi predates that, but it doesn't seem to me that Jennifer Stewart does, because she was sitting in the PPTs that were -- she just left the District sort of subsequent to all this.

ATTORNEY ROSEN: No problem. The next witness, if I may just raise objection to, is Darlene Koosa. She is a teacher leader at JFK Elementary. Ms. Koosa is not a member of the planning and placement team meeting for [[redacted] She has not

attended any of the planning and placement team meetings that are at issue during this due process.

While she does support staff in the school setting and reaches out with regards to school management or behavioral management, she is not a participant in any of the school education decisions with respect to the provision of special education to [[redacted] during the '23-'24 school year or the '24-'25 school year. So, we believe her involvement is fruitless and not relevant with respect to this matter.

ROBERT [redacted] I have to object to Mr. Rosen's interpretation of that. She was involved with my child. I have e-mails to show it is part of the whole complaint that I had filed. I had submitted e-mail exhibits involving her and my child. So, she did have involvement with my son during the school year.

So, if she was not part of the team, then she wouldn't have had been involved in this, you know, with my child, and she was. So, it's definitely fair that she be a witness. You know, I do have the e-mail evidence to show that she was involved with my child.

THE HEARING OFFICER: Well, when you say, was involved, how so?
ROBERT [redacted] Well, e-mails speak for themselves. I have exhibits that I had submitted.
THE HEARING OFFICER: Well, just kind of say -- I mean, summarize what was her involvement? Did she actually teach? Did she teach the student, your son? Was she a teacher for him?
ROBERT [redacted] Well, I have e-mails here. So, let me bring them up here. Just give me a minute.
THE HEARING OFFICER: I mean, can you just sort of tell me in very --
ROBERT [redacted] Yeah, I'm just looking for them.
THE HEARING OFFICER: I mean, I don't necessarily think you need the e-mails right now to just be able to tell me what was her involvement. She apparently wasn't on the PPT team. Did she teach?
ROBERT [redacted] She was a teacher leader. So, she was involved with my child. So, let me --
THE HEARING OFFICER: Was he actually her student? Was he in a class that she taught?
ROBERT [redacted] That, I'm -- let me find. Let me look at these and find out before I answer.
(Pause.)
ATTORNEY ROSEN: Respectfully, from the Board's

perspective, there's a distinguishment between those who are involved in the actual provision of special education and the provision of free appropriate public education.

And staff --

ROBERT [redacted] Okay. I just found it.

ATTORNEY ROSEN: -- may interact with the student from a managerial standpoint or school operations standpoint.

ROBERT [redacted] I do have -- so, basically we do have the e-mail incident. There were some incidents involving my child, which came from Ms. Koosa, specifically on September 25, 2024.

THE HEARING OFFICER: All right. We don't necessarily have to get into the details of everything she's going to testify to.

But she reported what? She e-mailed you about potential behavioral issues or incidents?

ROBERT [redacted] Yes, exactly. Yes. And these, these are things that are part of our case. We're trying to build a case that's, you know, showing that, you know, this is what was reported by this, by the staff.

She is a staff of the school. She was directly involved with my child and we have

e-mails to show that. So, they are definitely relevant.

THE HEARING OFFICER: You know what? I mean, I'm not going to block a witness from testifying unless it's clear even before we start that what she's -- you know that she has nothing to say basically.

I'll allow her testimony, and then subject to any objections to relevance or lack of personal knowledge and anything she might testify to, but I just don't see at this stage of the proceedings where I can make that determination. So, I'll allow her to testify.

I mean, it may turn out that a lot of what she's asked might be objectionable, but I just can't determine that right now. I think the actual -- we have to go through the actual questions to find out. So, I'm not going to bar her from testifying at this, or bar the parent from requiring her to testify at this, this point. I think it's just premature to make that determination.

She seems to have had some involvement during the period in question, and I'm not entirely sure what it is, but I'm not going to guess at her right now either. All right?

ATTORNEY ROSEN: Sure. Understood.

The final, the final witness --

ROBERT [redacted] Also the -- we'd like to also --

ATTORNEY ROSEN: I'm sorry.

ROBERT [redacted] Go ahead.

THE HEARING OFFICER: Yeah, let's hear the last witness?

ATTORNEY ROSEN: Yeah, the final witness we want to raise objection to is Thomas Zenowitz. Mr. Zenowitz is the current director of pupil personnel services for Milford Public Schools. He did not assume that position until August of 2025. Mr. Zenowitz had no direct involvement with the provision of special education for this student at the times at issue and relevant for this due process. While he is the director of pupil personnel services, he has not been directly involved.

And we're talking about the recommendations and provision of services during two preceding academic years, and the recommendations that were made before Mr. Zenowitz's employment with Milford Public Schools pertain to this year. So, there's no evidence that he could offer that would be probative in this matter.

ROBERT [redacted] So, my response to Mr. Rosen would be that Mr. Zenowitz is the current pupil personnel. Ms. Stewart was the previous pupil personnel. And one of my exhibits does refer to a communication and letter that was sent. And when I clicked on it to look, view it, it was deleted from the system.

And records should not be deleted from a school system. We had received the link to an e-mail and to a communication log. It wasn't an actual PDF with any school -- it didn't have any school, you know, heading on it or any headers on it. It was just -- one was a blank document written up by Ms. Anziano. And since Mr. Zenowitz is the current pupil personnel, I did e-mail him recently, and he has ignored my e-mail. So, I think he would be relevant.

As a matter of fact, because I'm trying to get communications to bring into evidence because they could be objected to based on, you know, relevance or hearsay, because when you see a blank document without, you know, with just, you know, writing on it or something, and there's no header on it, I mean, who? Who could have made it?

I mean, and that's the whole reason, is that

I have an e-mail from Ms. Anziano that shows that, you know, here's the communication log, here's the letter, but when you click on it, it says it's deleted. And I, specifically, when I addressed that with Mr. Zenowitz, since he's the new pupil personnel, I was -- I wanted to get these records. He ignored me. So, I had not received any response from him.

So, he would definitely be relevant. And, you know, so this way I can get those records into testimony regarding, you know, during that time of the school where, you know, during that school year where these exhibits would be relevant.

ATTORNEY ROSEN: When did --

THE HEARING OFFICER: Can I just? When exactly did he start again?

ATTORNEY ROSEN: Mr. Zenowitz started employment in mid-August, 2025, with the District. So, that was after the filing of this due process complaint.

Any correspondence with him subsequent to the filing of the complaint is not at issue here and not relevant.

THE HEARING OFFICER: Yeah, the PPT was held in May of 2025, and the complaint basically was filed immediately after that. Right? I have the timing

right?

ATTORNEY ROSEN: That's correct.

THE HEARING OFFICER: Yeah. He's definitely outside the time period covered by this. So, I don't see any relevant testimony that he could provide.

So, I am going to sustain the District's objection to Mr. Zenowitz.

ROBERT [redacted] Well, Hearing Officer Kennedy, the reason I'm asking, the reason I was requesting his testimony is because since Ms. Stewart doesn't have access to school records, he would be the next in charge that has access to these school records, which is relevant to my testimony.

Matter of fact, I have -- let me get my list here. There are -- I'm going to find the exhibit here that I'm referring to.

So, it was in -- let me just bring it up.

Oh, no. It was back in 2023 -- no, '24.

Okay. Just see if this one -- okay. Here it is. I did receive a letter from -- let's see here. A letter, an e-mail from Ms. Anziano, who was the interim principal at the time in May of 2023, which says, please see attached letter and communication plan. When you click on it, it says deleted. It should not be deleted.

And my exhibits, one of my exhibits is a letter from Ms. Anziano dated May 4, twenty-twenty -- actually, May 4th -- it says, 3023. She obviously made a typo.

But when you look at it, she didn't sign it. It just says, dear Ms. [redacted] and Mr. [redacted] And there's -- in here, it's --

ATTORNEY ROSEN: Objection. Hearing Officer Kennedy, this is testimony.

ROBERT [redacted] Please don't interrupt me, Mr. Rosen.

THE HEARING OFFICER: Now let me --

ROBERT [redacted] Mr. Rosen, let me finish, please? Mr. Rosen, I (unintelligible) --

THE HEARING OFFICER: Really, the issue here is that he's after the time period. So, whatever happened after that just isn't part of this case.

So, I am --

ROBERT [redacted] Well, Hearing officer Kennedy --

THE HEARING OFFICER: I've ruled. I'm --

ROBERT [redacted] But Hearing officer Kennedy, I --

THE HEARING OFFICER: I'm sustaining the objection to Mr. Zenowitz.

ROBERT [redacted] Okay. Hearing officer Kennedy, I have an exhibit, which is -- let me see here -- P-6, which is a letter from Ms. Anziano, she sent

us, which is highly relevant to my case.
THE HEARING OFFICER: All right. P-6 hasn't been admitted yet, and it's not clear whether or not it will be. You would have to offer it in the normal course of the hearing. But --
ROBERT [redacted] But I'm assuming it's (unintelligible) --
THE HEARING OFFICER: Again, I think you have some reason that you think that he can provide some testimony that sort of bears on this, but really he was hired in August. The case was brought in May. I mean, that's pretty much it.
ROBERT [redacted] If Ms. Stewart was still the pupil personnel I wouldn't have to -- this wouldn't be an issue right now, because I'm looking to verify this, the authenticity of this letter, which is attached to, actually, my exhibit P-7, which is coming from -- on Friday, May 23, 2023, from Brenda Anziano, who was the interim principal at the time. That says, please see attached letter of communication. When it's clicked on, it has been deleted and it should not have been deleted.
So, being (unintelligible) --
THE HEARING OFFICER: All right. Well, I mean, you know we can -- I mean, if there's something to

take up there, and if there's something to take up during the hearing, I mean, at least you can testify to what you found when you went into school records. I mean, a lot of this involves you on the other side, but --
ROBERT [redacted] It's just a blank document. It basically doesn't have any e-mail headers.
She didn't put her name on it.
THE HEARING OFFICER: And when was this?
ROBERT [redacted] This was sent -- we received this -- well, this letter basically, which is my exhibit P-6, a letter from Anziano, which I have received from Ms. Anziano, May 3rd -- it actually says 3023.
THE HEARING OFFICER: All right. So, I mean, you can ask her --
ATTORNEY ROSEN: I'm sorry. That's May 3, 2023.
That is not at issue.
THE HEARING OFFICER: Oh, 2023.
ROBERT [redacted] Yes.
THE HEARING OFFICER: Oh, I thought you were talking about 2025.
ROBERT [redacted] No, I'm just saying it was a typo there, but this is coming from, you know, Ms. Anziano because it says in the e-mail -- on my

Exhibit P-7, it says, here's my third try. Sorry. Please see attached letter and communication.

But it wasn't attached. It was basically a blank.

THE HEARING OFFICER: All right. I mean, you can ask her. You can question her about that, but this guy just wasn't there.

ROBERT [redacted] Who would I be able to question about that, because Ms. Anziano is no longer working for the District? And my concern is that the District will basically object to this on hearsay, because where does this come from?

And I'm showing that the new pupil personnel who would be the next in line, you know, since she's no longer available, you know, to produce these records, that Mr. Zenowitz would be able to produce these records. Because I specifically asked him in my Exhibit 78, since he's a new pupil personnel, that she referenced an attached letter and communication plan which were shared as a link.

When I attempted to access the document, I received a message stating that the file had been deleted. I don't know why the document was deleted, but given its relevance to my child's

education and its role in ongoing due process proceedings, it should have not been removed or made inaccessible. As a parent, I should have continuous access to educational records that pertain to my child.

And I made a Freedom of Information Request, a FERPA request to the new pupil personnel, because I cannot make that to Ms. Jennifer Stewart because she's no longer involved with the District. So, I did make a FERPA request. He had ignored it, because I'm looking to basically --

THE HEARING OFFICER: All right. We're basically going around the same things. We'll see what happens. I mean, if you offer something and they object to it, I mean, I'll consider if you have to bring in somebody else to bring it in.

I mean, something that's an obvious business record I don't think -- because the strict rules of evidence don't necessarily apply in administrative proceedings, I'd be inclined to allow it, notwithstanding sort of technical rules of laying foundation.

But the objections may be more in the nature of relevance, or whatever. And that, I mean, that isn't anything that you really need someone who

was hired three months later for. So --

ROBERT [redacted] Yeah, as long as my exhibit (unintelligible) --

THE HEARING OFFICER: We'll see where we go with the hearings. I mean, I can always reconsider some of these things if I think that it's unfairly keeping you from introducing something. But right now, I just think that that's, you know, having them testify to something that predated his being there is just not really relevant or necessary.

So, with that, that was the last person you objected to?

ATTORNEY ROSEN: In terms of witnesses who are listed who had not yet appeared, I just wanted to note that Ms. Truscello, Tara Truscello was here at the full hearing. The family had the opportunity to cross-examine her. So, our understanding is she will not be required to appear again.

THE HEARING OFFICER: Oh, all right.

ROBERT [redacted] That would prejudice us terribly because of the situation. As you know, we had filed a few motions with you, Hearing Officer. They were denied, but I did explain in my statements, in my -- the motions, everything that I had filed explained the situation, you know,

with your denials of our motion for recusals and our statements and our clarifications that we had filed. They -- everything was denied.

But I did explain in there that, you know, based upon the circumstances that she should be allowed back to cross-examine, you know, like I said, based upon the circumstances.

THE HEARING OFFICER: All right.

ROBERT [redacted] It would prejudice us.

THE HEARING OFFICER: All right. So, if we have nothing further, why don't we proceed with the first witness?

Do you want to call your first witness?

ATTORNEY ROSEN: Sure. So, the Milford Board of Education would like to call Amy Rizzo, please?

And just a logistics point, is Ms. [redacted] still with us? I don't see her camera on. Okay.

KAREN [redacted] (Inaudible.)

THE HEARING OFFICER: Okay.

ATTORNEY ROSEN: I'm sorry. Ms. [redacted] if you were speaking, you were muted.

KAREN [redacted] Oh. I'm still here.

THE HEARING OFFICER: Okay. All right. Let's see. Ms. Rizzo, would you raise your right hand?

A M Y R I Z Z O,
called as a witness, being first duly sworn by the THE HEARING OFFICER, was examined and testified under oath as follows:

THE HEARING OFFICER: Okay. Please identify yourself for the record.
AMY RIZZO: I'm Amy Rizzo. I am currently principal of JFK Elementary School in Milford.
THE HEARING OFFICER: Okay. You can proceed.
ATTORNEY ROSEN: Thank you. Good morning, Ms. Rizzo.

DIRECT EXAMINATION (of A. Rizzo)

BY ATTORNEY ROSEN:
Q. Who are you currently employed by?
A. Milford Public Schools.
Q. Okay. I'm going to share what has been marked into evidence as Board Exhibit B-36.
Is this your resume?
A. Yes.
Q. Okay. And you mentioned you're employed by Milford Public Schools. Could you tell me who is -- oh. You can see your resume right now. Right? I just want to make sure that

the screen sharing is working correctly, and I'm not showing you a picture of my kids in the background.
A. Yes, I can see it. Thank you.
Q. Okay. Great. Thank you. What is your current position at Milford Public Schools?
A. I am currently the Principal at JFK.
Q. Okay. And prior to being principal at JFK, can you describe your educational background for me? Where did you receive your undergraduate education?
A. Certainly. I graduated in 2001 from James Madison University. And then after that, I received a master's degree from Fairfield University. My master's was in curriculum and instruction. And then I went on to get my educational leadership degree at the University of Connecticut.
Q. What is an educational leadership degree?
A. It's a program that results, in successful completion, you receive a sixth-year degree in educational leadership and administration.
Q. Okay. And do you have any certifications in the realm of education?
A. I do. I hold a professional educator

certificate for English education, grades 7 through 12; for library media, pre-K-12; and also an 092, which is an educational administrator certificate.

Q. Okay. And prior to working at Milford Public Schools, what were some of your previous professional roles in the realm of education?

A. I've been a classroom teacher. I've been a library media specialist. I was teacher leader for instructional technology, teacher leader for professional learning for the Milford Public Schools, and then most recently principal of JFK.

Q. Okay. And could you describe for me some of your responsibilities as principal at JFK?

A. Certainly. My primary responsibility is, of course, safety and security within our building and setting a vision for our building and our school community. I also supervise and evaluate staff.

I work in partnership with parents and community stakeholders on our school climate and communication. I work on instructional leadership, making sure that the curriculum is implemented and to support all of our

students' needs.
Q. As part of your responsibility for supporting students' needs, does that include attending planning and placement team meetings for students with special education and related service needs?
A. Yes.
Q. Okay. While in your role as principal for JFK, and to be clear, you started -- it says, 2023 to present. When exactly in 2023 did you begin as principal at JFK?
A. I began at JFK July 5, 2023.
Q. Okay. So, at the commencement of the 2023-2024 school year?
A. Yes.
Q. In your role as school principal, did you ever become familiar with a Milford Public School student named [[redacted] -- or he goes by [[redacted]
A. Yes.
Q. And how did you become familiar with [[redacted]
A. [[redacted] was a student at JFK, a fourth- and fifth-grader when I was principal.
Q. Okay. When he was a student at JFK, were you aware that [[redacted] had an individualized

education plan, an IEP?
A. Yes.
Q. And did you become involved at all in the special education planning for [[redacted] during either the '23-'24 school year or the '24-'25 school year?
A. Yes.
Q. Okay. Do you recall exactly when you started to be involved in the special education decision-making for [[redacted]
A. I believe that would be at his first annual review. I -- I think that was January of his fourth-grade year.
So, that would be January, 2024.
Q. Okay. And prior to being involved in attending his annual review, have you had any interactions with [[redacted]s parents?
A. Only through, I believe, maybe e-mail correspondence or over behavioral things, but not a formal meeting.
Q. Okay. When you say behavioral things, what do you mean by that?
A. In [[redacted]s fourth-grade year, in the fall, there were some incidents in the bathroom. I wasn't directly involved in them, but they --

they did make their way down to the office.
I didn't speak directly to Mr. [redacted] or Mrs. [redacted] about them, but I was aware of the incidents.
Q. Okay. And what do you know exactly about these incidents that you're referring to?
A. In one of the incidents in fourth grade, I believe [[redacted] was in the bathroom with some students, and there were just concerns about him exposing himself in the bathroom to other students. And we had to put some plans in place as a school to help support [[redacted] with a more private bathroom space.
Q. Okay. And were these -- the private bathroom space, what was the purpose of having him use a private bathroom, as opposed to continued use of the regular students' bathroom?
A. Really, that was to ensure safety and security for both [[redacted] and the other students at the school, and to maintain [[redacted]s dignity.
I believe at that time we had encouraged him to use the nurse's bathroom, which is a single stall rather than the public stall.
Q. Was the directive that he use the separate

bathroom a punitive measure?

A. No.

Q. Okay. And is this something that your school team was communicating with/to the parents about for the reasoning behind that directive?

A. I believe so, yes.

Q. And just to understand the timeframe we're talking about, what school year was this that the conversations were taking place about the alternate bathroom usage?

A. So, that would be the first year, '23-'24.

Q. During the '24-'25 school year, was there any directive or protocol where [[redacted] used a separate bathroom?

A. I can't recall in the '24-'25 school year, but I know that there were multiple bathroom incidents.

Q. Okay. Now with respect to, you've mentioned you had been present at his annual review during the '23-'24 school year. So, I'm going to show you what's listed as -- excuse me for a second.

(Pause.)

B-13. Okay. Can you see the

individualized education plan dated February 8, 2024?
A. Yes.
Q. Okay. Now, at the annual review, what do you recall was discussed at the February 8, 2024, annual review?
A. I believe at this annual review we reviewed [[redacted]s goals and objectives. We made a plan for [[redacted] together. He -- there was no objections to his goals and objectives in the written IEP.
It felt like a successful PPT meeting.
Q. In terms of his placement he -- it says listed as current enrolled school, JF Kennedy School. As of February 8, 2024, was there any suggestions or thoughts by the school team that the physical location in which [[redacted] received services should be changed?
A. No.
Q. Was it the opinion at the time of this meeting that the IEP and placement for [[redacted] was appropriate?
A. Yes.
Q. And what is the information that the school team relies on when making the decision at

this PPT meeting that continued placement at JFK is appropriate?

A. Well, we always try to provide the least restrictive environment for our students. [[redacted] was making progress along his goals and objectives. He was in the general-education setting for parts of his day, and that seemed to be working for him in terms of him making progress towards his goals.

Q. So, when an annual review meets, and I understand an annual review takes place at least once during, you know, a calendar year, but when placement is discussed, is it set in stone that we're saying, all right. No matter what, [[redacted] is going to stay at JFK for a calendar year from this annual review?

A. Well, it's my understanding that an IEP is a living document, and we're always responsive to student needs. So, a placement is never set in stone. We're always looking to best meet student needs and support them in the way that they need to be.

Q. Okay. And did there come a point at all during the 2023-2024 school year where you or your team sought to have a supplemental

planning and placement team meeting with the family after the February 8, 2024, annual review?
A. Yes.
Q. And what was the intended -- or why did you want to have another planning and placement team meeting during the '23-'24 school year?
A. As the year progressed, [[redacted]s teachers and support staff were noticing that he was struggling a little bit more in his fourth-grade year, particularly in the gen-ed setting.
We wanted to come back together as a team to take a look at his IEP, make sure that it was appropriate for him, including a discussion about placement, to come together as a team and figure out the best plan for him.
ATTORNEY ROSEN: When you --
THE HEARING OFFICER: I'm just going to stop you for just one second. My pen ran out of ink, so I'm just going to get another one.
THE REPORTER: Pausing the record.
(Pause.)
THE HEARING OFFICER: All right. I'm back with a new

one, so we can proceed.
THE REPORTER: Back on.
BY ATTORNEY ROSEN:
Q. You just mentioned talking about the possibility of another placement. What did you mean by that?
A. So [[redacted] had been at JFK for all of his education, I think beginning in preschool. In Milford Public Schools we also have some specialized programs that are within district, but in other buildings. And sometimes when we are trying to meet student needs, we consider alternate placements within the District to meet their needs.
Q. And why would an alternate placement start to be considered at this time for [[redacted]
A. [[redacted] was demonstrating more of his behaviors and frustration in class. A program within the District might offer him more structured supports that we simply don't have the resources for in our school, really with the intent of supporting him in the ways that he needed to be supported.
Q. When you said that there was consideration of a possible change in placement, when a school

team is starting to consider this might be a possibility, what did the steps look like to meet with the family and discuss?

A. Sure. We had reached out to Mr. and Mrs. [redacted] to invite them in for a review and revise of the IEP.

It was, I believe, towards the end of the school year that we reached out to them.

Q. When you say, review and revise, and that being the purpose of the meeting, what's your understanding of what review and revise means?

A. A PPT with the purpose of review and revise means that we would take a look at the IEP as it stands, making sure that the goals and objectives for the student are appropriate, making sure that the placement is appropriate.

It might mean that we would result in revising the IEP, but it might also mean that we come to an agreement that it is an appropriate plan. It also might mean that we would service hours of paraprofessional support.

It's really meant to bring the whole

team together, including the parents, so we could have meaningful participation from all.
Q. Was there a specific placement that you or school team members thought should be raised as a possibility for [[redacted] moving forward?
A. Yes, we were thinking about a certain program that we wanted to propose as a possibility to explore at another school.
Q. And what school was that?
A. That was at Matthewson Elementary.
Q. Okay. And Matthewson, you said -- would Matthewson be a placement within the District that you thought had more structured supports?
A. Yes. So, Matthewson School has a program that is designed for students with [redacted] like [[redacted] And it was a program that at his annual review one of his parents had asked about previously. So, there had been some conversation just about what the program offered.
At the time in February the school-based team felt like JFK was still an appropriate placement, but towards the end of the year we wanted to explore that together as a team.

Q. Okay. You mentioned towards the end of the year. Approximately when do you estimate you were reaching out to try and schedule this planning and placement team meeting?
A. It was in May.
Q. Okay. And did you or a member of the school team explain to the family the purpose of the intended planning and placement team meeting?
A. Yes.
Q. And were the parents receptive to having that planning and placement team meeting?
A. No.
Q. And what was the reason, if any, given as to why they were not receptive to having the planning and placement team meeting?
A. I believe that Mr. [redacted] had written back that I was kicking [[redacted] out of JFK, which was certainly not our attempt, and that they would not be coming in for the meeting because I was throwing him out.
Q. In terms of that, the statement that, you know, or allegation that you were throwing out, was that an accurate statement? I mean, what did you -- how did you -- let's first state, did you agree with that statement that

you were trying to throw [[redacted] out of JFK?
A. Absolutely not.
Q. Was there any predetermination by you or members of the school team that [[redacted] should be moved out of JFK?
A. No. The purpose of coming together for an IEP is to look at programming together.
Q. Okay. So, my understanding is the idea of Matthewson was a recommendation from the school team?
A. Correct.
Q. Okay. At the time -- so, you mentioned at the time of the previous annual review, the school team definitively said that [[redacted] needed -- and this was the annual review on February 8, 2024, that [[redacted] should stay at JFK, that that placement was meeting his needs?
A. Yes.
Q. In your experience as an educator, is it common that a student's needs would change between portions of the school year, warranting a possible discussion of a change in placement?
A. Yes. Students' needs do change, and we try

to be responsive to those needs.

Q. Okay. Now, this is towards the end of the school year. Could a planning and placement team meeting like this happen during the summer?

A. It could, but it is difficult for us as -- to sometimes gather all of the people around the table because school is not in session, people are not working. Just logistically, it can be a challenge.

Q. Okay. So, the idea that you know you were coming down towards the tail end of the '23-'24 school year, and it kind of appears it was trying to squeeze that meeting in before the end. Why was that?

A. Simply for the reason I just stated, we knew the school year was coming to a close. Staff were not going to be available in the summer to meet, and we were trying to be timely about it, knowing that we wanted to talk to the parents about it as soon as we -- as possible.

Q. Now, at the time you mentioned behavioral concerns and possible need for further support for [[redacted] but was [[redacted] making

progress on his academic goals as outlined in his IEP at JFK?

A. He was.

Q. And did this proposed planning and placement team meeting happen at all during the '23-'24 school year?

A. No.

Q. Okay. And did the school team ever make any effort to change [[redacted]s placement from JFK to another placement, such as Matthewson, outside of a planning and placement team meeting?

A. Certainly not, no.

Q. Was there ever any formal recommendation to change [[redacted]s program from JFK to Matthewson?

A. No.

Q. In terms of moving forward, in light of the parents' refusal to come to a planning and placement team meeting, I mean, the PPT could have still, with reasonable notice of the parents, scheduled a meeting, offered them a chance to participate, and gone forward and met. Was that considered?

Or what was the school team's perspective about how to move forward?

A. The school team's perspective was that we wanted it to be a partnership. We value the parent participation. That's a very important piece. We wanted to set [[redacted] up for success.

You're right, we could have held the PPT without them, but we didn't feel like that would be beneficial.

Q. And in light of the spirit of trying to have a partnership with the parents and understanding that the parents did not want to come to a meeting where Matthewson might be discussed, did the school team believe it could still appropriately program for [[redacted] and support [[redacted] at JFK moving forward?

A. We hoped to, but we did realize we may need to increase his paraprofessional support.

Q. So, given that a planning and placement team meeting was not happening at the end of the '23-'24 school year, was there any effort from the school team to schedule a planning and placement team meeting moving forward into the '24-'25 school year?

A. Yes, I believe we had reached out at some point during the summer to suggest that we

would have it either right at the start of the school year, or -- or early in the fall.
Q. Okay. And was -- so, you said you were reaching out to the family about this?
A. Yes.
Q. Was there any comments or questions from them as to whether a change in placement was going to still be raised at a planning and placement team meeting?
A. I'm sorry. Can you repeat that one more time?
Q. Yeah, let me rephrase. In terms of when messaging the family about trying to have a planning and placement team meeting in the fall of the '24-'25 school year, what were you telling the family you wanted to discuss at the planning and placement team meeting?
A. Oh. If I -- if I recall correctly, at that time we tabled talking about Matthewson. We just wanted them to come in to talk about making sure that his IEP provided the appropriate supports at JFK.
Q. In terms of the invitation to have a planning and placement team meeting at the onset of the fall of 2024, were the parents receptive

to attending a meeting?
A. No, they refused.
Q. What, to your understanding, was the basis of their refusal?
A. My understanding was that Mr. [redacted] had indicated on -- through several e-mails that he felt as though we were trying to trick him into throwing, quote-unquote, throwing [[redacted] out of JFK. That was not our intent.
Q. Okay. Did Mr. [redacted] have any demands or requests when you were reaching out, or a school team member was reaching out to schedule a PPT meeting in the fall of '24-'25?
A. I -- the only demand or request was that they would not be coming in until the annual review. They were refusing any meetings until the next annual review.
Q. And what did you understand the basis of that opinion to be?
Did you have any perspective on that?
A. Only that there was perhaps fear that, again, that we were going to talk about Matthewson, which we already had indicated that was not what the purpose of the meeting was.

Q. And apart from trying to schedule a planning and placement team meeting, were you involved in any further correspondence with the parents as to how [[redacted] was functioning during the course of the '24-'25 school year?

A. Yes. There were a few instances of some unsafe behaviors at the beginning of the school year that we reached out to Mr. and Mrs. [redacted] about.

Q. And what? Like, could you give an example of the type of behavior you'd be talking about?

A. Sure. At -- I believe it was in the start of his fifth-grade year there was a day that [[redacted] had entered the building and was throwing his shoes, and the staff had a hard time regulating him when he was entering the building. I also recall a recess incident with a classmate where [[redacted] had some hands-on behavior.

So typically, as the principal, I would reach out on matters of -- of school safety, and both of those were safety concerns.

Q. When you reached out to the parents about reports of school safety, to be clear, was [[redacted] getting punitive consequences as a

result of these incidents?
A. No -- well, a consequence for [[redacted] might be to take a quiet break in the office, have some time to calm down. I don't consider that punitive. It's more to help him self-regulate.
Q. Okay. And in terms of when there are some behavioral concerns from a student and you're trying to address that with the parents, what would be the proper venue to try and address those concerns with a student of [[redacted]s profile?
A. Well, typically we call parents first. That's always for a phone conversation so that we can have discourse back and forth. If that is unsuccessful, typically we invite parents in for a meeting, especially matters that have to do with student safety.
It's usually better to not just communicate over e-mail. We try to meet face-to-face.
Q. Okay. And in terms of -- let me show you what's in evidence for a second as its Parent's Exhibit, P-29. I believe it was fully admitted.

I want to start for a moment on page 2. We're going to go back to the top in a moment, but I see that this is an e-mail, it looks like to both parents on November 19, 2024. There's a line here that you write, in recent e-mails you inquired about phone calls placed home earlier this school year. I've spoken to our school team about your concerns and reviewed what occurred with the school team.

Do you know what phone calls placed home earlier this school year are you referring to?

A. I think, if I'm looking at this e-mail correctly, Mrs. Doherty had called home. Mrs. Doherty is our school social worker. She works with [[redacted] on social skills. She had called home, I believe, several times to report some hands-on behavior.

And also, I think there was an instance where [[redacted] had indicated some self-harm, and I believe she had called home about that as well.

Q. And when Mrs. Doherty calls home to the parents, is that -- what, to your

understanding, was the purpose of those, of that call? Just to inform the parents that situations had occurred?

A. Correct. Yes, whenever we reach out, it's just to give the report of -- of what had happened.

Q. In terms of the concern about a self-harm statement or unsafe behavior, how was the school team hoping to respond to what they were observing from [[redacted] during the school day?

A. Can you --

Q. I can rephrase.

A. Yeah, thank you.

Q. What were the steps? What were the steps that you or members of your school team wanted to take, if any, in response to the behaviors that were being reported?

A. I understand. Thank you for rephrasing.

You know, the school team, I think, was hopeful that they could reach out to [[redacted]s parents, explain to them what was happening, and work in partnership to best support him, and if needed be, have a follow-up meeting. Sometimes that is -- is what happens in

matters that are more serious like that. We come together and have a team meeting.

Q. Were there efforts by the school team to engage the family in a planning and placement team meeting to discuss supporting [[redacted]

A. Yes. So, all the while, we had been continuously extending invitations for a PPT while all of these things were happening.

Q. And when invitations were sent out for a planning and placement team meeting in the fall of 2024, what was the reception by the parents?

A. They refused all invitations. We also tried to accommodate by offering virtual, even a phone call conference.

They were all refused.

Q. Now, looking at your e-mail, you said that you've spoken to our school team about concerns and reviewed what occurred with the school team. When the parents raised concerns about conduct of staff members or incidents involving [[redacted] what was typically your response?

A. Well, I would proceed in a way I would if any parent had concerns, and that is to do an

investigation, to speak to the appropriate staff members, anyone who may have been a witness, and to gather information. Sometimes that means looking at video footage that we have from our security cameras, gathering as much information as possible.

Q. Okay. Now, this following page where you break down, it appears, what happened on September 17th or September 19th or September 26th, is this the kind of reporting you would get back to the parents in response to their concerns?

A. Yes.

Q. And what did your reporting typically entail? Just, you know, what was your practice after you had done your investigation?

A. Oh, to share the facts of whatever the investigation resulted with. So, just based on the evidence collected, the video footage viewed, try to be very black-and-white with what was observed and what was said.

Q. Now, it says here on September 26th, you wrote, Mrs. Doherty again called home with [[redacted] and had him leave messages for both of you. Can you explain what you understand

that was happening there? What was the purpose of having [[redacted] call home?

A. When I spoke to Mrs. Doherty about that, her purpose was to hope -- her hope was that in doing so it would help [[redacted] Mr. [redacted] Mrs. [redacted] and the school all be very transparent and on the same page with what had happened. She was hoping that [[redacted] could communicate in his own words what had happened.

That particular incident, I'm just trying to -- if I could just have a minute to read what that one was.

So, that was regarding hands-on behavior. And she was hoping that [[redacted] could communicate what had happened.

Q. Okay. And you mentioned here, as you know, Mrs. Doherty works with [[redacted] on social skills, and that sometimes includes cueing expected behavior or practicing conversation skills. And to your understanding, was [[redacted] being told what to say, or cued as to how to explain the behavior that had occurred?

A. It's my understanding that it was cueing. [[redacted] has ADHD. Sometimes when he is talking,

he will start to talk about something else and has to be redirected back. So, it could have been that, or it could have been that he was talking about something else and she was cueing him back to the topic.

Q. So, this practice of having [[redacted] call home, this was a trialed practice by his social worker?

A. Yes.

Q. Okay. And what, to your understanding, was the response, if any, from the family or [[redacted] about that practice by the social worker?

A. Mr. [redacted] had communicated with us that it was very upsetting to him and to [[redacted] that they felt as though [[redacted] was being, for lack of a better word, manipulated into saying he did something he didn't do.

And Mr. [redacted] shared in a later communication that he did not want us to have [[redacted] call anymore. And I believe at that time, the school -- I did speak to staff and I did insist that we should no longer have [[redacted] call.

Q. Okay. And I see in this e-mail, page 3, it says, since you have indicated that [[redacted] is

upset about calling home, the staff of JFK has not had him make any calls or self-report?

A. Right.

Q. That JFK will not have [[redacted] make calls home like this again. The team working with [[redacted] is not in violation of his IEP, as you suggest.

What did you understand was the alleged violation in the IEP that the parents were saying was occurring?

A. I -- I believe that Mr. [redacted] had expressed concern that having him, having [[redacted] call was a violation of his IEP, but it was not a violation of his IEP, nor a violation of his BIP. It was simply a strategy we were trying with him to see if he could communicate with his parents and recall what had happened.

Q. You write at the end here, it's my sincere hope that we come together as a team for a PPT on Wednesday, December 11th at 10 a.m. to better support needs.

So, is this part of that next step that you had been suggesting to address some of

the concerns raised by the parents?

A. Yes, that was part of the -- just the ongoing extending of an invitation to a PPT, which began back in May. So, it's a continue -- we're now at December, according to this e-mail, that we were continuing to invite them in for a PPT.

Q. Okay. I'm scrolling up here to a response that it appears that Mr. [redacted] sent to you and members of the school team. He writes here, on September 17th it was reported that [[redacted] hit two classmates. [[redacted] explained to us that he accidentally bumped into two girls during recess. This discrepancy is concerning, particularly since [[redacted] has previously told us he's being blamed for actions he did not commit.

This type of response from Mr. [redacted] what -- when you reported incidents of behavior and the facts that you believed reflected what had occurred, what was Mr. [redacted] or either parent's typical response like?

A. Mr. [redacted] often would say that that did not happen. You're not telling the truth.

You're putting words in [[redacted]s mouth. I believe my son. He had a great distrust of information that was shared with him by staff, including me as the principal.

Q. Were you trying to do anything in response to that, that sense of distrust in terms of explaining to the family, at least, your perspective of what had occurred for some of these alleged incidents?

A. Yes, it -- I find it very hard with the e-mails going back and forth and trying -- it almost feels like I'm trying to defend questions back and forth, where a conversation, if we were able to come together, even a phone call or -- or by PPT would have been more fruitful.

Q. Going down in this e-mail, there's a statement from Mr. [redacted] you continue to paint [[redacted] in the negative light, claiming he displays unsafe behaviors towards other students, when in fact it is the other students who exhibit unsafe behaviors towards him. This misrepresentation exasperates his challenges and leaves him feeling misunderstood and unsupported.

He follows, the team at JFK and Milford School District are not meeting [[redacted]s academic, social or emotional needs. Instead, the mistreatment by staff and failure to provide necessary accommodations are actively hindering his progress and well-being.

When these kinds of concerns are raised by a parent, in general what is a school team's response for a student receiving special education?

A. Our response would be, please come in. Let's meet together to talk about his progress and whether or not he's making progress, and whether or not we have the correct supports in place. So, that the logical next step would be, please come in together so we can -- we can meet as a team to discuss.

Q. And I see as part of this e-mail he writes, we are not available 10 a.m. on December 11th. Why is he referring to that date?

A. That was the date that we had invited for a PPT.

Q. Okay. Now with respect to, you've mentioned that there were communications going with the

family about possible behavioral incidents. You mentioned about the e-mails that you would have going back and forth with parents.

When you communicated with the family via e-mail, did you feel like that was an appropriate means of communication?

A. Um --

Q. Let me rephrase. I'm sorry. With respect to communicating concerns and suggested next steps moving forward to support [[redacted] was e-mail, in your opinion, the most appropriate means of communication?

A. No.

Q. And why is that?

A. E-mail is open to interpretation. There are inferences that can be made. It's not a conversation back and forth. There's not room to clarify or bring up questions, which is -- it's the purpose of a meeting, meeting together so that you can have a dialogue.

Mr. [redacted] always insisted on e-mail communication.

Q. To be clear, was he at times refusing in-person meetings just to have communications over e-mail?

A. Repeatedly.
Q. And did you feel like that was allowing the school team and the parents to exchange a meaningful conversation about how [[redacted] was presenting?
A. It was, in my opinion, impeding our ability to work together as a team.
Q. How so when you say, impeding ability to work together?
A. It's hard to work together and in partnership when you're not around the table having a conversation, and that it's just a back and forth via e-mail. Many of the e-mails we received were just accusations about staff rather than about [[redacted]s goals and objectives and helping [[redacted]
Q. Did there come a time during the '24-'25 school year that the parents agreed to meet for a PPT meeting?
A. Well, for his -- yes, they came in in, I believe it was January of [[redacted]s fifth-grade year. So, January of 2025.
Q. And do you recall what the purpose of that planning and placement team meeting was in January 2025?

A. There were two meetings, one -- I believe it was the annual review was one, and the other was requested by the parents.
Q. And that was the purpose, you mean?
A. Yeah, there was one that the parents had requested a meeting for outplacement and then there was the annual review.
Q. Okay. And prior to the annual review, were you aware whether or not the parents were provided with progress reports as to how [[redacted] was presenting and performing on his goals and objectives in advance of the planning and placement team meeting?
A. I believe they were, yes.
Q. Okay. I'm sharing with you now Exhibit B-21. So, this is the IEP. The January 16, 2025, date, is this the annual review that you're referring to?
A. Yes.
Q. Okay. And I see here you're listed as present at the planning and placement team meeting. You mentioned a request, and it says here the purpose of meeting, parent requests.
Did you understand what the reasoning

was from the parents for the parent request?
Why were they requesting a meeting?
A. At that time, Mr. and Mrs. [redacted] had requested a consideration for outplacement, but I believe that we wanted to conduct the annual review piece of that. So, we were inviting them in for the annual review.
Q. To be clear, was this meeting to discuss the annual review and the outplacement request?
A. I believe in one meeting we had hoped to talk about both pieces.
Q. Okay.
A. Yes.
Q. Were you aware of any --
A. At that meeting.
Q. Oh, I'm sorry. Were you aware of any resistance by the parents for holding one meeting to address both the annual review and the outplacement request?
A. I believe that Mr. [redacted] had requested a separate meeting.
Q. In your experience when discussing an outplacement possibility for a student, what is involved in making that kind of determination?

A. So -- well, typically the team would come together and look at a student's IEP goals and objectives, look at their progress and whether or not they are making progress to determine if the School District and the school -- or the School District is not -- not meeting students' needs.

Q. Is that essentially a similar sequence that takes place during the annual review in terms of looking at present levels of performance, updates to goals and objectives?

A. Correct. It's the same.

Q. Okay.

A. The same conversation.

Q. Now, at this planning and placement team meeting, was there a presentation by service providers and teachers about [[redacted]s present levels of performance?

A. Yes.

Q. Did the parents have the opportunity to ask questions about [[redacted]s present levels of performance?

A. Yes.

Q. Was there any disagreement from either parent with the depiction shared by school team

members about [[redacted]s present levels of performance?
A. No, I do not believe so.
Q. Did the school team members provide updates about [[redacted]s progress on his previous goals and objectives?
A. Yes.
Q. And did the school team members propose new goals and objectives for [[redacted] moving forward?
A. Yes.
Q. Did the parents have the opportunity to ask about [[redacted]s goals and objectives?
A. Yes.
Q. Do you recall whether the parents disagreed with any of the proposed goals and objectives for [[redacted]
A. They did not, to the best of my memory.
Q. And were the parents given an opportunity to present their perspective about how [[redacted] was performing and functioning in Milford Public Schools?
A. Yes.
Q. And did each parent have an opportunity to speak and present their opinion and their perspective about, you know, [[redacted]s education

with Milford Public Schools?
A. Yes.
Q. You mentioned that there had been a request for an outplacement. Was the request for outplacement shared and discussed by the parents during this planning and placement team meeting?
A. Yes.
Q. Okay. And do you recall what was the reasoning shared from either parent as to why they were requesting an outplacement?
A. Mr. [redacted] said that he felt that it would meet, better meet [[redacted]s needs. He felt like the staff was not meeting [[redacted]s needs. However, in relation to [[redacted]s goals and his progress, it seemed that he -- he was making progress.
So, the -- the outplacement request was actually not for the current school year. He was asking it for the following school year.
Q. Okay. And at that time was the school team prepared to discuss what [[redacted]s formal recommendation would be for placement for the '25-'26 school year?
A. No.

Q. And why is that?
A. Well, I -- I'm looking at the date. It was February 7th, so it would be difficult for us to determine on February 7th where the best placement would be for September of the following year.
Q. Oh, you're referring to February 7th as the IEP implementation date?
A. Oh, I'm sorry. Yes, I'm looking at the --
Q. No, no, no. Just to clarify, so the date where this IEP took effect.
A. Yes, thank you.
Q. Okay.
A. Thank you for clarifying. Yes. So, you know, we're looking at, we still have several months left of the school year. We wouldn't want to predetermine placement for him. We would want to come back together more towards the end of the school year to talk about placement.
Q. Okay. At the time, however, based on what you understood from [[redacted] did you feel that he would require an outplacement from the District for the following school year as opposed to any of the programs the District

could provide?
A. No.
Q. Was there any discussion by the school team as possible options to explore and consider closer to the end of the school year to discuss [[redacted]s transition to middle school?
A. Yes.
Q. And what were those discussions?
A. In [[redacted]s IEP, you'll notice that he has some life skills as part of his goals and objectives, and we have a program in Milford Public Schools at one of our middle schools that focuses on life skills and preparing students for later in life.
So, there was a little discussion about what that program could offer.
Q. And what program is that exactly?
A. So that's the life-skills program, and it is held at Harborside Middle School.
Q. Okay. And is Harborside -- would that be his neighborhood middle school in the District?
A. It would not.
Q. Okay. What is his neighborhood middle school in the District?
A. [[redacted] is districted for Westshore Middle

School.

Q. Okay. Now, after the annual review do you recall receiving any correspondence from either parent as to their disagreement with the recommendations that were made at the annual review PPT?

A. Yes, I believe we received an e-mail after that.

ATTORNEY ROSEN: Okay. I'm going to show you what's in evidence currently as P-37.

THE REPORTER: And that is "P," as Parent 37?

ATTORNEY ROSEN: That's right. "P," as in Parent 37, a five-page document.

BY ATTORNEY ROSEN:

Q. So I see here that there is an e-mail thread ARizzo@MilfordEd.org. That's you. Right?

A. Correct.

Q. Okay. So, I just want to go through this e-mail thread to make sure I understand what was happening. I see that an e-mail dated January 20th was sent. So, that's after the annual review. Right?

A. Yes.

Q. I see that Mr. [redacted] writes, after thoroughly reviewing the meeting's

proceedings and considering the District's ongoing failure to meet [[redacted]s educational and emotional needs, we must reiterate that his needs cannot be met within the current in-district environment.

What was the explanation, if any, as to why the District could not meet -- from the parents -- why the District could not meet [[redacted]s educational and emotional needs?

A. Mr. [redacted] spoke at length about things he was upset with that staff had done, particularly the phone call that you referenced earlier, but none of the points that he brought up were about the IEP or about [[redacted]s current level of performance. It was more about staff and the relationship with the school.

Q. On this paragraph Mr. [redacted] says, the District combined the discussion for outplacement with annual review against our explicit wishes. This decision prevented a meaningful, focused conversation about [[redacted]s outplacement which remains our primary concern. The meeting concluded with a swift decision to keep [[redacted] in district without a

comprehensive evaluation of his needs over the District's ongoing failures to provide sufficient support.

You mentioned -- testified earlier that the school team had walked through present levels of performance, goals, and objectives. Did you agree with this, this statement from Mr. [redacted] with respect to a swift decision without a comprehensive evaluation of his needs?

A. No, we -- we conducted all parts of the PPT process. The staff was very thorough in their reporting.

Q. Was there at any point where the parents were prevented from speaking or discussing their reasoning or request for an outplacement during the annual review PPT meeting?

A. No.

Q. Mr. [redacted] again wrote, the meeting did not provide the thorough, meaningful conversation we were promised, and the decision to keep [[redacted] in district was made without addressing the critical question of why outplacement was not appropriate.

Do you recall a discussion as to why

outplacement was not appropriate at that time?
A. I do. I'm going to go back to what I said before, that the discussion was that we would have to revisit placement more towards the end of the school year.
Q. Okay.
A. And just to underscore that we have just conducted a meeting in which it was shared that [[redacted] was making progress on his goals. His present level of performance indicated that he was -- that we were meeting his academic and social-emotional learning needs.
Q. Okay. Mr. [redacted] writes, adding services to [[redacted]s IEP does not address the deep-rooted issues that severely impacted his educational and emotional well-being.
What to your understanding was that, the deep-rooted issues that he is referring to?
A. I believe he is referring to the relationship with the school, or -- or the staff.
Q. So again, was there any critique of the actual programming being provided to [[redacted]
A. No.
Q. Was there any actual critique of the goals

and objectives to which [[redacted] was expected to aspire to as part of his IEP?

A. No.

Q. Was there any objection to the services that [[redacted] was receiving?

A. No.

Q. Was there any objection to any of the accommodations being provided to [[redacted] at that time?

A. No.

Q. Mr. [redacted] later writes, given [[redacted]s ongoing challenges and the critical need for a consistent, specialized learning environment we request that the District arrange for an appropriate out-of-district placement from sixth through twelfth grade with transportation provided.

Now, in your experience as an educator, when outplacement conversations are taking place what is the time period that you're looking to evaluate whether an outplacement is appropriate?

A. Well, that would be for the immediate. So, if -- if we were discussing outplacement, it wouldn't be for next year. It would be that

we weren't meeting this, the child's needs currently, and we would need to -- to find a placement for them that would better meet their needs.

Q. And it's decisions made per term of IEP. Right? Like the calendar year that IEP is in effect?

A. Correct.

Q. Okay. And so, my understanding is at the time of the annual review the school team did not believe an outplacement was appropriate at that point?

A. Correct.

Q. And it sounds like the school team did not think that an outplacement would be appropriate looking into the '25-'26 school year?

A. Correct.

Q. Okay. With respect to -- so, I see a response here from Jen Stewart. She writes, as the school-based members of the PPT state at the meeting, outplacement is not appropriate for [[redacted] at this time, nor did the team think they could realistically entertain a placement of [[redacted] at a program

for the next six years.
Do you agree with that statement? Is that an accurate depiction of the school team's perspective at the time of this annual review?
A. Yes.
Q. And I see here, another meeting in the spring will be held to discuss [[redacted]s performance and transition to sixth grade.
Is this the PPT meeting that you were referring to that would need to be planned to discuss [[redacted]s transition to middle school?
A. Yes.
Q. Okay. Now, I see here Mr. [redacted] then had an e-mail response of, the evidence we have provided including detailed documentation demonstrates a consistent pattern of unmet needs and inadequate support for [[redacted]
I have to ask, what was the unmet needs to the best of the school team's understanding that Mr. [redacted] is referring to?
A. I'm not sure, because at the meeting he didn't indicate anything in [[redacted]s IEP that was not meeting his needs.

Q. Was there any discussion or request from the parents of, [[redacted] is not receiving a specific service that we have requested?

A. No.

Q. Or, [[redacted] is not receiving a certain accommodation that we want?

A. No.

Q. Or that [[redacted] doesn't have a certain goal or objective that we want?

A. No.

Q. Okay. Now, in light of the correspondence that you received from the parents, did the school team feel that further conversation would be beneficial or warranted with the parents with respect to their perspective on how [[redacted] was performing?

A. Can you restate that? I'm sorry.

Q. Let me restate. Did the school team feel that it would be appropriate to offer another opportunity for the parents to come in as a part of a planning and placement team meeting moving forward?

A. Yes. So, as noted, this -- this meeting took place in January. Sometimes when we have planning and placement teams at this time of

year, we'll come back together towards the end of the year to discuss placement or to talk about extended school year services closer to the end of the year to meet a student's needs.
Q. And did the parents request a subsequent planning and placement team meeting after the annual review?
A. Yes.
Q. Okay. Were you present at that planning and placement team meeting?
A. Yes.
Q. Okay. I'm going to put up "B," as in Board, 25. Can you see the IEP marked March 6, 2025?
A. I can. Thank you.
Q. So, I see that you're present here at this meeting. Was this the meeting that was held to further discuss the parents' concerns about [[redacted]s programming?
A. Yes.
Q. And what was discussed at the March 6th meeting?
A. Mr. [redacted] presented his concerns at that meeting. He had many -- he -- he kind of

went back in time and told us the many concerns he had about the team and some of our communication with him regarding [[redacted] over the last few years.

There really wasn't discussion, again, of current levels of performance or questions about his progress. The parents, neither parent indicated that they had concerns about the IEP.

Q. And what was Mr. [redacted] or either parents' justification as to why an outplacement should be pursued?
A. I believe just that they thought that that would better meet his needs. I don't know.
Q. At that time -- and now, this was the March 6th meeting, so roughly a month and a half after the annual review.

Did the school team feel that an outplacement was warranted for [[redacted]
A. We still did not think so, no.
Q. During this planning and placement team meeting, did both parents have the opportunity to meaningfully discuss their viewpoints and ask questions of the school team?

A. Yes.
Q. And what was the tone of the meeting? How, you know, how was the tone of the participants as the meeting went on?
A. It was tense and felt accusatory. There were lots of statements and inferences made. It felt as though there was some misrepresentation of -- of staff or of communication. It was -- it was not a productive meeting, in my opinion.
Q. And just to clarify when you say, inferences and misrepresentations, who was making these inferences and misrepresentations?
A. Mr. [redacted]
Q. And could you give an example of what you mean?
A. Mr. [redacted] brought many e-mails and documents with him, and he was sort of jumping from document to document, piecing together different pieces to paint a picture that -- that staff had not communicated with him or had mistreated [[redacted]
But again, the conversations and the points made were -- were not about the IEP, were not about [[redacted]s learning.

Q. Was there any discussion as to why, you know, [[redacted] being prevented from accessing his education?
A. No.
Q. Were either parents, at any time, cut off during their sharing of their perspective during the March 6th meeting?
A. Yes, because there was some repetitive conversation happening. It was kind of in a loop. And Ms. Stewart several times directed, do you have any additional questions, where we've already discussed that, sort of to move the meeting along and follow the process of -- of a PPT.
Q. Okay. And in terms of when you say, move the meeting along, what do you mean by that?
A. Meaning, that it was the same -- Mr. [redacted] was sharing the same information over and over, and -- and I think Ms. Stewart's attempts were to acknowledge that they were heard. Do you have anything additional that you'd like to add, or ask?
Q. In terms of what Mr. [redacted] was sharing, it was about situations that occurred in the past and his perspective?

A. Yes, correct.
Q. So, was there any issue -- to be clear, no specific issues with the IEP or the actual education programming for [[redacted] was raised?
A. Correct.
Q. Did Ms. [redacted] have any comments or requests of the school team during that March 6th meeting?
A. Not during the meeting, no.
Q. Okay. And did she have any critique of the IEP or the educational programming to offer?
A. No.
Q. Did she play a role at all during the March 6, 2025, PPT meeting?
A. Not during the PPT.
Q. You mentioned the meeting became unproductive. How did it become unproductive?
A. Again, it seemed to just go around and around in a circle. Mr. [redacted] was -- it felt like maybe an airing of grievances rather than a look at [[redacted]s present level of performance and his -- and looking at his IEP.
Mr. [redacted] did speak about his desire

for an outplacement, and he did take some time to discuss why he thought, I think it was, Woodhouse Academy and Hope Academy would be a better placement for [[redacted]

Q. With respect to discussing possible school location for [[redacted] next year, did the District make any suggestions for placements or areas to be explored?

A. We did. Again, we -- we had mentioned our life-skills program at Harborside which we feel would be aligned with [[redacted]s areas of need and would support his -- his growth towards those life-skills goals that he has.

Q. And with respect to harborside, was an opportunity given to either parent to tour the Harborside program?

A. Yes.

Q. And to the best of your understanding, did either parent visit or tour harborside?

A. Yes. [[redacted]s mom went on a tour of the Harborside program with Ms. Truscello.

Q. Now, with respect to a formal recommendation for placement for the '25-'26 school year, did the district team attempt to schedule PPT meetings to discuss that placement with the

parents?

A. Yes.

Q. And were the parents receptive to meeting to discuss the formal recommendations and to decide where [[redacted] would be attending school since he could not continue at JFK, as he was finishing the fifth grade, where he would be continuing attending school for the '25-'26 school year?

A. No, attempts at a meeting were refused.

Q. And what did you understand was the reasoning shared by either parent for refusing to attend the meeting?

A. I believe it was because there was a refusal for the outplacement.

Q. I'm going to share what is in evidence as "P," as in parent, P-46.

So, looking at this e-mail thread, the subject being PPT date, it appears this is a thread with you, Jen Stewart, the parent, and ARizzo@MilfordEd.org. That's you, right?

A. Yes.

Q. Okay. I want to scroll down for a moment.

I see Jen Stewart writes, I'm following up on a previous e-mail regarding the PPT

meeting. Since we didn't receive any alternate dates, the originally scheduled meeting for May 6th has passed. Attached is a new notice for May 21st.

Were you involved in the scheduling attempts for this PPT meeting?

A. I'm sorry. Mr. Rosen -- Attorney Rosen, I'm -- our safety and security officer is calling all of my phones right now.

Can I take a pause?

ATTORNEY ROSEN: Yeah. Can we adjourn for a 10-minute recess?

THE HEARING OFFICER: (Inaudible.)

ATTORNEY ROSEN: I'm sorry. Hearing Officer Kennedy, you're muted.

THE HEARING OFFICER: Yeah, the dog was contributing her observations earlier.

Yeah, why don't we say at noon we'll reconvene?

ATTORNEY ROSEN: Thank you.

THE WITNESS (Rizzo): Thank you very much.

I apologize.

THE REPORTER: Pausing the record.

(Pause: 11:47 a.m. to 12:03 p.m.)

THE HEARING OFFICER: All right. So, everyone seems to
be here. So, why don't we proceed?
ATTORNEY ROSEN: Okay. Ms. Rizzo, first of all, I hope
everything is okay over there.
THE WITNESS (Rizzo): Thank you, yes.
BY ATTORNEY ROSEN:
Q. Can you see the e-mail thread that we were
just looking at prior to the -- okay.
So, my understanding is multiple
planning and placement team meetings were
offered to the parents to discuss the actual
formal decision of where [[redacted] would attend
school for the '25-'26 school year.
Is that correct?
A. That's correct.
Q. Okay. Now, I see an e-mail here from May
14th from Mr. [redacted] He writes, as
previously stated, we do not consent to the
proposed placement at Harborside Middle
School, and therefore will not be attending a
PPT regarding this matter. Our position is
final and no further discussion is necessary.
What was the perspective of the school
team in terms of whether or not a planning
and placement team meeting needed to happen,

even after receiving this e-mail from Mr. [redacted]

A. We felt it was necessary for a planning and placement meeting to happen so that we could appropriately plan for [[redacted]s sixth-grade year. Also, I believe we wanted to discuss summer school as well.

Q. Mr. [redacted] wrote also and included, I guess, a letter he had sent to Ms. Stewart previously, we have already completed [[redacted]s annual review and no further PPT meeting is necessary. Any attempt to move forward with a placement we have not agreed to is not appropriate.

Do you agree with that statement?

A. I do not.

Q. Why?

A. It was very appropriate for us to come back together as a team to discuss the placement. We weren't in -- in agreement, but that was an opportunity for us to discuss further and to maybe provide a little more insight on our recommendation.

Q. And to be clear, a school needed to be determined for the '25-'26 school year.

Right?

A. Yes, it had yet to be determined.

Q. Okay. At this time, did you believe that meaningful multiple opportunities were given to the parents to participate in a planning and placement team meeting discussing the '25-'26 school year?

A. Yes.

Q. And I see Ms. Stewart sent a response on May 14, 2025. And I'll note she says, at this point, no final decision has been made regarding where [[redacted] will attend middle school next year.

So, this was prior to that planning and placement team meeting. Right?

A. Correct.

Q. She writes, to support the process, the District has invited representatives from both [[redacted]s home middle school and the Harborside program to provide information about their offerings.

Why are representatives from both the home middle school and the Harborside program being invited to the PPT meeting?

A. Well, I think the intent was to offer

conversation about what -- what West Shore Middle School would be able to provide for [[redacted] in terms of his programming, and then also what Harborside might be able to provide for his programming so that we could make a thoughtful decision on what would best meet his needs.

Q. So, although Harborside had been listed as a suggestion, there was still a possibility a placement at West Shore would be discussed as appropriate?

A. Correct.

Q. So, was a planning and placement team meeting actually held to discuss placement for the '25-'26 school year?

A. Yes.

Q. And were you in attendance?

A. Yes.

Q. Okay. I'm going to what has been put in evidence as Exhibit B, as in board, B-30.

I believe this is the IEP for May 21st, 2025, reason for meeting, review or revise and transition planning. Is this the IEP from the PPT meeting you were referring to for planning for '25 and '26?

A. Yes.
Q. Okay. And I see you're listed. You're listed as an attendee?
A. Yes.
Q. Okay. And to be clear, did the parents attend?
A. No.
Q. And what was the recommendation made for the '25-'26 school year?
A. Well, after reviewing [[redacted]s services and the programs at both schools, the determination was made that Harborside would be a better fit for his programmatic needs.
Q. And so, that was the recommended placement for '25 and '26?
A. Yes.
Q. Have you ever been part of a planning and placement team meeting where a parent refused to attend despite given previous notices?
A. No.
Q. Did you have any personal concerns or disagreements with the recommendation made by the full school team at the May 21, '25, PPT meeting?
A. No, I had no concerns with the

recommendation.

ATTORNEY ROSEN: Okay. I have no further questions at this time.

THE HEARING OFFICER: Okay. Let's see. Did you want to go right into cross-examination or -- I know we had a short break -- and then take a lunch break after that?

ROBERT [redacted] I have a lot of -- I do have a lot of questions based upon what was just said. And I have, you know, I have a compiled list of -- so, I just want to let you know --

THE HEARING OFFICER: Yeah, if you're going to take a while --

ROBERT [redacted] I am.

THE HEARING OFFICER: Maybe right now is the best time to break.

ROBERT [redacted] Yes. I could be a long time.

THE HEARING OFFICER: How long do people want for a lunch break?

ATTORNEY ROSEN: If we return by one o'clock?

THE HEARING OFFICER: Yeah, that makes sense. It's about 50 minutes.

All right. So, we will reconvene at 1 p.m. We'll take a lunch break.

ROBERT [redacted] Okay.

ATTORNEY ROSEN: Thank you.
THE REPORTER: Pausing the record.

(Pause: 12:09 p.m. to 1:00 p.m.)

THE HEARING OFFICER: It looks like everybody is back.
All right. So, we just finished the direct examination of Ms. Rizzo.
So, Mr. [redacted] you have cross-examination?
ROBERT [redacted] Oh, yes, I have an extensive cross-examination. First, I want to start off with, it was Ms. Rizzo's testimony that at the March 6th PPT meeting that Ms. [redacted] did not participate. My exhibit P-41 --
THE HEARING OFFICER: Well, at this point -- at this point, cross-examination has to be questions.
ROBERT [redacted] Okay.
THE HEARING OFFICER: You have to -- it's like Jeopardy. You have to do it in the form of a question.

CROSS-EXAMINATION (of A. Rizzo)

BY R. [redacted]
Q. Okay. Ms. Rizzo, was it your testimony

earlier when asked the question if Ms. [redacted] participated at the March 6th PPT meeting, your testimony was no.

Is that correct?

A. She was present at the meeting, yes.

Q. That's not what I asked. I asked if she participated. You -- when Mr. Rosen had asked you a question if Ms. [redacted] had participated, your answer was no.

Is that correct?

A. I believe that was my answer.

ROBERT [redacted] Okay. Hearing officer, it's testified for the record that she raised her right hand and she swore to tell the whole truth and nothing but the truth --

ATTORNEY ROSEN: Objection. Right now this is argumentative. I'm not sure. Is there a --

THE HEARING OFFICER: Yeah, just ask your next question.

ROBERT [redacted] Okay. Well, I would like to bring up, I had sent a file, P-41. We'll bring up P-41. That's one of my exhibits. That's actually a formal complaint.

And which I did send to you Hearing Officer, an exhibit list, and I also sent you the March 6th

audio file. There's a link that you can download, or if it's in your -- it is in your e-mail, which I did send to all the parties on file, of the March 6th meeting that shows that Ms. [redacted] was absolutely --

ATTORNEY ROSEN: I'm going to object. Right now this is testimony, and I'm also going to object to the inclusion of the full exhibit of P-41, which I assume Mr. [redacted] is attempting to introduce with respect to the audio recording.

ROBERT [redacted] I deny his -- I object to his objection, Hearing Officer, because that's relevant.

That impeaches Ms. Rizzo's credibility here because she had not presented -- she presented false information to a tribunal. This is untrue.

THE HEARING OFFICER: Okay. First of all, this P-41 is an e-mail that you sent?

ROBERT [redacted] Yes. And also, if you look on the exhibit list, there's an exhibit list that I had sent to all parties as part -- in the mail.

THE HEARING OFFICER: All right. Well, here's the thing. I mean --

ROBERT [redacted] And I have the audio file that shows that she was participating, which is, for the

record, the link can -- you can download the PPT March 6th meeting. I have brought this up to your attention, Hearing Officer, that I would like to introduce the March 6th PPT meeting, which I think is important and it must be introduced. It shouldn't be objected to.

THE HEARING OFFICER: All right. Well, first of all, I don't see -- I don't see how you can. This is your e-mail. I don't see how you -- A, I don't see how you can really introduce it through this, this Witness. And you know it's not something sent by her, so it wouldn't really be admissible as an admission.

You can't --

ROBERT [redacted] So, the March 6th meeting audio will show that she did participate.

THE HEARING OFFICER: Well, here's sort of the bottom line to it. You can't impeach the Witness with something you said. Something she said? Yes.

ROBERT [redacted] And that's --

THE HEARING OFFICER: Not something -- I mean, this whole e-mail is something you said. So --

ROBERT [redacted] No. Hearing Officer, I'm talking about the March 6th meeting. I'm talking about if -- so, I was referring to this e-mail because

P-41, on the list of the exhibit list, it shows there's a link, link to audio of meeting below.

Then I sent the meeting on March 6th as an audio file to both parties as one of my exhibits, which is linked to P-41, that will show -- that's not what I said -- that will show that Ms. [redacted] was actively participating in it.

And you know Ms. Rizzo testified that she wasn't. And to --

THE HEARING OFFICER: Well, Ms. [redacted] hasn't really testified to anything about her participation yet.

So, there's no real --

ROBERT [redacted] Well, Ms. Rizzo --

THE HEARING OFFICER: At this point there's no real conflict in testimony. I mean, when you put on your case maybe she'll have something to say about that, but --

KAREN [redacted] May I step in and share?

THE HEARING OFFICER: Well, you can't testify. I mean, this just isn't the time to do that.

KAREN [redacted] I can't ask Ms. Rizzo a question regarding --

THE HEARING OFFICER: When your husband is done I'll allow you to --

KAREN [redacted] May I, for the record, state that my

name is Ms. Karen [redacted] not Mrs. [redacted] and I'm not married to Mr. [redacted]

THE HEARING OFFICER: Yeah. Well, I noted that that had been said by the Witness, and I just assumed it was an inadvertent error. And yeah, for the record, I don't think there's any dispute or disagreement that when she was --

THE WITNESS (Rizzo): My apologies.

THE HEARING OFFICER: Yeah. So --

ROBERT [redacted] Hearing Officer, I really -- the exhibit, the audio --

THE HEARING OFFICER: I'm not going to allow Exhibit P-41 at this time.

ROBERT [redacted] What do you mean at this time, so I have an understanding? I'm not understanding why it can't be to show that the testimony just provided was false, because that will show that the test -- and that's why I meant -- you told me (unintelligible) --

THE HEARING OFFICER: An e-mail that you sent doesn't really --

ROBERT [redacted] I'm not talking about the e-mail, sir. I was talking about the audio file.

THE HEARING OFFICER: Well, did you mark those as a separate exhibit?

ROBERT [redacted] Yes, P-41 is a link to the audio of the meeting and that is the file that I sent.
So, it is an exhibit.
THE HEARING OFFICER: P-41 is denied. Now, what is --
ROBERT [redacted] Why is P-41 denied, sir?
THE HEARING OFFICER: Because it's an e-mail you sent. It's not anything that the Witness sent.
ROBERT [redacted] Because I'm talking about P-41 on the exhibit list, sir. I'm talking -- I'm referring to the exhibit list, the exhibit list that I sent you and the exhibit list that I sent the --
THE HEARING OFFICER: What's the exhibit number of the actual, I guess, transcription or recording of the --
ROBERT [redacted] It's the audio file that -- we had e-mails going back and forth, that I was going to be sending an audio file. And P-41 shows --
THE HEARING OFFICER: Is that separately marked as an exhibit? Or is this sort of included within P-41?
ROBERT [redacted] It's part. It is part of P -- it's right here on P-41.
THE HEARING OFFICER: Oh, okay.
ROBERT [redacted] It says, formal written complaint regarding unprofessional and obstructive conduct by district staff during March 6, 2025 --

THE HEARING OFFICER: Let me ask the District -- okay.
ROBERT [redacted] It says, link to meeting, link to meeting below. So, that is --
THE HEARING OFFICER: Let me ask the District. Okay. So, I mean, what I was kind of ruling on was the e-mail. I guess P-41 also includes an audio file.
What's the District's objection to that?
ATTORNEY ROSEN: Right. The District is objecting to the inclusion of the audio file as the exhibit. While, in state policy in Connecticut, parents may be allowed to tape record PPT meetings in that way to ensure that they understand their child's IEP and the IEP process, there's nothing that would permit the parent to use the recording outside of what is it is intended for.
The state regulations, regulation 1076D-12 state that each board of education shall take any and all actions necessary to ensure that parents understand the proceedings at the meetings. The purpose of permitting recording is to allow parents to go back and re-listen to anything that may have been said at a meeting. It's not designed to create evidence for due process hearings and subsequent litigation.
In our experience, hearing officers --

ROBERT [redacted] I object, Hearing Officer.

THE HEARING OFFICER: Well, no. Let the attorney --

ROBERT [redacted] I object, Hearing Officer.

THE HEARING OFFICER: Sir, let the attorney finish.

ATTORNEY ROSEN: Hearing officers routinely exclude these recordings from evidence because the recordings are informal. They're not maintained in any rigid way that allows anyone to have confidence in the authenticity and the integrity of the recording.

For example, a court reporter, as is here, would create a recording for purposes of making a transcript, and we'd actually have a transcript to match up with the recording. That doesn't exist here.

The best evidence rule -- and I understand evidence rules are relaxed, but the best evidence rule indicates that if there were people who were present at the PPT meetings, that they could be called to testify about their recollection of what happened at the PPT meeting. Ms. Rizzo testified as to her recollection.

And by the way, the point about Ms. [redacted] participation was she was not inserting arguments. There was no testimony that

she wasn't participating in the actual meeting.

But back to the recording, we have Ms. Rizzo here to testify. Ms. Truscello --

ROBERT [redacted] I object.

THE HEARING OFFICER: Let him finish.

ATTORNEY ROSEN: Ms. Truscello previously testified. We have witnesses who are present and testified. That parents were present and presumably will testify about their understanding of what happened at the meeting.

An audio record, however, cannot be cross-examined. It's not a good use of our time to go through an audio recording, listen, stop, rewind, go back about -- to argue about was that this word or what word was said, or who cut off whom, or is something audible? Were two people talking over at the same time?

We have witnesses, again, and we have made witnesses available, including Ms. Rizzo, who came in under oath, who testified about their understanding of what happened at the PPT.

Further, there's prior case law where audio tapes of PPTs were not admitted into evidence as a transcript could not be provided. It was not a reliable recording or documentation of what

occurred. I'm referring to Case Number 18-0100, a Trumbull Board of Education matter.

Further, we've had case law from New York, and I'm referring to Warrensburg Central School District. Warrensburg is W-a-r-r-e-n-s-b-u-r-g. The citation is 17 I-D-E-L-R 371, which states that there's the law that PPT meetings can typically be recorded to aid in meaningful participation and memory aids, but the right to tape record is not to be used as a weapon or as a shield in subsequent litigation.

So, we would --

ROBERT [redacted] I object, Hearing Officer.

THE HEARING OFFICER: Let the attorney finish.

ATTORNEY ROSEN: We would respectfully request that the recording is excluded from evidence.

If Mr. [redacted] lays foundation for the introduction of the e-mail part of P-41, if a foundation can be provided -- and I would want to hear that provided -- that what we are objecting to is the actual audio recording that has been linked in the table of contents for the parents and was sent in a separate e-mail.

We're objecting to the inclusion, that it would not be probative to introduce that here when

you have witnesses present, as Ms. Rizzo testified. And now is the opportunity for the parents to ask questions and cross-examine. The insertion of the recording is not necessary.

ROBERT [redacted] I object, Hearing Officer Kennedy. I believe that Mr. Rosen is just making all noise because he doesn't want the impeachment of, the possible impeachment of Ms. Amy Rizzo, because she did testify, no, when she was asked a direct question if Ms. [redacted] participated.

The audio recording, which is referenced in my exhibit, to the link to the audio and the audio recording that I sent prior, and I asked you in the e-mail that, you know, I would want to submit this audio. How can I submit it? I submitted it as an mp3 file. Okay? I haven't heard anything back in an e-mail afterwards.

I do have it, the audio here. There's no reason why it can't come into evidence to impeach the credibility of the Witness, because the audio will clearly show that Ms. [redacted] did participate. If she didn't participate, she wouldn't have said anything. That was her testimony, Hearing Officer.

And we do have recordings of the meetings.

We did inform the District ahead of time and they recorded the meeting, too. This was recorded not privately. This was recorded in agreement of the District and agreement of the parents recording this meeting.

And this is allowed to be used in a due process hearing as far as -- because we just had a witness testify something that was not true, and the only way to prove if it was true or not would be through this audio recording. And obviously, the District doesn't want it to come in is because it's going to impeach the credibility of his witness because she was not truthful.

She took an oath, raised her right hand, said, I swear to tell the whole truth and nothing but the truth. But did she? No. According to this, she did not. She said, no, when Ms. [redacted] did not participate.

This audio should be coming into evidence, and it would prejudice us and it would not be beneficial to our case to have it denied. We have proof. The audio is there. It speaks for itself and it does impeach the Witness about her testimony. And it does need to come into evidence because that would prejudice if we didn't have it

coming into evidence.

We did link it. It was linked specifically in the exhibit list, which I provided to Mr. Rosen and to yourself, Hearing Officer Kennedy. They're linked to the audio, and it was sent via e-mail, and I do have the March 6th meeting.

The e-mail that I'm referring to is something else that will be coming up later on, but the reason I brought it up is because it is in P-41. There it says, link to audio of meeting. And this shows that, yes, we have an exhibit. We have the audio as an exhibit and we would like it to come into evidence to impeach the credibility of the Witness. Because like I said, she agreed to tell the whole truth and nothing but the truth, but that wasn't the case as far as this is concerned.

And Hearing Officer, the audio file does need to come into evidence to show that Ms. [redacted] did participate, and it shows the complete opposite of what Ms. Rizzo testified to. It was untruthful, and she was not truthful to a tribunal, Hearing Officer Kennedy.

So, I do respectfully request that the audio file be submitted into evidence for these purposes. I think it's a very valid reason to,

and there's no reason why it shouldn't come into evidence. And it would prejudice us if we didn't have it come into evidence.

ATTORNEY ROSEN: Hearing Officer Kennedy, may I be heard briefly?

THE HEARING OFFICER: All right. Go ahead.

ATTORNEY ROSEN: All I'll just note is, regardless of whether or not Ms. Rizzo was mistaken in her statement about participation, there's not --

ROBERT [redacted] I object to that.

THE HEARING OFFICER: Wait, wait, wait.

ROBERT [redacted] I object. There was no mistaking. He's twisting words.

ATTORNEY ROSEN: I hope we can proceed through the cross-examination with each side sharing their side respectfully without interruption. Otherwise, I don't see how this can continue.

What I was going to say is, even if Ms. Rizzo was mistaken or had said something that was not entirely accurate, there's nothing preventing either parent when it is their turn to testify to share their recollection.

I've seen nothing that would warrant the inclusion of an audio recording that we have no way of confirming its authenticity, or whether it

is an accurate recording of the PPT meeting taking place coming into evidence.

THE HEARING OFFICER: All right. Well --

ROBERT [redacted] Hearing Officer, I object to Attorney Rosen --

THE HEARING OFFICER: I think there's been enough back-and-forth.

ROBERT [redacted] I know, but I'd like to respond to that, sir. I would like to respond.

He's now trying to twist the words saying, oh, she was mistaken. That wasn't a mistake. That was a complete misrepresentation, and she was being untruthful when she said those words.

She said, no. When she asked the question specifically if Ms. [redacted] testified her answer was, no. And when I asked on cross-examination just a little while ago, Ms. Rizzo said yes, that was my testimony.

And then you have, now, Attorney Rosen trying to misinterpret her words that it was mistaken. It wasn't mistaken.

THE HEARING OFFICER: All right. I mean --

ATTORNEY ROSEN: He's trying to distort --

THE HEARING OFFICER: We've gone back. We can't -- you know it will take us months to hear the case if we

have this much discussion on every point.

All right. So --

ROBERT [redacted] But this is very important, Hearing Officer.

THE HEARING OFFICER: Yeah, P-41 in effect is two exhibits. The e-mail, it hasn't been specifically designated. I'll just say P-41A for convenience.

I mean, that's just a statement by the parent, which presumably contains information that the parent could testify to. So, I mean, I don't know that. There may be some reason for it to come in, but you really have to put it in for your case. I don't see putting it in through this, through this Witness. So --

ROBERT [redacted] So, it can't be put in now?

THE HEARING OFFICER: Now, let me finish.

ROBERT [redacted] I'm sorry.

THE HEARING OFFICER: The audio recording, which is really a second exhibit, I'll say for convenience P-41B. This actually isn't really anyone's first rodeo on this issue. It's been discussed. We've talked about it in hearing officer meetings going back years, and our policy basically is not to allow those for the reasons that Attorney Rosen stated.

I've already had one, at least one that I can think of, a Monroe case where parents wanted to put in an audio recording of a PPT, and I denied that. So, for me, that's something I've already ruled on in another case, and I don't see any reason to change that, change that position.

So, I'm going to uphold the objections to the introduction of P-41. So, your P-41 is not admitted as a full exhibit, and your objection and exception to that are noted.

So, you can just go. You can just proceed with your cross-examination and ask her --

ROBERT [redacted] Okay. I would -- first of all, I would like to respond to that. I think it's important. The audio exhibit, like I said, needs to come into evidence to impeach the credibility of the Witness.

There's no reason why it can't come into evidence, and it prejudices us terribly by not having it come into evidence. It's basically shielding the District. And we feel that by not allowing it to come in, that the Hearing Officer is shielding the District for any liability.

We have a meeting. We have an audio file of that meeting. I referenced it. It could be -- it

is -- or it's already submitted as an exhibit, and it shows that Ms. [redacted] was not silent. She was participating in the meeting. But again, the Witness testified that she was not.

And this, without having it come into evidence, is terribly prejudiced. It will prejudice us, and it's not -- it wouldn't be fair not to have this exhibit to come in, because we have an audio recording. They are legal. This is a recording that was agreed upon by the District and agreed upon by the parents, and is definitely something that is proper to have.

And it also supports my P-41, which was an e-mail from me. So, everything I stated in that e-mail is in that audio file. So, there will be no question as to the accuracy of P-41. And without having this exhibit come in, that means P-41 doesn't mean anything. That's why I have an audio recording of it.

THE HEARING OFFICER: All right. Well, I've ruled.

So, just ask your next question.

ROBERT [redacted] Well, I would like to find out why we -- I think this is important that we have --

THE HEARING OFFICER: Ask your next question.

ROBERT [redacted] Okay.

BY R. [redacted]

Q. Ms. Rizzo, you claim that my e-mails impede the ability to work into partnership.

Is that correct?

A. Yes.

Q. Okay. I'm not sure if you know, but I do -- how many exhibits are you aware that I put into evidence today?

ATTORNEY ROSEN: Objection.

BY ROBERT [redacted]

Q. Or I should say into evidence in the case?

ATTORNEY ROSEN: Objection, relevance.

ROBERT [redacted] Okay.

THE HEARING OFFICER: Sustained. Ask another question.

ROBERT [redacted] Okay. The exhibits that I put in, if -- okay.

Let me ask you this question, Ms. Rizzo.

BY R. [redacted]

Q. You claim during your testimony that you wanted to come to the table or have a phone conversation or in-person conversations. You thought that would be more productive.

Is that correct?

A. Yes.

Q. Okay. Would you agree that if we had no

exhibits at all, we came in to talk at the table, we had no documentation, we had -- you know, of course, we can't record phone conversations. We only had phone conversations and we had no exhibits, do you think we would actually have any kind of case right now?

ATTORNEY ROSEN: Objection.

ROBERT [redacted] I think --

THE HEARING OFFICER: You're asking a hypothetical question to a lay witness.

ROBERT [redacted] The point I was trying to make is that e-mails --

THE HEARING OFFICER: Yeah, you can't ask a hypothetical question like that. Only when you're questioning an expert on someone within -- something within their area of expertise.

BY R. [redacted]

Q. Okay. Ms. Rizzo, the IEP for [[redacted] his IEP, his BIP, is that verbal or written?

A. His IEP is written.

Q. Okay. And why wouldn't it just be verbal? Why can't we just have an IEP as being verbal? Why does it have to be documented?

A. It's a living document. It's an agreement

amongst the team. And it's a document that could be carried with the student no matter what school they go to.

Q. Okay. So, having an IEP in writing will show that everything is clear, it's in writing, and it's for documentation purposes?

A. Correct.

Q. And wouldn't it be fair to ask also that our e-mail communications are also documents as well?

A. It's a form of communication, but it's not the same as an IEP document, in my perception.

Q. That's not the question I asked. I didn't say it was an IEP document. I would say it is a document, though. When we e-mail and we put things to the, you know, the pen to the paper -- we e-mail. That is considered documentation. Isn't it correct?

A. Yes.

Q. Okay. Moving on.

The -- let me see here.

Okay. Prior to the September of 2025 -- 2024 school year, prior to fifth grade. So, when [[redacted] was in fourth grade and prior, was

there any reports of violent, aggressive behaviors that you had reported to us prior to the start of fifth grade?
A. Violent behaviors? No.
Q. Physical behaviors, violent behaviors, or any anything, these kind of behaviors that you reported that were security issues that you mentioned, or were safety issues and things like that. Were there any reports of these violent, aggressive, or, you know, throwing things and twisting arms and everything else?
Was any of these behaviors reported, any of those violent behaviors reported prior to the start of fifth grade?
A. Not that I'm aware of.
Q. Okay. And getting on to the questions. So, I do want to establish the exact timeline. On May 22, 2025, did the school receive our e-mail reporting that Ms. Truscello told [[redacted] he can't be trusted anymore, and he would probably pull his pants and show them to everyone in the bathroom? Do you recall receiving an e-mail from -- you were CC'd on the e-mail of that we reported this?
A. If you are saying that I was CC'd on it, then

I received it, yes.

ROBERT [redacted] So you do? Okay. I would like to bring up exhibit P-15. So, let me see. I guess I'd have to share it on the screen as well.

And let me see. How do we do this now? Let's see if we can see. Now, when I do a screen share, I have a bunch of things open. Do I only have to have one thing open at a time to do a screen share? Because then I'll have to close out everything.

I've never done this and I want to make sure that I'm going to be sharing the, you know, only exhibits. So, how do -- when I do, how do I do a screen share, basically?

THE HEARING OFFICER: I have no idea. I'm probably the least technical person in the Zoom room.

ROBERT [redacted] Okay. Let me -- all right. Let me try this. Let me see if I can. I'll try a screen share. Let me see. I've never done this sharing.

Okay. Yeah, there's windows here. Okay. P-15. Now, I understand. Okay. Share. Okay. Yeah. Okay. I was able to successfully do it.

Okay. In this e-mail -- let me get to -- one second.

BY R. [redacted]

Q. Okay. In this exhibit, this entire exhibit, Ms. Rizzo, which is P-15, you were CC'd on every one of these e-mail communications.

Is that correct?

ATTORNEY ROSEN: Objection.

ROBERT [redacted] I think it's -- I claim it.

THE HEARING OFFICER: What's the objection?

He's asking if --

ATTORNEY ROSEN: I don't think any foundation has been laid. And as Mr. [redacted] is scrolling through this document that I can't even track, he's going so fast, I see highlights on the document that appear to be added.

So, this reflects to me that this is not a true and accurate copy of the document.

ROBERT [redacted] That's just -- well, there you go. I can delete if that would -- if that would be helpful, I can delete it. That was highlighted in Acrobat. So, that's just basically a highlighting.

So, that's it. You see? I can click on it. If that makes you happy, Mr. Rosen, there you go. That is an accurate and true attested document.

THE HEARING OFFICER: I mean, I think asking her if

she's CC'd on --
ROBERT [redacted] I claim it.
THE HEARING OFFICER: -- CC'd on the document is foundational in nature. So, I'll allow that question.
ATTORNEY ROSEN: I'd just like to know clearly what part of the document he's talking about.
ROBERT [redacted] Okay. And that's where I'll be getting into -- if you cannot interrupt me, Mr. Rosen?
THE HEARING OFFICER: Well, are you talking about the entire e-mail chain? Or?
ROBERT [redacted] Yes, I'm going to be getting into this e-mail chain. So, I'm scrolling through it because this is the first time I'm doing a screen share. And so, you have to forgive me.
THE HEARING OFFICER: Well, let me clarify the question. Are you asking if she's been -- if she basically was CC'd on the entire e-mail chain?
ROBERT [redacted] Yes. That that's my first question, yes.
THE HEARING OFFICER: All right. So that, that's a question you can -- you can answer it, Ms. Rizzo.
THE WITNESS (Rizzo): May I have an opportunity to read which e-mails he's referring to?

ROBERT [redacted] I'm talking about all this entire e-mail chain. So, if you want to look at -- if the District wants to look at Exhibit P-15, you can. You can do so. I did provide that, the entire P-15.

ATTORNEY ROSEN: Just a point of order? This is the cross-examination. It is the examiner's responsibility to make sure the Witness sees clearly the exhibit that's being discussed.

THE HEARING OFFICER: So, you're going to have to make sure that she can see it well enough to answer.

THE WITNESS (Rizzo): Can you scroll to the top, Mr. [redacted] so I can read?

ROBERT [redacted] You know, on the very top. These, again, these are just my highlights. I can delete and I can go back and put them in. Those are just my highlights for myself.

And let me go to the top. So, I'll just put the --

ATTORNEY ROSEN: If an exhibit is going to be shared with the Witness and we're going to opine about its admissibility, I want the clear and accurate exhibit, not with any notes or marked up.

ROBERT [redacted] There's nothing marked up or notes here. This is the exhibit. There you go. If you

would like, I could just take all that out for you.

And all I have to do is -- it's highlighted in Adobe Acrobat, which is basically just clicking on it and choosing highlight. That's all it is. It is not doctoring any documents at all. It's just basically a highlight. And there you go.

Let me take this one out, this last one for you, Attorney Rosen, to make you feel comfortable. There's one right there. And let me go to the top. This is the top. So, this is --

THE HEARING OFFICER: I mean, I'll note any highlighting I consider insubstantial as a, quote-unquote, alteration of the documents.

So, yeah, it's fine for you to do it that way, and I don't really care about it on the paper copy. So, go ahead.

BY R. [redacted]

Q. Okay. So --

A. Mr. [redacted] may I read the e-mail?

Q. Which -- yes. Let me --

A. This is the first that I'm seeing this.

Q. Do you want to read the whole e-mail chain first? Because there are 20 pages. If you would like to read the whole e-mail chain

first, I can certainly have you do that. You want me to start at the top and you can read the whole e-mail chain?

We can read it together.

A. Are you going to be questioning me on all of the e-mails?

ROBERT [redacted] I'm going to be questioning to you on (unintelligible) --

THE HEARING OFFICER: Well, let's just start. Let's just start. I mean, it looks like there's a lengthy e-mail chain, and I see one of the CCs is ARizzo@MilfordEd.org. So --

ROBERT [redacted] Uh-huh.

THE WITNESS (Rizzo): Correct.

THE HEARING OFFICER: Does that indicate to you that you got that?

THE WITNESS (Rizzo): Yes.

THE HEARING OFFICER: Okay.

ROBERT [redacted] Okay. Now, I'm going to scroll down. I'm scrolling down because I have some questions for the Witness. So, I'm going to scroll down to a part here.

BY R. [redacted]

Q. Okay. Ms. Rizzo, since you were CC'd on these e-mails, this is an e-mail that we

received from Ms. Truscello. Let me go to the top so you can see on Thursday, April 11, 2024, at 3:46 p.m., Tara Truscello, TaraTruscello@Milford.org -- she wrote. And this is the e-mail.

So, this is page 13 of 20. And if I come down here, this is page 14 of 20. It says right here, we would also express that when we use the term "behavior," it is not a negative situation.

So, my question is this, all the behaviors that were reported prior to the start of the -- well, I should say that before fifth grade, there was no negative -- that they were not considered negative and there was no concerns about his behaviors.

Is that correct?

ATTORNEY ROSEN: Objection, compound question.

THE HEARING OFFICER: Sustained.

BY R. [redacted]

Q. Okay. According to this e-mail chain, it says that we would also express that when we use the term "behavior," it is not a negative situation. So, my question to you is that -- the team feels that behaviors are not

negative. They're not, you know, a negative situation. Would you say that is correct?
A. There's different levels of behavior. There are behaviors that deal with safety, and there are behaviors that are behaviors that a student is working on through their BIP that we're trying to help shape.
Q. Okay. I was talking about --
A. Two different types.
Q. Yeah. I was talking about behaviors prior to fifth grade. We're talking about this.
A. Well, I'm noting that above you have something highlighted about a bathroom incident. That behavior would be a safety behavior. That would be a substantial behavior, which is different than a redirection that would be in his BIP, or elopement from task, which would be in his BIP. Those are different kinds of behaviors.
So, to answer your question, yes, in fourth grade there were some bigger behaviors because we did have some bathroom issues.
ROBERT [redacted] Okay. I would like to -- I will be getting back to this document in a minute, but I'd like to -- since we brought up bathroom behaviors,

I would like to bring up exhibit -- let me get that here.

Let me see here.

Okay. It would be P-13. Let me bring this up on the screen, and let me share this document.

Oh, stop share. Let me stop the share right now, and let me share another one.

So, this one would be -- okay. I think I got it now. Okay.

So, on Friday, November 17, 2023, you were obviously CC'd on this e-mail. This is the bathroom, one of the bathroom incidences that you're referring to. I'm going to scroll through it. Let me start at the bottom and we can work our way up. So, make sure this -- this is okay.

So, starting on November 16, 2023, it states, Ms. Rizzo and I would like to invite you to meet with us this afternoon to talk about our recent questions and concerns. We are available at 3 p.m. for an in-person meeting and can arrange a Google Meet or provide phone conference to accommodate your schedule.

BY R. [redacted]

Q. According to this e-mail, Ms. Rizzo, does it state why you wanted to hold a meeting, or

no?

A. This is Ms. Koosa's e-mail and it says we would like to talk about recent questions and concerns.

Q. Okay. These recent questions and concerns that would have to do with the bathroom incident. Is that correct?

A. From what you have up on the screen, it appears to be in reference to the bathroom incident, yes.

Q. Okay. And it states here for Ms. Koosa, we would like to follow up on the bathroom incident. During the day, I learned Ms. Rizzo has already responded to you while we are -- to your video request, and Ms. Curria addressed the Chromebook. So, it's regarding a bathroom incident.

So, if I scroll up a little more, it says, we -- then I had written back, if you could please outline the bathroom incident in this e-mail, we would appreciate it.

And when we scroll up, Ms. Koosa did outline it. It was reported that [[redacted] had some unexpected behaviors in the bathroom yesterday. He did not pull up his pants

after using the bathroom and walked around when other students were using the bathroom at the same time.

Who reported this specific bathroom incident that [[redacted] -- that saw [[redacted] in the bathroom walking around with his pants down?

A. I believe it was reported by other students to the teacher.

Q. So, other five-grade students in [[redacted]s class. Is that correct?

A. I can't be certain what grade those students were in. I don't know.

I don't -- I don't recall.

Q. But there were just other students. There wasn't any staff, though?

A. The staff is not in the boys bathroom.

Q. Right. Okay. Now, when [[redacted] -- you understand that [[redacted] has [redacted] Correct?

A. Correct.

Q. Okay. Now, since it was reported that he was -- he didn't pull his pants up, when you're in a bathroom using a urinal, when you have a string tie on or, you know, not a zipper and you're not wearing jeans, which he wasn't, pulling, you know, your pants down to

use the bathroom, would you say that would be inappropriate when you're in a bathroom?

He didn't have his pants down in the hallway. If he pulled down his pants to use the bathroom -- to use the bathroom, wouldn't that be appropriate to use the urinal where you have to, you know, pull your pants down somewhat to use the bathroom?

ATTORNEY ROSEN: Objection, relevance. And that was testimony as well.

ROBERT [redacted] I claim it.

THE HEARING OFFICER: Yeah, sustained. We're not -- there's no basis for any of that.

ROBERT [redacted] Well, I believe (unintelligible) --

THE HEARING OFFICER: And it's going way beyond the scope of the hearing. So, sustained.

Just ask another question.

ROBERT [redacted] Well, I feel it's very relevant to this because this is this e-mail.

THE HEARING OFFICER: It's not relevant to the case.

ROBERT [redacted] Okay. So, this was one bathroom incident. The District claims that [[redacted] had his pants down in the bathroom. Okay. So, that was one of the instances that -- and in scrolling up, we did state if there's evidence -- if there's

ever an incident again, please let us know as soon as possible in an e-mail.

BY R. [redacted]

Q. So, is there a reason why we weren't notified in an e-mail about this incident, why you didn't want to discuss it in e-mail? Why did you want it as in-person rather than having it documented for the record?

ATTORNEY ROSEN: Objection, compound question.

ROBERT [redacted] I claim it.

THE HEARING OFFICER: Sustained. Sustained.

BY R. [redacted]

Q. Is there a reason, Ms. Rizzo, that this wasn't documented in an e-mail prior?

A. I believe you just showed me the e-mail that we had -- had explained the situation to you.

Is that not the same e-mail? The same situation --

ROBERT [redacted] My question is that when you reached out to us that you wanted to, you know, have us come in for a meeting, why wasn't this just discussed in the e-mail first? Why did we have to, you know, it was like pulling teeth to try to get information out of the District.

Do you think --

THE HEARING OFFICER: That's testimony. Just ask a question.

ROBERT [redacted] Okay. So, that can come up during my testimony? Okay.

Okay. So this, this bathroom incident I'm going to close out of. I also want to share another bathroom incident, because Ms. Rizzo testified there were two, multiple. And I do agree there was another bathroom incident.

I will bring up exhibit 14, P-14, and I will share that now.

Okay. Let me see here. P-14, okay.

Okay. Let me scroll down to the bottom. Okay.

BY R. [redacted]

Q. So, you testified there were multiple bathroom incidences. Correct, Ms. Rizzo?

A. Yes.

Q. Okay. This is an e-mail received on February 12, 2024, from, again from Ms. Koussa that there was a bathroom incident. When I scroll up -- if you could please document through the e-mail, I would really appreciate it.

So, when I scroll up, Ms. Koussa states, when [[redacted] was in the bathroom, he turned to

another student with his underwear down and grabbed his private part. He then said, can I put my balls in your jaws, to that student as he was grabbing his private part.

[[redacted] reported to me that he hears inappropriate sounds and words on a website called Sound Button, and he heard that phrase on the site. Due to this incident, he will be using the bathroom in the nurse's office.

Ms. Rizzo, do you feel that because of this incident that he should be restricted solely to the nurse's bathroom rather than, you know, working with [[redacted] you know, on this, on this particular incident? That he should automatically be subjected to a nurse's bathroom?

ATTORNEY ROSEN: Objection, compound question.

ROBERT [redacted] I claim it.

THE HEARING OFFICER: Sustained.

BY R. [redacted]

Q. Okay. Let me ask you this question. Do you feel it's appropriate, Ms. Rizzo, that [[redacted] be subjected to use only the nurse's bathroom because of this incident?

A. Yes.

Q. You do? Okay.

And scrolling up. I responded on February 12th, thank you for letting us know about this incident. We spoke with [[redacted] and he told us what happened in the boys restroom. We asked how he learned about the website. He said his classmate, Corey, showed him the Sound Button website and played the clip, can I put my balls in your jaws, to [[redacted] This was done on Corey's Chromebook while in Ms. Curia's class.

We both spoke to -- with [[redacted] and explained to him that this was not appropriate behavior, and that if a classmate ever shows him anything bad, to report it immediately to a teacher.

Going forward, to avoid these types of incidences from happening, would it be possible to have those websites blocked on the school Chromebook? Also, would it be possible to monitor [[redacted] and the other classmates while they're using their Chromebooks? It may prevent incidences like this from happening in school.

Do you feel that is a very valid reason

coming from a parent, you know, basically blocking the website and to prevent these incidences from happening, everything that I had said here, blocking the websites and monitoring other classmates? Do you think that's a reasonable request?

ATTORNEY ROSEN: Objection, compound question.

And I question the relevance to the provision of free appropriate public education and the IEPs at issue in this case.

ROBERT [redacted] Well, the IEP (unintelligible) --

THE HEARING OFFICER: I mean, that this question is so long and compound, I lost track of it.

So, just --

ROBERT [redacted] Okay. Well, then I'll ask another way (unintelligible) --

THE HEARING OFFICER: I sustain the objection. You can try to ask it. You can try to be --

ROBERT [redacted] Okay. I'm going to ask it again.

THE HEARING OFFICER: -- brief. Yeah.

BY R. [redacted]

Q. Do you feel like -- so, Ms. Rizzo, let me ask you, these requests coming from me as a parent, do you think these are reasonable requests?

A. Yes.

Q. Okay. Now, if I scroll up, it says, good afternoon -- coming from Ms. Koosa on February 14th. Good afternoon, Mr. [redacted] and Ms. [redacted] Thank you for following up with [[redacted] at home. We made a request to our IT department to block that website. Chromebook use in the classroom will be closely monitored.

So, my question to you, Ms. Rizzo, is that, do you think if the school -- was the School District proactive or reactive according to this incident?

ATTORNEY ROSEN: Objection as to relevance.

ROBERT [redacted] The relevance is that --

THE HEARING OFFICER: Sustained.

ROBERT [redacted] The relevance is, I'm asking --

THE HEARING OFFICER: That's just asking for an opinion that isn't really legally relevant to anything.

So, just ask --

ROBERT [redacted] It is legally relevant --

THE HEARING OFFICER: Ask the next question.

ROBERT [redacted] Yeah. No, it is legally relevant to this because we made a request to our IT -- she says, we made the request. So, was this

request --

THE HEARING OFFICER: You brought something to their attention and they said, yeah, you're right. We corrected it. So, I'm not sure if it's --

ROBERT [redacted] You can't -- this is not about curing anything, Hearing Officer. This is about being proactive.

THE HEARING OFFICER: All right. Just --

ROBERT [redacted] (Unintelligible) the District has not --

THE HEARING OFFICER: Just ask the next question.

ROBERT [redacted] What I'm trying to state, Attorney Rosen -- which I do want to make a statement. He says this is not about the IEP. Our testimony as -- and in the pre-hearing conference, Attorney Hearing Officer Kennedy, I specifically stated, and I'm going to get in for the record what I stated at the pre-hearing conference, that the IEP seems to be robust on paper, but the reality was completely different of how he was treated and how we -- how his violate -- his rights were violated and our rights were violated across the board.

And this is what -- I'm trying to make our case to show that we're not disputing the contents of the IEP, which I know Attorney Rosen is stating

that everything is appropriate. Yes, according to the IEP, which we did state at the pre-hearing conference -- which I will again, make it again official for the record that we are not objecting to anything in the IEP as far as, well, that wasn't appropriate in the IEP.

What they put in the IEP wasn't appropriate. It looks robust, but the reality was completely different in how [[redacted] was treated and how he was denied a free and appropriate public education. This is not based on the content of the IEP. It's based upon how they did not implement that IEP that shows that if they did, we wouldn't even be having this due process hearing to begin with.

So, I think it is relevant that if the District did state that they made a request, it will be closely monitored, that if this -- if they were proactive and they already blocked the website and they closely monitor their students, then my question to Ms. Rizzo was that, if the district --

THE HEARING OFFICER: All right. Well, no. You had said it's clear, I mean, from the statement of issues we developed, and then you actually said that earlier and at the very beginning of the

hearing, that the substantive IEP is not at issue. You know you've said that implementation is at issue, which is fine, but you have to show.

You have to show what specific provision of the IEP was not provided or was not implemented.

ROBERT [redacted] Well, this is -- this is all. His BIP, his IEP, it's all intertwined. This is not --

THE HEARING OFFICER: The other thing that I noticed is we've never actually -- Exhibit P-14 is not one of the ones that's been stipulated to. It hasn't actually been admitted into the record, so.

ROBERT [redacted] What do you mean, admitted into the record? I'm not understanding, sir.

THE HEARING OFFICER: It's not a full exhibit. You never -- you just started questioning from it. You didn't --

ATTORNEY ROSEN: And that -- and pardon me. I was waiting to see if foundation was laid, but we would object to the inclusion of this exhibit. It's not relevant to the issues at stake.

ROBERT [redacted] It is. Yes, it is here, Hearing Officer. That would prejudice us. What Attorney Rosen is trying to do, for the record here, Hearing Officer, is trying to prevent our exhibits

coming in because it shows the District did not do right by our child. They were not being proactive, and this is how they violated his free and appropriate public education.

It's not just about the IEP itself, which is written. It's about how my son was treated, how we were treated as parents, and how they did not provide him a free and appropriate public education is the reason why we're requesting outplacement.

Because my next question to Ms. Rizzo is that --

THE HEARING OFFICER: Well, I haven't ruled on the admissibility of P-14. Well --

ROBERT [redacted] I'm not understanding that. I though it was told.

THE HEARING OFFICER: Yeah, I haven't ruled on the admissibility of -- you never really --

ROBERT [redacted] (Unintelligible) --

THE HEARING OFFICER: I assume you're implicitly offering it, but the District has objected to it. Okay. Well, I do see -- so, at the very --

ROBERT [redacted] I'm not understanding, sir.

THE HEARING OFFICER: At the very -- Ms. Rizzo, at the very top, I see that you are CC'd

ARizzo@MilfordEd.org. So, you did receive this?

THE WITNESS (Rizzo): Correct.

THE HEARING OFFICER: All right.

ROBERT [redacted] I claim it.

THE HEARING OFFICER: You know what? I'll admit it for what it's worth.

(Parent Exhibit Number 14, marked for identification and noted in index.)

THE HEARING OFFICER: It's not completely outside the scope of the case. So, I mean, as the evidence comes in, we'll see if it supports any claim of failure to implement, but I'll allow a little bit of latitude on that. All right. So, that --

ROBERT [redacted] My next question --

THE HEARING OFFICER: Next question?

ROBERT [redacted] Yeah, my next question.

BY R. [redacted]

Q. Ms. Rizzo, do you feel that should the -- as a school district, when you have, you know, being -- getting on the, you know, having the Internet access, accessibility to the Internet and, you know, things like that, should the -- had the district been proactive

and had made that request to the IT department ahead of time and closely monitored to prevent these incidences from happening?

ATTORNEY ROSEN: Objection. Relevance, and calls for speculation.

ROBERT [redacted] No, I claim it.

THE HEARING OFFICER: Sustained.

ROBERT [redacted] Then I will ask it a different way. Then I'll have to ask it until I can get it into evidence. I'm trying my best.

THE HEARING OFFICER: Well, no. I mean --

ROBERT [redacted] I'm going to try my best.

THE HEARING OFFICER: P-14 is in evidence. I mean, you --

ROBERT [redacted] Right, but I do have questions about it.

THE HEARING OFFICER: I mean, you can argue, frankly, from the exhibit.

ROBERT [redacted] But I do have another question. Yeah, I do have some more.

BY R. [redacted]

Q. So, my question, Ms. Rizzo, is that if the District had already blocked the website and closely monitored the classroom, could this

incident have been completely prevented?
ATTORNEY ROSEN: Objection. It's the same question, just rephrased. Calls for speculation.
THE HEARING OFFICER: Yeah, that calls for speculation.
ROBERT [redacted] It's not --
THE HEARING OFFICER: Sustained.
ROBERT [redacted] What I'm going to (unintelligible) --
THE HEARING OFFICER: You're asking a question that calls for speculation.
ROBERT [redacted] Well, then I'm going to have to keep answering it until it can get into evidence. All of this (unintelligible) --
THE HEARING OFFICER: Well, no. I mean, you're just going to have to move on.
ROBERT [redacted] Well, I really don't -- I think this --
THE HEARING OFFICER: You can argue the point, but at this point, I haven't seen really any tie to the IEP --
ROBERT [redacted] This is a tie --
THE HEARING OFFICER: To the IEP itself, you have to show that --
ROBERT [redacted] You can't do --
THE HEARING OFFICER: I mean, not implementing the IEP is like, you know you're supposed to have --

ROBERT [redacted] Ms. Rizzo --

THE HEARING OFFICER: You're supposed to have, like, ten hours of phonics instruction during the week, and the District didn't provide it. They only provided, like, three.

I mean, you have to show --

ROBERT [redacted] Miss --

THE HEARING OFFICER: It's not just a generalized criticism of the District. I mean --

ROBERT [redacted] Well, I don't think this is fair Hearing Officer, because I'm trying to get my questions into evidence, and now I feel like -- I feel everything is being twisted not to have this to come into evidence.

THE HEARING OFFICER: Just move --

ROBERT [redacted] All you're doing is you're not letting the March 6th meeting --

THE HEARING OFFICER: P-14, I've actually admitted P-14 into evidence. You're just not --

ROBERT [redacted] Right, but I'm asking questions, and I feel like they're being deflected to -- not to come into evidence. I have very valid concerns and questions about this, which are valid, regarding Ms. Rizzo's --

THE HEARING OFFICER: I mean, it's argumentative.

ROBERT [redacted] I'm trying to --

THE HEARING OFFICER: If you want to --

ROBERT [redacted] I was trying to finish my point.

THE HEARING OFFICER: If you want to make the argument in your brief at the end, that somehow it violated the IEP essentially, not to take these measures earlier before the District was even aware of an issue, you can argue that. But further questioning along those lines isn't achieving anything. So, just move on.

ROBERT [redacted] Well, I wanted to finish, but I was just interrupted. I wanted to get my point across, is that -- and I did loose my train of thought because I was interrupted, Hearing Officer. I was trying to make a point that Ms. Rizzo testified there were two bathroom incidences.

She did testify about his behaviors and tied his behaviors to these bathroom incidences, and I'm defending against them. And --

THE HEARING OFFICER: All right. Well, you're arguing the same stuff over and over again. And --

ROBERT [redacted] Because I'm trying to get my question in, because it's being --

THE HEARING OFFICER: Whether you're in court or an

administrative hearing, when the judge or the administrative hearing officer rules, then that's the ruling and you move on.

ROBERT [redacted] And I'm trying rule -- yeah, I'm trying to find a different way to question it so this --

THE HEARING OFFICER: No, there is no different way to question it. Just move on.

ROBERT [redacted] I believe there is a different way to question it because --

THE HEARING OFFICER: Not really.

ROBERT [redacted] -- I do have a question.

THE HEARING OFFICER: Just -- I mean, you've gotten P-14 into evidence. There's really nothing more to ask on this. Just move on.

ROBERT [redacted] Well, I believe it is important to get in questioning --

THE HEARING OFFICER: Yeah, don't argue.

Ask a question.

ROBERT [redacted] Yes, that's what -- I'm trying to. I'm trying to come up with a question.

THE HEARING OFFICER: All right. Ask.

ROBERT [redacted] But I keep being objected to.

THE HEARING OFFICER: Ask. Yeah, ask --

ROBERT [redacted] So, I have to find a question --

THE HEARING OFFICER: Ask -- you don't have to keep asking this, trying to rephrase the same question. Ask a completely different question.

ROBERT [redacted] Well, I'd like to rephrase this so I can get this into evidence --

THE HEARING OFFICER: No.

ROBERT [redacted] -- this question --

THE HEARING OFFICER: No.

ROBERT [redacted] -- because it's being objected to.

THE HEARING OFFICER: There really is no way to rephrase this. You've tried several times and --

ROBERT [redacted] I don't think that's fair, Hearing Officer, because that prejudices (unintelligible) --

THE HEARING OFFICER: You're inherently asking her to speculate.

ROBERT [redacted] That's not true, Hearing Officer. It was testified there to --

THE HEARING OFFICER: You've got the IEP. You've got the document, and there's been ample testimony on this. You have enough to argue from in your brief if you really think that this constitutes a violation, you know, a failure to implement the IEP. So --

ROBERT [redacted] Yes, this all -- this has to do with

it. That's what I'm trying to do --
THE HEARING OFFICER: And I mean, we're --
ROBERT [redacted] We're tying it to the IEP.
THE HEARING OFFICER: Your penchant for arguing the same thing over and over again is --
ROBERT [redacted] I don't believe it is, sir.
THE HEARING OFFICER: -- grossly delaying the hearing.
ROBERT [redacted] No, sir. I don't believe that. I'm trying to get a question into evidence because there are two things that I brought up. One was the audio, which you objected to.
THE HEARING OFFICER: I mean, if you want me to --
ROBERT [redacted] (Unintelligible) I'm being cut off again, Hearing Officer.
THE HEARING OFFICER: If you want me to just terminate the cross-examination because you won't move on, you know I can do that.
ROBERT [redacted] Are you -- sir, I'm trying to move on, but you keep cutting me off.
THE HEARING OFFICER: All right. Then move on.
ROBERT [redacted] I'm not -- I would object to your --
THE HEARING OFFICER: Stop. Stop arguing.
ROBERT [redacted] What you just said --
THE HEARING OFFICER: Stop arguing and ask another question to the Witness.

ROBERT [redacted] I'm not arguing, sir. I'm trying to explain, and I keep being cut off. And now you just threatened to abandon our cross-examination like you did at the first hearing --

THE HEARING OFFICER: Uh-huh.

ROBERT [redacted] -- to just dismiss the case.

THE HEARING OFFICER: Well, because --

ROBERT [redacted] And I don't think that's fair to us. That's not right, sir.

THE HEARING OFFICER: I mean, because you keep arguing the same -- I think it was called by another witness that you go into a loop. So, move on.

ROBERT [redacted] Hearing Officer, I don't believe that is fair.

THE HEARING OFFICER: Sir, move on. Move on.

ROBERT [redacted] So, you're using those words against me?

THE HEARING OFFICER: Ask another question.

ROBERT [redacted] Sir, I don't feel that -- I feel you're using those words against me. I feel what you're doing right now is taking the District's side because you're using their term "loop" against me (unintelligible) --

THE HEARING OFFICER: I'm watching you in action, and you're not listening to --

ROBERT [redacted] I'm trying to find a way to answer -- ask this question, sir, because they keep being objected to. And then when I do try to ask the question, you're saying it doesn't tie into the IEP, which -- so, I can't get my questions, you know, into the evidence.

So, if I have to move on, then yes, I will. Then, I will move on --

THE HEARING OFFICER: Move on.

ROBERT [redacted] -- with other questions. Okay.

THE HEARING OFFICER: Okay.

BY R. [redacted]

Q. Ms. Rizzo, did the school subsequently receive our e-mail on May 27, 2025, reporting that Ms. Curria told [[redacted] he would be sent to the principal's office and written up for ten minutes simply for attempting to use the regular boy's restroom?

A. I don't recall that e-mail.

ROBERT [redacted] Okay. Let me bring that up.

That would be -- let me get back to -- let me stop sharing this. Let me get back to the exhibit here.

Okay. I'm going to be introducing -- well, again I'm going to be sharing the P-15. As I

said, I would be coming back to Parent 15.
Let me share this. Here we go. So, May 27th. Let me get to -- I'm scrolling to May 27th to recollect your memory.
Let me see.
BY R. [redacted]
Q. Okay. This is the e-mail that I'm referring to. If you would like to take a minute to read it, or I could read it along.
You let me know.
A. If you don't mind, I'll take a minute. Thank you.
Q. I'm sorry. You'd like to take a minute to read it?
A. If that's okay.
Q. That's fine. Do you need me to scroll, or do you have it on your end? Just so I want to make sure that you --
A. I'll let you know if it needs to go down.
Just one minute.
Q. Uh-huh.
(Pause.)
A. Can you scroll down a little bit, please?
Q. Sure.
A. Thank you.

(Pause.)

I'm all set. Thank you.

Q. So, my question again is, did the school subsequently receive -- so did you receive our e-mail, this e-mail on May 27th, now that you read it?

A. I was CC'd on it, as in I -- as part of the team.

Q. Right. So, you did receive it. So, you -- you did receive it. Correct? Since you were CC'd. Is that correct?

A. The way that the screen was initially presented, I couldn't see who it was sent to, but you were telling me that I was -- that I was CC'd on it. I can't tell from this.

It just says to the team.

Q. Yeah. And so, these are everybody that it comes from, on top again.

A. So, yes, it looks like I was.

Q. Okay. Yes. Okay. So you were? Okay.

Now I'm just going to scroll down here. And so, we reported this incident. And my next question would be -- let me see here.

And also on June 3, 2024, this e-mail, do you recall receiving this e-mail, too,

where I said, I spoke with [[redacted]s mom tonight. [[redacted] got on the phone and said to me, Daddy, I want to tell you something. Sometimes Ms. Curria is mean. I asked him what happened. He told me that he was doing his work with -- Ms. Curria came up to him and said, [[redacted] do your second-grade math.

We understand [[redacted] is not up to grade level, and the team made it clear he won't be because of his disability. [[redacted] told us that that statement made him feel very upset and we can understand why it would. He is in fourth grade, not second. It is very inappropriate and belittling. He already feels bad that he can't keep up with his current classmates, and to have a statement like this thrown at him is inexcusable. As parents, we are extremely upset.

Robert and Karen.

Do you remember receiving this communication?

A. Yes. Yes.

Q. Okay. Now these, this communication, the one that was sent on May 27th and also another communication in here that I will be --

there's also this e-mail on May 15, 2024, which was sent by me to Ms. Truscello.

There was something we need to discuss with you. [[redacted] had shared with me that Ms. Truscello said to him the reason he's not using the regular boys' bathroom is because he can't be trusted. [[redacted] reported this Tuesday and told us it was said to him again on Wednesday, today.

Then he told me he -- she said to him, don't go home and tell your dad anymore that you want to use the regular bathroom. [[redacted] told me he felt very upset by the things Ms. Truscello said to him. He then asked me what he should do the next time Ms. Truscello says those things. I made it clear that he should report it to me and his mother right away.

He should not be afraid to, or intimidated to feel that he should report things to us. [[redacted] is already feeling left out that he is not being able to use the regular restroom like all the other classmates. He needs positive reinforcement, not to be told that he can't be trusted.

This needs -- this sends a wrong message to him.

So, this e-mail that I sent to you --

ATTORNEY ROSEN: I'm sorry. I have to object. Mr. [redacted] is just reading something that's not in evidence into the record, and I'm just wondering if --

ROBERT [redacted] P-15 is (unintelligible) --

THE HEARING OFFICER: Sustained.

ROBERT [redacted] Okay. I would like to get -- I thought P-15 was in evidence. I would like to get the entire P-15 into evidence. My understanding it was, because we discussed it a little while ago. So, how can we be discussing if it wasn't already in evidence?

I did point it out before I went to another exhibit. We did discuss it prior. This was not brought up that it wasn't into evidence.

THE HEARING OFFICER: All right. The objection hadn't been made yet, but it is now. So, all right. So, you offered it. And the District --

ROBERT [redacted] I'm offering it.

THE HEARING OFFICER: Does the District object?

ATTORNEY ROSEN: I'm just -- I didn't know if there were questions. He was just reading it and

talking about it.

ROBERT [redacted] Oh, I'm going to get into that. I'm going to have questions.

ATTORNEY ROSEN: I guess I would just object as to, yeah, I'm concerned about the highlights, I know, but just the objection of this correspondence.

What's the relevance of this correspondence?

ROBERT [redacted] Again, the highlights are just this. Like I told you, we went over this. I don't want to waste any more time with the highlights, Mr. Rosen. It was already explained to you by Hearing Officer Kennedy, but you're still bringing up the high points.

ATTORNEY ROSEN: Hearing Officer Kennedy, I'd like to finish my --

THE HEARING OFFICER: Well, he just mentioned it in passing. I mean, the exhibit consists mostly of e-mails sent by the parents, and it looks like there was one sent by someone else on school staff.

But I mean, did this particular Witness write any of this, any of -- anything? Any of this 20 pages?

ROBERT [redacted] Did what? I'm sorry, sir?

THE HEARING OFFICER: Did Ms. Rizzo write any of the

e-mails in this 20-page chain?
ROBERT [redacted] Well, that's what I was going to get into. I'm glad you brought up that question, because my next question to Ms. Rizzo was, all these incidences that I brought up, these three incidences, my next question was going to be exactly that.
Ms. Rizzo, did you respond to any of these incidences where Ms. Truscello, in these e-mails, told him that, don't go home and tell your dad anything? And everything that I had explained in these e-mails about what Ms. Curria said and everything else that we reported from May 15th up until -- let me see here -- June 3rd, which I did read for the record. So --
THE HEARING OFFICER: All right. Well --
BY R. [redacted]
Q. So, here's my question. My question is, Ms. Rizzo, did you respond to any of these e-mails or our concerns regarding these, these e-mails?
ATTORNEY ROSEN: Objection. This is not yet in evidence, and I'm not sure of the relevance.
ROBERT [redacted] The relevance is -- okay. Hearing Officer Kennedy, can we get this officially into

evidence? Because if it wasn't into evidence, so everything that I testified to -- or I should say not testified, that I used as cross-examination before, when I used this (unintelligible) --

THE HEARING OFFICER: What's the purpose for which it's being offered?

ROBERT [redacted] The purpose for it being offered is to present my case. Without being offered, it's going to prejudice me. I feel like everything I'm presenting into evidence is being --

THE HEARING OFFICER: Well, you got --

ROBERT [redacted] Everything across the board so far.

THE HEARING OFFICER: I mean, everything, everything that you say, everything that you represent in the e-mail is stuff that you can testify to.

ROBERT [redacted] Okay. So, I can use that on testifying? Okay.

So, my question to Ms. Rizzo is that -- I want to make sure this e-mail gets into evidence. So, can this e-mail be admitted into evidence now? Because I'm using this for cross-examination.

THE HEARING OFFICER: For what purpose?

ROBERT [redacted] For what purpose? For cross-examination, because I have a question for Ms. Rizzo.

THE HEARING OFFICER: Well --

ROBERT [redacted] You said that this is -- you told us last time, Hearing Officer --

THE HEARING OFFICER: All right. Well, all you've established was that she was CC'd on it.

ROBERT [redacted] Okay. Hearing Officer, my question is --

THE HEARING OFFICER: You haven't established that she's really been involved in this e-mail chain other than to be CC'd on, I guess, the last e-mail containing the change.

She was one of a number of CCs.

ROBERT [redacted] Okay. My question -- well, here's a question, Hearing Officer Kennedy. During my testimony, can I call back Ms. Rizzo as a witness, you know, to testify to these e-mails on, you know, when it comes down to my testimony?

THE HEARING OFFICER: Let me just take -- this is a 20-page document.

ROBERT [redacted] Well, it's not just this. There's a lot. There's many other e-mails, too, not just this one.

THE HEARING OFFICER: And -- all right. But what exactly are you trying to show through this e-mail?

ROBERT [redacted] My question to you, again, Hearing Officer, is that when it comes down to my testimony, which I just asked you but I did not get any answer to my question, was that when it comes down to my testimony, can I recall Ms. Rizzo as a witness so I can prevent -- present my testimony, and then use these e-mails into evidence? Can I call Ms. Rizzo back during my testimony?

THE HEARING OFFICER: I mean, if the e-mail is relevant. I mean, you can identify that you sent them. So, I'm not that concerned about that, that aspect of it.

But are you offering these things for the purpose of establishing that everything in them is true? Or is it for some other purpose?

ROBERT [redacted] Well, the purpose is exactly what it is. It speaks for itself. I'm basically cross-examining her, and I need to get this into evidence, you know, to present, you know. You know, as part of cross-examination.

It also presents my case, too, as well, and I need to get, you know, that everything I'm trying to put into evidence seems to be getting shot down. The audio file, this e-mail, that e-mail.

And so, my question is that when it comes down to my testimony, can I have Ms. Rizzo back on the stand? Because last time when I asked to have Ms. Truscello back, you said she cannot come back, and you said it was deliberate bad-faith refusal because I didn't submit the --

THE HEARING OFFICER: Well, in this case, I'm not concerned. I mean, in this case, I wouldn't bar. You've provided the exhibits in advance. You know what? I mean, just for the potential effect on --

ROBERT [redacted] Here's my --

THE HEARING OFFICER: Well, now let me finish.

ROBERT [redacted] Yes, sir.

THE HEARING OFFICER: Just for the potential effect on the listener and, you know, the implication that maybe the District should have taken some action other than what it did or didn't do in response to receiving this communication, for that limited purpose, I'll allow P-15.

(Parent Exhibit Number 15, marked for identification and noted in index.)

THE HEARING OFFICER: So, go ahead and ask your next question.

ROBERT [redacted] So, I just want to make sure if I already asked this, because then Attorney Rosen interrupted and objected, that he's --

THE HEARING OFFICER: Well, he has a right to do that. So, just ask your question.

ROBERT [redacted] Okay. Well, that's why I'm going to ask the question. So, I'm not sure if it was okay.

BY R. [redacted]

Q. My question is, then, Ms. Rizzo, did you respond to us with any of these concerns we brought up, you know, in these e-mails since you were CC'd?

A. As you noted, these e-mails were not sent to me. They were sent to his case manager, Ms. Truscello. They were not sent from me.

And from what I read here, you weren't asking for a response. You were reporting what you thought happened.

Q. Do I have to ask for a response for an administrator like yourself as a school principal to get involved? Or is it appropriate just to remain silent when you're CC'd on these matters?

Do you take these kind of --

ATTORNEY ROSEN: Objection, compound question.
ROBERT [redacted] So then, I'll ask it --
THE HEARING OFFICER: Yeah. And argumentative, yeah.
ROBERT [redacted] Well, then I'm going to ask it a different way.
BY R. [redacted]
Q. As a school administrator and a principal being CC'd on these e-mails, do you feel that you should be responding back to these e-mails about these parents' concerns since you were CC'd on them?
ATTORNEY ROSEN: Objection, argumentative.
ROBERT [redacted] That's not argumentative.
THE HEARING OFFICER: Yeah, it is. Sustained.
ROBERT [redacted] Okay. Well, then let me ask it another way. I'm going to have to ask it until I can get it answered, because --
THE HEARING OFFICER: No, you actually don't.
ROBERT [redacted] Again, everything I'm providing, Hearing Officer --
THE HEARING OFFICER: Yeah. I mean, you're --
ROBERT [redacted] Everything is being shot down. We're not having a case now because everything I'm trying to ask and provide, everything is getting shot down across the board, and it's going to

prejudice --

THE HEARING OFFICER: The exhibit was admitted. I mean, you can argue --

ROBERT [redacted] But I have to ask questions about it --

THE HEARING OFFICER: And there's no dispute that she didn't really -- that she didn't provide a specific response to it. So, I mean, you've established that.

ROBERT [redacted] Okay. My question --

THE HEARING OFFICER: Just asking argumentative questions about what's already been established doesn't really prove anything.

ROBERT [redacted] Well, I'm a pro se party, and when you say, argumentative, you know, I'm not sure what you mean by that. It's not that I'm deliberately being argumentative, like in a way of like I'm trying to argue something.

What I'm trying to do is state my case. And my question to you is that all these exhibits I'm putting into evidence, if I don't get to explain them, and do I have to question --

THE HEARING OFFICER: Well, I mean, you can write a brief, which explains where you get --

ATTORNEY ROSEN: I wasn't going to (unintelligible) --

THE HEARING OFFICER: -- how you get from the facts to the legal conclusion.
ROBERT [redacted] Well --
THE HEARING OFFICER: But sort of asking the Witness hypotheticals about whether you should respond to every e-mail you get --
ROBERT [redacted] That's not the question I asked --
THE HEARING OFFICER: Whether she -- well, that's kind of the implication. And (unintelligible) --
ROBERT [redacted] But that's not the implication, sir. That's not -- I feel like you're defending the District.
THE HEARING OFFICER: I mean, how many people were CC'd on this? Like, ten? So --
ROBERT [redacted] I'm asking the school principal. I'm not asking the --
THE HEARING OFFICER: Again, just --
ROBERT [redacted] Hearing Officer?
THE HEARING OFFICER: Yeah. I mean, you've got the evidence. Just asking her argumentative questions about whether she should have responded to this? You can argue that she should have, but you also then have to --
ROBERT [redacted] But --
THE HEARING OFFICER: But then you also have to argue

that somehow it's a failure to implement the IEP, which is a legal question. So --

ROBERT [redacted] You're tying it into the IEP, when I specifically said the IEP is robust on paper.

THE HEARING OFFICER: No, no, no, no, no.

ROBERT [redacted] I've already testified to it.

THE HEARING OFFICER: I'm not talking about the accuracy of the IEP. You're talking about the implementation of the IEP, and you have to show that this is a failure to implement what's actually there, so.

ROBERT [redacted] Right. And the IEP is supposed to (unintelligible) --

THE HEARING OFFICER: Anyway, just -- yeah, just --

ROBERT [redacted] Right. So, my --

THE HEARING OFFICER: Just move on to the next question.

ROBERT [redacted] So, to respond back, because I keep getting interrupted -- I'm trying to explain, Hearing Officer. I'm trying to do the best I can. You know, please forgive me if you think I'm being argumentative, but that's not my intention.

I'm trying to get things into evidence and I'm trying to present my case, but again, I feel everything is getting shot down. What I'm trying

to ask, a question -- is that these e-mails, these 78 exhibits that I have, I think it's important in order before -- because this case is eventually going to end, and this basically tells a story of what happened, how my son was not treated right, how we weren't treated as parents, because, you know, that will come up through our testimony.

But these e-mails speak for themselves.

THE HEARING OFFICER: Remember, that's not necessarily the legal question. The question is whether there are procedural violations, or whether the IEP wasn't implemented according to its terms.

ROBERT [redacted] Well, according to the (unintelligible) --

THE HEARING OFFICER: And just sort of general grievances against the school system aren't really what I'm deciding.

ROBERT [redacted] Well, here's the thing. This is not to -- this is not just a general grievance. This has to do -- if his IEP -- in his IEP, his IEP states, you know, basically, like I said, it's robust. It's to help the child. That's what -- I'm trying to make this connection.

The IEP is to help the child progress, to educate this child, not to hold him back.

THE HEARING OFFICER: All right. But what --
ROBERT [redacted] You know, and then --
THE HEARING OFFICER: I mean, the IEP --
ROBERT [redacted] And so, I'm being cut off again, Hearing Officer. Every time I try to make a point, I'm being cut off. If I --
THE HEARING OFFICER: The IEP has specific --
ROBERT [redacted] Can I please not be cut off? I'm trying to -- I -- respectfully, Hearing Officer, please don't --
THE HEARING OFFICER: The IEP has specific things in it. What specific things in it are you --
ROBERT [redacted] May I please not -- may I please? See, I'm losing train of thought when you cut me off, Hearing Officer. And I would -- please respectfully not to cut me off during the mid-sentence because I can't make -- I can't get this into testimony. I'm being cut off.
Every time I try to make a valid point, I'm being cut off, and then I lose train of thought. I don't think that's fair. I'm not cutting you off, you know, Hearing Officer Kennedy.
THE HEARING OFFICER: But we're taking about five times the amount of time this cross-examination should.
ROBERT [redacted] Well, that's not the point. The

point is that -- is that I feel like, again, that's another deflection. It's like, you know, every time I try to get into -- my question is this -- and I lost my train of thought because I was interrupted, and I don't think that's fair.

I was trying to make a point that the IEP itself is trying to help the child, is to educate the child, and to, you know, to basically -- so the School District is testifying that, oh, where we've -- we're doing our best for [[redacted]

We're educating him, everything in the IEP. We're doing everything, and these parents are just, you know, they don't want to come to meetings. They don't want to do -- which I'll be getting into.

But the point I'm trying to make is that these e-mails show that how could they be educating him as far as his IEP? How could he be learning? His IEP is strictly for learning, is strictly to help this child learn, and to grow to the best of his ability.

But when these things happen in the District, you know, and we report them, and we don't get any, you know, she doesn't respond to them, and my son is, you know, this is, you know, what's

happening to him is not helping him. It's not. It's going against the IEP.

THE HEARING OFFICER: Yeah, but that -- again, you haven't pointed to any specific provisions of the IEP. This is taking --

ROBERT [redacted] I am.

THE HEARING OFFICER: This is taking way too long.

ATTORNEY ROSEN: We're going to ask that this Witness get dismissed if we don't actually have questions tailored to the IEP and the provision of FAPE at issue here.

ROBERT [redacted] Well, that's not true, because (unintelligible) --

ATTORNEY ROSEN: I think Mr. [redacted] is just launching into oral argument, and I respect his opportunity to give his opinion, but that will come.

Ms. Rizzo is here. She's taken the time from the school day in her capacity as principal to be here as a witness. She's available for cross-examination. And if there aren't going to be questions directly related to the issues here, I'd ask that she be dismissed.

ROBERT [redacted] Okay. Here's -- okay. I would like to respond to that.

THE HEARING OFFICER: I won't dismiss her right this

minute -- but, A, stop arguing.
ROBERT [redacted] I would like to respond.
THE HEARING OFFICER: B -- well, wait. A, stop arguing. B, ask another question, because frankly, Attorney Rosen is right, but I don't want to do that without giving you a chance to finally sort of self-correct and start asking --
ROBERT [redacted] I don't feel like --
THE HEARING OFFICER: Start asking some, you know, start asking questions that really get to the legal case here.
ROBERT [redacted] And that's -- this is part of the legal case. The other thing I want to bring up is that the reason I'm asking these questions is because you told me last time that I could not call the Witness back to the stand, because once they're here, they're here.
Because you stated in your denial of my first motion for recusal stating that the School District --
THE HEARING OFFICER: Again, you're --
ROBERT [redacted] See, I'm being cut off again.
THE HEARING OFFICER: You're engaging in repetitive arguments. Now please --
ROBERT [redacted] I'm not, Hearing Officer.

THE HEARING OFFICER: You are.

ROBERT [redacted] I cannot get anything on record. And it's like I can't present my -- I can't present my testimony or I'm not going to, you know, I can't present my cross-examination.

So, I just want to get -- just to be clear on something. Maybe I'm not clear. If I'm not clear, I truly apologize. I'm a pro se party. And so, let me get this clear for the record.

I do have a whole bunch of questions of what I want to be asking Ms. Rizzo. If Ms. Rizzo is allowed to come back during my testimony, then we could probably cut through a lot of this, because my concern is that I need to get all this out now, because I'm not going to be able to have Ms. Rizzo come back again. From what you told me last time, that once the Witness is here, that mister --

THE HEARING OFFICER: Here, you've provided the exhibits you need to cross-examine her. I mean, if you want to recall her in your own case, I'm fine, fine with that unless -- unless we get to the point that I just dismiss the Witness, and then I won't. I won't allow her to be recalled.

ROBERT [redacted] Well, that's -- see, I'm not having an understanding, and I'm trying to get a clear

understanding. If she can come back, then we could probably cut through a lot of this.
My understanding is that I have to get all this in today because she's not coming back again.
THE HEARING OFFICER: No, she can come -- you've provided the exhibits that you need for cross-examination, so --
ROBERT [redacted] Okay. Hearing Officer --
THE HEARING OFFICER: -- which you didn't the last time. So, she can come back. But --
ROBERT [redacted] Okay. That's good.
THE HEARING OFFICER: And your cross -- yeah. So, anyway. Just proceed with cross-examination.
KAREN [redacted] I have a question for Ms. Rizzo.
THE HEARING OFFICER: Well, when he finishes his cross-examination, I'll allow you to -- we're just going to do one at a time.
KAREN [redacted] Okay. Hearing officer, my son is coming home at 2:55 p.m. So, I don't want him hearing any of this. And I -- yeah, I need to --
ROBERT [redacted] I would like Ms. [redacted] to speak.
KAREN [redacted] That's what I would like to share now and ask my one question, and then Mr. [redacted] can proceed.
ROBERT [redacted] I will allow that.

THE HEARING OFFICER: If it's only one question just to accommodate the schedule of the child coming home, go ahead. Ask your question.

KAREN [redacted] All right.

CROSS-EXAMINATION (of A. Rizzo)

BY K. [redacted]

Q. So, why did changes in [[redacted]s planning and programming change so frequently from May of 2024 to August of 2024, to being a misunderstanding and miscommunication to fifth-grade year, which was just last year, recommending a more structured environment for [[redacted]

The -- I mean, I just need some clarification on this because it just -- there was a lot of things going back and forth, going from a least restrictive environment to a more restrictive environment.

A. I'm not sure I understand the question.

KAREN [redacted] Okay. In May of 2024, there was an e-mail sent from you, and I believe it was May 30th of 2024, that you wanted to hold a planning

and placement team meeting to discuss [[redacted]s planning and programming to a more structured environment. Then, we did not attend.

And then in August of 2024, you sent us an e-mail saying it was all a misunderstanding, a miscommunication, meaning that, hey, [[redacted] is going to stay at JFK for the 2024-'25 school year.

Then in fifth grade --

THE HEARING OFFICER: Well, the problem is that you're testifying now. So, I just want you to just ask a very clear -- a clear, straightforward question.

KAREN [redacted] I'm just trying to clarify the information.

BY K. [redacted]

Q. My question is, why were there so many changes going back and forth within the past year regarding [[redacted]s planning and placement from talking about saying, okay. We're going from a least restrictive environment to a more restrictive environment.

Why? Why were there so many recommendations and changes?

A. So, changes and recommendations by the team for [[redacted]s IEP?

Q. Yes.

A. So, we had the one recommendation at the end of his fourth-grade year that we were hoping to come together to discuss placement. When that seemed to be impossible and not entertained, we wanted to come back together to talk about then upping his para-support services so there was greater support within the JFK school.

And then, as the fifth-grade year progressed and [[redacted] maintained, you know, continued on in the fifth-grade year, he -- he was at JFK the entire year, and we met about his IEP at his annual review in January, I believe.

So, I don't -- I don't see a path of so many changes.

K. [redacted] No. I'm not saying that changes did occur. I'm saying that changes were suggested from a more structured environment in May of 2024.

And then in August of 2024, you sent us -- you sent Mr. [redacted] and I an e-mail saying that it was all a misunderstanding.

THE HEARING OFFICER: Well, again, you're testifying. Just ask a question.

BY K. [redacted]

Q. Then in May -- and then during [[redacted]s fifth-grade year, he was at JFK. Why was a more structured environment to Harborside suggested in fifth grade?

A. It's not necessarily about a more structured environment for Harborside, although that was still our recommendation. It's really about the skills that that Harborside program would be providing him, which is a life-skills focus and a greater level of support.

There's more paraprofessional support at the Harborside program.

Q. So, my next question is, you don't -- the team does not recommend that West Shore Middle School or even an outplacement would be in [[redacted]s best interests?

A. We always try to consider the least restrictive environment. I and -- we, as a team, believe that that program at Harborside would meet his needs and would provide him with the adequate amount of paraprofessional support and support services.

KAREN [redacted] All right. My next question is, when I went to visit Harborside in March of this year,

I observed a classroom. And it is my understanding that [[redacted] is -- is a very high-functioning autistic child. What I observed in this classroom was a boy bouncing on a bouncing ball.

ATTORNEY ROSEN: I'm sorry. I have to object.

THE HEARING OFFICER: Yeah, that's testimony. You're going to have to ask a question.

KARAN [redacted] Okay.

BY K. [redacted]

Q. Well, the question is, have you ever visited the Harborside special education program, Ms. Rizzo?

A. I have. In my previous role in the District I was in all of the schools. So, I have been at that program.

Q. So, with what I just said, how do you feel that Harborside would be a good fit for [[redacted]

A. One of the assets of the -- of the program aligns with some of [[redacted]s IEP goals and objectives. One of the key features of that program is there is a store and a coffee cart.

It's not called a coffee cart. I forget what they -- the actual name they call it,

but the kids in the program have the opportunity to sell things, make change, interact with customers in a real, authentic experience. And that is one of the -- the hearts of that program, which aligns with his IEP.

[[redacted] is working on making change. [[redacted] is working on communication skills. He's working on brochure items and menu items, and it would provide opportunities for that on a regular basis.

I can't speak to what students were there that day when you visited. I don't know.

KAREN [redacted] My -- yeah. So, my concern -- and maybe I can share this further in my testimony, is that I don't want my son to regress in a more structured environment.

THE HEARING OFFICER: Well, that would have to be testimony. Do you have any other questions?

KAREN [redacted] Not at this time.

THE HEARING OFFICER: All right. So --

ROBERT [redacted] Then I'll continue.

THE HEARING OFFICER: All right. Go ahead.

ROBERT [redacted] Okay.

(Cont'd) CROSS-EXAMINATION (of A. Rizzo)

BY R. [redacted]

Q. Ms. Rizzo, since we were just talking about the change in placement to Matthewson, when did you first bring up the change in placement to Matthewson, specifically to us?

A. I can't be certain of a date, but I know it was towards the end of the school year.

Q. That would be May 30th, to be exact. So, because I do want to get back to -- I'm going to get back to this exhibit I have on the screen, but I will bring up since -- P-16.

Now, let me see here. Sixteen.

Is this shared on my screen now? Because I didn't stop, but I clicked on it. Is which -- I'm not sure.

A. I see P-18.

ROBERT [redacted] Let me see which one is being shared. Let me stop this. Let me share this P-16 and make sure it's shared. Okay.

Okay. Now it should be shared here. Okay. I'm going to scroll down to this e-mail. So, the end of May.

First, I'd just -- I'd like to bring up,

Hearing Officer? I think it's important when Ms. Truscello was on the stand, since she can't come back anymore, she testified that they reached out to us at the end of May. Ms. Rizzo reached out to us because they wanted to discuss a para-educator support. That's not true.

According to this e-mail (unintelligible) --

ATTORNEY ROSEN: Objection. I'm sorry. This is testimony, argumentative, and you have a witness in front of you. You're squandering the opportunity to cross-exam.

THE HEARING OFFICER: Yeah --

ROBERT [redacted] I object to his characterization --

THE HEARING OFFICER: Ask Ms. Rizzo an actual question.

ROBERT [redacted] Okay. So all this can come up in my testimony? That's basically what it's for then, so I have an understanding.

THE HEARING OFFICER: Sure.

ROBERT [redacted] Oh, I understand. Okay.

Then I'm going to ask you this question.

BY R. [redacted]

Q. On May 30, 2024, why did -- you wanted to hold a PPT meeting right here on May 30th. You wanted to hold a PPT meeting. What was this specifically about?

ATTORNEY ROSEN: Is this in evidence?
THE HEARING OFFICER: P-16 isn't. You're going to have to --
ROBERT [redacted] Yes, I -- well, I didn't understand. I apologize. I would like to get this into evidence if it's not. I thought these were all into the evidence, because once I --
THE HEARING OFFICER: No.
ROBERT [redacted] -- you know, provide them, that I don't know if --
THE HEARING OFFICER: All right. So, this actually sent to Ms. Rizzo, it looks like.
ROBERT [redacted] No, this one --
ATTORNEY ROSEN: To be clear, I wasn't making an objection. I just need to know if this is in evidence and what the -- you know?
THE HEARING OFFICER: Yeah.
ROBERT [redacted] Ms. Rizzo sent this to me.
THE HEARING OFFICER: Yeah, it's not in evidence yet. Do you object to the admission of this?
ATTORNEY ROSEN: No.
THE HEARING OFFICER: Okay. Without objection, P-16 is admitted as a full exhibit.
ROBERT [redacted] All right. Thank you, sir.

(Parent's Exhibit Number 16, marked for identification and noted in index.)

BY R. [redacted]

Q. So my question is, Ms. Rizzo, when you reached out to us on May 30, 2024, at the very end of the school year, about a week before school was about to end, what solely did you reach out to us to hold this meeting -- what was the main purpose of -- what was the only purpose of this meeting?

What did you want to accomplish?

A. So at the time, [[redacted]s school-based team expressed that they weren't sure there were enough structures in place for a successful fifth-grade year for [[redacted] So, the hope was to invite you to the table to talk about what the necessary program and placement, if any, adjustments needed to be made to the IEP.

It was what we call a review and revise. Let's look at the plan we've made, and let's see if we need to revise any of it, if we need to revise any of the IEP or the placement to set him up for success for fifth grade.

We were focused on [[redacted]s needs and making sure it was -- it was honestly an effort on the school's behalf to get it done by the end of the school year to set him up for success right at the beginning of grade five.

Q. Okay. Let me find this in a minute here. I'm just looking for -- let me see if I can find it here.

Okay. So, your testimony you just -- you wanted to come together to discuss what would be better for [[redacted] On Saturday, June 1st, in your words, you wrote, we would like to discuss the program at Matthewson.

So, is it your testimony that the reason you wanted to meet was solely to discuss the change in program to Matthewson?

A. That was not the sole reason for meeting, no.

Q. But according to what you said here, it says we'd like to discuss the program at Matthewson.

A. I -- I believe that was in response to your question. You said the location was not even -- I'm sorry. I can't read down from there. I -- it's not on my screen.

Q. And so, we can read. Here's what I want to do. Let me -- so you can read this better.
So, the program that we would like to suggest would be an alternate location at another elementary school within the Milford Public Schools. That was your -- this is the e-mail that you sent us. So, this is why you wanted to hold a meeting. Correct?
A. Yes, that was one purpose, to look at the IEP and look at the IEP to see if we needed to review and revise, as I stated just a few minutes ago, and then also to talk about placement. Yes.
Q. Well, I don't see any other --
A. That is the purpose of a review and revise.
ROBERT [redacted] Right. I don't see any other purpose other than Matthewson here in this e-mail chain that's now admitted into evidence. I would like to let the facts speak for itself because according to this, we have -- or according to our discussions, it was to discuss --
THE HEARING OFFICER: Well, if you let the facts speak for themselves and then you don't really say anything. Do you have an actual question?
ROBERT [redacted] Yes. Well, I'm just making a point

about that right here. So, it was discussed, the Matthewson problem. Okay. Yes.

No, I do have other questions, too.

BY R. [redacted]

Q. So the reason you wanted to discuss the change of Matthewson was because [[redacted] was struggling, or what? What was the story behind that? All of the sudden, in May, on May 30th, what was happening with [[redacted] that was so urgent that he had to -- that you wanted to, you know, suggest this change in placement?

ATTORNEY ROSEN: Objection, argumentative.

ROBERT [redacted] I claim it.

THE HEARING OFFICER: Could you repeat the question?

ROBERT [redacted] Yes.

ATTORNEY ROSEN: If he's asking what's the reason for the -- to the discussion, I have no objection to the question, but the adding of what is so urgent and not, it is --

THE HEARING OFFICER: Oh, yeah. That, yeah.

ROBERT [redacted] Well, the urgency has to --

THE HEARING OFFICER: Just -- yeah. Just restate the first part of the question. I think that's proper.

BY R. [redacted]

Q. Okay. Ms. Rizzo, when you reached out to us on May 30th and you wanted to hold a meeting on June 3rd, is that giving us our -- I believe is it a five- or six-day notice to schedule a PPT meeting? Was this, you know, was this our five-day notice, or was this before having the five-day notice?

A. I believe that it would be asking you to waive the five-day notice.

Q. Okay. So, you want us to waive the five-day notice. Was there a reason why you wanted to? And again, I say the urgency why you wanted to -- us to waive the five-day notice at the end of the year? And then over --

THE HEARING OFFICER: Well, just ask an actual question.

BY R. [redacted]

Q. My question to you is, what was the urgency that you wanted to have us waive our five-day notice that you wanted to hold this meeting? What was so urgent?

A. Well, I believe I -- as I testified earlier today, the school year was coming to a close, which meant staff would not be available for

a PPT. And we were trying to be timely and getting the PPT completed and be able to make some decisions and help [[redacted] with his successful start to grade five.

So, the urgency was just the calendar, the school year ending in a week's time.

Q. You just testified that the District was not available. What do you mean they were not available? If I can, you know, if you can -- they were not available on May 30th?

A. No, I'm -- you asked why it was -- why we were asking for a meeting on June 3rd. I believe that's what you were asking, and I was --

Q. Right. You reached out for this meeting.

A. Right. And you were asking why it was so urgent to have to meet so quickly -- because our staff members at the end of the school year no longer work. Our teachers, our support staff, our psychologists, our social worker, they don't work during the summer.

So, I work during the summer. Administrators work, but the rest of the staff would not be available for a PPT.

Q. So, was [[redacted] not meeting -- was [[redacted] -- what

was [[redacted]s struggles that he was having that you wanted to discuss the change in placement to Matthewson?

A. In the springtime, [[redacted] was having increased behaviors, demonstrating a lot of frustration in the classroom. As you have noted, he was getting more upset. The general-ed classroom seemed to put pressure on him being in that environment (unintelligible) --

ROBERT [redacted] I object. I never said he was getting more upset in the classroom.

THE HEARING OFFICER: Well, you can't -- you can't object to her answer.

ROBERT [redacted] Okay.

THE HEARING OFFICER: Let her finish her answer.

BY R. [redacted]

Q. Sure.

A. Staff, I think, were concerned that we didn't have enough supports in place for him. And that's where the question came on, do we need to come back together and take a look at what other options there are to help [[redacted]

Q. Okay. You just testified that I -- that [[redacted] was getting upset. And what was -- what did I report that [[redacted] was getting upset about?

A. Just previously, you shared an e-mail where
you said that he was upset about school.
Q. What exactly?
A. In the last piece of evidence, you shared
that he was upset about his classroom
teacher's interactions with him with math,
and about his math work.
ROBERT [redacted] About him -- the way he was being
treated. Is that -- I can -- I'm going to bring
up that e-mail again -- which would be, I think,
P-15 -- to show that we reported how he was being
treated about his --
ATTORNEY ROSEN: Objection. This is testimony.
ROBERT [redacted] Okay. So, if I don't --
THE HEARING OFFICER: Yeah, just ask a question.
ROBERT [redacted] Okay, okay. Sure. My next question
is -- okay. I'm going to bring up -- let me stop
this. Let me bring up P-15 again. I have that on
here. Shoot. Oh, okay. Here it is. Yes, I --
let me just get up to the part.
BY R. [redacted]
Q. Okay. You previously testified [[redacted] was
struggling in his academics?
A. Not with his goals and objectives, but in the
general-ed classroom. So, in the general-ed

classroom, the students may have been working on math. [[redacted] would be working on his goals and objectives in math, with which was not the same, necessarily the same work.

Q. Okay. We were -- you were -- because we went over this. You were CC'd on this e-mail from Ms. Truscello. We asked for an update in May 13th of 2024 about his progress about his math academics, overall progress, which includes his behaviors.

And this e-mail here, would you say that this is a pretty positive update as far as, you know, [[redacted] is concerned? Because it does say in terms of behavior, [[redacted] did a nice job last week joining another fourth-grade class while his room finished up SBA testing. During the testing times he was able to complete the test and then remain quiet for the other students working.

So, my question to you is, would you consider this a favorable update on his behaviors on May 14th of 2024?

A. Yes, she was pointing out a day that he had met success. Yes.

ROBERT [redacted] All right. So, we got a pos -- we

asked for a pos -- we had an update, and we got an update. Right? Okay.

Right now, my next question is -- okay. Again, you were CC'd on this e-mail from Ms. Truscello. I'm just going to read this.

In terms of his academic performance I provided you with --

ATTORNEY ROSEN: Objection. Is there a question --

ROBERT [redacted] Please don't interrupt me.

ATTORNEY ROSEN: -- that is that --

THE HEARING OFFICER: Well, now what --

ROBERT [redacted] Is this testimony? Or is this -- I'm trying to get -- so, that's what -- I'm confused.

THE HEARING OFFICER: Yeah. What's the question?

What's the question?

ROBERT [redacted] Okay. So -- okay. So, then I can provide this as testimony going forward. I don't have to do this now. I feel like I'm, you know, that I have to get this done now.

But so, when -- so, I read from it. That would be considered testimony, so this way I'm clear. Is that correct?

THE HEARING OFFICER: Well, actually it's not -- it's in the exhibit. The exhibit has been admitted. It's evidence in and of itself.

ROBERT [redacted] But I need to discuss it, yeah.
THE HEARING OFFICER: So, right now you're cross-examining a witness.
So, you ask her questions.
ROBERT [redacted] Okay.
THE HEARING OFFICER: You know you ask her questions, but you don't have to just read from exhibits.
BY R. [redacted]
Q. Okay. According to this, this passage here in this e-mail from Ms. Truscello, which you were CC'd on, would you agree that he was making progress towards, you know, mastering his goals and objectives?
A. I just would like to ask for a second to read the excerpt in front of me.
Q. Sure.
(Pause.)
A. She indicates that he's continuing to make progress towards his goals.
Q. Right. And he's not at a standstill. Okay?
A. Correct.
ROBERT [redacted] Okay. Let me stop sharing this. I'm going to submit an exhibit now. Just find it here.
Okay. I'm going to submit -- I believe, P-16

is already into evidence. Is that correct?

THE HEARING OFFICER: Yes.

ROBERT [redacted] Okay. I'm going to open back up P-16.

Okay, Ms. Rizzo, in -- let me get the date here. I'm scrolling up so I can get the date. Actually, it's back -- this was in June of 2025. I had wrote you an e-mail requesting information. And in this -- let me just scroll to it. Let me get to the part here.

So, let me just scroll above so I could show that where on Monday, June 10, 2024, ARizzo@Milford -- so, this is what you wrote to us. So, I just want to show for the record that Ms. Rizzo had written this to us and answered our questions.

So, the blue part is her -- she put them in line. The ones in black are our questions and the ones in blue are her responses. And just to show I just put a highlight there so I can come back to it. That's blue.

BY R. [redacted]

Q. Oh, let me just -- okay. So, I had -- when I asked you a question. When you state -- when you -- to please note the desire to meet and

discuss the -- an appropriate placement for [[redacted] was certainly not an oversight. As -- and I said, it certainly was an overnight-rest decision.

You stated here -- so, my question to you is that you have been sharing an increase in behaviors you have seen with [[redacted] through e-mail since the parent-teacher conference, and you have repeatedly asked for meetings to discuss and we have repeatedly declined these meetings.

Can you produce those e-mails that we declined these specific meetings since the February PPT up until, you know, the end of May, you know, before you sent that e-mail that you wanted to change his programming?

So, between -- so, my question to you is, between February and the parent-teacher conferences can you produce that e-mail that you -- that you shared an increase in behaviors and that we repeatedly declined these meetings? You know, these meetings.

ATTORNEY ROSEN: Objection. The Witness is under no obligation to produce e-mails. This is questions about the Witness's understanding.

THE HEARING OFFICER: Yeah, that -- I mean, that's what the attorneys do, is put together the exhibit binders. The Witness isn't in a position to do that. So, sustained.

ROBERT [redacted] So, this would be during our testimony then? Like, is that one of the kind of things I bring up during testimony?

THE HEARING OFFICER: If you have a point, if you have a point to make about --

ROBERT [redacted] Oh, yeah (unintelligible) --

THE HEARING OFFICER: If you have a point to make about not declining, or about the District's claim that you declined to participate in PPTs, you can testify about it then.

But right now, this is just questions --

ROBERT [redacted] Okay. Got it.

THE HEARING OFFICER: This is just questions for the Witness.

ROBERT [redacted] Okay. Okay. Then if I can come back to testimony, I certainly will. Okay.

Okay. In number seven, in this e-mail where you -- again, let me just clear that so you can see it's in blue. She had responded. This, again, was just so I can highlight it so I can get to it easily.

BY R. [redacted]

Q. You stated that you had previously -- there was a communication that was sent to us about an increase in behaviors since February PPT to work becoming increasingly difficult, which resulted in the team considering options to better support [[redacted]

So, my question to you is that this communication that here you're stating that you sent us about the increasing behaviors and the work becoming increasingly difficult, what work became increasingly difficult if he has an IEP in place just for him?

A. So, at the time of parent con -- I was not at [[redacted]s parent conference, as you know, but when you met with Ms. Curria and I -- I believe Ms. Truscello may have been in the room as well, although I'm -- I'm not certain about that. They communicated to you that [[redacted] was struggling a bit in the classroom.

The work itself may not have been difficult, but his ability to attend to it was becoming increasingly more challenging due to behaviors. They shared that with you, was my understanding at that meeting, and it

was shared with me that your response was, on repeat, when will he be at grade level? When will he be at grade level?

You were not, perhaps, understanding that they were trying to describe to you some of the challenges that he was having in the general-ed classroom at that time.

Q. When did I say that? When did I say that, when is he going to be at grade level? When is he going to be at grade level? Since you just testified to that, when did -- exactly did I tell the teachers that?

A. It was reported to me that that was what -- a statement that you made during parent conferences.

ROBERT [redacted] That is not true, actually.

ATTORNEY ROSEN: Objection. Argumentative, and testifying.

THE HEARING OFFICER: Yeah, ask a question.

ROBERT [redacted] All right. So, that will be on testifying. So, I have to write -- okay. So, I come back to that during my testimony, then.

BY R. [redacted]

Q. Okay. And what kind of behaviors did you see exactly with [[redacted] between the March, you

know, between the parent-teacher conference in March and the middle of May when we got that positive update?

A. So, what was reported to me, I -- you have to understand that I'm not in the classroom with [[redacted] It would be reported to me by his classroom teacher and his special education teacher and paraprofessional, was that there was a lot of work refusal, eloping from his area in the classroom where he was, whether it was a desk or a table; very distracted, very frustrated.

All areas that the staff were working with him on, there was an uptick in that.

Q. Then why didn't we receive any communications about this? We received no communications about this. Is there a reason why?

ATTORNEY ROSEN: Objection, argumentative.

ROBERT [redacted] I --

THE HEARING OFFICER: Yeah, that assumes. You know it's a question that assumes a premise, sort of a 'when did you stop beating your wife'-type questions.

ROBERT [redacted] I don't see the relevance.

THE HEARING OFFICER: You'll have to rephrase that.

You'll have to ask if the District sent you those communications first.

ROBERT [redacted] I don't see how you can cross reference of beating your wife. She was on this testimony that --

THE HEARING OFFICER: That's just sort of a classic legal example of --

ROBERT [redacted] She just testified to something and I'm asking her questions on cross-examination.

THE HEARING OFFICER: You're asking why wasn't this communicated, and you have to first establish that they hadn't communicated it to you. So, you have to ask that as the first question.

ROBERT [redacted] So, what was that again? If you could repeat that? I'm sorry. I missed it.

THE HEARING OFFICER: Yeah. You said, why didn't you communicate all this to us?

ROBERT [redacted] Okay.

THE HEARING OFFICER: Yeah. I mean, you can't ask a why question without first establishing that the premise of the why question is there. So, you have to ask -- but you have to ask whether they sent you communications about that.

ROBERT [redacted] Who would I have to ask about that?

THE HEARING OFFICER: The Witness that's in front of

you, Ms. Rizzo.

ROBERT [redacted] So, I have to ask why she didn't send communications to us?

THE HEARING OFFICER: Well, you asked that and that's not a proper question unless you first established that she didn't.

ROBERT [redacted] So, how would I go about doing that, which I need to do?

THE HEARING OFFICER: Ask her whether she sent the communications to you during that period about those events.

BY R. [redacted]

Q. Okay. Did you -- Ms. Rizzo, did you send any of these communications regarding what you just testified to? Exactly, you know, exactly what you just testified to?

A. I'm sorry. Can you repeat that one more time?

Q. Did you send us these communications regarding what you just testified to about his behaviors, what you just told me?

A. Did I send you e-mails about his increase in behaviors? No, I did not.

Q. May I ask why?

A. [[redacted] had a behavior plan which was the staff

was following his behavior plan and supporting those behaviors. I mean, we -- we would be contacting you all day long to inform you that he was struggling to maintain his seat or that needed redirection if we were, you know, constantly communicating with you what he was struggling with. It would be every day.

But there was data kept, I believe, through his BIP that indicates that.

Q. Isn't it -- so, my question to you is, isn't it important to keep the parents up to date about these behaviors?

A. Of course.

Q. So, why didn't you?

ATTORNEY ROSEN: Objection, asked and answered.

ROBERT [redacted] That's -- I claim it.

THE HEARING OFFICER: It has been asked, asked and answered. You can just, you know, you can move on from that.

ROBERT [redacted] So, now that I've established that, what is that? The foundation? Then I can ask the other question that you said I couldn't ask, which I believe was, why didn't we receive these communicate --

THE HEARING OFFICER: Yeah, yeah. I mean, you established that and she explained it.

BY R. [redacted]

Q. So -- but why didn't we receive these communications? If this -- if [[redacted] was struggling so much that we required a change in placement at the end of May, isn't that something that parents should have been communicated about?

A. Well, I think that's why we were inviting you in for a meeting to talk about it.

Q. That was to talk about the change in Matthewson?

A. As a result of us observing increases in behavior, yes.

Q. But why weren't we notified of this increase in behaviors? We got an update in May, on May, you know, 15th, a positive update about his overall progress. And this is -- which I just -- we had -- I just shared on the screen?

THE HEARING OFFICER: All right. So, that's -- you're testifying. You just have to really ask a question.

ROBERT [redacted] Okay. So, that would come up back in

testimony? Okay. And then when she -- when I can call her back again. So, Okay. Fair enough.

ATTORNEY ROSEN: Wait a second. I object to the notation that Ms. Rizzo can be called back again if certain questions aren't answered. We've made her available, and if there aren't --

ROBERT [redacted] If she can't come back, then I'm going to have to -- then I can't have these questions, you know. You know, everybody's objecting to my questions.

If Ms. Rizzo is not made -- Hearing Officer Kennedy, you just said that since I (unintelligible) --

THE HEARING OFFICER: Well, the problem that you'd have is that if you're asking questions that are improper now, they're not -- I mean, they're not going to become any more, except unless this issue --

ROBERT [redacted] How would it be improper, sir? I'm not asking any improper --

THE HEARING OFFICER: Well, let me finish. If you ask questions that really aren't proper now, unless the only objection is that they're outside the scope of direct, which no objections have been made on those grounds, then there's really no

reason to call her back.
ROBERT [redacted] I object to your characterization that I'm asking improper questions, sir, because the question I'm asking, you said provide testimony on one hand, and then you previously told me that, yes, since you provided the exhibits --
THE HEARING OFFICER: Well, I mean, a lot of what --
ROBERT [redacted] I'm going to say I'm being cut off again. Every -- Hearing Officer, please. Every time I try to make a point, you cut me off. It's a hundred percent. I'm trying to make a point.
THE HEARING OFFICER: But a lot of --
ROBERT [redacted] I'm getting cut off --
THE HEARING OFFICER: A lot of what you're talking about with providing test --
ROBERT [redacted] Hearing Officer, I'm being cut off.
THE HEARING OFFICER: A lot of this stuff that you yourself can provide testimony.
ROBERT [redacted] May I ask why I'm being cut off consistently, Hearing Officer? I don't feel like I'm getting a fair hearing, and I'm being very -- because every time --
THE HEARING OFFICER: Because --
ROBERT [redacted] I shouldn't be cut off, sir.

THE HEARING OFFICER: Because you go on lengthy repetitive rants.

ROBERT [redacted] No, that's not true.

THE HEARING OFFICER: Sir? Sir?

ROBERT [redacted] You're mischaracterizing --

THE HEARING OFFICER: Mr. [redacted]

ROBERT [redacted] I don't feel like I'm getting a fair hearing here.

THE HEARING OFFICER: A lot of what you're trying to do is stuff that you yourself can testify to.

That's what I'm saying.

ROBERT [redacted] But I'd like to have the Witness -- now you're saying what I can testify to, but --

THE HEARING OFFICER: Yeah.

ROBERT [redacted] See? Again, when I try to get something I keep getting cut off. I would please respect not to -- if you could please not cut me off I would really appreciate that. I'm saying that respectfully, Hearing Officer.

Because throughout this whole entire hearing, anytime -- even the last time, anytime I try to make a point or something valid to get onto the record to ask a question I'm being cut off, and I lose my train of thought, and then you come back with an answer to make me like I'm being

inappropriate, like, you know, all this -- and which is I'm being mischaracterized.

You know, the whole thing is -- I feel like it's a distortion of, you know, of, you know, my -- my behavior and my character, you know. Everything that you're saying is, you know, just distorting, you know -- you know, my behaviors and they're not. There's not, you know, this is not what I'm doing. I'm trying to ask a question. I'm trying to, you know, clear things up and I'm being cut off, and then I lose my train of thought, you know, which is not fair to me.

So, you did testify -- I mean, not testify. You did tell me that since I submitted the exhibits that Ms. Rizzo would be able to come back and Mr. Rosen didn't say anything. Now, when I bring it up again Mr. Rosen objects. Oh, she's here now.

So, she's here now. Then, I'm going to have to get all my testimony in because if she can't come back, then, you know, I'm not going to be able to, you know, ask her these questions. And you're (unintelligible) --

THE HEARING OFFICER: It's just -- no. I mean, ask.

ROBERT [redacted] It's not fair.

THE HEARING OFFICER: Ask a question. Ask the questions, but don't, you know, if there's a valid objection --

ROBERT [redacted] Can Ms. Rizzo come back? I need to --

THE HEARING OFFICER: If there's a valid objection to the question, it's not going to be any different if she comes back, so.

ROBERT [redacted] It is going to be. It is going to be. You --

THE HEARING OFFICER: Just ask.

ROBERT [redacted] This is not fair to me, Hearing Officer Kennedy.

THE HEARING OFFICER: Ask your next question.

ROBERT [redacted] I don't feel I'm getting a fair hearing here, because I'm, if I have testimony -- because everything I'm asking you're saying that, well, this comes up in testimony, which I understand and I appreciate. There might have been things as a pro se party that maybe I don't understand and maybe, yes. Okay. You're right, that this could be up in testimony.

So, if I can have her called back, then I don't have to be, you know, feel like, all right. I've got to get this in now, but then when

Mr. Rosen says that she's here now, she's not coming back. And if she's not going to be allowed back, then I'm going to be prejudiced, you know, because I have these questions.

And then I'm going to have to, you know, revert back to this during -- because if it's considered testimony, then I've got to ask her these questions under testimony, and I can't, and she can't come back, then I can't answer these questions under testimony and that's going to prejudice me. So, I don't think that's fair. I'm not (unintelligible) --

THE HEARING OFFICER: Just ask whatever questions you want to ask now.

ROBERT [redacted] And that's what I've been trying to do, and they're being objected --

THE HEARING OFFICER: All right. All right.

ROBERT [redacted] -- because you're saying it has to do with --

THE HEARING OFFICER: But, I mean, sometimes there are valid object --

ROBERT [redacted] For the last two hours --

THE HEARING OFFICER: Sometimes there are valid objections to the questions.

ROBERT [redacted] I don't believe they have --

THE HEARING OFFICER: And --

ROBERT [redacted] The objections --

THE HEARING OFFICER: Yeah.

ROBERT [redacted] Yeah, the objection, sir, was the fact that this is something that has to be asked during testimony. And you did say that to his mother, Ms. [redacted] that this will be coming up during testimony.

So, if we can -- so, on one hand, you're saying that, yes, since you submitted the exhibits you can come back --

THE HEARING OFFICER: I said there was something she could testify. She was getting into stuff that she could testify to.

ROBERT [redacted] Right. And so, I'm going to need her back during my testimony, because things I'm asking now, you're saying that this would be up -- come up during testimony. And so --

THE HEARING OFFICER: Well, she wouldn't -- I mean, she wouldn't be back during your testimony. I mean, when you're testifying --

ROBERT [redacted] That's what I mean. She would have to be testifying.

THE HEARING OFFICER: Yeah, when you're testifying you would testify. She wouldn't be --

ROBERT [redacted] But I would need her back. Well, then, if I can't ask her these questions now, that that prejudices me, because I feel like I'm being put in the spot that's being unfair. Because on one minute you're telling me you'll get -- I'm --
I feel like you're giving me --

THE HEARING OFFICER: You don't even --

ROBERT [redacted] See?

THE HEARING OFFICER: You don't have any questions pending. Why don't you just --

ROBERT [redacted] See, every time I try to make a statement I'm being cut off, sir. It's because I can't get this into the record and it's not fair.

THE HEARING OFFICER: Well, because this isn't really the time to make statements. This is the time to ask --

ROBERT [redacted] It is, because you're making statements to me. I'm --

THE HEARING OFFICER: This is the time to ask the Witness cross-examination questions.

ROBERT [redacted] Right. And when I do, I'm -- right, because you're making statements to me and I'm trying to respond to them. And I think it's only fair if you make something onto the record I get to respond to that. And that's important, because

now you're saying she can't come back and I'm trying to ask her questions.

But you're saying that this has to do with testimony. Then, I'm thinking, okay. Then I'll ask at testimony and I can call her back. And Mr. Rosen says, no, she's here now. She's not coming back. And now you're saying that, oh, no. She can't. So, here you're -- I feel like you're giving me mixed signals.

THE HEARING OFFICER: Well, so far there's really nothing to call her back over. I mean --

ROBERT [redacted] There certainly is. It would be during my testimony, because I'm trying to -- I'm trying to ask questions. When I'm asking these questions now, you're saying that this would come up during testimony. That's not cross-examination questions. So, I said, okay. Then I'll --

THE HEARING OFFICER: Well, I'm saying that you can state your version of the facts when you testify.

ROBERT [redacted] But I need her back, too, to testify, because you did mention before that, yes, since you submitted exhibits, she's -- she can come back as a witness. You did tell me that before, because I did submit the exhibits.

Last time around is because I didn't know I

should submit the exhibits, because you said it was a five-day. And that, that whole thing with -- which you didn't include the cross-examination --

THE HEARING OFFICER: What would you want to ask her about --

ROBERT [redacted] Over the last two hours --

THE HEARING OFFICER: -- on your, on your case that you can't ask her about now on cross?

ROBERT [redacted] Well, that's what I'm saying. What you just said is that it -- that would be testimony. And if I need her back on testimony, I'm going to need her back on testimony to ask, ask these questions, because you're saying that this has to do with testimony.

So, that prejudices me. That's basically, you know, as it fractures my case beyond belief. I'm not getting a fair hearing.

THE HEARING OFFICER: I mean --

ROBERT [redacted] I'm not getting a fair hearing.

THE HEARING OFFICER: If you can make an offer of proof, something that you know you couldn't get in before because you know you didn't --

ROBERT [redacted] Because the last two hours I've been (unintelligible) --

THE HEARING OFFICER: -- because you didn't have adequate foundation for an exhibit that was subsequently admitted, or because something was objected to is beyond the scope of cross, I mean, it certainly would be valid to have her back, but not because you're asking her questions that aren't going to become any more valid.

ATTORNEY ROSEN: I don't want to delay this further, but Ms. Rizzo has been on the stand for two hours.

I don't know if anybody needed a break or if Ms. Rizzo needed break. Otherwise, I'm comfortable with --

ROBERT [redacted] And I have a lot more questions, and I'd like to get to them, because now I'm getting confused and it's not fair to me.

I'm -- I've been getting mixed signals throughout this for the last two hours. I've been trying to ask questions. No, you have to wait to testify. They're not (unintelligible) --

THE HEARING OFFICER: Well, you actually haven't tried to ask a question probably for, like, 20 minutes.

ROBERT [redacted] Yes, because you --

THE HEARING OFFICER: Does anyone actually need --

ROBERT [redacted] Because I'm trying to clear up something with you, and it's not -- I'm being

prejudiced.
THE HEARING OFFICER: All right. Does anyone actually need a break right now. If not, we can just continue. All right?
ROBERT [redacted] We can take a break. I think we need a break, and then we can come back and continue.
That will be fine.
THE HEARING OFFICER: All right. Let's see what time it is. I've got three. So we'll come back at 3:15.
THE REPORTER: Pausing the record.

(Pause: 3:00 p.m. to 3:15 p.m.)

THE HEARING OFFICER: Everyone is here. All right.
THE REPORTER: On the record.
THE HEARING OFFICER: All right. So, why don't we continue with cross-examination.
ROBERT [redacted] I want to know will I be able to call Ms. Rizzo back during my testimony, because I'm getting mixed signals? Because I'm understanding that, you know, after what Mr. Rosen said, she's here today; she's not coming back. You said she could come back since I submitted the exhibits. Everybody is giving me all these mixed signals and

it's not fair to me.

So, I'm going to need her back during my testimony because the questions I'm asking -- so, the questions I'm asking are basically just it has to do with -- relevant to what he examined her on, you know. So, I can't ask her any questions about, like, you know, outside of the scope of what he asked her on. Is that -- am I getting it right? I just want to --

THE HEARING OFFICER: Yeah. I mean, we haven't really had that come up, because everything you've asked has been within the scope of direct, and actually the direct was pretty broad.

But in fairness, it's not completely uncommon for witnesses to be called essentially by both sides. So, I'll allow some latitude for her to come back. If the District objects and you make an offer of proof, I'd probably err on the side of allowing her to come back. So --

ROBERT [redacted] Yes, I would definitely need her back, but I will continue. I just want to see where we're left off here.

Okay. Ms. Rizzo, I want to ask -- getting back to the Exhibit 15. Let me see this here so I can bring it up.

It's working now. This is weird.

Okay. On May 19th, about four days after we started reporting what Ms. Truscello told [[redacted] there was an incident that happened -- well, the incident with [[redacted] where --

THE HEARING OFFICER: All right. That's testifying. You have to ask a question.

BY R. [redacted]

Q. Ms. Rizzo, are you aware that on or around March -- let me get this date here -- 20th, I would say around nine -- around March 19th between, I would say between March 15th and March 20th that [[redacted] said he wanted to kill himself? Are you aware of that?

A. I believe the timeframe was May on those dates that were -- you're scrolling fast, but it looks like May, not March.

Are you talking about March?

Q. We're talking about May.

A. I am aware that there was a threat, threat assessment based on some words that [[redacted] had said, yes.

Q. Okay. Upon learning that a student had expressed suicidal thoughts, what steps did you personally take to ensure district crisis

procedures were followed?

A. Our school social worker did a threat assessment, which is part of our protocol. She notified me, and she notified you as the family. And I believe she reached out also to 211 as part of our protocol.

Q. Okay. Did you verify that a risk assessment or mental health evaluation occurred that day, and please identify who completed it?

A. Did I ver -- are you asking who I verified it with?

Q. Did you verify that a risk assessment or a mental health evaluation occurred that day?

A. Yes.

Q. And please identify who completed it?

A. It was -- it was Mrs. Doherty.

Q. Okay. Why were we never contacted directly by you as a building administrator to discuss the seriousness of the incident, or to offer support?

ATTORNEY ROSEN: Objection, argumentative.

ROBERT [redacted] No, I claim it.

THE HEARING OFFICER: Sustained.

ROBERT [redacted] So, how can I ask in another way?

BY R. [redacted]
Q. Did you ever contact us to offer support?
A. I did not, but often when we have threat assessments it's handled through our mental health clinicians, our social worker, or school counselor. But I do believe this was close in time to when we were offering you a PPT, which led to us inviting you in for a PPT.
Previously you asked me what was escalating, what behaviors were happening that the team thought [[redacted] needed extra support. This would be one of them.
Q. The PPT meeting was May 30th. That was when you wanted to change the placement to Matthewson. So?
A. Correct. So, this was prior to that. So, this happened as another thing that happened that made us think, maybe we need to come together as a team.
Q. Before we reported what Ms. Truscello said about [[redacted] were there any others? Has he ever made any suicide comments before we reported on how he was being treated by his teachers?

A. I believe the previous school year there was also a threat assessment done in grade four.

Q. And what? What would that be, since you brought it up?

A. I can't recall the specifics of it. I would have to look back at the document.

ROBERT [redacted] Yes, we -- well, we would like to request, though, I guess, next time that she can produce that document about the threat assessment?

ATTORNEY ROSEN: I'm going to object. The Witness does not have the obligation to produce the document.

ROBERT [redacted] She made it. She made testimony, and she needs to back up her testimony. That's as simple as that. I claim it.

THE HEARING OFFICER: No, that you -- you can't. There's no discovery like there is -- and you wouldn't get that from a witness, anyway. If in court, you'd get discovery from the other side.

ROBERT [redacted] But this is not court. This is (unintelligible) --

THE HEARING OFFICER: In this, in this context, basically each side proposes whatever exhibits they themselves would like to put in, but you don't --

ROBERT [redacted] Right. We never received it. But

this is not a court. This is a more relaxed environment.

THE HEARING OFFICER: I know. But -- yeah, I mean you can't demand that anyone else produce anything, so.

ROBERT [redacted] Well, she made a statement and I'm asking her about --

THE HEARING OFFICER: She's a witness.

ROBERT [redacted] Right. But then --

THE HEARING OFFICER: So, she's not going to produce anything.

ROBERT [redacted] Witnesses don't have to produce --

THE HEARING OFFICER: Just -- no.

ROBERT [redacted] So, they can make a statement and they don't have to back them up? I'm just trying to understand. That's all.

THE HEARING OFFICER: No, they don't.

ROBERT [redacted] I'm a self-represented party.

They don't?

THE HEARING OFFICER: No.

ROBERT [redacted] Okay. Well, it's -- we never received anything.

THE HEARING OFFICER: You asked the question. She gave an answer, and that's it.

ROBERT [redacted] Right. Well, we never received

one --

THE HEARING OFFICER: So, ask your next question.

ROBERT [redacted] Right. For the record, we never received -- we never got one before that.

ATTORNEY ROSEN: Objection, testimony.

ROBERT [redacted] Okay. So, that will come up --

THE HEARING OFFICER: You can testify to that one --

ROBERT [redacted] Sure.

THE HEARING OFFICER: -- when it's your turn to testify.

ROBERT [redacted] Understandable. Understandable.

BY R. [redacted]

Q. Okay. What documentation exists showing your review of the February bathroom and the March-April concerns that we raised in writing?

A. I'm sorry. I'm not sure what you're asking.

Q. What documentation exists showing your review of the February bathroom incident? The February bathroom incident and the stress concerns that we waged -- that we raised in writing, which were the concerns that we had about the staff?

ATTORNEY ROSEN: Objection as to relevance.

ROBERT [redacted] The relevance is that we're, you

know, we want to know what documentation exists showing about, you know --

THE HEARING OFFICER: I'll allow her to answer -- if you know, if you know sitting here right off the top of your head. If not, then you don't know.

THE WITNESS (Rizzo): What documentation from your e-mail? Is that what you're asking?

BY R. [redacted]

Q. Yes. Yes. So, I'll ask that first. I don't want -- yeah. Uh-huh. So, what documentation exists showing your review, from you?

A. My review of -- of the incident?

Q. Yes.

A. So, there is a log entry. I believe that was entered following the investigation.

Q. And which log entry would that be, because I can bring that up on my screen?

I do have log entries here.

ATTORNEY ROSEN: Objection. The Witness can't point to exhibits that haven't been put in front of her.

So, if Mr. [redacted] has something she wants to put in front of her --

ROBERT [redacted] Okay.

ATTORNEY ROSEN: -- he needs to do so.

THE HEARING OFFICER: All right. What -- yeah. I mean, what exhibit are you referring to?

ROBERT [redacted] Okay. Well, the -- we were talking about the February bathroom incident, and we were trying to find out what documentation exists from her about the bathroom incident.

THE HEARING OFFICER: Okay. I mean, but you're asking her about something that I don't know whether it's in evidence or not.

ROBERT [redacted] Well, my next --

THE HEARING OFFICER: But --

ROBERT [redacted] Yeah, okay.

THE HEARING OFFICER: Yeah. I mean, or if it's something you want to put in evidence, but right now I have no idea what you're talking about.

BY R. [redacted]

Q. Okay. My next question would be, can you explain why no written followup or intervention plan was provided to the parents?

ATTORNEY ROSEN: Objection, argumentative.

ROBERT [redacted] I don't see how that's argumentative. It's a question.

THE HEARING OFFICER: Well, you can -- I mean, you can ask if anything was provided to the parents before

you ask why.

THE WITNESS (Rizzo): No, the -- I believe the bathroom incident that you're referring to was -- is this the one where -- I'm not sure which one we're referring to. I'm sorry. There's multiple bathroom incidents.

So, could you just clarify which one you're referring to?

BY R. [redacted]

Q. Well, there's two. There's one in November and one in February. Can you explain why no written followup or intervention plan was provided to the parents regarding the bathroom incidences?

A. Well, there was the e-mails that you shared as communication.

Q. What kind of intervention plan did you put into place regarding these bathroom incidences to help support [[redacted]

A. We made a plan for [[redacted] to use the nurse's bathroom so that he would have privacy in the bathroom, and to ensure his safety and the comfortability and safety of our students.

Q. Did you ever --

A. We discussed this.

Q. Okay. Did you ever reach out to us about your concern about his safety with these bathroom incidences? Did we get any communication from you that, yes, we're really concerned about these bathroom incidences and what you were going to do about it besides isolating him to a bathroom?

ATTORNEY ROSEN: Objection, argumentative and compound question.

ROBERT [redacted] I claim it.

THE HEARING OFFICER: Yeah. I mean, you can answer the question of whether you, you know, sort of the question buried in there, whether you communicated with the parents about the having the student use a nurse's bathroom.

THE WITNESS (Rizzo): Yeah, the -- the e-mail that you previously, I think, were -- were sharing with us was our communication back and forth about that.

We looked at that before.

BY R. [redacted]

Q. Which e-mail? So I can be clear that, are you talking about P-16?

A. I don't have any documents in front of me. I only have what you are projecting.

Q. Let me see here.

A. Ms. Koosa, I believe it was, who wrote the e-mail that you shared.

Q. Let me bring this up. All right. Stop share. I think it was 16, this one -- no, this was it. Yeah, let me get to this part because we're on the bathroom incident.

Let me -- so, this is already in evidence, P-15. So, let me get to the part.

Okay. Getting back to May 13, 2024, and P-15. When I wrote to Ms. Truscello which you were CC'd on about asking for an update, I said -- and I'm going to read this line.

In addition [[redacted] had said that he would like to start using the regular boys restroom again, like the other children. He feels left out. The response we got, we spoke to/with Ms. Rizzo, and for the remainder of the year we will continue to have [[redacted] use the nurse's bathroom.

Is there a reason why this was not elaborated on? Why it was just the general, we're just going to have him them use the nurse's bathroom if you felt he was such -- so my, question is, if you felt he was such a safety threat, why didn't you reach out to

us? If they spoke with you, why didn't you reach out to us as the school principal, to reach out to the parents? Hey, I understand you want [[redacted] to use the bathroom. You know, but this is why.

So, why didn't we receive an e-mail from you regarding if this was such a safety, as you characterize it, as such a safety issue? Why didn't you reach out to us about it?

ATTORNEY ROSEN: Objection. Compound question and argumentative.

THE HEARING OFFICER: Yeah. Well, you've asked a string of several questions. So, just pick one and ask that.

ROBERT [redacted] So, you can only pick -- okay. One? So, you can only do -- okay.

BY R. [redacted]

Q. So, my question to you is that -- Ms. Truscello spoke with you. Why didn't you reach out to us if you felt he was such a safety issue to the other children when we asked -- that we requested [[redacted] use the regular restroom?

A. Well, I spoke with Ms. Truscello who communicated with you through this e-mail.

And I -- I can't see the entire e-mail for Ms. Truscello, but I -- I can tell that --

Q. Well, here it is.

A. I can tell that in the contents of that she was referring to a lot of increasing silly behaviors, which were happening in throughout [[redacted]s day. An unsupervised bathroom, we cannot provide adult supervision, and the boy's restroom does not seem like a good environment -- did not seem at the time like a good environment for [[redacted]

We were trying to provide -- provide him with resources and support so that he could be successful at school. We didn't feel at that time that an unsupervised bathroom would help that matter.

Q. Did you update his behavioral intervention, the intervention plan or his IEP to -- which you just testified to, to offer him support? What kind of support did you offer [[redacted] besides isolating him to the nurse's bathroom to help him? If you're saying he's a safety issue, what did you offer [[redacted] as support?

So, let me -- so, I'm going to have a couple questions. I don't want to -- if, I

guess, this is compound where you ask a couple questions in one. So, I'll do them one at a time, and forgive me.

So, my first question is, what supports did you offer [[redacted] at, you know, offer [[redacted]

A. As part of [[redacted]s counseling, his social stories and his work with Mrs. Doherty was focused on appropriate behavior, when to be silly, when not to be silly.

You can see in this e-mail, I think they gave an example of something that they were working on with him. When were you having fun? When were you being silly? It was continual as part of his plan. So, that would be offered as a support to him for this instance and responsive to the issue at hand.

The nurse's bathroom, I -- I would like to mention we offer that support, not just for [[redacted] but when students are having trouble, whether they have an IEP or not, if they're having trouble using the public bathroom.

Because it is an unsupervised, as I mentioned, area, we often take advantage of either the teacher leaders bathroom being a

single stall, or the nurse's bathroom being a single stall so that -- that students can have access to a bathroom and eliminate some of those worries.

In terms of safety, I -- I, you know, I prefer to use the word in [[redacted]s case, when I think about him, it was more about maintaining his dignity. Some of this, the silly behaviors put him in a position with his peers that were, you know, perhaps not unsafe, but were not positions that you would want your son in. You know, we want to keep his dignity and his privacy.

Q. What kind of dignity and privacy? What kind of -- what are you referring to exactly?

If you can elaborate, please?

A. Sir, you shared two e-mails. I would like -- not like to repeat what they said, but they indicated where he was showing body parts and saying rude things.

Q. Oh, let me put my balls -- okay. And that gets back to my next, the next question. When I tried to ask it before it was objected to and I think it's very important and relevant to this, you know, to this case, is

that -- so, let me ask you.
The first question is that, are you aware [[redacted] has [redacted]
A. Yes, I answered this question before. Yes.
Q. Okay. Are you aware part of [redacted] one of his -- the manifestation of his disability would be including [redacted]
Is that correct?
A. Yes.
Q. And [redacted] would be repeating back things that he heard. Is that correct?
A. Yes.
Q. Okay. So, if [[redacted] heard this on another student's Chromebook, and he repeated it in the bathroom, wouldn't that be a manifestation of his disability, what he repeated, that he heard something on somebody else's Chromebook that the kids showed it to him?
ATTORNEY ROSEN: Objection. This is hypothetical.
ROBERT [redacted] It's not a hypothetical. It's in writing.
THE HEARING OFFICER: Well, there's no manifestation determination that we're reviewing. He was never suspended or expelled, or anything. So, it's not

really relevant. So, sustained.

ROBERT [redacted] Why I believe the question is relevant is that they isolated him to the nurse's bathroom. Okay? And they're saying he had these behaviors, but [redacted] is part -- he repeated something he heard from another student's Chromebook.

And then my question is that when I asked this question, don't you think this could have been possibly prevented if the -- if they were more closely monitoring the students and blocking the websites, as the teacher said, if they were proactive?

Like, that's the question I'm trying to ask, and when I do ask it, it gets sustained. It gets objected to, and I think it's very relevant because it was -- it's clearly in the e-mail that going forward we'll block the websites. We will, you know, monitor the students more closely.

BY R. [redacted]

Q. Why -- my question is, why wasn't this done prior, Ms. Rizzo?

ATTORNEY ROSEN: I'm sorry. Wait. First -- first of all, I object to the whole preamble, as that's testimony. So, if the question is about, you

know, steps taken with regards to guarding the Chromebook, that's already been asked and answered. That's already, you know, that's not at issue here. So, I'd object to the question.

ROBERT [redacted] Well, it's all an issue because --

THE HEARING OFFICER: You know what? He actually asked it a little bit differently this time. He didn't ask for speculation about --

ROBERT [redacted] And he keeps interrupting me.

THE HEARING OFFICER: -- about whether it wouldn't have happened. I mean, he's asking, why didn't you do it before? I mean, all right.

You can answer that one.

THE WITNESS (Rizzo): I can answer that. And I actually bring some knowledge to this, Mr. [redacted] My -- my previous role in the District was instructional technology, so I know quite a bit about our security and technology security. We have a platform called Securely that combs all student use of Chromebooks and it does a really good job of catching things, but it's not perfect.

So, there are many websites out there that we're not aware of, but when we -- we become aware of them, we block them. So, you made us aware of

this website, and that students had access to it, and we, in response, blocked it.

So, I -- I think we did do our due diligence.

ROBERT [redacted] Well, YouTube is a site that should have been blocked.

THE HEARING OFFICER: Well, now that you --

ROBERT [redacted] That's --

THE HEARING OFFICER: To talk about YouTube, that's -- you know you're giving testimony about that.

So, ask a question.

ROBERT [redacted] Right. So, my question is that if -- again, if these websites were blocked, and the District took proactive measures, this incident could have been prevented. Is that reason? I think that's a reasonable question.

Is that if -- I'm trying to show a pattern that the District was not proactive, you know, and this is very relevant to the case. It's because that, according to Ms. Koosa, she says that, oh, going forward, we're going to close the --

ATTORNEY ROSEN: Objection. This is testimony.

ROBERT [redacted] Again, I am being interrupted.

THE HEARING OFFICER: Yeah, but that's what objections do, is they interrupt you.

I'm going to sustain the objection. I mean,

even before you wandered off you were asking the same speculative question that you had asked before. I mean, basically you -- previously you had rephrased it in a way that I said, yeah, you could do it. And she -- you asked a question and she answered it.

She can't really speculate on what might or might not have happened if some reason that had been, blocked earlier. So, I think -- at this point I think you're mining a dry hole. I mean, you really have to move on to something else.

ROBERT [redacted] Well, I disagree with that, but I guess I will have to move on. Okay.

BY R. [redacted]

Q. So, my next question would be that, did you ever convene a direct -- a crisis meeting to address [[redacted]s mental health needs after he expressed those suicidal thoughts in May?

A. I believe this was leading to the invitation that we gave you for a PPT. Right? These, these escalating behaviors compounded and brought to my attention resulted in us saying, maybe we need to come back to the table and think about [[redacted]s IEP. Let's review and revise. Let's take a look at it.

That was the meeting that you refused.
ROBERT [redacted] No, we didn't refuse anything. You're putting words into my mouth.
ATTORNEY ROSEN: Objection. Argumentative, testimony. Let's ask the question.
ROBERT [redacted] I'm going to bring up exhibit -- Right. I'm going to bring up --
THE HEARING OFFICER: Well, in fairness the testimony actually exceeded the scope of the question. You didn't -- he asked if you implemented a crisis management team.
You didn't actually do that. Right?
THE WITNESS (Rizzo): We did not.
THE HEARING OFFICER: Okay. That was the answer to the question. You can ask the next one.
BY R. [redacted]
Q. Is there any reason why you didn't intervene and call us at the time that it happened, and why you would wait until May 30th to change his placement?
A. I believe Mrs. Doherty did call you.
Q. No, I'm talking -- so, let me ask you this question again. When the suicide comment was made, why didn't you convene a PPT meeting immediately regarding this? This is a very

serious thing. When a child makes a suicide comment and you have to call 211 and you have to get, you know.

You know that's a very big -- a child wants to kill himself? Yeah, well that's --

ATTORNEY ROSEN: I'm sorry, Hearing Officer Kennedy. I have to object and (unintelligible) --

ROBERT [redacted] Everything is going to be objected --

THE HEARING OFFICER: Well --

ROBERT [redacted] -- and I'm being cut off. (Unintelligible) is just what I'm saying.

THE HEARING OFFICER: The question, I guess, is, why didn't you call a PPT meeting earlier than, I guess, when you heard --

ROBERT [redacted] Immediately. Right. Immediately.

THE HEARING OFFICER: I mean, you can answer that. You can answer that.

THE WITNESS (Rizzo): We didn't call a PPT meeting at that time. To my knowledge --

BY R. [redacted]

Q. Why?

A. My recollection was that Mrs. Doherty had spoken with -- I believe this was the time that miss -- Ms. [redacted] came into the building, or she was invited to come into the

building to have a direct conversation immediately following the threat assessment.

So, we did reach out and tried to make parent contact. We did not take this lightly.

Q. So --

A. But no, we did not convene a PPT.

Q. And why wouldn't you convene a PPT right away? This is very serious.

A. At the time the -- the team did not convene a PPT. I can't go back in time and tell you why -- what our thought pattern was at that, at that moment. I don't recall.

Q. Do you think it would be in [[redacted]s best interest not to convene a PPT immediately following the suicide comment? You know, when a suicide comment, he wants to kill himself, is made, wouldn't it be reasonable to hold a PPT meeting immediately?

Listen. [[redacted] made a comment. We would like to hold a meeting.

THE HEARING OFFICER: Well, I mean, the side editorial comments aren't necessary.

You can answer the actual question.

THE WITNESS (Rizzo): Can you repeat the question?

BY R. [redacted]

Q. Yes. My question, again, is that when [[redacted]
made that comment that he wanted to kill
himself, wouldn't it be reasonable to hold an
immediate PPT meeting regarding a situation
like this?

A. Would it be reasonable? Certainly, that
would be a reasonable course of action.

Q. Then why wasn't it done?

A. I just answered that. I -- I don't know in
that moment what the team's decision was, but
we didn't do that -- but we didn't. I can't
speculate on why. I don't know.

Q. You don't know why when a kid makes a suicide
comment you don't hold a PPT meeting?

ATTORNEY ROSEN: Objection. This is argumentative.

THE HEARING OFFICER: Yeah, that's --

ROBERT [redacted] It's not argumentative. She made a
comment and --

THE HEARING OFFICER: That's not a question. I mean,
you asked a question. You got the answer. So,
you have to move on to the next question.

BY R. [redacted]

Q. Wouldn't that be best supporting [[redacted]
Wouldn't that be in [[redacted]s best interest to

hold a PPT meeting immediately?
ATTORNEY ROSEN: Objection, argumentative. Asked and answered.
ROBERT [redacted] It's not argumentative. I claim it.
THE HEARING OFFICER: Well, both are true. Objection is sustained. Just -- yeah.
ROBERT [redacted] So, then I guess I'll have to answer again.
BY R. [redacted]
Q. Wouldn't it be in [[redacted]s best interest to hold a PPT meeting?
THE HEARING OFFICER: No, you can't --
ROBERT [redacted] That's the question --
THE HEARING OFFICER: You can't just try to change minor -- you haven't even really changed the phraseology. You've covered that.
ROBERT [redacted] What do you mean, the phraseology?
THE HEARING OFFICER: You've covered that subject.
ROBERT [redacted] No. Well, I'm asking these questions because --
THE HEARING OFFICER: You've covered that subject. They tried to hold a PPT, I think, May 30th. They didn't hold one earlier. And you've asked her about why. She said she doesn't really recall specifically.

ROBERT [redacted] All right. So, I'm going to bring up the exhibit -- let me see here -- Exhibit 16, yeah. So, let me bring up Exhibit 16 as why the PPT meeting was held.

So again, I guess if this -- when Ms. Rizzo comes back again, you know, I guess, would this be part of my testimony? And that's where I'm trying to be respectful of the process, but it gets confusing for a pro se party because I want to make a direct link to these e-mails, why they wanted to hold the meeting. It was not about [[redacted]s suicide comment. It was about changing his placement.

But would this be -- just be considered testimony? If it is, then I'll wait to call her back to the stand and I can get involved in this, and I'll just move on with my other questions. I just want to be respectful of the process. That's all. So, I'm just trying to understand that.

THE HEARING OFFICER: I mean, well, the e-mail certainly speaks for itself.

ROBERT [redacted] Nothing about she was --

THE HEARING OFFICER: Yeah.

ROBERT [redacted] Yeah.

THE HEARING OFFICER: So, the e-mail speaks for itself.

You can also testify yourself as to what you have firsthand knowledge of. So, I'm not sure why she needs to be cross-examined on it, but --

ROBERT [redacted] Well, I believe so. Well, this -- there's -- yeah. I would have other questions that would be considered testimony, which means I would need her back for cross-examining, not just on this one thing alone, but there are, you know, many other things that I would need her back on, you know, during our testimony. That's why it's important that she come back.

Because otherwise, you know, I've got to save it for that. Otherwise, if I say it here, then it's going to be considered testimony. And then I won't -- I want to have a question because I --

ATTORNEY ROSEN: Can we please move on and ask the Witness a question?

ROBERT [redacted] I know. Please, don't interrupt (unintelligible) --

THE HEARING OFFICER: Yeah, why don't you --

ROBERT [redacted] There's no reason to interrupt me, Mr. Rosen. I'm respecting you. Respect me.

THE HEARING OFFICER: Why don't you just ask her? Why don't you just ask whatever questions you want to ask her about this e-mail right now?

ROBERT [redacted] Okay. But I'm trying to get something in for the record and Mr. Rosen, for the record, interrupted me, you know, interrupting my train of thought and should not be doing something like that.

THE HEARING OFFICER: Well, no. He's within --

ROBERT [redacted] He's just -- it's very improper.

THE HEARING OFFICER: He's within his rights. He's within his rights.

ROBERT [redacted] Not to interrupt --

THE HEARING OFFICER: You really --

ROBERT [redacted] Not to interrupt --

THE HEARING OFFICER: You really should just be asking questions.

ROBERT [redacted] Right. And that's why I need you to, you know, why you're -- why I need her to come back for testimony. So, okay. I'll move on then.

About a week or so after receiving -- or a few -- or I would say a few days after receiving the final complaint about the teachers, because we, you know, we brought up an exhibit. It was submitted into evidence and we complained about things that were going on about how our --

THE HEARING OFFICER: All right. That's not a question. What's the question?

BY R. [redacted]

Q. Okay. So, my question was, just days after receiving the final complaint about the bathroom isolation and the teacher misconduct, your e-mail dated May 30, 2025, initiated the urgent PPT to move [[redacted] to the Matthewson [redacted] program.

Given the evidence, isn't the only logical conclusion that the decision to pursue a drastic change in placement was retaliation for the parents reporting staff misconduct?

ATTORNEY ROSEN: Objection.

ROBERT [redacted] Oh, I claim it.

ATTORNEY ROSEN: Objection. This is argumentative.

ROBERT [redacted] No, it's not. You just don't want it into evidence. Yeah?

THE HEARING OFFICER: Well, he's asking whether it was retaliation. So you can. You can answer the question.

THE WITNESS (Rizzo): It was in no means retaliation. I can say with a hundred percent certainty.

BY R. [redacted]

Q. Did you reach out to us to hold a PPT meeting regarding a change in placement before we

reported the behaviors of the teachers and complained about them?
A. We did not.
Q. Thank you. So, I'm moving on. At [[redacted]s annual PPT in February of 2025, did the IEP team agree that the current placement and services were appropriate to provide him with a free appropriate public education?
A. Can you repeat the beginning part again? I'm sorry.
Q. At [[redacted]s annual PPT in February of 2025, which you were there, did the IEP team agree that the current placement and services were appropriate to provide him with a free and appropriate public education?
A. Yes.
ATTORNEY ROSEN: Just a point of clarification. I assume you meant 2024, not 2025?
ROBERT [redacted] Oh, I'm sorry. I believe I said 2025. But to clarify for the record, no, it would be -- I'm sorry. No, you -- I apologize. Let me see. I think I meant, February of 2024. Yes, I did. My apologies. I wrote 2025.
So, I'll repeat the question.

BY R. [redacted]

Q. At [[redacted]s annual PPT in February of 2024, did the IEP team agree that the current placement and services were appropriate to provide him with a free and appropriate public education?

A. Yes.

Q. Okay. May 14 of 2025, the special education, Ms. Truscello reported that [[redacted] did a nice job last week, was able to remain quiet for other students during testing.

Is that -- well, that is an accurate quote from the team's official progress update. Is that correct?

A. That was an e-mail that Mr. Truscello had written to you, yes.

Q. Right. So, that's an accurate quote? Okay.

Given that the team deemed the placement appropriate in February and his behavior was stable in mid-May, how could the team legally claim to the parents just days later that [[redacted]s behavior had so drastically increased that it created an urgent need to move him to a self-contained program?

A. Well, sir, you just shared that he was making self-harm threats within this timeframe.

That, that to me seems urgent. There's some frustration on his part, some concerns.

Is that what you're referring to? Or is this a different timeline? I'm sorry, I'm getting -- I'm having a hard time following which year you're talking about.

Q. Well, I just want to quote what you just testified to about his suicide comments. I will get back to this question in a minute, but to clarify what you just said about his comments, and that's something I had brought up, that if it was so urgent about his, you know, suicide comments, we already -- I think it's already on record that there was no PPT meeting immediately put into place following those comments.

So, to get back to this question again, I will read it again. Given that the team deemed the placement appropriate in February and his behavior was stable in mid-May, how could the team legally claim to the parents just days later that [[redacted]s behavior had so drastically increased that it created an urgent need to move him to a self-contained program, which is your -- the e-mail that you

sent to us on May 30th?
You wanted to, you know, change his placement from the least restrictive to a total restrictive.
ATTORNEY ROSEN: Objection, testimony.
THE HEARING OFFICER: Yeah, that is sustained.
ROBERT [redacted] So, that will come out when I can do testimony? Okay.
BY R. [redacted]
Q. Okay. You stated that the placement -- well, the placement change was necessary because work was becoming increasingly difficult, yet just days before your team reported [[redacted] was engaged in a peer book club working on rounding numbers, and on May 16, 2024, that he was making progress in mastering his goals.
Which of these two contradictory statements did the team rely upon to initiate the urgent PPT?
ATTORNEY ROSEN: Objection, argumentative.
ROBERT [redacted] It's not. I claim it. It's not argumentative.
That question has already been answered.
THE HEARING OFFICER: Yeah, the way it's phrased, it

is. Why don't you rephrase it?

BY R. [redacted]

Q. Okay. So, you claimed a change of placement was necessary, which is your May 30th e-mail, yet on May 16th we got a positive update on his progress. So, which of these two contradictory statements did the team reply -- rely upon to initiate the urgent PPT?

ATTORNEY ROSEN: That is the same question that was just asked. It is argumentative.

ROBERT [redacted] I don't see it being argumentative. I think it's a very valid question that should be answered.

THE HEARING OFFICER: I mean, that the way it's phrased, the phrase is -- and you didn't really change it. I mean, if you want to ask about the discrepancy between two statements you can, but not in that, not in that phraseology.

BY R. [redacted]

Q. Well, the point I'm trying to make is that he was -- it's already testified that we got a positive update on May 16th, and then two weeks later all of the sudden they want to, you know, change his placement to the total

restrictive environment.

What changed between May 16th and May 30th that caused this, you know, that you wanted to change his placement? Something happened between May 16th and May 30th. What happened in those two weeks that initiated an urgent PPT to discuss a change in placement?

A. So, I would just like to be able to say that we wanted to discuss a possible change, that we were not demanding a change to his placement.

As noted, beginning in March, the classroom teacher and Ms. Truscello had conversations with you about his increased behaviors in the classroom, inability to focus on task, refusal to do his work. That continued and was with greater frequency leading into the end of the school year.

Um --

Q. I'm sorry. When was that? That you're saying Ms. Truscello told us about his increased behaviors in the classroom? When was that --

ATTORNEY ROSEN: I'm sorry. The Witness was testifying.

THE HEARING OFFICER: Yeah, don't cut --
ROBERT [redacted] Oh, I though she was finished.
I apologize.
THE HEARING OFFICER: Yeah, let her finish her answer.
BY R. [redacted]
Q. Sure.
A. At the parent conference when you came in, Ms. Truscello and Ms. Curria I think both met with you that evening -- I'm not sure if it was together or separately -- to discuss areas of concern.
ROBERT [redacted] Okay. Let's bring up that. I believe I have it on the screen here. Since you brought that up, let me make sure.
No, I'm sorry. This is the -- let me get that exhibit back in. Oh, okay. Fifteen.
My screen seems to be stuck here.
Oh. Oh, here it is.
Oh, here it is. Okay. Maybe I can launch -- open it.
Oh, let me see. That was next.
Oh, wait. I think I have that wrong -- oh, no. Oh, I'm sorry, I think it's the wrong exhibit here. Fifteen. I just have a lot on my screen, so it's confusing on my taskbar. I apologize for

that.

I have it now. Okay. Let me get back to the conversations about that PPT meeting.

Okay. In an e-mail that you were CC'd to, this is on -- to get the date, it is on April 15, 2024. This is regarding at the parent-teacher conference, what we were told about one of the behaviors. One of the behaviors reported that he ripped the --

ATTORNEY ROSEN: Objection. I'd like the question to be asked of the Witness, not testimony --

ROBERT [redacted] Okay. So, I'm going to ask the question.

BY R. [redacted]

Q. According to this e-mail, Ms. Rizzo, that you were CC'd on, [[redacted] didn't intentionally mean to rip a page. We offered to replace the book, and why didn't the District take us up on our offer to replace the book that was accidentally -- the page that was accidentally ripped?

ATTORNEY ROSEN: Objection. What is the relevance of this?

ROBERT [redacted] The relevance of this is that they're complaining about his behaviors. I'm glad you

asked. Thank you -- is that they're claiming that he has an increase in behaviors that needed to discuss a change in program to Matthewson from the least restrictive to a total restrictive. And these are the behaviors that they're reporting to us at the PPT meeting about. They complain that he ripped a page in a book.

And it's right here, clear as day, in their own words.

ATTORNEY ROSEN: Hearing Officer Kennedy, I'm not trying to directly argue with Mr. [redacted] I just don't think this is relevant to the issue.

ROBERT [redacted] I believe he is arguing.

ATTORNEY ROSEN: Yeah. That, I mean, the issue really is his placement. Restitution for a damaged book just has nothing to do with that. So --

ROBERT [redacted] Well, the comment -- they testified I was making --

THE HEARING OFFICER: I'm going to sustain the objection. This is just not -- if you offered to pay for it, fine. Whatever happened with that, fine. It's not really relevant to the subject matter of the case.

ROBERT [redacted] Well, after sending this e-mail about [[redacted] you know, about them telling us that he has

an IQ of 65 -- so, I sent this e-mail. And --
THE HEARING OFFICER: Yeah, but now you're testifying.
ROBERT [redacted] Okay.
THE HEARING OFFICER: Just ask the Witness a question.
BY R. [redacted]
Q. Okay. After sending this e-mail on April 15th -- if you would like to read it, Ms. Rizzo, I'm going to ask you a question. The response we got was, thank you for your response. We are happy to have this team to support [[redacted]
After sending this e-mail that I did on April 15th, do you think that was just an appropriate response? Shouldn't there have been, you know, was that a total appropriate response basically to this e-mail, especially that we offered to replace the book and explain things?
But I will give you time to read it over so you can, you know, look at it. So, do you need to read it on my screen?
ATTORNEY ROSEN: I'm going to object. This calls for speculation --
ROBERT [redacted] It's not speculation.
ATTORNEY ROSEN: -- and she hasn't had the opportunity

to review.

THE HEARING OFFICER: Well, who -- wait a minute. I mean, it doesn't even look like she sent the e-mail.

ROBERT [redacted] Yes. Miss -- well, she was CC'd on it and she's the school principal. So, she's the, you know, she the --

THE HEARING OFFICER: I mean, you're asking her about an e-mail that somebody else sent. So, sustained.

Ask her a question about, you know, basically within her scope of knowledge.

ROBERT [redacted] Right. She testified to his behaviors and I'm showing that these are, you know, we got a positive update. But if that's testimony, I'll save it. But I'm just, you know, trying to, you know, poke holes in her testimony, that she's not being honest.

THE HEARING OFFICER: Yeah. I mean, facts that you want to put in --

ROBERT [redacted] It's distorted.

THE HEARING OFFICER: Yeah. I mean, facts that you have knowledge about that you want to make a record of, that's when you give your own testimony. So, just ask her --

ROBERT [redacted] Okay. I'll get to --

THE HEARING OFFICER: Ask her questions right now.

ROBERT [redacted] Okay.

ATTORNEY ROSEN: Just briefly, a point of order. I know it's almost four o'clock. I just wanted to clarify, Hearing Officer, your understanding of how much longer you intend to have today's hearing go on?

THE HEARING OFFICER: I mean, I --

ROBERT [redacted] I have a lot of questions, actually.

THE HEARING OFFICER: I didn't really want to get until five, but I'm willing to go that long. I mean, between that and any redirect, will we even be done, done by five?

ROBERT [redacted] Because I still have a lot of questions. I don't even know if we're going to get through them by five. I just want to, you know, be honest and clear for the record. If we have to continue this next time, we have to add extra -- which we probably need extra dates because we have our testimony, but then I still have a lot more cross-examination.

So, I just want to be clear about that. I don't want to lead you into, you know, that, you know, I'm going to be done by five, which I probably won't. And I want to be fair about that

because I do have a lot more questions because of everything that has, you know, transpired. I have to -- would like to get through these questions, you know, for the cross-examination. And it would prejudice me not to be able to get through all these questions as part of our case.

The District had asked questions. They had no more questions and we have a right to ask questions, too, and get through them. Otherwise, we don't have a case.

ATTORNEY ROSEN: Hearing Officer Kennedy, may I briefly be heard?

THE HEARING OFFICER: Sure.

ATTORNEY ROSEN: My direct examination was under two hours for Ms. Rizzo. We have made her available and, by all means, Mr. [redacted] and Ms. [redacted] have the opportunity to cross-examine, but we're going on hour three right now. The majority of the time has been spent debating and arguing with regards to objections.

If the cross-examination is not over by the time of this hearing, we understand it would continue, but I'm asking, although I know pro se litigants are afforded some leeway, there's been multiple reminders here that testimony is -- this

not the time for Mr. [redacted] testimony. This is time for questions of Ms. Rizzo, who is the president of JFK -- or excuse me, not president, principal of JFK Elementary, has spent the majority of her day with us today.

While we can make her available if we are not done by five o'clock, I would ask for a tighter restriction in terms of arguing about the objections and respectfully just request that if there are questions, let's just ask them of Ms. Rizzo so that we can move on.

ROBERT [redacted] I would like to respond back to that. I have a right to respond. I object to Mr. Rosen's interpretation of that. He did interrupt many times where he shouldn't have interrupted. Based, you know, he objected when there wasn't even objection necessary. So he's, you know, wasting my time.

And there isn't a time put on this because we're being prejudiced. It doesn't matter that he took under two hours. We have -- we filed this complaint. We have 78 exhibits. I'm not saying we have -- we're not going to get through them in this cross-examination, you know, but what I'm saying is that we have a large case that's going

to require more time.

So, we should not feel rushed or prejudiced, you know, into rushing to get through this. That's what Mr. Rosen wants. He doesn't want -- based on what he just said, he doesn't want us to get through our testimony because it doesn't look good for the District.

But guess what? We have a right as pro se parents to get through this, you know, our examination. And it would prejudice us not, you know, if we couldn't, it would prejudice us terribly, because we need to put on our case and make our case. Otherwise, we just don't have a case and it wouldn't be fair to us.

THE HEARING OFFICER: All right. Here's what I'm going to do. I mean, usually you can get a couple witnesses, two or three witnesses in during a day. You know this witness has sort of endured a marathon.

We'll end for today. When we convene, I'll allow more. I'll allow you one hour of cross-examination. That includes all time arguing and monologuing. So, you know, make your questions very focused and don't keep, you know, if an objection is sustained, don't keep arguing

it over and over again, because you will eat your time up very rapidly.

ROBERT [redacted] So, as long as Mr. Rosen --

THE HEARING OFFICER: Let me finish.

ROBERT [redacted] I apologize. I apologize.

THE HEARING OFFICER: I think we have another hearing next week. I don't remember the specific day, but we'll reconvene then. You'll have one hour of cross and that will be it. And then, if you have any redirect you can ask that, and then we'll move on to the next witness.

All right?

ROBERT [redacted] Well, I would -- if I need over an hour, I would respectfully ask, you know. You know it may be over an hour, but I'm going to try. I'll look over my questions. Fair enough. And I'll try to consolidate them, you know, to be fair to the process.

You know, that's what I'll do is -- but I'll try to do it within an hour. But then, you know, it's, you know, again, Mr. Rosen interjected, interjected many times when he shouldn't have had, because you know even you had to, Hearing Officer, say that, no, I'll allow the question, I'll allow this. But that takes up my time, too.

So, he can't just blame me for, you know, because I'm a pro se party, you know, and I'm, you know, I'm trying to understand the difference between the testimony and the cross-examine. But then again, as long as I can bring back Ms. Rizzo during my testimony, then that would alleviate a lot of those issues.

So, then I will try to get it done, hopefully within an hour, but if it goes a little bit over, you know. I'm not saying it's going to go three or four or five hours. No, no, no. Not at all. But you know it could be an hour and a half. It could be up to two. It might even be less.

I'm going to do the best I can, you know, to go over the questions, you know, and, you know, try --

THE HEARING OFFICER: You know what? An hour. An hour is the limit. So, I mean, one, triage. Have very focused questions and prioritize.

ROBERT [redacted] I'll do my best.

THE HEARING OFFICER: So, all right. So, we'll end the hearing for today, and we'll reconvene. You know the parent has one hour to complete cross-examination of Ms. Rizzo, and be done --

ROBERT [redacted] Okay. Before we go, Hearing Officer,

I have to ask, how many more days is the district going to use? When we -- so, we need to find out when we're going to provide our testimony, because as per Mr. Rosen, he says that we need to see your exhibits. We need to see this.

He's got everything now, so there's no reason why -- he should have answered the question before, but there's no reason why we can't get a direct answer now so we know when we're going to provide our testimony, so I know when to subpoena Ms. Stewart. Because there's other subpoenas, you know, we're going to -- whether the subpoenas are asking them to come in, you know.

Like I said, I have the State. I have, you know, Ms. Stewart, so, you know, getting her subpoena. That's probably the biggest -- because I know the State, you said you can ask them. So, we're going to have to make days to have them come in, you know, during ours. So, we've got to find out when our testimony is going to start so we're not taken by surprise, knowing that, okay. We're two hours into this.

All of the sudden -- all right. Now your testimony begins. Well, wait a minute. We're not ready. We thought he was going to take up three

days. So, we want to know when our testimony is going to start.

THE HEARING OFFICER: All right. Well, you don't necessarily have to have Ms. Stewart at the start.

ROBERT [redacted] No, we don't.

THE HEARING OFFICER: So, any of the days, any of the days when you're going to put on evidence is fine. But I don't know if the District may have been planning to call more than one witness today. So, I mean, that may be part of the problem in estimating how long it's going to take.

ROBERT [redacted] But if he goes over the three days, that's not a problem for us. Like, for instance, if Mr. Rosen says he's going to use three, but he needs a fourth day, of course I'm not going to object to that, because I would like that courtesy in return. As you said, attorneys work with each other.

I'm not holding him to the exact three days. I'm just saying that I'd like to find out when approximately we're going to -- I just don't want to be taken -- but what I'm trying to say, I don't want to be taken by surprise that, let's say, you know, come Tuesday is the third day. And then two hours into it is that, well, I'm done. Everything

is done.

Now the parents go, and then we're not prepared for our testimony on that day saying, well, we should have this. That's what I'm worried about. You know?

THE HEARING OFFICER: Yeah. No, that that's fine. I mean, as we go on hopefully -- and if you need witnesses from the District, you're also going to have to give him some heads-up so he can provide them. So, yeah. And when we think we know we'll want Ms. Stewart, we can issue a subpoena for that for that day.

So, yeah. I do encourage. You know I encourage the parties, obviously, to coordinate that type of thing. And as it hopefully starts to become clear when certain witnesses are needed or whatever, that we know that when we know that in advance, so. But --

ROBERT [redacted] For the record, I never even got responses back from Mr. Rosen from the last time around when I asked questions. He ignored me. So, it's kind of hard. I'm going to have to, you know, CC you on those communications because, you know, as far as that's concerned.

And also, you know, we want to find out,

like, is -- so, on the next hearing date, he's going to -- basically, that will be his full day. And then, you know, when our testimony is going to be coming up, he's going to need a fourth day. You know, that's something -- or is that something --

THE HEARING OFFICER: Well, he estimated three days. I mean, so he'll definitely need the next, the next day and the one after that. When we get to the one after that he can tell us whether he needs another day.

ATTORNEY ROSEN: I'm hopeful we'll be done at the next hearing date.

THE HEARING OFFICER: The next hearing date?

ATTORNEY ROSEN: I would like to make that if I can. I can't account for how long cross-examination may take. Our plan was to be done by the end of the next hearing date. But worst comes to worst, you're probably seeing two hours of the following hearing date.

THE HEARING OFFICER: All right.

ATTORNEY ROSEN: And then at that date we would expect the parents to present their case.

THE HEARING OFFICER: Okay.

ROBERT [redacted] So, then -- so, to be clear --

THE HEARING OFFICER: That's the estimate right now.
ROBERT [redacted] I'm sorry. So, to be clear, the estimate would be, so the next time around he -- which would be the next day, he'll take up the full day. And then we would be providing our testimony starting on -- let's see -- the 20.
Let me see here.
THE HEARING OFFICER: What's the next hearing? The hearing date after that, is it the 27th?
ATTORNEY ROSEN: Our next hearing date is the 21st. Quite honestly, depending on how testimony unfolds, we may be done that day from the District.
But the following hearing date is the 28th. At worst, I see us taking up an hour or two of the 28th -- excuse me, not the 27th.
THE HEARING OFFICER: It's the 27th. Isn't it?
ATTORNEY ROSEN: The 27th, yes. So, the 27th --
THE HEARING OFFICER: The 28th, we're flying out to North Carolina. So, I don't think that works.
ATTORNEY ROSEN: Don't worry. Don't worry. We won't ruin your flight.
THE HEARING OFFICER: The 27th will work out better.
ATTORNEY ROSEN: Yeah. I intend at the latest to be done in the morning of the 27th, in which we would

then expect the family to begin their presentation.

THE HEARING OFFICER: All right. And certainly, if you and the mother plan to testify that, you know, I mean, those are witnesses that you can call at any time.

Did the parents put themselves on the witness list?

ROBERT [redacted] Do we have to? I mean --

ATTORNEY ROSEN: They did not.

THE HEARING OFFICER: I mean --

ROBERT [redacted] I didn't even know we were supposed to.

THE HEARING OFFICER: Will you waive the technicality of them not having --

ROBERT [redacted] I can submit a new witness list?

ATTORNEY ROSEN: Yes, I will. I would waive with the understanding that both parents plan to testify.

THE HEARING OFFICER: All right.

ATTORNEY ROSEN: I do realize that there was a witness we did not respond to with respect to Katherine Matz, but at our next hearing date I can raise my objections.

THE HEARING OFFICER: Okay.

ROBERT [redacted] Well, she's a valid witness. That's

for sure.
THE HEARING OFFICER: Oh. She's never even worked for the Milford School District. Right? I think she worked for Region 9, and then moved to the State.
ROBERT [redacted] Who's that? Ms. Matz, are you talking about?
THE HEARING OFFICER: Yeah.
ROBERT [redacted] Ms. Matz is from the State. Right. That's the one I was looking to either, you know, subpoena, which I thought we had to.
But you said you could bring them in just by asking them, so -- or Ms. Jones.
THE HEARING OFFICER: Well, I don't necessarily -- well, we can take that up at the next hearing if you've got, you know, if -- you can state your objection to that.
ATTORNEY ROSEN: Understood.
THE HEARING OFFICER: All right. So, we'll end for today. An hour limit to cross-examination, and we'll put Ms. Rizzo in for combat pay for the whole, you know, enduring this the whole day. All right.
So, have a good weekend, everybody.

(End: 4:12 p.m.)

STATE OF CONNECTICUT
[Hartford County]

I, ROBERT G. DIXON, a Certified Verbatim Reporter for the State of Connecticut, do hereby certify that I took the above 268 pages of proceedings of the STATE OF CONNECTICUT, DEPARTMENT OF EDUCATION, SPECIAL EDUCATION HEARING In Re: [redacted] COMPLAINANT, VS. MILFORD BOARD OF EDUCATION, RESPONDENT, Docket Number: 25-0686; HELD BEFORE: PATRICK KENNEDY, ESQ., THE HEARING OFFICER, on October 17, 2025 (via Teams teleconference).

I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of computer assisted transcription; and I further certify that said deposition is a true and accurate record of the testimony given in these proceedings.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and seal the 6th day of January, 2026.

Robert G. Dixon, N.P., CVR-M No. 857

My Commission Expires 6/30/2030

INDEX


WITNESS PAGE

Amy Rizzo ---------------------------------------- 304

Direct Examination by Attorney Rosen ----------- 304

Cross-Examination by R. [redacted] ---------- 367, 451

Cross-Examination by K. [redacted] -------------- 445


PARENT EXHIBITS


NUMBER PAGE

Exh 12 -------------------------------------------- 277

Exh 13 -------------------------------------- (398), 277

Exh 14 -- 2/12/'24 Bathroom e-mail chain ----- (403), 412

Exh 15 -- E-mail chain (20 pgs) - (391), (421), 432, (461)

Exh 16 -- 5/30/'24 A. Rizzo e-mail ----- (451), 454, (465)

Exh 20 -------------------------------------------- 277

Exh 21 -------------------------------------------- 277

Exh 22 -------------------------------------------- 277

Exh 29 -- Parent/JFK e-mail correspondence ---- 277, (325)

Exh 30 -------------------------------------------- 277

Exh 34 -------------------------------------------- 277

Exh 35 -------------------------------------------- 277

Exh 37 -- A. Rizzo e-mail thread (5 pages) ---- 277, (345)

Exh 38 -------------------------------------------- 277

Exh 42 -------------------------------------------- 277

Exh 43 -------------------------------------------- 277

Exh 45 -------------------------------------------- 277

Exh 46 -- PPT Meeting date e-mail thread ------ 277, (359)

Exh 47 -------------------------------------------- 277

Exh 52 -------------------------------------------- 277

Exh 65 -------------------------------------------- 277

Exh 68 -------------------------------------------- 277

Exh 76 -------------------------------------------- 277


BOARD EXHIBITS


NUMBER PAGE

*Exh 13 ---- 2/8/'24 IEP From reviews (25 pages)----- (310)

*Exh 21 ---- 1/16/'25 Annual review IEP-------------- (338)

*Exh 25 ---- 3/6/'25 IEP ---------------------------- (353)

*Exh 30 ---- 5/21/'25 Placement PPT/IEP meeting ----- (364)

*Exh 36 ---- Principal A. Rizzo CV ------------------ (304)


*Exhibit entered into evidence on prior hearing date.

All exhibits retained by Counsel.

**0**

**06460** 274:5
**092** 306:3

**1**

**1** 276:8 366:23
**1/16** 542:21
**10** 332:22 335:20 360:11 465:12
**1076d** 374:16
**10:05** 273:19 275:1
**11** 396:2
**11:47** 360:25
**11th** 332:22 335:21
**12** 276:21 277:18 306:2,2 374:16 403:20 542:7
**12:03** 360:25
**12:09** 367:4
**12th** 405:3
**13** 276:21 277:18 310:25 396:6 398:4 498:9 542:7,21
**13th** 462:8
**14** 363:10 396:7 403:10 403:10,12 410:10 411:14 412:8 413:14 415:18,18 417:14 518:7 542:8
**14th** 361:17 407:4 462:22
**15** 390:3,21 391:3 393:3,5 421:25 422:1 425:1 426:8,11 426:12 432:19 432:21 461:11 461:18 487:24 498:8,10 524:5 542:8
**15th** 428:13 474:18 488:12 526:7,13
**16** 338:16 398:16 451:13 451:20 453:2 453:22 454:1 464:25 465:4 497:22 498:4 513:2,3 520:15 542:9
**16th** 521:5,23 522:2,5
**17** 273:18 377:6 398:10 541:6
**176** 279:22
**17th** 329:9 333:11
**18** 451:18
**18-0100** 377:1
**19** 326:4
**19th** 329:9 488:2,11
**1:00** 367:4
**1st** 455:13

**2**

**2** 326:1
**2/12** 542:8
**2/8** 542:21
**20** 276:22 277:18 394:24 396:6,7 427:22 428:1 430:19 485:21 538:6 542:8,9
**2001** 305:12
**2022-2023** 283:11
**2023** 288:9,11 296:18,23 298:18 299:17 299:19 307:10 307:10,12 398:10,16
**2023-2024** 288:10 307:14 312:24
**2024** 291:13 308:14 311:2,5 311:15 313:2 318:16 322:25 326:5 328:11 388:24 396:3 403:20 423:24 425:1 445:11 445:11,23,25 446:4,7 447:19 447:20 452:22 454:6 462:8,22 465:12 498:9 517:18,22 518:2 520:15 524:6
**2025** 273:18 293:12 295:18 295:24 299:22 337:22,25 338:16 353:15 357:14 363:10 364:22 373:25 388:23 389:18 421:14 465:7 516:5 517:5,11 517:18,20,23 518:7 541:6
**2026** 541:15
**203.783.1200** 274:8
**20th** 345:21 488:10,13
**21** 276:22 277:6,18 338:15 365:23 542:10,21

**211** 489:6 509:2
**21st** 360:4 364:21 538:10
**22** 277:6,18 284:9 389:18 542:10
**23** 283:16 284:9,11 286:21 287:11 289:9 298:18 308:5 310:12 310:21 313:7 319:13 320:5 321:20
**24** 283:16,16 289:9,10 296:18 308:5,5 310:12,13,16 310:21 313:7 319:13 320:5 321:20,23 322:15 323:14 324:5 337:17 542:8,9,21
**24th** 279:19
**25** 283:16 289:10 291:13 308:5 310:13 310:16 321:23 322:15 323:14 324:5 337:17 342:24 350:16 353:14 358:23 359:8 361:13 362:25 363:7 364:15,25 365:9,15,23 446:7 542:21 542:21,22,22 542:22
**25-0686** 273:8 541:6
**26** 342:24 350:16 358:23 359:8 361:13 362:25 363:7 364:15,25 365:9,15
**268** 541:4
**26th** 329:10,22
**27** 421:14
**277** 542:7,7,9 542:10,10,11 542:11,12,12 542:13,13,14 542:14,15,15 542:16,16,17 542:17,18
**27th** 422:3,3 423:5 424:24 538:9,16,17,18 538:18,23,25
**28th** 538:14,16 538:19
**29** 277:8,19 325:24 542:11
**2:55** 444:19

**3**

**3** 299:17 331:24 398:19 423:24
**3/6** 542:22
**30** 277:8,19 364:20 452:22 454:6 516:5 542:11,22
**3023** 297:4 299:14
**304** 542:2,3,23
**30th** 445:25 451:10 452:23 457:9 458:3 459:10 490:14 508:19 512:22 520:1 521:4 522:3,5
**310** 542:21
**325** 542:11
**338** 542:21
**34** 277:8,19 542:12
**345** 542:13
**35** 277:8,19 542:12
**353** 542:22
**35318** 541:18
**359** 542:15
**36** 304:19 542:23
**364** 542:22
**367** 542:3
**37** 277:8,19 345:10,11,12 542:13
**371** 377:6
**38** 277:8,19 542:13
**391** 542:8
**398** 542:7
**3:00** 486:13
**3:15** 486:10,13
**3:46** 396:3
**3rd** 299:13 428:14 458:4 459:12

**4**

**4** 297:2
**403** 542:8
**41** 367:14 368:21,21 369:8,17 371:1 371:5 372:13 373:1,4,5,8,17 373:19,21 374:6 377:18 380:9 383:5 384:8,8 385:13 385:16,18
**412** 542:8
**41a** 383:7
**41b** 383:20

**42** 277:9,19 542:14
**421** 542:8
**43** 277:9,19 542:14
**432** 542:8
**44** 277:9,10
**445** 542:4
**45** 277:10,11,19 542:15
**451** 542:3,9
**454** 542:9
**46** 277:11,19 359:17 542:15
**461** 542:8
**465** 542:9
**47** 277:11,19 542:16
**4:12** 540:25
**4th** 297:3

**5**

**5** 307:12 542:13
**5/21** 542:22
**5/30** 542:9
**50** 366:22
**52** 277:12,19 542:16

**6**

**6** 297:25 298:2 299:12 353:14 357:14 373:25
**6/30/2030** 541:22
**65** 277:13,19 526:1 542:17
**68** 277:13,20 542:17
**6th** 353:22 354:16 356:7 357:8 360:3 367:13 368:2 368:25 369:4 370:2,4,15,24 371:3 380:6 415:17 541:14

**7**

**7** 298:17 300:1 306:1
**75** 274:4
**76** 277:13,20 542:18
**78** 276:8 300:18 438:2 530:22
**7th** 343:3,4,7

**8**

**8** 311:2,5,15 313:2 318:16
**857** 273:24 541:21

**9**

**9** 279:23 540:4

**a**

**a.m.** 273:19 275:1 332:22 335:20 360:25
**abandon** 420:3
**ability** 337:6,8 386:3 440:21 468:22
**able** 283:2 284:14 290:15 300:8,16 334:14 364:2,4 390:22 425:22 443:15 459:2 462:17 478:15 478:22 486:19 518:9 522:8 529:5
**above** 397:12 465:11 541:4
**absolutely** 318:2 369:5
**academic** 293:21 320:1 335:3 348:13 463:6
**academics** 461:23 462:9
**academy** 358:3 358:3
**access** 296:11 296:12 300:22 301:4 412:23 502:3 506:1
**accessibility** 412:23
**accessing** 356:2
**accidentally** 333:13 524:20 524:21
**accommodate** 328:14 398:22 445:2
**accommodati...** 352:6
**accommodati...** 335:5 349:8
**accomplish** 454:12
**account** 537:16
**accuracy** 385:16 437:8
**accurate** 317:23 351:3 381:20 382:1 391:16,24 393:22 518:11 518:16 541:9
**accusations** 337:14
**accusatory** 355:5
**achieving** 416:9
**acknowledge** 356:20

**acrobat** 391:20 394:4
**action** 420:24 432:16 511:8 541:11,13
**actions** 333:17 374:18
**actively** 335:6 371:7
**actual** 291:2 292:16,16 294:11 348:23 348:25 357:3 361:11 373:13 376:1 377:21 449:25 452:14 456:24 458:16 510:24
**actually** 276:25 290:7,20 297:3 298:17 299:13 342:19 364:14 368:22 375:13 383:20 387:6 409:24 410:10 410:12 415:18 434:18 437:11 441:9 453:11 463:23 465:7 469:16 485:20 485:23 486:2 487:12 505:6 505:15 508:9 508:12 528:9
**add** 356:22 528:18
**added** 391:14
**adding** 348:14 457:19
**addition** 498:13
**additional** 356:11,21
**address** 279:14 281:2,8,12 286:3 325:9,10 332:25 339:18 348:15 507:17
**addressed** 295:4 399:16
**addressing** 347:22
**adequate** 448:22 485:2
**adhd** 330:25
**adinolfi** 283:7 283:17,23 284:2 285:10 285:16 286:16 286:20,22 287:1 288:13 288:16
**adjourn** 360:11
**adjustments** 454:19
**administration** 305:22
**administrative** 301:20 417:1,2
**administrator** 306:4 433:21 434:7 489:18
**administrators** 459:23
**admissibility** 276:17 279:4 393:22 411:14 411:18
**admissible** 370:12
**admission** 370:13 453:20
**admit** 412:5
**admitted** 277:16 278:24 279:3,12 298:3 325:25 376:23 384:9 410:12 410:13 415:18 429:20 435:2 453:23 456:18 463:24 485:3
**adobe** 394:4
**adult** 500:8
**advance** 338:12 432:9 536:18
**advantage** 501:24
**afforded** 529:24
**afraid** 425:19
**afternoon** 398:18 407:3,4
**aggressive** 389:1,10
**ago** 382:17 426:14 456:12
**agree** 317:25 347:7 351:2 362:15 386:25 403:9 464:11 517:6,12 518:3
**agreed** 278:23 279:2 337:18 362:13 380:14 385:10,11
**agreement** 278:25 315:21 362:20 379:3,4 387:25
**ahead** 275:17 276:21 279:16 293:5 379:1 381:6 394:17 413:2 432:24 445:3 450:24
**aid** 377:8
**aids** 377:9
**airing** 357:21
**aligned** 358:11
**aligns** 449:20 450:5
**allegation** 317:22

**allegations** 284:20
**alleged** 332:9 334:9
**alleviate** 533:6
**allow** 286:14 292:7,12 301:21 371:24 372:12 374:20 383:24 392:4 412:14 432:19 443:23 444:16 444:25 487:16 494:3 531:21 531:21 532:24 532:24
**allowed** 303:6 374:11 379:6 443:12 480:2
**allowing** 337:2 384:22 487:19
**allows** 375:8
**alteration** 394:14
**alternate** 310:11 314:13 314:15 360:2 456:4
**amount** 439:24 448:22
**amounting** 280:20
**ample** 418:20
**amy** 275:20 303:15 304:8,8 378:8 542:2
**andrea** 282:22
**annual** 308:11 308:16 310:20 311:4,6,7 312:10,11,16 313:2 316:18 318:13,15 323:16,18 338:2,7,8,17 339:6,7,9,18 340:9 345:2,6 345:22 346:20 347:17 350:10 351:4 353:8 354:17 362:11 447:13 517:5 517:11 518:2 542:21
**answer** 290:23 368:9,11 382:15 392:23 393:11 397:20 421:1 431:4 460:13,15 477:25 480:9 492:24 494:3 497:11 505:13 505:14 508:14 509:16,17 510:24 511:21 512:7 516:19 523:4 534:9
**answered** 434:17 465:15 473:16,19 475:5 503:4 505:3 507:6 511:10 512:3 520:24 521:14 534:7
**answering** 414:11
**anybody** 485:10
**anymore** 331:20 389:20 425:11 452:3
**anyone's** 383:20
**anytime** 477:21 477:21
**anyway** 437:14 444:13 491:17
**anziano** 282:19 294:14 295:1 296:21 297:2 297:25 298:19 299:12,13,25 300:9
**apart** 324:1
**apologies** 372:8 517:23
**apologize** 288:6 360:22 443:8 453:5 517:21 523:3,25 532:5 532:5
**apparently** 290:16
**appear** 302:18 391:14
**appeared** 302:14
**appears** 319:13 329:8 333:9 359:19 399:9
**apply** 301:19
**appointed** 275:5
**appreciate** 399:21 403:23 477:18 479:19
**appropriate** 283:15,19 291:4 311:22 312:2 313:15 315:16,18,22 316:23 322:22 329:1 336:6,11 347:24 348:1 349:15,22 350:11,16,23 352:19 362:14 362:18 364:11 401:6 404:22 405:14 406:9 409:1,6,7,10 411:4,8 433:23 466:1 501:8

517:7,8,14,15 518:4,5,18 519:19 526:14 526:15
**appropriately** 321:14 362:5
**approximately** 317:2 535:21
**april** 396:2 493:15 524:5 526:6,13
**area** 387:17 470:10 501:24
**areas** 358:7,11 470:13 523:11
**argue** 376:14 413:18 414:17 416:8 417:18 418:21 435:3 435:18 436:22 436:25 525:11
**arguing** 416:21 419:4,22,24 420:1,10 442:1 442:4 525:13 529:19 530:8 531:22,25
**argument** 281:16 416:4 441:15
**argumentative** 368:17 415:25 434:3,12,13 435:11,15,17 436:20 437:22 452:9 457:13 469:17 470:18 489:21 495:21 495:22 497:8 499:11 508:4 511:16,18 512:2,4 516:15 520:21,23 521:11,12
**arguments** 375:25 442:24
**arizzo** 345:16 359:21 395:12 412:1 465:13
**arms** 389:11
**arrange** 349:15 398:20
**asked** 292:14 300:18 316:18 368:1,6,6,8 378:9,13 382:14,16 388:14 405:6 424:4 425:14 431:3 432:3 433:2 436:7 459:11 462:7 463:1 465:24 466:9 472:4 473:16,18,18 481:5 487:8,11 490:10 492:23 499:12,22 504:8 505:2,6 507:2,5 508:10 511:21 512:2 512:23 521:11 524:11 525:1 529:7 536:21
**asking** 296:9 342:20 387:10 391:9,25 392:18 407:17 407:18 414:8 415:20 418:2 418:15 433:18 435:11 436:4 436:15,16,20 442:7,9,10,14 443:11 457:17 458:9 459:12 459:13,16 471:9,10 475:15,20 476:3,4 479:17 481:17 483:14 485:6 487:3,4 489:10 492:7 493:17 494:7 495:7 498:11 505:11 507:1 512:19 515:13 516:18 527:8 529:23 534:13 540:12
**aspect** 431:13
**aspire** 349:2
**assert** 278:12
**assessment** 488:21 489:3,7 489:12 491:2,9 510:2
**assessments** 490:4
**assets** 449:19
**assisted** 541:9
**assume** 293:12 369:9 411:20 517:18
**assumed** 372:4
**assumes** 470:20 470:21
**assuming** 276:23 298:6
**attached** 296:23 298:17 298:20 300:2,3 300:19 360:3
**attempt** 317:18 358:24 362:12
**attempted** 300:22
**attempting** 278:9 369:9 421:17
**attempts** 356:20 359:10 360:6
**attend** 359:13 361:12 363:12

365:6,19 446:3 468:22
**attendance** 364:17
**attended** 289:1
**attendee** 365:3
**attending** 307:3 308:16 323:1 359:5,8 361:20
**attention** 370:3 408:3 507:22
**attested** 391:24
**attorney** 275:15,16 276:11,20 277:2,5,8 280:25 281:20 282:10,14 288:6,15,21 290:25 291:7 293:1,4,8 295:14,17 296:2 297:8 299:17 302:13 303:14,20 304:11,15 313:19 314:3 345:9,12,14 360:7,11,14,20 361:3,6 366:2 366:20 367:1 368:16 369:6 374:8 375:2,4 375:5 376:6 377:14,15 381:4,7,14 382:4,19,23 383:24 386:9 386:12 387:8 391:6,10 392:6 393:6,20 394:9 396:18 401:9 402:9 404:17 406:7 407:14 408:12,15,25 410:18,23 413:5 414:2 426:4,24 427:4 427:14 428:22 433:2 434:1,12 435:25 441:8 441:14 442:5 449:6 452:8 453:1,14,21 457:13,17 461:13 463:8 463:10 466:23 469:17 470:18 473:16 475:3 485:8 489:21 491:10 493:5 493:24 494:20 494:25 495:21 497:8 499:10 503:20 504:23 506:21 508:4 509:6 511:16 512:2 514:16 516:13,15 517:17 520:5 520:21 521:10 522:24 524:10 524:22 525:10 525:14 526:22 526:25 528:3 529:11,14 537:12,15,22 538:10,18,21 538:24 539:10 539:17,20 540:17 541:12 542:3
**attorneys** 467:2 535:17
**audible** 376:16
**audio** 369:1,10 369:24 370:15 371:2,4 372:11 372:23 373:1 373:15,17 374:6,9 376:11 376:13,22 377:21 378:11 378:12,12,15 378:18,20 379:10,19,22 380:5,10,12,17 380:23 381:24 383:18 384:3 384:15,24 385:9,15,19 419:11 431:25
**august** 293:12 295:18 298:11 445:11 446:4 447:20
**authentic** 450:3
**authenticity** 287:16 298:16 375:9 381:25
[redacted] 316:16 400:18 503:3,5 516:7
[redacted] 449:3
**automatically** 404:15
**available** 282:21 283:3,5 284:23 300:15 319:18 335:20 376:19 398:19 441:19 458:25 459:8,9,10,24 475:6 529:15 530:6
**avoid** 405:17
**aware** 307:25 309:3 338:9 339:14,16 386:7 389:15 416:7 488:9,14 488:20 503:3,5 505:24,24,25

**b**

**b** 304:19 310:25 338:15 353:13 364:20 364:20 377:5 442:3,4
**back** 296:18 303:6 313:13 313:25 314:2 317:16 325:15 326:2 329:11 331:2,5 333:4 334:11,13 336:3,17 337:12 343:18 348:3 353:1 354:1 362:18 367:6 373:16 374:21 376:2 376:14 378:17 382:7,24 383:23 393:16 397:24 399:19 421:21,22 422:1 430:15 431:8 432:2,4 432:4 434:9 437:18 438:25 442:16 443:12 443:16 444:1,4 444:10 445:18 446:16 447:5 451:11,12 452:3 460:21 465:3,7,20 467:19 469:22 474:25 475:2,4 475:7 476:1 477:24 478:15 478:21 479:4,8 479:23 480:2,3 480:6,9 481:11 481:16,20 482:1 483:1,5 483:7,11,20,22 484:12,13 485:5 486:6,9 486:20,23,24 487:2,17,19,21 487:24 491:6 491:13 492:15 497:18 498:9 502:22 503:10 507:23 510:11 513:6,16 514:7 514:9,11 515:17 519:9 519:17 523:16 524:2 530:12 533:5 536:20
**background** 276:3 305:3,9
**bad** 405:15 424:15 432:5
**ball** 449:5
**balls** 404:3 405:9 502:21
**bar** 292:17,18 432:8
**based** 278:7 280:4,11 285:9 286:24 294:20 303:5,7 316:22 329:18 343:21 350:21 366:9 409:11,12 454:13 488:21 530:16 531:5
**basically** 276:8 287:3 291:10 292:6 295:24 299:7,11 300:3 300:11 301:11 301:12 383:23 384:20 390:14 391:20 392:19 394:4,7 406:1 431:18 438:4 438:21 440:8 452:16 484:16 487:4 491:22 507:3 526:16 527:10 537:2
**basis** 323:3,19 401:13 450:11
**bathroom** 308:24 309:8 309:10,13,14 309:16,17,23 310:1,11,15,17 389:22 397:13 397:22,25 398:12,12 399:6,9,12,17 399:20,24 400:1,2,4,6,16 400:22 401:1,2 401:5,5,8,21,23 403:5,7,9,17,21 403:25 404:9 404:12,16,23 416:16,19 425:6,12 493:14,19,20 495:4,6 496:2 496:6,14,18,21 496:22 497:3,5 497:7,15 498:6 498:19,23 499:4 500:7,15 500:21 501:17 501:22,25 502:1,3 503:15 504:4 516:4 542:8
**bears** 298:10
**beating** 470:22 471:4
**becoming** 468:5,11,23 520:12
**began** 307:12 333:4
**beginning** 314:8 324:7

409:25 455:5
517:9 522:12
**begins** 534:24
**behalf** 455:3
**behavior**
324:11,19
326:19 327:8
330:15,20,23
333:20 396:9
396:23 397:3
397:14,15,16
405:14 462:14
472:25 473:1
474:15 478:5
501:8 518:18
518:21 519:20
519:22
**behavioral**
289:6 291:18
308:19,21
319:23 325:8
336:1 500:17
**behaviors**
287:8 314:17
324:7 327:18
334:20,22
389:2,4,5,5,6
389:12,13
396:12,16,25
397:4,5,5,10,19
397:21,25
399:24 416:18
416:19 460:5
462:10,22
466:7,21 468:4
468:10,24
469:24 472:21
472:23 473:2
473:13 474:17
478:7 490:11
500:6 502:9
504:5 507:21
517:1 522:15
522:22 524:8,8
524:25 525:2,5
527:13
**belief** 484:17
**beliefs** 279:21
280:11
**believe** 279:23
280:2 285:11
285:21 289:10
308:11,18
309:8,22 310:7
311:7 315:7
317:16 321:13
321:24 324:12
325:24 326:18
326:22 331:20
332:12 334:2
337:21 338:1
338:14 339:5
339:10,20
341:3 345:7
348:20 350:11
354:13 359:14
362:6 363:3
364:21 368:11
378:6 400:7
401:14 402:15
417:9,16 419:6
419:8 420:13
445:24 447:14
448:20 455:22
458:5,9,23
459:13 464:25
468:17 473:9
473:24 480:25
488:15 489:5
490:6 491:1
494:15 496:2
498:1 504:2
507:19 508:21
509:23 514:4
517:19 523:13
525:13
**believed** 333:20
**belittling**
424:14
**beneficial**
321:8 352:14
379:21
**benefit** 278:13
**berchem** 274:3
**berchemmos...**
274:7
**best** 312:20
313:17 327:23
341:17 343:4
351:20 358:18
364:6 366:15
375:16,17
413:11,13
437:20 440:10
440:21 448:17
510:14 511:24
511:25 512:10
533:14,20
**better** 325:19
331:16 332:23
342:13 350:3
354:14 358:4
365:12 455:12
456:2 468:7
538:23
**beyond** 401:15
484:17 485:4
**big** 509:4
**bigger** 397:21
**biggest** 534:16
**binders** 467:3
**bip** 332:16
387:20 397:6
397:17,19
410:7 473:10
**bit** 313:10
412:14 422:23
468:20 505:7
505:18 533:9
**black** 329:20
465:18
**blame** 533:1
**blamed** 333:16
**blank** 294:13
294:21 299:6
300:4

**blanket** 281:4
**block** 292:4 407:7 504:18 505:25
**blocked** 405:19 409:18 413:24 506:2,5,12 507:9
**blocking** 406:2 406:4 504:11
**blue** 465:17,19 465:21 467:23
**board** 273:10 274:2,17 275:5 275:8,16,19,22 303:14 304:19 353:13 364:20 374:17 377:2 408:22 429:12 434:25 541:5 542:20
**board's** 281:7 290:25
**body** 502:19
**book** 520:14 524:18,19 525:7,15 526:17
**bottom** 370:17 398:14 403:13
**bouncing** 449:4 449:4
**boy** 449:4
**boy's** 421:18 500:9
**boys** 400:16 405:5 425:6 498:14
**break** 325:3 329:8 366:6,6 366:16,19,24 485:10,11 486:3,5,6
**breaks** 281:10
**brenda** 282:19 298:19
**brief** 406:20 416:5 418:21 435:24
**briefly** 381:5 528:3 529:11
**bring** 287:23 290:10 294:19 296:17 301:15 301:16 315:25 336:18 368:20 368:21 390:3 398:1,4 403:10 421:20 442:13 451:6,13,25 461:9,17,18 467:7 478:17 487:25 494:18 498:3 505:15 508:6,7 513:1 513:3 523:12 533:5 540:11
**bringing** 427:12
**broad** 274:4 487:13
**brochure** 450:9
**brought** 298:11 346:14 355:17 370:2 380:9 397:25 408:2 419:10 426:18 428:3,5 433:12 491:4 507:22 515:21 519:11 523:14
**build** 291:21
**building** 306:18,19 324:14,17 489:18 509:25 510:1
**buildings** 314:11
**bumped** 333:13
**bunch** 390:7 443:10
**buried** 497:13
**business** 286:3 287:18 301:17
**button** 404:7 405:8
**bypass** 277:1

**c**

**c** 274:1
**calendar** 288:9 312:12,16 350:6 459:5
**call** 280:24 303:13,15 325:13 327:2 328:15 330:2 331:6,20,23 332:14 334:15 346:12 430:15 431:8 442:16 449:25 454:20 475:2 476:1 483:5,11 486:19 508:18 508:21 509:2 509:13,18 513:15 535:9 539:5
**called** 282:25 304:2 326:15 326:18,22 329:23 375:20 404:7 420:11 449:24 475:4 479:23 487:15 505:19
**calling** 332:1 360:9
**calls** 326:6,11 326:24 332:2,5

413:5 414:3,4 414:9 526:22
**calm** 325:4
**camera** 303:17
**cameras** 329:5
**capacity** 441:18
**care** 394:16
**carolina** 538:20
**carrano** 282:22 284:25 285:3
**carried** 388:2
**cart** 449:23,24
**case** 275:7 278:20 282:21 285:13 287:3 291:20,21 297:16 298:1 298:11 371:16 376:22 377:1,3 379:21 380:16 382:25 383:13 384:2,5 386:11 387:6 401:20 406:10 408:24 412:12 420:6 429:8 431:22 432:7,8 433:15 434:23 435:19 437:24 438:3 442:11,13 443:20 484:8 484:17 502:6 502:25 506:18 525:23 529:6 529:10 530:25 531:12,13,14 537:23
**catching** 505:21
**caused** 522:3
**cc** 536:23
**cc'd** 389:23,25 391:3 392:1,3 392:19 395:24 398:11 411:25 423:7,11,15 430:5,10 433:13,24 434:8,11 436:13 462:6 463:4 464:11 498:11 524:4 524:16 527:5
**ccs** 395:11 430:12
**center** 284:19
**central** 377:4
**certain** 316:6 352:5,8 400:11 451:8 468:18 475:5 536:16
**certainly** 305:12 306:16 317:18 320:13 395:1 466:2,3 467:20 483:12 485:5 511:7 513:21 539:3
**certainty** 516:22
**certificate** 306:1,4
**certifications** 305:23
**certified** 541:3
**certify** 541:4,7 541:9,10
**chain** 392:12 392:14,19 393:2 394:23 394:25 395:3 395:11 396:21 428:1 430:9 456:17 542:8,8
**challenge** 319:10
**challenges** 334:24 349:12 469:6
**challenging** 468:23
**chance** 320:22 442:6
**change** 314:25 318:21,23,25 320:9,15 322:7 384:6,6 430:11 445:10 450:2,7 451:5,6 455:17 457:6,11 460:2 466:16 474:6 474:12 490:15 508:19 512:14 516:10,25 520:2,11 521:3 521:17,25 522:4,7,9,10 525:3
**changed** 311:18 512:15 522:2
**changes** 445:9 446:16,22,23 447:16,17,18
**changing** 513:12
**character** 478:5
**characterizati...** 452:13 476:2
**characterize** 499:8
**charge** 296:12
**charlotte** 283:7 285:15 286:16 288:13,16
**child** 289:15,17 289:22,25 290:19 291:12 291:25 301:5 411:2 438:22 438:24,25 440:7,8,20 445:2 449:3 509:1,4

**child's** 300:25 350:1 374:12
**children** 498:15 499:21
**choosing** 394:5
**chromebook** 399:16 405:11 405:20 407:8 503:14,18 504:7 505:2
**chromebooks** 405:23 505:20
**circle** 357:20
**circumstances** 303:5,7
**citation** 377:6
**claim** 386:2,19 391:7 392:2 401:11 402:10 404:18 412:4 412:13 413:7 457:14 467:12 473:17 489:22 491:14 497:10 512:4 516:14 518:20 519:21 520:22
**claimed** 521:3
**claiming** 334:19 525:1
**claims** 401:22
**clarification** 280:25 445:17 517:17
**clarifications** 303:2
**clarify** 288:8 336:18 343:10 355:11 392:17 446:12 496:7 517:20 519:10 528:5
**clarifying** 343:14
**class** 290:21 314:18 400:10 405:11 462:15
**classic** 471:6
**classmate** 324:18 405:7 405:14
**classmates** 333:12 405:22 406:5 424:16 425:24
**classroom** 306:8 407:8 413:25 449:1,4 460:6,7,11 461:5,25 462:1 468:20 469:7 470:5,7,10 522:13,15,22
**clear** 292:5 298:3 307:9 324:24 336:23 339:8 357:2 362:24 365:5 388:5 393:22 409:23 424:9 425:16 443:6,7 443:8,9,25 446:11,11 453:14 463:22 467:22 478:10 485:24 497:21 525:8 528:17 528:22 536:16 537:25 538:2
**clearly** 378:21 392:6 393:9 504:17
**click** 295:3 296:24 391:22
**clicked** 294:5 298:21 451:16
**clicking** 394:4
**climate** 306:22
**clinicians** 490:5
**clip** 405:9
**close** 319:17 390:9 403:6 458:24 490:7 506:20
**closely** 407:9 409:17,19 413:2,25 504:11,19
**closer** 344:5 353:4
**club** 520:14
**coffee** 449:22 449:24
**collected** 329:19
**collection** 281:3
**combat** 540:20
**combined** 346:19
**combs** 505:20
**come** 278:16 281:3,18 285:4 285:7,12 286:9 286:15,23 300:12 312:23 313:13,16 315:21 320:18 321:12 322:20 328:2 332:21 334:14 335:12 335:17 337:17 340:1 343:18 352:20 353:1 362:18 378:19 379:11,24 380:12,18 381:1,3 383:12 384:16,18,20 384:22 385:5,8 385:17 386:20 396:7 402:21 403:3 415:14 415:22 417:21 432:4 438:7

440:13 441:16 443:12,16 444:1,5,10 447:3,5 452:3 452:15 455:11 460:21 465:20 467:19 469:22 474:25 475:7 477:24 478:15 478:21 479:4 480:9 481:11 481:18 483:1 483:15,22 486:6,9,24 487:11,17,19 490:19 493:6 507:23 509:25 514:11 515:16 520:7 534:13 534:18 535:24
**comes** 281:8,12 287:9 412:13 423:18 430:17 431:2,5 432:1 479:8,18 513:6 537:18
**comfortability** 496:23
**comfortable** 394:9 485:12
**coming** 298:18 299:24 317:19 318:6 319:12 319:17 323:16 379:19 380:1,8 382:2 406:1,23 407:3 411:1 422:1 444:4,19 445:2 458:24 480:2 481:7 483:7 486:23 537:4
**commencem...** 307:13
**comment** 281:22 284:8 508:23 509:2 510:16,17,20 511:3,15,19 513:12 525:17
**comments** 322:6 357:6 490:23 510:23 519:8,11,13,16
**commission** 541:22
**commit** 333:17
**common** 318:21
**communicate** 325:20 330:9 330:16 332:18 471:17 473:25
**communicated** 331:13 336:4 355:21 468:19 471:11,12 474:9 497:13 499:25
**communicating** 310:4 336:9 473:6
**communication** 294:4,10 295:2 296:24 298:21 300:2,20 306:23 331:19 336:6,12,22 354:3 355:9 388:11 424:21 424:23,25 432:18 450:8 468:3,9 496:16 497:4,18
**communicati...** 294:19 335:25 336:25 388:9 391:4 470:15 470:16 471:2 471:23 472:3 472:10,14,19 474:5 536:23
**community** 306:19,22
**compiled** 366:10
**complain** 525:6
**complainant** 273:8 274:10 541:5
**complained** 515:22 517:2
**complaining** 524:25
**complaint** 289:16 295:19 295:21,24 368:23 373:23 515:20 516:3 530:22
**complete** 380:19 382:12 462:18 533:23
**completed** 362:10 459:2 489:9,15
**completely** 408:20 409:8 412:11 414:1 418:3 487:14
**completion** 305:21
**compound** 396:18 402:9 404:17 406:7 406:13 434:1 497:8 499:10 501:1
**compounded** 507:21
**comprehensive** 347:1,9
**compromise** 278:4,8,11
**computer** 541:9

**con** 468:14
**concern** 285:9 286:25 300:10 327:7 332:13 346:24 443:14 450:15 497:2 523:11
**concerned** 380:16 427:5 431:12 432:8 460:18 462:13 497:5 536:24
**concerning** 280:18 333:15
**concerns** 309:9 319:24 324:22 325:8,11 326:8 328:19,21,25 329:12 333:1 335:8 336:9 353:19,24 354:2,8 365:21 365:25 396:16 398:19 399:4,5 415:22 428:20 433:11 434:10 493:15,21,22 519:2
**concluded** 346:24
**conclusion** 436:2 516:9
**conduct** 328:21 339:5 373:24
**conducted** 347:11 348:9
**conference** 328:15 398:21 408:15,18 409:3 466:8 468:15 470:1 523:7 524:7
**conferences** 466:19 469:15
**confidence** 375:9
**confirming** 381:25
**conflict** 371:15
**confused** 463:13 485:15
**confusing** 513:9 523:25
**conjecture** 280:11
**connecticut** 273:2 274:5 275:5 305:18 374:10 541:1,3 541:4
**connection** 438:23
**consent** 361:18
**consequence** 325:2
**consequences** 324:25
**consider** 282:3 285:16 301:15 314:13 315:1 325:4 344:4 394:13 448:18 462:21
**consideration** 314:24 339:4
**considered** 314:16 320:23 388:18 396:15 463:21 480:7 513:14 514:6 514:14
**considering** 346:1 468:6
**consistent** 349:13 351:17
**consistently** 476:21
**consists** 427:17
**consolidate** 532:17
**constantly** 473:6
**constitutes** 418:22
**cont'd** 451:1
**contact** 490:2 510:4
**contacted** 489:17
**contacting** 473:3
**contain** 280:10
**contained** 518:23 519:24
**containing** 430:11
**contains** 383:9
**content** 409:11
**contents** 377:22 408:24 500:4
**context** 491:21
**continual** 501:14
**continue** 283:21 333:4 334:18 359:6 381:17 450:23 486:4,6,18 487:21 498:18 528:18 529:23
**continued** 275:9 309:16 312:1 447:11 522:17
**continuing** 333:6 359:8 464:18
**continuous** 301:4
**continuously** 328:7
**contradictory** 520:18 521:7

**contributing** 360:16
**convene** 507:16 508:24 510:7,8 510:10,15 531:20
**convenience** 383:7,19
**conversation** 316:20 325:14 330:20 334:14 336:17 337:4 337:12 340:14 346:22 347:20 352:13 356:9 364:1 386:21 510:1
**conversations** 284:19 310:10 349:19 355:23 386:21 387:4,5 522:14 524:3
**coordinate** 536:14
**copy** 391:16 394:17
**corey** 405:7
**corey's** 405:10
**correct** 296:2 318:11 327:4 335:15 340:12 345:17 350:8 350:13,18 357:1,5 361:14 361:15 363:16 364:12 368:4 368:10 386:4 386:23 388:7 388:19 391:5 395:14 396:17 397:2 399:7 400:10,18,19 403:17 412:2 423:10,11 442:7 456:8 463:22 464:21 465:1 490:17 503:8,11 518:13
**corrected** 280:13 408:4
**correctly** 281:1 305:1 322:18 326:15
**corresponden...** 295:20 308:19 324:3 345:3 352:11 427:6,7 542:11
**counsel** 541:10 541:12 542:25
**counseling** 501:6
**counselor** 490:6
**county** 541:1
**couple** 500:25 501:2 531:16
**course** 279:5 298:5 306:17 324:5 387:3 473:14 511:8 535:15
**court** 375:11 416:25 491:18 491:19 492:1
**courtesy** 278:3 278:6,11,13 282:5,5 535:16
**courtney** 282:21 284:24 285:2
**covered** 284:4 296:4 512:16 512:18,21
**create** 374:23 375:12
**created** 518:22 519:23
**credibility** 369:14 378:20 379:12 380:13 384:16
**crisis** 488:25 507:16 508:10
**critical** 347:23 349:12
**criticism** 415:9
**critique** 348:22 348:25 357:10
**cross** 302:17 303:6 366:5 367:9,11,16,22 376:12 378:3 381:15 382:16 384:12 393:7 419:16 420:3 429:3,21,24 431:19,21 439:24 441:20 443:5,19 444:7 444:12,13,16 445:6 451:1 452:11 464:3 471:3,9 482:20 483:16 484:4,9 485:4 486:18 514:3,7 528:21 529:4,17,21 530:24 531:22 532:9 533:4,24 537:16 540:19 542:3,4
**cued** 330:22
**cueing** 330:19 330:24 331:5
**curia's** 405:11
**curing** 408:5
**current** 283:3 293:10 294:2 294:15 305:6 311:14 342:19 346:4,15 354:6 424:16 517:6 517:13 518:3

**currently** 304:8 304:16 305:7 345:10 350:2
**curria** 399:16 421:15 424:4,6 428:12 468:16 523:8
**curriculum** 305:15 306:24
**customers** 450:3
**cut** 281:10 356:5 376:15 419:13 420:2 439:4,6,8,14,16 439:18,20 442:22 443:13 444:2 476:9,11 476:14,17,20 476:25 477:16 477:17,23 478:11 482:12 509:10 523:1
**cutting** 419:19 439:21
**cv** 542:23
**cvr** 273:24 541:21

**d**

**d** 377:6
**dad** 275:23 425:11 428:10
**daddy** 424:3
**damaged** 525:15
**darlene** 288:22
**data** 473:9
**date** 273:18 286:5 335:21 335:22 338:17 343:2,8,10 359:19 451:8 465:5,6 473:12 488:10 524:5 537:1,13,14,18 537:20,22 538:9,10,14 539:22 542:15 542:24
**dated** 297:2 311:1 345:20 516:5
**dates** 360:2 488:16 528:19
**day** 312:7 324:13 327:11 399:13 441:18 450:13 458:5,7 458:8,10,11,14 458:20 462:23 473:3,8 484:2 489:9,13 500:7 525:8 530:5 531:17 532:7 535:15,24 536:3,12 537:2 537:4,9,11 538:4,5,12 540:21 541:14
**days** 488:2 515:19 516:2 518:20 519:22 520:13 534:1 534:18 535:1,6 535:7,12,19 537:7
**deal** 397:4
**dear** 297:6
**debating** 529:19
**december** 332:22 333:5 335:20
**decide** 359:5
**decides** 287:4
**deciding** 438:17
**decision** 308:10 311:25 346:21 346:25 347:8 347:21 361:12 363:11 364:6 466:4 511:11 516:9
**decisions** 289:8 350:5 459:3
**declined** 466:10,13,21 467:13
**declining** 467:12
**deemed** 518:17 519:19
**deep** 348:16,19
**defend** 334:12
**defending** 416:20 436:11
**definitely** 285:3 289:22 292:1 295:9 296:3 385:11 487:20 537:8
**definitively** 318:14
**deflected** 415:21
**deflection** 440:2
**degree** 305:14 305:17,19,21
**delay** 485:8
**delaying** 419:7
**delete** 391:18 391:19 393:15
**deleted** 294:6,8 295:4 296:25 296:25 298:22 298:22 300:24 300:25
**deliberate** 432:5
**deliberately** 435:17

**demand** 323:15 492:4
**demanding** 522:10
**demands** 323:10
**demonstrates** 351:17
**demonstrating** 278:10 314:17 460:5
**denial** 442:18
**denials** 303:1
**denied** 302:23 303:3 373:4,5 379:21 384:3 409:10
**deny** 369:11
**department** 273:2 286:7 407:7 413:2 541:4
**depending** 538:11
**depiction** 340:25 351:3
**deposition** 541:9
**describe** 305:9 306:14 469:5
**designated** 383:7
**designed** 316:16 374:23
**desire** 357:25 465:25
**desk** 470:11
**despite** 365:19
**detailed** 351:16
**details** 291:15
**determination** 292:11,21 339:25 365:11 503:24
**determine** 288:3 292:15 340:5 343:4
**determined** 362:25 363:2
**developed** 409:24
**dialogue** 336:20
**difference** 533:3
**different** 355:20 397:3,9 397:16,19 408:20 409:9 413:9 417:5,7 417:9 418:3 434:5 479:7 519:4
**differently** 505:7
**difficult** 319:6 343:3 468:5,11 468:12,22 520:12
**dignity** 309:21 502:8,13,14
**diligence** 506:3
**direct** 293:13 304:13 367:7 378:9 475:24 487:12,13 507:16 510:1 513:10 529:14 534:9 542:3
**directed** 356:11
**direction** 541:8
**directive** 309:25 310:6 310:14
**directly** 291:25 293:17 308:25 309:2 441:21 489:17 525:11
**director** 293:10 293:16
**disability** 424:10 503:6 503:16
**disagree** 507:12
**disagreed** 341:14
**disagreement** 340:24 345:4 372:7
**disagreements** 365:22
**discourse** 325:15
**discovery** 491:16,18
**discrepancy** 333:14 521:18
**discuss** 282:11 315:3 322:16 328:5 335:18 339:8 342:22 344:6 351:8,12 353:2,19 354:23 358:2 358:25 359:4 361:11 362:6 362:19,21 364:14 402:6 425:3 426:17 446:1 447:3 452:5 455:11 455:14,16,20 456:21 457:5 460:2 464:1 466:1,10 489:18 522:7,9 523:10 525:3
**discussed** 311:5 312:13 321:13 342:5 353:22 356:12 364:10 383:21 393:9 402:22 426:13 457:1 496:25

**discussing** 339:22 347:15 349:24 358:5 363:6 426:14
**discussion** 313:16 318:23 344:3,15 346:19 347:25 348:4 352:1 354:5 356:1 361:22 383:1 457:18
**discussions** 344:8 456:21
**dismiss** 420:6 441:25 443:22
**dismissed** 441:9,22
**displays** 334:20
**dispute** 372:6 435:6
**disputing** 408:24
**distinguishm...** 291:1
**distort** 382:23
**distorted** 527:20
**distorting** 478:7
**distortion** 478:4
**distracted** 470:11
**district** 276:9 278:7,9,12 279:3,20 280:23 282:2 282:20 283:2 283:18 284:18 285:1,24 287:4 288:19 295:18 300:10,10 301:10 314:11 314:14,19 316:12 335:2 340:5,6 343:24 343:25 344:21 344:24 346:5,7 346:8,19,25 347:22 349:14 349:15 358:6 358:24 363:18 373:25 374:1,4 374:8 377:5 379:1,4,11 384:21,23 385:10 393:3 401:22 402:24 407:12 408:9 409:16,21 411:1,21 412:21,25 413:24 415:4,9 416:7 426:21 426:23 432:16 436:12 440:9 440:22 442:20 449:14 459:7 471:1 487:17 488:25 505:17 506:13,17 524:18 529:7 531:7 534:1 535:8 536:8 538:13 540:3
**district's** 277:25 278:5 283:15 286:13 287:21 296:6 346:1 347:2 374:7 420:21 467:12
**districted** 344:25
**distrust** 334:2 334:6
**dixon** 273:24 541:3,21
**doc** 273:8
**docket** 541:5
**doctoring** 394:6
**document** 294:13,22 299:6 300:22 300:24 312:18 345:13 355:19 355:19 387:25 388:1,12,15,16 391:12,13,16 391:24 392:3,7 397:24 398:5 403:22 418:20 430:19 491:6,9 491:11
**documentation** 351:16 376:25 387:2 388:6,19 493:13,18 494:1,6,11 495:5
**documented** 387:24 402:8 402:14
**documents** 355:18 388:9 394:6,14 497:23
**dog** 360:16
**doherty** 326:15 326:16,24 329:23 330:3 330:18 489:16 501:7 508:21 509:22
**doing** 279:7 330:5 392:15 415:16 420:21 424:5 440:10 440:12 472:7 478:9 515:4
**download** 369:1 370:1
**drastic** 516:10

**drastically** 518:21 519:23
**dry** 507:10
**due** 283:12,14 284:21 287:12 289:2 293:15 295:19 301:1 374:23 379:6 404:8 409:14 468:24 506:3
**duly** 304:2

**e**

**e** 274:1,1 284:18,25 285:1,4,8 286:19,22,24 287:5,15,19 289:15,17,24 290:3,9,15 291:11,17 292:1 294:10 294:15,16 295:1 296:21 299:7,25 308:18 323:6 325:20 326:3,6 326:14 328:17 331:24 333:6 334:11,17 335:19 336:2,5 336:11,15,21 336:25 337:13 337:13 345:7 345:15,19,20 351:15 355:17 359:18,25 361:7,16 362:1 369:2,18 370:9 370:22,25 372:20,22 373:6,16 374:6 377:5,6,18,23 378:14,17 380:5,7 383:6 385:14,15 386:2 387:13 388:9,16,18 389:19,23,24 390:23 391:4 392:12,14,19 392:25 393:2 394:20,23,25 395:3,6,11,25 395:25 396:5 396:21 398:11 398:24 399:2 399:21 401:19 402:2,5,6,14,15 402:17,22 403:19,23 421:14,19 422:7 423:5,5 423:24,25 425:1 426:3 427:18 428:1,9 428:12,20,21 429:15,19,20 430:9,10,16,21 430:25 431:7 431:10,25,25 433:12,14 434:8,10 436:6 438:1,8 440:17 445:24 446:5 447:21 451:23 452:7 456:7,17 461:1,10 462:6 462:11 463:4 464:10 465:8 466:8,12,15,19 466:24 467:21 472:22 494:7 496:15 497:16 497:21 498:2 499:6,25 500:1 501:10 502:17 504:17 513:10 513:20,25 514:25 516:5 518:14 519:25 521:4 524:4,15 525:24 526:1,6 526:12,16 527:4,9 542:8 542:8,9,11,13 542:15
**earlier** 326:7 326:12 346:13 347:4 360:17 368:1 409:25 416:7 458:23 507:9 509:13 512:23
**early** 322:2
**easily** 467:25
**eat** 532:1
[redacted] 503:7 503:10 504:5
**ed** 285:17,18,22 313:11 460:7 461:25,25 469:7
**editorial** 510:22
**educate** 438:25 440:7
**educating** 440:11,18
**education** 273:2,3,11 274:2,17,18 275:6,6,8,16,18 275:19 283:7 283:10,16,20 284:3 289:7,9 291:3,4 293:14 301:1 303:15 305:11,24 306:1,7 307:5 308:1,4,9 311:1 312:6 314:8 335:11 341:25 356:3 357:4 374:17 377:2 406:9

409:10 411:4,9 449:12 470:7 517:8,15 518:5 518:7 541:4,5 541:5
**education's** 275:22
**educational** 301:4 305:9,17 305:19,22 306:3 346:2,9 348:17 357:11
**educator** 305:25 318:20 349:18 452:6
**effect** 343:11 350:7 383:5 432:10,14
**effort** 320:9 321:20 455:3
**efforts** 328:3
**either** 292:25 308:5 322:1 333:22 340:24 342:10 345:4 354:10 356:5 358:15,19 359:12 381:21 501:25 540:9
**elaborate** 502:16
**elaborated** 498:21
**elementary** 275:21,21,22 288:23 304:9 316:10 456:5 530:4
**eliminate** 502:3
**elopement** 397:18
**eloping** 470:9
**else's** 503:18
**emotional** 335:3 346:3,9 348:13,17
**emphasized** 278:3
**employed** 304:16,22 541:11,12
**employee** 282:22 541:12
**employees** 282:20 283:3
**employment** 293:22 295:17
**encourage** 536:13,14
**encouraged** 309:22
**endured** 531:18
**enduring** 540:21
**engage** 328:4
**engaged** 520:14
**engaging** 442:23
**english** 306:1
**enrolled** 311:14
**ensure** 309:18 374:12,18 488:25 496:22
**entail** 329:14
**enter** 279:11
**entered** 279:18 324:14 494:16 542:24
**entering** 324:16
**entertain** 350:25
**entertained** 447:5
**entire** 285:21 285:23 391:2 392:12,19 393:1,5 426:12 447:12 477:20 500:1
**entirely** 292:23 381:20
**entries** 494:19
**entry** 494:15,17
**environment** 312:4 346:5 349:14 445:14 445:20,21 446:3,19,20
447:19 448:4,7 448:19 450:18 460:9 492:2 500:10,11 522:1
**err** 487:18
**error** 372:5
**escalating** 490:11 507:21
**especially** 286:25 325:17 526:16
**esq** 273:16 274:6 541:6
**essentially** 340:8 416:6 487:15
**establish** 389:17 471:11
**established** 430:5,8 435:9 435:12 472:5 473:21 474:2
**establishing** 278:23 431:15 471:20
**estimate** 317:2 538:1,3
**estimated** 537:7
**estimating** 535:11
**evaluate** 306:20 349:21

**evaluation** 347:1,9 489:8 489:13
**evening** 523:9
**events** 472:11
**eventually** 438:3
**everybody** 367:6 423:17 486:25 540:23
**everybody's** 475:9
**evidence** 278:15,17 280:23 284:25 287:7 288:5 289:24 293:24 294:19 301:19 304:19 325:23 329:19 345:10 351:15 359:16 364:20 374:23 375:6,16,17,17 376:23 377:16 378:19 379:19 379:24 380:1 380:13,18,24 381:2,3 382:2 384:16,19,20 385:6 386:8,11 401:25 412:12 413:11,14 414:11 415:12 415:14,19,22 417:14 418:5 419:9 421:6 426:6,11,12,15 426:18 428:23 429:1,1,10,19 429:20 431:8 431:20,24 435:21 436:20 437:23 453:1,6 453:7,16,19 456:18 461:4 463:25 465:1 495:9,14 498:8 515:22 516:8 516:17 535:7 542:24
**exact** 286:5 389:17 451:10 535:19
**exactly** 291:19 295:15 307:10 308:8 309:5 344:17 428:7 430:24 431:17 461:3 469:11 469:25 472:15 472:16 502:15
**exam** 452:11
**examination** 304:13 366:5 367:8,9,11,16 367:22 381:15 382:16 384:12 393:7 419:16 420:3 429:3,21 429:24 431:21 439:24 441:20 443:5 444:7,13 444:16 445:6 451:1 471:9 482:20 483:16 484:4 486:18 528:21 529:4 529:14,21 530:24 531:10 531:22 533:24 537:16 540:19 542:3,3,4
**examine** 302:17 303:6 378:3 443:19 529:17 533:4
**examined** 304:3 376:12 487:5 514:3
**examiner's** 393:7
**examining** 431:19 464:3 514:7
**example** 324:10 355:15 375:11 471:7 501:11
**exasperates** 334:23
**exceeded** 508:9
**except** 475:17
**exception** 384:10
**excerpt** 464:15
**exchange** 337:3
**exclude** 375:5
**excluded** 377:16
**excuse** 277:9,9 310:22 530:3 538:16
**exh** 542:7,7,8,8 542:9,9,10,10 542:11,11,12 542:12,13,13 542:14,14,15 542:15,16,16 542:17,17,18 542:21,21,22 542:22,23
**exhibit** 277:18 279:5 296:15 297:24 298:17 299:11 300:1 300:18 302:2 304:19 325:24 334:22 338:15 364:20 367:14 368:25 369:8 369:20,20 371:1 372:11 372:12,25 373:3,9,10,10 373:11,12,19

374:9 378:12 380:3,11,12 383:19 384:9 384:15 385:1,8 385:17 390:3 391:2,2 393:3 393:9,20,23,25 398:1 403:10 410:10,15,20 412:8 413:19 421:22 426:17 427:17 432:21 435:2 451:12 453:23 454:1 463:24,24 464:23 467:2 485:2 487:24 495:2 508:6 513:2,2,3 515:21 523:16 523:23 542:24
**exhibits** 276:1 276:6,24 277:4 277:13,16,24 278:1,5,10,16 278:22,24,25 279:8,11 281:2 281:4,23 282:3 284:13,13 289:17 290:4 294:4 295:13 297:1,1 368:22 371:4 383:6 386:7,15 387:1 387:5 390:13 410:25 432:9 435:20 438:2 443:19 444:6 464:7 476:7 478:15 481:10 483:22,24 484:1 486:24 491:22 494:21 530:22 534:5 542:6,20,25
**exist** 375:14
**exists** 493:13 493:18 494:1 494:11 495:5
**expect** 282:5 537:22 539:1
**expectation** 278:8,8
**expected** 278:11 330:20 349:1
**expelled** 503:25
**experience** 318:20 339:22 349:18 374:25 450:4
**expert** 387:16
**expertise** 387:17
**expires** 541:22
**explain** 287:10 302:23 303:4 317:7 327:22 329:25 330:23 420:2 435:21 437:19 495:18 496:11 526:18
**explained** 302:25 333:12 402:16 405:13 427:11 428:11 474:2
**explaining** 334:7
**explains** 435:24
**explanation** 346:6
**explicit** 346:21
**explore** 316:8 316:25 344:4
**explored** 358:8
**exposing** 309:10
**express** 396:8 396:22
**expressed** 332:13 454:14 488:24 507:18
**extend** 278:13
**extended** 278:6 281:16 353:3
**extending** 328:7 333:3
**extensive** 367:10
**extra** 490:12 528:19,19
**extremely** 424:18

**f**

**face** 325:21,21
**fact** 294:18 296:14 334:21 481:5
**facts** 280:5 329:17 333:20 436:1 456:19 456:22 483:19 527:18,21
**factual** 280:14
**failure** 278:10 335:5 346:2 412:14 418:23 437:1,10
**failures** 347:2
**fair** 280:18 287:25 289:23 385:7 388:8 415:10 418:12 420:8,14 439:21 440:5 475:2 476:22 477:7 478:12 478:25 479:12 479:15 480:11 482:13,24 484:18,20 485:15 487:1 528:25 531:14 532:16,17

**fairfield** 305:14
**fairness** 487:14 508:8
**faith** 278:7 432:5
**fall** 308:23 322:2,15,25 323:13 328:11
**false** 369:16 372:17
**familiar** 307:17 307:21
**family** 302:16 313:2 315:3 317:7 322:4,13 322:16 328:4 331:11 334:7 336:1,4 489:5 539:1
**fape** 441:10
**far** 284:16,24 285:10 286:19 287:1 379:7 380:16 409:5 429:12 440:18 462:12 483:10 536:24
**fast** 391:13 488:16
**favorable** 462:21
**fear** 323:22
**features** 449:21
**february** 311:1 311:5,15 313:2 316:22 318:16 343:3,4,7 403:19 405:3 407:4 466:14 466:18 468:4 493:14,19,20 495:4 496:11 517:5,11,22 518:2,18 519:19
**feel** 321:7 336:5 337:2 343:22 352:13,18 354:18 358:11 384:21 394:9 401:18 404:10 404:22 405:25 406:22 412:20 415:12,13,21 420:19,19,20 424:11 425:20 429:9 434:8 436:11 437:24 440:1 442:8 449:17 463:18 476:21 477:7 478:3 479:15 479:24 482:3,6 483:8 500:14 531:2
**feeling** 334:24 425:21
**feels** 334:12 396:25 424:15 498:15
**felt** 311:12 316:23 323:7 331:15 342:12 342:13 355:5,7 357:20 362:3 425:13 498:23 498:24 499:20
**ferpa** 301:7,10
**fifteen** 523:16 523:24
**fifth** 307:23 324:13 337:21 359:7 388:24 389:3,14 396:14 397:11 445:13 446:8 447:9,11 448:3 448:5 454:16 454:24
**figure** 313:17
**file** 285:15 300:23 368:21 369:1,3,24 371:4 372:23 373:2,15,17 374:6,9 378:16 380:17,24 384:24 385:15 431:25
**filed** 287:12 289:16 295:24 302:22,25 303:3 530:21
**files** 286:11
**filing** 295:19,21
**final** 293:2,2,8 361:22 363:11 515:20 516:3
**finally** 442:6
**financially** 541:13
**find** 284:17 290:22,23 292:17 296:15 334:10 350:2 385:22 417:5 417:25 421:1 455:7,9 464:23 495:5 534:2,19 535:20 536:25
**fine** 277:5 281:15 394:15 410:3 422:16 443:21,21 486:7 525:21 525:22 535:7 536:6
**finish** 297:12 375:4 376:5 377:14 383:16 416:3,11 427:15 432:12 460:15 475:21 523:4 532:4

**finished** 367:7 462:16 523:2
**finishes** 444:15
**finishing** 359:7
**first** 280:24 284:7 303:12 303:13 304:2 308:11 310:12 317:24 325:13 361:3 367:11 369:17 370:7 383:20 384:13 392:15,20 394:22,24 395:1 402:22 420:4 442:18 451:6,25 457:24 471:2 471:11,13,20 472:5 494:9 501:4 503:2 504:23,23
**firsthand** 514:2
**fit** 365:13 449:18
**five** 345:13 400:9 439:23 455:6 458:5,7 458:8,10,11,14 458:20 459:4 484:2 528:11 528:13,16,24 530:7 533:11
**flight** 538:22
**flying** 538:19
**focus** 448:11 522:16
**focused** 346:22 455:1 501:8 531:24 533:19
**focuses** 344:13
**follow** 327:24 356:14 399:12
**followed** 489:1
**following** 329:7 342:20 343:6 343:24 359:24 407:5 473:1 494:16 510:2 510:16 519:5 519:15 537:19 538:14
**follows** 304:4 335:1
**followup** 495:18 496:12
**footage** 329:4 329:19
**forget** 449:24
**forgive** 392:16 437:21 501:3
**form** 367:19 388:11 541:8
**formal** 308:20 320:14 342:22 358:22 359:4 361:12 368:23 373:23
**former** 282:20 282:22
**forth** 325:15 334:11,13 336:3,17 337:13 373:16 382:7 445:19 446:16 497:18
**forty** 277:9
**forward** 281:11 284:11 286:6,6 316:5 320:17 320:22,25 321:15,22 336:10 341:9 352:22 362:12 405:17 463:17 504:18 506:20
**found** 279:22 291:6 299:3
**foundation** 276:23 301:22 377:17,19 391:10 410:19 473:22 485:2
**foundational** 392:4
**four** 488:2 491:2 528:4 533:11
**fourth** 307:22 308:13,23 309:7 313:11 388:25 397:21 424:13 447:2 462:15 535:15 537:4
**fractures** 484:17
**frankly** 413:18 442:5
**free** 283:15,19 291:3 406:9 409:10 411:3,8 517:8,14 518:5
**freedom** 301:6
**frequency** 522:17
**frequently** 445:10
**friday** 298:18 398:10
**front** 284:19 452:10 464:15 471:25 494:21 494:23 497:23
**fruitful** 334:16
**fruitless** 289:11
**frustrated** 470:12
**frustration** 314:18 460:5 519:2
**fulfilled** 283:18
**full** 277:4,16 278:25 302:16 365:23 369:8

384:9 410:15 453:23 537:2 538:5
**fully** 325:25
**fun** 501:13
**functioning** 324:4 341:20 449:3
**further** 303:11 319:24 324:3 352:13 353:19 361:22 362:11 362:21 366:2 376:22 377:3 416:8 450:16 485:8 541:7,9 541:10,12

**g**

**g** 273:24 377:5 541:3,21
**gather** 319:7 329:3
**gathering** 329:6
**gen** 313:11
**general** 312:6 335:9 438:15 438:19 460:7 461:25,25 469:7 498:21
**generalized** 415:8
**getting** 324:25 389:16 392:9 392:13 397:24 412:22 431:24 434:24 437:19 437:25 440:15 459:2 460:7,11 460:24,25 476:14,22 477:7,16 479:15 481:13 484:18,20 485:14,16 486:21 487:8 487:23 498:9 519:5 534:15
**giannattasio** 282:23 284:24 285:2
**girls** 333:13
**give** 290:10 324:10 327:5 355:15 441:16 526:19 527:23 536:9
**given** 280:19 300:25 317:13 321:18 341:18 349:11 358:15 363:4 365:19 516:8 518:17 519:18 541:10
**giving** 442:6 458:4 482:6 483:9 486:25 506:9
**glad** 428:3 524:25
**go** 275:17 276:21 279:8 279:16 281:5 288:14 292:16 293:5 302:4 326:2 345:18 348:3 357:19 366:5 374:21 376:13,14 381:6 384:11 388:3 391:17 391:23 393:16 393:18,25 394:7,10,17 396:1 420:12 422:2,19 425:11 428:10 432:24 445:3 450:24 472:7 477:1 510:11 528:7,11 533:10,15,25 536:2,7
**goal** 352:8
**goals** 311:8,10 312:5,9 315:15 320:1 337:15 338:11 340:2 340:11 341:5,9 341:12,15 342:15 344:10 347:6 348:10 348:25 358:13 449:20 461:24 462:2 464:13 464:19 520:17
**goes** 279:1 307:18 533:9 535:12
**going** 281:17 286:5 291:16 292:4,17,24 296:6,15 301:12 304:18 310:22 312:15 313:20,22 319:18 322:7 323:23 326:2 334:11,17 335:25 336:3 345:9 348:3 353:13 359:16 364:19 366:12 369:6,7 372:12 373:16,16 379:12 381:18 383:22 384:7 390:12 391:12 392:13 393:10 393:20,21 395:5,7,19,21 398:13 401:15 403:6 405:17 406:19 408:17

413:13 414:7 414:10,14 421:24,25 423:21 427:2,3 428:2,6 429:9 433:6 434:4,16 434:25 435:25 438:4 441:2,8 441:20 443:4 443:15 444:17 445:18,19 446:6,16,18 449:8 451:11 451:23 452:20 453:2 461:9,17 463:5,17 464:23,25 465:3 469:9,10 475:8,17 476:9 478:19,21 479:7,9,9 480:2,3,5,10 481:15 484:13 485:7 487:2 491:10 492:10 497:6 498:12 498:22 500:24 504:18 506:20 506:20,25 508:6,7 509:8 513:1 514:14 515:23 524:12 525:19 526:8 526:22 528:15 528:24 529:18 530:23,25 531:15 532:15 533:10,14 534:2,3,9,12,18 534:20,25 535:2,7,11,14 535:15,21 536:8,22 537:2 537:3,4
**good** 275:15 278:7 304:11 376:12 407:2,4 444:11 449:18 500:9,11 505:21 531:7 540:23
**google** 398:21
**gotten** 417:13
**grabbed** 404:2
**grabbing** 404:4
**grade** 308:13 308:23 309:7 313:11 324:13 337:21 349:16 351:9 359:7 362:5 388:24 388:25 389:3 389:14 396:14 397:11,21 400:9,11 424:7 424:8,13 445:13 446:8 447:2,9,11 448:3,5 454:16 454:25 455:5 459:4 462:15 469:2,3,9,10 491:2
**grader** 307:23
**grades** 306:1
**graduated** 305:12
**great** 305:5 334:2
**greater** 447:7 448:11 522:17
**greenwich** 284:18
**grievance** 438:19
**grievances** 357:21 438:16
**grossly** 419:7
**grounds** 278:6 287:21 475:25
**grow** 440:20
**growth** 358:12
**guarding** 505:1
**guess** 292:24 362:9 373:13 374:6 390:3 427:4 430:10 491:8 501:1 507:13 509:12 509:14 512:7 513:5,6 531:8
**guy** 300:7

**h**

**half** 354:16 533:12
**hallway** 401:4
**hand** 303:24 368:14 379:14 476:5 481:9 501:16 541:14
**handled** 490:4
**hands** 324:18 326:19 330:14
**happen** 319:4 320:5 333:25 361:25 362:4 440:22
**happened** 297:15 327:6 329:8 330:8,10 330:16 332:19 375:21 376:9 376:21 405:5 424:5 433:19 438:5 488:4 490:18,18 505:11 507:8 508:18 522:5,6 525:21
**happening** 321:19 327:22 328:8 330:1 345:20 356:9 405:18,24

406:3 413:4 441:1 457:9 490:11 500:6
**happens** 281:19 301:13 327:25
**happy** 391:23 526:10
**harborside** 344:19,20 358:10,14,16 358:19,21 361:19 363:20 363:23 364:4,8 365:12 448:4,7 448:9,13,20,25 449:12,18
**hard** 324:15 334:10 337:10 519:5 536:22
**harm** 326:21 327:7 518:25
**hartford** 541:1
**he'll** 537:8 538:4
**head** 494:5
**header** 294:23
**headers** 294:12 299:7
**heading** 294:12
**heads** 536:9
**health** 489:8,13 490:5 507:17
**hear** 281:7 293:6 377:20 382:25
**heard** 356:21 378:16 381:5 404:7 503:11 503:13,17 504:6 509:14 529:12
**hearing** 273:3 273:16 275:3,4 275:7,9,11,13 275:25 276:5 276:13,16,25 277:3,7,15,23 278:18,21 279:1,6,13,16 279:19,24 280:16 281:6 281:12,23,24 282:8,12 283:13,14 284:1,4,6,21 285:13,14 287:14,19 288:1,12,16 290:1,5,11,14 290:20 291:14 292:3 293:6 295:15,23 296:3,8 297:8 297:11,14,18 297:19,20,21 297:23 298:2,5 298:8,24 299:2 299:9,15,19,21 300:5 301:12 302:4,16,19,22 303:8,10,19,23 304:3,6,10 313:20,25 360:13,14,16 361:1 366:4,12 366:15,18,21 367:6,15,18 368:12,18,24 369:12,17,22 370:3,7,17,21 370:23 371:10 371:14,19,23 372:3,9,10,12 372:20,24 373:4,6,12,18 373:22 374:1,4 374:25 375:1,2 375:3,4,5 376:5 377:13 377:14 378:5 378:24 379:7 380:4,17,22 381:4,6,11 382:3,4,6,22,24 383:3,5,16,18 383:22 384:22 385:20,24 386:14 387:10 387:14 390:15 391:8,25 392:3 392:11,17,22 393:10 394:12 395:9,15,18 396:19 401:12 401:15,16,20 402:11 403:1 404:19 406:12 406:17,20 407:16,18,22 408:2,6,8,11,15 408:16,18 409:2,14,22 410:1,9,15,22 410:25 411:13 411:17,20,24 412:3,5,11,17 413:8,12,14,18 414:4,6,8,13,17 414:21,24 415:2,8,11,15 415:18,25 416:2,4,14,21 416:25 417:1,2 417:7,11,13,18 417:22,24 418:1,6,8,10,12 418:15,17,19 419:2,4,7,7,12 419:14,15,20 419:22,24 420:4,5,7,10,13 420:15,18,24 421:9,11 426:9 426:19,23

427:12,14,16
427:25 428:16
428:24 429:5
429:11,13,22
430:1,3,4,6,8
430:14,18,23
431:1,10 432:7
432:12,14,24
433:4 434:3,14
434:18,20,21
435:2,6,11,23
436:1,4,8,13,17
436:18,19,25
437:5,7,14,16
437:20 438:9
438:15 439:1,3
439:5,7,9,11,15
439:22,23
441:3,7,25
442:3,9,21,23
442:25 443:1
443:18 444:5,8
444:9,12,15,18
444:20 445:1
446:9 447:23
449:7 450:19
450:22,24
452:1,12,14,18
453:2,8,11,17
453:19,22
456:22 457:15
457:21,23
458:16 460:12
460:15 461:15
463:11,14,23
464:2,6 465:2
467:1,8,11,17
469:19 470:20
470:25 471:6
471:10,16,19
471:25 472:4,9
473:18 474:1
474:22 475:11
475:14,21
476:8,10,13,15
476:17,18,21
476:22,24
477:1,4,6,8,9
477:14,19,20
478:24 479:1,6
479:11,12,14
479:16 480:13
480:17,20,23
481:1,3,12,19
481:24 482:7,9
482:14,19
483:10,18
484:5,8,18,19
484:20,21
485:1,20,23
486:2,8,15,17
487:10 488:6
489:23 491:15
491:21 492:3,8
492:10,13,17
492:20,23
493:2,7,9
494:3 495:1,7
495:11,13,24
497:11 499:12
503:23 505:6
505:10 506:6,8
506:23 508:8
508:14 509:6,9
509:12,16
510:22 511:17
511:20 512:5
512:12,14,18
512:21 513:20
513:23,25
514:20,23
515:6,8,11,13
515:24 516:18
520:6,25
521:15 523:1,4
525:10,19
526:2,4 527:2
527:8,18,21
528:1,5,6,8,10
529:11,13,22
531:15 532:4,6
532:6,23
533:17,21,22
533:25 535:3,6
536:6 537:1,7
537:13,14,14
537:18,20,21
537:24 538:1,8
538:8,9,10,14
538:17,19,23
539:3,11,14,19
539:22,24
540:2,7,13,14
540:18 541:5,6
542:24

**hearings** 276:7 302:5 374:24

**hears** 404:5

**hearsay** 285:9 286:25 287:5 294:21 300:11

**hearts** 450:5

**held** 273:15 295:23 321:6 344:19 351:8 353:18 364:14 513:4 541:6

**help** 309:12 325:5 330:5 397:7 438:22 438:24 440:7 440:20 459:3 460:22 496:19 500:16,22

**helpful** 391:19

**helping** 337:16 441:1

**herbert** 274:6

**herbie** 275:15

**hereto** 541:12

**hey** 446:6 499:3

**hi** 275:15

**high** 427:13 449:3

**highlight** 394:5 394:7 465:20 467:24
**highlighted** 391:19 394:3 397:13
**highlighting** 391:21 394:13
**highlights** 391:13 393:15 393:17 427:5,8 427:10
**highly** 298:1
**hindering** 335:6
**hired** 298:11 302:1
**hit** 333:12
**hold** 276:2 282:14 305:25 398:25 438:25 445:25 452:23 452:24 454:9 456:8 458:3,21 510:19,21 511:4,15 512:1 512:11,22,23 513:11 516:24
**holding** 339:17 535:19
**hole** 507:10
**holes** 527:16
**home** 326:7,11 326:15,18,22 326:24 329:23 330:2 331:6 332:1,5 363:19 363:23 407:6 425:11 428:10 444:19 445:2
**honest** 527:17 528:17
**honestly** 455:2 538:11
**hope** 330:4,4 332:21 358:3 361:3 381:14 454:16
**hoped** 321:16 339:10
**hopeful** 327:21 537:12
**hopefully** 533:8 536:7,15
**hoping** 327:9 330:8,15 447:2
**hour** 529:18 531:21 532:8 532:14,15,20 533:9,12,17,17 533:23 538:15 540:19
**hours** 315:23 415:3 480:22 484:7,24 485:9 485:17 529:15 530:21 533:11 534:22 535:25 537:19
**hrosen** 274:7
**huh** 395:13 420:5 422:21 494:10
**hundred** 476:12 516:22
**husband** 371:23
**hypothetical** 387:10,15 503:20,21
**hypotheticals** 436:5

**i**

**idea** 318:8 319:11 390:15 495:15
**identification** 277:20 412:9 432:22 454:2
**identify** 275:11 275:13 304:6 431:11 489:9 489:15
**iep** 308:1 311:11,21 312:17 313:14 315:6,14,20 318:7 320:2 322:21 332:7 332:10,14,15 338:16 340:2 343:8,11 344:9 346:14 348:15 349:2 350:5,6 351:24 353:14 354:9 355:24 357:3,11,24 364:21,23 374:12,13 387:19,19,21 387:23 388:4 388:12,15 406:11 408:14 408:18,25 409:2,5,6,7,11 409:12 410:1,5 410:7 411:5 414:19,21,24 416:6 418:19 418:24 419:3 421:5 437:1,3 437:4,8,9,12 438:11,20,20 438:20,24 439:3,7,11 440:6,11,18,19 441:2,5,10 446:24 447:13 449:20 450:6 454:19,23 456:9,10 468:13 500:18 501:20 507:24 517:5,12 518:3 542:21,21,22

542:22
**ieps** 406:9
**ignored** 294:16 295:7 301:11 536:21
**immediate** 349:23 511:5
**immediately** 295:25 405:16 508:25 509:15 509:15 510:2 510:15,19 512:1 519:15
**impacted** 348:16
**impeach** 370:18 378:19 379:12,23 380:13 384:16
**impeaches** 369:14
**impeachment** 378:7,8
**impede** 386:2
**impeding** 337:6 337:8
**implement** 409:12 412:14 418:23 437:1 437:10
**implementati...** 343:8 410:2 437:9
**implemented** 306:25 410:5 438:12 508:10
**implementing** 414:24
**implication** 432:15 436:9 436:10
**implicitly** 411:20
**importance** 278:3
**important** 284:22 285:12 321:4 370:5 383:3 384:15 385:23 417:16 438:2 452:1 473:12 482:25 502:24 514:11
**impossible** 447:4
**improper** 475:16,19,20 476:3 515:7
**inability** 522:15
**inaccessible** 301:3
**inadequate** 351:18
**inadvertent** 372:5
**inappropriate** 280:9 401:2 404:6 424:14 478:1
**inaudible** 303:18 360:13
**incidences** 398:12 403:17 405:18,23 406:3 413:3 416:17,19 428:5,6,9 496:14,19 497:3,6
**incident** 291:11 324:17 330:11 397:14 399:7 399:10,13,17 399:20 400:5 401:22 402:1,5 403:5,7,9,21 404:8,11,14,24 405:4 407:13 414:1 423:22 488:4,5 489:19 493:19,20 494:13 495:4,6 496:3 498:6 506:13
**incidents** 291:11,18 308:24 309:4,6 309:7 310:18 325:1 328:22
333:19 334:9 336:1 496:6
**inclined** 286:14 286:15 287:20 301:20
**include** 307:3 484:3
**included** 281:5 362:8 373:19
**includes** 330:19 374:6 462:10 531:22
**including** 283:7 313:15 316:1 334:4 351:16 376:19 503:7
**inclusion** 369:8 374:9 377:24 381:24 410:20
**increase** 321:17 466:6,20 468:4 472:22 474:16 525:2
**increased** 460:4 518:21 519:23 522:14 522:22
**increases** 474:14
**increasing** 468:10 500:5
**increasingly** 468:5,11,12,23 520:12

**index** 277:21 412:9 432:22 454:2 542:1
**indicate** 351:24 395:15
**indicated** 323:6 323:24 326:21 331:25 348:11 354:8 502:19
**indicates** 375:18 464:18 473:10
**individualized** 307:25 311:1
**inexcusable** 424:17
**inferences** 336:16 355:6 355:11,13
**inform** 327:2 379:1 473:4
**informal** 375:7
**information** 301:6 311:24 329:3,6 334:3 356:18 363:20 369:16 383:9 402:24 446:13 465:8
**inherently** 418:15
**initially** 423:12
**initiate** 520:19 521:8
**initiated** 516:6 522:6
**ink** 313:21
**inquire** 275:7
**inquired** 326:6
**inserting** 375:25
**insertion** 378:4
**insight** 362:22
**insist** 331:22
**insisted** 336:21
**instance** 326:20 501:16 535:13
**instances** 324:6 401:24
**instruction** 305:16 415:3
**instructional** 306:10,23 505:17
**insubstantial** 394:13
**integrity** 375:9
**intend** 528:6 538:24
**intended** 313:5 317:8 374:15
**intent** 314:22 323:9 363:25
**intention** 437:22
**intentionally** 524:16
**interact** 291:7 450:3
**interactions** 308:17 461:6
**interest** 510:15 511:25 512:10
**interested** 541:13
**interests** 448:17
**interim** 296:22 298:19
**interjected** 532:21,22
**internet** 412:23 412:24
**interpretation** 289:14 336:15 530:14
**interrupt** 282:15 297:10 392:9 463:9 506:24 514:19 514:21 515:10 515:12 530:15
**interrupted** 416:12,14 433:3 437:19 440:5 506:22 515:3 530:16
**interrupting** 505:9 515:3
**interruption** 381:16
**intertwined** 410:7
**intervene** 508:17
**intervention** 495:19 496:12 496:17 500:17 500:18
**intimidated** 425:20
**introduce** 275:17 276:16 369:9 370:4,10 377:25
**introduced** 370:5
**introducing** 302:7 421:24
**introduction** 377:18 384:8
**investigation** 329:1,16,18 494:16
**invitation** 322:23 333:3 507:19
**invitations** 328:7,9,13
**invite** 315:5 325:16 333:6 398:17 454:17
**invited** 335:22 363:18,24 509:25

**inviting** 339:7 474:10 490:8
**involved** 284:8 289:14,21,24 290:1,19 291:2 291:25 293:18 301:9 308:3,9 308:15,25 324:2 339:24 360:5 430:9 433:22 513:16
**involvement** 283:1 289:11 289:18 290:6 290:16 292:22 293:13
**involves** 299:4
**involving** 289:17 291:12 328:22
**iq** 526:1
**isolated** 504:3
**isolating** 497:7 500:21
**isolation** 516:4
**issue** 283:10,12 283:20 285:20 286:13,15 288:9 289:2 293:15 295:21 297:14 298:15 299:18 357:2 383:21 406:10 410:1,3 416:8 441:11 475:18 499:8,21 500:23 501:16 505:4,5 525:12 525:14 536:11
**issues** 284:21 291:18 348:16 348:19 357:3 389:7,8 397:22 409:24 410:21 441:21 533:7
**items** 450:9,9

**j**

**james** 305:12
**january** 308:12 308:14 337:21 337:22,25 338:16 345:21 352:24 447:14 541:15
**jaws** 404:3 405:10
**jeans** 400:24
**jen** 350:20 359:20,24
**jennifer** 282:19 284:16 286:1 286:14 288:1 288:17 301:8
**jeopardy** 367:19
**jf** 311:14
**jfk** 275:20 288:23 304:9 305:7,8 306:13 306:15 307:9 307:11,12,22 307:24 312:2 312:15 314:7 316:23 317:17 318:1,5,17 320:2,9,15 321:15 322:22 323:9 332:1,5 335:1 359:6 446:7 447:8,12 448:3 530:3,4 542:11
**job** 462:14 505:21 518:9
**joining** 462:15
**jones** 540:12
**judge** 417:1
**july** 288:10 307:12
**jumping** 355:19
**june** 423:24 428:14 455:12 458:4 459:12 465:7,12
**justification** 354:11

**k**

**k** 306:2 445:8 446:14 447:17 448:1 449:10 542:4
**karen** 274:13 275:24,24 303:18,22 371:18,21,25 372:1 424:19 444:14,18,22 445:4,23 446:12 448:24 449:9 450:15 450:21
**katherine** 539:21
**keep** 346:25 347:21 414:10 417:23 418:1 419:19 420:2 420:10 421:2 424:15 437:18 473:12 477:16 502:12 531:24 531:25
**keeping** 302:6
**keeps** 505:9
**kennedy** 273:16 275:4 277:23 279:13 279:24 296:8 297:8,18,20,23

311:14 360:14 378:5 380:4,22 381:4 408:16 427:12,14 428:25 430:14 439:22 475:12 479:13 509:6 525:10 529:11 541:6
**kept** 473:9
**key** 449:21
**kicking** 317:17
**kid** 511:14
**kids** 305:2 450:1 503:18
**kill** 488:13 509:5 510:17 511:3
**kind** 280:20 290:5 319:13 329:10 339:24 353:25 356:9 374:5 387:6 389:6 433:25 436:8 467:6 469:24 496:17 500:20 502:14 502:14 536:22
**kinds** 335:8 397:19
**knew** 319:16
**know** 276:15 277:1 282:6 285:2,7,11,13 285:16 286:2,8 286:21 287:4,6 287:9,10,11,17 289:21,23 291:21,22 292:3,6 294:12 294:20,22,22 295:2,10,11,12 298:25 299:24 300:14,15,24 302:8,21,25 303:4,6 309:5 310:17 312:12 317:22 319:11 326:11 327:20 329:15 330:17 341:25 343:15 354:14 355:3 356:1 366:5,10 366:11 370:11 371:8 378:14 382:8,25 383:11 386:6 387:3 388:17 389:10 390:12 392:6 393:14 397:1 400:12 400:23,25 401:7 402:1,20 402:23 404:13 404:13 405:3 406:1 408:25 410:2 412:5,21 412:22,24 414:25 418:23 419:17 421:6 422:10,19 426:24 427:5 430:16,17 431:20,20,21 431:23 432:9 432:15 433:12 435:15 437:21 438:7,21 439:2 439:22 440:2,8 440:13,23,24 440:25,25 442:9 443:4 447:10 450:14 451:8 453:9,10 453:15,16 457:11 458:6 459:9 462:13 463:18 464:6 464:12 466:14 466:15,22 468:15 470:1 470:20 472:15 473:6,19 474:18 475:9,9 478:1,3,4,4,5,6 478:7,7,8,10,12 478:21,22 479:2,24 480:3 480:5 483:25 484:17,22,23 485:10 486:19 486:22 487:6,7 492:3 494:1,1 494:2,4,4,5 495:8 497:12 499:4 501:5 502:5,10,12,25 504:19 505:1,3 505:6,17 506:9 506:17 509:3,4 510:16 511:10 511:13,14 513:6 514:8,10 514:12,18 515:3,16,21 519:13 520:2 521:25 522:3 525:25 526:15 526:20 527:7 527:10,14,15 527:16 528:4 528:15,17,23 528:24 529:2,4 529:23 530:16 530:18,24 531:3,9,11,18 531:23,24 532:14,15,17 532:19,20,21 532:23 533:1,2 533:3,10,12,14 533:15,15,17 533:22 534:9 534:10,12,13 534:15,15,17 534:19 535:1,8

535:24 536:5 536:10,13,17 536:17,23,24 536:25 537:3,5 539:4,12 540:9 540:15,21
**knowing** 280:2 319:20 534:21
**knowledge** 280:4 292:9 505:15 509:19 514:2 527:11 527:22
**koosa** 288:22 288:24 291:12 399:11,22 407:3 498:1 506:19
**koosa's** 399:2
[redacted]
274:11 275:23 275:23 277:23 278:19 279:13 279:17 281:21 283:1,24 284:5 284:7 286:19 287:18,25 289:13 290:3,9 290:13,18,22 291:6,10,19 293:3,5 294:1 296:8 297:6,10 297:12,18,20 297:23 298:6 298:13 299:6 299:10,20,23 300:8 302:2,20 303:9 309:2,3 315:5 317:16 323:5,10 324:9 330:5,6 331:13 331:18 332:12 333:9,18,24 334:18 336:21 339:3,20 342:12 345:24 346:10,18 347:8,19 348:14 349:11 351:14,21 353:24 355:14 355:17 356:17 356:23 357:20 357:25 361:17 362:2,8 366:8 366:14,17,25 367:9,10,17,24 368:12,20 369:9,11,19,24 370:15,20,23 371:13 372:1,2 372:10,14,22 373:1,5,8,15,20 373:23 374:2 375:1,3 376:4 377:13,17 378:5 381:10 381:12 382:4,8 383:3,15,17 384:13 385:22 385:25 386:1 386:10,13,15 386:18 387:9 387:12,18 390:2,17 391:1 391:7,11,17 392:2,8,13,20 393:1,13,14,24 394:18,20 395:7,13,19,23 396:20 397:23 398:23 401:11 401:14,18,21 402:3,10,12,19 403:3,15 404:18,20 406:11,15,19 406:21 407:4 407:15,17,21 407:23 408:5,9 408:12 410:6 410:13,22 411:15,19,23 412:4,16,18,19 413:7,9,13,16 413:20,22 414:5,7,10,15 414:20,23 415:1,7,10,16 415:20 416:1,3 416:11,23 417:4,9,12,16 417:20,23,25 418:4,7,9,12,17 418:25 419:3,6 419:8,13,18,21 419:23 420:1,6 420:8,13,16,19 421:1,10,12,20 422:6 426:5,8 426:10,22 427:2,8,24 428:2,17,24 429:7,12,16,23 430:2,6,13,20 431:1,17 432:11,13 433:1,6,9 434:2,4,6,13,15 434:19,22 435:4,10,14 436:3,7,10,15 436:18,24 437:3,6,12,15 437:18 438:13 438:18 439:2,4 439:8,13,25 441:6,12,14,23 442:2,8,12,22 442:25 443:2 443:24 444:8 444:11,21,23 444:25 447:21 450:23,25 451:3,19 452:13,15,19

452:21 453:4,9 453:13,18,24 454:4 456:16 456:25 457:4 457:14,16,22 458:1,18 460:10,14,16 461:8,14,16,21 462:25 463:9 463:12,16 464:1,5,8,22 465:3,22 467:5 467:10,16,19 468:1 469:16 469:20,23 470:19,24 471:3,8,14,18 471:24 472:2,7 472:12 473:17 473:21 474:3 474:25 475:7 475:19 476:2,9 476:14,17,20 476:25 477:3,5 477:6,7,12,15 478:25 479:4,9 479:12,15 480:15,18,22 480:25 481:2,4 481:15,22 482:1,8,11,17 482:21 483:12 483:20 484:7 484:10,20,24 485:13,22,24 486:5,19 487:20 488:8 489:22,24 490:1 491:7,12 491:19,25 492:6,9,12,14 492:18,21,25 493:3,6,8,11,12 493:25 494:8 494:22,24 495:3,10,12,16 495:22 496:9 497:10,20 499:15,17 503:21 504:2 504:20 505:5,9 505:16 506:4,7 506:11,22 507:12,14 508:2,6,16 509:8,10,15,20 511:1,18,23 512:4,7,9,13,17 512:19 513:1 513:22,24 514:4,18,21 515:1,7,10,12 515:15 516:1 516:14,16,23 517:19 518:1 520:7,9,22 521:2,12,20 523:2,5,12 524:12,14,24 525:11,13,17 525:24 526:3,5 526:24 527:5 527:12,20,25 528:2,9,14 529:16 530:12 532:3,5,13 533:20,25 535:5,12 536:19 537:25 538:2 539:9,12 539:16,25 540:5,8 542:3

[redacted] 281:2 333:22 354:10 530:1

**koussa** 403:20 403:24

**l**

**l** 377:6

**lack** 292:8 331:15

**laid** 391:11 410:19

**large** 530:25

**latest** 538:24

**latitude** 412:15 487:16

**launch** 523:19

**launching** 441:14

**law** 376:22 377:3,7

**lay** 387:11

**laying** 301:22

**lays** 377:17

**lead** 528:23

**leader** 288:23 290:18 306:10 306:11

**leaders** 501:25

**leadership** 305:17,19,22 306:24

**leading** 507:19 522:18

**learn** 440:20

**learned** 399:13 405:6

**learning** 306:11 348:13 349:13 355:25 440:19,19 488:23

**leave** 329:24

**leaves** 334:24

**led** 490:8

**leeway** 529:24

**left** 288:19 343:16 425:21 487:22 498:16

**legal** 385:9 436:2 437:2 438:10 442:11 442:13 471:7

**legally** 407:19 407:21,23 518:19 519:21
**length** 346:10
**lengthy** 395:11 477:1
**letter** 294:5 295:3 296:20 296:21,23 297:2,25 298:16,20 299:11,12 300:2,19 362:9
**letting** 405:3 415:17
**level** 346:15 348:11 357:22 424:9 448:11 469:2,3,9,10
**levels** 340:10 340:18,21 341:1 347:6 354:6 397:3
**liability** 384:23
**library** 306:2,9
**life** 344:10,13 344:14,18 358:10,13 448:10
**light** 320:17 321:9 334:19 352:11
**lightly** 510:5
**limit** 533:18 540:19
**limited** 276:20 432:18
**line** 279:23 300:14 326:5 370:18 465:18 498:12
**lines** 416:9
**link** 294:9 300:21 369:1 370:1 371:2,2 373:1 374:2,2 378:12 380:2 380:10 513:10
**linked** 371:5 377:22 380:2,5
**list** 276:20 283:5 285:6 296:14 366:10 368:25 369:20 369:20 371:1,1 373:9,10,10,11 380:3 539:8,16
**listed** 282:18 302:13 310:22 311:14 338:20 364:8 365:2,3
**listen** 374:21 376:13 510:20
**listener** 432:15
**listening** 420:25
**litigants** 529:24
**litigation** 374:24 377:11
**little** 313:10 344:15 362:22 382:17 399:18 412:14 422:23 426:13 505:7 533:9
**living** 312:18 387:25
**location** 311:17 358:6 455:23 456:4
**log** 294:10 295:2 494:15 494:17,19
**logical** 335:16 516:9
**logistically** 319:9
**logistics** 303:16
**long** 302:2 366:17,18 406:13 441:7 473:3 528:11 532:3 533:5 535:11 537:16
**longer** 300:9,15 301:9 331:22 459:19 528:6
**look** 290:23 294:6 297:5 313:14 315:2 315:14 318:7 340:2,3 357:22 369:19 393:2,3 454:21 456:9 456:10 460:21 491:6 507:25 526:20 527:3 531:6 532:16
**looked** 497:19
**looking** 290:13 298:15 301:11 312:20 326:14 328:17 329:4 340:10 343:2,9 343:15 349:21 350:16 357:23 359:18 361:8 455:8 540:9
**looks** 326:4 367:6 395:10 409:8 423:19 427:18 453:12 488:17
**loop** 356:10 420:12,22
**loose** 416:13
**lose** 439:20 477:24 478:11
**losing** 439:14
**lost** 406:13 440:4
**lot** 284:20 286:9 292:13 299:4 366:8,8

430:21 443:13 444:2 445:18 460:5 470:9 476:8,13,15,18 477:9 485:13 500:5 523:24 528:9,14,21 529:1 533:7
**lots** 355:6
**lunch** 366:6,19 366:24

**m**

**m** 273:24 304:1 541:21
**macklin** 274:16 275:18
**made** 279:20 284:23 293:22 294:24 297:4 301:3,6 311:8 336:16 345:5 347:22 350:5 355:6,24 363:11 365:8 365:12,22 376:18 407:6 407:24,25 409:16 413:1 424:9,11 425:16 426:20 454:19,21 469:14 475:5 475:11,25 490:19,23 491:12,12 492:6 496:20 505:25 508:24 510:18,20 511:3,18 529:15
**madison** 305:13
**mail** 284:18,25 287:19 289:17 289:24 291:11 294:10,15,16 295:1 296:21 299:7,25 308:18 325:20 326:3,14 328:17 331:24 333:6 334:17 335:19 336:5 336:11,15,21 336:25 337:13 345:7,15,19,20 351:15 359:18 359:25 361:7 361:16 362:1 369:2,18,21 370:9,22,25 372:20,22 373:6 374:6 377:18,23 378:14,17 380:5,7 383:6 385:14,15 388:9,16,18 389:19,23,24 390:23 391:4 392:12,14,19 393:2 394:20 394:23,25 395:3,11,25 396:5,21 398:11,24 399:2,21 401:19 402:2,5 402:6,14,15,17 402:22 403:19 403:23 421:14 421:19 422:7 423:5,5,24,25 425:1 426:3 429:15,19,20 430:9,10,25 431:10,25,25 436:6 445:24 446:5 447:21 451:23 452:7 456:7,17 461:1 461:10 462:6 462:11 463:4 464:10 465:8 466:8,15,19 467:21 494:7 497:16,21 498:2 499:6,25 500:1 501:10 504:17 513:20 513:25 514:25 516:5 518:14 519:25 521:4 524:4,15 525:24 526:1,6 526:12,16 527:4,9 542:8 542:8,9,11,13 542:15
**mailed** 291:17
**mails** 285:1,4,8 286:19,22,24 287:5,15 289:15 290:3,9 290:15 292:1 323:6 326:6 334:11 336:2 337:13 355:17 373:16 386:2 387:13 392:25 395:6,25 427:18 428:1,9 428:12,20,21 430:16,21 431:7 433:12 433:14 434:8 434:10 438:1,8 440:17 466:12 466:24 472:22 496:15 502:17 513:10
**main** 454:10
**maintain** 309:20 473:4

**maintained** 375:7 447:10
**maintaining** 502:8
**majority** 529:18 530:5
**make** 282:21 283:3 284:7 292:11,20 301:8,10 304:25 309:1 313:14 320:8 332:2,5 345:19 358:7 364:5 387:12 390:11 393:8,10 394:9 398:15 408:13 408:23 409:3 416:4,15 422:18 429:19 433:1 438:23 439:5,17,19 440:6,16 450:2 451:20 459:2 464:18 467:9 467:11 476:11 476:12 477:22 477:25 482:11 482:15,24 484:21 487:17 492:14 510:3 513:10 521:21 523:14 527:22 530:6 531:13 531:23 534:18 537:15
**makes** 286:10 366:21 391:23 509:1 511:14
**making** 306:24 308:10 311:25 312:5,8 315:15 315:17 319:25 322:21 335:14 339:24 340:4 342:16 348:10 355:12 375:12 378:6 450:7 453:14 455:2 456:25 464:12 482:17,22 518:24 520:16 525:18
**management** 289:6,6 508:11
**manager** 433:15
**managerial** 291:8
**manifestation** 503:6,16,23
**manipulated** 331:16
**marathon** 531:19
**march** 353:14 353:22 354:15 356:7 357:7,13 367:13 368:2 368:25 369:4 370:2,4,15,24 371:3 373:25 380:6 415:17 448:25 469:25 470:2 488:10 488:11,12,13 488:17,18 493:15 522:12
**mark** 372:24
**marked** 277:20 304:19 353:14 373:18 393:23 393:24 412:8 432:21 454:1
**married** 372:2
**master's** 305:14,15
**mastering** 464:12 520:16
**match** 375:14
**math** 424:7 461:6,7 462:2 462:3,9
**matter** 275:9 289:12 293:25 294:18 296:14 312:15 361:21 377:2 388:2 500:16 525:23 530:20
**matters** 324:21 325:17 328:1 433:24
**matthewson** 316:10,11,12 316:15 318:9 320:10,15 321:12 322:19 323:23 451:5,7 455:14,17,21 456:17 457:2,6 460:3 474:13 490:16 516:7 525:3
**matz** 539:22 540:5,8
**mean** 276:25 280:18 282:14 285:14 286:1,8 287:14 288:2 290:5,11,14 292:3,13 294:24,25 298:12,24,25 299:2,4,15 300:5 301:14 301:15,17,24 302:5 308:22 314:6 315:19 315:20,22 317:23 320:19 338:4 355:16 356:16 369:23 370:21 371:15 371:19 372:14 374:5 382:22

383:8,10 385:18 391:25 394:12 395:10 406:12 409:23 410:13 412:12 413:12,14,18 414:13,24 415:6,9,25 417:13 419:2 419:12 420:10 424:4 427:17 427:21 429:13 431:10,11 432:8,10 434:21 435:3,8 435:16,23 436:13,19 439:3 443:19 445:16 459:8 467:1 471:19 473:2 474:1 475:16 476:8 478:13,24 480:20 481:19 481:20,22 483:11 484:19 485:4 487:10 492:3 495:2,7 495:13,24 497:11 505:11 505:12 506:25 507:3,10 509:16 510:22 511:20 512:17 513:20 521:15 521:17 524:16 525:14 527:3,8 527:18,21 528:8,11 531:16 533:18 535:10 536:7 537:8 539:5,9 539:11

**meaning** 356:17 446:6

**meaningful** 316:2 337:4 346:22 347:20 363:4 377:8

**meaningfully** 354:23

**means** 315:12 315:14 329:4 336:6,12 385:17 514:6 516:21 529:16 541:8

**meant** 315:25 372:18 458:25 517:18,22

**measure** 310:1

**measures** 416:6 506:13

**media** 306:2,9

**meet** 312:21 314:12,14 315:3 319:19 325:20 335:13 335:18 337:18 342:13,13 346:2,7,8 350:3 353:4 354:14 364:6 398:17,21 448:21 455:16 459:17 465:25

**meeting** 288:25 308:20 311:12 311:21 312:1 313:1,7 315:10 317:4,8,11,15 317:19 318:17 319:4,14 320:5 320:12,19,21 321:12,19,22 322:9,14,17,24 323:1,13,25 324:2 325:17 327:24 328:2,5 328:10 335:2 336:19,19 337:19,24 338:6,13,22,23 339:2,8,10,15 339:18,21 340:7,16 342:7 342:14 346:24 347:17,19 348:9,12 350:1 350:22 351:7 351:10,23,25 352:21,23 353:7,11,18,18 353:23,25 354:16,22 355:2,4,10 356:7,13,16 357:8,9,14,16 359:3,10,13 360:1,3,6 361:25 362:4 362:11 363:6 363:15,24 364:13,22,24 365:18,24 367:13 368:3,5 369:4 370:2,4 370:15,24 371:2,3 373:2 374:2,3,22 375:21 376:1 376:10 379:2,5 380:6,10 382:1 384:24,25 385:3 398:20 398:25 402:21 415:17 446:1 452:23,24 454:10,11 455:18 456:8 458:3,6,21 459:12,15,25 468:25 474:11 490:14 507:16 508:1,24 509:13,18

510:19,21 511:5,15 512:1 512:11 513:4 513:11 516:24 519:15 524:3 525:6 542:15 542:22
**meeting's** 345:25
**meetings** 289:2 307:4 323:17 336:24 338:1 358:25 361:10 374:11,19 375:19 377:7 378:25 383:22 440:14 466:9 466:11,13,22 466:22
**meets** 312:10
**member** 288:24 317:6 323:12
**members** 316:4 318:4 327:16 328:21 329:2 333:10 341:1,4 341:8 350:21 459:18
**memory** 341:17 377:9 422:4
**mental** 489:8 489:13 490:4 507:17
**mention** 483:21 501:18
**mentioned** 284:13 304:22 310:19 314:4 317:1 318:12 319:23 330:17 335:24 336:2 338:22 342:3 347:4 357:16 358:9 389:8 427:16 501:24
**menu** 450:9
**message** 300:23 426:1
**messages** 329:24
**messaging** 322:13
**met** 320:23 346:4 447:12 462:24 468:16 523:8
[redacted]
274:13 275:24 275:24 297:6 303:16,18,20 303:22 357:6 367:13 368:2,8 369:4 371:7,10 371:18,21,25 372:1 378:10 378:21 379:18 380:18 382:15 385:2 407:5 444:14,18,21 444:22 445:4,8 445:23 446:12 446:14 447:17 448:1,24 449:9 449:10 450:15 450:21 481:7 509:24 529:16 542:4
[redacted]
375:24
**mid** 295:18 439:17 518:19 519:20
**middle** 344:6 344:12,19,21 344:23,25 351:12 361:19 363:12,19,23 364:2 448:16 470:2
**milford** 273:10 274:2,5,17 275:8,16,19,22 286:13 287:17 293:11,22 303:14 304:9 304:17,23 305:6 306:5,12 307:17 314:9 335:1 341:20 342:1 344:11 456:5 465:13 540:3 541:5
**milford.org** 396:4
**milforded.org.** 345:16 359:21 395:12 412:1
**mind** 279:23 280:7 422:11
**mining** 507:10
**minor** 512:15
**minute** 290:10 330:12 360:11 397:24 422:8 422:11,13,20 442:1 455:7 482:5 519:9 527:2 534:24
**minutes** 366:22 421:17 456:12 485:21
**mischaracteri...** 478:2
**mischaracteri...** 477:5
**miscommuni...** 445:12 446:6
**misconduct** 516:5,12
**misinterpret** 382:20
**misrepresent...** 334:23 355:8 382:12

**misrepresent...** 355:12,13
**missed** 471:15
**mistake** 382:11
**mistaken** 381:8 381:19 382:11 382:20,21
**mistaking** 381:12
**mister** 443:17
**mistreated** 355:22
**mistreatment** 335:4
**misunderstan...** 445:12 446:5 447:22
**misunderstood** 334:25
**mixed** 483:9 485:16 486:21 486:25
**mom** 358:20 424:1
**moment** 280:25 326:1,3 359:23 510:13 511:11
**monday** 465:12
**monitor** 405:21 409:19 504:19
**monitored** 407:9 409:17 413:3,25
**monitoring** 406:5 504:11
**monologuing** 531:23
**monroe** 384:2
**month** 354:16
**months** 302:1 343:16 382:25
**morning** 275:15 304:11 538:25
**moses** 274:3
**mother** 275:24 425:17 481:7 539:4
**motion** 276:16 286:11 303:1 442:19
**motions** 302:22 302:24
**mouth** 334:1 508:3
**move** 279:2,11 280:22 281:11 288:4 320:25 356:13,15 362:12 414:14 415:15 416:10 417:3,8,15 419:16,18,20 420:12,15,15 421:7,8,9 437:16 473:19 507:11,13 511:22 513:17 514:16 515:17 516:6 518:22 519:24 530:11 532:10
**moved** 318:5 540:4
**moving** 284:11 316:5 320:17 321:15,22 336:10 341:9 352:22 388:21 517:4
**mp3** 378:16
**multiple** 310:17 361:9 363:4 403:8,16 496:5 529:25
**muted** 303:21 360:15

**n**

**n** 274:1 377:5
**n.p.** 541:21
**nadine** 274:16 275:17
**name** 275:4 286:2,8 299:8 372:1 449:25
**named** 307:18
**nature** 287:22 301:23 392:4
**necessarily** 290:14 291:14 301:19 438:9 448:6 462:4 535:4 540:13
**necessary** 283:2 302:10 335:5 361:22 362:3,12 374:18 378:4 454:18 510:23 520:11 521:4 530:17
**need** 285:5,11 286:5 287:23 288:7 290:15 301:25 312:22 319:24 321:16 349:12 350:2 351:11 358:12 379:24 380:17 422:16 425:3 431:19,23 443:14,19 444:6,20 445:16 453:15 454:22,23 460:20 464:1 472:8 479:4 481:15 482:1 483:20 484:12 484:13 485:23 486:3,5 487:2 487:20 490:19 507:23 514:7,9 515:15,16

518:22 519:24 526:21 528:19 531:12 532:13 534:2,4,5 536:7 537:4,8
**needed** 314:23 318:15 327:24 361:25 362:24 454:19 456:10 473:5 485:10 485:11 490:12 525:2 536:16
**needs** 283:9 307:1,3,6 312:19,21 314:13,14 318:18,21,25 319:1 332:23 335:3 340:7 342:13,14 346:3,4,9 347:1,10 348:13 350:1,4 351:18,19,25 353:5 354:14 364:7 365:13 384:15 422:19 425:24 426:1 448:21 455:1 491:13 494:25 507:17 514:3 535:15 537:10
**negative** 334:19 396:10 396:14,15,23 397:1,1
**neighborhood** 344:21,23
**neither** 354:7 541:10
**never** 312:19 390:11,19 410:10,16 411:18 460:10 489:17 491:25 492:21,25 493:3,4 503:24 536:19 540:2
**new** 295:5 300:13,18 301:7 313:25 341:8 360:4 377:3 539:16
**nice** 462:14 518:8
**nine** 488:11
**noise** 276:3 378:6
**noon** 360:18
**normal** 298:4
**north** 538:20
**notation** 475:4
**note** 282:18 302:14 363:10 381:7 394:12 465:25
**noted** 277:20 352:23 372:3 384:10 412:9 432:22 433:14 454:2 460:6 522:12
**notes** 393:23,24
**notice** 283:4 320:20 344:9 360:4 458:5,7 458:8,10,12,14 458:21
**noticed** 410:9
**notices** 365:19
**noticing** 313:9
**notified** 402:4 474:16 489:4,4
**noting** 397:12
**notwithstandi...** 301:21
**november** 326:4 398:10 398:16 496:10
**number** 276:6 279:9 373:12 377:1 412:8 430:12 432:21 454:1 467:21 541:5 542:6,20
**numbers** 277:18 520:15
**nurse's** 309:23 404:9,12,16,23 496:20 497:15 498:19,23 500:21 501:17 502:1 504:3

**o**

**o** 304:1
**o'clock** 366:20 528:4 530:7
**oath** 304:4 376:20 379:14
**object** 276:15 277:25 278:4,9 279:3,25 280:16,17 282:12 289:13 300:11 301:14 369:6,7,11 375:1,3 376:4 377:13 378:5 381:10,12 382:4 410:20 419:21 426:4 426:23 427:4 449:6 452:13 453:20 460:10 460:13 475:3 476:2 480:21 491:10 504:24 505:4 509:7 526:22 530:13 535:16
**objected** 281:25 285:8 286:24 294:20 302:12 370:6 411:21 417:23

418:9 419:11 421:3 433:3 480:16 485:4 502:23 504:16 509:8 530:16
**objecting** 277:10 282:4 374:8 377:20 377:24 409:4 475:10
**objection** 276:19,21,22 276:22 277:25 278:14 279:4 283:6,21 284:16 287:20 288:22 293:9 296:7 297:8,21 349:4,7 368:16 369:12 374:7 384:9 386:9,12 387:8 391:6,8 396:18 401:9 402:9 404:17 406:7,17 407:14 413:5 414:2 426:19 427:6 428:22 434:1,12 452:8 453:15,22 457:13,18 461:13 463:8 466:23 469:17 470:18 473:16 475:23 479:3,6 481:4 489:21 493:5,24 494:20 495:21 497:8 499:10 503:20 506:21 506:25 508:4 511:16 512:2,5 516:13,15 520:5,21 524:10,22 525:20 530:17 531:25 540:16
**objectionable** 292:14
**objections** 276:12 287:21 288:7 292:8 301:23 311:10 384:7 475:24 480:24 481:2 506:23 529:20 530:9 539:23
**objective** 352:9
**objectives** 311:8,10 312:6 315:16 337:15 338:12 340:3 340:11 341:6,9 341:12,15 344:11 347:6 349:1 449:21 461:24 462:3 464:13
**objects** 285:1 478:17 487:17
**obligation** 283:19 466:24 491:11
**observation** 280:5,18
**observations** 360:17
**observed** 281:14 329:21 449:1,3
**observing** 327:10 474:14
**obstructive** 373:24
**obvious** 301:17
**obviously** 297:4 379:10 398:11 536:14
**occur** 447:18
**occurred** 284:22 326:9 327:3 328:19 330:23 333:21 334:8 356:24 377:1 489:8,13
**occurring** 332:11
**october** 273:18 541:6
**offer** 282:25 283:8 285:15 293:24 298:4 301:14 314:19 344:16 352:19 357:11 363:25 484:21 487:18 489:19 490:2 500:19,20,23 501:5,5,18 524:19
**offered** 281:19 316:21 320:21 361:11 426:21 429:6,7,8 501:15 524:17 525:20 526:17
**offering** 328:14 411:21 426:22 431:14 490:7
**offerings** 363:21
**office** 309:1 325:3 404:9 421:16
**officer** 273:16 275:3,5,25 276:5,13,25 277:3,7,15,23 278:18,21 279:13,16,24 280:16 281:12 282:8,12 284:1 284:6 285:14 287:14,19 288:1,12,16 290:1,5,11,14

290:20 291:14
292:3 293:6
295:15,23
296:3,8 297:8
297:11,14,18
297:19,20,21
297:23 298:2,8
298:24 299:9
299:15,19,21
300:5 301:12
302:4,19,22
303:8,10,19,23
304:3,6,10
313:20,25
360:8,13,14,16
361:1 366:4,12
366:15,18,21
367:6,15,18
368:12,18,24
369:12,17,22
370:3,7,17,21
370:23 371:10
371:14,19,23
372:3,9,10,12
372:20,24
373:4,6,12,18
373:22 374:1,4
375:1,2,3,4
376:5 377:13
377:14 378:5
378:24 380:4
380:17,22
381:4,6,11
382:3,4,6,22,24
383:4,5,16,18
383:22 384:22
385:20,24
386:14 387:10
387:14 390:15
391:8,25 392:3
392:11,17,22
393:10 394:12
395:9,15,18
396:19 401:12
401:15,20
402:11 403:1
404:19 406:12
406:17,20
407:16,18,22
408:2,6,8,11,16
409:22 410:9
410:15,23,25
411:13,17,20
411:24 412:3,5
412:11,17
413:8,12,14,18
414:4,6,8,13,17
414:21,24
415:2,8,11,15
415:18,25
416:2,4,15,21
416:25 417:2,7
417:11,13,18
417:22,24
418:1,6,8,10,13
418:15,17,19
419:2,4,7,12,14
419:15,20,22
419:24 420:5,7
420:10,13,15
420:18,24
421:9,11 426:9
426:19,23
427:12,14,16
427:25 428:16
428:25 429:5
429:11,13,22
430:1,3,4,6,8
430:14,18,23
431:2,10 432:7
432:12,14,24
433:4 434:3,14
434:18,20,21
435:2,6,11,23
436:1,4,8,13,17
436:18,19,25
437:5,7,14,16
437:20 438:9
438:15 439:1,3
439:5,7,9,11,15
439:22,23
441:3,7,25
442:3,9,21,23
442:25 443:1
443:18 444:5,8
444:9,12,15,18
445:1 446:9
447:23 449:7
450:19,22,24
452:1,12,14,18
453:2,8,11,17
453:19,22
456:22 457:15
457:21,23
458:16 460:12
460:15 461:15
463:11,14,23
464:2,6 465:2
467:1,8,11,17
469:19 470:20
470:25 471:6
471:10,16,19
471:25 472:4,9
473:18 474:1
474:22 475:11
475:14,21
476:8,10,13,15
476:17,18,21
476:24 477:1,4
477:6,9,14,19
478:24 479:1,6
479:11,13,14
480:13,17,20
480:23 481:1,3
481:12,19,24
482:7,9,14,19
483:10,18
484:5,8,19,21
485:1,20,23
486:2,8,15,17
487:10 488:6
489:23 491:15
491:21 492:3,8
492:10,13,17
492:20,23
493:2,7,9

494:3 495:1,7 495:11,13,24 497:11 499:12 503:23 505:6 505:10 506:6,8 506:23 508:8 508:14 509:6,9 509:12,16 510:22 511:17 511:20 512:5 512:12,14,18 512:21 513:20 513:23,25 514:20,23 515:6,8,11,13 515:24 516:18 520:6,25 521:15 523:1,4 525:10,19 526:2,4 527:2 527:8,18,21 528:1,5,8,10 529:11,13 531:15 532:4,6 532:23 533:17 533:21,25 535:3,6 536:6 537:7,14,21,24 538:1,8,17,19 538:23 539:3 539:11,14,19 539:24 540:2,7 540:13,18 541:6

**officers** 374:25 375:5

**official** 409:4 518:12

**officially** 428:25

**oh** 286:2 296:18 299:19 299:21 302:19 303:22 304:24 322:18 329:17 339:16 343:7,9 367:10 373:22 382:11 398:6 427:2 440:9 452:19 457:21 461:19 465:23 467:10 478:17 483:7 502:21 506:19 516:14 517:19 523:2 523:16,18,18 523:19,21,22 523:22,23 540:2

**okay** 275:3,25 276:5 277:5,7 279:17 281:20 284:7 291:6 296:19,19 297:23 303:17 303:19,23 304:6,10,18,22 305:5,8,23 306:5,14 307:8 307:13,24 308:8,15,21 309:5,14 310:3 310:19,25 311:4 312:23 316:11 317:1,6 318:8,12 319:2 319:11 320:8 322:3 323:10 325:7,22 329:7 330:17 331:10 331:24 333:8 335:24 338:8 338:15,20 339:12 340:13 342:9,21 343:13,21 344:20,23 345:2,9,18 348:7,14 350:9 350:19 351:14 352:11 353:10 353:13 356:15 357:10 359:23 361:3,4,8,16 363:3 364:19 365:2,5 366:2 366:4,25 367:17,25 368:12,20 369:17 373:22 374:1,4 378:16 384:13 385:25 386:6,13,15,16 386:25 387:19 387:22 388:4 388:21,23 389:16 390:2 390:17,20,20 390:21,21,22 390:23 391:2 392:8 394:19 395:18,19,24 396:21 397:8 397:23 398:4,8 398:9,15 399:5 399:11 400:17 400:20 401:21 401:23 403:3,4 403:5,12,12,13 403:14,19 404:21 405:1 406:15,19 407:2 411:22 421:10,11,20 421:24 422:7 422:15 423:20 423:20,20 424:23 426:10 428:24 429:16 429:17 430:6 430:13 433:6,8 434:15 435:10 441:23,23 444:8,11,18 445:23 446:18 449:9 450:25

451:21,22,22 452:15,19 453:22 455:7 455:10 457:2 458:2,11 460:14,23 461:14,16,16 461:17,19,22 462:5 463:2,3 463:16,16 464:5,9,20,22 464:25 465:3,5 465:23 467:16 467:19,19,20 467:21 469:21 469:24 471:18 472:13 474:25 475:1,2 479:21 483:4,17 487:23 488:2 488:23 489:7 489:17 492:21 493:6,13 494:24 495:3,7 495:12,17 497:1 498:9 499:15,16 502:21 503:5 503:13 504:4 507:13 508:14 515:1,17 516:2 518:7,16 520:8 520:10 521:3 523:12,16,19 524:2,4,12 526:3,6 527:25 528:2 533:25 534:21 537:24 539:24

**once** 312:12 442:16 443:17 453:7

**ones** 278:23 279:2 410:11 465:18,19

**ongoing** 301:1 333:2 346:2 347:2 349:12

**onset** 322:24

**open** 336:15 390:7,8 465:3 523:20

**operations** 291:8

**opine** 393:21

**opinion** 311:20 323:20 336:11 337:6 341:24 355:10 407:18 441:16

**opportunities** 363:4 450:10

**opportunity** 302:16 340:20 341:11,18,23 352:20 354:23 358:15 362:21 378:2 392:24 441:15 450:2 452:11 526:25 529:17

**opposed** 309:16 343:25

**opposite** 380:20

**options** 344:4 460:22 468:7

**oral** 441:15

**order** 393:6 438:3 528:3

**ongoing**

**originally** 360:2

**outcome** 541:13

**outline** 399:20 399:23

**outlined** 320:1

**outplacement** 338:6 339:4,9 339:19,23 342:4,5,11,18 343:23 346:20 346:23 347:16 347:23 348:1 349:19,21,24 350:11,15,22 354:12,19 358:1 359:15 411:10 448:16

**outside** 284:3 296:3 320:11 374:14 412:11 475:23 487:7

**overall** 462:9 474:19

**overnight** 466:4

**overrule** 287:20

**oversight** 466:2

**own** 278:2 330:9 443:20 525:9 527:23

**p**

**p** 274:1,1 276:21,21,22 276:22 277:6,6 277:8,8,8,8,8,8 277:9,9,9,9,10 277:10,11,11 277:11,12,13 277:13,13 297:25 298:2 298:17 299:12 300:1 325:24 345:10,11,12 359:17,17 367:14 368:21 368:21 369:8 369:17 371:1,5 372:13 373:1,4 373:5,8,17,19 373:20,21 374:6 377:18 380:9 383:5,7

383:20 384:8,8 385:13,16,18 390:3,21 391:3 393:3,5 398:4 403:10,12 410:10 411:14 413:14 415:18 415:18 417:14 421:25 426:8 426:11,12 432:19 451:13 451:18,20 453:2,22 461:11,18 464:25 465:4 497:22 498:8 498:10
**p.m.** 360:25 366:23 367:4,4 396:3 398:20 444:19 486:13 486:13 540:25
**page** 279:22 326:1 329:7 330:7 331:24 345:13 396:6,7 428:1 430:19 524:17,20 525:7 542:2,6 542:20
**pages** 394:24 427:23 541:4 542:13,21
**paint** 334:19 355:20
**pants** 389:21 399:25 400:6 400:21,25 401:3,4,7,23
**paper** 388:18 394:16 408:19 437:4
**para** 447:6 452:6
**paragraph** 346:18
**paraprofessio...** 315:23 321:17 448:12,22 470:8
**pardon** 410:18
**parent** 277:18 292:18 301:3 321:3 328:25 335:9 338:23 339:1 340:24 341:23 342:10 345:4,11,12 354:8 358:15 358:19 359:12 359:17,20 365:18 374:14 381:21 383:9 383:10 406:1 406:24 412:8 422:1 432:21 466:8,18 468:14,15 469:14 470:1 510:4 523:7 524:6 533:23 542:6,11
**parent's** 325:24 333:22 454:1
**parents** 276:8 282:11 306:21 308:17 310:4 316:1,18 317:10 319:21 320:18,21 321:10,11 322:25 324:4 324:23 325:9 325:13,17 326:4,25 327:2 327:22 328:12 328:20 329:11 332:10,18 333:1 336:3 337:3,18 338:3 338:5,9 339:1 339:17 340:20 341:11,14,18 342:6 346:8 347:14 352:2 352:12,15,20 353:6,19 354:7 354:11,22 356:5 359:1,3 361:11 363:5 365:5 374:10 374:18,21 376:8 377:22 378:3 379:4 384:2 385:11 411:7 424:18 427:18 434:10 438:6 440:12 473:12 474:8 495:20,25 496:13 497:14 499:3 516:11 518:20 519:21 531:9 536:2 537:23 539:7 539:18
**part** 280:3 285:12 289:15 289:20 291:20 297:16 307:2 332:24 333:2 335:19 344:10 349:2 352:21 365:17 369:21 373:20,20 377:18 392:7 395:22 404:2,4 423:7 431:21 442:12 457:24 461:20 465:10 465:17 489:3,6 498:5,8 501:6 501:14 503:5 504:5 513:7 517:9 519:2

529:6 535:10
**participant** 289:7
**participants** 355:4
**participate** 320:22 363:5 367:14 370:16 378:22,22 379:18 380:19 467:13
**participated** 368:2,7,9 378:10
**participating** 369:25 371:7 376:1 385:3
**participation** 316:2 321:3 371:11 375:24 377:9 381:9
**particular** 330:11 404:14 427:21
**particularly** 313:11 333:15 346:12
**parties** 278:4 287:15 369:3 369:21 371:4 536:14 541:11 541:12
**partnership** 306:21 321:2 321:10 327:23 337:10 386:3
**parts** 312:7 347:11 502:19
**party** 279:24 435:14 443:8 479:20 492:18 513:9 533:2
**passage** 464:9
**passed** 360:3
**passing** 427:17
**past** 356:25 446:16
**path** 447:15
**patrick** 273:16 275:4 541:6
**pattern** 287:7,8 351:17 506:16 510:12
**pause** 276:4 290:24 310:24 313:24 360:10 360:25 367:4 422:22 423:1 464:17 486:13
**pausing** 313:23 360:23 367:2 486:11
**pay** 525:21 540:20
**pc** 274:3
**pdf** 294:11
**peer** 520:14
**peers** 502:10
**pen** 313:21 388:17
**penchant** 419:4
**pending** 482:10
**people** 319:7,9 366:18 375:18 376:16 436:13
**percent** 476:12 516:22
**perception** 388:13
**perfect** 505:22
**performance** 340:10,18,22 341:2 346:15 347:6 348:11 351:8 354:6 357:23 463:6
**performing** 338:11 341:20 352:16
**period** 284:3 285:18,19 286:17 292:23 296:4 297:15 349:20 472:10
**permit** 374:14
**permitted** 278:12
**permitting** 374:20
**person** 302:11 336:24 386:21 390:16 398:20 402:7
**person's** 280:6
**personal** 280:4 280:14 292:8 365:21
**personally** 488:25
**personnel** 293:11,17 294:2,3,15 295:6 298:14 300:13,19 301:7
**perspective** 281:7 291:1 320:25 321:1 323:21 334:8 341:19,25 351:4 352:15 356:6,25 361:23
**pertain** 293:23 301:5
**pgs** 542:8
**phone** 325:14 326:6,11 328:15 334:15 346:12 386:20 387:3,4 398:21 424:2
**phones** 360:9
**phonics** 415:3

**phrase** 404:7 521:16
**phrased** 520:25 521:16
**phraseology** 512:16,17 521:19
**physical** 311:17 389:5
**pick** 499:13,15
**picture** 305:2 355:20
**piece** 321:4 339:6 461:4
**pieces** 339:11 355:20
**piecing** 355:19
**place** 273:20 309:12 310:10 312:11 335:16 340:9 349:20 352:24 382:2 454:15 460:19 468:13 496:18 519:15
**placed** 326:7,11
**placement** 288:25 289:1 307:4 311:13 311:21 312:1 312:13,19 313:1,6,16 314:5,15,25 315:17 316:3 316:12,24 317:4,8,11,15 318:17,24 319:3 320:4,9 320:10,11,19 321:18,22 322:7,9,14,17 322:24 324:2 328:4,10 337:24 338:13 338:21 340:15 342:6,23 343:5 343:17,20 348:5 349:16 350:3,25 352:21,25 353:2,7,11 354:21 358:4 358:23,25 361:10,19,25 362:4,13,19 363:6,15 364:10,13,14 365:14,18 446:1,17 447:3 451:5,7 454:18 454:24 456:13 457:12 460:2 466:1 474:7 490:15 508:20 513:13 516:10 516:25 517:6 517:13 518:3 518:17 519:19 520:3,10,11 521:3,25 522:4 522:7,11 525:15 542:22
**placements** 314:13 358:7
**plan** 296:24 300:20 308:1 311:1,8 313:17 315:22 362:5 454:21 472:25 473:1 495:19 496:12,17,20 500:18 501:14 537:17 539:4 539:18
**planned** 351:11
**planning** 288:24 289:1 307:4 308:4 313:1,6 317:4 317:8,11,15 319:3 320:4,11 320:18 321:18 321:21 322:8 322:14,17,23 324:1 328:4,10 337:24 338:12 338:21 340:15 342:6 352:21 352:25 353:7 353:10 354:21 361:10,24 362:3 363:5,14 364:13,23,25 365:17 445:9 445:25 446:2 446:17 535:9
**plans** 309:11
**platform** 505:19
**play** 285:12 357:13
**played** 405:9
**please** 279:15 296:23 297:10 297:12 298:20 300:2 303:15 304:6 335:12 335:17 399:20 402:1 403:22 422:23 437:21 439:8,10,13,13 439:15 442:24 463:9 465:25 476:10 477:16 477:17 489:9 489:15 502:16 514:16,18
**point** 275:10 285:24 292:19 303:16 312:23 321:25 347:14 350:12 363:11 367:15,16 371:14 375:23 383:1 387:12 393:6 414:17

414:18 416:3 416:12,15 426:16 439:6 439:19,25 440:1,6,16 443:22 456:25 467:8,9,11 476:11,12 477:22 494:20 507:10 517:17 521:21 528:3
**pointed** 441:4
**pointing** 462:23
**points** 346:13 355:24 427:13
**poke** 527:16
**policy** 374:10 383:23
**portions** 318:22
**pos** 462:25 463:1
**position** 293:12 305:6 361:21 384:6 467:3 502:9
**positions** 502:11
**positive** 425:24 462:12 470:3 474:18 521:5 521:23 527:14
**possibility** 314:5 315:2 316:5,7 339:23 364:9
**possible** 314:25 318:23 319:22 319:24 329:6 336:1 344:4 358:5 378:8 402:2 405:19 405:21 522:9
**possibly** 504:10
**potential** 291:18 432:10 432:14
**ppt** 290:17 295:23 311:12 312:1 315:13 320:19 321:6 323:13 328:7 332:22 333:3,7 334:15 335:23 337:19 345:6 347:11,17 350:21 351:10 356:14 357:14 357:15 358:24 359:19,25 360:6 361:21 362:11 363:24 364:24 365:23 367:13 368:3 370:1,4 374:11 375:19,21 376:21 377:7 382:1 384:3 452:23,24 458:6 459:1,2 459:24 466:14 468:4 490:8,9 490:14 507:20 508:24 509:13 509:18 510:7,8 510:11,15,19 511:5,15 512:1 512:11,22 513:4 516:6,24 517:5,11 518:2 519:14 520:20 521:9 522:7 524:3 525:6 542:15,22
**ppts** 286:10 288:2,18 376:23 467:13
**practice** 329:15 331:6,7,12
**practicing** 330:20
**pre** 306:2 408:15,18 409:2
**preamble** 504:24
**preceding** 293:20
**predated** 302:9
**predates** 288:13,16
**predetermina...** 318:3
**predetermine** 343:17
**prefer** 281:2 502:6
**prejudice** 302:20 303:9 379:20,25 381:2 385:7 410:23 429:9 435:1 480:11 529:5 531:10 531:11
**prejudiced** 385:6 480:3 486:1 530:20 531:2
**prejudices** 384:19 418:13 482:3 484:16
**prejudicial** 280:12
**premature** 292:20
**premise** 470:21 471:21
**prepared** 342:22 536:3
**preparing** 344:13

**preschool** 314:8
**present** 274:15 275:10,20 286:9,21 307:10 310:20 338:21 340:10 340:17,21 341:1,19,24 347:5 348:11 353:10,17 357:22 368:5 375:19 376:7,8 378:1 429:8 431:6,20 437:24 443:3,3 443:5 537:23
**presentation** 340:16 539:2
**presented** 353:24 369:15 369:15 423:13
**presenting** 337:5 338:11 429:10
**presents** 431:22
**preside** 275:6
**president** 530:3 530:3
**pressure** 460:8
**presumably** 376:8 383:9
**pretty** 281:14 298:12 462:12 487:13
**prevent** 405:23 406:2 410:25 413:3 431:6
**prevented** 346:21 347:15 356:2 414:1 504:10 506:14
**preventing** 381:20
**previous** 294:3 306:6 318:13 341:5 359:25 365:19 449:14 491:1 505:16
**previously** 316:19 333:16 361:18 362:10 376:6 461:1,22 468:2 476:5 490:10 497:17 507:3
**primary** 306:16 346:23
**principal** 275:20 296:22 298:19 304:8 305:7,8 306:13 306:15 307:8 307:11,16,23 324:20 334:4 433:22 434:7 436:15 441:18 499:2 527:6 530:4 542:23
**principal's** 421:16
**prior** 276:2 305:8 306:5 308:15 338:8 361:8 363:14 376:22 378:13 388:23,24,25 389:2,13 396:12 397:10 402:14 426:17 490:17 504:22 542:24
**prioritize** 533:19
**privacy** 496:21 502:13,14
**private** 309:13 309:14,16 404:2,4
**privately** 379:3
**pro** 274:11,13 279:24 435:14 443:8 479:20 513:9 529:23 531:8 533:2
**proactive** 407:12 408:7 409:18 411:3 412:25 504:13 506:13,17
**probably** 286:4 389:21 390:15 443:13 444:2 485:21 487:18 528:19,25 534:16 537:19
**probative** 293:25 377:25
**problem** 288:21 446:9 457:2 475:14 535:10,13
**procedural** 438:11
**procedures** 489:1
**proceed** 282:9 282:16 303:11 304:10 314:1 328:24 361:2 381:14 384:11 444:13,24
**proceeding** 541:11
**proceedings** 292:10 301:2 301:20 346:1 374:19 541:4 541:10
**process** 280:15 281:9 283:12 283:14 284:21 287:12 289:3 293:16 295:19

301:1 347:12 356:14 363:17 374:13,23 379:7 409:14 513:8,18 532:18
**produce** 285:25 300:15,17 466:12,19,24 491:9,11 492:4 492:10,12
**productive** 355:10 386:22
**professional** 305:25 306:7 306:11
**profile** 325:12
**program** 305:20 314:18 316:6,15,17,20 320:15 321:14 344:11,16,17 344:18 350:25 358:10,16,21 363:20,23 448:9,13,20 449:12,16,19 449:22 450:1,5 454:18 455:14 455:17,20 456:3 516:7 518:23 519:25 525:3
**programmatic** 365:13
**programming** 318:7 348:23 353:20 357:4 357:11 364:3,5 445:10 446:2 466:16
**programs** 314:10 343:25 365:11
**progress** 312:5 312:9 320:1 335:6,13,14 338:10 340:3,4 341:5 342:16 342:17 348:10 354:7 438:24 462:8,9 464:12 464:19 474:19 518:12 520:16 521:6
**progressed** 313:8 447:10
**projecting** 497:24
**promised** 347:21
**proof** 282:25 283:8 285:15 379:22 484:22 487:18
**proper** 325:10 385:12 457:25
472:5 475:22
**proposal** 283:6
**propose** 316:7 341:8
**proposed** 282:11,17 320:4 341:15 361:19
**proposes** 491:22
**protocol** 310:14 489:3,6
**prove** 379:9 435:13
**provide** 283:19 296:5 298:9 312:3 335:5 341:4 344:1 347:2,20 362:22 363:20 364:2,4 393:4 398:21 411:8 415:4 434:24 435:7 448:21 450:10 453:9 463:17 476:4 476:19 500:8 500:12,12 517:7,14 518:4 534:3,10 536:9
**provided** 276:23 279:9 283:4 322:21 338:10 348:23
349:8,17 351:16 372:17 376:24 377:19 377:20 380:3 410:5 415:5 432:9 443:18 444:6 463:7 476:6 495:19 495:25 496:13
**providers** 340:17
**providing** 287:1 434:19 448:10 476:16 538:5
**provision** 283:15 289:8 291:2,3 293:14 293:20 406:8 410:4 441:10
**provisions** 441:4
**psychologists** 459:20
**public** 283:16 283:19 291:4 293:11,23 304:17,23 305:6 306:5,12 307:17 309:24 314:9 341:20 342:1 344:12 406:9 409:10 411:4,8 456:6

501:21 517:8 517:15 518:5
**pull** 389:21 399:25 400:21 401:7
**pulled** 401:4
**pulling** 400:25 402:23
**punitive** 310:1 324:25 325:5
**pupil** 293:10,16 294:2,3,15 295:5 298:13 300:13,18 301:7
**pure** 280:3
**purpose** 309:15 315:10,13 317:7 318:6 323:25 327:1 330:2,4 336:19 337:23 338:4 338:23 374:20 429:5,7,22,23 431:15,16,17 432:19 454:10 454:11 456:9 456:15,16
**purposes** 375:12 380:25 388:6
**pursue** 516:10
**pursued** 354:12
**put** 282:25 285:6 287:6 299:8 309:11 353:13 364:19 371:15 383:12 383:15 384:3 386:7,15 388:17 393:16 393:18 404:3 405:9 409:7 431:24 460:8 465:17,20 467:2 482:4 491:23 494:21 494:23 495:14 496:17 502:9 502:21 519:15 527:19 530:19 531:12 535:7 539:7 540:20
**putting** 334:1 383:13 435:21 508:3

**q**

**quash** 286:12
**question** 285:19 286:17 292:23 300:6,8 347:23 367:20 368:1,8,19 371:21 378:10 382:14 385:16 385:21,24 386:14,17 387:11,15 388:14 392:5 392:18,20,23 396:11,18,24 397:20 401:17 402:9,19 403:2 404:17,21 406:7,8,12 407:10,22 408:11 409:20 411:11 412:16 412:17,18 413:20,23 414:2,8 416:23 417:5,8,10,12 417:19,21,25 418:2,3,7 419:9,25 420:18 421:2,4 423:3,23 428:3 428:4,6,18,18 429:18,24 430:6,13,14 431:1,4 432:1 432:25 433:5,7 433:10 434:1 435:10,20,22 436:7 437:2,17 438:1,10,10 440:3 442:4 444:14,23 445:1,3,22 446:11,15 447:24 448:14 448:24 449:8 449:11 452:14 452:20 454:5 455:23 456:24 457:15,19,24 458:17,19 460:20 461:15 461:16 462:20 463:3,8,14,15 465:24 466:5 466:17 468:8 469:19 470:21 471:13,20,21 472:5 473:11 473:23 474:24 476:4 477:23 478:9 479:1,7 479:14 485:21 488:7 492:23 493:2 495:17 495:23 497:9 497:12,13 498:24 499:10 499:18 501:4 502:22 503:2,4 504:2,8,9,14,21 504:25 505:4 506:10,11,15 507:2,5,15 508:5,9,15,23 509:12 510:24 510:25 511:2 511:20,21,22

512:13 514:15 514:17 515:25 515:25 516:2 516:20 517:24 519:9,17 520:24 521:10 521:13 524:10 524:13 526:4,8 527:10 532:24 534:7
**questioning** 387:16 395:5,7 410:16 416:9 417:17
**questions** 292:17 322:6 334:13 336:18 340:21 354:6 354:24 356:12 366:2,9 367:16 378:3 389:16 395:20 398:19 399:3,5 413:16 415:12,20,23 421:5,10 426:25 427:3 435:4,12 436:20 441:9 441:21 442:10 442:14 443:10 450:20 457:3 464:4,6 465:16 465:18 466:24 467:15,17 470:23 471:9 475:5,9,10,15 475:22 476:3 478:22 479:2 480:4,8,10,13 480:24 482:2,9 482:20 483:2 483:14,15,17 484:14 485:6 485:13,18 487:3,4,6 499:13 500:25 501:2 512:19 513:17 514:5 514:24 515:14 528:1,9,15 529:1,3,6,7,8,9 530:2,10 531:24 532:16 533:15,19 536:21
**quickly** 281:21 459:17
**quiet** 325:3 462:18 518:9
**quite** 505:18 538:11
**quote** 323:8 394:14 518:12 518:16 519:7

**r**

**r** 274:1 304:1 367:24 377:5,5 377:5,6 386:1 386:18 387:18 391:1 394:18 395:23 396:20 398:23 402:3 402:12 403:15 404:20 406:21 412:19 413:22 421:12 422:6 428:17 433:9 434:6 451:3 452:21 454:4 457:4 458:1,18 460:16 461:21 464:8 465:22 468:1 469:23 472:12 474:3 488:8 490:1 493:12 494:8 495:16 496:9 497:20 499:17 504:20 507:14 508:16 509:20 511:1,23 512:9 516:1,23 518:1 520:9 521:2,20 523:5 524:14 526:5 542:3
**raise** 276:12 283:6 288:7,22 293:9 303:24 539:22
**raised** 316:4 322:8 328:20 333:1 335:8 357:4 368:13 379:14 493:15 493:21
**ran** 313:21
**rants** 477:2
**rapidly** 532:2
**rather** 309:24 337:15 357:21 402:7 404:12
**reach** 324:21 327:4,21 454:9 497:1 498:25 499:2,3,9,20 510:3 516:24
**reached** 315:4 315:8 321:24 324:8,23 402:19 452:3,4 454:6 458:2 459:15 489:5
**reaches** 289:5
**reaching** 317:3 322:4 323:11 323:12
**reactive** 407:12
**read** 330:13 392:24 393:13 394:20,23,25 395:2,4 422:9 422:9,14 423:6 428:15 433:17 455:24 456:1,2 463:5,20 464:7

464:14 498:12 519:18 526:7 526:19,21
**reading** 426:5 426:25
**ready** 534:25
**real** 276:12 371:12,14 450:3
**realistically** 350:24
**reality** 408:19 409:8
**realize** 321:16 539:20
**really** 279:7,11 285:23 286:13 297:14 298:10 301:25 302:10 309:18 314:21 315:25 354:5 370:10,12 371:10 372:10 372:21 383:12 383:19,20 394:16 403:23 407:19 411:18 414:15,18 417:11,14 418:10,22 430:9 435:7,13 438:16 442:10 448:8 456:23 474:23 475:22 475:25 477:18 482:14 483:10 487:10 497:5 504:1 505:21 507:7,11 512:15,24 515:11,13 521:16 525:14 525:22 528:10
**realm** 305:24 306:7
**reason** 281:4 285:5 294:25 296:9,9 298:9 317:13 319:16 364:22 378:19 380:9,25 381:1 383:11 384:6 384:18 402:4 402:13 405:25 411:9 425:5 442:14 455:15 455:18 457:5 457:17 458:12 470:17 476:1 498:20 506:14 507:8 508:17 514:21 534:6,8
**reasonable** 320:20 406:6 406:24 506:15 510:18 511:4,7 511:8
**reasoning** 310:5 338:25 342:10 347:16 359:11
**reasons** 383:24
**recall** 278:2 308:8 310:16 311:5 322:18 324:17 332:18 337:23 341:14 342:9 345:3 347:25 389:22 400:13 421:19 423:25 431:5 443:20 491:5 510:13 512:24
**recalled** 443:23
**receive** 296:20 305:10,21 360:1 389:18 412:1 421:14 423:4,4,9,10 470:15 473:24 474:4 499:6
**received** 294:9 295:7 299:10 299:12 300:23 305:14 311:18 337:14 345:7 352:12 390:1 396:1 403:19 470:16 491:25 492:22,25 493:4
**receiving** 335:10 345:3 349:5 352:2,5 362:1 389:23 423:25 424:20 432:18 515:18 515:19 516:3
**recent** 326:6 398:18 399:3,5
**recently** 294:16 306:13
**reception** 328:11
**receptive** 317:10,14 322:25 359:3
**recess** 324:17 333:14 360:12
**reciprocate** 278:11
**recollect** 422:4
**recollection** 375:20,22 381:22 509:22
**recommend** 448:15
**recommendat...** 318:9 320:14 342:23 358:22 362:23 365:8 365:22 366:1 447:1 448:8
**recommendat...** 293:19,21

345:5 359:4 446:22,23
**recommended** 365:14
**recommending** 445:14
**reconsider** 302:5
**reconvene** 360:19 366:23 532:8 533:22
**record** 275:3 275:12,14 278:2,19 279:18 280:9,9 280:13 282:18 288:8 301:18 304:7 313:23 360:23 367:2 368:13 370:1 371:25 372:6 374:11 376:11 377:10 387:3 402:8 408:17 409:4 410:12 410:14,24 426:6 428:15 443:2,9 465:14 477:23 482:13 482:24 486:11 486:16 493:3 515:2,3 517:20 519:14 527:23 528:17 536:19 541:9
**recorded** 377:8 379:2,2,3
**recording** 369:10 373:13 374:14,20 375:10,12,14 376:2,13,25 377:16,21 378:4,11,13 379:4,10 381:24 382:1 383:18 384:3 385:9,10,19
**recordings** 375:6,7 378:25
**records** 287:18 294:8 295:6,10 296:11,13 299:4 300:16 300:17 301:4
**recusal** 442:19
**recusals** 303:1
**redirect** 528:12 532:10
**redirected** 331:2
**redirection** 397:17 473:5
**reduced** 541:8
**refer** 294:4
**reference** 399:9 471:4
**referenced** 300:19 346:13 378:11 384:25
**referring** 296:16 309:6 326:12 335:21 338:18 343:7 348:19,20 351:11,21 364:24 370:25 373:9 377:1,4 380:7 392:25 398:13 422:7 495:2 496:3,5 496:8 500:5 502:15 519:3
**reflect** 280:14
**reflected** 333:21
**reflects** 391:15
**refusal** 320:18 323:4 359:14 432:5 470:9 522:16
**refuse** 508:2
**refused** 323:2 328:13,16 359:10 365:18 508:1
**refusing** 323:17 336:23 359:12
**regarding** 277:24 279:21 280:10 295:11 330:14 354:3 359:25 361:21 363:12 371:22 373:24 399:17 415:24 428:20 446:17 472:14 472:20 496:13 496:18 499:7 508:25 511:5 516:25 524:6
**regardless** 381:7
**regards** 289:5 505:1 529:20
**region** 540:4
**regress** 450:17
**regular** 309:17 421:18 425:6 425:12,23 450:11 498:14 499:23
**regulate** 325:6
**regulating** 324:16
**regulation** 374:16
**regulations** 374:16
**reinforcement** 425:24
**reiterate** 346:3
**related** 307:5 441:21 541:11

**relation** 342:15
**relationship** 346:16 348:20
**relative** 541:12
**relaxed** 375:17 492:1
**relevance** 287:22 292:8 294:21 300:25 301:24 386:12 401:9 406:8 407:14,15,17 413:5 427:7 428:23,24 470:24 493:24 493:25 524:22 524:24
**relevant** 278:19 284:12 286:22 287:1 289:11 292:2 293:15 294:17 295:9 295:13,22 296:5,13 298:1 302:10 369:13 401:18,20 407:19,21,23 409:15 410:21 431:11 487:5 502:25 504:1,3 504:16 506:18 525:12,22
**reliable** 376:25
**relies** 311:25
**rely** 520:19 521:8
**remain** 433:23 462:18 518:9
**remainder** 498:17
**remains** 346:23
**remember** 424:20 438:9 532:7
**reminders** 529:25
**removed** 301:2
**repeat** 322:10 457:15 469:2 471:15 472:17 502:18 510:25 517:9,24
**repeated** 503:14,17 504:5
**repeatedly** 337:1 466:9,10 466:21
**repeating** 503:10
**repetitive** 356:8 442:23 477:2
**rephrase** 322:12 327:13 336:8 418:2,4 418:11 470:25 521:1
**rephrased** 414:3 507:4
**rephrasing** 327:19
**replace** 524:17 524:19 526:17
**reply** 521:8
**report** 326:19 327:5 332:3 405:15 425:17 425:20 440:23 460:25
**reported** 291:17,22 327:18 333:11 333:19 389:2,7 389:12,13,24 396:12 399:23 400:4,7,20 404:5 423:22 425:7 428:13 461:11 469:13 470:4,6 490:21 490:24 517:1 518:8 520:13 524:8
**reporter** 273:24 313:23 314:2 345:11 360:23 367:2 375:11 486:11 486:16 541:3
**reporting** 329:10,14 347:13 389:19 421:14 433:18 488:3 516:11 525:5
**reports** 324:24 338:10 389:1,9
**represent** 429:14
**representatives** 363:18,22
**represented** 492:18
**representing** 279:25
**request** 278:16 280:7,13 301:6 301:7,10 323:15 338:22 339:1,9,19 342:3,4,18 347:16 349:14 352:1 353:6 377:15 380:23 399:15 406:6 407:6,24,25 408:1 409:16 413:1 491:8 530:9
**requested** 338:3,6 339:4 339:20 352:3 499:22

**requesting** 296:9 339:2 342:11 411:9 465:8
**requests** 323:11 338:24 357:7 406:23 406:25
**require** 283:8 284:14 343:23 531:1
**required** 302:18 474:6
**requiring** 292:19
**resistance** 339:17
**resources** 314:21 500:13
**respect** 281:6 282:17 283:14 283:23 284:11 289:8,12 310:19 335:24 336:8 347:8 350:19 352:15 358:5,14,22 369:10 441:15 477:17 514:22 539:21
**respectful** 282:2 513:8,18
**respectfully** 278:16 280:7 290:25 377:15 380:23 381:16 439:9,16 477:19 530:9 532:14
**respecting** 514:22
**respond** 277:24 281:21 283:24 284:1 327:9 382:8,9 384:14 428:8,19 433:11 436:5 437:18 440:24 441:24 442:2 482:23,25 530:12,13 539:21
**responded** 399:14 405:2 436:21 467:23
**respondent** 273:11 541:5
**responding** 434:9
**response** 294:1 295:8 327:17 328:23 329:11 331:11 333:8 333:18,23 334:5 335:10 335:12 350:20 351:15 363:9 432:17 433:18 433:20 435:8 455:22 469:1 498:16 506:2 526:9,10,14,16
**responses** 465:19 536:20
**responsibilities** 306:15
**responsibility** 306:16 307:2 393:8
**responsive** 312:18 319:1 501:16
**rest** 459:23 466:4
**restate** 352:17 352:18 457:23
**restitution** 525:15
**restricted** 404:11
**restriction** 530:8
**restrictive** 312:4 445:19 445:20 446:19 446:20 448:19 520:3,4 522:1 525:4,4
**restroom** 405:6 421:18 425:23 498:14 499:23 500:9
**result** 315:19 325:1 474:14
**resulted** 329:18 468:6 507:22
**results** 305:20
**resume** 304:20 304:24
**retained** 542:25
**retaliation** 516:11,19,21
**return** 282:6 366:20 535:17
**revert** 480:6
**review** 308:12 308:16 310:20 311:4,6,7 312:10,11,16 313:3 315:5,9 315:11,13 316:18 318:13 318:15 323:17 323:18 338:2,7 338:8,17 339:6 339:7,9,18 340:9 345:2,6 345:22 346:20 347:17 350:10 351:5 353:8 354:17 362:11 364:22 447:13 454:20 456:11 456:15 493:14 493:18 494:11

494:13 507:25 527:1 542:21
**reviewed** 311:7 326:9 328:19
**reviewing** 345:25 365:10 503:24
**reviews** 542:21
**revise** 315:6,9 315:11,13 364:22 454:20 454:22,23 456:11,15 507:25
**revising** 315:20
**revisit** 348:5
**rewind** 376:14
**right** 276:6,13 277:15 278:18 278:22 279:12 280:16,22 281:19 282:8 283:22 285:14 285:17 288:3 288:14 290:15 291:14 292:15 292:25,25 295:25 296:1 298:2,15,24 299:15 300:5 301:12 302:7 302:19 303:8 303:10,23,24 304:24,25 312:14 313:25 321:6 322:1 332:4 345:12 345:16,22 350:6 359:21 360:9 361:1 363:1,15 366:5 366:15,23 367:7 368:13 368:16 369:6 369:22 370:7 373:21 374:8 377:9 379:14 381:6 382:3,22 383:2 385:20 387:7 390:17 392:22 394:10 396:8 398:6 400:17 408:3,8 409:22 411:2 412:3,15 413:16 415:20 416:21 417:22 419:20 420:9 420:21 423:9 425:17 426:19 426:20 428:16 430:4,23 433:4 437:12,15 438:5 439:1 441:25 442:5 445:4 448:24 450:22,24 452:23 453:11 453:24 455:5 456:16 457:1 459:15,16 462:25 463:2,3 464:2,20 467:15 469:20 474:22 479:21 479:24 480:17 480:17 481:15 482:21,21 486:2,3,4,8,15 486:17 487:9 488:6 491:25 492:9,25 493:3 494:4 495:1,14 498:3 505:12 506:11 507:20 508:7,12 509:15 510:8 513:1 514:25 515:15,24 518:16 525:8 527:12 528:1 529:8,18 530:13 531:8 531:15 532:12 533:21 534:23 535:3 537:21 538:1 539:3,19 540:3,8,18,22
**rights** 408:21 408:22 515:8,9
**rigid** 375:8
**rip** 524:17
**ripped** 524:9 524:21 525:7
**risk** 489:7,12
**rizzo** 275:20 303:15,24 304:8,8,11,13 360:21 361:3,5 367:8,22,25 371:8,13,21 372:8 375:21 376:2,19 378:1 378:8 380:20 381:8,18 382:17 386:2 386:17 387:19 391:3 392:23 392:24 393:12 395:14,17,24 398:17,24 399:14 402:13 403:7,17 404:10,22 406:22 407:10 409:20 411:11 411:24 412:2 412:20 413:23 415:1 416:16 421:13 427:25 428:4,8,19 429:18,25 430:15 431:5,8 432:2 433:10 441:17 443:11

443:11,15 444:14 445:6 449:13 451:1,4 452:4,14 453:12,18 454:5 458:2 465:5,15 472:1 472:13 475:4 475:11 478:15 479:4 485:9,11 486:20 487:23 488:9 494:6 496:2 497:16 498:17 504:22 505:14 508:13 509:18 510:25 513:5 516:21 524:15 526:8 529:15 530:2 530:11 533:5 533:24 540:20 542:2,9,13,23

**rizzo's** 367:12 369:14 415:24

[redacted] 273:8 274:10 275:8,23,24 288:25 289:9 307:18,19,21 307:22,25 308:4,10,17,23 309:8,12,19,20 310:14 311:8,9 311:17,21 312:5,15 313:8 314:7,16,17 316:5,17 317:17 318:1,4 318:14,16 319:25,25 320:9,15 321:4 321:14,15 323:8 324:4,14 324:18,25 325:2,11 326:17,21 327:10,21 328:5,22 329:24 330:2,5 330:8,15,18,21 330:25 331:6 331:11,14,15 331:20,23,25 332:5,6,14 333:12,12,15 334:1,19 335:2 336:10 337:4 337:15,16,21 338:10 340:17 340:21 341:1,5 341:9,12,16,19 341:25 342:13 342:14,15,22 343:22 344:6,9 344:25 346:2,9 346:15,22,25 347:22 348:10 348:15,23 349:1,5,8,11 350:23,25 351:8,12,18,24 352:2,5,8,16 353:20 354:3 354:19 355:22 355:25 356:2 357:4,22 358:4 358:6,11,20 359:5 361:12 362:5,10 363:12,19 364:3 365:10 387:19 388:25 389:19 399:23 400:5,5,9,17,18 401:22 403:25 404:5,13,22 405:4,10,12,21 407:6 409:9 421:15 424:1,2 424:7,8,10 425:4,7,12,21 440:10 445:9 445:15 446:1,6 446:17,24 447:10 448:2 448:17 449:2 449:18,20 450:7,7 454:13 454:16 455:1 455:12 457:6,9 459:3,25,25 460:1,4,22,23 460:25 461:22 462:2,13,14 466:2,7 468:7 468:15,20 469:25 470:6 472:25 474:5 488:3,5,13,21 490:12,22 496:19,20 498:13,18 499:4,22 500:7 500:11,20,23 501:5,5,6,19 502:6 503:3,13 507:17,24 510:14,20 511:2,24,25 512:10 513:12 516:6 517:4,11 518:2,8,21 519:22 520:13 524:16 525:25 526:11 541:5

**robert** 273:24 274:11 275:23 275:23 277:23 278:19 279:13 279:17 281:21 283:24 284:5,7 286:19 287:18 287:25 289:13 290:3,9,13,18 290:22 291:6 291:10,19 293:3,5 294:1

| | | | |
|---|---|---|---|
| 296:8 297:10 | 406:11,15,19 | 436:18,24 | 478:25 479:4,9 |
| 297:12,18,20 | 407:15,17,21 | 437:3,6,12,15 | 479:12,15 |
| 297:23 298:6 | 407:23 408:5,9 | 437:18 438:13 | 480:15,18,22 |
| 298:13 299:6 | 408:12 410:6 | 438:18 439:2,4 | 480:25 481:2,4 |
| 299:10,20,23 | 410:13,22 | 439:8,13,25 | 481:15,22 |
| 300:8 302:2,20 | 411:15,19,23 | 441:6,12,23 | 482:1,8,11,17 |
| 303:9 366:8,14 | 412:4,16,18 | 442:2,8,12,22 | 482:21 483:12 |
| 366:17,25 | 413:7,9,13,16 | 442:25 443:2 | 483:20 484:7 |
| 367:10,17 | 413:20 414:5,7 | 443:24 444:8 | 484:10,20,24 |
| 368:12,20 | 414:10,15,20 | 444:11,21,25 | 485:13,22,24 |
| 369:11,19,24 | 414:23 415:1,7 | 450:23,25 | 486:5,19 |
| 370:15,20,23 | 415:10,16,20 | 451:19 452:13 | 487:20 489:22 |
| 371:13 372:10 | 416:1,3,11,23 | 452:15,19 | 489:24 491:7 |
| 372:14,22 | 417:4,9,12,16 | 453:4,9,13,18 | 491:12,19,25 |
| 373:1,5,8,15,20 | 417:20,23,25 | 453:24 456:16 | 492:6,9,12,14 |
| 373:23 374:2 | 418:4,7,9,12,17 | 456:25 457:14 | 492:18,21,25 |
| 375:1,3 376:4 | 418:25 419:3,6 | 457:16,22 | 493:3,6,8,11,25 |
| 377:13 378:5 | 419:8,13,18,21 | 460:10,14 | 494:24 495:3 |
| 381:10,12 | 419:23 420:1,6 | 461:8,14,16 | 495:10,12,22 |
| 382:4,8 383:3 | 420:8,13,16,19 | 462:25 463:9 | 497:10 499:15 |
| 383:15,17 | 421:1,10,20 | 463:12,16 | 503:21 504:2 |
| 384:13 385:22 | 424:19 426:8 | 464:1,5,22 | 505:5,9 506:4 |
| 385:25 386:10 | 426:10,22 | 465:3 467:5,10 | 506:7,11,22 |
| 386:13,15 | 427:2,8,24 | 467:16,19 | 507:12 508:2,6 |
| 387:9,12 390:2 | 428:2,24 429:7 | 469:16,20 | 509:8,10,15 |
| 390:17 391:7 | 429:12,16,23 | 470:19,24 | 511:18 512:4,7 |
| 391:17 392:2,8 | 430:2,6,13,20 | 471:3,8,14,18 | 512:13,17,19 |
| 392:13,20 | 431:1,17 | 471:24 472:2,7 | 513:1,22,24 |
| 393:1,14,24 | 432:11,13 | 473:17,21 | 514:4,18,21 |
| 395:7,13,19 | 433:1,6 434:2 | 474:25 475:7 | 515:1,7,10,12 |
| 397:23 401:11 | 434:4,13,15,19 | 475:19 476:2,9 | 515:15 516:14 |
| 401:14,18,21 | 434:22 435:4 | 476:14,17,20 | 516:16 517:19 |
| 402:10,19 | 435:10,14 | 476:25 477:3,5 | 520:7,22 |
| 403:3 404:18 | 436:3,7,10,15 | 477:7,12,15 | 521:12 523:2 |

523:12 524:12 524:24 525:13 525:17,24 526:3,24 527:5 527:12,20,25 528:2,9,14 530:12 532:3,5 532:13 533:20 533:25 535:5 535:12 536:19 537:25 538:2 539:9,12,16,25 540:5,8 541:3 541:21
**robust** 408:19 409:8 437:4 438:22
**rodeo** 383:21
**role** 301:1 307:8,16 357:13 449:14 505:16
**roles** 306:7
**room** 275:11 336:18 390:16 462:16 468:18
**rooted** 348:16 348:19
**rosen** 274:6 275:15,15 276:11,20 277:2,5,8 280:25 281:20 282:8,10,14 284:8 288:6,15 288:21 290:25 291:7 293:1,4 293:8 294:1 295:14,17 296:2 297:8,10 297:12,13 299:17 302:13 303:14,20 304:11,15 313:19 314:3 345:9,12,14 360:7,7,11,14 360:20 361:3,6 366:2,20 367:1 368:7,16 369:6 374:8 375:5 376:6 377:15 378:6 380:3 381:4,7,14 382:5,19,23 383:24 386:9 386:12 387:8 391:6,10,23 392:6,10 393:6 393:20 394:9 396:18 401:9 402:9 404:17 406:7 407:14 408:13,25 410:18,24 413:5 414:2 426:4,24 427:4 427:11,14 428:22 433:2 434:1,12 435:25 441:8 441:14 442:5 449:6 452:8 453:1,14,21 457:13,17 461:13 463:8 463:10 466:23 469:17 470:18 473:16 475:3 478:16,17 480:1 483:6 485:8 486:22 489:21 491:10 493:5,24 494:20,25 495:21 497:8 499:10 503:20 504:23 506:21 508:4 509:6 511:16 512:2 514:16,22 515:2 516:13 516:15 517:17 520:5,21 521:10 522:24 524:10,22 525:10,14 526:22,25 528:3 529:11 529:14 531:4 532:3,21 534:4 535:14 536:20 537:12,15,22 538:10,18,21 538:24 539:10 539:17,20 540:17 542:3
**rosen's** 281:22 289:13 530:14
**roughly** 354:16
**rounding** 520:15
**route** 287:5
**routinely** 375:5
**rude** 502:20
**ruin** 538:22
**rule** 276:16 279:4 281:13 281:17 285:9 286:25 375:16 375:18 417:4
**ruled** 297:19 384:5 385:20 411:13,17
**rules** 301:18,21 375:17 417:2
**ruling** 278:21 278:22 374:5 417:3
**rushed** 531:2
**rushing** 531:3

**s**

**s** 274:1 275:23 275:24 308:17 308:23 309:20

311:8 313:8 320:9,15 325:11 327:21 334:1 335:2 337:15,21 340:17,21 341:1,5,12,25 342:13,14,15 342:22 344:6,9 346:2,9,15,22 348:15 349:11 351:8,12,24 353:20 355:25 357:22 358:11 358:20 362:5 362:10 363:19 365:10 377:5 400:9 424:1 445:9 446:1,17 446:24 448:2 448:17 449:20 454:13 455:1 460:1 468:15 500:7 501:6 502:6 507:17 507:24 510:14 511:25 512:10 513:12 517:4 517:11 518:2 518:21 519:22
**safety** 306:17 309:18 324:21 324:22,24 325:18 360:8 389:8 397:4,14 496:22,23 497:2 498:25 499:7,8,21 500:22 502:5
**saturday** 455:12
**save** 514:12 527:15
**saw** 400:5
**saying** 279:7 299:23 312:14 331:16 332:11 382:10 389:25 421:4 446:5,18 447:17,18,21 477:11,13,18 478:6 479:17 480:18 481:10 481:17 483:1,3 483:7,15,18 484:10,14 500:22 502:20 504:4 507:23 509:11 522:21 530:22,25 533:10 535:20 536:3
**says** 284:10 295:3 296:23 296:24 297:3,6 298:20 299:13 299:25 300:1 307:9 311:13 329:22 331:25 338:23 346:18 363:10 373:23 374:2 380:10 396:8,22 399:2 399:19 407:2 407:25 408:14 423:16 425:16 455:19 480:1 483:6 506:19 534:4 535:14
**sba** 462:16
**schedule** 317:3 321:21 323:13 324:1 358:24 398:22 445:2 458:6
**scheduled** 320:21 360:2
**scheduling** 360:5
**school** 275:21 275:21,22 279:20 283:11 283:12,17,20 284:9,11,18 285:7,19 286:13 287:4 287:11,17 288:10,14 289:4,5,7,9,10 289:19 291:8 291:24 294:9 294:11,12 295:12,12 296:11,12 299:4 304:9 306:19,22 307:14,16,18 308:5,6 309:12 309:20 310:3,9 310:13,16,21 311:14,15,16 311:24 312:24 313:7 314:21 314:25 315:8 316:4,8,9,15,22 317:6 318:4,10 318:14,22 319:3,8,13,17 320:6,8,24 321:1,13,20,21 321:23 322:2 322:15 323:12 324:5,8,21,24 326:7,8,9,12,16 327:9,10,16,20 328:3,18,20 330:6 331:21 333:10 335:2,9 337:3,18 340:5 340:6,6,25 341:4,8 342:19 342:20,21,24 343:16,19,24 344:3,5,6,19,21 344:23 345:1 346:17 347:5

348:6,21 350:10,14,16 350:21 351:3 351:12,20 352:13,18 353:3 354:18 354:24 357:7 358:5,23 359:5 359:8,9 361:13 361:13,20,23 362:7,24,25 363:7,13,19,23 364:2,15 365:9 365:23 377:4 388:3,24 389:18 405:20 405:24 407:11 407:12 412:21 421:13 423:3 427:19 433:21 434:7 436:15 438:16 440:9 441:18 442:19 446:7 447:8 448:16 451:9 454:7,8,13 455:4 456:5 458:24 459:6 459:18 461:2 489:2 490:6 491:1 499:2 500:14 522:18 527:6 540:3

**school's** 455:3

**schools** 293:11 293:23 304:17 304:23 305:6 306:6,12 314:9 341:21 342:1 344:12,12 365:11 449:15 456:6

**scope** 401:16 412:12 475:24 485:4 487:7,12 508:9 527:11

**screen** 305:1 390:4,6,9,14,18 392:15 398:5 399:8 423:12 451:13,15 455:25 474:21 494:18 523:13 523:17,24 526:21

**scroll** 359:23 393:12 395:19 395:21 398:13 399:18,22 403:13,21,24 407:2 422:16 422:23 423:21 451:23 465:9 465:11

**scrolling** 333:8 391:11 392:14 395:20 401:24 405:2 422:3 465:6 488:16

**se** 274:11,13 279:24 435:14 443:8 479:20 513:9 529:23 531:8 533:2

**seal** 541:14

**seat** 473:5

**second** 276:2 310:23 313:21 325:23 383:19 390:24 424:7 424:13 464:14 475:3

**securely** 505:19

**security** 306:17 309:19 329:5 360:8 389:7 505:18,19

**see** 285:8,23 286:9 287:23 292:10 294:21 296:4,19,20,23 297:24 298:20 300:2 301:13 302:4 303:17 303:23 304:24 305:4 310:25 326:3 331:24 332:17 335:19 338:20 345:15 345:20,24 350:19 351:7 351:14 353:14 353:17 359:24 361:7,16 363:9 365:2 366:4 370:8,8,9,10 381:17 383:13 384:5 388:22 390:3,5,6,6,18 390:19 391:13 391:22 393:11 395:11 396:2 398:3 403:12 410:19 411:22 411:25 412:13 422:5 423:13 423:23 428:14 439:14 442:22 443:24 447:15 451:14,18,19 454:22 455:8 456:10,14,16 467:23 469:24 470:24 471:3 477:15 482:8 482:11 486:8 487:21,24 495:22 497:25 500:1 501:10 513:2 517:22 521:12 523:21 534:4,5 538:6 538:7,15

**seeing** 394:22 537:19

**seem** 288:17 500:9,10
**seemed** 312:7 342:16 357:19 447:4 460:8
**seems** 285:17 292:22 361:1 408:19 431:24 519:1 523:17
**seen** 288:2 381:23 414:18 466:7
**sees** 393:8
**self** 325:6 326:21 327:7 332:3 442:7 492:18 518:23 518:25 519:24
**sell** 450:2
**send** 368:24 369:3 472:2,13 472:19,22
**sending** 373:17 525:24 526:6 526:12
**sends** 426:1
**sense** 334:6 366:21
**sent** 294:5 297:25 299:10 328:9 333:9 345:21 362:9 363:9 368:21 368:25 369:18 369:21 370:12 371:3 372:20 373:2,6,7,10,11 377:23 378:13 380:5 421:15 423:13 424:24 425:2 426:3 427:18,19 431:11 433:14 433:15,16 445:24 446:4 447:20,21 453:12,18 456:7 466:15 468:3,10 471:1 471:23 472:9 520:1 526:1 527:3,9
**sentence** 284:10 439:17
**separate** 309:25 310:15 339:21 372:25 377:23
**separately** 373:18 523:10
**september** 279:19 291:13 329:9,9,9,22 333:11 343:5 388:23
**sequence** 340:8
**series** 276:11
**serious** 328:1 509:1 510:9
**seriousness** 489:19
**served** 286:4,11
**service** 286:7 307:6 315:23 340:16 352:3
**services** 293:11 293:17,20 311:18 348:14 349:4 353:3 365:10 447:7 448:23 517:7 517:13 518:4
**session** 319:8
**set** 312:13,20 321:4 423:2 454:24 455:4
**setting** 289:5 306:18 312:7 313:12
**seven** 467:21
**several** 323:6 326:18 343:15 356:10 418:11 499:13
**severely** 348:16
**shape** 397:7
**share** 304:18 329:17 359:16 371:18 381:22 390:4,7,9,14,19 390:21 392:16 398:5,6,6,7 403:6,11 422:2 444:22 450:16 451:20 498:4
**shared** 300:20 331:18 334:3 340:25 342:5 342:10 348:9 359:12 393:20 425:4 451:15 451:19,21,22 461:1,4 466:20 468:24 469:1 474:20 496:15 498:2 502:17 518:24
**sharing** 305:1 338:15 356:6 356:18,23 381:15 390:12 390:19 421:22 421:25 464:22 466:6 497:17
**she'll** 371:16
**shield** 377:11
**shielding** 384:21,23
**shoes** 324:15
**shoot** 461:19
**shore** 364:1,10 448:15
**short** 366:6
**shot** 431:24 434:22,25

437:25
**show** 287:5 289:15,24 292:1 310:22 325:22 345:9 370:16 371:5,6 372:16,17 378:21 380:18 388:4 389:21 408:24 410:3,4 414:22 415:6 430:24 437:9 440:17 461:11 465:11,14,19 506:16
**showed** 402:15 405:8 503:18
**showing** 287:7 287:8,10 291:21 300:13 305:2 493:13 493:18 494:2 494:11 502:19 527:13
**shows** 295:1 369:4,24 371:1 373:17 380:11 380:19 385:2 405:15 409:13 411:1
**side** 299:5 381:15,16 420:22 487:18 491:18,22
510:22
**sides** 487:16
**sign** 275:12,12 297:5
**signals** 483:9 485:16 486:21 486:25
**signature** 541:18
**silence** 278:15 282:2
**silenced** 282:1
**silent** 385:2 433:23
**silly** 500:5 501:9,9,13 502:9
**similar** 340:8
**simple** 491:14
**simply** 314:20 319:16 332:16 421:17
**simultaneously** 278:14
**sincere** 332:20
**single** 309:24 502:1,2
**sir** 284:5 372:23 373:5,9 375:4 382:9 410:14 411:23 419:6,8,18 420:1,9,15,19 421:2 427:24
432:13 436:10 453:24 475:19 476:3,25 477:4 477:4 481:4 482:12 502:17 518:24
**site** 404:8 506:4
**sitting** 288:18 494:4
**situation** 302:21,25 396:10,24 397:2 402:16 402:18 511:5
**situations** 327:3 356:24
**six** 351:1 458:5
**sixteen** 451:14
**sixth** 305:21 349:16 351:9 362:5
**skills** 326:17 330:19,21 344:10,13,18 358:10,13 448:9,10 450:8
**social** 326:16 326:17 330:18 331:7,12 335:3 348:13 459:20 489:2 490:5 501:6
**sole** 455:18
**solely** 404:12 454:8 455:16
**somebody** 301:16 503:17 527:9
**somewhat** 401:8
**son** 289:18 290:8 334:2 411:6 438:5 440:25 444:18 450:17 502:12
**soon** 319:21 402:1
**sorry** 276:5 282:14 293:4 299:17 300:1 303:20 322:10 336:8 339:16 343:9 352:17 360:7,14 383:17 422:13 426:4 427:24 449:6 452:8 455:24 471:15 472:17 493:17 496:5 504:23 509:6 517:10 517:19,21 519:4 522:20 522:24 523:15 523:23 538:2
**sort** 277:1 281:13 288:19

290:11 298:10 301:21 355:18 356:13 370:17 373:19 436:4 438:15 442:7 470:21 471:6 497:12 531:18
**sought** 312:25
**sound** 404:7 405:8
**sounds** 287:14 350:14 404:6
**space** 309:13 309:15
**speak** 290:3 309:2 329:1 331:21 341:24 357:25 438:8 444:21 450:12 456:19,22
**speaking** 303:21 347:15
**speaks** 379:22 431:18 513:21 513:25
**special** 273:3 274:18 275:6 275:18 283:7 283:10 284:2 285:17,18,22 289:8 291:3 293:14 307:5 308:4,9 335:11 449:12 470:7 518:7 541:5
**specialist** 306:9
**specialized** 314:10 349:13
**specific** 279:17 280:1 286:3 316:3 352:2 357:3 400:4 410:4 435:8 439:7,11,12 441:4 466:13 532:7
**specifically** 291:13 295:4 300:17 380:2 382:15 383:6 408:16 437:4 451:7 452:25 512:25
**specifics** 491:5
**speculate** 418:16 507:7 511:13
**speculation** 280:3,15 413:6 414:3,4,9 505:8 526:23 526:24
**speculative** 280:8 507:2
**spent** 529:19 530:4
**spirit** 321:9
**spoke** 330:3 346:10 405:4 405:12 424:1 498:16 499:1 499:19,24
**spoken** 326:8 328:18 509:23
**spot** 482:4
**spring** 351:7
**springtime** 460:4
**squandering** 452:10
**squeeze** 319:14
**stable** 518:19 519:20
**staff** 289:4 291:5,23,24 306:20 313:9 319:17 324:15 328:21 329:2 331:21 332:1 334:4 335:4 337:14 342:14 346:11,16 347:12 348:21 355:8,21 373:25 400:15 400:16 427:20 458:25 459:18 459:20,24 460:18 470:13 472:25 493:23 516:11
**stage** 292:10
**stake** 410:21
**stakeholders** 306:22
**stall** 309:24,24 502:1,2
**stand** 432:3 442:16 452:2 485:9 513:16
**standpoint** 291:8,9
**stands** 315:15
**standstill** 464:20
**start** 292:5 295:16 314:15 322:1 324:12 326:1 331:1 367:11 389:3 389:14 395:2,9 395:10 396:13 398:14 442:7,9 442:10 459:4 498:14 534:20 535:2,4
**started** 295:17 307:9 308:8 410:16 488:3
**starting** 287:10 315:1 398:16 538:6
**starts** 288:10 536:15

**state** 273:2 275:5 280:7 286:20 317:25 350:21 371:25 374:10,16,17 398:25 401:25 408:12 409:2 409:16 435:19 465:24 483:19 534:14,17 540:4,8,15 541:1,3,4
**stated** 278:7 281:22 319:16 361:18 383:25 385:14 408:16 408:18 442:18 456:11 466:5 468:2 520:10
**statement** 279:17,20,21 280:2 317:21 317:23,25 327:8 334:18 347:7 351:2 362:15 381:9 383:8 408:13 409:23 424:11 424:16 469:14 482:12 492:6 492:14
**statements** 302:24 303:2 355:6 482:15 482:18,22 520:19 521:7 521:18
**states** 279:23 377:6 398:16 399:11 403:24 438:21
**stating** 300:23 408:25 442:19 468:9
**stay** 312:15 318:16 446:7
**stenographic...** 541:8
**step** 332:24 335:16 371:18
**steps** 315:2 327:15,15 336:10 488:24 505:1
**stewart** 282:19 284:17,23 285:10 286:1 286:14 288:1 288:18 294:3 296:10 298:13 301:8 350:20 356:10 359:20 359:24 362:9 363:9 534:11 534:15 535:4 536:11
**stewart's** 356:19
**stipulate** 276:10 277:12 277:14 279:10
**stipulated** 410:11
**stipulating** 276:14 277:3
**stipulation** 277:16
**stone** 312:14,20
**stop** 283:22 313:20 376:13 398:6,6 419:22 419:22,24 421:22 442:1,3 451:16,20 461:17 464:22 470:22 498:3
**store** 449:22
**stories** 501:7
**story** 438:4 457:7
**straightforward** 446:11
**strategy** 332:17
**streamline** 281:9
**street** 274:4
**stress** 493:20
**stricken** 280:8
**strict** 301:18
**strictly** 440:19 440:20
**string** 400:23 499:13
**structured** 314:19 316:13 445:14 446:2 447:19 448:4,6 450:18
**structures** 454:15
**struggles** 460:1
**struggling** 313:10 457:7 461:23 468:20 473:4,7 474:6
**stuck** 523:17
**student** 283:10 290:7,20 291:7 293:14 307:18 307:22,24 312:19,21 314:12 315:16 325:8,11,18 335:10 339:23 388:2 397:6 404:1,3 488:23 497:14 505:20
**student's** 318:21 340:2 353:5 503:14 504:6
**students** 307:1 307:3,5 309:9 309:11,17,19 312:4 316:16

318:25 334:21 334:22 340:7 344:14 400:2,7 400:9,11,14 409:19 450:12 462:1,19 496:23 501:19 502:2 504:11 504:19 506:1 518:10
**stuff** 416:22 429:15 476:18 477:10 481:13
**subject** 285:20 292:7 359:19 512:18,21 525:22
**subjected** 404:15,23
**submit** 378:14 378:15 432:6 464:23,25 483:24 484:1 539:16
**submitted** 276:2,7,9 289:16 290:4 378:15 380:24 385:1 478:14 481:10 483:22 486:24 515:22
**subpoena** 286:2,15 534:10,16
536:11 540:10
**subpoenas** 534:11,12
**subsequent** 285:15 288:20 295:20 353:6 374:24 377:11
**subsequently** 421:13 423:4 485:3
**substantial** 397:15
**substantive** 410:1
**success** 321:5 454:24 455:5 462:24
**successful** 305:20 311:12 454:15 459:4 500:14
**successfully** 390:22
**sudden** 457:8 521:24 534:23
**sufficient** 347:3
**suggest** 282:24 321:25 332:8 456:4 457:11
**suggested** 336:9 447:18 448:5
**suggesting** 332:25
**suggestion** 364:9
**suggestions** 311:16 358:7
**suicidal** 488:24 507:18
**suicide** 490:23 508:23 509:1 510:16,17 511:14 513:12 519:8,13
**summarize** 290:6
**summer** 319:5 319:18 321:25 362:7 459:21 459:22
**supervise** 306:20
**supervision** 500:8
**supervisor** 274:18 275:18
**supplemental** 312:25
**support** 289:4 306:25 309:12 312:21 313:9 315:24 319:25 321:15,17 327:23 332:23 336:10 347:3 351:18 358:12 363:17 447:6,7
448:11,12,23 448:23 452:6 459:20 468:7 489:20 490:2 490:13 496:19 500:13,19,20 500:23 501:15 501:18 526:11
**supported** 314:23
**supporting** 307:2 314:22 328:5 473:2 511:24
**supports** 314:20 316:14 322:22 335:15 385:13 412:13 460:19 501:4
**supposed** 280:10 414:25 415:2 437:12 539:12
**suppress** 278:15
**sure** 276:11,20 277:2,5 282:10 292:23 293:1 303:14 304:25 306:24 313:14 315:4,15,17 322:21 324:12 345:19 351:23 368:17 386:6

390:11 393:8 393:11 398:15 408:4 422:18 422:24 428:23 429:19 433:1,7 435:15 445:22 451:17,21 452:18 454:14 455:2 460:17 461:16 464:16 493:8,17 496:4 514:2 523:6,9 523:14 529:13 540:1
**surprise** 534:21 535:23
**suspended** 503:25
**sustain** 296:6 406:17 506:25 525:19
**sustained** 386:14 396:19 401:12,16 402:11,11 404:19 407:16 413:8 414:6 426:9 434:14 467:4 489:23 504:1,15 512:6 520:6 527:9 531:25
**sustaining** 297:21
**swear** 379:15
**swift** 346:24 347:8
**swore** 368:14
**sworn** 304:2
**system** 294:7,9 438:16
**system's** 287:17

**t**

**table** 319:8 337:11 377:22 386:20 387:2 454:17 470:11 507:24
**tabled** 322:19
**tail** 319:12
**tailored** 441:10
**take** 287:4 299:1,1 313:14 315:14 325:3 327:17 358:1 360:10 366:6 366:12,24 374:17 382:25 394:1,8 416:6 422:8,11,13 430:18 433:25 460:21 486:5 488:25 501:24 507:25 510:4 524:18 534:25 535:11 537:17 538:4 540:14
**taken** 432:16 441:17 505:1 534:21 535:22 535:23 541:8 541:11
**takes** 312:11 340:9 532:25
**talk** 319:20 322:20 323:23 331:1 335:13 339:10 343:19 353:3 387:1 398:18 399:3 447:6 454:17 456:12 474:11 474:12 506:8
**talked** 286:1 383:22
**talking** 293:19 299:21 310:9 314:4 322:19 324:11 330:25 331:4 370:23 370:24 372:22 372:23 373:8,9 376:17 392:7 392:11 393:1 397:8,10,11 427:1 437:7,8 446:18 451:4 476:15 488:18 488:19 495:3 495:15 497:22 508:22 519:6 540:6
**tape** 374:11 377:10
**tapes** 376:23
**tara** 302:15 396:3
**taratruscello** 396:4
**task** 397:18 522:16
**taskbar** 523:25
**taught** 290:21
**teach** 290:7,7 290:17
**teacher** 283:8 283:10 284:3 285:18,22 288:23 290:8 290:18 306:8,9 306:10 400:8 405:16 466:8 466:18 470:1,7 470:8 501:25 504:12 516:4 522:13 524:6
**teacher's** 461:6
**teachers** 313:8 340:17 459:19 469:12 490:25 515:20 517:1
**team** 288:25 289:1,20 290:17 307:4

310:4 311:17 311:25 312:25 313:1,7,14,17 315:1 316:1,4 316:23,25 317:4,7,8,11,15 318:4,10,14 319:4 320:5,8 320:11,19 321:13,18,21 321:22 322:9 322:14,17,24 323:12 324:2 326:8,10 327:9 327:16,20 328:2,3,5,10,18 328:20 332:6 332:21 333:10 335:1,18 337:3 337:7,24 338:13,21 340:1,15,25 341:4,8 342:7 342:21 344:3 347:5 350:10 350:14,24 352:13,18,21 353:7,11 354:2 354:18,21,25 357:7 358:24 361:10,24,25 362:19 363:6 363:15 364:13 365:18,23 388:1 396:25 423:8,16 424:9 446:1,23 448:15,20 454:13 468:6 490:12,20 508:11 510:10 517:6,12 518:3 518:17,19 519:18,21 520:13,19 521:7 526:10

**team's** 320:24 321:1 335:10 351:4,20 511:11 518:12

**teams** 273:20 352:25 541:6

**technical** 278:14 301:21 390:16

**technicality** 539:14

**technology** 306:10 505:17 505:18

**teeth** 402:23

**teleconference** 273:20 541:7

**tell** 290:11,16 304:23 368:14 379:15 380:14 423:15 424:3 425:11 428:10 469:12 478:14 483:23 500:2,4 510:11 537:10

**telling** 322:16 333:25 423:14 482:5 525:25

**tells** 438:4

**ten** 415:3 421:16 436:14

**tense** 355:5

**term** 350:5 396:9,23 420:22

**terminate** 419:15

**terms** 302:13 311:13 312:8 317:21 320:17 322:12,23 325:7,22 327:7 334:6 340:9 356:15,23 361:24 364:3 438:12 462:14 463:6 502:5 530:8

**terribly** 302:20 384:19 385:6 531:12

**test** 372:18 462:18 476:16

**testified** 285:22 304:3 347:4 368:13 371:8 371:11 375:21 376:6,7,20 378:2 380:20 382:15 385:4 403:8,16 416:16 418:18 429:2,3 437:6 452:3 458:23 459:7 460:23 461:22 469:11 471:8 472:15 472:16,20 500:19 519:8 521:22 525:17 527:12

**testify** 280:6 284:15 286:18 286:23 287:16 291:16 292:9 292:12,19 299:3 302:9 371:19 375:20 376:3,9 378:9 379:8 381:21 383:10 416:18 429:15 430:16 467:14 477:10 477:13 478:13 478:13 481:13 481:14,25 483:19,20 485:19 493:7 493:10 514:1 539:4,18

**testifying** 292:4 292:18 429:17 440:9 446:10 447:23 469:18 469:21 474:23 481:21,23,24 488:6 522:25 526:2
**testimony** 280:1,8,10,14 280:17,19 281:10,24 282:15 283:2,4 283:18 287:2,9 292:7 295:11 296:5,10,13 297:9 298:10 367:12,25 368:3 369:7 371:15 372:16 375:25 378:24 379:24 382:18 386:19 401:10 403:1,4 408:14 418:20 430:15 430:17 431:3,5 431:7,9 432:2 438:7 439:18 443:4,12 449:7 450:16,20 452:9,16 455:10,15 461:13 463:12 463:17,21 467:6,7,20 469:22 471:5 475:1 476:5,19 478:20 479:16 479:18,22 480:7,8,10 481:6,8,16,18 481:20 483:4,5 483:13,16 484:12,12,13 484:15 486:20 487:3 491:12 491:13 493:5 504:25 506:9 506:21 508:4,8 513:7,15 514:6 514:10,14 515:17 520:5,8 524:11 527:15 527:16,24 528:20 529:25 530:1 531:6 533:4,6 534:3 534:10,20,24 535:1 536:3 537:3 538:6,11 541:7,10
**testing** 462:16 462:17 518:10
**thank** 275:25 304:11 305:4,5 327:14,19 343:12,14 353:16 360:20 360:21 361:5 367:1 405:3 407:5 422:11 422:25 423:2 453:24 517:4 525:1 526:9
**thing** 280:21 281:13,14 369:23 390:8 410:9 419:5 438:18 442:13 478:3 484:2 490:18 509:1 514:8 536:15
**things** 281:17 291:20 301:13 302:6 308:19 308:21 328:8 346:10 388:17 389:8,11 390:7 412:24 419:10 425:13,16,21 431:14 437:23 439:11,12 440:22 445:18 450:2 467:7 478:10 479:20 481:16 502:20 503:10 505:21 514:9 515:23 526:18
**think** 280:2,18 281:15 284:2 286:10,12,16 286:17,20 288:13 290:14 292:15,20 294:17 298:8,9 301:18 302:6,8 308:12 314:8 326:14,20 327:20 350:15 350:24 354:20 356:19 358:2 363:25 370:4 372:6 380:25 382:6 384:2,14 385:23 387:6,9 391:7,10,25 398:8 402:25 406:5,24 407:11 409:15 414:15 415:10 418:12,22 420:8,11 437:21 438:2 439:21 440:5 441:14 452:1 457:24 460:18 461:10 474:10 480:11 482:23 486:5 490:19 497:17 498:4 501:10 502:7 502:24 504:9 504:16 506:3 506:15 507:9 507:10,24

510:14 512:22 517:22 519:13 521:13 523:8 523:22,23 525:12 526:13 532:6 536:10 538:20 540:3
**thinking** 316:6 483:4
**thinks** 279:23
**third** 300:1 535:24
**thomas** 293:9
**thorough** 347:12,20
**thoroughly** 345:25
**thought** 280:15 281:4 299:21 316:4,13 354:13 358:2 386:22 416:14 426:11 433:19 439:14,20 440:4 453:6 477:24 478:12 490:12 510:12 515:4 534:25 540:10
**thoughtful** 364:6
**thoughts** 279:21 280:10 311:16 488:24 507:18
**thread** 345:15 345:19 359:18 359:20 361:7 542:13,15
**threat** 488:20 488:20 489:2 490:3 491:2,9 498:25 510:2
**threatened** 420:3
**threats** 518:25
**three** 302:1 415:5 428:5 486:9 529:18 531:17 533:10 534:25 535:12 535:14,19 537:7
**throw** 318:1
**throwing** 317:20,22 323:8,8 324:15 389:10
**thrown** 424:17
**thursday** 396:2
**tie** 400:23 414:18,20 421:4
**tied** 416:18
**tighter** 530:7
**time** 273:19 276:9 279:14 280:17 282:10 285:21,22,23 295:11 296:4 296:22 297:15 298:20 309:22 311:20 314:16 316:22 318:12 318:13 319:23 322:11,19 324:16 325:4 331:21 337:17 339:3 342:21 343:21 348:2 349:9,20 350:10,23 351:4 352:25 354:1,15 356:5 358:2 363:3 366:3,15,17 371:20 372:13 372:14 376:12 376:17 379:1 390:8 392:15 400:3 413:2 425:15 427:10 430:3 432:3 439:5,19,24 440:3 441:17 442:15 443:16 444:10,17 450:21 454:13 459:6 468:14 469:7 472:18 476:11,23 477:21 482:11 482:15,15,19 483:25 486:8 490:7 491:8 500:10,15 501:3 505:7 508:18 509:19 509:23 510:10 510:11 519:5 526:19 528:18 529:19,22 530:1,2,18,19 531:1,22 532:2 532:25 536:20 538:3 539:6
**timeframe** 287:12 310:8 488:15 518:25
**timeline** 389:17 519:4
**timely** 319:19 459:1
**times** 293:15 326:18 336:23 356:10 418:11 439:23 462:17 530:15 532:22
**timing** 295:25
**today** 386:8 425:9 444:4 458:24 486:23 530:5 531:20 533:22 535:9 540:19

**today's** 528:6
**together** 311:9 313:13,16 316:1,25 318:6 318:7 328:2 332:21 334:15 335:13,17 336:20 337:7,9 337:10 340:2 343:18 353:1 355:20 362:19 395:4 447:3,5 455:11 460:21 467:2 490:20 523:10
**told** 330:22 333:16 354:1 372:18 389:19 405:5 411:16 421:15 424:5 424:10 425:8 425:10,13,25 427:9 428:10 430:2 442:15 443:16 472:21 476:6 488:3 522:21 524:7
**tone** 355:2,3
**tonight** 424:2
**took** 343:11 352:23 379:14 506:13 530:21 541:4
**top** 326:2 393:12,14,18 394:11,11 395:2 396:2 411:25 423:18 494:5
**topic** 331:5
**total** 520:4 521:25 525:4 526:15
**tour** 358:15,19 358:20
**towards** 312:9 315:7 316:24 317:1 319:2,12 334:20,22 343:18 348:5 353:1 358:13 451:9 464:12 464:19
**track** 391:12 406:13
**train** 416:13 439:14,20 440:4 477:24 478:11 515:4
**transcript** 279:22 375:13 375:13 376:24
**transcription** 373:13 541:9
**transition** 344:6 351:9,12 364:23
**transparent** 330:7
**transpired** 529:2
**transportation** 349:17
**treated** 408:20 409:9 411:6,7 438:5,6 461:9 461:12 490:24
**triage** 533:18
**trialed** 331:7
**tribunal** 369:16 380:22
**trick** 323:7
**tried** 328:13 418:11 485:20 502:23 510:3 512:22
**trouble** 501:20 501:21
**true** 379:8,9 391:16,24 418:17 431:16 441:12 452:6 469:16 477:3 512:5 541:9
**truly** 443:8
**trumbull** 377:2
**truscello** 279:20 302:15 302:15 358:21 376:3,6 389:19 396:1,3 425:2 425:5,14,15 428:9 432:4 433:16 452:2 462:7 463:5 464:10 468:17 488:3 490:21 498:10 499:19 499:24 500:2 518:8,14 522:13,21 523:8
**trusted** 389:20 425:7,25
**truth** 333:25 368:14,15 379:15,16 380:15,15
**truthful** 379:13 380:21
**try** 300:1 312:3 317:3 318:25 325:10,20 329:20 390:18 390:18 402:23 406:18,18 413:13 421:3 439:5,19 440:3 448:18 476:11 477:15,21 482:11 512:14 532:15,17,20 533:8,16
**trying** 277:1 281:9 291:21

294:18 314:12 318:1 319:14 319:19 321:9 322:13 323:7 324:1 325:9 330:12 332:17 334:5,11,12 382:10,19,23 387:12 397:7 408:12,23 410:24,25 413:11 415:11 416:1,3,15,23 417:4,5,20,21 418:2 419:1,9 419:18 420:1 421:1 430:24 431:23 434:24 435:18,19 437:19,20,23 437:24,25 438:23 439:9 440:6,7,16 443:25 446:12 459:1 463:13 469:5 476:12 477:9 478:9,10 480:15 482:23 483:2,13,14 485:18,24 492:15 495:5 500:12 504:14 506:16 513:7 513:19 515:1 521:21 525:11 527:16 533:3 535:22
**tuesday** 425:8 535:24
**turn** 292:13 381:21 493:9
**turned** 403:25
**twelfth** 349:16
**twenty** 297:3,3
**twist** 382:10
**twisted** 415:13
**twisting** 381:13 389:11
**two** 276:7 287:15 293:20 333:12,13 338:1 376:16 383:5 397:9 403:8 416:16 419:10 480:22 484:7,24 485:9 485:17 496:10 502:17 520:18 521:6,18,23 522:6 529:14 530:21 531:17 533:13 534:22 535:24 537:19 538:15
**tying** 419:3 437:3
**type** 324:11 333:18 470:22 536:15
**types** 397:9 405:17
**typewritten** 541:8
**typical** 333:22
**typically** 324:20 325:13 325:16 328:22 329:14 340:1 377:8
**typo** 297:4 299:23

**u**

**u** 377:5
**uh** 395:13 420:5 422:21 494:10
**um** 336:7 522:19
**uncommon** 487:14
**under** 281:20 304:4 376:20 466:23 480:8 480:10 529:14 530:21 541:8
**undergraduate** 305:11
**underscore** 348:8
**understand** 281:1,1 288:12 310:8 312:11 323:19 327:19 329:25 332:9 338:25 345:19 359:11 374:12 374:19 375:16 390:21 400:18 424:8,12 445:22 452:19 453:4 470:5 479:19,21 492:16 499:3 513:19 529:22 533:3
**understandable** 493:11,11
**understanding** 302:17 312:17 315:11 318:8 321:11 323:3,5 327:1 330:21 330:24 331:10 348:18 350:9 351:21 358:18 361:9 372:15 372:15 376:9 376:21 410:14 411:15,23 426:12 443:25 444:1,3 449:2 452:17 466:25 468:25 469:4 486:21 528:5 539:18

**understood** 293:1 343:22 540:17
**underwear** 404:1
**unexpected** 399:24
**unfair** 482:4
**unfairly** 280:12 282:1 302:6
**unfolds** 538:12
**unfounded** 280:15
**unintelligible** 297:13 298:7 298:23 302:3 372:19 395:8 401:14 406:11 406:16 408:9 411:19 414:7 414:12 418:14 419:13 420:23 426:8 429:4 435:25 436:9 437:13 438:14 441:13 452:7 460:9 467:10 475:13 478:23 480:12 484:25 485:19 491:20 509:7,11 514:19
**university** 305:13,15,18
**unmet** 351:17 351:19
**unproductive** 357:17,18
**unprofessional** 373:24
**unquote** 323:8 394:14
**unsafe** 324:7 327:8 334:20 334:22 502:11
**unsuccessful** 325:16
**unsupervised** 500:7,15 501:23
**unsupported** 334:25
**untrue** 369:16
**untruthful** 380:21 382:13
**update** 462:7 462:12,21 463:1,2 470:3 474:17,18 498:11 500:17 518:13 521:5 521:23 527:14
**updates** 340:11 341:4
**uphold** 384:7
**upping** 447:6
**upset** 332:1 346:11 424:11 424:18 425:13 460:7,11,24,25 461:2,5
**upsetting** 331:14
**uptick** 470:14
**urgency** 457:22 458:13,19 459:5
**urgent** 457:10 457:19 458:22 459:17 516:6 518:22 519:1 519:12,24 520:20 521:8 522:7
**urinal** 400:22 401:6
**usage** 310:11
**use** 286:23 309:15,17,23 309:25 374:14 376:12 396:9 396:23 401:1,4 401:5,6,8 404:23 407:8 421:17 425:12 425:22 429:16 431:7 496:20 497:14 498:18 498:22 499:4 499:22 502:6 505:20 534:2 535:14
**used** 310:14 377:10 379:6 429:3,4
**using** 278:14 400:1,2,22 404:9 405:22 420:16,20,22 425:6 429:21 498:14 501:21
**usually** 325:19 531:16

**v**

**valid** 286:10 380:25 405:25 415:22,23 439:19 477:22 479:2,6 480:21 480:23 485:5,7 521:13 539:25
**value** 321:2
**venue** 325:10
**ver** 489:10
**verbal** 387:20 387:22,24
**verbatim** 541:3
**verified** 489:10
**verify** 285:4 298:15 489:7 489:12
**version** 483:19
**versus** 275:8
**video** 329:4,19 399:15

**view** 294:6
**viewed** 329:20
**viewpoints** 354:24
**violate** 408:21
**violated** 408:21 408:22 411:3 416:5
**violation** 332:7 332:10,14,15 332:16 418:23
**violations** 284:22 438:11
**violent** 389:1,4 389:5,10,13
**virtual** 275:13 328:14
**vision** 306:18
**visit** 358:19 448:25
**visited** 449:11 450:13
**vital** 281:24
**vs** 273:9 541:5

**w**

**w** 377:5
**waged** 493:21
**wait** 381:11,11 381:11 442:3 475:3 485:18 504:23 508:19 513:15 523:22 527:2 534:24
**waiting** 410:19
**waive** 458:10 458:11,14,20 539:14,17
**walked** 347:5 400:1
**walking** 400:6
**wandered** 507:1
**want** 276:14 279:1 280:24 281:6 282:15 282:18 283:6 284:7 285:14 288:8 293:8 303:13 304:25 313:6 321:11 326:1 331:19 343:17,18 345:18 352:6,9 359:23 366:4 366:11,18 367:11 377:19 378:7,14 379:11 389:17 390:11 393:2 393:22 394:23 395:2 402:6,7 403:6 408:13 416:2,4 419:12 419:15 422:17 424:3 425:12 427:9 429:19 433:1 440:13 440:14 442:5 442:13 443:6 443:11,20 444:19 446:10 450:17 451:11 454:12 456:1 458:11 465:14 480:14 484:5 485:8 486:19 487:9,21,23 494:1,10 495:14 499:4 500:25 502:12 502:12 513:9 513:18 514:15 514:24 516:16 519:7 521:17 521:24 527:19 527:22 528:10 528:16,22,23 528:25 531:4,5 535:1,21,23 536:11,25
**wanted** 295:6 302:14 313:13 316:7,25 319:20 321:2,4 322:16,20 327:17 339:5 362:6 384:2 386:20 398:25 402:20 416:11 416:12 445:25 447:5 452:5,22 452:24 455:11 455:16 456:8 457:5,11 458:3 458:12,14,20 458:21 460:2 466:16 488:13 490:15 511:3 513:11 520:2 522:4,9 528:4
**wants** 393:3 494:22 509:5 510:17 531:4
**warrant** 381:23
**warranted** 352:14 354:19
**warranting** 318:23
**warrensburg** 377:4,5
**waste** 427:10
**wasting** 530:18
**watching** 420:24
**way** 280:1 282:25 295:10 309:1 312:22 328:24 374:11 375:8,23 379:9 381:25 394:16 398:15 401:15 406:16 413:9 417:5,7,9 418:10 421:1 423:12 434:5

434:16 435:17 441:7 461:8 463:21 489:24 507:4 520:25 521:15
**ways** 314:22
**we've** 276:1,8 356:12 377:3 382:24 383:21 410:10 440:10 454:21 475:5 534:19
**weapon** 377:10
**wearing** 400:24
**website** 404:6 405:7,8 406:2 407:7 409:19 413:24 506:1
**websites** 405:19 406:4 504:12,18 505:23 506:12
**wednesday** 332:22 425:9
**week** 415:3 454:7 462:15 515:18 518:9 532:7
**week's** 459:6
**weekend** 540:23
**weeks** 521:24 522:6
**weight** 280:19
**weird** 488:1
**went** 299:3 305:16 354:1 355:4 358:20 426:16 427:9 448:25 462:5
**west** 364:1,10 448:15
**westshore** 344:25
**white** 329:20
**wife** 470:22 471:4
**willing** 276:10 279:10 528:11
**wind** 280:20 281:18
**windows** 390:20
**wishes** 346:21
**witness** 279:19 280:1,3,6,24 283:9 284:12 285:21 286:11 288:21 289:23 292:4 293:2,7 293:8 303:12 303:13 304:2 329:3 360:21 361:5 370:11 370:18 372:4,8 373:7 378:20 379:8,13,23 380:14 383:14 384:17 385:4 387:11 392:24 393:8,12,21 395:14,17,21 412:2 419:25 420:12 427:21 430:15 431:6 436:4 441:8,19 442:16 443:17 443:22 452:9 464:3 466:23 467:3,18 471:25 477:12 482:20 483:23 491:10,17 492:8 494:6,20 496:2 497:16 505:14 508:13 509:18 510:25 514:17 516:21 522:24 524:11 526:4 531:18 532:11 535:9 539:7,16,20,25 541:14 542:2
**witness's** 466:25
**witnesses** 282:11,17,24 283:5,22 285:6 285:11 288:7 302:13 376:7 376:18,19 378:1 487:15 492:12 531:17 531:17 536:8 536:16 539:5
**wondering** 426:7
**woodhouse** 358:3
**word** 331:16 376:15,15 502:6
**words** 278:2 330:9 334:1 381:13 382:10 382:13,20 404:6 420:16 420:20 455:13 488:21 508:3 525:9
**work** 306:21,23 327:23 337:7,8 337:10 386:3 398:14 424:6 459:19,21,22 459:23 461:7 462:4 468:5,11 468:12,21 470:9 501:7 520:12 522:16 535:17 538:23
**worked** 540:2,4
**worker** 326:16 331:8,12 459:21 489:2

490:5
**working** 284:17 300:9 305:1 306:5 312:8 319:9 332:6 397:6 404:13 450:7,8 450:9 462:1,2 462:19 470:13 488:1 501:12 520:14
**works** 326:17 330:18 538:20
**worried** 536:5
**worries** 502:4
**worry** 538:21 538:21
**worst** 537:18 537:18 538:15
**worth** 412:6
**write** 326:5 332:20 427:21 427:25 435:23 469:21
**writes** 333:10 335:19 345:24 348:14 349:11 350:20 359:24 361:17 363:17
**writing** 294:23 388:4,5 493:16 493:22 503:22
**written** 294:14 311:11 317:16 373:23 387:20 387:21 399:19 411:6 421:16 465:15 495:18 496:12 518:15
**wrong** 426:1 523:22,23
**wrote** 329:23 347:19 362:8 396:4 455:13 465:8,13 498:1 498:10 517:23

**y**

**y** 304:1
**yeah** 276:20 280:25 284:1,6 287:19 288:1 288:12,14,15 290:13 293:6,8 295:23 296:3 302:2 322:12 327:14 338:5 360:11,16,18 366:12,21 368:18 372:3,5 372:9 383:5 387:14 390:20 390:22 394:15 397:10 401:12 406:20 407:23 408:3 411:17 412:18 413:21 414:4 417:4,18 417:24 423:17 427:5 434:3,3 434:14,21 436:19 437:14 441:3 444:12 444:20 449:7 450:15 452:12 453:17,19 457:21,21,23 461:15 463:14 464:1 467:1,10 469:19 470:20 471:16,19 474:1,1 477:14 481:3,4,24 487:10 492:3 494:10 495:1 495:12,13 497:11,16 498:5 499:12 506:23 507:4 509:5 511:17 512:6 513:3,23 513:24 514:5 514:20 516:17 520:6,25 523:1 523:4 525:14 526:2 527:18 527:21 536:6 536:10,13 538:24 540:7
**year** 283:11,12 283:17 284:9 284:11 286:21 287:11 288:9 288:10 289:9 289:10,19 293:23 295:13 305:21 307:14 308:5,6,13,23 310:9,12,13,16 310:21 312:12 312:16,24 313:7,8,11 315:8 316:24 317:2 318:22 319:3,13,17 320:6 321:20 321:23 322:2 322:15 324:5,8 324:13 326:7 326:12 337:18 337:22 342:19 342:20,24 343:6,16,19,24 344:5 348:6 349:25 350:6 350:17 353:1,2 353:3,4 358:6 358:23 359:9 361:13 362:6 362:25 363:7 363:13 364:15 365:9 388:24 445:13,13 446:7,17 447:2 447:9,11,12 448:3,25 451:9

454:7,16 455:4 458:15,24 459:6,19 491:1 498:18 519:6 522:18
**years** 283:20 285:19 288:14 293:21 351:1 354:4 383:23
**yesterday** 399:25
**york** 377:3
**youtube** 506:4 506:8

**z**

**z** 274:6 304:1,1
**zenowitz** 293:9 293:10,13 294:2,14 295:5 295:17 296:7 297:22 300:16
**zenowitz's** 293:22
**zipper** 400:24
**zoom** 390:16

CONNECTICUT STATE DEPARTMENT OF EDUCATION
SPECIAL EDUCATION HEARING

In Re: [redacted] ) Doc. No.: 25-0686
Complainant )
vs. )
MILFORD BOARD OF EDUCATION, )
Respondent )

HELD BEFORE:
PATRICK KENNEDY, ESQ., THE HEARING OFFICER

DATE: October 21, 2025
TIME: 10:01 a.m.
PLACE: (Via Teams Teleconference)

Reporter: Robert G. Dixon, CVR-M #857

A P P E A R A N C E S:

For MILFORD BOARD OF EDUCATION:

BERCHEM MOSES, PC
75 Broad Street
Milford, Connecticut 06460
By: HERBERT Z. ROSEN, ESQ.
HRosen@berchemmoses.com
203.783.1200

For the Complainant ([redacted]

ROBERT [redacted] (pro se)
and
KAREN [redacted] (pro se)

Also Present:

NADINE MACKLIN,
Milford Board of Education
Special Education Supervisor

(Begin: 10:01 a.m.)

THE HEARING OFFICER: All right. Is everyone ready to start?

THE REPORTER: On the record.

THE HEARING OFFICER: Okay. Good morning. The hearing will please come to order. My name is Patrick Kennedy, the Hearing Officer appointed by the Connecticut State Board of Ed to preside over this special education -- this is the case of [redacted] versus Milford, Case Number 25-0686.

I'll ask all the parties present in the Zoom hearing room to identify themselves at this time.

ATTORNEY ROSEN: Good morning. This is Herbie Rosen, attorney for Milford Public Schools. I'm joined by Nadine Macklin, Special Education Supervisor representing the administration for Milford Public Schools.

Also present is Amy Rizzo, prez -- Principal -- I keep trying to elevate you -- Principal of JFK Elementary School, who I believe is on the stand as a witness.

THE HEARING OFFICER: All right. And do the parents want to identify themselves?

ROBERT [redacted] Yes. Robert [redacted] [[redacted]s dad.

KAREN [redacted] Karen [redacted] [[redacted]s mother.

THE HEARING OFFICER: Okay. Let's see. So, we don't have any new exhibits.

All right. So, before we hear testimony, does anyone have any preliminary matters?

ATTORNEY ROSEN: The District has some concerns about some witnesses on the parent's anticipated witness list, but we can address that after Ms. Rizzo has testified. I'm also happy to talk about that at the end of the hearing.

THE HEARING OFFICER: Okay. That's fine. We can take that up at the end of the hearing.

All right. So, Ms. Rizzo --

ROBERT [redacted] I'm sorry. I do have -- I'm sorry, Hearing Officer Kennedy, I do have something that I want to make clear for the record.

So, the parents, you know, we just want to make, you know, one statement as far as what happened on October 14th. That the previous introduction of the irrelevant financial considerations by the District's counsel on October 14th, we are currently determining an appropriate regulatory agency to file a formal complaint regarding the introduction of financial considerations into a student's educational rights

proceedings, as such matters are irrelevant to the FEEP standard. So, I just wanted to make that clear for the record.

THE HEARING OFFICER: All right.

ATTORNEY ROSEN: Hearing Officer Kennedy, let me know if you want the District to be heard on that point made by Mr. [redacted]

THE HEARING OFFICER: I mean, I think you just said that the repeated motions were imposing potentially an administrative burden, and I've just been ruling on them without requiring the District to respond. So, I think we've avoided the administrative burden that way.

But if he's planning to file something somewhere else, you know I don't have any jurisdiction over that, and there's no real reason we have to address that.

ATTORNEY ROSEN: Yeah. I'll just note for the record that it was merely the fact that Mr. [redacted] -- this was Mr. [redacted] fourth bite at the apple at that time. And my experience was, based on res judicata, we weren't revisiting a previous ruling, so that it was just a clarification.

The administration would have filed an objection if it was sought prior to the motion

being denied, and we reiterate that stands for all the subsequent motions that have come in since then.

THE HEARING OFFICER: Uh-huh. Right.

ROBERT [redacted] I'd like to respond to that.

THE HEARING OFFICER: Noted.

ROBERT [redacted] That's just an opinion. That's not based on any legal facts at all. There was no -- it was very inappropriate to introduce finances, you know, to shape the mind of a hearing officer as far as bringing, you know, the finances into it.

So, basically what attorney -- what Mr. Rosen was saying was that, you know, please rule in our favor. You know it's costing the District a lot of money. So, we have good reason to believe that and we will be taking appropriate action outside of this hearing to address that issue.

That will be brought up.

ATTORNEY ROSEN: I don't think any reasonable person would infer that intent from my messaging, but we're prepared to move on.

THE HEARING OFFICER: All right.

ROBERT [redacted] Absolutely. I object to that statement because any reasonable person would

definitely -- that was inappropriate to bring that up, and we'll let the agency make that decision when the time comes.

THE HEARING OFFICER: All right. Well, if you're talking about something in some other forum, it's not within my jurisdiction.

So, it's 10:07. Your hour starts now.

Ms. Rizzo, you're still under oath.

A M Y R I Z Z O,

recalled as a witness, having been previously sworn, was examined and testified under oath as follows:

THE HEARING OFFICER: You can start with your cross-examination.

ROBERT [redacted] Oh, okay.

(Cont'd) CROSS-EXAMINATION (of A. Rizzo)

BY R. [redacted]

Q. Okay. Ms. Rizzo, you were sworn in by Hearing Officer Kennedy. Correct?

A. (Inaudible.)

ATTORNEY ROSEN: Sorry. Ms. Rizzo, you're muted.

THE WITNESS (Rizzo): Sorry about that. Yes, correct.

BY R. [redacted]

Q. Okay. You raised your right hand. Correct?

A. Correct.

Q. And you swore to tell the whole truth -- the truth, the whole truth and nothing but the truth, so help you God, under penalty of perjury. Is that correct?

A. Yes.

ATTORNEY ROSEN: Objection, relevance.

ROBERT [redacted] The relevance is that this is a fact. She did. She was sworn in. And if attorney -- if Mr. Rosen is going to be interrupting like this and I have limited time, it's going to prohibit me to get my questions in.

THE HEARING OFFICER: I'll take administrative notice of the fact that she's been sworn in and is still under oath.

So, you can just ask your next question.

ROBERT [redacted] Oh, okay. I'd like to bring up Exhibit P-18, which I believe is already in.

Let me bring that up here.

ATTORNEY ROSEN: I'll note for the record, P-18 is not in evidence.

THE HEARING OFFICER: Yeah, I'm just looking through my notes and I don't see that it was admitted yet.

So, I mean, you can --
ROBERT [redacted] I believe we did. If not, I would like to get that admitted into the evidence so I can discuss this.
THE HEARING OFFICER: Let me take a -- oops. I'm looking at the wrong set of exhibits. Let's see.
P-18.
(Pause.)
THE HEARING OFFICER: All right. I mean, now you can ask. You can ask some questions to lay foundation for the admission of the exhibit. Go ahead.
ROBERT [redacted] Okay. I'm now sharing it. Okay.
BY R. [redacted]
Q. Ms. Rizzo, you were copied on this e-mail from September 5th, stating, once our questions and concerns are answered via e-mail, we will then be in touch with you with a date and time that works within our schedules. Correct?
A. I just need a moment to review the e-mail.
Q. Okay. Let me get to that. September 5th. September -- oh. So, this is September 5th, as you can see up here. And this is the e-mail here. Let me -- oh, there is also -- after I'll have you read this, and then I'll

scroll down. Let me know when you're ready.
A. Okay. Thank you.
Okay.
Q. Okay. So, I'm going to get to that part here.
(Pause.)
Oh, yes. Here it is. I'm sorry. Right here. Let me just get this here.
So, this is the e-mail that I'm referring to that was on -- let me scroll this up -- on September 5th.
And I'll scroll down to that part now.
A. So, I believe your question was, was I CC'd on this? Can you just scroll up to who it was sent to?
Q. Yes. If I go to the top here, let me -- this is the very top of the e-mail chain.
You were CC'd on all of this?
A. So, then the answer is yes, I was CC'd on it.
Q. Okay. So, you do confirm that once all of -- that I did state to you that, once all of our questions and concerns are answered, we will then provide you dates that were available for the meeting. Is that correct?
A. This e-mail was sent to Ms. Stewart.

Correct.
Q. Right. And you were CC'd -- yes. And you were CC'd on this e-mail. Correct?
A. Yes.
Q. Okay. So again, the question was -- so, on record, you, it's your testimony that you were CC'd on this e-mail. And we stated to you once we -- that once all our questions and concerns were answered via e-mail, we will then provide dates that we were available for that PPT meeting. Correct?
A. That's what it says in this paragraph, yes.
Q. So, you were notified of that. Correct?
A. Yes.
Q. Okay. The August 19th e-mail from Ms. Stewart, which you were copied on, stated that we could have asked the team questions, which would be answered. And then we were offered the opportunity to record the meeting if we choose. Correct? And I can get to that part if you'd like.
A. Yes, if you could please scroll to that part?
Q. Sure.
She states, you can ask the team questions, which will be answered, and the

meeting can be recorded if you choose.
Correct?
A. Correct.
Q. Okay.
A. That was Ms. Stewart's communication.
Q. Yes, but you were CC'd on it. Correct.
Okay. You testified that on December 11th -- you testified previously on October 17th that the December 11th PPT meeting was scheduled for 10 a.m. Correct?
A. I would have to go back to look at the -- the dates. There are so many dates that were offered. I -- off the top of my head, I -- I would have to look back at the information.
Q. But the question was, you testified that on December 11th, that the December 11th PPT meeting was scheduled for 10 a.m. Correct?
A. I believe there was information on the screen that showed that e-mail when I (unintelligible) --
Q. No, you're not -- I'm asking a question. Your testimony was that on December 11th you scheduled a PPT meeting for 10 a.m. Correct?
A. I'm not sure how to answer that, because I -- I don't have that information in front of me.

If I testified that, it was based on the information that was being shared on the screen.

Q. No, this has nothing to do with the screen. That was part of your testimony.

ATTORNEY ROSEN: Objection. Argumentative.

THE HEARING OFFICER: Yeah. You know there's --

ROBERT [redacted] I asked a direct question.

THE HEARING OFFICER: Well, first of all, I think she's testifying that she has no independent recollection, and that her testimony was either based on -- maybe not even refreshing her recollection, but in effect past recollection recorded. That, in essence, that's what the exhibit said.

You're also questioning from an exhibit that hasn't actually been put into evidence. I mean, you kind of -- or first of all, are you offering the exhibit into evidence?

ROBERT [redacted] Yeah, I wasn't questioning for an exhibit yet. I was asking a question because that was her testimony on transcript.

THE HEARING OFFICER: I mean, you were reading off from this exhibit you're asking --

ROBERT [redacted] That was prior.

THE HEARING OFFICER: Yeah.

ROBERT [redacted] That was prior.

I'm talking about December 11th.

THE HEARING OFFICER: All right. Do you want to put this exhibit into evidence?

ROBERT [redacted] Yes, I'm going to put P-29 into evidence.

THE HEARING OFFICER: This is P-18.

ROBERT [redacted] Yes, I'm -- now I'm referring to P-29. So, my question with her --

THE HEARING OFFICER: Oh, wait a minute.

So, you're not trying to get --

ROBERT [redacted] I took it off the screen, as you can see. This is --

THE HEARING OFFICER: You're not trying -- well, let me ask you. You're not offering P-18 into evidence then?

ROBERT [redacted] I did offer P-18. That was prior. That was prior.

So, I'm going to bring up another, which --

THE HEARING OFFICER: Okay. Well, but you never actually offered into evidence and got a ruling.

So, are you asking --

ROBERT [redacted] Well, I would like to get a ruling on P-18, if that's the correct procedures.

THE HEARING OFFICER: Yeah.

ROBERT [redacted] Because we have limited time and I'm not going to get through my questions, sir.

THE HEARING OFFICER: Does the District have any objection to P-18 being admitted into evidence?

ATTORNEY ROSEN: No.

THE HEARING OFFICER: No? Okay. P-18, without objection, P-18 is admitted.

ROBERT [redacted] Okay.

(Parent Exhibit Number 18, marked for identification and noted in index.)

THE HEARING OFFICER: Okay.

ROBERT [redacted] I would like to introduce --

THE HEARING OFFICER: Now, you're moving on to P-29, is it?

ROBERT [redacted] Yes. That is correct, yes.

THE HEARING OFFICER: Okay. All right.

ROBERT [redacted] And for the record, I asked Ms. Rizzo about the -- her testimony last time about scheduling the meeting for 10 a.m. So, I will bring up -- I will now introduce Parent's Exhibit 29.

THE HEARING OFFICER: Let me just see if P-29 was

already previously admitted.

It doesn't look like it.

ROBERT [redacted] I believe it was, because Mr. Rosen had brought this up as one of his. So, this --

ATTORNEY ROSEN: Yeah, I have no objection.

It's in evidence on my notes.

THE HEARING OFFICER: All right. P-29 is admitted without objection. All right. Very good.

ROBERT [redacted] Okay. Great. So, let me just get this up here. We'll all be able to see it on my screen now.

BY R. [redacted]

Q. So, you received an e-mail from us stating on -- let me see here. On November 20, 2024, which is that we were not available for the December. We were not available for 10 a.m. on December 11th. Is that correct?

A. Correct.

ROBERT [redacted] Okay. I would also like to bring up another exhibit to get that into record. That would be P-30. I don't believe this has been offered into evidence, which I would like to offer that into evidence. Let me bring that up.

This would be the December 10th e-mail about our outplacement for our son [[redacted]

THE HEARING OFFICER: Do you stipulate to the exhibit, or do you want them to lay some foundation?

ATTORNEY ROSEN: Previously, I believe we stipulated that this could come in.

THE HEARING OFFICER: Oh, okay. I'll have to look at my -- okay. All right. Let me look at my notes from the beginning.

Actually, I don't have it in my list, but okay. If you have no objection, P-30 is admitted without objection. Go ahead.

BY R. [redacted]

Q. Okay. And in that e-mail, we specifically stated that we agreed to, as per the e-mail, that we agreed to, via e-mail, to schedule the PPT meeting for December 11, 2024, at 12:30 p.m. Is that correct?

A. Correct.

Q. Okay. Did the meeting occur at that time, at 12:30? We informed the District we were available?

A. It did not. I believe Ms. Stewart was not available at that time.

Q. And the District did not provide any written responses to our questions before our March 6th PPT meeting. Correct?

A. I'm not certain.
Q. Well, we have our e-mails. You testified on October 17th that the parents refused all PPT meetings. Correct?
A. I believe we were talking about the May meetings at that moment.
Q. We were talking about the -- everything combined, all the PPT meetings.
ATTORNEY ROSEN: Objection. Argumentative.
THE HEARING OFFICER: I mean, she clearly testified to --
ROBERT [redacted] That we refused the PPT meetings.
THE HEARING OFFICER: The May 25 meeting that you refused to attend, so that was the only one she testified to.
ROBERT [redacted] She also testified to the fall PPT meetings, too. That was part of her testimony. It will come up on transcript. She said we refused all of the meetings.
THE HEARING OFFICER: You did have meetings, so you couldn't have refused all of them, but --
ROBERT [redacted] Well, she said that we refused them all --
THE HEARING OFFICER: Anyway, just ask. Just ask the question.

ROBERT [redacted] Well, that was her testimony that we refused the meetings.

BY R. [redacted]

Q. Ms. Rizzo, if a parent states in writing, once all of our questions and concerns are answered we will then agree to a PPT meeting, that statement indicates a willingness to meet once their concerns are addressed.

Correct?

A. Typically, yes.

Q. How would such a written statement constitute a refusal to attend a PPT meeting?

A. Can you rephrase that question?

Q. How would such a written statement constitute a refusal to attend a PPT meeting?

A. I don't think a refusal, but there's a pattern of no end to the questioning.

Q. That wasn't part of my questioning. My question to you previously was that you did testify that the parents refused all the PPT meetings.

ATTORNEY ROSEN: Objection. Asked and answered and dealt with, and argumentative at this point.

THE HEARING OFFICER: Sustained.

ROBERT [redacted] Oh, I claim that question.

THE HEARING OFFICER: Sustained. Sustained.

BY R. [redacted]

Q. You also testified that the March 6th meeting was a continuation of the PPT process that began in May of 2024. Correct?

A. Can you repeat that?

Q. Sure. You also testified that the March 6th PPT meeting, March 6, 2025, was a continuation of the PPT process that began in May of 2024. Correct?

A. Not a continuation of May. It was a continuation --

Q. That's what was testified.

A. -- from the previous PPT.

Q. From the May. That was your testimony. That will come up on transcript.

I'm trying to lay the foundation. I'm trying to make a connection to what you testified last time, and I'm asking you questions about this. So, that was stated last time. It will be on the transcript.

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] I claim it.

THE HEARING OFFICER: I don't really understand the question. What do you mean by continuation?

BY R. [redacted]

Q. Well, the question was -- okay. I asked a simple question. You testified on October 17th that the March 6th meeting was a continuation of the PPT process that began in May 2024. Correct?

THE HEARING OFFICER: What do you mean by continuation?

ROBERT [redacted] I'll ask the question again, sir.

BY R. [redacted]

Q. Ms. Rizzo, you also testified that the March 6th meeting was a continuation of the PPT process that began in May of 2024. Correct?

THE HEARING OFFICER: At this point, I'm going to sustain the objection.

I mean, you know that you're --

ROBERT [redacted] I think that's a question --

THE HEARING OFFICER: Your question is too vague to be answered.

ROBERT [redacted] Well, they're not vague.

THE HEARING OFFICER: Just ask another one.

ROBERT [redacted] Excuse me, Hearing Officer Kennedy. I don't believe that's right.

THE HEARING OFFICER: The objection is sustained.

ROBERT [redacted] She testified here -- for the record, Hearing Officer, she testified at last hearing --

THE HEARING OFFICER: Have you noticed that when I rule on the District's objections, they don't argue with me? They just accept it and move on.

ROBERT [redacted] Well, Hearing Officer, I would also --

THE HEARING OFFICER: Even if it goes against him.

ROBERT [redacted] -- for the record, I feel like I'm being silenced here.

THE HEARING OFFICER: I mean, you're filibustering away your own time.

ROBERT [redacted] I'm not, sir.

THE HEARING OFFICER: Just ask another question.

ROBERT [redacted] You're not letting my answers come in, because I'm trying to show that this is what she testified to, and now you're not allowing -- and now you're objecting to it because it was testified. It will show that up on transcript, and that's the point I'm trying to make.

She testified on March 6th, that this March 6th -- that on the 17th, the March 6th meeting was a continuation of the PPT process that began in May. That was her testimony and I asked her if it was correct, and I'm not getting an answer.

And I -- that is -- I've never heard of such a thing. The question has to be answered. It was

testified to.
THE HEARING OFFICER: The objection is sustained.
Just move on.
BY R. [redacted]
Q. Okay. Ms. Rizzo, you're aware that the March 6th meeting was requested by the parents. Correct?
A. Correct.
Q. Okay. The notice for the meeting stated its purpose was parent request, and to review or revise the IEP. Correct?
A. Correct.
Q. Okay. Ms. Stewart responded that the District would answer questions during a PPT meeting. Correct?
A. Correct.
Q. Okay. You characterized the March 6th meeting in your own sworn testimony as a tense and accusatory -- as tense and accusatory. Correct?
A. Correct.
ROBERT [redacted] Okay. I'd like to bring up Exhibit 41. If we don't have this already in evidence, I'd like to get this into evidence.
ATTORNEY ROSEN: Objection. This was a piece of

evidence that was thrown out. This is the -- if it's the e-mail, I believe the full e-mail -- I just want to confirm that we are not talking about the audio recording.

THE HEARING OFFICER: I think we -- I already ruled on this. So, yeah.

ROBERT [redacted] Well, this is the e-mail now.

THE HEARING OFFICER: The objection is sustained.

ROBERT [redacted] You ruled on the audio recording itself, not the e-mail, sir.

THE HEARING OFFICER: Do you have an objection to the e-mail?

ATTORNEY ROSEN: No, no. That's what I wanted to clarify. Thank you.

THE HEARING OFFICER: Okay. So P-41, the e-mail, is in. The audio recording is out.

(Parent Exhibit Number 41, marked for identification and noted in index.)

ROBERT [redacted] Okay, this is the e-mail.

BY R. [redacted]

Q. Okay. This is the e-mail that was sent on March 10, 2025, and you were CC'd. Correct?

A. Correct.

Q. This e-mail, is this accurate, a reflection of the meeting that occurred during March 6, 2025? If you would like to read it?

ATTORNEY ROSEN: Objection. This is the parent's e-mail.

ROBERT [redacted] Right, the e-mail, and what -- I don't even see why there's an objection, and why attorney -- Mr. Rosen is wasting my time here.

BY R. [redacted]

Q. I'm asking a question, is that I had -- she was CC'd on this, and I wanted to ask if this is -- what is stated here in this e-mail is correct on what the meeting -- what happened at the meeting. If it's -- everything that's stated here is what happened at the meeting, if it's correct?

A. I would not agree that this is an accurate depiction.

Q. So, if we had the audio file into evidence, would your testimony remain the same?

A. Yes.

Q. The March 6th meeting was requested by the parents for the purpose of addressing parental concerns. Right?

A. Correct.

Q. Okay. At the March 6th meeting, I requested clarification on why the December 17th PPT notice was generated without transition language, and while the January PPT notice included transition language. Correct?
A. I'm sorry. You said that very fast.
Can you please repeat that?
Q. Sure. At the March 6, 2025 meeting, I requested clarification on why the December 17th PPT notice was generated without transition language, while the January PPT notice included transition language.
Correct?
A. I do recall that, yes.
Q. Okay. The meeting resulted in no formal revisions to the goals, objectives, or services of the IEP. Correct?
A. Correct.
Q. Okay. The primary change made during the March 6th meeting was the update to the parent note concerns section of the IEP to reflect our input. Correct?
A. I believe so, yes.
Q. Okay. I'd like to get that introduced into evidence, which would be --

A. I believe -- if I may? Ms. Stewart had indicated that this was not typical, but that she was going to add that for you.

ROBERT [redacted] That's not the question I asked. I would -- I'd like that stricken from the record. That is not the question that I --

THE HEARING OFFICER: Actually, there was no question pending at the time you said that. So, your attorney can cover that and redirect if he wants.

ROBERT [redacted] So, P-55, I'd like to get -- let me stop sharing this. That's why I was confused here.

Okay. Here it is. Okay. This is the P-55. This is the IEP, that meeting date on 3/6/2025. I'd like to request that this get submitted into evidence.

ATTORNEY ROSEN: I'm objecting as this is duplicative of the IEP that's already in evidence as Board Exhibit 25.

ROBERT [redacted] I would object to that. I would like this to get this in evidence, because this shows that the parents' note section had been updated to reflect the District's actions and behaviors, and we noted our concerns in this.

So, this was the only update that the

meeting -- this is the only update that resulted in the change of this IEP, it was just the parent note section here. So, I would like to get this submitted into evidence, and I believe it is relevant.

ATTORNEY ROSEN: This exact text is already in evidence as B-25. I believe another copy of the same IEP is duplicative.

ROBERT [redacted] Well, I believe the whole IEP needs to be in because it shows it is in the IEP.

THE HEARING OFFICER: Yeah. I mean, is there any actual difference between the Board's exhibit and this exhibit?

ROBERT [redacted] If it's the same one, then we have it. If it's the same IEP from -- if it's this one, then it's already in evidence, but I brought it up because this is my test -- this is my cross-examination.

So, if this is the exact meeting date 3/6/2025 -- then if it's already in evidence? I don't know how this works, if the parent can have the same exhibit into evidence, but if it is, then it is. But I'm --

THE HEARING OFFICER: There's never really any harm in a duplicate exhibit. I mean, I'm not going to

scrutinize it line by line to make sure it's exactly the same. So, I mean, the exhibit obviously itself isn't objectionable. You know the District has already put it into theirs.

So, even though it's duplicative, I don't see any harm in that. So, I'll just admit it.

ROBERT [redacted] Thank you.

(Parent Exhibit Number 55, marked for identification and noted in index.)

THE HEARING OFFICER: All right?

ROBERT [redacted] Okay. Let me stop sharing that.

BY R. [redacted]

Q. Ms. Rizzo, you testified in your sworn testimony that the social worker, Ms. Dougherty, the action of having [[redacted] call home was a strategy and a trial to practice. Correct?

A. It was something she was trying with him, yes.

Q. So, your testimony is that it was a trial and practice. Correct?

A. I'm not sure what you mean by practice.

Q. So, let me ask the question again.

Ms. Rizzo, you testified in your sworn testimony that the social worker's action of having [[redacted] call home was a strategy and a trial to practice. Correct?

A. It was a strategy she was trying with him to give him opportunities to practice is the -- I think that's what you're asking me.

Q. No, I'm asking if this was your sworn testimony last time. I'm asking you if you can confirm that, please?

ATTORNEY ROSEN: Objection. Asked and answered.

THE HEARING OFFICER: Whatever she said is in the record, so.

ROBERT [redacted] It would be in the record. Okay.

BY R. [redacted]

Q. The next question, can you reference any BIP, IEP goal, behavioral plan, or official school documentation that lists this calling home as an agreed-upon strategy?

A. I don't think it was within those documents, but we try strategies with students all the time that aren't written into formal documents. We're always just trying to meet their needs in the moment.

Q. Shouldn't have this been officially into one

of those documents?
A. I'm sorry. Can you repeat that?
Q. Shouldn't -- if this is the calling home strategy, shouldn't have this been agreed upon and documented into one of these, either a BIP, IEP, or any appropriate school documentation?
A. The issue where she had him calling home was not something that was related to his IEP. It was a separate circumstance that had come up. So, I think that she was trying a social skills strategy with him.
Q. Did you reach out --
A. It -- no.
Q. Did you reach out ahead of time to the parents that you were going to implement this strategy or practice?
A. No.
Q. Okay. You were aware that during one of these calls, which I had reiterated to you in an e-mail, that Ms. Dougherty, the social worker interrupted [[redacted] and instructed him to say, no, that you put your hands on another child. Correct?
And I can bring up Exhibit P-25. I

would like to offer that into evidence.
A. I'm not sure what the question was.
Q. Okay. I'll ask the question again. You were aware that during one of those calls, Ms. Dougherty, the social worker interrupted [[redacted] and instructed him to say, no, that you put your hands on another child. Correct?
A. I wouldn't say interrupted him. She redirected him, because he started to talk about something else.

ROBERT [redacted] Okay. I would like to get P-25 into evidence. Forcing [[redacted] to call home is the subject line. I don't know whether P-25 is already in. Does the District have any objection if it's not?

ATTORNEY ROSEN: No.

THE HEARING OFFICER: Okay. So, P-25 is in without objection.

(Parent Exhibit Number 25, marked for identification and noted in index.)

BY R. [redacted]

Q. And here I do explain to you -- which we do have a voice message -- what we heard in the

background. And so, my question to you is that you are aware that we sent you this e-mail about Ms. Dougherty, what she had stated to [[redacted] Correct?

A. I am aware of this e-mail, yes.

Q. You also testified that Ms. Dougherty was cueing [[redacted] back to the topic during the call. Correct?

A. Correct.

ROBERT [redacted] Okay. I would like to get into -- Exhibit P-22, if this is not already into evidence. Let me get this here. This is an e-mail regarding information regarding recent events.

THE HEARING OFFICER: Okay. P-22. Let me see if it's -- that one is already in.

ROBERT [redacted] Oh, this one is in? Okay. Great. Let me just move these boxes here.

BY R. [redacted]

Q. Okay. In this e-mail you state that you wanted to clarify what happened. When it was time to line up, the other student ran past [[redacted] to get to the assigned line spot. There was no contact by the other student. [[redacted] put his arm out as the student ran by.

So, this was an e-mail that you sent to us October 24th explaining this situation.
Correct?
A. Correct.
Q. Okay. [[redacted] has [redacted] and [redacted] as part of that condition. Correct?
A. As part of what condition?
Q. [redacted]
A. Oh, that is possible, yes, that, that he has [redacted] which we've discussed this before.
Yes.
Q. That's not the question I asked you, if we had discussed it. I had asked you a direct question that [[redacted] has [redacted] and [redacted] as part of that condition. Is that correct?
A. Yes.
Q. Okay. And going forward, if you could please answer the questions directly as I'm asking them and not your interpretation of how you want to answer them, I would appreciate that.
Thank you.
So, if Ms. Doherty's statement or cue was reported by [[redacted] that could reasonably be explained by his [redacted] [redacted]
Correct?

A. My understanding --
ATTORNEY ROSEN: Objection, calls for speculation.
ROBERT [redacted] Well, she -- I have to say that Ms. Rizzo testified that she has a master's degree and Ms. Dougherty (unintelligible) --
THE HEARING OFFICER: But in --
ROBERT [redacted] -- over her background.
THE HEARING OFFICER: In education, not [redacted] So, it's not -- you're asking an opinion of someone who's a lay witness for these purposes, so.
ROBERT [redacted] Well, the thing is, is that she deals with special-needs children. And if she doesn't know about [redacted] then my whole thing is that, well, then how can then -- then that wouldn't make any sense. You have to know about [redacted] if you're doing --
THE HEARING OFFICER: I'm going to sustain the objection.
BY R. [redacted]
Q. Does Milford Public Schools have any written policy allowing staff to participate in a student's call home to parents?
A. Can you repeat that one more time?
I want to make sure I got it.
Q. Does Milford Public Schools have any written

policy allowing staff to participate in a student's call home to parents?

A. A policy allowing it? No, not -- not that I'm aware of.

Q. Okay. Exhibit 15, which I brought into evidence last time, which states, in terms of behavior, [[redacted] did -- by Ms. Truscello, she had gave us an update on, I believe it was May 14th or 15th. In terms of [[redacted]s behavior, [[redacted] did a nice job last week, joining another fourth-grade class while in his room; finished up on SBA testing.

During his testing times he was able to -- been able to complete the test and then remain quiet for the other students working.

Correct? You were CC'd on that e-mail. Correct?

ATTORNEY ROSEN: Objection. This exhibit is not in front of the Witness.

ROBERT [redacted] Okay. I can bring up that exhibit. I'll get that here. Let me stop sharing this.

Let me share this now.

THE WITNESS (Rizzo): I apologize. Our facility is mowing out in front of my window, so I don't know if you can all hear that. That's why I'm having a

little trouble hearing.

BY R. [redacted]

Q. This is the e-mail that I'm referring to, may 16, 2024. You were CC'd on this e-mail from Ms. Truscello. Correct? I'm sorry --

A. Yes.

Q. Okay. Let me just get to that part here.

During the March 6, 2025, meeting, you stated that the teachers came to you at the very end of the year and admitted they were stuck in meeting [[redacted]s needs. Correct?

A. I don't recall saying stuck.

ROBERT [redacted] And for the record, Hearing Officer, this is exactly why we're asking for the audio to come in. I know you ruled in it, but I just would like to make that for the record. This is why we asked. Okay. So, moving on.

BY R. [redacted]

Q. You testified on October 17, 2025, that an alternate placement was considered because you stated JFK Elementary, referring to JFK Elementary, that they can't and simply really don't have the resources to support him.

Correct?

ATTORNEY ROSEN: I'm sorry. Is Mr. [redacted] referring

to this exhibit?

ROBERT [redacted] No. I am referring to testimony --

THE HEARING OFFICER: What actually are you --

BY R. [redacted]

Q. I'm referring -- I'll get this off the screen. I am referring, you testified on October 17th that an alternate placement was considered because you stated that we can't and simply don't have the resources to support him. Correct?

A. I believe in that part of my testimony, I was talking about the structured supports that he might require in terms of paraprofessional hours --

Q. That's not the question I'm asking. You're going off topic. I'm asking you a direct question. If you could (unintelligible) --

ATTORNEY ROSEN: Objection. Argumentative.

THE HEARING OFFICER: Now she's answering --

ROBERT [redacted] I claim the question.

THE HEARING OFFICER: Sir, she's answering the question. Let her finish. Go ahead.

THE WITNESS (Rizzo): I -- I don't think I was. I mean, I -- I feel like there's an inference here that I was saying our whole program was not able

to meet his needs, but we were specifically, from my recollection, talking about this structured support that he might need might be beyond what our school can offer.

BY R. [redacted]

Q. That's not what I asked. So, the question is that you testified on October 17th that an alternate placement was considered because you stated, we simply don't have the resources, referring to JFK Elementary?

ATTORNEY ROSEN: Objection. Argumentative, and asked and answered.

ROBERT [redacted] That's not argumentative. That's what she testified to.

THE HEARING OFFICER: Sustained. I mean, she clearly was testifying about a potential placement in another school because of what wasn't at JFK, and what was the structured supports that were at the other school.

So, I mean, I remember the testimony.

ROBERT [redacted] Right. So simply, she's saying that here at JFK we simply don't have the resources to support him here. That's why we're going to propose another change to another placement in the District.

So, that's the link I'm trying to make, is that she claimed that JFK simply didn't have the resources -- and her testimony, can't and simply don't have the resources to support him at JFK.

ATTORNEY ROSEN: Objection. Testimony.

THE HEARING OFFICER: Yeah, ask a question.

BY R. [redacted]

Q. Yeah. So, that's the question I'm trying to ask. That's what I'm trying to get at, is that you testified that you really don't have, simply don't have the resources to support him at JFK. Correct?

ATTORNEY ROSEN: Objection. Argumentative, and asked and answered.

ROBERT [redacted] That's not argumentative. That was on the transcript. So, if I can't --

THE HEARING OFFICER: I mean, she already answered the question.

So, there's really nothing more. There's nothing more to ask --

ROBERT [redacted] And I feel like you're defending the District. Hearing Officer Kennedy, it's like you're trying to say, well, this is what they meant. I believe you're supposed to remain fair and impartial, and not interpret what she meant.

THE HEARING OFFICER: I mean, I'm --

ROBERT [redacted] I think that's (unintelligible) --

THE HEARING OFFICER: -- saying that that's what she testified to. And she just answered your question as to what she was testifying to, so.

ROBERT [redacted] I really don't feel that this is fair. My questioning, my questions are getting deflected and I don't believe that's fair for me.

Because this is going to, you know, there's going to be a final ruling on this, Hearing Officer. If I can't get my questions answered, and when I'm asking direct questions and you're finding ways to deflect them, that's not fair to me, because I've asked -- these are related to what she testified to, and that's what -- that was her testimony, and that will be on record.

THE HEARING OFFICER: You've got 22 minutes.

So, I suggest you ask your next question.

ROBERT [redacted] Right, and -- yeah, and you brought that up. It puts a lot of pressure on me.

I'm directing your attention to the January 26th e-mail between miss -- oh, let me -- I would like to get Exhibit P-1 into evidence. I don't believe that is in evidence here.

ATTORNEY ROSEN: I'm going to object to the inclusion

of P-1. It's a January 26, 2023 e-mail. That's not a timeframe that's at issue here.

Further, Mr. Rizzo is not on this e-mail and cannot possibly testify to it.

ROBERT [redacted] Well, this will come up during my test -- if that's the proper procedure, I do claim it, because it is part of my, you know, my original complaint.

So, I'm proving that this e-mail shows that [[redacted] has -- currently will have access to everything he needs. And they did not -- they agreed that Matthewson would not be appropriate for him. So, yes, this e-mail --

THE HEARING OFFICER: Both, both grounds of objection are correct. I mean, there's nothing to ask this Witness about. And in any event, it's the 2022-'23 school year, so it's not within the timeframe covered by the complaint.

So, sustained.

ROBERT [redacted] Well, it's also the '23 school year, so.

THE HEARING OFFICER: Well, I mean, we go by school year. So, it's like '22-'23, '23-'24, and this is not within the '23-'24 school year.

So, no, P-1 is excluded. Go ahead.

BY R. [redacted]

Q. During the February 7, 2024, PPT meeting it was determined that [[redacted]s current placement and supports at JFK were appropriate.
Correct?

A. Yes.

Q. Between the February 7th PPT meeting and May 30th, your e-mail proposing a change in placement, there were no new evaluations, no updated FBA or BIP, and no formal data showing a regression or behavioral escalation. Correct?

A. I can't be certain of that. I'm not sure what his resource teacher shared with you within that timeframe.

Q. But I'm saying there's nothing. My question was, there is no FBA, BIP, or official school documentation that shows this. Correct? There's nothing. There's nothing written about this. Correct?
Between February 7th and May 30th -- that was the direct question. There was no new evaluations or updated FBA or BIP, and no formal data showing a regression or behavioral escalation. Correct?

ATTORNEY ROSEN: Objection. Argumentative, and asked an answered.
ROBERT [redacted] No, she didn't --
THE HEARING OFFICER: Oh, well --
ROBERT [redacted] She answered it --
THE HEARING OFFICER: It's not -- I mean, you're asking about several different things. So, it's --
ROBERT [redacted] Right. I'm asking about school (unintelligible) --
THE HEARING OFFICER: It's really a compound question. I mean, you have to break it up a little bit.
ROBERT [redacted] Okay. Then I'll break it up.
BY R. [redacted]
Q. Between the February 7th PPT and your May 30th e-mail proposing a change in placement, there were no new evaluations. Correct?
A. Not that I'm aware of.
Q. And there was no updated FBA or BIP, and no formal data showing a regression or behavioral escalation. Correct?
A. I'm not certain.
Q. Therefore, your statement that JFK can't simply and don't have the resources contradicts the District's earlier written representation that [[redacted] currently and

will -- well, that he -- that you can't and simply don't have the resources, that would not be correct. Right?

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] It's not argumentative. I'm trying to --

THE HEARING OFFICER: Sustained.

BY R. [redacted]

Q. Did you conduct a formal reevaluation of [[redacted]s needs between May 14th and May 30th, a placement proposal that recommended a move to Matthewson program?

A. No.

ATTORNEY ROSEN: Objection, asked and answered.

ROBERT [redacted] But she said, no. I -- she just testified, no. She testified, no.

THE HEARING OFFICER: I'll allow it. She testified. That's fine.

ROBERT [redacted] She testified, no.

BY R. [redacted]

Q. Did the May 14th teacher report document any physical threat or harm to staff or other students?

A. Can you repeat that one more time?

Q. Did the May 14th report that we got an update

from Ms. Truscello, which previously you testified that you were aware of, did that have any -- was there any report of any physical threat or harm to staff or other students?

A. I'm not sure if that was an e-mail or not. I'm --

Q. That was the one we just got into evidence, which was May 14th about him, about his -- a positive update.

ATTORNEY ROSEN: Objection. Argumentative. If there's an exhibit and he wants her to comment on --

ROBERT [redacted] That was the same one just put in. I was referring to one she just --

ATTORNEY ROSEN: -- it should be provided.

THE HEARING OFFICER: Which exhibit? Which exhibit are your referring to?

ROBERT [redacted] Now I only have ten minutes and I have to get through these questions. So, I'm talking about the exhibit, about May 16th.

THE HEARING OFFICER: All right. But if you're --

ROBERT [redacted] From Ms. Truscello.

THE HEARING OFFICER: If you're going to refer to an exhibit, you're really going to have to put it up --

ROBERT [redacted] Okay. Was there any --
THE HEARING OFFICER: -- for her to answer. I mean, you may want to try to ask questions that you don't have to keep referring to exhibits for.
BY R. [redacted]
Q. Okay. Was there any report of any documentation of physical threat or harm to any staff that was reported to us by Milford School District, you know, between February 7th and May 30th?
A. I'm not certain.
Q. I'm sorry. If you could please elaborate that? You're not certain?
ATTORNEY ROSEN: Objection. Asked and answered.
THE HEARING OFFICER: Yeah. I mean, I'm not certain is I'm not certain. You can't really elaborate on that. She answered the question.
So, just ask another one.
BY R. [redacted]
Q. Between May 14th and May 30th I sent multiple written communications complaining about conduct of specific staff members. Correct?
A. I'm not certain if there were multiple. I -- I don't have any documents in front of me.
I'm not certain.

ROBERT [redacted] That would be between May 14th and May 30th. I can bring that up fast, but you know, because if I'm -- the time is ticking, I probably have to get through these questions. So, I would probably rather get through these questions than to bring up a document that's going to take ten minutes.

So, if I could ask for an extra 10 or 15 minutes, can I be granted that, Hearing Officer, because I'm trying to make this as efficient as possible? I have the questions. As you can see, there weren't many that were objected to based on, you know, relevance or really anything else. So, I'm trying to -- I took time to streamline these.

So, if I could get an extra maybe --

THE HEARING OFFICER: You've been spending an undue amount of arguing, arguing even in this last hour.

So, just --

ROBERT [redacted] I'm not arguing.

So, may I get an extra 15 minutes. Can I? May I?

THE HEARING OFFICER: That's denied. Finish.

Finish your cross-exam. Make it efficient.

ROBERT [redacted] That's what I'm trying to do.

BY R. [redacted]
Q. The May 30, 2024, e-mail proposing a placement change was sent after you received those complaints. Correct?
A. I'm -- I don't feel I can answer that. I don't -- I don't recall the multiple complaints that you are referring to.
ROBERT [redacted] Okay. I will bring that up for a minute. Okay. These are the multiple complaints. They're all in yellow so you can read them.
THE HEARING OFFICER: For the record, you're referring to P-15?
ROBERT [redacted] Yes. I'm referring to P-15.
THE HEARING OFFICER: Okay.
ROBERT [redacted] That I did send, that [[redacted] informed me the other day that he asked Mr. Truscello if he could use the boys restroom.
So, I did make -- basically, I'm not going to go through this and waste my time. I just want to confirm that I did, you know, make multiple complaints about staff members, and how he was upset, and this happened on May 27th and I spoke with [[redacted]
BY R. [redacted]
Q. You know, so this happened on, actually, even

June 3rd. But between, you know, that timeline, I did complain about multiple staff members before you had, you know, proposed a change to Matthewson. Is that correct?

ATTORNEY ROSEN: Objection. Testimony.

BY R. [redacted]

Q. So, the May 30, 2024, e-mail proposing a placement change was sent after you received these complaints. Correct?

A. It appears so, yes.

Q. Okay. Between May and June of 2024, you stated the purpose of the PPT was to discuss an ultimate placement at Matthewson.

Is that correct?

A. I believe initially you were just invited in for a program and placement, and then you had asked which program we were thinking about.

Q. No, I'm talking about your May 30th e-mail, when you reached out to us. You primarily -- you reached out to us. It was regarding a change in placement to Matthewson. Correct? When you first reached out to us on May 30th?

A. No, it was a program and placement. Matthewson was not named, I believe, on that, on that date.

I would have to have -- look back at the e-mail, but I believe it was just inviting you in for -- to discuss programming and placement for a review and revise.

ROBERT [redacted] Okay. I'd like to -- this is Exhibit P-16. I believe we have this in the evidence, and I'd like to scroll down to get this into the record.

Is P-16 admitted into evidence?

THE HEARING OFFICER: Let me see. These would be the original ones. So, I think this was, yeah. Let's see. Yeah, it was admitted during the testimony.

All right. Go ahead.

ROBERT [redacted] Okay.

THE HEARING OFFICER: Yeah, there it is.

BY R. [redacted]

Q. Okay. On June 1st, 2024, it says, Amy Rizzo, we would like to discuss the program at Matthewson. So, is that correct?

This is why you don't --

ATTORNEY ROSEN: Objection. Mr. [redacted] is referring to an exhibit that's not in front of Ms. Rizzo.

ROBERT [redacted] Oh, I'm sorry. This is not in front of her? I apologize. I thought it was shared.

My apologies. Let me see.

THE HEARING OFFICER: Yeah, you're on P-15.

ROBERT [redacted] All right. There's something wrong with my screen right now, and my time is very limited -- and I don't know. I'm kind of locked up here, so I can't even -- hold on.

Here we go. All right. P-16. Okay. Right here.

BY R. [redacted]

Q. Saturday, June 1, 2024, we would like to discuss the program at Matthewson. This was your e-mail to us. Right? The reason that you wanted to bring us in for this meeting from May 30th. Correct?

A. Correct. It was in response to you asking where.

Q. Right.

A. What location.

Q. So, my question to you is that you wanted to bring us into a meeting because you wanted to discuss a possible change in placement to Matthewson. Is that correct?

A. As a possibility, yes.

ROBERT [redacted] Okay. Thank you.

I'm trying to -- I have a lot of questions and I only have a few minutes, so I'm under a lot

of stress and pressure now, for the record. And I'm trying to ask questions so I can get them in, but I'm not going to be able to get everything in.

And the Hearing Officer, for the record, refuses to give me an additional maybe 10 or 15 minutes max. Is that correct, Hearing Officer?

I can't get an extra 10 or 15 minutes?

THE HEARING OFFICER: Yes.

ROBERT [redacted] That would prejudice us, for the record.

THE HEARING OFFICER: Yeah. Your screen is frozen up.

BY R. [redacted]

Q. After we explicitly stated on July -- (inaudible).

So, again, this is referring to P-16?

A. I'm sorry. I didn't hear your question.

THE HEARING OFFICER: You froze up. So, I don't think --

ROBERT [redacted] Yes, I know. I'm having a problem with my screen now and it's wasting my time here. I'm trying to -- I'm having an Internet, you know, stability issues with my Internet. I don't have control over that, sir.

BY R. [redacted]

Q. So, this e-mail that I had sent to you on --

(Pause.)

Oh, the change in Matthew -- let me find that here.

We do not -- We are not in agreement with [[redacted] attending Matthewson program. We stand firm on our position. Therefore, we will not be attending a PPT meeting in the fall.

So, this is referring to the e-mail that I had sent to you that we were not in agreement of Matthewson. Correct? After you sent us a proposed change that you wanted to hold a meeting. So, my question to you is, is that you were aware of this e-mail that we sent you. We were not in agreement of the proposed change to Matthewson.

Is that correct?

A. Yes, I see the e-mail before me.

Yes, I did receive that.

ROBERT [redacted] Okay. I'd like to bring in another exhibit here. This is P-17. I'm going to share this one here -- and my screen is frozen. Shoot. If this is --

THE HEARING OFFICER: I have 11:02. Because of the problems in the last few minutes with repeated

screen freezings, I'll give you another five minutes. So, that gives you to 11:12. That's ten more minutes.

ROBERT [redacted] Okay. Thank you, sir.

Okay. I'd like to get P-17 admitted into evidence, if this is not into evidence. P-17.

THE HEARING OFFICER: P-17. So, it wasn't originally.

I don't see P-17. Does the District have any objection to that one?

ATTORNEY ROSEN: No objection.

THE HEARING OFFICER: All right.

ROBERT [redacted] Okay. Great.

THE HEARING OFFICER: Admitted without objection.

(Parent Exhibit Number 17, marked for identification and noted in index.)

BY R. [redacted]

Q. Okay. After we explicitly stated, which I just explained in our e-mail to you, that we did not agree with [[redacted] attending the Matthewson program under no circumstances, and we would not attend a PPT meeting -- so, that was already established. That was the foundation.

So, my question to you is that after we explicitly stated that we didn't agree to the change to Matthewson, you had submitted an e-mail to us on August 2nd saying there had been a miscommunication and a misunderstanding about the purpose of the PPT meeting. Correct?

A. Not about the purpose. My meaning in miscommunication and misunderstanding was your inference that we were kicking [[redacted] out. That's what I was responding to --

Q. That's not the question I asked you.

So, right here it says, we understand there has been a miscommunication and misunderstanding of our attempts to hold a PPT meeting to discuss [[redacted]s programming for the '24-'25 school year. So, you testified earlier that on May 30th you reached out to us because you wanted to propose a change to Matthewson that you wanted to discuss.

That's correct. Right?

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] So, I just established the foundation. On May 30th she had --

THE HEARING OFFICER: You can answer that question.

THE WITNESS (Rizzo): Yes, we were inviting you in to discuss the possibility.

BY R. [redacted]

Q. The possibility of a change to Matthewson, right. And we also stated to you that -- we explicitly stated to you that we did not agree in [[redacted] attending Matthewson.
Is that correct?

A. You just showed the e-mail that -- that stated that. Correct.

Q. Okay. And then on your August 2nd e-mail, you clarified that you did not intend to discuss a change in placement at this time.
Correct?

A. I don't have that e-mail.

Q. It's right in front of you.
It's right in front of you here.

A. Give me a second to just read through it, please.

Q. Please note the school-based team does not intend to discuss a change in placement at this time. Those are in your own written words, Ms. Rizzo.

A. Yes, I do. I do remember writing that, yes.

Q. Right. Do you agree that this statement that

you made was made only after the parents expressly rejected the Matthewson placement?

A. Yes, you made it clear that you would not entertain it or discuss it.

Q. Right. So, you agree that the statement that you made that you sent us this e-mail about the miscommunication and misunderstanding was sent only after we expressly stated that we were not in agreement of him attending Matthewson, not before?

ATTORNEY ROSEN: Objection. Asked and answered.

THE HEARING OFFICER: That's sustained.

She answered that.

ROBERT [redacted] So, she answered it correctly? Okay.

I just want to make sure it was correctly because of the way it was just answered.

ATTORNEY ROSEN: Objection. Testimony and argumentative.

ROBERT [redacted] I object to that.

THE HEARING OFFICER: Well, that wasn't a question. So there's, you know.

ROBERT [redacted] There's no argument.

THE HEARING OFFICER: It was just a straight comment.

BY R. [redacted]

Q. Does the miscommunication explain why there

were continued attempts to schedule the PPT meetings despite the parents' clear refusal to discuss placement changes?

A. I'm not sure what you're asking.

Can you rephrase?

Q. So, I'm asking your e-mail about, this has been a miscommunication and misunderstanding.

Does it explain why there were continued attempts to schedule PPT meetings despite the parents' clear refusal to discuss the placement changes?

A. I -- I'm sorry. I still don't -- I'm not clear on what you're asking me.

ROBERT [redacted] I'm going to ask the question again.

Hearing Officer, for the time I believe she's trying not -- avoiding answering the question. The question --

ATTORNEY ROSEN: Objection. Argumentative.

THE HEARING OFFICER: I don't really understand your question either, so.

ROBERT [redacted] Okay. My question is, is that Ms. Rizzo sent an e-mail, there has been miscommunication and misunderstanding. Okay? And does this explain why there were continued attempts that she wanted to schedule the meeting?

And I'm trying to ask if this was to explain why there were continued attempts to schedule the meeting. So, she wanted to schedule the meeting after we made it clear that the parents, our clear refusal that we were not in agreement of Matthewson.

So, that's -- so, the question I'm asking is that your attempts to hold a PPT meeting in May was for a proposed change in his placement to Matthewson.

THE HEARING OFFICER: Are you asking why she tried to schedule a meeting in August?

ROBERT [redacted] Well, she scheduled a meeting in May. Now -- yes, for this meeting alone. So, now --

THE HEARING OFFICER: All right. So, you can answer the question. Why did you try to schedule a meeting in August?

ROBERT [redacted] No, my question to her is that the meeting in August that she's now claiming that -- so, she's claiming that there has been a miscommunication and a misunderstanding of their attempts to hold a PPT meeting to discuss his programming. How could that be a misunderstanding --

THE HEARING OFFICER: You're testifying your time away.

ROBERT [redacted] Okay.
THE HEARING OFFICER: You've only got five minutes now.
ROBERT [redacted] Okay. Well, may I --
THE HEARING OFFICER: I was trying to -- yeah, I was trying to help you, you know --
ROBERT [redacted] May I please continue?
THE HEARING OFFICER: Yeah.
ROBERT [redacted] May I please continue? Thank you.
BY R. [redacted]
Q. Okay. This, the e-mail that you sent us, there has been a miscommunication and a misunderstanding, how could there be a miscommunication and misunderstanding when you clearly reached out to us in May to discuss a change in Matthewson?
A. As I previously testified, the miscommunication and misunderstanding was in response to your words that I was kicking [[redacted] out, throwing [[redacted] out.
You repeated (unintelligible) --
Q. That's not what it says here, Ms. Rizzo. Right here, we understand there has been a miss-under --
THE HEARING OFFICER: Now -- you're just arguing with her now. She's given her testimony.

ROBERT [redacted] Well, I'd like to get this in for the record. We understand there has been a miscommunication and a misunderstanding of our attempts to hold a PPT. That miscommunication of their attempts to hold a PPT, it had nothing to do with what she's claiming, what she just testified to about throwing [[redacted] out.

She wanted to hold a PPT meeting the end of May --

THE HEARING OFFICER: You're testifying.

Ask her a question.

ROBERT [redacted] Okay. So, then I can -- okay.

BY R. [redacted]

Q. So, my question to you is that in August, when you wanted to hold a PPT meeting, you said, the school-based team does not intend to discuss a change in placement.

Why all of the sudden was there a change to your previous e-mail where you wanted to discuss the change? What came about?

A. I think we already covered this.

You had sent an e-mail that said --

Q. Just answer the question.

A. You had --

ATTORNEY ROSEN: Objection. Argumentative.

Let her finish.

ROBERT [redacted] She's arguing.

THE HEARING OFFICER: Yeah, don't interrupt her.
Let --

ROBERT [redacted] She's saying, I think we already covered this. That's not for her to say.
So, my question to her is -- she's trying to avoid answering the question. My question to her is that --

THE HEARING OFFICER: Let her finish her answer.
Please continue, Ms. Rizzo.

THE WITNESS (Rizzo): You had sent an e-mail between our initial invitation, and this time there were e-mails sent that you said you would absolutely not entertain talking about Matthewson.

BY R. [redacted]

Q. Right. That is correct.

A. We looked at that evidence.

Q. So, then did you change -- so, basically, now that we made that clear that we would not be -- you wanted to discuss it. We were not in agreement.
So, my question to you is that -- is this, the e-mail that you're saying, is that you're now classifying that as a

misunderstanding and miscommunications of your attempts to hold a meeting, which how could there be a misunderstanding and miscommunication when you clearly wanted to discuss a change in placement?

There was no miscommunication about that. Was there?

ATTORNEY ROSEN: Objection. Asked and answered, compound question, argumentative, and testimony.

ROBERT [redacted] That is not. I could just --

THE HEARING OFFICER: All of the above. Sustained.

ROBERT [redacted] So, my question is --

THE HEARING OFFICER: I mean, you've only got a couple more minutes. So, you --

ROBERT [redacted] Can you please stop saying -- Hearing Officer, by you saying that, it's wasting my time and it's not -- I don't think that's fair to be, you know, reiterating what I have.

I would like to get this, and that loses my train of thought, you know, when you say that. You know, I know what I have. I don't really need to --

THE HEARING OFFICER: You should probably ask your next question.

BY R. [redacted]

Q. So, my question to you is that on this, this e-mail here that you wanted to hold a meeting that says right here, please note, the school-based team does not intend to discuss a change in placement at this time, but we would like to discuss his program at JFK to ensure that we would be meeting his needs.

So, according to this e-mail on May 30th, did you not want to discuss a change in his program at JFK to ensure that you were meeting his needs?

ATTORNEY ROSEN: Objection. Asked and answered.

ROBERT [redacted] No, it's -- no, that's -- it was not. I'm --

THE HEARING OFFICER: You know what? The way it's phrased this time you can. You can answer that. Go ahead.

THE WITNESS (Rizzo): So, I think what you're asking me is, were we not going to talk about JFK in May at a review and revise? We would --

BY R. [redacted]

Q. That's not what I asked you.

A. Is that what you're asking me?

Q. No, I'm asking you simply --

A. Oh.
Q. Because my time is ticking, Ms. Rizzo. If you could please answer the question directly. You said here, please note the school-based team does not intend to discuss a change of placement at this time, but we would like to discuss his program at -- so, you say here that you want to hold a meeting now, on August 2nd to discuss his program at JFK, but on May 30th, you did not want to discuss his program. You wanted -- because you couldn't. You stated that you couldn't meet his needs.
So, my question to you is that the reason that you wanted to hold this meeting starting on August 2nd was completely contradictory to the May 30th e-mail.
Is that correct?
A. I don't agree.
THE HEARING OFFICER: And that's your last question. It's 11:12. So, I had given you another five --
ROBERT [redacted] I have 11:11. I have 11:11 on my screen here.
THE HEARING OFFICER: Well, I'm going by my clock. So, that's what I started with.

So, any redirect?
ATTORNEY ROSEN: Just one moment as I look through my notes.
THE HEARING OFFICER: Okay.
ROBERT [redacted] Hearing Officer, I'd also like to, you know, just say for the record that the e-mails do speak for themselves. So, you know, regarding our testimony and the e-mails, you could see that when you do review them that they won't coincide with each other. So, like I -- the e-mails speak for themselves.
ATTORNEY ROSEN: All right. No redirect here.
THE HEARING OFFICER: All right. Thank you, Ms. Rizzo. You can step down and go back to running your school.
THE WITNESS (Rizzo): Thank you.
THE HEARING OFFICER: All right. Does the District call its next witness?
ATTORNEY ROSEN: Yes. Our second-to-last witness is Ms. Dougherty, the school social worker. She is going to be able to join us at 11:30, if that's all right?
THE HEARING OFFICER: All right. Do you want to just break until 11:30, and come back and you can start your -- all right.

ATTORNEY ROSEN: That would be good.
THE HEARING OFFICER: Yeah, we'll resume at 11:30.
ATTORNEY ROSEN: Thank you.
THE HEARING OFFICER: Okay.
THE REPORTER: Pausing the record.

(Pause: 11:12 a.m. to 11:32 a.m.)

THE HEARING OFFICER: So, we have everybody here. We can go back on the record.
So, you can call your next witness.
ATTORNEY ROSEN: Sure. The Board calls Lori Dougherty, please.
THE HEARING OFFICER: Okay, I'll have you raise your right hand.
L A U R I D O U G H E R T Y,
called as a witness, being first duly sworn by the THE HEARING OFFICER, was examined and testified under oath as follows:

THE HEARING OFFICER: Okay. You may proceed.
ATTORNEY ROSEN: Okay. Good morning, Ms. Dougherty.
THE WITNESS (Dougherty): Good morning.

DIRECT EXAMINATION (of L. Dougherty)

BY ATTORNEY ROSEN:

Q. Could you please state for the record who your current employer is?

A. The Milford Board of Education.

Q. And what is your current role with the Milford Board of Education?

A. School social worker.

Q. Okay. Now, Ms. Dougherty, I'm going to share with you what's marked in evidence as Board Exhibit 34.

Okay. Can you see at the top it says your name right here?

A. Correct, yes.

Q. Okay. So, this is a copy of your resume.

Correct?

A. Correct.

Q. Okay. And could you just explain to me, before we talk a little bit about your role as a school social worker, could you tell me about your educational history, please?

A. Sure. I did my undergraduate in the school social work -- no, in social work at Southern Connecticut State University. I did my

master's at Fordham University in the advanced standing program. From there, I did two advanced practices, post-degree certificates. That was with children and adolescents. And I have my sixth-year in administration.

Q. Okay. And I see here you listed military experience.

A. Uh-huh.

Q. Could you tell me a bit about that? Thank you for your service, by the way.

A. Oh, thank you. So, I joined the Army National Guard in 1984. I served -- I was enlisted until 1988 when I became -- I went to officer's candidate school and became a second lieutenant. And I stayed with the National Guard until 2022 -- 2002, I'm sorry.

So --

Q. Okay.

A. Yes.

Q. Wonderful. Thank you.

With respect to -- how long have you been practicing as a school social worker?

A. Since 1998. That was in New Haven Public Schools that I started, and then transferred

over in two-thou -- January of 2000, to Milford.

Q. The work that you were doing here, it says listed from 1996 to 1997 at Boys Village.

Were you also a school social worker at that time?

A. I was.

Q. Okay.

A. I was. I'm sorry, it's -- yes.

Q. No, it's all right. I know I scrolled briefly through.

How long have you been with Milford Public Schools?

A. Since January 2000.

Q. Okay. And could you tell me a little bit about your responsibilities as a school social worker currently for Milford Public Schools?

A. Sure. I -- I work with students from kindergarten through fifth grade. I help in teaching self-regulation, which means just basically how to control themselves when in the classroom setting, regardless of what type of diagnosis, like oppositional defiance disorder, or attention deficit disorder, or

there's many different kinds of behaviors that impact a student's functioning. So, helping them learn strategies to calm themselves down and be available to learning.

I've done a lot of work with the [redacted] population within the school system and also with the summer program. I -- but the summer program is high school students that I work with.

Q. And in your role as a school social worker does your responsibilities also include providing services for students who have individualized education plans?

A. Yes, the majority of my caseload is IEP students.

Q. Okay. And when a student is placed on your caseload do you familiarize yourself with the student's IEP and educational file?

A. Yes.

Q. Okay.

A. I --

Q. So, you're aware -- I'm sorry.

You were saying?

A. My interventions are based on the IEP.

Q. Okay. At times do you trial other

behavior-management strategies in response to situations that your student or you may encounter during a school day?

A. I do.

Q. Okay. And what would be the purpose of trialing different techniques that may not necessarily be reflected in an IEP or a behavior intervention plan?

A. To find out which strategies work best for the student.

Q. Okay. In the course of your role of a school social worker at Milford with the Milford Board of Education, did you ever become familiar with a student named [[redacted]

A. Yes.

Q. And how was it that you became familiar with [[redacted]

A. I provided small-group counseling for him.

Q. Okay. The small-group counseling that you're referring to, was that just counseling service that had been set up with him as a student? Or was that service set up through an IEP?

A. The service was through an IEP.

Q. Okay. Approximately when did you start

working with [[redacted]
A. Oh.
Q. Best estimate?
A. Okay. I'm not -- I'm not sure of the exact year when he came into JFK.
Q. No problem. Did you work with him during the 2023-2024 school year?
A. Yes.
Q. Okay. So, you were a member of his planning and placement team during the 2023-2024 school year?
A. Correct.
Q. And during your -- as a school social worker and member of his planning and placement team meeting, do you recall attending annual review planning and placement team meetings for [[redacted] during the 2023-2024 school year?
A. Yes.
Q. Okay. So, I'm putting it before you, what's been marked into exhibit -- into evidence as B-13. Can you see this document? It says individualized education program at the top?
A. Yes.
Q. Okay. Just let me know if my other screen with the background of my children shows up.

So, I wanted to make sure my screen share is working correctly.
So, the meeting date here is listed February of 2024, the annual review. Is this the annual review PPT meeting that took place for [[redacted] during the 2023-2024 school year?
A. To the best of my knowledge, yes.
Q. Okay. In looking at attendees here, do you see yourself listed as an attendee?
A. Yes.
Q. Okay. So -- and you're identified as social worker. At this -- what's the purpose of an annual review in your own words?
A. It is to go over the current level of functioning and review how the student did on the previous year's goals, if they were mastered. And then to -- to add new goals for the next coming year.
Q. So, when you say an IEP is demonstrated, or an annual review is to assess how a student is functioning, are we talking at that moment of the meeting?
A. It's from the date a year before the meeting up until the meeting.
Q. I see. So, you're assessing the progress and

the performance of the student from the previous IEP up until the date of the annual review?

A. Correct.

Q. And it's that student's then present levels of performance that inform the IEP moving forward?

A. Correct.

Q. Okay. So, you mentioned you provided small-group counseling services to [[redacted] What did small-group counseling services look like for [[redacted] at the time of this February 8, 2024, IEP?

If it helps, I'm just scrolling down to the service grid of the IEP. I see under related services -- but before you tell me about the small-group counseling, let me just confirm the counseling group, effective until February 14, 2025, four times per week, that's the counseling group that you're referring to?

A. Correct.

Q. That your work was involved when -- okay.

So, tell me what a typical session would look like.

A. The session would be [ [redacted] another student, Ms. Truscello and myself. And I would lead the group if -- a solo if -- if Ms. Truscello had -- was absent or something, was detained.
Q. Okay. And how did a typical session unfold? What would happen?
A. We would go to an alternate setting. We had a ViewSonic that had a calendar. So, we'd go over what day, what year. We do -- we -- according to the IEP, there would be a social skill that we would be focusing on.
We would watch a short video on that social skill, and then we would talk about how it's used in school and eventually giving examples of how each student utilized that skill in real life.
Q. When you say, we're taking a social skill from the IEP, are you referring to the goals in the IEP?
A. Goals and objectives.
Q. Okay. And to understand the goals that you're working on in the context of your small-group counseling, I see here on the column it says, goal ID 5 and 15. Does that correspond with the goals in the IEP that

your service is trying to work on?
A. Correct.
Q. Okay. So, I'm going to just scroll up for a moment to what's been -- what's listed in the IEP as -- I see goal 15 here, but let's first talk about goal 5. This talks about perspective-taking and social skills, I see from the top here.
Why was this a goal for [[redacted] as of the February 2024 annual review, to work on perspective-taking and social skills?
A. When [[redacted] was in a situation -- well, first it's based off of the previous year's goal. So -- but for this, when [[redacted] was in a situation, sometimes he would get very upset and not understand the other person's point of view, which could then lead to behaviors.
So, it was getting [[redacted] -- it was trying to help [[redacted] to understand how somebody else might feel in the same situation, and to help understand how others respond to what's happening.
Q. When you say, behaviors would sometimes happen, what behaviors are you referring to?
A. I would say that there were times that [[redacted]

would get very frustrated and would cry. There were times that he's thrown objects. There were times that he may have misunderstood what was happening and thought that a student was tattling on him when maybe the student was trying to say something that was to help [[redacted] to let the teacher know that he was struggling.

Q. And what were you doing to prevent these behaviors or help [[redacted] learn not to engage in these behaviors?

A. Well, we used strategies that were on the behavior intervention plan. So, those were strategies specifically developed to help [[redacted] with his coping skills.

Q. Uh-huh. Were those strategies sometimes used as part of practice to try and meet this goal?

A. Yes.

Q. Improving perspective-taking and social skills?

A. Yes.

Q. Okay. I just want to scroll down for a moment. So, we talked about two -- we saw two goals listed. I see goal 15.

Now, this lists explicit instruction on what funny -- I'm assuming there's an "is" missing between there. What's funny versus what is disruptive? Can you explain why this was a goal in [[redacted]s IEP as of February 2024?

A. [[redacted] had a habit of calling things out while the teacher was instructing. And from [[redacted]s own words, he felt that it was funny and he was trying to get his classmates to laugh.

So that, that screaming out, one time it was the word "chicken." It had nothing to do with the lesson that was happening and it was disrupting learning, and he did it in enough of the different environments. By that, I mean, gym, music, art, science, in the classroom that -- in small-group instruction, in the resource room that it needed to be identified and dealt with.

Q. And these objectives, it talks about the sorting through behaviors. And then I see the third and final objective is reflecting on behaviors and identifying times he may have been disruptive.

Why, in your opinion, was it important or was it included that [[redacted] reflects on his

behaviors as part of this objective?
A. First, it was important because in the -- in the moment when the behavior occurred, [[redacted] had difficulty self-regulating. He had difficulty calming down and he was unable to take responsibility for his behavior, but if you talk to him after some time had passed, [[redacted] was able to look at the situation and take responsibility for his behavior at times.
Q. In terms of working with [[redacted] and his behavior, would you encounter him elsewhere in the school outside of your small-group counseling sessions?
A. Yes.
Q. And what would be the context in which you would see him outside of small-group counseling instruction?
A. There were times that I attended what's called community meeting in the classroom, which is a 15-minute block of time where the students, they learn social-emotional skills and they take -- that they share information about themselves in order to build a classroom community.

There were times that I would see him at recess. I would see him at lunchtime, in the gym, because I work with many different students. So, I may have been in his class for a different reason, but I -- I basically did see [[redacted] throughout the school.

Q. And did you ever observe him during recess time?

A. Yes, I did on a regular basis.

Q. And why is that?

A. Because [[redacted] was having difficulty at recess.

Q. When you say, difficulty at recess, could you elaborate what did that look like based on your observations?

A. He would become very engrossed in the game. One of the games was tag and he -- he, instead of just tagging someone, he would be hitting them or pushing them in his excitement of playing the game.

So, it was trying to give him reminders and cues of good sportsmanship and how the game should be played.

Q. The cues that you're talking about, not only in terms of preventing [[redacted] from hitting peers, but would you say that's connected to

the goals about instruction on what is funny, what is disruptive, and, you know, perspective-taking with peers?

A. Definitely.

Q. Okay. At times, did you ever have to step in from a behavior management standpoint when [[redacted] was in the playground or elsewhere in another -- outside of your small-group counseling sessions?

A. Yes.

Q. I'm going to show you -- just give me one moment. I'm going to stop the screen share for a second as I pull up -- and I'll say for the record what it is in a moment. I just need to check.

(Pause.)

Okay. I'm going to share with you what's in evidence as the Parent's Exhibit 21. Do you see an e-mail titled, planning for the '24, slash, '25 school year on your team?

A. Yes.

Q. Okay. And looking at the e-mails, LDougherty@MilfordEd.org.

Is that your e-mail?

A. Yes.
Q. Okay. And [redacted]Verizon.net, who is that?
A. Mr. [redacted]
Q. Okay. I see that Mr. [redacted] is characterizing what he talks about below as continued and repeated emotional abuse towards our son [[redacted] and I want to talk about an incident raised in this e-mail and just make sure I understand here your perspective on what is being alleged.
There is, as we scroll down, the -- just one moment.
So, at this e-mail that starts, we see exactly what is going on, what the true intensions of the team are. Now fast-forwarding into the new school year he makes reference to Ms. Dougherty and Ms. Koosa forcing him to call us repeatedly almost on a daily basis and coaxing him into telling that he did things purposely, when he didn't, just to trigger his behaviors to try and build a case against him.
Before we unpack that, more of what Mr. [redacted] is messaging, do you know what Mr. [redacted] is referring to when he makes

this reference?
A. Yes.
Q. And what, to the best of your understanding, is Mr. [redacted] talking about?
A. He's talking about when we would have [[redacted] call home to let each parent know what the -- what serious behavior had occurred in school.
Q. Now, I don't see that approach in a behavior intervention plan or IEP. Can you tell me why that was an approach being taken with [[redacted]
A. That was one of the approaches that we were trialing to see if it would help him to be able to take responsibility in the moment.
Q. Tell me more what you mean by, being able to take responsibility in the moment.
What's the purpose of the call?
A. The purpose is for [[redacted] to understand his behavior and how it impacted others in the hopes that it would prevent it from happening again.
Q. Is this a practice that you've utilized in your -- in the course of a school social worker with other students in Milford Public Schools?

A. Yes, it is.

Q. Okay. Has it been effective in your prior experience for a student to grasp and understand, you know, that, the weight and the consequences of their behavior?

A. Yes.

Q. Okay. How often did you personally have [[redacted] make a call home about behavior that you witnessed?

A. I would have to look at the log.

Q. Okay.

A. The phone.

Q. There is a reference here where Mr. [redacted] says, we have the voicemails and when listening to them you can hear Ms. Dougherty in the background telling [[redacted] want to say. Do you know what he is referring to here?

A. I do. He's referring to, Mr. [redacted] and Ms. [redacted] were not answering their phones, so we would have to leave messages.

And [[redacted] when you would first call and I would say -- explain, you know, [[redacted] is going to let you know what happened, [[redacted] would then start talking about tying his shoelaces, or he would talk about something

else rather than the behavior that occurred.
So, it was me giving him a cue of, no, the call is to discuss whatever the issue was at that time.
Q. Okay. Have you ever directed [[redacted] what to report to his parents on a call?
A. No. I've told him, we're calling because you threw woodchips up in the air and -- yeah.
Q. Was [[redacted] being referred for suspension or expulsion based on any of the behaviors that were subject to the calls home?
A. No.
Q. Okay. Did you feel that after making the call home was [[redacted] getting any benefit from the calls?
A. He did not.
Q. Approximately how long do you think you were having [[redacted] make phone calls home when there were behaviors to report home?
A. I believe I can't -- I'm not sure, because I can't see, but as soon as -- as soon as Mr. [redacted] and -- had said that it was something that he wanted not to be happening, and the team at the same time was feeling it wasn't benefiting [[redacted] in taking

responsibility, then the phone calls home stopped.

Q. Okay. Because you determined they weren't an effective -- that they weren't getting the outcome you were trialing them, that technique for?

A. Correct.

Q. Okay. Now, Mr. [redacted] just because you're referenced in this paragraph -- that the characterization here of switching his programming and tossing him out of JFK from the least restrictive environment, do you agree with that characterization from Mr. [redacted]

A. Not at all.

Q. And what is your perspective on the situation that he is discussing?

A. My perspective is that [[redacted] was starting to demonstrate more and more behaviors and having difficulty in the regular-ed classroom on a more regular basis, and we simply wanted to talk about the options at a PPT. No determination is made before a PPT.

Q. Okay. In the course of your time as a school social worker supporting [[redacted] have you ever

made any recommendations for how the -- for the PPT or for [[redacted]s special education planning based solely out of frustration with correspondence with the parents?

A. No.

Q. When you make a recommendation for a change to [[redacted]s IEP or his services, what is that? What do you base your recommendations on?

A. It's based on data that we've collected from the behavior intervention plan, from his progress on goals and objectives throughout the IEP. It's -- there's -- there's criteria that you need to meet in order to make any type of proposal.

Q. When you refer to data, is that produced via the progress reports on the IEP goals and objectives on a regular basis to parents?

A. Yes.

Q. Okay. And could data also include, you know, personal observations that get shared in the context of a planning and placement team meeting?

A. Yes.

Q. Okay. Now you mentioned attending an annual review for [[redacted] during the 2023-2024 school

year. In your role as a school social worker did you attend an annual review planning and placement team meeting for [[redacted] during the 2024-2025 school year?

A. I would have to see the paperwork.

Q. Okay. Sure. Let me -- putting in front of you what's been marked into evidence as Exhibit B-21, do you see this document titled, individualized education program?

A. Yes.

Q. Okay. So, the meeting date of January 16, 2025, I see that you're listed in attendance as a social worker. Is this, to the best of your understanding, the cover page or the first page from his annual review on January 16, 2025?

A. Yes.

Q. So, I assume you would agree with me you were in attendance at the annual review for this, for this meeting?

A. Yes.

Q. You mentioned earlier that you were providing small-group counseling services to [[redacted] as part of his previous IEP. For this IEP I'm going down to the service grid, and I see

you're listed alongside a few services, or the school social worker is listed along counseling group, again, for four times per week for 30 minutes from February 7, 2025, to February 6, 2026.

So, this was the service you were going to be involved in moving forward from this, this IEP?

A. Correct.

Q. Okay. And again, goals identified are goal 5 and 16. So, I just want to scroll up here to the goal section. Let's start with the goal number five.

I see here there's a listing that [[redacted] won't group his perspective-taking and social skills. I recall this being a similar -- a similarly worded goal from the previous IEP. Why wasn't it included as part of this IEP?

A. Because he did not -- he did not master it.

Q. Did he master some objectives during the course of your instruction with him?

A. I would have to see that, the other document.

Q. Uh-huh?

A. I know the hypothetical social situations is the same.

Q. Uh-huh?
A. Given examples of his own behavior, that's the same, okay.
Q. So, when a goal is not mastered, what -- or objective is not mastered, what is typically your next step as a social worker trying to meet that goal?
A. We would try and meet the goal through different mediums.
Q. Uh-huh?
A. So, if it wasn't effective, let's say, in reading a story, maybe watching a video and being able to stop the video and say, okay. What's happening here?
Q. Okay. So, you modify the goal as you go if -- if he's not making any satisfactory progress, as you would anticipate?
A. Correct.
Q. Okay. And going down here, goal 16. So this, under -- it looks like it's under executive functioning. So, could you tell me a little bit of what you understand the purpose of this goal was? This is given a task presented to him using a first-then visual, [[redacted] would create a checklist of what

he needs and his expectation.
Why was this added to the IEP?
A. Because [[redacted] could get overwhelmed by a direction and that included everything. So, if you broke it down for him, first we're going to do this and then we're going to do that. And when he completes that, then you give him the next instruction.
Q. And did you find that [[redacted] responded well to visuals?
A. He did better with visuals.
Q. Uh-huh?
A. But he -- he did get to a point where he didn't want to do that. He didn't want to the first-then, because the other children in class, the other students weren't doing that same intervention.
Q. And when you're referring to other students in class, are you referring to students in his small-group instruction, or his general-education classroom?
A. General education.
Q. And tell me what that looked like when he didn't want to do something because of what his other peers were doing?

A. Towards the end of fifth grade he would break down and cry and say, I want to do what they're doing. I'm not like them, but I want to be like them.
Q. And in terms of, I want to do what they're doing, can you elaborate a little bit further about why he would not be working on the same level of work?
A. [[redacted]s -- [[redacted] was not able to complete fifth-grade work in reading, writing and math. So, in order for him to be successful he needed to work on lower-order key concepts than his -- than his peers.
Q. And you mentioned his work was modified to a place where he could complete it?
A. And be successful, yes.
Q. Now, in terms of the environment of him in a general-education classroom, as the fifth-grade year wound down -- and we're talking about the end of the 2024-2025 school year, did you feel [[redacted] was best served receiving instruction in a general-education environment?
A. Not for the whole school day, no.
Q. And why is that?

A. Because [[redacted] was very aware that he wasn't on grade level, and he was identifying more with his differences rather than things that were -- he had in common with the general-education students.

Q. Based on your experience supporting [[redacted] and instructing [[redacted] what did you think would be an appropriate step forward to better support him for instruction? Like, what change to his program would need to take place?

A. I think that if [[redacted] were in a program that allowed him to be with other like students that were on the same type of grade level as him, that he -- he would be able to build his self esteem.

He could sit -- see that he could still do the things that everyone else can do. He just does it at a different level. He could build peer relationships with peers that understood and were able to work with him.

His maturity level was below grade level, and I think he needed to be with like peers so that he could build his self image, self esteem.

Q. Okay. And the program or structure that

you're describing, to the best of your understanding, does the District have a program that meets that definition, that kind of -- that structure that you're discussing for middle schools students within the district?
A. Yes, the Harborside Middle School life skills program.
Q. Okay. And just out of curiosity, have you ever worked with the Harborside program, or visited that program?
A. I have. I have worked professionally with some of the people in the program, but not in that -- but not as a teacher in that program.
Q. But would it be safe to say you have an understanding --
A. Yes.
Q. -- as to how the Harborside program functions?
A. Yes.
Q. And my understanding was that there was a planning and placement team meeting towards the end of the '24-'25 school year.
Did you participate in that meeting?
A. I believe I did.

Q. Okay. Just one second.
So, I'm going to show you what's been marked in evidence as B-30, "B" as in board.
Okay, can you say this document titled, individualized education program?
A. Yes.
Q. So, this meeting date is May 21, 2025. I see that you're listed as the social worker. Is this the cover page, to the best of your recollection, for the meeting that took place May 21, 2025, where the placement was discussed for the '25-'26 school year?
A. Yes.
Q. Okay. And it lists here under recommendations, the team recommends the specialized program at Harborside for [[redacted] for the '25-'26 school year. Were you in agreement with this recommendation?
A. Yes.
Q. Did you feel that you had the requisite knowledge based on your training and your experience instructing [[redacted] to make this recommendation that he go to Harborside?
A. Yes.
Q. Okay. My understanding is that the parents

did not attend this meeting.
Is that correct?
A. I would have to look, look back up at the attendance thing.
Q. The attendance list here doesn't include the parents. Is that an accurate --
A. Correct.
Q. -- listing of who was in attendance at that May 2025 meeting?
A. Correct.
Q. Okay. Did you feel that the District had, although the parents weren't in attendance -- and we can talk about, you know, I understand the parents were not in attendance, but that those listed at this meeting, did you feel that the District was able to provide service providers and teachers with the requisite knowledge required to make a recommendation for where [[redacted] should be during the 2025-2026 school year?
A. Yes.
Q. I see that there's a resource teacher listed, Maureen Raccio, resource teacher at WSMS. Does WSMS stand for West Shore Middle School, to the best of your understanding?

A. Yes.
Q. Did you hear a description of the program that would be available to [[redacted] at West Shore Middle School during the course of this PPT meeting? Or do you --
A. I don't remember.
Q. Let me phrase it this way.
A. Okay.
Q. As a school social worker, did you have an understanding of the programming that could be provided to [[redacted] at West Shore Middle School?
A. Yes.
Q. And in your opinion, what was the appropriate placement between Harborside and West Shore Middle School?
A. Harborside Middle School.
Q. Why Harborside?
A. Because it was a specialized program for [[redacted] that he would have been more with like peers and he could have felt more successful. He still would be mainstreamed in some of the subjects or courses, but at least he would have an environment in which he was comfortable and -- and he could feel

successful in, and learn to the best of his ability.

ATTORNEY ROSEN: Okay. Thank you. I have no further questions at this time.

THE HEARING OFFICER: All right. We have 12:14.

Do you think that this might be a good time to break for lunch?

THE WITNESS (Dougherty): Okay.

ROBERT [redacted] Yes, I agree.

THE HEARING OFFICER: All right. Why don't we break until one? Does that sound reasonable to people?

All right. So, we will reconvene at one.

ATTORNEY ROSEN: Thanks. Ms. Dougherty, if you could just mute and turn off your camera.

THE WITNESS (Dougherty): Mute and turn off.

THE REPORTER: Pausing the record.

(Pause: 12:14 p.m. to 1:00 p.m.)

THE HEARING OFFICER: All right. It looks like everybody is back. So, all right. We'll proceed with cross-examination.

ROBERT [redacted] Okay.

Wait a second here.

Ms. Dougherty is present. Correct?

THE HEARING OFFICER: Yes.
ROBERT [redacted] Okay.

CROSS-EXAMINATION (of L. Dougherty)

BY R. [redacted]
Q. Ms. Dougherty, how many years have you worked specifically with children diagnosed with [redacted] spectrum disorder?
THE HEARING OFFICER: Oh, you're muted, ma'am.
BY R. [redacted]
Q. Can she hear? I'll --
A. Yes. Yes, I heard. I'm just taking a minute to think about it. I'm thinking about the population at Boys and -- it was just Boys Village when I worked there. So, just give me a minute. I'm just trying to --
Q. Sure. No problem. Take your time.
A. I'm going to say since 1998.
Q. So, that would be about 27 years. Correct?
A. Correct.
Q. And what is your educational background and training related to [redacted] and special education?
A. We -- my education, it was covered in

undergraduate, in graduate school. There have been in-services through Milford Public Schools, and I've gone to professional development on my own accord where I earned CEUs regarding [redacted]
Q. So, you have an extensive background in [redacted] Correct?
A. Correct.
Q. Would you consider yourself an expert in [redacted] and children with, you know, special needs?
A. I don't know that I would be an expert, but competent.
Q. How confident would you say you are?
ATTORNEY ROSEN: Objection as to relevance?
ROBERT [redacted] The relevance is about her education. If she has 27 years of experience in [redacted] I would consider that would be an expert, but she says she doesn't consider herself an expert.
THE HEARING OFFICER: The problem is that the question is so vague I'm not sure she can answer it. So, why don't you ask one that has a little more specificity to it?
ROBERT [redacted] Which question was that, so, I don't have to ask it again? I'm just wondering --

THE HEARING OFFICER: How competent are you? I mean, I
think to find a way to ask that in a more specific
manner, because that that's so vague I don't
really understand how it could be answered.
ROBERT [redacted] Well, I'm not sure how to ask. I
mean, I can try, but I'm trying to relate 27
years' experience I would consider an expert. You
know, we're not talking three days. We're talking
20 -- that's from 1998.
So, I want to find out how competent she is
in her educational background and related to
children with [redacted] because my son [[redacted] has
[redacted] and she worked with him. So, that's the
whole point we're trying to make is that, you
know, we try to, you know, we want to find out,
like, what her competency is as far as [redacted]
because she worked with [[redacted]
THE HEARING OFFICER: Well, she didn't really give
expert testimony. She gave testimony more as a
fact witness. So, she basically said what
happened. She wasn't giving expert opinions. So,
she's not really being held out as an expert.
So, if you can't find a more specific
question to ask, then you just have to move on.
ROBERT [redacted] Yeah. No, I do. If you can give me

a minute? Sure. I'm going to try to think if I can rephrase that somehow.

BY R. [redacted]

Q. Ms. Dougherty, are you confident in your -- in working around children with [redacted] that you can provide the services that children need, with [redacted]

A. Yes.

Q. Have you received any specialized training in behavioral interventions or communication strategies for students with [redacted]

A. On a district level, yes.

Q. What do you mean, on a district level?

A. Can you restate that question again?

Q. Well, you did -- and it was asked and you said on a district level. I had asked, have you received any specialized training in behavioral interventions or communication strategy for students with [redacted] But you did say on a district level. So, that was already asked and answered.

Then my next question was, how so?

A. We, as a district, go over behavior intervention plans with BCBAs. And also in my professional development, I have received

instruction on [redacted] if that answers your question -- as far as behavior interventions, yes.
Q. So, you haven't received any formal training with responsibilities with -- so, you haven't received any specialized training in behavioral interventions, just working with BCBAs. Is that correct?
A. No.
Q. What's no? I'm sorry. If you can explain?
A. No, I said that I had attended a professional development that was given by an autistic adult on [redacted] and the best ways of communicating.
Q. Where was this? Was this through the Milford Public Schools, or was this through a university or a, you know, where you attended college?
A. This was through a professional development that was located in Hartford, through continuing education units.
Q. And how many years did you attend that training? How many years was it?
A. It was a one-time session.
Q. A one-time session. How long is that session

about?

ATTORNEY ROSEN: I'm going to object as to relevance at this point.

ROBERT [redacted] Well, the relevance is that I'm trying to --

THE HEARING OFFICER: I'll overrule that.

I'll allow you to answer the question.

ROBERT [redacted] And I would say going forward, Mr. Rosen, if you please? You should, as an attorney, know when to object and when not to object, so --

ATTORNEY ROSEN: Hearing Officer Kennedy, I'm --

THE HEARING OFFICER: It's a fair objection, but in this case --

ROBERT [redacted] I don't believe so.

THE HEARING OFFICER: In this case, I think that it's relevant. So, she can answer the question.

THE WITNESS (Dougherty): So, I'm a little confused. The -- the session was a day, but the resources that we are provided are our books that -- and intervention plans that last, that can last for years.

So, even though the session was one day, the resources we received were something that I still refer to on a regular basis.

BY R. [redacted]

Q. But your only training was just for a few hours that one day, and there was no other training after that?

A. Yes, there was training in the District.

Q. But not -- I'm talking about outside of the District.

ATTORNEY ROSEN: Objection. Argumentative at this point.

ROBERT [redacted] I don't believe it's argumentative.

THE HEARING OFFICER: Yeah. I mean, I think if you want to ask other questions about the other training in the District, fine. But --

ROBERT [redacted] Well, I don't think I should be limited to ask about training in the District. (Unintelligible) --

THE HEARING OFFICER: Well, I mean, that was -- you know she said she had that course --

ROBERT [redacted] But Hearing Officer, your --

THE HEARING OFFICER: -- and then she said she also had some training in the District.

So, if you want to ask her about that?

ROBERT [redacted] But Hearing Officer? Hearing Officer, I also want to state for the record that you're trying to coach me on, like, what I should

ask her about the District. I should decide what I should be able to ask and what I shouldn't be able to ask.

If I don't want to ask about district training, I shouldn't have to know.

THE HEARING OFFICER: All right. No, you don't have to --

ROBERT [redacted] I don't think that would be appropriate (unintelligible) --

THE HEARING OFFICER: But then you can just --

ROBERT [redacted] If you could please not cut me off?

THE HEARING OFFICER: Then you can just move on.

ROBERT [redacted] Can you please not cut me off when I'm trying --

THE HEARING OFFICER: Sir?

ROBERT [redacted] Sir, if you could please not cut me off when I'm trying to make a point, I would really appreciate it. Last time I did advise the Hearing Officer that I lose my train of thought when I'm being cut off by the Hearing Officer.

And again --

THE HEARING OFFICER: Yeah, but you have -- I mean, do you want me to put --

ROBERT [redacted] And I'm being interrupted again, Hearing Officer.

THE HEARING OFFICER: The actual direct examination only took about 45 minutes. I mean, do you want me to put a time limit on you?

ROBERT [redacted] See, Hearing Officer, that is not even fair to state that you're giving me pressure now about the cross-examination now. That should not even be a time factor at this point, because that's not fair that you're trying to lock me into a time because you're cutting me off and I can't get my --

THE HEARING OFFICER: But the problem is your pattern --

ROBERT [redacted] I can't get this into the record. The problem is you keep cutting me off, though.

THE HEARING OFFICER: Your pattern is four minutes of argument for every one minutes of questions.

ROBERT [redacted] That's not true. That's characterization. I have to object to because that is not correct, sir. My question was that I was trying to state for the record that you were trying to have me ask questions (unintelligible) --

THE HEARING OFFICER: Why don't you just ask the --

ROBERT [redacted] Can I please not be cut off?

THE HEARING OFFICER: Why don't you ask the actual --

ROBERT [redacted] Can I please not be cut off?
THE HEARING OFFICER: Ask the actual witness the next question?
ROBERT [redacted] Can I please not be -- I would like to get this in --
THE HEARING OFFICER: Do you want me to just terminate your cross examination?
ROBERT [redacted] Are you threatening to terminate? I'm trying to get something in for the record, sir, because I need this in case we go for an appeal. I can't have interruptions like this. I want to make this point for the record.
You stated to me, why don't you just ask questions about her training in the Milford School District? That is not even appropriate to try to guide me down that road when I don't want to go down that road. I feel like you're taking the District's side.
THE HEARING OFFICER: Well, then don't go down that road. Ask something else.
ROBERT [redacted] But I shouldn't have to be guided like that. That's not part of your, you know, as a hearing officer, that's not appropriate, sir.
THE HEARING OFFICER: I mean, I thought the District's objection was well taken about repeated asking

about that one, that one day. I mean, she's asked and answered that. I was saying you could move on to, you know.

Rather than cut off your entire line of questioning, I said you could move on to the next subject (unintelligible) --

ROBERT [redacted] Well, I shouldn't have to be threatened. You shouldn't have to threaten me to cut off my entire line of questioning (unintelligible) --

THE HEARING OFFICER: I'm not. I'm not threatening. I'm saying --

ROBERT [redacted] You just threatened me, sir. You said, do you want me to cut off your questioning like you did last time?

THE HEARING OFFICER: I'm saying that if you continue to argue like this and filibuster like this, yeah, that may be what I have to do.

ROBERT [redacted] That's --

THE HEARING OFFICER: But just ask another question.

ROBERT [redacted] That's your characterization about filibustering, and that is not correct. For the record, sir, I was basically stating my rights as a pro se party. I have a right to get this into there, into the testimony. Okay?

So, this is something that you said that I'm trying to correct. Okay? And I have a right as a pro se party to correct the Hearing Officer when he's doing something that I believe should not be done.

THE HEARING OFFICER: You don't have a right to correct the Hearing Officer.

ROBERT [redacted] I have a right to have it -- I have a right to --

THE HEARING OFFICER: Go -- try going court and say I have a right to correct the judge, and see how that works out.

ROBERT [redacted] Well, this is a hearing officer. It's a lot more relaxed. This is not a court of law. But the Hearing Officer made something that I felt wasn't right and I have a right to get it on the record.

So, let's move on, please. Thank you.

THE HEARING OFFICER: That would be a good idea.

BY R. [redacted]

Q. Have you been involved in developing or implementing [[redacted]s individual educational IEP or behavioral intervention plan?

A. Yes.

Q. During which school years have you worked

with [[redacted]

A. I would need to see the IEPs.

ROBERT [redacted] Okay. I think we have to bring up -- do we have the IEPs? I think Mr. Rosen had a plethora of IEPs. So, I believe we can bring up the IEPs. I do have some as exhibits, but I think Mr. Rosen had submitted pretty much the IEPs, you know, relevant to this timeframe, you know, for this due process.

So, I would like to get that into -- let's see here.

ATTORNEY ROSEN: Hearing Officer Kennedy, if I'm to understand Mr. [redacted] I mean, this is his cross-examination and I'm not comfortable putting in exhibits and guiding through cross-examination.

Copies of these exhibits were provided to the parents in advance, both virtual and hard copy. So, if Mr. [redacted] has exhibits he wants to put on during the course of his cross-examination, he's welcome to.

THE HEARING OFFICER: Well, is there any dispute --

ROBERT [redacted] That's what I'm going to do.

THE HEARING OFFICER: Is there any dispute that this social worker worked with the student during the years in question in this case?

You're shaking your head. That means no, just for the Court Reporter's benefit?

ATTORNEY ROSEN: Yeah. As she testified to, she worked with him during the '23-'24 school year and the '24-'25 school year.

THE HEARING OFFICER: Okay. So, you can proceed.

BY R. [redacted]

Q. Okay. So, to get this correct, you have worked with [[redacted] in fourth grade and fifth grade. Correct?

A. Correct.

Q. Okay. Great. Thank you. We'll move on.

Based on your experience with [[redacted] who has [redacted] how do you typically approach supporting communication and behavioral regulation?

A. I'm not sure what you're asking. Do you mean with the student in counseling sessions?

Q. Well, my question is, based on your experience working with [[redacted] -- you worked with [[redacted] in fourth and fifth grade, it was just testified, and [[redacted] does have [redacted] -- how do you typically approach supporting communication and behavior regulation with [[redacted]

A. In the small --

Q. Not how did you, not at this point, but how did you in fourth and fifth grade?

A. In the small-group setting, or in the classroom? The way I approach him is different depending on which setting you're referring to.

Q. Okay. Let's start off with the classroom setting and then we'll get on to the -- this, the other setting, I guess the individual setting or the small-group setting. So, we'll do the classroom setting.

You could, you know, answer that?

A. In this, in the classroom setting I would be moving within the whole class. [[redacted] did not like someone sitting right next to him. He felt like it was -- he felt like it was pointing out that he was different.

So, I would work with the different students. And if [[redacted] had a problem, he would raise his hand and I would go over and work with him. Or if he seemed stuck and wasn't writing or doing something, then I would approach him on a one-to-one and talk to him about what was going on.

If it was at recess, I would talk to [[redacted] or the group of boys that he was playing with if something was going on and someone was upset.

Q. So, this was in the classroom setting?

Or is this privately?

A. Classroom setting.

Q. Okay. Now, how about the small-group setting that you had just mentioned?

A. The small-group setting was with another student and we worked on communicating with him, his ideas, his feelings, his thought. He created a vision board where he picked out the different things that he would like in his future, cut them out of magazines, put them on a board.

We -- I tried as best I could to individualize the instruction, but also have it be so that it was at a level that [[redacted] was comfortable with and the other student, and that they could work together on.

Q. And did [[redacted] work together with the other student?

A. Yes.

Q. Okay. During the '23-'24 school year -- so,

I'm referring to '23-'24, which would be fourth grade. Did you observe [[redacted] having any difficulty regulating his emotions?

A. I would -- I would have to see the phone logs. Typically, if there was a problem, you and Mrs. [redacted] had asked for to be communicated with, by each of you by phone. So, whenever I phoned you, I would put it in the communication log and that's how I kept my data of -- of behaviors that occurred.

I -- I also don't have the behavior intervention plan in front of me, so I don't have the dates and times of everything.

Q. You just testified that we, me and Ms. [redacted] had -- well, the parents, me and [[redacted]s mom. I'm referring to [[redacted]s mom as Ms. [redacted] -- that we requested to be called.

We have communications that you were CC'd on that we requested to be communicated via e-mail.

A. I believe that was -- I believe that was in the '24 year. At the beginning of '23-'24, we were still making phone calls. Your request to only have e-mails was not at that

time.

Q. Did you have [[redacted] -- well, let's let me ask you this question. Can you produce a communication that in the '23-'24 school year that we requested only to be communicated via phone?

ATTORNEY ROSEN: Objection. The Witness can't be asked to produce documents during testimony.

THE HEARING OFFICER: Sustained.

ROBERT [redacted] Well, I would -- how can I have this Witness produce documents? Because there is no documents. We never requested to have the phone calls. It was always by e-mail.

ATTORNEY ROSEN: Objection. That's testimony.

THE HEARING OFFICER: Okay. You can testify. I mean, you can testify to that when it's your turn to testify.

ROBERT [redacted] Okay. But I'm not sure if my question was completely answered.

BY R. [redacted]

Q. So, during the '24 -- '23-'24 school year, did you notice [[redacted] having difficulty regulating his emotions?

A. Again, I would need to see the data. But yes, he -- I did. There were occasions that

he did have trouble self regulating.
That's part of [redacted]
Q. Had you reached out to us during that '23-'24 school year that [[redacted] had these problems regulating?
A. Yes.
Q. And how did you reach out to us?
A. Either phone call, parent-teacher conferences, I was available three times a year when those were held. Through progress reports on objectives and goals through annual reviews.
Q. Did you speak with me by phone at any time during the '23-'24 school year about [[redacted] and these, about him -- difficulty regulating his emotions?
A. I would have to see the phone logs from '23-'24.
ROBERT [redacted] How do I get the logs in, Hearing Officer? She would have to see the phone logs. Would I have to request that as a Freedom of Information, or something? Because she mentioned she would have to see the phone logs, and I would like to get the phone logs into evidence.
So, how would I go about doing that?

ATTORNEY ROSEN: I'm going to object because my understanding is, you know, we've had the time to prepare exhibits and provide them and produce them in preparation for our case. So, asking for legal analysis as to how to move forward and prosecute a case when all procedural rights have been explained at this point, I think is inappropriate.

ROBERT [redacted] I object to Attorney Rosen's --

THE HEARING OFFICER: I mean, you know you can make --

ROBERT [redacted] I object.

THE HEARING OFFICER: You can make a FERPA request and follow that process. But it's not really anything that I have any control over here, so.

ROBERT [redacted] Well, I would like them into the record before the hearing is over so I can get it into evidence, because once the hearing is over, Hearing Officer, this decision will be made without that coming in evidence.

The Witness just testified she would have to see the phone logs. So, I think the phone logs are relevant now. She brought that up. She would have to see the phone logs. So, I would like to give her the opportunity to view those phone logs to prove that she spoke to me on the phone, or she didn't speak to me on the phone. I want to see

what calls were made.

So, it was testified. I think it's very relevant and it needs to be, you know, I need to get the phone logs. So, I think that's important before the hearing ends.

I can't get them right now, of course, but I'm going to have to get them. And I would respectfully request to get those before the hearing concludes so I can get them into evidence. They are relevant based upon her testimony.

THE WITNESS (Dougherty): Can I just say you have those documents when you FERPA'd --

ATTORNEY ROSEN: Sorry. Ms. Dougherty --

THE WITNESS (Dougherty): Oh, sorry.

ATTORNEY ROSEN: You haven't been asked a question.

THE HEARING OFFICER: Yeah, you haven't.

ATTORNEY ROSEN: From the District's perspective, all FERPA requests that were made have been satisfied. So, we're under no obligation to produce any further documents.

THE HEARING OFFICER: Well, if they're in your --

ROBERT [redacted] We had no phone logs. No phone logs.

THE HEARING OFFICER: All right. I mean, you'll have to -- you know, that's not really anything I have jurisdiction over.

I mean, if they've been provided through FERPA requests then you can submit them with five days, five business days' notice of a hearing. If you don't have them, you can make a FERPA request.

Anything more than that, you really have to get legal advice from your own attorney.

ROBERT [redacted] Well, here's the thing. I did make a FERPA request in the past. We had a Freedom of Information hearing regarding that. There were no phone logs. If there were, I would be able to say, yes, I have them. I'm going to get them in five days. We don't.

So, that's another issue that is going to have to be brought up with the Freedom of Information, but that's outside of this. That's another complaint I have to make.

But besides that, I need to get these phone logs since the Witness just testified she would need to see the phone logs to prove that there were no calls made. She --

ATTORNEY ROSEN: Mr. [redacted] phone logs are PowerSchool logs.

ROBERT [redacted] Excuse me? Excuse me, Mr. Rosen?

ATTORNEY ROSEN: They were provided to you in the FERPA response.

ROBERT [redacted] Do not interrupt me while I'm talking.

THE HEARING OFFICER: Actually, let me hear what Attorney Rosen has to say.

ROBERT [redacted] No, I wasn't finished. Please don't take -- jump to Attorney Rosen's defense when he cut me off. I would expect you to request the same as if I, you know -- in the past, if I had said something while Attorney Rosen was talking, you would say, please let him finish.

I would expect that same courtesy given, to tell Attorney Rosen that, please let Mr. [redacted] finish, rather than jumping to his defense, not being able to finish my statement, and then having him talk over me and giving him the freedom to not let me, you know, finish my statement. I don't think that's fair.

And for the record, I'm going to object to that. That's unfair. He should not be cutting me off and I should be able to finish my statement. And I don't believe the Hearing Officer should be jumping to his defense to, you know, to let him talk when I wasn't finished.

THE HEARING OFFICER: Well, I mean, I think we want to find out what the status of the logs are.

Apparently, you said that the logs are part of PowerSchool, which was produced in response to a FERPA request. Is that what you're saying?
ATTORNEY ROSEN: Yeah --
ROBERT [redacted] Hearing Officer --
ATTORNEY ROSEN: -- although FERPA requests are not at issue in this hearing, and I know the Hearing Officer doesn't have jurisdiction over the FERPA requests, it is the District's understanding that all FERPA requests that previously had been made have been fully satisfied and responded to.
PowerSchool logs were included. When we refer to phone logs or entries or communications with parents, that's part of the PowerSchool log. I know those records were produced.
Whether or not the parents agree with our characterization, I can't say, but at the end of the day we believe all FERPA requests were adhered to, and we're prepared to move forward.
THE HEARING OFFICER: All right. Well --
ROBERT [redacted] I would have to -- I would like to respond to that. We did not receive them during the FERPA request. Regardless, that's going to be a separate complaint outside of this.
But for the time being, I need to get those

phone logs into the record before the hearing comes to a conclusion. The Witness just testified to something that, you know, she made phone calls, and I want to show that there were no phone calls made. It was only e-mail requests. So, that's important to get into the record.

I can, you know, attack the credibility of the Witness, and that's another opportunity to have, which I believe is my right to, to get that into evidence. And I would like -- and I will be making a request with the School District at the conclusion of this hearing today.

And I would like to get the phone logs into evidence at some point during the hearing and adhere to the five-business-day rule. That I don't have an issue with.

THE HEARING OFFICER: All right. Why don't you proceed with your next question?

ROBERT [redacted] Okay.

BY R. [redacted]

Q. You testified that [[redacted] sometimes called out during instruction, including saying words like "chicken," which caused classmates to laugh.

Is this behavior related to [redacted]

ATTORNEY ROSEN: Objection. Calls for speculation.
ROBERT [redacted] It doesn't. She has 27 years' experience with autistic children. This is not a question where I'm asking her a question about, can you tell me about the engine of my car? This is relevant.
She works with children with [redacted] It is not speculation. It is --
THE HEARING OFFICER: I'll allow her to answer.
ROBERT [redacted] I would -- also for the record, I would respectfully request that Mr. Rosen does not interrupt me during my time to object.
THE HEARING OFFICER: No, that's --
ATTORNEY ROSEN: He should not be objecting.
THE HEARING OFFICER: That's how it works. I mean, that's how it works.
ROBERT [redacted] He should not be objecting.
THE HEARING OFFICER: I mean --
ROBERT [redacted] Okay.
THE HEARING OFFICER: Yeah, I mean --
ROBERT [redacted] He should know better.
THE HEARING OFFICER: -- he's entitled to object to a question.
ROBERT [redacted] But he should know better as an attorney. I'm a pro se party. He should know

better as an attorney.

THE HEARING OFFICER: That's how it works in these hearings. But anyway, Ms. Dougherty, you can answer the question, if you can.

THE WITNESS (Dougherty): The question was if the calling out of the word "chicken" had to do with the [redacted]

ROBERT [redacted] I will read you the question again. Yeah, to make -- to be fair, I will read the question.

BY R. [redacted]

Q. You testified that [[redacted] sometimes called out during instruction, including saying words like "chicken," which caused classmates to laugh. Is this behavior related to [redacted]

A. I don't think that's exactly what I said.
I said it disrupted learning.

Q. You did testify in your own words that -- and including saying words you -- you did testify before that [[redacted] sometimes called out during instruction, including saying words like "chicken," which caused classmates to laugh. That's what you testified to.
So, my question to you is, is this

behavior related to [redacted] The calling out, you know, saying words that, you know, as you testified, that he'll just say something that is not related to anything.

Is that behavior related to [redacted] which is a part of his [redacted]

A. In my opinion, no.

Q. And why is that?

A. Because it wasn't -- it wasn't a behavior that happened with any type of pattern.

ROBERT [redacted] But that's just your opinion. That's not any -- you're not an expert witness. So that is just your opinion.

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] No, I was just (unintelligible) --

THE HEARING OFFICER: The problem is she answered the question that you asked. So, ask your next one.

BY R. [redacted]

Q. Can you explain what [redacted] is, and how it typically presents in children with [redacted] like [[redacted]

A. I don't -- I don't have a dictionary in front of me to give you the specific definition.

Q. You testified you have 27 years' experience with autistic children. Correct?

A. Correct.
Q. And you would need to --
ATTORNEY ROSEN: Objection. We've already established that this witness is not an expert witness. She gave fact testimony and shared her opinion.
I'm going to object to the continued line of this questioning as to --
ROBERT [redacted] Well, I object to --
ATTORNEY ROSEN: -- in terms of relevance.
ROBERT [redacted] -- to Mr. Rosen. She testified that we're not -- I am not claiming she's an expert witness at this point. She worked with and she has 27 years' experience, she testified, in working with children with [redacted] and related disabilities. And she just testified she would have to pull out a dictionary. I mean, I don't understand. I'm confused myself.
So, I'm trying to ask a question about [redacted] It seems like Ms. Dougherty can't answer basic questions about [redacted] If she -- so, the point I'm trying to make is that if she has to pull out a dictionary to answer a simple question, you know, how did my son -- you know, his free and public and appropriate education was violated. You know, just on that, you know, I

would say including that.

I mean, she should know these things.

THE HEARING OFFICER: Well, I mean, you asked the question. You got the answer that she didn't -- she couldn't really answer without referring to a dictionary. So, that is the answer.

So, you can just move on to --

ROBERT [redacted] Can we get a dictionary about echo -- should we bring up a dictionary so she can answer it? I mean, I would like to get this question answered. I feel my question was just kind of (unintelligible) --

THE HEARING OFFICER: She did. I mean, she did answer it. She said she couldn't. She basically said she couldn't. She couldn't answer it.

ROBERT [redacted] So, she couldn't answer the question.

THE HEARING OFFICER: So, that's the answer.

ROBERT [redacted] Okay. Fine.

BY R. [redacted]

Q. Ms. Dougherty, being your experience of 27 years, do you feel you should be able to answer basic questions like about [redacted]

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] That's not argumentative.

THE HEARING OFFICER: Sustained, sustained.

ROBERT [redacted] Okay. I would like to answer that -- ask that in a way where it's not going to be met by an objection. So, I'm going to have to think of a way to ask that.

We've already established she has 27 years' experience, but then she can't answer questions about [redacted] --

ATTORNEY ROSEN: Objection. Testimony.

THE HEARING OFFICER: Yeah, just move on and ask --

ROBERT [redacted] (Unintelligible) --

THE HEARING OFFICER: Ask an actual question.

ROBERT [redacted] Okay.

BY R. [redacted]

Q. Is it common for children with [redacted] to repeat words or phrases that they have just heard?

A. It is. Not all autistic children have [redacted]

Q. My question to you was, is it common for children -- well, let me rephrase. Well, is it common for children with [redacted]

Since [[redacted] has [redacted] would it be common for him, since he has [redacted] to repeat words or phrases that he has just heard? So, I'm making the question

specifically on [[redacted] because he has [redacted] and [redacted] so not other children.

But -- so, I'm going to ask this question. Again, this question is directed towards [[redacted] So, is it common? Since [[redacted] has [redacted] and [redacted] is it common for him to repeat words or phrases that he has just heard?

A. I don't have a diagnosis of [redacted] for [[redacted]

Q. Well, you just answered this question when it came to other children. Correct?

A. [[redacted] does not demonstrate the characteristics of [redacted] and he does not have a diagnosis of it.

Q. He has a diagnosis of [redacted] and [redacted] So, would you say that [redacted] is linked and related to [redacted]

A. Not all the time.

Q. But it is, though. Correct?

ATTORNEY ROSEN: Objection. Argumentative. And it's --

ROBERT [redacted] So, basically we have a situation here where [redacted] is a trait of [redacted] So, maybe I'll ask this question.

BY R. [redacted]

Q. Ms. Dougherty, is [redacted] a trait of [redacted]

A. It can be.

Q. Okay. So, is it reasonable to say that if [[redacted] repeats words or he calls out, that this could be tied to his [redacted] classification?

ATTORNEY ROSEN: I'm going to object. Asked and answered, and she's already testified as to her understanding of [[redacted]s presentation.

ROBERT [redacted] No, I have to -- I'm not going to (unintelligible) --

THE HEARING OFFICER: I mean, this isn't a manifestation determination being reviewed. So, you know --

ROBERT [redacted] Well, this is a due process hearing and this is going to have an outcome. And I --

THE HEARING OFFICER: Yeah, but --

ROBERT [redacted] I think the questions are fair.

THE HEARING OFFICER: Yeah, but -- well, that isn't really relevant to the specific issues in this case, so.

ROBERT [redacted] The relevance is my son has [redacted] He has special needs. If my son didn't have [redacted] we wouldn't be having this. This has to

do with because he's a special-ed student. This is why we're having this hearing.

So, by you saying it's not related -- you know I'm not asking about my car. I'm asking questions about my child. He has [redacted] you know, and this is definitely relevant to this case, Hearing Officer. I have to object to that.

This is absolutely 100 percent related to this case. I'm asking valid questions about, you know, [redacted] The Witness claims she has 27 years' experience working with children. And if she can't -- and she needs dictionaries and she can't answer simple questions and they're getting sidetracked, and I'm not getting answers, I don't believe that that's -- I don't -- I'm confused.

THE HEARING OFFICER: Well, your specific question was about manifestation, which is, you know --

ROBERT [redacted] I did not ask about manifestation --

THE HEARING OFFICER: So you can -- I mean, you can ask another question.

ROBERT [redacted] No, for the record, I did not ask about -- I did not use the term "manifestation."

THE HEARING OFFICER: I know you didn't use the term, but that's substantively what was asked. So --

ROBERT [redacted] That's not what was asked.
THE HEARING OFFICER: Just ask another question.
ROBERT [redacted] Yeah, I have to object. That was not asked, because I did not use the term "manifestation."
So, for the record, that, that was not used.
BY R. [redacted]
Q. You mentioned [[redacted] sometimes hits other children while playing tag. You testified this was out of excitement. Is that correct?
A. Excitement, frustration, feelings, strong feelings.
Q. Right. But my specific question to you was, you mentioned [[redacted] sometimes hits other students while playing tag. You testified this was out of excitement. Is that correct?
That was my direct question. If you could please answer the direct question, I would appreciate it.
ATTORNEY ROSEN: Objection. Asked and answered, and argumentative at this point.
ROBERT [redacted] She had added. She had added other things. I asked her about this specific. I didn't ask her about, you know, anything else. I asked her about -- about the -- what she testified

to about the excitement. I didn't ask her about, you know, going off all these other topics.

THE HEARING OFFICER: Do you remember? Do you remember what you actually said specifically?

THE WITNESS (Dougherty): I do. It was more than just excitement.

THE HEARING OFFICER: All right.

THE WITNESS (Dougherty): So, in the context --

ROBERT [redacted] So, I'm asking the question about excitement.

THE HEARING OFFICER: Go ahead. You can.

THE WITNESS (Dougherty): Oh. So, in the context, if -- if Mr. [redacted] is saying it's only out of excitement, then no, that's not what I said.

ROBERT [redacted] No, I -- I question you -- you mentioned [[redacted] sometimes hits other children. He'll -- hits other students while playing tag. And you testified this was out of excitement. That was your testimony. So, I'm asking you if that was correct? It's a simple question.

THE HEARING OFFICER: Well, at this point, we've gone around on that. That's been asked and answered.

So, just ask your next question.

ROBERT [redacted] How is this -- I'm confused. And I apologize if -- but I just don't understand how

that was. I asked a direct question, but I didn't get a direct answer, and I feel like I'm getting (unintelligible) --

THE HEARING OFFICER: She answered. She answered the question. I mean --

ROBERT [redacted] Not directly related to how I asked it. She added other, you know, she added -- she gave other input when I didn't ask her for it.

THE HEARING OFFICER: All right. I mean, if you want to just say that it --

ROBERT [redacted] I would like her to answer directly to this. I didn't say out of -- I didn't say excitement and this.

THE HEARING OFFICER: It's been asked and answered. Move on.

ROBERT [redacted] Not properly. Not according to the record, but -- and I don't think that's fair for me, because these questions are -- because my questioning is important.

BY R. [redacted]

Q. Given that [[redacted]s excitement during tag caused him to hit other children, what steps were taken to modify or supervise this activity?

A. There were a couple of steps taken. Number

one, that when an incident would happen, there would be a duration of time in which [[redacted] could not play tag, as well as the other students involved.

And then when it happened on numerous events, even after the prevention of tag, nobody could play tag.

Q. So, according to what you just testified, it wasn't [[redacted] to only get suspended. It was other students. Correct?

A. Nobody was suspended.

Q. What do you mean? You just mentioned -- or not suspended -- or taken out? What? Not suspended, he was taken out of the -- so, let's get back to my question here.

So, I asked you, what steps were taken to modify or supervise the activity, and you said that he wasn't suspended. He was taken out of that activity and so were other children for a certain time. Correct?

A. Correct.

Q. Okay. Thank you.

Why was [[redacted] still permitted to play tag despite these concerns?

A. As I said, after a certain amount of

incidents, he was not allowed to play tag.
Q. When did these issues with the tag that went -- that were going on, did this happen in -- what grade level did this happen in?
A. Again, I would -- I would need the PowerSchool logs.
ROBERT [redacted] Okay. Then we're going to have to get the PowerSchool logs. So, I need these -- the Witness to answer these questions. So, what do I have to get in order to have these questions answered, because they are important?
So, she's saying she needs the phone logs, the PowerSchool logs. So, what PowerSchool logs would I have to produce for as far, you know, to get my question answered?
THE HEARING OFFICER: Well, I mean, she's testifying that basically she doesn't really remember without the logs to refresh her recollection, or to constitute past recollection recorded.
So, right now, the answer is that she doesn't really remember specifically.
ROBERT [redacted] Okay. But then to recollect her memory, I would need the PowerSchool logs. So, that's something else that I'm going to have to -- which I think is important to be submitted before

the conclusion of this entire due process hearing. Otherwise, it's going to go unchecked and I do not want that to go unchecked.

So, I would like to request that -- I'm going to have to make a request to get these PowerSchool logs so she can answer that question, you know, for the record, if she can't answer it now.

Okay. Moving on.

BY R. [redacted]

Q. Did you observe whether other children ever hit [[redacted] while playing tag?

A. The nature of the game of tag is that you tag someone and then they become it. So, [[redacted] did get tagged by other students in the game.

Q. Okay. When [[redacted] was playing tag, did he hit students, or was he just tagging them back?

A. Both.

Q. Were the other children also hitting and tagging [[redacted]

A. No.

Q. So, why were the other children taken out of the game if they weren't hitting [[redacted] and they were just playing a friendly game of tag?

A. Because the other children knew that this was

something that was aggravating [[redacted] So, we stopped the game altogether.

Q. Why would you stop the game altogether? You took [[redacted] out. Okay? So, why would you stop the game altogether if they were just playing friendly? So, why would you stop the game altogether and not have the other children play and just have [[redacted] sit, you know, taken out? Why were other children taken out, too?

ATTORNEY ROSEN: Objection. Argumentative and relevance.

ROBERT [redacted] Well, it is relevant. So it --

THE HEARING OFFICER: I'll allow her to answer that.

THE WITNESS (Dougherty): While the children are playing tag, if you notice, as a social skill, if you notice that somebody is getting aggravated or angry, then you can -- you can stop the game, pause the game, do some self-regulation. But to continue playing the game is not -- is not a responsible way of playing the game.

So, if you get hit by somebody, that's time to stop.

BY R. [redacted]

Q. So, who is getting -- were the other children aggravated, or was it just [[redacted]

A. [[redacted]

Q. [[redacted] got aggravated. Okay. But you allow him to continue playing at another time, knowing that [[redacted] becomes aggravated.
Correct?

A. No.

Q. How many times did this occur where you took him out of the game? Was it just one time?

A. I can't answer that question. I wasn't out with him at recess every single day. I can only talk about the times that I was with him.

Q. What other teachers were out there that's -- that saw this, that saw the, you know, this, this going on?

A. In fourth grade, it would have been his fourth-grade teacher or a substitute teacher. In fifth grade, it would have been his fifth-grade teacher or a substitute teacher.

Q. Were there any concerns with the tag incidences in fourth grade or fifth grade?

A. Both.

Q. Did you reach out to us in -- specifically in fourth grade about, you know, your concerns about [[redacted] playing tag in fourth grade?

A. Again, all of that information is in the PowerSchool logs that you have. You produced them as information at a PPT in February.

Q. Right, we --

A. So, you have those PowerSchool logs.

ROBERT [redacted] Okay. We -- Hearing Officer, we did not receive any information about -- so, I would have to subpoena -- or I mean, or I should say, request the -- all the PowerSchool logs for fourth grade.

ATTORNEY ROSEN: I'm going to object to testimony. And I think we've made clear our understanding on the logs and the FERPA requests at this time.

ROBERT [redacted] Well, I think I made it clear that is important to come in. You're trying to shield the District from the accountability, and I'm showing that they have to be accountable. And that's our right to show that we're making a case here and we have a right as a pro se party to put on the case.

It's now that the District doesn't want this to come in evidence because it's going to, quote-unquote, incriminate, you know, the District, or so to speak. You know we have a right to have this evidence come in.

She testified that she would have to see the

PowerSchool logs, and they're all there. So, yes, the PowerSchool logs are irrelevant and they need to come into evidence before the hearing is --

THE HEARING OFFICER: All right. Well, at this point, there's no evidence that's being offered. There's no specific provision for discovery in --

ROBERT [redacted] What do you mean? I'm sorry.

THE HEARING OFFICER: There's no specific provision for discovery in school hearings. That's really through FERPA. So, you'll have to pursue that, pursue that separately.

ROBERT [redacted] Right. But I respectfully request that before the hearing concludes, you know, in the final that, you know, since I'm going to make the request in a timely manner, which would be, you know, today or tomorrow, preferably today, that I'm going to, you know, subpoena these school logs.

And I need these school logs before the hearing concludes, you know, so I can get this into evidence. And again, I will abide by the five-day rule that I understand now, so. But I'm making that clear for the record that I do really need these PowerSchool logs, you know, to get this into the record if she can't answer these today,

which she doesn't seem to be answering.
ATTORNEY ROSEN: I'm going to object to that last statement and ask that we move on for questions.
ROBERT [redacted] I'll object to his objection. But let's move on.
THE HEARING OFFICER: Yeah. I mean, there there's no actual pending question for anyone to object to.
So, why don't you ask a question?
ROBERT [redacted] Okay.
BY R. [redacted]
Q. Did you observe any incidents with [[redacted] became emotionally upset or cried during the fourth grade?
A. I would have to refer to the logs.
Q. You previously testified that you did observe [[redacted] became emotionally upset and cried.
Was that during fourth or fifth grade?
A. I would have to see the logs.
ROBERT [redacted] Okay. So, we're going to have to get the logs.
BY R. [redacted]
Q. Were there any, like, violent behaviors reported during fourth grade?
A. Same answer. I'd have to see the logs.
ROBERT [redacted] Okay. I'd like to open up an exhibit

now, which is P-18. Let me -- I believe P-18 is in evidence. If it's not, I'd like it to get into evidence, and I will have some questions for the Witness about it. Let me share it.

THE HEARING OFFICER: Let me double check, but I think we've admitted that one. Let's see.

ATTORNEY ROSEN: It's in evidence.

THE HEARING OFFICER: Okay. I thought we had.
Yeah, go ahead.

ROBERT [redacted] Thank you. Okay. Let me just minimize it here. Oh, okay.
Let me make sure this is the right one here. Give me a second. I just want to make sure I have the right one.
No, I might -- I apologize. I may have had the wrong one open here. Let me just make -- it's still shared? Because I don't see it's even shared.

THE HEARING OFFICER: Nothing is on the screen that's being shared right now.

ROBERT [redacted] Thank you for that. Okay. Let me get -- oh, yeah.
Okay. This would be -- I believe we have this. It would be Exhibit P-16. So, let me share this. Oh, yeah. This is the one here. I

think -- wait, is that -- I'm sorry.

No, I'm -- give me a second here. Something is different on here. Why is that not up here? Sixteen -- oh, five. Oh, here -- I apologize. It is P-15. Okay. I got it right this time.

Let me -- I've got a lot of things open up here.

Yes, I have the right open. I apologize for that. I just have a lot open on my screen.

So, we submitted complaints that you were copied on. So, I guess my first call -- I'm not trying to make this complex.

BY R. [redacted]

Q. So, I guess my first question are -- you were CC'd on all these e-mails that were going back between March and June 3rd. Would that be correct according to this?

Do you see, LDougherty@MilfordEd.org? That would be your e-mail?

A. Yes, that's my e-mail.

Q. Right. So, you were in receipt of all these communications. Correct?

A. The e-mails that had my e-mail on it, yes.

Q. Yes, they all had your -- yeah. This is -- every one of them here has your e-mail on

them.

Okay. Here's my question. We submitted a complaint regarding staff and teacher interactions during fourth grade that coincided with the start of these so-called violent behaviors. You were copied on an e-mail, which is this e-mail. Can you explain the context of -- can you explain, were there any follow-up actions taken regarding the complaints that we had made in these e-mails about the staff?

ATTORNEY ROSEN: Objection. The Witness hasn't had an opportunity to look through all the e-mails. And I'd appreciate the specific e-mails.

I saw that Ms. Dougherty was listed as a recipient of the most recent e-mail in this thread. Unless she recalls receiving each individual e-mail, I'm not sure she can opine on them.

ROBERT [redacted] Well, this is how the e-mail chain works. When I make an e-mail chain -- she has been. But when you reply back to an e-mail, which I've done to keep the chain, you know, when I replied back each time it will say that it was sent on. So, this is how the e-mail chain works.

So it --

THE HEARING OFFICER: I mean, you'll have to refer to a specific e-mail and --

ROBERT [redacted] Right.

THE HEARING OFFICER: -- I mean, if she knows, she can say whether something was done as a result of it.

But she may not know and she may not, you know. I mean, you may be talking about something further down in the chain that at that point she hadn't been copied on anything yet, so.

ROBERT [redacted] Well this is -- well, so my -- so, the e-mail that I wrote, [[redacted] informed me the other day that he asked Ms. Truscello, if he could use the boys bathroom and told her, and told her he was upset that he couldn't use it.

And Ms. Truscello, told him not to be upset and [[redacted] said that the calm -- that he promised it wouldn't happen anymore. And Ms. Truscello, responded that he can't be trusted anymore.

So, basically, I could read through this about, you know, this, this e-mail chain, what the teacher had said to him and that Ms. Dougherty was a recipient to this.

So, to move on with that, she said that he can't -- or she can't give him another chance and

there are no more chances. And said, because he would probably pull his pants down and show them to everyone in the bathroom.

And we expressed we are quite shocked at the statements to our son. Statements like that are very harmful, hurtful, and damaging to [[redacted] as it messes with his self esteem and isolates him. Negative statements will only lead to negative outcomes which do play a role in affecting his behaviors. Positivity breeds positivity and negativity breeds negativity.

[[redacted] needs positivity in his life.

ATTORNEY ROSEN: I'm going to object. This is just a reading of an exhibit in evidence, not a question.

THE HEARING OFFICER: Yeah. Well, you're basically reading --

ROBERT [redacted] For her to -- you read. You read --

THE HEARING OFFICER: You're reading your own statement. I mean, you can testify to that.

What's your question for the actual witness?

ROBERT [redacted] Right, but then Mr. Rosen as he was crossing -- when he was examining the Witness, you know, I'm cross-examining. So, I want to, you know, so what I'm saying here, I want to make sure that, you know, she's aware of what I sent her.

So, that's why I'm reading it.
And I do have a right to read it and Mr. Rosen shouldn't be interrupting me. He read word-for-word verbatim, and I have a right to read word-for-word --

THE HEARING OFFICER: Well, what are you asking the Witness? Because you're not -- you haven't established anything other than that she was copied on the entire chain in the last e-mail, which could have been a while after this one was sent.

ROBERT [redacted] So, should I --

THE HEARING OFFICER: And it doesn't refer to her specifically. It refers to Ms. Truscello.

ROBERT [redacted] So, should I refrain from reading now and that's coming from my testimony? Is that what you're saying? I should save reading these for, you know, until I get to my testimony?

THE HEARING OFFICER: Yeah. I mean, you could. You know you could testify to what you put in the e-mail.

ROBERT [redacted] And then I could read it?

THE HEARING OFFICER: Well, you can just testify to it.

ROBERT [redacted] And then I can -- right. I would have to, you know, read it and test -- because if

I just say, well, here's an e-mail, I want you to read it, I would have to read it.

So, every time -- when I go into testimony --

THE HEARING OFFICER: The e-mail itself is in evidence, but you know the e-mail contains things that you could testify to. So, when it's time for you to testify, you should actually testify to it.

ROBERT [redacted] Okay. So, we just established that Ms. Dougherty is in receipt of these e-mails. So, then I'm going to -- I will then ask my question.

BY R. [redacted]

Q. Can you explain of any follow-up actions taken since you're the social worker and you were CC'd on this? Did you -- have you personally followed up with the parents, being that you were CC'd on these?

You know these are concerns that we had. Were you -- did you follow up with the parents after you were CC'd on these complaints that we had said?

ATTORNEY ROSEN: Objection. Compound question.

ROBERT [redacted] All right. So, my question is --

THE HEARING OFFICER: Well, I think he asked the same question a couple times. The question was whether she took any action in response to the e-mail

chain. So, you can answer that question.

BY R. [redacted]

Q. Thank you.

A. I'm not sure how to answer that question, because the e-mail is subjective as far as what Mr. [redacted] thinks was said and what Ms. Truscello actually said. So, I don't know how to answer that question.

THE HEARING OFFICER: Well, the question was, did you do anything about it? And you can answer that. I mean, it's kind of yes-or-no.

THE WITNESS (Dougherty): No, I did not.

THE HEARING OFFICER: Okay.

ROBERT [redacted] And since Ms. Dougherty just testified, well, that was her opinion that was, you know, what we're writing is, you know. So, basically she just shared an opinion. It wasn't a fact that these things didn't happen. So, we don't know. So, basically --

ATTORNEY ROSEN: Objection. This is testimony.

THE HEARING OFFICER: Yeah.

ROBERT [redacted] Right, but she just (unintelligible) --

THE HEARING OFFICER: She answered the question. You can ask the next one.

ROBERT [redacted] But then she went off, off tangent and I'm trying to, you know, correct that as well, or, you know, get my statement in there because she made a comment that was outside of the scope of this question.

Because the question wasn't related to, would you say that what we said is accurate? That wasn't the question, and she went out of the scope of the question to say, well that was just, you know, his interpretation of it.

THE HEARING OFFICER: No, you're right. That was not -- that the first, her first answer was nonresponsive. Her second one was.

ROBERT [redacted] What do you mean?

THE HEARING OFFICER: So, you can ask the next question.

ROBERT [redacted] I didn't understand that last part. Just so I have an understanding, what do you mean?

THE HEARING OFFICER: The first, her first answer was nonresponsive to the question, to the actual question. Her second answer was responsive to the question.

ROBERT [redacted] Okay. So, all right. So, she answered the question that she did not reach out. Did not? Okay.

THE HEARING OFFICER: Yeah. Yeah, I'm not really considering the first nonresponsive answer.

ROBERT [redacted] Okay. I understand.

Okay. I'm going to -- let me stop sharing this. I'm going to bring an exhibit now.

Let's see here.

Okay. This is exhibit P-29. I'm going to share this right now. I believe it is an exhibit. I believe that's what Mr. Rosen and I had previously put in, but let me share it.

THE HEARING OFFICER: Yeah, I'm pretty sure that's been admitted already.

ROBERT [redacted] Okay. Great. Thank you.

Ms. Dougherty, you are familiar with this behaviors described in this October communication regarding [[redacted] such as running -- now, I don't know if this is considered compound. Should I just ask this question and then ask another question after that? So, I can ask it and then if you want to --

THE HEARING OFFICER: If you have two questions to ask, ask them separately.

ROBERT [redacted] Got it.

Okay. Ms. Dougherty, you are familiar with this behavior described in the school's October --

well, when I say behavior, so I think I need to build a foundation first. So, I think I should ask this question here.

It was reported on 9/20 that -- should I read this and get into, like, what? What should I do? I mean, I don't want to, like, make testimony. I'm trying to be respectful of the process. So, I'm trying to, you know, interpret in my mind, you know, how to frame this.

So, what I, you know, what I want to do is ask a question about, that she's familiar with this communication that was sent.

THE HEARING OFFICER: I'll tell you what. Ms. Dougherty, why don't you read the part that he's got right up on the screen, the paragraph beginning 9/26. Read it to yourself.

(Pause.)

THE WITNESS (Dougherty): Okay. I've read it.

ROBERT [redacted] Okay. You read it. Actually, I noticed that P-22 is really the one I wanted to submit. I could ask you some questions about this. I don't know if -- to ask it later on. Yeah, let me just do this. So, there's -- yeah, let me try to get this back here.

Now, I can't even see my screen now.

Let's -- yeah, I'm having -- hold on a second here. I'm trying to see. All right. I'm going to -- I have to stop sharing this for a minute, because my screen is not refreshing.

Let me share that again. What was that?

Or actually, here. Wait. Is the one?

Hold on.

I'm not sure if that's the same one, but this is the one -- I might have to get back to it, but this is the one. Let me see here. Yeah, I think this is the one I have on here. Okay.

All right. I will have to -- let's see. Twenty-two. I will stop sharing this.

I apologize. I'm going to be sharing P -- again, I apologize for this. P-22. Let me just bring that up here. Okay?

Okay. So, I'm trying to make this not too small where you can't read it, but not too big where, you know, you only see a couple words.

So, is P-22 admitted into evidence? I want to make sure it is. And if not, I would like to, you know, bring that into evidence.

THE HEARING OFFICER: I thought it was. Let me --

ATTORNEY ROSEN: Yes.

ROBERT [redacted] This is the one.

THE HEARING OFFICER: Yeah, it was, uh-huh.
ROBERT [redacted] Okay. Thank you.
THE HEARING OFFICER: Go ahead.
ROBERT [redacted] So, my question to you, Ms. Dougherty -- and I apologize. It was really this exhibit I was referring to. I brought up the wrong one and I do apologize. So, I'm going to ask the question.
BY R. [redacted]
Q. So, you're familiar with the behaviors described in this October communication regarding [[redacted] such as running -- well, regarding [[redacted] Correct?
A. I would have to read it.
Q. Yes. If you would?
Do you want me to make this bigger?
A. Sure. Go ahead.
Q. Okay. And then I can scroll down when you're done just to show, yeah.
(Pause.)
A. Okay.
Q. And this is the other part of it now. So, let me zoom out a little bit. So, you read the first part. This is the second part, the other half.

(Pause.)

A. Okay.

Q. Yeah. So, that's it. Okay. So, my next question is, you know, to summarize this, these communications were about [[redacted] such as running into the building, stomping his feet, yelling, grabbing and twisting a classmate's shirt and hand at recess.

So, this is pretty much -- instead of me reading it, you read it. That's pretty much what it sums it up. So, is that correct, what you read in here, what I just described?

A. I don't know. I wasn't part of the situation.

Q. I'm talking about this e-mail, not your -- the situation. I'm talking about what you just read. So, I'm basically -- the question I'm asking you, is what you just read, is this -- does this actually describe, rather than me reading this whole e-mail, I'm just going to sum it up.

This is -- what you just read, does this accurately describe him running into the building, stomping his feet, yelling, grabbing and twisting a classmate's shirt and

hand at recess?

ATTORNEY ROSEN: Objection. She just said she wasn't involved in the incident.

ROBERT [redacted] That's not my question. My question was --

THE HEARING OFFICER: Was this one specific incident?

ROBERT [redacted] I'm not talking about that she was involved. I'm talking about what she just read.

So, I'm trying to lay a foundation that she was carbon copied on this e-mail. Okay? She just read it. And I'm just summing it up, rather -- I mean, I can read the whole thing if that's what you would like, but I'm just summing it up.

What she just read, not that she was involved in this, but what she just read, am I accurately describing what you just read? It's about him running into the building, stomping his feet, yelling, grabbing and twisting classmate's shirt and hand at recess?

ATTORNEY ROSEN: Objection. Hearing Officer Kennedy, Mr. [redacted] is just asking her, does my description of what I just wrote match what I wrote. And I don't see the relevance.

THE HEARING OFFICER: Yeah, I mean, you can --

ROBERT [redacted] I'm not saying I wrote here. You're

twisting my words.
THE HEARING OFFICER: You can ask her if she's familiar with the incident in question.
BY ROBERT [redacted]
Q. Okay. So, then may I read this for the record, what she just wrote? Because otherwise I can't get my question answered, it seems like.
So, I'm going to have to read this.
A. No, no. I don't --
ROBERT [redacted] My question --
THE HEARING OFFICER: No, let me. Let me ask the Witness. Did you read the letter and see what it referred to?
THE WITNESS (Dougherty): I, just now, I did.
THE HEARING OFFICER: Okay.
THE WITNESS (Dougherty): I know what it refers to, but I can't answer the question because I didn't witness the event then.
ROBERT [redacted] That's not the question.
BY R. [redacted]
Q. So, my question is, is that not that you -- I'm not asking if you witnessed it. Just, I'm referencing. So, instead of me reading all this, what you just read, such as running

into the building, stomping feet, yelling, grabbing and twisting a classmate's shirt and hand at recess, this is what you just read. Correct? That's what I'm asking. No that you witnessed --

A. That is what I read.

Q. Okay. Thank you.

Did you observe any of these behaviors that you just read during fourth grade?

A. I don't know without my -- the -- without my documentation.

ROBERT [redacted] Well, then we -- can I ask that -- well, not today, but would I be able to ask the Witness to produce the documentation? She said without her documentation.

This happened in fifth grade.

BY R. [redacted]

Q. So, my question is, is that -- did she observe any of these specific behaviors during fourth grade?

A. Everything is in the PowerSchool log.

Q. Right. So, then we're going to have to get documentation about fourth grade, because what I'm trying to establish here is that this October twenty twenty-fourth -- 24 --

October 24, 2024, e-mail, this is while [[redacted]
my son, was in fifth grade.
So, my question was, did you observe any of these specific behaviors during fourth grade, what you just read, if she noticed them in fourth grade at all? Any of these, you know, what you just read here and what I just kind of summed up?
A. I -- there are 185 days in each school year, and I would need the documentation that I wrote into the PowerSchool log to be able to answer that question truthfully.
Q. Are you the only one that writes PowerSchool logs? Or is it other staff members as well? Like with these -- so, let me ask. I have a couple of questions, but I don't want to make them compound.
So, my first question, are you the only staff member that writes these incidences into PowerSchool logs?
A. No.
Q. So, you're not the only one. What other staff members write incidences like these into the PowerSchool logs?
A. The personnel that have access to the admin

PowerSchool.
Q. And who exactly would that be, specifically, if you can name them?
A. Mrs. Rizzo, Ms. Koosa. You want only people related to this case?
ROBERT [redacted] Just as --
ATTORNEY ROSEN: I'm sorry. I'm just going to object. I'm not entirely sure what the relevance of this is.
ROBERT [redacted] The relevance is, is that I'm trying to take this into evidence.
ATTORNEY ROSEN: I'm stating my comment for the Hearing Officer.
THE HEARING OFFICER: What's your objection?
ATTORNEY ROSEN: My objection is to relevance. I have not heard anything yet about an IEP, a behavior intervention plan. We're talking about an e-mail that Ms. Rizzo wrote that described something she reviewed, which Ms. Dougherty said she wasn't involved in.
Further conversation about PowerSchool log and who has access, I'm still not sure what the relevance is to the question of, did the District provide free appropriate public education and implement the IEP?

ROBERT [redacted] So, here's the thing, Mister --

THE HEARING OFFICER: Well --

ROBERT [redacted] I have to object. Mr. Rosen is basically trying to now spin this around, you know, just to fit his narrative, because this is definitely related, because if these behaviors actually occurred -- so, that's another thing. If these behaviors occurred, they would be in his IEP or BIP or some documentation. They're in e-mails.

So, it does relate to his IEP and it does relate to basically a violation of his free and appropriate public education across the board. And then again, this case is also about my violations regarding, you know, my rights as a parent under IDEA, but that's something that will come up during my testimony.

THE HEARING OFFICER: Well, I can understand the Witness not really specifically remembering all the incidents and all the dates, and stuff like that.

But do you have a general recollection of what behaviors pretty much occurred and in what years?

ROBERT [redacted] That's not even the question I asked. This is (unintelligible) --

THE HEARING OFFICER: I know, but let me. I'm asking.
I'm asking the Witness because, I mean, you've kind of asked about this. And she said, well, I'll have to refer to the logs. But certainly, you might for relatively specific things.
You don't really have a general recollection of behaviors in the two, the fourth and fifth, the fourth grade and the fifth grade separated?
THE WITNESS (Dougherty): No, I don't.
THE HEARING OFFICER: Okay. All right. I mean, that's kind of the answer.
BY R. [redacted]
Q. So, my question was, is that, did any of those behaviors or -- so, you know, did they occur in fourth grade or fifth grade?
A. I would have to refer back to the log.
ROBERT [redacted] Okay. So, that's something else we'll have to get. As a matter of fact, I may have some of the logs here. Let me just check, because she mentioned logs. Let me just check my exhibit list and then I can get them into evidence.
Let me just check here.
Okay. Actually, I have something in the PowerSchool, but I -- actually, I do have a

question for -- another question, which I do have others, but this question I'm going to ask.

BY R. [redacted]

Q. Ms. Dougherty, did [[redacted] make a suicide comment in May of 2024?

Did he say he wanted to kill himself?

A. I think that was classified as self-harm. There were two incidents, one on May 17th, and one, I believe, on September 30th.

So, I would need to see the -- the documentation to be able to tell you which one.

Q. But my question to you was, in May of 2024 did you report that [[redacted] made a self-harm comment and said he wanted to kill himself?

A. Yes.

Q. Okay. So, that's been established.

Was this comment made only after we started complaining and reporting the staff or before?

A. I don't understand.

Q. Let me repeat it again. The self-harm comment that [[redacted] made that he wanted to kill himself in May of 2024, was that made before we started complaining? Because I brought up

the, you know -- just, I brought up the e-mail where we complain about staff, you know, from May up until June, which was already established.

So, this is my question. Did [[redacted] make that self-harm comment saying he wanted to kill himself before we reported and complained about the staff? Or was it only after?

ATTORNEY ROSEN: Objection as to form of question.

ROBERT [redacted] The form of question is that I'm trying to establish a timeframe of when he made the self-harm comment. Was it before --

THE HEARING OFFICER: She testified to May of 2024. Don't you have exhibits --

ROBERT [redacted] Yeah, so let me open --

THE HEARING OFFICER: -- in evidence that say that, you know, have basically copies of, like, e-mails you've sent complaining?

ROBERT [redacted] Yeah. So, I can open up those ones.

THE HEARING OFFICER: Those would establish a timeline in and of itself. She may not be aware of all the complaints, but you know your e-mails certainly have -- your exhibits certainly have that information.

ROBERT [redacted] Right. Okay. Understandable. So, I'm going to, you know, bring that up.

THE HEARING OFFICER: That means you don't really have to ask her about it.

ROBERT [redacted] I'm sorry?

THE HEARING OFFICER: You don't really have to ask her about the timeline if it's manifest in the exhibits. You know she testified to her part, which is May of 2024. And you know the other part of the timeline is established by your exhibits, which, from my recollection, your complaints started a good deal before that.

ROBERT [redacted] Yeah, let me bring this up here.

Is this shared now? I don't even know.

Oh, it's gone now.

Maybe I'll ask 15 again. Let me bring that up, so then I can -- so, this way, you know, so I can recollect her memory here. Let me bring that up.

Oh, here it is. All right. Try and move this out of the way. Let me just get to the --

BY R. [redacted]

Q. Okay. Ms. Dougherty, you were CC'd on this e-mail from Ms. Truscello on Tuesday, May 14, 2024. Correct?

A. I don't see my name on there.

ROBERT [redacted] Well, your name is at the top. Like I said, this is an e-mail chain, which -- so, let me scroll back up to the top and show you this e-mail chain is -- so, when Ms. Truscello writes an e-mail, she does e-mail everybody. I replied back to everybody, too.

And these are all the parties that were CC'd. And I do see LDougherty.

ATTORNEY ROSEN: Objection. That's testimony. Whether or not she recalls or knows that she received each specific e-mail is up to the Witness.

THE HEARING OFFICER: I mean, that --

ROBERT [redacted] I think it's a valid question.

THE HEARING OFFICER: Within the four corners of the document, I mean, what he's showing me with -- what he's showing with CCs at the top of the document is that it's dated June 3rd.

ROBERT [redacted] Right. But this is not just the June 3rd. So, all these e-mails that I have, all of these recipients up here were.

Do I have to resubmit my exhibits to show individual ones? I thought I would submit an e-mail chain, otherwise I could have -- if I have to -- I could have (unintelligible) --

THE HEARING OFFICER: I'm fine to submit exhibits.
ROBERT [redacted] I'm sorry?
THE HEARING OFFICER: I'm fine to submit the e-mail chain, but I'm just saying that if someone is CC'd at the top of the chain, that doesn't necessarily mean that they got everything below until the date at the top of the chain.
ROBERT [redacted] So, what I'm going to have to do is maybe resubmit my exhibits to show that they were CC'd, because then I have to do them individually rather than e-mail chain.
So, if this e-mail chain is 20 pages, 20 pages long, I'm going to have to have -- maybe make this into 20 exhibits, make another one and then there will be a lot more than you'll actually have to --
THE HEARING OFFICER: What's the actual relevance of this? What are you trying to show?
ROBERT [redacted] The relevance is that, was she CC'd on these e-mails? And I have to -- I want to, you know, my -- the relevance is that, was she CC'd on the e-mail from May 16th?
If I have to resubmit the exhibits individually to show that she was, if she doesn't want to admit that she was, being that she does --

just said she doesn't know, well, then I can submit the exhibits again. But then I would have to have them individually rather than the e-mail chain.

Because in the e-mail chain it shows here on Monday, May 27th, Robert wrote, but it doesn't show this. This is how e-mail chains work. They were -- everybody was CC'd here. And every time I hit reply or there's a reply back it does not show that, you know, this is how the e-mail client works.

So, if I have to resubmit, you know, this e-mail chain separately which will then show that who I sent it to, then I'm going to have to cut it up into 20 different e-mails by going back to my e-mail client and saying, okay. Sent on this day, sent on this day.

So, basically what I'm going to have to do is go, like, Thursday May 16th will be one e-mail. Then I'll have to go down in here. May 15, 2024, at 9:29 p.m. was another e-mail. And I could show that, that specific e-mail that I sent about, you know, what I wrote was actually CC'd to Ms. Dougherty. And what Ms. Truscello wrote was actually CC'd to Ms. Dougherty.

I have to go back, which I can, and show that the e-mail I received on May 16th from Ms. Truscello was actually also CC'd to Ms. Dougherty. So, then I can establish that, yes, were you CC'd on the e-mail, Ms. Dougherty?

Then she can look back and say, oh, yes. According to that, I was.

And if I have to resubmit the exhibits it may take many more days, and that, that's fine. But we're going to have to, you know, what I'm saying is that if that's how I'm going to have to get this into evidence, then I'm going to have this, you know --

THE HEARING OFFICER: Well, P-15 is already into evidence.

ROBERT [redacted] Well, the thing is --

THE HEARING OFFICER: Is this P-15? Or P-22? Whichever one it is.

ROBERT [redacted] Right. But my question is that I'm asking her if she received all these e-mails. That means if she doesn't know, then I'll have to go back and split them up and resubmit them as exhibits separately, rather than an e-mail chain.

THE WITNESS (Dougherty): I don't -- I don't know.

ATTORNEY ROSEN: Ms. Dougherty, you weren't asked a

question. One moment.

From the District's perspective, during cross-examination this is about questions in Ms. Dougherty's realm of knowledge. So, regardless of whether or not who was CC'd on what, I think if Ms. Dougherty is asked to opine on a certain e-mail, just a basic, did you receive this on an e-mail, is sufficient for foundation.

I think the fact that this is in evidence, we understand. I'm just -- we have this Witness who's been made available for cross-examination. We're hitting an hour and a half, and I'd just like that we use this time for questions within her knowledge.

ROBERT [redacted] Well, I have to object to that because Mr. Rosen just contradicted himself. He says that we have this e-mail into evidence, and she just, you know, said that -- so, I'm trying to establish that she was CC'd. She said she didn't know. So, if she doesn't know, then I'm going to have to get these in individually.

So, I'm asking a question, where you CC'd on these e-mails? Or specifically, to make it easier, were you CC'd on the e-mail which I'm referring to now on May 16th?

Let me just get there. This e-mail. Because -- let me see here. Yeah, this e-mail sent from Ms. Truscello on Tuesday, May 14, 2024, at 3:05 p.m. So, I'm asking Ms. Dougherty if she was CC'd. She doesn't know, because she doesn't see her name there.

So, then I have to go back, which I can. I can do that now, but it -- since it's submitted into evidence, I can show that specific e-mail that she was CC'd. So, I'm trying to establish a link and a foundation that this e-mail -- that she did receive it.

So, that's what I'm trying to do. I'm establishing a foundation, and in order to do that I have to recollect her memory. Did you receive this e-mail that Ms. Truscello sent? Were you CC'd on this?

It doesn't show it according to this, because when you hit reply it doesn't show a list. I have to go back, and I have to go into each individual e-mail, which I still have, and go into this specific e-mail sent by Ms. Truscello on May 14th at 3:05 p.m., which I can definitely do at this point.

If I go into my e-mail client, then save it

as a PDF and then submit it, or if we have to do it another time because my question is, were you CC'd? Well, I don't know. So, if she doesn't know, receiving this, then how can my question be relevant?

I want to make sure she received this e-mail and she's aware of it, that she did receive it. So if she's not, then I have to go back and take each individual e-mail and show that, yes, Ms. Truscello, I was, you know, it was sent to me. It was sent to Ms. Dougherty. It was sent to Ms. Rizzo. It was sent to Ms. Stewart, or whoever. Then I can show that, yes, you were CC'd.

Because if I go to the top, if I go right to the top of the e-mail -- like, Hearing Officer, you had stated that this just shows that on Monday, June 3rd, she received the e-mail for that, but it doesn't establish the fact that it proved that she received the e-mails below.

So, I don't know how --

THE HEARING OFFICER: Well, I mean, it does show that everything was attached as a string, a string to the first e-mail.

ROBERT [redacted] So, my question, did you -- so, let

me go back to this e-mail.

And Attorney Rosen is complaining about time, but here it's not because of me, it's because of the way the questions are not being answered, and I think that they're just being deflected. And I have to take the time to explain this when I shouldn't have to. So --

THE HEARING OFFICER: I mean, what's your -- she did get a CC. You know she got a CC of the whole chain at some point, so.

ROBERT [redacted] Did she? Well, she didn't -- I asked --

THE HEARING OFFICER: Why don't you just ask her about the e-mail? Let me see if it, you know, if it's something --

ROBERT [redacted] So my question to her was --

THE HEARING OFFICER: -- something she can answer.

ROBERT [redacted] -- were you CC'd on all these e-mails?

And then Mr. Rosen was arguing the fact, oh, she doesn't remember because we don't see her name there. She didn't see her name there. You did, Hearing Officer, say, well, I only see it for June 3rd. And I have to take, you know -- what? A half hour out of this time to explain that.

Now -- now you're saying that, well, it's obviously she was CC'd. We could have (unintelligible) --

THE HEARING OFFICER: She was obviously CC'd on the first e-mail, and the chain was attached. Whether she was CC'd on everything below at the time, I don't know.

But why don't you just ask her the question?

BY R. [redacted]

Q. Well, that's what I have to establish. I want to make sure she received this e-mail. If she was CC'd on this e-mail from Tuesday, May 14, 2024?

A. I don't know.

Q. Oh, she doesn't know.

A. I don't see my name there, so I can't --

THE HEARING OFFICER: She doesn't know at the time. Yeah, okay.

ROBERT [redacted] Okay. So, basically, we're going to have -- then I'm going to have to get this e-mail, split them up as separate exhibits, which will show -- if I go into my e-mail client right now, I can bring up that e-mail and show that, that specific e-mail from the 14th that we received from Ms. Truscello was, in fact, CC'd to her,

rather than just seeing [redacted] on Verizon wrote. It doesn't show, or Ms. Truscello -- Ms. Truscello wrote, you know, on this day.

So, I have to go back, which I can do, and show that e-mail was sent to her, because that's establishing a foundation. So, if that's what I have to do, I don't have any problem with that.

But I can't be held responsible for this time, because I can't just move on to the next question.

THE HEARING OFFICER: I mean --

ROBERT [redacted] It's not fair to me.

THE HEARING OFFICER: She apparently saw it at least on June 3rd.

Why don't you just ask her the question? I don't even know how important this is.

ROBERT [redacted] Oh, it's very important. And to even mischaracterize this, how important this is -- this is extremely important. This has to do with my son. This has to do with his future, and this is what this whole due process is about --

THE HEARING OFFICER: No. But I mean, this specific e-mail. I mean, she didn't send it. Apparently it wasn't really directed to her. She was just maybe CC'd on it.

ROBERT [redacted] Maybe? Well --
THE HEARING OFFICER: Or at least saw it as a CC later.
And so what's --
ROBERT [redacted] Right, and that's what I -- yeah.
THE HEARING OFFICER: What is it in the e-mail that is specific, is specific to her?
ROBERT [redacted] Well, because she said -- I just asked the question, were you CC'd on this e-mail?
She said she doesn't know.
THE HEARING OFFICER: Well, what --
ROBERT [redacted] And I have to make sure she knows.
THE HEARING OFFICER: In the text of the e-mail, what is it that you're saying is important from her standpoint? Because, I mean, even if she's just CC'd on it? Okay. Well, what --
ROBERT [redacted] All right. Well, so I -- my question is this --
THE HEARING OFFICER: What are you trying to establish?
ROBERT [redacted] Okay. Here's what I'm trying to establish right now.
Let me -- I'm trying to bring this up.
Now it's a screen refresh issue. So, I think that was 16.
ATTORNEY ROSEN: Perhaps we could take a break? It's been an hour and a half.

THE HEARING OFFICER: All right. Let's see what time it is.
ROBERT [redacted] Want to take a quick break? That's fine. I don't have a problem with that.
THE HEARING OFFICER: All right. It's --
ROBERT [redacted] And then I'll ask my next questions after that. So, if she -- before we take a break, it was established that, you know, she's aware of, you know, this e-mail that, you know [[redacted] was, you know, according to the e-mail, we got a positive update that, you know, she was aware of that. Because she's --
ATTORNEY ROSEN: Objection.
THE HEARING OFFICER: It's 25 of 3. We'll take a 15-minute break, and then you can have until four o'clock, so we take a reasonable amount of time with this.
So, back at ten of three.
ROBERT [redacted] Well, it goes until five, I believe. Right? This, the session?
THE HEARING OFFICER: But this, I mean, this has taken, you know. I mean, the questioning didn't even last 45 minutes on direct, and cross is supposed to be within the scope of direct. So, this is --
ROBERT [redacted] And that's what I'm trying to do.

THE HEARING OFFICER: I mean, so this is several times what he took on direct.

So, four o'clock is late enough.

ROBERT [redacted] But what I'm trying to establish is that that's time wasted for me.

THE HEARING OFFICER: Okay. We'll come back at ten of.

THE REPORTER: Pausing the record.

(Pause: 2:35 p.m. to 2:49 p.m.)

THE HEARING OFFICER: All right. It looks like we've got everybody, everybody here. All right. You can proceed with cross.

ROBERT [redacted] Okay. I think we left off about -- what I'd like to do is introduce -- I don't think this has been introduced -- P-57, which is actually a PowerSchool log. So, I do have, you know, the PowerSchool log. So, I'm going to introduce that one.

Let's see, 57. Let me just find it here.

Oh, here it is. Okay. So this is a PowerSchool log I'd like to submit into evidence. It starts off with another suicide comment made on 9/30. So, this is P-57.

ATTORNEY ROSEN: I just haven't heard any foundation.

I can't specify or understand as to what it is.
ROBERT [redacted] The foundation is --
ATTORNEY ROSEN: I'm sorry. From the Witness, not Mr. [redacted] testifying.
THE HEARING OFFICER: Why don't you ask the Witness to identify the document?
ROBERT [redacted] Okay.
BY R. [redacted]
Q. Ms. Dougherty, can you identify this, this Power -- this? We talked about a log entry. Could you identify this PowerSchool log?
A. This is not part of the PowerSchool log. The Columbia -- the PowerSchool log starts there.
Q. Right. Is this a Columbia-Suicide that you filled out on September 30th of 2024?
A. Yes.
Q. So, this was the second suicide comment [[redacted] made since May 17th. Is that correct?
A. Yes.
Q. Okay. Going back to this PowerSchool log, since -- on October 19th of 2023, a social worker, which was you, Lauri Dougherty, you reported that [[redacted] was to be picked up.
So, my question is this. This PowerSchool log is something that you are

familiar with as far as [[redacted]s behaviors. Correct?

A. Yes.

ROBERT [redacted] Okay. So, it says right here on 10/19/2023, [[redacted] was to be picked up. No one showed up. [[redacted] was very upset. He was crying and repeating, this is horrific. It's never -- I'll never see him again.

He was basically referring to me because I was running late. It says, Dad called at 1:35 to say that he was on his way. So, this doesn't have anything to do with [[redacted]s, you know, outbursts or behaviors or anything. This was in relation because [[redacted] was upset that I didn't -- I wasn't there on time to pick him up.

THE HEARING OFFICER: Well, you're -- I mean, you're testifying. Let's back up.

First of all, it looks like some of these are separate exhibits, but they weren't necessarily --

ROBERT [redacted] Well, P-57 --

THE HEARING OFFICER: How they were marked is a little bit unclear to me. Let's see. We've got -- I mean, some of the pagination -- and it's a little bit confusing. All right.

Is 57 just the suicide, the Columbia-Suicide

report?

ROBERT [redacted] No, this was -- P-57 is both. This was given to me. This is one exhibit, how it was given to me by the District exactly, exactly like it is here.

THE HEARING OFFICER: All right. Well, I think --

ATTORNEY ROSEN: I'm going to object. It's two separate documents.

THE HEARING OFFICER: The thing --

ROBERT [redacted] This is how it was given to me by the District.

THE HEARING OFFICER: Wait, wait, wait. All right. So, I'm just kind of working backwards. P-60 seems to be -- all right. That's the date --

ROBERT [redacted] If I have to subpoena the School District again for this specific record --

THE HEARING OFFICER: Wait, wait, wait.

ROBERT [redacted] -- I can.

THE HEARING OFFICER: P-60 is data collection incidents. So, there's P-57. There should be a 58 and 59, you know, between 57 and 60.

ROBERT [redacted] This entire exhibit right here, which -- page 2, which has a suicide. And this, this was given to me by the District in its entirety as it's presented here. There was

nothing patched together or pieced together.

This was given, given to me by the District and I'm just --

THE HEARING OFFICER: Well, all right. All right. First of all, I'm trying to figure out just the numbering of the exhibits because --

ROBERT [redacted] And I don't want this to cut into my time. I understand you have to do that, but then this is cutting into my time and I need to get through all these questions. So, this, you know, I'm going to have to go probably past four o'clock, because if you have to verify this -- and I appreciate that, and that's not a problem.

But again, you know, I have to (unintelligible) --

THE HEARING OFFICER: I mean, the problem is you didn't number anything 58 or 59. There is 57 and then there's 60, and then there's two pages in between.

ROBERT [redacted] No, that's what I have. Those, those are my exhibits --

THE HEARING OFFICER: Okay. Tell me, what's 58?

ROBERT [redacted] That would be a different PowerSchool log. And then there's 59. So, you have it all there. You have everything there. So, this is the one I'm putting into evidence on 57.

THE HEARING OFFICER: Let me see something. You know what? I think I can make sense of this. And I'm going to say 57 -- okay. 57 is the Columbia-Suicide Severity Rating Scale.

58 is the --

ROBERT [redacted] This is 57, this whole exhibit right here with -- this is attached. This is what it is. Fifty seven is the CSSRS.

And this is what was given to me, the PowerSchool log. This is all one exhibit right here. This is how they just gave it me.

THE HEARING OFFICER: All right. So, I mean, some of that pagination isn't showing at the bottom of my -- okay. So, all right. Fifty-seven, you're saying two of two is the -- okay.

So, 57, page 2 is the logs ending in 10/19/'23. So, that's 57.

What's 58?

ROBERT [redacted] This is the one I'm referring to. This is. This is 58. This is the one I'm putting in exhibit right now.

57 is this power -- is this log right here, which has the Columbia Suicide Rating.

THE HEARING OFFICER: All right. Well, if you --

ROBERT [redacted] And this is how --

THE HEARING OFFICER: All right. If you're not referring to -- all right. At least I know what you're offering is 57.

ROBERT [redacted] This is all 57 right here. These two pages are 57, yes.

THE HEARING OFFICER: All right.

ROBERT [redacted] This is one exhibit. This is what I put in as evidence in 57. And that's why I, again, as per the rules, page 57, 1 of 2, page 57, 2 of 2. This is how it was given to me by the District.

I requested, you know, the logs --

THE HEARING OFFICER: All right. Okay. So, do you have any objection to 57 being admitted?

ATTORNEY ROSEN: Not to the first page on the suicide scale that was discussed.

As to the log entries, I understand Mr. [redacted] is saying that's how it was provided to him. I will note that the log seems to have a second page that is not attached, which then looks like it's attached as part of Exhibit 58.

So, as long as there's an acknowledgement that the page of the PowerSchool log we're looking at as part of P-57. It's not the entire log, you know, I don't have --

THE HEARING OFFICER: All right.
ATTORNEY ROSEN: I have no objection.
THE HEARING OFFICER: P-57 is admitted.
ROBERT [redacted] This is how it was it given to me.
THE HEARING OFFICER: All right.
ROBERT [redacted] If I have to subpoena the School District for records --
THE HEARING OFFICER: P-57 is admitted.
ROBERT [redacted] Okay. Thank you.

(Parent Exhibit Number 57, marked for identification and noted in index.)

ROBERT [redacted] So, this is this is how it was given to me directly. Okay.
BY R. [redacted]
Q. So my question to you, Ms. Dougherty, on 10/19/2023 this was, again, reported that [[redacted] was crying because I didn't come to pick him up in time. Is that correct?
A. No.
Q. It's not? Then let's read it. School ended at 1:15 p.m. due to parent-teacher conferences. [[redacted] was to be a car pickup, but no one showed up. [[redacted] was very upset.

He was crying and repeating -- repeating, this is horrific. I'll never see him again.

Called each parent, but it went to voicemail for both numbers. Dad called at 1:35 p.m. to say that he was on his way.

So, your testimony that this is not why [[redacted] was crying is because --

ATTORNEY ROSEN: Objection as to relevance.

ROBERT [redacted] The relevance is this, is that I'm establishing a foundation here that [[redacted] has all these behaviors. He, you know, all these behaviors, so I'm showing that the reason he was crying and he gets frustrated --

THE HEARING OFFICER: Well --

ROBERT [redacted] This is why. It was her previous testimony -- was that Ms. Dougherty claimed that [[redacted] gets frustrated and --

THE HEARING OFFICER: Okay. I mean, you said this wasn't correct. Is that your -- it's entered under your name. Is there some reason why something --

ROBERT [redacted] She said it was incorrect.

THE WITNESS (Dougherty): I --

THE HEARING OFFICER: Yeah. Why don't you explain that.

THE WITNESS (Dougherty): I'm describing the behavior that I saw. I'm not saying what caused him to cry.

THE HEARING OFFICER: Okay.

THE WITNESS (Dougherty): I'm simply stating what I observed from [[redacted] and what happened at that time.

BY R. [redacted]

Q. Was [[redacted] crying because there was something else going on in school? Was he misbehaving at the time?

A. He was doing exactly what it says in the log.

Q. And why was he doing this?

ATTORNEY ROSEN: Objection, calls for speculation --

ROBERT [redacted] There's no speculation. She was there. She's the (unintelligible) --

ATTORNEY ROSEN: -- and she has already also testified as to her comments --

THE HEARING OFFICER: It may or may not be. If you know?

THE WITNESS (Dougherty): I don't know.

THE HEARING OFFICER: Okay.

ROBERT [redacted] Well, according to this -- I'm reading by her own words. Again, I will have to use this term. The document speaks for itself. [[redacted] was crying. He repeated, it was

horrific. I'll never see him again.
ATTORNEY ROSEN: Objection. This is testimony.
ROBERT [redacted] This is -- oh, okay. So --
THE HEARING OFFICER: Yeah, there's no reason for you to reread it. You got her testimony on it.
So, you should probably ask her another question.
ROBERT [redacted] Okay. Well, I have a follow-up question with this one, too.
BY R. [redacted]
Q. You wrote down in your own words, I'll never see him again. Who was [[redacted] referring to that he would never see again?
A. I don't know.
Q. Did I -- was I there on time to pick [[redacted] up?
A. According to the log? No.
Q. Thank you for answering that. Okay. To move on, on February 2nd there was a bathroom incident, which I believe was part of Ms. Rizzo's testimony.
So, are you familiar with this bathroom incident, Ms. Dougherty?
A. I don't see a log for February 2nd.
Q. 2/12/2024 -- I'm sorry. Is this not shared? I believe it's shared. Right?

So, you want me to zoom in here? February -- February the 12th -- I'm sorry. Did I say the 2nd? I apologize. I meant Feb -- I saw it, too, and I said the 2nd. I mean, February 12, 2024. I apologize. That was my mistake, but I meant February 12, 2024.

So, let me zoom out.

Are you familiar with this incident here, with that bathroom incident?

A. I did not deal with that bathroom incident.

Q. Okay. Well, that's something I'll probably have to get Ms. Koosa on a stand about. Understandable. Thank you.

Now, according to this log incident, you had stated on May 17th of 2024, [[redacted] made a low-risk suicide comment. The Columbia assessment was completed. So, your testimony is that [[redacted] did make a suicide comment saying he wanted to kill himself.

Is that correct?

A. He made a suicidal ideation comment.

Q. What did he say exactly, since you were there?

A. I can't recall.

Q. Did he say he wanted to kill himself?
A. I can't recall.
ATTORNEY ROSEN: Objection, asked and answered.
BY R. [redacted]
Q. What is a suicide comment? If you can explain what a suicide comment is? Since you have 27 years' experience and you're an educational professional, what is a suicide comment, Ms. Dougherty?
A. It could be anything from, I wish I wasn't here, to, I don't deserve to live, not -- they don't all necessarily say, I'm going to kill myself.
Q. So, [[redacted] made a comment that he, like you just testified, that he either wanted to kill himself or he didn't want to be here. It was some kind of comment like that about, you know, not living anymore. Correct?
A. Correct.
ROBERT [redacted] Okay. Thank you.
Okay. I'm going to come back to this exhibit, but I do want to bring in Exhibit Number 15 now. Again, I think it's already in evidence.
THE HEARING OFFICER: Uh-huh.
ROBERT [redacted] Let me share this one, share Exhibit

15.

Okay. And getting back to before we took our break, I think we've already established this e-mail that on May 14th that we -- especially with when Ms. Rizzo came in, that we established that we got a pretty positive update.

BY R. [redacted]

Q. So, my question to you, Ms. Dougherty, did [[redacted] make that May -- that suicide comment in May, was it before the 14th? Or was it after the 14th?

A. It looked like on the log it said May 17th.

Q. Right. So -- right. Okay.

And again, on May 15th of 2024, you -- I guess we established that this is the entire e-mail chain, that you were CC'd on this, that we complained about the teacher, starting with Ms. Truscello.

If you would like to read this?

A. I -- I don't have proof that I got this before June 3rd.

Q. Okay. So, that means I'm going to have to break up the e-mails and show that she was CC'd on a specific e-mail, because now we're -- I think we're looping around again.

We keep going around in circles, that she was CC'd on all this.

Because when I write to everybody, I write to everybody, not just, you know, one specific individual. So, I can go back to my e-mail chain and show that she was CC'd on this. So, she just testified that -- that you were not CC'd on this?

A. I don't know.

ROBERT [redacted] Okay. So, Hearing Officer, this is the time we have to take out of my, you know, testimony.

THE HEARING OFFICER: Well, I mean, you're asking her about an e-mail that basically was sent to somebody else, I guess, and referring -- it's really referring to Ms. Truscello, not Ms. Dougherty.

So, why don't you ask her about something that pertains to her?

ROBERT [redacted] Well, that's it. If she was CC'd, it does pertain to her, because she was CC'd on it, and I'm trying to, you know, I made a foundation and I'm trying to establish that she was CC'd on this, but she says she doesn't know.

So, in order to recollect her memory, I would

have to then -- I can go back into my e-mail client now. It's going to take --

THE HEARING OFFICER: Well, even if she did remember, even if it did show she was CC'd on this, it doesn't really involve her. So, what would you ask her? What's the importance of it for her, to her testimony?

ROBERT [redacted] Well, the importance of it? Oh, okay. The importance is that on May 17th, she testified that [[redacted] made a suicide comment. On May 15th, I started complaining about the teachers.

THE HEARING OFFICER: All right. Well, that's manifest in both the exhibit and the logs. So, you don't really need her testimony to establish a timeline.

ROBERT [redacted] Well, that she's familiar with it. Right. So, I -- because she's on the stand now.

So, Ms. Truscello is not on the stand. So, I can't ask questions about Ms. Truscello or somebody else if Ms. Dougherty's on the stand. So, that's why I have her here. I'm cross-examining her, and I think it's only fair that, you know, I'm establishing that she was CC'd on these e-mails.

BY R. [redacted]

Q. So, she's familiar with it that the -- so, basically, the suicide comment was made only after we started reporting the -- it was only after we started complaining about the staff.

Is that correct?

ATTORNEY ROSEN: I'm sorry. Objection as to form of question. It sounds like a few different questions, a compound question.

ROBERT [redacted] Okay. So, my question is that it was already established that on May 17th [[redacted] made a suicide comment. According to this, we started complaining about the teachers after, after the 16th.

So, we received on the -- which was just established back here -- that we got an update, a favorable update that was on the 14th. The suicide comment was already testified that it was made after this date.

BY R. [redacted]

Q. Were there any complaints that you received, Ms. Dougherty, about the complaints that I had that I mentioned from the -- starting on the -- I think the 16th, it was, going up to June 3rd? So, those complaints were -- so he

made the suicide comment first, and then -- but so, he actually -- we -- I started complaining, and only after I started complaining, a suicide comment was made.

Is that correct?

ATTORNEY ROSEN: I'm going to object. At this point, the exhibit speaks --

ROBERT [redacted] I'm explaining (unintelligible) --

THE HEARING OFFICER: Yeah, let --

ATTORNEY ROSEN: Hearing Officer Kennedy, if I could just?

ROBERT [redacted] See, you're interrupting me.

THE HEARING OFFICER: I'll sustain the objection. I mean, this P-15 shows complaints going all the way back to March. March 28th, that's when the chain begins.

I mean, I don't think you really need the Witness to testify that March 28th is earlier than May 17th. I mean, it just is. So --

ROBERT [redacted] Well, when we started complaining about -- I'm talking about complaining about Ms. Truscello saying, you know, what my son reported to me and what I reported to in the e-mail. So, that's what I'm establishing.

THE HEARING OFFICER: Okay. And then, May 15th is

earlier than May 17th. Again, this Witness doesn't really have anything to add to that.

That's just --

ROBERT [redacted] So, that will come up in my testimony then?

THE HEARING OFFICER: Yeah. I mean, that's just chronology. So, you know you don't need to have --

ROBERT [redacted] Okay. So -- all right. So, let me get back to the other exhibit here, which is, I believe, 57.

So, you are a part of this whole -- this incident log. I know Ms. Koosa is on here, but these incidents that have -- you have been reporting and what's on there has been reported on here, according to this incident log.

After we started complaining about the teachers and he made the suicide comment, all of -- this is the entire behavior log.

BY R. [redacted]

Q. So, my question to you is that, according to this behavior log, was there any of these behaviors that are from May 30th to September 30th? Were any of these previously reported to us prior to, to May 30th?

THE HEARING OFFICER: Of what years?
ROBERT [redacted] Twenty -- so, I'm talking about May 30th, twenty -- so, okay. Let me explain this again. May 30, 2024, through September 30th of 2024.
BY R. [redacted]
Q. These behaviors that are -- according to this log, were any of these behaviors between May 30th of 2024 and 9/30 of 2024 reported previously, you know, between 10/19 and 5/17?
ATTORNEY ROSEN: Objection. There's nothing in front of the Witness.
ROBERT [redacted] Oh, this is not shared? Oh, I apologize. I thought it was shared. I apologize. I thought I was scrolling down and I was explaining it. That's my fault. I apologize. I thought it was shared.
THE HEARING OFFICER: Okay.
ROBERT [redacted] I think I'm having a problem. So that was my mistake. I'm sorry. I wasn't, you know. Let me bring this up here. I thought it was already shared, yeah.
So, now I was scrolling and I thought it was shared, and I'm looking at it. Okay. So, now it's shared. So, now that you can see it, so from

May 30, 2024, through 9/30/2024.

Now we get it.

BY R. [redacted]

Q. Was there any of these incidents between May 30th and 9/30/2024 reported previously before we started complaining about the teachers in, you know, starting on May 16th, that was, which I just showed you? I started, you know, complaining about Ms. Truscello and then Ms. Curria.

So were any of these behaviors happening before I complained about the teachers?

ATTORNEY ROSEN: Objection. This is the same thing that we were just discussing with the previous e-mails, asking if one date occurred after another. This, this is not relevant for this Witness's understanding.

ROBERT [redacted] I think it is.

THE HEARING OFFICER: Well, you know you can rephrase it.

ROBERT [redacted] She made these logs.

THE HEARING OFFICER: I mean, she doesn't necessarily have any specific knowledge of all the complaints that you might have made or specific dates, but you can ask her.

You can ask her the specific date. Did any of these happen before this specific date? Give her a specific date, not just when we started complaining.

ROBERT [redacted] Okay. Ms. Dougherty testified when I asked her, did [[redacted] have any behaviors in fourth grade that he had in fifth grade? She goes, I would have to see the logs. Here is the log. It's right here.

So, it's going back to that. She said she would have to see the log, and I'm showing her the log right here.

BY R. [redacted]

Q. So, were any of these behaviors reported in fourth grade, Ms. Dougherty?

ATTORNEY ROSEN: Objection. This is showing behaviors being described that took place during fifth grade. To ask Ms. Dougherty, did these exact behaviors get reported from fifth grade during fourth grade is a trick question.

ROBERT [redacted] It's not a trick question. That, what you're trying to do is avoid the -- is avoid answering the question, because it shows that you just don't want -- you don't want your witness to (unintelligible) --

THE HEARING OFFICER: Well, I mean --
ROBERT [redacted] How is it a trick question? To even make that accusation (unintelligible) --
THE HEARING OFFICER: Are you talking about -- first of all, are you talking about fifth grade or fourth grade?
ROBERT [redacted] Right now, there's no trick question here. Is it -- okay. Mr. Rosen, is this a trick that's in front of you right now? Am I making this up? Am I making things jump around?
No, Mr. Rosen.
THE HEARING OFFICER: Are you talking about fifth grade or --
ROBERT [redacted] The answer is no, and this not a trick.
THE HEARING OFFICER: Is the question about fifth grade or fourth grade?
ROBERT [redacted] This question is about any of these behaviors that occurred in fifth. So, from May 30th of twenty -- so, let's see. From -- so, I would say from May, September -- let's see.
May 30th of 2024, was this -- did this incident occur where he grabbed his -- where it says he grabbed his private, and this is what I want you to do, out loud? So --

THE HEARING OFFICER: All right, that May 30th --
ROBERT [redacted] Let me rephrase that.
THE HEARING OFFICER: May 30th, twenty-twenty --
ROBERT [redacted] I'm getting a little confused here, because of, you know, he --
THE HEARING OFFICER: Yeah, May 30, 2024. Just established a basic --
ROBERT [redacted] Okay. So --
THE HEARING OFFICER: May 30, 2024, that was toward the end of fourth grade. Correct?
ROBERT [redacted] Okay. Yes, but my question --
THE HEARING OFFICER: Okay.
ROBERT [redacted] To make this clear, my question is this. So, on September -- so, September. So maybe this is a better question. Maybe I, you know, here -- here's a question.
BY R. [redacted]
Q. On September, from September 4th of 2024 through September 30th of 2024 -- which year did this happen in, these behaviors from September 4th of 2024 through September 30th of 2024?
What grade was [[redacted] in at that time?
A. Fifth grade.
Q. Fifth grade? Okay. Thank you.

A. In September of '24. May of twenty --
Q. We're not talking about May. I was asking you specifically --
ATTORNEY ROSEN: Objection. Let the Witness finish answering.
THE HEARING OFFICER: Well, no. She answered the question --
ATTORNEY ROSEN: She's going outside of the scope.
THE HEARING OFFICER: -- September of 2024 was fifth grade.
ROBERT [redacted] So, you would have talk to your witness, you know, not to go outside the scope of the question.
Okay. So, you answered that. So, that was in fifth grade. So we established that from September 4th through September 30th he was in fifth grade.
Now, these behaviors from September, from May -- no, September 30th of 2024 through September 30th of 2024, so you could see here they were quite out of character for [[redacted]
BY R. [redacted]
Q. So, my question is this, were any of these types of behaviors between September 4th of 2024 and 9/30 of 2024, in fifth grade -- were

any of these reported in fourth grade, these types of behaviors?

A. I would have to see the logs from fourth grade.

Q. Here's the logs right here. This is what I was given. You have the log right here. The fourth grade started in 2023. So, you have 2023. You have February of -- so, there was only one in 2023.

This is what I was given.

A. I can't answer, then.

Q. How can you answer? This is the log in front of you, ma'am.

THE HEARING OFFICER: First of all, what's the question?

ROBERT [redacted] I just asked the question, and it's not being answered.

THE HEARING OFFICER: Why don't you repeat it? What was the actual question?

ROBERT [redacted] It was a very simple question. Yes. So, my question is that -- and it loses my train of thought when this happens, because I don't feel the Witness wants to answer the question.

BY R. [redacted]

Q. But was there any of these behaviors between

9/4 of 2024, which you established between 9/30 of 2024 -- since he was in fifth grade, were any of these types of behaviors between that? Were they reported in fourth grade?

A. I would have to see the fourth-grade log.

Q. It's in front of you right now. We have the log. This is what was sent. This is an exhibit sent from the District.

ATTORNEY ROSEN: Hearing Officer Kennedy, asking the Witness if information from one year is also included in information from another where the document just lists what's there --

ROBERT [redacted] So, I object (unintelligible) --

ATTORNEY ROSEN: -- I don't see the point of the question.

ROBERT [redacted] He's trying to waste my time.

THE HEARING OFFICER: I mean, there she said she has no general recollection. You know there is an exhibit showing four entries from fourth grade. So, she can --

ROBERT [redacted] Then I should have my question answered, right. So, fourth grade --

THE HEARING OFFICER: She can answer it.

ROBERT [redacted] So, between 10/19 twenty --

THE HEARING OFFICER: And she said that, I can't answer

these questions without seeing the logs. Well, you've got the logs. So, answer the question.

ROBERT [redacted] There you go. Thank you, sir.

THE WITNESS (Dougherty): I don't know.

BY R. [redacted]

Q. You don't know what, ma'am?

A. These are phone calls home. As far as other behaviors that occur, that would be in the behavior intervention plan. So --

Q. We're not talking (unintelligible) --

A. -- I don't have that data in front of me.

ROBERT [redacted] We're not talking about phone calls, ma'am. Please, if you could just concentrate and focus on the question. Okay? I would appreciate that very much.

My question to you -- and the Hearing Officer did say you can answer it, but you're not answering it and you're going outside the scope of the question. And Mr. Rosen, you should definitely notify your client that you should not be doing that.

ATTORNEY ROSEN: Objection. Hearing Officer Kennedy --

ROBERT [redacted] I object to you, Mr. Rosen.

ATTORNEY ROSEN: -- asking the attorney to direct a witness is inappropriate.

ROBERT [redacted] Please do not interrupt me, Mr. Rosen.

ATTORNEY ROSEN: At this time she has answered the question as to her understanding.

ROBERT [redacted] She did not answer the question. Mister --

THE HEARING OFFICER: Well, you might not like the answer. And --

ROBERT [redacted] I'm sorry, but --

THE HEARING OFFICER: And I can draw my own conclusions from that. So --

ROBERT [redacted] We're not trying to -- I understand.

THE HEARING OFFICER: I can draw my own conclusions from that sort of answer. I mean, but --

ROBERT [redacted] You instructed the Witness to answer and she didn't answer the question. I would like the question answered.

THE HEARING OFFICER: She said she didn't know, or didn't recall.

BY R. [redacted]

Q. How could you not recall if we have the incident log in front of us right here? You said you needed to see the log. Here's the log right here.

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] It's not argumentative. We have the log in front of here. I think you're being argumentative, sir. We have the log in front of us. It's clear as day.

THE HEARING OFFICER: Well, sometimes you just have to ask a question. And if the Witness's answer seems like incomplete or evasive or anything, you can let the finder of fact make their own evaluation of that.

ROBERT [redacted] Well, yes. I meant that -- oh. So, right now I'm going to --

THE HEARING OFFICER: But I mean, just continuing to argue with the Witness doesn't really accomplish anything.

ROBERT [redacted] I object to your characterization. I'm not arguing, sir. I'm trying to -- you even said that she can answer the question, and she didn't. And then your characterization of me arguing is another instance of why I feel that, you know, there's no impartiality here.

I feel you're (unintelligible) --

THE HEARING OFFICER: I don't think you listened to what I just said, but that's all right.

ROBERT [redacted] I did, sir. I did. I wasn't arguing with her. I was trying to get my question. You

even stated before that she could answer the question. I said, thank you, sir. And she didn't answer the question. She went off on the tangent.

And then now you're characterizing me as being argumentative with her when I'm not. I'm trying to ask a question. I did. She said she didn't answer it. She doesn't know. She said before, she testified that I would have to see the log. I'm showing her the log and she still doesn't know. So, yes.

So, what I'm saying right now is that I'm asking the fact finder, which is you, to make your own conclusion according to this log itself --

THE HEARING OFFICER: Uh-huh?

ROBERT [redacted] -- that there were no behavior incidents of this type.

THE HEARING OFFICER: All right. Yeah. I mean, she gave an answer. So, it's --

ROBERT [redacted] So, I'm asking the fact finder to come to the conclusion that the Witness is not, you know -- I don't -- not being cooperative. She's being evasive answering the questions and she's not answering them directly. That's the problem.

I asked her a direct question. She would

not -- she brought in phone calls. I'm not asking her about phone calls.

And then Mr. Rosen cuts in. It cuts into my time. It also --

THE HEARING OFFICER: All right.

ROBERT [redacted] My train of thought (unintelligible) --

THE HEARING OFFICER: Yeah. No, I mean, I just -- yeah. I think you've asked and she's given her answer, and you know you're going to have to just kind of move on, move on from this.

ROBERT [redacted] Okay. And just for the record, too, I want to say that when Mr. Rosen is cross-examining her, I haven't said a word. He cried -- he has all that time, those hours that he spent cross-examining, I did not cut in like him.

I was not rude. I was not interrupting him, but he was interrupting me and being rude to me. So, I'd like to just to make that for the record. And I will move on with the questions. Thank you.

ATTORNEY ROSEN: We'll dispute that characterization and we look forward to cross-examination continuing.

ROBERT [redacted] I disagree with his characterization on that.

THE HEARING OFFICER: Just ask a question.

ROBERT [redacted] Okay.

BY R. [redacted]

Q. During a phone call on September 26, 2024, did you instruct [[redacted] to say, no, that you put your hands on another student?

A. No, I did not.

Q. So, when [[redacted] was on the phone call, did you, when [[redacted] was -- so, when [[redacted] was on the phone call with you when you had to make the call home, while he was describing something did you say anything to him?

A. I redirected him. He was talking about his shoelaces, and that wasn't why we called.

ROBERT [redacted] It wasn't the shoelaces, but -- so, Hearing Officer Kennedy, can we have -- during break last time the mother found the voice-mail that was left regarding this phone call. Would we be able to get that into evidence another time?

It is a phone call. It's about 16 seconds long. Will you permit that? Because it does show that the Witness said, no, that you put your hands on another, another student.

And then he repeated back. Oh, no, no. Forget that, Daddy. I put my hands on another

student. You can hear my son saying that, and that's Ms. Dougherty in the background. It's confirmed that she was with him. So, I think that's very relevant. I would like to get that audio, that voicemail into evidence.

Would I be able to get that into evidence to show that, you know, she's misrepresenting her testimony right now. I -- it needs to be --

THE HEARING OFFICER: Well, first of all -- first of all, I'm being asked to rule on an exhibit that hasn't been filed.

You know you can ask for it. The District can object. I'll make my make my ruling, but you know right now it's kind of a hypothetical question.

ROBERT [redacted] Okay. I'll, instead of wasting the -- I need to, you know, as far as to get that in, I can ask questions now or maybe I'll just e-mail you later about it, you know, if I have to update the list or something to make sure I can get it in effectively. And then, you know, like you said, you know, we'll decide later on.

Okay. So -- but I would like to get it in, but I'm not going to ask you now. I'll have to, you know, I'll e-mail you later about that then.

Okay. So, moving on.

BY R. [redacted]

Q. During your testimony before with Mr. Rosen, you characterized the repeated calls home as a trial. Was that correct?

A. I'm sorry. Dismissal announcements are going on. I missed your question.

Q. Sure. In your testimony earlier, you characterized the repeated phone calls as a trial. Is that correct?

A. The phone calls that [[redacted] made home, yes.

Q. Right. That you had to make. Okay.

Did you or any staff member reach out to [[redacted] reach out, reach out to us, you know, to discuss or obtain consent for this approach?

[Interruption.]

THE HEARING OFFICER: You might have to repeat that. I think there's an announcement from the school loudspeaker that came over.

ROBERT [redacted] Absolutely. Yes, sir.

BY R. [redacted]

Q. Okay. So, my next question is, did you reach out to us to discuss and obtain consent for this type of -- for this approach, for this

so-called trial?

A. I don't understand. Your son is calling you.

Q. Okay. So, no. What I'm asking is that you had [[redacted] call. So, you said you had [[redacted] call home as a trial. Is that correct? Those, I believe there were three or four times that you had him call home, but you characterized them as that was a trial. Correct? I think we've already testified to that. So, if -- asking it again, it would probably be asked and answered. So, my next -- so, then I'll move on.

Did you reach out to us prior to this, what you characterize as a trial? Did you reach out to either me or [[redacted]s mother to discuss or obtain consent for this type of approach?

A. No, we did not.

Q. Given [[redacted]s [redacted] and [redacted] is it possible he repeated your words because he was echoing what you prompted?

A. I have no way of knowing that.

Q. But a child with [redacted] [redacted] can be a trait of [redacted] Is that correct?

A. He is not diagnosed with [redacted]

Q. No --

A. He is diagnosed with [redacted]

Q. Right. When you have [redacted] isn't -- [redacted] can be a part of [redacted] is what I'm saying.

A. Not for every autistic student.

Q. That's not my question, ma'am. Not for every -- I said, it can be a part of [redacted] Right?

ATTORNEY ROSEN: Objection, asked and answered.

ROBERT [redacted] No, she didn't answer it. She went off track.

THE HEARING OFFICER: No, she --

ATTORNEY ROSEN: You should know better, Mr. Rosen.

THE HEARING OFFICER: Yeah, she actually didn't answer that. The question is, can it be a part of [redacted] You can answer that question.

THE WITNESS (Dougherty): It can be.

THE HEARING OFFICER: Okay.

ROBERT [redacted] Okay. Thank you. Yes.

BY R. [redacted]

Q. Would you agree that this instruction was directing [[redacted]s exact words during the call?

A. No.

Q. Did you tell [[redacted] no, that you put your

hands on another student?

A. I redirected [[redacted]

Q. And what did you say when you redirected [[redacted] What was your words?

A. I told him that I was referring to the incident where he put his hands on another student.

Q. So, you did say to [[redacted] you put your hands on another student. Is that correct?

A. I redirected him.

Q. You're not answering the question. You're going off track. I'm asking you a direct question. I would like a direct answer please.

ATTORNEY ROSEN: Objection. Argumentative, and asked and answered.

ROBERT [redacted] It's not argumentative. Please, Mr. Rosen (unintelligible) --

THE HEARING OFFICER: Well, actually -- I mean, she didn't. She didn't really answer the question.

ATTORNEY ROSEN: She didn't, Mr. Rosen, and you should know better.

THE HEARING OFFICER: And in the process of redirecting him, did you use those words about having --

THE WITNESS (Dougherty): Yes.

THE HEARING OFFICER: Okay.

ROBERT [redacted] And it shouldn't have to get to this point where he rudely interrupts when he knows he shouldn't be objecting. You know, he should know it as an attorney when to object and when to not. I'm a pro se party. You know, I'm already (unintelligible) --

THE HEARING OFFICER: All right. The editorializing is just wasting time. So, just ask her a question.

ROBERT [redacted] Well, no, it's not.

Him interrupting is wasting time.

BY R. [redacted]

Q. Given [[redacted]s -- given that you testified that [redacted] can be a part of [redacted] is it possible he repeated your words because he was echoing your prompt?

A. No.

Q. So, it's not -- not possible?

A. He's not diagnosed with [redacted]

Q. That's not -- again. You're going off track. It's like this is getting -- this is like spiraling and getting, you know, we're going around in circles here.

My question to you, ma'am, was that given [[redacted] has [redacted] you testified that

[redacted] could be a characteristic, a characteristic of [redacted] That's already you know, you already agreed to that.

So, is it possible he repeated what you said to him? And you just said in your own words on the record that, yes, that's -- that's what I had said to him. So, is it possible he repeated? Is it possible he repeated your words because he was echoing your prompt?

A. No.

Q. How could that be if [redacted] is -- how? How could that be from what you just testified? You testified that that is possible, that children can repeat words, but now you're saying it's not possible.

ATTORNEY ROSEN: Objection. Asked and answered, argumentative, calling for speculation --

ROBERT [redacted] It's not argumentative. It is not (unintelligible) --

ATTORNEY ROSEN: -- and she's already stated her understanding.

THE HEARING OFFICER: She said it's not possible. I mean, he can ask.

But I mean, I think the question contained in

that is, why is it not possible? And you can answer that.

THE WITNESS (Dougherty): It's not part of his diagnosis.

THE HEARING OFFICER: Okay.

BY R. [redacted]

Q. What's not part of his diagnosis?

THE HEARING OFFICER: Well, she's given you the answer. I mean --

ROBERT [redacted] So, I'm asking her what is not --

THE HEARING OFFICER: So, at this point we're sort of circling. I mean, I understand --

ROBERT [redacted] What is not part of his --

THE HEARING OFFICER: I understand what you're saying.

ROBERT [redacted] -- (unintelligible) thank you.

THE HEARING OFFICER: Yeah, that there's --

ROBERT [redacted] What is not part of --

THE HEARING OFFICER: -- maybe a logical fallacy in the answer, but that's her answer.

ROBERT [redacted] Right.

BY R. [redacted]

Q. What is not part of his diagnosis, ma'am?

A. [redacted] is not part of his diagnosis. There is no diagnosis under his [redacted] diagnosis that says that he has [redacted]

Q. But [redacted] -- you testified before in your own words that it is possible that [redacted] can be a part, a part of [redacted] Isn't it? That is what you testified, ma'am. Correct?

A. When it's diagnosed --

ATTORNEY ROSEN: Objection. Hearing Officer Kennedy --

ROBERT [redacted] (Unintelligible) --

ATTORNEY ROSEN: -- we are going in circles. This was asked and answered.

THE HEARING OFFICER: Yeah, this --

ROBERT [redacted] This is -- yeah, because she's not --

THE HEARING OFFICER: No, this is repetitive. I mean, she's testified that --

ROBERT [redacted] She did, for the record, she did --

THE HEARING OFFICER: She's testified that [redacted] is not part of his diagnosis, but it could be part of [redacted] I mean --

ROBERT [redacted] Okay. So, there's not --

THE HEARING OFFICER: -- all the information at this point has been gathered about what she thinks about this.

And just arguing with her about it and going round and round, you know, I mean, you can point out in your brief where you think there's a fallacy there, but at this point you're not

covering any new ground.
ROBERT [redacted] I disagree with -- I object to your characterization of (unintelligible) --
THE HEARING OFFICER: All right. So --
ROBERT [redacted] Again, I object to your characterization.
THE HEARING OFFICER: Ask -- ask --
ROBERT [redacted] I object.
THE HEARING OFFICER: Ask her a question.
ROBERT [redacted] Again, I'm being -- I object to your characterization of me being argumentative with her because I established already she says that, yes, [redacted] is possible, that it links to [redacted]
And then when I asked her a direct question about that, you know, can -- is it possible that he repeated your words because he was echoing? She said, no. So, that contradicts to what she's saying.
So, again -- I guess, moving forward, like you said, in the brief there's something that is a contradiction, but it is now made for the record. Okay. Then I will move forward with the question.
So, I just wanted to establish that she contradicted herself.

BY R. [redacted]

Q. Did you have [[redacted] make any of these phone calls home during fourth grade?

A. I don't know.

Q. I believe we still have a log in front of us. This is fourth grade into 2023. I don't see any -- I don't see anything about calls here. So, how could you say you don't know when you have a log right in front of you, ma'am?

ATTORNEY ROSEN: Objection. Mischaracterizing testimony and asked and answered --

ROBERT [redacted] It's not mischaracterizing testimony.

ATTORNEY ROSEN: -- and she testified she doesn't know.

ROBERT [redacted] I have a log right here. I object --

THE HEARING OFFICER: I don't --

ROBERT [redacted] -- to his objection.

THE HEARING OFFICER: I don't understand. I don't really understand the question. Are you saying that there are no -- there's no record of this in these logs?

ROBERT [redacted] From fourth grade, that is correct.

THE HEARING OFFICER: All right. So, I mean, there's really nothing to ask her about that there. I mean --

ROBERT [redacted] Well, that's -- that's what I'm trying to establish is that it was --

BY ROBERT [redacted]

Q. So, these calls that you had [[redacted] make, there was three calls. Were they in fourth grade or when he was in fifth grade?

ATTORNEY ROSEN: Objection. Asked and answered.

ROBERT [redacted] Did she? Did she answer that question? The phone calls were made in fourth or fifth grade. I don't believe I had asked that direct question.

THE HEARING OFFICER: I don't -- I'm not sure. I'll allow it.

THE WITNESS (Dougherty): I don't know. This is not -- the phone log is from when [[redacted] entered JFK. This stops at 10/23. So, I don't know if this is complete or not.

ROBERT [redacted] This is what I received from the District. So, that's something else. This is what I received, and I'm going to subpoena them for, you know, this log again to make it -- I think this is an official record. It's right here.

BY R. [redacted]

Q. My question to you was, the phone calls that

you had [[redacted] make in September of 2024 on those three or four occasions, was he in fifth grade or fourth grade at the time?

A. September 2024, as I said, was fifth grade.

Q. Thank you.

In fourth grade -- again, I'm asking this. According to this log which I received, did you have him make any -- any phone calls home as a trial, as you characterize it as, in fourth grade?

A. I can't answer that. I don't know.

Q. You don't remember if you made him -- if you had asked him to call home in fourth grade?

A. I don't know.

ROBERT [redacted] Your Honor, I have to state for the record that I don't believe she's answering honestly, because how can you not know if you -- I asked her a direct question. She doesn't want to answer the question. She has to answer the question.

BY R. [redacted]

Q. How can you say you don't know? You work -- did you work with [[redacted] in fourth grade, Ms. Dougherty?

ATTORNEY ROSEN: I'm going to object.

ROBERT [redacted] I'm going to object to his objection.
ATTORNEY ROSEN: This line --
ROBERT [redacted] He's wasting time.
ATTORNEY ROSEN: -- of point has been --
ROBERT [redacted] Stop. Stop interrupting.
THE HEARING OFFICER: First of all, I mean, I obviously can draw my own conclusions as to credibility, and you know you can argue that in the brief.
ROBERT [redacted] Oh, I will.
THE HEARING OFFICER: If she doesn't remember whether stuff happened in fourth grade or fifth grade, you know that -- I don't know. But she says she doesn't really remember which grade it was.
So, you'll just have --
ROBERT [redacted] Okay. According -- so this is --
THE HEARING OFFICER: That's her testimony. You'll have to move on.
BY R. [redacted]
Q. Okay. So according to this log that you see right here, were there any calls, calls made home that were reported in fourth grade, according to this log in front of you?
A. I don't know.
Q. It's in front of you. 10/19/'23, was there a call made there? That was -- we have here.

So, that was -- he was in fourth grade in 10/19/2023. Correct?
A. I believe so.
ROBERT [redacted] You believe in 10/19 twenty-twenty -- so, you're not sure on 10/19/2023 if [[redacted] was in fourth or fifth grade?
Hearing officer. This is just -- I'm sorry, but I don't know how to clarify. This is just getting ridiculous already. She's not sure if [[redacted] was in fourth grade in 10/19/2023, yet she has a resume. She has, you know, 27 years' experience and she can't remember.
This is ridiculous.
THE HEARING OFFICER: I mean, 10/'23 was apparently not a call that [[redacted] made. So, I mean, what's your question --
ROBERT [redacted] But what grade was [[redacted] in? Again --
THE HEARING OFFICER: What's your question about that?
BY ROBERT [redacted]
Q. My question was on 10/19/2023, was [[redacted] in fourth grade or fifth grade during this incident?
A. That was not the question.
Q. That's the question I'm asking you, ma'am. Please answer it.

A. 10/19/'23?
Q. 10/19/2023 was [[redacted] in fourth grade or fifth grade? Again, this shouldn't take ten minutes to answer one question.
ATTORNEY ROSEN: Objection. Hearing Officer Kennedy --
ROBERT [redacted] I object to you, Mr. Rosen. This is -- I'm sorry, Mr. Rosen.
ATTORNEY ROSEN: -- at this point --
THE HEARING OFFICER: Wait, wait, wait.
ROBERT [redacted] You're going to have to stop, please. I answered your -- you client, I asked, asked a question. You're being -- you know something?
THE HEARING OFFICER: What's the objection?
ROBERT [redacted] Hearing Officer, we can't continue. We cannot continue with this hearing.
THE HEARING OFFICER: What's the objection? What's the objection?
ROBERT [redacted] We cannot continue this hearing. We cannot continue under these circumstances with Mr. Rosen interrupting --
THE HEARING OFFICER: What's the --
ROBERT [redacted] -- and wasting my time.
THE HEARING OFFICER: What is the objection?
ATTORNEY ROSEN: At this point, asking when the exhibit clearly lists when calls were made or not,

Ms. Dougherty has testified as to she doesn't know, or doesn't know beyond the log that's listed here.

Asking repeatedly --

ROBERT [redacted] That's not the question to be on the log. We're not --

ATTORNEY ROSEN: Please?

ROBERT [redacted] We're not -- we're talking about this log. This is the log we received. This is the incident log we received. That was in fourth grade. According to this log, I asked the direct question --

THE HEARING OFFICER: I mean --

ATTORNEY ROSEN: Hearing Officer Kennedy, may I continue?

ROBERT [redacted] Sorry, Miss -- I'm sorry.

THE HEARING OFFICER: Voluminous evidence is --

ROBERT [redacted] We cannot continue this hearing like this.

THE HEARING OFFICER: Voluminous evidence has established, I think, beyond any dispute that the student was in fourth grade in 2023-'24 and in fifth grade in 2024-'25. I think we can just accept that as a given. So, you can just --

ATTORNEY ROSEN: Yes, and that was my point. Just to

move on beyond the line of questioning.

ROBERT [redacted] (Unintelligible) --

THE HEARING OFFICER: You can just --

ROBERT [redacted] -- (unintelligible) questions --

THE HEARING OFFICER: You can just ask your next question.

ROBERT [redacted] -- then she could have just -- she could have just answered the questions that we (unintelligible) --

THE HEARING OFFICER: You can ask your --

ROBERT [redacted] -- going for an hour.

THE HEARING OFFICER: You can ask your next question.

ROBERT [redacted] Every question gets difficult, and it shouldn't be. It should just be a direct answer, but I'm not getting that.

BY R. [redacted]

Q. Was it your -- so, is it correct that these phone calls that were made in fifth grade only began after we raised complaints about the staff?

ATTORNEY ROSEN: Objection. Asked and answered.

ROBERT [redacted] That wasn't asked and answered. No, it was not. Geez.

THE HEARING OFFICER: Yeah. Yeah, it really was. You have to cover some new ground.

ROBERT [redacted] When? When was this asked? I don't remember asking this question. If you could recollect my memory, I'd appreciate it.

I don't believe so.

THE HEARING OFFICER: I directed you to ask about a date and you said May of 2024, so. And she answered --

ROBERT [redacted] But this question wasn't answered. This question was not asked. I'm going down my list. So that, that was not asked and answered.

I did not ask this specific question.

BY R. [redacted]

Q. So, is it correct that these phone calls that were made in fifth grade -- we established in 2024 he was in fifth grade, in 2024.

So, with these phone calls that you had [[redacted] make in September of 2024, did that begin after we raised complaints about the staff or before we raised complaints about the staff?

ATTORNEY ROSEN: Hearing Officer Kennedy, objection. Asked and answered.

ROBERT [redacted] It wasn't asked and answered. That question was not asked. That was not asked. It's a direct question.

THE HEARING OFFICER: Well, when --
ROBERT [redacted] I'll ask it again.
THE HEARING OFFICER: When are you saying that the complaints started?
ROBERT [redacted] I would just like a direct -- my question is --
THE HEARING OFFICER: When? I mean, she doesn't necessarily know.
ROBERT [redacted] I'm being --
THE HEARING OFFICER: Because a lot of the complaints are made to other people.
ROBERT [redacted] I'm being sidelined here.
THE HEARING OFFICER: Let me --
ROBERT [redacted] I'm being --
THE HEARING OFFICER: What are you choosing as your date that you started making complaints?
ROBERT [redacted] My question was, so is it correct --
THE HEARING OFFICER: Well, I mean, she needs --
ROBERT [redacted] Well, asking me -- I feel like you're defending the District.
THE HEARING OFFICER: I'm just saying --
ROBERT [redacted] Now I'm asking a question.
THE HEARING OFFICER: I'm saying that you're asking her something that's not something that she necessarily -- that's not within her scope of

knowledge, because you made complaints to all sorts of people.

Who --

ROBERT [redacted] No, I'm talking about the (unintelligible) --

THE HEARING OFFICER: I mean, what are using as your specific date that --

ROBERT [redacted] My specific date --

THE HEARING OFFICER: -- that you're saying that you started making complaints? Yeah.

ROBERT [redacted] We starting making -- we -- that the complaints we started making was beginning with Ms. Truscello -- which I can bring up that e-mail again -- it was, I believe, May 17th of 2024.

THE HEARING OFFICER: Okay. May '24. And you're asking her about log entries about complaints that [[redacted] made home in, you know, at her, at the social worker's direction in September of 2024. Correct?

ROBERT [redacted] So, my --

THE HEARING OFFICER: I mean, I don't think you need her testimony to establish that September is later than May.

ROBERT [redacted] I believe I do need her testimony. I think it's very important for the record. And each -- each question becomes ten minutes, and it

shouldn't. So, I'm saying so as of May --

THE HEARING OFFICER: I mean, the objection sustained. I mean, September -- I'll take administrative notice that September is later than May.

ROBERT [redacted] Okay.

THE HEARING OFFICER: Okay?

ROBERT [redacted] So, I have a right to ask this question. It should not be sustained. So, I'm saying that -- you asked for a date. I'm giving you a date. And so, I'm -- from May of --

THE HEARING OFFICER: So, you said May, and the log entries say September. They're in evidence.

ROBERT [redacted] Okay. So, my question is --

THE HEARING OFFICER: What more is there to ask about this?

ROBERT [redacted] Here we go. Now I feel like I'm being sidelined again.

From May of 2024 -- if I cannot be interrupted, I would really appreciate it, Hearing Officer. I would really appreciate it. That's all I'm asking is just to please give me the courtesy of, you know, because otherwise, like I had said last time, that I get sidetracked. I lose my train of thought and then, then I'm -- I'm stuck where I'm, you know, at, and I shouldn't be.

BY R. [redacted]

Q. So, my question is, as of May of 2024, when I started complaining about Ms. Truscello, Ms. Curria -- which we already established that started. And then when you had [[redacted]
make, make these calls home, which was established in September of 2024.

So, my question to you is, so it's correct that these phone calls began only after we raised complaints in May of 2024.

Is that correct?

ATTORNEY ROSEN: Objection. Asked and answered.

ROBERT [redacted] That was not asked and answered.

I'm not getting a direct answer.

THE HEARING OFFICER: Sustained. Sustained.

I mean, and you keep phrasing it in terms of when we made complaints and that, you know, she doesn't -- that complaints were made to all sorts of people. They weren't necessarily (unintelligible) --

ROBERT [redacted] No, I'm not talking about all sorts of people. That's why I'm --

THE HEARING OFFICER: So, it's not, you know, it's not really specifically within her knowledge.

ROBERT [redacted] Okay. All right.

THE HEARING OFFICER: So, you know we've established --
ROBERT [redacted] So, then that will come up during --
THE HEARING OFFICER: Frankly, we've established the dates on the basis of the log. There's nothing --
ROBERT [redacted] Right. I'm trying to show that from May of 2024 when we started complaining about staff that -- that all these things have -- this is how [[redacted]s, you know, a part, a big part of him, you know, his FAPE being violated is that everything in that incident log, you know, all these violent behaviors began only after we started complaining about the teachers.
And the facts speak for themselves.
THE HEARING OFFICER: And the dates in the log show that. So, there's nothing really you need to ask her more about that.
BY R. [redacted]
Q. Did [[redacted] call home voluntarily? Or was he told to make these calls home?
A. [[redacted] was told that if he didn't stop his behavior that we would be calling home.
Q. So, my question -- you didn't answer the question directly -- was, did [[redacted] voluntarily call home? Did [[redacted] say, you know, I want to call my parents and my dad

and my mom? Or did you tell him that he -- that you had made him call home?

Was it voluntary? Yes or no?

A. Yeah, he -- I didn't force him to get on the phone.

Q. So, [[redacted] said to you, I want to make you -- Ms. Dougherty, I would like to make calls home to my parents?

A. No.

Q. So, then again, Hearing Officer, this is a contradiction on the record. That's -- so it means -- I asked the question, did he voluntarily? And then she just said another way, no, he didn't.

So, she keeps twisting my --

A. He didn't refuse.

ROBERT [redacted] -- my questions. Here again. She's twisting. She's contradicting herself. And it becomes --

THE HEARING OFFICER: Well, you, at that time, that time you asked two different questions. The first was, was it voluntary? The second essentially was, was it initiated by him? And she answered both questions.

ROBERT [redacted] So --

THE HEARING OFFICER: So, you ask your next question.
ROBERT [redacted] So, the question -- so, I'm confused because you're saying I asked her twice.
So, [[redacted] voluntarily -- [[redacted] didn't voluntarily say I want to call home. That's -- did I ask that question? If I did, then I apologize. I don't remember if I asked it. But if that was already asked specifically.
BY R. [redacted]
Q. So, that's my question, did [[redacted] voluntarily call home? Meaning, voluntarily like, Ms. Dougherty, I would like to call my parents. Did he volunteer, volunteer to call? That's my question.
A. [[redacted] did not ask to call his parents.
Q. Okay. Thank you. So, [[redacted] was told to call his parents. Correct?
A. He was told we would be calling his parents.
Q. That's not the question. [[redacted] was told to call his parents. Is that correct?
A. No.
Q. No what? I'm sorry.
A. He was not told to call his parents. He was told we would call his parents together.
Q. So, did you call -- that's not the question I

asked you. Again, so [[redacted] called home. Did you call? Did you call us or did [[redacted] call us? Who was on the phone at the time of these phone calls, ma'am?

A. Both of us.

ROBERT [redacted] I did not -- we did not receive any call from you. [[redacted] was on the phone.

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] It's not argumentative.

ATTORNEY ROSEN: And asked and answered.

THE HEARING OFFICER: Yeah, that's -- at this point, you're testifying. Okay?

BY R. [redacted]

Q. Did you specifically get on the phone with me or Ms. [redacted] during these calls and say, listen, Ms. [redacted] or Mr. [redacted] I have [[redacted] here right now?

So, my question to you is, were you specifically on the call itself, you know, talking to us? Or was it [[redacted] talking to us?

A. I don't know.

ROBERT [redacted] How could you not remember? So, you don't remember. See -- okay. So, for the record, Hearing Officer, again, this is just another -- she doesn't remember. It's convenient that --

ATTORNEY ROSEN: Objection. This is testimony by Mr. [redacted]

ROBERT [redacted] I am not. I am trying to make -- I'm trying to make a point for the record.

THE HEARING OFFICER: Well, you know, I mean, you can --

ROBERT [redacted] This is ridiculous.

THE HEARING OFFICER: In your in your brief you can. You know you can argue what I should infer in terms of credibility of --

ROBERT [redacted] Yeah. No, this is definitely (unintelligible) --

THE HEARING OFFICER: -- the testimony. But she did. She did give you an answer.

ROBERT [redacted] Right. And it's contradictory. So, yes, I definitely will bring that up.

BY R. [redacted]

Q. Are you aware of any school policy that authorizes staff to have a child call home, to make calls home to their parents?

A. I am not aware of any policy.

Q. Thank you.

Did you pull [[redacted] out of class to make these calls?

A. I don't know.

Q. I'm sorry. What do you mean you don't know?
A. I don't know. Some of the incidents were at recess. As far as what time and where his location was at the time that it happened, I -- I can't recall that.

ROBERT [redacted] Okay. So, that means we're going to subpoena the -- we have to get the call logs, and then we can find out what those times were and if a recess were -- so, that's something we'll have to do later on. So, okay. So, I will make sure I get those call logs from the school of every call that was made.

BY R. [redacted]

Q. In your professional opinion, is it appropriate to require a student -- since [[redacted] has [redacted] was it appropriate to have him repeatedly make calls home if it causes him emotional distress?

ATTORNEY ROSEN: Objection. Calls for speculation.

ROBERT [redacted] It doesn't call for speculation. How does that call for speculation?

THE HEARING OFFICER: Yeah. No, overruled. You can answer the question.

THE WITNESS (Dougherty): We did not see any distress when making the phone call.

BY R. [redacted]

Q. But my direct question to you -- that wasn't my question. Is it appropriate for -- to require a student, to require [[redacted] since he has [redacted] to repeatedly make calls if it causes emotional distress?

A. We -- it didn't cause any emotional distress at school.

Q. Did [[redacted] make a suicide comment on May -- on September 30th? Did you call us about a suicide comment he made on September 30th?

A. Yes.

Q. Thank you.

Do you believe that requiring [[redacted] to make these calls home to us hinders his emotional well-being and psychological health?

A. No.

ROBERT [redacted] Well, again, I refer back to September 30th, the suicide comment.

ATTORNEY ROSEN: Objection. Argumentative and testimony.

ROBERT [redacted] It's not argumentative.

ATTORNEY ROSEN: There's no question here.

THE HEARING OFFICER: It's not a question. So, just

ask one.

BY R. [redacted]

Q. And how did it not hinder his emotional well-being and psychological health? Was [[redacted] happy to make -- so, let me ask you, was [[redacted] happy to make these calls home?

A. I don't know.

Q. Did you see a smile on [[redacted]s face and saying, thank you so much for letting me? You know, was he happy to make these calls, or did he want to make them? Or did he not want to make them? So, that's my question.

ATTORNEY ROSEN: Objection. Compound question.

BY R. [redacted]

Q. All right. So, my question is, did [[redacted] want to make these calls home?

A. He willingly made these calls home.

ROBERT [redacted] But you just testified that he didn't volunteer, didn't volunteer. So, how could he -- how could that -- that's just -- it doesn't make any sense. You testified that he didn't volunteer, but then you said he willingly made it.

So, that's a contradiction for the record, Hearing officer.

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] That's not argumentative. That is for the record.

THE HEARING OFFICER: Well, just -- yeah, ask a question.

ROBERT [redacted] I know, but I want to make for the record that she just contradicted herself, so.

BY R. [redacted]

Q. Would you say that [[redacted] had a successful fifth-grade year?

A. No.

Q. Would you say that when a child is in a school that they should have a successful -- should he have had a successful fifth-grade year?

A. I'm not sure I understand the question.

Q. It's pretty simple. If you could please answer it? Should [[redacted] have had a successful fifth-grade year?

ATTORNEY ROSEN: Objection. Calls for speculation.

ROBERT [redacted] Calls for spec -- so. So -- so, my question -- so --

THE HEARING OFFICER: Well, I mean, it's kind of unnecessary. I mean, I --

ROBERT [redacted] It's not unnecessary. It's a question, of course. No, it's not unnecessary.

THE HEARING OFFICER: Success is obviously preferable to non-success. So, I don't see where that is unique to this, this Witness to be able to say.

ROBERT [redacted] Oh, it is. Well, she just testified that he did not have a successful fifth-grade year.

THE HEARING OFFICER: Yeah. Yeah.

ROBERT [redacted] But should he have had a successful fifth-grade year? Should that be something he should have had or not at all?

ATTORNEY ROSEN: Objection.

ROBERT [redacted] That's a valid question.

ATTORNEY ROSEN: What's the relevance?

ROBERT [redacted] That's a valid question.

THE HEARING OFFICER: Based on what?

ROBERT [redacted] Based on what? Based on the question. She just testified that when I asked, did [[redacted] have a successful fifth-grade year? She's testified, no. And my next question was, should he have had a successful fifth-grade year? It's a simple yes or no.

THE HEARING OFFICER: I don't think so. I'm going to sustain the objection to that question.

You can just ask your next one.

ROBERT [redacted] And may I ask why? That, that's a

valid question.

THE HEARING OFFICER: No. I mean, it's really just an opinion and not -- It's an opinion from a lay witness. So, I don't -- it's not, not admissible.

So, you can ask another question.

ROBERT [redacted] Well, that's not an opinion. I mean, if a child goes to school, I'm trying to establish that, you know, they're there to be successful. If they can't help him be successful, that's why he needs outplacement. So, this is exactly what we're talking about here.

So, she's testified he did not have a successful fifth-grade year when we trust that the, you know. But that will be -- I guess that will be testimony. I'm learning now. So, if that has to be -- come up during testimony, I will. So, okay.

BY R. [redacted]

Q. So, my next question would be, Ms. Dougherty, you're familiar that we did, as parents, request an outplacement to Woodhouse Academy.

Correct?

A. No.

ROBERT [redacted] You're not? Okay. Let me bring up an exhibit here.

Oh, let me stop sharing all of this. Oh, now I can get into it.

Okay. I am going to bring up an exhibit, which is P-30. I'll just share it on my screen here.

Okay. This, I would like to submit into evidence, P-30. I believe it's already in from last time. This was our outplacement request for our son [[redacted]

THE HEARING OFFICER: Let me see.

Yeah, P-30 was admitted by agreement at the beginning of the hearing.

BY R. [redacted]

Q. Ms. Dougherty, you just testified when I asked, are you familiar with that we had requested outplacement, you responded no.

Were you CC'd on this e-mail for outplacement for our son [[redacted] Yes or no?

A. Yes, I was.

ROBERT [redacted] Okay. In this --

THE HEARING OFFICER: I'll just tell you it's five of. So, you know. Ask your --

ROBERT [redacted] I'm going to --

THE HEARING OFFICER: Ask, you know --

ROBERT [redacted] I'm sorry, but you can't -- you

shouldn't be bringing time into this to pressure me. So, this way I can't answer my question. I do have some other questions. Even if we go to -- I would expect because of the time wasted by Mr. Rosen and all this other comments that, you know, it shouldn't have gone this far that I, you know, get an extra, you know, maybe ten minutes. That's all I would need.

I'm almost done with the questioning. I only have maybe, you know, a handful more questions. That's it. But then for you to bring up time, that I should move on? No, I don't think that's fair. I think that's protecting the District. And I'm making up my case now and you're saying, oh, it's five of. Hurry up, Mr. [redacted] That's the impression I'm trying to get.

And again, that's what I mean about impartiality. I don't feel like there's any -- I don't -- I don't even see how we can continue this hearing. I believe that --

THE HEARING OFFICER: You're wasting your own time.

So, ask your question.

ROBERT [redacted] I'm not sure -- I believe, for the record, that this hearing is tainted, completely tainted. So, let me continue, please.

So, Ms. Dougherty testified that when I asked her the question, she did not -- she was not aware that we requested outplacement, but yet she was CC'd on this. So, right there. So, yes, this shows that we did --

ATTORNEY ROSEN: Objection. Testimony. Ask the question.

ROBERT [redacted] Well, I'm going to make a link to this.

THE HEARING OFFICER: P-30 speaks for itself.

ROBERT [redacted] Yes. Okay.

BY R. [redacted]

Q. Have you ever referred a student to Woodhouse Academy?

A. Personally?

Q. Yeah, if you had referred a student or -- yeah. For you? Yes. For you, personally, yes.

A. I personally have not. Your e-mail does not say Woodhouse or whatever name you're saying. It just says outplacement. It doesn't say a specific placement.

Q. I know, but we --

A. So, I didn't know you picked --

ROBERT [redacted] Maybe somebody testified for the

record about Woodhouse. Right, but it was already testified. I mean, basically -- so, we did request a replace --

THE HEARING OFFICER: Why don't you just ask? Why don't you just ask a question?

BY R. [redacted]

Q. Were you part of the meeting on March 6, 2025, the PPT meeting?

A. I -- I would need to see the front of the PPT.

Q. On January 16th of 2025, were you part of the annual PPT meeting?

A. If my name is in attendance, I was.

Q. Was your name in attendance, ma'am?

A. I don't have that documentation in front of me.

Q. So, you don't recall if you were there or not? Unless you have the documentation, you don't remember being at my son's PPT meeting?

ATTORNEY ROSEN: Objection. Asked and answered.

ROBERT [redacted] That is -- how could she? How could she be helping [[redacted] if she can't remember she was at a meeting? If her memory span is that short, it doesn't make any sense.

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] She was at the PPT meeting.
THE HEARING OFFICER: Ask. You should ask a question.
ROBERT [redacted] I'm sorry?
THE HEARING OFFICER: You should ask a question.
ROBERT [redacted] All right. So, again, do I have to bring up the PPT notice that she was there on January 16th? Again, I think we're just grasping at straws here. It's obvious she was there, but do we have to bring up to show that she was at that PPT meeting?
She's not answering the questions directly, your Honor.
THE HEARING OFFICER: You've only got a couple more minutes, so I wouldn't do that. I'd ask a question --
ROBERT [redacted] Oh, see, I get it.
THE HEARING OFFICER: -- without using --
ROBERT [redacted] See, now. Now, you're forcing my hand, sir.
THE HEARING OFFICER: -- without using --
ROBERT [redacted] Now, I feel like you're forcing my hand. You're bringing up time again, which I don't think is fair. And you're using that against me, which I don't think is fair.
This, I don't -- again, I feel that this

whole case is tainted. It really is.
BY R. [redacted]
Q. At the annual -- on the 16th of January of 2025, did we request outplacement specifically to Woodhouse Academy?
A. I don't know.
Q. And what do you mean you don't know?
A. I would need to see the documentation.
ROBERT [redacted] Okay. Well, I do have other e-mails here that I can bring up to show that we did request placement on January 16th to Woodhouse Academy.
And I only have, like, maybe three other questions after this, so I think it's only fair I get a few minutes.
THE HEARING OFFICER: If you limit -- if you limit yourself to three questions, I'll allow it.
ROBERT [redacted] Yes. Oh, that's all, sir.
THE HEARING OFFICER: All right, three questions.
ROBERT [redacted] I'll go through the questions and I think I got maybe -- let me see. Maybe one, two --
THE HEARING OFFICER: Three questions. Three questions with no --
ROBERT [redacted] Three or four at the most.

THE HEARING OFFICER: I'll allow you four, but no argument. Just ask questions.

ROBERT [redacted] Thank you. Okay. So, I just want to bring this up first because -- so then I can answer those other questions. And I'll -- we'll be done with this Witness. Let me just get that e-mail here.

Let me scroll up here.

Okay. I'm trying to find that communication here.

(Pause.)

ROBERT [redacted] Now, I just want to ask you, Hearing Officer -- I do have an e-mail. I don't see that she was specifically CC'd on this. So, I could tell you right now that Ms. Dougherty, this specific e-mail that I was going to, you know, put in, you know, as evidence right now, it was just to Ms. Stewart. It does mention Woodhouse.

So, the District was aware that I wanted Woodhouse.

ATTORNEY ROSEN: Objection. This is testimony.

THE HEARING OFFICER: Okay. Well, I mean, it's not --

ROBERT [redacted] (Unintelligible) testimony --

THE HEARING OFFICER: There's no questions on this that you would direct to this Witness. So, do you have

any other questions --
ROBERT [redacted] Yes.
THE HEARING OFFICER: -- for this witness?
ROBERT [redacted] Okay. Yeah, yeah. Let me ask the
other -- yes, I do. Let me just get them here.
BY R. [redacted]
Q. Is it your professional opinion that
Woodhouse Academy may be appropriate for boys
like [[redacted] or for [[redacted]
A. No.
Q. And why is that?
A. Because that academy has much more severe
autistic children. I think it would be
harmful to [[redacted]
Q. And how do you come to that conclusion? Is
that based on opinion? Is that based on
opinion, or fact?
A. That's based on the fact of the population at
that academy.
Q. And how do you come up with that? How do you
come to that conclusion?
A. If you talk --
ATTORNEY ROSEN: Objection. Asked and answered.
ROBERT [redacted] No. How do you come to that
conclusion? It's a fair question. How did she

come to that conclusion? So, this is basically, you know I have to ask follow-up questions. So, that's --

THE HEARING OFFICER: Well, I mean, she told you that she -- Woodhouse's population is more severely autistic. So, what is your --

ROBERT [redacted] Well, that's only an opinion. That's not based on fact. So, that's what I'm saying, so.

THE HEARING OFFICER: I mean, that's the basis for her answer to your question.

BY R. [redacted]

Q. During the March 6th PPT meeting, when we brought up the topic of Woodhouse, didn't Ms. Truscello say that, well, I don't know anything about Woodhouse?

ATTORNEY ROSEN: Objection. Relevance.

ROBERT [redacted] The relevance? The relevance is that --

THE HEARING OFFICER: Well, if you were at that meeting and you remember, you can answer.

THE WITNESS (Dougherty): No, I don't remember.

ROBERT [redacted] Well, that's why it's important to get that meeting and that audio and evidence, but I know you will -- I'm not -- all I'm saying is

I'm making it a thing for the record that this proves --
THE HEARING OFFICER: All right. I mean, you've asked a couple questions.
ROBERT [redacted] Yeah.
THE HEARING OFFICER: So, okay.
ROBERT [redacted] Well, it was follow-up questions. So, I think I only have maybe one or two more, and that's it.
THE HEARING OFFICER: All right. Two more.
BY R. [redacted]
Q. Have you reviewed personally any assessments, evaluations, or reports regarding Woodhouse's effectiveness with, you know, with students who have -- who are similar to [[redacted] you know, with [redacted]
A. No.
Q. Then how can you come to the conclusion that it would be -- it wouldn't be good for him?
ATTORNEY ROSEN: Objection. Argumentative.
ROBERT [redacted] It's not argumentative. It's --
THE HEARING OFFICER: Yeah, that's asked and answered.
ROBERT [redacted] She said that it wouldn't be, and I'm asking her --
THE HEARING OFFICER: She's familiar. I mean, you're

familiar with the general population of Woodhouse. Correct?

THE WITNESS (Dougherty): Uh-huh.

ROBERT [redacted] We're not talking --

THE HEARING OFFICER: All right. So, that's -- well, you have to say, yes, for the Court Reporter.

THE WITNESS (Dougherty): Oh, yes.

THE HEARING OFFICER: Yeah, okay.

ROBERT [redacted] Well --

THE HEARING OFFICER: So, that's -- I mean, that's the basis. That's the basis of her opinion, and you asked her --

ROBERT [redacted] I just asked a direct question.

THE HEARING OFFICER: Well, I mean, you asked her the question of whether --

ROBERT [redacted] You just got her to say something, I need you to say about the -- with the Reporter.

THE HEARING OFFICER: Well, you asked her the question of whether she had any real reports or anything to back that up, and she said no.

ROBERT [redacted] But you just said that you have to say that for the Reporter. That's not something you should -- you should, you know, be telling her. That's not appropriate, you know.

THE HEARING OFFICER: Don't forget, the Hearing Officer

can ask questions. I mean, I said that at the very beginning, and that's --

ROBERT [redacted] Well, this is not asking questions. This is --

THE HEARING OFFICER: Frankly, there's a lot of Hearing Officers who are much --

ROBERT [redacted] It's prompting a witness, sir. You were prompting a witness, sir.

THE HEARING OFFICER: There are a lot of hearing officers --

ROBERT [redacted] Sir, you are prompting a witness.

THE HEARING OFFICER: Sir, there are a lot of hearing officers that intervene and ask their own questions a lot more than I do.

ROBERT [redacted] You weren't asking, you were prompting her. You were prompting her. You have to, you know, you get this in for the Court Reporter.

THE HEARING OFFICER: Well, I'm trying to --

ROBERT [redacted] That's not appropriate, sir. Okay.

So, for the record, I did ask that she didn't have any evaluations or -- so, she just doesn't know. So, right. Those are based on the assessments. So, that's another attack to the credibility.

ATTORNEY ROSEN: Objection. That's testimony, and I think we've exceeded the questions.

ROBERT [redacted] And I have another question here, my last question.

THE HEARING OFFICER: One more. One more. What is it?

BY R. [redacted]

Q. If you do not have direct knowledge or experience with Woodhouse Academy, would you recommend further evaluation or consultation before making a decision about [[redacted]s placement?

A. No.

Q. And why is that?

A. Because of my knowledge. There the [redacted] is at a much more severe level, and I believe it would be harmful for him to go there.

Q. And how did you come to that knowledge?

THE HEARING OFFICER: At this point, we're rehashing the same ground and --

ROBERT [redacted] Well, then -- well, then that (unintelligible) --

THE HEARING OFFICER: I mean, you've gone beyond the four that I, you know, the four that were requested.

ROBERT [redacted] My Followup was, like -- well,

actually, I should have -- I should have added to that question --

THE HEARING OFFICER: This --

ROBERT [redacted] -- before making the decision about his placement, like an IEE.

BY R. [redacted]

Q. So, do you think an IE -- my last and final question, which was part of this, was that do you think an independent educational evaluation would be in the parent's right to obtain?

ATTORNEY ROSEN: Objection. Asked and answered. He asked about further evaluations, and she said no.

ROBERT [redacted] No, not the IEE. I'm talking about the IEE.

THE HEARING OFFICER: Well, there's a few problems with that, and you know that may be one of them. But the other is; A, it calls for a legal conclusion; and B, this is not an IEE case.

There's a specific procedure in IDEA for IEEs, and apparently none was requested. This hearing is not about an IEE. That would have to be brought by the District. It's just not a subject of this case.

ROBERT [redacted] Well, that's something -- remember

you said that it's fair game. I brought up in my complaint, I did mention IEE, independent -- that, so that is part of this.

So, yes, it does have to do with this case. I remember in the beginning, you said during the pre-hearing conference that, well, if it's in the complaint, it's fair game. Those were your words.

THE HEARING OFFICER: And that's -- yeah.

ROBERT [redacted] And it is in the complaint, so it's fair game.

THE HEARING OFFICER: This is not an IEE case. That if there was a request for IEE, the District would have to bring that. So, do you have any redirect?

ATTORNEY ROSEN: No.

THE HEARING OFFICER: Okay. The Witness may step down.

And our next hearing is on Monday. Right?

ROBERT [redacted] And whose turn is it to go on Monday?

THE HEARING OFFICER: It will be whatever witness the District calls.

Do you know who that's going to be?

ATTORNEY ROSEN: Yes, the District's final witness is Sara Collette.

ROBERT [redacted] He's not calling Ms. Stuart?

ATTORNEY ROSEN: She's not a district witness.

ROBERT [redacted] No, I'm talking about Jen -- I'm

talking about S-T-U, Donna Stuart, the one you had on your list.

ATTORNEY ROSEN: We will not be calling her.

ROBERT [redacted] That's something I would like to -- then, I believe it's on my list. I thought they were going to be calling, and I had questions for her.

So, I -- if my list -- I will have to update the list to include her. So, I definitely want to include Ms. Donna Stuart. I thought that was one of the District witnesses on the list, and I prepared a cross-examination, you know, a, you know, list of questions for her for cross-examination.

THE HEARING OFFICER: All right. Well, the list is a list of people who you might call. You don't necessarily have to call all of them, so.

ROBERT [redacted] Oh, that's -- okay. So, what I want to find out, is this going to be a full day for them on Monday? I know they're going over the three days, and that's perfectly fine.

If he needs four days or he needs five days, that's up to him. He has a right to use his, you know, the time he needs to make his case, just like we have a right to use the time we need to

make this case.

And I'm saying this in all fairness, because as you stated, that, you know, attorneys work with each other. I'm not a legal attorney, but I'm being fair, so I know we said he would only use three days. I'm not holding him to that, and that's fine. He can have all day Monday, but I want to find out when we're going to start. That's my main concern.

So, whatever Mr. Rosen needs, you know, I will grant him that time, as much time as he needs. I'm not going to stop him saying, he said three days. That's it. It's over. No, I don't work like that.

And similarly, when we present our case, we may need five or six days or seven. I'm just making an example. I don't know, but I would expect the same fairness in return. I don't know how many days we're going to need. I don't know if it's going to be two or three, or if it's going to be five or six. I have no idea. I don't know if it's going to be more or if --

THE HEARING OFFICER: All right. Well, I mean, I'm not making any decision on limiting days at this, at this point.

ROBERT [redacted] Okay.
THE HEARING OFFICER: So, all right.
ROBERT [redacted] So, can we expect to be testifying, because I -- we want to be prepared? Is he going to use the full day on Monday? If he is, that's perfectly fine, but, you know, we have to know his --
THE HEARING OFFICER: Well, that would include cross-examination, too, and that experience seems to show that may go -- between direct and cross-examination, that may take up the lion's share of the day.
I mean, what does that --
ATTORNEY ROSEN: May I respond?
THE HEARING OFFICER: Sure.
ATTORNEY ROSEN: We don't anticipate for Ms. Collette's testimony to take up the full day. So, we would expect the parents would begin presenting their case that day.
So, if they're -- if we could get clarification as to what witnesses the parents expect to begin with, I just want to -- in good faith, if there are district witnesses who need to be present, we would like to make them present.
ROBERT [redacted] Well, that's something we had to

know, because you, you know, according to our --

THE HEARING OFFICER: Yeah.

ROBERT [redacted] You know, we didn't know when we were going to start, because Mr. Rosen wasn't clear exactly, or, you know, we just don't know.

So, if we're going to start Monday, I guess that would be afternoon, or he'll have the morning. I mean, so -- now that's been said, I'd like to know.

THE HEARING OFFICER: Okay. Do you know who? Do you have anyone who you would like him to make available on Monday?

ROBERT [redacted] Oh. You're talking to me, sir?

I'm sorry.

THE HEARING OFFICER: Yeah, yeah.

ROBERT [redacted] Oh, I apologize. I was just writing something down.

On Monday, let me bring up my -- well, I want to -- before that, I want to talk about Ms. Jennifer Stewart. I would like a subpoena sent to her.

I would like her probably -- again, was it -- because I want to get through some of the district witnesses first. So, what are we at now? We're on October 21st. Monday would be the 27th. We'll

start then. And the next hearing date, I think, after the 27th would be the 4th, but we're going to need continued dates, obviously. So, I would ask that Jennifer Stewart get in, you know, to give her time.

Also, it wouldn't even be on the 4th. It would be after the 4th. So, to give her enough time for the subpoena, I would assume -- I'm not sure how it works. You know, is there a certain amount of time I have to give her for the subpoena? Or how does that work?

THE HEARING OFFICER: I mean, technically 18 hours, but really for me to draw it up and get it, get it to the office and have them get a process server, you know you don't necessarily want to do it at the last minute.

ROBERT [redacted] No, I'm not going to do that.

THE HEARING OFFICER: Yeah, I think you're anticipating doing a few days. You can just e-mail with it, e-mail me with the date you want her.

And I have the name. You know you can give me the -- I know she works for the Greenwich School District somewhere. If you have a business address, you can give that to me, too. You can just e-mail that.

ROBERT [redacted] Yeah, let me write this down, so.
THE HEARING OFFICER: And I would think at some point maybe, you know you'll probably want to testify, and maybe the mother, too.
So, you have to keep in mind, you know, I don't know whether you want to do it at the beginning, at the end, in the middle.
It's up to you.
ROBERT [redacted] Well, that's what I'm saying. Right. We'd like to test -- so, basically, to answer Mr. Rosen's question about he wants to know how -- or you wanted to know how many or who we're going to have on Monday, let me look at my list here.
I would say -- now that you said that, I really don't think -- I do want to call district witnesses, but to be fair, you know, I want to give it, you know, enough time. So, I would think that we would like to get through our testimony first before we call witnesses, me or the mother, which is basically providing our testimony.
We could start that on Monday and then go through, and then we're going to -- of course, we're going to need, you know, many other days, and then we're going to start calling witnesses. But then I will get that list to let them know.

Okay. On this day, we plan on having these witnesses because also I have the State of Connecticut, that you said you would be able to -- that you did have to subpoena, which was Ms. Matz and Ms. Jones.

THE HEARING OFFICER: Well, that? I'm not sure what people from the State of Connecticut would be about. They don't really have any -- they're not involved in this case.

ROBERT [redacted] Well, yes, they are, because that has to do with the complaint, as that's -- it's fair game. It was part of my complaint, and I have e-mail exhibits from them, and they are part of this, this, because that has to do with -- when it comes up during our testimony, I think it will make more sense.

If I start explaining that now, it's going to be testimony, and we haven't started it. So, to be fair to this process, I don't want to bring up, like, you know, our testimony now. Now, that I understand how it works, we'll have to wait for our testimony, so then I can explain then why they would be -- during our testimony, why they would be a relevant witness or not.

And then we can make that decision whether,

you know -- or, I guess, Hearing Officer, then you would make that decision whether or not we can have them as witnesses or not. I think it's relevant, but I guess we'll have to make that decision at that time.

THE HEARING OFFICER: All right. So, on Monday, if the District doesn't take up the whole day, which they don't really anticipate happening, then you would -- then probably you would just start with your testimony.

So, they don't have to produce anyone on Monday for your case?

ROBERT [redacted] No, no.

THE HEARING OFFICER: Okay. So, we --

ROBERT [redacted] If there's any chance, I would -- you always e-mail ahead of time saying, I decided to subpoena this one, but I would give him advance notice.

But as far as Monday? No. If he's going to do testimony on us, then I'm safe to say I don't think I'm going to be calling any district witnesses.

THE HEARING OFFICER: All right.

ATTORNEY ROSEN: Just a point of order? So, the hearing day on Tuesday the 4th is an election day.

Ms. Macklin, are we able to produce district witnesses on election day?

NADINE MACKLIN: Yes. Are we talking about Darlene and Donna?

ATTORNEY ROSEN: Just, if there are any district witnesses, I just want to make sure there's not contractual -- I can't recall if you have a professional development day or school is completely closed.

NADINE MACKLIN: So, school is closed for students, but our teachers and our admin will be in, and some will be leading professional learning. So, it would be really nice to know who would possibly be called on the 4th so we can give them that.

ATTORNEY ROSEN: Okay. I just wanted to make sure there wasn't a logistical impossibility preventing their participation on the 4th.

THE HEARING OFFICER: Okay.

NADINE MACKLIN: They should be here, as long as they're not taking a vacation day.

THE HEARING OFFICER: All right. So, yeah, that can be worked out in advance. And if both the father and the mother are testifying, you know we may just have them on the 4th anyway. You know we can figure that out as it gets a little closer.

All right. If there's nothing else, we'll end today's hearing, and we'll come back on Monday. Okay.

THE REPORTER: Would anybody like transcripts? Attorney Rosen? Mr. [redacted]

ATTORNEY ROSEN: Yes, I'll follow up with you on correspondence for both dates that you e-mailed about. Thank you.

THE REPORTER: Understood.

THE HEARING OFFICER: Okay.

NADINE MACKLIN: All right. Thank you.

ROBERT [redacted] Thank you.

ATTORNEY ROSEN: Thank you.

(End: 4:17 p.m.)

STATE OF CONNECTICUT
[Hartford County]

I, ROBERT G. DIXON, a Certified Verbatim Reporter for the State of Connecticut, do hereby certify that I took the above 273 pages of proceedings of the STATE OF CONNECTICUT, DEPARTMENT OF EDUCATION, SPECIAL EDUCATION HEARING In Re: [redacted] COMPLAINANT, VS. MILFORD BOARD OF EDUCATION, RESPONDENT, Docket Number: 25-0686; HELD BEFORE: PATRICK KENNEDY, ESQ., THE HEARING OFFICER, on October 21, 2025 (via Teams teleconference).

I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of computer assisted transcription; and I further certify that said deposition is a true and accurate record of the testimony given in these proceedings.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and seal the 4th day of November, 2025.

Robert G. Dixon, N.P., CVR-M No. 857

My Commission Expires 6/30/2030

INDEX


WITNESS PAGE

Amy Rizzo ---------------------------------------- 549

(Cont'd) Cross-Examination by R. [redacted] ------ 549

Lauri Dougherty ---------------------------------- 610

Direct Examination by Attorney Rosen ---------- 611

Cross-Examination by R. [redacted] -------------- 643

PARENT EXHIBITS

NUMBER PAGE

*Exh 15 -- E-mail chain (20 pgs) -- (578),(591),(689),(737)

*Exh 16 -- 5/30/'24 A. Rizzo e-mail ----------------- (593)

Exh 17 -- August 2nd A. Rizzo e-mail ---------------- 597

Exh 18 -- September 5th e-mail --------------- (550), 557

*Exh 21 -- '24/'25 School year planning ------ (625), (632)

*Exh 22 -- E-mail Re: Recent events ---------- (575), (699)

Exh 25 -- Communication: Forcing [[redacted] to call home -- 574

*Exh 29 -- Parent/JFK e-mail correspondence -- (558), (697)

*Exh 30 -- [[redacted] Outplacement request --------- (559), (791)

Exh 41 -- 3/10/'25 Parent e-mail ------------------- 566

Exh 55 -- 3/6/'25 IEP ------------------------------- 571

Exh 57 -- CSSR Scale (2 pages) --------- (724), 731, (742)

BOARD EXHIBITS

NUMBER PAGE

*Exh 13 --- 2/8/'24 IEP From reviews (25 pages)--- (616)

*Exh 21 --- 1/16/'25 Annual review IEP------------- (632)

*Exh 30 --- 5/21/'25 IEP ------------------------- (639)

*Exh 34 --- L. Dougherty Resume ------------------ (611)


*Exhibit entered into evidence on prior hearing date.
All exhibits retained by counsel.

**0**

**06460** 2:5

**1**

**1** 41:23 42:1,25 52:9 188:9
**1/16** 275:17
**10** 12:10,17,23 15:22 16:16 24:24 48:8 53:5,7 229:14
**10/19** 187:17 201:10 208:24 228:24 229:4 230:1
**10/19/2023** 184:5 189:18 229:2,5,10,20 230:2
**10/23** 226:16
**100** 134:8
**10:01** 1:19 3:1
**10:07** 7:7
**10th** 16:24
**11** 17:15
**11:02** 54:24
**11:11** 66:22,22
**11:12** 55:2 66:21 68:7
**11:30** 67:21,24 68:2
**11:32** 68:7
**11th** 12:7,9,16 12:16,22 14:3 16:17
**12** 193:5,6
**12:14** 100:5,18
**12:30** 17:16,19
**12th** 193:2
**13** 74:21 275:17
**14** 76:19 169:24 175:3 178:13
**14th** 4:19,22 36:9 45:10,21 45:25 46:9 47:20 48:1 175:22 178:24 195:4,10,11 198:17
**15** 36:5 48:8,20 49:12,13 52:1 53:5,7 77:24 78:5 79:25 81:21 147:5 169:16 172:20 173:14,17 181:15 194:23 195:1 199:14 275:8
**15th** 36:9 195:14 197:11 199:25
**16** 37:4 51:6,9 52:6 53:15 90:11,16 91:11 92:19 146:24 180:23 214:20 275:9
**16th** 46:20 171:22 172:19 173:2 174:25 198:14,24 202:7 252:11 253:7 254:3,11
**17** 37:19 54:21 55:5,6,7,8,15 275:9
**17th** 12:8 18:3 21:4 22:20 26:2,10 38:7 39:7 167:8 183:18 193:16 195:12 197:9 198:11 199:19 200:1 235:14
**18** 8:20,22 9:7 14:8,16,18,25 15:5,7,8,11 146:1,1 268:12 275:10
**185** 163:9
**1984** 70:13
**1988** 70:14
**1996** 71:4
**1997** 71:4
**1998** 70:24 101:19 103:9
**19th** 11:15 183:21
**1:00** 100:18
**1:15** 189:23
**1:35** 184:10 190:5
**1st** 51:17

**2**

**2** 185:23 187:16 188:9 188:10,10 275:14
**2/12/2024** 192:24
**2/8** 275:17
**20** 16:14 103:9 171:12,12,14 172:15 275:8
**2000** 71:1,14
**2002** 70:17
**2022** 42:17 70:17
**2023** 42:1 183:21 207:7,8 207:9 225:6 231:22
**2023-2024** 74:7 74:10,17 75:6 89:25
**2024** 16:14 17:15 20:5,10 21:6,12 37:4 43:2 49:2 50:7 50:11 51:17 52:9 75:4

76:13 78:10 80:5 163:1 167:5,13,24 168:14 169:9 169:25 172:20 175:3 178:13 183:15 193:5,7 193:16 195:14 201:4,5,9,9 202:1 204:22 205:6,9,18,19 205:21,22 206:9,19,20,25 206:25 208:1,2 214:4 227:1,4 231:23 233:6 233:15,15,17 235:14,18 236:18 237:2,7 237:10 238:6

**2024-2025** 90:4 94:20

**2025** 1:18 20:8 24:24 25:3 26:8 37:8,19 76:19 90:12,16 91:4 97:7,11 98:9 252:8,11 254:4 274:6,15

**2025-2026** 98:19

**2026** 91:5

**203.783.1200** 2:8

**21** 1:18 83:19 90:8 97:7,11 274:6 275:10 275:17

**21st** 267:25

**22** 33:11,15 41:17 42:23 156:20 157:15 157:20 173:17 275:11

**23** 42:17,20,23 42:23,24 114:4 116:25 117:1 117:23 118:4 118:21 119:3 119:14,18 187:17 228:24 229:14 230:1

**24** 42:23,24 56:17 83:20 96:23 114:4,5 116:25 117:1 117:23,23 118:4,21,21 119:3,14,18 162:25 163:1 206:1 231:22 235:15 275:9 275:10,17

**24th** 34:2

**25** 18:13 27:19 28:7 31:25 32:11,13,17,20 56:17 83:20 96:23 97:12,17 114:5 181:14 231:23 275:10 275:11,13,13 275:17,17,18

**25-0686** 1:8 3:11 274:6

**26** 42:1 97:12 97:17 214:4

**26th** 41:22

**27** 101:20 102:17 103:6 126:2 128:24 129:13 130:20 131:5 134:11 194:7 229:11

**273** 274:4

**27th** 49:22 172:6 267:25 268:2

**28th** 199:15,18

**29** 14:6,10 15:16,24,25 16:7 155:7 275:12

**2:35** 182:9

**2:49** 182:9

**2nd** 56:4 57:11 66:9,16 192:18 192:23 193:3,4 275:9

**3**

**3** 181:14

**3/10** 275:13

**3/6** 275:13

**3/6/2025** 27:14 28:20

**30** 16:21 17:9 49:2 50:7 91:4 97:3 201:4 202:1 205:6,9 249:4,7,11 251:10 275:12 275:18

**30th** 43:8,21 44:15 45:10 47:10,20 48:2 50:18,22 52:13 56:18,24 65:10 66:10,17 167:9 183:15 200:23 200:24,25 201:3,4,9 202:5 204:20 204:22 205:1,3 205:19,21 206:16,19,20 244:10,11,20

**34** 69:12 275:18

**35318** 274:20

**3:05** 175:4,23

**3rd** 50:1 147:16 170:18

170:20 176:18 177:24 179:14 195:21 198:25

**4**

**41** 23:23 24:15 24:18 275:13
**45** 109:2 181:23
**4:17** 273:15
**4th** 205:18,21 206:16,24 268:2,6,7 271:25 272:14 272:17,24 274:14

**5**

**5** 77:24 78:6 91:10
**5/17** 201:10
**5/21** 275:18
**5/30** 275:9
**549** 275:2,3
**55** 27:10,13 29:9 275:13
**550** 275:10
**557** 275:10
**558** 275:12
**559** 275:12
**566** 275:13
**57** 182:16,20,24 184:20,25 185:2,20,21 186:17,25 187:3,3,6,16,17 187:22 188:3,4 188:5,8,9,9,14 188:24 189:3,8 189:11 200:11 275:14
**571** 275:13
**574** 275:11
**575** 275:11
**578** 275:8
**58** 185:21 186:17,21 187:5,18,20 188:21
**59** 185:21 186:17,23
**591** 275:8
**593** 275:9
**597** 275:9
**5th** 9:15,21,22 10:11 275:10

**6**

**6** 20:8 25:2 26:8 37:8 91:5 252:7
**6/30/2030** 274:22
**60** 185:13,19,21 186:18
**610** 275:4
**611** 275:4,18
**616** 275:17
**625** 275:10
**632** 275:10,17
**639** 275:18
**643** 275:5
**689** 275:8
**697** 275:12
**699** 275:11
**6th** 17:25 20:3 20:7 21:4,11 22:19,20,20 23:6,17 25:22 26:1,20 257:13

**7**

**7** 43:2 91:4
**724** 275:14
**731** 275:14
**737** 275:8
**742** 275:14
**75** 2:4
**791** 275:12
**7th** 43:7,21 44:14 47:10

**8**

**8** 76:12
**857** 1:24 274:21

**9**

**9/20** 156:4
**9/26** 156:16
**9/30** 182:24 201:9 206:25 208:2
**9/30/2024** 202:1,5
**9/4** 208:1
**9:29** 172:21

**a**

**a.m.** 1:19 3:1 12:10,17,23 15:22 16:16 68:7,7
**abide** 144:21
**ability** 100:2
**able** 16:10 36:13,14 38:25 53:3 67:21 81:8 85:14,15 92:13 94:9 95:14,20 98:16 108:2,3 122:10 123:14,20 130:21 162:13 163:11 167:11 214:19 215:6 247:3 270:3 272:1
**above** 64:11 274:4
**absent** 77:4
**absolutely** 6:24 63:14 134:8 216:21
**abuse** 84:6
**academy** 248:21 251:14

254:5,12 256:8 256:12,19 261:8
**accept** 22:3 231:24
**access** 42:10 163:25 164:22
**accomplish** 211:13
**accord** 102:4
**accountability** 143:16
**accountable** 143:17
**accurate** 25:1 25:17 98:6 154:7 274:9
**accurately** 159:23 160:15
**accusation** 204:3
**accusatory** 23:19,20
**acknowledge...** 188:22
**action** 6:17 29:17 30:2 152:25 274:11 274:13
**actions** 27:23 148:9 152:12
**activity** 137:24 138:17,19
**actual** 28:12 109:1,25 110:2 131:11 145:7 150:20 154:20 171:17 207:19
**actually** 13:17 14:22 17:8 27:7 38:3 49:25 123:3 136:4 152:7 153:7 156:19 157:6 159:19 165:7 166:24 166:25 171:15 172:23,25 173:3 182:17 199:2 218:15 219:19 262:1
**add** 27:3 75:17 200:2
**added** 93:2 135:22,22 137:7,7 262:1
**additional** 53:5
**address** 4:8 5:17 6:18 268:24
**addressed** 19:8
**addressing** 25:23
**adhere** 125:15
**adhered** 124:18
**admin** 163:25 272:11
**administration** 3:17 5:24 70:6
**administrative** 5:10,13 8:15 236:3
**admissible** 248:4
**admission** 9:11
**admit** 29:6 171:25
**admitted** 8:25 9:3 15:5,8 16:1 16:7 17:9 37:10 51:9,12 55:5,13 146:6 155:12 157:20 188:14 189:3,8 249:11
**adolescents** 70:5
**adult** 105:13
**advance** 113:17 271:17 272:22
**advanced** 70:2 70:3
**advice** 122:6
**advise** 108:18
**affecting** 150:9
**afternoon** 267:7
**agency** 4:23 7:2
**aggravated** 141:16,25 142:2,4
**aggravating** 141:1
**agree** 19:6 25:17 55:21 56:2 57:7,25 58:5 66:19 88:13 90:18 100:9 124:16 218:22
**agreed** 17:13 17:14 30:19 31:4 42:12 221:3
**agreement** 54:4 54:11,15 58:9 60:5 63:22 97:18 249:11
**ahead** 9:11 17:10 31:15 38:22 42:25 51:13 65:18 136:11 146:9 158:3,17 271:16
**air** 87:8
**alleged** 84:10
**allow** 45:17 106:7 126:9 141:13 142:2 226:13 254:17 255:1
**allowed** 95:12 139:1

**allowing** 22:15 35:21 36:1,3
**alongside** 91:1
**alternate** 37:20 38:7 39:8 77:7
**altogether** 141:2,3,5,7
**amount** 48:17 138:25 181:16 268:10
**amy** 3:19 51:17 275:2
**analysis** 120:5
**angry** 141:17
**announcement** 216:19
**announcements** 216:6
**annual** 74:15 75:4,5,13,20 76:2 78:10 89:24 90:2,15 90:19 119:12 252:12 254:3 275:17
**answer** 10:19 12:24 22:23 23:14 34:18,20 47:2 49:5 56:25 60:15 62:23 63:10 65:17 66:3 102:21 106:7 106:17 115:13 126:9 127:4 129:20,22 130:4,5,6,9,13 130:15,16,17 130:22 131:1,6 134:13 135:18 137:2,11 139:9 139:20 140:6,7 141:13 142:9 144:25 145:24 153:1,4,8,10 154:12,19,21 155:2 161:18 163:12 166:11 177:17 204:14 207:11,12,23 208:23,25 209:2,17 210:5 210:8,14,15,16 211:6,17 212:1 212:3,7,18 213:10 218:11 218:15,17 219:13,20 222:2,8,19,19 226:8 227:11 227:19,19 229:25 230:4 232:14 237:14 238:22 242:14 243:23 246:17 250:2 255:5 257:11,21 269:10
**answered** 9:16 10:22 11:9,18 11:25 19:6,22 21:18 22:25 30:11 39:12 40:14,17 41:4 41:11 44:2,5 45:14 47:14,17 58:11,13,14,16 64:8 65:13 103:4 104:21 111:2 118:19 128:16 130:11 132:11 133:9 135:20 136:22 137:4,4,14 139:11,15 153:24 154:24 161:7 177:4 194:3 206:6,14 207:17 208:22 210:3,17 217:11 218:10 219:16 221:17 223:9 225:11 226:7 230:11 232:8,21,22 233:7,8,10,22 233:23 237:12 237:13 239:23 241:10 252:20 256:23 258:22 262:12
**answering** 38:19,21 59:16 63:8 86:19 145:1 192:17 203:23 206:5 209:18 212:22 212:23 219:11 227:16 253:11
**answers** 22:13 105:1 134:14
**anticipate** 92:17 266:16 271:8
**anticipated** 4:7
**anticipating** 268:18
**anybody** 273:4
**anymore** 149:18,19 194:18
**anyway** 18:24 127:3 272:24
**apologies** 51:25
**apologize** 36:23 51:24 136:25 146:15 147:4,8 157:14,15 158:5,7 193:3 193:5 201:14 201:14,16 240:7 267:16
**apparently** 124:1 179:13 179:23 229:14

262:21
**appeal** 110:11
**appears** 50:10
**apple** 5:20
**appointed** 3:8
**appreciate** 34:20 108:18 135:19 148:14 186:13 209:14 233:3 236:19 236:20
**approach** 85:8 85:10 114:14 114:23 115:5 115:24 216:16 216:25 217:17
**approaches** 85:12
**appropriate** 4:23 6:17 31:6 42:12 43:4 95:8 99:14 108:9 110:15 110:23 129:24 164:24 165:12 243:15,16 244:3 256:8 259:24 260:20
**approximately** 73:25 87:17
**argue** 22:2 111:17 211:13 228:8 242:9
**arguing** 48:17 48:17,19 61:24 63:2 177:20 211:16,19,24 223:22
**argument** 58:22 109:16 255:2
**argumentative** 13:6 18:9 19:23 20:22 38:18 39:11,13 40:13,15 44:1 45:4,5 46:11 56:22 58:18 59:18 62:25 64:9 107:8,10 128:14 130:23 130:24 132:21 135:21 141:10 210:25 211:1,3 212:5 219:15 219:17 221:18 221:19 224:11 241:8,9 244:21 244:23 245:25 246:1 252:25 258:20,21
**arm** 33:25
**army** 70:12
**art** 80:15
**asked** 11:17 13:8 15:20 19:22 21:2 22:22 27:4 30:11 34:12,13 37:17 39:6,11 40:13 41:14 44:1 45:14 47:14 49:16 50:17 56:12 58:11 64:8 65:13,23 104:15,16,21 111:1 117:6 118:7 121:15 128:17 130:3 133:8 134:25 135:1,4,20,23 135:25 136:22 137:1,6,14 138:16 149:13 152:23 165:24 166:3 173:25 174:6 177:12 180:8 194:3 203:6 207:16 212:25 213:9 215:10 217:11 218:10 219:15 221:17 223:9 224:15 225:11 226:7,10 227:13,18 230:11,11 231:11 232:21 232:22 233:1,9 233:10,22,23 233:24,24 236:9 237:12 237:13 239:12 239:21 240:3,7 240:8 241:1,10 247:17 249:15 251:1 252:20 256:23 258:3 258:22 259:12 259:13,14,18 262:12,13
**asking** 12:21 13:21,24 14:23 20:19 25:10 30:7,8,9 34:18 35:9 37:14 38:15,16 41:12 44:6,8 52:14 59:4,6,13 60:7 60:11 65:19,24 65:25 110:25 114:17 120:4 126:4 134:4,4 134:9 136:9,19 151:6 159:18 160:21 161:23 162:4 166:1,2 173:20 174:22 175:4 196:13 202:15 206:2 208:9 209:24 212:12,19 213:1 217:3,10 219:12 222:10

227:6 229:24 230:24 231:4 233:2 234:19 234:22,23 235:16 236:21 258:24 260:3 260:15
**assess** 75:20
**assessing** 75:25
**assessment** 193:18
**assessments** 258:12 260:24
**assigned** 33:23
**assisted** 274:9
**assume** 90:18 268:8
**assuming** 80:2
**attached** 176:23 178:5 187:7 188:20 188:21
**attack** 125:7 260:24
**attempts** 56:15 59:1,9,25 60:2 60:8,22 62:4,5 64:2
**attend** 18:14 19:12,15 55:23 90:2 98:1 105:22
**attendance** 90:12,19 98:4 98:5,8,12,14 252:13,14
**attended** 81:19 105:11,17
**attendee** 75:9
**attendees** 75:8
**attending** 54:5 54:7 55:21 57:7 58:9 74:15 89:24
**attention** 41:21 71:25
**attorney** 3:14 3:15 4:6 5:5,18 6:13,20 7:24 8:9,11,22 13:6 15:6 16:5 17:3 18:9 19:22 20:22 23:25 24:13 25:4,8 27:9,17 28:6 30:11 32:16 35:2 36:18 37:25 38:18 39:11 40:5,13 41:25 44:1 45:4,14 46:11 46:15 47:14 50:5 51:21 55:10 56:22 58:11,17 59:18 62:25 64:8 65:13 67:2,12 67:19 68:1,3 68:12,22 69:3 100:3,13 102:15 106:2 106:10,12 107:8 113:12 114:3 118:7,14 120:1,8 121:13 121:15,17 122:6,21,24 123:4,6,9,12 124:4,6 126:1 126:14,25 127:1 128:14 129:3,9 130:23 131:8 132:21 133:8 135:20 141:10 143:11 145:2 146:7 148:12 150:13 152:21 153:20 157:24 160:2 160:20 164:7 164:12,15 168:10 170:10 173:25 177:2 180:24 181:13 182:25 183:3 185:7 188:15 189:2 190:8 191:13,16 192:2 194:3 198:7 199:6,10 201:11 202:13 203:16 206:4,8 208:9,14 209:22,24,24 210:3,25 213:21 218:10 218:14 219:15 219:21 220:5 221:17,21 223:6,8 225:10 225:13 226:7 227:25 228:2,4 230:5,8,24 231:7,14,25 232:21 233:21 237:12 241:8 241:10 242:1 243:19 244:21 244:24 245:13 245:25 246:19 247:11,13 251:6 252:20 252:25 255:21 256:23 257:17 258:20 261:1 262:12 263:14 263:21,24 264:3 265:4 266:14,16 271:24 272:5 272:15 273:5,6 273:13 274:12 275:4
**attorneys** 265:3
**audio** 24:4,9,16 25:19 37:14

215:5 257:24
**august** 11:15 56:4 57:11 60:12,17,19 62:14 66:9,16 275:9
**authorizes** 242:19
[redacted] 34:5,8 34:14 35:8,13 35:15 72:5 101:9,23 102:5 102:7,10,17 103:12,13,16 104:5,7,11,19 105:1,13 114:14,22 119:2 126:7 128:6,20 129:14 131:22 132:1,6,16,18 132:24 133:3,7 133:23,25 134:5,10 217:19,23,24 218:2,3,4,8,17 220:14,25 221:2 222:24 223:3,17 224:14 243:16 244:5 258:16 261:14
**autistic** 105:12 126:3 128:25 131:17 218:6 256:13 257:6
**available** 10:23 11:11 16:15,16 17:20,22 72:4 99:3 119:9 174:11 267:12
**avoid** 63:8 203:22,22
**avoided** 5:12
**avoiding** 59:16
**aware** 23:5 31:19 32:4 33:2,5 36:4 44:17 46:2 54:14 72:22 95:1 150:25 168:22 176:7 181:8,11 242:18,21 251:2 255:19

**b**

**b** 28:7 74:21 90:8 97:3,3 262:19
**back** 12:11,14 33:7 51:1 67:14,24 68:10 98:3 100:21 138:15 140:16 147:16 148:22 148:24 156:24 157:9 166:16 170:4,7 172:9 172:15 173:1,6 173:22 175:7 175:20 176:8 177:1 179:4 181:18 182:6 183:20 184:17 194:21 195:2 196:5 197:1 198:16 199:15 200:10 203:10 214:24 244:19 259:20 273:2
**background** 33:1 35:7 74:25 86:16 101:22 102:6 103:11 215:2
**backwards** 185:13
**base** 89:8
**based** 5:21 6:8 13:1,12 48:12 57:20 62:16 65:5 66:5 72:24 78:13 82:13 87:10 89:3,9 95:6 97:21 114:13 114:19 121:10 247:15,16,16 256:16,16,18 257:8 260:23
**basic** 129:20 130:22 174:7 205:7
**basically** 6:13 49:18 63:19 71:22 82:5 103:20 111:23 130:14 132:23 139:17 149:20 150:15 153:17 153:19 159:17 165:4,11 168:18 172:18 178:19 184:9 196:14 198:3 252:2 257:1 269:10,20
**basis** 82:9 84:19 88:21 89:17 106:25 238:4 257:10 259:11,11
**bathroom** 149:14 150:3 192:18,21 193:10,11
**bcbas** 104:24 105:8
**began** 20:5,9 21:5,12 22:21 232:19 237:9 238:11
**beginning** 17:7 117:23 156:16

235:12 249:12 260:2 263:5 269:7
**begins** 199:16
**behavior** 36:7 36:10 73:1,8 79:13 81:3,6,9 81:12 83:6 85:7,8,19 86:5 86:8 87:1 89:10 92:2 104:23 105:2 114:24 117:11 125:25 127:15 128:1,5,9 155:25 156:1 164:16 191:1 200:19,22 209:9 212:15 238:21
**behavioral** 30:17 43:11,25 44:20 104:10 104:18 105:7 112:23 114:15
**behaviors** 27:23 72:1 78:17,23,24 79:10,11 80:20 80:22 81:1 84:21 87:10,19 88:19 117:10 145:22 148:6 150:10 155:15 158:10 162:8 162:19 163:4 165:6,8,22 166:7,14 184:1 184:13 190:11 190:12 200:23 201:7,8 202:11 203:6,14,16,19 204:19 205:20 206:18,24 207:2,25 208:3 209:8 238:11
**believe** 3:21 6:16 8:20 9:2 10:13 12:18 16:3,21 17:3 17:21 18:5 21:22 24:2 26:23 27:1 28:4,7,9 36:8 38:11 40:24 41:8,24 50:15 50:24 51:2,6 59:15 87:20 96:25 106:15 107:10 112:4 113:5 117:22 117:22 123:21 124:18 125:9 134:15 146:1 146:23 155:8,9 167:9 181:19 192:19,25 200:11 217:6 225:5 226:10 227:16 229:3,4 233:4 235:14 235:23 244:14 249:7 250:20 250:23 261:15 264:5
**benefit** 87:14 114:2
**benefiting** 87:25
**berchem** 2:3
**berchemmos...** 2:7
**best** 73:9 74:3 75:7 85:3 90:13 94:21 96:1 97:9 98:25 100:1 105:13 116:17
**better** 93:11 95:8 126:21,24 127:1 205:15 218:14 219:22
**beyond** 39:3 231:2,21 232:1 261:22
**big** 157:18 238:8
**bigger** 158:16
**bip** 30:16 31:6 43:10,17,23 44:18 165:9
**bit** 44:11 69:20 70:10 71:15 92:22 94:6 158:23 184:22 184:24
**bite** 5:20
**block** 81:21
**board** 1:10 2:2 2:17 3:9 27:18 68:12 69:6,8 69:11 73:13 97:3 116:13,16 165:12 274:5 275:16
**board's** 28:12
**books** 106:20
**bottom** 187:13
**boxes** 33:18
**boys** 49:17 71:4 101:15,15 116:2 149:14 256:8
**break** 44:11,12 67:24 94:1 100:7,10 180:24 181:3,7 181:15 195:3 195:23 214:17
**breeds** 150:10 150:11
**brief** 223:24 224:21 228:8 242:8

**briefly** 71:11
**bring** 7:1 8:19 8:21 14:20 15:23 16:19,23 23:22 31:25 36:20 48:2,6 49:8 52:12,19 54:20 113:3,5 130:9 155:5 157:16,22 169:2,13,16,18 178:23 180:21 194:22 201:21 235:13 242:16 248:24 249:3 250:11 253:6,9 254:10 255:4 263:13 267:18 270:19
**bringing** 6:11 250:1 253:22
**broad** 2:4
**broke** 93:5
**brought** 6:19 16:4 28:16 36:5 41:19 120:21 122:14 158:6 167:25 168:1 213:1 257:14 262:23 263:1
**build** 81:24 84:22 95:14,19 95:23 156:2
**building** 159:6 159:24 160:17 162:1
**burden** 5:10,13
**business** 122:3 125:15 268:23

**c**

**c** 2:1
**calendar** 77:8
**call** 29:17 30:3 32:12 33:8 35:22 36:2 67:18 68:11 84:18 85:6,17 86:8,21 87:3,6 87:14 119:8 147:11 214:4,8 214:10,11,18 214:20 217:4,5 217:7 218:23 227:13 228:25 229:15 238:18 238:24,25 239:2 240:5,11 240:12,14,15 240:16,20,23 240:24,25 241:2,2,2,7,19 242:19 243:7 243:11,11,20 243:21,25 244:10 264:16 264:17 269:15 269:19 275:11
**called** 68:17 81:20 117:18 125:21 127:12 127:21 148:5 184:10 190:3,4 214:14 217:1 241:1 272:14
**calling** 30:18 31:3,8 80:6 87:7 127:6 128:1 217:2 221:18 238:21 240:18 263:23 264:3,6 269:24 271:21
**calls** 31:20 32:4 35:2 68:12 87:11,15,18 88:1 117:24 118:13 121:1 122:20 125:3,4 126:1 133:6 191:13 209:7 209:12 213:1,2 216:4,9,11 225:3,7 226:4 226:5,9,25 227:9 228:20 228:20 230:25 232:18 233:13 233:16 237:6,9 238:19 239:7 241:4,15 242:20,24 243:17,19 244:5,15 245:6 245:10,16,17 246:19,20 262:18 263:19
**calm** 72:3 149:17
**calming** 81:5
**camera** 100:14
**candidate** 70:15
**car** 126:5 134:4 189:24
**carbon** 160:10
**case** 3:10,11 84:22 106:14 106:16 110:10 113:25 120:4,6 133:22 134:7,9 143:18,19 164:5 165:13 250:14 254:1 262:19,24 263:4,11 264:24 265:1 265:15 266:19 270:9 271:12
**caseload** 72:14 72:17
**cause** 244:7
**caused** 125:23 127:14,23 137:22 191:2

**causes** 243:17 244:6
**cc** 177:9,9 180:2
**cc'd** 10:13,18 10:19 11:2,3,7 12:6 24:24 25:11 36:16 37:4 117:20 147:15 152:14 152:16,19 169:23 170:8 171:4,10,19,21 172:8,23,25 173:3,5 174:5 174:19,22,24 175:5,10,17 176:3,14 177:18 178:2,4 178:6,12,25 179:25 180:8 180:15 195:16 195:24 196:2,6 196:8,20,21,23 197:4,23 249:17 251:4 255:14
**ccs** 170:17
**certain** 18:1 43:13 44:21 47:11,13,15,16 47:23,25 138:20,25 174:7 268:9
**certainly** 166:4 168:23,24
**certificates** 70:4
**certified** 274:3
**certify** 274:4,7 274:9,10
**ceus** 102:5
**chain** 10:17 148:20,21,23 148:25 149:9 149:21 151:9 153:1 170:3,5 170:24 171:4,5 171:7,11,12 172:4,5,13 173:23 177:10 178:5 195:16 196:6 199:15 275:8
**chains** 172:7
**chance** 149:25 271:15
**chances** 150:1
**change** 26:19 28:2 39:24 43:8 44:15 49:3 50:4,8,21 52:20 54:2,12 54:16 56:3,19 57:4,13,21 60:9 61:15 62:17,18,20 63:19 64:5 65:6,10 66:6 89:6 95:9
**changes** 59:3 59:11
**character** 206:21
**characteristic** 221:1,2
**characteristics** 132:13
**characterizati...** 88:10,13 109:18 111:21 124:17 211:15 211:18 213:21 213:24 224:3,6 224:11
**characterize** 217:14 227:10
**characterized** 23:17 216:4,9 217:8
**characterizing** 84:5 212:4
**check** 83:15 146:5 166:19 166:20,23
**checklist** 92:25
**chicken** 80:11 125:23 127:6 127:14,23
**child** 31:24 32:7 134:5 217:23 242:19 246:11 248:7
**children** 35:12 70:4 74:25 93:15 101:8 102:10 103:12 104:5,6 126:3 126:7 128:20 128:25 129:14 131:14,17,20 131:21 132:2 132:12 134:11 135:9 136:16 137:22 138:20 140:10,18,21 140:25 141:7,9 141:14,24 221:15 256:13
**choose** 11:20 12:1
**choosing** 234:15
**chronology** 200:7
**circles** 196:1 220:23 223:8
**circling** 222:12
**circumstance** 31:10
**circumstances** 55:22 230:19
**claim** 19:25 20:23 38:20 42:6

**claimed** 40:2 190:16
**claiming** 60:19 60:20 62:6 129:11
**claims** 134:10
**clarification** 5:23 26:2,9 266:21
**clarified** 57:12
**clarify** 24:14 33:21 229:8
**class** 36:11 82:4 93:16,19 115:15 242:23
**classification** 133:7
**classified** 167:7
**classifying** 63:25
**classmate's** 159:7,25 160:18 162:2
**classmates** 80:9 125:23 127:14 127:23
**classroom** 71:23 80:16 81:20,25 88:20 93:21 94:18 115:5,8,12,14 116:5,7
**clear** 4:16 5:3 58:3 59:2,10 59:13 60:4,4 63:20 143:12 143:14 144:23 205:13 211:4 267:4
**clearly** 18:10 39:15 61:14 64:4 230:25
**client** 172:10 172:16 175:25 178:22 197:2 209:20 230:11
**clock** 66:24
**closed** 272:9,10
**closer** 272:25
**coach** 107:25
**coaxing** 84:19
**coincide** 67:9
**coincided** 148:5
**collected** 89:9
**collection** 185:19
**college** 105:18
**collette** 263:22
**collette's** 266:16
**columbia** 183:13,14 184:25 187:4 187:23 193:17
**column** 77:24
**combined** 18:8
**come** 3:7 6:2 17:4 18:18 20:16 22:13 31:10 37:15 42:5 67:24 143:15,21,24 144:3 165:16 182:6 189:19 194:21 200:4 212:20 238:2 248:16 256:15 256:20,21,24 257:1 258:18 261:17 273:2
**comes** 7:3 125:2 270:15
**comfortable** 99:25 113:14 116:20
**coming** 75:18 120:18 151:16
**comment** 46:12 58:23 154:4 164:12 167:5 167:15,18,23 168:6,13 182:23 183:17 193:17,19,22 194:5,6,9,14,17 195:9 197:10 198:3,12,18 199:1,4 200:18 244:9,11,20
**comments** 191:17 250:5
**commission** 274:22
**common** 95:4 131:14,19,21 131:23 132:5,6
**communicated** 117:7,20 118:5
**communicating** 105:14 116:11
**communication** 12:5 104:10,18 114:15,24 117:9 118:4 155:15 156:12 158:11 255:9 275:11
**communicati...** 47:21 117:19 124:13 147:22 159:5
**community** 81:20,25
**competency** 103:16
**competent** 102:13 103:1 103:10
**complain** 50:2 168:2
**complainant** 1:8 2:10 274:5

**complained** 168:8 195:17 202:12
**complaining** 47:21 167:19 167:25 168:19 177:2 197:11 198:5,13 199:3 199:4,20,21 200:17 202:6,9 203:4 237:3 238:6,12
**complaint** 4:24 42:8,18 122:16 124:24 148:3 263:2,7,9 270:11,12
**complaints** 49:4,7,9,21 50:9 147:10 148:10 152:20 168:23 169:11 198:21,22,25 199:14 202:23 232:19 233:18 233:19 234:4 234:10,16 235:1,10,12,16 237:10,17,18
**complete** 36:14 94:9,15 226:17
**completed** 193:18
**completely** 66:16 118:19 250:24 272:9
**completes** 93:7
**complex** 147:12
**compound** 44:10 64:9 152:21 155:17 163:17 198:9 245:13
**computer** 274:9
**concentrate** 209:13
**concepts** 94:12
**concern** 265:9
**concerns** 4:6 9:16 10:22 11:9 19:5,8 25:24 26:21 27:24 138:24 142:20,24 152:17
**concludes** 121:9 144:13 144:20
**conclusion** 125:2,12 140:1 212:13,20 256:15,21,25 257:1 258:18 262:18
**conclusions** 210:10,13 228:7
**condition** 34:6 34:7,15
**conduct** 45:9 47:22
**conference** 263:6
**conferences** 119:9 189:24
**confident** 102:14 104:4
**confirm** 10:20 24:3 30:10 49:20 76:18
**confirmed** 215:3
**confused** 27:11 106:18 129:17 134:16 136:24 205:4 240:2
**confusing** 184:24
**connected** 82:25
**connecticut** 1:2 2:5 3:9 69:25 270:3,7 274:1 274:3,4
**connection** 20:18
**consent** 216:15 216:24 217:16
**consequences** 86:5
**consider** 102:9 102:18,19 103:7
**considerations** 4:21,25
**considered** 37:20 38:8 39:8 155:17
**considering** 155:2
**constitute** 19:11,14 139:19
**consultation** 261:9
**cont'd** 7:18 275:3
**contact** 33:24
**contained** 221:25
**contains** 152:5
**context** 77:22 81:16 89:21 136:8,12 148:8
**continuation** 20:4,9,11,12,25 21:5,7,11 22:21
**continue** 61:6,8 63:11 111:16 141:19 142:3 230:14,15,18

230:19 231:15 231:18 250:19 250:25
**continued** 59:1 59:8,24 60:2 84:6 129:6 268:3
**continuing** 105:21 211:12 213:23
**contractual** 272:7
**contradicted** 174:16 224:25 246:6
**contradicting** 239:18
**contradiction** 224:22 239:11 245:23
**contradictory** 66:17 242:15
**contradicts** 44:24 224:18
**control** 53:23 71:22 120:13
**convenient** 241:25
**conversation** 164:21
**cooperative** 212:21
**copied** 9:14 11:16 147:11 148:6 149:10 151:9 160:10
**copies** 113:16 168:18
**coping** 79:15
**copy** 28:7 69:16 113:17
**corners** 170:15
**correct** 7:22,25 8:2,3,7 9:19 10:24 11:1,3 11:11,13,20 12:2,3,6,10,17 12:23 14:25 15:18 16:17,18 17:16,17,25 18:4 19:9 20:5 20:10 21:6,12 22:23 23:7,8 23:11,12,15,16 23:20,21 24:24 24:25 25:13,16 25:25 26:5,13 26:17,18,22 29:19,23 30:4 31:24 32:7 33:4,8,9 34:3,4 34:6,15,25 36:16,17 37:5 37:11,24 38:10 40:12 42:15 43:5,12,18,20 43:25 44:16,20 45:3 47:22 49:4 50:4,9,14 50:21 51:19 52:13,14,21 53:6 54:11,17 56:7,21 57:8 57:10,14 63:17 66:18 69:15,17 69:18 74:12 76:4,8,22 78:2 88:7 91:9 92:18 98:2,7 98:10 100:25 101:20,21 102:7,8 105:8 109:19 111:22 112:2,3,6,11 114:8,10,11 128:25 129:1 132:12,20 135:10,16 136:20 138:10 138:20,21 142:5 147:17 147:22 154:2 158:13 159:11 162:4 169:25 183:18 184:2 189:20 190:19 193:21 194:18 194:19 198:6 199:5 205:10 216:5,10 217:5 217:9,24 219:9 223:4 225:22 229:2 232:17 233:13 234:17 235:18 237:9 237:11 240:17 240:20 248:22 259:2
**correctly** 58:14 58:15 75:2
**correspond** 77:25
**corresponden...** 89:4 273:7 275:12
**costing** 6:15
**counsel** 4:21 274:10,12 275:21
**counseling** 73:18,19,20 76:10,11,17,18 76:20 77:23 81:14,18 83:9 90:23 91:3 114:18
**county** 274:1
**couple** 64:13 137:25 152:24 157:19 163:16 253:13 258:4
**course** 73:11 85:23 88:24 91:21 99:4 107:18 113:19 121:6 246:25

269:22
**courses** 99:23
**court** 112:10,14 114:2 259:6 260:17
**courtesy** 123:11 236:22
**cover** 27:9 90:14 97:9 232:25
**covered** 42:18 62:21 63:6 101:25
**covering** 224:1
**create** 92:25
**created** 116:13
**credibility** 125:7 228:7 242:10 260:25
**cried** 145:12,16 213:15
**criteria** 89:12
**cross** 7:15,18 28:18 48:23 100:22 101:4 109:6 110:7 113:14,15,19 150:23 174:3 174:11 181:23 182:13 197:22 213:14,16,22 264:12,14 266:9,11 275:3 275:5
**crossing** 150:22
**cry** 79:1 94:2 191:3
**crying** 184:6 189:19 190:1,7 190:13 191:8 191:25
**cssr** 275:14
**cssrs** 187:8
**cue** 34:22 87:2
**cueing** 33:7
**cues** 82:21,23
**curiosity** 96:9
**current** 43:3 69:5,7 75:14
**currently** 4:22 42:10 44:25 71:17
**curria** 202:10 237:4
**cut** 108:11,13 108:16,20 109:24 110:1 111:4,9,14 116:15 123:7 172:14 186:7 213:16
**cuts** 213:3,3
**cutting** 109:9 109:14 123:19 186:9
**cvr** 1:24 274:21

**d**

**d** 68:16
**dad** 3:25 184:10 190:4 238:25
**daddy** 214:25
**daily** 84:19
**damaging** 150:6
**darlene** 272:3
**data** 43:10,24 44:19 89:9,15 89:19 117:10 118:24 185:19 209:11
**date** 1:18 9:18 27:14 28:19 50:25 75:3,23 76:2 90:11 97:7 171:6 185:14 198:19 202:15 203:1,2 203:3 233:6 234:16 235:7,8 236:9,10 268:1 268:20 275:20
**dated** 170:18
**dates** 10:23 11:10 12:12,12 117:13 165:19 202:24 238:4 238:14 268:3 273:7
**day** 49:16 73:3 77:9 94:24 106:19,23 107:3 111:1 124:18 125:15 142:10 144:22 149:13 172:16 172:17 179:3 211:4 264:19 265:7 266:5,12 266:17,19 270:1 271:7,25 271:25 272:2,8 272:20 274:14
**days** 103:8 122:3,3,12 163:9 173:9 264:21,22,22 265:6,13,16,19 265:24 268:19 269:23
**deal** 169:12 193:11
**deals** 35:11
**dealt** 19:23 80:18
**december** 12:7 12:9,16,16,22 14:3 16:16,17 16:24 17:15 26:2,9
**decide** 108:1 215:22

**decided** 271:16
**decision** 7:2 120:17 261:10 262:4 265:24 270:25 271:2,5
**defending** 40:21 234:20
**defense** 123:6 123:13,22
**defiance** 71:24
**deficit** 71:25
**definitely** 7:1 83:4 134:6 165:6 175:23 209:20 242:12 242:16 264:9
**definition** 96:3 128:23
**deflect** 41:13
**deflected** 41:8 177:5
**degree** 35:4 70:3
**demonstrate** 88:19 132:13
**demonstrated** 75:19
**denied** 6:1 48:22
**department** 1:2 274:4
**depending** 115:6
**depiction** 25:18
**deposition** 274:9
**describe** 159:19,23
**described** 155:15,25 158:11 159:12 164:18 203:17
**describing** 96:1 160:16 191:1 214:11
**description** 99:2 160:22
**deserve** 194:11
**despite** 59:2,9 138:24
**detained** 77:4
**determination** 88:23 133:14
**determined** 43:3 88:3
**determining** 4:22
**developed** 79:14
**developing** 112:21
**development** 102:4 104:25 105:12,19 272:8
**diagnosed** 101:8 217:25 218:2 220:19 223:5
**diagnosis** 71:24 132:9,15,16 222:4,7,22,23 222:24,25 223:16
**dictionaries** 134:12
**dictionary** 128:22 129:16 129:22 130:6,8 130:9
**difference** 28:12
**differences** 95:3
**different** 44:7 72:1 73:6 80:14 82:3,5 92:9 95:18 115:6,18,19 116:14 147:3 172:15 186:22 198:8 239:21
**difficult** 232:13
**difficulty** 81:4 81:5 82:11,12 88:20 117:3 118:22 119:15
**direct** 13:8 34:13 38:16 41:12 43:22 69:1 109:1 135:17,18 137:1,2 181:23 181:24 182:2 209:24 212:25 219:12,13 224:15 226:11 227:18 231:11 232:14 233:25 234:5 237:14 244:2 255:25 259:13 261:7 266:10 275:4
**directed** 87:5 132:4 179:24 233:5
**directing** 41:21 218:23
**direction** 93:4 235:18 274:8
**directly** 34:18 66:4 137:6,11 189:15 212:23 238:23 253:11
**disabilities** 129:15
**disagree** 213:24 224:2
**discovery** 144:6,9
**discuss** 9:4 50:12 51:3,18 52:10,20 56:16 56:20 57:2,13 57:21 58:4

59:3,10 60:22 61:15 62:17,20 63:21 64:5 65:5,7,10 66:5 66:7,9,11 87:3 216:15,24 217:16
**discussed** 34:10 34:13 97:12 188:16
**discussing** 88:17 96:4 202:14
**dismissal** 216:6
**disorder** 71:25 71:25 101:9
**dispute** 113:21 113:23 213:21 231:21
**disrupted** 127:18
**disrupting** 80:13
**disruptive** 80:4 80:23 83:2
**distress** 243:18 243:24 244:6,7
**district** 4:6 5:6 5:12 6:15 15:4 17:19,23 23:14 29:4 32:14 39:25 40:22 47:9 55:8 67:17 96:2,6 98:11,16 104:12,13,16 104:20,23 107:5,7,13,15 107:21 108:1,4 110:15 125:11 143:16,20,23 164:23 185:4 185:11,16,24 186:2 188:11 189:7 208:8 215:12 226:19 234:20 250:13 255:19 262:23 263:12,19,24 264:11 266:23 267:23 268:23 269:15 271:7 271:21 272:1,5
**district's** 4:21 22:2 27:23 44:24 110:18 110:24 121:17 124:9 174:2 263:21
**dixon** 1:24 274:3,21
**doc** 1:8
**docket** 274:5
**document** 45:21 48:6 74:21 90:8 91:22 97:4 170:16,18 183:6 191:24 208:12
**documentation** 30:18 31:7 43:18 47:7 162:11,14,15 162:23 163:10 165:9 167:11 252:15,18 254:8
**documented** 31:5
**documents** 30:20,23 31:1 47:24 118:8,11 118:12 121:12 121:20 185:8
**doherty's** 34:22
**doing** 35:16 71:3 79:9 93:16,25 94:3 94:6 112:4 115:23 119:25 191:11,12 209:21 268:19
**donna** 264:1,10 272:4
**double** 146:5
**dougherty** 29:17 31:21 32:5 33:3,6 35:5 67:20 68:12,22,23 69:1,10 84:17 86:15 100:8,13 100:15,25 101:4,7 104:4 106:18 121:11 121:13,14 127:3,5 129:19 130:20 133:2 136:5,8,12 141:14 148:15 149:22 152:9 153:12,14 155:14,24 156:14,18 158:5 161:15 161:17 164:19 166:9 167:4 169:23 172:24 172:25 173:4,5 173:24,25 174:6 175:4 176:11 183:9 183:22 189:17 190:16,23 191:1,5,20 192:22 194:9 195:8 196:17 198:22 203:5 203:15,18 209:4 215:2 218:18 219:25 222:3 226:14 227:24 231:1 239:7 240:12 243:24 248:19

249:14 251:1 255:15 257:22 259:3,7 275:4 275:18
**dougherty's** 174:4 197:20
**draw** 210:10,13 228:7 268:13
**due** 113:9 133:16 140:1 179:21 189:23
**duly** 68:17
**duplicate** 28:25
**duplicative** 27:17 28:8 29:5
**duration** 138:2

**e**

**e** 2:1,1 9:14,17 9:20,24 10:9 10:17,25 11:3 11:7,9,15 12:19 16:13,24 17:12,13,14 18:2 24:2,2,7 24:10,12,15,21 24:23 25:1,5,6 25:12 31:21 33:3,5,13,20 34:1 36:16 37:3,4 41:22 42:1,3,9,13 43:8 44:15 46:6 49:2 50:7 50:18 51:2 52:11 53:25 54:9,14,18 55:20 56:4 57:9,11,15 58:6 59:6,22 61:10 62:19,22 63:12,14,24 65:3,9 66:17 67:6,8,10 68:16 83:19,23 83:25 84:8,13 117:21,25 118:13 125:5 147:15,19,20 147:23,23,25 148:7,7,11,13 148:14,16,18 148:20,21,22 148:25 149:3 149:12,21 151:9,21 152:1 152:4,5,9,25 153:5 159:15 159:20 160:10 163:1 164:17 165:9 168:2,18 168:23 169:24 170:3,5,6,6,12 170:20,24 171:3,11,12,20 171:22 172:3,5 172:7,10,13,15 172:16,19,21 172:22 173:2,5 173:20,23 174:7,8,17,23 174:24 175:1,2 175:9,11,16,21 175:22,25 176:6,9,16,18 176:20,24 177:1,14,19 178:5,11,12,20 178:22,23,24 179:5,23 180:5 180:8,12 181:9 181:10 195:4 195:16,23,24 196:6,14 197:1 197:24 199:24 202:15 215:19 215:25 235:13 249:17 251:19 254:9 255:7,13 255:16 268:19 268:20,25 270:13 271:16 273:7 275:8,9 275:9,10,11,12 275:13
**earlier** 44:24 56:18 90:22 199:18 200:1 216:8
**earned** 102:4
**easier** 174:24
**echo** 130:8
**echoing** 217:21 220:16 221:9 224:17
[redacted] 34:5 34:10,14,24,24 125:25 127:7 127:16 128:1,5 128:19 129:19 129:20 130:22 131:7,14,18,21 131:23 132:2,6 132:9,14,16,17 132:24 133:2 134:10 217:19 217:23,25 218:4 220:14 220:19 221:1 221:12 222:23 222:25 223:1,2 223:15 224:13
**ed** 3:9 88:20 134:1
**editorializing** 220:8
**education** 1:2,3 1:11 2:2,17,18 3:10,16 35:8 69:6,8 72:13 73:13 74:22 89:2 90:9 93:21,22 94:18 94:22 95:5

97:5 101:24,25 102:16 105:21 129:24 164:24 165:12 274:4,5 274:5
**educational** 4:25 69:22 72:18 101:22 103:11 112:22 194:8 262:9
**effect** 13:13
**effective** 76:18 86:2 88:4 92:11
**effectively** 215:21
**effectiveness** 258:14
**efficient** 48:10 48:23
**either** 13:11 31:5 59:20 119:8 194:15 217:15
**elaborate** 47:12 47:16 82:13 94:6
**election** 271:25 272:2
**elementary** 3:21 37:21,22 39:10
**elevate** 3:20
**emotional** 81:22 84:6 243:18 244:6,7 244:16 245:3
**emotionally** 145:12,16
**emotions** 117:3 118:23 119:16
**employed** 274:11,12
**employee** 274:12
**employer** 69:5
**encounter** 73:3 81:12
**ended** 189:22
**ends** 121:5
**engage** 79:10
**engine** 126:5
**engrossed** 82:15
**enlisted** 70:14
**ensure** 65:8,11
**entered** 190:19 226:15 275:20
**entertain** 58:4 63:15
**entire** 111:4,9 140:1 151:9 185:22 188:24 195:15 200:19
**entirely** 164:8
**entirety** 185:25
**entitled** 126:22
**entries** 124:13 188:17 208:19 235:16 236:12
**entry** 183:10
**environment** 88:12 94:17,23 99:24
**environments** 80:14
**escalation** 43:12,25 44:20
**especially** 195:4
**esq** 1:16 2:6 274:6
**essence** 13:14
**essentially** 239:22
**establish** 162:24 168:12 168:21 173:4 174:19 175:10 176:19 178:10 180:18,20 182:4 196:23 197:15 224:24 226:2 235:21 248:7
**established** 55:24 56:23 129:3 131:5 151:8 152:8 167:17 168:4 169:10 181:8 195:3,5,15 198:11,16 205:7 206:15 208:1 224:12 231:21 233:14 237:4,7 238:1 238:3
**establishing** 175:14 179:6 190:10 197:23 199:24
**esteem** 95:15 95:24 150:7
**estimate** 74:3
**evaluation** 211:8 261:9 262:10
**evaluations** 43:9,23 44:16 258:13 260:22 262:13
**evasive** 211:7 212:22
**event** 42:16 161:19
**events** 33:14 138:6 275:11
**eventually** 77:14
**everybody** 68:9 100:21 170:6,7 172:8 182:12 182:12 196:3,4

**evidence** 8:23 9:3 13:17,19 14:5,7,16,22 15:5 16:6,22 16:23 23:23,24 24:1 25:19 26:25 27:16,18 27:21 28:4,6 28:16,20,22 32:1,12 33:12 36:6 41:23,24 46:8 51:6,9 55:6,6 63:18 69:11 74:20 83:18 90:7 97:3 119:24 120:16,18 121:9 125:10 125:14 143:21 143:24 144:3,5 144:21 146:2,3 146:7 150:14 152:4 157:20 157:22 164:11 166:22 168:17 173:12,15 174:9,17 175:9 182:22 186:25 188:8 194:23 214:19 215:5,6 231:17,20 236:12 249:7 255:17 257:24 275:20
**exact** 28:6,19 74:4 203:18 218:23
**exactly** 29:2 37:14 84:14 127:17 164:2 185:4,4 191:11 193:23 248:10 267:5
**exam** 48:23
**examination** 7:15,18 28:18 69:1 100:22 101:4 109:1,6 110:7 113:14 113:15,19 174:3,11 213:22 264:12 264:14 266:9 266:11 275:3,4 275:5
**examined** 7:11 68:18
**examining** 150:22,23 197:22 213:14 213:16
**example** 265:17
**examples** 77:15 92:2
**exceeded** 261:2
**excitement** 82:19 135:10 135:11,16 136:1,6,10,14 136:18 137:13 137:21
**excluded** 42:25
**excuse** 21:21 122:23,23
**executive** 92:21
**exh** 275:8,9,9 275:10,10,11 275:11,12,12 275:13,13,14 275:17,17,18 275:18
**exhibit** 8:20 9:11 13:15,16 13:19,21,24 14:5 15:11,23 16:20 17:1 23:22 24:18 27:19 28:12,13 28:22,25 29:2 29:9 31:25 32:20 33:11 36:5,18,20 38:1 41:23 46:12,16,16,20 46:24 51:5,22 54:21 55:15 69:12 74:20 83:18 90:8 145:25 146:24 150:14 155:5,7 155:8 158:6 166:21 185:3 185:22 187:6 187:10,21 188:7,21 189:11 194:22 194:22,25 197:14 199:7 200:10 208:8 208:19 215:10 230:24 248:25 249:3 275:20
**exhibits** 4:3 9:6 47:4 113:6,15 113:16,18 120:3 168:15 168:24 169:8 169:10 170:22 171:1,9,14,23 172:2 173:8,23 178:21 184:19 186:6,20 270:13 275:7 275:16,21
**expect** 123:7,11 250:4 265:18 266:3,18,22
**expectation** 93:1
**experience** 5:21 70:8 86:3 95:6 97:22 102:17 103:7 114:13 114:20 126:3 128:24 129:13

130:20 131:6 134:11 194:7 229:12 261:8 266:9
**expert** 102:9,12 102:18,19 103:7,19,21,22 128:12 129:4 129:11
**expires** 274:22
**explain** 32:24 58:25 59:8,24 60:1 69:19 80:4 86:22 105:10 128:19 148:8,8 152:12 177:6,25 190:24 194:6 201:3 270:22
**explained** 34:24 55:20 120:7
**explaining** 34:2 199:8 201:16 270:17
**explicit** 80:1
**explicitly** 53:13 55:19 56:2 57:6
**expressed** 150:4
**expressly** 58:2 58:8
**expulsion** 87:10
**extensive** 102:6
**extra** 48:8,15 48:20 53:7 250:7
**extremely** 179:19

**f**

**face** 245:8
**facility** 36:23
**fact** 5:19 8:10 8:16 103:20 129:5 153:18 166:18 174:9 176:19 177:20 178:25 211:8 212:12,19 256:17,18 257:8
**factor** 109:7
**facts** 6:8 238:13
**fair** 40:24 41:7 41:8,13 64:17 106:13 109:5,8 123:17 127:9 133:19 137:17 179:12 197:22 250:13 253:23 253:24 254:14 256:25 263:1,7 263:10 265:5 269:16 270:11 270:19
**fairness** 265:2 265:18
**faith** 266:23
**fall** 18:16 54:8
**fallacy** 222:18 223:25
**familiar** 73:14 73:16 155:14 155:24 156:11 158:10 161:2 184:1 192:21 193:9 197:16 198:2 248:20 249:15 258:25 259:1
**familiarize** 72:17
**fape** 238:9
**far** 4:18 6:11 103:16 105:2 139:14 153:5 184:1 209:7 215:17 243:3 250:6 271:19
**fast** 26:6 48:2 84:16
**father** 272:22
**fault** 201:16
**favor** 6:15
**favorable** 198:17
**fba** 43:10,17,23 44:18
**feb** 193:4
**february** 43:2,7 43:21 44:14 47:9 75:4 76:12,19 78:10 80:5 91:4,5 143:3 192:18 192:23 193:2,2 193:5,6 207:8
**feel** 22:7 38:24 40:21 41:6 49:5 78:20 87:13 94:21 97:20 98:11,15 99:25 110:17 130:11,21 137:2 207:22 211:19,21 234:19 236:16 250:18 253:21 253:25
**feeling** 87:24
**feelings** 116:12 135:11,12
**feep** 5:2
**feet** 159:6,24 160:17 162:1
**felt** 80:8 99:21 112:16 115:17 115:17
**ferpa** 120:11 121:18 122:2,4

122:8,24 124:3 124:6,8,10,18 124:23 143:13 144:10
**ferpa'd** 121:12
**fifth** 71:20 94:1 94:10,19 114:9 114:21 115:3 142:18,19,21 145:17 162:16 163:2 166:7,8 166:15 203:7 203:17,19 204:5,12,16,19 205:24,25 206:9,15,17,25 208:2 226:6,10 227:3,4 228:11 229:6,21 230:2 231:23 232:18 233:14,15 246:9,13,18 247:5,9,18,20 248:13
**fifty** 187:8,14
**figure** 186:5 272:25
**file** 4:23 5:14 25:19 72:18
**filed** 5:24 215:11
**filibuster** 111:17
**filibustering** 22:9 111:22
**filled** 183:15
**final** 41:10 80:21 144:14 262:7 263:21
**finances** 6:9,11
**financial** 4:20 4:24
**financially** 274:13
**find** 54:2 73:9 93:9 103:2,10 103:15,23 123:25 182:20 243:8 255:9 264:19 265:8
**finder** 211:8 212:12,19
**finding** 41:13
**fine** 4:11 45:18 107:13 130:18 171:1,3 173:9 181:4 264:21 265:7 266:6
**finish** 38:22 48:22,23 63:1 63:10 123:10 123:13,14,16 123:20 206:4
**finished** 36:12 123:5,23
**firm** 54:6
**first** 13:9,18 50:22 68:17 78:5,12 81:2 86:21 90:15 92:24 93:5,15 147:11,14 154:12,12,19 154:19 155:2 156:2 158:24 163:18 176:24 178:5 184:18 186:5 188:15 199:1 204:4 207:14 215:9,9 228:6 239:21 255:4 267:24 269:19
**fit** 165:5
**five** 55:1 61:2 66:21 91:13 122:2,3,12 125:15 144:22 147:4 181:19 249:21 250:15 264:22 265:16 265:21
**focus** 209:14
**focusing** 77:11
**follow** 120:12 148:9 152:12 152:18 192:8 257:2 258:7 273:6
**followed** 152:15
**follows** 7:12 68:19
**followup** 261:25
**force** 239:4
**forcing** 32:12 84:18 253:18 253:21 275:11
**fordham** 70:1
**forget** 214:25 259:25
**form** 168:10,11 198:7 274:8
**formal** 4:23 26:15 30:22 43:10,24 44:19 45:9 105:4
**forum** 7:5
**forward** 34:17 76:7 91:7 95:8 106:8 120:5 124:19 213:22 224:20,23
**forwarding** 84:16
**found** 214:17
**foundation** 9:10 17:2 20:17 55:25 56:24 156:2 160:9 174:8 175:11,14

179:6 182:25 183:2 190:10 196:22
**four** 76:19 91:3 109:15 170:15 181:15 182:3 186:11 208:19 217:6 227:2 254:25 255:1 261:23,23 264:22
**fourth** 5:20 36:11 114:9,21 115:3 117:2 142:16,17,21 142:24,25 143:9 145:13 145:17,23 148:4 162:9,20 162:23,25 163:4,6 166:7 166:8,15 203:6 203:15,20 204:5,17 205:10 207:1,3 207:7 208:4,5 208:19,22 225:3,6,22 226:5,9 227:3 227:6,10,13,23 228:11,21 229:1,6,10,21 230:2 231:10 231:22
**frame** 156:9
**frankly** 238:3 260:5
**free** 129:24 164:24 165:11
**freedom** 119:21 122:8,14 123:15
**freezings** 55:1
**friendly** 140:23 141:6
**front** 12:25 36:19,24 47:24 51:22,23 57:16 57:17 90:6 117:12 128:22 201:11 204:9 207:12 208:6 209:11 210:22 211:2,3 225:5 225:9 228:22 228:24 252:9 252:15
**froze** 53:17
**frozen** 53:11 54:22
**frustrated** 79:1 190:13,17
**frustration** 89:3 135:11
**full** 24:2 264:19 266:5,17
**fully** 124:11
**functioning** 72:2 75:15,21 92:21
**functions** 96:19
**funny** 80:2,3,8 83:1
**further** 42:3 94:6 100:3 121:20 149:9 164:21 261:9 262:13 274:7,9 274:10,12
**future** 116:15 179:20

**g**

**g** 1:24 68:16 274:3,21
**game** 82:15,19 82:22 140:12 140:14,22,23 141:2,3,5,6,17 141:18,19,20 142:8 263:1,7 263:10 270:12
**games** 82:16
**gathered** 223:20
**geez** 232:23
**general** 93:21 93:22 94:18,22 95:5 165:21 166:6 208:18 259:1
**generated** 26:3 26:10
**getting** 22:23 41:7 78:18 87:14 88:4 134:14,14 137:2 141:16 141:24 195:2 205:4 220:21 220:22 229:9 232:15 237:14
**give** 30:6 53:5 55:1 57:18 82:20 83:11 93:8 101:16 103:18,25 120:23 128:23 146:13 147:2 149:25 203:2 236:21 242:14 268:5,7,10,21 268:24 269:17 271:17 272:14
**given** 61:25 66:21 92:2,23 105:12 123:11 137:21 185:3,4 185:10,24 186:2,2 187:9 188:10 189:4 189:14 207:6 207:10 213:9 217:19 220:13 220:13,25

222:8 231:24 274:10
**gives** 55:2
**giving** 77:14 87:2 103:21 109:5 123:15 236:9
**go** 9:11 10:16 12:11 17:10 38:22 42:22,25 49:19 51:13 52:6 65:18 67:14 68:10 75:14 77:7,8 92:15 97:23 104:23 110:10 110:16,19 112:10 115:21 119:25 136:11 140:2,3 146:9 152:3 158:3,17 172:19,20 173:1,22 175:7 175:20,20,21 175:25 176:8 176:15,15 177:1 178:22 179:4 186:11 196:5 197:1 206:12 209:3 236:16 250:3 254:20 261:16 263:17 266:10 269:21
**goal** 30:17 77:24 78:5,6,9 78:13 79:18,25 80:5 91:10,12 91:12,17 92:4 92:7,8,15,19,23
**goals** 26:16 75:16,17 77:18 77:20,21,25 79:25 83:1 89:11,16 91:10 119:11
**god** 8:6
**goes** 22:6 181:19 203:7 248:7
**going** 8:12,13 10:4 14:6,20 15:3 21:13 27:3 28:25 31:16 34:17 35:17 38:16 39:23 41:9,10 41:25 46:23,24 48:6 49:18 53:3 54:21 59:14 65:20 66:24 67:21 69:10 78:3 83:11,12,17 84:14 86:23 90:25 91:6 92:19 93:6,6 97:2 101:19 104:1 106:2,8 112:10 113:22 115:25 116:3 120:1 121:7 122:11,13 123:18 124:23 129:6 131:2,3 132:3 133:8,11 133:17 136:2 139:3,7,24 140:2,4 142:15 143:11,21 144:14,17 145:2,19 147:15 150:13 152:10 155:4,5 155:7 157:2,14 158:7 159:21 161:9 162:22 164:7 167:2 169:2 171:8,13 172:14,15,18 173:10,11,12 174:20 178:19 178:20 182:18 183:20 185:7 186:11 187:3 191:9 194:12 194:21 195:22 196:1 197:2 198:24 199:6 199:14 203:10 206:8 209:18 211:11 213:10 215:24 216:6 219:12 220:20 220:22 223:8 223:22 226:20 227:25 228:1 230:10 232:11 233:9 243:6 247:22 249:3 249:23 251:8 255:16 263:20 264:6,19,20 265:8,12,19,20 265:20,22 266:4 267:4,6 268:2,17 269:12,22,23 269:24 270:17 271:19,21
**good** 3:6,14 6:16 16:8 68:1 68:22,23 82:21 100:6 112:19 169:12 258:19 266:22
**grabbed** 204:23,24
**grabbing** 159:7 159:25 160:18 162:2
**grade** 36:11 71:20 94:1,10 94:19 95:2,13 95:21 114:9,10 114:21 115:3

117:2 139:4 142:16,17,18 142:19,21,21 142:24,25 143:10 145:13 145:17,23 148:4 162:9,16 162:20,23 163:2,5,6 166:8,8,15,15 203:7,7,15,18 203:19,20 204:5,6,12,16 204:17 205:10 205:23,24,25 206:10,15,17 206:25 207:1,4 207:7 208:2,4 208:5,19,22 225:3,6,22 226:5,6,10 227:3,3,4,6,10 227:13,23 228:11,11,13 228:21 229:1,6 229:10,17,21 229:21 230:2,3 231:11,22,23 232:18 233:14 233:15 246:9 246:13,18 247:5,9,18,20 248:13

**graduate** 102:1
**grant** 265:11
**granted** 48:9
**grasp** 86:3
**grasping** 253:7
**great** 16:9 33:17 55:12 114:12 155:13
**greenwich** 268:22
**grid** 76:15 90:25
**ground** 224:1 232:25 261:19
**grounds** 42:14
**group** 73:18,19 76:10,11,17,18 76:20 77:3,23 80:16 81:13,17 83:8 90:23 91:3,15 93:20 115:4,11 116:2 116:8,10
**guard** 70:13,17
**guess** 115:10 147:11,14 195:15 196:15 224:20 248:14 267:6 271:1,4
**guide** 110:16
**guided** 110:21
**guiding** 113:15
**gym** 80:15 82:3

**h**

**h** 68:16
**habit** 80:6
**half** 158:25 174:12 177:25 180:25
**hand** 8:2 68:15 115:21 159:8 160:1,19 162:3 253:19,22 274:14
**handful** 250:10
**hands** 31:23 32:7 214:6,22 214:25 219:1,6 219:8
**happen** 77:6 78:24 138:1 139:3,4 149:18 153:18 203:2 205:20
**happened** 4:19 25:13,15 33:21 49:22,25 86:23 103:21 128:10 138:5 162:16 191:6 228:11 243:4
**happening** 78:22 79:4 80:12 85:20 87:23 92:14 202:11 271:8

**happens** 207:22
**happy** 4:9 245:5,6,10
**harborside** 96:7,10,18 97:16,23 99:15 99:17,18
**hard** 113:17
**harm** 28:24 29:6 45:22 46:4 47:7 167:7,14,22 168:6,13
**harmful** 150:6 256:14 261:16
**hartford** 105:20 274:1
**haven** 70:24
**he'll** 128:3 136:17 267:7
**head** 12:13 114:1
**health** 244:17 245:4
**hear** 4:4 36:25 53:16 86:15 99:2 101:12 123:3 215:1
**heard** 5:6 22:24 32:25 101:13 131:16,25 132:8 164:16 182:25

**hearing** 1:3,16 3:3,6,6,8,13,23 4:2,10,11,12,15 5:4,5,8 6:4,6,10 6:18,23 7:4,14 7:22 8:15,24 9:5,9 13:7,9,23 14:1,4,8,11,15 14:21 15:1,4,7 15:14,16,19,25 16:7 17:1,5 18:10,13,20,24 19:24 20:1,24 21:7,13,17,20 21:21,23,25,25 22:1,4,6,9,12 23:2 24:5,8,11 24:15 27:7 28:11,24 29:12 30:12 32:17 33:15 35:6,8 35:17 37:1,13 38:3,19,21 39:15 40:6,17 40:22 41:1,3 41:10,17 42:14 42:22 44:4,6 44:10 45:7,17 46:16,21,23 47:2,15 48:9 48:16,22 49:11 49:14 51:10,15 52:1 53:4,6,8 53:11,17 54:24 55:7,11,13 56:25 58:12,20 58:23 59:15,19 60:11,15,25 61:2,4,7,24 62:10 63:3,10 64:11,13,15,23 65:16 66:20,24 67:4,5,13,17,23 68:2,4,9,14,18 68:21 100:5,10 100:20 101:1 101:10 102:20 103:1,18 106:6 106:12,13,16 107:11,17,19 107:20,23,23 108:6,10,12,15 108:19,20,22 108:25 109:1,4 109:11,15,23 109:25 110:2,6 110:19,23,24 111:11,16,20 112:3,6,7,10,13 112:15,19 113:12,21,23 114:6 118:9,15 119:19 120:9 120:11,15,16 120:17 121:5,9 121:16,21,23 122:3,9 123:3 123:21,24 124:5,7,7,20 125:1,12,14,17 126:9,13,15,18 126:20,22 127:2 128:16 130:3,13,17,25 131:9,11 133:13,16,18 133:20 134:2,7 134:17,20,24 135:2 136:3,7 136:11,21 137:4,9,14 139:16 140:1 141:13 143:6 144:3,4,8,13,20 145:6 146:5,8 146:19 149:2,5 150:15,18 151:6,13,19,23 152:4,23 153:9 153:13,21,24 154:11,15,19 155:1,11,21 156:13 157:23 158:1,3 160:6 160:20,24 161:2,12,16 164:12,14 165:2,17 166:1 166:10 168:14 168:17,21 169:3,6 170:13 170:15 171:1,3 171:17 173:14 173:17 176:16 176:22 177:8 177:13,17,23 178:4,17 179:11,13,22 180:2,5,10,12 180:18 181:1,5 181:14,21 182:1,6,11 183:5 184:16 184:21 185:6,9 185:12,17,19 186:4,16,21 187:1,12,24 188:1,6,13 189:1,3,5,8 190:14,18,24 191:4,18,21 192:4 194:24 196:10,13 197:3,13 199:9 199:10,13,25 200:6 201:1,18 202:19,22 204:1,4,12,16 205:1,3,6,9,12 206:6,9 207:14 207:18 208:9 208:17,23,25 209:16,22 210:7,10,13,18 211:5,12,22 212:14,17

213:5,8 214:1 214:16 215:9 216:18 218:13 218:15,19 219:19,23 220:1,8 221:23 222:5,8,11,14 222:16,18 223:6,10,12,15 223:19 224:4,7 224:9 225:16 225:18,23 226:12 228:6 228:10,16 229:7,14,18 230:5,9,13,14 230:15,16,18 230:21,23 231:13,14,17 231:18,20 232:3,5,10,12 232:24 233:5 233:21 234:1,3 234:7,10,13,15 234:18,21,23 235:6,9,15,20 236:2,6,11,14 236:19 237:15 237:23 238:1,3 238:14 239:10 239:20 240:1 241:11,24 242:5,8,13 243:22 244:25 245:24 246:3 246:22 247:1,7 247:15,22 248:2 249:10 249:12,21,24 250:20,21,24 251:10 252:4 253:2,4,13,17 253:20 254:16 254:19,23 255:1,12,22,24 256:3 257:4,10 257:20 258:3,6 258:10,22,25 259:5,8,10,14 259:18,25,25 260:5,5,9,9,12 260:12,19 261:5,18,22 262:3,16,22 263:6,8,11,15 263:16,18 264:15 265:23 266:2,8,15 267:2,10,15 268:1,12,18 269:2 270:6 271:1,6,14,23 271:25 272:18 272:21 273:2 273:10 274:5,6 275:20

**hearings** 127:3 144:9

**held** 1:15 103:22 119:10 179:8 274:6

**help** 8:6 61:5 71:20 78:19,20 79:7,10,14 85:13 248:9

**helping** 72:3 252:22

**helps** 76:14

**herbert** 2:6

**herbie** 3:14

**hereto** 274:12

**high** 72:8

**hinder** 245:3

**hinders** 244:15

**history** 69:22

**hit** 137:22 140:11,15 141:21 172:9 175:19

**hits** 135:8,14 136:16,17

**hitting** 82:18 82:24 140:18 140:22 174:12

**hold** 52:5 54:13 56:15 60:8,22 62:4,5,8,15 64:2 65:3 66:8 66:15 157:1,7

**holding** 265:6

**home** 29:18 30:3,18 31:3,8 32:12 35:22 36:2 85:6 86:8 87:11,14,18,19 88:1 209:7 214:11 216:4 216:11 217:5,7 225:3 227:9,13 228:21 235:17 237:6 238:18 238:19,21,24 239:2,8 240:5 240:11 241:1 242:19,20 243:17 244:15 245:6,16,17 275:11

**honestly** 227:17

**honor** 227:15 253:12

**hopes** 85:20

**horrific** 184:7 190:2 192:1

**hour** 7:7 48:17 174:12 177:25 180:25 232:11

**hours** 38:14 107:3 213:15 268:12

**hrosen** 2:7

**huh** 6:4 70:9 79:16 91:23 92:1,10 93:12 158:1 194:24

212:14 259:3
**hurry** 250:15
**hurtful** 150:6
**hypothetical** 91:24 215:14

**i**

**idea** 112:19 165:15 262:20 265:21
**ideas** 116:12
**ideation** 193:22
**identification** 15:12 24:19 29:10 32:21 55:16 189:12
**identified** 75:11 80:18 91:10
**identify** 3:13 3:24 183:6,9 183:11
**identifying** 80:22 95:2
**iee** 262:5,14,15 262:19,22 263:2,11,12
**iees** 262:21
**iep** 23:11 26:17 26:21 27:14,18 28:2,7,9,10,15 30:17 31:6,9 72:14,18,24 73:7,23,24 75:19 76:2,6 76:13,15 77:10 77:18,19,25 78:5 80:5 85:9 89:7,12,16 90:24,24 91:8 91:17,18 93:2 112:23 164:16 164:25 165:8 165:10 275:13 275:17,17,18
**ieps** 113:2,4,5,6 113:7
**image** 95:23
**impact** 72:2
**impacted** 85:19
**impartial** 40:25
**impartiality** 211:20 250:18
**implement** 31:16 164:25
**implementing** 112:22
**importance** 197:6,8,9
**important** 80:24 81:2 121:4 125:6 137:19 139:11 139:25 143:15 179:16,17,18 179:19 180:13 235:24 257:23
**imposing** 5:9
**impossibility** 272:16
**impression** 250:16
**improving** 79:20
**inappropriate** 6:9 7:1 120:7 209:25
**inaudible** 7:23 53:14
**incidences** 142:21 163:19 163:23
**incident** 84:8 138:1 160:3,6 161:3 192:19 192:22 193:9 193:10,11,15 200:13,16 204:23 210:22 219:6 229:22 231:10 238:10
**incidents** 139:1 145:11 165:19 167:8 185:20 200:14 202:4 212:16 243:2
**include** 72:11 89:19 98:5 264:9,10 266:8
**included** 26:5 26:12 80:25 91:18 93:4 124:12 208:11
**including** 125:22 127:13 127:20,22 130:1
**inclusion** 41:25
**incomplete** 211:7
**incorrect** 190:22
**incriminate** 143:22
**independent** 13:10 262:9 263:2
**index** 15:12 24:19 29:10 32:21 55:16 189:12 275:1
**indicated** 27:2
**indicates** 19:7
**individual** 112:22 115:10 148:18 170:23 175:20 176:9 196:5
**individualize** 116:18
**individualized** 72:13 74:22 90:9 97:5
**individually** 171:10,24

172:3 174:21
**infer** 6:21 242:9
**inference** 38:24 56:10
**inform** 76:6
**information** 12:14,18,25 13:2 33:13 81:23 119:22 122:9,15 143:1 143:3,7 168:25 208:10,11 223:19
**informed** 17:19 49:15 149:12
**initial** 63:13
**initially** 50:15
**initiated** 239:23
**input** 26:22 137:8
**instance** 211:19
**instruct** 214:5
**instructed** 31:22 32:6 210:15
**instructing** 80:7 95:7 97:22
**instruction** 80:1,16 81:18 83:1 91:21 93:8,20 94:22 95:9 105:1 116:18 125:22 127:13,22 218:22
**intend** 57:12,21 62:16 65:5 66:5
**intensions** 84:15
**intent** 6:21
**interactions** 148:4
**interested** 274:13
**internet** 53:21 53:22
**interpret** 40:25 156:8
**interpretation** 34:19 154:10
**interrupt** 63:3 123:1 126:12 210:1
**interrupted** 31:22 32:5,8 108:24 236:19
**interrupting** 8:12 151:3 199:12 213:17 213:18 220:11 228:5 230:20
**interruption** 216:17
**interruptions** 110:11
**interrupts** 220:3
**intervene** 260:13
**intervention** 73:8 79:13 85:9 89:10 93:17 104:24 106:21 112:23 117:12 164:17 209:9
**interventions** 72:24 104:10 104:18 105:2,7
**introduce** 6:9 15:15,23 182:15,19
**introduced** 26:24 182:16
**introduction** 4:20,24
**invitation** 63:13
**invited** 50:15
**inviting** 51:2 57:1
**involve** 197:5
**involved** 76:23 91:7 112:21 138:4 160:3,8 160:14 164:20 270:9
**irrelevant** 4:20 5:1 144:2
**isolates** 150:7
**issue** 6:18 31:8 42:2 87:3 122:13 124:7 125:16 180:22
**issues** 53:22 133:21 139:2

**j**

**january** 26:4 26:11 41:21 42:1 71:1,14 90:11,16 252:11 253:7 254:3,11
**jen** 263:25
**jennifer** 267:20 268:4
**jfk** 3:21 37:21 37:21 39:10,17 39:22 40:2,4 40:12 43:4 44:22 65:7,11 65:20 66:10 74:5 88:11 226:15 275:12
**job** 36:10
**join** 67:21
**joined** 3:15 70:12
**joining** 36:11

**jones** 270:5
**judge** 112:11
**judicata** 5:22
**july** 53:13
**jump** 123:6 204:10
**jumping** 123:13,22
**june** 50:1,11 51:17 52:9 147:16 168:3 170:18,19 176:18 177:23 179:14 195:21 198:25
**jurisdiction** 5:16 7:6 121:25 124:8

**k**

**karen** 2:13 4:1 4:1
**keep** 3:20 47:4 109:14 148:23 196:1 237:16 269:5
**keeps** 239:15
**kennedy** 1:16 3:8 4:15 5:5 7:22 21:21 40:22 106:12 113:12 160:20 199:10 208:9 209:22 214:16 223:6 230:5 231:14 233:21 274:6
**kept** 117:9
**key** 94:12
**kicking** 56:10 61:18
**kill** 167:6,15,23 168:7 193:20 194:1,13,15
**kind** 13:18 52:4 96:3 130:11 153:11 163:8 166:3,11 185:13 194:17 213:11 215:14 246:22
**kindergarten** 71:20
**kinds** 72:1
**knew** 140:25
**know** 4:17,18 5:5,15 6:10,11 6:14,15 10:1 13:7 21:15 28:21 29:3 32:13 35:13,15 36:24 37:15 41:9 42:7 47:9 48:2,13 49:20 49:25 50:1,3 52:4 53:19,21 58:21 61:5 64:18,20,21,21 65:16 67:6,7 71:10 74:24 79:7 83:2 84:24 85:6 86:4,17,22,23 89:19 91:24 98:13 102:10 102:12 103:8 103:15,15 105:17 106:10 107:18 108:5 110:22 111:3 113:8,8 115:13 120:2,9 121:3 121:24 123:8 123:16,22 124:7,15 125:3 125:7 126:21 126:24,25 128:2,2 129:23 129:23,25,25 130:2 133:15 134:4,6,10,18 134:24 135:24 136:2 137:7 139:14 140:6 141:8 142:14 142:24 143:22 143:23 144:13 144:14,16,17 144:20,24 148:23 149:7,8 149:21 150:23 150:24,25 151:18,20,25 152:5,17 153:8 153:16,16,19 154:2,3,10 155:17 156:8,9 156:10,22 157:19,22 159:4,13 161:17 162:10 163:7 165:5,14 166:1,14 168:1 168:3,18,23 169:2,8,9,14,17 171:21 172:1 172:10,12,23 173:10,13,21 173:24 174:18 174:20,20 175:5 176:3,4 176:10,21 177:9,14,24 178:7,14,15,17 179:3,16 180:9 181:8,9,9,10,11 181:22 182:18 184:12 185:21 186:10,14 187:1 188:2,12 188:25 190:11 191:19,20 192:14 194:18 196:4,9,11,22 196:24 197:23 199:22 200:7

200:13 201:10 201:21 202:7,9 202:19 205:5 205:16 206:12 208:18 209:4,6 210:18 211:20 212:7,10,21 213:10 215:7 215:12,14,17 215:19,21,22 215:25 216:14 218:14 219:22 220:4,4,6,22 221:3 223:23 224:16 225:4,8 225:13 226:14 226:16,21 227:11,14,17 227:22 228:8 228:12,12,23 229:8,11 230:12 231:2,2 234:8 235:17 236:22,25 237:17,23 238:1,8,9,10,25 241:19,21 242:5,9,25 243:1,2 245:7 245:10 246:5 248:8,14 249:22,24 250:6,7,7,10 251:23,24 254:6,7 255:16 255:17 257:2 257:15,25 258:14,16 259:23,24 260:17,23 261:23 262:17 263:20 264:12 264:13,20,24 265:3,5,10,17 265:18,19,21 266:6,6 267:1 267:1,3,3,5,5,9 267:10 268:4,9 268:15,21,22 269:3,5,6,11,12 269:16,17,23 269:25 270:20 271:1 272:13 272:23,24

**knowing** 142:4 217:22

**knowledge** 75:7 97:21 98:18 174:4,14 202:23 235:1 237:24 261:7 261:14,17

**knows** 149:5 170:11 180:11 220:3

**koosa** 84:18 164:4 193:13 200:13

[redacted] 2:11 3:25,25 4:14 5:7,19 6:5,7,24 7:16,20 8:1,10 8:19 9:2,12,13 13:8,20,25 14:2,6,9,13,18 14:24 15:2,9 15:15,18,20 16:3,9,12,19 17:11 18:12,16 18:22 19:1,3 19:25 20:2,23 21:1,8,9,16,19 21:21,24 22:4 22:7,11,13 23:4,22 24:7,9 24:21,22 25:6 25:9 27:4,10 27:20 28:9,14 29:7,13,14 30:14,15 32:11 32:23 33:10,17 33:19 35:3,7 35:11,19 36:20 37:2,13,18,25 38:2,4,20 39:5 39:13,21 40:7 40:15,21 41:2 41:6,19 42:5 42:20 43:1 44:3,5,8,12,13 45:5,8,15,19,20 46:13,18,22 47:1,5,19 48:1 48:19,24 49:1 49:8,13,15,24 50:6 51:5,14 51:16,21,23 52:2,8,23 53:9 53:12,19,24 54:20 55:4,12 55:18 56:23 57:3 58:14,19 58:22,24 59:14 59:21 60:13,18 61:1,3,6,8,9 62:1,12,13 63:2,5,16 64:10,12,15 65:1,14,22 66:22 67:5 84:3,4,24,25 85:4 86:13,18 87:22 88:8,14 100:9,23 101:2 101:6,11 102:16,24 103:5,25 104:3 106:4,8,15 107:1,10,14,19 107:23 108:8 108:11,13,16 108:24 109:4 109:13,17,24 110:1,4,8,21 111:7,13,19,21 112:8,13,20

113:3,13,18,22
114:7 118:10
118:18,20
119:19 120:8
120:10,14
121:22 122:7
122:21,23
123:1,5,12
124:5,21
125:19,20
126:2,10,17,19
126:21,24
127:8,11
128:11,15,18
129:8,10 130:8
130:16,18,19
130:24 131:1
131:10,12,13
132:23 133:1
133:11,16,19
133:23 134:19
134:22 135:1,3
135:7,22 136:9
136:13,15,24
137:6,11,16,20
139:7,22 140:9
141:12,23
143:6,14 144:7
144:12 145:4,9
145:10,19,21
145:25 146:10
146:21 147:13
148:20 149:4
149:11 150:17
150:21 151:12
151:15,22,24
152:8,11,22
153:2,6,14,22
154:1,14,17,23
155:3,13,23
156:19 157:25
158:2,4,9
160:4,7,21,25
161:4,11,20,21
162:12,17
164:6,10 165:1
165:3,24
166:12,17
167:3 168:11
168:16,20
169:1,5,13,22
170:2,14,19
171:2,8,19
173:16,19
174:15 176:25
177:11,16,18
178:9,19
179:12,17
180:1,4,7,11,16
180:19 181:3,6
181:19,25
182:4,14 183:2
183:4,7,8
184:4,20 185:2
185:10,15,18
185:22 186:7
186:19,22
187:6,19,25
188:4,7,18
189:4,6,9,14,16
190:9,15,22
191:7,14,22
192:3,8,10
194:4,20,25
195:7 196:10
196:20 197:8
197:16 198:1
198:10,20
199:8,12,20
200:4,9,20
201:2,6,13,19
202:3,18,21
203:5,13,21
204:2,7,14,18
205:2,4,8,11,13
205:17 206:11
206:22 207:16
207:20,24
208:13,16,21
208:24 209:3,5
209:12,23
210:1,5,9,12,15
210:20 211:1
211:10,15,24
212:15,19
213:6,12,24
214:2,3,15
215:16 216:2
216:21,22
218:11,20,21
219:17 220:2
220:10,12
221:19 222:6
222:10,13,15
222:17,20,21
223:7,11,14,18
224:2,5,8,10
225:1,12,14,17
225:22 226:1,3
226:8,18,24
227:15,21
228:1,3,5,9,15
228:18 229:4
229:17,19
230:6,10,14,18
230:22 231:5,8
231:16,18
232:2,4,7,11,13
232:16,22
233:1,8,12,23
234:2,5,9,12,14
234:17,19,22
235:4,8,11,19
235:23 236:5,7
236:13,16
237:1,13,21,25
238:2,5,17
239:17,25
240:2,9 241:6
241:9,13,16,22
242:2,3,7,11,15
242:17 243:6
243:13,20
244:1,19,23
245:2,14,18
246:1,5,7,20,24

247:4,8,12,14 247:16,25 248:6,18,24 249:13,20,23 249:25 250:15 250:23 251:8 251:11,12,25 252:6,21 253:1 253:3,5,16,18 253:21 254:2,9 254:18,20,25 255:3,12,23 256:2,4,6,24 257:7,12,18,23 258:5,7,11,21 258:23 259:4,9 259:13,16,21 260:3,7,11,15 260:20 261:3,6 261:20,25 262:4,6,14,25 263:9,17,23,25 264:4,18 266:1 266:3,25 267:3 267:13,16 268:17 269:1,9 270:10 271:13 271:15 273:5 273:12 275:3,5

[redacted]
5:20

**l**

**l** 68:16 69:1 101:4 275:18
**language** 26:4 26:5,11,12
**late** 182:3 184:10
**laugh** 80:9 125:24 127:15 127:23
**lauri** 183:22 275:4
**law** 112:15
**lay** 9:10 17:2 20:17 35:10 160:9 248:3
**ldougherty** 83:24 147:18 170:9
**lead** 77:2 78:17 150:8
**leading** 272:12
**learn** 72:3 79:10 81:22 100:1
**learning** 72:4 80:13 127:18 248:15 272:12
**leave** 86:20
**left** 182:14 214:18
**legal** 6:8 120:4 122:6 262:18
265:4
**lesson** 80:12
**letter** 161:13
**letting** 22:13 245:9
**level** 75:14 94:8 95:2,13,18,21 95:22 104:12 104:13,16,20 116:19 139:4 261:15
**levels** 76:5
**lieutenant** 70:16
**life** 77:16 96:7 150:12
**limit** 109:3 254:16,16
**limited** 8:13 15:2 52:4 107:15
**limiting** 265:24
**line** 29:1,1 32:13 33:22,23 111:4,9 129:6 228:2 232:1
**link** 40:1 175:11 251:8
**linked** 132:17
**links** 224:13
**lion's** 266:11
**list** 4:8 17:8 98:5 166:21 175:19 215:20
233:10 264:2,5 264:8,9,11,13 264:15,16 269:13,25
**listed** 70:7 71:4 75:3,9 78:4 79:25 90:12 91:1,2 97:8 98:15,22 148:15 231:2
**listen** 241:16
**listened** 211:22
**listening** 86:15
**listing** 91:14 98:8
**lists** 30:18 80:1 97:14 208:12 230:25
**little** 37:1 44:11 69:20 71:15 92:22 94:6 102:22 106:18 158:23 184:21 184:23 205:4 272:25
**live** 194:11
**living** 194:18
**located** 105:20
**location** 52:17 243:4
**lock** 109:8
**locked** 52:4
**log** 86:10 117:9 124:14 162:21

163:11 164:21 166:16 182:17 182:18,22 183:10,11,12 183:13,20,25 186:23 187:10 187:22 188:17 188:19,23,24 191:11 192:16 192:23 193:15 195:12 200:13 200:16,19,22 201:8 203:8,11 203:12 207:6 207:12 208:5,7 210:22,23,24 211:2,3 212:9 212:9,13 225:5 225:9,14 226:15,21 227:7 228:19 228:22 231:2,6 231:9,9,10,11 235:16 236:11 238:4,10,14
**logical** 222:18
**logistical** 272:16
**logs** 117:5 119:17,19,20 119:23,24 120:20,20,22 120:23 121:4 121:22,22 122:10,18,19 122:21,22 123:25 124:1 124:12,13 125:1,13 139:6 139:8,12,13,13 139:18,23 140:6 143:2,5 143:9,13 144:1 144:2,18,19,24 145:14,18,20 145:24 163:14 163:20,24 166:4,19,20 187:16 188:12 197:14 202:21 203:8 207:3,5 209:1,2 225:21 243:7,11
**long** 70:22 71:12 87:17 105:25 171:13 188:22 214:21 272:19
**look** 12:11,14 16:2 17:5,6 51:1 67:2 76:11,25 81:8 82:13 86:10 98:3,3 148:13 173:6 213:22 269:13
**looked** 63:18 93:23 195:12
**looking** 8:24 9:6 75:8 83:23 188:23 201:24
**looks** 92:20 100:20 182:11 184:18 188:20
**looping** 195:25
**lori** 68:12
**lose** 108:19 236:24
**loses** 64:19 207:21
**lot** 6:15 41:20 52:24,25 72:5 112:14 147:6,9 171:15 234:10 260:5,9,12,14
**loud** 204:25
**loudspeaker** 216:20
**low** 193:17
**lower** 94:12
**lunch** 100:7
**lunchtime** 82:2

**m**

**m** 1:24 7:9 274:21
**ma'am** 101:10 207:13 209:6 209:13 218:7 220:24 222:22 223:4 225:9 229:24 241:4 252:14
**macklin** 2:16 3:16 272:1,3 272:10,19 273:11
**made** 5:7 26:19 58:1,1,3,6 60:4 63:20 88:23 89:1 112:15 120:17 121:1 121:18 122:20 124:10 125:3,5 143:12,14 148:10 154:4 167:14,18,23 167:24 168:12 174:11 182:23 183:18 193:16 193:22 194:14 196:22 197:10 198:3,11,19 199:1,4 200:18 202:21,24 216:11 224:22 226:9 227:12 228:20,25 229:15 230:25 232:18 233:14 234:11 235:1 235:17 237:17 237:18 239:2 243:12 244:11 245:17,22

**magazines** 116:15
**mail** 9:14,17,20 9:24 10:9,17 10:25 11:3,7,9 11:15 12:19 16:13,24 17:12 17:13,14 24:2 24:2,7,10,12,15 24:21,23 25:1 25:5,6,12 31:21 33:3,5 33:13,20 34:1 36:16 37:3,4 41:22 42:1,3,9 42:13 43:8 44:15 46:6 49:2 50:7,18 51:2 52:11 53:25 54:9,14 54:18 55:20 56:4 57:9,11 57:15 58:6 59:6,22 61:10 62:19,22 63:12 63:24 65:3,9 66:17 83:19,25 84:8,13 117:21 118:13 125:5 147:19,20,23 147:25 148:7,7 148:16,18,20 148:21,22,25 149:3,12,21 151:9,21 152:1 152:4,5,25 153:5 159:15 159:20 160:10 163:1 164:17 168:2 169:24 170:3,5,6,6,12 170:24 171:3 171:11,12,22 172:3,5,7,10,13 172:16,19,21 172:22 173:2,5 173:23 174:7,8 174:17,24 175:1,2,9,11,16 175:21,22,25 176:6,9,16,18 176:24 177:1 177:14 178:5 178:11,12,20 178:22,23,24 179:5,23 180:5 180:8,12 181:9 181:10 195:4 195:16,24 196:6,14 197:1 199:24 214:17 215:19,25 235:13 249:17 251:19 255:7 255:13,16 268:19,20,25 270:13 271:16 275:8,9,9,10,11 275:12,13
**mailed** 273:7
**mails** 18:2 63:14 67:6,8 67:10 83:23 117:25 147:15 147:23 148:11 148:13,14 152:9 165:9 168:18,23 170:20 171:20 172:15 173:20 174:23 176:20 177:19 195:23 197:24 202:15 254:9
**main** 265:9
**mainstreamed** 99:22
**majority** 72:14
**make** 4:16,18 5:2 7:2 20:18 22:18 29:1 35:14,24 37:16 40:1 48:10,23 49:18,20 58:15 75:1 84:9 86:8 87:18 89:6,13 97:22 98:18 103:14 108:17 110:12 120:9 120:11 122:4,7 122:16 127:9 129:21 140:5 144:14 146:12 146:13,16 147:12 148:21 150:24 156:6 157:17,21 158:16 163:16 167:4 168:5 171:14,14 174:23 176:6 178:11 180:11 187:2 193:19 195:9 204:3 205:13 211:8 212:12 213:19 214:10 215:13 215:13,20 216:12 225:2 226:4,21 227:1 227:8 233:17 237:6,6 238:19 239:6,7 242:3 242:4,20,23 243:10,17 244:5,9,15 245:5,6,10,11 245:12,16,20 246:5 251:8 252:24 264:24 265:1 266:24 267:11 270:16 270:25 271:2,4 272:6,15
**makes** 84:17,25

**making** 87:13 92:16 117:24 125:11 131:25 143:18 144:23 204:9,10 234:16 235:10 235:11,12 243:25 250:14 258:1 261:10 262:4 265:17 265:24
**management** 73:1 83:6
**manifest** 169:7 197:13
**manifestation** 133:14 134:18 134:19,23 135:5
**manner** 103:3 144:15
**march** 17:24 20:3,7,8 21:4 21:10 22:19,19 22:20 23:5,17 24:24 25:2,22 26:1,8,20 37:8 147:16 199:15 199:15,18 252:7 257:13
**marked** 15:11 24:18 29:9 32:20 55:15 69:11 74:20 90:7 97:3 184:21 189:11
**master** 91:19 91:20
**master's** 35:4 70:1
**mastered** 75:17 92:4,5
**match** 160:22
**math** 94:11
**matter** 166:18
**matters** 4:5 5:1
**matthew** 54:2
**matthewson** 42:12 45:12 50:4,13,21,24 51:19 52:10,21 54:5,11,16 55:22 56:3,20 57:4,7 58:2,10 60:6,10 61:15 63:15
**maturity** 95:21
**matz** 270:4
**maureen** 98:23
**max** 53:6
**mean** 5:8 9:1,9 13:17,23 18:10 20:25 21:7,15 22:9 28:11,25 29:2,24 38:24 39:15,20 40:17 41:1 42:15,22 44:6,11 47:2 47:15 64:13 80:15 85:15 103:1,6 104:13 107:11,17 108:22 109:2 110:24 111:1 113:13 114:17 118:15 120:9 121:23 122:1 123:24 126:15 126:18,20 129:16 130:2,3 130:10,13 133:13 134:20 137:5,9 138:12 139:16 143:8 144:7 145:6 149:2,5,8 150:19 151:19 153:11 154:14 154:18 156:6 160:12,24 166:2,10 170:13,16 171:6 176:22 177:8 179:11 179:22,23 180:14 181:21 181:22 182:1 184:16,23 186:16 187:12 190:18 193:5 196:13 199:14 199:17,19 200:6 202:22 204:1 208:17 210:14 211:12 212:17 213:8 219:19 221:24 221:25 222:9 222:12 223:12 223:17,23 225:23,25 228:6 229:14 229:15 231:13 234:7,18 235:6 235:20 236:2,3 237:16 242:5 243:1 246:22 246:23 248:2,6 250:17 252:2 254:7 255:22 257:4,10 258:3 258:25 259:10 259:14 260:1 261:22 265:23 266:13 267:8 268:12
**meaning** 56:8 240:11
**means** 71:21 114:1 169:3 173:21 195:22 239:12 243:6 274:8
**meant** 40:24,25 193:3,6 211:10

**mediums** 92:9
**meet** 19:8 30:23 39:1 66:13 79:17 89:13 92:7,8
**meeting** 10:24 11:11,19 12:1 12:9,17,23 15:22 17:15,18 17:25 18:13 19:6,12,15 20:3,8 21:4,11 22:20 23:6,9 23:15,18 25:2 25:13,14,15,22 26:1,8,15,20 27:14 28:1,19 37:8,11 43:2,7 52:12,19 54:7 54:13 55:23 56:7,16 59:25 60:3,3,8,12,13 60:14,17,19,22 62:8,15 64:2 65:3,8,12 66:8 66:15 74:15 75:3,5,22,23,24 81:20 89:22 90:3,11,20 96:22,24 97:7 97:10 98:1,9 98:15 99:5 252:7,8,12,19 252:23 253:1 253:10 257:13 257:20,24
**meetings** 18:4,6 18:8,12,17,19 18:20 19:2,21 59:2,9 74:16
**meets** 96:3
**member** 74:9 74:14 163:19 216:13
**members** 47:22 49:21 50:3 163:14,23
**memory** 139:23 169:18 175:15 196:25 233:3 252:23
**mention** 255:18 263:2
**mentioned** 76:9 89:24 90:22 94:14 116:9 119:22 135:8 135:14 136:16 138:12 166:20 198:23
**merely** 5:19
**message** 32:25
**messages** 86:20
**messaging** 6:21 84:24
**messes** 150:7
**met** 131:2
[redacted] 2:13 4:1,1 86:19 117:6,15,17 241:15,16
**middle** 96:5,7 98:24 99:4,11 99:16,17 269:7
**milford** 1:10 2:2,5,17 3:11 3:15,17 35:20 35:25 47:8 69:6,8 71:2,12 71:17 73:12,12 85:24 102:2 105:15 110:14 274:5
**milforded.org** 147:18
**milforded.org.** 83:24
**military** 70:7
**mind** 6:10 156:8 269:5
**minimize** 146:11
**minute** 14:11 49:9 81:21 101:13,17 104:1 157:3 181:15 268:16
**minutes** 41:17 46:18 48:7,9 48:20 52:25 53:6,7 54:25 55:2,3 61:2 64:14 91:4 109:2,15,16 181:23 230:4 235:25 250:7 253:14 254:15
**misbehaving** 191:9
**mischaracteri...** 179:18
**mischaracteri...** 225:10,12
**miscommuni...** 56:5,9,14 58:7 58:25 59:7,23 60:21 61:11,13 61:17 62:3,4 64:4,6
**miscommuni...** 64:1
**misrepresenti...** 215:7
**missed** 216:7
**missing** 80:3
**mistake** 193:6 201:20
**mister** 165:1 210:6
**misunderstan...** 56:6,9,15 58:7 59:7,23 60:21 60:24 61:12,13 61:17 62:3 64:1,3

**misunderstood** 79:4
**modified** 94:14
**modify** 92:15 137:23 138:17
**mom** 117:16,16 239:1
**moment** 9:20 18:6 30:24 67:2 75:21 78:4 79:24 81:3 83:12,14 84:12 85:14,16 174:1
**monday** 172:6 176:18 263:16 263:17 264:20 265:7 266:5 267:6,12,18,25 269:13,21 271:6,12,19 273:3
**money** 6:16
**morning** 3:6,14 68:22,23 267:8
**moses** 2:3
**mother** 4:1 214:17 217:15 269:4,19 272:23
**motion** 5:25
**motions** 5:9 6:2
**move** 6:22 22:3 23:3 33:18 45:11 103:24 108:12 111:2,5 112:18 114:12 120:5 124:19 130:7 131:9 137:15 145:3,5 149:24 169:20 179:9 192:17 213:11,11,20 217:12 224:23 228:17 232:1 250:12
**moving** 15:16 37:17 76:6 91:7 115:15 140:8 216:1 224:20
**mowing** 36:24
**multiple** 47:20 47:23 49:6,9 49:20 50:2
**music** 80:15
**mute** 100:14,15
**muted** 7:24 101:10

**n**

**n** 2:1
**n.p.** 274:21
**nadine** 2:16 3:16 272:3,10 272:19 273:11
**name** 3:7 69:14 164:3 170:1,2 175:6 177:21 177:22 178:16 190:20 251:20 252:13,14 268:21
**named** 50:24 73:14
**narrative** 165:5
**national** 70:13 70:17
**nature** 140:12
**necessarily** 73:7 171:5 184:19 194:12 202:22 234:8 234:25 237:20 264:17 268:15
**need** 9:20 39:3 64:21 83:15 89:13 95:10 104:7 110:10 113:2 118:24 121:3 122:17 122:19 124:25 129:2 139:5,8 139:23 144:2 144:19,24 156:1 163:10 167:10 186:9 197:15 199:17 200:7 215:17 235:20,23 238:15 250:8 252:9 254:8 259:17 264:25 265:16,19 266:23 268:3 269:23
**needed** 80:17 94:12 95:22 210:23
**needs** 28:9 30:24 35:12 37:11 39:1 42:11 45:10 65:8,12 66:13 93:1 102:11 121:3 133:24 134:12 139:12 150:12 215:8 234:18 248:10 264:22,22,24 265:10,12
**negative** 150:8 150:8
**negativity** 150:11,11
**neither** 274:10
**never** 14:21 22:24 28:24 118:12 184:7,8 190:2 192:1,11 192:13
**new** 4:3 43:9,23 44:16 70:24 75:17 84:16 224:1 232:25

**nice** 36:10 272:13
**non** 247:2
**nonresponsive** 154:13,20 155:2
**note** 5:18 8:22 26:21 27:22 28:3 57:20 65:4 66:4 188:19
**noted** 6:6 15:12 24:19 27:24 29:10 32:21 55:16 189:12
**notes** 8:25 16:6 17:6 67:3
**notice** 8:15 23:9 26:3,4,10 26:12 118:22 122:3 141:15 141:16 236:4 253:6 271:18
**noticed** 22:1 156:20 163:5
**notified** 11:13
**notify** 209:20
**november** 16:14 274:15
**number** 3:11 15:11 24:18 29:9 32:20 55:15 91:13 137:25 186:17 189:11 194:22 274:5 275:8,16
**numbering** 186:6
**numbers** 190:4
**numerous** 138:5

**o**

**o** 7:9 68:16
**o'clock** 181:16 182:3 186:12
**oath** 7:8,11 8:17 68:19
**object** 6:24 27:20 41:25 58:19 106:2,10 106:11 109:18 120:1,8,10 123:18 126:12 126:22 129:6,8 133:8 134:7 135:3 143:11 145:2,4,7 150:13 164:7 165:3 174:15 185:7 199:6 208:13 209:23 211:15 215:13 220:5 224:2,5 224:8,10 225:15 227:25 228:1 230:6
**objected** 48:12
**objecting** 22:16 27:17 126:14 126:17 220:4
**objection** 5:25 8:9 13:6 15:5,8 16:5,8 17:9,10 18:9 19:22 20:22 21:14,23 23:2,25 24:8 24:11 25:4,7 30:11 32:14,18 35:2,18 36:18 38:18 39:11 40:5,13 42:14 44:1 45:4,14 46:11 47:14 50:5 51:21 55:9,10,13 56:22 58:11,17 59:18 62:25 64:8 65:13 102:15 106:13 107:8 110:25 118:7,14 126:1 128:14 129:3 130:23 131:3,8 132:21 135:20 141:10 145:4 148:12 152:21 153:20 160:2 160:20 164:14 164:15 168:10 170:10 181:13 188:14 189:2 190:8 191:13 192:2 194:3 198:7 199:13 201:11 202:13 203:16 206:4 209:22 210:25 218:10 219:15 221:17 223:6 225:10,17 226:7 228:1 230:5,13,16,17 230:23 232:21 233:21 236:2 237:12 241:8 242:1 243:19 244:21 245:13 245:25 246:19 247:11,23 251:6 252:20 252:25 255:21 256:23 257:17 258:20 261:1 262:12
**objectionable** 29:3
**objections** 22:2
**objective** 80:21 81:1 92:5
**objectives** 26:16 77:20 80:19 89:11,17 91:20 119:11

**objects** 79:2
**obligation** 121:19
**observations** 82:14 89:20
**observe** 82:7 117:2 140:10 145:11,15 162:8,19 163:3
**observed** 191:6
**obtain** 216:15 216:24 217:16 262:11
**obvious** 253:8
**obviously** 29:3 178:2,4 228:6 247:1 268:3
**occasions** 118:25 227:2
**occur** 17:18 142:7 166:15 204:23 209:8
**occurred** 25:2 81:3 85:7 87:1 117:10 165:7,8 165:22 202:15 204:19
**october** 1:18 4:19,22 12:8 18:3 21:3 34:2 37:19 38:7 39:7 155:15,25 158:11 162:25 163:1 183:21 267:25 274:6
**offer** 14:18 16:22 32:1 39:4
**offered** 11:19 12:13 14:22 16:22 144:5
**offering** 13:18 14:16 188:3
**office** 268:14
**officer** 1:16 3:3 3:6,8,23 4:2,11 4:15 5:4,5,8 6:4,6,10,23 7:4 7:14,22 8:15 8:24 9:5,9 13:7 13:9,23 14:1,4 14:8,11,15,21 15:1,4,7,14,16 15:19,25 16:7 17:1,5 18:10 18:13,20,24 19:24 20:1,24 21:7,13,17,20 21:21,23,25 22:1,4,6,9,12 23:2 24:5,8,11 24:15 27:7 28:11,24 29:12 30:12 32:17 33:15 35:6,8 35:17 37:13 38:3,19,21 39:15 40:6,17 40:22 41:1,3 41:11,17 42:14 42:22 44:4,6 44:10 45:7,17 46:16,21,23 47:2,15 48:9 48:16,22 49:11 49:14 51:10,15 52:1 53:4,6,8 53:11,17 54:24 55:7,11,13 56:25 58:12,20 58:23 59:15,19 60:11,15,25 61:2,4,7,24 62:10 63:3,10 64:11,13,16,23 65:16 66:20,24 67:4,5,13,17,23 68:2,4,9,14,18 68:21 100:5,10 100:20 101:1 101:10 102:20 103:1,18 106:6 106:12,13,16 107:11,17,19 107:20,23,24 108:6,10,12,15 108:19,20,22 108:25 109:1,4 109:11,15,23 109:25 110:2,6 110:19,23,24 111:11,16,20 112:3,6,7,10,13 112:15,19 113:12,21,23 114:6 118:9,15 119:20 120:9 120:11,17 121:16,21,23 123:3,21,24 124:5,8,20 125:17 126:9 126:13,15,18 126:20,22 127:2 128:16 130:3,13,17,25 131:9,11 133:13,18,20 134:7,17,20,24 135:2 136:3,7 136:11,21 137:4,9,14 139:16 141:13 143:6 144:4,8 145:6 146:5,8 146:19 149:2,5 150:15,18 151:6,13,19,23 152:4,23 153:9 153:13,21,24 154:11,15,19 155:1,11,21 156:13 157:23 158:1,3 160:6 160:20,24 161:2,12,16

164:13,14 165:2,17 166:1 166:10 168:14 168:17,21 169:3,6 170:13 170:15 171:1,3 171:17 173:14 173:17 176:16 176:22 177:8 177:13,17,23 178:4,17 179:11,13,22 180:2,5,10,12 180:18 181:1,5 181:14,21 182:1,6,11 183:5 184:16 184:21 185:6,9 185:12,17,19 186:4,16,21 187:1,12,24 188:1,6,13 189:1,3,5,8 190:14,18,24 191:4,18,21 192:4 194:24 196:10,13 197:3,13 199:9 199:10,13,25 200:6 201:1,18 202:19,22 204:1,4,12,16 205:1,3,6,9,12 206:6,9 207:14 207:18 208:9 208:17,23,25 209:16,22 210:7,10,13,18 211:5,12,22 212:14,17 213:5,8 214:1 214:16 215:9 216:18 218:13 218:15,19 219:19,23 220:1,8 221:23 222:5,8,11,14 222:16,18 223:6,10,12,15 223:19 224:4,7 224:9 225:16 225:18,23 226:12 228:6 228:10,16 229:7,14,18 230:5,9,13,14 230:16,21,23 231:13,14,17 231:20 232:3,5 232:10,12,24 233:5,21 234:1 234:3,7,10,13 234:15,18,21 234:23 235:6,9 235:15,20 236:2,6,11,14 236:20 237:15 237:23 238:1,3 238:14 239:10 239:20 240:1 241:11,24 242:5,8,13 243:22 244:25 245:24 246:3 246:22 247:1,7 247:15,22 248:2 249:10 249:21,24 250:21 251:10 252:4 253:2,4 253:13,17,20 254:16,19,23 255:1,13,22,24 256:3 257:4,10 257:20 258:3,6 258:10,22,25 259:5,8,10,14 259:18,25,25 260:5,9,12,19 261:5,18,22 262:3,16 263:8 263:11,15,18 264:15 265:23 266:2,8,15 267:2,10,15 268:12,18 269:2 270:6 271:1,6,14,23 272:18,21 273:10 274:6

**officer's** 70:15

**officers** 260:6 260:10,13

**official** 30:17 43:17 226:22

**officially** 30:25

**oh** 7:16 8:19 9:22,24 10:7 14:11 17:5 19:25 33:17 34:9 41:22 44:4 51:23 54:2 66:1 70:12 74:2 101:10 121:14 136:12 146:11 146:22,25 147:4,4 169:15 169:20 173:6 177:20 178:15 179:17 182:21 192:3 197:8 201:13,13 211:10 214:24 228:9 247:4 249:1,1 250:15 253:16 254:18 259:7 264:18 267:13,16

**okay** 3:6 4:2,11 7:16,21 8:2,19 9:12,12,21 10:2,3,4,20 11:5,15 12:4,7 14:21 15:7,9

15:14,19 16:9 16:19 17:5,6,9 17:12,18 21:2 23:5,9,13,17,22 24:15,21,23 26:1,15,19,24 27:13,13 29:13 30:14 31:19 32:3,11,17 33:10,15,17,20 34:5,17 36:5 36:20 37:7,17 44:12 47:1,6 49:8,9,14 50:11 51:5,14 51:17 52:6,23 54:20 55:4,5 55:12,19 57:11 58:14 59:21,23 61:1,3,10 62:12,12 67:4 68:4,14,21,22 69:10,13,16,19 70:7,19 71:8 71:15 72:16,20 72:25 73:5,11 73:19,25 74:4 74:9,19,24 75:8,11 76:9 76:23 77:5,21 78:3 79:23 83:5,17,23 84:2,4 86:2,7 86:11 87:5,13 88:3,8,24 89:19,24 90:6 90:11 91:10 92:3,13,15,19 95:25 96:9 97:1,4,14,25 98:11 99:8 100:3,8,23 101:2 111:25 112:2 113:3 114:6,8,12 115:8 116:8,25 118:15,18 125:19 126:19 130:18 131:1 131:12 133:5 138:22 139:7 139:22 140:8 140:15 141:4 142:2 143:6 145:9,19,25 146:8,10,11,21 146:23 147:5 148:2 152:8 153:13 154:23 154:25 155:3,4 155:7,13,24 156:18,19 157:11,16,17 158:2,18,21 159:2,3 160:10 161:5,16 162:7 166:10,17,24 167:17 169:1 169:23 172:16 178:18,19 180:15,19 182:6,14,21 183:7,20 184:4 186:21 187:3 187:14,15 188:13 189:9 189:15 190:18 191:4,21 192:3 192:8,17 193:12 194:20 194:21 195:2 195:13,22 196:10 197:9 198:10 199:25 200:9 201:3,18 201:24 203:5 204:8 205:8,11 205:12,25 206:14 209:14 213:12 214:2 215:16,23 216:1,12,23 217:3 218:19 218:20 220:1 222:5 223:18 224:23 228:15 228:19 235:15 236:5,6,13 237:25 240:16 241:12,23 243:6,10 248:17,24 249:3,6,20 251:11 254:9 255:3,9,22 256:4 258:6 259:8 260:20 263:15 264:18 266:1 267:10 270:1 271:14 272:15,18 273:3,10

**once** 9:15 10:20 10:21 11:8,8 19:5,8 120:16

**ones** 51:11 168:20 170:23

**oops** 9:5

**open** 145:25 146:16 147:6,8 147:9 168:16 168:20

**opine** 148:18 174:6

**opinion** 6:7 35:9 80:24 99:14 128:7,11 128:13 129:5 153:15,17 243:14 248:3,3 248:6 256:7,16 256:17 257:7 259:11

**opinions** 103:21

**opportunities** 30:6
**opportunity** 11:19 120:23 125:8 148:13
**oppositional** 71:24
**options** 88:22
**order** 3:7 81:24 89:13 94:11,12 139:10 175:14 196:25 271:24
**original** 42:8 51:11
**originally** 55:7
**outbursts** 184:12
**outcome** 88:5 133:17 274:13
**outcomes** 150:9
**outplacement** 16:25 248:10 248:21 249:8 249:16,18 251:3,21 254:4 275:12
**outside** 6:17 81:13,17 83:8 107:6 122:15 124:24 154:4 206:8,12 209:18
**overrule** 106:6
**overruled** 243:22
**overwhelmed** 93:3
**own** 22:10 23:18 57:22 75:13 80:8 92:2 102:4 122:6 127:19 150:18 191:23 192:11 210:10 210:13 211:8 212:13 221:5 223:2 228:7 250:21 260:13

**p**

**p** 2:1,1 8:20,22 9:7 14:6,8,10 14:16,18,25 15:5,7,8,16,25 16:7,21 17:9 24:15 27:10,13 31:25 32:11,13 32:17 33:11,15 41:23 42:1,25 49:12,13 51:6 51:9 52:1,6 53:15 54:21 55:5,6,7,8 146:1,1,24 147:5 155:7 156:20 157:14 157:15,20 173:14,17,17 182:16,24 184:20 185:2 185:13,19,20 188:24 189:3,8 199:14 249:4,7 249:11 251:10
**p.m.** 17:16 100:18,18 172:21 175:4 175:23 182:9,9 189:23 190:5 273:15
**page** 90:14,15 97:9 185:23 187:16 188:9,9 188:15,20,23 275:2,8,16
**pages** 171:12 171:13 186:18 188:5 274:4 275:14,17
**pagination** 184:23 187:13
**pants** 150:2
**paperwork** 90:5
**paragraph** 11:12 88:9 156:15
**paraprofessio...** 38:13
**parent** 15:11 19:4 23:10 24:18 26:21 28:2,21 29:9 32:20 55:15 85:6 119:8 165:15 189:11 189:23 190:3 275:7,12,13
**parent's** 4:7 15:23 25:4 83:18 262:10
**parental** 25:24
**parents** 3:23 4:17 18:3 19:20 23:6 25:23 27:22 31:16 35:22 36:2 58:1 59:2 59:10 60:4 87:6 89:4,17 97:25 98:6,12 98:14 113:17 117:15 124:14 124:16 152:15 152:19 238:25 239:8 240:13 240:15,17,18 240:20,23,24 242:20 248:20 266:18,21
**part** 10:4,12 11:21,22 13:5 18:17 19:18 34:5,7,15 37:7 38:11 42:7

79:17 81:1 90:24 91:18 110:22 119:2 124:1,14 128:6 154:17 156:14 158:22,24,24 159:13 169:8,9 183:12 188:21 188:24 192:19 200:12 218:4,8 218:16 220:14 222:3,7,13,17 222:22,23 223:3,3,16,16 238:8,8 252:7 252:11 262:8 263:3 270:12 270:13
**participate** 35:21 36:1 96:24
**participation** 272:17
**parties** 3:12 170:8 274:11 274:12
**party** 111:24 112:3 126:25 143:19 220:6
**passed** 81:7
**past** 13:13 33:22 122:8 123:8 139:19 186:11
**patched** 186:1
**patrick** 1:16 3:7 274:6
**pattern** 19:17 109:12,15 128:10
**pause** 9:8 10:6 54:1 68:7 83:16 100:18 141:18 156:17 158:20 159:1 182:9 255:11
**pausing** 68:5 100:16 182:7
**pc** 2:3
**pdf** 176:1
**peer** 95:19
**peers** 82:25 83:3 93:25 94:13 95:19,23 99:21
**penalty** 8:6
**pending** 27:8 145:7
**people** 96:13 100:11 164:4 234:11 235:2 237:19,22 264:16 270:7
**percent** 134:8
**perfectly** 264:21 266:6
**performance** 76:1,6
**perjury** 8:7
**permit** 214:21
**permitted** 138:23
**person** 6:20,25
**person's** 78:16
**personal** 89:20
**personally** 86:7 152:15 251:15 251:17,19 258:12
**personnel** 163:25
**perspective** 78:7,11 79:20 83:3 84:10 88:16,18 91:15 121:17 174:2
**pertain** 196:21
**pertains** 196:19
**pgs** 275:8
**phone** 86:12 87:18 88:1 117:4,7,24 118:6,12 119:8 119:13,17,20 119:23,24 120:20,20,22 120:23,24,25 121:4,22,22 122:10,17,19 122:21 124:13 125:1,3,4,13 139:12 209:7 209:12 213:1,2 214:4,8,10,18 214:20 216:9 216:11 225:2 226:9,15,25 227:9 232:18 233:13,16 237:9 239:5 241:3,4,7,14 243:25
**phoned** 117:8
**phones** 86:20
**phrase** 99:7
**phrased** 65:17
**phrases** 131:15 131:24 132:7
**phrasing** 237:16
**physical** 45:22 46:4 47:7
**pick** 184:15 189:19 192:15
**picked** 116:13 183:23 184:5 251:24
**pickup** 189:24
**piece** 23:25
**pieced** 186:1
**place** 1:20 75:5 94:15 95:10 97:10 203:17
**placed** 72:16
**placement** 37:20 38:7

39:8,16,24 43:3,9 44:15 45:11 49:3 50:8,13,16,21 50:23 51:4 52:20 57:13,21 58:2 59:3,11 60:9 62:17 64:5 65:6 66:6 74:10,14,16 89:21 90:3 96:22 97:11 99:15 251:22 254:11 261:11 262:5
**plan** 30:17 73:8 79:13 85:9 89:10 112:23 117:12 164:17 209:9 270:1
**planning** 5:14 74:9,14,16 83:19 89:3,21 90:2 96:22 275:10
**plans** 72:13 104:24 106:21
**play** 138:3,7,23 139:1 141:8 150:9
**played** 82:22
**playground** 83:7
**playing** 82:19 116:2 135:9,15 136:17 140:11 140:15,23 141:5,15,19,20 142:3,25
**please** 3:7 6:14 11:22 26:7 30:10 34:17 47:12 57:19,20 61:6,8 63:11 64:15 65:4 66:3,4 68:13 69:4,22 106:9 108:11,13,16 109:24 110:1,4 112:18 123:5 123:10,12 135:18 209:13 210:1 219:14 219:17 229:25 230:10 231:7 236:21 246:16 250:25
**plethora** 113:5
**point** 5:6 19:23 21:13 22:18 78:16 93:13 103:14 106:3 107:9 108:17 109:7 110:12 115:2 120:7 125:14 129:12 129:21 135:21 136:21 144:4 149:9 175:24 177:10 199:6 208:14 220:3 222:11 223:20 223:23,25 228:4 230:8,24 231:25 241:11 242:4 261:18 265:25 269:2 271:24
**pointing** 115:18
**policy** 35:21 36:1,3 242:18 242:21
**population** 72:6 101:15 256:18 257:5 259:1
**position** 54:6
**positive** 46:10 181:10 195:6
**positivity** 150:10,10,12
**possibility** 52:22 57:2,4
**possible** 34:9 48:11 52:20 217:20 220:15 220:18 221:4,8 221:8,15,16,23 222:1 223:2 224:13,16
**possibly** 42:4 272:13
**post** 70:3
**potential** 39:16
**potentially** 5:10
**power** 183:10 187:22
**powerschool** 122:22 124:2 124:12,14 139:6,8,13,13 139:23 140:5 143:2,5,9 144:1,2,24 162:21 163:11 163:13,20,24 164:1,21 166:25 182:17 182:18,22 183:11,12,13 183:20,25 186:22 187:10 188:23
**ppt** 11:11 12:9 12:16,23 17:15 17:25 18:3,8 18:12,16 19:6 19:12,15,20 20:4,8,9,14 21:5,11 22:21 23:14 26:2,4 26:10,11 43:2 43:7 44:14

50:12 54:7 55:23 56:6,16 59:1,9 60:8,22 62:4,5,8,15 75:5 88:22,23 89:2 99:4 143:3 252:8,10 252:12,19 253:1,6,10 257:13
**practice** 29:18 29:23,24 30:4 30:6 31:17 79:17 85:22
**practices** 70:3
**practicing** 70:23
**pre** 263:6
**preferable** 247:1
**preferably** 144:16
**prejudice** 53:9
**preliminary** 4:5
**preparation** 120:4
**prepare** 120:3
**prepared** 6:22 124:19 264:12 266:4
**present** 2:15 3:12,19 76:5 100:25 265:15 266:24,24
**presentation** 133:10
**presented** 92:24 185:25
**presenting** 266:18
**presents** 128:20
**preside** 3:9
**pressure** 41:20 53:1 109:5 250:1
**pretty** 113:7 155:11 159:9 159:10 165:22 195:6 246:16
**prevent** 79:9 85:20
**preventing** 82:24 272:16
**prevention** 138:6
**previous** 4:19 5:22 20:14 62:19 75:16 76:2 78:13 90:24 91:17 190:15 202:14
**previously** 7:10 12:8 16:1 17:3 19:19 46:1 61:16 124:10 145:15 155:10 200:24 201:10 202:5
**prez** 3:19
**primarily** 50:19
**primary** 26:19
**principal** 3:20 3:21
**prior** 5:25 13:25 14:2,18 14:19 86:2 200:25 217:13 275:20
**private** 204:24
**privately** 116:6
**pro** 2:11,13 111:24 112:3 126:25 143:19 220:6
**probably** 48:3 48:5 64:23 150:2 186:11 192:6 193:12 217:11 267:22 269:3 271:9
**problem** 53:19 74:6 101:18 102:20 109:11 109:14 115:20 117:5 128:16 179:7 181:4 186:13,16 201:19 212:24
**problems** 54:25 119:4 262:16
**procedural** 120:6
**procedure** 42:6 262:20
**procedures** 14:25
**proceed** 68:21 100:21 114:6 125:17 182:13
**proceeding** 274:11
**proceedings** 5:1 274:4,10
**process** 20:4,9 21:5,12 22:21 113:9 120:12 133:16 140:1 156:7 179:21 219:23 268:14 270:19
**produce** 118:3 118:8,11 120:3 121:19 139:14 162:14 271:11 272:1
**produced** 89:15 124:2,15 143:2
**professional** 102:3 104:25 105:11,19 194:8 243:14

256:7 272:8,12
**professionally** 96:12
**program** 38:25 45:12 50:16,17 50:23 51:18 52:10 54:5 55:22 65:7,11 66:7,9,11 70:2 72:7,8 74:22 90:9 95:10,11 95:25 96:3,8 96:10,11,13,14 96:18 97:5,16 99:2,19
**programming** 51:3 56:16 60:23 88:11 99:10
**progress** 75:25 89:11,16 92:17 119:10
**prohibit** 8:13
**promised** 149:17
**prompt** 220:16 221:10
**prompted** 217:21
**prompting** 260:7,8,11,16 260:16
**proof** 195:20
**proper** 42:6
**properly** 137:16
**proposal** 45:11 89:14
**propose** 39:24 56:19
**proposed** 50:3 54:12,16 60:9
**proposing** 43:8 44:15 49:2 50:7
**prosecute** 120:5
**protecting** 250:13
**prove** 120:24 122:19
**proved** 176:20
**proves** 258:2
**provide** 10:23 11:10 17:23 98:16 104:6 120:3 164:24
**provided** 46:15 73:18 76:9 99:11 106:20 113:16 122:1 122:24 188:18
**providers** 98:17
**providing** 72:12 90:22 269:20
**proving** 42:9
**provision** 144:6 144:8
**psychological** 244:16 245:4
**public** 3:15,17 35:20,25 70:24 71:13,17 85:24 102:2 105:16 129:24 164:24 165:12
**pull** 83:13 129:16,22 150:2 242:23
**purpose** 23:10 25:23 50:12 56:6,8 73:5 75:12 85:17,18 92:23
**purposely** 84:20
**purposes** 35:10
**pursue** 144:10 144:11
**pushing** 82:18
**put** 13:17 14:4 14:6 29:4 31:23 32:7 33:25 46:13,24 108:23 109:3 113:18 116:15 117:8 143:19 151:20 155:10 188:8 214:6,22 214:25 218:25 219:6,8 255:16
**puts** 41:20
**putting** 74:19 90:6 113:14 186:25 187:20

**q**

**question** 8:18 10:13 11:5 12:15,21 13:8 13:21 14:10 18:25 19:13,19 19:25 20:25 21:2,3,8,16,17 22:12,25 25:10 27:4,6,7 29:25 30:16 32:2,3 33:1 34:12,14 38:15,17,20,22 39:6 40:6,8,18 41:4,18 43:16 43:22 44:10 47:17 52:18 53:16 54:13 56:1,12,25 58:20 59:14,16 59:17,20,21 60:7,16,18 62:11,14,23 63:7,8,8,23 64:9,12,24 65:2 66:3,14 66:20 102:20

102:24 103:24 104:14,22 105:2 106:7,17 109:19 110:3 111:20 113:25 114:19 118:3 118:19 121:15 125:18 126:4,4 126:23 127:4,5 127:8,10,25 128:17 129:18 129:23 130:4 130:10,11,16 131:11,19,25 132:4,4,11,25 134:17,21 135:2,13,17,18 136:9,15,20,23 137:1,5 138:15 139:15 140:6 142:9 145:7,8 147:14 148:2 150:14,20 152:10,21,22 152:24,24 153:1,4,8,9,24 154:5,6,8,9,16 154:20,21,22 154:24 155:18 155:19 156:3 156:11 158:4,8 159:4,17 160:4 160:4 161:3,7 161:11,18,20 161:22 162:18 163:3,12,18 164:23 165:24 166:13 167:1,1 167:2,13 168:5 168:10,11 170:14 173:19 174:1,22 176:2 176:4,25 177:16 178:8 179:10,15 180:8,16 183:24 189:17 192:7,9 195:8 198:8,9,10 200:21 203:20 203:21,23 204:2,7,16,18 205:11,13,15 205:16 206:7 206:13,23 207:15,16,19 207:20,21,23 208:15,21 209:2,14,16,19 210:4,5,16,17 211:6,17,25 212:2,3,6,25 214:1 215:15 216:7,23 218:7 218:16,17 219:11,13,20 220:9,24 221:25 224:9 224:15,23 225:19 226:9 226:11,25 227:18,19,20 229:16,18,20 229:23,24 230:4,12 231:5 231:12 232:6 232:12,13 233:2,8,9,11,24 233:25 234:6 234:17,22 235:25 236:8 236:13 237:2,8 238:22,23 239:12 240:1,2 240:6,10,14,19 240:25 241:18 243:23 244:2,3 244:24,25 245:12,13,15 246:4,15,21,25 247:12,14,17 247:19,23 248:1,5,19 250:2,22 251:2 251:7 252:5 253:2,4,15 256:25 257:11 259:13,15,18 261:3,4 262:2 262:8 269:11

**questioning** 13:16,20 19:17 19:18 41:7 111:5,9,14 129:7 137:19 181:22 232:1 250:9

**questions** 8:14 9:10,16 10:22 11:8,17,25 15:3 17:24 19:5 20:20 23:14 34:18 41:7,11,12 46:19 47:3 48:4,5,11 52:24 53:2 100:4 107:12 109:16,21 110:14 129:20 130:22 131:6 133:19 134:5,9 134:13 137:18 139:9,10 145:3 146:3 155:21 156:21 163:16 174:3,13 177:4 181:6 186:10 197:19 198:9 209:1 212:22 213:20 215:18 232:4,8 239:17 239:21,24 250:3,10 253:11 254:14 254:17,19,20

254:23,23 255:2,5,24 256:1 257:2 258:4,7 260:1 260:3,14 261:2 264:6,13
**quick** 181:3
**quiet** 36:15
**quite** 150:4 206:21
**quote** 143:22

**r**

**r** 2:1 7:9,20 8:1 9:13 16:12 17:11 19:3 20:2 21:1,9 23:4 24:22 25:9 29:14 30:15 32:23 33:19 35:19 37:2,18 38:4 39:5 40:7 43:1 44:13 45:8,20 47:5,19 49:1 49:24 50:6 51:16 52:8 53:12,24 55:18 57:3 58:24 61:9 62:13 63:16 65:1,22 68:16,16 101:6 101:11 104:3 107:1 112:20 114:7 118:20 125:20 127:11 128:18 130:19 131:13 133:1 135:7 137:20 140:9 141:23 145:10,21 147:13 152:11 153:2 158:9 161:21 162:17 166:12 167:3 169:22 178:9 183:8 189:16 191:7 192:10 194:4 195:7 198:1,20 200:20 201:6 202:3 203:13 205:17 206:22 207:24 209:5 210:20 214:3 216:2,22 218:21 220:12 222:6,21 225:1 226:24 227:21 228:18 232:16 233:12 237:1 238:17 240:9 241:13 242:17 243:13 244:1 245:2,14 246:7 248:18 249:13 251:12 252:6 254:2 256:6 257:12 258:11 261:6 262:6 275:3,5
**raccio** 98:23
**raise** 68:14 115:21
**raised** 8:2 84:8 232:19 233:18 233:19 237:10
**ran** 33:22,25
**rather** 48:5 87:1 95:3 111:4 123:13 159:19 160:11 171:11 172:3 173:23 179:1
**rating** 187:4,23
**reach** 31:13,15 119:7 142:23 154:24 216:13 216:14,14,23 217:13,15
**reached** 50:19 50:20,22 56:18 61:14 119:3
**read** 9:25 25:3 49:10 57:18 127:8,9 149:20 150:17,17 151:2,3,4,22,25 152:2,2 156:4 156:14,16,18 156:19 157:18 158:14,23 159:10,12,17 159:18,22 160:8,11,12,14 160:15,16 161:5,9,13,25 162:3,6,9 163:5,7 189:22 195:19
**reading** 13:23 92:12 94:10 150:14,16,18 151:1,15,17 159:10,20 161:24 191:23
**ready** 3:3 10:1
**real** 5:16 77:16 259:19
**really** 20:24 28:24 37:22 40:10,19 41:6 44:10 46:24 47:16 48:13 59:19 64:21 103:4,18,22 108:18 120:12 121:24 122:5 130:5 133:21 139:17,21 144:9,23 155:1 156:20 158:5 165:18 166:6 169:3,6 179:24 196:16 197:5 197:15 199:17

200:2 211:13 219:20 225:19 225:24 228:13 232:24 236:19 236:20 237:24 238:15 248:2 254:1 268:13 269:15 270:8 271:8 272:13
**realm** 174:4
**reason** 5:16 6:16 52:11 66:15 82:5 190:12,20 192:4
**reasonable** 6:20,25 100:11 133:5 181:16
**reasonably** 34:23
**recall** 26:14 37:12 49:6 74:15 91:16 193:25 194:2 210:19,21 243:5 252:17 272:7
**recalled** 7:10
**recalls** 148:17 170:11
**receipt** 147:21 152:9
**receive** 54:19 124:22 143:7 174:7 175:12 175:15 176:7 241:6
**received** 16:13 49:3 50:8 104:9,17,25 105:4,6 106:24 170:11 173:2 173:20 176:6 176:18,20 178:11,24 198:15,21 226:18,20 227:8 231:9,10
**receiving** 94:22 148:17 176:4
**recent** 33:13 148:16 275:11
**recess** 82:2,7 82:11,12 116:1 142:10 159:8 160:1,19 162:3 243:3,9
**recipient** 148:16 149:23
**recipients** 170:21
**recollect** 139:22 169:18 175:15 196:25 233:3
**recollection** 13:11,13,13 39:2 97:10 139:18,19 165:21 166:6 169:11 208:18
**recommend** 261:9
**recommendat...** 89:6 97:18,23 98:18
**recommendat...** 89:1,8 97:15
**recommended** 45:11
**recommends** 97:15
**reconvene** 100:12
**record** 3:5 4:16 5:3,18 8:22 11:6,19 15:20 16:20 21:24 22:7 27:5 30:13,14 37:13 37:16 41:16 49:11 51:8 53:1,4,10 62:2 67:6 68:5,10 69:4 83:14 100:16 107:24 109:13,20 110:9,12 111:23 112:17 120:15 123:18 125:1,6 126:10 134:22 135:6 137:17 140:7 144:23,25 161:6 182:7 185:16 213:12 213:19 221:6 223:14 224:22 225:20 226:22 227:16 235:24 239:11 241:23 242:4 245:23 246:2,6 250:24 252:1 258:1 260:21 274:9
**recorded** 12:1 13:14 139:19
**recording** 24:4 24:9,16
**records** 124:15 189:7
**redirect** 27:9 67:1,12 263:13
**redirected** 32:9 214:13 219:2,3 219:10
**redirecting** 219:23
**reduced** 274:8
**reevaluation** 45:9
**refer** 46:23 89:15 106:25 124:13 145:14 149:2 151:13 166:4,16

244:19
**reference** 30:16 84:17 85:1 86:13
**referenced** 88:9
**referencing** 161:24
**referred** 87:9 161:14 251:13 251:16
**referring** 10:10 14:9 37:3,21 37:25 38:2,5,6 39:10 46:14,17 47:4 49:7,11 49:13 51:21 53:15 54:9 73:20 76:21 77:18 78:24 84:25 86:17,18 93:18,19 115:7 117:1,16 130:5 158:6 174:25 184:9 187:19 188:2 192:12 196:15,16 219:5
**refers** 151:14 161:17
**reflect** 26:22 27:23
**reflected** 73:7
**reflecting** 80:21
**reflection** 25:1
**reflects** 80:25
**refrain** 151:15
**refresh** 139:18 180:22
**refreshing** 13:12 157:4
**refusal** 19:12 19:15,16 59:2 59:10 60:5
**refuse** 239:16
**refused** 18:3,12 18:14,19,21,22 19:2,20
**refuses** 53:5
**regarding** 4:24 33:13,13 50:20 67:7 102:5 122:9 148:3,10 155:16 158:12 158:13 165:14 214:18 258:13
**regardless** 71:23 124:23 174:5
**regression** 43:11,24 44:19
**regular** 82:9 88:20,21 89:17 106:25
**regulating** 81:4 117:3 118:23 119:1,5,15
**regulation** 71:21 114:16 114:24 141:18
**regulatory** 4:23
**rehashing** 261:18
**reiterate** 6:1
**reiterated** 31:20
**reiterating** 64:18
**rejected** 58:2
**relate** 103:6 165:10,11
**related** 31:9 41:14 76:16 101:23 103:11 125:25 127:15 128:1,4,5 129:14 132:18 134:3,8 137:6 154:6 164:5 165:6 274:11
**relation** 184:13
**relationships** 95:19
**relative** 274:12
**relatively** 166:5
**relaxed** 112:14
**relevance** 8:9 8:10 48:13 102:15,16 106:2,4 129:9 133:23 141:11 160:23 164:8 164:10,15,23 171:17,19,21 190:8,9 247:13 257:17,18,18
**relevant** 28:5 106:17 113:8 120:21 121:3 121:10 126:6 133:21 134:6 141:12 176:5 202:16 215:4 270:24 271:4
**remain** 25:20 36:15 40:24
**remember** 39:20 57:24 99:6 136:3,3 139:17,21 177:21 197:3 227:12 228:10 228:13 229:12 233:2 240:7 241:22,23,25 252:19,22 257:21,22 262:25 263:5
**remembering** 165:18
**reminders** 82:20
**repeat** 20:6 26:7 31:2 35:23 45:24

131:15,24 132:7 167:22 207:18 216:18 221:15
**repeated** 5:9 54:25 61:20 84:6 110:25 191:25 214:24 216:4,9 217:20 220:15 221:4,8 221:9 224:17
**repeatedly** 84:18 231:4 243:17 244:5
**repeating** 184:7 190:1,1
**repeats** 133:6
**repetitive** 223:12
**rephrase** 19:13 59:5 104:2 131:20 202:19 205:2
**replace** 252:3
**replied** 148:24 170:6
**reply** 148:22 172:9,9 175:19
**report** 45:21,25 46:3 47:6 87:6 87:19 167:14 185:1
**reported** 34:23 47:8 145:23 156:4 168:7 183:23 189:18 199:23,23 200:15,24 201:9 202:5 203:14,19 207:1 208:4 228:21
**reporter** 1:24 3:5 68:5 100:16 182:7 259:6,17,22 260:18 273:4,9 274:3
**reporter's** 114:2
**reporting** 167:19 198:4 200:15
**reports** 89:16 119:11 258:13 259:19
**representation** 44:25
**representing** 3:17
**request** 23:10 27:15 117:25 119:21 120:11 121:8 122:4,8 123:7 124:3,23 125:11 126:11 140:4,5 143:9 144:12,15 248:21 249:8 252:3 254:4,11 263:12 275:12
**requested** 23:6 25:22 26:1,9 117:17,20 118:5,12 188:12 249:16 251:3 261:24 262:21
**requests** 121:18 122:2 124:6,9,10,18 125:5 143:13
**require** 38:13 243:15 244:4,4
**required** 98:18
**requiring** 5:11 244:14
**requisite** 97:20 98:17
**reread** 192:5
**res** 5:21
**resource** 43:14 80:17 98:22,23
**resources** 37:23 38:9 39:10,22 40:3 40:4,11 44:23 45:2 106:19,24
**respect** 70:22
**respectful** 156:7
**respectfully** 121:8 126:11 144:12
**respond** 5:12 6:5 78:21 124:22 266:14
**responded** 23:13 93:9 124:11 149:19 249:16
**respondent** 1:11 274:5
**responding** 56:11
**response** 52:14 61:18 73:1 122:25 124:2 152:25
**responses** 17:24
**responsibilities** 71:16 72:11 105:5
**responsibility** 81:6,9 85:14 85:16 88:1
**responsible** 141:20 179:8
**responsive** 154:21
**restate** 104:14
**restrictive** 88:12

**restroom** 49:17
**resubmit** 170:22 171:9 171:23 172:12 173:8,22
**result** 149:6
**resulted** 26:15 28:1
**resume** 68:2 69:16 229:11 275:18
**retained** 275:21
**return** 265:18
**review** 9:20 23:10 51:4 65:21 67:9 74:16 75:4,5 75:13,15,20 76:3 78:10 89:25 90:2,15 90:19 275:17
**reviewed** 133:14 164:19 258:12
**reviews** 119:12 275:17
**revise** 23:11 51:4 65:21
**revisions** 26:16
**revisiting** 5:22
**ridiculous** 229:9,13 242:7
**right** 3:3,23 4:4 4:13 5:4 6:4,23 7:4 8:2 9:9 10:7 11:2 14:4 15:19 16:7,8 17:6 21:22 25:6,24 29:12 39:21 41:19 44:8 45:3 46:21 51:13 52:2,3,6,6,11 52:16 55:11 56:13,21 57:5 57:16,17,25 58:5 60:15 61:22 63:17 65:4 67:12,13 67:17,22,23,25 68:15 69:14 71:10 100:5,10 100:12,20,21 108:6 111:24 112:2,6,8,9,11 112:16,16 115:16 121:6 121:23 124:20 125:9,17 135:13 136:7 137:9 139:20 143:4,18,19,24 144:4,12 146:12,14,20 147:5,8,21 149:4 150:21 151:2,4,24 152:22 153:22 154:11,23 155:8 156:15 157:2,12 162:22 166:10 169:1,20 170:19 173:19 176:15 178:22 180:4,16,20 181:1,5,20 182:11,12 183:14 184:4 184:24 185:6 185:12,14,22 186:4,4 187:6 187:10,12,14 187:21,22,24 188:1,2,4,6,13 189:1,5 192:25 195:13,13 197:13,17 200:9 203:9,12 204:7,9 205:1 207:5,6 208:6 208:22 210:22 210:24 211:11 211:23 212:11 212:17 213:5 215:8,14 216:12 218:3,9 220:8 222:20 224:4 225:9,14 225:23 226:22 228:20 236:7 237:25 238:5 241:17 242:15 245:15 251:4 252:1 253:5 254:19 255:15 255:17 258:3 258:10 259:5 260:23 262:10 263:16 264:15 264:23,25 265:23 266:2 269:9 271:6,23 272:21 273:1 273:11
**rights** 4:25 111:23 120:6 165:14
**risk** 193:17
**rizzo** 3:19 4:8 4:13 7:8,18,21 7:24,25 9:14 15:20 19:4 21:10 23:5 29:15 30:1 35:4 36:23 38:23 42:3 51:17,22 57:1 57:23 59:22 61:21 63:11,12 65:19 66:2 67:13,16 164:4 164:18 176:12 195:5 275:2,9

275:9

**rizzo's** 192:20

[redacted] 1:8 2:10 3:10,25 4:1 16:25 29:17 30:3 31:22 32:6,12 33:4,7 33:23,24 34:5 34:14,23 36:7 36:9,10 37:11 42:10 43:3 44:25 45:10 49:15,23 54:5 55:21 56:10,16 57:7 61:19,19 62:7 73:14,17 74:1,17 75:6 76:10,12 77:1 78:9,12,14,18 78:19,25 79:7 79:10,15 80:5 80:6,7,25 81:3 81:8,11 82:6 82:11,24 83:7 84:7 85:5,11 85:18 86:7,16 86:21,22,23 87:5,9,14,18,25 88:18,25 89:2 89:7,25 90:3 90:23 91:14 92:25 93:3,9 94:9,9,21 95:1 95:6,7,11 97:16,22 98:19 99:3,11,20 103:12,17 112:22 113:1 114:9,13,20,21 114:22,25 115:15,20 116:2,19,22 117:2,16,16 118:2,22 119:4 119:14 125:21 127:12,21 128:21 131:22 132:1,5,5,10,13 133:6,10 135:8 135:14 136:16 137:21 138:3,9 138:23 140:11 140:13,15,19 140:22 141:1,4 141:8,25 142:1 142:2,4,25 145:11,16 149:12,17 150:6,12 155:16 158:12 158:13 159:5 163:1 167:4,14 167:23 168:5 181:9 183:17 183:23 184:1,5 184:6,12,14 189:19,24,25 190:7,10,17 191:6,8,25 192:12,15 193:16,19 194:14 195:9 197:10 198:11 203:6 205:23 206:21 214:5,8 214:9,9 216:11 216:14 217:4,5 217:15,19 218:23,25 219:2,4,8 220:13,25 225:2 226:4,15 227:1,23 229:5 229:10,15,17 229:20 230:2 233:17 235:17 237:5 238:8,18 238:20,23,24 239:6 240:4,4 240:10,15,16 240:19 241:1,2 241:7,17,20 242:23 243:16 244:4,9,14 245:5,6,8,15 246:8,17 247:18 249:9 249:18 252:22 256:9,9,14 258:15 261:10 274:5 275:11 275:12

**road** 110:16,17 110:20

[redacted] 84:2 179:1

[redacted] 1:24 2:11 3:25,25 4:14 6:5,7,24 7:16 8:10,19 9:2,12 13:8,20 13:25 14:2,6,9 14:13,18,24 15:2,9,15,18,20 16:3,9,19 18:12,16,22 19:1,25 20:23 21:8,16,19,21 21:24 22:4,7 22:11,13 23:22 24:7,9,21 25:6 27:4,10,20 28:9,14 29:7 29:13 30:14 32:11 33:10,17 35:3,7,11 36:20 37:13 38:2,20 39:13 39:21 40:15,21 41:2,6,19 42:5 42:20 44:3,5,8 44:12 45:5,15 45:19 46:13,18 46:22 47:1 48:1,19,24 49:8,13,15

| | | | |
|---|---|---|---|
| 51:5,14,23<br>52:2,23 53:9<br>53:19 54:20<br>55:4,12 56:23<br>58:14,19,22<br>59:14,21 60:13<br>60:18 61:1,3,6<br>61:8 62:1,12<br>63:2,5 64:10<br>64:12,15 65:14<br>66:22 67:5<br>100:9,23 101:2<br>102:16,24<br>103:5,25 106:4<br>106:8,15<br>107:10,14,19<br>107:23 108:8<br>108:11,13,16<br>108:24 109:4<br>109:13,17,24<br>110:1,4,8,21<br>111:7,13,19,21<br>112:8,13 113:3<br>113:22 118:10<br>118:18 119:19<br>120:8,10,14<br>121:22 122:7<br>122:23 123:1,5<br>124:5,21<br>125:19 126:2<br>126:10,17,19<br>126:21,24<br>127:8 128:11<br>128:15 129:8 | 129:10 130:8<br>130:16,18,24<br>131:1,10,12<br>132:23 133:11<br>133:16,19,23<br>134:19,22<br>135:1,3,22<br>136:9,15,24<br>137:6,11,16<br>139:7,22<br>141:12 143:6<br>143:14 144:7<br>144:12 145:4,9<br>145:19,25<br>146:10,21<br>148:20 149:4<br>149:11 150:17<br>150:21 151:12<br>151:15,22,24<br>152:8,22<br>153:14,22<br>154:1,14,17,23<br>155:3,13,23<br>156:19 157:25<br>158:2,4 160:4<br>160:7,25 161:4<br>161:11,20<br>162:12 164:6<br>164:10 165:1,3<br>165:24 166:17<br>168:11,16,20<br>169:1,5,13<br>170:2,14,19<br>171:2,8,19 | 172:6 173:16<br>173:19 174:15<br>176:25 177:11<br>177:16,18<br>178:19 179:12<br>179:17 180:1,4<br>180:7,11,16,19<br>181:3,6,19,25<br>182:4,14 183:2<br>183:7 184:4,20<br>185:2,10,15,18<br>185:22 186:7<br>186:19,22<br>187:6,19,25<br>188:4,7 189:4<br>189:6,9,14<br>190:9,15,22<br>191:14,22<br>192:3,8 194:20<br>194:25 196:10<br>196:20 197:8<br>197:16 198:10<br>199:8,12,20<br>200:4,9 201:2<br>201:13,19<br>202:18,21<br>203:5,21 204:2<br>204:7,14,18<br>205:2,4,8,11,13<br>206:11 207:16<br>207:20 208:13<br>208:16,21,24<br>209:3,12,23<br>210:1,5,9,12,15 | 211:1,10,15,24<br>212:15,19<br>213:6,12,24<br>214:2,15<br>215:16 216:21<br>218:11,20<br>219:17 220:2<br>220:10 221:19<br>222:10,13,15<br>222:17,20<br>223:7,11,14,18<br>224:2,5,8,10<br>225:12,14,17<br>225:22 226:1,3<br>226:8,18<br>227:15 228:1,3<br>228:5,9,15<br>229:4,17,19<br>230:6,10,14,18<br>230:22 231:5,8<br>231:16,18<br>232:2,4,7,11,13<br>232:22 233:1,8<br>233:23 234:2,5<br>234:9,12,14,17<br>234:19,22<br>235:4,8,11,19<br>235:23 236:5,7<br>236:13,16<br>237:13,21,25<br>238:2,5 239:17<br>239:25 240:2<br>241:6,9,22<br>242:3,7,11,15 |

243:6,20 244:19,23 245:18 246:1,5 246:20,24 247:4,8,12,14 247:16,25 248:6,24 249:20,23,25 250:23 251:8 251:11,25 252:21 253:1,3 253:5,16,18,21 254:9,18,20,25 255:3,12,23 256:2,4,24 257:7,18,23 258:5,7,21,23 259:4,9,13,16 259:21 260:3,7 260:11,15,20 261:3,20,25 262:4,14,25 263:9,17,23,25 264:4,18 266:1 266:3,25 267:3 267:13,16 268:17 269:1,9 270:10 271:13 271:15 273:12 274:3,21

**role** 69:7,20 72:10 73:11 90:1 150:9

**room** 3:13 36:12 80:17

**rosen** 2:6 3:14 3:14 4:6 5:5,18 6:13,20 7:24 8:9,12,22 13:6 15:6 16:3,5 17:3 18:9 19:22 20:22 23:25 24:13 25:4,8 27:17 28:6 30:11 32:16 35:2 36:18 37:25 38:18 39:11 40:5,13 41:25 44:1 45:4,14 46:11,15 47:14 50:5 51:21 55:10 56:22 58:11,17 59:18 62:25 64:8 65:13 67:2,12 67:19 68:1,3 68:12,22 69:3 100:3,13 102:15 106:2,9 106:12 107:8 113:4,7,12 114:3 118:7,14 120:1 121:13 121:15,17 122:21,23,24 123:4,9,12 124:4,6 126:1 126:11,14 128:14 129:3,9 129:10 130:23 131:8 132:21 133:8 135:20 141:10 143:11 145:2 146:7 148:12 150:13 150:21 151:3 152:21 153:20 155:9 157:24 160:2,20 164:7 164:12,15 165:3 168:10 170:10 173:25 174:16 177:2 177:20 180:24 181:13 182:25 183:3 185:7 188:15 189:2 190:8 191:13 191:16 192:2 194:3 198:7 199:6,10 201:11 202:13 203:16 204:8 204:11 206:4,8 208:9,14 209:19,22,23 209:24 210:2,3 210:25 213:3 213:13,21 216:3 218:10 218:14,14 219:15,18,21 219:21 221:17 221:21 223:6,8 225:10,13 226:7 227:25 228:2,4 230:5 230:6,7,8,20,24 231:7,14,25 232:21 233:21 237:12 241:8 241:10 242:1 243:19 244:21 244:24 245:13 245:25 246:19 247:11,13 250:5 251:6 252:20,25 255:21 256:23 257:17 258:20 261:1 262:12 263:14,21,24 264:3 265:10 266:14,16 267:4 271:24 272:5,15 273:5 273:6,13 275:4

**rosen's** 120:8 123:6 269:11

**round** 223:23 223:23

**rude** 213:17,18

**rudely** 220:3

**rule** 6:14 22:1 125:15 144:22 215:10
**ruled** 24:5,9 37:15
**rules** 188:9
**ruling** 5:11,22 14:22,24 41:10 215:13
**running** 67:14 155:16 158:12 159:6,23 160:17 161:25 184:10

**s**

**s** 2:1 3:25 4:1 36:9 37:11 43:3 45:10 56:16 80:5,7 89:2,7 94:9 112:22 117:16 117:16 133:10 137:21 184:1 184:12 217:15 217:19 218:23 220:13 238:8 245:8 261:10 264:1
**safe** 96:15 271:20
**sara** 263:22
**satisfactory** 92:16
**satisfied** 121:18 124:11
**saturday** 52:9
**save** 151:17 175:25
**saw** 79:24 142:14,14 148:15 179:13 180:2 191:2 193:4
**saying** 6:14 37:12 38:25 39:21 41:3 43:16 56:4 63:5,24 64:15 64:16 72:23 111:2,12,16 124:3 125:22 127:13,20,22 128:2 134:3 136:13 139:12 150:24 151:17 160:25 168:6 171:4 172:16 173:10 178:1 180:13 187:15 188:18 191:2 193:20 199:22 212:11 215:1 218:5 221:16 222:14 224:19 225:19 234:3 234:21,23 235:9 236:1,9 240:3 245:9 250:14 251:20 257:8,25 265:2 265:12 269:9 271:16
**says** 11:12 51:17 56:13 61:21 65:4 69:13 71:3 74:21 77:24 86:14 102:19 174:17 184:4 184:10 191:11 196:24 204:24 222:25 224:12 228:12 251:21
**sba** 36:12
**scale** 187:4 188:16 275:14
**schedule** 17:14 59:1,9,25 60:2 60:3,12,16
**scheduled** 12:9 12:17,23 60:13
**schedules** 9:19
**scheduling** 15:22
**school** 3:21 30:17 31:6 39:4,17,19 42:17,20,22,24 43:17 44:9 47:9 56:17 57:20 62:16 65:5 66:5 67:15,20 69:9 69:21,23 70:15 70:23 71:5,16 72:6,8,10 73:3 73:11 74:7,11 74:13,17 75:6 77:14 81:13 82:6 83:20 84:16 85:7,23 88:24 89:25 90:1,4 91:2 94:20,24 96:7 96:23 97:12,17 98:20,24 99:4 99:9,12,16,17 102:1 110:14 112:25 114:4,5 116:25 118:4 118:21 119:4 119:14 125:11 144:9,17,19 163:9 185:15 189:6,22 191:9 216:19 242:18 243:11 244:8 246:12 248:7 268:23 272:8 272:10 275:10
**school's** 155:25
**schools** 3:15,18 35:20,25 70:25 71:13,18 85:25 96:5 102:3

105:16
**science** 80:15
**scope** 154:4,8 181:24 206:8 206:12 209:18 234:25
**screaming** 80:10
**screen** 12:18 13:3,4 14:13 16:11 38:6 52:3 53:11,20 54:22 55:1 66:23 74:24 75:1 83:12 146:19 147:9 156:15,25 157:4 180:22 249:4
**scroll** 10:1,10 10:12,14 11:22 51:7 78:3 79:23 84:11 91:11 158:18 170:4 255:8
**scrolled** 71:10
**scrolling** 76:14 201:15,23
**scrutinize** 29:1
**se** 2:11,13 111:24 112:3 126:25 143:19 220:6
**seal** 274:14
**second** 57:18 67:19 70:16 83:13 97:1 100:24 146:13 147:2 154:13 154:21 157:1 158:24 183:17 188:20 239:22
**seconds** 214:20
**section** 26:21 27:22 28:3 91:12
**see** 4:2 8:25 9:6 9:23 14:14 15:25 16:10,14 25:7 29:5 33:15 48:11 51:10,12,25 54:18 55:8 67:8 69:13 70:7 74:21 75:9,25 76:15 77:23 78:5,7 79:25 80:20 81:17 82:1,2,6 83:19 84:4,13 85:8,13 87:21 90:5,8,12,25 91:14,22 95:16 97:7 98:22 109:4 112:11 113:2,11 117:4 118:24 119:17 119:20,23 120:20,22,25 122:19 143:25 145:18,24 146:6,17 147:18 155:6 156:25 157:2 157:10,12,19 160:23 161:13 167:10 170:1,9 175:2,6 177:14 177:21,22,23 178:16 181:1 182:20 184:8 184:22 187:1 190:2 192:1,12 192:13,23 199:12 201:25 203:8,11 204:20,21 206:20 207:3 208:5,14 210:23 212:8 225:6,7 228:19 241:23 243:24 245:8 247:2 249:10 250:19 252:9 253:16 253:18 254:8 254:21 255:13
**seeing** 179:1 209:1
**seem** 145:1
**seemed** 115:22
**seems** 129:19 161:8 185:14 188:19 211:6 266:9
**self** 71:21 81:4 95:15,23,24 119:1 141:18 150:7 167:7,14 167:22 168:6 168:13
**send** 49:15 179:23
**sense** 35:15 187:2 245:21 252:24 270:16
**sent** 10:15,25 24:23 33:2 34:1 47:20 49:3 50:8 53:25 54:10,12 54:15 58:6,8 59:22 61:10 62:22 63:12,14 148:25 150:25 151:11 156:12 168:19 172:14 172:16,17,22 175:3,16,22 176:10,11,11 176:12 179:5 196:14 208:7,8 267:21

**separate** 31:10 124:24 178:21 184:19 185:8
**separated** 166:8
**separately** 144:11 155:22 172:13 173:23
**september** 9:15 9:21,22,22 10:11 167:9 183:15 200:23 201:4 204:21 205:14,14,18 205:18,19,21 205:21 206:1,9 206:16,16,18 206:19,20,24 214:4 227:1,4 233:17 235:18 235:21 236:3,4 236:12 237:7 244:10,11,20 275:10
**serious** 85:7
**served** 70:13 94:21
**server** 268:14
**service** 70:11 73:21,22,24 76:15 78:1 90:25 91:6 98:16
**services** 26:17 72:12 76:10,11 76:16 89:7 90:23 91:1 102:2 104:6
**session** 76:24 77:1,5 105:24 105:25,25 106:19,23 181:20
**sessions** 81:14 83:9 114:18
**set** 9:6 73:21,22
**setting** 71:23 77:7 115:4,6,9 115:10,11,11 115:12,14 116:5,7,8,10
**seven** 187:8,14 265:16
**several** 44:7 182:1
**severe** 256:12 261:15
**severely** 257:5
**severity** 187:4
**shaking** 114:1
**shape** 6:10
**share** 36:22 54:21 69:10 75:1 81:23 83:12,17 146:4 146:24 155:8 155:10 157:5 194:25,25 249:4 266:12
**shared** 13:2 43:14 51:24 89:20 129:5 146:17,18,20 153:17 169:14 192:24,25 201:13,14,17 201:22,24,25
**sharing** 9:12 27:11 29:13 36:21 155:4 157:3,13,14 249:1
**shield** 143:15
**shirt** 159:8,25 160:18 162:2
**shocked** 150:4
**shoelaces** 86:25 214:14,15
**shoot** 54:22
**shore** 98:24 99:3,11,15
**short** 77:12 252:23
**show** 22:14,17 83:11 97:2 125:4 143:18 150:2 158:19 170:4,22 171:9 171:18,24 172:7,9,13,21 173:1 175:9,18 175:19 176:9 176:13,22 178:22,23 179:2,5 195:23 196:6 197:4 214:21 215:7 238:5,14 253:9 254:10 266:10
**showed** 12:19 57:9 184:6 189:25 202:8
**showing** 43:11 43:24 44:19 143:16 170:16 170:17 187:13 190:12 203:11 203:16 208:19 212:9
**shows** 27:21 28:10 42:9 43:18 74:25 172:5 176:17 199:14 203:23 251:5
**side** 110:18
**sidelined** 234:12 236:17
**sidetracked** 134:14 236:23
**signature** 274:20
**silenced** 22:8
**similar** 91:16 258:15

**similarly** 91:17 265:15
**simple** 21:3 129:22 134:13 136:20 207:20 246:16 247:21
**simply** 37:22 38:9 39:9,21 39:22 40:2,3 40:11 44:23 45:2 65:25 88:21 191:5
**single** 142:10
**sir** 15:3 21:8 22:11 24:10 38:21 53:23 55:4 108:15,16 109:19 110:10 110:23 111:13 111:23 209:3 211:3,16,24 212:2 216:21 253:19 254:18 260:7,8,11,12 260:20 267:13
**sit** 95:16 141:8
**sitting** 115:16
**situation** 34:2 78:12,15,20 81:8 88:16 132:23 159:14 159:16
**situations** 73:2 91:24
**six** 265:16,21
**sixteen** 147:4
**sixth** 70:5
**skill** 77:11,13 77:16,17 141:15
**skills** 31:12 78:7,11 79:15 79:21 81:22 91:16 96:7
**slash** 83:20
**small** 73:18,19 76:10,11,17 77:23 80:16 81:13,17 83:8 90:23 93:20 115:1,4,11 116:8,10 157:18
**smile** 245:8
**social** 29:16 30:2 31:11,21 32:5 67:20 69:9,21,24,24 70:23 71:5,17 72:10 73:12 74:13 75:11 77:10,13,17 78:7,11 79:20 81:22 85:23 88:25 90:1,13 91:2,15,24 92:6 97:8 99:9 113:24 141:15 152:13 183:21 235:17
**solely** 89:3
**solo** 77:3
**somebody** 78:19 141:16 141:21 196:15 197:20 251:25
**son** 16:25 84:7 103:12 129:23 133:23,24 150:5 163:2 179:20 199:22 215:1 217:2 249:9,18
**son's** 252:19
**soon** 87:21,21
**sorry** 4:14,14 7:24,25 10:7 26:6 31:2 37:5 37:25 47:12 51:23 53:16 59:12 70:17 71:9 72:22 105:10 121:13 121:14 144:7 147:1 164:7 169:5 171:2 183:3 192:24 193:2 198:7 201:20 210:9 216:6 229:7 230:7 231:16 231:16 240:22 243:1 249:25 253:3 267:14
**sort** 210:14 222:11
**sorting** 80:20
**sorts** 235:2 237:18,21
**sought** 5:25
**sound** 100:11
**sounds** 198:8
**southern** 69:24
**span** 252:23
**speak** 67:7,10 119:13 120:25 143:23 238:13
**speaks** 191:24 199:7 251:10
**spec** 246:20
**special** 1:3 2:18 3:10,16 35:12 89:2 101:23 102:10 133:24 134:1 274:5
**specialized** 97:16 99:19 104:9,17 105:6
**specific** 47:22 103:2,23 128:23 133:21 134:17 135:13 135:23 144:6,8 148:14 149:3 160:6 162:19 163:4 166:5

170:12 172:22 175:9,22 178:24 179:22 180:6,6 185:16 195:24 196:5 202:23,24 203:1,2,3 233:11 235:7,8 251:22 255:16 262:20
**specifically** 17:12 39:1 79:14 101:8 132:1 136:4 139:21 142:23 151:14 164:2 165:18 174:23 206:3 237:24 240:8 241:14 241:19 254:5 255:14
**specificity** 102:23
**specify** 183:1
**spectrum** 101:9
**speculation** 35:2 126:1,8 191:13,14 221:18 243:19 243:20,21 246:19
**spending** 48:16
**spent** 213:16
**spin** 165:4
**spiraling** 220:22
**split** 173:22 178:21
**spoke** 49:22 120:24
**sportsmanship** 82:21
**spot** 33:23
**stability** 53:22
**staff** 35:21 36:1 45:22 46:4 47:8,22 49:21 50:2 148:3,11 163:14,19,23 167:19 168:2,8 198:5 216:13 232:20 233:19 233:20 238:7 242:19
**stand** 3:22 54:6 98:24 193:13 197:17,18,20
**standard** 5:2
**standing** 70:2
**standpoint** 83:6 180:14
**stands** 6:1
**start** 3:4 7:14 67:24 73:25 86:24 91:12 115:8 148:5 265:8 267:4,6 268:1 269:21 269:24 270:17 271:9
**started** 32:9 66:25 70:25 167:19,25 169:12 197:11 198:4,5,12 199:2,3,20 200:17 202:6,8 203:3 207:7 234:4,16 235:10,12 237:3,5 238:6 238:12 270:18
**starting** 66:16 88:18 195:18 198:23 202:7 235:11
**starts** 7:7 84:13 182:23 183:13
**state** 1:2 3:9 10:21 33:20 69:4,25 107:24 109:5,20 227:15 270:2,7 274:1,3,4
**stated** 11:7,16 17:13 20:20 23:9 25:12,15 33:4 37:9,21 38:8 39:9 50:12 53:13 55:19 56:2 57:5,6,10 58:8 66:12 110:13 176:17 193:16 212:1 221:21 265:3
**statement** 4:18 6:25 19:7,11 19:14 34:22 44:22 57:25 58:5 123:14,16 123:20 145:3 150:19 154:3
**statements** 150:5,5,8
**states** 11:24 19:4 36:6
**stating** 9:15 16:13 111:23 164:12 191:5
**status** 123:25
**stayed** 70:16
**stenographic...** 274:8
**step** 67:14 83:5 92:6 95:8 263:15
**steps** 137:22,25 138:16
**stewart** 10:25 11:16 17:21 23:13 27:1 176:12 255:18 267:20 268:4

**stewart's** 12:5
**stipulate** 17:1
**stipulated** 17:3
**stomping** 159:6 159:24 160:17 162:1
**stop** 27:11 29:13 36:21 64:15 83:12 92:13 141:3,4 141:6,17,22 155:4 157:3,13 228:5,5 230:10 238:20 249:1 265:12
**stopped** 88:2 141:2
**stops** 226:16
**story** 92:12
**straight** 58:23
**strategies** 30:21 72:3 73:1,9 79:12 79:14,16 104:11
**strategy** 29:18 30:3,5,19 31:4 31:12,17 104:19
**straws** 253:8
**streamline** 48:14
**street** 2:4
**stress** 53:1
**stricken** 27:5
**string** 176:23 176:23
**strong** 135:11
**structure** 95:25 96:4
**structured** 38:12 39:2,18
**struggling** 79:8
**stuart** 263:23 264:1,10
**stuck** 37:11,12 115:22 236:25
**student** 33:22 33:24,25 72:16 73:2,10,14,22 75:15,20 76:1 77:1,15 79:5,6 86:3 113:24 114:18 116:11 116:20,23 134:1 214:6,23 215:1 218:6 219:1,7,9 231:22 243:15 244:4 251:13 251:16
**student's** 4:25 35:22 36:2 72:2,18 76:5
**students** 30:21 36:15 45:23 46:5 71:19 72:8,12,15 81:22 82:4 85:24 93:16,18 93:19 95:5,12 96:5 104:11,19 115:20 135:15 136:17 138:4 138:10 140:14 140:16 258:14 272:10
**stuff** 165:19 228:11
**subject** 32:13 87:11 111:6 262:24
**subjective** 153:5
**subjects** 99:23
**submit** 122:2 156:21 170:23 171:1,3 172:2 176:1 182:22 249:6
**submitted** 27:15 28:4 56:3 113:7 139:25 147:10 148:2 175:8
**subpoena** 143:8 144:17 185:15 189:6 226:20 243:7 267:20 268:8 268:11 270:4 271:17
**subsequent** 6:2
**substantively** 134:25
**substitute** 142:17,19
**success** 247:1,2
**successful** 94:11,16 99:21 100:1 246:8,12 246:13,17 247:5,8,18,20 248:8,9,13
**sudden** 62:18
**sufficient** 174:8
**suggest** 41:18
**suicidal** 193:22
**suicide** 167:4 182:23 183:14 183:17 184:25 184:25 185:23 187:4,23 188:15 193:17 193:19 194:5,6 194:8 195:9 197:10 198:3 198:12,18 199:1,4 200:18 244:9,11,20
**sum** 159:21
**summarize** 159:4
**summed** 163:8

**summer** 72:7,7
**summing** 160:11,13
**sums** 159:11
**supervise** 137:23 138:17
**supervisor** 2:18 3:16
**support** 37:23 38:10 39:3,23 40:4,12 95:8
**supporting** 88:25 95:6 114:15,23
**supports** 38:12 39:18 43:4
**supposed** 40:24 181:23
**sure** 11:23 12:24 20:7 26:8 29:1,24 32:2 35:24 43:13 46:6 58:15 59:4 68:12 69:23 71:19 74:4 75:1 84:9 87:20 90:6 101:18 102:21 103:5 104:1 114:17 118:18 146:12,13 148:18 150:24 153:4 155:11 157:8,21 158:17 164:8 164:22 176:6 178:11 180:11 215:20 216:8 226:12 229:5,9 243:10 246:15 250:23 266:15 268:9 270:6 272:6,15
**suspended** 138:9,11,13,14 138:18
**suspension** 87:9
**sustain** 21:14 35:17 199:13 247:23
**sustained** 19:24 20:1,1 21:23 23:2 24:8 39:15 42:19 45:7 58:12 64:11 118:9 130:25,25 236:2,8 237:15 237:15
**switching** 88:10
**swore** 8:4
**sworn** 7:11,21 8:11,16 23:18 29:15 30:1,8 68:17
**system** 72:6

**t**

**t** 68:16 264:1
**tag** 82:16 135:9 135:15 136:17 137:21 138:3,6 138:7,23 139:1 139:2 140:11 140:12,12,15 140:24 141:15 142:20,25
**tagged** 140:14
**tagging** 82:17 140:16,19
**tainted** 250:24 250:25 254:1
**take** 4:11 8:15 9:5 48:6 81:6,9 81:23 85:14,16 95:10 101:18 123:6 164:11 173:9 176:8 177:6,24 180:24 181:3,7 181:14,16 196:11 197:2 230:3 236:3 266:11,17 271:7
**taken** 85:10 110:25 137:23 137:25 138:13 138:14,16,18 140:21 141:8,9 148:9 152:13 181:21 274:8 274:11
**talk** 4:9 32:9 65:20 69:20 77:13 78:6 81:7 84:7 86:25 88:22 98:13 115:24 116:1 123:15 123:23 142:11 206:11 256:22 267:19
**talked** 79:24 183:10
**talking** 7:5 14:3 18:5,7 24:3 38:12 39:2 46:20 50:18 63:15 75:21 82:23 85:4,5 86:24 94:20 103:8,8 107:6 123:2,9 149:8 159:15,16 160:7,8 164:17 199:21 201:2 204:4,5,12 206:2 209:10 209:12 214:13 231:8 235:4 237:21 241:20 241:20 248:11

259:4 262:14 263:25 264:1 267:13 272:3
**talks** 78:6 80:19 84:5
**tangent** 154:1 212:3
**task** 92:24
**tattling** 79:5
**teacher** 43:14 45:21 79:7 80:7 96:14 98:22,23 119:8 142:17,17,19 142:19 148:3 149:22 189:23 195:17
**teachers** 37:9 98:17 142:13 197:12 198:13 200:18 202:6 202:12 238:12 272:11
**teaching** 71:21
**team** 11:17,24 57:20 62:16 65:5 66:5 74:10,14,16 83:21 84:15 87:24 89:21 90:3 96:22 97:15
**teams** 1:20 274:6
**technically** 268:12
**technique** 88:6
**techniques** 73:6
**teleconference** 1:20 274:7
**tell** 8:4 69:21 70:10 71:15 76:16,24 85:9 85:15 92:21 93:23 123:12 126:5 156:13 167:11 186:21 218:25 239:1 249:21 255:15
**telling** 84:20 86:16 259:23
**ten** 46:18 48:6 55:2 181:18 182:6 230:3 235:25 250:7
**tense** 23:19,19
**term** 134:23,24 135:4 191:24
**terminate** 110:6,8
**terms** 36:6,9 38:13 81:11 82:24 94:5,17 129:9 237:16 242:10
**test** 28:17 36:14 42:6 151:25 269:10
**testified** 4:9 7:11 12:7,8,15 13:1 18:2,10 18:15,16 20:3 20:7,13,19 21:3,10,24,25 22:15,17,19 23:1 29:15 30:1 33:6 35:4 37:19 38:6 39:7,14 40:10 41:4,15 45:16 45:16,17,19 46:2 56:17 61:16 62:6 68:18 114:3,22 117:14 120:19 121:2 122:18 125:2,21 127:12,24 128:3,24 129:10,13,15 133:9 135:9,15 135:25 136:18 138:8 143:25 145:15 153:15 168:14 169:8 191:16 194:15 196:7 197:10 198:18 203:5 212:8 217:9 220:13,25 221:14,14 223:1,4,13,15 225:13 231:1 245:18,21 247:4,17,19 248:12 249:14 251:1,25 252:2
**testify** 19:20 42:4 118:15,16 118:17 127:19 127:20 150:19 151:20,23 152:6,7,7 199:18 269:3
**testifying** 13:10 39:16 41:5 60:25 62:10 139:16 183:4 184:17 241:12 266:3 272:23
**testimony** 4:4 11:6 12:22 13:5,11,22 15:21 18:17 19:1 20:15 22:22 23:18 25:20 29:16,22 30:2,9 38:2,11 39:20 40:3,5 41:16 50:5 51:12 58:17 61:25 64:9 67:8 103:19,19 111:25 118:8 118:14 121:10

129:5 131:8 136:19 143:11 151:16,18 152:3 153:20 156:6 165:16 170:10 190:6 190:16 192:2,5 192:20 193:18 196:12 197:7 197:15 200:4 215:8 216:3,8 225:11,12 228:16 235:21 235:23 242:1 242:13 244:22 248:15,16 251:6 255:21 255:23 261:1 266:17 269:18 269:20 270:15 270:18,20,22 270:23 271:10 271:20 274:7 274:10
**testing** 36:12 36:13
**text** 28:6 180:12
**thank** 10:2 24:14 29:7 34:21 52:23 55:4 61:8 67:13,16 68:3 70:10,12,21 100:3 112:18 114:12 138:22 146:10,21 153:3 155:13 158:2 162:7 189:9 192:17 193:14 194:20 205:25 209:3 212:2 213:20 218:20 222:15 227:5 240:16 242:22 244:13 245:9 255:3 273:8,11,12,13
**thanks** 100:13
**theirs** 29:4
**thing** 22:25 35:11,13 98:4 122:7 160:12 165:1,7 173:16 185:9 202:13 258:1
**things** 44:7 80:6 84:20 95:3,17 116:14 130:2 135:23 147:6 152:5 153:18 166:5 204:10 238:7
**think** 5:8,12 6:20 13:9 19:16 21:16 24:5 30:7,20 31:11 38:23 41:2 51:11 53:18 62:21 63:5 64:17 65:19 87:17 95:7,11,22 100:6 101:14 103:2 104:1 106:16 107:11 107:14 108:8 113:3,4,6 120:7,20 121:2 121:4 123:17 123:24 127:17 131:3 133:19 137:17 139:25 143:12,14 146:5 147:1 152:23 156:1,2 157:10 167:7 170:14 174:6,9 177:5 180:22 182:14,15 185:6 187:2 194:23 195:3 195:25 197:22 198:24 199:17 201:19 202:18 211:2,22 213:9 215:3 216:19 217:9 221:25 223:24 226:22 231:21,23 235:20,24 247:22 250:12 250:13 253:7 253:23,24 254:14,21 256:13 258:8 261:2 262:7,9 268:1,18 269:2 269:15,17 270:15 271:3 271:21
**thinking** 50:17 101:14
**thinks** 153:6 223:20
**third** 80:21
**thou** 71:1
**thought** 51:24 64:20 79:4 108:19 110:24 116:12 146:8 157:23 170:23 201:14,15,17 201:21,23 207:22 213:6 236:24 264:5 264:10
**thread** 148:17
**threat** 45:22 46:4 47:7
**threaten** 111:8
**threatened** 111:8,13
**threatening** 110:8 111:11

**three** 103:8 119:9 181:18 217:6 226:5 227:2 254:13 254:17,19,23 254:23,25 264:21 265:6 265:13,20
**threw** 87:8
**throwing** 61:19 62:7
**thrown** 24:1 79:2
**thursday** 172:19
**ticking** 48:3 66:2
**tied** 133:7
**time** 1:19 3:13 5:21 7:3 8:13 9:18 15:2,21 17:18,22 20:19 20:21 22:10 25:8 27:8 30:9 30:22 31:15 33:22 35:23 36:6 45:24 48:3,14 49:19 52:3 53:20 57:13,22 59:15 60:25 63:13 64:16 65:6,17 66:2,6 71:6 76:12 80:10 81:7,21 82:8 87:4,24 88:24 100:4,6 101:18 105:24,25 108:18 109:3,7 109:9 111:15 118:1 119:13 120:2 124:25 126:12 132:19 138:2,20 141:21 142:3,8 143:13 147:5 148:24 152:3,6 172:8 174:13 176:2 177:2,6 177:25 178:6 178:17 179:9 181:1,16 182:5 184:15 186:8,9 189:20 191:6 191:10 192:15 196:11 205:23 208:16 210:3 213:4,15 214:17,19 220:9,11 227:3 228:3 230:22 236:23 239:20 239:21 241:3 243:3,4 249:8 250:1,4,11,21 253:22 264:24 264:25 265:11 265:11 268:5,8 268:10 269:17 271:5,16
**timeframe** 42:2 42:18 43:15 113:8 168:12
**timeline** 50:2 168:21 169:7 169:10 197:15
**timely** 144:15
**times** 36:13 72:25 76:19 78:25 79:2,3 80:22 81:10,19 82:1 83:5 91:3 117:13 119:9 142:7,11 152:24 182:1 217:7 243:8
**titled** 83:19 90:9 97:4
**today** 125:12 144:16,16,25 162:13
**today's** 273:2
**together** 116:21,22 186:1,1 240:24
**told** 87:7 149:14,14,16 219:5 238:19 238:20 240:16 240:18,19,23 240:24 257:4
**tomorrow** 144:16
**took** 14:13 48:14 75:5 97:10 109:2 141:4 142:7 152:25 182:2 195:2 203:17 274:4
**top** 10:16,17 12:13 69:13 74:22 78:8 170:2,4,17 171:5,7 176:15 176:16
**topic** 33:7 38:16 257:14
**topics** 136:2
**tossing** 88:11
**touch** 9:17
**toward** 205:9
**towards** 84:7 94:1 96:22 132:5
**track** 218:12 219:12 220:20
**train** 64:20 108:19 207:21 213:6 236:24
**training** 97:21 101:23 104:9 104:17 105:4,6 105:23 107:2,4 107:5,13,15,21

108:5 110:14
**trait** 132:24 133:2 217:24
**transcript** 13:22 18:18 20:16,21 22:17 40:16
**transcription** 274:9
**transcripts** 273:4
**transferred** 70:25
**transition** 26:3 26:5,11,12
**trial** 29:18,22 30:4 72:25 216:5,10 217:1 217:5,8,14 227:9
**trialing** 73:6 85:13 88:5
**trick** 203:20,21 204:2,7,8,15
**tried** 60:11 116:17
**trigger** 84:21
**trouble** 37:1 119:1
**true** 84:14 109:17 274:9
**truscello** 36:7 37:5 46:1,22 49:16 77:2,3 149:13,16,18 151:14 153:7 169:24 170:5 172:24 173:3 175:3,16,22 176:10 178:25 179:2,2 195:18 196:16 197:18 197:19 199:22 202:9 235:13 237:3 257:15
**trust** 248:13
**trusted** 149:19
**truth** 8:4,5,5,6
**truthfully** 163:12
**try** 30:21 47:3 60:16 79:17 84:21 92:8 103:6,15 104:1 110:15 112:10 156:24 169:20
**trying** 3:20 14:12,15 20:17 20:18 22:14,18 29:20 30:5,23 31:11 40:1,8,9 40:23 45:5 48:10,14,24 52:24 53:2,21 59:16 60:1 61:4,5 63:7 78:1,18 79:6 80:9 82:20 92:6 101:17 103:6,14 106:5 107:25 108:14 108:17 109:8 109:20,21 110:9 112:2 129:18,21 143:15 147:12 154:2 156:7,8 157:2,17 160:9 162:24 164:10 165:4 168:12 171:18 174:18 175:10,13 180:18,19,21 181:25 182:4 186:5 196:22 196:23 203:22 208:16 210:12 211:16,25 212:6 226:2 238:5 242:3,4 248:7 250:16 255:9 260:19
**tuesday** 169:24 175:3 178:12 271:25
**turn** 100:14,15 118:16 263:17
**twenty** 157:13 162:25,25 201:2,3 204:20 205:3,3 206:1 208:24 229:4,4
**twice** 240:3
**twisting** 159:7 159:25 160:18 161:1 162:2 239:15,18
**two** 70:3 71:1 79:24,25 155:21 157:13 166:7 167:8 185:7 186:18 187:15,15 188:4 239:21 254:22 258:8 258:10 265:20
**tying** 86:24
**type** 71:24 89:14 95:13 128:10 212:16 216:25 217:16
**types** 206:24 207:2 208:3
**typewritten** 274:8
**typical** 27:2 76:24 77:5
**typically** 19:10 92:5 114:14,23 117:5 128:20

**u**

**u** 68:16,16 264:1
**uh** 6:4 70:9 79:16 91:23

92:1,10 93:12 158:1 194:24 212:14 259:3
**ultimate** 50:13
**unable** 81:5
**unchecked** 140:2,3
**unclear** 184:22
**under** 7:8,11 8:6,17 52:25 55:22 61:23 68:19 76:15 92:20,20 97:14 121:19 165:15 190:20 222:24 230:19 274:8
**undergraduate** 69:23 102:1
**understand** 20:24 56:13 59:19 61:22 62:2 77:21 78:16,19,21 84:9 85:18 86:4 92:22 98:13 103:4 113:13 129:17 136:25 144:22 154:17 155:3 165:17 167:21 174:10 183:1 186:8 188:17 210:12 217:2 222:12,14 225:18,19 246:15 270:21
**understandable** 169:1 193:14
**understanding** 35:1 85:3 90:14 96:2,16 96:21 97:25 98:25 99:10 120:2 124:9 133:10 143:12 154:18 202:17 210:4 221:22
**understood** 95:20 273:9
**undue** 48:16
**unfair** 123:19
**unfold** 77:5
**unintelligible** 12:20 35:5 38:17 41:2 44:9 61:20 107:16 108:9 109:22 111:6 111:10 128:15 130:12 131:10 133:12 137:3 153:23 165:25 170:25 178:3 186:15 191:15 199:8 203:25 204:3 208:13 209:10 211:21 213:7 219:18 220:7 221:20 222:15 223:7 224:3 232:2,4 232:9 235:5 237:20 242:12 255:23 261:21
**unique** 247:3
**units** 105:21
**university** 69:25 70:1 105:17
**unnecessary** 246:23,24,25
**unpack** 84:23
**unquote** 143:22
**update** 26:20 27:25 28:1 36:8 45:25 46:10 181:11 195:6 198:16 198:17 215:20 264:8
**updated** 27:22 43:10,23 44:18
**upset** 49:22 78:15 116:4 145:12,16 149:15,16 184:6,14 189:25
**use** 49:17 134:23,24 135:4 149:14 149:15 174:13 191:24 219:24 264:23,25 265:5 266:5
**used** 77:14 79:12,16 135:6
**using** 92:24 235:6 253:17 253:20,23
**utilized** 77:15 85:22

**v**

**vacation** 272:20
**vague** 21:17,19 102:21 103:3
**valid** 134:9 170:14 247:12 247:14 248:1
**verbatim** 151:4 274:3
**verify** 186:12
**verizon** 179:1
**verizon.net** 84:2
**versus** 3:10 80:3
**video** 77:12 92:12,13
**view** 78:17 120:23
**viewsonic** 77:8
**village** 71:4 101:16

**violated** 129:25 238:9
**violation** 165:11
**violations** 165:14
**violent** 145:22 148:6 238:11
**virtual** 113:17
**vision** 116:13
**visited** 96:11
**visual** 92:25
**visuals** 93:10 93:11
**voice** 32:25 214:17
**voicemail** 190:4 215:5
**voicemails** 86:14
**voluminous** 231:17,20
**voluntarily** 238:18,24 239:13 240:4,5 240:10,11
**voluntary** 239:3,22
**volunteer** 240:13,13 245:19,19,22
**vs** 1:9 274:5

**w**

**wait** 14:11 100:24 147:1 157:6 185:12 185:12,12,17 185:17,17 230:9,9,9 270:21
**want** 3:24 4:16 4:17 5:6 14:4 17:2 24:3 34:20 35:24 47:3 49:19 58:15 65:10 66:8,10 67:23 79:23 84:7 86:16 91:11 93:14,14,24 94:2,3,5 103:10,15 107:12,22,24 108:4,23 109:2 110:6,12,16 111:14 120:25 123:24 125:4 137:9 140:3 143:20 146:13 150:23,24 152:1 155:20 156:6,10 157:20 158:16 163:16 164:4 171:20,25 176:6 178:11 181:3 186:7 193:1 194:16 194:22 203:24 203:24 204:25 213:13 227:18 238:25 239:6 240:5 245:11 245:12,15 246:5 255:3,12 264:9,18 265:8 266:4,22 267:18,19,23 268:15,20 269:3,6,15,16 270:19 272:6
**wanted** 5:2 24:13 25:11 33:21 52:12,18 52:19 54:12 56:19,20 59:25 60:3 62:8,15 62:19 63:21 64:4 65:3 66:11,15 75:1 87:23 88:21 156:20 167:6 167:15,23 168:6 193:20 194:1,15 224:24 255:19 269:12 272:15
**wants** 27:9 46:12 113:18 207:23 269:11
**waste** 49:19 208:16
**wasted** 182:5 250:4
**wasting** 25:8 53:20 64:16 215:16 220:9 220:11 228:3 230:22 250:21
**watch** 77:12
**watching** 92:12
**way** 5:13 58:16 65:16 70:11 99:7 103:2 115:5 131:2,4 141:20 169:17 169:21 177:4 184:11 190:5 199:14 217:22 239:14 250:2
**ways** 41:13 105:13
**we've** 5:12 34:10 89:9 120:2 129:3 131:5 136:21 143:12 146:6 182:11 184:22 195:3 217:9 238:1,3 261:2
**week** 36:10 76:19 91:4

**weight** 86:4
**welcome** 113:20
**went** 70:14 139:3 154:1,8 190:3 212:3 218:11
**west** 98:24 99:3 99:11,15
**whichever** 173:18
**willingly** 245:17,22
**willingness** 19:7
**window** 36:24
**wish** 194:10
**witness** 3:22 4:7 7:10,25 35:10 36:19,23 38:23 42:16 57:1 63:12 65:19 67:16,18 67:19 68:11,17 68:23 100:8,15 103:20 106:18 110:2 118:7,11 120:19 121:11 121:14 122:18 125:2,8 127:5 128:12 129:4,4 129:12 134:10 136:5,8,12 139:9 141:14 146:4 148:12 150:20,22 151:7 153:12 156:18 161:13 161:15,17,19 162:14 165:18 166:2,9 170:12 173:24 174:10 183:3,5 190:23 191:1,5,20 199:18 200:1 201:12 203:24 206:4,12 207:23 208:10 209:4,25 210:15 211:13 212:20 214:22 218:18 219:25 222:3 226:14 243:24 247:3 248:4 255:6,25 256:3 257:22 259:3,7 260:7 260:8,11 263:15,18,21 263:24 270:24 274:14 275:2
**witness's** 202:17 211:6
**witnessed** 86:9 161:23 162:5
**witnesses** 4:7 264:11 266:21 266:23 267:24 269:16,19,24 270:2 271:3,22 272:2,6
**wonderful** 70:21
**wondering** 102:25
**woodchips** 87:8
**woodhouse** 248:21 251:13 251:20 252:1 254:5,11 255:18,20 256:8 257:14 257:16 259:1 261:8
**woodhouse's** 257:5 258:13
**word** 80:11 127:6 151:4,4 151:5,5 213:14
**worded** 91:17
**words** 57:23 61:18 75:13 80:8 125:22 127:13,19,20 127:22 128:2 131:15,24 132:7 133:6 157:19 161:1 191:23 192:11 217:20 218:23 219:4,24 220:15 221:6,9 221:15 223:2 224:17 263:7
**work** 69:24,24 71:3,19 72:5,8 73:9 74:6 76:23 78:1,10 82:3 94:8,10 94:12,14 95:20 115:19,22 116:21,22 172:7 227:22 227:23 265:3 265:14 268:11
**worked** 96:10 96:12 101:7,16 103:13,17 112:25 113:24 114:3,9,20 116:11 129:12 272:22
**worker** 29:16 31:22 32:5 67:20 69:9,21 70:23 71:5,17 72:10 73:12 74:13 75:12 85:24 88:25 90:1,13 91:2 92:6 97:8 99:9 113:24 152:13 183:22
**worker's** 30:2 235:18

**working** 36:15 74:1 75:2 77:22 81:11 94:7 104:5 105:7 114:20 129:14 134:11 185:13
**works** 9:18 28:21 112:12 126:7,15,16 127:2 148:21 148:25 172:11 268:9,22 270:21
**wound** 94:19
**write** 163:23 196:3,4 269:1
**writes** 163:13 163:19 170:5
**writing** 19:4 57:24 94:10 115:23 153:16 267:16
**written** 17:23 19:11,14 30:22 35:20,25 43:19 44:24 47:21 57:22
**wrong** 9:6 52:2 146:16 158:7
**wrote** 149:12 160:22,23,25 161:6 163:11 164:18 172:6 172:23,24 179:1,3 192:11
**wsms** 98:23,24

**y**

**y** 7:9 68:16
**yeah** 5:18 8:24 13:7,20 14:1 15:1 16:5 24:6 28:11 40:6,8 41:19 47:15 51:11,12,15 52:1 53:11 61:4,7 63:3 68:2 87:8 103:25 107:11 108:22 111:17 114:3 121:16 124:4 126:20 127:9 131:9 133:18,20 135:3 145:6 146:9,22,25 147:24 150:15 151:19 153:21 155:1,1,11 156:23,23 157:1,10 158:1 158:19 159:3 160:24 168:16 168:20 169:13 175:2 178:18 180:4 190:24 192:4 199:9 200:6 201:22 205:6 212:17 213:8,9 218:15 222:16 223:10 223:11 232:24 232:24 235:10 239:4 241:11 242:11 243:22 246:3 247:7,7 249:11 251:16 251:17 256:4,4 258:5,22 259:8 263:8 267:2,15 267:15 268:18 269:1 272:21
**year** 37:10 42:17,20,23,24 56:17 70:5 74:5,7,11,17 75:6,18,23 77:9 83:20 84:16 90:1,4 94:19,21 96:23 97:12,17 98:20 114:4,5 116:25 117:23 118:4 118:21 119:4 119:10,14 163:9 205:19 208:10 246:9 246:14,18 247:6,9,18,20 248:13 275:10
**year's** 75:16 78:13
**years** 101:7,20 102:17 103:7 105:22,23 106:22 112:25 113:25 126:2 128:24 129:13 130:21 131:5 134:11 165:23 194:7 201:1 229:11
**yelling** 159:7 159:24 160:18 162:1
**yellow** 49:10

**z**

**z** 2:6 7:9,9
**zoom** 3:12 158:23 193:1,8

CONNECTICUT STATE DEPARTMENT OF EDUCATION
SPECIAL EDUCATION HEARING

| | |
|---|---|
| In Re: [redacted] Complainant | Doc. No.: 25-0686 |
| vs. | |
| MILFORD BOARD OF EDUCATION, Respondent | |

HELD BEFORE:
PATRICK KENNEDY, ESQ., THE HEARING OFFICER

DATE: October 27, 2025
TIME: 10:02 a.m.
PLACE: (Via Teams Teleconference)

Reporter: Robert G. Dixon, CVR-M #857

A P P E A R A N C E S:

For MILFORD BOARD OF EDUCATION:

BERCHEM MOSES, PC
75 Broad Street
Milford, Connecticut 06460
By: HERBERT Z. ROSEN, ESQ.
HRosen@berchemmoses.com
203.783.1200

For the Complainant ([redacted]

ROBERT [redacted] (pro se)

Also Present:

NADINE MACKLIN,
Milford Board of Education
Special Education Supervisor

(Begin: 10:02 a.m.)

THE HEARING OFFICER: All right. If everyone's here and ready to go forward, we'll start.

THE REPORTER: On the record.

THE HEARING OFFICER: All right. The hearing will please come to order. We're here on the case of [redacted] and Milford, and this is Case Number 25-0686.

The first bit of housekeeping is our mailing date is coming up on November 10th, so we're obviously going to need to do an extension. So, does someone want to request an extension of the mailing date?

ATTORNEY ROSEN: I would respectfully request an extension of the mailing date.

THE HEARING OFFICER: Okay.

ROBERT [redacted] What is this extension about a mail? What's the mailing date mean?

THE HEARING OFFICER: That that's the date that a decision has to be sent out. So --

ROBERT [redacted] We're going to need extra. I sent an e-mail. We're going to need extra days, and I won't be able to start until December after November 4th.

THE HEARING OFFICER: All right. Well, we'll get to

that, but the District just requested an extension of the mailing date. So, I'll extend, extend it 30 days, which is what I can do at a time.

But I think this isn't going to be the -- this isn't the first one that we've needed, and this won't be the last one we've needed, but -- all right. So, I'll issue -- it should be roughly 30 days from November 10th. So, I'll issue a notice of what it is, but I have a request on the record.

Did you want to talk about scheduling other dates now, or wait until later?

ATTORNEY ROSEN: I'd prefer that the District can put on its case, and then scheduling can be discussed perhaps towards the end of today's session.

ROBERT [redacted] I just --

THE HEARING OFFICER: Okay.

ATTORNEY ROSEN: We'll do Ms. Collette, and I'd like the District to be able to finish its case today.

THE HEARING OFFICER: Sure.

ROBERT [redacted] And I'd have to discuss it with Ms. [redacted] as far as what date she's available in December. So, that's something that we'll have to discuss.

And then there's the fourth -- we're

definitely going to need additional dates. I can't tell you how many, because we're going to have witnesses. We've got to do our testimony. So, we'll have to present our case in full, you know, a chance to do that.

The mailing date is referring to the brief. Is that correct? So, once the hearing concludes, that's the 30 days in order to submit a brief?

THE HEARING OFFICER: Well, no. We'll set up a briefing schedule. What it is, is that's the date that, as of now, that a decision has to be issued, and that that's obviously not going to happen. We'll need more time for hearings and briefs, and everything.

But that's actually, you know, the law sets relatively short mailing dates, but it can be extended at the request of either party. So, yeah, we just have to --

ROBERT [redacted] So, it can be extended again?

THE HEARING OFFICER: Yeah. So, it's kind of a pro forma marker really at this point. At the end it will set when everything has to be done, which is probably still a ways out.

All right. So, we'll put the scheduling of other hearings on the back burner for the moment.

Let me just have everybody who's here identify themselves to the record.

ATTORNEY ROSEN: Good morning. This is Herbert Rosen, attorney for Milford Board of Education. I'm with Nadine Macklin, special education supervisor for Milford Board of Education, representing the administration.

And our next witness, Sara Collette, also a special education supervisor for the Milford Board of Education.

THE HEARING OFFICER: All right.

ROBERT [redacted] I'm Robert [redacted] [[redacted]s dad.

THE HEARING OFFICER: All right. Very good. And I'm Hearing Officer Patrick Kennedy.

All right. Do we have any other preliminary matters that we have to discuss?

ATTORNEY ROSEN: The --

THE HEARING OFFICER: If not -- go ahead.

ATTORNEY ROSEN: If I may? I mean, typically the District would raise concerns if one defendant who has equal decision-making, as has been expressed to us, given that miss -- and I shouldn't say defendant. A family member and actually petitioner in this case, Ms. [redacted] says that she can't attend. Typically, we'd be concerned

about proceeding given that decisions may be made as to how to proceed, and we'd want both family members, both parents present.

But in light of the fact that we have the student currently at a stay-put where we're agreed upon what the stay-put is, but neither side believes it is appropriate for the student, we're fine moving forward, but I just wanted to note our reservation for the record.

THE HEARING OFFICER: All right.

ROBERT [redacted] We received an e-mail from the Hearing Officer when this question came up about parents, you know, attending. The Hearing Officer responded in an e-mail before the hearing that it's only one parent is required.

So, the absence of Ms. [redacted] today should not affect that at all.

THE HEARING OFFICER: I don't think she actually signed. I don't think she actually originally even signed the complaint.

So, I'm usually -- I'm willing to proceed without one, one parent. And the District said it's got reservations, but is also willing to proceed without one parent. So, I think we're fine. We can just start.

ATTORNEY ROSEN: Sure. Just for the record, I'm not sure what e-mail Mr. [redacted] is referring to. I don't think I've received a copy.
So, we're fine moving forward.
THE HEARING OFFICER: This was actually quite a while ago where we had set dates at the prehearing conference. And the mother had sent an e-mail back saying, well, I'm not really available for any of those dates.
And I was like, you know, we can't just --
ATTORNEY ROSEN: I see.
THE HEARING OFFICER: So, all right. So, you can proceed with your witness.
ATTORNEY ROSEN: Okay. The District calls Sara Collette, please.
SARA COLLETTE: Hello.
THE HEARING OFFICER: Good morning. Let me have you raise your right hand.
S A R A   C O L L E T T E,
called as a witness, being first duly sworn by the THE HEARING OFFICER, was examined and testified under oath as follows:

THE HEARING OFFICER: Okay. You can proceed.
ATTORNEY ROSEN: Okay. Good morning, Ms. Collette.

THE WITNESS (Collette): Good morning.
ATTORNEY ROSEN: Thank you for joining us.

DIRECT EXAMINATION (of S. Collette)

BY ATTORNEY ROSEN:
Q. By whom are you currently employed?
A. Milford Public School.
Q. And I'm going to show you what's in evidence as Exhibit 33.
Can you see your resume here on your screen? Let me know if you need me to --
A. Yes.
Q. Okay. So, Ms. Collette, what is your current position at Milford Public Schools?
A. I'm the middle school special pupil services supervisor.
Q. Okay. And before we discuss a bit about your responsibilities and what that role entails, could you please just let me know a bit more about your educational background? Where did you receive your undergraduate degree?
A. Sure. So, I double majored in elementary and special education at the University of Hartford, and I minored in behavioral

studies.

Q. And do you have advanced degrees beyond the bachelor's?

A. I do.

Q. And what are they?

A. I have a master's in special education at the University of St. Joseph, and that actually had a concentration in [redacted] spectrum disorders. And I also have a six-year degree from Quinnipiac. And then --

Q. I'm sorry. It was a little hard to hear.

Could you tell me what the focus or specialty was with respect to your master's?

A. [redacted] spectrum disorders.

Q. Okay. And what is an educational leadership six-year degree?

A. It's an additional master's, and it's tied to my 092 certification as -- as an administrator.

Q. Okay. And speaking of certifications, could you describe the certifications that you have in the realm of education in the State of Connecticut?

A. Sure. So, my current certifications are elementary education, comprehensive special

education, and my 092 for being an administrator or supervisor.
Q. And prior to working at Milford Public Schools, could you describe some of your prior roles?
A. Sure. So, the -- the rest of my career was spent in East Haven -- or the beginning of my career was spent in East Haven for East Haven Public Schools. I was a special education teacher.
Then I assumed a teacher on special assignment position, which was increasing in leadership responsibilities, and then was kind of acting elementary special education supervisor before actually assuming the title of special education supervisor for East Haven Public Schools.
Q. And as a special education supervisor at East Haven Public Schools, what were some of your responsibilities?
A. I supervised and evaluated staff and programming, and ensured that students received appropriate educational programs. I was the case manager for out-of-district -- for students who were placed out of district,

curriculum writing, state compliance with IEPs.

Q. I see on your resume you write, spearhead rollout of CT-SEDS to all pupil service staff and remain a resource for staff to troubleshoot clerical challenges.

What is CT-SEDS?

A. So, CT-SEDS is our IEP database within the State of Connecticut. There's a reason why that's on my resume, because that was incredibly challenging for all districts in the state, and that was a rather big lift, so to speak, for -- for districts and the manpower that it took to ensure that all staff were trained in that new program.

Q. And when you say, troubleshoot clerical challenges, what type of challenges are you referring to?

A. So within the CT-SEDS system, as staff were -- both as staff were adjusting to the new system and as the new system was being built as it was being used, there were frequent errors where team members -- for example, team members were trying to indicate a specific recommendation for students, and

the system wasn't -- wasn't able. We weren't able to do so within the confines of the data system.

So, there was a lot of collaboration between school staff and the help desk at CT-SEDS. That has since decreased but still occurs.

Q. Well, are there still situations where you have to go through a certain process on CT-SEDS to perhaps retroactively revise prior documents in response to conversations at planning and placement team meetings?

A. Sometimes. There are situations within the system that are kind of data-based quirks, as I think of them. So, for example, if you -- if you, as a user, complete the evaluation module for an initial or a triennial, before you -- you have to do that before you finalize an IEP. Otherwise, it locks you out of one of the modules.

It can be a bit challenging to navigate.

Q. Okay. And so currently, you're the special education supervisor at Milford Public Schools. What are your primary responsibilities in that role?

A. They're very similar to what I did in East Haven, supervising and evaluating staff and programs and ensuring students have the appropriate educational supports within their IEPs, providing professional learning opportunities.

I'm in my building once a week at least, so a lot of collaboration.

Q. And you've been serving in this role since July of 2024. Is that right?

A. Yes, July 1, 2024.

Q. Okay. Now, the first line here under your responsibility is, supervise and evaluate special education-related services staff in three middle schools. What are the three middle schools that you supervise?

A. Harborside Middle School, East Shore Middle School, and West Shore Middle School.

Q. Are there differences in what each of the middle schools within your district and under your charge provide in terms of special education services?

A. Yes. So, within our district we have a continuum, a full continuum of supports for students with individualized education plans,

and in each building there's a continuum as well.

So, for example, East Shore Middle School has resource room instruction for -- for students who require some academic instruction pulled out of or co-taught with general education.

East Shore also has specialized programs specific to students with social, emotional, or behavioral challenges.

West Shore Middle School has a resource room model with that, without any specialized program classrooms.

And Harborside Middle School has resource room instruction, and also three specialized program classrooms specific to the learning needs of students on the [redacted] spectrum, students who require some additional functional or life skills instruction. Yes, that's in its entirety.

Q. Okay. We're going to revisit that, because I'm going to want to hear a bit more about the differences from the programming.

But before we get there, you mentioned, you know, about the focus in your master's.

In your experience as a special education supervisor, do you have particular experience with respect to the planning and provision of education to students who are autistic?

A. I do. I, as a special education teacher, taught students with [redacted] and built IEPs that were appropriate for their needs. And now, as a special education supervisor in both my district, past and current, I have experience with building appropriate programs for the unique learning needs of each student on the spectrum.

Q. And in your role as special education supervisor, have you become familiar with a lot of the area out-of-district placements that can be available to students?

A. Yes. So, in my past professional experience and my current I am the case manager for students who are residents of town but attend out-of-district educational programs.

Q. Okay. Thank you.

So, while in your role as special education supervisor, did you ever become familiar with a Milford Public School student named [[redacted] or [[redacted]

A. Yes.

Q. What was the context in which you became familiar with who he was?

A. So, in an effort to provide thoughtful transitions between our elementary learners and as they come up to middle school there are case reviews, conversations that occur.

So, case review, meaning I look at IEPs and then have conversations with school staff and have transition PPTs to ensure that we're recommending appropriate services, because the schedule from elementary to middle is -- is different.

Q. So, walk me through a little bit more closely that, the sequence. When you're discussing the transition of an elementary school student with special education needs to a middle school, what's the process that you follow?

A. So typically, if an annual -- annual review for a student is, you know, held earlier in the year, we have a transition PPT in the spring of a student's fifth-grade year to ensure that we are planning for that student's transition to middle school.

So, I speak with grade -- current grade-five case managers. I connect with Ms. Macklin, who's on our call as well. And we ensure that when we, you know, that the grade-five team who has the most knowledge of that learner at that time is understanding of the supports and services available at middle school level. And then we go to PPT and make recommendations that are in alignment with what the student needs.

Q. And in terms of evaluating what the student needs, is it possible that staff from different middle schools would be invited at the same time to a transition meeting?

A. Yeah. So, if -- if a grade-five team working with a grade-five student feels like they're not sure where an appropriate educational placement could be within the District, then the homeschool team and the team from the middle school where the specialized program is located is also invited so that we can have conversations at PPT to determine what supports and services the student needs.

Q. Now, as [[redacted] was nearing the time of transition from elementary school to middle

school, were you provided a copy of his educational records? Or, at the very least, his most recent individualized education program at that time?
A. Yes.
Q. And so, were you able to get a sense from the documents of [[redacted]s IEP and his special education needs?
A. Yes.
Q. And did you have conversations with members of the school team supporting [[redacted] at JFK about their thoughts about what would be an appropriate placement for the next school year?
A. Yes.
Q. Okay. Did they have any suggestions of areas to explore, or schools to explore for [[redacted] for the '25-'26 school year?
A. Yes. They were -- they wanted to explore Harborside's specialized program classroom to ensure that [[redacted] had the ability to generalize and have connected lessons in an effort to generalize skills that were taught that -- that meet his specific areas of growth.

Q. And could you describe a bit more in detail what the Harborside program entails, the particular program that was being suggested by the JFK team?
A. Sure. So, there's a direct specialized instruction academically. There's embedded social skills opportunities so that they're facilitated by trained adults to kind of model and develop peer relationships.
Additionally, there are embedded field trip opportunities that are targeted to generalize and provide opportunities to generalize the skills that are taught within the specialized instructional time.
And then, certainly there's time with non-disabled peers to the maximum extent possible and as appropriate for each child.
Q. And --
A. There's also -- I'm sorry. There's also -- just -- just to be clear, there's also opportunities for participation in unified arts classes, lunch.
The intention is to have a comprehensive middle school experience, but also provide specialized learning, direct instruction, and

then opportunities to continue to develop those skills in, like, non-school settings. So, a community field trip, for example.

Q. Would the experience of [[redacted] hypothetically participating in this program mirror the experience of all the other students participating in the program?

A. Yes. Obviously tailored to his individual needs, but yes.

Q. When you say, tailored to his individualized needs, how does that make the programming different?

A. So, based on his specific need for academic -- intensive academic instruction, behavioral support, the need to generalize skills, like those opportunities for skill generalization, the facilitated peer interaction and -- and instruction.

What I mean by that is every child is looked at individually and planned for individually, but also have kind of a similar skill set where this particular program is appropriate for their learning needs.

Q. Given that there were considerations about exploring Harborside as an appropriate

placement, did you, in your role as special education supervisor, take any steps to provide information to the parents about the offerings at Harborside?

A. Yes, I offered a tour, and Mom attended a tour of Harborside's programs.

Q. Were you on that tour with Mom?

A. I toured Mom personally, yes.

Q. Oh, okay. So, what did you show Mom?

A. So, we met. Additionally, his fifth-grade teacher attended so that, you know, there was a kind of building relationship together. And so, I toured her around the building as kind of a basic building tour to see the different spaces.

At Harborside we have specialized classroom environments, which she was able to observe. And then we also have, like, some daily living and life skills areas. So, for example, there's a kitchen. There's access to laundry washer/dryer to practice skills related to being independent long term.

And then she was able to speak with other critical building-based team members. So, administrators, school social worker,

school psychologist, special education teachers.

I'm trying to think of anyone else we met that day. I think that was -- that was it.

Q. And how did the visit go from your perspective?

A. I mean, I -- I think well. Mom didn't indicate that she didn't want [[redacted] to participate. She initially arrived asking about whether there were programming for students with [redacted] in the building and then left thanking me, and said that the programs were great and she appreciated our time, and she didn't share any concern.

Q. Okay. Did there come a time where you attended a planning and placement team meeting for [[redacted] to discuss transition?

A. Yes.

Q. Okay. I'm going to show you what's in evidence as Exhibit B-30.

Can you see this document titled, individualized education program?

A. Yes.

Q. Now, this is dated May 21, 2025. I see you

listed as an attendee. Is this the planning and placement -- is this the IEP from the planning and placement team meeting you attended to discuss transition for [[redacted]

A. Yes.

Q. Okay. Looking at the attendees, and to the best of your recollection, did either parent for [[redacted] attend this meeting?

A. No.

Q. Were you aware of why the parents were not in attendance?

A. No. I remember having conversations at PPT waiting to see if they would attend.

Q. Okay.

A. That's how we started our meeting.

Q. Well, were you informed by any members of those who were in attendance that the parents had refused to attend this planning and placement team meeting?

A. I don't remember specifically.

Q. Okay.

A. I remember we waited seeing if they would attend before we convened.

Q. Okay. And what were the recommendations made at this planning and placement team meeting

in terms of services and placement for [[redacted]

A. So, we recommended the specialized program within Harborside Middle School. It looks like from this document that there's -- can you zoom in a little bit?

Q. Sure.

A. That they -- that we recommended 825 minutes three out of the four-day cycle for academics; 30 minutes five times a week of social skills instruction; 30 minutes four out of the five -- sorry, three out of the four-day cycle with the social worker for push-in support; paraprofessional support within general education classes, transitions, toileting, or bathroom and lunch; one 30-minute group counseling with a related service person in the related service location; one 15-minute individual counseling session within a related service context, 30 minutes for five times out of the eight-day cycle.

And two 30-minute push-in group counseling sessions in general education, which was what we were removing because this was the elementary schedule for recess, and

recess is not within our middle school schedule.
Q. Okay. Now, I saw that there were attendees from West Shore in attendance. Is West Shore [[redacted]s neighborhood school, like, where he would attend normally as a general -- if he were a general education student?
A. Yes.
Q. Okay. Why was West Shore not part of the recommendation for the '25-'26 school year?
A. Because after understanding [[redacted]s learning needs and the need for opportunities for skill generalization and a structured setting and specialized academic and behavioral instruction, the specialized program best meets [[redacted]s needs.
Q. Okay.
A. It was recommended because we, at that time, felt it best met his needs.
Q. Was there any discussion about whether or not [[redacted] would require an outplacement, as opposed to Harborside?
A. No.
Q. Okay. Based on what you knew of his education abilities and needs, did you feel

that an outplacement consideration was warranted?
A. No.
Q. Did you believe that the District could meet [[redacted]s needs in district through the Harborside program?
A. Definitely, yes.
Q. In your role as special education supervisor, are you familiar with Hope Academy?
A. Yes.
Q. What is Hope Academy?
A. Hope Academy is a private special education program, state-approved, and it's located right on kind of the Orange -- Orange-Milford line.
It -- I have placed students there in the past, so I'm familiar with their -- with their program.
Q. Okay. And based on what you understand about Hope, would Hope be an appropriate placement for [[redacted]
A. I don't believe so.
Q. Why is that?
A. So, hope has a therapeutic kind of talk therapy approach. And based on my

understanding of [[redacted]s learning needs, he requires direct instruction more than I believe they can provide academically and behaviorally. And he's not the type of learner who, in my knowledge, who would respond to that talk therapy model. Rather, more structured explicit instruction, academically, behaviorally, socially, is really how we would see him respond in that.

Hope also kind of has -- I'm sorry. Hope also kind of has an open-air feel, so to speak. So, there's more larger learning spaces. And from my understanding of [[redacted] he's a pretty distractible learner, and so that's not an ideal setting with auditory and visual distractions.

He seems to learn best, from my knowledge of him, in a less visually and auditorially distracting space.

Q. Well, you mentioned concerns about Hope being able to support [[redacted] from a behavioral perspective. Could you elaborate on that?

A. Yeah. So typically, from my knowledge of other students who have been placed at Hope and who were successful within their program,

there aren't -- there really isn't the need for, like, behavior plans in the -- in the sense that [[redacted] has.

So, students that I've seen successful at Hope previously don't really have any externalizing behaviors -- kind of are able to sit through for a longer duration of instruction, whether that's academic or social-emotional, and kind of engage in a back-and-forth conversation.

They're kind of more -- typically, students that I see at Hope that -- that have done well in the past are kind of internalizing behavioral students, meaning there's depression or anxiety, or different learning challenges of that nature. And [[redacted]s needs are more met with success in terms of, like, using visuals to kind of cue first and next.

Really explicit and short instructional bursts seem to do -- seem to -- [[redacted] seems to respond best to that approach.

Q. Now, in your capacity as special education supervisor for Milford Public Schools, are you familiar with Woodhouse Academy?

A. I am.
Q. And how are you familiar with Woodhouse Academy?
A. I have also placed students out of district within the context of Woodhouse's program.
Q. And what is your understanding of Woodhouse Academy and the programming that they offer?
A. So, Woodhouse is similar to Hope Academy with learning profile of students. Woodhouse is actually a larger open space. So, in my professional opinion and based on my knowledge of [[redacted] that he's not -- is definitely not a recommendation that I could see him being successful in, in such an open space with -- with so many learners and having it be so distracting visually and auditorily.
Q. Okay. Now, were you made available at any -- were you made aware at any point during the course of supporting the team, working with [[redacted] and helping plan transition, that the parents had made a request for outplacement?
A. Not -- no, not until very recently.
Q. Okay. Now, I'm going to show you what is in evidence right now as Exhibit P-30. And I

understand you were not in receipt of this e-mail, which you'll see is titled, outplacement for our son, [[redacted]

Here, Mr. [redacted] writes that [[redacted] requires a program that prioritized -- and he lists several elements.

A. Uh-huh?

Q. So, I just want to talk through some of these elements, elements that the parent identified as important to them. And what I want to understand is, do you feel like these elements are addressed in the Harborside program?

So, executive functioning skills. He writes, [[redacted] needs structure to support, to enhance his ability to plan, focus attention, remember instructions, juggle multiple tasks.

How, if at all, does Harborside address this need with respect to executive functioning skills?

A. Sure. So, Harborside's program does address executive functioning skills. Some examples of how the program does that is, in an effort to try to both address the executive functioning skills and have students become

as independent as possible, they are -- first it's modeled, but then they are expected to be organizing their materials.

So, like, in homeroom every morning students are expected to look at their schedule for the day. So, let me -- let me share for those who are not privileged to know the middle school schedule here in Milford is -- is an eight-day, drop two periods a day, rotating-letter-day schedule. And so, it is -- the students do a much better job knowing where they're going than I do, and it -- and we color code it and everything.

So, because it is variable and changes day by day, we have students within the program organize themselves and -- and write their daily schedule out so that they are focused and understanding of where they're expected to be and when for the day. And additionally, you know, there's organization of materials that you're going to need for, you know, each individual class period and -- and things of that nature, that that would be embedded within the specialized program.

Q. With respect to Mr. [redacted] second point about necessary academic support, academically, how is Harborside going to support [[redacted]
A. So, Harborside would be able to provide specialized academic instruction to [[redacted] as prescribed in his IEP and in -- in a quieter area within the classroom that is less visually and auditorily distracting so that he can focus that attention on -- on learning academics.
Q. And is the instruction provided by teachers and service providers who are familiar with the unique learning needs of a student with [redacted]
A. Yes.
Q. With respect to social communication and skills, a setting where social interactions are coached and guided, building essential social skills, does Harborside meet this, you know, aspirational goal for an educational setting?
A. Yes. So, I -- I referenced before that Harborside's program has embedded social skills. That's facilitated by a teacher and

related service provider. So, sometimes that's a social worker or a school psychologist. Sometimes that's our speech language pathologist.

Again, that's as prescribed in students' IEPs, but it is a class period that students participate in, and it's facilitated and modeled and scaffolded so that each student learns and understands how to appropriately communicate with peers.

Q. Okay. What about with respect to this point about problem-solving skills, reinforcing practical problem-solving strategies? Is that -- can that be addressed through the Harborside program?

A. Yeah, I -- I think definitely. So, like, one example would be the opportunities for skill generalization. So, thinking about if there's a goal, an academic goal surrounding money, making change or understanding coin or dollar amounts, that's taught within an academic instructional time. And also, there's embedded problem-solving opportunities there.

However, the program also does things

like run a snack cart. And so, there's the opportunity to travel throughout the school with peers, and supervised and facilitated by our trained staff to be, you know, using money within a real-world context.

So, problem-solving -- if whatever the person is purchasing is a dollar and they hand you a five-dollar bill, how do we -- how do we provide change for that? How do we reckon with that? So, yes, there are.

That's one example, but problem-solving skills and opportunities are certainly embedded within Harborside's program.

Q. So, with respect to the emotional growth aspect that Mr. [redacted] lists here, fostering emotional regulation, how can Harborside meet that need?

A. So, within Harborside's program we have, you know, different social-emotional, like, learning programs. So, either zones of regulation or, you know, there are -- there are tools that the program uses to identify, like, what we're feeling and then how to respond when we're feeling that way.

So, for example, if we're feeling angry,

what different strategies can we use to help regulate ourselves?

Q. Thank you.

Based on our conversation and what you have shared thus far, do you remain confident that Harborside is the appropriate placement for [[redacted] in the least restrictive environment possible?

A. I do.

ATTORNEY ROSEN: No further questions.

THE HEARING OFFICER: Okay. All right. Do you have cross-examination?

Mr. [redacted] do you have cross-examination?

ROBERT [redacted] (Inaudible.)

THE HEARING OFFICER: You're muted, so.

ROBERT [redacted] Yes. Just give me a minute.

Yes, I do. I'm getting it together here.

THE REPORTER: And, Ms. Collette, I got all of your testimony -- but just a request, if you could please slow down?

Your microphone is perfectly adequate, but it is a little bit crunchy, and sometimes it is difficult to hear what you're saying when you speak quickly.

Sorry for the interruption.

SARA COLLETTE: Sorry about that.
THE HEARING OFFICER: If you need a few minutes, do you just want to take a short break, maybe?
It's 10:42. Come back at ten of eleven?
ROBERT [redacted] Yes, that will be fine.
THE HEARING OFFICER: Okay. So, we'll come back at ten of eleven.
ATTORNEY ROSEN: Thank you.
THE WITNESS (Collette): Thank you.
THE REPORTER: Pausing the record.

(Pause: 10:41 a.m. to 10:50 a.m.)

THE HEARING OFFICER: All right. It looks like everyone is here. So, we can go back on the record and proceed with cross-examination.
THE REPORTER: On the record.
ROBERT [redacted] Should I proceed?
THE HEARING OFFICER: Yes, you may proceed.
ROBERT [redacted] Okay. Great.

CROSS-EXAMINATION (of S. Collette)

BY ROBERT [redacted]
Q. Ms. Collette, you began working for Milford

Public Schools in July of 2024. Correct?
A. Yes.
Q. Before July of 2024 you had no involvement with the Milford District with my child's educational program. Correct?
A. Correct.
Q. And you first became involved with my child's case in May of 2025 at a single transition PPT meeting. Correct?
A. No, I would -- I would say that I became involved with the case prior to that in preparation for that meeting.
Q. When exactly did you become involved?
A. I don't remember an exact date, but sometime in the spring of 2025.
Q. The spring of 2025. So, figure about April or May?
A. I do not remember an exact date.
Q. Prior to the May of 2025 meeting, the PPT meeting, had you ever -- have you ever met or observed my child in a classroom or school setting?
A. No.
Q. Have you attended any previous PPT meetings for my child, other than the May 2025

meeting?

A. I have not.

Q. Did you have any contact with any of the parents before the May 2025 meeting?

A. Yes, with Mom.

Q. When exactly did you have contact with her?

A. So, we e-mailed, and the tour of Harborside was sometime in March, but I'm not sure of the exact date of that.

Q. So, the May twenty-five -- 2025 transition meeting was the only meeting you attended for my child. Correct?

A. Correct.

Q. What records or reports did you review about my child before that meeting?

A. So, definitely his most recent IEP at that time, and I don't remember specifically other documents.

Q. Did you review any independent evaluations, or only district-generated documents?

A. I reviewed the most recent IEP. That's what I can remember. I certainly had access to his file, though.

Q. Did you review any independent evaluations?

A. I can't remember exactly.

I don't believe so.

Q. When you say you can't remember exactly, please explain. I'm not understanding.

ATTORNEY ROSEN: Objection. She stated she can't remember. Asked and answered.

THE HEARING OFFICER: Sustained.

BY ROBERT [redacted]

Q. But you do remember looking over his IEP, but you don't remember anything else.

Is that correct?

A. Correct.

Q. Approximately how much time did you spend reviewing his IEP?

A. I would not be able to give you a definitive minute amount on that.

Q. Did you conduct any independent observations or assessments?

ATTORNEY ROSEN: Objection. Asked and answered.

ROBERT [redacted] No, that question wasn't answered.

THE HEARING OFFICER: I'll allow that.

Go ahead. You can answer it.

THE WITNESS (Collette): I did not.

BY ROBERT [redacted]

Q. Have you spoken directly with me prior to the 2025 meeting?

A. No.
Q. So, you never reached out to me in any way.
Correct?
A. No, not to my knowledge.
Q. When you say, not to your knowledge, you're not sure? Or did you reach out -- did we have any conversations on e-mail or phone, or in-person meeting?
ATTORNEY ROSEN: Objection to form of question. And objection, asked and answered.
THE HEARING OFFICER: That's asked and answered. She said, no, she never talked to you prior to the meeting, so.
ROBERT [redacted] So, she -- okay.
BY ROBERT [redacted]
Q. You had stated that you weren't -- why we weren't attending the meeting.
Were you -- do you know exactly why we didn't attend the May 2025 meeting?
A. I was aware after the meeting that you were in disagreement. There was an e-mail that you had disagreed with --
Q. About what --
A. The potential exploration -- yes.
Q. About what specifically?

A. I believe you did not want to explore Harborside's program.

ROBERT [redacted] Okay. I'd like to bring up an exhibit I'd like to get into evidence. Let me run that here. This would be P-46.

(Pause.)

ROBERT [redacted] This exhibit --

THE HEARING OFFICER: P-46 was already admitted without objection by the District at the very beginning of the hearing.

ROBERT [redacted] Okay.

THE HEARING OFFICER: Yeah.

BY ROBERT [redacted]

Q. Okay. Ms. Collette, even though you weren't directly CC'd on this, were you familiar with the contents?

If would you like to read it off -- or why specifically we did not attend the meeting?

A. So, can you -- so, are you asking me to read this? Or are you asking me if I'm familiar with this?

ROBERT [redacted] Well, I know you weren't CC'd. It's obvious that you were not CC'd on this, because we didn't even know your involvement. We never even

heard of you before the meeting. So --
ATTORNEY ROSEN: Objection, testimony.
THE HEARING OFFICER: Yeah. What's the question?
ROBERT [redacted]
Q. So, my question is, were you familiar with why we didn't attend?
A. Not at the time of PPT. I wasn't on that e-mail, as you stated.
ROBERT [redacted] Okay. Yeah, I'd just like to read here, because she said she wasn't aware of why we had specifically stated. Now, is this going to be test -- I just want to make sure I'm following.
Can I introduce this now, or would that be testimony?
THE HEARING OFFICER: It's already been introduced into evidence. I mean --
ROBERT [redacted] Okay. We did --
THE HEARING OFFICER: -- at the beginning of the hearing.
ROBERT [redacted] Yeah. We specifically stated that, for the record, we did not attend the meeting.
There will be no meeting testimony --
ATTORNEY ROSEN: Objection. This is testimony.
ROBERT [redacted] See, that's what I had asked, so.
THE HEARING OFFICER: The exhibit speaks for itself,

and you're asking her about something she doesn't really know about, so.

ROBERT [redacted] Well, I'd like to read this part. Will that be considered test -- should I wait to read it at testimony, or now? Just asking.

THE HEARING OFFICER: This is your document, you know, your e-mail. If you want to testify as to the subject at the time that you're testifying, that would be what's appropriate.

Asking her about something that she doesn't really know about isn't appropriate and doesn't really accomplish anything.

ROBERT [redacted] Okay. So, I shouldn't read this out?

THE HEARING OFFICER: No.

ROBERT [redacted] That will be for my testimony?

THE HEARING OFFICER: Yeah.

ROBERT [redacted] Okay. Fair enough. Fair enough.

I'm going to stop the share. I'll continue with the questions.

BY ROBERT [redacted]

Q. Besides the IEP, what other evaluation documents did you rely on when coming to the conclusion that Harborside would be in your, from what you stated, only in your opinion of an appropriate program?

A. At the PPR meeting, you're asking?
Q. Well, which -- besides the IEP. You had testified that you looked over his IEP. Were any -- or was there any other, other documents you had relied on in order to come to that conclusion?
A. So, it's not a Sara Collette decision. It's a PPT conversation. And so, that's what occurred at the May PPT.
Q. Have you looked over any other documents besides the IEP?
A. So again, I believe that I did, but I don't recall specifically which documents. What I do remember is the IEP, the most recent IEP.
Q. Would you agree that you're not -- your knowledge of my child's needs is based entirely on the records and staff input, what they had told you, rather than firsthand experience?
A. I did not directly observe him. That's true.
Q. So, you -- you would agree to this question then?
A. Can you say it one more time, please?
Q. Would you agree that your knowledge of my child's needs is based entirely on records

and staff input, rather than firsthand experience?

A. A records review and IEP, yes.

Q. I'm sorry?

A. Yes.

Q. Okay. What role did you play in the May 2025 meeting, PPT meeting?

A. I attended as a participant.

Q. But what was your role? I mean, you're a participant, but what was your role as far as in --

A. Oh. Well, I was a special education supervisor, representing special education in middle school.

Q. And what specific information did you rely on to conclude that the Harborside program was appropriate for my son?

A. So, the team reviewed current levels of performance and had a conversation at PPT based on what [[redacted] needed at that time for supports and services and then, based on what was shared, recommended Harborside's specialized program.

Q. Okay. Were you previously informed by any of the staff of our communications that were

sent? Specifically, when we reported emotional abuse, were you aware of that?
A. No.
Q. Are there children in the Harborside [redacted] program that are nonverbal and lower, you know, are very -- first, let me ask a question. Are there nonverbal children in the program at Harborside?
A. In one of our classrooms, yes.
Q. I'm sorry.
A. So, there are varying levels of expressive communication skills, and there are three different specialized program classrooms.
So, there are some students who utilize assistive technology instead of their words.
Q. But there are children that are nonverbal in that program. Correct?
A. In a classroom at Harborside.
Q. But that's the program that you're talking about?
A. That would not be the class recommendation for [[redacted] no.
Q. So, there are three programs on Harborside?
A. Yes.
Q. And what are they exactly again?

A. So, there's --

Q. I'm --

A. I'm sorry. Was there more to your question?

Q. Well, my -- well, here's the question. Would my son in the pro -- the program would be a more restrictive environment than what he was at JFK. Is that correct?

A. That's not correct. So, and specifically what I'm thinking of is the goal to ensure that students are as independent as possible, and we frequently are able to fade paraeducator support within the context of a program.

And so, my knowledge of [[redacted] is that he requires pretty extensive support from a paraeducator, and we -- we know that that's a highly restrictive option. So, within the context of the program, one of the things that we are able to do for students is slowly look to fade that intervention as one example of why the program would not be the most restrictive option.

Q. Okay. You did testify that there are nonverbals in Harborside, that the -- there are now. Do you know other nonverbals in

Hope or Woodhouse Academy.

A. I'm not familiar with --

ATTORNEY ROSEN: Objection. Relevance.

ROBERT [redacted] That's -- I'm sorry?

THE HEARING OFFICER: What's --

BY ROBERT [redacted]

Q. Are there nonverbal students at Hope Academy and Woodhouse Academy?

ATTORNEY ROSEN: Objection. Relevance as to the (unintelligible) --

ROBERT [redacted] The relevance is that --

THE HEARING OFFICER: Overruled. Overruled.

You can answer it.

THE WITNESS (Collette): So, I don't know the entire enrollment within Hope or Woodhouse.

BY ROBERT [redacted]

Q. So, you're not familiar with, so you couldn't come to the conclude -- how could you come to the conclusion that Woodhouse or Hope Academy wouldn't be appropriate for him?

A. Based on my knowledge of -- of students with different learning profiles that we have placed at Hope or Woodhouse that have been successful within their program.

Q. So, would you -- so, would that be considered

like a cookie cutter if it -- because of -- because once -- we're talking about my -- my child.

So, would that mean that it would be impossible for my son to be successful?

ATTORNEY ROSEN: Objection. Argumentative, calls for speculation.

ROBERT [redacted] Well, I don't think -- believe it call for speculation --

THE HEARING OFFICER: (Unintelligible) --

ROBERT [redacted] She testified that Woodhouse wouldn't be appropriate.

THE HEARING OFFICER: The way it's phrased --

ROBERT [redacted] And if she doesn't know --

THE HEARING OFFICER: The way it's phrased, I'll sustain it.

BY ROBERT [redacted]

Q. So, would you -- if you're not familiar with Woodhouse, how could you come to the conclusion that it wouldn't be? That it wouldn't, you know, it wouldn't be appropriate for [[redacted]

A. So, from my knowledge of the supports and services that are provided at either Hope or Woodhouse Academy, for learning, [[redacted]s

learning profile requires a higher level of academic and behavioral support that they would not be able to meet his needs.

Q. But is that based on opinion? Or is that based on -- is that just based on your opinion?

A. So, we haven't actually placed [redacted] within those settings. So, I wouldn't be able to know specifically, but certainly from my knowledge of my -- I would say extensive knowledge of -- of learning profiles of students within those programs that you've named, [redacted] I don't believe from my knowledge of his learning style and his needs would be a good fit.

Q. That would be just based on your opinion. There would be -- so, that would be just based on your opinion. Is that correct?

A. From my professional judgment, yes.

Q. From -- I asked from your opinion.

Is that correct?

ATTORNEY ROSEN: Objection. Argumentative, asked and answered.

ROBERT [redacted] Not -- it's not argument. I said, is that opinion? I didn't ask her about her

professional --

THE HEARING OFFICER: It's clear. It's clear that's her professional opinion. She's got expert credentials. So, yeah.

I mean, that's your professional opinion. Correct, Ms. Collette?

THE WITNESS (Collette): Yes.

THE HEARING OFFICER: Okay. You can ask (unintelligible) --

ROBERT [redacted] Did she come here as a -- well, let me ask.

BY ROBERT [redacted]

Q. Are you here as an expert witness, Ms. Collette?

ATTORNEY ROSEN: Objection. Relevance.

ROBERT [redacted] The relevance is the Hearing Officer just stated that she was -- that was her expert opinion. Is she here as an expert witness? That's what I'm trying to find out. That's the relevance. It's a fair question. It's fair game.

THE HEARING OFFICER: She clearly established the credentials to testify on her judgment in this, in this field. So, you know she's expressed opinions. I'm treating them as expert ones, so.

And she obviously has some -- she has

knowledge of at least the transition recommendations to middle school. So, she's got some factual knowledge, too. So, she's kind of both. Anyway --

ROBERT [redacted] Well, I don't believe any of that was factual. Well, if you're treating it as expert, if she's not an expert (unintelligible) --

THE HEARING OFFICER: I'm basically allowing her --

ROBERT [redacted] If I cannot be cut off, sir? Sir --

THE HEARING OFFICER: I'm allowing her testimony, including your cross, you know, most of your cross-examination.

ROBERT [redacted] I would like to get this in for the record without being interrupted, sir.

THE HEARING OFFICER: Yeah.

ROBERT [redacted] If she's not here as an expert witness, how could you be treating as an expert? It's either she's an expert witness or she's not.

You can't just -- I don't see how if she's not here as an expert witness and she didn't come in as an expert witness, that you could be treating it as an expert.

THE HEARING OFFICER: Well, I am. So, you know what? Ask your next question.

ROBERT [redacted] May I ask why? I'm not understanding

that. I have a right to know.
THE HEARING OFFICER: Because she's established the credentials for what she's testifying to, her professional judgments.
So, you can ask your next question.
BY ROBERT [redacted]
Q. Based on the information you reviewed about my child, is my child verbal?
A. Yes.
Q. Yes? Is that correct?
A. Yes.
Q. Are you familiar with the IDEA requirement that students be educated in the least restrictive environment appropriate to their needs?
A. I am.
Q. Would you agree that a placement where most students function significantly below my child's level could be considered more restrictive?
A. I would agree with that sentence.
Q. You would agree? Okay. Thank you.
You said you would agree. Is that correct?
A. Yes.

Q. You stated that Hope Academy is not academically or behaviorally appropriate for my child. Can you identify what specific academic or behavioral criteria led you to that conclusion?
A. So, my knowledge of that outplacement is that it specializes in more of a talk therapy approach. And what my knowledge of [[redacted]s needs are are more direct and targeted and structured instruction within academic and behavioral context.
Q. You just testified that -- about his -- about his need, as far as what would be appropriate for him. Specifically, this -- just give me a moment.
You mentioned therapeutically. How could a therapeutic environment not be proper for my child? How could that be harmful to him.
A. Did you say that would not be harmful?
Q. How could a therapeutic environment be harmful to [[redacted]
A. So, that doesn't sound like it's a bad thing, a therapeutic environment. However, some students aren't ready for or are not able to

access the approach that that therapeutic environment -- and -- and again, they're calling themselves a therapeutic environment. That's kind of their title, not ours.

So, some students aren't responsive to that type of instruction. So, some learners talk therapy works wonderfully with, and some learners require a more direct limited distraction targeted with some, you know, ABA methodology instruction.

Q. On what objective data or firsthand observations are you basing your opinion that Hope Academy would be inappropriate?

A. So, from review -- so, my knowledge of his IEP when we came to PPT and through conversation at PPT. So, review of records and the IEP, and the conversation at PPT.

Q. And you testified that you never witnessed my son in the environment at JFK. Correct --

A. Correct.

Q. -- in the education environment? And of course, you have not witnessed my child either in Hope or Woodhouse Academy in that environment. Correct?

ATTORNEY ROSEN: Objection.

ROBERT [redacted] I think --
THE HEARING OFFICER: You have to ask one question, one question or the other.
ROBERT [redacted] Okay.
BY ROBERT [redacted]
Q. Have you witnessed -- have you witnessed my son firsthand in an education environment at Hope Academy?
ATTORNEY ROSEN: Objection. Asked and answered. She's already testified she has not observed --
THE HEARING OFFICER: Well, he's never gone to Hope.
ROBERT [redacted] She has not observed.
THE HEARING OFFICER: Well, he's never gone to Hope Academy. So, there's no basis, factual basis for that question.
ROBERT [redacted] Right, but that -- yeah, I'm trying to create a pattern here. If she has not seen my son, you know, function at JFK, she has not seen him at Hope, or see him at Woodhouse, I'm trying to find out how -- I'm confused how she can come up with such -- like you said, you're treating her as an expert witness, to just come out and say --
THE HEARING OFFICER: She testified she hasn't --
ROBERT [redacted] She stated it wouldn't be appropriate for him, you know.

THE HEARING OFFICER: She testified she hasn't observed him at all. So, I don't know --

ROBERT [redacted] Right.

THE HEARING OFFICER: -- you know, yeah. So, I mean that's the answer to your question.

I mean, you can move on.

BY ROBERT [redacted]

Q. Being you haven't observed my child, is it fair to say that that would jumping to conclusions on what would be best for him?

ATTORNEY ROSEN: Objection. Argumentative.

ROBERT [redacted] That's not argumentative. I think that's a fair question. She testified she has not seen him in this environment. And she's, you know, making conclusions --

THE HEARING OFFICER: You know what? I'll let her. I'll let her answer it. Go ahead.

THE WITNESS (Collette): So again, this is not a Sara Collette decision. It's the planning and placement team decision, or a recommendation. And I'm a member of that team, so I contribute the knowledge that I have to recommendations.

So -- so, I was -- I was a participant in that team's recommendation for the specialized program at Harborside.

BY ROBERT [redacted]

Q. Right. So, the only knowledge that you have is what you're being fed by the team.
Is that correct?

ATTORNEY ROSEN: Objection, argumentative.

ROBERT [redacted] That's not argumentative. That's a valid question.

THE HEARING OFFICER: Sustained.

BY ROBERT [redacted]

Q. So, my question to you is, is that your opinions come from, not your firsthand knowledge, but what you're being told by the team. Is that correct?

ATTORNEY ROSEN: Objection. Asked and answered. She's already been asked about the source of her information and her opinion.

THE HEARING OFFICER: Yeah.

ROBERT [redacted] Well, I'm trying to get that into the record.

THE HEARING OFFICER: It's clear at this point, so.

ROBERT [redacted] It's clear? Well, okay. So, it is clear that she hasn't observed him and she's only going by what the team is telling her. So, that's clear for the record.

ATTORNEY ROSEN: Objection. Testimony.

THE HEARING OFFICER: That's -- yeah, I mean that's your editorialization. I mean, you can make that point in your brief, if you want, but --

ROBERT [redacted] No, it's not an editorialization.

THE HEARING OFFICER: Yeah.

ROBERT [redacted] You know, she's coming to conclusions --

THE HEARING OFFICER: You can editorialize in your brief all you want, so. And but for now you should ask questions --

ROBERT [redacted] Oh, it's not editorial. I don't -- I don't believe your characterization is correct of me.

BY ROBERT [redacted]

Q. Have you ever sat in on any classes at Woodhouse Academy personally?

A. I have observed other students within the context of Woodhouse Academy, yes.

Q. No, that wasn't my question. Have you personally sat in any of the programs at Woodhouse Academy personally, yourself?

ATTORNEY ROSEN: Objection. She just answered as to that, yes.

THE HEARING OFFICER: She just said yes. Yeah.

BY ROBERT [redacted]
Q. She said that she was down at Woodhouse and she observed these programs?
A. Yes.
THE HEARING OFFICER: That's what she said.
BY ROBERT [redacted]
Q. When exactly did you observe these programs?
A. So, in -- so, in my past district I placed students within -- well, within Woodhouse's program, and as part of a thoughtful transition I observed students within the context of Woodhouse's program.
Q. So, the students that you have placed at Woodhouse, is it your testimony that none of them worked out?
A. No, it's my testimony that their learning profile is different than [[redacted]s.
Q. When you say, learning profile -- so, in your -- so, what do you mean learning profile?
A. So, I mean the needs of that, the particular student across academic, social-emotional, and behavioral skill areas.
Q. And how did you come to that conclusion that it would not fit [[redacted]s profile at Woodhouse

Academy?
A. So, based on --
Q. If you've never seen him there?
A. So, based on the students that I have placed in Woodhouse's program that do well, their learning needs are different than [[redacted]s learning needs.
Q. That's just your opinion. Is that correct?
A. Yes.
Q. But it's not based on any solid data. You haven't had, like, any solid data that you're basing this on then? You know --
ATTORNEY ROSEN: Objection. Asked and answered. Argumentative.
ROBERT [redacted] It's not argumentative.
ATTORNEY ROSEN: She already testified as to her opinion.
ROBERT [redacted] It's not (unintelligible) --
THE HEARING OFFICER: Sustained.
ROBERT [redacted] Is it based on any --
THE HEARING OFFICER: Sustained.
BY ROBERT [redacted]
Q. Is it based on any data?
ATTORNEY ROSEN: Objection. That question --
ROBERT [redacted] I claim it. I claim that question.

THE HEARING OFFICER: Yeah, sustained.
ROBERT [redacted] I claim it.
THE HEARING OFFICER: Yeah, you have to ask another question.
ROBERT [redacted] Well, I'm asking this question.
BY ROBERT [redacted]
Q. Is it based on any data?
ATTORNEY ROSEN: Objection.
THE HEARING OFFICER: Sustained.
ROBERT [redacted] No --
THE HEARING OFFICER: Don't -- yeah, don't ask the same question over and over after it's been objected to.
ROBERT [redacted] May I ask why it's sustained? Why I -- why? It's a question based on the data.
THE HEARING OFFICER: Because you've covered what her recommendation was based on.
ROBERT [redacted] Well, I'm not asking if it's based on any data. I think that's a fair question. If it doesn't come in, that prejudice as me. It's because then that question, for the record, is not on the record.
THE HEARING OFFICER: It's sustained. Stop. Stop arguing. Just ask the next question.
ROBERT [redacted] I'm not arguing, sir. I don't -- I

believe -- I feel like I'm being prejudiced here, sir, and I think we've made this clear throughout the process. And I think -- I believe this is just another one.

It's a valid question, I believe.

BY ROBERT [redacted]

Q. Ms. Collette, you previously mentioned concerns about you -- you testified that students being distracted visually and auditorily in the Woodhouse environment.

Is that correct?

A. I said that it would challenging for -- based on my knowledge of [[redacted] it would be challenging for him to focus within those learning environments because of the structure of classes in the open space, and that he is distracted easily by auditory or visual input.

Q. So, you testified to that Woodhouse Academy classrooms are open space, that they would -- he would be -- oh, let me ask you -- so, not to combine two questions.

So, you testified that Woodhouse Academy would be -- is a program where there's a lot of students?

A. I don't believe I testified that there was a lot of students.

Q. Well, you said it's an open space.

What did you mean by open space?

A. So, it's a large room, and there are -- there's the -- through the use of furniture and kind of partitions there's learning spaces created, but there aren't solid walls or doors to contain actual classrooms for all of the learning spaces.

So, while there may not be a lot of students, you are able to see and hear other students learning at the same time that you're, as a student, expected to learn.

Q. So, it's your testimony that Woodhouse Academy has large classrooms?

A. They're open spaces, open-air classrooms.

I think --

Q. What do you mean open air?

ATTORNEY ROSEN: Objection. Let the Witness finish testifying.

ROBERT [redacted] She made it -- I'm asking what she meant, open air?

THE HEARING OFFICER: Yeah, let her finish. You kind of cut her off. Go ahead.

THE WITNESS (Collette): So, there aren't walls or doors within -- within all of Woodhouse's learning spaces. So, there's a rather large area, and then there's furniture or partitions that have created smaller learning spaces within that large environment.

And so, I don't know the numbers of students. I mean, it's a rather open space without actual walls or doors. There are partitions of sorts for learning environments.

BY ROBERT [redacted]

Q. When did you visit Woodhouse Academy to come to that conclusion that it's just an open space, and there's no classroom doors?

A. So, in my past district. So, within the last three years.

ROBERT [redacted] Oh. Well, I don't know if it's testimony but, we recently visited. There is no open --

ATTORNEY ROSEN: Objection. Testimony.

ROBERT [redacted] (Unintelligible) --

THE HEARING OFFICER: That is testimony. Yeah, you're -- I mean --

ROBERT [redacted] Okay. Well, that will -- that will come in my testimony, that there is classrooms.

THE HEARING OFFICER: Yeah, you can testify on your own -- sure.

ROBERT [redacted] Yeah, that there are doors and there are classrooms. I just --

BY ROBERT [redacted]

Q. And how many students did you notice? Since it's a large classroom, how many students were in each classroom that you observed at Woodhouse?

A. So, within each of the learning spaces at Woodhouse there were a handful of students in total within those spaces in each separate kind of partitioned area.

There are some walls and doors, but there is also this expectation of learning within a larger kind of open-air, as I refer to it, space.

Q. Is Woodhouse Academy an approved Connecticut -- a state-approved school?

A. To my knowledge, yes.

Q. So, when you say, to your knowledge, is it -- would that be yes or no? Or you're just not sure?

ATTORNEY ROSEN: Objection. Asked and answered. She said, yes.

ROBERT [redacted] Well, she said her knowledge.
THE HEARING OFFICER: No, she can answer that followup.
Go ahead.
THE WITNESS (Collette): Yes.
BY ROBERT [redacted]
Q. Yes, what?
A. Yes, it is an approved -- yes, it is an approved private special education program.
Q. Then, wouldn't Woodhouse Academy be appropriate for boys like [[redacted]
A. That's not my -- that's not my professional judgment. No, I don't believe so.
Q. When you say, it's not your professional judgment, so it wouldn't -- I'm confused.
What do you mean, it's not your professional judgment?
A. So, based on my knowledge of [[redacted]s learning needs and the skills with which we need to help him grow, the environment at Woodhouse and the therapeutic approach that they use would not be the recommendation that I would make for how [[redacted] would best respond.
So, in -- in my knowledge of [[redacted] and his learning needs, a more structured specialized program with some ABA methodology

direct instruction in a less distractible environment with the opportunity for non-disabled peers would be the most appropriate setting.

Q. How do you know it would be? How do you know it would be a distraction for [[redacted]

A. So, I would hypothesize it is -- it would be distractible, as I found it distracting.

Q. I'm sorry. You what?

A. I would imagine for [[redacted] it would be distracting because I found it a rather distractible setting for myself.

Q. Right, because you found it distractive yourself, but that doesn't mean it would be distractive for [[redacted] That's just --

ATTORNEY ROSEN: Objection. Argumentative and testimony.

ROBERT [redacted] That's not argumentative. She's basically --

THE HEARING OFFICER: Yeah, it is.

ROBERT [redacted] She's -- she's basically saying that, well, it was for me. It's definitely going to be for [[redacted]

BY ROBERT [redacted]

Q. So, definitely it's going to be distractive

from him? Hands down, you would say guaranteed it would be distracting?
ATTORNEY ROSEN: Objection. Argumentative and testimony.
ROBERT [redacted] That's not argumentative. She's --
THE HEARING OFFICER: Yeah.
ROBERT [redacted] She's trying to testify that it's going to be distracting, but I'm trying to find out she came to that conclusion --
THE HEARING OFFICER: Yeah, we've covered this.
ROBERT [redacted] -- how it's going to be distracting.
THE HEARING OFFICER: We've covered that, that subject.
ROBERT [redacted] Well, if we covered it, she's answering.
THE HEARING OFFICER: Ask your next question.
ROBERT [redacted] So, when I do ask a question you want me to skip over and I don't think that's fair, Hearing Officer Kennedy.
I feel like my questions need to be answered.
THE HEARING OFFICER: The objection is sustained.
ROBERT [redacted] I feel like they're being thwarted. She's testifying it wouldn't be appropriate, but we're not getting any -- any of my questions answered on why. It's -- according to her, it's opinion. And so, that's what I'm trying to find

out.

You know, where is her firsthand knowledge? If she finds it distracting, how does she know it's going to be distracting for [[redacted] That's a fair question. It's fair game and I claim it.

I think it's appropriate. Absolutely.

THE HEARING OFFICER: Okay. The objection is sustained.

ROBERT [redacted] So, I can't ask the question on how it would be distracting for -- how she knows that would be distracting?

THE HEARING OFFICER: You've already been asking those questions. So, ask another one.

ROBERT [redacted] No, I don't believe so, sir. I'm sorry. I have to respectfully disagree with that. I believe my questions are just being thwarted.

BY ROBERT [redacted]

Q. So, the only program that would be a hundred percent appropriate would be Harborside, and nothing else. Correct?

A. So, the most appropriate program recommendation is Harborside --

Q. No, that -- that wasn't my question. That wasn't my question? My question was --

ATTORNEY ROSEN: Objection. Let the Witness testify.

ROBERT [redacted] But I need my questions answered directly. She's not answering them directly, and that needs to be answered directly.
ATTORNEY ROSEN: She had not finished answering.
He interrupted her.
ROBERT [redacted] But she did not answer.
THE HEARING OFFICER: I think she wasn't quite answering that question.
So, ask it again and then you can answer.
ROBERT [redacted] And I would respectfully ask Mr. Rosen to stop interjecting when he's (unintelligible) --
THE HEARING OFFICER: No, he's entitled to it. He's entitled to object. But ask a question.
ROBERT [redacted] And he should know as an attorney when to object and when not to object. I'm a pro se party.
THE HEARING OFFICER: Ask --
ROBERT [redacted] It's different for me, but he should know the rules.
THE HEARING OFFICER: Yeah. Just ask the question. She can answer that one, unless you change the question.
ROBERT [redacted] All right.

BY ROBERT [redacted]

Q. So, my question to you, Ms. Collette, is that, to have it directly answered, that Harborside is 100 percent the only program that would be appropriate, and nothing else besides Harborside in Milford, in the Milford School District?

A. Within Milford School District? Yes.

Q. What about outside of Milford School District? Like, Woodhouse Academy or Hope Academy?

A. That's not the District's recommendation. That wasn't our recommendation at that -- at this or at that time of PPT, because we firmly believe that we can meet [[redacted]s needs within district.

Q. Does that mean that Woodhouse Academy or Hope Academy cannot meet his needs, guaranteed?

A. So, I wouldn't be able to guarantee that, but what I can say is that an in-district program is a less restrictive option as he has access to and -- and currently receives time with non-disabled peers.

Q. So, you don't -- so, you don't know if Woodhouse Academy -- so, basically, Woodhouse

Academy may be very well appropriate, but
it's just -- so, you're not sure, though?
You just --
ATTORNEY ROSEN: Objection. Argumentative and asked
and answered.
ROBERT [redacted] It's not argumentative. She's trying
to -- so, basically what's happened, Harborside is
the only program. Woodhouse Academy and Hope, oh,
there was (unintelligible) --
THE HEARING OFFICER: She's actually testified that
they're not really appropriate. So, I mean, this
has been asked and answered.
BY ROBERT [redacted]
Q. So, why? Why wouldn't they be appropriate?
So, that's what I'm trying to find out here
is that the only program -- these are
state-approved schools. How could it be not
appropriate? If it's a state-approved school
how could it be? How could it be
inappropriate for [[redacted]
A. So, each of the state-approved schools
specializes in particular learning profiles
or the needs of specific students, and
Woodhouse and Hope are not appropriate for
[[redacted]s needs.

Q. Is that based on data and fact, or opinion?
ATTORNEY ROSEN: Objection. Asked and answered.
ROBERT [redacted] It has not been answered.
THE HEARING OFFICER: Sustained. Sustained. I mean --
BY ROBERT [redacted]
Q. Is that based on fact, or is that based on opinion?
THE HEARING OFFICER: Sustained.
ROBERT [redacted] You won't let me get that into the record, and that's going to prejudice me. I'm just making that for the record -- is that I have a right to ask a question. Is that based on fact or is that based on opinion?
That's a fair question.
THE HEARING OFFICER: The objection is --
ROBERT [redacted] But you're not allowing it.
THE HEARING OFFICER: The objection is sustained.
ROBERT [redacted] And I don't think that's fair. That will have to come up on appeal as well, too. I just want to make that for the record. I don't feel like I'm being treated fairly here, and I think we know why.
BY ROBERT [redacted]
Q. Does [[redacted] do well in a classroom where there's a lot of students, or a handful of

students?

A. I would imagine a smaller, smaller class size is more ideal for [[redacted]

Q. And from what you testified, is Woodhouse a large or smaller setting?

A. So, it's my understanding that Woodhouse has learning areas that have smaller -- a number of students who learn together at the same time. I don't know the total enrollment of Woodhouse right now.

Q. But that wasn't my question. My question is that -- I believe you testified before that the classrooms are comprised of a handful of students. So, being that was your testimony, Ms. Collette, a handful of students would mean a smaller environment. Is that correct?

A. Based on what I saw at that time that I observed Woodhouse, yes, there is -- there are small numbers of students in each of the learning areas.

But I didn't total them for the number of the total number of enrollment, is what I'm just trying to clarify.

Q. But then you testified that Woodhouse would not be appropriate even though it's smaller.

I'm just -- I'm trying to find out if Woodhouse is an environment that's smaller, how could that be inappropriate for [[redacted]

ATTORNEY ROSEN: Objection. She has already -- asked and answered as to her understanding --

ROBERT [redacted] It's not the question.

ATTORNEY ROSEN: -- why Woodhouse would be appropriate or not appropriate.

ROBERT [redacted] For the record, it's --

THE HEARING OFFICER: Sustained.

ROBERT [redacted] -- it's her understanding or opinion. It's not, you know, based on fact or data. And if that has to come up in my testimony, it will come up. I'm -- I'm trying to make a link here.

BY ROBERT [redacted]

Q. Did you conduct personally any measurements of noise levels, movement, or visual stimulation at Woodhouse, and in Woodhouse?

ATTORNEY ROSEN: Objection. Relevance.

ROBERT [redacted] The relevance is that she claimed that --

THE HEARING OFFICER: I'll overrule that one.

You can answer the question.

THE WITNESS (Collette): I did not.

BY ROBERT [redacted]

Q. You did not. Is that your testimony?

A. I did not conduct noise level testing. I did not.

Q. Are you aware of any reports or data indicating that students at Woodhouse Academy experience significant distractions that interfere with learning?

A. No.

Q. No? I'm sorry. No, you said?

A. Correct. I said, no.

Q. Okay. You just sound muffled on my end sometimes. So, that's -- I just needed to clarify it. Thank you.

Would you agree that a smaller contained classroom generally allows for better teacher oversight and less sensory distraction than a larger classroom?

ATTORNEY ROSEN: Objection. Relevance, and calls for speculation.

ROBERT [redacted] The relevance? So, according to her, she's an expect.

THE HEARING OFFICER: You know what? I'll allow her answer, answer that one. Go ahead.

THE WITNESS (Collette): Can you repeat that one more

time? I'm sorry.

BY ROBERT [redacted]

Q. Would you agree that a smaller contained classroom generally allows for better teacher oversight and less sensory distraction than a larger classroom?

A. Yes.

Q. On what evidence are you relying to claim that Woodhouse Academy poses significant visual or/and auditorial distractions?

ATTORNEY ROSEN: Objection. Asked and answered.

ROBERT [redacted] No, I don't believe that was asked and answered.

THE HEARING OFFICER: I'll let you answer that one. You can go ahead.

THE WITNESS (Collette): I'm sorry. Can you say that one more time?

BY ROBERT [redacted]

Q. On what evidence are you relying to claim that Woodhouse Academy poses significant visual and auditorial distractions?

A. Based on my observations of their style of instruction when I was in their setting.

Q. And how many times were you in, or how many times did you view their setting?

A. So, most recently, about three years ago and then periodically over the last decade or so.
Q. But you haven't visited recently.
Is that correct?
A. Not within the last three years, correct.
Q. Is there any data to support your opinions?
ATTORNEY ROSEN: Objection. Asked and answered.
ROBERT [redacted] No, I don't believe it's --
THE HEARING OFFICER: Sustained.
ROBERT [redacted] I believe it's relevant.
THE HEARING OFFICER: Sustained.
ROBERT [redacted] May I ask why it's sustained? I think data is important. This is part of the student process. The IEP is data.
And Hearing Officer, you had said that the, you know, if the IEP is data, that is what this whole due process is based upon, you know, which is basically --
THE HEARING OFFICER: She's basically --
ROBERT [redacted] And so, I'm trying to find if it's data. You know --
THE HEARING OFFICER: At this point she's -- asked and answered. You've asked that before.
ROBERT [redacted] Well, it was sustained. I didn't believe it was answered. I don't see where it was

it was answered when I asked, you know, is it based on opinion, or data? I'm not getting -- my answer is being -- sustained --

THE HEARING OFFICER: This is -- I mean, you're pretty much asking the same question over and over again, so. I mean, she's answered you. You can move on.

ROBERT [redacted] What was the answer, then? I'm sorry if I did. I apologize. I don't believe I did, but I'm giving you the benefit of the doubt, so this way I have an understanding.

How did she answer it then?

THE HEARING OFFICER: Well, first of all, it's not up to you to question me.

ROBERT [redacted] I'm just asking you.

THE HEARING OFFICER: She's answered you questions as to what her opinions are based on, what facts are based on.

So, if you want to argue in your brief that she has insufficient basis for the conclusions she reaches, you can, but beating, you know, asking the same over and over again isn't going to get you more information, so.

ROBERT [redacted] Well, you just said --

THE HEARING OFFICER: So, you can -- again --

ROBERT [redacted] I understand. I'm just trying

(unintelligible) --
THE HEARING OFFICER: Don't argue every time an objection goes against you.
ROBERT [redacted] I'm not, sir.
THE HEARING OFFICER: Just go --
ROBERT [redacted] I'm trying to understand this and I have a right to get this into the record, sir.
THE HEARING OFFICER: Yeah, just ask another question.
ROBERT [redacted] You mentioned opinion and then you mentioned facts.
THE HEARING OFFICER: Uh-huh.
ROBERT [redacted] So, opinions can't be facts. So, it's either you have an opinion or you have the facts.
THE HEARING OFFICER: Yeah --
ROBERT [redacted] You just can't combine them.
THE HEARING OFFICER: Just ask another --
ROBERT [redacted] And that's what I'm --
THE HEARING OFFICER: Ask another question.
ROBERT [redacted] And I'm trying to get this in for the record. You know, I think this is important to get in for the record that you had mentioned that was her opinion, and you said it's based on -- something that is based on facts, and I'm getting confused, Hearing Officer Kennedy

(unintelligible) --

THE HEARING OFFICER: All right. Just ask -- ask another. Ask another question.

ROBERT [redacted] Well, I'm trying to clarify this with you. Yeah, I'm trying to clarify this with -- and when I do, it gets -- you sustain them. They get objected to and sustained.

So, that's where I'm confused.

THE HEARING OFFICER: Well --

ROBERT [redacted] And this is important because if it's based on opinion -- or is it based on data? What I'm trying to find out, I'm not getting my answers (unintelligible) --

THE HEARING OFFICER: If you're just going to keep arguing I'll just end. I'll just end the cross-examination.

ROBERT [redacted] I don't think that's fair that you're threatening -- what you're trying to do is threaten me each time to end cross-examination, because I'm trying to clarify something with your, Hearing Officer. I don't believe that's fair. That's prejudicing me. Okay? And I'm trying to find out.

And then you said I shouldn't be questioning a hearing officer. I believe it's a valid

question. I'm trying to clarify this with you, because I did say -- I did say for this, for the record --
THE HEARING OFFICER: You need to stop --
ROBERT [redacted] Hearing Officer --
THE HEARING OFFICER: You need to stop arguing --
ROBERT [redacted] I did say this for the record. If you could please --
THE HEARING OFFICER: You need to stop arguing every objection that goes against you.
ROBERT [redacted] I know. If you could please let me get this in for the record? I'm not -- you're characterizing me the wrong way, sir. Your character -- you're mischaracterizing my intentions.
I said, if I had already stated that, I apologize. I don't believe I have, and I'm trying to find out from the Hearing Officer.
THE HEARING OFFICER: If you don't --
ROBERT [redacted] And you said I shouldn't be questioning --
THE HEARING OFFICER: If you don't have any more questions to ask --
ROBERT [redacted] And you're cutting me off, Hearing Officer. If I (unintelligible) this for the

record --
THE HEARING OFFICER: If you don't have any more questions to ask we're going to --
ROBERT [redacted] If asking -- I do have other questions, but I'm trying to clarify this.
THE HEARING OFFICER: -- stop cross-examination.
ROBERT [redacted] I'm trying to get this clarified, Hearing Officer. And I think it's important, because I'm trying to base my questions on -- so I don't ask the same question again. That's why I'm asking you, Hearing Officer, is that -- you even said yourself, you can answer questions.
THE HEARING OFFICER: Just ask. Ask another question.
ROBERT [redacted] I'm asking you a question, Hearing Officer. When I do they get sustained.
So, I need --
THE HEARING OFFICER: All right. Well --
ROBERT [redacted] May I please ask this question?
THE HEARING OFFICER: We're pretty much on the verge of just ending cross-examination if you don't have anything --
ROBERT [redacted] Okay. If you're going to threaten me to end, then I don't see how this hearing can continue. I'm being prejudiced. May I please --
THE HEARING OFFICER: Well, it's going to continue.

ROBERT [redacted] You're arguing with me, sir, instead of answering my question. May I please have my question answered? It's that I'm trying to find out, you know --

THE HEARING OFFICER: I'm not -- okay. That's it.

ROBERT [redacted] If you could just please answer my question?

THE HEARING OFFICER: This cross-examination is over.

Do you have any redirect?

ROBERT [redacted] No, it's not. Sir, I need to ask. I'm trying to get a question in.

ATTORNEY ROSEN: I have brief redirect.

THE HEARING OFFICER: Okay. Now, we're on redirect.

ROBERT [redacted] I'm sorry, but I don't believe this -- this hearing can continue based upon the prejudice I'm going through right now.

THE HEARING OFFICER: You know what? I've told you not behave like that. I've told you not to --

ROBERT [redacted] I'm not behaving like that, sir. You're mischaracterizing me. I'm not behaving -- I'm trying to --

THE HEARING OFFICER: Redirect?

ROBERT [redacted] I'm trying to find out from you so I don't have to ask the same question again over and over that you're claiming is the same question.

I think it's a fair question, and you keep cutting me off and I feel like it's being, you know, it's very rude to me. I explained this in other hearings that, you know, I can't get my, you know (unintelligible) --

ATTORNEY ROSEN: Permission to proceed uninterrupted?

THE HEARING OFFICER: Yeah. Yeah, proceed.

ATTORNEY ROSEN: Ms. Collette --

ROBERT [redacted] I do have other questions, too.

REDIRECT EXAMINATION (of S. Collette)

BY ATTORNEY ROSEN:

Q. Ms. Collette, you were asked with respect to your role at a planning and placement team meeting. My understanding is -- right, you have not observed [[redacted] You don't have personal knowledge, but the information was provided to you by the school team.

Can you clarify your role as special education supervisor what are you there to opine at, at the May 2025 PPT meeting?

A. So, with knowledge of the middle school supports and services, I bring that knowledge and, you know, a lense through conversation

to, you know, ensure that an appropriate recommendation for middle school is made.
Q. So, hearing the recommendation made by the JFK team, your responsibility is to opine as to whether or not Harborside would be appropriate?
A. Correct.
Q. And my understanding is, based on what was provided to you, you agree that Harborside would be appropriate?
A. Yes.
Q. In terms of the placement of students and programs at Harborside, is it differentiated based on need?
So, for example, Mr. [redacted] concern about nonverbal students. Would [[redacted] be placed with nonverbal students?
A. He would not.
Q. And so, is the placement of children in different classrooms and settings at Harborside individualized based on their needs?
A. Yes.
Q. Okay. What happens if a team, based on data, finds that a higher level of care is needed

after a placement?

A. After a placement within our specialized program?

Q. That's right.

A. So, we would come back together as a planning and placement team meeting and share that information, and then together determine if a different in-district program can meet their needs, or if we have to look out of district.

Q. If the District finds that it can appropriately program for a student in district, does it have a responsibility to find a more appropriate placement outside of district?

A. No.

Q. With respect to the continuum of supports and services offered, the outplacement outside of the district with non-disabled peers, is that more restrictive than what could be offered and provided to [[redacted] in the Harborside program?

A. Yes, definitely.

Q. Why is that?

A. Because he -- at an out-of-district placement, students do not have access to

non-disabled peers. They also don't have access to neighborhood peers, so anyone within the district with whom they may be able to connect with and make friendships with.

And there's -- we always try to program for students in -- in less restrictive settings. What's --

Q. No further questions.

A. -- ensuring that it's also appropriate.

Q. Oh, sorry.

A. Sorry.

Q. I'm sorry. I cut you off. Could you say that last part again?

A. Just ensuring that the program is -- is appropriate.

ATTORNEY ROSEN: Thank you. No further questions.

THE HEARING OFFICER: All right. Do you have any --

ROBERT [redacted] So, I have some question. May I? May I --

THE HEARING OFFICER: No, we've terminated your cross-examination based on your behavior.

ROBERT [redacted] It's not my behavior. I -- I object to your mischaracterization of my behavior, sir. I was -- for the record, for the record, sir, I

was just trying to clarify something with the Hearing Officer, because every time I asked a question, it was getting objected to.

And I did say for the record, I apologize if I had already asked that question, but I need to clarify because I was confused. Was it based on opinion or fact? But according to the objections, it was already asked and answered.

THE HEARING OFFICER: All right. Well --

ROBERT [redacted] I'm not understanding -- and I'm getting cut off again, Hearing Officer. This is not my behavior.

THE HEARING OFFICER: Yeah, it is.

ROBERT [redacted] I believe it's the Hearing Officer's behaviors towards the pro se party. At the very beginning of this, even before it started --

THE HEARING OFFICER: All right. We're not getting into the beginning.

ROBERT [redacted] And Hearing Officer, you keep cutting me off.

ATTORNEY ROSEN: Can Ms. Collette be excused?

THE HEARING OFFICER: Ms. Collette can be excused.

ROBERT [redacted] Hearing officer --

THE WITNESS (Collette): Thank you.

ROBERT [redacted] -- I don't believe that you should be

cutting off -- for the record, when I try to get something in for the record --

THE WITNESS (Collette): Bye now.

ROBERT [redacted] -- you keep cutting me off, sir. I don't believe it's appropriate. And I do need to get this in for the record, and it is my right to get this in for the record.

At the very beginning of the hearing, before it started, you made a comment --

THE HEARING OFFICER: If you're going to keep arguing, I'm just going to dismiss the case.

ROBERT [redacted] -- that with pro se's it's always about bad blood, than what it's in the -- than what's relative to the needs of the child.

THE HEARING OFFICER: If you're going to keep arguing, I'm just going to dismiss the case. So, enough.

ROBERT [redacted] If that's what you'd like to do, sir --

THE HEARING OFFICER: Enough.

ROBERT [redacted] If you're going to threaten to dismiss the case, sir, I don't believe it's fair. I'm trying to get this in for the record, and you're cutting me off. I was confused about a question. And right now you're characterizing my behavior, which is completely unfair and is

totally -- it's not even accurate.

I was trying to get in for the record that I was asking a question so I wouldn't have to repeat it, because apparently if I'm asking the same questions over -- I even stated for the record I do -- if I was -- If that was my behavior, I wouldn't have apologized.

I apologized if I was asking the same question, and I was confused because I'm trying to differ-ate -- differentiate --

THE HEARING OFFICER: I'm inclined to just dismiss the case at this point.

ROBERT [redacted] -- as to when did I ask about opinion, and when did I ask about that.

THE HEARING OFFICER: What is the District's --

ROBERT [redacted] That's what I'm trying to get in for the record.

ATTORNEY ROSEN: I would move for directed verdict at this time.

ROBERT [redacted] I'm not sure, sir.

ATTORNEY ROSEN: I think we've met our burden, and Mr. [redacted] is not adhering to the protocol that has been outlined at the (unintelligible).

ROBERT [redacted] I don't believe that's -- I believe that mischaracterization is attacking a pro se

party, because I'm trying to clear something for the record, and you're characterizing my behavior completely -- it's wrong.

THE HEARING OFFICER: You're going --

ROBERT [redacted] That is not my behavior, sir.

THE HEARING OFFICER: You're going to need to get yourself under control very quickly.

ROBERT [redacted] Excuse me, sir. My behavior is not out of control.

THE HEARING OFFICER: If you don't just want a decision to get --

ROBERT [redacted] I'm just trying to clarify something for the record. You already threatened to dismiss the case in the beginning, claiming that it was a deliberate bad-faith refusal.

THE HEARING OFFICER: (Unintelligible) --

ROBERT [redacted] Your characterization of me is not correct, and I'm trying to get this in for the record. So, this way on appeal at least I can say, hey, this is what I told the Hearing Officer.

But if you keep cutting me off, I can't get it in, sir. I'm trying to be as, you know. You know, I'm just trying to get this into the record.

THE HEARING OFFICER: You can argue -- you can argue what you want on appeal. You don't need to argue

it right now.

ROBERT [redacted] Your characterization is not correct, sir. I'm sorry, sir. It's not correct.

I don't feel it's fair.

THE HEARING OFFICER: Okay.

ROBERT [redacted] I don't feel I'm being treated fair, and I'm only on this hearing -- I'm here under protest. I'm not even agreeing to the -- to any remaining days, but I have to because it's the law, because I don't feel like I'm, you know, I filed 14 filings, as you know. That will be brought up on appeal.

And I will -- we -- I think, you know, I think it's best that we just get in front of -- if we can, in front of, you know, a court and a judge, or on a jury, however this works, and let them make that decision. You can present your case. I'll present my case, but I believe we have to get through this first. I just feel like I'm being prejudiced.

So, I'm not being unruly, as you falsely characterized me. You know, I'm trying to get this --

THE HEARING OFFICER: All right.

ROBERT [redacted] You won't --

THE HEARING OFFICER: All right. You've had more than your say.

ROBERT [redacted] Okay.

THE HEARING OFFICER: So, does the District have any other witnesses?

ATTORNEY ROSEN: No, the District rests.

THE HEARING OFFICER: All right. So, who's your first witness?

ROBERT [redacted] Well, I'm going to be providing some testimony. That's what I'm going to be doing for the remainder of the day. And the testimony will continue, I believe, on November 4th.

And then we have to work out, as far as my witnesses that I will be bringing in, including Ms. Stewart and some of the other District's witnesses, too, which I will give notice about.

But as far as November 4th, that would be the last hearing day for the remainder, as I e-mailed you, Hearing Officer, that I'm available in November.

And in December, like I said in my e-mail to you and to Mr. Rosen, that we would have to work out additional days, you know, based upon your schedule and based upon Mr. Rosen's schedule. And then I have to coordinate it with his mother as

well.

So, before (unintelligible) --

ATTORNEY ROSEN: Hearing Officer Kennedy?

ROBERT [redacted] Would you please not cut me off, please?

ATTORNEY ROSEN: May I be heard on the scheduling point if we're going to address it?

ROBERT [redacted] Mr. Rosen, you're cutting me off. I'm trying to explain. And again, I'm being cut off right now, Mr. Rosen, and that is -- that's inappropriate to be cutting me off.

THE HEARING OFFICER: I'll let you be heard in a minute on that. What, just --

ROBERT [redacted] But, please, for the record, Mr. Rosen, please do not cut me off. Okay? This hearing cannot continue if you're going to continue to cut me off every time (unintelligible) --

THE HEARING OFFICER: Well, yeah, you're just --

ROBERT [redacted] It cannot be. I'm trying to --

THE HEARING OFFICER: I just have to -- what's --

ROBERT [redacted] And I'm being cut off.

THE HEARING OFFICER: All right.

ROBERT [redacted] But I should not be cut off.

THE HEARING OFFICER: All right. So, you say you're

unavailable during the rest of November?

ROBERT [redacted] Right. That's what I'm trying to get at, and I should not be cut off. And that should be recognized by the Hearing Officer, I believe, to the opposing counsel, not to cut me off, because you -- I've been accused of that, but you're not, you know, correcting the opposing counsel.

THE HEARING OFFICER: All right.

ROBERT [redacted] And it should be corrected.

THE HEARING OFFICER: So, you've said you're not available for the rest of November. I think that may be what the District wanted to respond --

ROBERT [redacted] But I should not be cut off, though.

THE HEARING OFFICER: Okay.

ROBERT [redacted] I wasn't -- I wasn't finished.

THE HEARING OFFICER: Okay. Yeah, let me hear from the attorney for the District on that.

ROBERT [redacted] But I was not even finished, but --

THE HEARING OFFICER: Okay.

ROBERT [redacted] And I'm being cut off.

THE HEARING OFFICER: We can go back to you.

Go ahead.

ROBERT [redacted] I don't believe that's fair.

ATTORNEY ROSEN: First of all, I would respectfully

request -- we're trying to approach this hearing in good faith, and I would appreciate guidance from the Hearing Officer that every time I'm trying to make an objection or advocate on behalf of my client, as I'm entitled to do in this matter, that I not be subjected to accusations and insults from Mr. [redacted]

We're all here to provide --

ROBERT [redacted] I object. There were no insults. There were no insults for the record.

ATTORNEY ROSEN: (Unintelligible) -- if I could just finish, please? And to defend our position that we provide to [[redacted] appropriate education and can't do so.

We are concerned by the representation, given that hearing dates were scheduled -- I understand Mr. [redacted] is about to present his case, and we hope he gets underway to do so, but the representation that neither parent -- I couldn't tell if it's either parent or just Mr. [redacted] not available during the month of November.

While we agree on what the stay-put is, this is a stay-put that both sides believe is not appropriate for the student. So, I would at least like an offer of purpose to the justification as

to why no dates in November subject, of course, to the Hearing Officer's (unintelligible) --

ROBERT [redacted] I believe I've already made it clear in the e-mail to you, Mr. Rosen.

THE HEARING OFFICER: Now, let --

ROBERT [redacted] I believe I made it clear.

THE HEARING OFFICER: Let the District's attorney finish what he said.

Go ahead.

ROBERT [redacted] But he didn't let me finish, Hearing Officer.

THE HEARING OFFICER: No --

ROBERT [redacted] And now --

THE HEARING OFFICER: Please be quiet.

ROBERT [redacted] -- when I'm interjecting you want him to finish, but he didn't let me finish. Okay.

THE HEARING OFFICER: Go. Mr. Rosen, go ahead.

ATTORNEY ROSEN: Subject to the Hearing Officer's availability, we'd like to offer a proof as to why November dates cannot further be considered while we have a student just sitting in a stay-put placement that neither side agrees.

We've put on our case. We can make our client -- our witnesses available, but I just would like an explanation as to why no dates, you

know, can possibly be considered.

I haven't heard that Ms. [redacted] is not available, and we're -- we would like this case to be prosecuted appropriately. And to hold off, or state without proof that November is just unavailable appears to us as failure to prosecute a case.

ROBERT [redacted] I object to Mr. Rosen's characterization of me that --

THE HEARING OFFICER: What's the reason?

ROBERT [redacted] -- you know, his whole, his whole characterization that I have been, you know --

THE HEARING OFFICER: What's the reason that November is tied up for you?

ROBERT [redacted] I have already explained that in the e-mail, Hearing Officer. Let me bring it up. I will -- I will read the e-mail for you, for the record.

Did you receive my e-mail, Hearing Officer and Mr. Rosen?

THE HEARING OFFICER: Yes. No, it just said that November --

ROBERT [redacted] Mr. Rosen, did you receive my e-mail?

THE HEARING OFFICER: -- November was unavailable.

ROBERT [redacted] Right. And that's what I explained.

Right, I am not available for the remainder of, because I have, like I -- to state -- let me bring up the e-mail and I will read it again.

ATTORNEY ROSEN: The District's position is it's been told there's a preexisting commitment. We'd like to an offer proof as to why no November dates can be considered for either parent.

ROBERT [redacted] Okay. Dear Hearing Officer Kennedy -- this was sent on Tuesday, October 21st, 9:51 p.m., two weeks before November 4th. And the District's attorney was specifically CC'd on it. So, he's asking why. So, I will read it again for him.

This is a formal scheduling notice regarding the continuation of the due process hearing. As discussed at today's October 21st hearing, we anticipate that the scheduled November 4th date will not be sufficient to conclude the hearing and additional days will be required to finish the presentation of testimony, evidence, and witnesses.

I am writing to advise the Hearing Officer that I will be unavailable for all subsequent scheduling dates immediately following November 4th through the end of November. This

availability -- this unavailability is due to a preexisting mandatory commitment.

I am fully committed to concluding this matter and confirm that all future continuation dates must begin in December. We look forward to coordinating the December schedule, which will, of course, be subject to the schedules of the Hearing Officer and opposing counsel.

Sincerely, Robert [redacted] pro se father.

That was the e-mail I sent.

THE HEARING OFFICER: Okay. But you didn't explain what the preexisting commitment was.

ROBERT [redacted] I believe I did it in the e-mail. I have preexisting mandatory commitments. I cannot continue in November. It would have to be continued in December. I believe I did, sir.

THE HEARING OFFICER: You didn't. You didn't say what the preexisting commitment was.

ROBERT [redacted] Well, it's in the e-mail, sir. I mentioned I'm unavailable due to a preexisting mandatory commitment.

THE HEARING OFFICER: Okay. But what is the preexisting mandatory commitment?

ROBERT [redacted] I've already explained that there is unavailability due to a preexisting mandatory

commitment, sir.
THE HEARING OFFICER: All right. But --
ROBERT [redacted] I am unavailable in November. So, I'm just -- I had given you, you know, a fair notice on that. I had e-mailed on the 21st, and I've already explained my situation. I am not available. You know, we can work out the dates in December and then conclude them after that, after November 4th.
So, I will be available today and November 4th. That was scheduled, but I will not be available, you know, through the rest of November. And then we can start scheduling for December.
So, that's --
ATTORNEY ROSEN: Hearing Officer?
THE HEARING OFFICER: Yeah, a preexisting mandatory commitment doesn't really tell me anything.
ROBERT [redacted] Well, I explained in the e-mail, sir.
I'm not available in November.
ATTORNEY ROSEN: Absent an offer of proof, I think a date should be determined for November subject to the Hearing Officer's availability --
ROBERT [redacted] I don't believe so. I am not available in November. I'm sorry. I already sent the e-mail, and I gave you advanced notice.

This was not -- there was nothing in the e-mail that he objected to. He did not -- I did not receive any response back from Mr. Rosen when I sent it on October 21. So that's six days ago, I believe that was. He has not responded to it.

So, I have not received anything from you, Hearing Officer Kennedy. It was six days ago I sent it. We have not received anything.

I did let -- I respectfully let the Hearing Officer know and, you know, Mr. Rosen that I was not available in November for the remaining, and I am not available, you know, for the remaining of November after the 4th. It would have to be in December.

ATTORNEY ROSEN: Hearing Officer Kennedy, let me know if you would like to be -- hear from the District.

THE HEARING OFFICER: Go ahead.

ATTORNEY ROSEN: My concern is you have asked now several times what the preexisting commitment is, and Mr. [redacted] is declining or is not explaining what it is.

Absent an offer of proof to postpone this matter beyond November 4th for an entire month while the student is in the outplacement -- or excuse me, I keep saying that -- while the student

is in the stay-put placement that nobody deems appropriate I think prejudices the student, while we're trying -- the District has in good faith presented its case.

And I'd say asking for a month abeyance without any offer of proof is a failure to prosecute the matter.

So, the Board would entertain --

ROBERT [redacted] I have to fully -- I have to --

ATTORNEY ROSEN: -- or the Board would consider filing a motion based on failure to prosecute.

ROBERT [redacted] That's perfectly fine. You can file any motion. I object to Mr. Rosen's characterization that it prejudices my son. If anything prejudices, it's the way he was treated by the Milford Public Schools, which will be coming up in my testimony. That prejudiced my son.

You know, so that will -- so that will be coming up. This is not prejudicial to the child.

THE HEARING OFFICER: I actually have a --

ROBERT [redacted] He's in school. He is. It's not like he's home and he's not in school. He's in school right now.

So, I'm not asking for three or four or five

months, which I would agree that would be pretty excessive. We're talking about a few weeks. So, we're already almost in, you know, after November 4th, we're almost done with the first week. So, we're talking, you know, a little bit over three weeks. And I would not be available for those little bit over three weeks, and we could start scheduling for December. So, I believe that's fair.

I have preexisting mandatory commitments. I've already explained, and I am not going to be available in November. It does not prejudice my son at all in any way, shape, or form, you know.

And I'm not even in agreement of him remaining in the Milford Public Schools, whether it's Harborside or whether it's staying at, you know, West Shore. If I -- if it was up to me, you know, I would love to see him at Woodhouse Academy today, but apparently that can't happen.

So, the only -- he's in a stay-put right now. Okay? And he's in an environment right now in school. So, he's not being harmed. He's not being prejudiced. You know, if he characterizes as he's being prejudiced, that means Mr. Rosen is agreeing that, you know, Milford Public Schools is

harming him. And actually, I have to agree because I believe Woodhouse would be appropriate.

But in any event, like I said, I'm not available in November. And any motions Mr. Rosen wants to file, fine. Then I will file my responses accordingly, too. No problems.

I am sorry. I'm not available. I've explained that in the e-mail, and we can schedule dates in December.

THE HEARING OFFICER: I mean, I've got dates in November. December is much more full up for me. So, it's sort of a problem to take November off.

ROBERT [redacted] I'm not available in November.

THE HEARING OFFICER: I mean, yeah. I mean, you haven't told us what the mandatory preexisting commitment was. So, you know.

ROBERT [redacted] Well, I do have mandatory preexisting, you know, commitments already that I would have to start in December. So, I'm sorry. It's not going to work for me in November, unfortunately, after the 4th.

I sent the e-mail. If the District's counsel wants to file a motion, I will be responding accordingly. He's still -- he --

THE HEARING OFFICER: Is the mother also unavailable in

November?

ATTORNEY ROSEN: I have to talk -- yes. Yes, I do believe she is, yes. Uh-huh.

THE HEARING OFFICER: Okay. And do you know why?

ROBERT [redacted] I'm not sure exactly what days, but I would not. I would not be avail -- yes, I would not be available, yeah. Uh-huh. I have to talk to his mother, too.

But, you know, that means we would not be available in November. It would have to be in December.

ATTORNEY ROSEN: May I be heard?

THE HEARING OFFICER: Yeah.

ATTORNEY ROSEN: My concern is if there were an offer of proof to be considered, we would review and perhaps there would be some understanding. But just saying that there's a preexisting commitment, I mean, this is unilaterally just dictating the terms of hearing scheduling, which isn't fair to either party.

And so, if the Hearing Officer --

ROBERT [redacted] I object to the mischaracterization --

ATTORNEY ROSEN: If I could finish, please?

If the Hearing Officer --

ROBERT [redacted] But you didn't let me.

ATTORNEY ROSEN: -- you know, identified dates of availability, perhaps we schedule the hearing if there's an offer of proof that the parents are going to submit after the fact as to why they can't be available, so be it.

But I would agree that, again, just prolonging this, postponing it a month without any actual explanation or evidence as to the parents' unavailability to attend, I think prejudices the District, having presented our case. And I've already raised my concerns for the stay-put placement and its effect on [[redacted]

ROBERT [redacted] I have to -- I formally object to his characterization. First, he placed the condition on my son being prejudiced. Now, he's trying to flip the script and place it on the District being prejudiced.

The District is not being prejudiced. They had time to present their case. I even offered Mr. Rosen -- according to you, Hearing Officer, you said attorneys work and compromise with each other. And that's why I said, if Mr. Rosen needs a testimony pass today -- I said that at our last meeting.

I didn't know how far he was going to go with it. If he needs additional -- I said, he can have -- if he needs additional dates, whatever exhibit he wants to come in, that's perfectly fine by me. I've been very compromising towards the District. I have, you know, I've been working with Mr. Rosen, but he has not been working with me.

He's now trying to flip the script, now claiming -- because I have already stated the facts how my son is not being prejudiced, he decides to flip the script and claim now the District has been prejudiced. He didn't bring that up before. He said it prejudices my son. When I brought up a good argument about it, he decided to flip it.

It's not prejudicing the District in any way, shape, or form. They've already had their testimony. You know, if anything, it prejudices us, but -- and what I mean by that is, is that, you know, if we're forced to do a November, which we can't, it's going to prejudice us. Okay?

So, I'm not available, and I respectfully reached out. This was not a last-minute thing that, you know. This is something I reached out

on the 21st to let you know because we had discussed, you know, hearing dates passed. That was the first discussion we had about hearing dates, you know, going past the 4th. And that's why I reached out right away to let the Hearing Officer and also opposing counsel know that I would not be available for the remaining of November, which is a little over three weeks -- starting in December, that we can work out those dates.

So, I, again, I am not available in November, and there's no way I could do any November dates past the 4th. December? Yes, we can talk about it. I'd have to talk to Ms. [redacted] We could work around, you know, with her availability in December. I'm not sure what it is. Whatever, you know.

So, this is -- we're going to have to work this out. So, that's kind of -- that's where I stand now. I'm not available any time past the 4th in November up until December.

THE HEARING OFFICER: How long will it take you to file your motion, I guess, to dismiss for failure to prosecute?

ATTORNEY ROSEN: I could do it in the next two or three

days.

THE HEARING OFFICER: All right.

ROBERT [redacted] Then I will respond accordingly. That's fine. I will respond accordingly.

No problem.

ATTORNEY ROSEN: And my only point is, absent any offer of proof, I think -- I can say I have a commitment, but I'm not saying anything to justify why there's, you know. And I think, Hearing Officer Kennedy, you've asked Mr. [redacted] now at several points, can you further elaborate? And he is not doing so.

ROBERT [redacted] I did that.

THE HEARING OFFICER: I'll tell you what. Why don't you file --

ROBERT [redacted] I did send an e-mail.

THE HEARING OFFICER: Why don't you file your motion by Wednesday and the parents can file their response by Friday. I mean, I'll be away the next few days, anyway, getting back on Friday.

ROBERT [redacted] Like I said it in my e-mail, I am fully committed to concluding this matter and confirm that all future court continuation dates must begin in December.

We look forward to coordinating the December

schedule, which will, of course, be subject to the schedules of the Hearing Officer and opposing counsel.

So, I stated in the e-mail I am fully committed to concluding this. So, there is no way that I -- it could be dismissed for failure to, you know, prosecute, you know, that, this hearing. You know, it just doesn't -- there's no validity to that. It makes no sense at all. I'm fully committed to it.

So, I look forward to his motion on Wednesday and we will respond accordingly. No problems there, so.

THE HEARING OFFICER: All right. So, I'll get both sides by Friday and then I'll make a quick decision on it.

ROBERT [redacted] Great. Thank you.

THE HEARING OFFICER: Yeah, so, I could. All right.

ROBERT [redacted] I appreciate that.

THE HEARING OFFICER: So, at this point we're at 12:03.

So, do you want to take -- this, this might be a good time to take a lunch break.

ROBERT [redacted] Yes, I agree. Thank you.

THE HEARING OFFICER: We haven't actually started the testimony.

All right. So, do you think, like, 12:45?
One? How much time do you need?
ROBERT [redacted] One o'clock is good. That's fine.
THE HEARING OFFICER: Yeah, why don't we say one
o'clock? All right.
ROBERT [redacted] Great. Thank you.
THE REPORTER: Pausing the record.

(Pause: 12:02 p.m. to 1:00 p.m.)

THE HEARING OFFICER: All right. Do we have everybody
back now?
ATTORNEY ROSEN: I don't see Ms. Macklin back, but I
have authorize -- oh, she's here. Nevermind.
We're good to go.
THE HEARING OFFICER: Okay. All right. So, we'll move
to the father's testimony.
Mr. [redacted] please raise your right hand.
R O B E R T K O R N B E R G,
called as a witness, being first duly sworn by the
THE HEARING OFFICER, was examined and testified
under oath as follows:

THE HEARING OFFICER: Okay. So, you can just identify
your name and role in the case, and then you can

just start testifying in a narrative fashion.

THE WITNESS ([redacted] Okay. My name is Robert [redacted] I'm [[redacted]s dad. I had filed for the -- I had filed the due process complaint.

ATTORNEY ROSEN: Mr. [redacted] just -- I'm sorry. Just one quick point of clarification from the District's perspective?

Hearing Officer Kennedy, if you could just provide just a bit of guidance. I understand Mr. [redacted] is going to testify now, and I understand that pro se litigants are afforded some form of leeway in terms of testimony.

In terms of objections from the Board, obviously, we'll have the right for cross-examination, but could you just advise as to your guidance if the Board believes information that is being testified to is object-able in terms of the, you know, what is afforded during direct examination?

The Board would reserve objections if Mr. [redacted] is bringing in information that we believe is not relevant or is excluded from this hearing.

THE WITNESS ([redacted] It should be done, you know, on the, I guess in the brief. Like you had told

me, if I wasn't happy with something or what they said, I would have to bring it up in the brief.

THE HEARING OFFICER: So basically, like in a deposition, basically you can reserve, reserve objections to assert later.

ATTORNEY ROSEN: My point is I ask -- I expect that there may be, for example, testimony as to whether or not a resolution meeting was offered. I would immediately object as that is not information that's relevant in the hearing.

THE WITNESS ([redacted] I object. It is relevant to the hearing.

ATTORNEY ROSEN: So, I just wanted to note that we have to right to object during that (unintelligible) --

THE WITNESS ([redacted] He can not. He can not tell me that I did not -- what I can put into testimony and I can't, unless this hearing cannot continue.

THE HEARING OFFICER: Well, you know what?

THE WITNESS ([redacted] We can't continue.

THE HEARING OFFICER: I'll tell you what. There's no actual -- we'll just do, you know, like you usually would. If there's testimony that's objectionable, you can. You can object to it at the time and I'll rule on it.

And at this point, there's no objection

pending, so -- because there's been no testimony yet. So, you can just start testifying. And if the District has an objection, they can make it and I'll rule on it. All right?

THE WITNESS ([redacted] And for the record, Mr. Rosen had brought that up because he knows that's going to be incriminating to him and the District. Well, I would say really to the District. He's representing the District, I see.

But he doesn't want anything incriminating coming in for the record, just like the audio file, which would incriminate, and it would show that Ms. Rizzo perjured herself, but that's not allowed in evidence.

THE HEARING OFFICER: Yeah, before we start --

THE WITNESS ([redacted] I don't -- I don't believe it's right.

THE HEARING OFFICER: Before --

THE WITNESS ([redacted] He should not be telling me what I should be bringing up before my testimony begins, especially --

THE HEARING OFFICER: Well, I'll tell you. Why don't you just --

THE WITNESS ([redacted] Well, I'm not finished.

THE HEARING OFFICER: Why don't you just start

testifying?

THE WITNESS ([redacted] No, but I'm not finished yet, sir. If I could just finish my statement? Mr. Rosen had a chance. I'd like to finish, to respond to that.

He -- he doesn't have -- that there's not even a reason for him to even bring up, you know, well, if he's going to bring up the resolution meeting, I'm going to object to that. Of course, I have a right to bring it up. And you know, that's part of my testimony.

THE HEARING OFFICER: We'll cross that bridge when we --

THE WITNESS ([redacted] And that's part of the violations.

THE HEARING OFFICER: We'll cross that bridge when we come to it. In the meantime, why don't you just start your testimony?

THE WITNESS ([redacted] Yeah. First, I'd like to -- from last time, I'd like to correct the factual error that was made during testimony, actually.

The social worker stated that Woodhouse Academy serves severely autistic children. That was her testimony. That was Ms. Dougherty. And it would be harmful to my son to attend there.

That is not accurate. According to the Woodhouse -- Woodhouse Academy's own website, it's a Connecticut state-approved special education school for students with average to above average intelligence. Okay? It -- it supports students with [redacted] spectrum disorder, anxiety, executive functioning challenges. It is a therapeutic academic setting, not a high-needs behavioral program.

So that, that mischaracterization could unfairly influence the decision on placement, and I believe it's important to clarify that for the record, being it's my testimony. So, that's important to bring up for -- for the record.

And I'd also like to address another serious procedural issue that directly affects this hearing. I asked the School District's witness, Ms. Dougherty, a question about whether a parent has a right to obtain an independent educational evaluation, an IEE.

Under IDEA, an opposing counsel objected, claiming that the question had already been asked and answered. That was incorrect. I had not asked about general -- I had not asked about the IEE. I -- I was asking about a specific legal

right to an IEE.

And then the Hearing Officer stated that an IEE, this is not an IEE case and -- and, you know, and blocked the question, but that is factually and procedurally wrong. The IEE issue is central to this case.

In my original complaint that I filed in June and I gave you an updated copy, the Hearing Officer, the end of July, I described how the District -- well, that was already in there, but it was updated for other things. But in my original complaint, I described how the District refused to honor my IEE request, failed to provide a list of providers, misrepresented parental decision-making authority, and refused to initiate a due process hearing to justify denial.

And these are serious procedural violations under IDEA, and they are a part of the reason this hearing is taking place. So, I respectfully ask that the record reflect that this question was improperly excluded, despite being directly relevant to the issues related in my complaint.

You know, this mischaracterization by opposing counsel and the Hearing Officer's ruling prevented me from addressing a key procedural

safeguard, and I believe it undermines the fairness of the hearing. So, that's something I needed to make sure that is a part of the record.

Okay. I will start my testimony.

Okay. First, I'm going to bring up, this has to do with the resolution meeting that never happened, which is I'll -- I'm going to -- like to get into evidence P-69. I would like to have that into evidence. I'll bring it up on the screen.

ATTORNEY ROSEN: Hearing Officer Kennedy, I've seen P-69 as it was provided in advance to the parties. We're objecting to the inclusion of P-69 or any testimony as to P-69, as it includes correspondence that was raised as part of attempts to clarify positions in an attempt to schedule either a resolution meeting or a mediation.

This correspondence is also after the filing of the complaint. So, it's not at issue -- that were part of the subject matter at issue. It pertains to attempts at settlement conversations should not be relevant or included in the record.

And further, in any event, for -- the penalty for not holding a resolution meeting is the commencement of due process. We're here. So, it's irrelevant. So, I'm objecting to the

inclusion of P-69 and any testimony --
THE WITNESS ([redacted] Well, I object to mischaracter --
ATTORNEY ROSEN: -- any testimony as to what P-69 entails, or related to P-69.
THE WITNESS ([redacted] I object to Mr. Rosen's characterization. It has to do with this hearing. It's -- it is a procedural violation, which obviously Mr. Rosen does not want the District to reflect the record of the procedural violation.
P-69, P --
THE HEARING OFFICER: Well --
THE WITNESS ([redacted] -- 70 and P-71 are communications that I would respectfully request that come into this to --
THE HEARING OFFICER: Well, let's take one at a time.
THE WITNESS ([redacted] Yes.
THE HEARING OFFICER: Okay. Yeah. P-69, if it involves some -- yeah, it involves settlement negotiations. That's excludable by law, any statements --
THE WITNESS ([redacted] It doesn't include --
THE HEARING OFFICER: -- statements during settlement conversations, and it does arise after the bringing of the complaint. So, it's not really

part of this, part of this hearing.

THE WITNESS ([redacted] Because I'm --

THE HEARING OFFICER: I'm going to sustain the objection to P-69.

THE WITNESS ([redacted] Well, I would like to clarify that for the record, that it should come into evidence because it is part of it. It is -- we were not discussing settlement negotiations.

It is a clear procedural violation, because after I -- there was no way of me -- when I filed my due process complaint in June, there was no way of me telling, at that point, whether the District would hold a resolution meeting or not.

I didn't have a crystal ball in front of me. It was not something I could have preempted that, well, I have a feeling the District may not, but I'm going to bring this up because just in case, you know, I -- I want this in my complaint. That that would be unheard of at that point.

So, it is relevant. We were not discussing negotiations and it had nothing to do with a mediation. We're talking about a resolution meeting required by IDEA, which the District failed to hold. That is a procedural violation.

And by not having this exhibit come in and

being objected it completely -- and it will prejudice me, because at the beginning of this due, you know, at the beginning of the due process, I remember the -- you, Hearing Officer, I believe what you had said during the -- the pre-hearing conference that, well, if I don't find any violations, well, you know, then, you know, you weren't -- you're not going to, you know, basically find in our favor. Or you're not, you know, you would have to have, you know, if there's no violations, then you -- you wouldn't be able to rule in our favor.

So, this is one of the violations that you're -- that's being objected to and you're sustaining it, and not allowing it to come in. So, that is -- my concern is that it's not being allowed to come in. It prejudices me terribly because it is a violation under IDEA, and it should come in.

I did not object to any of the exhibits that Mr. Rosen put in, even though I could have. I could get into the detail if you would like, but you just let me know. I let him have all his exhibits and I didn't object to anything.

And Hearing Officer, you did say for the

record that, you know, hearing, you know, attorneys need to work with each other, implying that (unintelligible) --

THE HEARING OFFICER: The objection sustained.

THE WITNESS ([redacted] But -- but --

THE HEARING OFFICER: The objection is sustained.

P-69 is excluded. So, why don't you move on to your next, you know, move on to the next subject.

THE WITNESS ([redacted] I don't feel we can even continue this hearing if all -- if my exhibits are going to be objected to and you're going to sustain them. This is a procedural violation under IDEA.

I want to get in for the record the District failed to hold a resolution meeting within the 15-day required a timeframe. I do have, you know, the evidence to prove that. And I'm (unintelligible) --

THE HEARING OFFICER: The objection is sustained.

THE WITNESS ([redacted] Well, I'm going to explain exactly what happened. For the record, the Hearing Officer is refusing to allow my evidence to come in, which would incriminate the District, just like the audio file.

And I believe this hearing is completely tainted, as I had said last time. I -- I don't change my position here. So, this is not -- this is not fair to me as a pro se litigant.

From the very beginning, the Hearing Officer stated for the record that, oh, pro se people, it's more about bad blood than what -- than really what's going on with the child, implying that I'm not looking for my child's best interests, that I'm just, you know, out just -- just to get revenge on the District because I'm not happy with them. That's not what's going on here.

My child's IDEA is free and a public -- free and appropriate public education has been, in fact, violated. My rights as a parent has been violated. This is one of the violations. (Unintelligible) --

THE HEARING OFFICER: Do you have any information to impart that actually concerns the complaint itself?

THE WITNESS ([redacted] Yes, and this is part of the complaint, which I'm going to bring up. This has to do with the 15-day resolution period. This is part of my testimony. Okay?

On June 12th, I did file for the due process

complaint.

THE HEARING OFFICER: Yeah.

THE WITNESS ([redacted] Hearing Officer Kennedy, I'm sorry. I'm going to object.

THE HEARING OFFICER: I've ruled on this. I've ruled on this.

THE WITNESS ([redacted] I'm sorry, but I -- I'm allowed. You're not allowing the -- the exhibit to come in, but I'm going to explain it and now you're trying to silence me. I don't feel -- I don't feel -- I don't see how we can continue here.

THE HEARING OFFICER: Well, if you don't want to continue, I can dismiss it.

THE WITNESS ([redacted] Well, I'm not saying that. You're putting -- don't put words into my -- Hearing Officer --

THE HEARING OFFICER: Well --

THE WITNESS ([redacted] You don't -- I'm -- I don't feel how we can continue if -- if you're going to go along this route and not allow me to have my testimony come in.

THE HEARING OFFICER: We can finish the hearing. If you feel there have been errors --

THE WITNESS ([redacted] I'm trying to cooperate. I

don't believe you -- I don't believe you're cooperating with me, sir.
THE HEARING OFFICER: Look, you know, we can finish --
THE WITNESS ([redacted] I don't have any problem getting in front of a jury and a judge.
THE HEARING OFFICER: Sir, we can finish the hearing. If you feel there are errors, you can appeal it.
You know, if you --
THE WITNESS ([redacted] That's what I'm going to do. So, I would like to get this into the --
THE HEARING OFFICER: -- if you don't win the case, so.
THE WITNESS ([redacted] Well then, that's exactly what I plan on doing. There will be a full appeal.
THE HEARING OFFICER: And if --
THE WITNESS ([redacted] I can tell you that.
THE HEARING OFFICER: You know if the District doesn't win the case, if they feel there are errors that I made, then they can appeal.
THE WITNESS ([redacted] That's not what I said. I'm talking about I will be appealing this case. I can tell you that right now.
THE HEARING OFFICER: All right. So --
THE WITNESS ([redacted] I will be -- I will, for the record --
THE HEARING OFFICER: You can save your argument for

the appellate, for the court that hears the appeal.

THE WITNESS ([redacted] Okay. Well --

THE HEARING OFFICER: But that's my -- but for right now, that's my ruling.

THE WITNESS ([redacted] Okay. Well, I am going to discuss the 15-day resolution period. The District had failed to hold a resolution meeting with --

ATTORNEY ROSEN: Objection.

THE HEARING OFFICER: I've ruled on the 15-day resolution period. It's not part of the hearing. So, if you don't move on --

THE WITNESS ([redacted] How can that -- that is part of the hearing, sir.

THE HEARING OFFICER: If you don't, I mean, you know (unintelligible) --

THE WITNESS ([redacted] I don't understand. If you can explain, sir?

THE HEARING OFFICER: -- enough of this. If you don't --

THE WITNESS ([redacted] Sir, I'm not understanding.

THE HEARING OFFICER: If you don't move on --

THE WITNESS ([redacted] If you could please explain? I'm not understanding, sir.

THE HEARING OFFICER: If you don't move on, the case is just going to be dismissed. I mean, you've had --

THE WITNESS ([redacted] Sir, if that's what you want to do, then we could just go for an appeal. That's up to you, sir. I can't control your actions or behaviors. I can only -- all I want to do is I -- I want a fair case. Okay?

I wanted the Hearing Officer to be impartial. I don't feel you're being impartial. You know, I have evidence to put in and, you know, I'm being silenced here. And I don't feel that's right for me as a pro se litigant.

You're right. If I was represented by counsel, these things wouldn't happen, but I shouldn't have to be forced to be represented by counsel. I should be able to, you know, continue with a due process hearing without counsel. And I should not be prejudiced, and I should not, you know, I should not have a hearing officer, you know, make these kind of comments towards me.

Everything is well documented, sir. You know, I'm trying to present my case under testimony and here you're threatening to dismiss it. You know, everything becomes a threat and I don't understand why. And -- and you're

mischaracterizing my intentions. Okay? And I don't believe that's fair, and I believe I have a right to get this into the record.

You know, I -- I believe the 15-day resolution meeting that didn't take place, that is procedure (unintelligible) --

ATTORNEY ROSEN: Hearing Officer Kennedy, I'm objecting as to the -- any reference --

THE WITNESS ([redacted] Well, I'm objecting to Mr. Rosen's objection, sir.

ATTORNEY ROSEN: -- to resolution meeting. This has been sustained.

THE WITNESS ([redacted] It has to do with the due process (unintelligible) --

THE HEARING OFFICER: If you won't move, you know --

THE WITNESS ([redacted] Okay. Well, then I will save this for appeal. Then I will save this part for appeal. So --

THE HEARING OFFICER: Save that. Save that for appeal.

THE WITNESS ([redacted] Oh, I certainly will. Absolutely. So, it is -- it is in for the record that I'm being prejudiced. That's fine. Okay.

And I have to say, for the record, I feel like you're abusing your power as a hearing officer. That's the way I feel, by not allowing

this to come into -- to the record, that's my feelings based upon your actions and behaviors towards me. And I have a right to make that for the record, which I hope the record will reflect that. That is part of my testimony right now.

So, in moving forward, I would like to bring up P-70, which are communications.

ATTORNEY ROSEN: Hearing Officer Kennedy, I'm going to renew my objection for the same basis as to why 69 was excluded. It refers to settlement conversations that took place after the filing of the complaint. It is not at issue.

THE WITNESS ([redacted] There were no settlement conversations. There were no settlement conversations.

THE HEARING OFFICER: All right.

THE WITNESS ([redacted] We were not settling. There was nothing about settlement conversations.

THE HEARING OFFICER: No -- I mean, I think you have the right to make the, you know, you have the right to make the offer of proof just for the record.

But I'm going to -- I don't see it as any different than P-69. So, I'm going to exclude --

THE WITNESS ([redacted] When you say I have a right to

make the proof for the record, what do you mean, sir?

THE HEARING OFFICER: I mean, you offered P-70, and that's fine. I mean, there's a record of you offering P-70. The District has the same objection, I think, for the same reasons. The objection is well founded.

THE WITNESS ([redacted] They tried to force us to sign a non-mandated --

THE HEARING OFFICER: So, P -- yeah --

THE WITNESS ([redacted] -- confidentiality agreement --

THE HEARING OFFICER: P-70 --

THE WITNESS ([redacted] -- which is --

THE HEARING OFFICER: P-70 is excluded, but there's a record that you did offer it, so.

THE WITNESS ([redacted] May I ask why, Hearing Officer, you told us at the pre -- the pre-hearing --

THE HEARING OFFICER: You can -- I mean, you can --

THE WITNESS ([redacted] I understand, sir.

THE HEARING OFFICER: When you appeal, you can say he should have admitted P-69 and P-70.

THE WITNESS ([redacted] Okay.

THE REPORTER: But you've established that you did

offer it.

THE WITNESS ([redacted] I would like to ask you a question, Hearing Officer. At the pre-hearing conference, why is it that you said that if you don't find any violations that you're not going to be able to find in our favor? Those were your words during the pre-hearing conference, sir.

THE HEARING OFFICER: Okay. Well, if you don't -- if you don't prove any -- if there's no violations, then there's no reason -- that I have no basis for offering any relief.

THE WITNESS ([redacted] This is one of the violations. This is what I mean. This is one of the violations. You're not allowing it to come into evidence. So, that's why you --

THE HEARING OFFICER: This is a violation that existed at the time of the filing of the complaint?

THE WITNESS ([redacted] Yes, this is a violation that is part of the complaint. This is all part of the due process hearing. This is not something five years ago. And this is not something five years (unintelligible) --

THE HEARING OFFICER: All right. I've ruled on P-70 now, so.

THE WITNESS ([redacted] Right. So, but you just --

you just testified -- you just testified --
THE HEARING OFFICER: Let me ask, do you want to also offer P-71?
THE WITNESS ([redacted] Yes, but you just testified --
THE HEARING OFFICER: Okay.
THE WITNESS ([redacted] -- that if you don't find any violations --
THE HEARING OFFICER: I'm not testifying.
THE WITNESS ([redacted] Okay. Well, I'm asking (unintelligible) --
THE HEARING OFFICER: P-71, does the District --
THE WITNESS ([redacted] I have a question. I would like to --
THE HEARING OFFICER: Let me just ask, does the District have the same objection to P-71?
ATTORNEY ROSEN: We would have the same objection to 71 and P-72 if it is offered.
THE WITNESS ([redacted] Okay. I would like to find out, Hearing Officer, when you stated at the pre-hearing conference that if you don't find any violations that you're not going to be able to, you know, so -- and support our outplacement or find in our favor.
Again, this is one of the violations. I'm bringing it up in the record, which is a

violation, and you're not allowing it to come into evidence, which is it prejudices us as pro se parents, us, on behalf of Ms. [redacted] who is not here today. But it prejudices me.

You know I am his father. I filed this complaint, and not being able to have this come into evidence is one of the procedural violations, the ones that you specifically noted that if you don't find any, then you're not going to be able to, you know, support, you know, our, you know, our position for outplacement. So, this is one of them.

THE HEARING OFFICER: All right. Well, you've offered them, the three. You've offered 69, 70, and 71. I've excluded. You know you can appeal and say -- you know if you don't win the case, you can appeal then to a court and say those should have been included and have a judge rule on it.

THE WITNESS ([redacted] Okay.

THE HEARING OFFICER: That those (unintelligible) --

THE WITNESS ([redacted] If I can't have these come in -- I understand. If I can't have this into evidence, I'd like to discuss it, though.

Am I going to be silenced into discussing this as part of -- this is part of my testimony.

THE HEARING OFFICER: Yeah, there's no more reason to discuss it. You just can move on.

THE WITNESS ([redacted] May I ask why there's no reason to discuss it, sir?

THE HEARING OFFICER: Because I've ruled. So, move on.

THE WITNESS ([redacted] If I'm not going to use the exhibit -- I'm trying to understand as a pro se party. My understanding was if it can't come into evidence, I can still discuss it even -- because I believe you even told me that in your testimony, since I couldn't -- like, for instance, the audio evidence that you will not allow in, into evidence, which is the March 6th PPT meeting. I'm able to discuss it, but I can't put it into evidence.

The same thing should apply to this. If you're not going to allow this into evidence, I should be able to discuss it. That was something that you had said --

THE HEARING OFFICER: I mean, the subject is -- that the subject is not part of the hearing, so.

THE WITNESS ([redacted] May I ask why it's not part of the hearing? How can it not be part of the hearing?

THE HEARING OFFICER: Because I just said. I've just

said; A, it's not relevant because it didn't exist at the time the complaint was filed; and B, this is all involving settlement discussions, and that's excluded as a matter of law.

So, that's my ruling. You know you can ask a court to reverse the decision if it doesn't go your way.

THE WITNESS ([redacted] Oh, I know. I know. I understand that.

THE HEARING OFFICER: But there's -- I mean, right now there's nothing more to discuss.

THE WITNESS ([redacted] But -- but I'm trying to find out for the record that --

THE HEARING OFFICER: So, you're just going to have to testify on something else.

THE WITNESS ([redacted] Right, but I want to clarify for the record that the evidence does not have anything to do with we -- we're not discussing the settlement with -- with the District at that point.

This had to do with the resolution hearing and I'm not understanding how it's not relevant. I need to understand the process. Not just, well, I'm ruling and move on. I need -- because if I do --

THE HEARING OFFICER: The resolution -- the resolution meeting is a settlement discussion. So, the --
THE WITNESS ([redacted] Right. But the thing is that --
THE HEARING OFFICER: I've ruled. Stop arguing.
THE WITNESS ([redacted] How is that a settlement discussion? If a resolution meeting is not a settlement discussion -- it didn't happen.
And so, they're supposed to by law -- now, by law -- let me ask you. By law, is there supposed to be a mediation or just a resolution meeting? So, there are two things there. And I'm trying to understand this as a pro se party.
So, you -- you have -- because I think you had discussed, Hearing Officer, that at the beginning of that, you know, of the hearing that, well, did you ever try mediation? Is that considered? Is that -- under IDEA, is that mandated or is a resolute -- well, let me -- is a resolution a meeting --
ATTORNEY ROSEN: Hearing Officer Kennedy, you're muted.
THE WITNESS ([redacted] -- mandated under IDEA?
THE HEARING OFFICER: Mediation is not mandated. You can do it if you want.
THE WITNESS ([redacted] Is a resolution hearing

mandated by IDEA?
THE HEARING OFFICER: There's supposed to be one, unless both parties opt out, so.
THE WITNESS ([redacted] We didn't opt out, sir. That's what I'm saying. We didn't opt out.
THE HEARING OFFICER: All right.
THE WITNESS ([redacted] Under IDEA, so it is -- it is a valid concern.
ATTORNEY ROSEN: Hearing Officer Kennedy, I have to object. It's just continued attempted testimony --
THE HEARING OFFICER: Yeah.
THE WITNESS ([redacted] It's not continued.
ATTORNEY ROSEN: -- that has been ruled on.
THE WITNESS ([redacted] You just don't want me to have this --
THE HEARING OFFICER: All right. Look, look.
THE WITNESS ([redacted] -- come into evidence. I'm sorry, but this is prejudicing me. I don't see how we can continue here if this is going to prejudice me.
THE HEARING OFFICER: If you don't want to continue --
THE WITNESS ([redacted] You just said that it --
THE HEARING OFFICER: If you don't want to continue --
THE WITNESS ([redacted] I'm continuing, sir. I want

to, but you're not letting me continue.
THE HEARING OFFICER: -- I can dismiss the case and you can --
THE WITNESS ([redacted] Sir, I'm -- sir, if you want to dismiss the case --
THE HEARING OFFICER: -- you can just appeal it.
THE WITNESS ([redacted] -- I can't stop you from that. I'm trying to continue. I'm trying to understand (unintelligible) --
THE HEARING OFFICER: Well, if you're trying to continue, then continue. Actually --
THE WITNESS ([redacted] -- but you keep cutting my -- you keep cutting me off, sir, and I'm losing my train of thought. And I've -- I explained this to you. If you could please not cut me off, I would appreciate it.
THE HEARING OFFICER: Well, you're --
THE WITNESS ([redacted] I would expect the same respect. Just like now, you always interject.
THE HEARING OFFICER: Now, look. Sir, you're not running -- it's not your role to run the hearing.
THE WITNESS ([redacted] I'm not saying I'm running the show.
THE HEARING OFFICER: It's the Hearing Officer's role to run --

THE WITNESS ([redacted] You're mischaracterizing, yeah.

THE HEARING OFFICER: And when I tell you what you need to do, you need to do. And right now, it's to move off the subject of the resolution meeting and testify as to something else. Testify as to what's actually part of your complaint.

THE WITNESS ([redacted] Right. And I'm trying to understand because you made a comment about the resolution meeting, that it is required by IDEA. That's something.

THE HEARING OFFICER: Yeah. Stop talking about that. Testify about what's in your complaint, what you're actually claiming --

THE WITNESS ([redacted] So, this is one of the -- I'm trying -- I'm trying to get through that.

THE HEARING OFFICER: What you're actually claiming the violations are in your complaint.

THE WITNESS ([redacted] That's what I mean. This is one of the violations that you're not allowing to come in. So, now you're not going to let me discuss it. So, that is clear for the record. Okay, so.

Oh, also something I'd like to discuss is that I remember at the beginning, in the -- in the

pre-hearing conference, I believe Mr. Rosen objected to --

THE HEARING OFFICER: We're not talking about the pre-hearing conference.

THE WITNESS ([redacted] Right. But I'm trying to bring up --

THE HEARING OFFICER: This is time to testify.

THE WITNESS ([redacted] And this is part of my testimony, sir. And I have a right to bring this up.

THE HEARING OFFICER: No, this isn't --

THE WITNESS ([redacted] You're not letting me, because you don't want this for the record. Sir, I --

THE HEARING OFFICER: Pre-hearing conferences are off the record. We're not --

THE WITNESS ([redacted] I know, but -- but during the pre -- but -- but I'm testifying as to what was said during the pre-hearing conference (unintelligible) --

THE HEARING OFFICER: Yeah, we're not having testimony about the pre-hearing --

THE WITNESS ([redacted] I -- well, I would like testimony about that.

THE HEARING OFFICER: Sir?

THE WITNESS ([redacted] I have a right to have that

in.

THE HEARING OFFICER: Sir?

THE WITNESS ([redacted] Sir, if -- if -- sir, if you're not going to let me have testimony --

THE HEARING OFFICER: You can't testify about what the --

THE WITNESS ([redacted] I'm trying to clarify something with you. Sir, I'm trying to clarify. I'm trying to be respectful, but I don't feel like you're being respectful to me.

THE HEARING OFFICER: Does the District want to make a motion to dismiss this case with prejudice?

ATTORNEY ROSEN: Yes, please.

THE WITNESS ([redacted] Well, then if you would like to, then I -- then I think we -- we need to get it in front of a court. You're not allowed my testimony to come in. We're done.

THE HEARING OFFICER: Yeah, I think we're done.

THE WITNESS ([redacted] I -- I can't. I can't. I want to continue, but you're not allowing this to happen.

THE HEARING OFFICER: I think we're done, too.

THE WITNESS ([redacted] You're not allowing this. You're not allowing this fairly for me.

THE HEARING OFFICER: Enough --

THE WITNESS ([redacted] You're trying -- you made -- you made a comment at a pre-hearing conference --

THE HEARING OFFICER: All right.

THE WITNESS ([redacted] -- and I'm trying to, you know. You know, get clarification for the record. You know, you made a comment that starting in January of 2023, you know, you said, if it's any complaint, it's fair game.

And what I was trying to bring up and you wouldn't let me get into evidence is that all my exhibits from January until May of 2023, you would not allow to come into evidence. But if it's in my complaint, that's what I was trying to bring up. And you're -- you want to dismiss this case with prejudice because I have a question about the exhibits. And I want to find out if I could use them, because you said it was fair game.

So, it is mentioned in my -- my complaint. I'm -- I'm making my testimony now. And it states in my complaint I will -- let me bring up my complaint, and I will show for the record that -- let me just get it here.

ATTORNEY ROSEN: Hearing Officer Kennedy, we did make the motion, if Mr. [redacted] is not going to actually testify.

THE WITNESS ([redacted] I am testifying right now, but you're not letting me and you were interrupting me and (unintelligible) --

THE HEARING OFFICER: I think we've had enough of this. The case is dismissed with prejudice.

THE WITNESS ([redacted] Then I will be filing my appeal.

THE HEARING OFFICER: I'll cancel the next hearing. You can do what you want.

THE WITNESS ([redacted] Then I will be filing my appeal. I have no problem at all.

THE HEARING OFFICER: Okay.

ATTORNEY ROSEN: Thank you.

THE WITNESS ([redacted] Have a nice day.

THE HEARING OFFICER: Thank you.

THE WITNESS ([redacted] Have a nice day.

THE REPORTER: Closing the record.

(End: 1:26 p.m.)

STATE OF CONNECTICUT
[Hartford County]

I, ROBERT G. DIXON, a Certified Verbatim Reporter for the State of Connecticut, do hereby certify that I took the above 147 pages of proceedings of the STATE OF CONNECTICUT, DEPARTMENT OF EDUCATION, SPECIAL EDUCATION HEARING In Re: [redacted] COMPLAINANT, VS. MILFORD BOARD OF EDUCATION, RESPONDENT, Docket Number: 25-0686; HELD BEFORE: PATRICK KENNEDY, ESQ., THE HEARING OFFICER, on October 27, 2025 (via Teams teleconference).

I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of computer assisted transcription; and I further certify that said deposition is a true and accurate record of the testimony given in these proceedings.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and seal the 10th day of November, 2025.



Robert G. Dixon, N.P., CVR-M No. 857

My Commission Expires 6/30/2030

INDEX

WITNESS PAGE

Sara Collette ------------------------------------ 825

Direct Examination by Attorney Rosen ---------- 826

Cross-Examination by R. [redacted] --------------- 854

Redirect Examination by Attorney Rosen -------- 904

Robert [redacted] ---------------------------------- 932

(Examination) --------------------------------- 932

BOARD EXHIBITS (cont'd)

NUMBER PAGE

*Exh 33 --- S. Collette resume ------------------- (826)

*Exh 30 --- 5/21/'25 Placement PPT/IEP meeting --- (840)

PARENT EXHIBITS

NUMBER PAGE

*Exh 30 --- [[redacted] Outplacement request ------------ (847)

*Exh 46 --- PPT Meeting date e-mail thread ------- (859)

*Exhibit entered into evidence on prior hearing date.

All exhibits retained by counsel.

**0**

**06460** 819:5
**092** 827:18 828:1

**1**

**1** 831:11
**100** 890:4
**10:02** 818:19 820:1
**10:41** 854:12
**10:42** 854:4
**10:50** 854:12
**10th** 820:10 821:8 965:14
**12:02** 932:9
**12:03** 931:20
**12:45** 932:1
**12th** 944:25
**14** 912:11
**147** 965:4
**15** 842:18 943:17 944:23 947:7,11 949:4
**1:00** 932:9
**1:26** 964:19

**2**

**2023** 963:7,11
**2024** 831:10,11 855:1,3
**2025** 818:18 840:25 855:8 855:15,16,19 855:25 856:4 856:10 857:25 858:19 863:6 904:22 965:6 965:15
**203.783.1200** 819:8
**21** 840:25 922:4
**21st** 919:9,16 921:5 929:1
**25** 836:18 843:10 966:12
**25-0686** 818:8 820:8 965:6
**26** 836:18 843:10
**27** 818:18 965:6

**3**

**30** 821:3,8 822:8 840:21 842:9,10,16,19 842:22 847:25 966:12,16
**33** 826:10 966:12
**35318** 965:18

**4**

**46** 859:5,8 966:16
**4th** 820:24 913:12,17 919:10,17,25 921:9,11 922:13,23 924:4 925:21 929:4,13,21

**5**

**5/21** 966:12

**6**

**6/30/2030** 965:22
**69** 939:8,11,12 939:13 940:1,4 940:5,11,18 941:4 943:7 950:9,24 951:23 954:14
**6th** 955:13

**7**

**70** 940:13 950:7 951:3,5 951:13,15,23 952:23 954:14
**71** 940:13 953:3,11,15,16 954:14
**72** 953:17
**75** 819:4

**8**

**825** 842:7 966:2
**826** 966:3,12
**840** 966:12
**847** 966:16
**854** 966:3
**857** 818:24 965:21
**859** 966:16

**9**

**904** 966:4
**932** 966:6,6
**9:51** 919:10

**a**

**a.m.** 818:19 820:1 854:12 854:12
**aba** 873:9 885:25
**abeyance** 923:5
**abilities** 843:25
**ability** 836:21 848:16
**able** 820:23 821:19 830:1,2 836:6 839:17 839:23 845:21 846:6 850:5 857:14 865:11 865:19 868:3,8 872:25 882:12 890:19 907:4 933:17 942:11 948:16 952:6 953:21 954:6,9 955:14,18

**above** 937:4 965:4
**absence** 824:16
**absent** 921:20 922:22 930:6
**absolutely** 888:6 949:21
**abuse** 864:2
**abusing** 949:24
**academic** 832:5 838:14,14 843:14 846:8 850:2,6 851:19 851:22 868:2 872:4,10 878:22 937:8
**academically** 837:6 845:3,8 850:3 872:2
**academics** 842:9 850:11
**academy** 844:9 844:11,12 846:25 847:3,7 847:8 866:1,7 866:8,19 867:25 872:1 873:13,23 874:8,14 877:16,18,21 879:1 881:19 881:23 882:16 883:12 884:18 885:9 890:10 890:11,17,18 890:25 891:1,8 895:6 896:9,20 924:18 936:23
**academy's** 937:2
**access** 839:20 856:22 873:1 890:21 906:25 907:2
**accomplish** 861:12
**accurate** 910:1 937:1 965:9
**accusations** 916:6
**accused** 915:6
**acting** 828:14
**action** 965:11 965:13
**actions** 948:6 950:2
**actual** 882:9 883:8 927:9 934:21
**actually** 822:15 823:23 824:18 824:19 825:5 827:7 828:15 847:10 868:7 891:10 923:21 925:1 931:24 936:21 944:19 959:11 960:7 960:14,17 963:25
**additional** 822:1 827:17 832:19 913:23 919:19 928:2,3
**additionally** 837:10 839:10 849:21
**address** 848:18 848:21,24 914:7 937:15
**addressed** 848:12 851:14
**addressing** 938:25
**adequate** 853:21
**adhering** 910:22
**adjusting** 829:20
**administration** 823:7
**administrator** 827:19 828:2
**administrators** 839:25
**admitted** 859:8 951:23
**adults** 837:8
**advance** 939:11
**advanced** 827:2 921:25
**advise** 919:22 933:15
**advocate** 916:4
**affect** 824:17
**affects** 937:16
**afforded** 933:11,18
**ago** 825:6 897:1 922:4,7 952:21
**agree** 862:15 862:21,24 871:17,21,22 871:23 895:15 896:3 905:9 916:22 924:1 925:1 927:7 931:23
**agreed** 824:5
**agreeing** 912:8 924:25
**agreement** 924:14 951:12
**agrees** 917:22
**ahead** 823:18 857:21 875:17 882:25 885:3 895:24 896:15 915:23 917:9 917:17 922:17
**air** 845:11 882:17,19,23 884:16

**alignment** 835:9
**allow** 857:20 895:23 943:23 945:21 955:12 955:17 963:12
**allowed** 935:14 942:17 945:8 962:16
**allowing** 870:8 870:10 892:16 942:15 945:8 949:25 952:14 954:1 960:20 962:20,23,24
**allows** 895:16 896:4
**amount** 857:15
**amounts** 851:21
**angry** 852:25
**annual** 834:20 834:20
**answer** 857:21 866:13 875:5 875:17 885:2 889:6,9,22 894:23 895:24 895:24 896:14 898:3,7,11 902:12 903:6
**answered** 857:5,18,19 858:10,11 868:23 874:9 876:14 877:22 879:13 884:24 887:19,24 889:1,3 890:3 891:5,12 892:2 892:3 894:5 896:11,13 897:7,23,25 898:1,6,15 903:3 908:8 937:23
**answering** 887:14 889:2,4 889:8 903:2
**answers** 900:12
**anticipate** 919:17
**anxiety** 846:15 937:6
**anyway** 870:4 930:20
**apologize** 898:8 901:17 908:4
**apologized** 910:7,8
**apparently** 910:4 924:19
**appeal** 892:19 911:19,25 912:12 946:7 946:13,18 947:2 948:4 949:17,18,19 951:22 954:15 954:16 959:6 964:7,11
**appealing** 946:20
**appears** 918:6
**appellate** 947:1
**apply** 955:16
**appreciate** 916:2 931:19 959:16
**appreciated** 840:14
**approach** 844:25 846:22 872:8 873:1 885:20 916:1
**appropriate** 824:7 828:23 831:4 833:7,10 834:11 835:17 836:13 837:17 838:23,25 844:20 853:6 861:9,11,25 863:17 866:20 867:12,22 871:14 872:2 872:13 874:24 885:10 886:4 887:22 888:6 888:19,21 890:5 891:1,11 891:14,18,24 893:25 894:7,8 905:1,6,10 906:13 907:10 907:16 909:5 916:13,24 923:2 925:2 944:14
**appropriately** 851:9 906:11 918:4
**approved** 844:13 884:18 884:19 885:7,8 891:17,18,21 937:3
**approximately** 857:12
**april** 855:16
**area** 833:15 850:8 883:3 884:13
**areas** 836:16,24 839:19 878:23 893:7,20
**argue** 898:18 899:2 911:24 911:24,25
**arguing** 880:24 880:25 900:15 901:6,9 903:1 909:10,15 957:5
**argument** 868:24 928:15

946:25
**argumentative** 867:6 868:22 875:11,12 876:5,6 879:14 879:15 886:16 886:18 887:3,5 891:4,6
**arrived** 840:10
**arts** 837:22
**asked** 857:5,18 858:10,11 860:24 868:20 868:22 874:9 876:14,15 879:13 884:24 891:4,12 892:2 894:4 896:11 896:12 897:7 897:22,23 898:1 904:14 908:2,5,8 922:18 930:10 937:17,22,24 937:24
**asking** 840:10 859:20,21 861:1,5,10 862:1 880:5,18 882:22 888:12 898:5,14,20 902:4,11,14 910:3,4,8 919:12 923:5 923:25 937:25 953:10
**aspect** 852:15
**aspirational** 850:21
**assert** 934:5
**assessments** 857:17
**assignment** 828:12
**assisted** 965:9
**assistive** 864:15
**assumed** 828:11
**assuming** 828:15
**ate** 910:10
**attacking** 910:25
**attempt** 939:15
**attempted** 958:10
**attempts** 939:14,20
**attend** 823:25 833:19 841:8 841:13,18,23 843:6 858:19 859:18 860:6 860:21 927:10 936:25
**attendance** 841:11,17 843:4
**attended** 839:5 839:11 840:17 841:4 855:24 856:11 863:8
**attendee** 841:1
**attendees** 841:6 843:3
**attending** 824:13 858:17
**attention** 848:16 850:10
**attorney** 820:14 821:13 821:18 823:3,4 823:17,19 825:1,11,14,25 826:2,6 853:10 854:8 857:4,18 858:9 860:2,23 866:3,9 867:6 868:22 869:15 873:25 874:9 875:11 876:5 876:14,25 877:22 879:13 879:16,24 880:8 882:20 883:20 884:24 886:16 887:3 888:25 889:4 889:15 891:4 892:2 894:4,7 894:19 895:19 896:11 897:7 903:12 904:6,8 904:13 907:17 908:21 910:18 910:21 913:6 914:3,6 915:18 915:25 916:11 917:7,18 919:4 919:11 921:15 921:20 922:15 922:18 923:10 926:2,12,14,24 927:2 929:25 930:6 932:13 933:5 934:6,13 939:10 940:4 947:10 949:7 949:11 950:8 953:16 957:21 958:9,14 962:13 963:23 964:13 965:12 966:3,4
**attorneys** 927:22 943:2
**audio** 935:11 943:25 955:11
**auditorial** 896:10,21
**auditorially** 845:19
**auditorily** 847:17 850:9 881:10

**auditory** 845:15 881:17
**authority** 938:15
**authorize** 932:14
[redacted] 827:8 827:14 832:17 833:6 840:12 850:15 864:4 937:6
**autistic** 833:4 936:23
**avail** 926:6
**availability** 917:19 920:1 921:22 927:3 929:15
**available** 821:22 825:8 833:16 835:7 847:18 913:19 915:12 916:21 917:24 918:3 919:1 921:7,10 921:12,19,24 922:11,12 924:6,12 925:4 925:7,13 926:7 926:10 927:6 928:23 929:7 929:11,20
**average** 937:4 937:4
**aware** 841:10 847:19 858:20 860:10 864:2 895:5

**b**

**b** 840:21 932:19,19 956:2
**bachelor's** 827:3
**back** 822:25 825:8 846:10 854:4,6,15 906:5 915:22 922:3 930:20 932:12,13
**background** 826:21
**bad** 872:23 909:13 911:15 944:7
**ball** 941:14
**base** 902:9
**based** 830:14 838:13 839:24 843:24 844:19 844:25 847:11 853:4 862:16 862:25 863:20 863:21 866:21 868:4,5,5,16,18 871:7 879:2,4 879:10,20,23 880:7,15,17,18 881:12 885:17 892:1,6,6,12,13 893:17 894:12 896:22 897:17 898:2,16,17 899:23,24 900:11,11 903:15 905:8 905:14,21,24 907:22 908:6 913:23,24 923:11 950:2
**basic** 839:14
**basically** 870:8 886:19,21 890:25 891:7 897:18,19 934:3,4 942:9
**basing** 873:12 879:12
**basis** 874:14,14 898:19 950:9 952:10
**bathroom** 842:15
**beating** 898:20
**began** 854:25
**beginning** 828:7 859:9 860:18 908:16 908:18 909:8 911:14 942:2,3 944:5 957:16 960:25
**begins** 935:21
**behalf** 916:4 954:3
**behave** 903:18
**behaving** 903:19,20
**behavior** 846:2 907:22,23,24 908:12 909:25 910:6 911:2,5 911:8
**behavioral** 826:25 832:10 838:15 843:14 845:21 846:14 868:2 872:4,11 878:23 937:8
**behaviorally** 845:4,8 872:2
**behaviors** 846:6 908:15 948:6 950:2
**believe** 844:4 844:22 845:3 857:1 859:1 862:12 867:8 868:13 870:5 877:12 881:1,3 881:5 882:1 885:12 888:14 888:16 890:15 893:12 896:12 897:8,10,25

898:8 900:21 900:25 901:17 903:14 908:14 908:25 909:5 909:21 910:24 910:24 912:18 913:12 915:4 915:24 916:23 917:3,6 920:13 920:16 921:23 922:5 924:8 925:2 926:3 933:22 935:16 937:12 939:1 942:5 944:1 946:1,1 949:2 949:2,4 955:10 961:1

**believes** 824:7 933:16

**benefit** 898:9

**berchem** 819:3

**berchemmos...** 819:7

**best** 841:7 843:15,19 845:17 846:22 875:10 885:22 912:14 944:9

**better** 849:12 895:16 896:4

**beyond** 827:2 922:23

**big** 829:12

**bill** 852:8

**bit** 820:9 826:18,20 830:21 832:22 834:14 837:1 842:5 853:22 924:5,7 933:9

**blocked** 938:4

**blood** 909:13 944:7

**board** 818:10 819:2,15 823:4 823:6,9 923:8 923:10 933:13 933:16,20 965:5 966:11

**boys** 885:10

**break** 854:3 931:22

**bridge** 936:12 936:16

**brief** 822:6,8 877:3,9 898:18 903:12 933:25 934:2

**briefing** 822:10

**briefs** 822:13

**bring** 859:3 904:24 918:16 919:2 928:13 934:2 936:7,8 936:10 937:14 939:5,9 941:17 944:22 950:6 961:6,9 963:9 963:13,20

**bringing** 913:14 933:21 935:20 940:25 953:25

**broad** 819:4

**brought** 912:12 928:15 935:6

**building** 831:7 832:1 833:10 839:12,13,14 839:24 840:12 850:19

**built** 829:22 833:6

**burden** 910:21

**burner** 822:25

**bursts** 846:21

**bye** 909:3

**c**

**c** 819:1 825:19

**call** 835:3 867:9

**called** 825:20 932:20

**calling** 873:3

**calls** 825:14 867:6 895:19

**cancel** 964:8

**capacity** 846:23

**care** 905:25

**career** 828:6,8

**cart** 852:1

**case** 820:7,8 821:14,19 822:4 823:24 828:24 833:18 834:7,8 835:2 855:8,11 909:11,16,21 910:12 911:14 912:18,18 916:17 917:23 918:3,7 923:4 927:11,20 932:25 938:3,6 941:17 946:11 946:17,20 948:1,7,22 954:16 959:2,5 962:12 963:14 964:5

**cc'd** 859:15,23 859:24 919:11

**central** 938:5

**certain** 830:9

**certainly** 837:15 852:12 856:22 868:9 949:20

**certification** 827:18

**certifications** 827:20,21,24

**certified** 965:3
**certify** 965:4,7 965:9,10
**challenges** 829:6,17,17 832:10 846:16 937:7
**challenging** 829:11 830:21 881:12,14
**chance** 822:5 936:4
**change** 851:20 852:9 889:22 944:3
**changes** 849:15
**character** 901:14
**characterizati...** 877:12 911:17 912:2 918:9,12 923:14 927:15 940:7
**characterized** 912:22
**characterizes** 924:23
**characterizing** 901:13 909:24 911:2
**charge** 831:21
**child** 837:17 838:19 855:21 855:25 856:12 856:15 867:3 871:8,8 872:3 872:18 873:22 875:8 909:14 923:20 944:8
**child's** 855:4,7 862:16,25 871:19 944:9 944:13
**children** 864:4 864:7,16 905:19 936:23
**claim** 879:25 879:25 880:2 888:5 896:8,19 928:12
**claimed** 894:20
**claiming** 903:25 911:14 928:10 937:22 960:14,17
**clarification** 933:6 963:5
**clarified** 902:7
**clarify** 893:23 895:14 900:4,5 900:20 901:1 902:5 904:20 908:1,6 911:12 937:12 939:15 941:5 956:16 962:7,8
**class** 849:23 851:6 864:21 893:2
**classes** 837:22 842:14 877:15 881:16
**classroom** 836:20 839:17 850:8 855:21 864:18 883:14 884:7,8 892:24 895:16,18 896:4,6
**classrooms** 832:13,16 864:9,13 881:20 882:9 882:16,17 883:25 884:4 893:13 905:20
**clear** 837:20 869:2,2 876:20 876:21,22,24 881:2 911:1 917:3,6 941:9 960:22
**clearly** 869:21
**clerical** 829:6 829:16
**client** 916:5 917:24
**closely** 834:14
**closing** 964:17
**coached** 850:19
**code** 849:13
**coin** 851:20
**collaboration** 830:4 831:8
**collette** 821:18 823:8 825:15 825:16,25 826:1,4,14 853:18 854:1,9 854:22,25 857:22 859:14 862:7 866:14 869:6,7,14 875:18,19 881:7 883:1 885:4 890:2 893:15 894:24 895:25 896:16 904:8,11,14 908:21,22,24 909:3 966:2,12
**color** 849:13
**combine** 881:22 899:16
**come** 820:7 834:6 840:16 854:4,6 862:5 866:18,18 867:19 869:10 870:20 874:20 874:22 876:11 878:24 880:20 883:12,25 892:19 894:13 894:13 906:5

928:4 936:17 940:15 941:6 941:25 942:15 942:17,19 943:24 945:9 945:22 950:1 952:14 954:1,6 954:22 955:8 958:18 960:21 962:17 963:12
**coming** 820:10 861:22 877:6 923:17,20 935:11
**commencem...** 939:24
**comment** 909:9 960:9 963:2,6
**comments** 948:20
**commission** 965:22
**commitment** 919:5 920:2,12 920:18,21,23 921:1,17 922:19 925:16 926:17 930:8
**commitments** 920:14 924:10 925:18
**committed** 920:3 930:22 931:5,10
**communicate** 851:10
**communication** 850:17 864:12
**communicati...** 863:25 940:14 950:7
**community** 838:3
**complainant** 818:8 819:10 965:5
**complaint** 824:20 933:4 938:7,12,22 939:18 940:25 941:11,18 944:19,22 945:1 950:12 952:17,19 954:6 956:2 960:7,13,18 963:8,13,18,20 963:21
**complete** 830:16
**completely** 909:25 911:3 942:1 944:1
**compliance** 829:1
**comprehensive** 827:25 837:23
**comprised** 893:13
**compromise** 927:22
**compromising** 928:5
**computer** 965:9
**concentration** 827:8
**concern** 840:15 905:15 922:18 926:14 942:16 958:8
**concerned** 823:25 916:15
**concerns** 823:20 845:20 881:8 927:12 944:19
**conclude** 863:16 866:18 919:18 921:8
**concludes** 822:7
**concluding** 920:3 930:22 931:5
**conclusion** 861:23 862:6 866:19 867:20 872:5 878:24 883:13 887:9
**conclusions** 875:10,15 877:7 898:19
**condition** 927:15
**conduct** 857:16 894:16 895:3
**conference** 825:7 942:6 952:4,7 953:20 961:1,4,18 963:2
**conferences** 961:14
**confident** 853:5
**confidentiality** 951:11
**confines** 830:2
**confirm** 920:4 930:23
**confused** 874:20 885:14 899:25 900:8 908:6 909:23 910:9
**connect** 835:2 907:4
**connected** 836:22
**connecticut** 818:2 819:5 827:23 829:9 884:19 937:3 965:1,3,4

**consider** 923:10
**consideration** 844:1
**considerations** 838:24
**considered** 861:4 866:25 871:19 917:20 918:1 919:7 926:15 957:18
**cont'd** 966:11
**contact** 856:3,6
**contain** 882:9
**contained** 895:15 896:3
**contents** 859:16
**context** 834:2 842:19 847:5 852:5 865:12 865:18 872:11 877:18 878:12
**continuation** 919:15 920:4 930:23
**continue** 838:1 861:18 902:24 902:25 903:15 913:12 914:16 914:17 920:15 934:17,19 943:11 945:12 945:14,20 948:16 958:20 958:22,24 959:1,8,11,11 962:20
**continued** 920:16 958:10 958:13
**continuing** 958:25
**continuum** 831:24,24 832:1 906:16
**contribute** 875:21
**control** 911:7,9 948:5
**convened** 841:23
**conversation** 846:10 853:4 862:8 863:19 873:16,17 904:25
**conversations** 830:11 834:7,9 835:22 836:10 841:12 858:7 939:20 940:24 950:11,14,15 950:18
**cookie** 867:1
**cooperate** 945:25
**cooperating** 946:2
**coordinate** 913:25
**coordinating** 920:6 930:25
**copy** 825:3 836:1 938:8
**correct** 822:7 855:1,5,6,9 856:12,13 857:10,11 858:3 864:17 865:7,8 868:18 868:21 869:6 871:10,24 873:19,20,24 876:4,13 877:12 879:8 881:11 888:20 893:16 895:11 897:4,5 905:7 911:18 912:2,3 936:20
**corrected** 915:10
**correcting** 915:7
**corresponden...** 939:14,17
**counsel** 915:5,8 920:8 925:22 929:6 931:3 937:21 938:24 948:14,16,17 965:10,12 966:19
**counseling** 842:16,18,23
**county** 965:1
**course** 847:20 873:22 917:1 920:7 931:1 936:9
**court** 912:15 930:23 947:1 954:17 956:6 962:16
**covered** 880:16 887:10,12,13
**create** 874:17
**created** 882:8 883:4
**credentials** 869:4,22 871:3
**criteria** 872:4
**critical** 839:24
**cross** 853:12,13 854:16,22 870:11,12 900:16,19 902:6,20 903:8 907:22 933:15 936:12,16 966:3
**crunchy** 853:22
**crystal** 941:14

**ct** 829:4,7,8,19 830:6,10
**cue** 846:18
**current** 826:14 827:24 833:9 833:18 835:1 863:18
**currently** 824:5 826:7 830:22 890:22
**curriculum** 829:1
**cut** 870:9 882:25 907:13 908:11 914:4,9 914:15,17,22 914:24 915:3,5 915:14,21 959:15
**cutter** 867:1
**cutting** 901:24 904:2 908:19 909:1,4,23 911:21 914:8 914:11 959:12 959:13
**cvr** 818:24 965:21
**cycle** 842:8,12 842:21

**d**

**dad** 823:12 933:3
**daily** 839:19 849:18
**data** 830:2,14 873:11 879:10 879:11,23 880:7,15,19 892:1 894:12 895:5 897:6,13 897:14,16,21 898:2 900:11 905:24
**database** 829:8
**date** 818:18 820:10,13,15 820:18,19 821:2,22 822:6 822:10 855:14 855:18 856:9 919:17 921:21 966:16,18
**dated** 840:25
**dates** 821:12 822:1,16 825:6 825:9 916:16 917:1,20,25 919:6,24 920:5 921:7 925:9,10 927:2 928:3 929:2,4,10,12 930:23
**day** 840:4 842:8,12,20 849:6,9,10,10 849:16,16,20 913:11,18 943:17 944:23 947:7,11 949:4 964:14,16 965:14
**days** 820:22 821:3,8 822:8 912:9 913:23 919:19 922:4,7 926:5 930:1,20
**dear** 919:8
**decade** 897:2
**december** 820:23 821:23 913:21 920:5,6 920:16 921:8 921:13 922:14 924:8 925:9,11 925:19 926:11 929:9,13,16,21 930:24,25
**decided** 928:16
**decides** 928:12
**decision** 820:20 822:11 823:21 862:7 875:19 875:20 911:10 912:17 931:16 937:11 938:15 956:6
**decisions** 824:1
**declining** 922:20
**decreased** 830:6
**deems** 923:1
**defend** 916:12
**defendant** 823:20,23
**definitely** 822:1 844:7 847:13 851:16 856:16 886:22,25 906:22
**definitive** 857:14
**degree** 826:22 827:9,16
**degrees** 827:2
**deliberate** 911:15
**denial** 938:16
**department** 818:2 965:4
**deposition** 934:4 965:9
**depression** 846:15
**describe** 827:21 828:4 837:1
**described** 938:9,12
**desk** 830:5
**despite** 938:21
**detail** 837:1 942:22

**determine** 835:22 906:7
**determined** 921:21
**develop** 837:9 838:1
**dictating** 926:18
**differ** 910:10
**differences** 831:19 832:23
**different** 834:13 835:13 838:12 839:15 846:15 852:19 853:1 864:13 866:22 878:17 879:6 889:19 905:20 906:8 950:24
**differentiate** 910:10
**differentiated** 905:13
**difficult** 853:23
**direct** 826:4 837:5,25 845:2 872:9 873:8 886:1 933:18 966:3
**directed** 910:18
**direction** 965:8
**directly** 857:24 859:15 862:20 889:2,2,3 890:3 937:16 938:21
**disabled** 837:16 886:3 890:23 906:18 907:1
**disagree** 888:15
**disagreed** 858:22
**disagreement** 858:21
**discuss** 821:21 821:24 823:16 826:18 840:18 841:4 947:7 954:23 955:2,4 955:9,14,18 956:11 960:22 960:24
**discussed** 821:14 919:16 929:2 957:15
**discussing** 834:15 941:8 941:20 954:24 956:18
**discussion** 843:20 929:3 957:2,7,8
**discussions** 956:3
**dismiss** 909:11 909:16,21 910:11 911:13 929:23 945:14 948:23 959:2,5 962:12 963:14
**dismissed** 931:6 948:2 964:5
**disorder** 937:6
**disorders** 827:9 827:14
**distracted** 881:9,17
**distractible** 845:14 886:1,8 886:12
**distracting** 845:19 847:16 850:9 886:8,11 887:2,8,11 888:3,4,10,11
**distraction** 873:9 886:6 895:17 896:5
**distractions** 845:16 895:7 896:10,21
**distractive** 886:13,15,25
**district** 821:1 821:13,19 823:20 824:22 825:14 828:24 828:25 831:20 831:23 833:9 833:15,20 835:18 844:4,5 847:4 855:4 856:20 859:9 878:8 883:15 890:7,8,10,16 890:20 906:8,9 906:10,12,14 906:18,24 907:3 913:4,6 915:13,18 922:16 923:3 927:11,17,19 928:6,13,17 935:3,7,8,9 938:10,12 940:9 941:12 941:16,23 943:15,24 944:11 946:16 947:8 951:5 953:11,15 956:19 962:11
**district's** 890:12 910:15 913:15 917:7 919:4,11 925:22 933:7 937:17
**districts** 829:11 829:13

**dixon** 818:24 965:3,21
**doc** 818:8
**docket** 965:5
**document** 840:22 842:4 861:6
**documented** 948:21
**documents** 830:11 836:7 856:18,20 861:22 862:5 862:10,13
**doing** 913:10 930:12 946:13
**dollar** 851:21 852:7,8
**doors** 882:9 883:2,9,14 884:3,14
**double** 826:23
**doubt** 898:9
**dougherty** 936:24 937:18
**drop** 849:9
**dryer** 839:21
**due** 897:17 919:15 920:1 920:20,25 933:4 938:16 939:24 941:11 942:3,3 944:25 948:17 949:13 952:20
**duly** 825:20 932:20
**duration** 846:7

**e**

**e** 819:1,1 820:22 824:11 824:14 825:2,7 825:19,19 848:2 856:7 858:7,21 860:8 861:7 913:18 913:21 917:4 918:16,17,19 918:23 919:3 920:10,13,19 921:5,18,25 922:2 925:8,22 930:16,21 931:4 932:19 932:19 966:16
**earlier** 834:21
**easily** 881:17
**east** 828:7,8,8 828:16,18 831:1,17 832:3 832:8
**editorial** 877:11
**editorialization** 877:2,4
**editorialize** 877:8
**educated** 871:13
**education** 818:2,3,11 819:2,15,16 823:4,5,6,9,10 826:24 827:6 827:22,25 828:1,9,14,16 828:18 830:23 831:14,22,25 832:7 833:1,4 833:5,8,13,23 834:17 836:3,8 839:2 840:1,23 842:14,23 843:7,25 844:8 844:12 846:23 863:12,13 873:21 874:7 885:8 904:21 916:13 937:3 944:14 965:4,5 965:5
**educational** 826:21 827:15 828:23 831:4 833:20 835:17 836:2 850:21 855:5 937:19
**effect** 927:13
**effort** 834:4 836:23 848:23
**eight** 842:20 849:9
**either** 822:17 841:7 852:20 867:24 870:18 873:23 899:13 916:20 919:7 926:20 939:16
**elaborate** 845:22 930:11
**elementary** 826:23 827:25 828:14 834:5 834:12,16 835:25 842:25
**elements** 848:6 848:9,9,12
**eleven** 854:4,7
**embedded** 837:6,10 849:25 850:24 851:23 852:13
**emotional** 832:9 846:9 852:14,16,19 864:2 878:22
**employed** 826:7 965:11 965:12
**employee** 965:12
**engage** 846:9
**enhance** 848:16

**enrollment** 866:15 893:9 893:22
**ensure** 829:14 834:10,24 835:4 836:21 865:9 905:1
**ensured** 828:22
**ensuring** 831:3 907:10,15
**entails** 826:19 837:2 940:5
**entered** 966:18
**entertain** 923:8
**entire** 866:14 922:23
**entirely** 862:17 862:25
**entirety** 832:20
**entitled** 889:13 889:14 916:5
**environment** 853:7 865:6 871:14 872:17 872:21,24 873:2,3,19,21 873:24 874:7 875:14 881:10 883:6 885:19 886:2 893:16 894:2 924:21
**environments** 839:17 881:15 883:10
**equal** 823:21
**error** 936:21
**errors** 829:23 945:24 946:7 946:17
**especially** 935:21
**esq** 818:16 819:6 965:6
**essential** 850:19
**established** 869:21 871:2 951:25
**evaluate** 831:13
**evaluated** 828:21
**evaluating** 831:2 835:11
**evaluation** 830:16 861:21 937:20
**evaluations** 856:19,24
**event** 925:3 939:22
**everybody** 823:1 932:11
**everyone's** 820:3
**evidence** 826:9 840:21 847:25 859:4 860:16 896:8,19 919:20 927:9 935:14 939:8,9 941:7 943:18 943:23 948:10 952:15 954:2,7 954:23 955:9 955:12,13,15 955:17 956:17 958:18 963:10 963:12 966:18
**exact** 855:14,18 856:9
**exactly** 855:13 856:6,25 857:2 858:18 864:25 878:7 926:5 943:22 946:12
**examination** 826:4 853:12 853:13 854:16 854:22 870:12 900:16,19 902:6,20 903:8 904:11 907:22 933:15,19 966:3,3,4,6
**examined** 825:21 932:21
**example** 829:24 830:15 832:3 838:3 839:20 851:17 852:11,25 865:20 905:15 934:7
**examples** 848:22
**excessive** 924:2
**excludable** 940:20
**exclude** 950:24
**excluded** 933:22 938:21 943:7 950:10 951:15 954:15 956:4
**excuse** 911:8 922:25
**excused** 908:21 908:22
**executive** 848:14,19,22 848:24 937:6
**exh** 966:12,12 966:16,16
**exhibit** 826:10 840:21 847:25 859:4,7 860:25 928:4 941:25 945:9 955:7 966:18
**exhibits** 942:20 942:24 943:11 963:11,16 966:11,15,19
**exist** 956:1

**existed** 952:16
**expect** 895:22 934:6 959:18
**expectation** 884:15
**expected** 849:2 849:5,20 882:14
**experience** 833:1,2,10,17 837:24 838:4,6 862:19 863:2 895:7
**expert** 869:3,13 869:17,18,24 870:6,7,16,17 870:18,20,21 870:22 874:22
**expires** 965:22
**explain** 857:3 914:9 920:11 943:21 945:9 947:19,24
**explained** 904:3 918:15 918:25 920:24 921:6,18 924:11 925:8 959:14
**explaining** 922:20
**explanation** 917:25 927:9
**explicit** 845:7 846:20
**exploration** 858:24
**explore** 836:17 836:17,19 859:1
**exploring** 838:25
**expressed** 823:21 869:23
**expressive** 864:11
**extend** 821:2,2
**extended** 822:17,19
**extension** 820:11,12,15 820:17 821:1
**extensive** 865:15 868:10
**extent** 837:16
**externalizing** 846:6
**extra** 820:21,22

**f**

**facilitated** 837:8 838:17 850:25 851:7 852:3
**fact** 824:4 892:1,6,12 894:12 908:7 927:5 944:15
**facts** 898:16 899:10,12,14 899:24 928:11
**factual** 870:3,6 874:14 936:20
**factually** 938:4
**fade** 865:11,20
**failed** 938:13 941:24 943:16 947:8
**failure** 918:6 923:6,11 929:23 931:6
**fair** 861:17,17 869:20,20 875:9,13 880:19 887:17 888:5,5 892:14 892:18 900:17 900:21 904:1 909:21 912:4,6 915:24 921:4 924:9 926:19 944:4 948:7 949:2 963:8,17
**fairly** 892:21 962:24
**fairness** 939:2
**faith** 911:15 916:2 923:3
**falsely** 912:21
**familiar** 833:14 833:24 834:3 844:9,17 846:25 847:2 850:13 859:15 859:21 860:5 866:2,17 867:18 871:12
**family** 823:23 824:2
**far** 821:22 853:5 863:10 872:13 913:13 913:17 928:1
**fashion** 933:1
**father** 920:9 954:5
**father's** 932:17
**favor** 942:9,12 952:6 953:23
**fed** 876:3
**feel** 843:25 845:11 848:11 881:1 887:19 887:21 892:21 904:2 912:4,6 912:10,19 943:10 945:11 945:11,20,24 946:7,17 948:9 948:11 949:23 949:25 962:9
**feeling** 852:23 852:24,25 941:16

**feelings** 950:2
**feels** 835:16
**felt** 843:19
**field** 837:10 838:3 869:23
**fifth** 834:23 839:10
**figure** 855:16
**file** 856:23 923:12 925:5,5 925:23 929:22 930:15,17,18 935:12 943:25 944:25
**filed** 912:11 933:3,4 938:7 941:10 954:5 956:2
**filing** 923:10 939:17 950:11 952:17 964:6 964:10
**filings** 912:11
**finalize** 830:19
**financially** 965:13
**find** 869:19 874:20 887:8 887:25 891:15 894:1 897:20 900:12,23 901:18 903:3 903:23 906:13 942:6,9 952:5 952:6 953:6,18 953:20,23 954:9 956:12 963:16
**finds** 888:3 905:25 906:10
**fine** 824:8,25 825:4 854:5 923:12 925:5 928:4 930:4 932:3 949:22 951:4
**finish** 821:19 882:20,24 916:12 917:8 917:10,16,16 919:19 926:24 936:3,4 945:23 946:3,6
**finished** 889:4 915:16,19 935:24 936:2
**firmly** 890:15
**first** 820:9 821:5 825:20 831:12 846:19 849:1 855:7 864:6 898:12 912:19 913:7 915:25 924:4 927:15 929:3 932:20 936:19 939:5
**firsthand** 862:18 863:1 873:11 874:7 876:11 888:2
**fit** 868:15 878:25
**five** 835:2,5,15 835:16 842:9 842:11,20 852:8 856:10 923:25 952:20 952:21
**flip** 927:17 928:9,12,16
**focus** 827:12 832:25 848:16 850:10 881:14
**focused** 849:19
**follow** 834:19
**following** 860:12 919:24
**follows** 825:22 932:22
**followup** 885:2
**force** 951:8
**forced** 928:21 948:15
**form** 858:9 924:13 928:18 933:12 965:8
**forma** 822:21
**formal** 919:14
**formally** 927:14
**forth** 846:10
**forward** 820:4 824:8 825:4 920:5 930:25 931:11 950:6
**fostering** 852:16
**found** 886:8,11 886:13
**founded** 951:7
**four** 842:8,10 842:12 923:25
**fourth** 821:25
**free** 944:13,13
**frequent** 829:23
**frequently** 865:11
**friday** 930:19 930:20 931:15
**friendships** 907:4
**front** 912:14,15 941:14 946:5 962:16
**full** 822:4 831:24 925:11 946:13
**fully** 920:3 923:9 930:22 931:4,9
**function** 871:18 874:18

**functional** 832:19
**functioning** 848:14,20,22 848:25 937:7
**furniture** 882:6 883:4
**further** 853:10 907:9,17 917:20 930:11 939:22 965:7,9 965:10,12
**future** 920:4 930:23

**g**

**g** 818:24 932:19 965:3 965:21
**game** 869:20 888:5 963:8,17
**general** 832:7 842:14,23 843:6,7 937:24
**generalization** 838:17 843:13 851:18
**generalize** 836:22,23 837:12,13 838:15
**generally** 895:16 896:4
**generated** 856:20
**getting** 853:17 887:23 898:2 899:24 900:12 908:3,11,17 930:20 946:5
**give** 853:16 857:14 872:14 913:16
**given** 823:22 824:1 838:24 916:15 921:4 965:10
**giving** 898:9
**go** 820:4 823:18 830:9 835:8 840:6 854:15 857:21 875:17 882:25 885:3 895:24 896:15 899:5 915:22,23 917:9,17,17 922:17 928:1 932:15 945:21 948:4 956:6
**goal** 850:21 851:19,19 865:9
**goes** 899:3 901:10
**going** 820:11 820:21,22 821:4 822:1,2 822:12 826:9 832:21,22 840:20 847:24 849:12,22 850:3 860:11 861:18 876:23 886:22,25 887:8,11 888:4 892:10 898:21 900:14 902:3 902:22,25 903:16 909:10 909:11,15,16 909:20 911:4,6 913:9,10 914:7 914:16 924:11 925:20 927:5 928:1,22 929:4 929:18 933:10 935:6 936:8,9 939:5,7 941:3 941:17 942:8 943:12,12,21 944:8,12,22 945:4,9,20 946:9 947:6 948:2 950:8,23 950:24 952:5 953:21 954:9 954:24 955:6 955:17 956:14 958:20 960:21 962:4 963:24
**good** 823:3,13 825:17,25 826:1 868:15 916:2 923:3 928:15 931:22 932:3,15
**grade** 834:23 835:1,2,5,15,16 839:10
**great** 840:14 854:20 931:17 932:6
**group** 842:16 842:22
**grow** 885:19
**growth** 836:25 852:14
**guarantee** 890:19
**guaranteed** 887:2 890:18
**guess** 929:23 933:25
**guidance** 916:2 933:9,16
**guided** 850:19

**h**

**hand** 825:18 852:8 932:18 965:14
**handful** 884:11 892:25 893:13 893:15

**hands** 887:1
**happen** 822:12 924:19 948:14 957:8 962:21
**happened** 891:7 939:7 943:22
**happens** 905:24
**happy** 934:1 944:11
**harborside** 831:17 832:14 837:2 838:25 839:4,16 842:3 843:22 844:6 848:12,18 850:3,5,20 851:15 852:17 853:6 856:7 861:23 863:16 864:4,8,18,23 865:24 875:25 888:20,22 890:4,6 891:7 905:5,9,13,21 906:20 924:16
**harborside's** 836:20 839:6 848:21 850:24 852:13,18 859:2 863:22
**hard** 827:11
**harmed** 924:22
**harmful** 872:18 872:20,22 936:25
**harming** 925:1
**hartford** 826:25 965:1
**haven** 828:7,8 828:8,17,19 831:2
**hear** 827:11 832:22 853:23 882:12 915:17 922:16
**heard** 860:1 914:6,12 918:2 926:12
**hearing** 818:3 818:16 820:3,6 820:6,16,19,25 821:17,20 822:7,9,20 823:11,13,14 823:18 824:10 824:12,13,14 824:18 825:5 825:12,17,21 825:24 853:11 853:15 854:2,6 854:14,19 857:6,20 858:11 859:8 859:10,12 860:3,15,18,19 860:25 861:6 861:14,16 866:5,12 867:10,13,15 869:2,8,16,21 870:8,10,15,23 871:2 874:2,11 874:13,23 875:1,4,16 876:8,17,20 877:1,5,8,24 878:5 879:19 879:21 880:1,3 880:9,11,16,23 882:24 883:22 884:1 885:2 886:20 887:6 887:10,12,15 887:18,20 888:7,12 889:7 889:13,18,21 891:10 892:4,8 892:15,17 894:10,22 895:23 896:14 897:9,11,15,19 897:22 898:4 898:12,15,24 899:2,5,8,11,15 899:17,19,25 900:2,9,14,21 900:25 901:4,5 901:6,9,18,19 901:22,24 902:2,6,8,11,13 902:14,17,19 902:23,25 903:5,8,13,15 903:17,22 904:7 905:3 907:18,21 908:2,9,11,13 908:14,17,19 908:22,23 909:8,10,15,19 910:11,15 911:4,6,10,16 911:20,24 912:5,7,24 913:1,4,7,18,19 914:3,12,16,19 914:21,23,25 915:4,9,11,15 915:17,20,22 916:1,3,16 917:2,5,7,10,12 917:14,17,18 918:10,13,16 918:19,21,24 919:8,15,16,18 919:22 920:7 920:11,17,22 921:2,15,16,22 922:7,9,15,17 923:21 925:10 925:14,25 926:4,13,19,21 926:25 927:3

927:21 929:2,3
929:5,22 930:2
930:9,14,17
931:2,7,14,18
931:20,24
932:4,11,16,21
932:24 933:8
933:23 934:3
934:10,12,17
934:18,20
935:15,18,22
935:25 936:12
936:16 937:17
938:2,8,16,19
938:24 939:2
939:10 940:7
940:12,16,18
940:23 941:1,3
942:4,6,25
943:1,4,6,11,20
943:23 944:1,5
944:18 945:2,3
945:5,13,17,18
945:23,23
946:3,6,6,11,14
946:16,22,25
947:4,11,12,15
947:16,20,23
948:1,8,17,19
949:7,15,19,24
950:8,16,19
951:3,10,13,15
951:17,19,20
951:22 952:3,3
952:7,8,16,20
952:23 953:2,5
953:8,11,14,19
953:20 954:13
954:20 955:1,5
955:20,21,23
955:24,25
956:10,14,21
957:1,5,15,16
957:21,23,25
958:2,6,9,12,17
958:22,24
959:2,6,10,17
959:20,21,24
959:24 960:3
960:12,17
961:1,3,4,7,11
961:14,14,18
961:20,21,24
962:2,5,11,18
962:22,25
963:2,3,23
964:4,8,8,12,15
965:5,6 966:18

**hearings** 822:13,25 904:4

**hears** 947:1

**held** 818:15 834:21 965:6

**hello** 825:16

**help** 830:5 853:1 885:19

**helping** 847:21

**herbert** 819:6 823:3

**hereto** 965:12

**hey** 911:20

**high** 937:8

**higher** 868:1 905:25

**highly** 865:17

**hold** 918:4 941:13,24 943:16 947:8

**holding** 939:23

**home** 923:23

**homeroom** 849:4

**homeschool** 835:19

**honor** 938:13

**hope** 844:9,11 844:12,20,20 844:24 845:10 845:11,20,24 846:5,12 847:8 866:1,7,15,19 866:23 867:24 872:1 873:13 873:23 874:8 874:11,13,19 890:10,17 891:8,24 916:18 950:4

**housekeeping** 820:9

**hrosen** 819:7

**huh** 848:7 899:11 926:3,7

**hundred** 888:19

**hypothesize** 886:7

**hypothetically** 838:4

**i**

**idea** 871:12 937:21 938:18 941:23 942:18 943:14 944:13 957:18,22 958:1,7 960:10

**ideal** 845:15 893:3

**identified** 848:9 927:2

**identify** 823:2 852:22 872:3 932:24

**iee** 937:20,25 938:1,3,3,5,13

**iep** 829:8 830:19 836:7 841:2 850:7 856:16,21 857:8,13 861:21 862:2,3 862:11,14,14 863:3 873:15

873:17 897:14 897:16 966:12
**ieps** 829:2 831:5 833:6 834:8 851:6
**imagine** 886:10 893:2
**immediately** 919:24 934:9
**impart** 944:19
**impartial** 948:8 948:9
**implying** 943:2 944:8
**important** 848:10 897:13 899:21 900:10 902:8 937:12 937:14
**impossible** 867:5
**improperly** 938:21
**inappropriate** 873:13 891:20 894:3 914:11
**inaudible** 853:14
**inclined** 910:11
**include** 940:22
**included** 939:21 954:18
**includes** 939:13
**including** 870:11 913:14
**inclusion** 939:12 940:1
**incorrect** 937:23
**increasing** 828:12
**incredibly** 829:11
**incriminate** 935:12 943:24
**incriminating** 935:7,10
**independent** 839:22 849:1 856:19,24 857:16 865:10 937:19
**index** 966:1
**indicate** 829:24 840:9
**indicating** 895:6
**individual** 838:8 842:18 849:23
**individualized** 831:25 836:3 838:10 840:23 905:21
**individually** 838:20,21
**influence** 937:11
**information** 839:3 863:15 871:7 876:16 898:22 904:18 906:7 933:16 933:21 934:9 944:18
**informed** 841:16 863:24
**initial** 830:17
**initially** 840:10
**initiate** 938:15
**input** 862:17 863:1 881:18
**instance** 955:11
**instruction** 832:4,6,15,20 837:6,25 838:14,18 842:10 843:15 845:2,7 846:8 850:6,12 872:10 873:6 873:10 886:1 896:23
**instructional** 837:14 846:20 851:22
**instructions** 848:17
**insufficient** 898:19
**insults** 916:7,9 916:10
**intelligence** 937:5
**intensive** 838:14
**intention** 837:23
**intentions** 901:15 949:1
**interaction** 838:18
**interactions** 850:18
**interested** 965:13
**interests** 944:9
**interfere** 895:8
**interject** 959:19
**interjecting** 889:11 917:15
**internalizing** 846:14
**interrupted** 870:14 889:5
**interrupting** 964:2
**interruption** 853:25
**intervention** 865:20
**introduce** 860:13

**introduced** 860:15
**invited** 835:13 835:21
**involved** 855:7 855:11,13
**involvement** 855:3 859:25
**involves** 940:19 940:19
**involving** 956:3
**irrelevant** 939:25
**issue** 821:7,8 937:16 938:5 939:18,19 950:12
**issued** 822:11
**issues** 938:22

**j**

**january** 963:7 963:11
**jfk** 836:11 837:4 865:7 873:19 874:18 905:4
**job** 849:12
**joining** 826:2
**joseph** 827:7
**judge** 912:16 946:5 954:18
**judgment** 868:19 869:22 885:12,14,16
**judgments** 871:4
**juggle** 848:17
**july** 831:10,11 855:1,3 938:9
**jumping** 875:9
**june** 938:7 941:11 944:25
**jury** 912:16 946:5
**justification** 916:25
**justify** 930:8 938:16

**k**

**k** 932:19
**keep** 900:14 904:1 908:19 909:4,10,15 911:21 922:25 959:12,13
**kennedy** 818:16 823:14 887:18 899:25 914:3 919:9 922:7,15 930:10 933:8 939:10 945:3 949:7 950:8 957:21 958:9 963:23 965:6
**key** 938:25
**kind** 822:20 828:14 830:14 837:8 838:21 839:12,14 844:14,24 845:10,11 846:6,9,11,13 846:18 870:3 873:4 882:7,24 884:13,16 929:19 948:20
**kitchen** 839:20
**knew** 843:24
**know** 822:5,15 824:13 825:10 826:12,20 832:25 834:21 835:4 839:11 849:8,21,23 850:21 852:4 852:19,21 858:18 859:23 859:25 861:2,6 861:11 864:6 865:16,25 866:14 867:14 867:21 868:9 869:23 870:11 870:23 871:1 873:9 874:18 874:25 875:2,4 875:15,16 877:6 879:12 883:7,17 886:5 886:5 888:2,3 889:15,20 890:24 892:22 893:9 894:12 895:23 897:16 897:17,21 898:1,20 899:21 901:11 903:4,17 904:3 904:4,5,25 905:1 911:22 911:23 912:10 912:11,13,15 912:22 913:23 915:7 918:1,11 918:12 921:4,7 921:12 922:10 922:10,12,15 923:19 924:3,5 924:13,17,18 924:23,25 925:16,18 926:4,9 927:2 928:1,6,19,21 928:25 929:1,2 929:4,6,15,17 930:9 931:7,7 931:8 933:18 933:24 934:18 934:21 936:7 936:10 938:3 938:23 941:18 942:3,7,7,8,10

942:10,23
943:1,1,8,17
944:10 946:3,8
946:16 947:17
948:9,10,16,19
948:20,22,24
949:4,15
950:20 953:22
954:5,10,10,10
954:15,16
956:5,8,8
957:16 961:16
963:5,5,6,7
**knowing**
849:12
**knowledge**
835:5 845:5,18
845:23 847:12
858:4,5 862:16
862:24 865:14
866:21 867:23
868:10,11,14
870:1,3 872:6
872:8 873:14
875:22 876:2
876:12 881:13
884:20,21
885:1,17,23
888:2 904:18
904:23,24
**knows** 888:10
935:6
[redacted]
819:11 820:17
820:21 821:16
821:21 822:19
823:12,12
824:11 825:2
848:4 852:15
853:13,14,16
854:5,18,20,24
857:7,19,23
858:14,15
859:3,7,11,13
859:23 860:4,9
860:17,20,24
861:3,13,15,17
861:20 866:4,6
866:11,16
867:8,11,14,17
868:24 869:10
869:12,16
870:5,9,13,16
870:25 871:6
874:1,4,5,12,16
874:24 875:3,7
875:12 876:1,6
876:9,18,21
877:4,6,11,14
878:1,6 879:15
879:18,20,22
879:25 880:2,5
880:6,10,14,18
880:25 881:6
882:22 883:11
883:17,21,24
884:3,5 885:1
885:5 886:18
886:21,24
887:5,7,11,13
887:16,21
888:9,14,17
889:1,6,10,15
889:19,24
890:1 891:6,13
892:3,5,9,16,18
892:23 894:6,9
894:11,15,20
895:1,21 896:2
896:12,18
897:8,10,12,20
897:24 898:7
898:14,23,25
899:4,6,9,12,16
899:18,20
900:4,10,17
901:5,7,11,20
901:24 902:4,7
902:14,18,22
903:1,6,10,14
903:19,23
904:9 907:19
907:23 908:10
908:14,19,23
908:25 909:4
909:12,17,20
910:13,16,20
910:22,24
911:5,8,12,17
912:2,6,25
913:3,9 914:4
914:8,14,20,22
914:24 915:2
915:10,14,16
915:19,21,24
916:7,9,17,20
917:3,6,10,13
917:15 918:8
918:11,15,23
918:25 919:8
920:9,13,19,24
921:3,18,23
922:20 923:9
923:12,22
925:13,17
926:5,22 927:1
927:14 930:3
930:10,13,16
930:21 931:17
931:19,23
932:3,6,18
933:2,3,5,10,21
933:24 934:11
934:15,19
935:5,16,19,24
936:2,14,19
940:2,6,13,17
940:22 941:2,5
943:5,10,21
944:21 945:3,7
945:15,19,25
946:4,9,12,15
946:19,23
947:3,6,14,18
947:22,24
948:3 949:9,13

949:16,20
950:13,17,25
951:8,11,14,17
951:21,24
952:2,12,18,25
953:4,6,9,12,18
954:19,21
955:3,6,22
956:8,12,16
957:3,6,22,25
958:4,7,13,15
958:18,23,25
959:4,7,12,18
959:22 960:1,8
960:15,19
961:5,8,12,16
961:22,25
962:3,7,14,19
962:23 963:1,4
963:24 964:1,6
964:10,14,16
966:3,6
[redacted]
850:1 905:15

**l**

**l** 825:19,19
**language** 851:4
**large** 882:5,16 883:3,5 884:7 893:5
**larger** 845:12 847:10 884:16 895:18 896:6
**laundry** 839:21
**law** 822:15 912:10 940:20 956:4 957:9,10 957:10
**leadership** 827:15 828:13
**learn** 845:17 882:14 893:8
**learner** 835:6 845:5,14
**learners** 834:5 847:15 873:6,8
**learning** 831:5 832:17 833:11 837:25 838:23 843:11 845:1 845:12 846:16 847:9 850:10 850:14 852:20 866:22 867:25 868:1,11,14 878:16,18,19 879:6,7 881:15 882:7,10,13 883:2,5,10 884:10,15 885:17,24 891:22 893:7 893:20 895:8
**learns** 851:9
**led** 872:4
**leeway** 933:12
**left** 840:13
**legal** 937:25
**lense** 904:25
**lessons** 836:22
**letter** 849:10
**letting** 959:1 961:12 964:2
**level** 835:8 868:1 871:19 895:3 905:25
**levels** 863:18 864:11 894:17
**life** 832:19 839:19
**lift** 829:12
**light** 824:4
**limited** 873:8
**line** 831:12 844:15
**link** 894:14
**list** 938:14
**listed** 841:1
**lists** 848:6 852:15
**litigant** 944:4 948:12
**litigants** 933:11
**little** 827:11 834:14 842:5 853:22 924:5,7 929:8
**living** 839:19
**located** 835:21 844:13
**location** 842:18
**locks** 830:19
**long** 839:22 929:22
**longer** 846:7
**look** 834:8 849:5 865:20 906:9 920:5 930:25 931:11 946:3 958:17 958:17 959:20
**looked** 838:20 862:3,10
**looking** 841:6 857:8 944:9
**looks** 842:3 854:14
**losing** 959:13
**lot** 830:4 831:8 833:15 881:24 882:2,11 892:25
**love** 924:18
**lower** 864:5
**lunch** 837:22 842:16 931:22

**m**

**m** 818:24 965:21
**macklin** 819:14 823:5 835:3 932:13

**made** 824:1 841:24 847:18 847:19,22 881:2 882:22 905:2,3 909:9 917:3,6 936:21 946:18 960:9 963:1,2,6
**mail** 820:17,22 824:11,14 825:2,7 848:2 858:7,21 860:8 861:7 913:21 917:4 918:16 918:17,19,23 919:3 920:10 920:13,19 921:18,25 922:2 925:8,22 930:16,21 931:4 966:16
**mailed** 856:7 913:18 921:5
**mailing** 820:9 820:13,15,18 821:2 822:6,16
**majored** 826:23
**make** 835:8 838:11 860:12 877:2 885:22 892:20 894:14 907:4 912:17 916:4 917:23 931:15 935:3 939:3 948:20 950:3,20,21 951:1 962:11 963:23
**makes** 931:9
**making** 823:21 851:20 875:15 892:11 938:15 963:19
**manager** 828:24 833:18
**managers** 835:2
**mandated** 951:9 957:19 957:22,23 958:1
**mandatory** 920:2,14,21,23 920:25 921:16 924:10 925:15 925:17
**manpower** 829:14
**march** 856:8 955:13
**marker** 822:21
**master's** 827:6 827:13,17 832:25
**materials** 849:3 849:22
**matter** 916:6 920:4 922:23 923:7 930:22 939:19 956:4
**matters** 823:16
**maximum** 837:16
**mean** 820:18 823:19 838:19 840:8 860:16 863:9 867:4 869:5 875:4,6 877:1,2 878:19 878:21 882:4 882:19 883:8 883:23 885:15 886:14 890:17 891:11 892:4 893:16 898:4,6 925:10,14,14 926:18 928:20 930:19 947:16 948:2 950:19 951:1,3,4,20 952:13 955:20 956:10 960:19
**meaning** 834:8 846:14
**means** 924:24 926:9 965:8
**meant** 882:23
**measurements** 894:16
**mediation** 939:16 941:22 957:11,17,23
**meet** 836:24 844:4 850:20 852:17 868:3 890:15,18 906:8
**meeting** 835:14 840:18 841:3,8 841:15,19,25 855:9,12,19,20 856:1,4,11,11 856:15 857:25 858:8,13,17,19 858:20 859:19 860:1,21,22 862:1 863:7,7 904:16,22 906:6 927:25 934:8 936:9 939:6,16,23 941:13,23 943:16 947:8 949:5,11 955:13 957:2,7 957:11,20 960:5,10 966:12,16
**meetings** 830:12 855:24
**meets** 843:16
**member** 823:23 875:21

**members** 824:3 829:23,24 836:10 839:24 841:16
**mentioned** 832:24 845:20 872:16 881:7 899:9,10,22 920:20 963:18
**met** 839:10 840:4 843:19 846:17 855:20 910:21
**methodology** 873:10 885:25
[redacted] 821:22 823:24 824:16 918:2 929:14 954:3
**microphone** 853:21
**middle** 826:16 831:15,16,17 831:17,18,20 832:3,11,14 834:6,12,18,25 835:7,13,20,25 837:24 842:3 843:1 849:8 863:14 870:2 904:23 905:2
**milford** 818:10 819:2,5,15 820:8 823:4,6 823:9 826:8,15 828:3 830:23 833:24 844:14 846:24 849:9 854:25 855:4 890:6,6,8,9 923:16 924:15 924:25 965:5
**minored** 826:25
**minute** 842:16 842:18,22 853:16 857:15 914:12 928:24
**minutes** 842:7 842:9,10,20 854:2
**mirror** 838:5
**mischaracter** 940:3
**mischaracteri...** 907:24 910:25 926:23 937:10 938:23
**mischaracteri...** 901:14 903:20 949:1 960:1
**misrepresented** 938:14
**model** 832:12 837:9 845:6
**modeled** 849:2 851:8
**module** 830:17
**modules** 830:20
**mom** 839:5,7,8 839:9 840:8 856:5
**moment** 822:25 872:15
**money** 851:20 852:5
**month** 916:21 922:23 923:5 927:8
**months** 924:1
**morning** 823:3 825:17,25 826:1 849:4
**moses** 819:3
**mother** 825:7 913:25 925:25 926:8
**motion** 923:11 923:13 925:23 929:23 930:17 931:11 962:12 963:24
**motions** 925:4
**move** 875:6 898:6 910:18 932:16 943:7,8 947:13,23 948:1 949:15 955:2,5 956:24 960:5
**movement** 894:17
**moving** 824:8 825:4 950:6
**muffled** 895:12
**multiple** 848:17
**muted** 853:15 957:21

**n**

**n** 819:1 932:19
**n.p.** 965:21
**nadine** 819:14 823:5
**name** 932:25 933:2
**named** 833:25 868:13
**narrative** 933:1
**nature** 846:16 849:24
**navigate** 830:21
**nearing** 835:24
**necessary** 850:2
**need** 820:11,21 820:22 822:1 822:13 826:12 838:13,15 843:12 846:1 848:19 849:22 852:17 854:2

872:13 885:18 887:19 889:1 901:4,6,9 902:16 903:10 905:14 908:5 909:5 911:6,25 932:2 943:2 956:23,24 960:3,4 962:15
**needed** 821:5,6 863:20 895:13 905:25 939:3
**needs** 832:17 833:7,11 834:17 835:10 835:12,23 836:8 838:9,11 838:23 843:12 843:16,19,25 844:5 845:1 846:17 848:15 850:14 862:16 862:25 868:3 868:14 871:15 872:9 878:21 879:6,7 885:18 885:24 889:3 890:15,18 891:23,25 905:22 906:9 909:14 927:23 928:2,3 937:8
**negotiations** 940:20 941:8 941:21
**neighborhood** 843:5 907:2
**neither** 824:6 916:19 917:22 965:10
**never** 858:2,12 859:25 873:18 874:11,13 879:3 939:6
**nevermind** 932:14
**new** 829:15,21 829:21
**nice** 964:14,16
**noise** 894:17 895:3
**non** 837:16 838:2 886:3 890:23 906:18 907:1 951:9
**nonverbal** 864:5,7,16 866:7 905:16 905:17
**nonverbals** 865:24,25
**normally** 843:6
**note** 824:8 934:13
**noted** 954:8
**notice** 821:9 884:6 913:16 919:14 921:5 921:25
**november** 820:10,24 821:8 913:12 913:17,20 915:1,12 916:21 917:1 917:20 918:5 918:13,22,24 919:6,10,17,24 919:25 920:15 921:3,9,10,12 921:19,21,24 922:11,13,23 924:3,12 925:4 925:11,12,13 925:20 926:1 926:10 928:21 929:8,11,12,21 965:15
**number** 820:8 893:7,21,22 965:5 966:11 966:15
**numbers** 883:7 893:19

**o**

**o** 825:19 932:19,19
**o'clock** 932:3,5
**oath** 825:22 932:22
**object** 889:14 889:16,16 907:23 916:9 918:8 923:13 926:22 927:14 933:17 934:9 934:11,14,23 936:9 940:2,6 942:20,24 945:4 958:10
**objected** 880:12 900:7 908:3 922:2 937:21 942:1 942:14 943:12 961:2
**objecting** 939:12,25 949:7,9
**objection** 857:4 857:18 858:9 858:10 859:9 860:2,23 866:3 866:9 867:6 868:22 869:15 873:25 874:9 875:11 876:5 876:14,25 877:22 879:13 879:24 880:8 882:20 883:20 884:24 886:16 887:3,20 888:7 888:25 891:4

892:2,15,17 894:4,19 895:19 896:11 897:7 899:3 901:10 916:4 934:25 935:3 941:4 943:4,6 943:20 947:10 949:10 950:9 951:6,7 953:15 953:16
**objectionable** 934:23
**objections** 908:7 933:13 933:20 934:5
**objective** 873:11
**observations** 857:16 873:12 896:22
**observe** 839:18 862:20 878:7
**observed** 855:21 874:10 874:12 875:1,8 876:22 877:17 878:3,11 884:8 893:18 904:17
**obtain** 937:19
**obvious** 859:24
**obviously** 820:11 822:12 838:8 869:25 933:14 940:9
**occur** 834:7
**occurred** 862:9
**occurs** 830:7
**october** 818:18 919:9,16 922:4 965:6
**offer** 847:7 916:25 917:19 919:6 921:20 922:22 923:6 926:14 927:4 930:6 950:21 951:16 952:1 953:3
**offered** 839:5 906:17,19 927:20 934:8 951:3 953:17 954:13,14
**offering** 951:5 952:11
**offerings** 839:4
**officer** 818:16 820:3,6,16,19 820:25 821:17 821:20 822:9 822:20 823:11 823:13,14,18 824:10,12,13 824:18 825:5 825:12,17,21 825:24 853:11 853:15 854:2,6 854:14,19 857:6,20 858:11 859:8 859:12 860:3 860:15,18,25 861:6,14,16 866:5,12 867:10,13,15 869:2,8,16,21 870:8,10,15,23 871:2 874:2,11 874:13,23 875:1,4,16 876:8,17,20 877:1,5,8,24 878:5 879:19 879:21 880:1,3 880:9,11,16,23 882:24 883:22 884:1 885:2 886:20 887:6 887:10,12,15 887:18,20 888:7,12 889:7 889:13,18,21 891:10 892:4,8 892:15,17 894:10,22 895:23 896:14 897:9,11,15,19 897:22 898:4 898:12,15,24 899:2,5,8,11,15 899:17,19,25 900:2,9,14,21 900:25 901:4,5 901:6,9,18,19 901:22,25 902:2,6,8,11,13 902:15,17,19 902:25 903:5,8 903:13,17,22 904:7 907:18 907:21 908:2,9 908:11,13,17 908:19,22,23 909:10,15,19 910:11,15 911:4,6,10,16 911:20,24 912:5,24 913:1 913:4,7,19 914:3,12,19,21 914:23,25 915:4,9,11,15 915:17,20,22 916:3 917:5,7 917:11,12,14 917:17 918:10 918:13,16,19 918:21,24 919:8,22 920:8 920:11,17,22 921:2,15,16 922:7,10,15,17 923:21 925:10 925:14,25 926:4,13,21,25

927:21 929:6 929:22 930:2 930:10,14,17 931:2,14,18,20 931:24 932:4 932:11,16,21 932:24 933:8 934:3,18,20 935:15,18,22 935:25 936:12 936:16 938:2,9 939:10 940:12 940:16,18,23 941:3 942:4,25 943:4,6,20,23 944:5,18 945:2 945:3,5,13,17 945:18,23 946:3,6,11,14 946:16,22,25 947:4,11,16,20 947:23 948:1,8 948:19 949:7 949:15,19,25 950:8,16,19 951:3,10,13,15 951:18,20,22 952:3,8,16,23 953:2,5,8,11,14 953:19 954:13 954:20 955:1,5 955:20,25 956:10,14 957:1,5,15,21 957:23 958:2,6 958:9,12,17,22 958:24 959:2,6 959:10,17,20 959:24 960:3 960:12,17 961:3,7,11,14 961:20,24 962:2,5,11,18 962:22,25 963:3,23 964:4 964:8,12,15 965:6

**officer's** 908:14 917:2,18 921:22 938:24 959:24

**oh** 839:9 863:12 877:11 881:21 883:17 891:8 907:11 932:14 944:6 949:20 956:8 960:24

**okay** 820:16 821:17 825:14 825:24,25 826:14,18 827:15,20 830:22 831:12 832:21 833:21 836:16 839:9 840:16,20 841:6,14,21,24 843:3,9,17,24 844:19 847:18 847:24 851:11 853:11 854:6 854:20 858:14 859:3,11,14 860:9,17 861:13,17 863:6,24 865:23 869:8 871:22 874:4 876:21 883:24 888:7 895:12 900:22 902:22 903:5,13 905:24 912:5 913:3 914:15 915:15,17,20 917:16 919:8 920:11,22 924:21 926:4 928:22 932:16 932:24 933:2 937:5 939:4,5 940:18 944:24 947:3,6 948:7 949:1,16,22 951:24 952:8 953:5,9,18 954:19 960:23 964:12

**once** 822:7 831:7 867:2

**ones** 869:24 954:8

**open** 845:11 847:10,14 881:16,20 882:3,4,17,17 882:19,23 883:8,13,19 884:16

**opine** 904:22 905:4

**opinion** 847:11 861:24 868:4,6 868:16,18,20 868:25 869:3,5 869:18 873:12 876:16 879:8 879:17 887:25 892:1,7,13 894:11 898:2 899:9,13,23 900:11 908:7 910:14

**opinions** 869:24 876:11 897:6 898:16 899:12

**opportunities** 831:6 837:7,11 837:12,21 838:1,16 843:12 851:17 851:24 852:12

**opportunity** 852:2 886:2
**opposed** 843:22
**opposing** 915:5 915:7 920:8 929:6 931:2 937:21 938:24
**opt** 958:3,4,5
**option** 865:17 865:22 890:21
**orange** 844:14 844:14
**order** 820:7 822:8 862:5
**organization** 849:21
**organize** 849:17
**organizing** 849:3
**original** 938:7 938:12
**originally** 824:19
**outcome** 965:13
**outlined** 910:23
**outplacement** 843:21 844:1 847:22 848:3 872:6 906:17 922:24 953:22 954:11 966:16
**outside** 890:9 906:13,17
**overrule** 894:22
**overruled** 866:12,12
**oversight** 895:17 896:5
**own** 884:2 937:2

**p**

**p** 819:1,1 847:25 859:5,8 939:8,11,12,13 940:1,4,5,11,11 940:13,18 941:4 943:7 950:7,24 951:3 951:5,10,13,15 951:23,23 952:23 953:3 953:11,15,17
**p.m.** 919:10 932:9,9 964:19
**page** 966:2,11 966:15
**pages** 965:4
**paraeducator** 865:12,16
**paraprofessio...** 842:13
**parent** 824:15 824:22,24 841:7 848:9 916:19,20 919:7 937:18 944:15 966:15
**parental** 938:14
**parents** 824:3 824:13 839:3 841:10,17 847:22 856:4 927:4,9 930:18 954:3
**part** 843:9 861:3 878:10 897:13 907:14 936:11,14 938:18 939:3 939:14,19 941:1,1,7 944:21,24 947:12,14 949:17 950:5 952:19,19 954:25,25 955:21,22,23 960:7 961:8
**participant** 863:8,10 875:23
**participate** 840:10 851:7
**participating** 838:5,7
**participation** 837:21
**particular** 833:2 837:3 838:22 878:21 891:22
**parties** 939:11 958:3 965:11 965:12
**partitioned** 884:13
**partitions** 882:7 883:4,9
**party** 822:17 889:17 908:15 911:1 926:20 955:8 957:13
**pass** 927:24
**passed** 929:2
**past** 833:9,17 844:17 846:13 878:8 883:15 929:4,13,20
**pathologist** 851:4
**patrick** 818:16 823:14 965:6
**pattern** 874:17
**pause** 854:12 859:6 932:9
**pausing** 854:10 932:7
**pc** 819:3

**peer** 837:9 838:17
**peers** 837:16 851:10 852:3 886:3 890:23 906:18 907:1,2
**penalty** 939:22
**pending** 935:1
**people** 944:6
**percent** 888:19 890:4
**perfectly** 853:21 923:12 928:4
**performance** 863:19
**period** 849:23 851:6 944:23 947:7,12
**periodically** 897:2
**periods** 849:10
**perjured** 935:13
**permission** 904:6
**person** 842:17 852:7 858:8
**personal** 904:18
**personally** 839:8 877:16 877:20,21 894:16
**perspective** 840:7 845:22 933:7
**pertains** 939:20
**petitioner** 823:24
**phone** 858:7
**phrased** 867:13 867:15
**place** 818:20 927:17 938:19 949:5 950:11
**placed** 828:25 844:16 845:24 847:4 866:23 868:7 878:8,13 879:4 905:17 927:15
**placement** 830:12 835:18 836:13 839:1 840:17 841:2,3 841:19,25 842:1 844:20 853:6 871:17 875:20 904:15 905:12,19 906:1,2,6,13,25 917:22 923:1 927:13 937:11 966:12
**placements** 833:15
**plan** 847:21 848:16 946:13
**planned** 838:20
**planning** 830:12 833:3 834:24 840:17 841:1,3,18,25 875:19 904:15 906:5
**plans** 831:25 846:2
**play** 863:6
**please** 820:7 825:15 826:20 853:20 857:3 862:23 901:8 901:11 902:18 902:24 903:2,6 914:4,5,14,15 916:12 917:14 926:24 932:18 947:24 959:15 962:13
**point** 822:21 847:19 850:1 851:11 876:20 877:3 897:22 910:12 914:6 930:6 931:20 933:6 934:6,25 941:12,19 956:20
**points** 930:11
**poses** 896:9,20
**position** 826:15 828:12 916:12 919:4 944:3 954:11
**positions** 939:15
**possible** 835:12 837:17 849:1 853:8 865:10
**possibly** 918:1
**postpone** 922:22
**postponing** 927:8
**potential** 858:24
**power** 949:24
**ppr** 862:1
**ppt** 834:22 835:8,22 841:12 855:9 855:19,24 860:7 862:8,9 863:7,19 873:15,16,17 890:14 904:22 955:13 966:12 966:16
**ppts** 834:10
**practical** 851:13
**practice** 839:21

**pre** 942:6 951:18,19 952:3,7 953:20 961:1,4,14,17 961:18,21 963:2
**preempted** 941:15
**preexisting** 919:5 920:2,12 920:14,18,20 920:23,25 921:16 922:19 924:10 925:15 925:18 926:17
**prefer** 821:13
**prehearing** 825:6
**prejudice** 880:20 892:10 903:16 924:12 928:22 942:2 958:21 962:12 963:15 964:5
**prejudiced** 881:1 902:24 912:20 923:17 924:23,24 927:16,18,19 928:11,13 948:18 949:22
**prejudices** 923:2,14,15 927:10 928:14 928:19 942:17 954:2,4
**prejudicial** 923:20
**prejudicing** 900:22 928:17 958:19
**preliminary** 823:15
**preparation** 855:12
**prescribed** 850:7 851:5
**present** 819:13 822:4 824:3 912:17,18 916:17 927:20 948:22
**presentation** 919:20
**presented** 923:4 927:11
**pretty** 845:14 865:15 898:4 902:19 924:1
**prevented** 938:25
**previous** 855:24
**previously** 846:5 863:24 881:7
**primary** 830:24
**prior** 828:3,5 830:10 855:11 855:19 857:24 858:12 966:18
**prioritized** 848:5
**private** 844:12 885:8
**privileged** 849:7
**pro** 819:11 822:20 865:5 889:16 908:15 909:12 910:25 920:9 933:11 944:4,6 948:12 954:2 955:7 957:13
**probably** 822:23
**problem** 851:12,13,23 852:6,11 925:12 930:5 946:4 964:11
**problems** 925:6 931:12
**procedural** 937:16 938:17 938:25 940:8 940:10 941:9 941:24 943:13 954:7
**procedurally** 938:5
**procedure** 949:6
**proceed** 824:2 824:21,24 825:13,24 854:16,18,19 904:6,7
**proceeding** 824:1 965:11
**proceedings** 965:4,10
**process** 830:9 834:18 881:3 897:14,17 919:15 933:4 938:16 939:24 941:11 942:4 944:25 948:17 949:14 952:20 956:23
**professional** 831:5 833:17 847:11 868:19 869:1,3,5 871:4 885:11 885:13,16
**profile** 847:9 868:1 878:17 878:18,20,25
**profiles** 866:22 868:11 891:22

**program**
829:15 832:13 832:16 835:20 836:4,20 837:2 837:3 838:5,7 838:22 840:23 842:2 843:15 844:6,13,18 845:25 847:5 848:5,13,21,23 849:17,25 850:24 851:15 851:25 852:13 852:18,22 855:5 859:2 861:25 863:16 863:23 864:5,8 864:13,17,19 865:5,13,18,21 866:24 875:25 878:10,12 879:5 881:24 885:8,25 888:18,21 890:4,20 891:8 891:16 906:3,8 906:11,21 907:6,15 937:9
**programming**
828:22 832:23 838:11 840:11 847:7
**programs**
828:23 831:3 832:8 833:10 833:20 839:6 840:13 852:20 864:23 868:12 877:20 878:3,7 905:13
**prolonging**
927:8
**proof** 917:19 918:5 919:6 921:20 922:22 923:6 926:15 927:4 930:7 950:21 951:1
**proper** 872:17
**prosecute**
918:6 923:7,11 929:24 931:7
**prosecuted**
918:4
**protest** 912:8
**protocol**
910:22
**prove** 943:18 952:9
**provide** 831:21 834:4 837:12 837:24 839:3 845:3 850:5 852:9 916:8,13 933:9 938:13
**provided** 836:1 850:12 867:24 904:19 905:9 906:20 939:11
**provider** 851:1
**providers**
850:13 938:14
**providing**
831:5 913:9
**provision** 833:3
**psychologist**
840:1 851:3
**public** 826:8,15 828:3,9,17,19 830:23 833:24 846:24 855:1 923:16 924:15 924:25 944:13 944:14
**pulled** 832:6
**pupil** 826:16 829:4
**purchasing**
852:7
**purpose** 916:25
**push** 842:13,22
**put** 821:13 822:24 824:5,6 916:22,23 917:21,23 923:1 924:20 927:12 934:16 942:21 945:16 948:10 955:14
**putting** 945:16

**q**

**question**
824:12 857:19 858:9 860:3,5 862:21 864:7 865:3,4 869:20 870:24 871:5 874:2,3,15 875:5,13 876:7 876:10 877:19 879:24,25 880:4,5,12,15 880:19,21,24 881:5 887:15 887:16 888:5,9 888:23,24,24 889:8,14,21,23 890:2 892:12 892:14 893:11 893:11 894:6 894:23 898:5 898:13 899:8 899:19 900:3 901:1 902:10 902:13,14,18 903:2,3,7,11,24 903:25 904:1 907:19 908:3,5 909:24 910:3,9 937:18,22 938:4,20 952:3 953:12 963:15

**questioning** 900:24 901:21
**questions** 853:10 861:19 877:10 881:22 887:19,23 888:13,16 889:1 898:15 901:23 902:3,5 902:9,12 904:9 907:9,17 910:5
**quick** 931:15 933:6
**quickly** 853:24 911:7
**quiet** 917:14
**quieter** 850:7
**quinnipiac** 827:10
**quirks** 830:14
**quite** 825:5 889:7

**r**

**r** 819:1 825:19 932:19,19,19 932:19 966:3
**raise** 823:20 825:18 932:18
**raised** 927:12 939:14
**rather** 829:12 845:6 862:18 863:1 883:3,8 886:11
**reach** 858:6
**reached** 858:2 928:24,25 929:5
**reaches** 898:20
**read** 859:17,20 860:9 861:3,5 861:13 918:17 919:3,12
**ready** 820:4 872:25
**real** 852:5
**really** 822:21 825:8 845:9 846:1,5,20 861:2,11,12 891:11 921:17 935:8 940:25 944:7
**realm** 827:22
**reason** 829:9 918:10,13 936:7 938:18 952:10 955:1,4
**reasons** 951:6
**recall** 862:13
**receipt** 848:1
**receive** 826:22 918:19,23 922:3
**received** 824:11 825:3 828:23 922:6,8
**receives** 890:22
**recent** 836:3 856:16,21 862:14
**recently** 847:23 883:18 897:1,3
**recess** 842:25 843:1
**reckon** 852:10
**recognized** 915:4
**recollection** 841:7
**recommendat...** 829:25 843:10 847:13 864:21 875:20,24 880:17 885:21 888:22 890:12 890:13 905:2,3
**recommendat...** 835:9 841:24 870:2 875:22
**recommended** 842:2,7 843:18 863:22
**recommending** 834:11
**record** 820:5 821:10 823:2 824:9 825:1 854:10,16,17 860:21 870:14 876:19,24 880:21,22 892:10,11,20 894:9 899:7,21 899:22 901:3,7 901:12 902:1 907:25,25 908:4 909:1,2 909:6,7,22 910:2,5,17 911:2,13,19,23 914:14 916:10 918:18 932:7 935:5,11 937:13,14 938:20 939:3 939:21 940:10 941:6 943:1,15 943:22 944:6 946:24 949:3 949:21,23 950:1,4,4,22 951:1,4,16 953:25 956:13 956:17 960:22 961:13,15 963:5,21 964:17 965:9
**records** 836:2 856:14 862:17 862:25 863:3 873:16
**redirect** 903:9 903:12,13,22 904:11 966:4

**reduced** 965:8
**refer** 884:16
**reference** 949:8
**referenced** 850:23
**referring** 822:6 825:2 829:18
**refers** 950:10
**reflect** 938:20 940:10 950:4
**refusal** 911:15
**refused** 841:18 938:13,15
**refusing** 943:23
**regarding** 919:14
**regulate** 853:2
**regulation** 852:16,21
**reinforcing** 851:12
**related** 831:14 839:22 842:17 842:17,19 851:1 938:22 940:5 965:11
**relationship** 839:12
**relationships** 837:9
**relative** 909:14 965:12
**relatively** 822:16
**relevance** 866:3,9,11 869:15,16,20 894:19,20 895:19,21
**relevant** 897:10 933:22 934:10 934:11 938:22 939:21 941:20 956:1,22
**relied** 862:5
**relief** 952:11
**rely** 861:22 863:15
**relying** 896:8 896:19
**remain** 829:5 853:5
**remainder** 913:11,18 919:1
**remaining** 912:9 922:11 922:12 924:15 929:7
**remember** 841:12,20,22 848:17 855:14 855:18 856:17 856:22,25 857:2,5,8,9 862:14 942:4 960:25
**removing** 842:24
**renew** 950:9
**repeat** 895:25 910:3
**reported** 864:1
**reporter** 818:24 820:5 853:18 854:10 854:17 932:7 951:25 964:17 965:3
**reports** 856:14 895:5
**representation** 916:15,19
**represented** 948:13,15
**representing** 823:6 863:13 935:9
**request** 820:12 820:14 821:9 822:17 847:22 853:19 916:1 938:13 940:14 966:16
**requested** 821:1
**require** 832:5 832:18 843:21 873:8
**required** 824:15 919:19 941:23 943:17 960:10
**requirement** 871:12
**requires** 845:2 848:5 865:15 868:1
**reservation** 824:9
**reservations** 824:23
**reserve** 933:20 934:4,4
**residents** 833:19
**resolute** 957:19
**resolution** 934:8 936:8 939:6,16,23 941:13,22 943:16 944:23 947:7,8,12 949:5,11 956:21 957:1,1 957:7,11,20,25 960:5,10
**resource** 829:5 832:4,11,15
**respect** 827:13 833:3 848:19 850:1,17 851:11 852:14 904:14 906:16 959:19

**respectful** 962:9,10
**respectfully** 820:14 888:15 889:10 915:25 922:9 928:23 938:19 940:14
**respond** 845:6 845:9 846:22 852:24 885:22 915:13 930:3,4 931:12 936:5
**responded** 824:14 922:5
**respondent** 818:11 965:5
**responding** 925:23
**response** 830:11 922:3 930:18
**responses** 925:6
**responsibilities** 826:19 828:13 828:20 830:25
**responsibility** 831:13 905:4 906:12
**responsive** 873:5
**rest** 828:6 915:1,12 921:12
**restrictive** 853:7 865:6,17 865:22 871:14 871:20 890:21 906:19 907:7
**rests** 913:6
**resume** 826:11 829:3,10 966:12
**retained** 966:19
**retroactively** 830:10
**revenge** 944:11
**reverse** 956:6
**review** 834:8 834:20 856:14 856:19,24 863:3 873:14 873:16 926:15
**reviewed** 856:21 863:18 871:7
**reviewing** 857:13
**reviews** 834:7
**revise** 830:10
**revisit** 832:21
**right** 820:3,6 820:25 821:7 822:24 823:11 823:13,15 824:10 825:12 825:18 831:10 844:14 847:25 853:11 854:14 871:1 874:16 875:3 876:2 886:13 889:24 892:12 893:10 899:7 900:2 902:17 903:16 904:16 906:4 907:18 908:9 908:17 909:6 909:24 912:1 912:24 913:1,7 914:10,23,25 915:2,9 918:25 919:1 921:2 923:24 924:20 924:21 929:5 930:2 931:14 931:18 932:1,5 932:11,16,18 933:14 934:14 935:4,17 936:10 937:19 938:1 946:21 946:22 947:4 948:11,13 949:3 950:3,5 950:16,20,21 950:25 952:23 952:25 954:13 956:10,16 957:3 958:6,17 960:4,8 961:5 961:9,25 963:3 964:1
**rights** 944:15
**rizzo** 935:13
[redacted] 818:8 819:10 820:8 823:12 833:25,25 835:24 836:7 836:11,17,21 838:4 840:9,18 841:4,8 842:1 843:5,11,16,21 844:5,21 845:1 845:13,21 846:3,17,21 847:12,21 848:3,4,15 850:4,6 853:7 863:20 864:22 865:14 867:22 867:25 868:7 868:13 872:8 872:22 878:17 878:25 879:6 881:13 885:10 885:17,22,23 886:6,10,15,23 888:4 890:15 891:20,25 892:24 893:3 894:3 904:17 905:16 906:20 916:13 927:13 933:3 965:5

966:16
[redacted] 818:24
819:11 820:17
820:21 821:16
821:21 822:19
823:12,12
824:11 853:14
853:16 854:5
854:18,20,24
857:7,19,23
858:14,15
859:3,7,11,13
859:23 860:4,9
860:17,20,24
861:3,13,15,17
861:20 866:4,6
866:11,16
867:8,11,14,17
868:24 869:10
869:12,16
870:5,9,13,16
870:25 871:6
874:1,4,5,12,16
874:24 875:3,7
875:12 876:1,6
876:9,18,21
877:4,6,11,14
878:1,6 879:15
879:18,20,22
879:25 880:2,5
880:6,10,14,18
880:25 881:6
882:22 883:11
883:17,21,24
884:3,5 885:1
885:5 886:18
886:21,24
887:5,7,11,13
887:16,21
888:9,14,17
889:1,6,10,15
889:19,24
890:1 891:6,13
892:3,5,9,16,18
892:23 894:6,9
894:11,15,20
895:1,21 896:2
896:12,18
897:8,10,12,20
897:24 898:7
898:14,23,25
899:4,6,9,12,16
899:18,20
900:4,10,17
901:5,7,11,20
901:24 902:4,7
902:14,18,22
903:1,6,10,14
903:19,23
904:9 907:19
907:23 908:10
908:14,19,23
908:25 909:4
909:12,17,20
910:13,16,20
910:24 911:5,8
911:12,17
912:2,6,25
913:3,9 914:4
914:8,14,20,22
914:24 915:2
915:10,14,16
915:19,21,24
916:9 917:3,6
917:10,13,15
918:8,11,15,23
918:25 919:8
920:9,13,19,24
921:3,18,23
923:9,12,22
925:13,17
926:5,22 927:1
927:14 930:3
930:13,16,21
931:17,19,23
932:3,6 933:2
965:3,21 966:6

**role** 826:19
830:25 831:9
833:13,22
839:1 844:8
863:6,9,10
904:15,20
932:25 959:21
959:24

**roles** 828:5

**rollout** 829:4

**room** 832:4,12
832:15 882:5

**rosen** 819:6
820:14 821:13
821:18 823:3,3
823:17,19
825:1,11,14,25
826:2,6 853:10
854:8 857:4,18
858:9 860:2,23
866:3,9 867:6
868:22 869:15
873:25 874:9
875:11 876:5
876:14,25
877:22 879:13
879:16,24
880:8 882:20
883:20 884:24
886:16 887:3
888:25 889:4
889:11 891:4
892:2 894:4,7
894:19 895:19
896:11 897:7
903:12 904:6,8
904:13 907:17
908:21 910:18
910:21 913:6
913:22 914:3,6
914:8,10,15
915:25 916:11
917:4,17,18
918:20,23
919:4 921:15
921:20 922:3
922:10,15,18
923:10 924:24
925:4 926:2,12

926:14,24 927:2,21,23 928:7 929:25 930:6 932:13 933:5 934:6,13 935:5 936:4 939:10 940:4,9 942:21 947:10 949:7,11 950:8 953:16 957:21 958:9,14 961:1 962:13 963:23 964:13 966:3,4
**rosen's** 913:24 918:8 923:13 940:6 949:10
**rotating** 849:10
**roughly** 821:7
**route** 945:21
**rude** 904:3
**rule** 934:24 935:4 942:12 954:18
**ruled** 945:5,5 947:11 952:23 955:5 957:5 958:14
**rules** 889:20
**ruling** 938:24 947:5 956:5,24
**run** 852:1 859:4 959:21 959:25
**running** 959:21 959:22

**s**

**s** 819:1 823:12 825:19 826:4 836:7 843:5,11 843:16 844:5 845:1 846:17 854:22 867:25 872:8 878:17 878:25 879:6 885:17 890:15 891:25 904:11 933:3 966:12
**safeguard** 939:1
**sara** 823:8 825:14,16 854:1 862:7 875:18 966:2
**sat** 877:15,20
**save** 946:25 949:16,17,19 949:19
**saw** 843:3 893:17
**saying** 825:8 853:23 886:21 922:25 926:17 930:8 945:15 958:5 959:22
**says** 823:24
**scaffolded** 851:8
**schedule** 822:10 834:12 842:25 843:2 849:6,8,10,18 913:24,24 920:6 925:8 927:3 931:1 939:15
**scheduled** 916:16 919:17 921:11
**schedules** 920:7 931:2
**scheduling** 821:11,14 822:24 914:6 919:14,24 921:13 924:8 926:19
**school** 826:8,16 830:5 831:17 831:18,18 832:4,11,14 833:24 834:6,9 834:16,18,25 835:8,20,25 836:1,11,13,18 837:24 838:2 839:25 840:1 842:3 843:1,5 843:10 849:8 851:2 852:2 855:21 863:14 870:2 884:19 890:7,8,9 891:18 904:19 904:23 905:2 923:22,23,24 924:22 937:4 937:17
**schools** 826:15 828:4,9,17,19 830:24 831:15 831:16,20 835:13 836:17 846:24 855:1 891:17,21 923:16 924:15 924:25
**screen** 826:12 939:9
**script** 927:17 928:9,12
**se** 819:11 889:17 908:15 910:25 920:9 933:11 944:4,6 948:12 954:2 955:7 957:13
**se's** 909:12
**seal** 965:14
**second** 850:1
**seds** 829:4,7,8 829:19 830:6 830:10

**see** 825:11 826:11 829:3 839:14 840:22 840:25 841:13 845:9 846:12 847:14 848:2 860:24 870:19 874:19 882:12 897:25 902:23 924:18 932:13 935:9 945:11 950:23 958:19
**seeing** 841:22
**seem** 846:21,21
**seems** 845:17 846:21
**seen** 846:4 874:17,18 875:14 879:3 939:10
**send** 930:16
**sense** 836:6 846:3 931:9
**sensory** 895:17 896:5
**sent** 820:20,21 825:7 864:1 919:9 920:10 921:24 922:4,8 925:22
**sentence** 871:21
**separate** 884:12
**sequence** 834:15
**serious** 937:15 938:17
**serves** 936:23
**service** 829:4 842:17,17,19 850:13 851:1
**services** 826:16 831:14,22 834:11 835:7 835:23 842:1 863:21 867:24 904:24 906:17
**serving** 831:9
**session** 821:15 842:19
**sessions** 842:23
**set** 822:9,22 825:6 838:22
**sets** 822:15
**setting** 843:13 845:15 850:18 850:22 855:22 886:4,12 893:5 896:23,25 937:8
**settings** 838:2 868:8 905:20 907:8
**settlement** 939:20 940:19 940:23 941:8 950:10,13,14 950:18 956:3 956:19 957:2,6 957:8
**settling** 950:17
**several** 848:6 922:19 930:11
**severely** 936:23
**shape** 924:13 928:18
**share** 840:15 849:7 861:18 906:6
**shared** 853:5 863:22
**shore** 831:17 831:18 832:3,8 832:11 843:4,4 843:9 924:17
**short** 822:16 846:20 854:3
**show** 826:9 839:9 840:20 847:24 935:12 959:23 963:21
**side** 824:6 917:22
**sides** 916:23 931:15
**sign** 951:8
**signature** 965:18
**signed** 824:19 824:20
**significant** 895:7 896:9,20
**significantly** 871:18
**silence** 945:10
**silenced** 948:11 954:24
**similar** 831:1 838:21 847:8
**sincerely** 920:9
**single** 855:8
**sir** 870:9,9,14 880:25 881:2 888:14 899:4,7 901:13 903:1 903:10,19 907:24,25 909:4,18,21 910:20 911:5,8 911:22 912:3,3 920:16,19 921:1,18 936:3 946:2,6 947:15 947:19,22,25 948:3,5,21 949:10 951:2 951:21 952:7 955:4 958:4,25 959:4,4,13,20 961:9,13,24 962:2,3,3,8
**sit** 846:7
**sitting** 917:21

**situation** 921:6
**situations** 830:8,13
**six** 827:9,16 922:4,7
**size** 893:2
**skill** 838:16,22 843:13 851:17 878:23
**skills** 832:19 836:23 837:7 837:13 838:2 838:16 839:19 839:21 842:10 848:14,20,22 848:25 850:18 850:20,25 851:12 852:12 864:12 885:18
**skip** 887:17
**slow** 853:20
**slowly** 865:19
**small** 893:19
**smaller** 883:5 893:2,2,5,7,16 893:25 894:2 895:15 896:3
**snack** 852:1
**social** 832:9 837:7 839:25 842:10,12 846:9 850:17 850:18,20,24 851:2 852:19 878:22 936:22
**socially** 845:8
**solid** 879:10,11 882:8
**solving** 851:12 851:13,23 852:6,11
**son** 848:3 863:17 865:5 867:5 873:19 874:7,18 923:14,18 924:13 927:16 928:11,14 936:25
**sorry** 827:11 837:19 842:11 845:10 853:25 854:1 863:4 864:10 865:3 866:4 886:9 888:15 895:10 896:1,16 898:7 903:14 907:11 907:12,13 912:3 921:24 925:7,19 933:5 945:4,7 958:19
**sort** 925:12
**sorts** 883:9
**sound** 872:23 895:12
**source** 876:15
**space** 845:19 847:10,15 881:16,20 882:3,4 883:8 883:14 884:17
**spaces** 839:15 845:13 882:8 882:10,17 883:3,5 884:10 884:12
**speak** 829:13 835:1 839:23 845:12 853:24
**speaking** 827:20
**speaks** 860:25
**spearhead** 829:3
**special** 818:3 819:16 823:5,9 826:16,24 827:6,25 828:9 828:11,14,16 828:18 830:22 831:14,21 833:1,5,8,13,22 834:17 836:7 839:1 840:1 844:8,12 846:23 863:12 863:13 885:8 904:20 937:3 965:5
**specialized** 832:8,12,16 835:20 836:20 837:5,14,25 839:16 842:2 843:14,15 849:25 850:6 863:23 864:13 875:24 885:25 906:2
**specializes** 872:7 891:22
**specialty** 827:13
**specific** 829:25 832:9,16 836:24 838:13 863:15 872:3 891:23 937:25
**specifically** 841:20 856:17 858:25 859:18 860:11,20 862:13 864:1 865:8 868:9 872:14 919:11 954:8
**spectrum** 827:8 827:14 832:18 833:12 937:6
**speculation** 867:7,9 895:20
**speech** 851:3

**spend** 857:12
**spent** 828:7,8
**spoken** 857:24
**spring** 834:23 855:15,16
**st** 827:7
**staff** 828:21 829:4,5,15,19 829:20 830:5 831:2,14 834:9 835:12 852:4 862:17 863:1 863:25
**stand** 929:20
**start** 820:4,23 824:25 921:13 924:7 925:19 933:1 935:2,15 935:25 936:18 939:4
**started** 841:15 908:16 909:9 931:24
**starting** 929:9 963:6
**state** 818:2 827:22 829:1,9 829:12 844:13 884:19 891:17 891:18,21 918:5 919:2 937:3 965:1,3 965:4
**stated** 857:4 858:16 860:8 860:11,20 861:24 869:17 872:1 874:24 901:16 910:5 928:10 931:4 936:22 938:2 944:6 953:19
**statement** 936:3
**statements** 940:21,23
**states** 963:19
**stay** 824:5,6 916:22,23 917:21 923:1 924:20 927:12
**staying** 924:16
**stenographic...** 965:8
**steps** 839:2
**stewart** 913:15
**stimulation** 894:18
**stop** 861:18 880:23,23 889:11 901:4,6 901:9 902:6 957:5 959:7 960:12
**strategies** 851:13 853:1
**street** 819:4
**structure** 848:15 881:16
**structured** 843:13 845:7 872:10 885:24
**student** 824:5,7 833:11,24 834:17,21 835:10,11,16 835:23 843:7 850:14 851:8 878:22 882:14 897:14 906:11 916:24 917:21 922:24,25 923:2
**student's** 834:23,25
**students** 828:22,25 829:25 831:3 831:25 832:5,9 832:17,18 833:4,6,16,19 838:6 840:12 844:16 845:24 846:4,12,14 847:4,9 848:25 849:5,11,16 851:5,6 864:14 865:10,19 866:7,21 868:12 871:13 871:18 872:25 873:5 877:17 878:9,11,13 879:4 881:9,25 882:2,12,13 883:7 884:6,7 884:11 891:23 892:25 893:1,8 893:14,15,19 895:6 905:12 905:16,17 906:25 907:7 937:4,5
**studies** 827:1
**style** 868:14 896:22
**subject** 861:8 887:12 917:1 917:18 920:7 921:21 931:1 939:19 943:9 955:20,21 960:5
**subjected** 916:6
**submit** 822:8 927:5
**subsequent** 919:23
**success** 846:17
**successful** 845:25 846:4 847:14 866:24 867:5

**sufficient** 919:18
**suggested** 837:3
**suggestions** 836:16
**supervise** 831:13,16
**supervised** 828:21 852:3
**supervising** 831:2
**supervisor** 819:16 823:5,9 826:17 828:2 828:15,16,18 830:23 833:2,8 833:14,23 839:2 844:8 846:24 863:13 904:21
**support** 838:15 842:13,13 845:21 848:15 850:2,4 865:12 865:15 868:2 897:6 953:22 954:10
**supporting** 836:11 847:20
**supports** 831:4 831:24 835:7 835:23 863:21 867:23 904:24 906:16 937:5
**supposed** 957:9 957:10 958:2
**sure** 821:20 825:1,2 826:23 827:24 828:6 835:17 837:5 842:6 848:21 856:8 858:6 860:12 884:2 884:23 891:2 910:20 926:5 929:16 939:3
**surrounding** 851:19
**sustain** 867:16 900:6 941:3 943:13
**sustained** 857:6 876:8 879:19 879:21 880:1,9 880:14,23 887:20 888:8 892:4,4,8,17 894:10 897:9 897:11,12,24 898:3 900:7 902:15 943:4,6 943:20 949:12
**sustaining** 942:15
**sworn** 825:20 932:20
**system** 829:19 829:21,21 830:1,3,14

**t**

**t** 825:19,19 932:19
**tailored** 838:8 838:10
**tainted** 944:2
**take** 839:2 854:3 925:12 929:22 931:21 931:22 940:16 949:5
**taken** 965:8,11
**talk** 821:11 844:24 845:6 848:8 872:7 873:7 926:2,7 929:13,14
**talked** 858:12
**talking** 864:19 867:2 924:2,5 941:22 946:20 960:12 961:3
**targeted** 837:11 872:9 873:9
**tasks** 848:17
**taught** 832:6 833:6 836:23 837:13 851:21
**teacher** 828:10 828:11 833:5 839:11 850:25 895:16 896:4
**teachers** 840:2 850:12
**team** 829:23,24 830:12 835:5 835:15,19,19 836:11 837:4 839:24 840:17 841:3,19,25 847:20 863:18 875:20,21 876:3,13,23 904:15,19 905:4,24 906:6
**team's** 875:24
**teams** 818:20 965:6
**technology** 864:15
**teleconference** 818:20 965:7
**tell** 822:2 827:12 916:20 921:17 930:14 934:15,20 935:22 946:15 946:21 960:3
**telling** 876:23 935:19 941:12
**ten** 854:4,6

**term** 839:22
**terminated** 907:21
**terms** 831:21 835:11 842:1 846:18 905:12 926:19 933:12 933:13,17
**terribly** 942:17
**test** 860:12 861:4
**testified** 825:21 862:3 867:11 872:12 873:18 874:10,23 875:1,13 879:16 881:8 881:19,23 882:1 891:10 893:4,12,24 932:21 933:17 953:1,1,4
**testify** 861:7 865:23 869:22 884:1 887:7 888:25 933:10 956:15 960:6,6 960:13 961:7 962:5 963:25
**testifying** 861:8 871:3 882:21 887:22 933:1 935:2 936:1 953:8 961:17 964:1
**testimony** 822:3 853:19 860:2,14,22,23 861:5,15 870:10 876:25 878:14,16 882:15 883:18 883:20,22,25 886:17 887:4 893:14 894:13 895:2 913:10 913:11 919:20 923:17 927:24 928:19 931:25 932:17 933:12 934:7,16,22 935:1,20 936:11,18,21 936:24 937:13 939:4,13 940:1 940:4 944:24 945:22 948:23 950:5 954:25 955:10 958:11 961:9,20,23 962:4,17 963:19 965:7 965:10
**testing** 895:3
**thank** 826:2 833:21 853:3 854:8,9 871:22 895:14 907:17 908:24 931:17 931:23 932:6 964:13,15
**thanking** 840:13
**therapeutic** 844:24 872:17 872:21,24 873:1,3 885:20 937:7
**therapeutically** 872:16
**therapy** 844:25 845:6 872:7 873:7
**thing** 872:23 928:24 955:16 957:3
**things** 849:24 851:25 865:18 938:11 948:14 957:12
**think** 821:4 824:18,19,24 825:3 830:15 840:3,4,8 851:16 867:8 874:1 875:12 880:19 881:2,3 882:18 887:17 888:6 889:7 892:18,22 897:13 899:21 900:17 902:8 904:1 910:21 912:13,14 915:12 921:20 923:2 927:10 930:7,9 932:1 950:19 951:6 957:14 962:15 962:18,22 964:4
**thinking** 851:18 865:9
**thought** 959:14
**thoughtful** 834:4 878:10
**thoughts** 836:12
**thread** 966:16
**threat** 948:24
**threaten** 900:19 902:22 909:20
**threatened** 911:13
**threatening** 900:18 948:23
**three** 831:15,15 832:15 842:8 842:11 864:12 864:23 883:16 897:1,5 923:25 924:5,7 929:8 929:25 954:14
**thwarted** 887:21 888:16

**tied** 827:17 918:14
**time** 818:19 821:3 822:13 835:6,14,24 836:4 837:14 837:15 840:14 840:16 843:18 851:22 856:17 857:12 860:7 861:8 862:23 863:20 882:13 890:14,22 893:9,17 896:1 896:17 899:2 900:19 908:2 910:19 914:17 916:3 927:20 929:20 931:22 932:2 934:24 936:20 940:16 944:2 952:17 956:2 961:7
**timeframe** 943:17
**times** 842:9,20 896:24,25 922:19
**title** 828:15 873:4
**titled** 840:22 848:2
**today** 821:19 824:16 921:10 924:19 927:24 954:4
**today's** 821:15 919:16
**together** 839:12 853:17 893:8 906:5,7
**toileting** 842:15
**told** 862:18 876:12 903:17 903:18 911:20 919:5 925:15 933:25 951:18 955:10
**took** 829:14 950:11 965:4
**tools** 852:22
**total** 884:12 893:9,21,22
**totally** 910:1
**tour** 839:5,6,7 839:14 856:7
**toured** 839:8 839:13
**towards** 821:15 908:15 928:5 948:20 950:3
**town** 833:19
**train** 959:14
**trained** 829:15 837:8 852:4
**transcription** 965:9
**transition** 834:10,16,22 834:25 835:14 835:25 840:18 841:4 847:21 855:8 856:10 870:1 878:11
**transitions** 834:5 842:15
**travel** 852:2
**treated** 892:21 912:6 923:15
**treating** 869:24 870:6,17,22 874:21
**tried** 951:8
**triennial** 830:17
**trip** 837:11 838:3
**troubleshoot** 829:6,16
**true** 862:20 965:9
**try** 848:24 907:6 909:1 957:17
**trying** 829:24 840:3 869:19 874:16,19 876:18 887:7,8 887:25 891:6 891:15 893:23 894:1,14 897:20 898:25 899:6,20 900:4 900:5,12,18,20 900:22 901:1 901:17 902:5,7 902:9 903:3,11 903:21,23 908:1 909:22 910:2,9,16 911:1,12,18,22 911:23 912:22 914:9,20 915:2 916:1,4 923:3 927:16 928:9 945:10,25 948:22 955:7 956:12 957:12 959:8,8,10 960:8,16,16 961:5 962:7,8 962:9 963:1,4 963:9,13
**tuesday** 919:9
**twenty** 856:10
**two** 842:22 849:9 881:22 919:10 929:25 957:12
**type** 829:17 845:4 873:6
**typewritten** 965:8
**typically** 823:19,25

834:20 845:23 846:11

**u**

**uh** 848:7 899:11 926:3,7
**unavailability** 920:1,25 927:10
**unavailable** 915:1 918:6,24 919:23 920:20 921:3 925:25
**under** 825:22 831:12,20 911:7 912:7 932:22 937:21 938:18 942:18 943:14 948:22 957:18,22 958:7 965:8
**undergraduate** 826:22
**undermines** 939:1
**understand** 844:19 848:1 848:11 898:25 899:6 916:16 933:9,11 947:18 948:25 951:21 954:22 955:7 956:9,23 957:13 959:8 960:9
**understanding** 835:6 843:11 845:1,13 847:6 849:19 851:20 857:3 870:25 893:6 894:5,11 898:10 904:16 905:8 908:10 926:16 947:22 947:25 955:8 956:22
**understands** 851:9
**underway** 916:18
**unfair** 909:25
**unfairly** 937:11
**unfortunately** 925:21
**unheard** 941:19
**unified** 837:21
**unilaterally** 926:18
**unintelligible** 866:10 867:10 869:9 870:7 879:18 883:21 889:12 891:9 899:1 900:1,13 901:25 904:5 910:23 911:16 914:2,18 916:11 917:2 934:14 943:3 943:19 944:17 947:17 949:6 949:14 952:22 953:10 954:20 959:9 961:19 964:3
**uninterrupted** 904:6
**unique** 833:11 850:14
**university** 826:24 827:7
**unruly** 912:21
**updated** 938:8 938:11
**use** 853:1 882:6 885:20 955:6 963:16
**used** 829:22
**user** 830:16
**uses** 852:22
**using** 846:18 852:4
**usually** 824:21 934:22
**utilize** 864:14

**v**

**valid** 876:7 881:5 900:25 958:8
**validity** 931:8
**variable** 849:15
**varying** 864:11
**verbal** 871:8
**verbatim** 965:3
**verdict** 910:18
**verge** 902:19
**view** 896:25
**violated** 944:15 944:16
**violation** 940:8 940:10 941:9 941:24 942:18 943:13 952:16 952:18 954:1
**violations** 936:15 938:17 942:7,11,13 944:16 952:5,9 952:12,14 953:7,21,24 954:7 960:18 960:20
**visit** 840:6 883:12
**visited** 883:18 897:3
**visual** 845:16 881:18 894:17 896:10,21
**visually** 845:18 847:16 850:9 881:9

**visuals** 846:18
**vs** 818:9 965:5

**w**

**wait** 821:12 861:4
**waited** 841:22
**waiting** 841:13
**walk** 834:14
**walls** 882:8 883:1,9 884:14
**want** 820:12 821:11 824:2 832:22 840:9 848:8,10 854:3 859:1 860:12 861:7 877:3,9 887:16 892:20 898:18 911:10 911:25 917:15 931:21 935:10 940:9 941:18 943:15 945:13 948:3,6,7 953:2 956:16 957:24 958:15 958:22,24,25 959:4 961:13 962:11,20 963:14,16 964:9
**wanted** 824:8 836:19 915:13 934:13 948:8
**wants** 925:5,23 928:4
**warranted** 844:2
**washer** 839:21
**way** 852:24 858:2 867:13 867:15 898:10 901:13 911:19 923:15 924:13 928:17 929:12 931:5 941:10 941:11 949:25 956:7
**ways** 822:23
**we've** 821:5,6 822:3 881:2 887:10,12 907:21 910:21 917:23 964:4
**website** 937:2
**wednesday** 930:18 931:11
**week** 831:7 842:9 924:4
**weeks** 919:10 924:2,6,7 929:8
**west** 831:18 832:11 843:4,4 843:9 924:17
**willing** 824:21 824:23
**win** 946:11,17 954:16
**witness** 823:8 825:13,20 826:1 854:9 857:22 866:14 869:7,13,18 870:17,18,20 870:21 874:22 875:18 882:20 883:1 885:4 888:25 894:24 895:25 896:16 908:24 909:3 913:8 932:20 933:2,24 934:11,15,19 935:5,16,19,24 936:2,14,19 937:17 940:2,6 940:13,17,22 941:2,5 943:5 943:10,21 944:21 945:3,7 945:15,19,25 946:4,9,12,15 946:19,23 947:3,6,14,18 947:22,24 948:3 949:9,13 949:16,20 950:13,17,25 951:8,11,14,17 951:21,24 952:2,12,18,25 953:4,6,9,12,18 954:19,21 955:3,6,22 956:8,12,16 957:3,6,22,25 958:4,7,13,15 958:18,23,25 959:4,7,12,18 959:22 960:1,8 960:15,19 961:5,8,12,16 961:22,25 962:3,7,14,19 962:23 963:1,4 964:1,6,10,14 964:16 965:14 966:2
**witnessed** 873:18,22 874:6,6
**witnesses** 822:3 913:5,14,16 917:24 919:21
**wonderfully** 873:7
**woodhouse** 846:25 847:2,6 847:8,9 866:1 866:8,15,19,23 867:11,19,25 873:23 874:19 877:16,18,21 878:2,14,25

881:10,19,23 882:15 883:12 884:9,11,18 885:9,19 890:10,17,25 890:25 891:8 891:24 893:4,6 893:10,18,24 894:2,7,18,18 895:6 896:9,20 924:18 925:2 936:22 937:2,2
**woodhouse's** 847:5 878:9,12 879:5 883:2
**words** 864:15 945:16 952:7
**work** 913:13,22 921:7 925:20 927:22 929:9 929:15,18 943:2
**worked** 878:15
**worker** 839:25 842:12 851:2 936:22
**working** 828:3 835:15 847:20 854:25 928:6,7
**works** 873:7 912:16
**world** 852:5
**write** 829:3 849:17
**writes** 848:4,15
**writing** 829:1 919:22
**wrong** 901:13 911:3 938:5

**y**

**yeah** 822:18,20 835:15 845:23 851:16 859:12 860:3,9,20 861:16 869:4 870:15 874:16 875:4 876:17 877:1,5,24 880:1,3,11 882:24 883:22 884:1,3 886:20 887:6,10 889:21 899:8 899:15 900:5 904:7,7 908:13 914:19 915:17 921:16 925:14 926:7,13 931:18 932:4 935:15 936:19 940:18,19 945:2 951:10 955:1 958:12 960:2,12 961:20 962:18
**year** 827:9,16 834:22,23 836:14,18 843:10
**years** 883:16 897:1,5 952:21 952:21

**z**

**z** 819:6
**zones** 852:20
**zoom** 842:5

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**

Student v. Milford Board of Education

| | |
|---|---|
| Appearing on behalf of the Parent: | Pro se |
| Appearing on behalf of the District: | Herbert Rosen, Esq<br>Berchem Moses PC<br>75 Broad Street<br>Milford, CT 06460 |
| Appearing before: | Patrick L. Kennedy, Esq.<br>Hearing Officer |

# FINAL DECISION AND ORDER

## ISSUES:

1. Did the District commit procedural violations amounting to a denial of FAPE for the 2023-24 school year?
2. Did the District fail to implement the IEP of the Student for the 2023-24 school year?
3. Did the District fail to provide the Student with an appropriate program for the 2024-25 school year?
4. Did the District commit procedural violations amounting to a denial of FAPE for the 2024-25 school year?
5. Did the District fail to implement the IEP of the Student for the 2024-25 school year?
6. If the District has committed any violations, should an outplacement at Woodhouse Academy or Hope Academy be ordered?

## SUMMARY AND PROCEDURAL HISTORY:

Case 25-0686 was commenced by the Father[1] by request received by the District on June 12, 2025. A prehearing conference was held on July 29, 2025 and the Complaint was amended on that date. At the prehearing conference, hearing dates were set for September 24, 2025; October 17, 2025; October 21, 2025; October 23, 2025[2]; October 27, 2025 and November 4. 2025 and the decision date was determined to be October 10, 2025 by virtue of the amendment. The decision date was later extended to November 10, 2025.[3]

The hearing commenced on September 24, 2025 as scheduled and continued on October 17, 2025; October 21, 2025 and October 27, 2025. The Father refused to produce exhibits prior to the first hearing although he had need for them for cross-examination purposes although he did so prior to the second hearing. The District put on several witnesses during this period. On numerous occasions the District objected to the Father's questions and, if the objections were sustained, the Father repeatedly became belligerent, spent long periods of time arguing the Hearing Officer's rulings and kept asking the same questions to which objections had been sustained. At several points, the Hearing Officer had to remind the Father of the possibility that the case could be dismissed with prejudice or cross-examination terminated in order to obtain some semblance of proper behavior from the Father.

On the morning of October 27, 2025, the District presented its final witness. During the cross-examination, the Father started asking numerous repetitive questions to which the District objected, which objections were sustained. Instead of moving on as instructed, the Father repeatedly spent long periods of time arguing the rulings and asking the same questions to which objections had been sustained. After the Father was warned against this behavior, cross-examination of the witness was terminated.

Subsequently, the parties discussed scheduling of future hearings. The Father had previously sent an email stating that he was unavailable during the month of November after the scheduled hearing on November 4 due to a "preexisting mandatory commitment". The District observed that some more specific offer of proof should be furnished to justify the delay. The undersigned Hearing Officer noted that he had a high degree of availability to schedule hearings in November and questioned the Father for some more information on why the delay was necessary and was told repeatedly only that it was a "mandatory preexisting commitment".

After the lunch break, the hearing reconvened for the Father's testimony. Rather than testify, the Father spent several minutes rehashing his disagreements with past rulings. When finally induced to provide testimony, the Father proceeded to attempt to testify and produce exhibits concerning a failed resolution meeting, to which the District

---

[1] Although the Mother did not sign the Complaint and did not attend the prehearing conference, she was provided notice of all proceedings at her request. The Mother attended all hearings except the final one but only spoke occasionally and briefly.

[2] This date was not in the notice which was later issued at the request of the Mother due to a scheduling conflict.

[3] Although a request was made on the record at the beginning of what turned out to be the final day of the hearing, it has become unnecessary to actually order that extension.

successfully objected. Instead of moving on as instructed, the Father spent several minutes rearguing the matter, which metastasized into a more general airing of grievances. Despite being warned that the case would be dismissed if the Father did not move on to actually provide testimony, the Father continued his belligerent and argumentative diatribe. Finally, the Hearing Officer entertained a motion from the District to dismiss the case and granted the motion.

The case is dismissed with prejudice for repeated belligerent and disruptive conduct by the Father and the undue delay that has been caused and will be caused by that conduct.

**FINAL DECISION AND ORDER:**

The matter is dismissed with prejudice.

If the local or regional board of education or the unified school district responsible for providing special education for the student requiring special education does not take action on the findings or prescription of the hearing officer within fifteen days after receipt thereof, the State Board of Education shall take appropriate action to enforce the findings or prescription of the hearing officer.

Appeals from the hearing decision of the hearing officer may be made to state or federal court by either party in accordance with the provisions of Section 4-183, Connecticut General Statutes, and Title 20, United States Code 1415(i)(2)(A).

Hearing Officer Signature

Patrick L. Kennedy

Hearing Officer Name in Print

signpage.doc (ho disk)
4/1/04

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert [redacted] Pro Se
v.
Milford BOE

Case No. 25-0686

October 16, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert [redacted]
4 2nd Ave
Shelton, CT 06484
[redacted]verizon.net

**Motion for Written Findings of Fact and Conclusions of Law Regarding Denials of Previous Motions**

**Introduction:**

I respectfully submit this motion requesting written findings of fact and conclusions of law regarding the denials of two previously submitted motions in the above-referenced case.

**Background:**

- On October 15, 2025, I submitted a Motion for Reconsideration and Clarification.
- On October 16, 2025, I submitted a Motion for Stay of Proceedings.

Both motions were denied without explanation.

**Request:**

To ensure clarity and a complete understanding of the rulings, I respectfully request that the Hearing Officer issue written findings of fact and conclusions of law explaining the legal and factual basis for the denial of each motion.

**Purpose:**

This request is made to support proper preparation for the ongoing hearing and to maintain a clear procedural record.

Respectfully submitted,

Robert [redacted]

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING ON MOTION FOR STAY OF PROCEEDINGS**

VIA E-MAIL

Date: October 16, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Robert [redacted]
[redacted]
Shelton, CT 06484
[redacted]verizon.net

Ms Karen [redacted]
[redacted]
Milford, CT 06461
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

The Motion for Stay of Proceedings filed by the Father on October 16, 2025 is denied.

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING ON MOTION FOR CLARIFICATION AND RECONSIDERATION**

VIA E-MAIL

Date: October 16, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Robert [redacted]
[redacted]
Shelton, CT 06484
[redacted]verizon.net

Ms Karen [redacted]
[redacted]
Milford, CT 06461
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

The Motion for Clarification and Reconsideration filed by the Father on October 15, 2025 is denied.

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert [redacted] Pro Se
v.
Milford BOE

Case No. 25-0686

October 15, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert [redacted]
4 2nd Ave
Shelton, CT 06484
[redacted]verizon.net

**MOTION FOR CLARIFICATION AND RECONSIDERATION OF THE DENIAL OF THE MOTION FOR RECUSAL**

## I. INTRODUCTION

The undersigned, Robert [redacted] appearing pro se, respectfully moves for clarification and reconsideration of the Hearing Officer's ruling dated October 14, 2025, which denied the Father's renewed Motion for Recusal on the basis of res judicata. This motion is submitted to preserve the integrity of the administrative record and to ensure that the ruling reflects all relevant facts and procedural considerations.

The denial of the recusal motion should be reconsidered because a new, independent basis for recusal has arisen based on the October 3 ruling's "bad-faith" finding and newly available transcript excerpts revealing prejudgment of the Father's motives.

This motion is submitted based on the Hearing Officer's authority to reconsider prior procedural rulings in light of new and material evidence, and in the interest of fairness.

## II. MOTION FOR CLARIFICATION

The Father respectfully requests the Hearing Officer to clarify the legal basis for applying res judicata to a second motion for recusal where new and materially different evidence has arisen — specifically, a post-ruling adverse finding issued in response to the original motion, and transcript excerpts that were not available at the time.

The doctrine of res judicata does not apply when a motion is supported by new facts that were not previously available. The October 3 ruling introduces a new adverse finding not present in prior decisions, and the transcript excerpts provide additional context that was not previously accessible. Together, these constitute a changed circumstance that justifies reconsideration.

The Father also respectfully requests confirmation that the ruling was based solely on the merits.

## III. MOTION FOR RECONSIDERATION BASED ON NEWLY AVAILABLE EVIDENCE

The Father is not reasserting the same claim, but presenting a new and independent basis for reconsideration grounded in newly available evidence.

### A. Newly Created Evidence — October 3 Ruling

The Hearing Officer's October 3, 2025 written ruling includes the finding of "deliberate, bad-faith refusal" to submit exhibits. This finding introduces a new adverse characterization of the Father's motives — "deliberate, bad-faith refusal" — which had not appeared in any prior ruling. It reflects a judgment about intent, not just conduct, and when viewed in conjunction with the Hearing Officer's remarks about the Father's motives and credibility, may contribute to a

reasonable perception of partiality — the applicable standard under administrative law, which requires adjudicators to avoid not only actual bias but also the appearance of impropriety.

The “bad-faith” finding directly impacts the Father’s credibility in the proceeding. When paired with the transcript remarks, it creates a cumulative impression that the Hearing Officer may have prejudged the Father’s motives, which undermines the fairness of subsequent rulings.

The Father respectfully submits that the “bad-faith” finding mischaracterizes the circumstances surrounding the exhibit submission. The Father’s conduct was based on a good-faith reliance on the Hearing Officer’s prior instruction concerning the procedural timing of exhibit submission, and the adverse language in the ruling reflects a misinterpretation that contributes to the appearance of partiality.

See Exhibit A, the Hearing Officer’s October 3, 2025 ruling, which includes the finding of “deliberate, bad-faith refusal.”

See Exhibit F, the September 11, 2025 email from the Hearing Officer stating that exhibits must be submitted five business days before the hearing in which testimony is provided.

## B. Newly Available Evidence — Transcript Excerpts

Verbatim transcript excerpts (previously submitted with the second motion for recusal and now reasserted) include statements that may reflect a prejudgment regarding the Father’s motives, such as:

“I mean, quite frankly the problem is with pro se's I mean a lot of the time, it’s more about bad blood than, you know, what’s really going to happen with the kid.” (Tr. 19:7–10)

Additional remarks include:

“You’re playing with fire.” (Tr. 268:2)
“That’s just absurd.” (Tr. 20:3–4)
“You are out of luck.” (Tr. 269:4)
“When people are represented by attorneys, these things tend to go more smoothly. Even if they don't reach a settlement, at least they cooperate with each other on procedure. These types of skirmishes are just unheard of in cases where there's attorneys on both sides. I mean, no parent attorney would ever try to subpoena people from the state. That's just absurd.” (Tr. 19:20–25; 20:1–4)

These statements, when considered alongside the October 3 ruling, reflect a tone and posture that may reasonably be perceived as lacking judicial detachment and contributing to the appearance of partiality.

See Exhibit B, excerpts from the hearing transcript, which include these remarks.

The Father formally requested the transcript on October 1, 2025, stating in writing: “As you are aware, I have submitted a motion for recusal. After reviewing our notes, my son’s mother and I have identified additional concerns that we intend to raise in a supplemental statement. To do so accurately and responsibly, we require access to the full transcript of the proceedings.” The transcript was received on Friday, October 10, after the October 3 ruling. Upon receipt, the Father promptly reviewed the transcript and is submitting this Motion for Clarification and Reconsideration request on October 15.

See Exhibit D, transcript request confirmation dated October 1, and Exhibit E, transcript delivery confirmation dated October 10, which demonstrate the timeline of availability.

The Father emphasizes that Exhibit A is newly created evidence — it did not exist at the time of the prior rulings — and that Exhibit B is newly available evidence — it was not accessible to the Father until after the prior rulings. This timeline demonstrates reasonable diligence in identifying and presenting newly available evidence.

The Father respectfully submits that this evidence is not merely a reframing of prior arguments, but introduces new factual content and tone that were unavailable at the time of the original motion and materially alter the context in which impartiality must be assessed.

The Father further submits that the previous denial of the recusal motion was not a final decision. The Father respectfully requests that the Hearing Officer reconsider the ruling in light of new evidence and in the interest of fairness.

## IV. TIMELINE OF EVENTS

September 29: Original recusal motion filed
October 1: Transcript requested
October 3: Ruling issued with “deliberate, bad-faith refusal” language (newly created evidence)
October 10: Transcript received (newly available evidence)
October 14: Email from opposing counsel received
October 14: decision rendered on second motion for recusal

## V. PROCEDURAL OBJECTION TO OPPOSING COUNSEL’S EMAIL

The Father respectfully objects to opposing counsel’s October 14 email referencing financial burden, and requests that this objection be placed on the record to confirm that the ruling was based solely on the merits.

See Exhibit C, the October 14, 2025 email from opposing counsel referencing financial burden as a factor to consider prior to ruling.

While the Father strongly disagrees with the characterization in the October 3 ruling, this motion does not presume intent or personal bias. It seeks clarification and reconsideration based on the cumulative appearance of partiality created by the language used, the transcript excerpts, and the procedural record.

## VI. REQUESTED RELIEF

The Father respectfully requests that the Hearing Officer:

- Grant the Motion for Clarification
- Grant the Motion for Reconsideration based on newly created and newly available evidence
- Clarify the application of res judicata
- Acknowledge the objection to opposing counsel's email
- Reconsider the denial of the Father's renewed Motion for Recusal, which was based on newly created and newly available evidence not presented in the original motion or rebuttal

**Respectfully submitted,**
Robert [redacted]
Pro Se Litigant

Exhibit A

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING RE MOTION FOR RECUSAL**

VIA E-MAIL

Date: October 3, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Ro [redacted]
Shelton, CT 06484
[redacted]verizon.net

Ms Karen [redacted]
Milford, CT 06461
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

This ruling is directed to the Motion for Recusal filed by the Father in the above-captioned case on September 29, 2025.

The motion asserts three grounds for recusal. The first is that, when the Father became unruly and insisted on talking over the Hearing Officer, he was reminded that his case could be dismissed with prejudice as a sanction.[1] Thereafter, the Father's conduct improved somewhat and the hearing was able to continue without any dismissal needing to be issued. The administrative hearing process could not function if hearing officers did not use the tools at their disposal to curb the disruptive behavior of pro se litigants (or attorneys).

The other two grounds are mere disagreements with procedural rulings. The undersigned Hearing Officer ruled that the Father was not required to file exhibits until five business days prior to the hearing in which he intended to use them, including using them for purposes of cross-examination. The Father apparently disagrees with the second part of the preceding sentence.[2] When the Father was limited in his ability to cross-examine the District's witness because he not filed the exhibits that he needed to, he indicated that he would recall the witness for his own case. The undersigned Hearing Officer indicated that the District would not be required to produce a witness, with its attendant disruption of the school system, based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them.

---

[1] It should be noted that administrative hearing officers, unlike judges, do not have contempt powers.

[2] The District disagrees with the first part.

Exhibit A

Disagreement with procedural rulings or other matters involving the conduct of hearings is not grounds for recusal, it is grounds for appeal. If the ultimate ruling is not in the Parents' favor, they can file an administrative appeal with the appropriate court.[3] The Father has not alleged that the undersigned Hearing Officer has any personal of financial interest in the outcome of this case or has any friends or relatives involved in it. If there is no true conflict of interest, a demand for recusal is not proper based on mere disagreement with rulings.

Finally, it appears that the Father filed a recusal motion against a prior hearing officer in this case. Moving to disqualify one hearing officer after another until a litigant cherry-picks the one that he wants undermines the integrity of the process. Recusal also has a disruptive effect, particularly in a case, such as this one, where the evidentiary hearing has begun. As a new hearing officer could not make credibility determinations on a cold transcript, the hearing would need to start from scratch. Allowing recusal on specious grounds under such circumstances would allow a party to reboot a case that was not going well, further undermining the integrity of the process.

Therefore, the Motion for Recusal is denied.

[3] As can the District if the ruling is not in the District's favor.

mediator about trying to resolve this?

ROBERT [redacted] Well, the District did not even want to. I reached out as far as IDA as far as having a hearing as far as having the resolution meeting, and that's something that I will be discussing when our testimony comes up.

But the District had not even -- they're supposed to within, I believe --

THE HEARING OFFICER: All right. Well, we're not --

ROBERT [redacted] (Unintelligible) --

THE HEARING OFFICER: I'm not going to get into that. I mean, it's just a question of, you know. I mean, there's a lot of skirmishing over --

ROBERT [redacted] They were not interested in (unintelligible) --

THE HEARING OFFICER: There's a lot of skirmishing over procedure and, you know. Probably, you could -- probably if people actually sat down and talked with a third party then they might actually come up with a solution that worked and was in the best interests of the child -- but all right.

I mean --

ROBERT [redacted] We were open to that but the District wasn't. We wanted the --

THE HEARING OFFICER: All right. All right.

ROBERT [redacted] -- a prehearing. You know, we wanted a resolution meeting and they --

THE HEARING OFFICER: Yeah, I don't want to get -- whatever happened with the resolution meeting. Okay? It didn't happen. I mean, that we're way past --

ROBERT [redacted] Well, that is a violation and that's something that we're going to brining up during the hearing.

I submitted e-mail (unintelligible) --

THE HEARING OFFICER: I was just throwing it out that if no one has ever mediated the case, it wouldn't necessarily be a terrible idea. But --

ROBERT [redacted] There should have been a resolution meeting, but there wasn't and that's (unintelligible) --

THE HEARING OFFICER: All right. Yeah --

ROBERT [redacted] -- my testimony.

THE HEARING OFFICER: Okay. I mean --

ROBERT [redacted] That's the law. The law is the law.

ATTORNEY ROSEN: Hearing Officer Kennedy, if you'd like the Board's perspective on this issue, I'm happy to share. I don't really want to opine on, you know, confidential attempts to try and mediate or resolve the matter.

THE HEARING OFFICER: Sure. Yeah, yeah.
ATTORNEY ROSEN: I mean, we are here.
THE HEARING OFFICER: I'm just suggesting it might not be a terrible idea now to, you know.
ATTORNEY ROSEN: We hear you, and if we thought it was --
THE HEARING OFFICER: I mean, the problem -- quite frankly, the problem is when with pro se's, I mean, a lot of the time it's more about bad blood than what's really going to happen with the kid.
That's why, you know (unintelligible) --
ROBERT [redacted] Respectfully, we disagree. It's not about bad blood.
THE HEARING OFFICER: Sir, I'm just saying --
ROBERT [redacted] It's about my son's rights being violated --
THE HEARING OFFICER: Sir, will you please --
ROBERT [redacted] And it's also --
THE HEARING OFFICER: Will you please listen to me? I'm saying that when, basically when people are represented by attorneys they tend to -- these things tend to go more smoothly. And often, even if they don't reach a settlement, at least they cooperate with each other on procedure.
And I mean, these types of skirmishes are

just unheard of in cases where there's attorneys on both sides. I mean, no parent attorney would ever try to subpoena people from the State. I mean, that's just absurd.

ROBERT [redacted] Well, I believe it's important. If it's --

THE HEARING OFFICER: All right.

ROBERT [redacted] -- we don't need a subpoena are I can get the e-mails into evidence and all their communications, then I won't need to subpoena them or have them testify.

And I'd also like to comment on Attorney Rosen's comment about the school district and his opinion, provided a free and appropriate public education. My view on it, they have not. This is what this whole hearing is about. It's not about bad blood. It's about my son's rights being violated --

THE HEARING OFFICER: All right.

ROBERT [redacted] -- and my rights being violated across the board. And I do have proof of all those violations, and I believe that this hearing is necessary. I don't even believe a mediation at this point would solve anything. It would be fruitless at this point.

evidence and I can still explain it then? I can still --
THE HEARING OFFICER: Yeah, sure. You can put them into evidence on your own case, but you can't cross-examine from documents that aren't in evidence. And --
ROBERT [redacted] Right. So when my documents come into evidence --
THE HEARING OFFICER: And you didn't put them into evidence for today.
ROBERT [redacted] Because you advised us that it would be five days before we provide our testimony.
THE HEARING OFFICER: What I said is for you to use them in a hearing. You can't --
ROBERT [redacted] No, we did -- we have an e-mail --
THE HEARING OFFICER: Sir, you can't use --
ROBERT [redacted] Hearing officer Kennedy --
THE HEARING OFFICER: Sir.
ROBERT [redacted] -- we do have an e-mail.
THE HEARING OFFICER: Sir?
ROBERT [redacted] I'm being cut off.
THE HEARING OFFICER: Do you want me to just dismiss the case? You cannot use --
ROBERT [redacted] Sir, are you threatening me? Are you threatening us to dismiss the case --

Exhibit B

THE HEARING OFFICER: You cannot use --

ROBERT [redacted] -- because I'm trying to get my evidence into the record?

THE HEARING OFFICER: -- (unintelligible) in any way.

ROBERT [redacted] I don't believe you should be threatening to dismiss the case, sir.

THE HEARING OFFICER: Yes, if you're going to be unruly, then --

ROBERT [redacted] I'm not being unruly, sir. I'm sorry you feel that way.

THE HEARING OFFICER: I'll dismiss it with prejudice now. You cannot use the exhibits in any way including cross-examination, unless you've put them in five business days before.

ROBERT [redacted] That's what we plan on doing then.

THE HEARING OFFICER: (Unintelligible) you can -- you can ask her questions, but you just have no documents, except for the ones that the District has put in to cross examine her from. Simple as that.

ROBERT [redacted] So, then when our testimony happens in the future --

THE HEARING OFFICER: Those are the tradeoffs.

ROBERT [redacted] Okay. So, when we present our case, I can put them into evidence.

THE HEARING OFFICER: You know, I mean, you're playing -- you're playing with fire to say, no, we're going to wait until --

ROBERT [redacted] I don't believe I'm playing with fire.

THE HEARING OFFICER: -- what we think the last minute is, but --

ROBERT [redacted] They got five business days, sir. We're just looking for the same. We're looking for the same respect, five business days.

THE HEARING OFFICER: Like any lawyer, you can make your tactical choices and if they go sideways, they go sideways.

ROBERT [redacted] I don't see anything is going sideways.

THE HEARING OFFICER: We've talked about this long enough. You know --

ROBERT [redacted] Well, I don't feel that's being fair to us as pro se parents because I have to say for the record, because, you know, if you're -- if the District got the five business days, we would expect to get the five business days, too.

And now you're saying, well, you know, if they cut their testimony short, then, yeah. You're basically saying, well, then you're out of

luck. No, that's not (unintelligible) --
THE HEARING OFFICER: All right.
ROBERT [redacted] That's going to prejudice us.
THE HEARING OFFICER: You are out of luck. So, anyway --
ROBERT [redacted] We shouldn't be out of luck. That's not even a fair statement to make, sir.
THE HEARING OFFICER: No, it's your choice.
So, anyway --
ROBERT [redacted] No, it's not my choice (unintelligible) --
THE HEARING OFFICER: -- we're done. We're done with today's hearing. We'll reconvene at the next one.
ATTORNEY ROSEN: Thank you.
THE HEARING OFFICER: So, have a good day, everybody.
KAREN [redacted] Thank you.
THE REPORTER: Off the record.

(End: 4:05 p.m.)

Exhibit C

# Re: Submission of Second Motion for Recusal – Case No. BOE 25-0686

From: Robert ([redacted]verizon.net)

To: hrosen@berchemmoses.com; plkennedyesq@aol.com

Cc: dueprocess.sde@ct.gov

Date: Tuesday, October 14, 2025 at 10:40 AM EDT

Dear Hearing Officer Kennedy,

I'm replying here to ensure both of my responses regarding Attorney Rosen's October 14 email are properly included in the record and considered together.

This email is in response to Attorney Rosen's October 14, 2025 email, which commented on my Second Motion for Recusal.

I must object to Attorney Rosen's inclusion of financial considerations in this context—specifically his reference to *"the Board's expense"* in connection with a potential objection. The introduction of financial matters raises a serious concern about the potential for undue influence and constitutes an improper basis for ruling on a motion for recusal.

Recusal decisions must be determined solely on the legal and factual merits of the motion, not on the cost implications for any party. The integrity and impartiality required in an IDEA due process hearing demand that such extraneous considerations have no bearing on the outcome.

Given the importance of a determination free from the appearance of bias or improper influence, I respectfully request that any decision regarding my second motion for recusal be reviewed solely on its legal and factual merits. Any and all references to financial burden should be disregarded in the interest of fairness and procedural integrity.

Thank you for your attention to this matter.

Respectfully submitted,

Robert [redacted]

Exhibit C

On Tuesday, October 14, 2025 at 09:02:48 AM EDT, Robert <[redacted]verizon.net> wrote:

Good morning,

Respectfully, Mr.Rosen's characterization of my filing is inaccurate. The motion submitted on October 13, 2025, is **not a third attempt** at the same request but a **distinct motion for recusal** based on **new, on-the-record evidence** that was not available or part of the record when the prior motion or motion for reconsideration were decided.

Under both IDEA due process procedures and general administrative principles, a party is entitled to seek recusal when new evidence emerges that reasonably calls impartiality into question. This motion therefore presents **independent grounds for consideration**, not a repetition of prior arguments.

I respectfully request that this motion be considered on its merits and made part of the official record.

Sincerely,

Robert [redacted]

On Tue, Oct 14, 2025 at 8:53 AM, Herbert Z. Rosen <hrosen@berchemmoses.com> wrote:

> Good Morning,
>
> The Board is in receipt of Mr. [redacted] Motion for Recusal. My understanding is after the original motion to recuse (which was denied) and the motion to reconsider (which was denied), this is now Mr. [redacted] third attempt to recuse this Hearing Officer.
>
> Hearing Officer Kennedy, before I file an objection at the Board's expense, could you please advise whether you intend to rule on this third attempt to get a ruling of recusal? I have never seen a situation where a party is permitted to have consideration of a motion that has already previously been denied and denied reconsideration.

Exhibit C

Respectfully,
Herbie Rosen

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460

(203) 783-1200 ● www.berchemmoses.com

hrosen@berchemmoses.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

---

**From:** Robert <[redacted]verizon.net>
**Sent:** Monday, October 13, 2025 7:00 PM
**To:** plkennedyesq@aol.com <plkennedyesq@aol.com>
**Cc:** DueProcess SDE <dueprocess.sde@ct.gov>; Herbert Z. Rosen <hrosen@berchemmoses.com>
**Subject:** Submission of Second Motion for Recusal – Case No. BOE 25-0686

Dear Hearing Officer Kennedy, Counsel, and Due Process Unit,

Exhibit C

Please find attached my Second Motion for Recusal in Case No. BOE 25-0686, submitted pursuant to Conn. Agencies Regs. § 10-76h-8(f)(1). The motion, along with all supporting exhibits, is provided in PDF format for your review.

Thank you for your attention to this matter.

Respectfully submitted,

Robert [redacted]

-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests that you wire or otherwise transfer funds to any party, you must confirm the request and any corresponding instructions via telephone before you initiate any wire or other transfer. PLEASE CONFIRM BY CALLING THE ORIGINATOR OF THE EMAIL, USING PREVIOUSLY KNOWN CONTACT INFORMATION, PRIOR TO WIRING OR OTHERWISE TRANSFERRING FUNDS.

# Request for Hearing Transcript – Case No. 25-0686

From: Robert ([redacted]verizon.net)
To: plkennedyesq@aol.com
Cc: [redacted]yahoo.com; hrosen@berchemmoses.com; dueprocess.sde@ct.gov
Date: Wednesday, October 1, 2025 at 09:49 AM EDT

Dear Hearing Officer Kennedy, Counsel, and Due Process Unit,

I am writing to formally request a copy of the transcript from the due process hearing held on September 24, 2025, for Case No. 25-0686.

As you are aware, I have submitted a Motion for Recusal. After reviewing our notes, my son's mother and I have identified additional concerns that we intend to raise in a supplemental statement. To do so accurately and responsibly, we require access to the full transcript of the proceedings.

Please advise on the process for obtaining the transcript and how it will be provided. We would appreciate your prompt guidance so we may proceed accordingly.

Thank you for your attention to this matter.

Respectfully submitted,

Robert [redacted]

Exhibit E

# Transcript of : HEARING [redacted] vs. Milford Board of Education

From: Court Reporters (scheduling@aplusreportingservice.com)

To: plkennedyesq@aol.com; [redacted]verizon.net

Date: Friday, October 10, 2025 at 08:17 AM EDT

Your repository files for JobNo. 43054 on 9/24/2025 are available for download on RB Connect:

Here's a list of the available files:

| File Type | File Name | Size (KB) | Description |
|---|---|---|---|
| PDF Transcript | 24Sep2025 [redacted] v Milford BOE 1005-1605 272pgs-Copy.pdf | 620 | |

Download Link: https://aplusreporting.reporterbase.com/Contact?ep=cGdtaWQ9Q0NfUlAwMCZmaWxlTm89MjI0NzU3

24Sep2025 [redacted] v Milford BOE 1005-1605 272pgs-Copy.pdf
619.9 kB

# Re: [redacted] vs Milford BOE 25-0686

From: plkennedyesq@aol.com (plkennedyesq@aol.com)

To: [redacted]yahoo.com; hrosen@berchemmoses.com; [redacted]verizon.net

Date: Thursday, September 11, 2025 at 05:06 PM EDT

If you are using the US Postal Service you should send my copies to PO Box 8078, Manchester, CT 06040-0078. If you are using a private courier that cannot deliver to a postal mail box you may send them to 132 Strawberry Lane, Manchester, CT. You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony. (This usually means a week, but keep in mind that Columbus Day would push back the deadline for the following hearing one more day.)

Patrick L. Kennedy
Hearing Officer

> On Thursday, September 11, 2025 at 04:49:11 PM EDT, Robert <[redacted]verizon.net> wrote:
>
> > I understand your preference for hard copies during the hearing, and I will submit a hard copy packet of my exhibits directly to you. Could you please confirm the appropriate mailing address for delivery, as well as the deadlines for both the hard copy and electronic submissions?
> >
> > I'd also like to confirm whether it would be acceptable to provide the opposing party with the exhibits in electronic format only, rather than hard copy. I want to ensure I'm complying with all procedural requirements while also streamlining the process for all parties.
> >
> > Please let me know if this arrangement is acceptable or if hard copies must be provided to both parties.

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING RE SECOND MOTION FOR RECUSAL**

VIA E-MAIL

Date: October 14, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Robert [redacted]
[redacted]
Shelton, CT 06484
[redacted]verizon.net

Ms Karen [redacted]
[redacted]
Milford, CT 06461
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

The Second Motion for Recusal filed by the Father dated October 13, 2025 is barred by res judicata and is denied.

**Second Motion for Recusal of Hearing Officer Kennedy Based on New Evidence of Bias**

**Case No. BOE 25-0686**

**Submitted by:**
Robert [redacted]
Pro Se Litigant

October 13, 2025

The Father, Robert [redacted] respectfully submits this Second Motion for Recusal of Hearing Officer Kennedy based on new, on-the-record statements made during the September 24, 2025 hearing, and the October 3, 2025 written ruling denying the initial recusal motion. These statements raise serious concerns about impartiality, judicial temperament, and bias against pro se litigants.

This is the Father's second request for recusal, following the Hearing Officer's October 3, 2025 ruling denying the initial Motion for Recusal, and the subsequent denial of the Father's Motion for Reconsideration of that ruling.

On October 3, 2025, the Hearing Officer denied the Father's initial Motion for Recusal. That ruling was issued prematurely — at 10:02 AM, before the Father's rebuttal was filed at 10:17 AM — despite the Hearing Officer's prior notice that a rebuttal was forthcoming. The Father subsequently filed a Motion for Reconsideration on that procedural ground (see Exhibit E), which the Hearing Officer subsequently denied. The early issuance of the ruling, before considering the full record, and the subsequent denial of reconsideration reflect the same pattern of procedural imbalance and disregard for due process that underlies this Second Motion for Recusal.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

This motion arises from new, on-the-record statements made during the September 24, 2025 hearing and the October 3, 2025 written ruling denying the Father's initial recusal motion. These statements were not previously presented and provide new, independent grounds for disqualification.

Under 34 C.F.R. § 300.511(c)(1) and the Connecticut Due Process framework, a Hearing Officer must remain impartial and avoid both actual bias and the appearance of bias. The Hearing Officer's statements and rulings described below raise serious concerns of prejudgment, hostility toward a self-represented parent, and retaliatory reasoning that may compromise the fairness and integrity of this proceeding.

## II. GROUNDS FOR RECUSAL

**A. Prejudgment of Parental Intent Undermines Fairness**

During the hearing, when the Father attempted to address concerns regarding the educational interests of his child, the Hearing Officer made the following unsolicited statement:

"I mean, quite frankly the problem is with pro se's I mean a lot of the time, it's more about bad blood than, you know, what's really going to happen with the kid." (Tr. 19:7-10)

This remark reflects a clear prejudgment of the Father's motives. It implies that his efforts to secure his child's rights are rooted in animosity rather than advocacy, dismissing his credibility before any evidence has been evaluated. This prejudgment undermines the Father's ability to receive a fair hearing.

**B. Bias against Self-Represented Parent and Disparagement of Procedural Rights**

When discussing procedural issues and the Father's attempt to subpoena state employees—a right allowed under IDEA—the Hearing Officer stated:

"When people are represented by attorneys, these things tend to go more smoothly… even if they don't reach a settlement, at least they cooperate with each other on procedure… these types of skirmishes are just unheard of in cases where there's attorneys on both sides. I mean, no parent attorney would ever try to subpoena people from the state." (Tr. 19:20–25; 20:1–4)

This statement reveals an institutional bias against pro se parents. It implies that only attorney-led cases are orderly and legitimate, while pro se efforts are disruptive. It also condemns a lawful procedural step — issuing subpoenas — solely because it was taken by a self-represented litigant.

**C. Use of Inflammatory and Dismissive Language**

In response to the Father's valid procedural action, the Hearing Officer remarked:
"I mean, that's just absurd." (Tr. 20:3–4.)

This comment—referring to the Father's effort to subpoena state employees—was unwarranted and dismissive.

The Hearing Officer's characterization of the Father's procedural step as "absurd" was inconsistent with the duty of impartiality and suggests that the Hearing Officer allowed personal frustration to influence the proceedings.

Such language undermines the appearance of neutrality and reinforces the perception of bias against the self-represented parent.

**D. Trivializing Procedural Safeguards under IDEA**

When the Father raised a legitimate concern that the District had failed to convene the required Resolution Meeting within the 15-day window mandated by federal law, the exchange proceeded as follows:

**ROBERT** [redacted] "Well, the District did not even want to. I reached out as far as IDA as far as having a hearing as far as having the resolution meeting, and that's something that I will

be discussing when our testimony comes up. But the District had not even—they're supposed to within, I believe—" (Tr. 17:2-8)

**THE HEARING OFFICER:** "I'm not going to get into that. I mean, it's just a question of, you know. I mean, there's a lot of skirmishing over procedure and, you know. Probably, you could—probably if people actually sat down and talked with a third party then they might actually come up with a solution that worked and was in the best interests of the child—but all right." *(Tr. 17:9–21)*

Referring to a statutory obligation under the IDEA as a mere "skirmish" minimizes the importance of procedural safeguards designed to protect parents and students. The Hearing Officer declined to engage with the Father's concerns about the missing Resolution Meeting and did not address the alleged statutory violation despite the Father's repeated references to it. This lack of consideration for a clear procedural requirement raises concerns about the Hearing Officer's impartiality in evaluating the Father's claims.

**Additional Grounds for Recusal: Repeated Refusal to Engage with Valid Procedural Concerns**

Throughout the hearing, the Father repeatedly attempted to raise the District's failure to convene the required Resolution Meeting within the IDEA-mandated timeframe. Each time he sought to address this critical procedural safeguard, the Hearing Officer interrupted or cut him off, effectively preventing the issue from being heard. For example, when the Father began explaining the District's failure, the Hearing Officer interjected with, "All right. Well, we're not—" and shortly thereafter stated, "I'm not going to get into that." Later, when the Father again attempted to raise the issue, the Hearing Officer dismissed it as "a lot of skirmishing over procedure" and declined to engage further, saying, "Yeah, I don't want to get—whatever happened with the resolution meeting. Okay? It didn't happen. I mean, that we're way past—" (Tr. 17:2–21; 18:3–6). This repeated refusal to address a valid procedural concern demonstrates a prejudgment of the issue and an unwillingness to provide a fair and impartial hearing, warranting recusal.

**E. Retaliatory Reasoning and Retroactive Rule Interpretation**

After the Father's first motion for recusal, the Hearing Officer, in a written ruling, accused the Father of:

"a deliberate, bad-faith refusal" to submit exhibits.

This accusation appeared for the first time in the written ruling, was unsupported by the hearing record, and contradicted the Hearing Officer's own prior instruction in a September 11, 2025 email:

"You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony."

This instruction made no reference to cross-examination. The Father acted in accordance with that guidance. Only after the recusal motion was denied did the Hearing Officer retroactively reinterpret this instruction to apply to cross-examination and used it to justify not allowing a witness.

Such reasoning appears retaliatory and lacks any basis in fact. It constitutes a misuse of discretion that further erodes trust in the fairness of these proceedings.

**F. Transcript Evidence Now Confirms Threats to Dismiss and Accusations of Misconduct**

In the Father's initial recusal motion, he described an exchange where the Hearing Officer appeared to threaten dismissal of the case in response to the Father's attempts to clarify procedural expectations. At that time, the official hearing transcript was not yet available. The subsequently obtained transcript now confirms this exchange verbatim, providing clear and compelling evidence supporting the Father's prior account:

**THE HEARING OFFICER:** "And you didn't put them into evidence for today."
**ROBERT** [redacted] "Because you advised us that it would be five days before we provide our testimony."
**THE HEARING OFFICER:** "What I said is for you to use them in a hearing. You can't --"
**ROBERT** [redacted] "No, we did -- we have an e-mail --"
**THE HEARING OFFICER:** "Sir, you can't use --"
**ROBERT** [redacted] "Hearing officer Kennedy --"
**THE HEARING OFFICER:** "Sir."
**ROBERT** [redacted] "We do have an e-mail."
**THE HEARING OFFICER:** "Sir?"
**ROBERT** [redacted] "I'm being cut off."
**THE HEARING OFFICER:** "Do you want me to just dismiss the case? You cannot use --"
**ROBERT** [redacted] "Sir, are you threatening me? Are you threatening us to dismiss the case --"
**THE HEARING OFFICER:** "You cannot use --"
**ROBERT** [redacted] "-- because I'm trying to get my evidence into the record?"
**THE HEARING OFFICER:** (unintelligible)
**ROBERT** [redacted] "I don't believe you should be threatening to dismiss the case, sir."
**THE HEARING OFFICER:** "Yes, if you're going to be unruly, then --"
**ROBERT** [redacted] "I'm not being unruly, sir. I'm sorry you feel that way."
**THE HEARING OFFICER:** "I'll dismiss it with prejudice now."
(*Tr.*246:9–25; 247:1-12)

This exchange demonstrates the Hearing Officer's resort to threatening language in place of neutral, impartial adjudication The Father's attempt to clarify procedural requirements does not constitute "unruly" behavior. Threatening dismissal of the case "with prejudice"—the harshest procedural sanction—solely in response to this attempt reflects punitive intent and chills the Father's right to advocate without fear of retaliation. This new, on-the-record evidence further confirms concerns regarding the Hearing Officer's impartiality and undermines the fairness and integrity required under the IDEA.

**G. Mischaracterization of Prior Procedural History**

In denying the first recusal motion, the Hearing Officer wrote:

"It appears that the Father filed a recusal motion against a prior hearing officer in this case. Moving to disqualify one hearing officer after another until a litigant cherry-picks the one that he wants undermines the integrity of the process."

This assertion is factually false. The Father did not file multiple recusal motions. He merely accepted a voluntary recusal previously offered by another hearing officer. The above language misrepresents the Father's actions and implies bad faith where none exists. It creates an unfair narrative of manipulation unsupported by the record.

### H. Editorializing and Implied Threats

In a footnote to the written ruling, the Hearing Officer remarked that:
"administrative hearing officers lack contempt powers."

This unnecessary editorial comment implies that the Father's conduct was contemptuous or disruptive. Such language serves no legitimate legal purpose and conveys disapproval in a manner inconsistent with the impartiality and restraint expected from a hearing officer. The Father did not engage in any conduct warranting such implications. This statement could be perceived as an implied threat, undermining the neutrality of the proceeding.

### I. Use of Intimidating and Demeaning Phrases

During the September 24 hearing, the Hearing Officer engaged in a tense exchange with the Father concerning the timing and fairness of submitting exhibits and witness lists. The Father emphasized that both parties should abide by the same timeline for submitting exhibits, based on the Hearing Officer's stated requirement of five business days. However, the Hearing Officer suggested that the District was not bound by its own timeline and warned the Father:

"You're playing with fire." (Tr. 268:2)

Later, when the Father expressed concern that delays in the District's case could prejudice their ability to present evidence, the Hearing Officer bluntly responded:

"You are out of luck." (Tr. 269:4)

These statements are unduly harsh and convey hostility rather than impartiality. Rather than providing neutral guidance, the Hearing Officer's remarks reflect a punitive, dismissive, and intimidating attitude toward the Father's legitimate procedural concerns. Such language is inconsistent with the judicial temperament expected of an IDEA Hearing Officer, whose role is to ensure fairness and maintain an impartial hearing environment.

Under the applicable recusal standard, a hearing officer must be disqualified if their conduct creates a reasonable question as to their impartiality. Here, the Hearing Officer's intimidating and dismissive remarks create such a reasonable doubt, warranting recusal.

## III. APPEARANCE OF IMPROPRIETY

The cumulative effect of the Hearing Officer's dismissive comments, factual misrepresentations, accusatory tone, and retaliatory rulings creates not only the potential for actual bias but a clear appearance of impropriety.

Under federal and Connecticut standards, even the appearance of partiality is sufficient to require recusal. A reasonable observer reviewing this record would have serious doubts about the fairness and neutrality of the current adjudicator.

**Importance of Impartiality in IDEA Hearings**

Due process under the IDEA is meant to be accessible and fair to all parents, including those who are not represented by legal counsel. Hearing officers have a heightened duty to remain neutral and to avoid any comments or actions that could deter participation or suggest hostility. Impartiality is not only a legal requirement but essential to ensure that families can advocate for their children's rights without fear of being dismissed, discredited, or punished for procedural errors.

## IV. LEGAL STANDARDS

Under 34 C.F.R. § 300.511(c)(1), a hearing officer “must not have a personal or professional interest that conflicts with the person’s objectivity in the hearing.”

Connecticut due process requirements similarly mandate impartiality, fairness, and judicial decorum.

*The test for disqualification is whether a reasonable person, knowing all the facts, would question the Hearing Officer’s impartiality.*

The totality of the Hearing Officer’s conduct described herein raises a reasonable question as to impartiality and therefore warrants recusal under these standards to ensure the Father’s right to a fair and impartial hearing under IDEA.

## V. REQUEST FOR RELIEF

The Father respectfully requests that:

1. Hearing Officer Kennedy be recused from all further proceedings in this matter;
2. A new, impartial Hearing Officer be appointed;
3. The case be reset before the new Hearing Officer to ensure a fair and unbiased process; and
4. This Motion and its supporting materials—including all attached exhibits—be made part of the official record, as follows:

   **Exhibit List:**

   - **Exhibit A:** Transcript excerpts from September 24, 2025 Hearing
   - **Exhibit B:** Supplemental Statement of Procedural Concerns
   - **Exhibit C:** September 11, 2025 Email from Hearing Officer Kennedy
   - **Exhibit D:** Written Ruling Denying Initial Recusal Motion

- **Exhibit E:** Motion for Reconsideration and denial order

## VI. CONCLUSION

This Second Motion for Recusal is based on new, on-the-record evidence of bias, prejudgment, and procedural retaliation. The Hearing Officer's repeated comments and rulings — including inflammatory language, unjustified threats, and factual misrepresentations — raise a serious appearance of partiality that undermines the due process protections guaranteed by the IDEA.

Recusal is necessary to preserve the fairness of these proceedings and to uphold public confidence in the integrity of the special education hearing process

**Certificate of Good Faith**

I, Robert [redacted] hereby certify that this motion is made in good faith.
Respectfully submitted,
**Robert [redacted]**
Pro Se Litigant
October 13, 2025

mediator about trying to resolve this?

ROBERT [redacted] Well, the District did not even want to. I reached out as far as IDA as far as having a hearing as far as having the resolution meeting, and that's something that I will be discussing when our testimony comes up.

But the District had not even -- they're supposed to within, I believe --

THE HEARING OFFICER: All right. Well, we're not --

ROBERT [redacted] (Unintelligible) --

THE HEARING OFFICER: I'm not going to get into that. I mean, it's just a question of, you know. I mean, there's a lot of skirmishing over --

ROBERT [redacted] They were not interested in (unintelligible) --

THE HEARING OFFICER: There's a lot of skirmishing over procedure and, you know. Probably, you could -- probably if people actually sat down and talked with a third party then they might actually come up with a solution that worked and was in the best interests of the child -- but all right.

I mean --

ROBERT [redacted] We were open to that but the District wasn't. We wanted the --

THE HEARING OFFICER: All right. All right.

ROBERT [redacted] -- a prehearing. You know, we wanted a resolution meeting and they --

THE HEARING OFFICER: Yeah, I don't want to get -- whatever happened with the resolution meeting. Okay? It didn't happen. I mean, that we're way past --

ROBERT [redacted] Well, that is a violation and that's something that we're going to brining up during the hearing.

I submitted e-mail (unintelligible) --

THE HEARING OFFICER: I was just throwing it out that if no one has ever mediated the case, it wouldn't necessarily be a terrible idea. But --

ROBERT [redacted] There should have been a resolution meeting, but there wasn't and that's (unintelligible) --

THE HEARING OFFICER: All right. Yeah --

ROBERT [redacted] -- my testimony.

THE HEARING OFFICER: Okay. I mean --

ROBERT [redacted] That's the law. The law is the law.

ATTORNEY ROSEN: Hearing Officer Kennedy, if you'd like the Board's perspective on this issue, I'm happy to share. I don't really want to opine on, you know, confidential attempts to try and mediate or resolve the matter.

THE HEARING OFFICER: Sure. Yeah, yeah.

ATTORNEY ROSEN: I mean, we are here.

THE HEARING OFFICER: I'm just suggesting it might not be a terrible idea now to, you know.

ATTORNEY ROSEN: We hear you, and if we thought it was --

THE HEARING OFFICER: I mean, the problem -- quite frankly, the problem is when with pro se's, I mean, a lot of the time it's more about bad blood than what's really going to happen with the kid.

That's why, you know (unintelligible) --

ROBERT [redacted] Respectfully, we disagree. It's not about bad blood.

THE HEARING OFFICER: Sir, I'm just saying --

ROBERT [redacted] It's about my son's rights being violated --

THE HEARING OFFICER: Sir, will you please --

ROBERT [redacted] And it's also --

THE HEARING OFFICER: Will you please listen to me? I'm saying that when, basically when people are represented by attorneys they tend to -- these things tend to go more smoothly. And often, even if they don't reach a settlement, at least they cooperate with each other on procedure.

And I mean, these types of skirmishes are

just unheard of in cases where there's attorneys on both sides. I mean, no parent attorney would ever try to subpoena people from the State. I mean, that's just absurd.

ROBERT [redacted] Well, I believe it's important. If it's --

THE HEARING OFFICER: All right.

ROBERT [redacted] -- we don't need a subpoena are I can get the e-mails into evidence and all their communications, then I won't need to subpoena them or have them testify.

And I'd also like to comment on Attorney Rosen's comment about the school district and his opinion, provided a free and appropriate public education. My view on it, they have not. This is what this whole hearing is about. It's not about bad blood. It's about my son's rights being violated --

THE HEARING OFFICER: All right.

ROBERT [redacted] -- and my rights being violated across the board. And I do have proof of all those violations, and I believe that this hearing is necessary. I don't even believe a mediation at this point would solve anything. It would be fruitless at this point.

Exhibit B

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert [redacted] Pro Se
v.
Milford BOE

Case No. 25-0686

October 5, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert [redacted]
4 2nd Ave
Shelton, CT 06484
[redacted]verizon.net

Exhibit B

**Supplemental Statement Regarding Procedural Objections to the October 3, 2025 Ruling on Motion for Recusal**

**Case No. 25-0686**
**Robert [redacted] Pro Se v. Milford Public Schools**
**Submitted: October 5, 2025**

**I. Purpose of Submission**

This Supplemental Statement is respectfully submitted to preserve procedural objections and clarify the record in light of the Hearing Officer's October 3, 2025 ruling on my Motion for Recusal. It formally objects to several factual and procedural mischaracterizations — specifically, the accusation that I engaged in a deliberate, bad-faith refusal to file exhibits at the time they were needed, the allegation of unruly conduct, and the assertion that I attempted to "cherry-pick" hearing officers. These characterizations are inconsistent with the written record and your prior guidance.

I set forth below my account of how the hearing was structured and why your October 3 ruling raises serious procedural concerns. The email chain referenced throughout this statement was previously submitted as part of the original Motion for Recusal. For clarity and completeness, it is reattached here as Exhibit A – Email Chain (September 11–16, 2025).

**II. Background and Timeline**

**Compliance with Hearing Officer's Guidance:**
I acted in good faith based on the Hearing Officer's written instruction, which stated that "you should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony." Since my testimony had not yet occurred, I had not submitted exhibits at the time of the ruling. My actions were consistent with the timeline he provided, and no additional expectations were communicated to me.

**Intent to Use Exhibits:**
I informed opposing counsel and the Hearing Officer that I did not intend to use exhibits during the District's presentation, but rather during my own case, scheduled for a later date.

**Request for Clarification:**
I proactively invited clarification:

"If you believe otherwise, I welcome clarification from the Hearing Officer." (Email, Sept. 13, 2025)

**No Contradictory Order Issued:**
At no point was I informed that failure to file exhibits prior to the hearing's first day would result in their exclusion from cross-examination. In the October 3, 2025 ruling, the Hearing

Officer stated that the District would not be required to produce a witness "based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them." This characterization is not supported by any evidence in the record. The email chain from September 11–13, 2025 (attached as Exhibit A) reflects the Hearing Officer's written guidance that exhibits should be submitted "at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony." I relied on this instruction in good faith and sought clarification to ensure compliance.

Based on the structure communicated to me, I understood that the District would present its case first, followed at a later date by my own testimony and the opportunity to call witnesses. I was not informed that cross-examination would occur during the District's presentation, nor that exhibits would be required for that purpose. My expectation was that I would present exhibits during my own case — including the opportunity to call and question the District's witnesses — consistent with the Hearing Officer's written guidance. No directive was issued to the contrary prior to the hearing.

**III. Procedural Mischaracterization and Shift in Guidance Characterization of Prior Ruling:**

Characterization of Prior Ruling: In the October 3, 2025 ruling, the Hearing Officer asserts:

"The undersigned Hearing Officer ruled that the Father was not required to file exhibits until five business days prior to the hearing in which he intended to use them, including using them for purposes of cross-examination."

This characterization is inconsistent with the facts of record. The written record contains no directive from the Hearing Officer requiring exhibits for cross-examination prior to the start of the District's case. I was not informed that cross-examination would occur during the District's presentation. The record is silent on this point, despite my direct request for clarification on September 12 and 13.

Furthermore, the Hearing Officer divides the sentence into two parts — stating that "the Father apparently disagrees with the second part of the preceding sentence" and "the District disagrees with the first part." This framing is not supported by the record, which contains no prior ruling requiring exhibits to be filed for purposes of cross-examination. If the Hearing Officer maintains that this requirement was previously ruled upon, I respectfully request citation to the specific portion of the record where this instruction was issued. To date, no such guidance has been provided, either in writing or orally, prior to the hearing.

**Initial Communication and Structure of the Hearing:** The Hearing Officer stated: "You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony." This guidance was provided in the September 11–13, 2025 email chain (attached as Exhibit A). I relied on his written guidance and our communications in good faith and sought clarification to ensure compliance.

Based on his written guidance and our communications, I understood that the District would present its case first, including testimony from its witnesses. I believed that I would then present my own case at a later date — after the District's case concluded — and that I would be able to call those same witnesses again during my testimony, if needed. That was my understanding of the structure: the District would provide its testimony and witnesses, and I would then provide mine, using the same witnesses if necessary. I was not informed that cross-examination would occur during the District's presentation, nor that exhibits would be required for that purpose. I had no prior notice that this limitation would apply.

**Introduction of "Attorney Courtesy" and Stricter Expectations:** After opposing counsel objected to the timeline I followed in reliance on the Hearing Officer's written guidance, the Hearing Officer introduced the concept of "attorney courtesy" and suggested a more stringent timing expectation. However, this was not accompanied by any ruling or directive modifying the deadline or advising of consequences. At no point prior to the hearing did the Hearing Officer communicate that exhibits were required for cross-examination or that failure to file them would result in denial of witness recall.

**Impact of Shifting Guidance:** Because no guidance was provided regarding the use of exhibits for cross-examination, I was unable to cross-examine a key witness using relevant materials — a procedural disadvantage that materially affected my ability to present my case. The retroactive imposition of a stricter standard was prejudicial and undermined the fairness of the hearing.

**No Prior Warning of Witness Denial**: In the October 3, 2025 ruling, the Hearing Officer states that the District would not be required to produce a witness "based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them." He also uses the word "indicated" in reference to this consequence. During the hearing, the Hearing Officer told me that I would not be able to recall a witness. However, this was not communicated prior to the hearing. The ruling does not cite any written instruction or pre-hearing communication stating that exhibits were required for cross-examination or that failure to file them would result in denial of witness recall. No prior notice of this limitation appears in the record.

**Verbal Exchange During the Hearing:** During the hearing, when I attempted to reference the Hearing Officer's written guidance from his September 12 email — in which he stated "I think it unlikely that the district will take less than a day to present its case" — I was repeatedly interrupted. As I began to explain that we were not presenting our case on the first day and attempted to place that guidance into the record, the Hearing Officer stated, "That includes if you want to use exhibits… for any purpose, including cross-examination." This directive was made verbally during the hearing and had never been communicated in any prior email. As I proceeded to clarify what the hearing officer told me in an email, he interrupted me. When I said, "Sir, I'm being cut off," the Hearing Officer responded, "Do you just want me to dismiss the case?" — followed by a threat to dismiss with prejudice and an accusation that I was being unruly. This

exchange occurred in direct response to my effort to clarify the procedural timeline and preserve the record. The timing and tone of the threat suggest an attempt to suppress the Hearing Officer's own prior guidance, which contradicts his characterization of my conduct as unruly. That accusation is false, unsupported by the record, and ignores my documented efforts to seek clarification and comply with procedural expectations. I was not being unruly or disrespectful — I was attempting to ensure procedural fairness.

**IV. Summary of Key Evidence**

- Email dated September 11, 2025: The Hearing Officer outlines the five-business-day rule.
- Emails on September 12–13, 2025: I sought guidance to ensure compliance and explained my timeline.
- Opposing Counsel's Email (Sept. 13, 2025): Attorney Rosen objected based on a different interpretation, to which I responded transparently.
- **No Ruling Issued to Override:** the Hearing Officer did not issue any directive before the hearing modifying the five-day rule or requiring exhibits to be filed for cross-examination. The expectation that exhibits were needed for cross-examination was not communicated prior to the hearing and does not appear anywhere in the record.

**V. Response to Allegation of Unruly Conduct**
**Denial of Unruly Conduct:**
I categorically deny that I acted in an unruly manner during the hearing.
I conducted myself professionally and respectfully throughout. The characterization of my conduct as unruly is inaccurate and should be withdrawn or corrected in the record.

**VI. Response to Allegation of Cherry-Picking Hearing Officers**

**Clarification Regarding Prior Recusal:**
The October 3, 2025 ruling states: "it appears that the Father filed a recusal motion against a prior hearing officer in this case. Moving to disqualify one hearing officer after another until a litigant cherry-picks the one that he wants undermines the integrity of the process." The record reflects that I accepted a voluntary recusal offered by Hearing Officer Sylvia Ho, following a respectful exchange. The record reflects only one recusal motion, and no effort to disqualify one hearing officer after another. I respectfully request that this accusation be withdrawn from the record.

**VII. Conclusion**

**No "Deliberate, Bad-Faith Refusal":** The record does not support the Hearing Officer's characterization of my conduct as a "deliberate, bad-faith refusal." I openly sought clarification on procedural expectations and made good-faith efforts to comply. No

procedural directive was issued that required exhibits to be submitted for use in cross-examination, and no communication indicated that failure to do so would result in exclusion. My conduct was consistent with the information provided, and the retroactive imposition of a stricter standard — without prior notice — was prejudicial and unfair.

**Failure to Communicate Stricter Standards:** The Hearing Officer imposed a stricter procedural standard without prior notice or any communication indicating that exhibits for cross-examination were subject to the five-business-day rule. The record contains no directive requiring such submission, and no communication indicating that failure to do so would result in exclusion. My conduct was consistent with the procedural guidance provided. The absence of any guidance regarding procedural expectations or consequences directly contributed to the circumstances that led to my request to recall a witness.

**Clarification Regarding Cross-Examination Exhibits:** Nowhere in the email communications submitted as exhibits in my original motion for recusal did the Hearing Officer state that exhibits must be submitted for use during cross-examination. At no point — in any email, ruling, or oral instruction — did he state or imply that the five-business-day rule applied to exhibits used for cross-examination. The record is silent on this point, despite my direct request for clarification on September 12 and 13. The Hearing Officer's characterization of my conduct as a "deliberate, bad-faith refusal" to file exhibits is unsupported by the record and inconsistent with my documented efforts to seek clarification and comply with procedural requirements.

**Request to Supplement the Record:**
To preserve the integrity of the record for any future review, the characterization of my actions as a "deliberate, bad-faith refusal," any allegation of unruly conduct, and the assertion that I attempted to "cherry-pick" hearing officers are factually and legally incorrect. These statements should be formally withdrawn or clarified in the official hearing record.

**Good Faith Submission:**
This submission is made in good faith and respectfully requests that it be entered into the hearing record to ensure accuracy and fairness.

**Exhibit A – Email Chain**

Respectfully submitted,
**Robert** [redacted]
Pro Se Litigant

Exhibit C

# Re: [redacted] vs Milford BOE 25-0686

From: plkennedyesq@aol.com (plkennedyesq@aol.com)

To: [redacted]yahoo.com; hrosen@berchemmoses.com; [redacted]verizon.net

Date: Thursday, September 11, 2025 at 05:06 PM EDT

---

If you are using the US Postal Service you should send my copies to PO Box 8078, Manchester, CT 06040-0078. If you are using a private courier that cannot deliver to a postal mail box you may send them to 132 Strawberry Lane, Manchester, CT. You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony. (This usually means a week, but keep in mind that Columbus Day would push back the deadline for the following hearing one more day.)

Patrick L. Kennedy
Hearing Officer

> On Thursday, September 11, 2025 at 04:49:11 PM EDT, Robert <[redacted]verizon.net> wrote:
>
> > I understand your preference for hard copies during the hearing, and I will submit a hard copy packet of my exhibits directly to you. Could you please confirm the appropriate mailing address for delivery, as well as the deadlines for both the hard copy and electronic submissions?
> >
> > I'd also like to confirm whether it would be acceptable to provide the opposing party with the exhibits in electronic format only, rather than hard copy. I want to ensure I'm complying with all procedural requirements while also streamlining the process for all parties.
> >
> > Please let me know if this arrangement is acceptable or if hard copies must be provided to both parties.

Exhibit D

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING RE MOTION FOR RECUSAL**

VIA E-MAIL

Date: October 3, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Ro [redacted]
[redacted]
Shelton, CT 06484
[redacted]verizon.net

Ms Karen [redacted]
Milford, CT 06461
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

This ruling is directed to the Motion for Recusal filed by the Father in the above-captioned case on September 29, 2025.

The motion asserts three grounds for recusal. The first is that, when the Father became unruly and insisted on talking over the Hearing Officer, he was reminded that his case could be dismissed with prejudice as a sanction.[1] Thereafter, the Father's conduct improved somewhat and the hearing was able to continue without any dismissal needing to be issued. The administrative hearing process could not function if hearing officers did not use the tools at their disposal to curb the disruptive behavior of pro se litigants (or attorneys).

The other two grounds are mere disagreements with procedural rulings. The undersigned Hearing Officer ruled that the Father was not required to file exhibits until five business days prior to the hearing in which he intended to use them, including using them for purposes of cross-examination. The Father apparently disagrees with the second part of the preceding sentence.[2] When the Father was limited in his ability to cross-examine the District's witness because he not filed the exhibits that he needed to, he indicated that he would recall the witness for his own case. The undersigned Hearing Officer indicated that the District would not be required to produce a witness, with its attendant disruption of the school system, based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them.

---

[1] It should be noted that administrative hearing officers, unlike judges, do not have contempt powers.

[2] The District disagrees with the first part.

Disagreement with procedural rulings or other matters involving the conduct of hearings is not grounds for recusal, it is grounds for appeal. If the ultimate ruling is not in the Parents' favor, they can file an administrative appeal with the appropriate court.[3] The Father has not alleged that the undersigned Hearing Officer has any personal of financial interest in the outcome of this case or has any friends or relatives involved in it. If there is no true conflict of interest, a demand for recusal is not proper based on mere disagreement with rulings.

Finally, it appears that the Father filed a recusal motion against a prior hearing officer in this case. Moving to disqualify one hearing officer after another until a litigant cherry-picks the one that he wants undermines the integrity of the process. Recusal also has a disruptive effect, particularly in a case, such as this one, where the evidentiary hearing has begun. As a new hearing officer could not make credibility determinations on a cold transcript, the hearing would need to start from scratch. Allowing recusal on specious grounds under such circumstances would allow a party to reboot a case that was not going well, further undermining the integrity of the process.

Therefore, the Motion for Recusal is denied.

[3] As can the District if the ruling is not in the District's favor.

Exhibit E

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert [redacted] Pro Se
v.
Milford BOE

Case No. 25-0686

October 3, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert [redacted]
4 2nd Ave
Shelton, CT 06484
[redacted]verizon.net

**MOTION FOR RECONSIDERATION: RULING ISSUED PREMATURELY AND BASED ON AN INCOMPLETE RECORD**

## Introduction

The Father respectfully submits this Motion for Reconsideration of the Hearing Officer's ruling dated October 3, 2025, denying the Motion for Recusal.

This request is based on procedural error: the Hearing Officer issued a ruling before considering rebuttal evidence that the Father had already noticed and was in the process of submitting. The Father's intent to file rebuttal evidence was communicated directly to the Hearing Officer and opposing counsel in writing on September 30, 2025 (see Exhibit C). On October 1, 2025, the Father also submitted a separate request for the transcript and stated that, after reviewing notes, he and his son's mother had identified additional concerns that they intended to raise in a supplemental statement once the transcript was received (see Exhibit B). That notice was distinct from the rebuttal already in progress. Despite having actual notice of the rebuttal, the Hearing Officer issued a ruling at 10:02 AM on October 3, 2025 (see Exhibits F and G), before the Father's rebuttal was filed at 10:17 AM (see Exhibits A and H).

## Grounds for Reconsideration

This motion is based on a procedural error: the Hearing Officer issued a final decision on the Motion for Recusal despite having actual notice that the Father intended to file a rebuttal to the District's objection.

- On September 29, 2025, the Father submitted the original Motion for Recusal.
- Later that day, at 3:18 PM, the District notified all parties of its intent to submit an objection by the end of the following day (see Exhibit D, page 2).
- On September 30 at 12:16 PM, the District followed up, stating it was awaiting the transcript from the September 24 hearing and anticipated submitting its objection "tomorrow" (see Exhibit D, page 1).
- The District ultimately submitted its objection on October 1 at 4:51 PM — two full days after its initial notice (see Exhibit E).
- On September 30, the Father sent an email to all parties, including the Hearing Officer, stating his intent to submit a rebuttal (see Exhibit C, page 1).
- On October 1, the Father again emailed all parties, including the Hearing Officer, formally requesting the transcript and stating that, after reviewing notes, he and his son's mother had identified additional concerns that they intended to raise in a supplemental statement once the transcript was received (see Exhibit B).
- On October 3 at exactly 10:02 AM, the Hearing Officer issued a ruling denying the Motion for Recusal (see Exhibits F and G).
- The Father submitted his rebuttal at 10:17 AM — without having seen the Hearing Officer's ruling at that time, as he was finalizing the rebuttal prior to its submission (see Exhibits A and H).

The rebuttal evidence was material and necessary because it directly exposed the District's objection as relying on factual misrepresentations and failing to rebut the core evidence of procedural prejudice and the clear appearance of bias against the pro se party. Specifically, the rebuttal clarified that the District's objection omitted key context regarding statements made during the hearing that supported the Father's concerns about impartiality. This evidence went to the heart of the recusal issue and, if considered, could have materially affected the outcome.

This timeline demonstrates that the Hearing Officer allowed the District two full days to prepare and submit its objection, waited for it, and clearly reviewed it before issuing a ruling just over 24 hours later. In contrast, despite having actual notice that the Father's rebuttal was forthcoming, the Hearing Officer issued a decision before receiving and considering it.

Even if the District argues the rebuttal was not yet filed, the Father had given explicit notice of intent to file, and the Hearing Officer should have awaited its submission before ruling.

This sequence creates a clear appearance of procedural imbalance and raises concerns about the fairness of the process. The decision was issued prematurely, based on an incomplete record, and deprived the Father of a meaningful opportunity to be heard — a core principle of due process. By waiting for and considering the District's objection while issuing the ruling before the Father's rebuttal was considered, the process created an appearance of unequal treatment and raised concerns about the impartiality of the proceeding.

## Legal Basis for Reconsideration

Connecticut Agencies Regulations § 10-76h-8 permits a party to request that a hearing officer take action consistent with relevant statutes and regulations. A motion for reconsideration is the proper vehicle when a party believes the hearing officer made an error of fact or law, or when new evidence materially affects the outcome.

This motion is based on error of procedure and new evidence that materially affects the outcome, both of which are grounds for reconsideration under § 10-76h-8.

Issuing a ruling before the record was complete constitutes both an error of procedure and "other good cause" under § 10-76h-8, because it deprived the Father of a fair opportunity to be heard and resulted in a decision based on an incomplete record.

Here, the Father respectfully submits that the ruling of October 3, 2025 was issued prematurely, before rebuttal evidence was considered, and therefore reconsideration is warranted.

## Relief Requested

The Father respectfully requests that the Hearing Officer:

1. Vacate or reconsider the ruling on the Motion for Recusal;
2. Review and consider the rebuttal submitted on October 3, 2025 (see Exhibit A);
3. Acknowledge the transcript request and the Father's notice, on October 1, that additional concerns had been identified and would be raised in a supplemental statement once the transcript was received (see Exhibit B);
4. Take notice of the record evidence — specifically, the rebuttal transmission timestamp and the ruling issuance timestamp — which demonstrate that the rebuttal was submitted shortly after the ruling was issued;
5. Issue a revised ruling that reflects the full record, including the Father's response.

## Conclusion

The Father submits this motion to preserve the integrity of the hearing process and ensure that all parties are afforded a fair opportunity to be heard. The procedural timeline — including prior notice, active engagement, and prompt submission — supports reconsideration of the ruling. Fundamental fairness requires that both parties be given equal opportunity to present their case before a neutral arbiter, and issuing a ruling before the Father's rebuttal was considered is inconsistent with that principle. Reconsideration is not only a matter of fairness to the parties, but necessary to uphold the integrity of the hearing process itself.

**Respectfully submitted,**
Robert [redacted]
Pro Se Parent
October 3, 2025

## Attached Exhibit List

- Exhibit A: Rebuttal submitted October 3, 2025
- Exhibit B: Transcript request email dated October 1, 2025
- Exhibit C: September 30 email stating intent to file rebuttal
- Exhibit D: District emails dated September 29 and September 30 regarding objection timeline
    - Includes:
        - September 29 email at 3:18 PM stating intent to submit objection by end of next day
        - September 30 email at 12:16 PM stating transcript was pending and objection would be submitted "tomorrow"
- Exhibit E: District's objection submission timestamp (October 1, 2025 at 4:51 PM)
- Exhibit F: Hearing Officer's ruling denying Motion for Recusal (October 3, 2025 at 10:02 AM)

- Exhibit H: Email transmitting rebuttal at 10:17 AM on October 3, 2025
- Exhibit G: Email from Hearing Officer showing issuance of ruling at 10:02 AM on October 3, 2025

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING ON MOTION FOR RECONSIDERATION**

VIA E-MAIL

Date: October 5, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Robert [redacted]
[redacted]
Shelton, CT 06484
[redacted]verizon.net

Ms Karen [redacted]
[redacted]
Milford, CT 06461
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

The Motion for Reconsideration of the denial of the Motion for Recusal filed by the Father dated October 3, 2025 is denied.

**STATE OF CONNECTICUT DEPARTMENT OF EDUCATION**

**Robert** [redacted]

**V.**

**Milford BOE**

**Case No. 25-0686**

**Before Hearing Officer: Patrick L. Kennedy**

**Date:** October 9, 2025

UPDATED WITNESS LIST OF THE PARENTS OF [redacted]

The parent hereby provides notice of intent to call all or some of the following witnesses in this matter. The parent reserves the right to supplement this list, to call any witnesses on the witness list provided by the Milford Board of Education, and/or to call such witnesses as may be necessary for rebuttal:

**Witnesses:**

1. Jennifer Stewart, Former Director of Pupil Personnel , Milford Public Schools
2. Brenda Anziano, Former Interim Principal, Milford Public Schools
3. Charlotte Adinolfi, Special Education Teacher, Milford Public Schools
4. Amy Rizzo, JFK Elementary School Principal, Milford Public Schools
5. Lauri Dougherty, Social Worker, Milford Public Schools
6. Darlene Koosa, Teacher Leader, Milford Public Schools
7. Courtney Carrano, Former SYC, BCBA, Milford Public Schools
8. Tara Truscello, Special Education Teacher, Milford Public Schools
9. Andrea Giannattasio, Former Supervision Special Education, Milford Public Schools
10. Thomas Zenowitz, Director of Pupil Personnel, Milford Public Schools
11. Ronald J. Brone, Psychologist PhD

**Respectfully submitted,**
Robert [redacted] Pro Se Parent

*Signature*

Robert [redacted]
[redacted]
Shelton, CT 06484
203-306-6406
[redacted]verizon.net

**Certification**

This is to certify that a copy of the foregoing was delivered via U.S.P.S. Certified Mail on or by October 9, 2025 to the following:

**Patrick L. Kennedy, Hearing Officer**
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

**Herbert Rosen, Esq.**
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

# Milford School District
# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 05/08/2025

**Parent/Guardian/Student:** Karen Michelson, Robert Kornberg

**SASID:** [redacted]

**Mailing Address:** [redacted]

[redacted]

Dear Karen Michelson, Robert Kornberg

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] (Student's name) [redacted] (DOB)

**Date:** 05/21/2025 **Time:** 2 :00 PM **Location:** J. F. Kennedy School

**The purpose of this meeting is to:**

Review or Revise the IEP

The team will develop, review, or revise transition goals and objectives (transition planning)

Agency representative(s) not appropriate to be invited to attend to assist in transition planning

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| Mother | Karen [redacted] |
| Father | Robert [redacted] |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Donna Stuart |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Other: West Shore Representative | Carrie Minar |
| Other: Instructional Supervisor Special Education Elementary | Nadine Macklin |
| Other: Instructional Supervisor Special Education | Sara Collette |
| Special Education Teacher | Kate Falzarano |
| Special Education Teacher | Sarah Stanley (Daily Living Middle School Program Representative) |
| Special Education Teacher | Maureen Raccio (Resource Teacher at WSMS) |

A parent/guardian has the right to be present at and participate in all portions of the meeting at which an educational program is being developed, reviewed, or revised and shall be given at least five days' prior notice of any planning and placement team meeting. Parent participation in this process is important. Please make every effort to attend this meeting. You may bring other individuals/advisors to the meeting, including those who have knowledge or special expertise regarding your child.

A parent/guardian also has the right to have (1) the paraeducator assigned to their child, if any, (2) the child's birth-to-three service coordinator, if any, and (3) a language interpreter, including a registered interpreter for persons who are deaf, hard of hearing, or deafblind if there is an apparent need or upon request, be present at the meeting. A parent/guardian is asked to provide reasonable notice to the District if they wish to have any of these individuals attend. The parent/guardian also has the right to have each recommendation made in a child's birth-to-three individualized transition plan, if any, addressed by the planning and placement team during a meeting at which an educational program for the child is developed.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher

(Name and Title)

**Procedural Safeguards**

☑ A copy of the Procedural Safeguards in Special Education was provided to you previously this school year. If you would like another copy of the Procedural Safeguards please contact

Jennifer Stewart 203-783-3410

**Parent Notice**

☑ A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

# Milford School District
# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 05/82/808K

**Parent/Guardian/Student:** [redacted]

**SASID:** [redacted]

**Mailing Address:** [redacted]

Dnr e a r enMi chl nso, MRb , t nega , eMt ne4

Psnr on t n r dvcond gl r gr Psr MMdM4 r Md Psr hnmnMgTnr m (PPT) mnngdM4 wcsst n h, MvnMhd , Mt nI r sf , f:

[redacted]
(SgudnMglo Mr mn)

[redacted]
(DOB)

**Date:** 0K/06/808K **Time:** 1 :30 Pi **Location:** J. F. a nMMndy ShI , , s

**The purpose of this meeting is to:**

b nvcnw , eb nvcon gl n IEP

TI n gnr m wcssdnvns, pRenvcnwR, eenvcon ger Mbcgc, M4, r so r Md , t jnhgcvno (ger Mbcgc, Mpsr MMdM4)

A4nMhy enpenonMgr gcvn(o) M, gr ppe, pecr gn g t n dMcgnd g r ggnMd g r ooocgdMger Mbcgc, Mpsr MMdM4

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| i , gl ne | a r enMi chl nso, M |
| Fr gl ne | b , t nega , eMt ne4 |
| AdmdMogr g e | Amy b czz, |
| SgudnMgo GnMher sEduhr gc; MTnr hl ne | D, MMr Sgur eg |
| Spnhcr sEduhr gc; MTnr hl ne | Tr er Teuohnss; |
| Shl , , sPoyhl , s; 4cog | JnMMcfneDr vco |
| Spnnhl r Md Lr M4ur 4n Pr gl , s; 4cog | a r enMa ecog M |
| S, hcr sW, ekne | Lr uecD, u4l negy |
| Ogl ne: BCBA | J, hnsyMWcssony |
| Ogl ne: lMogeuhgc; Mr sSupnevco, eSpnhcr sEduhr gc; M EsnmnMgr ey | Nr dcMh i r hksdM |
| Ogl ne: lMogeuhgc; Mr sSupnevco, eSpnhcr sEduhr gc; M | Sr er C, ssnggn |
| Spnhcr sEduhr gc; MTnr hl ne | a r gn Fr szr er M, |
| Spnhcr sEduhr gc; MTnr hl ne | Sr er l Sgr Msny (Dr csy LcvdM4 i cddsn Shl , , sPe, 4er m b npenonMgr gcvn) |

A pr enMg4ur edcr Ml r o gl n e4l gg t n penonMgr gr Md pr egchopr gn cMr ssp, egc, Mo , f gl n mnnngM4 r gwl chl r Mnduhr gc; Mr s pe, 4er m co t ndM4 dnvns; pndRenvcnwndR, eenvcond r Md ol r sst n 4cvnMr gsnr ogfcvn dr yo' pec, eM, gchn , f r My psr MMdM4 r Md psr hnmnMggnr m mnngdM4. Pr enMgpr egchopr gc; MdMgl co pe, hnoo co cmp, egr Mg Psnr on mr kn nvney nff, egg r ggnMd gl co mnngdM4. Y, u mr y t edM4 , gl nedMdcvcdur so/r dvco, eo g gl n mnngdM4RdMhsudcM4 gl , on wl , l r vn kM, wsnd4n , eopnhcr s nxpnegon en4r edcM4 y, uehl csd.

A pr enMg4ur edcr Mr so, l r o gl n e4l gg l r vn (1) gl n pr erndhur g er ooc4Mnd g gl ncehl csdRcf r MyR(8) gl n hl csd'o t ced -g - gl enn onevchn h, , edcMr g eRcf r MyRr Md (3) r sr M4ur 4n dMgnepengneRdMhsudcM4 r en4cognend dMgnepengnef, epneo, Mo wl , r en dnr fRl r ed , f l nr edM4R, ednr ft sMd cf gl nen co r Mr ppr enMgMhnd , eup, MenqunogRt n penonMgr ggl n mnngdM4. A pr enMg4ur edcr Mco roknd g pe, vcdn enr o, Mr t sn M, gchn g gl n Dcogehgcf gl ny wcol g l r vn r My , f gl non dMdcvcdur so r ggnMd. Tl n pr enMg4ur edcr Mr so, l r o gl n e4l gg l r vn nr hl enh, mmnMdr gc; Mmr dn cMr hl csd'o t ced -g -gl enn dMdcvcdur sczend ger Mocgc; Mpsr MRcf r MyRr ddenoond t y gl n psr MMdM4 r Md psr hnmnMggnr m duecM4 r mnngdM4 r gwl chl r Mnduhr gc; Mr spe, 4er m f, egl n hl csd co dnvns; pnd.

If y, u l r vn r My qunogc; Mo , ewcol g enohl ndusn gl n mnngdM4 psnr on h, Mgr hgmn r g

803-723-3K62 ggeuohnss; @mcsf, ednd., e4

ScMnnnsyR

Tr er Teuohnss; RSpnhcr sEduhr gc; MTnr hl ne

(Nr mn r Md Tcgsn)

**Procedural Safeguards**

☑ A h, py , f gl n Pe, hnduer sSr fn4ur edo dMSpnhcr sEduhr gc; Mwr o pe, vcdnd g y, u penvc, uosy gl co ohl , , synr e. If y, u w, usd sxkn r M, gl ne h, py , f gl n Pe, hnduer sSr fn4ur edo psnr on h, Mgr hg

JnMMfne Sgnwr eg 803-723-3510

**Parent Notice**

☑ A h, py , f gl co M, gchn I r o t nnMonMgg gl n pr enMg(o). (Tl co co enquaend cf ec4l go uMdne IDEA I r vn t nnM ger Mofneend g gl n ogudnMgr gr 4n 12. Wl nMec4l go ger MofneRmnngcM4 M, gchno muogt n onMgg gl n ogudnMgwcgl r h, py g gl n pr enMgo.)

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert [redacted] Pro Se
v.
Milford BOE

Case No. 25-0686

October 5, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert [redacted]
4 2nd Ave
Shelton, CT 06484
[redacted]verizon.net

**Supplemental Statement Regarding Procedural Objections to the October 3, 2025 Ruling on Motion for Recusal**

**Case No. 25-0686**
**Robert [redacted] Pro Se v. Milford Public Schools**
**Submitted: October 5, 2025**

**I. Purpose of Submission**

This Supplemental Statement is respectfully submitted to preserve procedural objections and clarify the record in light of the Hearing Officer's October 3, 2025 ruling on my Motion for Recusal. It formally objects to several factual and procedural mischaracterizations — specifically, the accusation that I engaged in a deliberate, bad-faith refusal to file exhibits at the time they were needed, the allegation of unruly conduct, and the assertion that I attempted to "cherry-pick" hearing officers. These characterizations are inconsistent with the written record and your prior guidance.

I set forth below my account of how the hearing was structured and why your October 3 ruling raises serious procedural concerns. The email chain referenced throughout this statement was previously submitted as part of the original Motion for Recusal. For clarity and completeness, it is reattached here as Exhibit A – Email Chain (September 11–16, 2025).

**II. Background and Timeline**

**Compliance with Hearing Officer's Guidance:**
I acted in good faith based on the Hearing Officer's written instruction, which stated that "you should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony." Since my testimony had not yet occurred, I had not submitted exhibits at the time of the ruling. My actions were consistent with the timeline he provided, and no additional expectations were communicated to me.

**Intent to Use Exhibits:**
I informed opposing counsel and the Hearing Officer that I did not intend to use exhibits during the District's presentation, but rather during my own case, scheduled for a later date.

**Request for Clarification:**
I proactively invited clarification:

"If you believe otherwise, I welcome clarification from the Hearing Officer." (Email, Sept. 13, 2025)

**No Contradictory Order Issued:**
At no point was I informed that failure to file exhibits prior to the hearing's first day would result in their exclusion from cross-examination. In the October 3, 2025 ruling, the Hearing

Officer stated that the District would not be required to produce a witness "based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them." This characterization is not supported by any evidence in the record. The email chain from September 11–13, 2025 (attached as Exhibit A) reflects the Hearing Officer's written guidance that exhibits should be submitted "at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony." I relied on this instruction in good faith and sought clarification to ensure compliance.

Based on the structure communicated to me, I understood that the District would present its case first, followed at a later date by my own testimony and the opportunity to call witnesses. I was not informed that cross-examination would occur during the District's presentation, nor that exhibits would be required for that purpose. My expectation was that I would present exhibits during my own case — including the opportunity to call and question the District's witnesses — consistent with the Hearing Officer's written guidance. No directive was issued to the contrary prior to the hearing.

**III. Procedural Mischaracterization and Shift in Guidance Characterization of Prior Ruling:**

Characterization of Prior Ruling: In the October 3, 2025 ruling, the Hearing Officer asserts:

"The undersigned Hearing Officer ruled that the Father was not required to file exhibits until five business days prior to the hearing in which he intended to use them, including using them for purposes of cross-examination."

This characterization is inconsistent with the facts of record. The written record contains no directive from the Hearing Officer requiring exhibits for cross-examination prior to the start of the District's case. I was not informed that cross-examination would occur during the District's presentation. The record is silent on this point, despite my direct request for clarification on September 12 and 13.

Furthermore, the Hearing Officer divides the sentence into two parts — stating that "the Father apparently disagrees with the second part of the preceding sentence" and "the District disagrees with the first part." This framing is not supported by the record, which contains no prior ruling requiring exhibits to be filed for purposes of cross-examination. If the Hearing Officer maintains that this requirement was previously ruled upon, I respectfully request citation to the specific portion of the record where this instruction was issued. To date, no such guidance has been provided, either in writing or orally, prior to the hearing.

**Initial Communication and Structure of the Hearing:** The Hearing Officer stated: "You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony." This guidance was provided in the September 11–13, 2025 email chain (attached as Exhibit A). I relied on his written guidance and our communications in good faith and sought clarification to ensure compliance.

Based on his written guidance and our communications, I understood that the District would present its case first, including testimony from its witnesses. I believed that I would then present my own case at a later date — after the District's case concluded — and that I would be able to call those same witnesses again during my testimony, if needed. That was my understanding of the structure: the District would provide its testimony and witnesses, and I would then provide mine, using the same witnesses if necessary. I was not informed that cross-examination would occur during the District's presentation, nor that exhibits would be required for that purpose. I had no prior notice that this limitation would apply.

**Introduction of "Attorney Courtesy" and Stricter Expectations:** After opposing counsel objected to the timeline I followed in reliance on the Hearing Officer's written guidance, the Hearing Officer introduced the concept of "attorney courtesy" and suggested a more stringent timing expectation. However, this was not accompanied by any ruling or directive modifying the deadline or advising of consequences. At no point prior to the hearing did the Hearing Officer communicate that exhibits were required for cross-examination or that failure to file them would result in denial of witness recall.

**Impact of Shifting Guidance:** Because no guidance was provided regarding the use of exhibits for cross-examination, I was unable to cross-examine a key witness using relevant materials — a procedural disadvantage that materially affected my ability to present my case. The retroactive imposition of a stricter standard was prejudicial and undermined the fairness of the hearing.

**No Prior Warning of Witness Denial**: In the October 3, 2025 ruling, the Hearing Officer states that the District would not be required to produce a witness "based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them." He also uses the word "indicated" in reference to this consequence. During the hearing, the Hearing Officer told me that I would not be able to recall a witness. However, this was not communicated prior to the hearing. The ruling does not cite any written instruction or pre-hearing communication stating that exhibits were required for cross-examination or that failure to file them would result in denial of witness recall. No prior notice of this limitation appears in the record.

**Verbal Exchange During the Hearing:** During the hearing, when I attempted to reference the Hearing Officer's written guidance from his September 12 email — in which he stated "I think it unlikely that the district will take less than a day to present its case" — I was repeatedly interrupted. As I began to explain that we were not presenting our case on the first day and attempted to place that guidance into the record, the Hearing Officer stated, "That includes if you want to use exhibits… for any purpose, including cross-examination." This directive was made verbally during the hearing and had never been communicated in any prior email. As I proceeded to clarify what the hearing officer told me in an email, he interrupted me. When I said, "Sir, I'm being cut off," the Hearing Officer responded, "Do you just want me to dismiss the case?" — followed by a threat to dismiss with prejudice and an accusation that I was being unruly. This

exchange occurred in direct response to my effort to clarify the procedural timeline and preserve the record. The timing and tone of the threat suggest an attempt to suppress the Hearing Officer's own prior guidance, which contradicts his characterization of my conduct as unruly. That accusation is false, unsupported by the record, and ignores my documented efforts to seek clarification and comply with procedural expectations. I was not being unruly or disrespectful — I was attempting to ensure procedural fairness.

**IV. Summary of Key Evidence**

- Email dated September 11, 2025: The Hearing Officer outlines the five-business-day rule.
- Emails on September 12–13, 2025: I sought guidance to ensure compliance and explained my timeline.
- Opposing Counsel's Email (Sept. 13, 2025): Attorney Rosen objected based on a different interpretation, to which I responded transparently.
- **No Ruling Issued to Override:** the Hearing Officer did not issue any directive before the hearing modifying the five-day rule or requiring exhibits to be filed for cross-examination. The expectation that exhibits were needed for cross-examination was not communicated prior to the hearing and does not appear anywhere in the record.

**V. Response to Allegation of Unruly Conduct**
**Denial of Unruly Conduct:**
I categorically deny that I acted in an unruly manner during the hearing.
I conducted myself professionally and respectfully throughout. The characterization of my conduct as unruly is inaccurate and should be withdrawn or corrected in the record.

**VI. Response to Allegation of Cherry-Picking Hearing Officers**

**Clarification Regarding Prior Recusal:**
The October 3, 2025 ruling states: "it appears that the Father filed a recusal motion against a prior hearing officer in this case. Moving to disqualify one hearing officer after another until a litigant cherry-picks the one that he wants undermines the integrity of the process." The record reflects that I accepted a voluntary recusal offered by Hearing Officer Sylvia Ho, following a respectful exchange. The record reflects only one recusal motion, and no effort to disqualify one hearing officer after another. I respectfully request that this accusation be withdrawn from the record.

**VII. Conclusion**

**No "Deliberate, Bad-Faith Refusal":** The record does not support the Hearing Officer's characterization of my conduct as a "deliberate, bad-faith refusal." I openly sought clarification on procedural expectations and made good-faith efforts to comply. No

procedural directive was issued that required exhibits to be submitted for use in cross-examination, and no communication indicated that failure to do so would result in exclusion. My conduct was consistent with the information provided, and the retroactive imposition of a stricter standard — without prior notice — was prejudicial and unfair.

**Failure to Communicate Stricter Standards:** The Hearing Officer imposed a stricter procedural standard without prior notice or any communication indicating that exhibits for cross-examination were subject to the five-business-day rule. The record contains no directive requiring such submission, and no communication indicating that failure to do so would result in exclusion. My conduct was consistent with the procedural guidance provided. The absence of any guidance regarding procedural expectations or consequences directly contributed to the circumstances that led to my request to recall a witness.

**Clarification Regarding Cross-Examination Exhibits:** Nowhere in the email communications submitted as exhibits in my original motion for recusal did the Hearing Officer state that exhibits must be submitted for use during cross-examination. At no point — in any email, ruling, or oral instruction — did he state or imply that the five-business-day rule applied to exhibits used for cross-examination. The record is silent on this point, despite my direct request for clarification on September 12 and 13. The Hearing Officer's characterization of my conduct as a "deliberate, bad-faith refusal" to file exhibits is unsupported by the record and inconsistent with my documented efforts to seek clarification and comply with procedural requirements.

**Request to Supplement the Record:**
To preserve the integrity of the record for any future review, the characterization of my actions as a "deliberate, bad-faith refusal," any allegation of unruly conduct, and the assertion that I attempted to "cherry-pick" hearing officers are factually and legally incorrect. These statements should be formally withdrawn or clarified in the official hearing record.

**Good Faith Submission:**
This submission is made in good faith and respectfully requests that it be entered into the hearing record to ensure accuracy and fairness.

**Exhibit A – Email Chain**

Respectfully submitted,
**Robert** [redacted]
Pro Se Litigant

Exhibit A

# Re: [redacted] vs Milford BOE 25-0686

From: plkennedyesq@aol.com (plkennedyesq@aol.com)
To: hrosen@berchemmoses.com; [redacted]yahoo.com; [redacted]verizon.net
Date: Tuesday, September 16, 2025 at 08:47 PM EDT

The regulation only bars exhibits from being used if they are not produced five business days in advance of the specific date that they are to be used. The attorneys as a matter of courtesy and administrative efficiency generally do a full exhibit exchange in advance of the hearing. Since the District is presenting first I would allow it to have the same right as parties going first in other types of legal proceedings to present rebuttal evidence after the Parents conclude their case.

Patrick L. Kennedy
Hearing Officer

> On Saturday, September 13, 2025 at 11:30:40 AM EDT, Robert <[redacted]verizon.net> wrote:
>
> Attorney Rosen,
>
> Based on guidance from Hearing Officer Kennedy and the applicable regulations—34 C.F.R. § 300.512 and Conn. Agencies Regs. § 10-76h-12—exhibits must be submitted at least five business days prior to the hearing date on which they will be used.
>
> Since I will not be presenting my case or testimony until the October hearing date, and I do not intend to introduce exhibits during the district's presentation, my submission deadline will be calculated from that October date.
>
> If you believe otherwise, I welcome clarification from the Hearing Officer.
>
> Robert [redacted]
>
> On Sat, Sep 13, 2025 at 11:12 AM, Herbert Z. Rosen <hrosen@berchemmoses.com> wrote:
>
> > Good Morning,
> >
> > The District expects that it will require three days to present its case. However, we expect to receive the Complainants' exhibits at least five days prior to September 24, pursuant to 34 C.F.R. Sec. 300.512 and Regs. Conn. State Agencies Sec. 10-76h-12.

Exhibit A

Although we will be presenting witnesses first, our understanding is that the Complainants would not be permitted to introduce any of their own evidence through cross-examination of our witnesses if we do not receive those exhibits in advance of the hearing. Further, it would be prejudicial towards the District's good faith attempts to mount a defense to the Complainant' claims if we were unable to view any of the records or exhibits that the Complainants are basing their claims on in advance.

Respectfully submitted,
Herbie Rosen

BERCHEM MOSES PC

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460

(203) 783-1200 ● www.berchemmoses.com

hrosen@berchemmoses.com

Rated by Super Lawyers 2025
visit SuperLawyers.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

---

**From:** plkennedyesq@aol.com <plkennedyesq@aol.com>
**Sent:** Friday, September 12, 2025 5:17 PM
**To:** Karen [redacted] <[redacted]yahoo.com>; Herbert Z. Rosen <hrosen@berchemmoses.com>; Robert <[redacted]verizon.net>
**Subject:** Re: [redacted] vs Milford BOE 25-0686

I think it unlikely that the district will take less than a day to present its case but, again, I suggest that you consult with the district's attorney concerning anticipated scheduling.

Patrick L. Kennedy
Hearing Officer

On Friday, September 12, 2025 at 05:07:15 PM EDT, Robert <[redacted]verizon.net> wrote:

> At the prehearing conference, you indicated that the respondent will present their case first. Given that the hearing begins on September 24, could you please confirm whether that day is expected to be dedicated entirely to the respondent's presentation?
>
> Understanding this will help me determine when I am likely to begin presenting my case and ensure

that my exhibits are submitted in accordance with the five-business-day rule.

Thank you for your guidance,

Robert

On Fri, Sep 12, 2025 at 5:00 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

> I cannot. The parties may wish to confer on how long they expect their respective cases to take.
>
> Patrick L. Kennedy
> Hearing Officer
>
> On Thursday, September 11, 2025 at 06:03:24 PM EDT, Robert <[redacted]verizon.net> wrote:
>
> > I understand the other party will present their case first on September 24. Could you please confirm which hearing date I'll be scheduled to begin presenting my case and providing testimony? I want to make sure my exhibits are submitted at least five business days in advance of that date.
> >
> > Thank you.
> >
> > Robert.
> >
> > On Thu, Sep 11, 2025 at 5:06 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:
> >
> > > If you are using the US Postal Service you should send my copies to PO Box 8078, Manchester, CT 06040-0078. If you are using a private courier that cannot deliver to a postal mail box you may send them to 132 Strawberry Lane, Manchester, CT. You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony. (This usually means a week, but keep in mind that Columbus Day would push back the deadline for the following hearing one more day.)
> > >
> > > Patrick L. Kennedy
> > > Hearing Officer
> > >
> > > On Thursday, September 11, 2025 at 04:49:11 PM EDT, Robert <[redacted]verizon.net> wrote:
> > >
> > > > I understand your preference for hard copies during the hearing, and I will submit a hard copy packet of my exhibits directly to you. Could you please confirm the appropriate mailing address for delivery, as well as the deadlines for both the hard copy and electronic submissions?
> > > >
> > > > I'd also like to confirm whether it would be acceptable to provide the opposing party

with the exhibits in electronic format only, rather than hard copy. I want to ensure I'm complying with all procedural requirements while also streamlining the process for all parties.

Please let me know if this arrangement is acceptable or if hard copies must be provided to both parties.

Exhibit A

On Thu, Sep 11, 2025 at 4:37 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

I really need the hard copies as I sometimes have some computer problems with large files and toggling through exhibits gets in the way of running the hearing. (If we were having an in-person hearing I would not have a computer there at all, only a notepad.) You may want to consider whether you have too many exhibits, particularly if the exhibits go back long before the events which are the subject of the complaint.

Patrick L. Kennedy
Hearing Officer

On Thursday, September 11, 2025 at 04:11:34 PM EDT, Robert <[redacted]verizon.net> wrote:

Dear Officer Kennedy,

I've prepared all of my exhibits as individual PDF files and organized them with an index, as required for electronic submission. Because of the substantial volume of documents involved, preparing and submitting hard copies presents a significant challenge. I'd like to respectfully request an exemption from the hard copy submission requirement.

If this modification is acceptable, I will submit the full set of exhibits electronically in a ZIP file, clearly labeled and indexed, and confirm receipt with all parties. I believe this approach would maintain clarity and accessibility while ensuring timely delivery.

Thank you very much for your time and consideration, and please let me know how best to proceed.

Robert.

On Thu, Sep 11, 2025 at 3:48 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

Mr [redacted] Ms [redacted] & Attorney Rosen,

Attached please find a set of guidelines for zoom hearings.

Patrick L. Kennedy
Hearing Officer

-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests

**Motion for Recusal of Hearing Officer Kennedy**
**Case No. BOE 25-0686**
**Submitted by:**
Robert [redacted]
Pro Se Litigant

## I. Introduction

The undersigned, Robert [redacted] appearing pro se, respectfully moves for the recusal of Hearing Officer Kennedy in the above-captioned matter on the grounds that his conduct has compromised the fairness and integrity of the proceedings and created an appearance of bias.

This motion arises from a series of documented incidents during the due process hearing, including:

- A disproportionate threat to dismiss the case with prejudice, which had a chilling effect on the proceedings;
- Reactive and inconsistent guidance regarding exhibit submission timelines, creating confusion and procedural uncertainty;
- A summary denial of witness questioning, issued without explanation or adherence to procedural safeguards.

Each of these incidents, when considered individually, raises serious concerns. Taken together, they create an appearance of partiality that warrants recusal under **Conn. Agencies Regs. § 10-76h-8(f)(1)** and applicable Connecticut administrative law, which guarantees a fair and impartial hearing consistent with constitutional principles of due process.

These incidents reflect a pattern of reactive and contradictory conduct that compromises the neutrality required of a hearing officer.

## II. Good Cause for Timing of Motion

This motion is being filed during the pendency of the hearing because the conduct giving rise to the request for recusal occurred during the hearing itself and could not have been reasonably anticipated beforehand. Specifically:

- The disproportionate threat to dismiss the case with prejudice;
- The denial of witness recall and cross-examination using relevant exhibits; and
- The reactive and inconsistent guidance regarding exhibit submission timelines

—all took place during the course of the hearing. These events were not foreseeable prior to the hearing and only became apparent through the Hearing Officer's conduct. Accordingly, good cause exists for filing this motion at this time.

## III. Factual Basis for Recusal

### *1. Disproportionate Threat to Dismiss the Case*

**September 24, 2025**, during the due process hearing in **Case No. BOE 25-0686**, I attempted to explain my understanding of the exhibit submission timeline, referencing prior written guidance from the Hearing Officer. When I stated, *"Sir, I'm being cut off,"* I was interrupted by Hearing Officer Kennedy, who responded:

**"Do you want me to just dismiss the case?"**

When I asked whether he was threatening dismissal, he replied:

**"Yes, if you're going to be unruly."**

I immediately responded:

**"I'm not being unruly, sir. Sorry you feel that way."**

He then escalated by threatening to **dismiss the case with prejudice**.

This exchange cut off my ability to present a procedural argument based on the hearing officer's own prior written guidance. The threat of dismissal would cause a reasonable party to hesitate in exercising procedural rights, thereby creating the **appearance of partiality**. It not only silenced my argument in that moment but also discouraged me from fully developing the record on procedural fairness. The hearing officer's threat was **disproportionate**, especially given that I was merely attempting to assert my procedural rights in good faith.

This incident has been memorialized in a **written statement** that I submitted with a request for inclusion in the hearing record. (See Exhibit B)

I respectfully request that the **transcript of the hearing** be reviewed to confirm the hearing officer's exact statements, which form part of the official record. This sequence demonstrates a **retaliatory response** to my assertion of rights and creates the **appearance of bias**.

### 2. Exhibit Submission Timeline

Prior to the hearing, I emailed the hearing officer to confirm deadlines for exhibit submission. He responded:

“You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony.” (See Exhibit A.)

Notably, in this initial communication, the hearing officer made no mention of any “courtesy” expectation or of any limitation on my ability to use exhibits in cross-examination.

Relying on this guidance, I calculated my submission deadlines accordingly and did not submit exhibits prior to the first hearing day, based on the timeline provided in the hearing officer’s guidance. I believed that cross-examination would occur only during my turn to testify, and I had been informed that the district would go first.

In an email dated September 12, 2025 (Exhibit A), the hearing officer stated, “I think it unlikely that the district will take less than a day to present its case,” confirming my understanding that the first hearing day would be dedicated to the district’s presentation. Based on this guidance, I reasonably believed I would not be testifying on September 24 and calculated my exhibit submission timeline accordingly. **And in fact, I did not testify that day.** The hearing officer did not indicate that failure to submit exhibits before the hearing start date would bar their use in cross-examination, nor did he provide any procedural warning beyond suggesting I consult with opposing counsel.

On September 13, opposing counsel objected, citing procedural rules and requesting earlier access to my exhibits. In response, on September 16, the hearing officer introduced a new expectation based on informal attorney “courtesy,” stating:

“The attorneys as a matter of courtesy and administrative efficiency generally do a full exhibit exchange in advance of the hearing.” (See Exhibit A.)

At the hearing on September 24, the officer contrasted my reliance on the five-day rule with opposing counsel’s objection and then remarked:

“Lawyers extend courtesies and work with each other because what goes around comes around.”

However, the regulation — as acknowledged in the hearing officer’s own written guidance — only bars exhibits from being used if they are not produced five business days in advance of the specific date they are to be used. The expectation of a full exhibit exchange prior to the hearing is described as a matter of “courtesy and administrative efficiency,” not a binding procedural rule.

The hearing officer justified a change in exhibit procedure based on this informal standard. Yet this change was applied in a way that disadvantaged me as a pro se party. Because I relied on the written five-day rule — and the hearing officer never disclosed that failure to pre-submit exhibits would bar their use — I did not know that I would be prevented from using them in cross-examination.

Opposing counsel submitted his exhibits on time and was permitted to use them without restriction. I, by contrast, relied on the hearing officer's written guidance regarding the five-day rule and the expected hearing schedule. As a result, I did not submit exhibits prior to the first day. This reliance led to my exclusion from using exhibits during cross-examination, creating a procedural disadvantage and reinforcing the appearance of unequal treatment.

This consequence was revealed only after the witness had testified, depriving me of procedural notice — a fundamental element of due process.

The denial of my ability to use the documents in cross-examination of the witness prevented me from effectively challenging her testimony, which was directly relevant to the core issues of this hearing. This caused prejudice to my case and significantly impeded my ability to participate in the hearing, in violation of the procedural protections guaranteed under the Individuals with Disabilities Education Act (IDEA).

The subsequent shift to informal "attorney courtesy" standards, applied only to opposing counsel, created an uneven playing field. As a result, I was unable to confront the district's witness with documentary evidence during cross-examination, even though those documents were directly relevant to her testimony.

This sequence of events demonstrates a violation of procedural fairness and reinforces the appearance of bias toward the represented party.

**3. Denial of Witness Questioning and Lack of Response**

During the hearing, I asked, referring to when my time comes to present my case, if once I submit my exhibits I would be able to question Ms. Truscello about the exhibits I put in. The Hearing Officer responded:

"Nope."

When I requested to question a witness, the hearing officer responded only with "Nope," without providing any procedural explanation. Even after I sought clarification, no justification was offered.

Because hearing officers serve a quasi-judicial role, they are expected to provide reasons for procedural rulings. The absence of any explanation created the impression of arbitrary treatment and undermined confidence in the fairness of the process.

Following the hearing, I submitted a written request for clarification, respectfully asking whether I would be permitted to recall the district witness or witnesses relevant to my case and to question them about the exhibits I submit during my time to present my case. (See Exhibit C)

Although I was informed that I would be permitted to submit exhibits during my case presentation, I was told I would not be allowed to recall the district's witness to address them—significantly impairing my ability to develop the evidentiary record.

Specifically, I was prevented from questioning Ms. Truscello about the very emails she had sent me, because they were not admitted into evidence during cross-examination. I had relied on the hearing officer's written five day rule and was never advised that failure to pre-mark those exhibits would bar me from using them in questioning.

As a result, I was denied the opportunity to confront the district's witness on key documentary evidence central to my claims.

The denial of a basic procedural right—to question witnesses on the evidence—violated the principles of due process and reinforced the appearance of unequal treatment.

## IV. Legal Standard: Appearance of Bias

A hearing officer must recuse themselves when their impartiality might reasonably be questioned. The applicable standard is whether a reasonable person, aware of all the facts, would doubt the hearing officer's impartiality.

Given the cumulative effect of:

- A chilling threat to dismiss,
- Shifting procedural rules,
- Denial of witness questioning, and
- Failure to respond to good-faith procedural inquiries

—an objective observer would question the impartiality of the hearing officer. Recusal is therefore warranted under the governing legal standard.

## V. Supporting Evidence

This motion is supported by the following exhibits, based on my direct participation in the hearing and corroborated by documentary evidence and the transcript.

The following exhibits are attached to this motion and referenced accordingly:

- **Exhibit A**: Email correspondence with Hearing Officer Kennedy and opposing counsel regarding procedural timelines
- **Exhibit B**: A contemporaneous letter dated September 24, 2025, documenting the dismissal threat and requesting inclusion in the hearing record

- **Exhibit C**: A written request for clarification on witness questioning, which received no response

In addition, I respectfully request that the transcript of the hearing be reviewed to substantiate all referenced verbal exchanges.

## VI. Legal Authority

This motion is filed pursuant to:

**Conn. Agencies Regs. § 10-76h-8(f)(1)**

"A party may request the recusal of a hearing officer on the grounds of bias, prejudice, or conflict of interest."

## VII. Requested Relief

The undersigned respectfully requests:

1. That Hearing Officer Kennedy recuse himself from further involvement in Case No. BOE 25-0686;
2. In the alternative, that the matter be referred to an appropriate authority for determination of disqualification.
3. Should recusal be granted, I respectfully request that a new impartial hearing officer be assigned to continue the proceedings.

For the reasons set forth above, this motion is based on the documented record and is necessary to ensure the impartiality and integrity of these proceedings.

The cumulative effect of the hearing officer's conduct has created an appearance of bias that undermines confidence in the fairness of the process.

Recusal is therefore required to preserve the due process rights guaranteed under law and to maintain public trust in the integrity of the adjudicatory system.

## Certificate of Good Faith

I, Robert [redacted] hereby certify that this motion is made in good faith.

Respectfully submitted,
**Robert** [redacted]
Pro Se Litigant
September 29, 2025

Exhibit A

# Re: [redacted] vs Milford BOE 25-0686

From: plkennedyesq@aol.com (plkennedyesq@aol.com)

To: hrosen@berchemmoses.com; [redacted]yahoo.com; [redacted]verizon.net

Date: Tuesday, September 16, 2025 at 08:47 PM EDT

The regulation only bars exhibits from being used if they are not produced five business days in advance of the specific date that they are to be used. The attorneys as a matter of courtesy and administrative efficiency generally do a full exhibit exchange in advance of the hearing. Since the District is presenting first I would allow it to have the same right as parties going first in other types of legal proceedings to present rebuttal evidence after the Parents conclude their case.

Patrick L. Kennedy
Hearing Officer

> On Saturday, September 13, 2025 at 11:30:40 AM EDT, Robert <[redacted]verizon.net> wrote:
>
> Attorney Rosen,
>
> Based on guidance from Hearing Officer Kennedy and the applicable regulations—34 C.F.R. § 300.512 and Conn. Agencies Regs. § 10-76h-12—exhibits must be submitted at least five business days prior to the hearing date on which they will be used.
>
> Since I will not be presenting my case or testimony until the October hearing date, and I do not intend to introduce exhibits during the district's presentation, my submission deadline will be calculated from that October date.
>
> If you believe otherwise, I welcome clarification from the Hearing Officer.
>
> Robert [redacted]
>
> On Sat, Sep 13, 2025 at 11:12 AM, Herbert Z. Rosen <hrosen@berchemmoses.com> wrote:
>
> > Good Morning,
> >
> > The District expects that it will require three days to present its case. However, we expect to receive the Complainants' exhibits at least five days prior to September 24, pursuant to 34 C.F.R. Sec. 300.512 and Regs. Conn. State Agencies Sec. 10-76h-12.

Exhibit A

Although we will be presenting witnesses first, our understanding is that the Complainants would not be permitted to introduce any of their own evidence through cross-examination of our witnesses if we do not receive those exhibits in advance of the hearing. Further, it would be prejudicial towards the District's good faith attempts to mount a defense to the Complainant' claims if we were unable to view any of the records or exhibits that the Complainants are basing their claims on in advance.

Respectfully submitted,
Herbie Rosen

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460

(203) 783-1200 • www.berchemmoses.com

hrosen@berchemmoses.com

Rated by Super Lawyers 2025
visit SuperLawyers.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

---

**From:** plkennedyesq@aol.com <plkennedyesq@aol.com>
**Sent:** Friday, September 12, 2025 5:17 PM
**To:** Karen [redacted] <[redacted]yahoo.com>; Herbert Z. Rosen <hrosen@berchemmoses.com>; Robert <[redacted]verizon.net>
**Subject:** Re: [redacted] vs Milford BOE 25-0686

I think it unlikely that the district will take less than a day to present its case but, again, I suggest that you consult with the district's attorney concerning anticipated scheduling.

Patrick L. Kennedy
Hearing Officer

On Friday, September 12, 2025 at 05:07:15 PM EDT, Robert <[redacted]verizon.net> wrote:

> At the prehearing conference, you indicated that the respondent will present their case first. Given that the hearing begins on September 24, could you please confirm whether that day is expected to be dedicated entirely to the respondent's presentation?
>
> Understanding this will help me determine when I am likely to begin presenting my case and ensure

that my exhibits are submitted in accordance with the five-business-day rule.

Thank you for your guidance,

Robert

On Fri, Sep 12, 2025 at 5:00 PM, plkennedyesq@aol.com
<plkennedyesq@aol.com> wrote:

> I cannot. The parties may wish to confer on how long they expect their respective cases to take.
>
> Patrick L. Kennedy
> Hearing Officer
>
> On Thursday, September 11, 2025 at 06:03:24 PM EDT, Robert <[redacted]verizon.net> wrote:
>
> > I understand the other party will present their case first on September 24. Could you please confirm which hearing date I'll be scheduled to begin presenting my case and providing testimony? I want to make sure my exhibits are submitted at least five business days in advance of that date.
> >
> > Thank you.
> >
> > Robert.
> >
> > On Thu, Sep 11, 2025 at 5:06 PM, plkennedyesq@aol.com
> > <plkennedyesq@aol.com> wrote:
> >
> > > If you are using the US Postal Service you should send my copies to PO Box 8078, Manchester, CT 06040-0078. If you are using a private courier that cannot deliver to a postal mail box you may send them to 132 Strawberry Lane, Manchester, CT. You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony. (This usually means a week, but keep in mind that Columbus Day would push back the deadline for the following hearing one more day.)
> > >
> > > Patrick L. Kennedy
> > > Hearing Officer
> > >
> > > On Thursday, September 11, 2025 at 04:49:11 PM EDT, Robert
> > > <[redacted]verizon.net> wrote:
> > >
> > > > I understand your preference for hard copies during the hearing, and I will submit a hard copy packet of my exhibits directly to you. Could you please confirm the appropriate mailing address for delivery, as well as the deadlines for both the hard copy and electronic submissions?
> > > >
> > > > I'd also like to confirm whether it would be acceptable to provide the opposing party

Exhibit A

with the exhibits in electronic format only, rather than hard copy. I want to ensure I'm complying with all procedural requirements while also streamlining the process for all parties.

Please let me know if this arrangement is acceptable or if hard copies must be provided to both parties.

Exhibit A

On Thu, Sep 11, 2025 at 4:37 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

I really need the hard copies as I sometimes have some computer problems with large files and toggling through exhibits gets in the way of running the hearing. (If we were having an in-person hearing I would not have a computer there at all, only a notepad.) You may want to consider whether you have too many exhibits, particularly if the exhibits go back long before the events which are the subject of the complaint.

Patrick L. Kennedy
Hearing Officer

On Thursday, September 11, 2025 at 04:11:34 PM EDT, Robert <[redacted]verizon.net> wrote:

Dear Officer Kennedy,

I've prepared all of my exhibits as individual PDF files and organized them with an index, as required for electronic submission. Because of the substantial volume of documents involved, preparing and submitting hard copies presents a significant challenge. I'd like to respectfully request an exemption from the hard copy submission requirement.

If this modification is acceptable, I will submit the full set of exhibits electronically in a ZIP file, clearly labeled and indexed, and confirm receipt with all parties. I believe this approach would maintain clarity and accessibility while ensuring timely delivery.

Thank you very much for your time and consideration, and please let me know how best to proceed.

Robert.

On Thu, Sep 11, 2025 at 3:48 PM, plkennedyesq@aol.com <plkennedyesq@aol.com> wrote:

Mr [redacted] Ms [redacted] & Attorney Rosen,

Attached please find a set of guidelines for zoom hearings.

Patrick L. Kennedy
Hearing Officer

-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests

Exhibit B

## Request to Document Hearing Incident – Case BOE 25-0686

From: Robert ([redacted]verizon.net)
To: plkennedyesq@aol.com
Cc: [redacted]yahoo.com; hrosen@berchemmoses.com
Date: Wednesday, September 24, 2025 at 06:23 PM EDT

Dear Hearing Officsr Kennedy,

This letter is to document an incident that occurred during the due process hearing on September 24, 2025, concerning case number BOE 25-0686.

During the hearing, while I was attempting to explain my understanding of the exhibit submission timeline, which was based on your prior written email, I was interrupted. I stated, "Sir, I'm being cut off," in an effort to assert my right to present my procedural position. In response, you stated, "Do you want me to dismiss the case?" and then threatened to dismiss the case with prejudice.

This exchange prevented me from completing my statement and fully presenting my position on the exhibit timeline, a matter of procedural importance. The exchange, and specifically the threat of dismissal, limited my opportunity to present my procedural position as a pro se litigant.

I respectfully request that this letter be included in the official hearing record to ensure my experience and concerns regarding this incident are accurately documented.

Thank you for your attention to this matter.

Sincerely,

Robert [redacted]

Exhibit C

# Clarification Request from Today's Hearing

From: Robert ([redacted]verizon.net)
To: plkennedyesq@aol.com
Cc: [redacted]yahoo.com; hrosen@berchemmoses.com
Date: Wednesday, September 24, 2025 at 08:29 PM EDT

Dear Hearing Officer Kennedy,

I would like to respectfully document a point from today's hearing and to seek clarification for the record.

During the hearing I asked, referring to when my time comes to present my case, if once I submit my exhibits I would be able to question Ms. Truscello about the exhibits I put in. You responded, "Nope."

I asked this in good faith, trying to understand the process and ensure I am following the correct procedures. I understand that cross-examination is limited to the scope of the district's presentation. However, I believe that the opportunity to question a witness about exhibits submitted during one's own case presentation is an essential part of the hearing process and a fundamental aspect of procedural due process. The exhibits I intend to introduce are directly relevant to my case, and my ability to question Ms. Truscello about those exhibits is essential to presenting a complete and meaningful defense.

Therefore, I respectfully request confirmation that I will be permitted to recall the district's witness or witnesses relevant to my case and to question them about the exhibits I submit during my time to present my case. My intent is not to re-litigate issues raised in the district's case, but to develop evidence directly related to my claims.

Thank you for your attention to this important matter.

Sincerely,

Robert [redacted]

STATE OF CONNECTICUT DEPARTMENT OF EDUCATION In Re: Student with a Disability Case No.: BOE 25-0686

REPLY TO MILFORD BOARD OF EDUCATION'S OBJECTION TO THE MOTION FOR RECUSAL OF HEARING OFFICER KENNEDY

Robert [redacted] appearing pro se, states as follows:

The District's Objection relies on mischaracterizations of the record and seeks to deflect from the central issue: whether the cumulative conduct of Hearing Officer Kennedy (Hearing Officer) has created an objective appearance of bias and procedural unfairness sufficient to warrant recusal. The Motion for Recusal is not based on mere disagreement with rulings, but on documented inconsistencies, procedural disadvantage, and conduct that undermines the fairness of the hearing.

The following clarifications and arguments are provided in support of the Motion:

## I. Rebuttal of "Forum Shopping" Accusation and Factual Misrepresentations

### A. The Prior Recusal Was Offered, Not Sought

The District inaccurately asserts that the Father engaged in "forum shopping" by seeking to remove a second Hearing Officer. However, the District's own Exhibit A (emails concerning Hearing Officer Ho) confirms that the Father did not request recusal. Instead, Hearing Officer Ho voluntarily offered to recuse herself in light of concerns raised about procedural restrictions, including her statement:

"I don't want you to use legal words because you're not lawyers."

This directive was not a neutral caution, but an instruction that treated the Parents differently based solely on their pro se status, which unjustly restricted their advocacy and denied them equal footing in the hearing process. The Father's acceptance of the voluntary recusal was a good-faith resolution of a situation that impaired meaningful participation—not an attempt to shop for a different decision-maker. The District's attempt to reframe a voluntary recusal as a strategic maneuver is contradicted by its own exhibit and reflects a selective reading of the record. It is unclear how the District can claim the Father sought recusal when its own exhibit shows that Hearing Officer Ho initiated the offer to step down. There is no motion, no request, and no demand from the Father in the record. The District's characterization is not supported by the evidence it submitted.

### B. Direct Response to Forum Shopping Allegation

The District's objection goes further by alleging that the Father is attempting to "forum shop." This accusation is unfounded. The Motion to Recuse is grounded in documented conduct that occurred during the hearing—specifically, shifting procedural standards, denial of witness questioning, and a procedurally disproportionate threat to dismiss. These events could not have

been anticipated prior to Hearing Officer Kennedy's appointment and are not part of any strategic maneuver. Raising concerns about bias based on the record is not forum shopping—it is the exercise of a procedural safeguard guaranteed under Conn. Agencies Regs. § 10-76h-8(f)(1). The Father is not seeking a different hearing officer for advantage, but rather to preserve the integrity of the process and ensure a fair and impartial hearing.

### C. Incorrect Account of Prehearing Attendance

The District incorrectly states that both Parents attended the prehearing conference on July 29, 2025. However, an email sent by Karen [redacted] to Hearing Officer Kennedy at 11:44 a.m. on that day confirms that she was unable to attend. **(Please see attached Exhibit D)** Attorney Rosen was copied on this email, which means the District was directly informed of her absence. The record is clear: only one Parent (the Father) was present. This misrepresentation further undermines the credibility of the District's objection.

## II. The Disproportionate Threat and Its Chilling Effect on Advocacy

The District attempts to frame Hearing Officer Kennedy's threat of dismissal as a necessary effort to restore order. This framing overlooks both the context and the severity of the threatened sanction.

### A. Threat of Dismissal Was Procedurally Disproportionate

During the first hearing session, the Father attempted to raise legitimate procedural concerns and sought clarification regarding exhibit submission deadlines—concerns based directly on the Hearing Officer's prior written instructions. The Father was responding to the Hearing Officer's interpretation of the rule and attempted to reference the written guidance that had been provided via email. As the Father began to explain that the Hearing Officer's comment contradicted the email, he was cut off mid-sentence. When he tried to clarify by stating, "But we received an email," the Hearing Officer interrupted again. The Father then respectfully stated, "Sir, I'm being cut off," in an effort to continue explaining the discrepancy. Instead of engaging with these concerns, the Hearing Officer issued a summary threat to dismiss the entire case with prejudice.

The Father repeatedly had to remind the Hearing Officer not to cut him off while asserting his procedural right to be heard. The threat of summary dismissal, issued in response to a good-faith inquiry about exhibit deadlines, was disproportionate and discouraged further participation.

The hearing transcript confirms that the Father's statements were respectful and focused on procedural clarification, as shown by his remarks:

"I'm not being unruly, sir. Sorry you feel that way," and "I don't feel you should be threatening to dismiss a case, sir."

This exchange reflects a breakdown in the fairness of the process and impeded the *pro se* party's ability to participate meaningfully in the hearing.

The District's objection misrepresents this exchange by claiming the Father interrupted the Hearing Officer while he was attempting to explain procedures. In reality, the transcript shows the Father was responding to a sudden threat of dismissal and referencing the Hearing Officer's own written guidance. The Father stated:

"We do have an email" and "I'm being cut off, sir,"

while attempting to clarify the exhibit submission rule. These remarks were not interruptions, but procedural advocacy in direct response to an abrupt shift in expectations that disadvantaged the Parents. The District's portrayal omits this context and reframes respectful engagement as unruly conduct.

Such a threat—delivered in response to a procedural clarification request—was disproportionate and discouraging. It inhibited further advocacy and raised an objectively reasonable concern about retaliatory action against the *pro se* party. It created an atmosphere in which the Father had to choose between silence or risking dismissal—a choice no party should face in a due process hearing. The District's assertion that the Hearing Officer showed patience before issuing his warning is contradicted by the transcript, which reflects that the Father was cut off while raising procedural concerns and threatened with dismissal without any prior disruptive conduct.

## III. Shifting Procedural Rules Created Uneven and Prejudicial Treatment

The Father was disadvantaged for complying with the Hearing Officer's own written instructions—while the District was granted a *de facto* procedural advantage.

### A. Hearing Officer's Written Rule Was Clear and Specific

In its objection, the District quoted the following procedural rule:

"At least five business days prior to a hearing date scheduled, each party shall disclose to the other party all documentary evidence, including evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing. A hearing officer may bar any party that fails to comply with this requirement from introducing such evaluations or recommendations at the hearing. Witness lists shall be exchanged by the parties and provided to the hearing officer no later than 5 business days prior to the scheduled hearing date."

However, this quoted language does not match the written instruction provided to the parties by Hearing Officer Kennedy. In his email, the Hearing Officer stated:

"You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony. (This usually means a week, but keep in mind that Columbus Day would push back the deadline for the following hearing one more day.)"

This distinction is critical. The District's quoted rule implies a blanket deadline tied to the first scheduled hearing date. In contrast, the Hearing Officer's instruction clearly ties the deadline to the specific hearing date on which the party intends to use the exhibits or testimony. The Hearing Officer's phrasing — "a hearing in which you wish to submit" — indicates that deadlines are session-specific, applying to each hearing date individually, not fixed to the start of the hearing.

The Parents relied on the Hearing Officer's written instruction in good faith, planning to submit their exhibits five business days before their own presentation date. There was no communication stating that exhibits needed to be submitted prior to the District's case-in-chief or in order to be used during cross-examination. The Hearing Officer's later retroactive application of the District's broader interpretation contradicted his own guidance and limited the Parents' opportunity to present their case.

**B. Detailed Timeline Shows Procedural Imbalance**

The District began its case on September 24, 2025, and submitted exhibits on September 17 (five business days before). The Parents were expected to begin presenting their case on October 27. Following the same five-day rule, their exhibit deadline was October 20. If the Parents had submitted their exhibits on September 17, as the District insisted, the District would have had over a month to prepare rebuttal, while the Parents would have had only five business days to respond to the District's exhibits—an unbalanced procedural outcome.

The District's assertion that the Father "made clear" he was not going to provide his exhibits or witness list at least five business days prior to the commencement of the hearing is a mischaracterization of the record. The District was scheduled to begin presenting its case on September 24, 2025. In an email submitted as Exhibit A in the original recusal motion, the District stated:

"The District expects that it will require three days to present its case. However, we expect to receive the Complainants' exhibits at least five days prior to September 24, pursuant to 34 C.F.R. Sec. 300.512 and Regs. Conn. State Agencies Sec. 10-76h-12."

Based on this, the District's presentation dates were September 24, October 17, and October 21. This confirms that the hearing was structured across multiple sessions, and supports the interpretation that exhibit deadlines should correspond to the specific session in which the evidence would be used.

The Parents were expected to begin presenting on October 27, making October 20 the correct deadline for their exhibit submission, in accordance with the Hearing Officer's directive. The District submitted its exhibits on September 17, five business days before its first hearing date. If the Parents had submitted their exhibits on September 17 as the District insisted, the District would have had nearly a month to prepare for the Parents' case, while the Parents would have had only five business days to prepare in response to the District's exhibits. This would have created a significant procedural imbalance and constrained the Parents' ability to mount their case.

Such a disparity would have compromised the Parents' ability to respond meaningfully to the District's case and would have undermined the principle of balanced participation. The Father's position was consistent with both the Hearing Officer's guidance and the applicable regulations, and the District's objection distorts the timeline and misrepresents his actions. The selective enforcement of disclosure expectations—favoring the District's timeline while limiting the Parents' participation—contributes to a reasonable perception of unequal procedural treatment that underlies this motion for recusal.

### C. Retroactive Shift in Disclosure Standard

Despite this imbalance, the Hearing Officer retroactively shifted the standard. The Father was barred from using his exhibits during cross-examination and from recalling witnesses. The Hearing Officer later described the disclosure expectation as an "attorney courtesy," contradicting the earlier written standard and applying it retroactively in a manner that disadvantaged the Parents. This shift significantly impaired the Father's ability to present his case and contributed to a reasonable perception of unequal procedural treatment.

## IV. Unexplained Rulings Undermined Procedural Fairness

### A. Denial of Witness Questioning Was Summary and Unexplained

The District's objection is silent on one of the clearest examples of procedural concern: the Hearing Officer's denial of the Father's request to recall a witness and introduce relevant exhibits during cross-examination. The ruling was made without explanation and is recorded in the transcript as a single word: "Nope." When the Father sought clarification in writing (Exhibit C, previously submitted with the original Motion for Recusal), no response was provided. The District's failure to address this incident only underscores its significance. It exemplifies unexplained procedural decisions that raise concerns about consistency and fairness, and contributes to the overall appearance of partiality.

## V. Conclusion

The legal standard for recusal is whether an objective observer, fully informed of the facts, would harbor **serious doubt that justice can be done** without recusal. That standard is clearly met here. The Hearing Officer has issued contradictory procedural guidance, imposed prejudicial sanctions based on retroactive standards, threatened dismissal in response to good-faith procedural inquiries, and arbitrarily denied witness questioning without explanation. The District's objection fails to rebut these core examples of procedural unfairness — including the Hearing Officer's unexplained denial of witness recall — further reinforcing the appearance of bias. The cumulative impact of this conduct is not minor error—it resulted in procedural conditions that impaired the ability of a *pro se* party to fully participate. Recusal is not a remedy for disagreement—it is a safeguard against the erosion of impartiality, and that safeguard is warranted here. While the District argues that recusal may cause delay, efficiency cannot outweigh fairness. The IDEA's stay-put protections ensure that no harm will result from a temporary delay, while the harm of proceeding under the appearance of bias is irreparable. An objective observer would reasonably question whether justice could be done absent recusal. Any

temporary delay is minimal compared to the permanent prejudice of a hearing conducted under even the appearance of bias. A hearing without impartiality is no hearing at all.

WHEREFORE, the Father, Robert [redacted] respectfully requests that:

the Milford Board of Education's Objection to the Motion for Recusal be DENIED; and the Motion for Recusal of Hearing Officer Kennedy be GRANTED.

Respectfully submitted,

Robert [redacted] (Pro Se)

Exhibit D

## Prehearing 7/29/25

From: Karen [redacted] ([redacted]yahoo.com)
To: plkennedyesq@aol.com; [redacted]verizon.net; hrosen@berchemmoses.com
Date: Tuesday, July 29, 2025 at 11:44 AM EDT

To Hearing Officer Kennedy,

I would like to introduce myself as I was unable to attend the prehearing this morning. My name is Karen [redacted] Mother. Mr. [redacted] and I spoke about what was discussed at the prehearing. The following hearing dates 9/24/25, 10/17/25, 10/21/25, 10/23/25, 10/27/25 and 11/4/25 will not work for my demanding schedule as I work a full time job. I need the dates to be spread out more and possibly half days via zoom. I also need to be present at every hearing.

I appreciate your cooperation in this matter.

Karen [redacted]

STATE OF CONNECTICUT
DEPARTMENT OF EDUCATION

| | | |
|---|---|---|
| [redacted]. | : | October 1, 2025 |
| v. | : | Case No. 25-0686 |
| Milford Board of Education | : | Hearing Officer Patrick L. Kennedy |

## MILFORD BOARD OF EDUCATION'S OBJECTION TO THE FATHER'S MOTION FOR RECUSAL OF HEARING OFFICER KENNEDY

### I. FACTUAL AND PROCEDURAL BACKGROUND

On June 11, 2025, the father ("the Father") of the student at issue ("the Student") submitted a due process complaint against the Milford Board of Education ("the Board"). On June 12, 2025, Sylvia Ho was appointed as the Hearing Officer in this matter. Hearing Officer Ho convened a prehearing conference on July 17, 2025, and the Student's parents ("the Parents") and the undersigned Board counsel participated in that virtual conference. At that prehearing conference, the issues for the hearing were established and hearing dates were discussed. During the prehearing conference, Hearing Officer Ho had asked the Father to explain his claims to better understand the issues in this case, and when the Father misused the phrase, "least restrictive environment," she cautioned him about using legal terms.

Afterwards, the Father and Hearing Officer Ho exchanged numerous emails in which the Father appeared to take offense to Hearing Officer Ho's explanation behind her comment which had been geared towards better understanding the issues in this matter. See Exhibit A. Specifically, the Father claimed without any basis that Hearing Officer Ho was limiting the Parents' ability "to fully engage in a federally governed process that relies on established

terminology." Id. at pg. 1. Hearing Officer Ho disagreed with the Father's claim but offered to recuse herself, which the Father accepted. Id.

On July 22, 2025, Patrick Kennedy was appointed as the second Hearing Officer in this matter. The parties were also provided with directions stating:

> "At least five business days prior to a hearing date scheduled, each party shall disclose to the other party all documentary evidence, including evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing. A hearing officer may bar any party that fails to comply with this requirement from introducing such evaluations or recommendations at the hearing. Witness lists shall be exchanged by the parties and provided to the hearing officer no later than 5 business days prior to the scheduled hearing date."

Hearing Officer Kennedy convened a prehearing conference on July 29, 2025 with the Board's Counsel and both Parents, during which the issues for this hearing were once again established and hearing dates were scheduled. The first hearing date was scheduled for September 24, 2025, and other hearing dates were scheduled for: October 17, 2025; October 21, 2025; October 27, 2025; and November 4, 2025. The parties confirmed the Student's stay-put placement at his neighborhood school of West Shore Middle School, despite the Board wanting the Student at its Harborside Middle School which it believed offered the Student necessary supports, and the Parents wanting the Student outplaced.

Thereafter, in emails exchanged with the undersigned counsel and Hearing Officer Kennedy, the Father made clear that he was not going to provide his exhibits or witness list at least five business days prior to the commencement of the due process hearing and was instead attempting to only submit such information five business days before the actual date he would start presenting his case-in-chief.[1] On September 17, 2025, consistent with Connecticut General

---

[1] On the first day of hearing on September 24, 2025, the undersigned counsel put the Board's objections on record about how the Parents have withheld their witness list and exhibit list in violation of Connecticut General Statute 10-76h(c)(2). While the Board's objection to the Parents' lack of disclosure is not at issue as part of this objection to

Statute § 10-76h(c)(2) and Regulations of Connecticut State Agencies ("R.C.S.A.") § 10-76h-12, the undersigned counsel provided the Parents and Hearing Officer Kennedy with copies of the Board's exhibits and the Board's list of witnesses that it intended to make available at the commencement of the hearing, including the Student's former special education teacher, Ms. Tara Truscello. See Exhibit B. The Parents submitted neither exhibits nor a witness list.

The parties convened for the first scheduled hearing date on September 24, 2025 ("the First Hearing").[2] Specifically, the Board's Special Education Elementary Supervisor and the Board's counsel attended the First Hearing on behalf of the Board, along with the Board's first witness, Ms. Truscello. The Parents were also in attendance. The Board's exhibits were accepted into evidence without objection by the Parents, both parties gave opening arguments, and the Board began calling the witnesses it had noticed the Parents about on September 17, 2025. Specifically, Board's counsel conducted the direct examination of Ms. Truscello, and both Parents had ample time to cross-examine Ms. Truscello.

At times during the First Hearing, the Father interrupted Hearing Officer Kennedy, even when Hearing Officer Kennedy was attempting to give an explanation of the due process hearing procedures and answering the Father's questions. Despite Hearing Officer Kennedy asking the Father to listen to explanations and rulings, the Father continued to interrupt and talk over the Hearing Officer, prompting a warning that the Father's case could be dismissed if he was unruly during the hearing.

---

Mr. [redacted]s Motion to Recuse, the Board maintains that it is prejudicial towards the Board for the Parents to not share their witness and exhibits lists while the Board presents its case-in-chief.

[2] On October 1, 2025, the parties were informed by the Court Reporter's agency that transcripts from the First Hearing may not be available until October 8, 2025. The Board is submitting this objection on October 1, 2025 but reserves the right to further supplement its objection with citations to the First Hearing transcript, if requested by this Hearing Officer.

On September 29, 2025, following the First Hearing, the Father filed a Motion to Recuse Hearing Officer Kennedy ("the Motion to Recuse").

Pursuant to R.C.S.A. § 10-76h-8, the Board hereby objects to the Motion to Recuse and respectfully requests that Hearing Officer Kennedy enter an order denying the Motion to Recuse in its entirety.

## II. LEGAL ARGUMENT

R.C.S.A. § 10-76h-8(a) provides for a party to a special education due process proceeding to request that a hearing officer rule on a motion, provided that such a motion *shall not be used to delay or protract any proceeding* (emphasis added).[3] R.C.S.A. § 10-76h-8(f)(1) prescribes the manner in which a motion to recuse must be filed. Specifically, R.C.S.A. § 10-76h-8(f)(1) states that a motion to recuse shall be based on *an assertion of bias, or a personal or professional interest that may conflict with the objectivity of the hearing officer* in the conduct or disposition of the hearing (emphasis added).[4]

It is well-established in the context of special education hearings that a hearing officer is presumed to be impartial, and that, in moving to recuse a hearing officer, the movant is obligated to rebut this presumption. See Dell v. Bd. of Ed., Tp. High Sch. Dist. No. 113, 32 F.3d 1053, 1065-1066 (7th Cir. 1994). A mere allegation disputing impartiality, however, will not suffice. Rather, "in the absence of anything concrete upon which to base a claim of lack of impartiality or bias," a motion to recuse a hearing officer must be denied. Delaware Valley Sch. Dist., 38

---

[3] In submitting a motion, R.C.S.A. § 10-76h-8(b) further requires a party to set forth the reasons for the desired ruling or action, and to *state whether a hearing on the motion is requested* (emphasis added). Given the silence on this issue, it is assumed that no hearing is requested, and the Board is not requesting such a hearing.

[4] See also 34 C.F.R. § 300.511(c)(i) (stating that at a minimum, a hearing officer must not be an employee of the state educational agency or the local educational agency that is involved in the education or case of the child, or a person having a personal or professional interest in the case that conflicts with the person's objectivity in the hearing).

IDELR 224 (PA SEA 2003). Therefore, in evaluating the Motion to Recuse, Hearing Officer Kennedy must be presumed to be impartial, and the Motion to Recuse must be denied unless it demonstrates a real, concrete bias, or a personal or professional interest conflicting with this Hearing Officer's impartiality.

Moreover, the decision as to whether to grant a motion for recusal is left to the sound discretion of Hearing Officer Kennedy. See Apple v. Jewish Hospital and Medical Center, 829 F.2d 326, 333 (2d Cir. 1987). The test in evaluating whether a judge's impartiality might be questioned focuses exclusively on appearances. See United States v. Amico, 486 F.3d 764, 775 (2d Cir. 2007). "Its purpose is the protection of the public's confidence in the impartiality of the judiciary." Id. "In other words… would a reasonable person, knowing all the facts, conclude that the [judge's] impartiality could be reasonably questioned? Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal." Id. In deciding whether to grant a motion for recusal, a judge should "carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his expected adverse decisions." In re Basciano, 542 F.3d 950, 956 (2d Cir. 2008).

Here, the Father's Motion to Recuse fails to introduce any concrete evidence upon which to base a claim of lack of impartiality or bias. First, the Father incorrectly argues that Hearing Officer Kennedy made a "disproportionate threat to dismiss the case with prejudice." The Motion to Recuse cites certain comments attributed to this Hearing Officer without any reference to the circumstances and/or the behavior on part of the Father at the time during the First Hearing. Hearing Officer Kennedy was not threatening the Father. Rather, in context, this

Hearing Officer was cautioning the Father that this matter could be dismissed if the Father was unruly during the hearing process.

R.C.S.A. 10-76h-13(a) provides that a "hearing officer shall take reasonable measures, including the exclusion from the hearing of parties, counsel, or any other participant, to ensure that the parties, counsel and all other participants comport themselves civilly and that the hearing is conducted in a fair and orderly manner. Behavior which may result in exclusion includes, but is not limited to, abusive speech, inflammatory remarks or disrespectful conduct towards the hearing officer, counsel or any party or party representative, or witness."

To that end, hearing officers in the State of Connecticut have consistently denied motions for recusal predicated upon allegations that a hearing officer's actions or comments, which were intended to ensure a fair and orderly hearing, actually evinced bias. See, e.g., North Branford Board of Education, Final Decision and Order, Case No. 20-0021 (CT SEA 2019, H.O. Ford Shaw); Monroe Board of Education, Final Decision and Order, Case Nos. 16-0486, 16-0617 (CT SEA 2017, H.O. Ho); Milford Board of Education, Final Decision and Order, Case No. 09-0518 (CT SEA 2009, H.O. Strong) (dismissing motion to recuse, noting that pro se parent's comments repeatedly violated R.C.S.A. 10-76h-13a); New Canaan Board of Education, Final Decision and Order, Case No. 05-320 (CT SEA 2006, H.O. Gelfman); Darien Board of Education, Final Decision and Order, Case No. 04-305 (CT SEA 2006, H.O. Rosado) (denying motion to recuse that was based on hearing officer's denial of request to limit each hearing date to three hours of testimony. "This would have greatly extended the hearing time, there was no bias or partiality of the hearing officer and the parents were not denied the ability to seek or retain representation").

During the First Hearing, the Father repeatedly interrupted and argued with this Hearing Officer. Hearing Officer Kennedy repeatedly warned the Father against interruptions and only

mentioned the possibility of a dismissal of the case if the Father continued to interrupt him and not follow the rules of the hearing. This matter is not dissimilar to Genn v. New Haven Bd. of Ed., 219 F.Supp.3d 296 (D. Conn. 2016), when a parent attorney moved for a hearing officer's recusal based on certain comments alleged to have been made by the hearing officer during the course of the due process proceedings, which allegedly evinced antagonism toward the parent and bias in favor of the board of education. The hearing officer denied the motion, citing, inter alia, the disrespectful and unprofessional conduct of the parent and parents' counsel, which unnecessarily prolonged the proceedings. Id. at 310-11. The parent appealed the adverse administrative decision to the District Court.

On appeal, the District Court affirmed the appropriateness of the hearing officer's denial of the parent's motion to recuse. The District Court emphasized the hearing officer's obligation to conduct the hearing in a fair and orderly manner and noted the hearing officer's repeated attempts to get the parent and counsel to respect the proceedings. Id. The District Court further noted that, even if the hearing officer's comments were at times "curt and harsh," it was not convinced that the hearing officer's conduct "so affected the [parent's] case that the outcome would have been different with another [hearing officer], nor that it rendered the process biased." Id. at 311-312. Similarly, Hearing Officer Kennedy's warning to the Father was an attempt to restore order to the First Hearing and to advise the Father to not continuously interrupt the Hearing Officer as he provided explanations. Hearing Officer Kennedy's warning only came after he had given the Father substantial leeway as a pro se litigant and permitted several earlier interruptions. Hearing Officer Kennedy's statement to the Father, made in an attempt to enforce R.C.S.A. § 10-76h-13(a), cannot possibly be considered evidence of bias warranting recusal.

Second, the Father incorrectly argues that he was wrongfully precluded from using exhibits during the cross-examination of Ms. Truscello and that he was wrongfully precluded from recalling Ms. Truscello. The Motion to Recuse is devoid of any argument as to how Hearing Officer Kennedy's alleged comments and directives are indicative of a bias which would conflict with the objectivity of the hearing. Rather, the record reflects that this Hearing Officer demonstrated his impartiality by talking through procedural expectations with the Parents, and clarifying with the Parents what would be the result of any decision by the Parents to not share evidence or exhibits prior to a hearing date.

For example, the Board provided the Parents with notice, at least five business days before the First Hearing, that the Board would be presenting Ms. Truscello as a witness. Despite advanced notice that Ms. Truscello would be called, but having elected to not disclose exhibits in advance, the Parents did not introduce any exhibits during their cross examination of Ms. Truscello. In his September 11, 2025 email to the parties, Hearing Officer Kennedy had clearly told the Parents that they should disclose exhibits at least five business days before the hearing date in which they intended to introduce evidence or provide the testimony. He further explained to the Parties in a September 16, 2025 email that exhibits are barred "from being used if they are not produced five business days in advance of the specific date that they are to be used." The fact that the Parents chose not to introduce exhibits for them to then cross-examine Ms. Truscello and produce testimony does not mean they get to try and call her again when they want to put on their case-in-chief. Contrary to the Father's allegations in the Motion to Recuse, Hearing Officer Kennedy explained what may be the ramifications of the Parents' strategy with respect to disclosing evidence and witnesses. Hearing Officer's explanations were not indicative of any

bias, but instead statements of impartial analysis and explanation about evidentiary practice in due process hearings.

The United States Supreme Court has held that the "opinions formed by [a] judge on the basis of facts introduced or events occurring during current or prior proceedings are not grounds for a recusal motion unless they display a deep-seated favoritism or antagonism that would make fair judgement impossible." Liteky v. U.S., 510 U.S. 540, 555 (1994). See also Pedraza v. Alameda Unif. Sch. Dist., 2012 U.S. Dist. LEXIS 41096* (N.D. C.A. 2012) (citing Liteky in denying plaintiff parents' motion to recuse a judge from litigation pertaining to special education issues). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Liteky, 510 U.S. at 555. In other words, "[a] conflict of interest must be real, not the perception of the parties." Douglas Cnty. Sch. Dist., 102 LRP 18786 (SEA NV 2000).

Here, Hearing Officer Kennedy's remarks do not reflect any conflict of interest or bias. Rather, an objective disinterested observer viewing the evidence cited by the Father could find only that the Hearing Officer made an informed assessment as to the Parents' plan to disclose or not disclose exhibits and a witness list in advance of the First Hearing. Further, Hearing Officer Kennedy has made efforts and accommodations to ensure that the Parents have a full understanding of due process procedures and their rights related thereto.

Ultimately, the Father's Motion to Recuse is full of allegations that are neither real nor concrete, but rather based on the Father's perception. It is indisputable that the Motion to Recuse does not allege any personal or professional interest that may conflict with the objectivity of the Hearing Officer in the conduct or disposition of the present due process proceeding, nor is there any evidence to question Hearing Officer Kennedy's impartiality.

Finally, Hearing Officer Kennedy is already the second hearing officer assigned to this matter after the Father took issue with Hearing Officer Ho's attempts to similarly ensure that a due process hearing be conducted in a "fair and orderly manner." Courts have recognized that the mere fact that a decision-maker's "opinions or rulings are unsatisfactory to a particular party," "will not give rise to a finding of prejudice or bias to serve as the basis for disqualification." Irish v. Irish, 59 Mich. App. 635, 639-640 (MI COA 1975). The Father cannot be permitted to simply seek recusal of a hearing officer each time he disagrees with a ruling or directive. To expect Hearing Officer Kennedy to immediately recuse himself just because the Father claims, without merit, that he is being restricted in prosecuting his case (despite his strategy to not produce exhibits or a witness list five business days before the First Hearing), would permit the Parents to essentially "forum shop." Such a strategy is impermissible and would unduly prejudice the Board by forcing the Board to either reintroduce evidence in front of a new hearing officer or continue presenting its case in front of a hearing officer who lacks knowledge of the evidence and context of the case that has already been produced.

Further, the Board has already expended significant time, resources, and public funds in preparing for the First Hearing and it is prepared to go forward with the remaining hearing dates. Most importantly, the Student continues to be in a stay-put placement that neither party believes is the appropriate educational placement in the least restrictive environment possible. Therefore, the introduction of a new hearing officer would no doubt delay these proceedings at the expense of both the Board and the Student. The recusal of Hearing Officer Kennedy, who has in no way demonstrated bias or interest toward either party but in fact sought to bring some clarity and organization to this matter, would further delay the proceedings and result in significant additional prejudice to the Board. The Motion to Recuse must therefore be denied.

## III. CONCLUSION

For the foregoing reasons, the Board respectfully requests that this Hearing Officer enter an order denying the Motion to Recuse in its entirety.

RESPECTFULLY SUBMITTED
THE MILFORD BOARD OF EDUCATION

BY________________________________

Herbert Z. Rosen, Esq.
Berchem Moses PC
75 Broad Street
Milford, CT 06460
(203) 783-1200
hrosen@berchemmoses.com

CERTIFICATION

This is to certify that a copy of the foregoing was sent by email on October 1, 2025, to the Parents:

Robert [redacted]g
[redacted]7@verizon.net

Karen [redacted]n
[redacted]@yahoo.com

Herbert Z. Rosen, Esq.



4917-7369-0734, v. 1

# EXHIBT A

**From:** Robert
**To:** Hearing Officer Sylvia Ho
**Cc:** Herbert Z. Rosen; DueProcess SDE; Kirsten Dovenberg; Karen [redacted]
**Subject:** Re: Pre hearing
**Date:** Monday, July 21, 2025 6:29:55 PM

Dear Hearing Officer Ho,

Thank you for your reply and for your offer to recuse yourself.

Given the concerns detailed in our letter regarding the clarity and consistency of the pre-hearing directives, and to ensure the impartiality crucial for a fair and effective due process hearing, we believe your recusal would be in the best interest of all parties involved.

We therefore **accept your offer for recusal** and respectfully request that the Due Process Unit promptly assign a new, impartial hearing officer to our case.

We look forward to proceeding with the due process hearing under the guidance of a newly assigned officer.

Sincerely,

Robert

On Monday, July 21, 2025 at 12:09:43 PM EDT, Hearing Officer Sylvia Ho <hearingofficersylviaho@gmail.com> wrote:

Mr. [redacted],

That is not my recollection. If you are not comfortable, I will recuse myself and withdraw as the hearing officer. Please let me know.

Attorney Sylvia Ho
Hearing Officer
16 Spring Lane
Farmington, CT 06032
hearingofficersylviaho@gmail.com

Sent by mobile phone. Please excuse typos.

On Jul 21, 2025, at 11:39 AM, Robert <[redacted]@verizon.net> wrote:

Dear Hearing Officer Ho,

We'd like to respectfully reiterate that our concern wasn't based on assumptions about your knowledge of our legal status, but rather on your specific directive during the prehearing conference: "Don't use legal words because you're not lawyers." This directive created a distinction based on our non-attorney status that we believe inadvertently limited our ability to fully engage in a federally governed process that relies on established terminology.

Terms such as **Least Restrictive Environment** aren't exclusive to attorneys—they're foundational components of the **Individuals with Disabilities Education Act (IDEA)** and are routinely used by parents, educators, and advocates alike in due process matters. These terms are part of the language of

special education, not solely of the legal profession.

Our concern isn't whether you provide legal advice, but whether your instruction had the effect of discouraging the use of essential, IDEA-based terminology central to presenting our case.

We've made a deliberate and thoughtful effort to document this concern because we believe an impartial hearing process must allow all parties—regardless of professional status—to advocate using the vocabulary that is intrinsic to the issues at hand.

Finally, your recent statement that you "had no knowledge" of our legal status **directly conflicts** with the directive you issued referencing that status. Moreover, your subsequent explanation that you would have issued the same directive to an attorney is difficult to reconcile with your original instruction that explicitly cited our non-attorney status. This only further underscores the need for procedural clarity as we move forward.

We appreciate your attention to this matter.

Respectfully,

Robert [redacted] and Karen [redacted]

On Mon, Jul 21, 2025 at 8:26 AM, Hearing Officer Sylvia Ho <hearingofficersylviaho@gmail.com> wrote:

> Mr. [redacted] and Ms. [redacted] (Attorney Rosen)
>
> You have just notified me that the parents are not attorneys. I had no knowledge one way or another of whether you are or are not attorneys. Some parents who are attorneys proceed pro se. That all being said, I have already explained why I did not want the use of the legal term, rather the factual circumstances and would have done the same thing if you were an attorney.
>
> You may consult your own attorney on what it means when the ultimate determination of the least restrictive environment depends factual circumstances, which is for hearing. The factual circumstances was what I was trying to elicit from you.
>
> This is a legal proceeding and I am an impartial hearing officer. My authority does not allow me to provide legal advice nor explanations of my actions, only to provide basic information about the process of hearing.
>
> You may consult an attorney and hire one to represent you in this matter.
>
> You and Attorney Rosen were to determine a mutually available date for hearing. Have you done so? Please propose dates as soon as possible.
>
> Thank you.
>
> Attorney Sylvia Ho
> Hearing Officer
> 16 Spring Lane
> Farmington, CT 06032
> hearingofficersylviaho@gmail.com
>
> Sent by mobile phone. Please excuse typos.
>
> On Jul 20, 2025, at 3:58 PM, Robert <[redacted]@verizon.net> wrote:

Dear Hearing Officer Ho

During the prehearing conference, you specifically stated to us, "I don't want you to use legal words because you're not lawyers." That comment, which functioned as a directive discouraging our use of legal terminology, conveyed a clear message that our advocacy was being diminished based solely on our status as non-attorneys. Had an attorney made the same statement regarding the least restrictive environment, we do not believe it would have been questioned.

Respectfully

Robert [redacted]g and Karen [redacted]n

On Fri, Jul 18, 2025 at 10:18 AM, Sylvia Ho
<hearingofficersylviaho@gmail.com> wrote:

> Mr. [redacted],
>
> The number is a randomly assigned freeconferencecall.com number. The access code is individual, so it is quite possible, religious organizations and others whom I do not know also use the freeconferencecall.com number. If you are in need of it, you can go to the website and have a conference call number for yourself as well without being affiliated with me, or anyone else.
>
> With respect to the use of the term "least restrictive environment", the term is a legal term and embraces a number of different setting, such that the placement of a child in a self contained classroom can be considered the "least restrictive environment" as a legal conclusion under certain circumstances. By asking you to stop using the legal terminology, I was trying to deduce the circumstances, which would help me determine the issues. I understand the claims that the parents wanted to make that the out of district placement was less restrictive, I was trying to determine the circumstances of the different placements that was offered leading to the complaint. I hope that is clear enough for you. If you are interested in further researching the law, you may research the term "continuum of placements" or "continuum" in combination with the term "least restrictive environment". This will better explanation the legal framework using when I approach the determination. Hopefully, that helps.
>
> Attorney Sylvia Ho
> Hearing Officer
> 16 Spring Lane
> Farmington, CT 06032
>
> On Fri, Jul 18, 2025 at 9:41 AM Robert <[redacted]@verizon.net> wrote:
>
>> Dear Hearing Officer Ho,
>>
>> Thank you again for your time during the prehearing conference.
>>
>> We just wanted to follow up briefly on one point. During the discussion, there was a moment when we were advised not to use legal terminology because we are not attorneys. We completely understand the importance of clear communication and are doing our best to participate in that spirit.
>>
>> At the same time, terms like "restrictive environment" are used frequently in special education documents and meetings, and they're part of how we've come to understand our child's rights. Our intention is only to communicate effectively and advocate for our child in a meaningful way.

We also wanted to inform you that when we searched the conference call number you provided —(605) 313-4822—we discovered that it is publicly associated with religious prayer gatherings hosted by various churches and ministries. This is the same number you shared with us for the conference on July 8, and then again on July 17. We were not aware of its religious affiliation at the time, and we experienced difficulty connecting to the line due to how some carriers classify it.

Thank you again for your time and attention.

Sincerely,

Robert and Karen

On Thu, Jul 17, 2025 at 10:04 AM, Sylvia Ho <hearingofficersylviaho@gmail.com> wrote:

> The call in number is 605-313-4822
> access code is 713627
>
> Attorney Sylvia Ho
> Hearing Officer
> 16 Spring Lane
> Farmington, CT 06032
>
> On Thu, Jul 17, 2025 at 9:10 AM Karen [redacted] <[redacted]yahoo.com> wrote:
>
> > To Officer Sylvia Ho
> >
> > This is Karen [redacted] [redacted] [redacted] Mother. I need to be included in this prehearing conference today. I can be reached at [redacted].
> >
> > Thank you
> >
> > Karen
> >
> > Yahoo Mail: Search, Organize, Conquer

# EXHIBT B

BERCHEM MOSES PC

BERCHEMMOSES.COM

75 Broad Street
Milford, CT 06460
T: 203.783.1200
F: 203.878-2235

1221 Post Road East
Westport, CT 06880
T: 203.227.9545
F: 203.226.1641

Robert L. Berchem
Marsha Belman Moses
Stephen W. Studer ▸
Richard J. Buturla
Floyd J. Dugas
Ira W. Bloom
Jonathan D. Berchem ▪
Michelle C. Laubin ◆
Gregory S. Kimmel
Christopher M. Hodgson
Mario F. Coppola
Christine A. Sullivan

Nicholas R. Bamonte
Richard C. Buturla
Ryan P. Driscoll ◆ ▪
Rebecca E. Goldberg ▪
Bryan L. LeClerc ◆
Brian A. Lema
Douglas E. LoMonte
Matthew L. Studer
Paul A. Testa * ▸

Anthony V. Avallone
Jacob P. Bryniczka
Eileen Lavigne Flug
Peter V. Gelderman ◊
Warren L. Holcomb
Eugene M. Kimmel

Carolyn Mazanec Dugas
Alanna M. Ferrigno
Chandler K. Holcomb
Jason D. Kaplan ◆
Alessandra Pellegrino Pulit ◆
Herbert Z. Rosen
Matthew J. Sponheimer
A. Weston Stephens

* - Also Admitted in FL
◊ - Also Admitted in IL
▸ - Also Admitted in MA
▪ - Also Admitted in NJ
◆ - Also Admitted in NY
▪ - Also Admitted in PA

PLEASE REPLY TO
MILFORD OFFICE

September 16, 2025

**VIA FEDERAL EXPRESS**

Patrick L. Kennedy
Hearing Officer
132 Strawberry Lane
Manchester, CT 06040

Re: [redacted]. v Milford Board of Education, Case No. 25-0686

Dear Hearing Officer Kennedy:

Enclosed please find Exhibits and Witness List of the Milford Board of Education relative to the above-referenced matter.

Very truly yours,

Herbert Z. Rosen

Enclosures
cc: Robert [redacted]
Karen [redacted]

/hbb

STATE OF CONNECTICUT
DEPARTMENT OF EDUCATION

| | | |
|---|---|---|
| In re: [redacted]. | : | Case No. 25-0686 |
| | : | |
| v. | : | Before Hearing Officer |
| | : | Patrick L. Kennedy |
| | : | |
| MILFORD BOARD OF EDUCATION | : | September 17, 2025 |

WITNESS LIST OF THE MILFORD BOARD OF EDUCATION

The Milford Board of Education hereby provides notice of its intent to call all or some of the following witnesses in this matter, reserving the right to supplement this list, to call any witnesses on the witness list provided by the Parents and/or to call such witnesses as may be necessary for rebuttal:

1. Sara Collette, Special Education Supervisor, Milford Public Schools
2. Lauri Dougherty, School Social Worker, Milford Public Schools
3. Nadine Macklin, Special Education Supervisor, Milford Public Schools
4. Amy Rizzo, JFK Elementary School Principal, Milford Public Schools
5. Donna Stuart, General Education Teacher, Milford Public Schools
6. Tara Truscello, Special Education Teacher, Milford Public Schools

RESPECTFULLY SUBMITTED,
MILFORD BOARD OF EDUCATION

By______________________

Herbert Z. Rosen
Berchem Moses, P.C.
75 Broad Street
Milford, CT 06460
(203) 783-1200
hrosen@berchemmoses.com



4920-1452-0936, v. 1

## CERTIFICATION

This is to certify that a copy of the foregoing was delivered via Federal Express on or by September 17, 2025, to the following:

Robert [redacted]
[redacted]
Shelton, Connecticut 06484
[redacted]@verizon.net

Karen [redacted]
[redacted]
Milford, Connecticut 06461
[redacted]@yahoo.com

Herbert Z. Rosen, Esq.

STATE OF CONNECTICUT
DEPARTMENT OF EDUCATION

| | | |
|---|---|---|
| In re: [redacted]. | : | Case No. 25-0686 |
| | : | |
| v. | : | Before Hearing Officer |
| | : | Patrick L. Kennedy |
| | : | |
| MILFORD BOARD OF EDUCATION | : | September 17, 2025 |

WITNESS LIST OF THE MILFORD BOARD OF EDUCATION

The Milford Board of Education hereby provides notice of its intent to call all or some of the following witnesses in this matter, reserving the right to supplement this list, to call any witnesses on the witness list provided by the Parents and/or to call such witnesses as may be necessary for rebuttal:

1. Sara Collette, Special Education Supervisor, Milford Public Schools
2. Lauri Dougherty, School Social Worker, Milford Public Schools
3. Nadine Macklin, Special Education Supervisor, Milford Public Schools
4. Amy Rizzo, JFK Elementary School Principal, Milford Public Schools
5. Donna Stuart, General Education Teacher, Milford Public Schools
6. Tara Truscello, Special Education Teacher, Milford Public Schools

RESPECTFULLY SUBMITTED,
MILFORD BOARD OF EDUCATION

By______________________

Herbert Z. Rosen
Berchem Moses, P.C.
75 Broad Street
Milford, CT 06460
(203) 783-1200
hrosen@berchemmoses.com

## CERTIFICATION

This is to certify that a copy of the foregoing was delivered via Federal Express on or by September 17, 2025, to the following:

Robert [redacted]
[redacted]
Shelton, Connecticut 06484
[redacted]@verizon.net

Karen [redacted]
[redacted]
Milford, Connecticut 06461
[redacted]@yahoo.com

Herbert Z. Rosen, Esq.

**EXHIBITS**

**OF**

**MILFORD BOARD OF EDUCATION**

**IN RE: [redacted].**

**SEPTEMBER 24, 2025**

**Hearing Officer Patrick L. Kennedy**
**Case No. 25-0686**

| EXHIBIT | DATE | DESCRIPTION OF DOCUMENT |
|---|---|---|
| B-1 | 2/2/2023 | Signed Consent for Reevaluation – 2 pgs |
| B-2 | 4/27/2023 | Individualized Education Plan – 18 pgs |
| B-3 | 6/13/2023 | Progress Report on IEP Goals and Objectives – 10 pgs |
| B-4 | 11/30/2023 | Individualized Education Plan – 18 pgs |
| B-5 | 11/30/2023 | Prior Written Notice – 2 pgs |
| B-6 | 12/14/2023 | Progress Report on IEP Goals and Objectives – 12 pgs |
| B-7 | 1/26/2024 | Board's Psychological Evaluation by Jennifer Davis, School Psych. – 10 pgs |
| B-8 | 2/2024 | Board's Behavior Intervention Plan – 4 pgs |
| B-9 | 2/1/2024 | Progress Report on IEP Goals and Objectives – 11 pgs |
| B-10 | 2/1/2024 | Notice of Planning and Placement Team Meeting on 2/8/2024 - 2 pgs |
| B-11 | 2/8/2024 | Board's Educational Evaluation by Tara Truscello – 9 pgs |
| B-12 | 2/8/2024 | Board's Speech and Language Evaluation by Karen Kristan, SLP – 10 pgs |
| B-13 | 2/8/2024 | Individualized Education Plan and Related Forms – 25 pgs |
| B-14 | 2/8/2024 | Prior Written Notices – 4 pgs |
| B-15 | 3/20/2024 | Progress Report on IEP Goals and Objectives – 14 pgs |
| B-16 | 6/10/2024 | Progress Report on IEP Goals and Objectives – 16 pgs |
| B-17 | 12/10/2024 | Progress Report on IEP Goals and Objectives – 18 pgs |
| B-18 | 12/17/2024 | Notice of Planning and Placement Team Meeting on 1/16/2025 – 3 pgs |

4930-1951-5496, v. 1

| EXHIBIT | DATE | DESCRIPTION OF DOCUMENT |
|---|---|---|
| B-19 | 1/2025 | Board's Behavior Intervention Plan – 4 pgs |
| B-20 | 1/9/2025 | Progress Report on IEP Goals and Objectives – 18 pgs |
| B-21 | 1/16/2025 | Individualized Education Plan and Related Forms – 23 pgs |
| B-22 | 1/16/2025, 2/14/2025 | Prior Written Notices – 4 pgs |
| B-23 | 2/3/2025 | Notice of Planning and Placement Team Meeting on 2/13/2025 – 3 pgs |
| B-24 | 2/26/2025 | Notice of Planning and Placement Team Meeting on 3/6/2025 – 3 pgs |
| B-25 | 3/6/2025 | Individualized Education Plan and Related Forms – 25 pgs |
| B-26 | 3/6/2025 | Prior Written Notice – 2 pgs |
| B-27 | 3/31/2025 | Notice of Planning and Placement Team Meeting on 4/10/2025 – 3 pgs |
| B-28 | 4/28/2025 | Notice of Planning and Placement Team Meeting on 5/6/2025 – 3 pgs |
| B-29 | 5/8/2025 | Notice of Planning and Placement Team Meeting on 5/21/2025 – 3 pgs |
| B-30 | 5/21/2025 | Individualized Education Plan and Related Forms – 26 pgs |
| B-31 | 5/21/2025 | Prior Written Notice – 2 pgs |
| B-32 | 6/11/2025 | Progress Report on IEP Goals and Objectives – 12 pgs |
| B-33 | Resume | Sara Collette – 2 pgs |
| B-34 | Resume | Lauri Dougherty – 3 pgs |
| B-35 | Resume | Nadine Macklin – 3 pgs |
| B-36 | Resume | Amy Rizzo – 2 pgs |
| B-37 | Resume | Donna Stuart – 2 pgs |
| B-38 | Resume | Tara Truscello – 2 pgs |

# Milford School District
## Consent to Conduct an Initial Evaluation/ Reevaluation

Date Sent: 01/26/2023

Dear Karen [redacted], Robert [redacted]

A planning and placement team (PPT) meeting regarding your child, [redacted] (Student's Name) [redacted] (DOB) was held on 01/26/2023 (meeting date)

The team determined that an evaluation should be conducted for the following reason:

To comply with Federal and State regulations which require that each child receiving special education and related services must be reevaluated at least every three years to determine eligibility for special education and related services unless the parent and district agree that a reevaluation is unnecessary.

## Procedural Safeguards

☑ A copy of the Procedural Safeguards in Special Education is enclosed

Chris Brown 203-783-3410

**Please Note:**

A. Parents have the right to refuse consent and, if given, it may be revoked at any time.
B. Parents have the right to review and obtain copies of all of the records used as a basis for the evaluation.
C. Parents have the right to be fully informed of all evaluation results and to receive a copy of the evaluation report(s).

**Evaluation Procedures**

☑ The tests/evaluation procedures listed below were recommended
☐ The PPT has determined that no additional tests/evaluations are needed to determine continuing eligibility for special education and related services (and no parent consent is required) because the existing evaluative information/data is sufficient to determine the student's continued eligibility and needs.
☐ The district and the parent agree that a reevalution is unnecessary.

Parents, please be aware that you have the right to request an assessment to determine continuing eligiblity for special education services and that the school district is not required to conduct such an assessment unless requested by parents.

**Assessment Plan**

| Assessment Area | Test/Evaluation Procedure | Evaluator |
|---|---|---|
| Communication (Speech/Language) | Receptive/Expressive/Pragmatic | Speech Language Pathologist |
| Adaptive Behavior | Individually Administered Assessment | School Psychologist |
| Intellectual/Cognitive Functioning | Cognitive/Processing | School Psychologist |
| Academic | Individually Administered Assessment | Special Education Teacher |
| Behavioral/Social/Emotional | Social/Behavior/[redacted] Specific | School Psychologist |

**Special Accommodations**

**Consent to Conduct an Initial Evaluation/ Reevaluation**

**Student Name:** [redacted]
**DOB:** [redacted]

Special adaptations or accommodations are to be considered when indicated by the student's language, cultural background or physical status. Adaptations/accommodations required for this evaluation are:

☑ No adaptations/accommodations required

**The District is Asking for your Consent to Conduct:**

☑ A three-year reevaluation of the student

**Parent or Adult Student Approval**

☑ I give my consent for the Milford School District Public Schools to conduct the evaluations described above. I understand that this consent may be revoked at any time.
☐ I do not give my consent for the Milford School District Public Schools to conduct the evaluations described above.

[redacted] 02/02/2023

Parent/Guardian or Adult Student Signature | Date

Date received by school district:

* Failure of the parent to respond to a request from the Board for consent to conduct a reevaluation within 10 school days from the date of the notice to the parent shall be construed as parental refusal of consent. (RCSA Section 10-76d-8(b))

# Individualized Education Program
# Milford School District

| | |
|---|---|
| **Student Name:** [redacted] | **Meeting Date:** 04/27/2023 |
| [redacted]: [redacted] | **Case Manager:** Charlotte Adinolfi |
| **Date of Birth:** [redacted] | **Parent/Guardian Name:** Karen [redacted], Robert [redacted] |
| **Current Grade:** 3 | **Primary Disability:** [redacted] |
| **Current Enrolled School:** J. F. Kennedy School (0841911) | **School Next Year:** |
| **Most Recent Evaluation Date:** 06/04/2021 | **Next Reevaluation Date:** 06/04/2024 |
| **Most Recent Annual Review Date:** 01/26/2023 | **Next Annual Review Date:** 01/25/2024 |

**Reason for Meeting:**

Review or Revise the IEP

## PLANNING AND PLACEMENT TEAM (PPT) MEMBERS PRESENT

| Name | Role |
|---|---|
| Robert [redacted] | Father |
| Karen [redacted] | Mother |
| Kris Aspinwall | Student's General Education Teacher |
| Charlotte Adinolfi | Special Education Teacher or Provider |
| Administrator | Administrator or Designee |
| Jennifer Davis | School Psychologist |
| Karen Kristan | Speech and Language Pathologist |
| Lauri Dougherty | Social Worker |
| D'Arcy Jeffery | Nurse |
| Christina Fuller | Administrator |

# Planning and Placement Team Recommendations

The PPT recommends the following:

The parents requested a change of placement and the school team felt he could be appropriately educated at his home school.

Recommendations:
Services:
Reading: 5 x 30 minutes weekly pullout
Writing: 5 x 30 minutes weekly pullout
Math: 5 x 30 minutes weekly pullout
Executive Functioning: 4 x 30 minutes a week
Speech: 3 X 30 minutes weekly pullout
Counseling: 2 hour and 45 minutes weekly
Paraprofessional: 5 x 60 minutes a week push-in academic/5 x 45 minutes a week push-in behavior

Alternate setting for state testing
ESY: Social Skills

The IEP will begin May 18th, 2023.

# Special Considerations

**Does the student exhibit behaviors that impede learning for self or others?**

☐ No ☑ Yes

IEP goal(s) and objectives will be developed to address the behavior.

A behavioral intervention plan based on a functional behavior assessment has been developed.

---

**Is the student deaf or hard of hearing?**

☑ No ☐ Yes

---

**Is the student blind or visually impaired?**

☑ No ☐ Yes

---

**Does the student have limited English proficiency (Student qualifies as an EL)?**

☑ No ☐ Yes

---

**Does the student require accessible educational materials (AEM)?**

☑ No ☐ Yes

---

**Does the student require an Augmentative and/or Alternative mode of Communication?**

☑ No ☐ Yes

# Present Levels of Academic Achievement and Annual Goal(s) and Objectives

## ACADEMIC, PRE-ACADEMIC, COGNITIVE ACHIEVEMENT

**Parent and/or Student Input**

Karen and Rob reported how [redacted] has been at home.

## GOAL AREA: Reading

**Present Level of Performance**

Fountas and Pinnell: January 2023: Level L (middle of grade two)

**Strengths**

Strengths: Decodes grade appropriate spelling patterns, chooses character, setting, event, events in order, problem and solution from list of three

**Concerns/Needs**

Areas of Concern: Identifying: prediction, character, setting, event, events in order, problem, solution, main idea, supporting detail

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Due to [redacted]s difficulty with comprehension, his ability to access the general education curriculum is impacted resulting in specialized instruction.

| **Annual Goal 1** | **Evaluation Method** |
|---|---|
| Given small group instruction [redacted] will improve his reading comprehension skills , as measured by the following objectives: | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly choose supporting detail from the text from a list of three across 3 out of 4 texts. by 02/15/2024 | |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly choose the main idea from the text from a list of three options. across 3 out of 4 texts. by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly choose the main character from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly choose the setting of the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly identify an event from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly identify two events in order from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly choose the problem from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly choose the solution from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] [redacted] will correctly choose a prediction about the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Writing

**Present Level of Performance**

Generating ideas, adding details, editing with significant adult support and prompting

**Strengths**

Strengths: Generating ideas, adding details, editing with significant adult support and prompting

**Concerns/Needs**

Areas of Concern: Writing topics, graphic organizer, topic sentence, supporting sentences, concluding sentences, editing

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Due to [redacted]s difficulty with writing, his ability to access the general education curriculum is impacted resulting in specialized instruction.

| **Annual Goal 2** | **Evaluation Method** |
|---|---|
| Given small group instruction, [redacted]will improve his writing abilities , as measured by the following objectives: | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given When presented with models and adult support, [redacted]T [redacted]G will brainstorm at least three fiction or non-fiction writing topics with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted]T [redacted]G will select and appropriately fill in a graphic organizer with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted]T [redacted]G will write a topic sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted]T [redacted]G will write three supporting sentences for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted]T [redacted]G will write a concluding sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted]T [redacted]G will utilize an editing checklist to edit his writing for capitalization, punctuation and grammar with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Mathematics

**Present Level of Performance**

Solves addition and subtraction through 20 fluently, can count, identify and write numbers within 1,000

**Strengths**

Strengths: Solves addition and subtraction through 20 fluently, can count, identify and write numbers within 1,000

**Concerns/Needs**

Areas of Concern: Place value within 10,000; adding and subtracting through 1,000; addition and subtraction word problems through 1,000; money; skip counting

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

[redacted]s difficulty with math impacts his ability to accurately complete math computation and requires specialized instruction in a small group setting.

| **Annual Goal 3** | **Evaluation Method** |
|---|---|
| Given small group instruction, [redacted] will improve his math computation skills , as measured by the following objectives: | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given direct instruction and models, [redacted] [redacted] will skip count by 2's to 500 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | consistent with grade level report cards |
| Given direct instruction and models, [redacted] [redacted] will skip count by 5's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will skip count by 10's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | |
| Given direct instruction and visuals, [redacted] [redacted] will name the equivalent of monies presented by the teacher using coins up to a quarter and bills up to a twenty dollar bill (e.g., four quarters = one dollar), in 5 out of 5 opportunities. by 02/15/2024 | |
| Given direct instruction and visuals, [redacted] [redacted] will be able to correctly identify U.S. currency (coins and bills) and their worth, in 5 out of 5 opportunities. by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will correctly solve subtraction word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | consistent with grade level report cards |
| Given direct instruction and models, [redacted] [redacted] will correctly solve subtraction problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will correctly solve addition word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will correctly solve addition problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will correctly identify the place value of a given number within 10,000 for 8 out of 10 problems across 3 opportunities. (Baseline: Understands within 100) by 02/15/2024 | |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

# Present Levels of Functional Performance and Annual Goal(s) and Objectives

## FUNCTIONAL PERFORMANCE

**Parent and/or Student Input**

N/A

## GOAL AREA: Communication

**Present Level of Performance**

[redacted]y has made progress answering comprehension questions involving critical thinking questions given multiple choice options. He continues to struggle with higher level thinking tasks and answering questions involving such thinking and reasoning independently.

**Strengths**

[redacted]y is able to answer concrete questions from presented stories/situations.

**Concerns/Needs**

[redacted]y is working on development of critical thinking and reasoning skills.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in critical thinking and reasoning impact [redacted]s progress in the general educational setting without specialized instruction.

| Annual Goal 4 | Evaluation Method |
|---|---|
| Given verbal prompting and visuals during structured task, [redacted] will respond to comprehension questions involving critical thinking and reasoning , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given prompting and visual cues during a structured task [redacted] will identify the problem and generate an appropriate solution from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | |
| Given prompting and visual cues during a structured activity [redacted] will answer "How do you know" questions about characters and events from a presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | consistent with grade level report cards |
| Given prompting and visual cues during structured activity [redacted] will provide evidence to support inferences from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | consistent with grade level report cards |
| Given prompting and visual cues during structured activity [redacted] will make an inference about a character's feelings or motives from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | |
| Given prompting and visual cues [redacted] will respond to comprehension questions involving prediction of events with 80% accuracy in 4/5 opportunities during structured activity by 02/15/2024 | |
| Given prompting and visual cues during a structured activity [redacted] will identify causes of events from presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | consistent with grade level report cards |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

## GOAL AREA: Social/Emotional

**Present Level of Performance**

[redacted] has demonstrated some growth in his conversational skills in a small group setting. He is able to listen to a peer and ask a question on topic. When [redacted] is excited about a topic; he has improved his patience with waiting his turn with visual cues. We are beginning to work on problem-solving skills. [redacted] struggles with maintaining focus and his demeanor when working on more complex situations.

**Strengths**

When engaging with a peer and/or adult, [redacted] is able to ask a couple of questions on topic and demonstrate turn taking skills.

**Concerns/Needs**

[redacted] has difficulty solving social problems and actively participating in conversations.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Due to [redacted]s delayed language and [redacted], he requires facilitation with communicative interactions and social interactions with others in order to participate in the curriculum and maintain social relationships.

| **Annual Goal 5** | **Evaluation Method** |
|---|---|
| Given hypothetical social problem situations, [redacted]will identify potential solutions and consequences of each solution , with 100% mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given A hypothetical social problem situation that he has provided solutions for [redacted]T [redacted]G will identify and discuss the possible consequences of each solution in 4/5 trials by 02/15/2024 | |
| Given a hypothetical social problem situation [redacted]T [redacted]G will identify 2 possible solutions to the problem in 4/5 trials by 02/15/2024 | |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |
| Counseling Individual | |
| Counseling Individual | |

**Individualized Education Program** **Student Name:** [redacted]
**DOB:** [redacted]

| **Annual Goal 6** | **Evaluation Method** |
|---|---|
| Given the opportunity to participate in conversations with peers and/or adults during counseling intervention sessions, [redacted] will actively participate and adhere to identified conversational rules , with 100% mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given the opportunity to participate in a conversation [redacted] will introduce relevant topics and ask 2 questions that are relevant to the topic in 70% of opportunities by 02/15/2024 | |
| Given the opportunity to participate in a conversation [redacted] will request clarification and respond to requests for clarification in 70% of opportunities by 02/15/2024 | |
| Given the opportunity to participate in a conversation [redacted] will maintain a topic for 6-7 conversational exchanges in 4/5 trials by 02/15/2024 | |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |
| Counseling Individual | |
| Counseling Individual | |
| Counseling | |

## GOAL AREA: Executive Functioning

**Present Level of Performance**

[redacted] enjoys being with his peers.

**Strengths**

[redacted] enjoys being with his peers.

**Concerns/Needs**

Follow classroom rules and routines; attending; following multi-step directions; appropriately engage with peers

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Due to [redacted] difficulty with executive functioning, he requires specialized instruction.

| **Annual Goal 7** | **Evaluation Method** |
|---|---|
| Given small group instruction, [redacted] will improve his executive functioning skills , as measured by mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given small group instruction in a separate setting and given a model, [redacted] will follow classroom rules and routines for 80% of the session for 8 out of 10 opportunities with no more than 3 verbal reminders per session. by 02/15/2024 | consistent with grade level report cards |
| Given small group instruction in a separate setting and provided expectations, [redacted] will attend for 80% of the session with no more than 3 verbal reminders per session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | consistent with grade level report cards |
| Given multi-step directions and visuals, [redacted] will follow 80% of the directions accurately with no more than 3 verbal reminders for 8 out of 10 opportunities. by 02/15/2024 | consistent with grade level report cards |
| Given partner work and provided with models, [redacted] will appropriately engage with peers for 80% of the session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | consistent with grade level report cards |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

## Progress Reporting

**A report of progress toward meeting the Annual Goals and Short Term Objectives included in this IEP will be provided to the parent(s):**

Consistent with general education grade-level report cards

## Transition Planning

**Is the PPT developing postsecondary/transition goals and services for the student?**

☐ Yes ☑ No

# Special Education and Related Services

## SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Reading | 1 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/16/2023 | 02/15/2024 | 2a | Small group/individual instruction |
| Writing | 2 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/16/2023 | 02/15/2024 | 2a | Small group/individual instruction |
| Mathematics | 3 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 05/11/2023 | 02/15/2024 | 2a | Small group/individual instruction |
| Executive Functioning | 7 | 4 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 05/18/2023 | 02/15/2024 | 2a | Small group/individual instruction |

## RELATED SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Counseling Group | 5<br>6 | 2 x per Week | 30 Minutes | School Psychologist | School Psychologist/ Social Worker | 03/24/2023 | 03/22/2024 | 2c | Small group/individual instruction |
| Counseling Individual | 5<br>6 | 1 x per Week | 15 Minutes | School Psychologist | School Psychologist | 02/16/2023 | 02/15/2024 | 2c | Small group/individual instruction |
| Counseling | 6 | 2 x per Week | 30 Minutes | School Social Worker | School Social Worker | 05/18/2023 | 02/15/2024 | 1a | |
| Counseling Individual | 5<br>6 | 1 x per Week | 30 Minutes | School Social Worker | School Social Worker | 03/24/2023 | 02/15/2024 | 1a | |
| Language/ Communication Group | 4 | 3 x per Week | 30 Minutes | Speech-language Pathologist | Speech-language Pathologist | 02/16/2023 | 02/15/2024 | 2c | small group/individual |

***Instructional Site Codes:**

1a. General Education Setting 50% or more non-disabled peers
1b. General Education Setting less than 50% non-disabled peers
2a. Resource Setting
2b. Separate Setting/Program
2c. Related Service Setting
3a. Community-Based Setting 50% or more non-disabled peers

3b. Community-Based Setting less than 50% non-disabled peers

## Supplementary Aids and Services

Supplementary aids and services will be provided for the duration of the IEP unless otherwise noted.

| ACCOMMODATION | Area(s)/Locations |
|---|---|
| Access to computer, manipulatives, review/repeat directions, simplify test wording | All Classes |
| Limited multiple choice, note taking assistance, reduce answer choices, templates for written work, use manipualtives | All Classes |
| Clear work area, preferential seating, reduction of auditory/visual stimulation, study carrel | All Classes |
| Extra time-tests/projects, written work, assignments, pace long-term projects, minimizing structure or transitions, short breaks throughout the day | All Classes |
| Give one paper or section at a time, list sequential steps, post routines | All Classes |
| Acknowledge positive work frequently, ask questions to encourage participation, behavior contracts, cueing expected behavior, positive reinforcement, proximity/touch control, peer supports/mentoring | All Classes |
| Check work in progress, check for understanding, manipulatives, pre-teach content, provide examples, reduced assignments, shortened tasks | All Classes |

## Indirect Services

**Are supports required for school personnel to implement this IEP?**

☑ Yes ☐ No

**Supports required for school personnel to implement this IEP Include:**

| Service | Goal ID | Frequency | Duration | Responsible Staff | Start Date | End Date |
|---|---|---|---|---|---|---|
| Paraprofessional Support | 1<br>2<br>3 | 5 x per Week | 60 Minutes | Paraprofessional | 05/18/2023 | 02/15/2024 |
| Paraprofessional Support | 7 | 5 x per Week | 45 Minutes | Paraprofessional | 05/18/2023 | 02/15/2024 |

# ESY Services

**Are extended school year (ESY) services required for the Student to receive FAPE?**

☑ Yes ☐ No

## ESY SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Social/ Emotional Development | 5 6 7 | 4 x per Week | 180 Minutes | Special Education Teacher | Special Education Teacher/Paraprofessional | 07/11/2023 | 08/04/2023 | 2a | Small group |

# Transportation

**Does the Student require special transportation as a related service?**

☐ Yes ☑ No

Regular Transportation

# Removal from the General Education Environment

## SCHOOL YEAR: 2022-23

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 182 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 05/18/2023 | 06/30/2023 | 9.5 | 24 | 71.11 |

## SCHOOL YEAR: 2023-24

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 181 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 07/01/2023 | 02/15/2024 | 9.5 | 24 | 71.11 |

**Explain the extent to which the student will not participate in general education classes and non-academic activities with non-disabled peers**

[redacted]y will participate in all activities with the exception of: Speech 1.5 hrs/wk, social skills 1.25 hr/wk, 9.5 hours of resource room instruction a week.

**Justification for the removal from the general education environment**

[redacted]y requires instruction in a small group setting to facilitate mastery of goals and objectives with minimal distractions.

**Will the student be removed from the general education environment for 60% or more of the time?**

☐ Yes ☑ No

**At the time of this IEP implementation, will the student be placed at a Private Residential Facility?**

☐ Yes ☑ No

# District and State Testing Information

## ENGLISH LANGUAGE PROFICIENCY (ELP) ASSESSMENT

**Has the student been identified as an English Learner?**

☑ No ☐ Yes

## DISTRICTWIDE ASSESSMENTS

The student will participate in Standard District Assessment(s)

| Assessment | Participation |
| --- | --- |
| Math Universal Screener | With designated supports/accommodations |
| Reading Benchmark | With designated supports/accommodations |

**Designated Supports and Accommodations**

Separate setting

## STATEWIDE ASSESSMENTS

**What grade will the student be in during the next statewide assessment testing window?**

3

**The student will participate in the Smarter Balanced Assessment.**

**Assessment:** Smarter Balanced Assessment ELA - Grade 3

With Accommodations

**Designated Supports and Accommodation(s)**

Separate Setting (Non-Embedded Designated Support )

**Assessment:** Smarter Balanced Assessment Math - Grade 3

With Accommodations

**Designated Supports and Accommodation(s)**

**Designated Supports and Accommodation(s)**

Separate Setting (Non-Embedded Designated Support )

Smarter Balanced designated supports and accommodations will be submitted directly to the testing vendor on behalf of the district.

## Resources

The following documents were provided to the parent(s) at this meeting or sent electronically with parental permission:

Procedural Safeguards in Special Education

Parental Notification of the Laws Relating to Physical Restraint and Seclusion in the Public Schools

A Parent's Guide to Special Education

IEP Manual

Building a Bridge

# Progress Report on IEP Goals and Objectives

**Reporting Period:** Reporting Period 1, 06/13/2023
**Milford School District**
**IEP Dates:** 05/18/2023 - 02/15/2024

**Student Name:** [redacted] T [redacted] G
**Date of Birth:** [redacted] 3
**Current Grade:** 3

**Parent/Guardian Name:** Karen [redacted] ı, Robert [redacted] g

[redacted] ): [redacted] 2
**Case Manager:** Charlotte Adinolfi
**Current Enrolled School:** J. F. Kennedy School (0841911)

## GOAL AREA: Reading

### ANNUAL GOAL 1

Given small group instruction, [redacted] will improve his reading comprehension skills , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y has made progress towards achieving his reading objectives. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose the main character from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Satisfactory Progress | 65 % | 100 % | When paying attention, [redacted] y is able to identify the main character with some adult support. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose the setting of the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Satisfactory Progress | 65 % | 100 % | When paying attention, [redacted] y is able to identify the setting with some adult support. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly identify an event from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Satisfactory Progress | 60 % | 100 % | When paying attention, [redacted] y is able to identify an event with some adult support. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly identify two events in order from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Limited/Minimal Progress | 10 % | 100 % | [redacted] y struggles to identify two events in order without significant adult support. |

**Progress Report**

**Student Name:** [redacted]
**DOB:** [redacted]

| | | | | |
|---|---|---|---|---|
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the problem from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Limited/Minimal Progress | 20 % | 100 % | [redacted] also requires significant adult support to identify the problem. |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the solution from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Limited/Minimal Progress | 20 % | 100 % | [redacted] also requires significant adult support to identify the solution. |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose a prediction about the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Satisfactory Progress | 60 % | 100 % | [redacted] can be inconsistent but when he is paying attention, he makes a prediction about the text using pictures and words as clues. |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the main idea from the text from a list of three options. across 3 out of 4 texts. by 02/15/2024 | Not Introduced | N/A | N/A | Not introduced |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose supporting detail from the text from a list of three across 3 out of 4 texts. by 02/15/2024 | Not Introduced | N/A | N/A | Not introduced |

## GOAL AREA: Writing

## ANNUAL GOAL 2

Given small group instruction, [redacted] will improve his writing abilities , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] has made progress towards his writing objectives. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given When presented with models and adult support, [redacted] T [redacted] G will brainstorm at least three fiction or non-fiction writing topics with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 70 % | 100 % | [redacted] y has done very well brainstorming both fiction and non-fiction writing topics. |
| Given When presented with models and adult support, [redacted] T [redacted] G will select and appropriately fill in a graphic organizer with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 60 % | 100 % | With adult support, [redacted] y has utilized a graphic organizer to plan his writing. |
| Given When presented with models and adult support, [redacted] T [redacted] G will write a topic sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 75 % | 100 % | When giving adult prompting and time to think, [redacted] y can writing a topic sentence. |
| Given When presented with models and adult support, [redacted] T [redacted] G will write three supporting sentences for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 70 % | 100 % | When giving adult prompting and time to think, [redacted] y can writing supporting sentences. |
| Given When presented with models and adult support, [redacted] T [redacted] G will write a concluding sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 70 % | 100 % | When giving adult prompting and time to think, [redacted] y can writing a concluding sentence. |
| Given When presented with models and adult support, [redacted] T [redacted] G will utilize an editing checklist to edit his writing for capitalization, punctuation and grammar with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Not Introduced | N/A | N/A | Not introduced |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Mathematics

## ANNUAL GOAL 3

Given small group instruction, [redacted] will improve his math computation skills , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making progress towards his math objectives. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given direct instruction and models, [redacted] T [redacted] G will correctly identify the place value of a given number within 10,000 for 8 out of 10 problems across 3 opportunities. (Baseline: Understands within 100) by 02/15/2024 | Limited/Minimal Progress | 20 % | 100 % | [redacted] y was achieving this skill for a while but we have not returned to this skill for some time recently and his carryover was not strong. |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve addition problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Satisfactory Progress | 75 % | 100 % | [redacted] y is doing well solving problems with four-digits with some adult prompting. |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve addition word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Not Introduced | N/A | N/A | Not introduced |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve subtraction problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Satisfactory Progress | 70 % | 100 % | [redacted] y is doing well solving problems with four-digits with some adult prompting. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve subtraction word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Not Introduced | N/A | N/A | Not introduced |
| Given direct instruction and visuals, [redacted] T [redacted] G will be able to correctly identify U.S. currency (coins and bills) and their worth, in 5 out of 5 opportunities. by 02/15/2024 | Limited/Minimal Progress | 10 % | 100 % | [redacted] y is currently requiring significant adult support to remember coin values across sessions. He knows the coin values but guesses which one it is when one is presented. |
| Given direct instruction and visuals, [redacted] T [redacted] G will name the equivalent of monies presented by the teacher using coins up to a quarter and bills up to a twenty dollar bill (e.g., four quarters = one dollar), in 5 out of 5 opportunities. by 02/15/2024 | Limited/Minimal Progress | 15 % | 100 % | We have not spent much time on this objective and he requires prompting and significant adult support when we have. |
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 2's to 500 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Limited/Minimal Progress | 45 % | 100 % | We have been utilizing a 100's chart and he is able to do so with prompting and scaffolding. |
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 5's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Limited/Minimal Progress | 45 % | 100 % | We have been utilizing a 100's chart and he is able to do so with prompting and scaffolding. |
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 10's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Limited/Minimal Progress | 45 % | 100 % | We have been utilizing a 100's chart and he is able to do so with prompting and scaffolding. |

**Progress Report**

**Student Name:** [redacted]
**DOB:** [redacted]

## GOAL AREA: Communication

## ANNUAL GOAL 4

Given verbal prompting and visuals during structured task, [redacted] will respond to comprehension questions involving critical thinking and reasoning , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | While [redacted] has made some progress with identification of problems and making basic inferences from presented stories/situations, he requires adult facilitation to explain inferences, make reasonable predictions, and answer "How do you know" questions. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given prompting and visual cues during a structured activity [redacted] T [redacted] G will identify causes of events from presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Limited/Minimal Progress | N/A | N/A | [redacted] y has difficulty determining the cause of events from presented stories/situations and requires adult support. |
| Given prompting and visual cues [redacted] T [redacted] G will respond to comprehension questions involving prediction of events with 80% accuracy in 4/5 opportunities during structured activity by 02/15/2024 | Limited/Minimal Progress | N/A | N/A | [redacted] y benefits from adult support to make expected predictions based on clues from presented stories/situations. |
| Given prompting and visual cues during structured activity [redacted] T [redacted] G will make an inference about a character's feelings or motives from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Satisfactory Progress | N/A | N/A | [redacted] y is beginning to make inferences about the feelings and motives of others, but he tends to guess the same basic emotions (happy, sad, mad). He benefits from adult support to utilize cues to guess other possible feelings (e.g. disappointed, embarrassed, frustrated, worried, etc.) and possible of motives of others. |
| Given prompting and visual cues during structured activity [redacted] T [redacted] G will provide evidence to support inferences from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Limited/Minimal Progress | N/A | N/A | [redacted] y requires adult support to provide specific evidence from presented stories/situations to support inferences he makes. |
| Given prompting and visual cues during a structured activity [redacted] T [redacted] G will answer "How do you know" questions about characters and events from a presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Limited/Minimal Progress | N/A | N/A | [redacted] y needs adult support to answer "How do you know type ?" questions.about presented stories/situations. |
| Given prompting and visual cues during a structured task [redacted] T [redacted] G will identify the problem and generate an appropriate solution from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Satisfactory Progress | N/A | N/A | Wen attentive, [redacted] y has been able to identify the problem in pictured problem situations.and suggest an appropriate solution. |

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 5

Given hypothetical social problem situations, [redacted] will identify potential solutions and consequences of each solution , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y has made satisfactory progress toward his social/emotional goals. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a hypothetical social problem situation [redacted] T [redacted] G will identify 2 possible solutions to the problem in 4/5 trials by 02/15/2024 | Satisfactory Progress | N/A | N/A | Satisfactory progress |
| Given A hypothetical social problem situation that he has provided solutions for [redacted] T [redacted] G will identify and discuss the possible consequences of each solution in 4/5 trials by 02/15/2024 | Satisfactory Progress | N/A | N/A | Satisfactory progress |

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 6

Given the opportunity to participate in conversations with peers and/or adults during counseling intervention sessions, [redacted] will actively participate and adhere to identified conversational rules , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y has made satisfactory progress toward his social/emotional goals. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will maintain a topic for 6-7 conversational exchanges in 4/5 trials by 02/15/2024 | Satisfactory Progress | N/A | N/A | Satisfactory progress |
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will request clarification and respond to requests for clarification in 70% of opportunities by 02/15/2024 | Satisfactory Progress | N/A | N/A | Satisfactory progress |
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will introduce relevant topics and ask 2 questions that are relevant to the topic in 70% of opportunities by 02/15/2024 | Satisfactory Progress | N/A | N/A | Satisfactory progress |

## GOAL AREA: Executive Functioning

### ANNUAL GOAL 7

Given small group instruction, [redacted] will improve his executive functioning skills , as measured by mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | We have not had much time to work on the below objectives. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| **Short-term Objective(s)** | **Current Status** | **Current Score** | **Target Score** | **Progress Data/ Notes** |
|---|---|---|---|---|
| Given small group instruction in a separate setting and given a model, [redacted] T [redacted] G will follow classroom rules and routines for 80% of the session for 8 out of 10 opportunities with no more than 3 verbal reminders per session. by 02/15/2024 | Limited/Minimal Progress | 20 % | 100 % | [redacted] y requires frequent reminders currently and is working on remembering the appropriate routines in the classroom. |
| Given small group instruction in a separate setting and provided expectations, [redacted] T [redacted] G will attend for 80% of the session with no more than 3 verbal reminders per session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Limited/Minimal Progress | 20 % | 100 % | [redacted] y requires frequent reminders currently and is working on remembering the appropriate routines in the classroom. |
| Given multi-step directions and visuals, [redacted] T [redacted] G will follow 80% of the directions accurately with no more than 3 verbal reminders for 8 out of 10 opportunities. by 02/15/2024 | Limited/Minimal Progress | 20 % | 100 % | [redacted] y requires frequent reminders currently and is working on remembering the appropriate routines in the classroom. |
| Given partner work and provided with models, [redacted] T [redacted] G will appropriately engage with peers for 80% of the session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Limited/Minimal Progress | 20 % | 100 % | [redacted] y can become over-stimulated very easily during these sessions with peers and requires frequent reminders and motivation. |

# Individualized Education Program
## Milford School District

| | |
|---|---|
| **Student Name:** [redacted] | **Meeting Date:** 11/30/2023 |
| [redacted]: [redacted] | **Case Manager:** Charlotte Adinolfi |
| **Date of Birth:** [redacted] | **Parent/Guardian Name:** Karen [redacted], [redacted] |
| **Current Grade:** 4 | **Primary Disability:** [redacted] |
| **Current Enrolled School:** J. F. Kennedy School (0841911) | **School Next Year:** |
| **Most Recent Evaluation Date:** 06/04/2021 | **Next Reevaluation Date:** 06/04/2024 |
| **Most Recent Annual Review Date:** 01/26/2023 | **Next Annual Review Date:** 01/25/2024 |

**Reason for Meeting:**
Review or Revise the IEP

## PLANNING AND PLACEMENT TEAM (PPT) MEMBERS PRESENT

| Name | Role |
|---|---|
| [redacted] | Father |
| Karen [redacted] | Mother |
| Alicia Curria | Student's General Education Teacher |
| Tara Truscello | Special Education Teacher or Provider |
| Amy Rizzo | Administrator or Designee |
| Jennifer Davis | School Psychologist |
| Karen Kristan | Speech and Language Pathologist |
| Lauri Dougherty | Social Worker |
| D'Arcy Jeffery | Nurse |

# Planning and Placement Team Recommendations

The PPT recommends the following:

As of the PPT on 11/30/2023, no modifications need to be made to the IEP.

The IEP will continue to be implemented as written.

## Special Considerations

**Does the student exhibit behaviors that impede learning for self or others?**

☐ No ☑ Yes

IEP goal(s) and objectives will be developed to address the behavior.

A behavioral intervention plan based on a functional behavior assessment has been developed.

**Is the student deaf or hard of hearing?**

☑ No ☐ Yes

**Is the student blind or visually impaired?**

☑ No ☐ Yes

**Does the student have limited English proficiency (Student qualifies as an EL)?**

☑ No ☐ Yes

**Does the student require accessible educational materials (AEM)?**

☑ No ☐ Yes

**Does the student require an Augmentative and/or Alternative mode of Communication?**

☑ No ☐ Yes

## Present Levels of Academic Achievement and Annual Goal(s) and Objectives

### ACADEMIC, PRE-ACADEMIC, COGNITIVE ACHIEVEMENT

**Parent and/or Student Input**

Karen and Rob expressed their understanding of the academic expectations for [redacted] at this time. They are happy to hear that he is making personal growth with his academics at school.

### GOAL AREA: Reading

**Present Level of Performance**

Fountas and Pinnell: January 2023: Level L (middle of grade two)

**Strengths**

Strengths: Decodes grade appropriate spelling patterns, chooses character, setting, event, events in order, problem and solution from list of three

**Concerns/Needs**

Areas of Concern: Identifying: prediction, character, setting, event, events in order, problem, solution, main idea,

supporting detail

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Due to [redacted] difficulty with comprehension, his ability to access the general education curriculum is impacted resulting in specialized instruction.

| **Annual Goal 1** | **Evaluation Method** |
|---|---|
| Given small group instruction, [redacted] will improve his reading comprehension skills , as measured by the following objectives: | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose a prediction about the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the solution from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the problem from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly identify two events in order from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly identify an event from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the setting of the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | consistent with grade level report cards |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the main character from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose supporting detail from the text from a list of three across 3 out of 4 texts. by 02/15/2024 | |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the main idea from the text from a list of three options. across 3 out of 4 texts. by 02/15/2024 | consistent with grade level report cards |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Writing

**Present Level of Performance**

Generating ideas, adding details, editing with significant adult support and prompting

**Strengths**

Strengths: Generating ideas, adding details, editing with significant adult support and prompting

**Concems/Needs**

Areas of Concern: Writing topics, graphic organizer, topic sentence, supporting sentences, concluding sentences, editing

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Due to [redacted] difficulty with writing, his ability to access the general education curriculum is impacted resulting in specialized instruction.

| Annual Goal 2 | Evaluation Method |
|---|---|
| Given small group instruction, [redacted] will improve his writing abilities , as measured by the following objectives: | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given When presented with models and adult support, [redacted] will utilize an editing checklist to edit his writing for capitalization, punctuation and grammar with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted] will write a concluding sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted] will write three supporting sentences for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted] will write a topic sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted] will select and appropriately fill in a graphic organizer with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| Given When presented with models and adult support, [redacted] will brainstorm at least three fiction or non-fiction writing topics with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Mathematics

**Present Level of Performance**

Solves addition and subtraction through 20 fluently, can count, identify and write numbers within 1,000

**Strengths**

Strengths: Solves addition and subtraction through 20 fluently, can count, identify and write numbers within 1,000

**Concerns/Needs**

Areas of Concern: Place value within 10,000; adding and subtracting through 1,000; addition and subtraction word problems through 1,000; money; skip counting

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

[redacted]s difficulty with math impacts his ability to accurately complete math computation and requires specialized instruction in a small group setting.

**Individualized Education Program**

**Student Name:** [redacted] [redacted]
**DOB:** [redacted]

| **Annual Goal 3** | **Evaluation Method** |
|---|---|
| Given small group instruction, [redacted] will improve his math computation skills , as measured by the following objectives: | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given direct instruction and models, [redacted] [redacted] will correctly identify the place value of a given number within 10,000 for 8 out of 10 problems across 3 opportunities. (Baseline: Understands within 100) by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will correctly solve addition problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will correctly solve addition word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will correctly solve subtraction problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will correctly solve subtraction word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | consistent with grade level report cards |
| Given direct instruction and visuals, [redacted] [redacted] will be able to correctly identify U.S. currency (coins and bills) and their worth, in 5 out of 5 opportunities. by 02/15/2024 | |
| Given direct instruction and visuals, [redacted] [redacted] will name the equivalent of monies presented by the teacher using coins up to a quarter and bills up to a twenty dollar bill (e.g., four quarters = one dollar), in 5 out of 5 opportunities. by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will skip count by 10's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will skip count by 5's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | |
| Given direct instruction and models, [redacted] [redacted] will skip count by 2's to 500 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | consistent with grade level report cards |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

# Present Levels of Functional Performance and Annual Goal(s) and Objectives

## FUNCTIONAL PERFORMANCE

**Parent and/or Student Input**

Karen and Rob were happy to have the first, next, then chart to also help keep consistency with routines at home.

## GOAL AREA: Communication

**Present Level of Performance**

[redacted] has made progress answering comprehension questions involving critical thinking questions given multiple choice options. He continues to struggle with higher level thinking tasks and answering questions involving such thinking and reasoning independently.

**Strengths**

[redacted] is able to answer concrete questions from presented stories/situations.

**Concerns/Needs**

[redacted] is working on development of critical thinking and reasoning skills.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in critical thinking and reasoning impact [redacted] progress in the general educational setting without specialized instruction.

Individualized Education Program

Student Name: [redacted]T [redacted]G
DOB: [redacted]3

| Annual Goal 4 | Evaluation Method |
|---|---|
| Given verbal prompting and visuals during structured task, [redacted]will respond to comprehension questions involving critical thinking and reasoning , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given prompting and visual cues during a structured task [redacted]T [redacted]G will identify the problem and generate an appropriate solution from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | |
| Given prompting and visual cues during a structured activity [redacted]T [redacted]G will answer "How do you know" questions about characters and events from a presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | consistent with grade level report cards |
| Given prompting and visual cues during structured activity [redacted]T [redacted]G will provide evidence to support inferences from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | consistent with grade level report cards |
| Given prompting and visual cues during structured activity [redacted]T [redacted]G will make an inference about a character's feelings or motives from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | |
| Given prompting and visual cues [redacted]T [redacted]G will respond to comprehension questions involving prediction of events with 80% accuracy in 4/5 opportunities during structured activity by 02/15/2024 | |
| Given prompting and visual cues during a structured activity [redacted]T [redacted]G will identify causes of events from presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | consistent with grade level report cards |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

## GOAL AREA: Social/Emotional

**Present Level of Performance**

[redacted]y has demonstrated some growth in his conversational skills in a small group setting. He is able to listen to a peer and ask a question on topic. When [redacted]y is excited about a topic; he has improved his patience with waiting his turn with visual cues. We are beginning to work on problem-solving skills. [redacted]y struggles with maintaining focus and his demeanor when working on more complex situations.

**Strengths**

When engaging with a peer and/or adult, [redacted]y is able to ask a couple of questions on topic and demonstrate turn taking skills.

**Concerns/Needs**

[redacted]y has difficulty solving social problems and actively participating in conversations.

Individualized Education Program

Student Name: [redacted]T [redacted]G
DOB: [redacted]3

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Due to [redacted]s delayed language and [redacted], he requires facilitation with communicative interactions and social interactions with others in order to participate in the curriculum and maintain social relationships.

| **Annual Goal 5** | **Evaluation Method** |
|---|---|
| Given hypothetical social problem situations, [redacted]will identify potential solutions and consequences of each solution, with 100% mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given A hypothetical social problem situation that he has provided solutions for [redacted]T [redacted]G will identify and discuss the possible consequences of each solution in 4/5 trials by 02/15/2024 | |
| Given a hypothetical social problem situation [redacted]T [redacted]G will identify 2 possible solutions to the problem in 4/5 trials by 02/15/2024 | |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |
| Counseling Individual | |
| Counseling Individual | |

| Annual Goal 6 | Evaluation Method |
|---|---|
| Given the opportunity to participate in conversations with peers and/or adults during counseling intervention sessions, [redacted] will actively participate and adhere to identified conversational rules , with 100% mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given the opportunity to participate in a conversation [redacted] will introduce relevant topics and ask 2 questions that are relevant to the topic in 70% of opportunities by 02/15/2024 | |
| Given the opportunity to participate in a conversation [redacted] will request clarification and respond to requests for clarification in 70% of opportunities by 02/15/2024 | |
| Given the opportunity to participate in a conversation [redacted] will maintain a topic for 6-7 conversational exchanges in 4/5 trials by 02/15/2024 | |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |
| Counseling Individual | |
| Counseling Individual | |
| Counseling | |

## GOAL AREA: Executive Functioning

**Present Level of Performance**

[redacted] enjoys being with his peers.

**Strengths**

[redacted] enjoys being with his peers.

**Concerns/Needs**

Follow classroom rules and routines; attending; following multi-step directions; appropriately engage with peers

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Due to [redacted] difficulty with executive functioning, he requires specialized instruction.

| Annual Goal 7 | Evaluation Method |
|---|---|
| Given small group instruction, [redacted]will improve his executive functioning skills , as measured by mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given partner work and provided with models, [redacted]T [redacted]G will appropriately engage with peers for 80% of the session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | consistent with grade level report cards |
| Given multi-step directions and visuals, [redacted]T [redacted]G will follow 80% of the directions accurately with no more than 3 verbal reminders for 8 out of 10 opportunities. by 02/15/2024 | consistent with grade level report cards . |
| Given small group instruction in a separate setting and provided expectations, [redacted]T [redacted]G will attend for 80% of the session with no more than 3 verbal reminders per session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | consistent with grade level report cards |
| Given small group instruction in a separate setting and given a model, [redacted]T [redacted]G will follow classroom rules and routines for 80% of the session for 8 out of 10 opportunities with no more than 3 verbal reminders per session. by 02/15/2024 | consistent with grade level report cards |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

## Progress Reporting

**A report of progress toward meeting the Annual Goals and Short Term Objectives included in this IEP will be provided to the parent(s):**

Consistent with general education grade-level report cards

## Transition Planning

**Is the PPT developing postsecondary/transition goals and services for the student?**

☐ Yes ☑ No

# Special Education and Related Services

## SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Reading | 1 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/16/2023 | 02/15/2024 | 2a | Small group/individual instruction |
| Writing | 2 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/16/2023 | 02/15/2024 | 2a | Small group/individual instruction |
| Mathematics | 3 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 05/11/2023 | 02/15/2024 | 2a | Small group/individual instruction |
| Executive Functioning | 7 | 4 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 05/18/2023 | 02/15/2024 | 2a | Small group/individual instruction |

## RELATED SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Counseling Group | 5<br>6 | 2 x per Week | 30 Minutes | School Psychologist | School Psychologist/ Social Worker | 03/24/2023 | 03/22/2024 | 2c | Small group/individual instruction |
| Counseling Individual | 5<br>6 | 1 x per Week | 15 Minutes | School Psychologist | School Psychologist | 02/16/2023 | 02/15/2024 | 2c | Small group/individual instruction |
| Counseling | 6 | 2 x per Week | 30 Minutes | School Social Worker | School Social Worker | 05/18/2023 | 02/15/2024 | 1a | |
| Counseling Individual | 5<br>6 | 1 x per Week | 30 Minutes | School Social Worker | School Social Worker | 03/24/2023 | 02/15/2024 | 1a | |
| Language/ Communication Group | 4 | 3 x per Week | 30 Minutes | Speech-language Pathologist | Speech-language Pathologist | 02/16/2023 | 02/15/2024 | 2c | small group/individual |

***Instructional Site Codes:**

1a. General Education Setting 50% or more non-disabled peers
1b. General Education Setting less than 50% non-disabled peers
2a. Resource Setting
2b. Separate Setting/Program
2c. Related Service Setting
3a. Community-Based Setting 50% or more non-disabled peers

3b. Community-Based Setting less than 50% non-disabled peers

## Supplementary Aids and Services

Supplementary aids and services will be provided for the duration of the IEP unless otherwise noted.

| ACCOMMODATION | Area(s)/Locations |
|---|---|
| Access to computer, manipulatives, review/repeat directions, simplify test wording | All Classes |
| Limited multiple choice, note taking assistance, reduce answer choices, templates for written work, use manipualtives | All Classes |
| Clear work area, preferential seating, reduction of auditory/visual stimulation, study carrel | All Classes |
| Extra time-tests/projects, written work, assignments, pace long-term projects, minimizing structure or transitions, short breaks throughout the day | All Classes |
| Give one paper or section at a time, list sequential steps, post routines | All Classes |
| Acknowledge positive work frequently, ask questions to encourage participation, behavior contracts, cueing expected behavior, positive reinforcement, proximity/touch control, peer supports/mentoring | All Classes |
| Check work in progress, check for understanding, manipulatives, pre-teach content, provide examples, reduced assignments, shortened tasks | All Classes |

## Indirect Services

**Are supports required for school personnel to implement this IEP?**

☑ Yes ☐ No

**Supports required for school personnel to implement this IEP Include:**

| Service | Goal ID | Frequency | Duration | Responsible Staff | Start Date | End Date |
|---|---|---|---|---|---|---|
| Paraprofessional Support | 1<br>2<br>3 | 5 x per Week | 60 Minutes | Paraprofessional | 05/18/2023 | 02/15/2024 |
| Paraprofessional Support | 7 | 5 x per Week | 45 Minutes | Paraprofessional | 05/18/2023 | 02/15/2024 |

# ESY Services

**Are extended school year (ESY) services required for the Student to receive FAPE?**

☑ Yes ☐ No

## ESY SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Social/ Emotional Development | 5<br>6<br>7 | 4 x per Week | 180 Minutes | Special Education Teacher | Special Education Teacher/Paraprofessional | 07/11/2023 | 08/04/2023 | 2a | Small group |

# Transportation

**Does the Student require special transportation as a related service?**

☐ Yes ☑ No

Regular Transportation

# Removal from the General Education Environment

## SCHOOL YEAR: 2022-23

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 182 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 02/16/2023 | 03/23/2023 | 5 | 28.5 | 84.44 |
| 03/24/2023 | 05/10/2023 | 5 | 27.5 | 81.48 |
| 05/11/2023 | 05/17/2023 | 7.5 | 25 | 74.07 |
| 05/18/2023 | 06/14/2023 | 9.5 | 23 | 68.15 |

## SCHOOL YEAR: 2023-24

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 180 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 08/30/2023 | 02/15/2024 | 9.5 | 23 | 68.15 |

**Explain the extent to which the student will not participate in general education classes and non-academic activities with non-disabled peers**

[redacted]y will participate in all activities with the exception of: Speech 1.5 hrs/wk, social skills 1.25 hr/wk, 9.5 hours of resource room instruction a week.

**Justification for the removal from the general education environment**

[redacted]y requires instruction in a small group setting to facilitate mastery of goals and objectives with minimal distractions.

**Will the student be removed from the general education environment for 60% or more of the time?**

☐ Yes ☑ No

**At the time of this IEP implementation, will the student be placed at a Private Residential Facility?**

☐ Yes ☑ No

# District and State Testing Information

## ENGLISH LANGUAGE PROFICIENCY (ELP) ASSESSMENT

**Has the student been identified as an English Learner?**

☑ No ☐ Yes

## DISTRICTWIDE ASSESSMENTS

The student will participate in Standard District Assessment(s)

| Assessment | Participation |
|---|---|
| Math Universal Screener | With designated supports/accommodations |
| Reading Benchmark | With designated supports/accommodations |

**Designated Supports and Accommodations**

Separate setting

## STATEWIDE ASSESSMENTS

**What grade will the student be in during the next statewide assessment testing window?**

4th Grade

**The student will participate in the Smarter Balanced Assessment.**

**Assessment:** Smarter Balanced Assessment Math - Grade 4

With Accommodations

**Designated Supports and Accommodation(s)**

Separate Setting (Non-Embedded Designated Support)

100 Numbers Table (Non-Embedded Accommodation)

Multiplication Table (Non-Embedded Accommodation)

Speech-to-Text (Embedded Accommodation)

**Assessment:** Smarter Balanced Assessment ELA - Grade 4

With Accommodations

**Designated Supports and Accommodation(s)**

Separate Setting (Non-Embedded Designated Support)

Speech-to-Text (Embedded Accommodation)

Smarter Balanced designated supports and accommodations will be submitted directly to the testing vendor on behalf of the district.

# Resources

The following documents were provided to the parent(s) at this meeting or sent electronically with parental permission:

Procedural Safeguards in Special Education

Parental Notification of the Laws Relating to Physical Restraint and Seclusion in the Public Schools

A Parent's Guide to Special Education

IEP Manual

Building a Bridge

# Prior Written Notice

**PURPOSE:** As a parent/guardian of a student suspected of needing or receiving special education services, the school district is required to provide you with prior written notice whenever it proposes or refuses to initiate or change the identification, evaluation, educational placement or provision of a free and appropriate public education (FAPE) to your child. This notice should be given to you after a school district makes a decision and 10 school days before action is taken on the decision, unless the school district and you both agree to waive the 10-day notice.

**To:** Karen [redacted], [redacted] [redacted]

Parent/Guardian/Adult Student

**Date:** 11/30/2023

**Re:** [redacted] [redacted]

[redacted]: [redacted]

## ACTION(S) PROPOSED/REFUSED

**Milford School District is providing notice of the following:**

1.
- ☑ The District is proposing to
- ☐ The District is refusing the request to

2.
- ☐ initiate
- ☑ change

3.
- ☐ identification/eligibility
- ☐ an evaluation
- ☐ an educational placement
- ☑ the provision of FAPE (IEP)

## DESCRIPTION / REASON

**Description/Reason of the proposed or refused action:**

Continue the services and support as described in this IEP document.

**The reason for proposing or refusing to take action is:**

The services and supports described in this IEP document are needed for [redacted] to make progress toward mastering the IEP goals and objectives and to make progress with the general education program.

**Description (including the date) of each evaluation procedure, assessment, record, or written report the school district used as a basis for the proposed/refused action:**

Teacher Reports (11/30/23), Parent Input (11/30/23)

**Date this action will take effect**

11/30/2023

**Other options the PPT considered and rejected**

- ☐ Instruction in the general education environment with supplementary aids and services
- ☑ No other options were considered and rejected
- ☐ Other

**Reason for rejecting other options**

- ☐ The student would not receive an appropriate program in the least restrictive environment.
- ☐ Other

**Prior Written Notice**

**Student Name:** [redacted]
[redacted]: [redacted]
**DOB:** [redacted]

**Other factors that are relevant to this action**

☑ There are no other factors that are relevant to the PPT decision

☐ Other

**PLEASE NOTE:**

Parents have a right to disagree with what is being proposed or refused by the district and may access the due process options described in the procedural safeguards of the IDEA. A copy of the procedural safeguards can be obtained by contacting Contact Name at Contact Phone or Contact Email .

This notice must be provided in the native language of the parent or other mode of communication used by the parent unless it is clearly not feasible to do so.

For assistance with understanding the provisions of the IDEA, please contact the district's special education director or the state's Parent Training and Information Center: Connecticut Parent Advocacy Center (CPAC) at 860-739-3089 or 1-800-445-2722; E-mail: cpac@cpacinc.org

**WAIVER:** The parent agrees to waive the school 10-day waiting period before the above proposed action takes effect and agrees that such action shall be implemented on the following date: 11/30/2023

**This notice was:** ☐ provided to Parent at the PPT meeting ☐ hand delivered ☐ mailed ☑ e-mailed ☐ sent electronically to the parent portal

# Progress Report on IEP Goals and Objectives

**Reporting Period:**November Progress Report, 12/14/2023
**Milford School District**
**IEP Dates:** 11/30/2023 - 02/15/2024

**Student Name:** [redacted]
**Date of Birth:** [redacted]
**Current Grade:** 4

**Parent/Guardian Name:** Karen [redacted]

[redacted]
**Case Manager:** Charlotte Adinolfi
**Current Enrolled School:** J. F. Kennedy School (0841911)

## GOAL AREA: Reading

### ANNUAL GOAL 1

Given small group instruction, [redacted] will improve his reading comprehension skills , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] has made progress towards achieving his reading objectives. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the main character from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] has mastered this objective. |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly choose the setting of the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] has mastered this objective. |
| Given an opportunity to listen to or read an instructional level text, [redacted] will correctly identify an event from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] has mastered this objective. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly identify two events in order from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Satisfactory Progress | 2 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose the problem from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Satisfactory Progress | 1 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose the solution from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Satisfactory Progress | 1 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose a prediction about the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Satisfactory Progress | 1 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose the main idea from the text from a list of three options. across 3 out of 4 texts. by 02/15/2024 | Satisfactory Progress | 1 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose supporting detail from the text from a list of three across 3 out of 4 texts. by 02/15/2024 | Satisfactory Progress | 1 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |

## GOAL AREA: Writing

## ANNUAL GOAL 2

Given small group instruction, [redacted] will improve his writing abilities , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making adequate progress towards mastering this goal. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|

**Progress Report**

**Student Name:**[redacted] T[redacted] G
**DOB:**[redacted] 3

| | | | | |
|---|---|---|---|---|
| Given When presented with models and adult support, [redacted] T[redacted] G will brainstorm at least three fiction or non-fiction writing topics with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y has mastered this objective. |
| Given When presented with models and adult support, [redacted] T[redacted] G will select and appropriately fill in a graphic organizer with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y has mastered this objective. |
| Given When presented with models and adult support, [redacted] T[redacted] G will write a topic sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 3 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |
| Given When presented with models and adult support, [redacted] T[redacted] G will write three supporting sentences for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 3 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |
| Given When presented with models and adult support, [redacted] T[redacted] G will write a concluding sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 3 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |
| Given When presented with models and adult support, [redacted] T[redacted] G will utilize an editing checklist to edit his writing for capitalization, punctuation and grammar with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Satisfactory Progress | 1 opportunities | 4.0 opportunities | [redacted] y is making adequate progress towards mastering this objective. |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Mathematics

### ANNUAL GOAL 3

Given small group instruction, [redacted] will improve his math computation skills , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making progress towards his math objectives. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given direct instruction and models, [redacted] T [redacted] G will correctly identify the place value of a given number within 10,000 for 8 out of 10 problems across 3 opportunities. (Baseline: Understands within 100) by 02/15/2024 | Limited/Minimal Progress | 2 opportunities | 10.0 opportunities | [redacted] y continues to struggle with identifying place value. |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve addition problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y was able to master this objective. |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve addition word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Satisfactory Progress | 1 opportunitites | 10.0 opportunitites | [redacted] y is making progress towards his math objectives. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve subtraction problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y was able to master this objective. |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve subtraction word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Satisfactory Progress | 1 opportunities | 10.0 opportunities | [redacted] y is making progress towards his math objectives. |
| Given direct instruction and visuals, [redacted] T [redacted] G will be able to correctly identify U.S. currency (coins and bills) and their worth, in 5 out of 5 opportunities. by 02/15/2024 | Limited/Minimal Progress | 1 opportunities | 5.0 opportunities | [redacted] y is currently requiring significant adult support to remember coin values across sessions. |
| Given direct instruction and visuals, [redacted] T [redacted] G will name the equivalent of monies presented by the teacher using coins up to a quarter and bills up to a twenty dollar bill (e.g., four quarters = one dollar), in 5 out of 5 opportunities. by 02/15/2024 | Limited/Minimal Progress | 1 opportunities | 5.0 opportunities | We have not spent much time on this objective and he requires prompting and significant adult support when we have. |
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 2's to 500 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Satisfactory Progress | 5 opportunities | 10.0 opportunities | [redacted] y is making progress towards his math objectives. |

| | | | | |
|---|---|---|---|---|
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 5's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Satisfactory Progress | 5 opportunities | 10.0 opportunities | [redacted] y is making progress towards his math objectives. |
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 10's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Satisfactory Progress | 5 opportunities | 10.0 opportunities | [redacted] y is making progress towards his math objectives. |

## GOAL AREA: Communication

### ANNUAL GOAL 4

Given verbal prompting and visuals during structured task, [redacted] will respond to comprehension questions involving critical thinking and reasoning , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | While [redacted] y has made some progress with identification of problems/solutions and causes of events, and his ability to make basic inferences from presented stories/situations, he requires adult facilitation to explain inferences, make reasonable predictions, and answer "How do you know" questions. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given prompting and visual cues during a structured activity [redacted] T [redacted] G will identify causes of events from presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Satisfactory Progress | N/A | N/A | [redacted] y is making progress towards mastery of this objective given prompts. |
| Given prompting and visual cues [redacted] T [redacted] G will respond to comprehension questions involving prediction of events with 80% accuracy in 4/5 opportunities during structured activity by 02/15/2024 | Limited/Minimal Progress | N/A | N/A | [redacted] y benefits from adult support to make expected predictions based on clues from presented stories/situations. |
| Given prompting and visual cues during structured activity [redacted] T [redacted] G will make an inference about a character's feelings or motives from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Satisfactory Progress | N/A | N/A | [redacted] y is beginning to make inferences about the feelings and motives of others, but benefits from prompting to consider a variety of feelings (e.g. disappointed, embarrassed, frustrated, worried, etc.) or possible of motives of others. |
| Given prompting and visual cues during structured activity [redacted] T [redacted] G will provide evidence to support inferences from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Limited/Minimal Progress | N/A | N/A | [redacted] y requires adult support to provide specific evidence from presented stories/situations to support inferences he makes. |
| Given prompting and visual cues during a structured activity [redacted] T [redacted] G will answer "How do you know" questions about characters and events from a presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Limited/Minimal Progress | N/A | N/A | [redacted] y needs adult support to answer "How do you know type ?" questions about presented stories/situations. |
| Given prompting and visual cues during a structured task [redacted] T [redacted] G will identify the problem and generate an appropriate solution from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Satisfactory Progress | N/A | N/A | [redacted] y is making progress towards mastery of this objective given prompts. |

**Progress Report**

**Student Name:** [redacted]
**DOB:** [redacted]

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 5

Given hypothetical social problem situations, [redacted] will identify potential solutions and consequences of each solution , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] has made satisfactory progress toward his social/emotional goals. He is often able to provide potential solutions and consequences but he can become silly while he is working. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a hypothetical social problem situation [redacted] will identify 2 possible solutions to the problem in 4/5 trials by 02/15/2024 | Satisfactory Progress | 70 % | 80.0 % | Satisfactory progress |
| Given A hypothetical social problem situation that he has provided solutions for [redacted] will identify and discuss the possible consequences of each solution in 4/5 trials by 02/15/2024 | Satisfactory Progress | 70 % | 80.0 % | Satisfactory progress |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 6

Given the opportunity to participate in conversations with peers and/or adults during counseling intervention sessions, [redacted] will actively participate and adhere to identified conversational rules , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y has made satisfactory progress toward his social/emotional goals. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will maintain a topic for 6-7 conversational exchanges in 4/5 trials by 02/15/2024 | Satisfactory Progress | 60 % | 80.0 % | Satisfactory progress on a preferred topic. |
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will request clarification and respond to requests for clarification in 70% of opportunities by 02/15/2024 | Satisfactory Progress | 70 % | 80.0 % | Satisfactory progress |
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will introduce relevant topics and ask 2 questions that are relevant to the topic in 70% of opportunities by 02/15/2024 | Satisfactory Progress | 70 % | 80.0 % | Satisfactory progress |

## GOAL AREA: Executive Functioning

## ANNUAL GOAL 7

Given small group instruction, [redacted] will improve his executive functioning skills , as measured by mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y is making adequate progress towards mastering his goal. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group instruction in a separate setting and given a model, [redacted] will follow classroom rules and routines for 80% of the session for 8 out of 10 opportunities with no more than 3 verbal reminders per session. by 02/15/2024 | Mastered (Objective Achieved) | 9 opportunities | 10.0 opportunities | [redacted] y [redacted] s able to follow classroom rules |
| Given small group instruction in a separate setting and provided expectations, [redacted] T [redacted] G will attend for 80% of the session with no more than 3 verbal reminders per session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Satisfactory Progress | 7 opportunities | 10.0 opportunities | [redacted] y is making adequate progress towards mastering his objective. |
| Given multi-step directions and visuals, [redacted] T [redacted] G will follow 80% of the directions accurately with no more than 3 verbal reminders for 8 out of 10 opportunities. by 02/15/2024 | Satisfactory Progress | 7 opportunities | 10.0 opportunities | [redacted] y is making adequate progress towards mastering his objective. |
| Given partner work and provided with models, [redacted] T [redacted] G will appropriately engage with peers for 80% of the session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Limited/Minimal Progress | 3 opportunities | 10.0 opportunities | [redacted] y continues to struggle with appropriately communicating with his peers. He continues to try and make children laugh, or enter their space. We will continue to work on this objective. |

MILFORD PUBLIC SCHOOLS
MILFORD, CONNECTICUT 06460

PSYCHOLOGICAL EVALUATION

CONFIDENTIAL

Name: [redacted]g

School: John F. Kennedy School
Grade: [redacted]

Evaluation Date: 1/12, 1/19, 1/22, 1/26/24

Date of Birth: [redacted]
Age at Testing: [redacted]

## Referral

[redacted]y was referred for a psychological evaluation by the Planning and Placement Team (PPT) as part of his triennial evaluation.

[redacted]y has been identified as a student with [redacted]. He is currently receiving reading instruction 2.5 hours per week, math instruction 2.5 hours per week, writing instruction 2.5 hours per week, executive functioning instruction 2.0 hours per week, language instruction 1.5 hours per week, and counseling 2.75 hours per week. [redacted]s current Special Education goals focus on improving his reading comprehension, math computations skills, writing skills, and executive functioning skills. [redacted]y is also working on improving his social problems solving and conversation skills and using critical thinking and reasoning to respond to comprehension questions.

## Instrumentation

Behavior Assessment System for Children – Third Edition (BASC-3) Parent Form
Behavior Assessment System for Children – Third Edition (BASC-3) Teacher Form
Childhood [redacted]h Rating Scale, Second Edition – Standard Functioning Version (CARS2-ST)
Childhood [redacted]h Rating Scale, Second Edition – Questionnaire for Parents or Caregivers (CARS2-QPC)
Cognitive Assessment System, Second Edition (CAS-2)
Informal Interview
NEPSY Second Edition (NEPSY-II), selected subtests
Social Responsiveness Scale – Second Edition (SRS-2), Parent Report
Social Responsiveness Scale – Second Edition (SRS-2), Teacher Report
Vineland Adaptive Behavior Scales – Third Edition, Comprehensive Parent/Caregiver

Form
Vineland Adaptive Behavior Scales – Third Edition, Comprehensive Teacher Form
Wechsler Intelligence Scale for Children – Fifth Edition (WISC-V)

Observations

[redacted] was evaluated during four testing sessions. He was friendly and cooperative throughout the evaluation. [redacted] attention was good during testing. He sometimes lost his focus but he was easily redirected to the task. [redacted] effort was also good. He attempted to complete all of the tasks he was given, even if they appeared to be difficult for him. During the evaluation, [redacted] eye contact was inconsistent and he often rubbed his head and rocked in his chair. He refused any breaks he was offered. [redacted] did not initiate any conversations but he did participate in conversations initiated by the examiner. [redacted] said that he loves to learn math and also likes to write and go to his specials. Reading can be a little difficult for him. He reported that he has friends in his class and plays with them at recess. At home, he likes to play with his stuffed animals and go to Bass Pro Shops with his mom or his dad. He also loves to learn about dinosaurs. The results of this evaluation are thought to be an accurate representation of [redacted] abilities.

Test Results

Wechsler Intelligence Scale for Children – Fifth Edition (WISC-V)

| | | | |
|---|---|---|---|
| Full Scale IQ | 65 | | |
| | | | |
| Verbal Comprehension Index | 73 | Visual Spatial Index | 72 |
| Similarities | 6 | Block Design | 6 |
| Vocabulary | 4 | Visual Puzzles | 4 |
| | | | |
| Fluid Reasoning Index | 67 | Working Memory Index | 72 |
| Matrix Reasoning | 4 | Digit Span | 4 |
| Figure Weights | 4 | Picture Span | 6 |
| | | | |
| Processing Speed Index | 66 | | |
| Coding | 5 | | |
| Symbol Search | 3 | | |

Subtest scores are based on a scale from 1 to 19. Scores of 8 to12 fall within the average range.

Currently on the WISC-V, [redacted] is functioning in the extremely low range of intelligence overall (Full Scale Intelligence Quotient). His Fluid Reasoning and Processing Speed Index scores are also in the extremely low range. [redacted] Verbal Comprehension, Visual Spatial, and Working Memory Index scores are in the very low range.

On the Verbal Comprehension Index, [redacted] demonstrated low average ability on a task that assessed his ability to think and reason logically. His ability to define common vocabulary words is in the very low range.

On the Visual Spatial Index, [redacted] demonstrated low average ability on a visual perception task that required him to construct blocks to match presented designs. He demonstrated very low range skills on a task that measured his visual and spatial reasoning and visual working memory.

On the Fluid Reasoning Index, [redacted] demonstrated very low skills on a task that measured his quantitative reasoning. He also demonstrated very low skills on a task that required him to complete visual analogies.

A review of [redacted] performance on the Working Memory and Processing Speed Indexes shows his skill levels to be in the very low and extremely low range, respectively. [redacted] demonstrated very low skills when asked to recall and sequence random series of numbers. He demonstrated low average skills in his ability to remember and sequence random series of pictures. On the pencil and paper tasks used to assess [redacted] speed of visual processing, his skill levels were in the extremely low to very low range. For the Processing Speed tasks, [redacted] was required to copy coded symbols and match visual symbols in a timely manner. He was able to complete both tasks accurately but did so at a speed that is much slower than would be expected for his age.

Cognitive Assessment System, Second Edition (CAS-2)

| | | | |
|---|---|---|---|
| Full Scale | 60 | | |
| | | | |
| Planning Scale | 71 | Simultaneous Scale | 74 |
| Planned Codes | 5 | Matrices | 6 |
| Planned Connections | 5 | Verbal-Spatial Relations | 5 |
| | | | |
| Attention Scale | 61 | Successive Scale | 70 |
| Expressive Attention | 5 | Word Series | 5 |
| Number Detection | 2 | Sentence Repetition | 5 |

[redacted] overall Full Scale score is 60, which is in the very poor range. He earned a score of 61 on the Attention Scale, which is in the very poor range and is a weakness. [redacted] had significant difficulty focusing on essential details and sustaining his attention over time.

[redacted]s scores on the Planning, Simultaneous, and Successive Scales are all in the poor range. These scales measured his ability to develop effective strategies for problem solving, to maintain the strategies he did develop as the tasks became more difficult, and to decide how to organize or complete a task. In addition, the scales also measured [redacted]s ability to understand spatial relationships, to understand word relationships, and to work with sounds and information in a specific linear order. [redacted]y had considerable difficulty completing tasks in all of these areas.

NEPSY Second Edition (NEPSY-II)

| | Scaled Score/ Percentile | Classification |
|---|---|---|
| **Attention and Executive Functioning** | | |
| Animal Sorting | 5 | Below Expected Level |
| Auditory Attention | 5 | Below Expected Level |
| Response Set | 5 | Below Expected Level |
| Clocks | 5 | Below Expected Level |
| Design Fluency | 5 | Below Expected Level |
| Inhibition – Naming | 2 | Well Below Expected Level |
| Inhibition – Inhibition | 4 | Below Expected Level |
| Inhibition – Switching | 4 | Below Expected Level |
| | | |
| **Social Perception** | | |
| Affect Recognition | 4 | Below Expected Level |
| Theory of Mind | <2% | Well Below Expected Level |

[redacted]s ability to categorize and shift between concepts, to shift to a new and complex set of stimuli, and to maintain his attention while both inhibiting previously learned responses and correctly responding to new stimuli is below the expected level. In addition, [redacted]y demonstrated below expected skills in his ability to sustain problem-solving behavior and to demonstrate cognitive flexibility using nonverbal stimuli. He had difficulty maintaining his auditory attention over time as well as with planning and organizing.

[redacted]s ability to discriminate among common facial expressions is below the expected level. He was able to recognize happy, sad, neutral, fear, and disgust. He had difficulty recognizing anger. [redacted]s ability to understand that others have their own thoughts, ideas and feelings that may be different from his own and his understanding of figurative language was well below the expected level. In most cases he was unable to predict what others could be thinking or feeling.

Behavior Assessment System for Children – Third Edition (BASC-3)

The BASC-3 is an assessment system designed to facilitate the identification and classification of a variety of emotional and behavioral disorders of children across environments. T-Scores of 70 and above are Clinically Significant and demonstrate problems that may need intervention. T-Scores between 60 and 69 are considered to be in the At-Risk range and indicate problems that may need careful monitoring. Adaptive measures with T-Scores of 31 to 40 are At-Risk and T-Scores of 30 and below are Clinically Significant. Clinically Significant scores are marked with two asterisks** and At-Risk scores are marked with one asterisk*.

| | T-Scores | | |
|---|---|---|---|
| Clinical Scales | Teacher | Mother | Father |
| Hyperactivity | 87** | 82** | 51 |
| Aggression | 68* | 65* | 43 |
| Conduct Problems | 79** | 54 | 40 |
| Anxiety | 67* | 59 | 42 |
| Depression | 63* | 55 | 44 |
| Somatization | 43 | 37 | 40 |
| Attention Problems | 78** | 70** | 61* |
| Learning Problems | 78** | N/A | N/A |
| Atypicality | 102** | 67* | 44 |
| Withdrawal | 56 | 55 | 48 |
| | | | |
| Adaptive Scales | | | |
| Adaptability | 31* | 32* | 38* |
| Social Skills | 35* | 31* | 50 |
| Leadership | 30** | 33* | 33* |
| Study Skills | 30** | N/A | N/A |
| Activities of Daily Living | N/A | 41 | 50 |
| Functional Communication | 24** | 31* | 34* |
| | | | |
| Composites | | | |
| Externalizing Problems | 80** | 70** | 44 |
| Internalizing Problems | 60* | 50 | 40 |
| School Problems | 81** | N/A | N/A |
| Behavioral Symptoms Index | 82** | 71** | 48 |
| Adaptive Skills | 27** | 31* | 40* |

[redacted]s teacher reported him to be in the Clinically Significant range in the areas of hyperactivity, conduct problems, attention problems, learning problems, atypicality, leadership, study skills, and functional communication. He was reported to be in the At-Risk range in the areas of aggression, anxiety, depression, adaptability, and social skills. [redacted]s teacher said that [redacted]y has poor self-control, is easily distracted, and has trouble keeping up in class. However, the teacher also said that [redacted]y quickly joins group activities, reads, and congratulates others when good things happen to them.

Clinically Significant responses were given by [redacted]s mother in the areas of hyperactivity and attention problems. She reported [redacted]y to be At-Risk in the areas of aggression, atypicality, adaptability, social skils, leadership, and functional communication. [redacted]s mother reported that he acts without thinking, has a short attention span, and argues when he is denied his own way. [redacted]s mother also said that he organizes his chores or other tasks well, is polite, and is clear when telling about personal experiences.

[redacted]s father's responses on the BASC-3 show him to be in the At-Risk range in the areas of attention problems, adaptability, leadership, and functional communication. He said that [redacted]y encourages others to do their best and is easily calmed when angry but that he can have trouble describing his feelings accurately and adjusting to changes in family plans.

Childhood [redacted]n Rating Scale, Second Edition (CARS-2)

The CARS-2 is an assessment tool designed to identify children with [redacted]n and distinguish them from other children with developmental delays. Children are rated on a scale ranging from Minimal-to-No Symptoms of [redacted]n Spectrum Disorder to Severe Symptoms of [redacted]n Spectrum Disorder. [redacted]y was rated by his teacher to be in the Mild-to-Moderate Symptoms of [redacted]n Spectrum Disorder range. His teacher noted that [redacted]y has the most difficulty controlling his body movements, forming relationships, regulating his emotions, and adapting to change. [redacted]y demonstrates several repetitive movements (i.e., rocking, rubbing his head, sucking on his upper arm) that he engages in throughout the day. He needs several reminders to transition and becomes anxious or agitated if his routine is disrupted. [redacted]y will laugh or react to an event to an inappropriate degree, often continuing after the event has ended or he has been asked to stop. He does seek out friendships and does not react adversely to sound, taste, smell, or touch in school.

Information from the Parent or Caregiver Questionnaire shows that with both of his parents, [redacted]y has difficulty carrying on a conversation and talking to people about their interests, making eye contact, coping with change, and expressing emotions that fit the situation. He also frequently flaps or claps his hands, can become anxious, and has difficulty with his fine-motor coordination. [redacted]y loves to have routines and has special interests, such as dinosaurs and art. He can be overly sensitive to sounds. When [redacted]y is with his mother, he will repeat words or phrases over and over. He used to have difficulty initiating and sustaining social interactions when he was with his mother. She is not seeing this as an area of difficulty anymore but he is still demonstrating it with his father. [redacted]s father also sees him having some difficulty using gestures to communicate. He has seen an improvement with [redacted]s ability to cope with change since he was younger.

Social Responsiveness Scale – Second Edition (SRS-2)

| | Teacher | | Mother | | Father | |
|---|---|---|---|---|---|---|
| | T-Score | Classification | T-Score | Classification | T-Score | Classification |
| Social Awareness | 67 | Moderate | 73 | Moderate | 48 | Within Normal Limits |
| Social Cognition | 84 | Severe | 70 | Moderate | 55 | Within Normal Limits |
| Social Communication | 70 | Moderate | 70 | Moderate | 59 | Within Normal Limits |
| Social Motivation | 57 | Within Normal Limits | 69 | Moderate | 52 | Within Normal Limits |
| Restricted Interests and Repetitive Behavior | 89 | Severe | 76 | Severe | 59 | Within Normal Limits |
| *SRS-2 Total Score* | *76* | *Severe* | *74* | *Moderate* | *57* | *Within Normal Limits* |

| T Scores: | |
|---|---|
| 76+ | Severe (Severe interference with everyday social interactions) |
| 66-75 | Moderate (Substantial interference with everyday social interactions) |
| 60-65 | Mild (Mild to moderate interference with everyday social interactions) |
| 59 and below | Within Normal Limits |

[redacted]s teacher and mother reported that [redacted]y demonstrates moderate to severe difficulty in his ability to pick up on social cues, to interpret social cues once he picks up on them, and with his expressive social communication. He is motivated to engage in social-interpersonal behavior in school and with his father but has difficulty in this area with his mother. [redacted]y demonstrates a severe level of stereotypical behaviors or highly restricted interests in school and with his mother. His father reported him to be within normal limits in all areas.

Vineland Adaptive Behavior Scales – Third Edition

| | Teacher | | Mother | | Father | |
|---|---|---|---|---|---|---|
| | **SS** | **Adaptive Level** | **SS** | **Adaptive Level** | **SS** | **Adaptive Level** |
| **Communication** | 69 | Low | 76 | Moderately Low | 71 | Moderately Low |
| Receptive | | Low | | Moderately Low | | Low |
| Expressive | | Moderately Low | | Moderately Low | | Moderately Low |
| Written | | Low | | Moderately Low | | Moderately Low |
| | | | | | | |
| **Daily Living Skills** | 60 | Low | 68 | Low | 74 | Moderately Low |

| | | | | | | |
|---|---|---|---|---|---|---|
| Personal | | Low | | Moderately Low | | Adequate |
| Numeric/Domestic | | Low | | Moderately Low | | Low |
| Community | | Low | | Low | | Low |
| | | | | | | |
| **Socialization** | 64 | Low | 82 | Moderately Low | 79 | Moderately Low |
| Interpersonal Relationships | | Low | | Moderately Low | | Adequate |
| Play and Leisure Time | | Low | | Moderately Low | | Moderately Low |
| Coping Skills | | Low | | Moderately Low | | Low |
| | | | | | | |
| **Adaptive Behavior Comp.** | 65 | Low | 74 | Moderately Low | 74 | Moderately Low |

Currently on the Vineland-3 Adaptive Behavior Scales, [redacted]y is functioning in the low range overall (Adaptive Behavior Composite) in school and in the moderately low range with his parents. Both in school and with his mother, [redacted]s daily living skills are in the low range. They are in the moderately low range with his father. [redacted]s communication skills and socialization skills are in the low range in school and in the moderately low range with his parents.

The communication domain measured [redacted]s ability to speak, understand others, and use written language. His overall score in this area is in the low range in school and in the moderately low range with his parents. [redacted]y has significant difficulty understanding others in school and with his father but more moderate difficulty in this area with his mother. He has a moderate level of difficulty expressing himself verbally. [redacted]y has moderate difficulty using written language at home but more significant difficulty in this area in school.

The daily living skills domain measured how [redacted]y uses the practical skills and behaviors that are needed to take care of himself in the school and household environments. These skills include his ability to eat, dress himself, practice personal hygiene, understand time, money and math, complete household tasks, follow school and classroom rules and routines, and use the computer. [redacted]s overall score is in the low range in school and with his mother and in the moderately low range with his father. He has significant difficulty following classroom and household routines independently. [redacted]y needs help with self-care tasks in school and with his mother but not with his father. He also has significant difficulty with academic skills in school and moderate to more severe difficulty completing household tasks with his parents.

The socialization domain measured how [redacted]y interacts with others, how he plays and uses his leisure time, and how he demonstrates responsibility and sensitivity to others. [redacted]s overall score in this area is in the low range in school and in the moderately low range with his parents. [redacted]y has difficulty engaging in play with his peers in school and at home. In school, he often copies the inappropriate behavior of others and can play too aggressively. [redacted]y also has difficulty forming friendships and participating in conversations in school and with his mother. This is not an area of concern with his father. [redacted]y has moderate to more severe difficulty using his coping skills independently. He will use them when prompted to by an adult.

Conclusion

Currently on the WISC-V, [redacted]y is functioning in the extremely low range of intelligence overall (Full Scale Intelligence Quotient). His Fluid Reasoning and Processing Speed Index scores are also in the extremely low range. [redacted]s Verbal Comprehension, Visual Spatial, and Working Memory Index scores are in the very low range.

On the CAS-2, [redacted]s overall Full Scale score is 60, which is in the very poor range. He earned a score of 61 on the Attention Scale, which is also in the very poor range. [redacted]y had significant difficulty focusing on essential details and sustaining his attention over time. [redacted]s scores on the Planning, Simultaneous, and Successive Scales are all in the poor range.

The results of the NEPSY-II show that [redacted]y has difficulty categorizing and shifting between concepts, shifting to a new and complex set of stimuli, and maintaining his attention while both inhibiting previously learned responses and correctly responding to new stimuli. In addition, [redacted]y also had difficulty sustaining problem-solving behavior and demonstrating cognitive flexibility using nonverbal stimuli. He had difficulty maintaining his auditory attention over time as well as with planning and organizing. [redacted]s ability to discriminate among common facial expressions is below the expected level. He was able to recognize happy, sad, neutral, fear, and disgust but had difficulty recognizing anger. [redacted]s ability to understand that others have their own thoughts, ideas and feelings that may be different from his own and his understanding of figurative language was well below the expected level. In most cases he was unable to predict what others could be thinking or feeling.

The results of the BASC-3 Parent and Teacher Reports indicate that [redacted]y is in the At-Risk or Clinically Significant range in school and with both parents in the areas of attention problems, adaptability, leadership, and functional communication. He is in the At-Risk or Clinically Significant range in school and with his mother in the areas of hyperactivity, aggression, atypicality, and social skills. [redacted]y is in the At-Risk or Clinically Significant range in school only in the areas of conduct problems, anxiety, depression, learning problems, and study skills.

[redacted]s score on the CARS2-ST places him in the Mild-to-Moderate Symptoms of [redacted]n Spectrum Disorder range. His teacher noted that [redacted]y has the most difficulty controlling his body movements, forming relationships, regulating his emotions, and adapting to change. [redacted]y demonstrates several repetitive movements (i.e., rocking, rubbing his head, sucking on his upper arm) that he engages in throughout the day. He needs several reminders to transition and becomes anxious or agitated if his routine is disrupted. [redacted]y will laugh or react to an event to an inappropriate degree, often continuing after the event has ended or he has been asked to stop. He does seek out friendships and does not react adversely to sound, taste, smell, or touch in school. Information from the Parent or Caregiver Questionnaire shows that with both of his parents, [redacted]y has difficulty carrying on a conversation and talking to people about their interests, making eye contact, coping with change, and expressing emotions that fit the situation. He also frequently flaps or claps his hands, can become anxious, and has

difficulty with his fine-motor coordination. [redacted]y loves to have routines and has special interests, such as dinosaurs and art. He can be overly sensitive to sounds. When [redacted]y is with his mother, he will repeat words or phrases over and over. He used to have difficulty initiating and sustaining social interactions when he was with his mother. She is not seeing this as an area of difficulty anymore but he is still demonstrating it with his father. [redacted]s father also sees him having some difficulty using gestures to communicate. He has seen an improvement with [redacted]s ability to cope with change since he was younger.

On the SRS-2, [redacted]s teacher and mother reported that [redacted]y demonstrates moderate to severe difficulty in his ability to pick up on social cues, to interpret social cues once he picks up on them, and with his expressive social communication. He is motivated to engage in social-interpersonal behavior in school and with his father but has difficulty in this area with his mother. [redacted]y demonstrates a severe level of stereotypical behaviors or highly restricted interests in school and with his mother. His father reported him to be within normal limits in all areas.

Currently on the Vineland-3 Adaptive Behavior Scales, [redacted]y is functioning in the low range overall (Adaptive Behavior Composite) in school and in the moderately low range with his parents. Both in school and with his mother, [redacted]s daily living skills are in the low range. They are in the moderately low range with his father. [redacted]s communication skills and socialization skills are in the low range in school and in the moderately low range with his parents.

Recommendations

The Planning and Placement Team should meet to discuss the results of this and other evaluations to determine an appropriate educational plan.

Jennifer Davis, M.A.
School Psychologist

MILFORD PUBLIC SCHOOLS
70 West River Street
Milford, CT 06460

# BEHAVIOR INTERVENTION PLAN

| | | | |
|---|---|---|---|
| Student | [redacted] | Date<br>Revised | 06/04/2021<br>02/2024 |
| DOB | [redacted] | School | John F. Kennedy School |
| Parents/ Guardians | Robert [redacted]<br>Karen [redacted] | Grade | [redacted] |
| Special Education Teacher | Tara Truscello | School Social Worker | Lauri Dougherty |
| Supervisor of Special Education | Andrea Giannattasio | School Psychologist | Jen Davis |
| Regular Education Teacher | Alicia Curria | BCBA | Courtney Carrano |

**Target Behaviors:**
*(Behavior(s) which are presenting as problematic to the student's learning and which the planning and placement team has identified to reduce or extinguish.)*

**Elopement** - defined as any time [redacted] gets out of his seat without adult permission

**Calling Out/Making noises** - defined as any time [redacted] vocally talks out or makes vocal noises without being called on to do so

**Misuse of Materials** - defined as anytime [redacted] uses materials for purposes other than what they were intended. For example: writing on the desk, tapping with a pencil, playing with items on his desk, playing with hands.

**Work Refusal** - defined as anytime [redacted] does not initiate a work demand within 15 seconds of being asked to do so OR stops working for more than 15 seconds

**Hypothesis/Function of Behaviors:**
*(A synthesis of data gathered to offer a hypothesis regarding what function the target behavior(s) serves for the student.)*

Based on the results of the analysis of antecedents and consequences as well as other data collection,the function of the target behaviors are as follows:

**Elopement** is hypothesized to be to gain access to attention.

**Calling Out/Making noises** is hypothesized to be to gain access to attention.

**Misuse of Materials -** is hypothesized to have a dual function, primarily to escape or avoid something and secondarily to gain access to attention.

**Work Refusal** - is hypothesized to have a dual function, primarily to escape or avoid something and secondarily to gain access to attention.

**Desired Replacement Behaviors:(*More acceptable behaviors planned to replace the target behaviors through the Behavior Intervention Plan)***

**Elopement -** staying in his seat

**Calling Out/Making noises -** waiting his turn, raising hand and waiting to be called on, and saying, "excuse me" to get staff or peers attention.

**Misuse of Materials -** using materials for what they purpose is intended to be

**Work Refusal** - asking for a break, completing and initiating work tasks and demands, asking for help

**Intervention Strategies:**
*(Specific interventions and strategies to be implemented in addressing the Target Behavior.)*

***Proactive Strategies:***

- **Clear Expectations** -[redacted]y should be provided clear expectations especially prior to transitions that also includes behavioral expectations to ensure he is clear of what is expected of him.
  - For example, "you are going to line up quietly by walking."
- **Behavior Specific Feedback** – when providing [redacted]y with verbal praise for engaging in appropriate peer interactions, raising his hand and not calling out; make praise sure you are making him aware of what specific behavior he is receiving the praise for.
  - For example, "nice job lining up getting in your spot", "I liked how you were able to complete your work independently."
- **Visual Checklist -** For multi step assignments, provide [redacted]y with a task checklist for him to check off tasks as he completes them.
- **Direct Instruction -** [redacted]y should receive direct instruction in the following areas:
  - **Functional Communication** - asking for attention, raising hand, requesting a break, asking for help,
  - **Peer interaction** - how to ask a friend to play, how to engage in conversation with peers, how to react when a peer does not want to play

***Consequence Strategies:***

- **Holding the Expectation:** If [redacted]y engages in target behavior, the demand/task that was presented prior to engaging in behavior should remain until he complies with the task or demand. For example, if the direction was to do 5 minutes of independent reading and [redacted]y does not comply, he should have to complete this task before engaging the next task or demand.

- **Planned ignoring-** the teacher will ignore inappropriate behaviors that [redacted]y is engaging in and wait to provide attention for appropriate behaviors. Doing this will reinforce the appropriate behaviors and in turn increase those behaviors while decreasing maladaptive behaviors. When [redacted]y exhibits calling out,and elopement, you should ignore the student, provide no eye contact or verbal statements. Provide visual cues. For instance, if [redacted]y is calling out you may raise your hand As soon as the student demonstrates ANY behavior resembling the appropriate behavior, provide immediate praise.

*System of Reinforcement:*

- ***Differential Reinforcement of Low Rates -*** [redacted]y should receive reinforcement if behaviors occur at low rates. [redacted]y is provided with a visual of tokens. When [redacted]y engages in target behavior a token is removed without providing attention. If [redacted]y has one token at the end of the interval, he will receive access to preferred activity or item. [redacted]y currently has five tokens for a duration of 30 minutes. The duration should be increased systematically over time as well as frequency decreased once [redacted]y consistently meets criteria for reinforcement.

**Person Responsible:**
*(The individual's designated to implement intervention strategies and/or designated for oversight of specific portions of the Behavior Intervention Plan.)*

| Task: | Responsible Party: | Date Implemented: |
|---|---|---|
| Direct Instruction - Behavioral Strategies, Coping Strategies, Replacement Behaviors | School Team | Ongoing |
| Proactive Strategies, Consequence Strategies, System of Reinforcement, Environmental Supports | School Team & BCBA as needed | Ongoing |

**Monitoring Progress/Evaluation Methods:**
*(A description of how progress toward achieving desired outcome will be monitored and evaluates.)*

Data will be collected on targeted behaviors to monitor behavior trends.

**Timelines/Review Dates:**
*(Segments of time during which specific portions of the Behavior Intervention Plan are to be addressed as well as specific dates by which specific portions of the Behavior Intervention Plan are to be reviewed with regard to progress.)*

| Date: | Specific portion of the plan to review | Responsible Party: |
|---|---|---|
| 2 week minimum increments from date of implementation | Review and analysis of Data | BCBA/ School Team |

| | | |
|---|---|---|
| 2 week minimum increments from date of implementation | Program adjustment if needed | BCBA/School Team |
| 2 week minimum increments from date of implementation | Communication to guardians regarding behavior change | School Team |

***FADING OF PLAN:*** When stable rates of behavioral change over time are demonstrated, current intermittent schedules of reinforcement will be adjusted. This will be done mindfully and systematically by increasing demands and/or increasing the time interval of reinforcement delivery, thus allowing natural contingencies to support behavioral change

# Progress Report on IEP Goals and Objectives

**Reporting Period:**Final Progress Report, 02/01/2024
**Milford School District**
**IEP Dates:** 11/30/2023 - 02/15/2024

**Student Name:**[redacted]T[redacted]G
**Date of Birth:**[redacted]3
**Current Grade:** 4

**Parent/Guardian Name:** Karen[redacted]ı,[redacted]g

[redacted]):[redacted]2
**Case Manager:** Tara Truscello
**Current Enrolled School:** J. F. Kennedy School (0841911)

## GOAL AREA: Reading

## ANNUAL GOAL 1

Given small group instruction,[redacted]will improve his reading comprehension skills , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted]y has made progress towards achieving his reading objectives. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given an opportunity to listen to or read an instructional level text,[redacted]T[redacted]G will correctly choose the main character from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted]y has mastered this objective. |
| Given an opportunity to listen to or read an instructional level text,[redacted]T[redacted]G will correctly choose the setting of the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted]y has mastered this objective. |
| Given an opportunity to listen to or read an instructional level text,[redacted]T[redacted]G will correctly identify an event from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted]y has mastered this objective. |
| Given an opportunity to listen to or read an instructional level text,[redacted]T[redacted]G will correctly identify two events in order from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted]y has mastered this objective. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose the problem from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Not Mastered | 1 opportunities | 4.0 opportunities | [redacted] y requires adult support to complete this task and is not independent at this time. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose the solution from the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Not Mastered | 1 opportunities | 4.0 opportunities | [redacted] y requires adult support to complete this task and is not independent at this time. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose a prediction about the text independently across 3 out of 4 texts. (Baseline: Choosing from an option of 3 accurately.) by 02/15/2024 | Not Mastered | 1 opportunities | 4.0 opportunities | [redacted] y requires adult support to complete this task and is not independent at this time. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose the main idea from the text from a list of three options. across 3 out of 4 texts. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y has mastered this objective. |
| Given an opportunity to listen to or read an instructional level text, [redacted] T [redacted] G will correctly choose supporting detail from the text from a list of three across 3 out of 4 texts. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y has mastered this objective. |

**Progress Report**

**Student Name:** [redacted]
**DOB:** [redacted]

## GOAL AREA: Writing

## ANNUAL GOAL 2

Given small group instruction, [redacted] will improve his writing abilities , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Mastered (Goal Achieved) | N/A | N/A | [redacted] is able to complete a paragraph on a topic with adult support. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given When presented with models and adult support, [redacted] T [redacted] G will brainstorm at least three fiction or non-fiction writing topics with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y has mastered this objective. |
| Given When presented with models and adult support, [redacted] T [redacted] G will select and appropriately fill in a graphic organizer with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y has mastered this objective. |
| Given When presented with models and adult support, [redacted] T [redacted] G will write a topic sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y is able to complete a paragraph on a topic with adult support. |
| Given When presented with models and adult support, [redacted] T [redacted] G will write three supporting sentences for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y is able to complete a paragraph on a topic with adult support. |
| Given When presented with models and adult support, [redacted] T [redacted] G will write a concluding sentence for a paragraph with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y is able to complete a paragraph on a topic with adult support. |
| Given When presented with models and adult support, [redacted] T [redacted] G will utilize an editing checklist to edit his writing for capitalization, punctuation and grammar with fading adult support for 3 out of 4 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 4 opportunities | 4.0 opportunities | [redacted] y is able to complete a paragraph on a topic with adult support. |

## GOAL AREA: Mathematics

## ANNUAL GOAL 3

Given small group instruction, [redacted] will improve his math computation skills , as measured by the following objectives:

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted] y is making progress towards his math objectives. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given direct instruction and models, [redacted] T [redacted] G will correctly identify the place value of a given number within 10,000 for 8 out of 10 problems across 3 opportunities. (Baseline: Understands within 100) by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y was able to master this objective. |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve addition problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y was able to master this objective. |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve addition word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunitites | 10.0 opportunitites | [redacted] y was able to master this objective. |
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve subtraction problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y was able to master this objective. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given direct instruction and models, [redacted] T [redacted] G will correctly solve subtraction word problems with sums up to 1,000 without regrouping for 8 out of 10 problems across 3 opportunities with fading adult support. (Baseline: Can solve through 20 independently.) by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y was able to master this objective. |
| Given direct instruction and visuals, [redacted] T [redacted] G will be able to correctly identify U.S. currency (coins and bills) and their worth, in 5 out of 5 opportunities. by 02/15/2024 | Not Mastered | 1 opportunities | 5.0 opportunities | [redacted] y is unable to identify the name and quantity of coins independently |
| Given direct instruction and visuals, [redacted] T [redacted] G will name the equivalent of monies presented by the teacher using coins up to a quarter and bills up to a twenty dollar bill (e.g., four quarters = one dollar), in 5 out of 5 opportunities. by 02/15/2024 | Not Mastered | 1 opportunities | 5.0 opportunities | [redacted] y is unable to identify the name and quantity of coins independently |
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 2's to 500 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Not Mastered | 5 opportunities | 10.0 opportunities | [redacted] y can count by 2's to 30. |
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 5's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Not Mastered | 5 opportunities | 10.0 opportunities | [redacted] y can count by 5's to 50. |
| Given direct instruction and models, [redacted] T [redacted] G will skip count by 10's to 1,000 for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Not Mastered | 5 opportunities | 10.0 opportunities | [redacted] y can count by 10's to 100. |

## GOAL AREA: Communication

## ANNUAL GOAL 4

Given verbal prompting and visuals during structured task, [redacted] will respond to comprehension questions involving critical thinking and reasoning , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | While [redacted] y has made some progress with identification of problems/solutions, causes of events, and his ability to make basic inferences from presented stories/situations, he continues to require adult facilitation/prompting. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given prompting and visual cues during a structured activity [redacted] T [redacted] G will identify causes of events from presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Not Mastered | N/A | N/A | [redacted] y continues to need prompts to consistently identify appropriate causes of events.. |
| Given prompting and visual cues [redacted] T [redacted] G will respond to comprehension questions involving prediction of events with 80% accuracy in 4/5 opportunities during structured activity by 02/15/2024 | Not Mastered | N/A | N/A | [redacted] y continues to benefit from adult support to make expected predictions based on clues from presented stories/situations. |
| Given prompting and visual cues during structured activity [redacted] T [redacted] G will make an inference about a character's feelings or motives from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Not Mastered | N/A | N/A | [redacted] y at times makes inferences about the feelings and motives of others, but benefits from adult support to consider a variety of feelings (e.g. disappointed, embarrassed, frustrated, worried, etc.) or possible of motives of others. |
| Given prompting and visual cues during structured activity [redacted] T [redacted] G will provide evidence to support inferences from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Not Mastered | N/A | N/A | [redacted] y continues to require adult support to provide specific evidence from presented stories/situations to support inferences he makes. |
| Given prompting and visual cues during a structured activity [redacted] T [redacted] G will answer "How do you know" questions about characters and events from a presented story or situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Not Mastered | N/A | N/A | [redacted] y continues to need adult support to answer "How do you know type ?" questions about presented stories/situations. |
| Given prompting and visual cues during a structured task [redacted] T [redacted] G will identify the problem and generate an appropriate solution from a presented story/situation with 80% accuracy in 4/5 opportunities by 02/15/2024 | Not Mastered | N/A | N/A | [redacted] y requires adult support to identify appropriate solutions for given problems. |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Social/Emotional

## ANNUAL GOAL 5

Given hypothetical social problem situations, [redacted] will identify potential solutions and consequences of each solution , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Mastered (Goal Achieved) | N/A | N/A | [redacted] y was able to master this goal with adult prompting. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a hypothetical social problem situation [redacted] T [redacted] G will identify 2 possible solutions to the problem in 4/5 trials by 02/15/2024 | Mastered (Objective Achieved) | 80 % | 80.0 % | [redacted] y is able to be successful on this objective with adult prompting. |
| Given A hypothetical social problem situation that he has provided solutions for [redacted] will identify and discuss the possible consequences of each solution in 4/5 trials by 02/15/2024 | Mastered (Objective Achieved) | 80 % | 80.0 % | [redacted] y is able to be successful on this objective with adult prompting. |

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 6

Given the opportunity to participate in conversations with peers and/or adults during counseling intervention sessions, [redacted] will actively participate and adhere to identified conversational rules , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Mastered (Goal Achieved) | N/A | N/A | [redacted]y was able to master this goal in a small group setting with adult prompting. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will maintain a topic for 6-7 conversational exchanges in 4/5 trials by 02/15/2024 | Mastered (Objective Achieved) | 80 % | 80.0 % | [redacted]y is able to be successful on this objective when he is talking about a preferred topic. |
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will request clarification and respond to requests for clarification in 70% of opportunities by 02/15/2024 | Mastered (Objective Achieved) | 70 % | 70.0 % | [redacted]y is able to be successful on this objective in a small group setting with adult prompting. |
| Given the opportunity to participate in a conversation [redacted] T [redacted] G will introduce relevant topics and ask 2 questions that are relevant to the topic in 70% of opportunities by 02/15/2024 | Mastered (Objective Achieved) | 70 % | 70.0 % | [redacted]y is able to be successful on this objective in a small group setting with adult prompting. |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Executive Functioning

### ANNUAL GOAL 7

Given small group instruction, [redacted] will improve his executive functioning skills , as measured by mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y is making adequate progress towards mastering his goal. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group instruction in a separate setting and given a model, [redacted] T [redacted] G will follow classroom rules and routines for 80% of the session for 8 out of 10 opportunities with no more than 3 verbal reminders per session. by 02/15/2024 | Mastered (Objective Achieved) | 9 opportunities | 10.0 opportunities | [redacted] y is able to follow classroom rules with no more than 3 verbal reminders |
| Given small group instruction in a separate setting and provided expectations, [redacted] T [redacted] G will attend for 80% of the session with no more than 3 verbal reminders per session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y has mastered this objective in a small group setting. |
| Given multi-step directions and visuals, [redacted] T [redacted] G will follow 80% of the directions accurately with no more than 3 verbal reminders for 8 out of 10 opportunities. by 02/15/2024 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y has mastered this objective in a small group setting. |
| Given partner work and provided with models, [redacted] T [redacted] G will appropriately engage with peers for 80% of the session for 8 out of 10 opportunities with fading adult support. by 02/15/2024 | Not Mastered | 3 opportunities | 10.0 opportunities | [redacted] y continues to struggle with appropriately communicating with his peers. He continues to try and make children laugh, or enter their space. We will continue to work on this objective. |

Milford School District

# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 02/01/2024

**Parent/Guardian/Student:** Karen [redacted], [redacted]

[redacted]: [redacted]

**Mailing Address:** [redacted]

Dear Karen [redacted]

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] [redacted]
(Student's name) (DOB)

**Date:** 02/08/2024 **Time:** 2 :00 PM **Location:** J. F. Kennedy School, 404 West Ave., Milford, CT, 06460-3091

**The purpose of this meeting is to:**

Conduct an Annual Review and review three-year reevaluation results to determine continued eligibility

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| Mother | Karen [redacted] |
| Father | Robert [redacted] |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Alicia Curria |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Nurse | Jacqueline Campbell |
| Other: BCBA | Courtney Carrano |

participation in this process is very important. Please make every effort to attend this meeting. You may bring any other individuals to the meeting, including those who have knowledge or special expertise regarding your child. Parents and guardians have the right to have the school paraprofessional assigned to their child, if any, present at the meeting. It is expected that parents will provide reasonable notice to the District if they wish to have their child's paraprofessional attend the meeting. The meeting may be rescheduled at a mutually agreed upon time and place.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher
(Name and Title)

**Procedural Safeguards**

☑ A copy of the Procedural Safeguards in Special Education is enclosed.

**Parent Notice**

☑ A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

**Milford Public Schools**
**70 West River Street**
**Milford, CT 06460**
CONFIDENTIAL

# EDUCATIONAL ASSESSMENT SUMMARY

| | |
|---|---|
| **Examinee:** [redacted] | **Date:** February 8, 2024 |
| **DOB:** [redacted] | **Testing Period:** 1/8/2024-1/18/2024 |
| **Age at Testing:** [redacted] | **Examiner:** Tara Truscello |
| **Grade:** 4th Grade | **School:** John F. Kennedy Elementary |

## Background Information:

[redacted]) is a fourth grade student at John F. Kennedy Elementary School. [redacted] has a diagnosis of [redacted]. He was referred for triennial testing by the JFK school based team in order to determine current level of functioning and determine continued eligibility for special education.

## Assessment Tools:

**WIAT-IV (Wechsler Individual Achievement Test, Fourth Edition):**
This test includes subtests designed to measure listening, speaking, reading, writing and mathematics skills. Subtests have been administered that correlate to the identified areas of concern for [redacted].

## Discussion of Test Results:

Below is an explanation of the Qualitative Descriptions for the evaluations.

| Standard Score | Classification |
|---|---|
| >145 | Very High |
| 130-145 | High |
| 115-130 | Above Average |
| 85-115 | Average |

| | |
|---|---|
| 70-85 | Below Average |
| 55-70 | Low |
| <55 | Very Low |

The first area assessed is Reading. [redacted] was given the WIAT-IV to look at her phonological awareness, decoding and reading comprehension skills. See below for specific results of these assessments.

| WIAT-IV | Standard Score | Qualitative Description |
|---|---|---|
| **Reading Composite** | **81** | **Below Average** |
| Word Reading | 95 | Average |
| Reading Comprehension | 71 | Below Average |
| **Basic Reading Supplemental Composite** | **88** | **Average** |
| Pseudoword Decoding | 98 | Average |
| Phonemic Proficiency | 76 | Below Average |
| Word Reading | 95 | Average |
| **Decoding Supplemental Composite** | **95** | **Average** |
| Pseudoword Decoding | 98 | Average |
| Word Reading | 95 | Average |
| **Reading Fluency Supplemental Composite** | **95** | **Average** |
| Oral Reading Fluency | 89 | Average |
| Orthographic Fluency | 93 | Average |
| Decoding Fluency | 108 | Average |
| **Phonological Processing Supplemental Composite** | **85** | **Average** |
| Pseudoword Decoding | 98 | Average |
| Phonemic Proficiency | 76 | Below Average |

[redacted]s performance on the WIAT-IV Reading Assessments are as follows.

The **Total Reading Composite Standard Score** of 81 is in the average range when compared to same-age peers. The Total Reading Composite is found based on performance in the Word Reading and Reading Comprehension supplemental assessments.

**Word Reading** provides a measure of letter and letter-sound knowledge as well as single-word reading through identifying letters before matching letters to sounds. [redacted] score was 95 which falls within the average range. [redacted] was able to decode multisyllabic words with a variety of reading patterns. Decoding is an area of strength for [redacted].

**Reading Comprehension** provides a measure of reading comprehension skills at the word, sentence and passage level. It assesses the types of reading comprehension skills taught in the classroom or used in everyday life. The [redacted] reads different types of text, including fictional stories, informational text, advertisements, and how-to passages. The individual may read passages aloud or silently. After each passage, the individual orally responds to literal and

inferential comprehension questions that are read aloud by the examiner. [redacted]s score was 71 which falls within the below average range. [redacted]preferred to read the passages aloud. Although accuracy was not assessed during this portion of the test, it was observed that [redacted] read the passages accurately. When it came to answering comprehension questions about the passages, [redacted]had difficulty. He was only able to answer one out of seven questions for this first passage, so this assessment did have to be reversed to lower leveled passages. For the next passage, [redacted]was able to answer some, but not all, literal questions when looking back at the passage for answers. He struggled with any inferential questions which required thinking beyond the text. Reading comprehension showed to be an area of difficulty for [redacted]

The **Basic Reading Supplemental Composite** looks at the results from the Pseudoword Decoding, Phonemic Proficiency and Word Reading subtest. [redacted]s Basic Reading Supplemental Composite score is 88 which falls within the average range.

**Pseudoword Decoding** measures a [redacted]s ability to apply phonetic decoding skills, by reading a list of nonsense words aloud. [redacted]s standard score was 98 which falls within the average range. [redacted]was able to decode multisyllabic pseudowords with multiple reading patterns. Again, decoding was an area of strength for [redacted]

**Phonemic Proficiency** measures the development of phonological and phonemic skills including elision, substitution and reversal. The elision portion looks at the examinee's ability to initial, medial and final syllables as well as sounds from words. The substitution portion looks at the examinee's ability to substitute the initial, medial and final sounds in words. Finally, the reversal portion looks at a student's ability to hear a word and reverse the sounds in their head (cat will become tack). [redacted]s standard score was 76 which falls within the below average range. [redacted]was able to delete beginning and ending sounds in words, but had difficulty deleting medial sounds, and substituting all sounds. In addition, he was unable to reverse the words he heard. The examiner noted that the difficulty with this portion of the assessment was due to attention to task and following directions. This assessment does not allow for repetition of words or directions. If he missed the expectation provided for the direction, he was unable to complete the task. The tasks he did well on, were the first few items within this assessment. As it went on, he began to lose focus and the directions and examples of expectations were not able to be repeated.

As mentioned previously in the report, **Word Reading** provides a measure of letter and letter-sound knowledge as well as single-word reading through identifying letters before matching letters to sounds. [redacted]s score was 95 which falls within the average range.

The **Decoding Supplemental Composite** looks at the results from the Pseudoword Decoding, and Word Reading subtest. [redacted]s Decoding Supplemental Composite score is 95 which falls within the average range.

As reported previously, **Pseudoword Decoding** measures a [redacted]s ability to apply phonetic decoding skills, by reading a list of nonsense words aloud. [redacted]s standard score was 98 which falls within the average range.

As mentioned previously in the report, **Word Reading** provides a measure of letter and letter-sound knowledge as well as single-word reading through identifying letters before matching letters to sounds. [redacted]s score was 95 which falls within the average range.

The **Reading Fluency Supplemental Composite** looks at the results from the Oral Reading Fluency, Orthographic Fluency and Decoding Fluency subtest. [redacted]s Decoding Supplemental Composite score is 95 which falls within the average range.

**Oral Reading Fluency** measures [redacted]s ability to read passages aloud accurately and then answer subsequent questions about the passage. [redacted]s standard score was 89 which falls within the average range. [redacted]was able to decode the passages fluently and accurately. Although he was able to read the passage fluently, he struggled with answering comprehension questions. He was unable to answer the literal question for each passage.

**Orthographic Fluency** measures sight word vocabulary through the process of reading irregular words aloud as quickly as possible during two 30 second timed trials. [redacted]s standard score was 93 which falls within the average range. [redacted]was able to decode words such as "tour", "muscle" and "tongue". The words he had difficulty with are words he may not have been exposed to often such as "surgeon", "subtle" and "colonel". As mentioned previously, decoding is a strength for [redacted].

**Decoding Fluency** measures pseudoword reading ability through the process of reading pseudo, or nonsense, words as quickly as possible during two 30 second timed trials. [redacted]s standard score was 108 which falls within the average range. He was able to read 22 words out of 25 attempted in his first trial and 16 out of 17 attempted in the second. He was able to decode nonsense words such as "glutch" and "drange" which shows he has a strong understanding of reading patterns and can apply them to words that are not real.

The **Phonological Processing Supplemental Composite** looks at the results from the Pseudoword Decoding and Phonemic Proficiency subtest. [redacted]s Phonological Processing Supplemental Composite score is 85 which falls within the average range.

As reported previously, **Pseudoword Decoding** measures a [redacted]s ability to apply phonetic decoding skills, by reading a list of nonsense words aloud. [redacted]s standard score was 98 which falls within the below average range.

As reported previously, **Phonemic Proficiency** measures the development of phonological and phonemic skills including elision, substitution and reversal. The elision portion looks at the examinee's ability to initial, medial and final syllables as well as sounds from words. The substitution portion looks at the examinee's ability to substitute the initial, medial and final sounds in words. Finally, the reversal portion looks at a student's ability to hear a word and reverse the sounds in their head (cat will become tack). [redacted]s standard score was 76 which falls within the below average range.

The next area assessed for [redacted]was Writing.

| WIAT-IV | Standard Score | Qualitative Description |
|---|---|---|
| **Written Expression** | **82** | **Below Average** |
| Spelling | 90 | Average |
| Sentence Composition | 69 | Low |
| Essay Composition | 97 | Average |
| **Writing Fluency** | **83** | **Below Average** |
| Alphabet Writing Fluency | 94 | Average |
| Sentence Writing Fluency | 79 | Below Average |
| **Sentence Composition** | **69** | **Low** |
| Sentence Building | 66 | Low |
| Sentence Combining | 75 | Below Average |

The **Written Expression Core Composite** standard score of 82 is in the below average range when compared to same-age peers. The Written Expression Core Composite is found based on performance in the Spelling, Sentence Composition and Essay Composition supplemental assessments. The Sentence Composition consists of two separate subtests, Sentence Writing and Sentence Combining.

**Spelling** provides a measure of the ability to spell dictated letters, letter blends, and words. The student hears each letter sound within the context of a word, and each word within the context of a sentence, and then the student writes the target letter sound or word. [redacted]s score of 90 falls within the average range. Spelling was another area of strength for him. He was able to spell words such as "inactive" and "camped".

**Sentence Composition** looks at the examinee's ability to formulate sentences through two sections. [redacted]s Sentence Composition Standard Score of 69 falls within the low range.

The first portion is the **Sentence Building Subtest** which measures sentence formulation skills and written syntactic ability. For each item the [redacted]is asked to write one sentence that uses a target word with appropriate context. For this subtest, [redacted]s Standard Score of 66 falls within the low range. In this section, [redacted]struggled to independently come up with grammatically correct sentences utilizing a specific word provided to him. Although provided with verbal directions, and a visual example, [redacted]was unable to independently form sentences. For every word, he began each sentence with the target word, which led to him writing incomplete sentences.

The second portion is the **Sentence Combining Subtest**, which measures sentence formulation skills and written syntactic maturity. The student combines two or three sentences into one sentence that preserves the meaning of the original sentences. [redacted]s standard score of 75 falls within the below average range. This portion of the assessment was easier for [redacted]. When the information was provided on the page for him, he was able to make good sentences, but often used "and" to join the ideas. When he was given more than two ideas to put into one sentence, he was unable to make a complete sentence.

**Essay Writing** assesses spontaneous, compositional writing skills within a 10-minute time limit. [redacted]s standard score of 97 falls within the average range. [redacted]easily came up with the

topic, playing tag, to write about. Although his sentences were very simple, he was able to introduce his topic, and provide sufficient amounts of details to support why he enjoys the game. He was given 10 minutes to write, after about 2 and a half, he stated he was done and had to be prompted twice to continue to write until he was able to reach the minimum amount of words, which is 40, for this assessment. When the topic was of interest, it showed that [redacted]s able to create a written piece to show his thinking.

The **Writing Fluency Supplemental Composite** standard score of 83 is in the below average range when compared to same-age peers. The Writing Fluency Supplemental Composite is found based on performance in the Alphabet Writing Fluency and Sentence Writing Fluency supplemental assessments.

**Alphabet Writing Fluency** looks at the examinee's ability to fluently compose the alphabet within a 60 second time frame. [redacted]s standard score of 94 falls within the average range. [redacted] was able to write 24 out of the 26 letters correctly within the 60 second time frame.

**Sentence Writing Fluency** looks at the examinee's ability to fluently compose sentences by asking them to write a simple sentence using a target word that describes a picture shown. They are given 5 minutes to complete as many sentences as possible. For this assessment, spelling, capitals and punctuation are not evaluated. [redacted]s Standard Score of 79 falls within the below average range. He often changed the word within the sentence in order to make it grammatically correct. For example, the word is "ride" and he wrote the sentence the boy is riding. Changing of the verb tense made the sentence incorrect.

Other areas assessed on the WIAT-IV that relate to a student's language arts skills are Orthographic Processing and Oral Language skills. See below for specific results from these areas of the assessment.

| WIAT-IV | Standard Score | Qualitative Description |
|---|---|---|
| **Orthographic Processing** | **91** | **Average** |
| Orthographic Fluency | 93 | Average |
| Spelling | 90 | Average |
| **Oral Language** | **63** | **Low** |
| Listening Comprehension | 65 | Low |
| • Receptive Vocabulary | 71 | Below Average |
| • Oral Discourse Comprehension | 66 | Low |
| Oral Expression | 64 | Low |
| • Expressive Vocabulary | 57 | Low |
| • Oral Word Fluency | 85 | Average |
| • Sentence Repetition | 68 | Low |

The **Orthographic Processing Supplemental Subtest** measures a [redacted]s ability to decode and encode. [redacted]s standard score of 91 falls within the average range. The Orthographic Processing Supplemental Subtest is based on performance on the Orthographic Fluency and Spelling subtests.

As previously reported, **Orthographic Fluency** measures sight word vocabulary through the process of reading irregular words aloud as quickly as possible during two 30 second timed trials. [redacted]s standard score was 93 which falls within the average range.

As previously reported, **Spelling** provides a measure of the ability to spell dictated letters, letter blends, and words. The student hears each letter sound within the context of a word, and each word within the context of a sentence, and then the student writes the target letter sound or word. Robert's score of 90 falls within the average range.

The **Oral Language Composite** measures an individual's expressive and receptive language skills. [redacted]s standard score of 63 falls in the low range. The Oral Language Composite is based on performance in the Listening Comprehension and Oral Expression subtests.

**Listening Comprehension** contains the Receptive Vocabulary and Oral Discourse Comprehension components and measures listening comprehension at the level of the word, sentence and discourse. [redacted]s standard score of 65 falls within the low range.

**Receptive Vocabulary** requires the individual to look at four pictures, listen to a word spoken aloud by the examiner, and then point to the picture that best illustrates the meaning of the target word. [redacted]s standard score of 71 falls within the below average range. [redacted]was able to find pictures that matched "pen" and "exhausted" but had difficulty with "festive" and "identical".

**Oral Discourse Comprehension** requires the [redacted]to listen to an audio recording of one or more sentences of narrative or expository information, listen to the question(s) read aloud by the examiner, and then orally answer the question(s). [redacted]s standard score of 66 fell within the low range. This assessment was difficult for [redacted]. He struggled to hold onto information within passages that are more than one sentence.

**Oral Expression** provides a measure of Expressive Vocabulary, Oral Word Fluency and Sentence Repetition. [redacted]s standard score of 64 fell within the low range.

**Expressive Vocabulary** provides a picture and the examiner gives a definition. The examinee needs to give the word that best matches the picture and the definition. [redacted]'s standard score of 57 falls within the low range. [redacted]was able to identify pictures that represented "butterfly" and "calculator", but had difficulty with "craw" which he said was baby and "straight" which he said "line". A difficulty with this assessment seemed to be [redacted]s ability to listen to the directions and follow the expectation. For example, with the word "crawl" was a picture of a baby who was crawling. The examiner provided the statement "what does it mean to crawl on hands and knees". Without focusing and listening to the statement provided, it is understandable how he arrived at the answer of baby. The difficulty of this assessment may not have only been due to a difficulty with expressive language, but also his ability to listen to and follow directions.

**Oral Word Fluency** allows 60 seconds to name as many items within a category as possible. [redacted]s standard score of 85 falls within the average range. He was able to tell 12 different animals and 10 different colors.

**Sentence Repetition** is when the examiner reads sentences that the individual listens to and then repeats it verbatim. [redacted]s standard score of 68 falls in the low range. [redacted] was able to repeat back sentences with up to 5 words. Once the sentences got longer, he was unable to repeat back what he heard and would often state that it was too hard to remember.

The final area assessed on the WIAT-IV is Mathematics. See below for specific results from these areas of the assessment.

| WIAT-IV | Standard Score | Qualitative Description |
|---|---|---|
| **Mathematics** | **65** | **Low** |
| Math Problem Solving | 62 | Low |
| Numerical Operations | 70 | Below Average |
| **Math Fluency** | **65** | **Low** |
| Math Fluency-Addition | 73 | Below Average |
| Math Fluency-Subtraction | 63 | Low |
| Math Fluency- Multiplication | 62 | Low |

The **Mathematics Core Composite** is a measure of a [redacted]s ability to solve math computation problems and apply that thinking to math problem solving. [redacted]s standard score of 65 falls within the low range. The Mathematics Core Composite is based on performance on the Math Problem Solving and Numerical Operations Subtests.

**Math Problem Solving** measures math problem-solving skills in the following domains: basic concepts, everyday applications, geometry, and algebra. The student provides oral and pointing responses. [redacted]s standard score of 62 falls within the low range. Math problem solving was very difficult for [redacted]. He struggled with ordering numbers, addition and subtraction of numbers, identifying money and interpreting graphs. This showed that he is unable to independently apply math skills to solving problems.

**Numerical Operations** measures written math calculation skills in the following domains: Basic skills, basic operations with integers, geometry, algebra, and calculus. [redacted]s standard score of 70 falls within the below average range. [redacted]is able to add and subtract when it does not require regrouping. He was unable to add or subtract with regrouping and when it came to multiplication he wouldn't attempt theses and stated he did not know how to solve the problems.

**Math Fluency** measures the speed and accuracy of a student's math calculations. The student solves written math problems within a 60-second time limit. [redacted]s standard score of 65 falls in the low range.

**Math Fluency-Addition** measures addition fact fluency within 60 seconds. [redacted]s score of 73 falls within the below average range. He attempted 10 problems within the time limit and got them all correct.

**Math Fluency-Subtraction** measures subtraction fact fluency within 60 seconds. [redacted]s standard score of 63 fell within the low average range. He attempted 8 problems within the time limit and got 7 wrong.

**Math Fluency-Multiplication** measures multiplication fact fluency within 60 seconds. [redacted]s standard score of 62 fell within the low range. [redacted]did not attempt any of these problems, he stated he is unable to solve problems like this.

Summary:

Decoding is an overall strength for [redacted]. He shows proficiency to decode real, nonsense and high frequency words. When reading orally, [redacted]s able to read fluently and accurately, but struggles with answering comprehension questions. Comprehension is a struggle for [redacted]. He has difficulty focusing on tasks which leads to his struggle to comprehend what he both reads and hears. This struggle also is apparent when he needs to follow explicit instructions in order to complete a task. Concepts, such as phonemic awareness, tend to be difficult for him due to his ability to hold onto information long enough to manipulate sounds. Typically phonemic awareness impacts decoding and encoding, but this is not the case for [redacted]

Similarly to decoding, encoding is also a strength for [redacted]. He is able to apply his phonics knowledge when spelling. When a topic is of interest to him, he is able to express his ideas and provide details to support his thinking. When needed to follow explicit instructions to complete a task, like finding ways to create a sentence when given a word, [redacted]does struggle.

Math is an area of difficulty for [redacted]. He struggles with math fact fluency and applying this knowledge to any computation problems or problem solving. At this time, [redacted]only showed proficiency of addition and subtraction of numbers without regrouping.

Upon meeting with the Planning and Placement Team, these results will be reviewed as a team to determine the best educational program for [redacted]

*Tara Truscello* — *February 8, 2024*

Tara Truscello, Special Education Teacher — Date

**Milford Public Schools**
**Special Education Speech-Language Reevaluation Report**

| | | | |
|---|---|---|---|
| **Student:** | [redacted] | **DOB:** | [redacted] |
| **School:** | John F. Kennedy School | **Grade:** | Grade 4 |
| **Parent:** | Ms. [redacted]/ Mr. [redacted] | **Teacher;** | Ms. Curria |
| **Testing Dates:** | 1/5, 1/9, 1/12, 1/17, 1/23, 1/25, 1/26, 1/31/24 | **PPT Date:** | 2/8/2024 |

**Reason for the Reevaluation:** [redacted] underwent this evaluation as part of his triennial review to assess his current level of functioning in receptive-expressive and social-pragmatic language skill areas and to determine appropriate educational programming.

**Summary of Services:**
[redacted] is a 10-4 year-old student in Ms. Curria's fourth grade class at Kennedy School. He received Birth to Three services as a two-year old due to concerns with his overall development. When he turned three years old. [redacted] attended an integrated preschool program at Kennedy School. [redacted] became eligible for special education speech-language services in September of 2016. Areas of concern included language processing, oral expression and social-pragmatic development. He attended the pre-K four-year old preschool program at Kennedy School for the 2017-2018 school year. At his annual PPT meeting that year, it was recommended that [redacted] attend a self-contained Primary Development program at Orange Avenue School after he completed his preschool programming. This student transitioned to a Supported Kindergarten program at Orange Avenue School for the 2019-2020 school year, and then returned to Kennedy School the following year to attend first grade.

**Pertinent Information:** [redacted] has been receiving 1.5hr/wk small group speech-language service since he was in preschool. Current goals and objectives have focused on listening comprehension and critical thinking and reasoning. [redacted] also receives academic service from the special education teacher and social skills training from the school psychologist and social worker. This year [redacted] has been demonstrating an increase in dysfluency when speaking. Reminders for breath support, smooth starts and slowing down his speech have been provided.

**Assessment Information:**

*Observations in the classroom and/or other relevant settings yielded the following pertinent functional information:

[redacted] was observed as he returned from a speech session to his classroom. When he arrived the room was empty, but [redacted] quickly came to the conclusion that his class was at their "Buddy's" room. He went directly to the appropriate first grade room and found his classmates sitting in groups with first grade students to complete an assigned activity. Upon entering the classroom [redacted] looked around and quickly sat down at an empty table without saying anything. At a peer's suggestion, he came and sat at the table

where first grade "buddy" was working with a few of the fourth grade students on an activity involving generation of sentences about "candy." [redacted] sat down at the table, but did not greet the students, inquire about what they were doing, or attempt to participate in the activity. When a peer suggested he move closer so he could see what the first grade student was writing, [redacted] got out of his seat and sat in an empty chair on one side of the first grader and looked around, but did not comment or ask a question about the assignment. When a peer asked what else the first grader could write about on the topic of "candy," [redacted] proceeded to read a written sentence from the student's paper. When another peer asked what else could be written. [redacted] stated, "I like candy." Throughout this observational period, [redacted] was noted to be very fidgety and to display frequent movements such as scratching his body, stretching his arm over his head, moving his head back and forth and shifting in his chair.

_ speech sample
_ oral language sample
_ written language sample
X teacher reports, checklists, interviews
_ curriculum based assessments (e.g., portfolios, text analysis, class tests)
X parent reports, checklists, interviews
_ child reports, checklists, interviews
_ other (describe)

* Standardized tests were used. Yes X No

1. **Peabody Picture Vocabulary Test –Fifth Edition (PPVT-5)**
The fifth edition of the Peabody Picture Vocabulary Test (PPVT-5) is an individually administered, norm-referenced instrument that assesses receptive (hearing) vocabulary of children and adults. Students are presented with four color picture choices and asked to identify (via pointing) the picture that best illustrates the meaning of an orally presented target word. The mean of this test is 100 with a standard deviation of 15. [redacted]s performance was as follows:

| Standard Score | Confidence Interval (90% Level) | Percentile Rank |
|---|---|---|
| **80** | 76 - 85 | 9 |

*Average abilities for the PPVT-5 standard score range from 85-115*

[redacted]s standard score of 80 falls slightly below the expected range when compared to peers his same age. During this task he was noted to view all four choices before pointing to his answer. At times he self-corrected his responses, made comments or asked questions about the pictures viewed. He was observed to correctly identify many words including *violin, globe, plumber, aquarium, refueling, drone, clarinet, inhaling, coast, mammal, citrus, and reprimanding.* Some of the words [redacted] was not noted to identify during this task included *vase, trunk, sorting, timer, flaming, athlete, towing, and solo.*

2. **Clinical Evaluation of Language Fundamentals-5** is administered to students ages 5-21 years to to determine if they have the basic foundation of content and form that characterize mature language use:

word meanings (semantics), word and sentence structure (morphology and syntax), as well as the recall and retrieval of spoken language (memory).

The following results on the CELF-5 were obtained for [redacted]:

| Subtests | Scaled/Standard Score | Confidence interval (90% Level) |
|---|---|---|
| Word Classes | 4 | - |
| Following Directions | 1 | - |
| Formulated Sentences | 5 | - |
| Recalling Sentences | 5 | - |
| Understanding Spoken Paragraphs | 3 | - |
| Sentence Assembly | 4 | - |
| Semantic Relationships | 2 | - |
| Pragmatics Profile | 1 | - |
| **CORE LANGUAGE SCORE** | 66 | 61-71 |
| **Receptive Language Index** | 55 | 50-60 |
| **Expressive Language Index** | 69 | 64-74 |
| **Language MemoryIndex** | 64 | 59-69 |

The following is a description of [redacted]s performance in language index areas and on specific subtests of the CELF-5.

**CELF-5 CORE LANGUAGE INDEX**
The Core Language Score (CLI) is a measure of general language ability. The following subtests are used to determine a CLI: Sentence Comprehension, Word Structure, Formulated Sentences, and Recalling Sentences. The current testing revealed [redacted]y to have a standard score of 66 which places him in the below-average range.

**CELF-5 RECEPTIVE LANGUAGE INDEX**
The Receptive Language Index is a measure of a student's listening and auditory comprehension skills. It is derived by summing the scaled scores from a combination of three receptive tests: Word Classes, Following Directions and Semantic Relationships. The current testing showed [redacted]y to have a standard score of 55, placing him in the below-average range.

**CELF-5 EXPRESSIVE LANGUAGE INDEX**
The Expressive Language Index is an overall measure of a student's expressive language skills. The following subtests are used to determine an ELI: Formulated Sentences, Recalling Sentences and Sentence Assembly. The current testing revealed that [redacted]y placed in the below-average range with a standard score of 69.

**CELF-5 LANGUAGE MEMORY INDEX**
The Language Memory Index is a measure of a student's performance on three subtests designed to probe memory dependent language tasks. The LMI is formed by a combination of the following subtests:

Following Directions, Formulated Sentences, and Recalling Sentences. Current testing showed [redacted]y to place in the below-average range, with a standard score of 64.

## CELF-5 SUBTEST SCORES

**Word Classes**
The Word Classes task is used to evaluate the student's ability to understand relationships between words based on semantic class features, function, or place or time of occurrence. The student is asked to identify which two of three-four items go together when provided with picture choices. Current test results revealed [redacted]y to have a scaled score of 4 placing him in the below-average range for his age level.

**Following Directions**
The Following Directions task evaluates a student's ability to interpret spoken directions of increasing length and complexity. [redacted]y had to point to presented shapes of varying attributes (*e.g.* black vs. white, large *vs.* small, first, middle, last, *etc.*) in the correct order. It should be noted that the test protocol did not allow for provision of repetition of items of this subtest. Current test results revealed [redacted]y received a scaled score of 1, placing him in the exceptionally-low range for his age level.

**Formulated Sentences**
The Formulated Sentences task evaluates the student's ability to formulate complete, semantically, and grammatically correct spoken sentences of increasing complexity. The student is given a picture and a target word, and must make up a sentence about the picture using the given word. Current test results revealed [redacted]y to have a scaled score of 5, placing him in the below-average range for his age level. While [redacted]y had success generating basic sentences, he struggled at times to generate complex sentences using given conjunctions such as, *although* and *unless*.

**Recalling Sentences**
The Recalling Sentences task evaluates the student's ability to listen to spoken sentences of increasing length and complexity and to repeat them verbatim. Points are taken off for words that are inserted, substituted, or omitted. No repetitions are allowed on this subtest. Current test results revealed [redacted]y to have a scaled score of 5, placing him in the below-average range for his age level.

**Understanding Spoken Paragraphs**
The Understanding Spoken Paragraphs task requires the student to respond to questions about a paragraph presented orally by the examiner. The questions target the paragraph's main idea, details, and sequencing, as well as inferential and predictive information. Scaled scores between 8-12 are in the average range. Test results showed [redacted]y to have a scaled score of 3, placing him in the below-range for his age level.

**Sentence Assembly**
The Sentence Assembly task requires the student to produce two semantically and grammatically correct sentences from words or groups of words presented visually and orally by the examiner. Scaled scores between 8-12 are in the average range. Current test results revealed [redacted]y to have a scaled score of 1, placing him in the below-average range for his age level.

**Semantic Relationships**
The Semantic relationships task requires the student to listen to a sentence and then select the two correct choices from four visually and orally presented options that answer a target question. Scaled scores

between 8-12 are in the average range. Current test results revealed [redacted]y to have a scaled score of 4, placing him in the below-average range for his age level.

**Pragmatics Profile**
The Pragmatic Profile is a 50-item checklist that provides normed scores on verbal and nonverbal social communication skills. It was completed by [redacted]s classroom teacher, Mrs. Curria, as a means of rating the social-language skills he displays during daily activity in the school setting.

The profile rates a student's abilities in the following skill areas: rituals and conversational skills; requesting, giving and responding to information; and interpretation and response to nonverbal cues. A score of 1-4 is given based on the degree to which each skill is observed. A score of 1=never or almost never, a score of 2=sometimes, a score of 3=often and a score of 4=always or almost always. Current test results revealed [redacted]y to have a scaled score of 1, placing him in the below-average range for his age level. [redacted]s performance indicates that he is performing below-average for his age-level. He received a score of 3 on the following skills indicating that he *often:*

-makes and responds to greetings to/from others (both verbal and nonverbal)
-making/responding to farewells to/from others (nonverbal)
-begins and ends a conversation (verbal)
-gives/asks for the time of events
-asks others for permission when necessary
-participates/interacts in structured group activities
-participates/interacts in unstructured group activities
-asks others to change their actions/states (*e.g.* "please move," "stop tapping")
-apologizes/accepts apologies

There are, however, many specific pragmatic skills that [redacted]y is not consistently displaying at this time. He received lower scores for the following skills indicating that he only *sometimes* (score=2) or *never or almost never* (score=1) demonstrated them:

***Rituals and Conversational Skills***

-observing turn-taking rules in the classroom or in social interactions (1)
-maintaining eye contact/gaze (2)
-introducing appropriate topics of conversations(1)
-maintaining topics using typical responses (e.g. nods, responds with "hmm…") (2)
-making relevant contributions to a topic during conversations (1)
-avoiding use of repetitive/redundant information (1)
-asking for/responding to requests for clarification during conversations (2)
-adjusting/modifying language based on the communication situation (2)
-telling/understanding jokes/stories that are related to the situation (1)
-showing a sense of humor during communication situations (1)
-joining or leaving an ongoing communicative interaction (1)
-responding to introductions and introducing others (2)
-using strategies for getting attention (1)
-using strategies for responding to interruptions and interrupting others (1)

***Asks for, Gives, and Responds to Information***

-giving/asking for directions (2)
-giving/asking for reasons and causes for actions/conditions/choices (2)
-asking for help from others (2)
-giving/responding to advice or suggestions (2)
-agreeing and disagreeing (1)
-asking for clarification if he is confused or if the situation is unclear (2)
-accepting/rejecting invitations (2)
-starting/responding to verbal and nonverbal negotiations (2)
-reminding others/responding to reminders (2)
-responding to tasing, anger, failure, disappointment (1)
-offering/responding to expressions of affection, appreciation (1)
-knowing how someone is feeling based on nonverbal cues (1)
-reading the social situation correctly and behaving/responding to it (1)
-understanding posted and implied group/school rules (1)

***Nonverbal Communication Skills***

The student reads and interprets the following nonverbal messages:

-reading and interpreting facial cues/expressions (1)
-beginning/ending conversations (nonverbal) (1)
-tone of voice (1)

The student demonstrates culturally appropriate use of the following nonverbal support:

-facial cues/expressions (1)
-body language/gestures (1)
-voice intonation (pitch, inflection, tone, or cadence) (1)
-expresses messages by using gestures or facial expression (1)
-uses gestures and/or facial expressions according to the situation (1)
-adjusts body distance (sits/stands) according to the situation (1)
-presents matching gestures/facial expressions and verbal message (1)

(Results from the *Pragmatic Language* subtest of the CASL-2 which are presented later in this report also support [redacted]s difficulty understanding some of the expected language/behavior to be used in different contexts and settings.)

3. **<u>The TAPS-4-A Language Processing Skills Assessment</u>** is an individually administered test for individuals aged 5 years through 21 years. It was designed to provide information about language processing skills and comprehension skills across three intersecting areas: phonological, auditory memory, and listening comprehension skills. The mean of the standard scores of this test is 100, with a standard deviation of 15.

| Subtest | Scaled/ Standard Score |
|---|---|
| Word Discrimination | 1 |
| Phonological Segmentation | 6 |
| Phonological Blending | 5 |
| **Phonological Processing Index** | **70** |
| | |
| Number Memory Forward | 3 |
| Word Memory | 2 |
| Sentence Memory | 4 |
| **Auditory Memory Index** | **65** |
| | |
| Processing Oral Directions | 3 |
| Auditory Comprehension | 2 |
| **Listening Comprehension Index** | **62** |
| | |
| **Overall Index Score** | **66** |

[redacted]y achieved an Overall Standard Score of 66 on the TAPS-4 which places him in the below-average range when compared to peers his age. His Phonological Index Score of 70 was within the below-average range, his Memory Index Score of 65 was within the below-average range, and his Listening Comprehension Index of 62 fell within the below-low range for his age-level. The following results were obtained for individual subtests:

***Subtests:***

*Word Discrimination*
This subtest requires the student to listen to orally-presented word pairs that at times differ by one sound, and determine if the words are the "same" or "different." [redacted]s scaled score of 1 places him in the below-average range for his age-level. Although he was given multiple practice items, [redacted]y often stated that word pairs that differed by one sound were the "same." It should be noted that repetition of orally-presented information was not allowed on this subtest.

*Phonological Deletion*
This subtest requires the student to manipulate phonemes within orally-presented words by eliminating syllables or sounds in different word positions. [redacted]s scaled score of 6 places him in the below-average range for his age-level. While he was successfully able to delete syllables from 2-syllable compound words (e.g. *Say "cowboy." Now say "cowboy" without "cow"*), [redacted]y had difficulty repeating target words without beginning, medial or final sounds (e.g. *Say "beef." Now say "beef" without /f/"*).It should be noted that repetition of orally-presented information was not allowed on this subtest.

*Phonological Blending*
This subtest requires the student to listen to a series of phonemes and then combine them into a word. [redacted]s scaled score of 5 places him in the below-average range for his age-level. It should be noted that repetition of orally-presented information was not allowed on this subtest.

*Number Memory Forward*
This subtest requires the student to recall orally-presented number series that increase in length. [redacted]s standard score of 3 places him in the below-average range for his age-level. It should be noted that repetition of orally-presented information was not allowed on this subtest.

*Word Memory*
This subtest requires the student to recall orally-presented word series that increase in length. [redacted]s scaled score of 2 places him in the below-average range for his age-level. It should be noted that repetition of orally-presented information was not allowed on this subtest.

*Sentence Memory*
This subtest requires the student to recall orally-presented sentences of increasing length and complexity. [redacted]s scaled score of 4 places him in the below-average range for his age. It should be noted that repetition of orally-presented information was not allowed on this subtest.

*Processing Oral Directions*
This subtest requires the student to listen to oral information about a direction and then is asked to answer a question about the direction. [redacted]s scaled score of 3 places him in the below-average range. It should be noted that repetition of orally-presented information was not allowed on this subtest.

*Auditory Comprehension*
This subtest requires students to listen to short, orally-presented stories and then answer questions about what they heard. Scaled scores between 8 and 12 are considered average. [redacted]s scaled score of 2 places him in the below-average range for his age. It should be noted that repetition of orally-presented information was not allowed on this subtest.

4. **The Test of Problem Solving-3rd edition Elementary Normative Update (TOPS-3E:NU)** is a diagnostic test of problem solving and critical thinking for elementary- age students ages 6-0 through 11-11 years. It is designed to assess children's language-based critical thinking and reasoning abilities needed for events of everyday living. Students are presented with a series of photographs depicting students in a variety of settings and asked several questions about each picture scene. Test questions focus on a broad range of language-based thinking skills, including clarifying, analyzing, generating solutions, evaluating, and affective thinking. The mean of the standard scores of this test is 100, with a standard deviation of 15. The following results were obtained for [redacted]:

| Problem Solving Index | Percentile Rank | Descriptive Term |
|---|---|---|
| 58 | < 1 | Impaired or delayed |

Results from the TOPS-3 indicate that [redacted]y achieved a Problem Solving Index (total) score of 58 which places him in the below range when compared to students his age. During this task, [redacted]y was noted to have difficulty making inferences, answering negative why questions, generating appropriate solutions to problems, making reasonable predictions, and determining causes of events without the benefit of cues or prompts.

5. The ***Pragmatic Language*** subtest of the **Clinical Assessment of Spoken Language-2 (CASL-2)** was administered to [redacted]y to test his knowledge and use of pragmatic language rules/expectations in the context of given social situations. On this task he was asked to explain what he (or someone else) should say and/or do in a situation, based on given environmental conditions. He received a scaled score of 2 on this task which indicates below-average performance compared to same aged peers. While [redacted]y was observed to make appropriate greetings, use polite markers at times, and generate simple requests for items/activities, he often had difficulty interpreting and generating appropriate responses to given situations. He was not observed to use appropriate social-language required to make complex requests for information or items or to request assistance with problematic situations. Misunderstanding of posed questions was noted at times. For example, when asked what he should say to find out if a new student was in the same grade, he stated, "We are in the same grade." [redacted]y knew the appropriate thing to say to a friend whose grandmother has just died ("I feel bad for you. I'm sorry"); however, when asked what should be said to a friend "with teary eyes who does not seem to be paying attention" he stated, " Pay attention." [redacted]y continues to need guidance from adults when conversing and interacting with others in the school setting. Ongoing practice with identification of expected vs. unexpected behavior and development of social problem solving skills is warranted.

*When the results of standardized tests and descriptive measures were discrepant, a weight of evidence from *multiple* descriptive measures supported the existence of a communication impairment.

Yes No N/A X

*Comments:*

*Assessment results provide evidence of adverse effects of communication on educational performance.

Yes X No N/A

*Comments:* [redacted]*y demonstrates deficits in listening comprehension, oral expression, critical thinking and social-pragmatic language areas which impact his ability to progress in the school setting.*

**Summary and Impressions:**

[redacted]y is a cooperative 10-4 year old male who attends Ms. Curria's fourth grade class. He underwent this reevaluation to determine his current level of functioning in receptive-expressive and social-pragmatic language areas and to assist in the development of appropriate educational programming.

Results from the above assessment indicate that [redacted]y demonstrates deficits in receptive and expressive language areas. Difficulties with attention and listening impact his grasp and recall of orally presented directions and details from stories. He often requires redirection to tasks, along with visual support, repetition and cuing. [redacted]y continues to demonstrate weaknesses with critical thinking and verbal reasoning. He needs prompting and cues from adults to make reasonable inferences and predictions based on given clues in presented stories or situations. Finally, [redacted]s weaknesses in social pragmatic areas

impact his ability to interact appropriately with others. He continues to require structured practice and monitoring for expected behavior when interacting with others and to develop social problem solving skills.

**Recommendations for the PPT's Consideration:**
Results and observations from the above assessment will be shared at [redacted]s Planning and Placement Team meeting. Eligibility status and service recommendations will be discussed by the team at that time.

Karen S. Kristan, SLP

Karen S.-Kristan, Speech-Language Pathologist

# Individualized Education Program
## Milford School District

| | |
|---|---|
| **Student Name:** [redacted] | **Meeting Date:** 02/08/2024 |
| [redacted]: [redacted] | **Case Manager:** Tara Truscello |
| **Date of Birth:** [redacted] | **Parent/Guardian Name:** Karen [redacted], [redacted] |
| **Current Grade:** 4 | **Primary Disability:** [redacted] |
| **Current Enrolled School:** J. F. Kennedy School (0841911) | **School Next Year:** |
| **Most Recent Evaluation Date:** 02/08/2024 | **Next Reevaluation Date:** 02/08/2027 |
| **Most Recent Annual Review Date:** 02/08/2024 | **Next Annual Review Date:** 02/07/2025 |

**Reason for Meeting:**
Conduct an Annual Review and review three-year reevaluation results to determine continued eligibility

## PLANNING AND PLACEMENT TEAM (PPT) MEMBERS PRESENT

| Name | Role |
|---|---|
| [redacted] | Father |
| Karen [redacted] | Mother |
| Alicia Curria | Student's General Education Teacher |
| Tara Truscello | Special Education Teacher or Provider |
| Amy Rizzo | Administrator or Designee |
| Jennifer Davis | School Psychologist |
| Karen Kristan | Speech and Language Pathologist |
| Lauri Dougherty | Social Worker |
| Courtney Carrano | Other: BCBA |

# Planning and Placement Team Recommendations

The PPT recommends the following:

Implement the services and support as described in this IEP document.

# Special Considerations

**Does the student exhibit behaviors that impede learning for self or others?**

☐ No ☑ Yes

IEP goal(s) and objectives will be developed to address the behavior.

A behavioral intervention plan based on a functional behavior assessment has been developed.

---

**Is the student deaf or hard of hearing?**

☑ No ☐ Yes

---

**Is the student blind or visually impaired?**

☑ No ☐ Yes

---

**Does the student have limited English proficiency (Student qualifies as an EL)?**

☑ No ☐ Yes

---

**Does the student require accessible educational materials (AEM)?**

☑ No ☐ Yes

---

**Does the student require an Augmentative and/or Alternative mode of Communication?**

☑ No ☐ Yes

# Present Levels of Academic Achievement and Annual Goal(s) and Objectives

## ACADEMIC, PRE-ACADEMIC, COGNITIVE ACHIEVEMENT

**Parent and/or Student Input**

Ms. [redacted]h and Mr. [redacted]g reported that they see [redacted]y having difficulty getting words out at times when he is at home. He can get fixated on things and changes in plans are difficult for him. They also feel that having resources to support [redacted]s current cognitive level of functioning will be important for the family. They are happy to hear that there is a good plan in place with supportive goals to help [redacted]y be successful in school.

## GOAL AREA: Reading

**Present Level of Performance**

WIAT-4 2024- Reading Composite Standard Score (SS) 81, Word Reading SS 95, Pseudoword Decoding SS 98, Phonemic Proficiency SS 76, Orthographic Fluency SS 93, Oral Reading Fluency SS 93, Decoding Fluency SS 108, Listening Comprehension SS 65, Reading Comprehension SS 71, Written Expression Standard Score (SS) 82, Spelling SS 95, Sentence Composition SS 69, Sentence Building SS 66, Sentence Combining SS 75, Essay Composition SS 97

**Strengths**

Decoding real, nonsense, and high-frequency words. Reading fluently and accurately within passages.

**Concerns/Needs**

Literal comprehension of texts heard and read. Making connections to text he listens to or reads. Comprehension of non-fiction information. Creating written responses to the literature he is reading.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

[redacted]s difficulties with comprehension impact his ability to access grade-level curriculum.

**Individualized Education Program**

**Student Name:** [redacted]
**DOB:** [redacted]

| **Annual Goal 8** | **Evaluation Method** |
|---|---|
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the problem, solution and make a self-to-text connection , with adult support through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] will make a self-to-text connection to the problem and solution with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | in alignment with general education report cards |
| **Related Services necessary to achieve this goal (if any)** | |

| Annual Goal 9 | Evaluation Method |
|---|---|
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the main purpose of the article and two key details about the article with adult support , through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted]T [redacted]G will identify the purpose of the article with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted]T [redacted]G will identify two key details to support the purpose of the information with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted]T [redacted]G will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | in alignment with general education report cards |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Mathematics

**Present Level of Performance**

WIAT-4- 2024 Mathematics Standard Score (SS) 65, Math Problem Solving SS 62, Numerical Operations SS 70, Math Fluency SS 60, Addition Fluency SS 73, Subtraction Fluency SS 63, Multiplication Fluency SS 62

**Strengths**

Addition and subtraction of multi-digit numbers without regrouping

**Concerns/Needs**

Identification of money names and worth, addition and subtraction with and without regrouping of money denominations, rounding numbers, and applying math skills to beginning budget understanding.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

[redacted]s difficulties with computations and basic math skills impact his ability to access grade-level curriculum.

| Annual Goal 10 | Evaluation Method |
|---|---|
| Given explicit instruction in money identification, addition, and subtraction with regrouping and rounding, [redacted] will apply this knowledge to solving real-life word problems including budgeting and purchasing , with adult support through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a set of images of real coins and dollars [redacted] will independently identify the name of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given a set of images of real coins and dollars [redacted] will independently identify the value of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given a set of 10 computation problems including two money quantities (i.e. $27.34 + $56.92) addition and subtraction problems which require regrouping [redacted] will solve the problem with no more than 3 adult prompts and check his answer with a calculator with 80% accuracy across 10 opportunities by 02/14/2025 | in alignment with general education report cards |
| Given a quantity of money without cents (i.e. $23) [redacted] will round the money to the nearest ten and hundred with 80% accuracy across 10 opportunities by 02/14/2025 | in alignment with general education report cards |
| Given a quantity of money with cents (i.e. $23.68) [redacted] will round the money to the nearest dollar with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | in alignment with general education report cards |
| Given a picture of items to be purchased (ex. food) [redacted] will determine the correct total by adding the price of each item together with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given a picture of items to be purchased (ex. food) and after he determined the correct total by adding the price of each item together [redacted] will decide the quantity of money he can pay for (i.e. total is $9.45, he will pay $10.00) and determine how much money he will get back with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

WISC-V: Full Scale IQ 65, Verbal Comprehension 73, Visual Spatial 72, Fluid Reasoning 67, Working Memory 72, Processing Speed 66. CAS-2: Full Scale 60, Planning 71, Attention 61, Simultaneous 74, Successive 70.

# Present Levels of Functional Performance and Annual Goal(s) and Objectives

## FUNCTIONAL PERFORMANCE

**Parent and/or Student Input**

Ms. [redacted]n and Mr. [redacted]g reported that they are happy to see that [redacted]y is independent with his at-home daily living activities such as getting dressed and is starting to be able to make his meals as well.

## GOAL AREA: Communication

**Present Level of Performance**

PPVT-5: SS=80
CELF-5: Core SS=66, Receptive SS=55, Expressive SS=69
TOPS-3: Problem Solving Index=58
TAPS-4: Overall Index=66
Pragmatic Language subtest of the CASL-2: Scaled Score=2

While [redacted]y recognizes pictured vocabulary, he has trouble explaining vocabulary concepts. Difficulty with listening comprehension for directions and stories continues to be noted. He needs cues and prompts to answer thinking questions about problem situations. Social-pragmatic skills are delayed. [redacted]y at times demonstrates dysfluencies especially when initiating speaking.

**Strengths**

[redacted]y demonstrate background knowledge for topics of interest.

**Concerns/Needs**

[redacted]y demonstrates delays in listening comprehension, thinking and reasoning for problem situations, and social-pragmatic skills.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in listening comprehension, critical thinking and reasoning and social-pragmatic skills related to [redacted]s [redacted]h diagnosis impact his progress in the general educational setting without specialized instruction.

**Individualized Education Program**

**Student Name:** [redacted]
**DOB:** [redacted]

| **Annual Goal 4** | **Evaluation Method** |
|---|---|
| Given repetition and visual cues during structured tasks, [redacted] will utilize strategies to increase listening comprehension skills , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given one repetition and visual cues during structured activity [redacted] will retell and follow oral directions containing two steps and temporal concepts with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | consistent with grade level report cards |
| Given one repetition and visual cues during structured activity. [redacted] will respond to WH comprehension questions about specific details/events from a presented story or situation with 80% accuracy in 4/5 opportunities during structured activity by 02/14/2025 | consistent with grade.level report cards |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

| **Annual Goal 13** | **Evaluation Method** |
|---|---|
| Given a problematic social situation, [redacted] will utilize respond to questions involving thinking and reasoning , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given one prompt and visual cues during structured activity [redacted] will answer "why" questions about characters and events from presented situations with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | consistent with grade level report cards |
| Given one prompt and visual cues during structured activity [redacted] will make a prediction about a what an individual will do next in a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | consistent with grade level report cards |
| Given one prompt and visual cues during structured activity [redacted] will make a reasonable guess to explain the actions or feelings of an individual using clues from a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | consistent with grade level report cards |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

Individualized Education Program

Student Name: [redacted]T [redacted]G
DOB: [redacted]3

| Annual Goal 14 | Evaluation Method |
| --- | --- |
| Given prompting and visual cues during structured activity, [redacted]will utilize strategies to increase listener awareness and perspective , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given visuals and no more than one repetition [redacted]T [redacted]G will paraphrase what a peer/adult has said in a presented story/situation/video clip to demonstrate understanding with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | consistent with grade level report cards |
| Given visuals and no more than one prompt/cue [redacted]T [redacted]G will state the perspective or point of view of two different individuals in a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | consistent with grade level report cards |
| Given visuals and no more than one prompt/cue [redacted]T [redacted]G will identify a problem and one appropriate solution from a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | consistent with grade level report cards |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

## GOAL AREA: Social/Emotional

### Present Level of Performance

In the small group, [redacted]y has demonstrated growth in his conversational skills and social problem solving skills. He is motivated to interact with his peers. [redacted]y has difficulty understanding the perspectives of others. He can become silly at times when it is not appropriate to do so.

### Strengths

[redacted]y is able to solve hypothetical social problems with adult prompting.

### Concerns/Needs

[redacted]y has difficulty understanding the perspective of others and knowing when it is an appropriate time to be silly.

### Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities

Due to [redacted]s [redacted], he requires facilitation with social interactions with others in order to participate in the curriculum and maintain social relationships.

| Annual Goal 5 | Evaluation Method |
|---|---|
| Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given pictures of people expressing various emotions, [redacted] [redacted] will correctly identify 5 feelings in 4/5 trials by 02/14/2025 | Consistent with grade-level report cards. |
| Given small group/individual instruction, [redacted] [redacted] will identify 3 strategies to react to people who are having a strong emotion in 4/5 trials by 02/14/2025 | Consistent with grade-level report cards. |
| Given hypothetical social situations, [redacted] [redacted] will will identify the feelings being felt by the people in the situation in 4/5 trials by 02/14/2025 | Consistent with grade-level report cards. |
| Given hypothetical social situations, [redacted] [redacted] will identify the possible thoughts of the people in the situation in 4/5 trials by 02/14/2025 | Consistent with grade-level report cards. |
| Given a hypothetical social scenario, [redacted] [redacted] will [redacted] will practice taking the perspective of each of the people in the scenario in 4/5 trials by 02/14/2025 | Consistent with grade-level report cards. |
| Given a hypothetical social scenario, [redacted] [redacted] will will identify the expected and unexpected behavior in the scenario in 4/5 trials by 02/14/2025 | Consistent with grade-level report cards. |
| Given examples of his own behavior, [redacted] [redacted] will will identify if the behavior was expected or unexpected in 4/5 trials by 02/14/2025 | Consistent with grade-level report cards. |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |
| Counseling Individual | |
| Counseling Group | |
| Counseling Group | |

| Annual Goal 15 | Evaluation Method |
|---|---|
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises), [redacted]will be able to determine what is an expected way to be funny with peers and when it is appropriate to be funny , through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted]T [redacted]G will complete a sort of these behaviors with no more than one teacher prompt with 80% accuracy across 5 opportunities. by 02/14/2025 | in alignment with general education report cards |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted]T [redacted]G will will identify expected versus unexpected times to be funny during school independently with 80% accuracy across 5 opportunities by 02/14/2025 | in alignment with general education report cards |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted]T [redacted]G will will reflect on his behaviors and identify times he may have been disruptive (unexpected behavior) and identify an alternative approach to his peer interactions thorough small group social skills discussions with no more than 3 teacher prompts for 3 opportunities. by 02/14/2025 | in alignment with general education report cards |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |

## GOAL AREA: Executive Functioning

### Present Level of Performance

In a small group setting, [redacted]y is following classroom routines and expectations.

### Strengths

[redacted]y raises his hand, and can put away materials when prompted by an adult.

### Concerns/Needs

[redacted]y has difficulty with independently completing and planning for multi-step tasks.

### Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities

Due to [redacted]s difficulty with executive functioning, he requires specialized instruction.

**Individualized Education Program**

**Student Name:** [redacted] [redacted]
**DOB:** [redacted]

| **Annual Goal 7** | **Evaluation Method** |
| --- | --- |
| Given explicit instruction in planning and organizing, [redacted] will plan for his independent work, get materials, and clean materials independently , as measured by mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a mastered task presented to him in a small group setting using a visual for the routine (i.e. checklist, first/next/then) [redacted] [redacted] will get the needed materials and complete the task independently with 80% accuracy across 5 opportunities by 02/14/2025 | in alignment with general education report cards |
| Given a mastered task presented to him in a small group setting [redacted] [redacted] will complete a visual for the routine (i.e. checklist, first/next/then) with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given a mastered task and a visual for the routine (i.e. checklist, first/next/then) that he filled out [redacted] [redacted] will get the materials needed and complete the task across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given folders to hold his work in a small group setting [redacted] will complete his task and return his work to the appropriate folder with no more than 1 verbal reminder across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Activities of Daily Living

**Present Level of Performance**

[redacted] can care for himself during lunch, snack, and in the bathroom. He can walk appropriately with a class in the hallway and can participate

**Strengths**

[redacted] can care for himself during lunch, snack, and in the bathroom. He can walk appropriately with a class in the hallway and can participate

**Concerns/Needs**

[redacted] needs to work on learning community signs and their purposes as well as how to research on the computer for pertinent daily information and how to record that information.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

[redacted] difficulties with daily living skills require direct instruction.

| Annual Goal 11 | Evaluation Method |
|---|---|
| Given real-life picture cards of safety signs and symbols from within the community, [redacted]will identify the name of the sign, where the sign can be located, and the purpose of it independently , through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a set of 5 real-life picture cards of safety signs and symbols from within the community [redacted]T [redacted]G will identify the name of the sign and where the sign can be located with 80% accuracy across 5 opportunities by 02/14/2025 | in alignment with general education report cards |
| Given completion of objective 1 and an additional 5 (totaling 10) real-life picture cards of safety signs and symbols from within the community [redacted]T [redacted]G will identify the name of the sign and where the sign can be located, across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| Given completion of objective 2 and an additional 5 (totaling 15) real-life picture cards of safety signs and symbols from within the community [redacted]T [redacted]G will identify the name of the sign and where it can be located across 5 opportunities with 80% accuracy by 02/14/2025 | in alignment with general education report cards |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

| Annual Goal 12 | Evaluation Method |
|---|---|
| Given explicit instruction on using Google Calendar and/or a daily planner, [redacted]will record his daily events as well as researching possible events (i.e. movies, travel, shopping) with teacher support , through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given explicit instruction in using Google Calendar and/or a daily planner [redacted]T [redacted]G will record his daily events by date and time for a complete week with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | in alignment with general education report cards |
| Given explicit instruction in using Google Calendar and/or a daily planner and a fake, but possible event (i.e. meal at a restaurant, movie, catching a train) [redacted]T [redacted]G will research the possible times to attend the event and log it on his calendar with adult support with 80% accuracy across 10 opportunities by 02/14/2025 | in alignment with general education report cards |
| Given an informational chart, list, or agenda, in which assignments, events, or important information must be documented [redacted]T [redacted]G will read to determine when an event will occur or when an assignment is due with teacher support with 80% accuracy across 5 opportunities by 02/14/2025 | in alignment with general education report cards |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

NEPSY-II: Attention & Executive Functioning - all areas below or well below expected level, Social Perception - all areas

below or well below expected level. CARS-2: Mild-to-Moderate Symptoms of [redacted]n Spectrum Disorder. Social Responsiveness Scale-2: most areas in the moderate to severe range for school and mother. Vineland-3: Teacher Communication 69, Daily Living Skills 60, Socialization 64, Composite 65; Mother/Father Communication 76/71, Daily Living Skills 68/74, Socialization 82/79, Composite 74/74. BASC-3: several areas At-Risk/Clinically Significant. See report.

## Progress Reporting

**A report of progress toward meeting the Annual Goals and Short Term Objectives included in this IEP will be provided to the parent(s):**

Consistent with general education grade-level report cards

## Transition Planning

**Is the PPT developing postsecondary/transition goals and services for the student?**

☐ Yes ☑ No

## Special Education and Related Services

### SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Reading | 7<br>8<br>9<br>11 | 5 x per Week | 60 Minutes | Special Education Teacher | Special Education Teacher/Paraprofessional | 02/15/2024 | 02/14/2025 | 2a | Small group/individual instruction |
| Mathematics | 7<br>10 | 5 x per Week | 60 Minutes | Special Education Teacher | Special Education Teacher/Paraprofessional | 02/15/2024 | 02/14/2025 | 2a | small group/individual |
| Social Skills | 15 | 4 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher/Paraprofessional | 02/15/2024 | 02/14/2025 | 2a | small group/individual |
| Daily Living Skills | 11<br>12 | 5 x per Week | 15 Minutes | Special Education Teacher | Special Education Teacher/Paraprofessional | 02/15/2024 | 02/14/2025 | 2a | Small group/individual instruction |

### RELATED SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|

Individualized Education Program

Student Name: [redacted]T [redacted]G
DOB: [redacted]

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Counseling Group | 5<br>15 | 4 x per Week | 30 Minutes | School Social Worker | School Social Worker | 02/15/2024 | 02/14/2025 | 2c | Small group/individual instruction |
| Counseling Group | 5 | 2 x per Week | 30 Minutes | School Psychologist | School Psychologist | 02/15/2024 | 02/14/2025 | 2c | Small group/individual instruction |
| Counseling Group | 5 | 1 x per Week | 30 Minutes | School Social Worker | School Social Worker | 02/15/2024 | 02/14/2025 | 2c | Small group/individual instruction |
| Counseling Individual | 5 | 1 x per Week | 15 Minutes | School Psychologist | School Psychologist | 02/15/2024 | 02/14/2025 | 2c | Small group/individual instruction |
| Language/ Communication Group | 4<br>11<br>13<br>14 | 3 x per Week | 30 Minutes | Speech-language Pathologist | Speech-language Pathologist | 02/15/2024 | 02/14/2025 | 2c | small group |

***Instructional Site Codes:**

1a. General Education Setting 50% or more non-disabled peers
1b. General Education Setting less than 50% non-disabled peers
2a. Resource Setting
2b. Separate Setting/Program
2c. Related Service Setting
3a. Community-Based Setting 50% or more non-disabled peers
3b. Community-Based Setting less than 50% non-disabled peers

# Supplementary Aids and Services

Supplementary aids and services will be provided for the duration of the IEP unless otherwise noted.

| ACCOMMODATION | Area(s)/Locations |
|---|---|
| Orally Read Tests/Directions | All Areas |
| Text to Speech (accessibility on the Chromebook) | All Areas |
| Repeat/Review Directions | All Areas |
| Visuals to support directions | All Areas |
| Limited Multiple Choice | All Areas |
| Math Manipulatives | All Areas |
| Access to a multiplication chart | All Areas |
| Preferential Seating | All Areas |
| Extra time text/quizzes/assignments | All Areas |
| Desktop list of tasks | All Areas |
| One paper/section at a time | All Areas |
| Post Routines | All Areas |
| Acknowledge positive work frequently | All Areas |
| Cue Expected Behavior | All Areas |
| Positive Reinforcement | All Areas |
| Set/Post Class Rules | |
| Check Work in Progress | All Areas |
| Have student restate information | All Areas |
| Provide Models | All Areas |
| Shortened Tasks | All Areas |

# Indirect Services

**Are supports required for school personnel to implement this IEP?**

☑ Yes ☐ No

**Supports required for school personnel to implement this IEP include:**

Individualized Education Program

Student Name: [redacted] [redacted]
DOB: [redacted]

| Service | Goal ID | Frequency | Duration | Responsible Staff | Start Date | End Date |
|---|---|---|---|---|---|---|
| Math Paraprofessional | 7<br>10 | 5 x per Week | 30 Minutes | Special Education Teacher | 02/15/2024 | 02/14/2025 |
| ELA Paraprofessional | 7<br>8<br>9 | 5 x per Week | 30 Minutes | Special Education Teacher | 02/15/2024 | 02/14/2025 |

# ESY Services

**Are extended school year (ESY) services required for the Student to receive FAPE?**

☑ Yes ☐ No

## ESY SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Social/ Emotional Development | 7 | 4 x per Week | 180 Minutes | Special Education Teacher | Special Education Teacher/Paraprofessional | 07/08/2024 | 08/01/2024 | 2b | group |

# Transportation

**Does the Student require special transportation as a related service?**

☐ Yes ☑ No

Regular Transportation

# Removal from the General Education Environment

## SCHOOL YEAR: 2023-24

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 179 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 02/15/2024 | 06/07/2024 | 13.25 | 17.25 | 51.11 |

## SCHOOL YEAR: 2024-25

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 232 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 07/01/2024 | 02/14/2025 | 13.25 | 17.25 | 51.11 |

**Explain the extent to which the student will not participate in general education classes and non-academic activities with non-disabled peers**

[redacted] will be pulled out for social skills 4x30, reading 5x60, math 5x30, daily living skills 5x15, counseling 4x30, and speech 3x30.

**Justification for the removal from the general education environment**

[redacted] requires instruction in a small group setting to facilitate mastery of goals and objectives.

**Will the student be removed from the general education environment for 60% or more of the time?**

☐ Yes ☑ No

**At the time of this IEP implementation, will the student be placed at a Private Residential Facility?**

☐ Yes ☑ No

# District and State Testing Information

## ENGLISH LANGUAGE PROFICIENCY (ELP) ASSESSMENT

**Has the student been identified as an English Learner?**

☑ No ☐ Yes

## DISTRICTWIDE ASSESSMENTS

The student will participate in Standard District Assessment(s)

| Assessment | Participation |
|---|---|
| Math Benchmarks | With designated supports/accommodations |
| Reading Benchmark | With designated supports/accommodations |

**Designated Supports and Accommodations**

Separate setting, hundreds chart, multiplication chart, calculator, all directions and passages read aloud when appropriate, and text-to-speech accessibility for any written assessments.

## STATEWIDE ASSESSMENTS

**What grade will the student be in during the next statewide assessment testing window?**

4th Grade

**The student will participate in the Smarter Balanced Assessment.**

**Assessment:** Smarter Balanced Assessment Math - Grade 4

With Accommodations

**Designated Supports and Accommodation(s)**

Separate Setting (Non-Embedded Designated Support)

100 Numbers Table (Non-Embedded Accommodation)

Multiplication Table (Non-Embedded Accommodation)

Speech-to-Text (Embedded Accommodation)

**Assessment:** Smarter Balanced Assessment ELA - Grade 4

With Accommodations

**Designated Supports and Accommodation(s)**

---

Separate Setting (Non-Embedded Designated Support)

Speech-to-Text (Embedded Accommodation)

Text-to-Speech (Embedded Designated Support)

Text-to-Speech of ELA Passages (Embedded Accommodation)

Smarter Balanced designated supports and accommodations will be submitted directly to the testing vendor on behalf of the district.

# Resources

The following documents were provided to the parent(s) at this meeting or sent electronically with parental permission:

Procedural Safeguards in Special Education

Parental Notification of the Laws Relating to Physical Restraint and Seclusion in the Public Schools

A Parent's Guide to Special Education

IEP Manual

Building a Bridge

[redacted]



# Appendix II-A
## Worksheet for Determination of Eligibility for Special Education Services Under the Classification of [redacted]

The student should meet the criteria listed below (A-C) to be eligible for special education services due to [redacted]:

*The child:*

**A.** has been evaluated by a professional with appropriate training, using an [redacted]-specific instrument, and must be found to be functioning in the range of autistic spectrum disorders.

**B.** demonstrates a disability that adversely affects educational performance as evidenced by professional judgment and/or scores that fall significantly below average (-1.5 SDs) in all of the following areas: social interaction (at least two of the items listed below), verbal/nonverbal communication and atypical behaviors (at least one of the items from each category listed below).

**C.** does not perform effectively in the social or academic area most of the time, despite the provision of general education accommodations and supports.

## Results of the Evaluation

*Indicate Yes, No, or NA for each item in the area evaluated if regarding impairment and how it was evidenced. Please also respond to the question at the end of each section.

**Social Interaction***

| Area | Impairment That Adversely Affects Educational Performance | Evidence by Observation (O), Clinical Judgment (CJ) and/or Formal Testing (FT) |
|---|---|---|
| Deficits in nonverbal communication (eye gaze, gesture) | Yes ☑ No ☐ NA ☐ | O, FT |
| Limited efforts to establish joint attention or share experience | Yes ☐ No ☑ NA ☐ | O, FT |
| Significant deficits in social/emotional reciprocity | Yes ☑ No ☐ NA ☐ | O, FT |
| Lack of developmentally appropriate peer relations | Yes ☑ No ☐ NA ☐ | O, FT |
| Lack of developmentally appropriate symbolic play/imagination | Yes ☐ No ☑ NA ☐ | O, FT |

| | | |
|---|---|---|
| Inability to make functional adjustment to the social environment | Yes ☑ No ☐ NA ☐ | O, FT |

*Does the child meet the criteria of demonstrating at least two characteristics from this area?
Yes ☑ No ☐

**Communication***

| Area | Impairment That Adversely Affects Educational Performance | Evidence by Observation (O), Clinical Judgment (CJ) and/or Formal Testing (FT) |
|---|---|---|
| Significant deficits in receptive language (e.g., acts as though does not hear although hearing is normal, does not respond to name, does not respond to verbal cues, concrete and literal comprehension | Yes ☑ No ☐ NA ☐ | O, FT |
| Significant deficits in expressive language (e.g., no babbling, pointing or use of gesture by 1 year of age, no single words by 16 months, does not combine words by 2 years, loss of language skills, [redacted], idiosyncratic use of words/phrases, pronoun reversals) | Yes ☑ No ☐ NA ☐ | O, FT |
| Significant deficits in pragmatic skills (e.g., inability to initiate or sustain conversation, perseveration on topic, stereotypic intonation, difficulty interpreting what others think and feel, difficulty taking others' perspective, difficulty relating emotion) (Strock, 2004) | Yes ☑ No ☐ NA ☐ | O, FT |

*Does the child demonstrate at least one characteristic from this area? Yes ☑ No ☐

## Atypical Behaviors*

Area

| | Impairment That Adversely Affects Educational Performance | Evidence by Observation (O), Clinical Judgment (CJ) and/or Formal Testing (FT) |
|---|---|---|
| Restricted or repetitive interests | Yes ☑ No ☐ NA ☐ | O, FT |
| Stereotyped, repetitive movements | Yes ☑ No ☐ NA ☐ | O, FT |
| Adherence to nonfunctional routines | Yes ☐ No ☑ NA ☐ | O, FT |

*(Note: Children under the age of 5 who have ASD may not exhibit atypical behaviors, so the requirement that they exhibit one of the behaviors listed under that category may be waived for children aged 3-5 years.)*

*Does the child demonstrate at least one characteristic from this area? Yes ☑ No ☐

***Ruling Out/Eliminating Other Factors***

Have other causes/contributing factors such as medical problems, environmental or cultural factors and emotional disturbance been ruled out as the primary cause of the student's educational difficulties?

Yes ☑ No ☐

Based on the above, does the child meet the criteria for classification under the category of [redacted]?

Yes ☑ No ☐

Based on the above, does the child need special education and related services?

Yes ☑ No ☐

The PPT has reviewed the information presented and has made the determination that the child meets the criteria for eligibility for special education services as defined in IDEA and Connecticut statutes.

Date: 2/8/24

# Milford School District
## Planning and Placement Team (PPT) Attendance Excusal

**Student Name:** [redacted]T [redacted]G **Date of Birth:** [redacted]3 **Grade:** 4

[redacted]: [redacted]2 **School:** J. F. Kennedy School **Date of PPT:** 02/08/2024

**Parent/Guardian:** Karen [redacted], [redacted]t [redacted]g

NOTE: THIS AGREEMENT IS OPTIONAL. Waiver of the attendance of a teacher or related service provider at a PPT meeting is optional. The district or parent/guardian may refuse to excuse such attendance.

**We agree to excuse the attendance of** Jacqueline Campbell
(Teacher or related service provider)

**at the PPT meeting scheduled for** 02/08/2024 **because (check one):**

☑ This staff member's area of the curriculum or related services is not being modified or discussed in this meeting.

OR

☐ Although the meeting involves a modification to or discussion of this staff member's area of the curriculum or related services, the staff member has submitted in writing, to the parent and IEP team, input into the development of the IEP prior to the meeting.

[redacted]

2-8-24
Date

2/8/24

School District Representative Signature Date

This agreement must be signed by a representative of the school district who has full authority to sign such a document on behalf of the school district and who, as described by federal statute, is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, is knowledgeable about the general education curriculum and is knowledgeable about the availability of resources of the public agency.

**Section 614(d)(1)(C) of H.R. 1350, the revised Individuals with Disabilities with Education Act, the "IDEA," provides as follows:**

**ATTENDANCE NOT NECESSARY:** A member of the IEP Team is not required to attend a meeting, in whole or in part, if the parent of a child with a disability and the public agency (school district) agree in writing that the attendance of the member is not necessary because the member's area of the curriculum or related services is not being modified or discussed in the meeting. (Section 614 (d)(1)(C)(i) and (iii))

**EXCUSAL:** A member of the IEP team may be excused from attending a meeting, in whole or in part, when the meeting involves a modification to or discussion of the member's area of the curriculum or related services, if the parent and the

public agency (school district) consent, in writing, to the excusal, and the member submits, in writing to the parent and the IEP Team, input into the development of the IEP prior to the meeting. (Section 614(d)(1)(C)(ii) and (iii))

# Prior Written Notice

**PURPOSE:** As a parent/guardian of a student suspected of needing or receiving special education services, the school district is required to provide you with prior written notice whenever it proposes or refuses to initiate or change the identification, evaluation, educational placement or provision of a free and appropriate public education (FAPE) to your child. This notice should be given to you after a school district makes a decision and 10 school days before action is taken on the decision, unless the school district and you both agree to waive the 10-day notice.

**To:** Karen [redacted], [redacted], [redacted] [redacted]

Parent/Guardian/Adult Student

**Date:** 02/08/2024

**Re:** [redacted] [redacted]

[redacted]: [redacted]

## ACTION(S) PROPOSED/REFUSED

**Milford School District is providing notice of the following:**

1.
- ☑ The District is proposing to
- ☐ The District is refusing the request to

2.
- ☑ initiate
- ☐ change

3.
- ☑ identification/eligibility
- ☐ an evaluation
- ☐ an educational placement
- ☐ the provision of FAPE (IEP)

## DESCRIPTION / REASON

**Description/Reason of the proposed or refused action:**

Implement identification/eligibility of [redacted] as described in this IEP document.

**The reason for proposing or refusing to take action is:**

The identification/eligibility of [redacted] described in this IEP document are needed to build an individualized plan to address [redacted] needs.

**Description (including the date) of each evaluation procedure, assessment, record, or written report the school district used as a basis for the proposed/refused action:**

Classroom observations, Progress Reports, Teacher Input, Parent Input, Rating Scales, Cognitive Evaluation, Speech and Language Evaluation, Speech and Language Evaluation and FBA/BIP behavioral data (2/8/24)

**Date this action will take effect**

02/09/2024

**Other options the PPT considered and rejected**

- ☐ Instruction in the general education environment with supplementary aids and services
- ☑ No other options were considered and rejected
- ☐ Other

**Reason for rejecting other options**

- ☐ The student would not receive an appropriate program in the least restrictive environment.
- ☐ Other

**Other factors that are relevant to this action**

☑ There are no other factors that are relevant to the PPT decision

☐ Other

**PLEASE NOTE:**

Parents have a right to disagree with what is being proposed or refused by the district and may access the due process options described in the procedural safeguards of the IDEA. A copy of the procedural safeguards can be obtained by contacting Contact Name at Contact Phone or Contact Email.

This notice must be provided in the native language of the parent or other mode of communication used by the parent unless it is clearly not feasible to do so.

For assistance with understanding the provisions of the IDEA, please contact the district's special education director or the state's Parent Training and Information Center: Connecticut Parent Advocacy Center (CPAC) at 860-739-3089 or 1-800-445-2722; E-mail: cpac@cpacinc.org

**WAIVER:** The parent agrees to waive the school 10-day waiting period before the above proposed action takes effect and agrees that such action shall be implemented on the following date: 02/09/2024

**This notice was:** ☐ provided to Parent at the PPT meeting ☐ hand delivered ☐ mailed ☐ e-mailed ☑ sent electronically to the parent portal

# Prior Written Notice

**PURPOSE:** As a parent/guardian of a student suspected of needing or receiving special education services, the school district is required to provide you with prior written notice whenever it proposes or refuses to initiate or change the identification, evaluation, educational placement or provision of a free and appropriate public education (FAPE) to your child. This notice should be given to you after a school district makes a decision and 10 school days before action is taken on the decision, unless the school district and you both agree to waive the 10-day notice.

**To:** Karen [redacted], [redacted]

Parent/Guardian/Adult Student

**Date:** 02/08/2024

**Re:** [redacted]

[redacted]: [redacted]

## ACTION(S) PROPOSED/REFUSED

**Milford School District is providing notice of the following:**

1.
- ☑ The District is proposing to
- ☐ The District is refusing the request to

2.
- ☑ initiate
- ☐ change

3.
- ☐ identification/eligibility
- ☐ an evaluation
- ☐ an educational placement
- ☑ the provision of FAPE (IEP)

## DESCRIPTION / REASON

**Description/Reason of the proposed or refused action:**

Implement the services and supports as described in this IEP document.

**The reason for proposing or refusing to take action is:**

The services and supports described in this IEP document are needed for [redacted] to make progress toward mastering the IEP goals and objectives and to make progress with the general education program.

**Description (including the date) of each evaluation procedure, assessment, record, or written report the school district used as a basis for the proposed/refused action:**

Academic Evaluation (2/8/24), Speech and Language Evaluation (2/8/24), Cognitive Evaluation (2/8/24), Rating Scales (2/8/24), Parent Input (2/8/24), Teacher Reports (2/8/24), BCBA Review (2/8/24)

**Date this action will take effect**

02/15/2024

**Other options the PPT considered and rejected**

- ☐ Instruction in the general education environment with supplementary aids and services
- ☑ No other options were considered and rejected
- ☐ Other

**Reason for rejecting other options**

- ☐ The student would not receive an appropriate program in the least restrictive environment.
- ☐ Other

**Prior Written Notice**

**Student Name:** [redacted]T [redacted]G
[redacted]: [redacted]2
**DOB:** [redacted]3

**Other factors that are relevant to this action**

☑ There are no other factors that are relevant to the PPT decision

☐ Other

**PLEASE NOTE:**

Parents have a right to disagree with what is being proposed or refused by the district and may access the due process options described in the procedural safeguards of the IDEA. A copy of the procedural safeguards can be obtained by contacting Contact Name at Contact Phone or Contact Email .

This notice must be provided in the native language of the parent or other mode of communication used by the parent unless it is clearly not feasible to do so.

For assistance with understanding the provisions of the IDEA, please contact the district's special education director or the state's Parent Training and Information Center: Connecticut Parent Advocacy Center (CPAC) at 860-739-3089 or 1-800-445-2722; E-mail: cpac@cpacinc.org

**WAIVER:** The parent agrees to waive the school 10-day waiting period before the above proposed action takes effect and agrees that such action shall be implemented on the following date: 02/15/2024

**This notice was:** ☐ provided to Parent at the PPT meeting ☐ hand delivered ☐ mailed

☑ e-mailed ☐ sent electronically to the parent portal

# Progress Report on IEP Goals and Objectives

**Reporting Period:** March Progress Report, 03/20/2024
**Milford School District**
**IEP Dates:** 02/15/2024 - 02/14/2025

**Student Name:** [redacted]
**Date of Birth:** [redacted]
**Current Grade:** 4

**Parent/Guardian Name:** Karen [redacted]

[redacted]
**Case Manager:** Tara Truscello
**Current Enrolled School:** J. F. Kennedy School (0841911)

## GOAL AREA: Communication

## ANNUAL GOAL 1

Given repetition and visual cues during structured tasks, [redacted] will utilize strategies to increase listening comprehension skills , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] needs multiple repetitions to retain details from oral information. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given one repetition and visual cues during structured activity [redacted] will retell and follow oral directions containing two steps and temporal concepts with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | [redacted] needs multiple repetitions to retain details of orally-presented 2-step directions. |
| Given one repetition and visual cues during structured activity [redacted] will respond to WH comprehension questions about specific details/events from a presented story or situation with 80% accuracy in 4/5 opportunities during structured activity by 02/14/2025 | Not Introduced | N/A | N/A | |

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 2

Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making progress towards this goal. |

**Progress Report**

**Student Name:**[redacted]T[redacted]G
**DOB:**[redacted]3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given pictures of people expressing various emotions, [redacted] T[redacted]G will correctly identify 5 feelings in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted]y is making satisfactory progress towards this goal. |
| Given small group/individual instruction, [redacted] T[redacted]G will identify 3 strategies to react to people who are having a strong emotion in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted]y is making satisfactory progress towards this goal. |
| Given hypothetical social situations, [redacted] T[redacted]G will will identify the feelings being felt by the people in the situation in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted]y has been successful with identifying feelings in others when he is not being silly. |
| Given hypothetical social situations, [redacted] T[redacted]G will identify the possible thoughts of the people in the situation in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted]y has been successful with identifying the possible thoughts of people in hypothetical situations. |
| Given a hypothetical social scenario, [redacted] T[redacted]G will [redacted]y will practice taking the perspective of each of the people in the scenario in 4/5 trials by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | [redacted]y requires adult support and is unable to take the perspective of others independently. |
| Given a hypothetical social scenario, [redacted] T[redacted]G will will identify the expected and unexpected behavior in the scenario in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted]y can identify expected and unexpected behavior of others. |
| Given examples of his own behavior, [redacted] T[redacted]G will will identify if the behavior was expected or unexpected in 4/5 trials by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | [redacted]y can identify expected and unexpected behaviors of himself after the incident occurred, not in the moment. |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Executive Functioning

### ANNUAL GOAL 3

Given explicit instruction in planning and organizing, [redacted] will plan for his independent work, get materials, and clean materials independently , as measured by mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a mastered task presented to him in a small group setting using a visual for the routine (i.e. checklist, first/next/then) [redacted] T [redacted] G will get the needed materials and complete the task independently with 80% accuracy across 5 opportunities by 02/14/2025 | Satisfactory Progress | 2 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given a mastered task presented to him in a small group setting [redacted] T [redacted] G will complete a visual for the routine (i.e. checklist, first/next/then) with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given a mastered task and a visual for the routine (i.e. checklist, first/next/then) that he filled out [redacted] T [redacted] G will get the materials needed and complete the task across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given folders to hold his work in a small group setting [redacted] T [redacted] G will complete his task and return his work to the appropriate folder with no more than 1 verbal reminder across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |

## GOAL AREA: Reading

## ANNUAL GOAL 4

Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the problem, solution and make a self-to-text connection , with adult support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will make a self-to-text connection to the problem and solution with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |

## GOAL AREA: Reading

### ANNUAL GOAL 5

Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the main purpose of the article and two key details about the article with adult support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the purpose of the article with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify two key details to support the purpose of the information with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |

## GOAL AREA: Mathematics

## ANNUAL GOAL 6

Given explicit instruction in money identification, addition, and subtraction with regrouping and rounding, [redacted] will apply this knowledge to solving real-life word problems including budgeting and purchasing , with adult support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a set of images of real coins and dollars [redacted] T [redacted] G will independently identify the name of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 10.0 opportunities | [redacted] y is making satisfactory progress but continues to require more than 3 adult prompts. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given a set of images of real coins and dollars [redacted] T [redacted] G will independently identify the value of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 10.0 opportunities | [redacted] y is making satisfactory progress but continues to require more than 3 adult prompts. |
| Given a set of 10 computation problems including two money quantities (i.e. $27.34 + $56.92) addition and subtraction problems which require regrouping [redacted] T [redacted] G will solve the problem with no more than 3 adult prompts and check his answer with a calculator with 80% accuracy across 10 opportunities by 02/14/2025 | Satisfactory Progress | 0 opportunities | 10.0 opportunities | [redacted] y is making satisfactory progress but continues to require more than 3 adult prompts. |
| Given a quantity of money without cents (i.e. $23) [redacted] T [redacted] G will round the money to the nearest ten and hundred with 80% accuracy across 10 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given a quantity of money with cents (i.e. $23.68) [redacted] T [redacted] G will round the money to the nearest dollar with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given a picture of items to be purchased (ex. food) [redacted] T [redacted] G will determine the correct total by adding the price of each item together with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given a picture of items to be purchased (ex. food) and after he determined the correct total by adding the price of each item together [redacted] T [redacted] G will decide the quantity of money he can pay for (i.e. total is $9.45, he will pay $10.00) and determine how much money he will get back with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |

## GOAL AREA: Activities of Daily Living

### ANNUAL GOAL 7

Given real-life picture cards of safety signs and symbols from within the community, [redacted] will identify the name of the sign, where the sign can be located, and the purpose of it independently , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a set of 5 real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where the sign can be located with 80% accuracy across 5 opportunities by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given completion of objective 1 and an additional 5 (totaling 10) real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where the sign can be located, across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given completion of objective 2 and an additional 5 (totaling 15) real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where it can be located across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |

## GOAL AREA: Activities of Daily Living

### ANNUAL GOAL 8

Given explicit instruction on using Google Calendar and/or a daily planner, [redacted] will record his daily events as well as researching possible events (i.e. movies, travel, shopping) with teacher support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Introduced | N/A | N/A | |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given explicit instruction in using Google Calendar and/or a daily planner [redacted] will record his daily events by date and time for a complete week with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given explicit instruction in using Google Calendar and/or a daily planner and a fake, but possible event (i.e. meal at a restaurant, movie, catching a train) [redacted] will research the possible times to attend the event and log it on his calendar with adult support with 80% accuracy across 10 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given an informational chart, list, or agenda, in which assignments, events, or important information must be documented [redacted] will read to determine when an event will occur or when an assignment is due with teacher support with 80% accuracy across 5 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

## GOAL AREA: Communication

### ANNUAL GOAL 9

Given a problematic social situation, [redacted] will utilize respond to questions involving thinking and reasoning , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making progress answering "why" questions about characters and events in presented situations when he is attentive. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given one prompt and visual cues during structured activity [redacted] T [redacted] G will answer "why" questions about characters and events from presented situations with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted] y is making progress answering "why" questions about characters and events in presented situations when he is attentive. |
| Given one prompt and visual cues during structured activity [redacted] T [redacted] G will make a prediction about a what an individual will do next in a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given one prompt and visual cues during structured activity [redacted] T [redacted] G will make a reasonable guess to explain the actions or feelings of an individual using clues from a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Introduced | N/A | N/A | |

## GOAL AREA: Communication

### ANNUAL GOAL 10

Given prompting and visual cues during structured activity, [redacted] will utilize strategies to increase listener awareness and perspective , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | When attentive to video-clips of a social interaction, [redacted] y is making progress on this goal. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given visuals and no more than one repetition [redacted] T [redacted] G will paraphrase what a peer/adult has said in a presented story/situation/video clip to demonstrate understanding with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | N/A | N/A | Given a repetition, [redacted] y has been able to paraphrase what someone has said in a video-clip of a social interaction. |
| Given visuals and no more than one prompt/cue [redacted] T [redacted] G will state the perspective or point of view of two different individuals in a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given visuals and no more than one prompt/cue [redacted] T [redacted] G will identify a problem and one appropriate solution from a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted] y has been able to identify a problem and one solution from presented video-clip of a social interaction. |

## GOAL AREA: Social/Emotional

## ANNUAL GOAL 11

Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises),[redacted] will be able to determine what is an expected way to be funny with peers and when it is appropriate to be funny , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted]y has difficulty pausing and thinking before speaking which interferes with him being successful in the moment. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises)[redacted].T[redacted].G will complete a sort of these behaviors with no more than one teacher prompt with 80% accuracy across 5 opportunities. by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | Newly introduced. |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises)[redacted].T[redacted].G will will identify expected versus unexpected times to be funny during school independently with 80% accuracy across 5 opportunities by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | Newly introduced. |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises)[redacted].T[redacted].G will will reflect on his behaviors and identify times he may have been disruptive (unexpected behavior) and identify an alternative approach to his peer interactions thorough small group social skills discussions with no more than 3 teacher prompts for 3 opportunities. by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | Newly introduced. |

# Progress Report on IEP Goals and Objectives

**Reporting Period:**June Progress Report, 06/10/2024
**Milford School District**
**IEP Dates:** 02/15/2024 - 02/14/2025

**Student Name:** [redacted]T[redacted]G
**Date of Birth:** [redacted]3
**Current Grade:** 4

**Parent/Guardian Name:** Karen [redacted], [redacted]g

[redacted]: [redacted]2
**Case Manager:** Tara Truscello
**Current Enrolled School:** J. F. Kennedy School (0841911)

## GOAL AREA: Communication

## ANNUAL GOAL 1

Given repetition and visual cues during structured tasks, [redacted] will utilize strategies to increase listening comprehension skills , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted]y is making progress on this objective given visual cues and one repetition. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given one repetition and visual cues during structured activity [redacted]T[redacted]G will retell and follow oral directions containing two steps and temporal concepts with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | 65 % | 80.0 % | [redacted]y is making progress on this objective given visual cues and one repetition. |
| Given one repetition and visual cues during structured activity [redacted]T[redacted]G will respond to WH comprehension questions about specific details/events from a presented story or situation with 80% accuracy in 4/5 opportunities during structured activity by 02/14/2025 | Satisfactory Progress | 70 % | 80.0 % | [redacted]y is making progress on this objective given visual cues and one repetition. |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 2

Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making progress towards this goal. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given pictures of people expressing various emotions, [redacted] T [redacted] G will correctly identify 5 feelings in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress towards this goal. |
| Given small group/individual instruction, [redacted] T [redacted] G will identify 3 strategies to react to people who are having a strong emotion in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress towards this goal. |
| Given hypothetical social situations, [redacted] T [redacted] G will will identify the feelings being felt by the people in the situation in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted] y has been successful with identifying feelings in others when he is not being silly. |
| Given hypothetical social situations, [redacted] T [redacted] G will identify the possible thoughts of the people in the situation in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted] y has been successful with identifying the possible thoughts of people in hypothetical situations. |
| Given a hypothetical social scenario, [redacted] T [redacted] G will [redacted] y will practice taking the perspective of each of the people in the scenario in 4/5 trials by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | [redacted] y requires adult support and is unable to take the perspective of others independently. |
| Given a hypothetical social scenario, [redacted] T [redacted] G will will identify the expected and unexpected behavior in the scenario in 4/5 trials by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted] y can identify expected and unexpected behavior of others. |
| Given examples of his own behavior, [redacted] T [redacted] G will will identify if the behavior was expected or unexpected in 4/5 trials by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | [redacted] y can identify expected and unexpected behaviors of himself after the incident occurred, not in the moment. |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Executive Functioning

## ANNUAL GOAL 3

Given explicit instruction in planning and organizing, [redacted] will plan for his independent work, get materials, and clean materials independently , as measured by mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a mastered task presented to him in a small group setting using a visual for the routine (i.e. checklist, first/next/then) [redacted] T [redacted] G will get the needed materials and complete the task independently with 80% accuracy across 5 opportunities by 02/14/2025 | Satisfactory Progress | 3 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support. |
| Given a mastered task presented to him in a small group setting [redacted] T [redacted] G will complete a visual for the routine (i.e. checklist, first/next/then) with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 3 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support. |

| | | | | |
|---|---|---|---|---|
| Given a mastered task and a visual for the routine (i.e. checklist, first/next/then) that he filled out [redacted] T [redacted] G will get the materials needed and complete the task across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 2 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support. |
| Given folders to hold his work in a small group setting [redacted] T [redacted] G will complete his task and return his work to the appropriate folder with no more than 1 verbal reminder across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support. |

## GOAL AREA: Reading

## ANNUAL GOAL 4

Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the problem, solution and make a self-to-text connection , with adult support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 3 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 3 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | Robby is making satisfactory progress. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will make a self-to-text connection to the problem and solution with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Reading

### ANNUAL GOAL 5

Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the main purpose of the article and two key details about the article with adult support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the purpose of the article with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 2 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify two key details to support the purpose of the information with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 2 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |

## GOAL AREA: Mathematics

## ANNUAL GOAL 6

Given explicit instruction in money identification, addition, and subtraction with regrouping and rounding, [redacted] will apply this knowledge to solving real-life word problems including budgeting and purchasing , with adult support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a set of images of real coins and dollars [redacted] T [redacted] G will independently identify the name of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 5 opportunities | 10.0 opportunities | [redacted] y is making satisfactory progress but continues to require more than 3 adult prompts. |

**Progress Report**

**Student Name:**[redacted] T[redacted] G
**DOB:**[redacted] 3

| | | | | |
|---|---|---|---|---|
| Given a set of images of real coins and dollars [redacted] T[redacted] G will independently identify the value of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 5 opportunities | 10.0 opportunities | [redacted]y is making satisfactory progress but continues to require more than 3 adult prompts. |
| Given a set of 10 computation problems including two money quantities (i.e. $27.34 + $56.92) addition and subtraction problems which require regrouping [redacted] T[redacted] G will solve the problem with no more than 3 adult prompts and check his answer with a calculator with 80% accuracy across 10 opportunities by 02/14/2025 | Satisfactory Progress | 3 opportunities | 10.0 opportunities | [redacted]y is making satisfactory progress but continues to require more than 3 adult prompts. |
| Given a quantity of money without cents (i.e. $23) [redacted] T[redacted] G will round the money to the nearest ten and hundred with 80% accuracy across 10 opportunities by 02/14/2025 | Limited/Minimal Progress | 0 opportunities | 10.0 opportunities | [redacted]y struggles to identify a coins quantity and name consistently. |
| Given a quantity of money with cents (i.e. $23.68) [redacted] T[redacted] G will round the money to the nearest dollar with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | Satisfactory Progress | 3 opportunities | 10.0 opportunities | [redacted]y is making satisfactory progress with full adult support. |

| | | | | |
|---|---|---|---|---|
| Given a picture of items to be purchased (ex. food) [redacted] T [redacted] G will determine the correct total by adding the price of each item together with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 2 opportunities | 10.0 opportunities | [redacted] y is making satisfactory progress with full adult support. |
| Given a picture of items to be purchased (ex. food) and after he determined the correct total by adding the price of each item together [redacted] T [redacted] G will decide the quantity of money he can pay for (i.e. total is $9.45, he will pay $10.00) and determine how much money he will get back with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |

## GOAL AREA: Activities of Daily Living

### ANNUAL GOAL 7

Given real-life picture cards of safety signs and symbols from within the community, [redacted] will identify the name of the sign, where the sign can be located, and the purpose of it independently , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a set of 5 real-life picture cards of safety signs and symbols from within the community [redacted] will identify the name of the sign and where the sign can be located with 80% accuracy across 5 opportunities by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y has mastered this objective. |
| Given completion of objective 1 and an additional 5 (totaling 10) real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where the sign can be located, across 5 opportunities with 80% accuracy by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y has mastered this objective. |
| Given completion of objective 2 and an additional 5 (totaling 15) real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where it can be located across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 2 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |

## GOAL AREA: Activities of Daily Living

### ANNUAL GOAL 8

Given explicit instruction on using Google Calendar and/or a daily planner, [redacted] will record his daily events as well as researching possible events (i.e. movies, travel, shopping) with teacher support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given explicit instruction in using Google Calendar and/or a daily planner [redacted] T [redacted] G will record his daily events by date and time for a complete week with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | Satisfactory Progress | 2 opportunities | 10.0 opportunities | [redacted] is making satisfactory progress with full adult support |
| Given explicit instruction in using Google Calendar and/or a daily planner and a fake, but possible event (i.e. meal at a restaurant, movie, catching a train) [redacted] T [redacted] G will research the possible times to attend the event and log it on his calendar with adult support with 80% accuracy across 10 opportunities by 02/14/2025 | Not Introduced | 2 opportunities | 10.0 opportunities | [redacted] y is making satisfactory progress with full adult support |
| Given an informational chart, list, or agenda, in which assignments, events, or important information must be documented [redacted] T [redacted] G will read to determine when an event will occur or when an assignment is due with teacher support with 80% accuracy across 5 opportunities by 02/14/2025 | Satisfactory Progress | 3 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support |

## GOAL AREA: Communication

## ANNUAL GOAL 9

Given a problematic social situation, [redacted] will utilize respond to questions involving thinking and reasoning , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted]y is making progress on this goal when he is attentive and given a prompt and visual cues. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given one prompt and visual cues during structured activity [redacted] will answer "why" questions about characters and events from presented situations with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | 75 % | 80.0 % | Progress on this objective is noted when [redacted]y is attentive. |
| Given one prompt and visual cues during structured activity [redacted] will make a prediction about a what an individual will do next in a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | 70 % | 80.0 % | Progress on this objective is noted when [redacted]y is attentive. |
| Given one prompt and visual cues during structured activity [redacted] will make a reasonable guess to explain the actions or feelings of an individual using clues from a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | 65 % | 80.0 % | [redacted]y is making progress on this objective when he is attentive and given visual cues and a prompt. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

## GOAL AREA: Communication

## ANNUAL GOAL 10

Given prompting and visual cues during structured activity, [redacted] T will utilize strategies to increase listener awareness and perspective , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | While progress with identification of a problem and solution from a presented story, situation, or video-clip is noted, [redacted] y has required multiple repetitions/cueing in order to paraphrase what has been said by a character or to state the perspective of two individuals. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given visuals and no more than one repetition [redacted] will paraphrase what a peer/adult has said in a presented story/situation/video clip to demonstrate understanding with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | 50 % | 80.0 % | [redacted] has required multiple repetitions in order to paraphrase what someone in a presented story/situation/video-clip has said. |
| Given visuals and no more than one prompt/cue [redacted] T [redacted] G will state the perspective or point of view of two different individuals in a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | 60 % | 80.0 % | [redacted] y has required multiple prompts/cues in order to state the perspective of two different individuals in presented stories/situations/video clips. |
| Given visuals and no more than one prompt/cue [redacted] T [redacted] G will identify a problem and one appropriate solution from a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | 70 % | 80.0 % | [redacted] y is making progress on this objective given visuals and a prompt or cue. |

## GOAL AREA: Social/Emotional

## ANNUAL GOAL 11

Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises), [redacted] will be able to determine what is an expected way to be funny with peers and when it is appropriate to be funny , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y has difficulty pausing and thinking before speaking which interferes with him being successful in the moment. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted] T [redacted] G will complete a sort of these behaviors with no more than one teacher prompt with 80% accuracy across 5 opportunities. by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | [redacted] y has difficulty pausing and thinking before speaking which interferes with him being successful in the moment. |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted] T [redacted] G will will identify expected versus unexpected times to be funny during school independently with 80% accuracy across 5 opportunities by 02/14/2025 | Satisfactory Progress | N/A | N/A | [redacted] y can identify expected versus unexpected behavior. |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted] T [redacted] G will will reflect on his behaviors and identify times he may have been disruptive (unexpected behavior) and identify an alternative approach to his peer interactions thorough small group social skills discussions with no more than 3 teacher prompts for 3 opportunities. by 02/14/2025 | Limited/Minimal Progress | N/A | N/A | [redacted] y is good about reflecting on his behavior but it does not prevent him from repeating the behavior when he returns to class (i.e making noises, blurting out unexpected statement and/or words that are not relevant to the class discussion |

# Progress Report on IEP Goals and Objectives

**Reporting Period:**November Progress Report, 12/10/2024
**Milford School District**
**IEP Dates:** 02/15/2024 - 02/14/2025

**Student Name:** [redacted] T [redacted] G
**Date of Birth:** [redacted] 3
**Current Grade:** 5

**Parent/Guardian Name:** Karen [redacted] , [redacted] g

[redacted] : [redacted] 2
**Case Manager:** Tara Truscello
**Current Enrolled School:** J. F. Kennedy School (0841911)

## GOAL AREA: Communication

## ANNUAL GOAL 1

Given repetition and visual cues during structured tasks, [redacted] will utilize strategies to increase listening comprehension skills , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y has demonstrated difficulty staying focused and has needed multiple repetitions in order to retain details from oral directions and stories. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given one repetition and visual cues during structured activity [redacted] T [redacted] G will retell and follow oral directions containing two steps and temporal concepts with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | 50 % | 80.0 % | From September to November, [redacted] y has needed multiple repetitions in order to retain details from orally-presented directions containing two steps. |
| Given one repetition and visual cues during structured activity [redacted] T [redacted] G will respond to WH comprehension questions about specific details/events from a presented story or situation with 80% accuracy in 4/5 opportunities during structured activity by 02/14/2025 | Limited/Minimal Progress | 65 % | 80.0 % | From September to November, [redacted] y has needed multiple repetitions in order to recall details and answer WH comprehension from presented stories/situations. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

## GOAL AREA: Social/Emotional

## ANNUAL GOAL 2

Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted]y is making progress towards this goal. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given pictures of people expressing various emotions, [redacted] T [redacted] G will correctly identify 5 feelings in 4/5 trials by 02/14/2025 | Satisfactory Progress | 70 % | 90.0 % | [redacted] y is making satisfactory progress towards this goal. |
| Given small group/individual instruction, [redacted] T [redacted] G will identify 3 strategies to react to people who are having a strong emotion in 4/5 trials by 02/14/2025 | Limited/Minimal Progress | 40 % | 90.0 % | [redacted] y tends to repeat one strategy rather than identifying three individual strategies. |
| Given hypothetical social situations, [redacted] T [redacted] will will identify the feelings being felt by the people in the situation in 4/5 trials by 02/14/2025 | Limited/Minimal Progress | 40 % | 90.0 % | [redacted] y silly behavior in group interferes with his being successful with identifying feelings of the characters in the case scenarios. |
| Given hypothetical social situations, [redacted] T [redacted] G will identify the possible thoughts of the people in the situation in 4/5 trials by 02/14/2025 | Satisfactory Progress | 70 % | 90.0 % | [redacted] y has been successful with identifying the possible thoughts of people in hypothetical situations. |
| Given a hypothetical social scenario, [redacted] T [redacted] G will [redacted] y will practice taking the perspective of each of the people in the scenario in 4/5 trials by 02/14/2025 | Limited/Minimal Progress | 35 % | 90.0 % | [redacted] y requires adult support and is unable to take the perspective of others independently. |
| Given a hypothetical social scenario, [redacted] T [redacted] G will will identify the expected and unexpected behavior in the scenario in 4/5 trials by 02/14/2025 | Satisfactory Progress | 70 % | 90.0 % | [redacted] y can identify expected and unexpected behavior of others. |
| Given examples of his own behavior, [redacted] T [redacted] G will will identify if the behavior was expected or unexpected in 4/5 trials by 02/14/2025 | Limited/Minimal Progress | 45 % | 90.0 % | [redacted] y can identify expected and unexpected behaviors of himself after the incident occurred, not in the moment. |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Executive Functioning

## ANNUAL GOAL 3

Given explicit instruction in planning and organizing, [redacted] will plan for his independent work, get materials, and clean materials independently , as measured by mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
| --- | --- | --- | --- |
| Limited/Minimal Progress | N/A | N/A | [redacted] y is making limited progress towards mastering this goal. |

**Progress Report**

**Student Name:** [redacted]
**DOB:** [redacted]

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a mastered task presented to him in a small group setting using a visual for the routine (i.e. checklist, first/next/then) [redacted] will get the needed materials and complete the task independently with 80% accuracy across 5 opportunities by 02/14/2025 | Limited/Minimal Progress | 3 opportunities | 5.0 opportunities | Due to an increase in behaviors, [redacted] has struggled to complete tasks independently and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. |
| Given a mastered task presented to him in a small group setting [redacted] will complete a visual for the routine (i.e. checklist, first/next/then) with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 3 opportunities | 5.0 opportunities | Due to an increase in behaviors, [redacted] has struggled to complete his visual for routines and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. |
| Given a mastered task and a visual for the routine (i.e. checklist, first/next/then) that he filled out [redacted] will get the materials needed and complete the task across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 4 opportunities | 5.0 opportunities | [redacted] is making satisfactory progress with full adult support. |
| Given folders to hold his work in a small group setting [redacted] will complete his task and return his work to the appropriate folder with no more than 1 verbal reminder across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 3 opportunities | 5.0 opportunities | [redacted] is making satisfactory progress with full adult support. |

## GOAL AREA: Reading

### ANNUAL GOAL 4

Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the problem, solution and make a self-to-text connection , with adult support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | See specific objectives below for more information. He was recently taught how to take notes on a sticky note by sketching a smiley face for a part that makes him happy or laugh, a heart for a connection and a question mark for any parts he is unsure about. [redacted] y understands the concept of note taking but requires full adult support and prompting to complete the task. Overall, he is making limited progress due to his attention and behavior. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 3 opportunities | 5.0 opportunities | Due to [redacted] s increase in behavior, his ability to accessing learning opportunities and no additional growth towards mastery of the objects has been collected for the 2024-2025 school year. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 3 opportunities | 5.0 opportunities | Due to [redacted] s increase in behavior, his ability to accessing learning opportunities and no additional growth towards mastery of the objects has been collected for the 2024-2025 school year. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 1 opportunities | 5.0 opportunities | Due to [redacted] s increase in behavior, his ability to accessing learning opportunities and no additional growth towards mastery of the objects has been collected for the 2024-2025 school year. [redacted] y understands the concept of note taking but requires full adult support to follow through with the directions and to fully understand the concept/skill. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 1 opportunities | 5.0 opportunities | Due to [redacted] s increase in behavior, his ability to accessing learning opportunities and no additional growth towards mastery of the objects has been collected for the 2024-2025 school year. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will make a self-to-text connection to the problem and solution with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | Not Introduced | N/A | N/A | |

## GOAL AREA: Reading

### ANNUAL GOAL 5

Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the main purpose of the article and two key details about the article with adult support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y has been listening to and watching commercials, news clips and movie trailers. He has learned how to take two notes after each clip. He requires prompting in order to understand what he should write (I.e.: write down what he learned, observed or wants to know more about/a question he has). However, these types of activities are engaging for [redacted] y so he is able to complete the tasks with support. He benefits from writing on paper with proper lines sizing and/or a graphic organizer. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the purpose of the article with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 2 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support. News articles, commercials and informational videos are engaging for [redacted] y and he seems to enjoy them. He can state the purpose. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify two key details to support the purpose of the information with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 2 opportunities | 5.0 opportunities | Due to [redacted]'s increase in behavior, his ability to accessing learning opportunities and focus on learning, has impacted his academic growth. [redacted] y can attend to a news article, informational video, etc. However, he needs significant prompting to state two details at this time. |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | Limited/Minimal Progress | 1 opportunities | 5.0 opportunities | Due to [redacted]'s increase in behavior, his ability to accessing learning opportunities and focus on learning, has impacted his academic growth. |

## GOAL AREA: Mathematics

## ANNUAL GOAL 6

Given explicit instruction in money identification, addition, and subtraction with regrouping and rounding, [redacted] will apply this knowledge to solving real-life word problems including budgeting and purchasing , with adult support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | Due to [redacted] s increase in behavior, his ability to accessing learning opportunities and focus on learning, has impacted his academic growth. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a set of images of real coins and dollars [redacted] T [redacted] G will independently identify the name of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 5 opportunities | 10.0 opportunities | [redacted] y struggles to identify the name of coins. He often mixes up the dime and nickel. [redacted] y has struggled to complete tasks and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. |
| Given a set of images of real coins and dollars [redacted] T [redacted] G will independently identify the value of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | Limited/Minimal Progress | 5 opportunities | 10.0 opportunities | [redacted] y continues to struggle to identify the quantity of coins. He can only consistently identify the penny at this time with out adult support and prompting. [redacted] y has struggled to complete tasks and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. |

**Progress Report**

**Student Name:** [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given a set of 10 computation problems including two money quantities (i.e. $27.34 + $56.92) addition and subtraction problems which require regrouping [redacted] T [redacted] G will solve the problem with no more than 3 adult prompts and check his answer with a calculator with 80% accuracy across 10 opportunities by 02/14/2025 | Limited/Minimal Progress | 3 opportunities | 10.0 opportunities | [redacted] y can complete addition problems with regrouping independently. At this time he has shown regression in is ability to subtract with regrouping. He can not complete this task without full adult support. [redacted] y has struggled to complete tasks and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. |
| Given a quantity of money without cents (i.e. $23) [redacted] T [redacted] G will round the money to the nearest ten and hundred with 80% accuracy across 10 opportunities by 02/14/2025 | No Progress to Date | 0 opportunities | 10.0 opportunities | [redacted] y has struggled to complete tasks related to money and has not shown any growth towards mastery of this objective during the 2024-2025 school year. |
| Given a quantity of money with cents (i.e. $23.68) [redacted] T [redacted] G will round the money to the nearest dollar with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | Satisfactory Progress | 7 opportunities | 10.0 opportunities | [redacted] y is making satisfactory progress with full adult support. |
| Given a picture of items to be purchased (ex. food) [redacted] T [redacted] G will determine the correct total by adding the price of each item together with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Satisfactory Progress | 8 opportunities | 10.0 opportunities | [redacted] y is making satisfactory progress with full adult support. |
| Given a picture of items to be purchased (ex. food) and after he determined the correct total by adding the price of each item together [redacted] T [redacted] G will decide the quantity of money he can pay for (i.e. total is $9.45, he will pay $10.00) and determine how much money he will get back with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Introduced | N/A | N/A | |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Activities of Daily Living

### ANNUAL GOAL 7

Given real-life picture cards of safety signs and symbols from within the community, [redacted] will identify the name of the sign, where the sign can be located, and the purpose of it independently , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Mastered (Goal Achieved) | N/A | N/A | [redacted] y has mastered this goal. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a set of 5 real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where the sign can be located with 80% accuracy across 5 opportunities by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y has mastered this objective. |
| Given completion of objective 1 and an additional 5 (totaling 10) real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where the sign can be located, across 5 opportunities with 80% accuracy by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y has mastered this objective. |
| Given completion of objective 2 and an additional 5 (totaling 15) real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where it can be located across 5 opportunities with 80% accuracy by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y has mastered this objective. |

## GOAL AREA: Activities of Daily Living

### ANNUAL GOAL 8

Given explicit instruction on using Google Calendar and/or a daily planner, [redacted] will record his daily events as well as researching possible events (i.e. movies, travel, shopping) with teacher support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y is able to fill out a November calendar with full adult support. He does well answering calendar questions orally. |

**Progress Report**

**Student Name:**[redacted]T[redacted]G
**DOB:**[redacted]3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given explicit instruction in using Google Calendar and/or a daily planner[redacted]T [redacted]G will record his daily events by date and time for a complete week with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | Limited/Minimal Progress | 2 opportunities | 10.0 opportunities | With full adult support, [redacted]y can recall information related to a calendar. |
| Given explicit instruction in using Google Calendar and/or a daily planner and a fake, but possible event (i.e. meal at a restaurant, movie, catching a train)[redacted]T [redacted]G will research the possible times to attend the event and log it on his calendar with adult support with 80% accuracy across 10 opportunities by 02/14/2025 | Limited/Minimal Progress | 2 opportunities | 10.0 opportunities | [redacted]y tends to say the same time for any event that may happen during the day. For instance, when might you go swimming? He may say 3:00. Or, if you ask him what time you eat lunch, he may say 3:00 again. |
| Given an informational chart, list, or agenda, in which assignments, events, or important information must be documented[redacted]T[redacted]G will read to determine when an event will occur or when an assignment is due with teacher support with 80% accuracy across 5 opportunities by 02/14/2025 | Limited/Minimal Progress | 3 opportunities | 5.0 opportunities | Due to[redacted]s increase in behavior, his ability to accessing learning opportunities and focus on learning, has impacted his academic growth. |

## GOAL AREA: Communication

### ANNUAL GOAL 9

Given a problematic social situation, [redacted] will utilize respond to questions involving thinking and reasoning , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y often needs multiple prompts and cues in order to answer critical thinking questions about presented stories or situations. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given one prompt and visual cues during structured activity [redacted] T [redacted] G will answer "why" questions about characters and events from presented situations with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | 65 % | 80.0 % | From September to November, [redacted] y has needed multiple prompts in order to respond appropriately to "Why" questions from orally-presented stories/situations. |
| Given one prompt and visual cues during structured activity [redacted] T [redacted] G will make a prediction about a what an individual will do next in a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Satisfactory Progress | 70 % | 80.0 % | [redacted] y is making progress on this objective given a prompt and visual cues.. |
| Given one prompt and visual cues during structured activity [redacted] T [redacted] G will make a reasonable guess to explain the actions or feelings of an individual using clues from a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | 65 % | 80.0 % | [redacted] y has needed multiple prompts in order to explain the actions or feelings of individuals. |

## GOAL AREA: Communication

### ANNUAL GOAL 10

Given prompting and visual cues during structured activity, [redacted] will utilize strategies to increase listener awareness and perspective , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | From September to November [redacted] y has demonstrated difficulty staying focused and has required multiple repetitions/cues or prompts during presented tasks. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given visuals and no more than one repetition [redacted] T [redacted] G will paraphrase what a peer/adult has said in a presented story/situation/video clip to demonstrate understanding with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | 50 % | 80.0 % | [redacted] y has required multiple repetitions in order to paraphrase what has been said by others. |
| Given visuals and no more than one prompt/cue [redacted] T [redacted] G will state the perspective or point of view of two different individuals in a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | 65 % | 80.0 % | [redacted] y has required multiple prompts/cues and multiple choice options to identify appropriate |
| Given visuals and no more than one prompt/cue [redacted] T [redacted] G will identify a problem and one appropriate solution from a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Limited/Minimal Progress | 65 % | 80.0 % | [redacted] y has required multiple prompts/cues and multiple choice options to identify appropriate solutions to presented problems. |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 11

Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises), [redacted] will be able to determine what is an expected way to be funny with peers and when it is appropriate to be funny , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y continues to have difficulty pausing and thinking before speaking which interferes with him being successful in the moment. |

**Progress Report**

**Student Name:**[redacted] T[redacted] G
**DOB:**[redacted] 3

| **Short-term Objective(s)** | **Current Status** | **Current Score** | **Target Score** | **Progress Data/ Notes** |
|---|---|---|---|---|
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises)[redacted] T[redacted] G will complete a sort of these behaviors with no more than one teacher prompt with 80% accuracy across 5 opportunities. by 02/14/2025 | Limited/Minimal Progress | 2 % | 5.0 % | [redacted] y continues to have difficulty pausing and thinking before speaking which interferes with him being successful in the moment. |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises)[redacted] T[redacted] G will will identify expected versus unexpected times to be funny during school independently with 80% accuracy across 5 opportunities by 02/14/2025 | Satisfactory Progress | 3 % | 5.0 % | [redacted] y can identify expected versus unexpected behavior when he is focused |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises)[redacted] T[redacted] G will will reflect on his behaviors and identify times he may have been disruptive (unexpected behavior) and identify an alternative approach to his peer interactions thorough small group social skills discussions with no more than 3 teacher prompts for 3 opportunities. by 02/14/2025 | Limited/Minimal Progress | 1 % | 3.0 % | [redacted] y continues to be good about reflecting on his behavior but it does not prevent him from repeating the behavior when he returns to class (i.e making noises, blurting out unexpected statement and/or words that are not relevant to the class discussion |

Milford School District

# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 12/17/2024

**Parent/Guardian/Student:** Karen [redacted], [redacted] [redacted]

[redacted]: [redacted]

**Mailing Address:** [redacted] [redacted],
[redacted];

[redacted] [redacted],
[redacted], [redacted], [redacted];

Dear Karen [redacted], [redacted] [redacted]

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] [redacted] (Student's name) [redacted] (DOB)

**Date:** 01/16/2025 **Time:** 2 :00 PM **Location:** J. F. Kennedy School/ Virtual PPT

**The purpose of this meeting is to:**

Conduct an Annual Review

Parent Request;
The team will develop, review, or revise transition goals and objectives (transition planning)

Agency representative(s) not appropriate to be invited to attend to assist in transition planning

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| Student | [redacted] T [redacted] G |
| Mother | Karen [redacted] n |
| Father | Robert [redacted] g |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Donna Stuart |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Other: BCBA | Courtney Carrano |
| Other: Director of Pupil Personnel Service | Jennifer Stewart |
| Other: Instructional Supervisor Special Education | Nadine Macklin |
| Other: Teacher Leader | Darlene Koosa |
| Other: Nurse | Jacqueline Campbell |
| Occupational Therapist | Reyna Rhodes |
| Special Education Teacher | Kate Falzarano |
| Other: District Counsel | Herbie Rosen |

A parent/guardian has the right to be present at and participate in all portions of the meeting at which an educational program is being developed, reviewed, or revised and shall be given at least five days' prior notice of any planning and placement team meeting. Parent participation in this process is important. Please make every effort to attend this meeting. You may bring other individuals/advisors to the meeting, including those who have knowledge or special expertise regarding your child.

A parent/guardian also has the right to have (1) the paraeducator assigned to their child, if any, (2) the child's birth-to-three service coordinator, if any, and (3) a language interpreter, including a registered interpreter for persons who are deaf, hard of hearing, or deafblind if there is an apparent need or upon request, be present at the meeting. A parent/guardian is asked to provide reasonable notice to the District if they wish to have any of these individuals attend. The parent/guardian also has the right to have each recommendation made in a child's birth-to-three individualized transition plan, if any, addressed by the planning and placement team during a meeting at which an educational program for the child is developed.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher

(Name and Title)

**Procedural Safeguards**

☑ A copy of the Procedural Safeguards in Special Education is enclosed.

**Parent Notice**

☑ A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

**MILFORD PUBLIC SCHOOLS**
70 West River Street
Milford, CT 06460

# BEHAVIOR INTERVENTION PLAN

| | | | |
|---|---|---|---|
| Student | [redacted] | Date<br>Revised | 06/04/2021<br>01/2025 |
| DOB | [redacted] | School | John F. Kennedy School |
| Parents/ Guardians | [redacted] &<br>Karen [redacted] | Grade | Fifth Grade |
| Special Education Teacher | Tara Truscello | School Social Worker | Lauri Dougherty |
| Supervisor of Special Education | Nadine Macklin | School Psychologist | Jen Davis |
| Regular Education Teacher | Donna Stuart | BCBA | Courtney Carrano |

**Target Behaviors:**
*(Behavior(s) which are presenting as problematic to the student's learning and which the planning and placement team has identified to reduce or extinguish.)*

**Elopement** - defined as any time [redacted] gets out of his seat without adult permission

**Calling Out/Making noises** - defined as any time [redacted] vocally talks out or makes vocal noises without being called on to do so

**Misuse of Materials** - defined as anytime [redacted] uses materials for purposes other than what they were intended. For example: writing on the desk, tapping with a pencil, playing with items on his desk, playing with hands.

**Work Refusal** - defined as anytime [redacted] does not initiate a work demand within 15 seconds of being asked to do so OR stops working for more than 15 seconds

**Hypothesis/Function of Behaviors:**
*(A synthesis of data gathered to offer a hypothesis regarding what function the target behavior(s) serves for the student.)*

Based on the results of the analysis of [redacted] and consequences as well as other data collection,the function of the target behaviors are as follows:

**Elopement** is hypothesized to be to gain access to attention.

**Calling Out/Making noises** is hypothesized to be to gain access to attention.

**Misuse of Materials** - is hypothesized to have a dual function, primarily to escape or avoid something and secondarily to gain access to attention.

| |
|---|
| **Work Refusal** - is hypothesized to have a dual function, primarily to escape or avoid something and secondarily to gain access to attention. |

| **Desired Replacement Behaviors:**(*More acceptable behaviors planned to replace the target behaviors through the Behavior Intervention Plan)* |
|---|
| **Elopement** - staying in his seat<br><br>**Calling Out/Making noises** - waiting his turn, raising hand and waiting to be called on, and saying, "excuse me" to get staff or peers attention.<br><br>**Misuse of Materials** - using materials for what they purpose is intended to be<br><br>**Work Refusal** - asking for a break, completing and initiating work tasks and demands, asking for help |

**Intervention Strategies:**
*(Specific interventions and strategies to be implemented in addressing the Target Behavior.)*

***Proactive Strategies:***

- **Clear Expectations** -[redacted]y should be provided clear expectations especially prior to transitions that also includes behavioral expectations to ensure he is clear of what is expected of him.
    - For example, "you are going to line up quietly by walking."
- **Behavior Specific Feedback** – when providing [redacted]y with verbal praise for engaging in appropriate peer interactions, raising his hand and not calling out; make praise sure you are making him aware of what specific behavior he is receiving the praise for.
    - For example, "nice job lining up getting in your spot", "I liked how you were able to complete your work independently."
- **Visual Checklist** - For multi-step assignments, provide [redacted]y with a task checklist for him to check off tasks as he completes them.
- **Social Stories** - Social stories addressing [redacted]s specific needs should be created based on interactions that have occurred with [redacted]. These stories should be read frequently.
- **Break Cards:** [redacted]y should be given a break card, that he has access to at all times. Breaks should have a clear beginning and a clear end. Breaks may need to be prompted by an adult, when demonstrating precursor behaviors.
- **Use simple, concise instructions**: Provide [redacted]y with a clear understanding of what is happening or going to happen, particularly when a preferred activity is about to end. Use simple instructions such as, "first clean up slime, then raise your hand for a book". Provide short and clear instructions for [redacted]y to follow before the transition so that he can quickly follow the instruction and gain access to reinforcement.

- **Model appropriate behaviors -** behaviors should be taught, modeled and practiced in a controlled environment with reinforcement.

- **Direct Instruction -** [redacted] should receive direct instruction in the following areas:
  - **Functional Communication -** asking for attention, raising hand, requesting a break, asking for help,
  - **Peer interaction** - how to ask a friend to play, how to engage in conversation with peers, how to react when a peer does not want to play

***Consequence Strategies:***

- **Holding the Expectation:** If [redacted] engages in target behavior, the demand/task that was presented prior to engaging in behavior should remain until he complies with the task or demand. For example, if the direction was to do 5 minutes of independent reading and [redacted] does not comply, he should have to complete this task before engaging the next task or demand.

- **Time out of Reinforcement -** the staff will provide limited eye contact and limited verbal directions when [redacted] is engaging in target behaviors. Staff will reinforce the appropriate behaviors and in turn increase those behaviors while decreasing maladaptive behaviors.

- **Behavior mapping** - when [redacted] engages in significant behavior(ex hands on), staff will utilize behavior mapping as a tool to teach [redacted] the relationship between behaviors, other's perspectives, other's actions, and [redacted]s own emotions about those around him.

***System of Reinforcement:***

**Differential Reinforcement of Alternative Behaviors -** [redacted] should receive reinforcement in the form of attention for engaging in alternative behaviors such as but not limited to:

- initiating a demand
- appropriate peer interactions
- attempting to gain attention appropriately
- following directions
- provided personal space
- asking for a break
- transitioning from preferred to non-preferred tasks
-

***First/Then board* -** first work then choice. [redacted] will engage in a demand/task and when completed he will have an opportunity to engage in a preferred activity.

**Person Responsible:**
*(The individual/s designated to implement intervention strategies and/or designated for oversight of specific portions of the Behavior Intervention Plan.)*

| Task: | Responsible Party: | Date Implemented: |
|---|---|---|
| Direct Instruction - Behavioral Strategies, Coping Strategies, Replacement Behaviors | School Team | Ongoing |

| | | |
|---|---|---|
| Proactive Strategies, Consequence Strategies, System of Reinforcement, Environmental Supports | School Team & BCBA as needed | Ongoing |

**Monitoring Progress/Evaluation Methods:**
*(A description of how progress toward achieving desired outcome will be monitored and evaluates.)*

Data will be collected on targeted behaviors to monitor behavior trends.

**Timelines/Review Dates:**
*(Segments of time during which specific portions of the Behavior Intervention Plan are to be addressed as well as specific dates by which specific portions of the Behavior Intervention Plan are to be reviewed with regard to progress.)*

| Date: | Specific portion of the plan to review | Responsible Party: |
|---|---|---|
| 2 week minimum increments from date of implementation | Review and analysis of Data | BCBA/ School Team |
| 2 week minimum increments from date of implementation | Program adjustment if needed | BCBA/School Team |
| 2 week minimum increments from date of implementation | Communication to guardians regarding behavior change | School Team |

***FADING OF PLAN:*** When stable rates of behavioral change over time are demonstrated, current intermittent schedules of reinforcement will be adjusted. This will be done mindfully and systematically by increasing demands and/or increasing the time interval of reinforcement delivery, thus allowing natural contingencies to support behavioral change

# Progress Report on IEP Goals and Objectives

**Reporting Period:**Final Progress Report, 01/09/2025
**Milford School District**
**IEP Dates:** 02/15/2024 - 02/14/2025

**Student Name:** [redacted] T[redacted] G
**Date of Birth:** [redacted] 3
**Current Grade:** 5

**Parent/Guardian Name:** Karen [redacted] ı, Robert [redacted] g

[redacted] ): [redacted] 2
**Case Manager:** Tara Truscello
**Current Enrolled School:** J. F. Kennedy School (0841911)

## GOAL AREA: Communication

## ANNUAL GOAL 1

Given repetition and visual cues during structured tasks, [redacted] will utilize strategies to increase listening comprehension skills , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted] y has demonstrated difficulty staying focused and has needed multiple repetitions in order to retain details from oral directions and stories. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given one repetition and visual cues during structured activity [redacted] T[redacted] G will retell and follow oral directions containing two steps and temporal concepts with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Mastered | 60 % | 80.0 % | [redacted] y has needed multiple repetitions in order to retain details from orally-presented directions containing two steps. |
| Given one repetition and visual cues during structured activity [redacted] T[redacted] G will respond to WH comprehension questions about specific details/events from a presented story or situation with 80% accuracy in 4/5 opportunities during structured activity by 02/14/2025 | Not Mastered | 70 % | 80.0 % | [redacted] y has needed multiple repetitions in order to recall details and answer WH comprehension from presented stories/situations. |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Social/Emotional

## ANNUAL GOAL 2

Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted] y has mastered some objectives but has significant difficulty identifying the feelings other others in scenarios, taking the perspective of others, and identifying expected and unexpected behavior in himself. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given pictures of people expressing various emotions, [redacted] T [redacted] G will correctly identify 5 feelings in 4/5 trials by 02/14/2025 | Mastered (Objective Achieved) | 80 % | 80.0 % | [redacted] y has mastered this objective. |
| Given small group/individual instruction, [redacted] T [redacted] G will identify 3 strategies to react to people who are having a strong emotion in 4/5 trials by 02/14/2025 | Not Mastered | 45 % | 80.0 % | [redacted] y tends to repeat one strategy rather than identifying three individual strategies. |
| Given hypothetical social situations, [redacted] T [redacted] G will will identify the feelings being felt by the people in the situation in 4/5 trials by 02/14/2025 | Not Mastered | 50 % | 80.0 % | [redacted] /'s silly behavior in group interferes with his being successful with identifying feelings of the characters in the hypothetical scenarios. |
| Given hypothetical social situations, [redacted] T [redacted] G will identify the possible thoughts of the people in the situation in 4/5 trials by 02/14/2025 | Mastered (Objective Achieved) | 80 % | 80.0 % | [redacted] y has mastered this objective. |
| Given a hypothetical social scenario, [redacted] T [redacted] G will [redacted] y will practice taking the perspective of each of the people in the scenario in 4/5 trials by 02/14/2025 | Not Mastered | 45 % | 80.0 % | [redacted] y requires adult support and has difficulty taking the perspective of others independently. |
| Given a hypothetical social scenario, [redacted] T [redacted] G will will identify the expected and unexpected behavior in the scenario in 4/5 trials by 02/14/2025 | Mastered (Objective Achieved) | 80 % | 80.0 % | [redacted] y has mastered this objective. |
| Given examples of his own behavior, [redacted] T [redacted] G will will identify if the behavior was expected or unexpected in 4/5 trials by 02/14/2025 | Not Mastered | 50 % | 80.0 % | [redacted] y can identify expected and unexpected behaviors in others but has difficulty identifying it in himself. |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Executive Functioning

### ANNUAL GOAL 3

Given explicit instruction in planning and organizing, [redacted] will plan for his independent work, get materials, and clean materials independently , as measured by mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted] y did not master this goal. He continues to struggle to independently plan for his work and requires multiple reminders in order to initiate, and sustain a task. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a mastered task presented to him in a small group setting using a visual for the routine (i.e. checklist, first/next/then) [redacted] T [redacted] G will get the needed materials and complete the task independently with 80% accuracy across 5 opportunities by 02/14/2025 | Not Mastered | 3 opportunities | 5.0 opportunities | Due to an increase in behaviors, [redacted] has struggled to complete tasks independently and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. He continues to require adult support and is not independent in completing tasks. |
| Given a mastered task presented to him in a small group setting [redacted] T [redacted] G will complete a visual for the routine (i.e. checklist, first/next/then) with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 3 opportunities | 5.0 opportunities | Due to an increase in behaviors, [redacted] y has struggled to complete his visual for routines and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. At this time, the first/next visual is being filled out by an adult. |
| Given a mastered task and a visual for the routine (i.e. checklist, first/next/then) that he filled out [redacted] T [redacted] G will get the materials needed and complete the task across 5 opportunities with 80% accuracy by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support. He will get materials when prompted by an adult. |
| Given folders to hold his work in a small group setting [redacted] T [redacted] G will complete his task and return his work to the appropriate folder with no more than 1 verbal reminder across 5 opportunities with 80% accuracy by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support. He will put away his materials when prompted by an adult. |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Reading

### ANNUAL GOAL 4

Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the problem, solution and make a self-to-text connection , with adult support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | See specific objectives below for more information. He was recently taught how to take notes on a sticky note by sketching a smiley face for a part that makes him happy or laugh, a heart for a connection and a question mark for any parts he is unsure about. [redacted] y understands the concept of note taking but requires full adult support and prompting to complete the task. Overall, he is making limited progress due to his attention and behavior and has not mastered this goal at this time. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 3 opportunities | 5.0 opportunities | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted] s comprehension. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the character's problem and provide a possible solution with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 3 opportunities | 5.0 opportunities | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted]s comprehension. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 1 opportunities | 5.0 opportunities | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted]s comprehension. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he reads independently, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the solution to the problem with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 1 opportunities | 5.0 opportunities | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted]s comprehension. |

**Progress Report**

**Student Name:** [redacted]
**DOB:** [redacted]

| | | | | |
|---|---|---|---|---|
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] will make a self-to-text connection to the problem and solution with adult support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | N/A | N/A | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted]s comprehension. |
| Given small group reading instruction along with social-emotional instruction, a fiction text that he listens to or reads, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | Not Mastered | N/A | N/A | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted]s comprehension. |

# GOAL AREA: Reading

## ANNUAL GOAL 5

Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer), [redacted] will identify the main purpose of the article and two key details about the article with adult support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted]y has been listening to and watching commercials, news clips and movie trailers. He has learned how to take two notes after each clip. He requires prompting in order to understand what he should write (I.e.: write down what he learned, observed or wants to know more about/a question he has). However, these types of activities are engaging for [redacted]y so he is able to complete the tasks with support. He benefits from writing on paper with proper lines sizing and/or a graphic organizer. This goal has not been mastered at this time. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify the purpose of the article with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 2 opportunities | 5.0 opportunities | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted]s comprehension. |

| | | | | |
|---|---|---|---|---|
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will identify two key details to support the purpose of the information with adult support across 10 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 2 opportunities | 5.0 opportunities | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted] s comprehension. |
| Given small group comprehension instruction along with daily living instruction, a non-fiction text and or video (i.e. a news article, website details, informational video) that he listens to, and instruction on a note-taking strategy (i.e. post-it notes, stop and jot, graphic organizer) [redacted] T [redacted] G will create a written response to a literal comprehension question of at least 3 complete sentences with adult support with 80% accuracy across 5 opportunities by 02/14/2025 | Not Mastered | 1 opportunities | 5.0 opportunities | This objective has not been mastered. New reading goals and objectives will be added to the next IEP to support [redacted] s comprehension. |

## GOAL AREA: Mathematics

## ANNUAL GOAL 6

Given explicit instruction in money identification, addition, and subtraction with regrouping and rounding, [redacted] will apply this knowledge to solving real-life word problems including budgeting and purchasing , with adult support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | Due to [redacted] s increase in behavior, his ability to accessing learning opportunities and focus on learning, has impacted his academic growth and he has not shown mastery of this goal. |

**Progress Report**

**Student Name:**[redacted].T[redacted]G
**DOB:**[redacted]3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a set of images of real coins and dollars[redacted].T [redacted]G will independently identify the name of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 5 opportunities | 10.0 opportunities | [redacted]y struggles to identify the name of coins. He often mixes up the dime and nickel.[redacted]y has struggled to complete tasks and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. He is unable to independently identify coins. He often struggles with the quarter and nickel. |
| Given a set of images of real coins and dollars[redacted].T [redacted]G will independently identify the value of each piece of money across 10 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 5 opportunities | 10.0 opportunities | [redacted]y continues to struggle to identify the quantity of coins. He can only consistently identify the penny at this time with out adult support and prompting.[redacted]y has struggled to complete tasks and has shown no additional growth towards mastery of this objective during the 2024-2025 school year. He is unable to independently identify coins. He often struggles with the quarter, dime and nickel quantities. |
| Given a set of 10 computation problems including two money quantities (i.e. $27.34 + $56.92) addition and subtraction problems which require regrouping[redacted].T[redacted]G will solve the problem with no more than 3 adult prompts and check his answer with a calculator with 80% accuracy across 10 opportunities by 02/14/2025 | Not Mastered | 5 opportunities | 10.0 opportunities | [redacted]y can complete addition problems with regrouping independently. At this time he has shown regression in is ability to subtract with regrouping. He can not complete this task without full adult support. [redacted]y has struggled to complete tasks and has shown no additional growth towards mastery of this objective during the 2024-2025 school year.[redacted]y continues to struggle with being able to subtract with regrouping independently. |
| Given a quantity of money without cents (i.e. $23)[redacted].T [redacted]G will round the money to the nearest ten and hundred with 80% accuracy across 10 opportunities by 02/14/2025 | Not Mastered | 0 opportunities | 10.0 opportunities | [redacted]y has struggled to complete tasks related to money and has not shown any growth towards mastery of this objective during the 2024-2025 school year. |
| Given a quantity of money with cents (i.e. $23.68)[redacted].T [redacted]G will round the money to the nearest dollar with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | With full teacher support,[redacted]y is able to round money to the next dollar. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| | | | | |
|---|---|---|---|---|
| Given a picture of items to be purchased (ex. food) [redacted] will determine the correct total by adding the price of each item together with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Mastered (Objective Achieved) | 10 opportunities | 10.0 opportunities | [redacted] y has mastered this goal. |
| Given a picture of items to be purchased (ex. food) and after he determined the correct total by adding the price of each item together [redacted] T [redacted] G will decide the quantity of money he can pay for (i.e. total is $9.45, he will pay $10.00) and determine how much money he will get back with teacher support across 5 opportunities with 80% accuracy by 02/14/2025 | Not Mastered | 0 opportunities | 10.0 opportunities | This objective was not introduced due to [redacted] s struggles with understanding money. |

## GOAL AREA: Activities of Daily Living

## ANNUAL GOAL 7

Given real-life picture cards of safety signs and symbols from within the community, [redacted] will identify the name of the sign, where the sign can be located, and the purpose of it independently , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Mastered (Goal Achieved) | N/A | N/A | [redacted] y has mastered this goal. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a set of 5 real-life picture cards of safety signs and symbols from within the community [redacted] G will identify the name of the sign and where the sign can be located with 80% accuracy across 5 opportunities by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y has mastered this objective. |
| Given completion of objective 1 and an additional 5 (totaling 10) real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where the sign can be located, across 5 opportunities with 80% accuracy by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y has mastered this objective. |
| Given completion of objective 2 and an additional 5 (totaling 15) real-life picture cards of safety signs and symbols from within the community [redacted] T [redacted] G will identify the name of the sign and where it can be located across 5 opportunities with 80% accuracy by 02/14/2025 | Mastered (Objective Achieved) | 5 opportunities | 5.0 opportunities | [redacted] y has mastered this objective. |

## GOAL AREA: Activities of Daily Living

## ANNUAL GOAL 8

Given explicit instruction on using Google Calendar and/or a daily planner, [redacted] will record his daily events as well as researching possible events (i.e. movies, travel, shopping) with teacher support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted] is able to fill out a November calendar with full adult support. He does well answering calendar questions orally. This goal has not been mastered. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given explicit instruction in using Google Calendar and/or a daily planner [redacted] T [redacted] G will record his daily events by date and time for a complete week with teacher support with 80% accuracy across 10 opportunities by 02/14/2025 | Not Mastered | 2 opportunities | 10.0 opportunities | This objective has not been mastered. New activities of daily living goals and objectives will be added to the next IEP to support [redacted] s functional performance. |
| Given explicit instruction in using Google Calendar and/or a daily planner and a fake, but possible event (i.e. meal at a restaurant, movie, catching a train) [redacted] T [redacted] G will research the possible times to attend the event and log it on his calendar with adult support with 80% accuracy across 10 opportunities by 02/14/2025 | Not Mastered | 2 opportunities | 10.0 opportunities | This objective has not been mastered. New activities of daily living goals and objectives will be added to the next IEP to support [redacted] s functional performance. |
| Given an informational chart, list, or agenda, in which assignments, events, or important information must be documented [redacted] T [redacted] G will read to determine when an event will occur or when an assignment is due with teacher support with 80% accuracy across 5 opportunities by 02/14/2025 | Not Mastered | 3 opportunities | 5.0 opportunities | This objective has not been mastered. New activities of daily living goals and objectives will be added to the next IEP to support [redacted] s functional performance. |

## GOAL AREA: Communication

### ANNUAL GOAL 9

Given a problematic social situation,[redacted] will utilize respond to questions involving thinking and reasoning , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted]y often needs multiple prompts, cues or multiple choice options in order to answer critical thinking questions about presented stories or situations. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given one prompt and visual cues during structured activity[redacted]T[redacted]G will answer "why" questions about characters and events from presented situations with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Mastered | 70 % | 80.0 % | [redacted]y has needed multiple prompts in order to respond appropriately to "Why" questions from orally-presented stories/situations. |
| Given one prompt and visual cues during structured activity[redacted]T[redacted]G will make a prediction about a what an individual will do next in a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Mastered | 70 % | 80.0 % | While some progress is noted, [redacted]y has required multiple prompts in order to make predictions about what an individual will do next in a presented situation. |
| Given one prompt and visual cues during structured activity[redacted]T[redacted]G will make a reasonable guess to explain the actions or feelings of an individual using clues from a presented situation with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Mastered | 65 % | 80.0 % | [redacted]y has needed multiple prompts in order to explain the actions or feelings of individuals. |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Communication

### ANNUAL GOAL 10

Given prompting and visual cues during structured activity, [redacted] will utilize strategies to increase listener awareness and perspective , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted] y has demonstrated difficulty staying focused and has required multiple repetitions, cues or prompts to understand the perspective of others. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given visuals and no more than one repetition [redacted] T [redacted] G will paraphrase what a peer/adult has said in a presented story/situation/video clip to demonstrate understanding with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Mastered | 60 % | 80.0 % | [redacted] y has had difficulty staying focused and has required multiple repetitions in order to paraphrase what has been said by others. |
| Given visuals and no more than one prompt/cue [redacted] T [redacted] G will state the perspective or point of view of two different individuals in a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Mastered | 60 % | 80.0 % | While [redacted] y has made progress identifying the perspective of one individual in presented stories/situations, he has required multiple prompts/cues and multiple choice options to state perspectives of different individuals. |
| Given visuals and no more than one prompt/cue [redacted] T [redacted] G will identify a problem and one appropriate solution from a presented story/situation/video clip with 80% accuracy in 4/5 opportunities over three random sessions by 02/14/2025 | Not Mastered | 70 % | 80.0 % | While some progress with identification of problems is noted, [redacted] y has required multiple prompts/cues and multiple choice options to identify appropriate solutions to presented problems. |



Date Printed: 01/09/2025

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 11

Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises), [redacted] will be able to determine what is an expected way to be funny with peers and when it is appropriate to be funny , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Mastered | N/A | N/A | [redacted] y continues to have difficulty pausing and thinking before speaking which interferes with him being successful in the moment. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted] T [redacted] G will complete a sort of these behaviors with no more than one teacher prompt with 80% accuracy across 5 opportunities. by 02/14/2025 | Not Mastered | 2 % | 5.0 % | [redacted] y continues to struggle with this goal. He speaks out during group, off topic, distracting the other group members. |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted] T [redacted] G will will identify expected versus unexpected times to be funny during school independently with 80% accuracy across 5 opportunities by 02/14/2025 | Not Mastered | 3 % | 5.0 % | [redacted] y can identify expected versus unexpected behavior when he is focused but not in 'Vivo' , in the moment. |
| Given explicit instruction on what funny (i.e. t.v. shows, jokes) versus what is disruptive in class (i.e. making random statements, making noises) [redacted] T [redacted] G will will reflect on his behaviors and identify times he may have been disruptive (unexpected behavior) and identify an alternative approach to his peer interactions thorough small group social skills discussions with no more than 3 teacher prompts for 3 opportunities. by 02/14/2025 | Not Mastered | 1 % | 3.0 % | [redacted] y continues to be good about reflecting on his behavior but it does not prevent him from repeating the behavior when he returns to class (i.e making noises, blurting out unexpected statement and/or words that are not relevant to the class discussion |

# Individualized Education Program
## Milford School District

| | |
|---|---|
| **Student Name:** [redacted] T [redacted] G | **Meeting Date:** 01/16/2025 |
| [redacted]: [redacted] 2 | **Case Manager:** Tara Truscello |
| **Date of Birth:** [redacted] 3 | **Parent/Guardian Name:** Karen [redacted], F [redacted] g |
| **Current Grade:** 5 | **Primary Disability:** [redacted] n |
| **Current Enrolled School:** J. F. Kennedy School (0841911) | **School Next Year:** |
| **Most Recent Evaluation Date:** 02/08/2024 | **Next Reevaluation Date:** 02/08/2027 |
| **Most Recent Annual Review Date:** 01/16/2025 | **Next Annual Review Date:** 01/15/2026 |

**Reason for Meeting:**

Conduct an Annual Review

Transition Planning - The team will develop, review, or revise transition goals and objectives (transition planning)
Parent Request

## PLANNING AND PLACEMENT TEAM (PPT) MEMBERS PRESENT

| Name | Role |
|---|---|
| Robert [redacted] g | Father |
| Karen [redacted] n | Mother |
| Donna Stuart | Student's General Education Teacher |
| Tara Truscello | Special Education Teacher or Provider |
| Amy Rizzo | Administrator or Designee |
| Jennifer Davis | School Psychologist |
| Karen Kristan | Speech and Language Pathologist |
| Lauri Dougherty | Social Worker |
| Courtney Carrano | Other: BCBA |
| Jennifer Stewart | Other: Director of Pupil Personnel Service |
| Nadine Macklin | Other: Instructional Supervisor Special Education |
| Jacqueline Campbell | Other: Nurse |
| Reyna Rhodes | Occupational Therapist |
| Kate Falzarano | Special Education Teacher |

| Name | Role |
|---|---|
| Herbie Rosen | Other: District Counsel |
| Renee Wright | Family Peer Support Specialist |

# Planning and Placement Team Recommendations

The PPT recommends the following:

Ms. [redacted]h an Mr. [redacted]g have requested out-of-district placement for [redacted]. The MPS school team has refused the request.

Services:

5 x 45 ELA in the resource room
5x30 Math in the resource room
3x30 Daily Living in the resource room
4x30 Social Skills in the resource/related service room
1x30 Group Couseling in the related service room
1x15 Individual Cousleing in the related service room
2x30 push-in group Counseling in the general education classroom
3x30 Speech and Language in the related service room
320 min per week- Academic/Behavior Para in the resource room
150 min per week- Academic/Behavior Para in the general education setting
320 min per week- Behavior Para general education setting

Accommodations:

Orally Read Tests/Directions, Text to Speech (accessibility on the Chromebook), Repeat/Review Directions, Visuals to support directions, Limited Multiple Choice, Math Manipulatives, Access to a multiplication chart, Preferential Seating, Extra time text/quizzes/assignments, Desktop list of tasks, One paper/section at a time, Post Routines, Acknowledge positive work frequently Cue Expected Behavior, Positive Reinforcement, Set/Post Class Rules, Check Work in Progress, Have student restate information, Shortened Tasks, Highlight Margins for writing, Putty for a fidget when needed for behavioral regulation.

State Testing:

CTAA

IEP Implementation Date: February 7, 2025

# Special Considerations

**Does the student exhibit behaviors that impede learning for self or others?**

☐ No ☑ Yes

IEP goal(s) and objectives will be developed to address the behavior.

A behavioral intervention plan based on a functional behavior assessment has been developed.

---

**Is the student deaf or hard of hearing?**

☑ No ☐ Yes

---

**Is the student blind or visually impaired?**

☑ No ☐ Yes

---

**Does the student have limited English proficiency (Student qualifies as an EL)?**

☑ No ☐ Yes

---

**Does the student require accessible educational materials (AEM)?**

☑ No ☐ Yes

---

**Does the student require an Augmentative and/or Alternative mode of Communication?**

☑ No ☐ Yes

# Present Levels of Academic Achievement and Annual Goal(s) and Objectives

## ACADEMIC, PRE-ACADEMIC, COGNITIVE ACHIEVEMENT

**Parent and/or Student Input**

Ms. [redacted] and Mr. [redacted] feel that [redacted] is struggling academically this year. They don't feel that he has made growth, and he continues to struggle. He has requested an out-of-district placement for the 25-26 school year.

## GOAL AREA: Reading

**Present Level of Performance**

[redacted] was unable to achieve mastery of his reading goals due to the amount of adult prompting. Listening comprehension (when listening to news clips, commercials, and short stories) is an area of weakness due to attention and the ability to verbalize his thoughts when asked a comprehension question. Additionally, it is difficult for [redacted] to write his ideas down after he states them due to his attention. He will frequently forget his idea before he has the time to write it down. He can answer questions relating to pictures and short sentences but it is difficult for him to make connections and state the main purpose of what he is listening to without more explicit comprehension instruction. Therefore, [redacted] is currently learning how to comprehend by utilizing a "visualization" strategy. With this approach, it allows [redacted] to learn new vocabulary words through discussions with an adult. Additionally, it allows [redacted] to learn keywords (i.e.: size, color, where, what, when) which will help him comprehend at the paragraph level in the future. Lastly, [redacted] enjoys Mercy Watson and has just began reading this in the classroom.

### Strengths

Decoding, fluency, sight word identification, and basic vocabulary. [redacted] can have a conversation relating to a topic and state "what" a book or read-aloud is based on.

### Concerns/Needs

Comprehending at the sentence level, sequencing sentences, and retelling.

### Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities

Deficits in comprehension due to the diagnosis of [redacted] impacts [redacted] ability to access the general education curriculum.

| **Annual Goal** 17 | **Evaluation Method** |
|---|---|
| Given a text at the sentence level, [redacted] will improve his comprehension skills , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a paragraph that is broken down into individual sentences (up to 4 total), [redacted] will be able to read, or listen to each sentence, verbalize his images, and answer one question (i.e.: what do you think the boy did next or based on the information, where do you think the boy is?) with no more than 3 teacher prompts to cue understanding and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph broken down into individual sentences, [redacted] will be able to read, listen to each sentence, verbalize his images, and state a summary using colored tiles. He will be able to do so by successfully stating at least 2 out of the 4 key elements from the story with 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph that is broken down into individual sentences [redacted] will be able to read or listen to each sentence, verbalize his images, and state the main idea of the 4 sentence paragraph (i.e.: what was the paragraph mostly about or what was the main idea of the paragraph?). He will be able to do so with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph that is broken down into individual sentences, [redacted] will be able to read or listen to each sentence, verbalize his images, and draw a sketch relating to the paragraph that he read. He will be able to do so with no more than 2 teacher prompts or reminders about what the text stated and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| **CT Core Standards Aligned to this Goal**<br>*(Early Learning and Development Standards)* | |
| CCSS.ELA-LITERACY.CCRA.R.5 Craft and Structure: Analyze the structure of texts, including how specific sentences, paragraphs, and larger portions of the text (e.g., a section, chapter, scene, or stanza) relate to each other and the whole. | |
| CCSS.ELA-LITERACY.CCRA.R.1 Key Ideas and Details: Read closely to determine what the text says explicitly and to make logical inferences from it; cite specific textual evidence when writing or speaking to support conclusions drawn from the text. | |
| **Related Services necessary to achieve this goal (if any)** | |

| Annual Goal 19 | Evaluation Method |
|---|---|
| Given a brochure, [redacted]will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a brochure (i.e.: of a state, activity such as hiking or jet skiing), [redacted]will be able to first state verbally "what" the brochure's topic is, with no more than 3 teacher prompts and 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| Given a brochure (i.e.: of a state, activity such as hiking or jet. skiing), [redacted]will be able to navigate the brochure with no more than 2 prompts per question (i.e.: show me where I can find the times I can access the water sports facility or what is Florida known for?), in 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| Given a brochure (i.e.: of a state, or activity such as hiking or jet skiing), [redacted]will be able to answer at least 2 questions relating to the brochure (i.e.: what is Florida known for? Or is Florida warm or hot?), with 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| **CT Core Standards Aligned to this Goal** *(Early Learning and Development Standards)* | |
| CCSS.ELA-LITERACY.CCRA.R.1 Key Ideas and Details: Read closely to determine what the text says explicitly and to make logical inferences from it; cite specific textual evidence when writing or speaking to support conclusions drawn from the text. | |
| CCSS.ELA-LITERACY.CCRA.R.10 Range of Reading and Level of Text Complexity: Read and comprehend complex literary and informational texts independently and proficiently. | |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Mathematics

### Present Level of Performance

[redacted]y mastered 2 out of 7 objectives. He shows the ability to add with regrouping, add and subtract without regrouping, can name a penny and dime and can identify the value of a penny consistently.

### Strengths

Addition and subtraction of multi-digit numbers without regrouping. Addition with regrouping including decimals representing money.

### Concerns/Needs

Identification of money names and worth, addition and subtraction with and without regrouping of money denominations, rounding up to the nearest dollar, and applying math skills to beginning budget understanding.

### Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities

Deficits in basic math skills due to the diagnosis of [redacted]h impacts [redacted]s ability to access the general education curriculum.

| Annual Goal 15 | Evaluation Method |
|---|---|
| Given explicit instruction in money identification, money value, rounding up to the nearest dollar and access to a calculator, [redacted]will solve real-life money problems with adult support , through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given 10 images of real coins and dollar bills and multiple-choice answers [redacted]will identify the correct name and value of the coin or dollar with adult support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given 5 addition and/or subtraction problems that list of up to 4 quantities of money ($23.54) [redacted]will use a calculator to add and/or subtract the problems with adult support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 10 quantities of money (i.e. $21.32) and a hundred chart or number line and multiple choice answers [redacted]will identify the next dollar amount with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situations (i.e. shopping, restaurant, bills) that require the addition of multiple amounts of money [redacted]will use a calculator to find the sum with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situation (i.e. shopping, restaurant) that requires the addition of multiple amounts of money [redacted]will find the sum using a calculator and decide which amount of money, from a set of multiple choice answers, he would give a cashier to pay for his items with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situations (i.e. shopping, restaurant) that he has solved the total sum for and has identified the quantity of money needed to pay [redacted]will use a calculator to find the difference and see how much change he would get back with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| **CT Core Standards Aligned to this Goal** *(Early Learning and Development Standards)* | |
| CCSS.Math.Content.5.NBT.A.1-4 Understand the place value system. | |
| CCSS.Math.Content.5.NBT.B.5-7 Perform operations with multi-digit whole numbers and with decimals to hundredths. | |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

WISC-V: Full Scale IQ 65, Verbal Comprehension 73, Visual Spatial 72, Fluid Reasoning 67, Working Memory 72, Processing Speed 66. CAS-2: Full Scale 60, Planning 71, Attention 61, Simultaneous 74, Successive 70.

# Present Levels of Functional Performance and Annual Goal(s) and Objectives

## FUNCTIONAL PERFORMANCE

**Parent and/or Student Input**

Ms. [redacted]n and Mr. [redacted]g do not feel that [redacted]s behaviors are properly addressed during the school day and have requested an out-of-district placement for the 25-26 school year.

## GOAL AREA: Communication

**Present Level of Performance**

[redacted]y demonstrates difficulty staying focused on presented language tasks and has required redirection and multiple repetitions, cues and/or prompts to retain details from orally-presented directions and stories. He benefits from multiple choice options when asked to answer thinking questions about problem situations. [redacted]y often needs reminders to listen carefully when others are speaking in order to understand their thoughts, feelings and perspectives. At times [redacted]y can demonstrate stuttering behaviors, especially when initiating speaking.

**Strengths**

[redacted]y likes to share his ideas and demonstrates background knowledge for topics of interest.

**Concerns/Needs**

[redacted]y demonstrates weaknesses in listening comprehension and social-pragmatic skills.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in listening comprehension and social-pragmatic skills due to the diagnosis of [redacted]n impacts [redacted]s ability to access the general education curriculum.

| Annual Goal 4 | Evaluation Method |
|---|---|
| Given structured tasks, [redacted]will increase listening comprehension skills , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a visual and no more than two repetitions [redacted]will retell orally-presented directions containing two steps and temporal or conditional concepts with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and no more than two repetitions [redacted]will follow orally-presented directions containing two steps and temporal or conditional concepts with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options [redacted]will respond to comprehension questions about key details/events/characters from a presented story with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given given no more than two repetitions during a structured task [redacted]will paraphrase what a peer or adult has said with 80 % accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

| Annual Goal 14 | Evaluation Method |
|---|---|
| Given structured activity, [redacted]will utilize strategies to increase social awareness and problem solving skills , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a visual and multiple choice options as needed [redacted]T will state the perspective or point of view of two different individuals in a presented story/situation with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will identify an appropriate solution for a problem faced by an individual in a presented story/situation with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will predict what an individual in a story/situation will do next with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will explain why an individual in a story or situation says or does something with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

## GOAL AREA: Social/Emotional

**Present Level of Performance**

In the small group, [redacted] has demonstrated growth in identifying feelings in pictures and identifying 'expected' and unexpected' behavior in others. He is motivated to interact with his peers. [redacted] has difficulty understanding the perspectives of others. He continues to become silly at times when it is not appropriate to do so.

**Strengths**

[redacted] is able to solve hypothetical social problems with adult prompting.

**Concerns/Needs**

[redacted] has difficulty understanding the perspective of others and knowing when it is an appropriate time to be silly.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in social interactions and relationships due to the diagnosis of [redacted] impacts [redacted] ability to access the general education curriculum.

| **Annual Goal 5** | **Evaluation Method** |
|---|---|
| Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given small group/individual instruction, [redacted] will identify 3 strategies to react to people who are having a strong emotion in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given hypothetical social situations, [redacted] will will identify the feelings being felt by the people in the situation in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given a hypothetical social scenario, [redacted] will [redacted] will practice taking the perspective of each of the people in the scenario in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given examples of his own behavior, [redacted] will will identify if the behavior was expected or unexpected in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Individual | |
| Counseling Group | |
| Counseling Group | |
| Counseling Individual | |

## GOAL AREA: Executive Functioning

**Present Level of Performance**

[redacted] requires full adult support in order to plan, initiate, and complete tasks.

**Strengths**

[redacted] can get and put away materials when prompted by an adult.

**Concerns/Needs**

[redacted] has difficulty with independently completing and planning for multi-step tasks.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in organization and planning due to the diagnosis of [redacted] impacts [redacted] ability to access the general education curriculum.

| **Annual Goal 16** | **Evaluation Method** |
|---|---|
| Given a task presented to him using a "first, then" visual, [redacted] will create a checklist of what he needs and his expectation , with teacher support through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a task presented to him with two steps and a "first, then" visual and a filled-out checklist [redacted] will follow the expectations and complete his task with adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with two steps and a "first, then" visual and provided and a blank check-list [redacted] will fill in the check-list with full adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with three steps and a "first, next, then" visual and a filled-out checklist [redacted] will follow the expectations and complete his task with adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with three steps and a "first, next, then" visual and a blank checklist [redacted] will fill in the checklist with full adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |
| Counseling Group | |
| Counseling Individual | |

## GOAL AREA: Activities of Daily Living

**Present Level of Performance**

[redacted] was able to identify 18/23 safety signs correctly. He has technically mastered this goal. He can explain each sign and its purpose. [redacted] can fill out a calendar, write when something will occur, and record his daily events. However, it is heavily prompted by an adult at this time.

**Strengths**

[redacted] can complete daily living tasks (i.e.: lunch and bathroom) on his own.

**Concerns/Needs**

[redacted] would benefit from learning how to understand a recipe, determine if he has enough money, and look up the items required to make the recipe. He would also benefit from learning how to read a brochure that outlines a state or activity.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in daily living skills due to the diagnosis of [redacted] impacts [redacted] ability to access the general education curriculum.

| **Annual Goal 18** | **Evaluation Method** |
|---|---|
| Given a recipe, [redacted] will will improve his daily living skills by interpreting the recipe , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a recipe (i.e.: the box or a printed copy or handout of the recipe), [redacted] will be able to state the ingredients required. He will be able to do so with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given the ingredients required (i.e.: Robert has verbally stated what is required for the recipe or the teacher has scribed the ingredients), [redacted] will be able to access a website (i.e.: Stop and Shop or Shop Rite) on the Chrome book to see what items are in stock. He will be able to do so by first typing the item into the search bar with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given Given a website (Stop and Shop or Shop Rite), [redacted] will be able to determine if an item is in stock that is required for a recipe. He will be able to do so by checking off "yes" or "no" next to the ingredient that an adult previously wrote down with 4 out of 5 opportunities and no more than 3 teacher prompts by 02/06/2026 | Consistent with grade-level report cards |
| Given a recipe that was previously written down, [redacted] will be able to write the dollar amount that the item costs. He will be able to do so with no more than 3 prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a recipe that has previously been written down with the cost and 5 hypothetical values, [redacted] will be given 5 dollar amounts to determine whether he has enough to purchase the ingredients required to make the recipe (i.e.: if you were given $20.00 would you have enough to buy what you need?) with the use of a calculator to add and subtract. He will be able to do so with 80% accuracy. by 02/06/2026 | Consistent with grade-level report cards |
| **Related Services necessary to achieve this goal (If any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

NEPSY-II: Attention & Executive Functioning - all areas below or well below expected level, Social Perception - all areas below or well below expected level. CARS-2: Mild-to-Moderate Symptoms of [redacted] Spectrum Disorder. Social Responsiveness Scale-2: most areas in the moderate to severe range for school and mother. Vineland-3: Teacher

Communication 69, Daily Living Skills 60, Socialization 64, Composite 65; Mother/Father Communication 76/71, Daily Living Skills 68/74, Socialization 82/79, Composite 74/74. BASC-3: several areas At-Risk/Clinically Significant. See report.

## Progress Reporting

**A report of progress toward meeting the Annual Goals and Short Term Objectives included in this IEP will be provided to the parent(s):**

Consistent with general education grade-level report cards

## Transition Planning

**Is the PPT developing postsecondary/transition goals and services for the student?**

☑ Yes ☐ No

| Transition Assessment | Date |
|---|---|
| PPT conversation | 01/16/2025 |

**Assessment Data Summary**

Parent shared at PPT that she hopes [redacted] will be an independent adult.

**Does the student require specially designed instruction to support independent living skills?**

☑ Yes ☐ No

Transition planning and services must address independent living skills

**Is the student in attendance at the meeting?**

No

**Summary of the student's preferences and interests**

[redacted] enjoys sensory-based activities (Play-Doh, coloring, etc.).

**Were any outside agencies invited to attend the PPT meeting?**

Agency representative(s) not appropriate to be invited to attend to assist in transition planning.

**Has any participating agency agreed to provide or pay for services/linkages?**

No

# Postsecondary Outcome Goal Statements

**Postsecondary Education or Training**

Upon high school graduation, [redacted] will attend a school/training program to study an area of interest.

**Employment**

Upon completion of high school, [redacted] will be employed in a field of interest.

**Independent Living Skills**

Upon completion of high school, [redacted] will have the skills necessary to live independently.

# Course of Study

**Has the student completed academic requirements?**

☐ Yes ☑ No

**Course of Study: Description of coursework and/or activities needed to assist the student in achieving postsecondary goals, from the student's current year to the anticipated exit year**

The student is enrolled in general education classes and specials(art, PE, music, library/media) that will allow him to explore his interests.

**Anticipated Exit Criteria: The student will be exited from special education upon:**

Ability to succeed in general education without specially designed instruction

# Transition Present Levels, Goals and Objectives

**Parent and/or Student Input: Transition**

Through conversation at PPT parent shared that she hoped [redacted] will be an independent adult.

**Present Level of Performance: Transition**

[redacted] is beginning to explore areas of interest that can be cultivated into long-term employment and/or independent living.

**Strengths**

[redacted] enjoys sensory-based activities.

**Concerns/Needs:**

Executive functioning skills such as managing a checklist independently, following a schedule and functional reading.

**Impact of student's disability on involvement and progress in the general education curriculum**

[redacted] diagnosis of [redacted] coupled with his intellectual disability impacts his ability to make grade-level progress in the area of post-secondary planning without individualized/small-group instruction.

## TRANSITION GOAL AREA: POSTSECONDARY EDUCATION OR TRAINING

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given a text at the sentence level, [redacted] will improve his comprehension skills , as measured by the following objectives
Given a task presented to him using a "first, then" visual, [redacted] will create a checklist of what he needs and his expectation , with teacher support through mastery of the following objectives.
Given a brochure, [redacted] will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives.

| **Annual Goal 20** | **Evaluation Method** |
|---|---|
| Given direct instruction and a daily schedule, [redacted] will utilize his supports to follow his schedule , with 75% accuracy | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a schedule and faded teacher prompting [redacted] will identify where he needs to be when asked a question about his schedule with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

## TRANSITION GOAL AREA: EMPLOYMENT

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given a brochure, [redacted] will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives.
Given structured activity, [redacted] will utilize strategies to increase social awareness and problem solving skills , as measured by the following objectives
Given explicit instruction in money identification, money value, rounding up to the nearest dollar and access to a calculator, [redacted] will solve real-life money problems with adult support , through mastery of the following objectives.

| **Annual Goal 21** | **Evaluation Method** |
|---|---|
| Given a checklist, [redacted] will indicate completion of a task with faded adult prompting , as evidenced by mastery of the following objective | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a task list and faded adult prompting [redacted] will indicate completion of tasks with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

## TRANSITION GOAL AREA: INDEPENDENT LIVING SKILLS

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given small group/individual instruction, [redacted]will improve his perspective taking and social skills , with 100% mastery of the following objectives

| **Annual Goal 22** | **Evaluation Method** |
|---|---|
| Given functional reading materials(such as recipes,ingredient lists, street signs etc), [redacted]will demonstrate comprehension of the reading , as evidenced by mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given functional reading materials [redacted]will answer wh-questions about the content with 75% accuracy by 02/06/2026 | Monthly |
| Given functional reading materials [redacted]will identify what comes next in a task with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

# Transfer of Rights

At least one year prior to reaching the age of 18, students must be informed of their rights under the IDEA that will transfer at age 18.

**Will the student be 17 within one year from today's date?**

☐ Yes ☑ No

Individualized Education Program

Student Name: [redacted] T [redacted] G
DOB: [redacted] B

# Special Education and Related Services

## SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Academic Skills | 15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | 1 x per Week | 320 Minutes | Special Education Teacher | Paraprofessional | 02/07/2025 | 02/06/2026 | 2a | small group/individual |
| Reading | 16<br>17<br>19 | 5 x per Week | 45 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 02/06/2026 | 2a | small group/individual |
| Mathematics | 15<br>16 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 02/06/2026 | 2a | small group/individual |
| Social Skills | 5<br>16 | 4 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 02/06/2026 | 2a | small group |
| Daily Living Skills | 16<br>18 | 3 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 02/06/2026 | 2a | small group/individual |

## RELATED SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Counseling Group | 5<br>16 | 4 x per Week | 30 Minutes | School Social Worker | School Social Worker | 02/07/2025 | 02/06/2026 | 2a | small group/individual |
| Counseling Group | 5<br>16 | 1 x per Week | 30 Minutes | School Psychologist | School Psychologist | 02/07/2025 | 02/06/2026 | 2c | small group |
| Counseling Individual | 5<br>16 | 2 x per Week | 30 Minutes | School Social Worker | School Social Worker | 02/07/2025 | 02/06/2026 | 1a | Individual |
| Counseling Individual | 5 | 1 x per Week | 15 Minutes | School Psychologist | School Psychologist | 02/07/2025 | 02/06/2026 | 2c | Individual |
| Language/ Communication Group | 4<br>14 | 3 x per Week | 30 Minutes | Speech-language Pathologist | Speech-language Pathologist | 02/07/2025 | 02/06/2026 | 2c | small group |

***Instructional Site Codes:**

1a. General Education Setting 50% or more non-disabled peers
1b. General Education Setting less than 50% non-disabled peers
2a. Resource Setting

2b. Separate Setting/Program
2c. Related Service Setting
3a. Community-Based Setting 50% or more non-disabled peers
3b. Community-Based Setting less than 50% non-disabled peers

## Supplementary Aids and Services

Supplementary aids and services will be provided for the duration of the IEP unless otherwise noted.

| ACCOMMODATION | Area(s)/Locations |
|---|---|
| Orally Read Tests/Directions | All Areas |
| Text to Speech (accessibility on the Chromebook) | All Areas |
| Repeat/Review Directions | All Areas |
| Visuals to support directions | All Areas |
| Limited Multiple Choice | All Areas |
| Math Manipulatives | All Areas |
| Access to a multiplication chart | All Areas |
| Preferential Seating | All Areas |
| Extra time text/quizzes/assignments | All Areas |
| Desktop list of tasks | All Areas |
| One paper/section at a time | All Areas |
| Post Routines | All Areas |
| Acknowledge positive work frequently | All Areas |
| Cue Expected Behavior | All Areas |
| Positive Reinforcement | All Areas |
| Set/Post Class Rules | |
| Check Work in Progress | All Areas |
| Have student restate information | All Areas |
| Provide Models | All Areas |
| Shortened Tasks | All Areas |
| Highlight Margins for writing | All Areas |
| Putty for a fidget when needed for behavioral regulation | All Areas, Writing |

| MODIFICATION | Area(s)/Locations |
|---|---|
| Academic Instruction | Social Studies, Reading, Science, Writing, Math |

| ADULT SUPPORT | Area(s)/Locations |
|---|---|
| 1:1 Aide - Behavioral Support | Music, Art, PE, Library , Recess |
| 1:1 Paraeducator - Instructional/Behavioral Support | Reading , Spanish and STEM |

## Indirect Services

**Are supports required for school personnel to implement this IEP?**

☑ Yes ☐ No

**Supports required for school personnel to implement this IEP Include:**

| Service | Goal ID | Frequency | Duration | Responsible Staff | Start Date | End Date |
|---|---|---|---|---|---|---|
| BCBA Consult | 5<br>16 | 1 x per Month | 120 Minutes | BCBA | 02/07/2025 | 02/06/2026 |

## ESY Services

**Are extended school year (ESY) services required for the Student to receive FAPE?**

☐ Yes ☑ No

## Transportation

**Does the Student require special transportation as a related service?**

☐ Yes ☑ No

Regular Transportation

# Removal from the General Education Environment

## SCHOOL YEAR: 2024-25

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 181 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 02/07/2025 | 06/10/2025 | 15.08 | 16.42 | 48.65 |

## SCHOOL YEAR: 2025-26

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 231 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 08/01/2025 | 02/06/2026 | 15.08 | 16.42 | 48.65 |

**Explain the extent to which the student will not participate in general education classes and non-academic activities with non-disabled peers**

5x45 ELA, 5x30 Math, 4x30 Social Skills, 3x30 Speech and Language, 3x30 Daily Living Skills, 1x15 individual counseling, 1x30 group counseling, 5.3 hours per week of academic/behavioral instruction in the resource room.

**Justification for the removal from the general education environment**

Due to [redacted], he requires small group instruction to meet his academic, social-emotional, speech and language and daily living instruction needs.

**Will the student be removed from the general education environment for 60% or more of the time?**

☐ Yes ☑ No

**At the time of this IEP implementation, will the student be placed at a Private Residential Facility?**

☐ Yes ☑ No

# District and State Testing Information

## ENGLISH LANGUAGE PROFICIENCY (ELP) ASSESSMENT

**Has the student been identified as an English Learner?**

☑ No ☐ Yes

## DISTRICTWIDE ASSESSMENTS

The student will participate in Alternate District Assessment(s)

| Assessment | Participation |
| --- | --- |
| Phonics/Decoding Benchmarks | With designated supports/accommodations |
| Math Progress Monitoring based on IEP | With designated supports/accommodations |
| Reading Progress Monitoring based on IEP | With designated supports/accommodations |

**Designated Supports and Accommodations**

Individually assessed with an adult.

## STATEWIDE ASSESSMENTS

**What grade will the student be in during the next statewide assessment testing window?**

5th Grade

**The student will participate in the CTAA Assessment.**

**Assessment:** CTAA ELA - Grade 5

**Assessment:** CTAA Math - Grade 5

**Assessment:** CTAS - Grade 5

**Alternate assessments must be specified and a statement provided for each as to why the student cannot participate in the standard assessment and why the particular alternate assessment selected is appropriate for the student.**

[redacted] requires an alternate assessment in order to show understanding of tasks due to his [redacted] and low IQ.

# Resources

The following documents were provided to the parent(s) at this meeting or sent electronically with parental permission:

Procedural Safeguards in Special Education

Parental Notification of the Laws Relating to Physical Restraint and Seclusion in the Public Schools

A Parent's Guide to Special Education

IEP Manual

Building a Bridge

# Milford School District
## Planning and Placement Team (PPT) Attendance Excusal

**Student Name:** [redacted] **Date of Birth:** [redacted] **Grade:** 5

[redacted]: [redacted] **School:** J. F. Kennedy School **Date of PPT:** 01/16/2025

**Parent/Guardian:** Karen [redacted]. [redacted]

NOTE: THIS AGREEMENT IS OPTIONAL. Waiver of the attendance of a teacher or related service provider at a PPT meeting is optional. The district or parent/guardian may refuse to excuse such attendance.

**We agree to excuse the attendance of** Darlene Koosa
(Teacher or related service provider)

**at the PPT meeting scheduled for** 01/16/2025 **because (check one):**

☑ This staff member's area of the curriculum or related services is not being modified or discussed in this meeting.

OR

☐ Although the meeting involves a modification to or discussion of this staff member's area of the curriculum or related services, the staff member has submitted in writing, to the parent and IEP team, input into the development of the IEP prior to the meeting.

[redacted] 1/16/25
Date

School District Representative Signature 1/16/25
Date

This agreement must be signed by a representative of the school district who has full authority to sign such a document on behalf of the school district and who, as described by federal statute, is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, is knowledgeable about the general education curriculum and is knowledgeable about the availability of resources of the public agency.

**Section 614(d)(1)(C) of H.R. 1350, the revised Individuals with Disabilities with Education Act, the "IDEA," provides as follows:**

**ATTENDANCE NOT NECESSARY:** A member of the IEP Team is not required to attend a meeting, in whole or in part, if the parent of a child with a disability and the public agency (school district) agree in writing that the attendance of the member is not necessary because the member's area of the curriculum or related services is not being modified or discussed in the meeting. (Section 614 (d)(1)(C)(i) and (iii))

**EXCUSAL:** A member of the IEP team may be excused from attending a meeting, in whole or in part, when the meeting involves a modification to or discussion of the member's area of the curriculum or related services, if the parent and the

public agency (school district) consent, in writing, to the excusal, and the member submits, in writing to the parent and the IEP Team, input into the development of the IEP prior to the meeting. (Section 614(d)(1)(C)(ii) and (iii))

# Prior Written Notice

**PURPOSE:** As a parent/guardian of a student suspected of needing or receiving special education services, the school district is required to provide you with prior written notice whenever it proposes or refuses to initiate or change the identification, evaluation, educational placement or provision of a free and appropriate public education (FAPE) to your child. This notice should be given to you after a school district makes a decision and 10 school days before action is taken on the decision, unless the school district and you both agree to waive the 10-day notice.

**To:** Karen [redacted], [redacted]

Parent/Guardian/Adult Student

**Date:** 01/16/2025

**Re:** [redacted] [redacted]

[redacted]: [redacted]

## ACTION(S) PROPOSED/REFUSED

**Milford School District is providing notice of the following:**

1.
- ☐ The District is proposing to
- ☑ The District is refusing the request to

2.
- ☐ initiate
- ☑ change

3.
- ☐ identification/eligibility
- ☐ an evaluation
- ☑ an educational placement
- ☐ the provision of FAPE (IEP)

## DESCRIPTION / REASON

**Description/Reason of the proposed or refused action:**

Mr. [redacted] and Ms. [redacted] requested an out-of-district placement for the 25-26 school year.

**The reason for proposing or refusing to take action is:**

The district feels that the increase in services and support is appropriate for [redacted] and we can not predict [redacted] needs for the 25-26 school year at this time.

**Description (including the date) of each evaluation procedure, assessment, record, or written report the school district used as a basis for the proposed/refused action:**

Teacher Input (1/16/25), Teacher Records and Reports (1/16/25)

**Date this action will take effect**

02/07/2025

**Other options the PPT considered and rejected**

- ☐ Instruction in the general education environment with supplementary aids and services
- ☑ No other options were considered and rejected
- ☐ Other

**Reason for rejecting other options**

- ☐ The student would not receive an appropriate program in the least restrictive environment.
- ☐ Other

**Other factors that are relevant to this action**

☑ There are no other factors that are relevant to the PPT decision

☐ Other

**PLEASE NOTE:**

Parents have a right to disagree with what is being proposed or refused by the district and may access the due process options described in the procedural safeguards of the IDEA. A copy of the procedural safeguards can be obtained by contacting Contact Name at Contact Phone or Contact Email.

This notice must be provided in the native language of the parent or other mode of communication used by the parent unless it is clearly not feasible to do so.

For assistance with understanding the provisions of the IDEA, please contact the district's special education director or the state's Parent Training and Information Center: Connecticut Parent Advocacy Center (CPAC) at 860-739-3089 or 1-800-445-2722; E-mail: cpac@cpacinc.org

**This notice was:** ☐ provided to Parent at the PPT meeting ☐ hand delivered ☐ mailed ☐ e-mailed ☑ sent electronically to the parent portal

[redacted] [redacted]

[redacted]

[redacted] [redacted]

**Other factors that are relevant to this action**

☑ There are no other factors that are relevant to the PPT decision

☐ Other

**PLEASE NOTE:**

Parents have a right to disagree with what is being proposed or refused by the district and may access the due process options described in the procedural safeguards of the IDEA. A copy of the procedural safeguards can be obtained by contacting Contact Name at Contact Phone or Contact Email .

This notice must be provided in the native language of the parent or other mode of communication used by the parent unless it is clearly not feasible to do so.

For assistance with understanding the provisions of the IDEA, please contact the district's special education director or the state's Parent Training and Information Center: Connecticut Parent Advocacy Center (CPAC) at 860-739-3089 or 1-800-445-2722; E-mail: cpac@cpacinc.org

**This notice was:** ☐ provided to Parent at the PPT meeting ☐ hand delivered ☐ mailed ☐ e-mailed ☑ sent electronically to the parent portal

# Milford School District
# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 02/03/2025

**Parent/Guardian/Student:** Karen [redacted], Robert [redacted]

[redacted]: [redacted]

**Mailing Address:** [redacted], [redacted];

[redacted], [redacted], [redacted];

Dear Karen [redacted], Robert [redacted]

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] [redacted]
(Student's name) (DOB)

**Date:** 02/13/2025 **Time:** 1 :30 PM **Location:** J. F. Kennedy School

**The purpose of this meeting is to:**

Review or Revise the IEP

Parent Request;

The team will develop, review, or revise transition goals and objectives (transition planning)

Agency representative(s) not appropriate to be invited to attend to assist in transition planning

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| Mother | Karen [redacted] |
| Father | Robert [redacted] |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Donna Stuart |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Other: BCBA | Courtney Carrano |
| Other: Director of Pupil Personnel Service | Jennifer Stewart |
| Other: Instructional Supervisor Special Education | Nadine Macklin |
| Special Education Teacher | Kate Falzarano |

A parent/guardian has the right to be present at and participate in all portions of the meeting at which an educational program is being developed, reviewed, or revised and shall be given at least five days' prior notice of any planning and placement team meeting. Parent participation in this process is important. Please make every effort to attend this meeting. You may bring other individuals/advisors to the meeting, including those who have knowledge or special expertise regarding your child.

A parent/guardian also has the right to have (1) the paraeducator assigned to their child, if any, (2) the child's birth-to-three service coordinator, if any, and (3) a language interpreter, including a registered interpreter for persons who are deaf, hard of hearing, or deafblind if there is an apparent need or upon request, be present at the meeting. A parent/guardian is asked to provide reasonable notice to the District if they wish to have any of these individuals attend. The parent/guardian also has the right to have each recommendation made in a child's birth-to-three individualized transition plan, if any, addressed by the planning and placement team during a meeting at which an educational program for the child is developed.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher

(Name and Title)

**Procedural Safeguards**

☑ A copy of the Procedural Safeguards in Special Education was provided to you previously this school year. If you would like another copy of the Procedural Safeguards please contact

Jennifer Stewart 203-783-3410

**Parent Notice**

☑ A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

# Milford School District
# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 02/26/2025

**Parent/Guardian/Student:** Karen [redacted], Robert [redacted]

[redacted]: [redacted]

**Mailing Address:** [redacted]

Dear Karen [redacted], Robert [redacted]

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] [redacted]
(Student's name) (DOB)

**Date:** 03/06/2025 **Time:** 1 :30 PM **Location:** J. F. Kennedy School

**The purpose of this meeting is to:**

Review or Revise the IEP

Parent Request;
The team will develop, review, or revise transition goals and objectives (transition planning)

Agency representative(s) not appropriate to be invited to attend to assist in transition planning

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| Mother | Karen [redacted] |
| Father | Robert [redacted] |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Donna Stuart |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Other: BCBA | Jocelyn Willsey |
| Other: Director of Pupil Personnel Service | Jennifer Stewart |
| Other: Instructional Supervisor Special Education | Nadine Macklin |
| Special Education Teacher | Kate Falzarano |

A parent/guardian has the right to be present at and participate in all portions of the meeting at which an educational program is being developed, reviewed, or revised and shall be given at least five days' prior notice of any planning and placement team meeting. Parent participation in this process is important. Please make every effort to attend this meeting. You may bring other individuals/advisors to the meeting, including those who have knowledge or special expertise regarding your child.

A parent/guardian also has the right to have (1) the paraeducator assigned to their child, if any, (2) the child's birth-to-three service coordinator, if any, and (3) a language interpreter, including a registered interpreter for persons who are deaf, hard of hearing, or deafblind if there is an apparent need or upon request, be present at the meeting. A parent/guardian is asked to provide reasonable notice to the District if they wish to have any of these individuals attend. The parent/guardian also has the right to have each recommendation made in a child's birth-to-three individualized transition plan, if any, addressed by the planning and placement team during a meeting at which an educational program for the child is developed.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher

(Name and Title)

**Procedural Safeguards**

☑ A copy of the Procedural Safeguards in Special Education was provided to you previously this school year. If you would like another copy of the Procedural Safeguards please contact

Jennifer Stewart 203-783-3410

**Parent Notice**

☑ A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

# Individualized Education Program
## Milford School District

| | |
|---|---|
| **Student Name:** [redacted] T [redacted] G | **Meeting Date:** 03/06/2025 |
| [redacted]: [redacted] 2 | **Case Manager:** Tara Truscello |
| **Date of Birth:** [redacted] 3 | **Parent/Guardian Name:** Karen [redacted], [redacted] t [redacted] g |
| **Current Grade:** 5 | **Primary Disability:** [redacted] h |
| **Current Enrolled School:** J. F. Kennedy School (0841911) | **School Next Year:** |
| **Most Recent Evaluation Date:** 02/08/2024 | **Next Reevaluation Date:** 02/08/2027 |
| **Most Recent Annual Review Date:** 01/16/2025 | **Next Annual Review Date:** 01/15/2026 |

**Reason for Meeting:**

Review or Revise the IEP

Transition Planning - The team will develop, review, or revise transition goals and objectives (transition planning)
Parent Request

## PLANNING AND PLACEMENT TEAM (PPT) MEMBERS PRESENT

| Name | Role |
|---|---|
| Robert [redacted] g | Father |
| Karen [redacted] h | Mother |
| Donna Stuart | Student's General Education Teacher |
| Tara Truscello | Special Education Teacher or Provider |
| Amy Rizzo | Administrator or Designee |
| Jennifer Davis | School Psychologist |
| Karen Kristan | Speech and Language Pathologist |
| Lauri Dougherty | Social Worker |
| Jocelyn Willsey | Other: BCBA |
| Jennifer Stewart | Other: Director of Pupil Personnel Service |
| Kate Falzarano | Special Education Teacher |

# Planning and Placement Team Recommendations

The PPT recommends the following:

Continue the IEP with the following recommendations:

Services:

5 x 45 ELA in the resource room
5x30 Math in the resource room
3x30 Daily Living in the resource room
4x30 Social Skills in the resource/related service room
1x30 Group Couseling in the related service room
1x15 Individual Counseling in the related service room
2x30 push-in group Counseling in the general education classroom
3x30 Speech and Language in the related service room
320 min per week- Academic/Behavior Para in the resource room
150 min per week- Academic/Behavior Para in the general education setting
320 min per week- Behavior Para general education setting

Accommodations:

Orally Read Tests/Directions, Text to Speech (accessibility on the Chromebook), Repeat/Review Directions, Visuals to support directions, Limited Multiple Choice, Math Manipulatives, Access to a multiplication chart, Preferential Seating, Extra time text/quizzes/assignments, Desktop list of tasks, One paper/section at a time, Post Routines, Acknowledge positive work frequently Cue Expected Behavior, Positive Reinforcement, Set/Post Class Rules, Check Work in Progress, Have student restate information, Shortened Tasks, Highlight Margins for writing, Putty for a fidget when needed for behavioral regulation.

State Testing:

CTAA

IEP Implementation Date: February 7, 2025

# Special Considerations

**Does the student exhibit behaviors that impede learning for self or others?**

☐ No ☑ Yes

IEP goal(s) and objectives will be developed to address the behavior.

A behavioral intervention plan based on a functional behavior assessment has been developed.

---

**Is the student deaf or hard of hearing?**

☑ No ☐ Yes

---

**Is the student blind or visually impaired?**

☑ No ☐ Yes

---

**Does the student have limited English proficiency (Student qualifies as an EL)?**

☑ No ☐ Yes

---

**Does the student require accessible educational materials (AEM)?**

☑ No ☐ Yes

---

**Does the student require an Augmentative and/or Alternative mode of Communication?**

☑ No ☐ Yes

# Present Levels of Academic Achievement and Annual Goal(s) and Objectives

## ACADEMIC, PRE-ACADEMIC, COGNITIVE ACHIEVEMENT

### Parent and/or Student Input

At the March 6, 2025 PPT meeting, Mr. [redacted] requested that the following statement be entered, word for word into the Parent and/or Student Input section. While the District-based members of the PPT disagree with Mr. [redacted] perspective, they honored Mr. [redacted] request to list the following statement

January 2025-

We have serious concerns about the district's handling of [redacted] education, emotional well-being, and placement, based on documented communications, interactions with district staff, and

[redacted] own reports of mistreatment. The ongoing lack of transparency, honesty, and meaningful communication has further eroded our trust in the district's ability to meet his needs. Despite repeated requests, the district has failed to proactively address [redacted] academic and emotional challenges. Supports that previously helped him have been removed, and necessary interventions were not implemented. [redacted] has reported distressing treatment, contributing to repeated self-harm comments. The district's responses have been reactive rather than proactive, which is unacceptable.

In May 2024, the district attempted to change [redacted] placement to a program that had previously been deemed inappropriate. When questioned, it was dismissed as a "misunderstanding and miscommunication," raising concerns about their credibility. If the district really believe they could meet [redacted] needs, they would have not attempted this placement change. In June 2024, despite acknowledging [redacted] academic difficulties, no additional academic support was recommended for his Extended School Year (ESY) program. The district has also claimed that they reached out to us about [redacted] increased behaviors and academic struggles, stating we declined meetings. However, despite repeated requests, the district has failed to provide any documentation to support these claims, which raises serious concerns about their accountability and transparency.

At the January 16, 2025, PPT meeting, the district failed to provide a meaningful discussion of our outplacement request, despite prior assurances. The decision to keep [redacted] in district appeared predetermined, and our requests for separate meetings were denied. Additionally, there have been discrepancies in the disciplinary log and revisions to meeting notices, raising concerns about the integrity and transparency of district documentation.

We continue to struggle with obtaining necessary documentation. Despite repeated requests, the district has failed to provide supporting records or has presented contradictory information, further eroding our confidence in their transparency and commitment to [redacted] needs. Given the district's continual pattern of failing to appropriately support [redacted] and the ongoing lack of transparency, we do not believe that remaining in Milford Public Schools is in his best interest. The services added to his IEP were only implemented after we requested outplacement, further demonstrating that the district's actions have been reactive rather than proactive in addressing [redacted] needs.

## GOAL AREA: Reading

### Present Level of Performance

[redacted] was unable to achieve mastery of his reading goals due to the amount of adult prompting. Listening comprehension (when listening to news clips, commercials, and short stories) is an area of weakness due to attention and the ability to verbalize his thoughts when asked a comprehension question. Additionally, it is difficult for [redacted] to write his

ideas down after he states them due to his attention. He will frequently forget his idea before he has the time to write it down. He can answer questions relating to pictures and short sentences but it is difficult for him to make connections and state the main purpose of what he is listening to without more explicit comprehension instruction. Therefore, [redacted]y is currently learning how to comprehend by utilizing a "visualization" strategy. With this approach, it allows [redacted]y to learn new vocabulary words through discussions with an adult. Additionally, it allows [redacted]y to learn keywords (i.e.: size, color, where, what, when) which will help him comprehend at the paragraph level in the future. Lastly, [redacted]y enjoys Mercy Watson and has just began reading this in the classroom.

**Strengths**

Decoding, fluency, sight word identification, and basic vocabulary. [redacted]y can have a conversation relating to a topic and state "what" a book or read-aloud is based on.

**Concerns/Needs**

Comprehending at the sentence level, sequencing sentences, and retelling.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in comprehension due to the diagnosis of [redacted]h impacts [redacted]s ability to access the general education curriculum.

**Individualized Education Program**

**Student Name:** [redacted]T [redacted]G
**DOB:** [redacted]3

| **Annual Goal 17** | **Evaluation Method** |
| --- | --- |
| Given a text at the sentence level, [redacted] will improve his comprehension skills , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a paragraph that is broken down into individual sentences (up to 4 total), [redacted] will be able to read, or listen to each sentence, verbalize his images, and answer one question (i.e.: what do you think the boy did next or based on the information, where do you think the boy is?) with no more than 3 teacher prompts to cue understanding and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph broken down into individual sentences, [redacted] will be able to read, listen to each sentence, verbalize his images, and state a summary using colored tiles. He will be able to do so by successfully stating at least 2 out of the 4 key elements from the story with 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph that is broken down into individual sentences [redacted] will be able to read or listen to each sentence, verbalize his images, and state the main idea of the 4 sentence paragraph (i.e.: what was the paragraph mostly about or what was the main idea of the paragraph?). He will be able to do so with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph that is broken down into individual sentences, [redacted] will be able to read or listen to each sentence, verbalize his images, and draw a sketch relating to the paragraph that he read. He will be able to do so with no more than 2 teacher prompts or reminders about what the text stated and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |

**CT Core Standards Aligned to this Goal**
*(Early Learning and Development Standards)*

CCSS.ELA-LITERACY.CCRA.R.5 Craft and Structure: Analyze the structure of texts, including how specific sentences, paragraphs, and larger portions of the text (e.g., a section, chapter, scene, or stanza) relate to each other and the whole.

CCSS.ELA-LITERACY.CCRA.R.1 Key Ideas and Details: Read closely to determine what the text says explicitly and to make logical inferences from it; cite specific textual evidence when writing or speaking to support conclusions drawn from the text.

**Related Services necessary to achieve this goal (if any)**

**Individualized Education Program**

**Student Name:** [redacted]T [redacted]G
**DOB:** [redacted]3

| **Annual Goal 19** | **Evaluation Method** |
|---|---|
| Given a brochure, [redacted]will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a brochure (i.e.: of a state, activity such as hiking or jet skiing), [redacted]will be able to first state verbally "what" the brochure's topic is, with no more than 3 teacher prompts and 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| Given a brochure (i.e.: of a state, activity such as hiking or jet skiing), [redacted]will be able to navigate the brochure with no more than 2 prompts per question (i.e.: show me where I can find the times I can access the water sports facility or what is Florida known for?), in 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| Given a brochure (i.e.: of a state, or activity such as hiking or jet skiing), [redacted]will be able to answer at least 2 questions relating to the brochure (i.e.: what is Florida known for? Or is Florida warm or hot?), with 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| **CT Core Standards Aligned to this Goal** *(Early Learning and Development Standards)* | |
| CCSS.ELA-LITERACY.CCRA.R.1 Key Ideas and Details: Read closely to determine what the text says explicitly and to make logical inferences from it; cite specific textual evidence when writing or speaking to support conclusions drawn from the text. | |
| CCSS.ELA-LITERACY.CCRA.R.10 Range of Reading and Level of Text Complexity: Read and comprehend complex literary and informational texts independently and proficiently. | |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Mathematics

**Present Level of Performance**

[redacted]y mastered 2 out of 7 objectives. He shows the ability to add with regrouping, add and subtract without regrouping, can name a penny and dime and can identify the value of a penny consistently.

**Strengths**

Addition and subtraction of multi-digit numbers without regrouping. Addition with regrouping including decimals representing money.

**Concerns/Needs**

Identification of money names and worth, addition and subtraction with and without regrouping of money denominations, rounding up to the nearest dollar, and applying math skills to beginning budget understanding.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in basic math skills due to the diagnosis of [redacted]h impacts [redacted]s ability to access the general education curriculum.

**Individualized Education Program**

**Student Name:** [redacted] **DOB:** [redacted]

| Annual Goal 15 | Evaluation Method |
|---|---|
| Given explicit instruction in money identification, money value, rounding up to the nearest dollar and access to a calculator, [redacted] will solve real-life money problems with adult support , through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given 10 images of real coins and dollar bills and multiple-choice answers [redacted] will identify the correct name and value of the coin or dollar with adult support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given 5 addition and/or subtraction problems that list of up to 4 quantities of money ($23.54) [redacted] will use a calculator to add and/or subtract the problems with adult support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 10 quantities of money (i.e. $21.32) and a hundred chart or number line and multiple choice answers [redacted] will identify the next dollar amount with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situations (i.e. shopping, restaurant, bills) that require the addition of multiple amounts of money [redacted] will use a calculator to find the sum with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situation (i.e. shopping, restaurant) that requires the addition of multiple amounts of money [redacted] will find the sum using a calculator and decide which amount of money, from a set of multiple choice answers, he would give a cashier to pay for his items with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situations (i.e. shopping, restaurant) that he has solved the total sum for and has identified the quantity of money needed to pay [redacted] will use a calculator to find the difference and see how much change he would get back with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| **CT Core Standards Aligned to this Goal** *(Early Learning and Development Standards)* | |
| CCSS.Math.Content.5.NBT.A.1-4 Understand the place value system. | |
| CCSS.Math.Content.5.NBT.B.5-7 Perform operations with multi-digit whole numbers and with decimals to hundredths. | |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

WISC-V: Full Scale IQ 65, Verbal Comprehension 73, Visual Spatial 72, Fluid Reasoning 67, Working Memory 72, Processing Speed 66. CAS-2: Full Scale 60, Planning 71, Attention 61, Simultaneous 74, Successive 70.

# Present Levels of Functional Performance and Annual Goal(s) and Objectives

## FUNCTIONAL PERFORMANCE

**Parent and/or Student Input**

Please refer to the statement that Mr. [redacted]g submitted at the March 6, 2025 PPT Meeting.

## GOAL AREA: Communication

**Present Level of Performance**

[redacted]y demonstrates difficulty staying focused on presented language tasks and has required redirection and multiple repetitions, cues and/or prompts to retain details from orally-presented directions and stories. He benefits from multiple choice options when asked to answer thinking questions about problem situations. [redacted]y often needs reminders to listen carefully when others are speaking in order to understand their thoughts, feelings and perspectives. At times [redacted]y can demonstrate stuttering behaviors, especially when initiating speaking.

**Strengths**

[redacted]y likes to share his ideas and demonstrates background knowledge for topics of interest.

**Concerns/Needs**

[redacted]y demonstrates weaknesses in listening comprehension and social-pragmatic skills.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in listening comprehension and social-pragmatic skills due to the diagnosis of [redacted]n impacts [redacted]s ability to access the general education curriculum.

| Annual Goal 4 | Evaluation Method |
|---|---|
| Given structured tasks, [redacted]will increase listening comprehension skills , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a visual and no more than two repetitions [redacted]will retell orally-presented directions containing two steps and temporal or conditional concepts with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and no more than two repetitions [redacted]will follow orally-presented directions containing two steps and temporal or conditional concepts with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options [redacted]will respond to comprehension questions about key details/events/characters from a presented story with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given given no more than two repetitions during a structured task [redacted]will paraphrase what a peer or adult has said with 80 % accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

| Annual Goal 14 | Evaluation Method |
|---|---|
| Given structured activity, [redacted]will utilize strategies to increase social awareness and problem solving skills , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a visual and multiple choice options as needed [redacted]T will state the perspective or point of view of two different individuals in a presented story/situation with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will identify an appropriate solution for a problem faced by an individual in a presented story/situation with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will predict what an individual in a story/situation will do next with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will explain why an individual in a story or situation says or does something with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |

GOAL AREA: Social/Emotional

**Present Level of Performance**

In the small group, [redacted]y has demonstrated growth in identifying feelings in pictures and identifying 'expected' and unexpected' behavior in others. He is motivated to interact with his peers. [redacted]y has difficulty understanding the perspectives of others. He continues to become silly at times when it is not appropriate to do so.

**Strengths**

[redacted]y is able to solve hypothetical social problems with adult prompting.

**Concerns/Needs**

[redacted]y has difficulty understanding the perspective of others and knowing when it is an appropriate time to be silly.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in social interactions and relationships due to the diagnosis of [redacted]n impacts [redacted]s ability to access the general education curriculum.

| **Annual Goal 5** | **Evaluation Method** |
|---|---|
| Given small group/individual instruction, [redacted]will improve his perspective taking and social skills , with 100% mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given small group/individual instruction, [redacted]will identify 3 strategies to react to people who are having a strong emotion in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given hypothetical social situations, [redacted]will will identify the feelings being felt by the people in the situation in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given a hypothetical social scenario, [redacted]will [redacted]y will practice taking the perspective of each of the people in the scenario in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given examples of his own behavior, [redacted]will will identify if the behavior was expected or unexpected in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Individual | |
| Counseling Group | |
| Counseling Group | |
| Counseling Individual | |

## GOAL AREA: Executive Functioning

**Present Level of Performance**

[redacted]y requires full adult support in order to plan, initiate, and complete tasks.

**Strengths**

[redacted]y can get and put away materials when prompted by an adult.

**Concerns/Needs**

[redacted]y has difficulty with independently completing and planning for multi-step tasks.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in organization and planning due to the diagnosis of [redacted]n impacts [redacted]s ability to access the general education curriculum.

| **Annual Goal 16** | **Evaluation Method** |
|---|---|
| Given a task presented to him using a "first, then" visual, [redacted]will create a checklist of what he needs and his expectation , with teacher support through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a task presented to him with two steps and a "first, then" visual and a filled-out checklist [redacted]will follow the expectations and complete his task with adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with two steps and a "first, then" visual and provided and a blank check-list [redacted]will fill in the check-list with full adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with three steps and a "first, next, then" visual and a filled-out checklist [redacted]will follow the expectations and complete his task with adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with three steps and a "first, next, then" visual and a blank checklist [redacted]will fill in the checklist with full adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |
| Counseling Group | |
| Counseling Individual | |

## GOAL AREA: Activities of Daily Living

**Present Level of Performance**

[redacted]y was able to identify 18/23 safety signs correctly. He has technically mastered this goal. He can explain each sign and its purpose. [redacted]y can fill out a calendar, write when something will occur, and record his daily events. However, it is heavily prompted by an adult at this time.

**Strengths**

[redacted]y can complete daily living tasks (i.e.: lunch and bathroom) on his own.

**Concerns/Needs**

[redacted]y would benefit from learning how to understand a recipe, determine if he has enough money, and look up the items required to make the recipe. He would also benefit from learning how to read a brochure that outlines a state or activity.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in daily living skills due to the diagnosis of [redacted]n impacts [redacted]s ability to access the general education curriculum.

| **Annual Goal 18** | **Evaluation Method** |
|---|---|
| Given a recipe, [redacted]will will improve his daily living skills by interpreting the recipe , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a recipe (i.e.: the box or a printed copy or handout of the recipe), [redacted]will be able to state the ingredients required. He will be able to do so with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given the ingredients required (i.e.: [redacted]has verbally stated what is required for the recipe or the teacher has scribed the ingredients), [redacted]will be able to access a website (i.e.: Stop and Shop or Shop Rite) on the Chrome book to see what items are in stock. He will be able to do so by first typing the item into the search bar with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given Given a website (Stop and Shop or Shop Rite), [redacted]T will be able to determine if an item is in stock that is required for a recipe. He will be able to do so by checking off "yes" or "no" next to the ingredient that an adult previously wrote down with 4 out of 5 opportunities and no more than 3 teacher prompts by 02/06/2026 | Consistent with grade-level report cards |
| Given a recipe that was previously written down, [redacted]will be able to write the dollar amount that the item costs. He will be able to do so with no more than 3 prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a recipe that has previously been written down with the cost and 5 hypothetical values, [redacted]will be given 5 dollar amounts to determine whether he has enough to purchase the ingredients required to make the recipe (i.e.: if you were given $20.00 would you have enough to buy what you need?) with the use of a calculator to add and subtract. He will be able to do so with 80% accuracy. by 02/06/2026 | Consistent with grade-level report cards |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

NEPSY-II: Attention & Executive Functioning - all areas below or well below expected level, Social Perception - all areas below or well below expected level. CARS-2: Mild-to-Moderate Symptoms of [redacted]h Spectrum Disorder. Social Responsiveness Scale-2: most areas in the moderate to severe range for school and mother. Vineland-3: Teacher

Communication 69, Daily Living Skills 60, Socialization 64, Composite 65; Mother/Father Communication 76/71, Daily Living Skills 68/74, Socialization 82/79, Composite 74/74. BASC-3: several areas At-Risk/Clinically Significant. See report.

## Progress Reporting

**A report of progress toward meeting the Annual Goals and Short Term Objectives included in this IEP will be provided to the parent(s):**

Consistent with general education grade-level report cards

## Transition Planning

**Is the PPT developing postsecondary/transition goals and services for the student?**

☑ Yes ☐ No

| Transition Assessment | Date |
|---|---|
| PPT conversation | 01/16/2025 |

**Assessment Data Summary**

Parent shared at PPT that she hopes [redacted] will be an independent adult.

**History of transition assessments**

| Transition Assessment | Date |
|---|---|
| PPT conversation | 01/16/2025 |

**Does the student require specially designed instruction to support independent living skills?**

☑ Yes ☐ No

Transition planning and services must address independent living skills

**Is the student in attendance at the meeting?**

No

**Summary of the student's preferences and interests**

[redacted] enjoys sensory-based activities (Play-Doh, coloring, etc.).

**Were any outside agencies invited to attend the PPT meeting?**

Agency representative(s) not appropriate to be invited to attend to assist in transition planning.

**Has any participating agency agreed to provide or pay for services/linkages?**

No

# Postsecondary Outcome Goal Statements

**Postsecondary Education or Training**

Upon high school graduation, [redacted] will attend a school/training program to study an area of interest.

**Employment**

Upon completion of high school, [redacted] will be employed in a field of interest.

**Independent Living Skills**

Upon completion of high school, [redacted] will have the skills necessary to live independently.

# Course of Study

**Has the student completed academic requirements?**

☐ Yes ☑ No

**Course of Study: Description of coursework and/or activities needed to assist the student in achieving postsecondary goals, from the student's current year to the anticipated exit year**

The student is enrolled in general education classes and specials(art, PE, music, library/media) that will allow him to explore his interests.

**Anticipated Exit Criteria: The student will be exited from special education upon:**

Ability to succeed in general education without specially designed instruction

# Transition Present Levels, Goals and Objectives

**Parent and/or Student Input: Transition**

Through conversation at PPT parent shared that she hoped [redacted] will be an independent adult.

**Present Level of Performance: Transition**

[redacted] is beginning to explore areas of interest that can be cultivated into long-term employment and/or independent living.

**Strengths**

[redacted] enjoys sensory-based activities.

**Concerns/Needs:**

Executive functioning skills such as managing a checklist independently, following a schedule and functional reading.

**Impact of student's disability on involvement and progress in the general education curriculum**

[redacted] diagnosis of [redacted] coupled with his intellectual disability impacts his ability to make grade-level progress in the area of post-secondary planning without individualized/small-group instruction.

## TRANSITION GOAL AREA: POSTSECONDARY EDUCATION OR TRAINING

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given a task presented to him using a "first, then" visual, [redacted] will create a checklist of what he needs and his expectation , with teacher support through mastery of the following objectives.
Given a text at the sentence level, [redacted] will improve his comprehension skills , as measured by the following objectives
Given a brochure, [redacted] will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives.

| **Annual Goal 20** | **Evaluation Method** |
|---|---|
| Given direct instruction and a daily schedule, [redacted] will utilize his supports to follow his schedule , with 75% accuracy | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a schedule and faded teacher prompting [redacted] will identify where he needs to be when asked a question about his schedule with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

## TRANSITION GOAL AREA: EMPLOYMENT

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given structured activity, [redacted] will utilize strategies to increase social awareness and problem solving skills , as measured by the following objectives
Given explicit instruction in money identification, money value, rounding up to the nearest dollar and access to a calculator, [redacted] will solve real-life money problems with adult support , through mastery of the following objectives.
Given a brochure, [redacted] will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives.

| **Annual Goal 21** | **Evaluation Method** |
|---|---|
| Given a checklist, [redacted] will indicate completion of a task with faded adult prompting , as evidenced by mastery of the following objective | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a task list and faded adult prompting [redacted] will indicate completion of tasks with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

Individualized Education Program

Student Name: [redacted]T [redacted]G
DOB: [redacted]3

TRANSITION GOAL AREA: INDEPENDENT LIVING SKILLS

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives

| **Annual Goal 22** | **Evaluation Method** |
|---|---|
| Given functional reading materials(such as recipes,ingredient lists, street signs etc), [redacted] will demonstrate comprehension of the reading , as evidenced by mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given functional reading materials [redacted] will answer wh-questions about the content with 75% accuracy by 02/06/2026 | Monthly |
| Given functional reading materials [redacted] will identify what comes next in a task with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

# Transfer of Rights

At least one year prior to reaching the age of 18, students must be informed of their rights under the IDEA that will transfer at age 18.

**Will the student be 17 within one year from today's date?**

☐ Yes ☑ No

Individualized Education Program

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

# Special Education and Related Services

## SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Academic Skills | 15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | 1 x per Week | 320 Minutes | Special Education Teacher | Paraprofessional | 02/07/2025 | 02/06/2026 | 2a | small group/individual |
| Reading | 16<br>17<br>19 | 5 x per Week | 45 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 02/06/2026 | 2a | small group/individual |
| Mathematics | 15<br>16 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 02/06/2026 | 2a | small group/individual |
| Social Skills | 5<br>16 | 4 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 02/06/2026 | 2a | small group |
| Daily Living Skills | 16<br>18 | 3 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 02/06/2026 | 2a | small group/individual |

## RELATED SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Counseling Group | 5<br>16 | 4 x per Week | 30 Minutes | School Social Worker | School Social Worker | 02/07/2025 | 02/06/2026 | 2a | small group/individual |
| Counseling Group | 5<br>16 | 1 x per Week | 30 Minutes | School Psychologist | School Psychologist | 02/07/2025 | 02/06/2026 | 2c | small group |
| Counseling Individual | 5<br>16 | 2 x per Week | 30 Minutes | School Social Worker | School Social Worker | 02/07/2025 | 02/06/2026 | 1a | Individual |
| Counseling Individual | 5 | 1 x per Week | 15 Minutes | School Psychologist | School Psychologist | 02/07/2025 | 02/06/2026 | 2c | Individual |
| Language/ Communication Group | 4<br>14 | 3 x per Week | 30 Minutes | Speech-language Pathologist | Speech-language Pathologist | 02/07/2025 | 02/06/2026 | 2c | small group |

***Instructional Site Codes:**

1a. General Education Setting 50% or more non-disabled peers
1b. General Education Setting less than 50% non-disabled peers
2a. Resource Setting

2b. Separate Setting/Program
2c. Related Service Setting
3a. Community-Based Setting 50% or more non-disabled peers
3b. Community-Based Setting less than 50% non-disabled peers

## Supplementary Aids and Services

Supplementary aids and services will be provided for the duration of the IEP unless otherwise noted.

| ACCOMMODATION | Area(s)/Locations |
|---|---|
| Orally Read Tests/Directions | All Areas |
| Text to Speech (accessibility on the Chromebook) | All Areas |
| Repeat/Review Directions | All Areas |
| Visuals to support directions | All Areas |
| Limited Multiple Choice | All Areas |
| Math Manipulatives | All Areas |
| Access to a multiplication chart | All Areas |
| Preferential Seating | All Areas |
| Extra time text/quizzes/assignments | All Areas |
| Desktop list of tasks | All Areas |
| One paper/section at a time | All Areas |
| Post Routines | All Areas |
| Acknowledge positive work frequently | All Areas |
| Cue Expected Behavior | All Areas |
| Positive Reinforcement | All Areas |
| Set/Post Class Rules | |
| Check Work in Progress | All Areas |
| Have student restate information | All Areas |
| Provide Models | All Areas |
| Shortened Tasks | All Areas |
| Highlight Margins for writing | All Areas |
| Putty for a fidget when needed for behavioral regulation | All Areas, Writing |

| MODIFICATION | Area(s)/Locations |
|---|---|
| Academic Instruction | Social Studies, Reading, Science, Writing, Math |

| ADULT SUPPORT | Area(s)/Locations |
|---|---|
| 1:1 Aide - Behavioral Support | Music, Art, PE, Library , Recess |
| 1:1 Paraeducator - Instructional/Behavioral Support | Reading , Spanish and STEM |

## Indirect Services

**Are supports required for school personnel to implement this IEP?**

☑ Yes ☐ No

**Supports required for school personnel to implement this IEP Include:**

| Service | Goal ID | Frequency | Duration | Responsible Staff | Start Date | End Date |
|---|---|---|---|---|---|---|
| BCBA Consult | 5<br>16 | 1 x per Month | 120 Minutes | BCBA | 02/07/2025 | 02/06/2026 |

## ESY Services

**Are extended school year (ESY) services required for the Student to receive FAPE?**

☐ Yes ☑ No

## Transportation

**Does the Student require special transportation as a related service?**

☐ Yes ☑ No

Regular Transportation

# Removal from the General Education Environment

## SCHOOL YEAR: 2024-25

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 181 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 02/07/2025 | 06/11/2025 | 15.08 | 16.42 | 48.65 |

## SCHOOL YEAR: 2025-26

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 181 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 08/28/2025 | 02/06/2026 | 15.08 | 16.42 | 48.65 |

**Explain the extent to which the student will not participate in general education classes and non-academic activities with non-disabled peers**

5x45 ELA, 5x30 Math, 4x30 Social Skills, 3x30 Speech and Language, 3x30 Daily Living Skills, 1x15 individual counseling, 1x30 group counseling, 5.3 hours per week of academic/behavioral instruction in the resource room.

**Justification for the removal from the general education environment**

Due to [redacted], he requires small group instruction to meet his academic, social-emotional, speech and language and daily living instruction needs.

**Will the student be removed from the general education environment for 60% or more of the time?**

☐ Yes ☑ No

**At the time of this IEP implementation, will the student be placed at a Private Residential Facility?**

☐ Yes ☑ No

# District and State Testing Information

## ENGLISH LANGUAGE PROFICIENCY (ELP) ASSESSMENT

**Has the student been identified as an English Learner?**

☑ No ☐ Yes

## DISTRICTWIDE ASSESSMENTS

The student will participate in Alternate District Assessment(s)

| Assessment | Participation |
| --- | --- |
| Phonics/Decoding Benchmarks | With designated supports/accommodations |

**Designated Supports and Accommodations**

Individually assessed with an adult.

## STATEWIDE ASSESSMENTS

**What grade will the student be in during the next statewide assessment testing window?**

5th Grade

**The student will participate in the CTAA Assessment.**

**Assessment:** CTAA ELA - Grade 5

**Assessment:** CTAA Math - Grade 5

**Assessment:** CTAS - Grade 5

**Alternate assessments must be specified and a statement provided for each as to why the student cannot participate in the standard assessment and why the particular alternate assessment selected is appropriate for the student.**

[redacted]y requires an alternate assessment in order to show understanding of tasks due to his [redacted]n and low IQ.

# Resources

The following documents were provided to the parent(s) at this meeting or sent electronically with parental permission:

Procedural Safeguards in Special Education

Parental Notification of the Laws Relating to Physical Restraint and Seclusion in the Public Schools

A Parent's Guide to Special Education

IEP Manual

Building a Bridge

# Milford School District
## Planning and Placement Team (PPT) Attendance Excusal

**Student Name:** [redacted]

**Date of Birth:** [redacted] **Grade:** 5

[redacted]: [redacted] **School:** J. F. Kennedy School **Date of PPT:** 03/06/2025

**Parent/Guardian:** Karen Michelson, Robert [redacted]

NOTE: THIS AGREEMENT IS OPTIONAL. Waiver of the attendance of a teacher or related service provider at a PPT meeting is optional. The district or parent/guardian may refuse to excuse such attendance.

**We agree to excuse the attendance of** Nadine Macklin
(Teacher or related service provider)

**at the PPT meeting scheduled for** 03/06/2025 **because (check one):**

☑ This staff member's area of the curriculum or related services is not being modified or discussed in this meeting.

OR

☐ Although the meeting involves a modification to or discussion of this staff member's area of the curriculum or related services, the staff member has submitted in writing, to the parent and IEP team, input into the development of the IEP prior to the meeting.

[redacted] 3/18/25

Parent/Guardian Signature Date

Lara Tuscello 3/6/2025

School District Representative Signature Date

This agreement must be signed by a representative of the school district who has full authority to sign such a document on behalf of the school district and who, as described by federal statute, is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, is knowledgeable about the general education curriculum and is knowledgeable about the availability of resources of the public agency.

**Section 614(d)(1)(C) of H.R. 1350, the revised Individuals with Disabilities with Education Act, the "IDEA," provides as follows:**

**ATTENDANCE NOT NECESSARY:** A member of the IEP Team is not required to attend a meeting, in whole or in part, if the parent of a child with a disability and the public agency (school district) agree in writing that the attendance of the member is not necessary because the member's area of the curriculum or related services is not being modified or discussed in the meeting. (Section 614 (d)(1)(C)(i) and (iii))

**EXCUSAL:** A member of the IEP team may be excused from attending a meeting, in whole or in part, when the meeting involves a modification to or discussion of the member's area of the curriculum or related services, if the parent and the

public agency (school district) consent, in writing, to the excusal, and the member submits, in writing to the parent and the IEP Team, input into the development of the IEP prior to the meeting. (Section 614(d)(1)(C)(ii) and (iii))

[redacted] [redacted]

[redacted]

[redacted] [redacted]

**Prior Written Notice**

**Student Name:** [redacted]
[redacted]
**DOB:** [redacted]

**Other factors that are relevant to this action**

☑ There are no other factors that are relevant to the PPT decision

☐ Other

**PLEASE NOTE:**

Parents have a right to disagree with what is being proposed or refused by the district and may access the due process options described in the procedural safeguards of the IDEA. A copy of the procedural safeguards can be obtained by contacting Contact Name at Contact Phone or Contact Email .

This notice must be provided in the native language of the parent or other mode of communication used by the parent unless it is clearly not feasible to do so.

For assistance with understanding the provisions of the IDEA, please contact the district's special education director or the state's Parent Training and Information Center: Connecticut Parent Advocacy Center (CPAC) at 860-739-3089 or 1-800-445-2722; E-mail: cpac@cpacinc.org

**This notice was:** ☐ provided to Parent at the PPT meeting ☐ hand delivered ☐ mailed ☐ e-mailed ☑ sent electronically to the parent portal

# Milford School District
## Notice of Planning and Placement Team Meeting

**Scheduling Date:** 03/31/2025

**Parent/Guardian/Student:** Karen [redacted], Robert [redacted]

[redacted]: [redacted]

**Mailing Address:** [redacted];

[redacted];

Dear Karen [redacted], Robert [redacted]

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] [redacted]
(Student's name) (DOB)

**Date:** 04/10/2025 **Time:** 2 :00 PM **Location:** J. F. Kennedy School

**The purpose of this meeting is to:**

Review or Revise the IEP

The team will develop, review, or revise transition goals and objectives (transition planning)

Agency representative(s) not appropriate to be invited to attend to assist in transition planning

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| Mother | Karen [redacted] |
| Father | Robert [redacted] |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Donna Stuart |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Other: BCBA | Jocelyn Willsey |
| Other: Director of Pupil Personnel Service | Jennifer Stewart |
| Other: Instructional Supervisor Special Education | Sara Collette |
| Special Education Teacher | Kate Falzarano |
| Special Education Teacher | Sarah Stanley (Harborside Representative) |

A parent/guardian has the right to be present at and participate in all portions of the meeting at which an educational program is being developed, reviewed, or revised and shall be given at least five days' prior notice of any planning and placement team meeting. Parent participation in this process is important. Please make every effort to attend this meeting. You may bring other individuals/advisors to the meeting, including those who have knowledge or special expertise regarding your child.

A parent/guardian also has the right to have (1) the paraeducator assigned to their child, if any, (2) the child's birth-to-three service coordinator, if any, and (3) a language interpreter, including a registered interpreter for persons who are deaf, hard of hearing, or deafblind if there is an apparent need or upon request, be present at the meeting. A parent/guardian is asked to provide reasonable notice to the District if they wish to have any of these individuals attend. The parent/guardian also has the right to have each recommendation made in a child's birth-to-three individualized transition plan, if any, addressed by the planning and placement team during a meeting at which an educational program for the child is developed.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher

(Name and Title)

**Procedural Safeguards**

☑ A copy of the Procedural Safeguards in Special Education was provided to you previously this school year. If you would like another copy of the Procedural Safeguards please contact

Jennifer Stewart 203-783-3410

**Parent Notice**

☑ A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

# Milford School District
# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 04/28/2025

**Parent/Guardian/Student:** Karen [redacted], Robert [redacted]

[redacted]: [redacted]

**Mailing Address:** [redacted]

Dear Karen [redacted], Robert [redacted]

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] [redacted]
(Student's name) (DOB)

**Date:** 05/06/2025 **Time:** 1 :30 PM **Location:** J. F. Kennedy School

**The purpose of this meeting is to:**

Review or Revise the IEP

The team will develop, review, or revise transition goals and objectives (transition planning)

Agency representative(s) not appropriate to be invited to attend to assist in transition planning

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| Mother | Karen [redacted] |
| Father | Robert [redacted] |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Donna Stuart |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Other: BCBA | Jocelyn Willsey |
| Other: Instructional Supervisor Special Education Elementary | Nadine Macklin |
| Other: Instructional Supervisor Special Education | Sara Collette |
| Special Education Teacher | Kate Falzarano |
| Special Education Teacher | Sarah Stanley (Daily Living Middle School Program Representative) |

A parent/guardian has the right to be present at and participate in all portions of the meeting at which an educational program is being developed, reviewed, or revised and shall be given at least five days' prior notice of any planning and placement team meeting. Parent participation in this process is important. Please make every effort to attend this meeting. You may bring other individuals/advisors to the meeting, including those who have knowledge or special expertise regarding your child.

A parent/guardian also has the right to have (1) the paraeducator assigned to their child, if any, (2) the child's birth-to-three service coordinator, if any, and (3) a language interpreter, including a registered interpreter for persons who are deaf, hard of hearing, or deafblind if there is an apparent need or upon request, be present at the meeting. A parent/guardian is asked to provide reasonable notice to the District if they wish to have any of these individuals attend. The parent/guardian also has the right to have each recommendation made in a child's birth-to-three individualized transition plan, if any, addressed by the planning and placement team during a meeting at which an educational program for the child is developed.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher

(Name and Title)

**Procedural Safeguards**

- [x] A copy of the Procedural Safeguards in Special Education was provided to you previously this school year. If you would like another copy of the Procedural Safeguards please contact

Jennifer Stewart 203-783-3410

**Parent Notice**

- [x] A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

# Milford School District

# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 05/08/2025

**Parent/Guardian/Student:** Karen [redacted], Robert [redacted]

[redacted]: [redacted]

**Mailing Address:** [redacted]

Dear Karen [redacted], Robert [redacted]

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] [redacted]

(Student's name) (DOB)

**Date:** 05/21/2025 **Time:** 2 :00 PM **Location:** J. F. Kennedy School

**The purpose of this meeting is to:**

Review or Revise the IEP

The team will develop, review, or revise transition goals and objectives (transition planning)

Agency representative(s) not appropriate to be invited to attend to assist in transition planning

**The following individuals have been invited to attend:**

| Title | Name |
|---|---|
| Mother | Karen [redacted] |
| Father | Robert [redacted] |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Donna Stuart |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Other: West Shore Representative | Carrie Minar |
| Other: Instructional Supervisor Special Education Elementary | Nadine Macklin |
| Other: Instructional Supervisor Special Education | Sara Collette |
| Special Education Teacher | Kate Falzarano |
| Special Education Teacher | Sarah Stanley (Daily Living Middle School Program Representative) |
| Special Education Teacher | Maureen Raccio (Resource Teacher at WSMS) |

A parent/guardian has the right to be present at and participate in all portions of the meeting at which an educational program is being developed, reviewed, or revised and shall be given at least five days' prior notice of any planning and placement team meeting. Parent participation in this process is important. Please make every effort to attend this meeting. You may bring other individuals/advisors to the meeting, including those who have knowledge or special expertise regarding your child.

A parent/guardian also has the right to have (1) the paraeducator assigned to their child, if any, (2) the child's birth-to-three service coordinator, if any, and (3) a language interpreter, including a registered interpreter for persons who are deaf, hard of hearing, or deafblind if there is an apparent need or upon request, be present at the meeting. A parent/guardian is asked to provide reasonable notice to the District if they wish to have any of these individuals attend. The parent/guardian also has the right to have each recommendation made in a child's birth-to-three individualized transition plan, if any, addressed by the planning and placement team during a meeting at which an educational program for the child is developed.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher
(Name and Title)

**Procedural Safeguards**

☑ A copy of the Procedural Safeguards in Special Education was provided to you previously this school year. If you would like another copy of the Procedural Safeguards please contact

Jennifer Stewart 203-783-3410

**Parent Notice**

☑ A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted] [redacted]

[redacted]

The PPT recommends the following:

May 21, 2025

Continue the IEP with the following recommendations:

6th Grade Recommendation:

The team recommends the specialized program at Harborside for [redacted] for the 2025-2026 school year

Services:

The following services will remain until the end of the 2024-2025 school year (June 11, 2025)
5 x 45 ELA in the resource room
5x30 Math in the resource room
3x30 Daily Living in the resource room
4x30 Social Skills in the resource/related service room
1x30 Group Counseling in the related service room
1x15 Individual Counseling in the related service room
2x30 push-in group counseling in the general education classroom
3x30 Speech and Language in the related service room
320 min per week- Academic/Behavior Para in the resource room
150 min per week- Academic/Behavior Para in the general education setting
320 min per week- Behavior Para in a general education setting

2025-2026 School Year:
Specialized Program Hours: 825 minutes 3 out of a 4 day cycle for academic skills,
30 minutes 5 days a week for social skills
30 minutes 3 out of a 4 day cycle the social worker will push-in for social skills instruction
Para Professional in all general education classes, transitions, bathroom, and lunch.
1x30 Group Counseling in the related service room
1x15 Individual Counseling in the related service room
30 minutes for 5 out of an 8 day cycle

Remove:
2x30 push-in group counseling in the general education classroom- this was for Recess, which does not happen in Middle School

Accommodations:

All of the following accommodations will be continued:
Orally Read Tests/Directions, Text to Speech (accessibility on the Chromebook), Repeat/Review Directions, Visuals to support directions, Limited Multiple Choice, Math Manipulatives, Access to a multiplication chart, Preferential Seating, Extra time text/quizzes/assignments, Desktop list of tasks, One paper/section at a time, Post Routines, Acknowledge positive work frequently Cue Expected Behavior, Positive Reinforcement, Set/Post Class Rules, Check Work in Progress, Have student restate information, Shortened Tasks, Highlight Margins for writing, Putty for a fidget when needed for behavioral regulation.

State Testing:

CTAA

Transportation:
Transportation from his Milford Address to and from Harborside Middle School

ESY:
[redacted] is eligible for ESY in the specialized program, which runs from 9-12, Monday-Thursday from July 7-July 31st.

IEP Implementation Date: June 11, 2025

The team was in agreement and the meeting was adjourned.

# Special Considerations

**Does the student exhibit behaviors that impede learning for self or others?**

☐ No ☑ Yes

IEP goal(s) and objectives will be developed to address the behavior.

A behavioral intervention plan based on a functional behavior assessment has been developed.

---

**Is the student deaf or hard of hearing?**

☑ No ☐ Yes

---

**Is the student blind or visually impaired?**

☑ No ☐ Yes

---

**Does the student have limited English proficiency (Student qualifies as an EL)?**

☑ No ☐ Yes

---

**Does the student require accessible educational materials (AEM)?**

☑ No ☐ Yes

---

**Does the student require an Augmentative and/or Alternative mode of Communication?**

☑ No ☐ Yes

# Present Levels of Academic Achievement and Annual Goal(s) and Objectives

## ACADEMIC, PRE-ACADEMIC, COGNITIVE ACHIEVEMENT

**Parent and/or Student Input**

May 21, 2025- Ms. [redacted] and Mr. [redacted] did not attend the PPT.

## GOAL AREA: Reading

**Present Level of Performance**

[redacted] was unable to achieve mastery of his reading goals due to the amount of adult prompting. Listening comprehension (when listening to news clips, commercials, and short stories) is an area of weakness due to attention and the ability to verbalize his thoughts when asked a comprehension question. Additionally, it is difficult for [redacted] to write his ideas down after he states them due to his attention. He will frequently forget his idea before he has the time to write it down. He can answer questions relating to pictures and short sentences but it is difficult for him to make connections and state the main purpose of what he is listening to without more explicit comprehension instruction. Therefore, [redacted] is currently learning how to comprehend by utilizing a "visualization" strategy. With this approach, it allows [redacted] to learn new vocabulary words through discussions with an adult. Additionally, it allows [redacted] to learn keywords (i.e.: size, color, where, what, when) which will help him comprehend at the paragraph level in the future. Lastly, [redacted] enjoys Mercy Watson and has just began reading this in the classroom.

**Strengths**

Decoding, fluency, sight word identification, and basic vocabulary. [redacted] can have a conversation relating to a topic and state "what" a book or read-aloud is based on.

**Concerns/Needs**

Comprehending at the sentence level, sequencing sentences, and retelling.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in comprehension due to the diagnosis of [redacted] impacts [redacted] ability to access the general education curriculum.

| **Annual Goal 17** | **Evaluation Method** |
|---|---|
| Given a text at the sentence level, [redacted] will improve his comprehension skills , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a paragraph that is broken down into individual sentences (up to 4 total), [redacted] will be able to read, or listen to each sentence, verbalize his images, and answer one question (i.e.: what do you think the boy did next or based on the information, where do you think the boy is?) with no more than 3 teacher prompts to cue understanding and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph broken down into individual sentences, [redacted] will be able to read, listen to each sentence, verbalize his images, and state a summary using colored tiles. He will be able to do so by successfully stating at least 2 out of the 4 key elements from the story with 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph that is broken down into individual sentences [redacted] will be able to read or listen to each sentence, verbalize his images, and state the main idea of the 4 sentence paragraph (i.e.: what was the paragraph mostly about or what was the main idea of the paragraph?). He will be able to do so with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a paragraph that is broken down into individual sentences, [redacted] will be able to read or listen to each sentence, verbalize his images, and draw a sketch relating to the paragraph that he read. He will be able to do so with no more than 2 teacher prompts or reminders about what the text stated and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| **CT Core Standards Aligned to this Goal** *(Early Learning and Development Standards)* | |
| CCSS.ELA-LITERACY.CCRA.R.5 Craft and Structure: Analyze the structure of texts, including how specific sentences, paragraphs, and larger portions of the text (e.g., a section, chapter, scene, or stanza) relate to each other and the whole. | |
| CCSS.ELA-LITERACY.CCRA.R.1 Key Ideas and Details: Read closely to determine what the text says explicitly and to make logical inferences from it; cite specific textual evidence when writing or speaking to support conclusions drawn from the text. | |
| **Related Services necessary to achieve this goal (if any)** | |

| **Annual Goal 19** | **Evaluation Method** |
|---|---|
| Given a brochure, [redacted]will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a brochure (i.e.: of a state, activity such as hiking or jet skiing), [redacted]will be able to first state verbally "what" the brochure's topic is, with no more than 3 teacher prompts and 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| Given a brochure (i.e.: of a state, activity such as hiking or jet skiing), [redacted]will be able to navigate the brochure with no more than 2 prompts per question (i.e.: show me where I can find the times I can access the water sports facility or what is Florida known for?), in 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| Given a brochure (i.e.: of a state, or activity such as hiking or jet skiing), [redacted]will be able to answer at least 2 questions relating to the brochure (i.e.: what is Florida known for? Or is Florida warm or hot?), with 4 out of 5 opportunities. by 02/06/2026 | Consistent with grade-level report cards |
| **CT Core Standards Aligned to this Goal** *(Early Learning and Development Standards)* | |
| CCSS.ELA-LITERACY.CCRA.R.1 Key Ideas and Details: Read closely to determine what the text says explicitly and to make logical inferences from it; cite specific textual evidence when writing or speaking to support conclusions drawn from the text. | |
| CCSS.ELA-LITERACY.CCRA.R.10 Range of Reading and Level of Text Complexity: Read and comprehend complex literary and informational texts independently and proficiently. | |
| **Related Services necessary to achieve this goal (if any)** | |

## GOAL AREA: Mathematics

**Present Level of Performance**

[redacted]y mastered 2 out of 7 objectives. He shows the ability to add with regrouping, add and subtract without regrouping, can name a penny and dime and can identify the value of a penny consistently.

**Strengths**

Addition and subtraction of multi-digit numbers without regrouping. Addition with regrouping including decimals representing money.

**Concerns/Needs**

Identification of money names and worth, addition and subtraction with and without regrouping of money denominations, rounding up to the nearest dollar, and applying math skills to beginning budget understanding.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in basic math skills due to the diagnosis of [redacted]h impacts [redacted]s ability to access the general education curriculum.

# Milford School District
# Notice of Planning and Placement Team Meeting

**Scheduling Date:** 04/28/2025

**Parent/Guardian/Student:** Karen [redacted], Robert [redacted]

[redacted]: [redacted]

**Mailing Address:** [redacted]

[redacted]

Dear Karen [redacted], Robert [redacted]

Please be advised that a Planning and Placement Team (PPT) meeting will be convened on behalf of:

[redacted] [redacted]
(Student's name) (DOB)

**Date:** 05/06/2025 **Time:** 1 :30 PM **Location:** J. F. Kennedy School

**The purpose of this meeting is to:**

Review or Revise the IEP

The team will develop, review, or revise transition goals and objectives (transition planning)

Agency representative(s) not appropriate to be invited to attend to assist in transition planning

The following individuals have been invited to attend:

| Title | Name |
|---|---|
| Mother | Karen [redacted] |
| Father | Robert [redacted] |
| Administrator | Amy Rizzo |
| Student's General Education Teacher | Donna Stuart |
| Special Education Teacher | Tara Truscello |
| School Psychologist | Jennifer Davis |
| Speech and Language Pathologist | Karen Kristan |
| Social Worker | Lauri Dougherty |
| Other: BCBA | Jocelyn Willsey |
| Other: Instructional Supervisor Special Education Elementary | Nadine Macklin |
| Other: Instructional Supervisor Special Education | Sara Collette |
| Special Education Teacher | Kate Falzarano |
| Special Education Teacher | Sarah Stanley (Daily Living Middle School Program Representative) |

A parent/guardian has the right to be present at and participate in all portions of the meeting at which an educational program is being developed, reviewed, or revised and shall be given at least five days' prior notice of any planning and placement team meeting. Parent participation in this process is important. Please make every effort to attend this meeting. You may bring other individuals/advisors to the meeting, including those who have knowledge or special expertise regarding your child.

A parent/guardian also has the right to have (1) the paraeducator assigned to their child, if any, (2) the child's birth-to-three service coordinator, if any, and (3) a language interpreter, including a registered interpreter for persons who are deaf, hard of hearing, or deafblind if there is an apparent need or upon request, be present at the meeting. A parent/guardian is asked to provide reasonable notice to the District if they wish to have any of these individuals attend. The parent/guardian also has the right to have each recommendation made in a child's birth-to-three individualized transition plan, if any, addressed by the planning and placement team during a meeting at which an educational program for the child is developed.

If you have any questions or wish to reschedule the meeting please contact me at:

203-783-3568 ttruscello@milforded.org

Sincerely,

Tara Truscello, Special Education Teacher

(Name and Title)

**Procedural Safeguards**

☑ A copy of the Procedural Safeguards in Special Education was provided to you previously this school year. If you would like another copy of the Procedural Safeguards please contact

Jennifer Stewart 203-783-3410

**Parent Notice**

☑ A copy of this notice has been sent to the parent(s). (This is required if rights under IDEA have been transferred to the student at age 18. When rights transfer, meeting notices must be sent to the student with a copy to the parents.)

| **Annual Goal 15** | **Evaluation Method** |
|---|---|
| Given explicit instruction in money identification, money value, rounding up to the nearest dollar and access to a calculator, [redacted] will solve real-life money problems with adult support , through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given 10 images of real coins and dollar bills and multiple-choice answers [redacted] will identify the correct name and value of the coin or dollar with adult support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given 5 addition and/or subtraction problems that list of up to 4 quantities of money ($23.54) [redacted] will use a calculator to add and/or subtract the problems with adult support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 10 quantities of money (i.e. $21.32) and a hundred chart or number line and multiple choice answers [redacted] will identify the next dollar amount with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situations (i.e. shopping, restaurant, bills) that require the addition of multiple amounts of money ROBERT will use a calculator to find the sum with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situation (i.e. shopping, restaurant) that requires the addition of multiple amounts of money [redacted] will find the sum using a calculator and decide which amount of money, from a set of multiple choice answers, he would give a cashier to pay for his items with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a set of 5 real-life situations (i.e. shopping, restaurant) that he has solved the total sum for and has identified the quantity of money needed to pay [redacted] will use a calculator to find the difference and see how much change he would get back with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| **CT Core Standards Aligned to this Goal**<br>*(Early Learning and Development Standards)* | |
| CCSS.Math.Content.5.NBT.A.1-4 Understand the place value system. | |
| CCSS.Math.Content.5.NBT.B.5-7 Perform operations with multi-digit whole numbers and with decimals to hundredths. | |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

WISC-V: Full Scale IQ 65, Verbal Comprehension 73, Visual Spatial 72, Fluid Reasoning 67, Working Memory 72, Processing Speed 66. CAS-2: Full Scale 60, Planning 71, Attention 61, Simultaneous 74, Successive 70.

# Present Levels of Functional Performance and Annual Goal(s) and Objectives

## FUNCTIONAL PERFORMANCE

**Parent and/or Student Input**

## GOAL AREA: Communication

**Present Level of Performance**

[redacted]y demonstrates difficulty staying focused on presented language tasks and has required redirection and multiple repetitions, cues and/or prompts to retain details from orally-presented directions and stories. He benefits from multiple choice options when asked to answer thinking questions about problem situations. [redacted]y often needs reminders to listen carefully when others are speaking in order to understand their thoughts, feelings and perspectives. At times [redacted]y can demonstrate stuttering behaviors, especially when initiating speaking.

**Strengths**

[redacted]y likes to share his ideas and demonstrates background knowledge for topics of interest.

**Concerns/Needs**

[redacted]y demonstrates weaknesses in listening comprehension and social-pragmatic skills.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in listening comprehension and social-pragmatic skills due to the diagnosis of [redacted]h impacts [redacted]s ability to access the general education curriculum.

| Annual Goal 4 | Evaluation Method |
|---|---|
| Given structured tasks, [redacted]will increase listening comprehension skills , as measured by the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a visual and no more than two repetitions [redacted]will retell orally-presented directions containing two steps and temporal or conditional concepts with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and no more than two repetitions [redacted]will follow orally-presented directions containing two steps and temporal or conditional concepts with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options [redacted]will respond to comprehension questions about key details/events/characters from a presented story with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given given no more than two repetitions during a structured task [redacted]will paraphrase what a peer or adult has said with 80 % accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |
| Language/Communication Group | |

| **Annual Goal 14** | **Evaluation Method** |
|---|---|
| Given structured activity, [redacted]will utilize strategies to increase social awareness and problem solving skills , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a visual and multiple choice options as needed [redacted]T will state the perspective or point of view of two different individuals in a presented story/situation with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will identify an appropriate solution for a problem faced by an individual in a presented story/situation with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will predict what an individual in a story/situation will do next with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| Given a visual and multiple choice options as needed [redacted]T will explain why an individual in a story or situation says or does something with 80% accuracy in 4/5 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Language/Communication Group | |
| Language/Communication Group | |

## GOAL AREA: Social/Emotional

**Present Level of Performance**

In the small group, [redacted]y has demonstrated growth in identifying feelings in pictures and identifying 'expected' and unexpected' behavior in others. He is motivated to interact with his peers. [redacted]y has difficulty understanding the perspectives of others. He continues to become silly at times when it is not appropriate to do so.

**Strengths**

[redacted]y is able to solve hypothetical social problems with adult prompting.

**Concerns/Needs**

[redacted]y has difficulty understanding the perspective of others and knowing when it is an appropriate time to be silly.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in social interactions and relationships due to the diagnosis of [redacted]n impacts [redacted]s ability to access the general education curriculum.

| **Annual Goal 5** | **Evaluation Method** |
|---|---|
| Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given small group/individual instruction, [redacted] will identify 3 strategies to react to people who are having a strong emotion in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given hypothetical social situations, [redacted] will will identify the feelings being felt by the people in the situation in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given a hypothetical social scenario, [redacted] will [redacted] will practice taking the perspective of each of the people in the scenario in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| Given examples of his own behavior, [redacted] will will identify if the behavior was expected or unexpected in 3/5 trials by 02/06/2026 | Consistent with grade-level report cards. |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Individual | |
| Counseling Group | |
| Counseling Group | |
| Counseling Individual | |

## GOAL AREA: Executive Functioning

**Present Level of Performance**

[redacted] requires full adult support in order to plan, initiate, and complete tasks.

**Strengths**

[redacted] can get and put away materials when prompted by an adult.

**Concerns/Needs**

[redacted] has difficulty with independently completing and planning for multi-step tasks.

**Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities**

Deficits in organization and planning due to the diagnosis of [redacted] impacts [redacted] ability to access the general education curriculum.

| Annual Goal 16 | Evaluation Method |
|---|---|
| Given a task presented to him using a "first, then" visual, [redacted]will create a checklist of what he needs and his expectation , with teacher support through mastery of the following objectives. | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a task presented to him with two steps and a "first, then" visual and a filled-out checklist [redacted]will follow the expectations and complete his task with adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with two steps and a "first, then" visual and provided and a blank check-list [redacted]will fill in the check-list with full adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with three steps and a "first, next, then" visual and a filled-out checklist [redacted]will follow the expectations and complete his task with adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| Given a task presented to him with three steps and a "first, next, then" visual and a blank checklist [redacted]will fill in the checklist with full adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Bi-Weekly |
| **Related Services necessary to achieve this goal (if any)** | |
| Counseling Group | |
| Counseling Group | |
| Counseling Individual | |

## GOAL AREA: Activities of Daily Living

### Present Level of Performance

[redacted]y was able to identify 18/23 safety signs correctly. He has technically mastered this goal. He can explain each sign and its purpose. [redacted]y can fill out a calendar, write when something will occur, and record his daily events. However, it is heavily prompted by an adult at this time.

### Strengths

[redacted]y can complete daily living tasks (i.e.: lunch and bathroom) on his own.

### Concerns/Needs

[redacted]y would benefit from learning how to understand a recipe, determine if he has enough money, and look up the items required to make the recipe. He would also benefit from learning how to read a brochure that outlines a state or activity.

### Impact of student's disability on involvement and progress in the general education curriculum or appropriate preschool activities

Deficits in daily living skills due to the diagnosis of [redacted]h impacts [redacted]s ability to access the general education curriculum.

| **Annual Goal 18** | **Evaluation Method** |
|---|---|
| Given a recipe, [redacted]will will improve his daily living skills by interpreting the recipe , as measured by the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a recipe (i.e.: the box or a printed copy or handout of the recipe), [redacted]will be able to state the ingredients required. He will be able to do so with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given the ingredients required (i.e.: [redacted]has verbally stated what is required for the recipe or the teacher has scribed the ingredients), [redacted]will be able to access a website (i.e.: Stop and Shop or Shop Rite) on the Chrome book to see what items are in stock. He will be able to do so by first typing the item into the search bar with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given Given a website (Stop and Shop or Shop Rite), [redacted]T will be able to determine if an item is in stock that is required for a recipe. He will be able to do so by checking off "yes" or "no" next to the ingredient that an adult previously wrote down with 4 out of 5 opportunities and no more than 3 teacher prompts by 02/06/2026 | Consistent with grade-level report cards |
| Given a recipe that was previously written down, [redacted]will be able to write the dollar amount that the item costs. He will be able to do so with no more than 3 prompts and 4 out of 5 opportunities by 02/06/2026 | Consistent with grade-level report cards |
| Given a recipe that has previously been written down with the cost and 5 hypothetical values, [redacted]will be given 5 dollar amounts to determine whether he has enough to purchase the ingredients required to make the recipe (i.e.: if you were given $20.00 would you have enough to buy what you need?) with the use of a calculator to add and subtract. He will be able to do so with 80% accuracy. by 02/06/2026 | Consistent with grade-level report cards |
| **Related Services necessary to achieve this goal (if any)** | |

**Additional Data/Assessment Information (not included in Present Level(s) of Performance)**

NEPSY-II: Attention & Executive Functioning - all areas below or well below expected level, Social Perception - all areas below or well below expected level. CARS-2: Mild-to-Moderate Symptoms of [redacted]n Spectrum Disorder. Social Responsiveness Scale-2: most areas in the moderate to severe range for school and mother. Vineland-3: Teacher Communication 69, Daily Living Skills 60, Socialization 64, Composite 65; Mother/Father Communication 76/71, Daily Living Skills 68/74, Socialization 82/79, Composite 74/74. BASC-3: several areas At-Risk/Clinically Significant. See report.

## Progress Reporting

**A report of progress toward meeting the Annual Goals and Short Term Objectives included in this IEP will be provided to the parent(s):**

Consistent with general education grade-level report cards

# Transition Planning

**Is the PPT developing postsecondary/transition goals and services for the student?**

☑ Yes ☐ No

| Transition Assessment | Date |
|---|---|
| PPT conversation | 01/16/2025 |

**Assessment Data Summary**

Parent shared at PPT that she hopes [redacted] will be an independent adult.

**History of transition assessments**

| Transition Assessment | Date |
|---|---|
| PPT conversation | 01/16/2025 |

**Does the student require specially designed instruction to support independent living skills?**

☑ Yes ☐ No

Transition planning and services must address independent living skills

**Is the student in attendance at the meeting?**

No

**Summary of the student's preferences and Interests**

[redacted] enjoys sensory-based activities (Play-Doh, coloring, etc.).

**Were any outside agencies invited to attend the PPT meeting?**

Agency representative(s) not appropriate to be invited to attend to assist in transition planning.

**Has any participating agency agreed to provide or pay for services/linkages?**

No

# Postsecondary Outcome Goal Statements

**Postsecondary Education or Training**

Upon high school graduation, [redacted] will attend a school/training program to study an area of interest.

**Employment**

Upon completion of high school, [redacted] will be employed in a field of interest.

**Independent Living Skills**

Upon completion of high school, [redacted] y will have the skills necessary to live independently.

## Course of Study

**Has the student completed academic requirements?**

☐ Yes ☑ No

**Course of Study: Description of coursework and/or activities needed to assist the student in achieving postsecondary goals, from the student's current year to the anticipated exit year**

The student is enrolled in general education classes and specials(art, PE, music, library/media) that will allow him to explore his interests.

**Anticipated Exit Criteria: The student will be exited from special education upon:**

Ability to succeed in general education without specially designed instruction

## Transition Present Levels, Goals and Objectives

**Parent and/or Student Input: Transition**

Through conversation at PPT parent shared that she hoped [redacted] y will be an independent adult.

**Present Level of Performance: Transition**

[redacted] y is beginning to explore areas of interest that can be cultivated into long-term employment and/or independent living.

**Strengths**

[redacted] y enjoys sensory-based activities.

**Concerns/Needs:**

Executive functioning skills such as managing a checklist independently, following a schedule and functional reading.

**Impact of student's disability on involvement and progress in the general education curriculum**

[redacted] s diagnosis of [redacted] h coupled with his intellectual disability impacts his ability to make grade-level progress in the area of post-secondary planning without individualized/small-group instruction.

### TRANSITION GOAL AREA: POSTSECONDARY EDUCATION OR TRAINING

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given a task presented to him using a "first, then" visual, ROBERT will create a checklist of what he needs and his expectation , with teacher support through mastery of the following objectives.
Given a text at the sentence level, ROBERT will improve his comprehension skills , as measured by the following objectives
Given a brochure, ROBERT will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives.

| **Annual Goal 20** | **Evaluation Method** |
|---|---|
| Given direct instruction and a daily schedule, [redacted] will utilize his supports to follow his schedule , with 75% accuracy | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a schedule and faded teacher prompting [redacted] will identify where he needs to be when asked a question about his schedule with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

## TRANSITION GOAL AREA: EMPLOYMENT

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given structured activity, [redacted] will utilize strategies to increase social awareness and problem solving skills , as measured by the following objectives
Given explicit instruction in money identification, money value, rounding up to the nearest dollar and access to a calculator, [redacted] will solve real-life money problems with adult support , through mastery of the following objectives.
Given a brochure, [redacted] will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives.

| **Annual Goal 21** | **Evaluation Method** |
|---|---|
| Given a checklist, [redacted] will indicate completion of a task with faded adult prompting , as evidenced by mastery of the following objective | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given a task list and faded adult prompting [redacted] will indicate completion of tasks with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

## TRANSITION GOAL AREA: INDEPENDENT LIVING SKILLS

**The Postsecondary Education/Training Annual Goal is supported by the following Annual Goal:**
Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives

| Annual Goal 22 | Evaluation Method |
|---|---|
| Given functional reading materials(such as recipes,ingredient lists, street signs etc), [redacted] will demonstrate comprehension of the reading , as evidenced by mastery of the following objectives | Progress toward meeting the annual goal will be measured by achievement on short-term objectives. |
| **Short-term Objectives/Benchmarks** | **Progress Monitoring Schedule** |
| Given functional reading materials [redacted] will answer wh-questions about the content with 75% accuracy by 02/06/2026 | Monthly |
| Given functional reading materials [redacted] will identify what comes next in a task with 75% accuracy by 02/06/2026 | Monthly |
| **Standards Aligned to this Goal** | |
| None | |
| **Related Services necessary to achieve this goal (if any)** | |
| None | |

# Transfer of Rights

At least one year prior to reaching the age of 18, students must be informed of their rights under the IDEA that will transfer at age 18.

**Will the student be 17 within one year from today's date?**

☐ Yes ☑ No

# Special Education and Related Services

## SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Reading | 16<br>17<br>19 | 5 x per Week | 45 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 08/27/2025 | 2a | small group/individual |
| Mathematics | 15<br>16 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 08/27/2025 | 2a | small group/individual |
| Social Skills | 5<br>16 | 4 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 08/27/2025 | 2a | small group |
| Daily Living Skills | 16<br>18 | 3 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher | 02/07/2025 | 08/27/2025 | 2a | small group/individual |
| Academic Skills | 15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | 1 x per Week | 320 Minutes | Special Education Teacher | Paraprofessional | 02/07/2025 | 08/27/2025 | 2a | small group/individual |
| Academic Skills | 5<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | 1 x per 4-Day Cycle | 825 Minutes | Special Education Teacher | Special Education Teacher | 08/28/2025 | 02/06/2026 | 2b | group |
| Social Skills | 5<br>16 | 5 x per Week | 30 Minutes | Special Education Teacher | Special Education Teacher/SEL Staff | 08/28/2025 | 02/06/2026 | 2b | group |

## RELATED SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Language/ Communication Group | 4<br>14 | 5 x per 8-Day Cycle | 30 Minutes | Speech-language Pathologist | Speech-language Pathologist | 08/28/2025 | 02/06/2026 | 2c | small group |
| Language/ Communication Group | 4<br>14 | 3 x per Week | 30 Minutes | Speech-language Pathologist | Speech-language Pathologist | 02/07/2025 | 08/27/2025 | 2c | small group |

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Counseling Group | 5<br>16 | 4 x per Week | 30 Minutes | School Social Worker | School Social Worker | 02/07/2025 | 08/27/2025 | 2a | small group/individual |
| Counseling Individual | 5<br>16 | 2 x per Week | 30 Minutes | School Social Worker | School Social Worker | 02/07/2025 | 08/27/2025 | 1a | Individual |
| Counseling Group | 5<br>16 | 1 x per Week | 30 Minutes | School Psychologist | School Psychologist | 02/07/2025 | 02/06/2026 | 2c | small group |
| Counseling Individual | 5 | 1 x per Week | 15 Minutes | School Psychologist | School Psychologist | 02/07/2025 | 02/06/2026 | 2c | Individual |

***Instructional Site Codes:**

1a. General Education Setting 50% or more non-disabled peers
1b. General Education Setting less than 50% non-disabled peers
2a. Resource Setting
2b. Separate Setting/Program
2c. Related Service Setting
3a. Community-Based Setting 50% or more non-disabled peers
3b. Community-Based Setting less than 50% non-disabled peers

# Supplementary Aids and Services

Supplementary aids and services will be provided for the duration of the IEP unless otherwise noted.

| ACCOMMODATION | Area(s)/Locations |
|---|---|
| Orally Read Tests/Directions | All Areas |
| Text to Speech (accessibility on the Chromebook) | All Areas |
| Repeat/Review Directions | All Areas |
| Visuals to support directions | All Areas |
| Limited Multiple Choice | All Areas |
| Math Manipulatives | All Areas |
| Access to a multiplication chart | All Areas |
| Preferential Seating | All Areas |
| Extra time text/quizzes/assignments | All Areas |
| Desktop list of tasks | All Areas |
| One paper/section at a time | All Areas |
| Post Routines | All Areas |
| Acknowledge positive work frequently | All Areas |
| Cue Expected Behavior | All Areas |
| Positive Reinforcement | All Areas |
| Set/Post Class Rules | All Areas |
| Check Work in Progress | All Areas |
| Have student restate information | All Areas |
| Provide Models | All Areas |
| Shortened Tasks | All Areas |
| Highlight Margins for writing | All Areas |
| Putty for a fidget when needed for behavioral regulation | All Areas, Writing |
| Paraprofessional for general education classrooms, transitions, bathrooms and lunch starting on 6/12/2025 | general education classrooms, transitions, bathrooms and lunch |

| MODIFICATION | Area(s)/Locations |
|---|---|

| MODIFICATION | Area(s)/Locations |
|---|---|
| Academic Instruction | Social Studies, Reading, Science, Writing, Math |

| ADULT SUPPORT | Area(s)/Locations |
|---|---|
| 1:1 Aide - Behavioral Support | Music, Art, PE, Library , Recess |
| 1:1 Paraeducator - Instructional/Behavioral Support | Reading , Spanish and STEM ending on 6/11/25 |

# Indirect Services

**Are supports required for school personnel to implement this IEP?**

☑ Yes ☐ No

**Supports required for school personnel to implement this IEP Include:**

| Service | Goal ID | Frequency | Duration | Responsible Staff | Start Date | End Date |
|---|---|---|---|---|---|---|
| BCBA Consult | 5<br>16 | 1 x per Month | 120 Minutes | BCBA | 02/07/2025 | 02/06/2026 |

# ESY Services

**Are extended school year (ESY) services required for the Student to receive FAPE?**

☑ Yes ☐ No

## ESY SPECIAL EDUCATION SERVICES

| Service | Goal ID | Frequency | Duration | Responsible Staff | Service Implementer | Start Date | End Date | Site | Instructional Service Delivery |
|---|---|---|---|---|---|---|---|---|---|
| Daily Living Skills | 5<br>16<br>18 | 4 x per Week | 180 Minutes | Special Education Teacher | Special Education Teacher | 07/07/2025 | 07/31/2025 | 2b | group |

## Transportation

**Does the Student require special transportation as a related service?**

☑ Yes ☐ No

Special Transportation will be provided with the following:

**Supports**

Pick up/ Drop off at Milford Home Address

## Removal from the General Education Environment

SCHOOL YEAR: 2024-25

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 181 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 02/07/2025 | 06/11/2025 | 15.08 | 16.42 | 48.65 |

SCHOOL YEAR: 2025-26

| Length of School Year | Length of School Day | Total School Hours/Week |
|---|---|---|
| 181 | 6.75 | 33.75 |

| Start Date | End Date | Special Education Hours/Week | Non-Disabled Peer Hours/Week | Percentage of Time with Non-Disabled Peers |
|---|---|---|---|---|
| 08/28/2025 | 02/06/2026 | 19.68 | 11.75 | 34.81 |

**Explain the extent to which the student will not participate in general education classes and non-academic activities with non-disabled peers**

24-25 School Year- 5x45 ELA, 5x30 Math, 4x30 Social Skills, 3x30 Speech and Language, 3x30 Daily Living Skills, 1x15 individual counseling, 1x30 group counseling, 5.3 hours per week of academic/behavioral instruction in the resource room.

25-26 School Year- 1 x 15 individual counseling, 1 x 30 group counseling, 2 x 30 Speech and Language, 825 minutes 1 time out of a 4-day cycle in the self-contained Classroom, 5 times a week for 30 minutes social skills instruction in the

self-contained classroom.

**Justification for the removal from the general education environment**

Due to [redacted] [redacted], he requires small group instruction to meet his academic, social-emotional, speech and language and daily living instruction needs.

**Will the student be removed from the general education environment for 60% or more of the time?**

☑ Yes ☐ No

The LRE Checklist is required.

**At the time of this IEP implementation, will the student be placed at a Private Residential Facility?**

☐ Yes ☑ No

# District and State Testing Information

## ENGLISH LANGUAGE PROFICIENCY (ELP) ASSESSMENT

**Has the student been identified as an English Learner?**

☑ No ☐ Yes

## DISTRICTWIDE ASSESSMENTS

The student will participate in Alternate District Assessment(s)

| Assessment | Participation |
| --- | --- |
| Phonics/Decoding Benchmarks | With designated supports/accommodations |

**Designated Supports and Accommodations**

Individually assessed with an adult.

## STATEWIDE ASSESSMENTS

**What grade will the student be in during the next statewide assessment testing window?**

5th Grade

**The student will participate in the CTAA Assessment.**

**Assessment:** CTAA ELA - Grade 5

**Assessment:** CTAA Math - Grade 5

**Assessment:** CTAS - Grade 5

**Alternate assessments must be specified and a statement provided for each as to why the student cannot participate in the standard assessment and why the particular alternate assessment selected is appropriate for the student.**

[redacted]y requires an alternate assessment in order to show understanding of tasks due to his [redacted]n and low IQ.

## Resources

The following documents were provided to the parent(s) at this meeting or sent electronically with parental permission:

Procedural Safeguards in Special Education

Parental Notification of the Laws Relating to Physical Restraint and Seclusion in the Public Schools

A Parent's Guide to Special Education

IEP Manual

Building a Bridge

# Least Restrictive Environment (LRE) Procedural Checklist

**Student Name:** [redacted] T [redacted] G

**Date of PPT:** 05/21/2025

**School:** J. F. Kennedy School

**Date of Birth:** [redacted] 3

[redacted]: [redacted] 2

Note: This form is to be completed by the PPT only *after* all other IEP components have been fully addressed.

## I. Section A: LRE Screen

1. All of the child's classes are in the general education environment. ☐ Yes ☑ No

2. The child has the opportunity to participate in nonacademic and extracurricular services and activities (including meals, recess periods, and services and activities such as counseling services, athletics, transportation, health services, recreational activities, special interest groups or clubs sponsored by the child's LEA, and employment of students, including both employment by the LEA and assistance in making employment available) to the same extent as peers who do not have disabilities. ☑ Yes ☐ No

3. The child is educated in the school that he or she would attend if nondisabled. ☐ Yes ☑ No

4. *Complete if the child is confined to a detention or correctional facility.* The child must remain within the facility during the school day. ☐ Yes ☐ No ☑ N/A

## II. Section B: LRE Factors and Considerations

1. The PPT based the educational placement of the child upon the child's IEP. ☑ Yes ☐ No

2. The PPT ensured that the child is educated to the maximum extent appropriate with children who are nondisabled. ☑ Yes ☐ No

3. The PPT ensured that the child participates in nonacademic and extracurricular services and activities with nondisabled children to the maximum extent appropriate to the needs of the child. ☑ Yes ☐ No

4. The PPT considered the use of supplementary aids and services (such as resource room, itinerant instruction, assistive technology devices or assistive technology services) in conjunction with general education class placement. ☑ Yes ☐ No

5. The PPT determined that the nature and severity of the child's disability is such that education in general education classes with the use of supplementary aids and services cannot be achieved satisfactorily. ☑ Yes ☐ No

6. The PPT selected the placement within the continuum of alternative placements which is required to implement the child's IEP. ☑ Yes ☐ No

7. The PPT considered any potential harmful effect of the placement on the child. ☑ Yes ☐ No

8. The PPT considered any potential harmful effect of the placement on the quality of the services that the child needs. ☑ Yes ☐ No

| | |
|---|---|
| 9. The PPT considered any potential harmful effect of the placement on the education of other children. | ☑ Yes ☐ No |
| 10. *Complete if the child is not being educated in the school that he or she would attend if nondisabled.* The child's education program is provided as close as possible to the child's home. | ☑ Yes ☐ No ☐ N/A |
| 11. *Complete if the child's education program has been modified as the result of procedures related to discipline.* The child is receiving education services in an alternative educational setting. | ☐ Yes ☐ No ☑ N/A |
| 12. *Complete if the child was determined eligible for special education during an initial evaluation.* The PPT determined that an out of district/private placement is needed to implement the IEP. | ☐ Yes ☐ No ☑ N/A |

**Comments/Additional Information**

None

# Prior Written Notice

**PURPOSE:** As a parent/guardian of a student suspected of needing or receiving special education services, the school district is required to provide you with prior written notice whenever it proposes or refuses to initiate or change the identification, evaluation, educational placement or provision of a free and appropriate public education (FAPE) to your child. This notice should be given to you after a school district makes a decision and 10 school days before action is taken on the decision, unless the school district and you both agree to waive the 10-day notice.

**To:** Karen [redacted], Robert [redacted]

Parent/Guardian/Adult Student

**Date:** 05/21/2025

**Re:** [redacted]

[redacted]

## ACTION(S) PROPOSED/REFUSED

**Milford School District is providing notice of the following:**

1.
- ☑ The District is proposing to
- ☐ The District is refusing the request to

2.
- ☐ initiate
- ☑ change

3.
- ☐ identification/eligibility
- ☐ an evaluation
- ☐ an educational placement
- ☑ the provision of FAPE (IEP)

## DESCRIPTION / REASON

**Description/Reason of the proposed or refused action:**

Review/Revise IEP

**The reason for proposing or refusing to take action is:**

Educational performance and evaluation results support proposed recommendations.

**Description (including the date) of each evaluation procedure, assessment, record, or written report the school district used as a basis for the proposed/refused action:**

Teacher Reports (5/21/25), review of records (5/21/25), Current Levels of Performance (5/21/25).

**Date this action will take effect**

06/11/2025

**Other options the PPT considered and rejected**

- ☐ Instruction in the general education environment with supplementary aids and services
- ☑ No other options were considered and rejected
- ☐ Other

**Reason for rejecting other options**

- ☐ The student would not receive an appropriate program in the least restrictive environment.
- ☐ Other

**Other factors that are relevant to this action**

☑ There are no other factors that are relevant to the PPT decision

☐ Other

**PLEASE NOTE:**

Parents have a right to disagree with what is being proposed or refused by the district and may access the due process options described in the procedural safeguards of the IDEA. A copy of the procedural safeguards can be obtained by contacting Contact Name at Contact Phone or Contact Email .

This notice must be provided in the native language of the parent or other mode of communication used by the parent unless it is clearly not feasible to do so.

For assistance with understanding the provisions of the IDEA, please contact the district's special education director or the state's Parent Training and Information Center: Connecticut Parent Advocacy Center (CPAC) at 860-739-3089 or 1-800-445-2722; E-mail: cpac@cpacinc.org

**This notice was:** ☐ provided to Parent at the PPT meeting ☐ hand delivered ☐ mailed ☐ e-mailed ☑ sent electronically to the parent portal

# Progress Report on IEP Goals and Objectives

**Reporting Period:**June Progress Report, 06/11/2025
**Milford School District**
**IEP Dates:** 06/11/2025 - 02/06/2026

**Student Name:** [redacted] T[redacted] G
**Date of Birth:** [redacted] 3
**Current Grade:** 5

**Parent/Guardian Name:** Karen [redacted] ı, Robert [redacted] g

[redacted] ): [redacted] 2
**Case Manager:** Tara Truscello
**Current Enrolled School:** J. F. Kennedy School (0841911)

## GOAL AREA: Communication

## ANNUAL GOAL 1

Given structured tasks, [redacted] will increase listening comprehension skills , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress on this goal during structured tasks. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a visual and no more than two repetitions [redacted] will retell orally-presented directions containing two steps and temporal or conditional concepts with 80% accuracy in 4/5 opportunities by 02/06/2026 | Mastered (Objective Achieved) | 80 % | 80.0 % | [redacted] y has mastered this objective given a visual and up to two repetitions. |
| Given a visual and no more than two repetitions [redacted] will follow orally-presented directions containing two steps and temporal or conditional concepts with 80% accuracy in 4/5 opportunities by 02/06/2026 | Satisfactory Progress | 70 % | 80.0 % | [redacted] y is making satisfactory progress on this objective given a visual and up to two repetitions. |
| Given a visual and multiple choice options [redacted] will respond to comprehension questions about key details/events/characters from a presented story with 80% accuracy in 4/5 opportunities by 02/06/2026 | Satisfactory Progress | 60 % | 80.0 % | [redacted] y is making satisfactory progress on this objective given a visual and multiple choice options. |
| Given given no more than two repetitions during a structured task [redacted] will paraphrase what a peer or adult has said with 80 % accuracy in 4/5 opportunities by 02/06/2026 | Satisfactory Progress | 70 % | 80.0 % | [redacted] y is making satisfactory progress on this objective given a visual and up to two repetitions. |



Date Printed: 06/11/2025

**Progress Report**

**Student Name:** [redacted]
**DOB:** [redacted]

## GOAL AREA: Social/Emotional

### ANNUAL GOAL 2

Given small group/individual instruction, [redacted] will improve his perspective taking and social skills , with 100% mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted]'s can behavior interfere with his progress on his objectives. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given small group/individual instruction, [redacted] will identify 3 strategies to react to people who are having a strong emotion in 3/5 trials by 02/06/2026 | Limited/Minimal Progress | 1 % | 3.0 % | [redacted]s behavior can interfere with identifying strategies. |
| Given hypothetical social situations, [redacted] will will identify the feelings being felt by the people in the situation in 3/5 trials by 02/06/2026 | Limited/Minimal Progress | 1 % | 3.0 % | [redacted]/s silly behavior continues to interfere with his being successful with identifying feelings of the characters in the hypothetical scenarios. |
| Given a hypothetical social scenario, [redacted] will [redacted] will practice taking the perspective of each of the people in the scenario in 3/5 trials by 02/06/2026 | Limited/Minimal Progress | 1 % | 3.0 % | [redacted] continues to require adult support and has difficulty taking the perspective of others independently. |
| Given examples of his own behavior, [redacted] will will identify if the behavior was expected or unexpected in 3/5 trials by 02/06/2026 | Limited/Minimal Progress | 1 % | 3.0 % | [redacted] can identify expected and unexpected behaviors in others but has difficulty identifying the unexpected in himself. |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Communication

## ANNUAL GOAL 3

Given structured activity, [redacted] will utilize strategies to increase social awareness and problem solving skills , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress on this goal given a visual and multiple choice options. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a visual and multiple choice options as needed [redacted] will state the perspective or point of view of two different individuals in a presented story/situation with 80% accuracy in 4/5 opportunities by 02/06/2026 | Satisfactory Progress | 60 % | 80.0 % | [redacted] y is making satisfactory progress on this objective given a visual and multiple choice options. |
| Given a visual and multiple choice options as needed [redacted] will identify an appropriate solution for a problem faced by an individual in a presented story/situation with 80% accuracy in 4/5 opportunities by 02/06/2026 | Satisfactory Progress | 70 % | 80.0 % | [redacted] y is making satisfactory progress on this objective given a visual and multiple choice options. |
| Given a visual and multiple choice options as needed [redacted] will predict what an individual in a story/situation will do next with 80% accuracy in 4/5 opportunities by 02/06/2026 | Satisfactory Progress | 70 % | 80.0 % | [redacted] y is making satisfactory progress on this objective given a visual and multiple choice options. |
| Given a visual and multiple choice options as needed [redacted] will explain why an individual in a story or situation says or does something with 80% accuracy in 4/5 opportunities by 02/06/2026 | Satisfactory Progress | 60 % | 80.0 % | [redacted] y is making satisfactory progress on this objective given a visual and multiple choice options. |

## GOAL AREA: Mathematics

## ANNUAL GOAL 4

Given explicit instruction in money identification, money value, rounding up to the nearest dollar and access to a calculator, [redacted] will solve real-life money problems with adult support , through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given 10 images of real coins and dollar bills and multiple-choice answers [redacted] T will identify the correct name and value of the coin or dollar with adult support with 80% accuracy across 10 opportunities by 02/06/2026 | Not Introduced | N/A | N/A | |
| Given 5 addition and/or subtraction problems that list of up to 4 quantities of money ($23.54) [redacted] will use a calculator to add and/or subtract the problems with adult support with 80% accuracy across 10 opportunities by 02/06/2026 | Satisfactory Progress | 6 Opportunities | 10.0 Opportunities | [redacted] y is making satisfactory progress using a calculator to add quantities of money independently. |
| Given a set of 10 quantities of money (i.e. $21.32) and a hundred chart or number line and multiple choice answers [redacted] will identify the next dollar amount with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Not Introduced | N/A | N/A | |

**Progress Report**

**Student Name:**[redacted]T[redacted]G
**DOB:**[redacted]3

| | | | | |
|---|---|---|---|---|
| Given a set of 5 real-life situations (i.e. shopping, restaurant, bills) that require the addition of multiple amounts of money[redacted] will use a calculator to find the sum with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Satisfactory Progress | 7 opportunities | 10.0 opportunities | [redacted]y is making satisfactory progress deciding which amount of money to use with adult support. |
| Given a set of 5 real-life situation (i.e. shopping, restaurant) that requires the addition of multiple amounts of money[redacted] will find the sum using a calculator and decide which amount of money, from a set of multiple choice answers, he would give a cashier to pay for his items with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Satisfactory Progress | 4 opportunities | 10.0 opportunities | [redacted]y is making satisfactory progress with multiple choice answers and adult support. |
| Given a set of 5 real-life situations (i.e. shopping, restaurant) that he has solved the total sum for and has identified the quantity of money needed to pay[redacted] will use a calculator to find the difference and see how much change he would get back with teacher support with 80% accuracy across 10 opportunities by 02/06/2026 | Limited/Minimal Progress | 0 opportunities | 10.0 opportunities | [redacted]y is making limited progress with this objective. He struggles with understanding making change with adult support. |

## GOAL AREA: Executive Functioning

## ANNUAL GOAL 5

Given a task presented to him using a "first, then" visual, [redacted] will create a checklist of what he needs and his expectation , with teacher support through mastery of the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Limited/Minimal Progress | N/A | N/A | [redacted] y has made limited progress with this goal. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a task presented to him with two steps and a "first, then" visual and a filled-out checklist [redacted] will follow the expectations and complete his task with adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Limited/Minimal Progress | 2 opportunities | 10.0 opportunities | [redacted] y is making limited progress with this objective due to his refusal to utilize this tool independently. |
| Given a task presented to him with two steps and a "first, then" visual and provided and a blank check-list [redacted] will fill in the check-list with full adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Satisfactory Progress | 3 opportunities | 10.0 opportunities | With full teacher support, [redacted] y can create a checklist of work. |
| Given a task presented to him with three steps and a "first, next, then" visual and a filled-out checklist [redacted] will follow the expectations and complete his task with adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Not Introduced | N/A | N/A | |
| Given a task presented to him with three steps and a "first, next, then" visual and a blank checklist [redacted] will fill in the checklist with full adult support with 90% accuracy across 10 opportunities by 02/06/2026 | Not Introduced | N/A | N/A | |

Progress Report

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Reading

### ANNUAL GOAL 6

Given a text at the sentence level, [redacted] will improve his comprehension skills , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a paragraph that is broken down into individual sentences (up to 4 total), [redacted] will be able to read, or listen to each sentence, verbalize his images, and answer one question (i.e.: what do you think the boy did next or based on the information, where do you think the boy is?) with no more than 3 teacher prompts to cue understanding and 4 out of 5 opportunities by 02/06/2026 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with adult prompts and hearing a text one sentence at a time. |
| Given a paragraph broken down into individual sentences, [redacted] will be able to read, listen to each sentence, verbalize his images, and state a summary using colored tiles. He will be able to do so by successfully stating at least 2 out of the 4 key elements from the story with 4 out of 5 opportunities by 02/06/2026 | Not Introduced | N/A | N/A | |

| | | | | |
|---|---|---|---|---|
| Given a paragraph that is broken down into individual sentences [redacted] will be able to read or listen to each sentence, verbalize his images, and state the main idea of the 4 sentence paragraph (i.e.: what was the paragraph mostly about or what was the main idea of the paragraph?). He will be able to do so with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Limited/Minimal Progress | 0 opportunities | 5.0 opportunities | [redacted]y requires full adult support in order to identify the main idea of a paragraph and/or sentence |
| Given a paragraph that is broken down into individual sentences, [redacted] will be able to read or listen to each sentence, verbalize his images, and draw a sketch relating to the paragraph that he read. He will be able to do so with no more than 2 teacher prompts or reminders about what the text stated and 4 out of 5 opportunities by 02/06/2026 | Not Introduced | N/A | N/A | |

## GOAL AREA: Activities of Daily Living

## ANNUAL GOAL 7

Given a recipe, [redacted] will will improve his daily living skills by interpreting the recipe , as measured by the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted]y is making satisfactory progress understanding ingredients in a recipe but needs adult support when creating lists for the recipe. |

**Progress Report**

**Student Name:** [redacted] T [redacted] G
**DOB:** [redacted] 3

| **Short-term Objective(s)** | **Current Status** | **Current Score** | **Target Score** | **Progress Data/ Notes** |
|---|---|---|---|---|
| Given a recipe (i.e.: the box or a printed copy or handout of the recipe), [redacted] will be able to state the ingredients required. He will be able to do so with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Satisfactory Progress | 2 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with limited prompts. |
| Given the ingredients required (i.e.: [redacted] has verbally stated what is required for the recipe or the teacher has scribed the ingredients), [redacted] will be able to access a website (i.e.: Stop and Shop or Shop Rite) on the Chrome book to see what items are in stock. He will be able to do so by first typing the item into the search bar with no more than 3 teacher prompts and 4 out of 5 opportunities by 02/06/2026 | Not Introduced | N/A | N/A | |
| Given Given a website (Stop and Shop or Shop Rite), [redacted] will be able to determine if an item is in stock that is required for a recipe. He will be able to do so by checking off "yes" or "no" next to the ingredient that an adult previously wrote down with 4 out of 5 opportunities and no more than 3 teacher prompts by 02/06/2026 | Not Introduced | N/A | N/A | |
| Given a recipe that was previously written down, [redacted] will be able to write the dollar amount that the item costs. He will be able to do so with no more than 3 prompts and 4 out of 5 opportunities by 02/06/2026 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress, but at times requires more than 3 prompts. |
| Given a recipe that has previously been written down with the cost and 5 hypothetical values, [redacted] T will be given 5 dollar amounts to determine whether he has enough to purchase the ingredients required to make the recipe (i.e.: if you were given $20.00 would you have enough to buy what you need?) with the use of a calculator to add and subtract. He will be able to do so with 80% accuracy. by 02/06/2026 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress with full adult support, |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

## GOAL AREA: Reading

## ANNUAL GOAL 8

Given a brochure, [redacted] will improve his daily living skills by reading and interpreting the brochure , as measured by the following objectives.

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Satisfactory Progress | N/A | N/A | [redacted] y is making satisfactory progress. |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a brochure (i.e.: of a state, activity such as hiking or jet skiing), [redacted] will be able to first state verbally "what" the brochure's topic is, with no more than 3 teacher prompts and 4 out of 5 opportunities. by 02/06/2026 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y is making satisfactory progress. |
| Given a brochure (i.e.: of a state, activity such as hiking or jet skiing), [redacted] will be able to navigate the brochure with no more than 2 prompts per question (i.e.: show me where I can find the times I can access the water sports facility or what is Florida known for?), in 4 out of 5 opportunities. by 02/06/2026 | Satisfactory Progress | 1 opportunities | 5.0 opportunities | [redacted] y can identify the areas of the brochure independently. |
| Given a brochure (i.e.: of a state, or activity such as hiking or jet skiing), [redacted] will be able to answer at least 2 questions relating to the brochure (i.e.: what is Florida known for? Or is Florida warm or hot?), with 4 out of 5 opportunities. by 02/06/2026 | Not Introduced | N/A | N/A | |

## GOAL AREA: Postsecondary Education or Training

### ANNUAL GOAL 9

Given direct instruction and a daily schedule, [redacted] will utilize his supports to follow his schedule , with 75% accuracy

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Introduced | N/A | N/A | |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a schedule and faded teacher prompting [redacted] will identify where he needs to be when asked a question about his schedule with 75% accuracy by 02/06/2026 | Not Introduced | N/A | N/A | |

## GOAL AREA: Employment

### ANNUAL GOAL 10

Given a checklist, [redacted] will indicate completion of a task with faded adult prompting , as evidenced by mastery of the following objective

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Introduced | N/A | N/A | |

Student Name: [redacted] T [redacted] G
DOB: [redacted] 3

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given a task list and faded adult prompting [redacted] will indicate completion of tasks with 75% accuracy by 02/06/2026 | Not Introduced | N/A | N/A | |

## GOAL AREA: Independent Living Skills

### ANNUAL GOAL 11

Given functional reading materials(such as recipes,ingredient lists, street signs etc), [redacted] will demonstrate comprehension of the reading , as evidenced by mastery of the following objectives

| Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|
| Not Introduced | N/A | N/A | |

| Short-term Objective(s) | Current Status | Current Score | Target Score | Progress Data/ Notes |
|---|---|---|---|---|
| Given functional reading materials [redacted] will answer wh-questions about the content with 75% accuracy by 02/06/2026 | Not Introduced | N/A | N/A | |
| Given functional reading materials [redacted] will identify what comes next in a task with 75% accuracy by 02/06/2026 | Not Introduced | N/A | N/A | |

**SARA F. COLLETTE**
saracollette@milforded.org

---

## CERTIFICATION

- Provisional Educator Certificate for Intermediate Administration or Supervision (092)
- Professional Comprehensive Special Education K-12 Endorsement (165)
- Professional Elementary Education (013)

## EDUCATION

- Educational Leadership Sixth Year Degree, Quinnipiac University, Hamden, CT - May 2017
- Master of Science in Special Education, University of St. Joseph, West Hartford, CT - May 2014
- Bachelor of Science in Elementary Education and Special Education, University of Hartford, West Hartford, CT - May 2008

## PROFESSIONAL EXPERIENCE

Special Education Supervisor, Milford Public Schools - July 2024 - present

- Supervised and evaluated special education and related services staff in three middle schools
- Coordinate and facilitate professional learning opportunities
- Collaborated with district administrators, staff, families, and community partners to ensure appropriate educational programming for students with IEPs

Special Education Supervisor, East Haven Public Schools - August 2022 - June 2024

- Developed district processes and systems that strategically and effectively allocate resources (i.e. referrals to in-district specialized programs, transition planning, distribution of pertinent information, etc.)
- Spearhead rollout of CT-SEDS to all Pupil Services staff and remain a resource for staff to troubleshoot clerical challenges
- Serve as case manager for students attending out-of-district special education programs
- Collaboratively wrote curriculum for specialized, self-contained programs
- Ensured timely and accurate state reporting, as well as compliance relative to IEP paperwork
- District test coordinator for special populations

Teacher on Special Assignment (Acting Elementary Special Education Supervisor), East Haven Public Schools - November 2015 - August 2022

- Birth-3 Coordinator; Developed the district's play-based assessment model to determine eligibility for Pre-K special education services
- Talented and Gifted Education Coordinator
- Mentored special education and related services staff
- Supervised state data collection (KEI, ECO, etc.) and ensured timely state reporting

- Analyzed academic data in an effort to provide meaningful professional learning opportunities and ensure curriculum materials met the needs of unique learners

Special Education Teacher, East Haven Public Schools - August 2008 - November 2015

- Designed and implemented IEPs
- Facilitated / chaired PPT meetings
- Collaborated with general education teachers to ensure appropriate accommodations and modifications were provided to students
- Directly supervised and evaluated paraeducators
- Collected and analyzed data to monitor student progress

COMMITTEES / COMMUNITY PARTNERSHIPS / AFFILIATIONS / OTHER

- ConnCASE member, August 2016 - present
- District Assessment Committee, July 2024 - present
- District Attendance Review Committee (DARC) Facilitator, July 2024 - present
- School Readiness Council Co-Chair, September 2016 - June 2024
- Early Intervention Coordinator, September 2016 - June 2024
- UCONN's Pre-K-Grade 3 Leadership Program Program - June 2018
- Kappa Delta Pi, International Honors Society in Education
- Wilson Reading Program - Introductory Training
- Volunteer for Unified Athletics

Lauri Dougherty

ldougherty@milforded.org

**School Social Worker- 2000- Present**

**Extended School Year Social Worker for the High School [redacted] Program- 2023- Present**

**Direct Services to Students:**

- **Counseling:** Providing individual and group counseling to help students with issues like conflict resolution, anger management, stress, and developing social skills.
- **Crisis Intervention:** Responding to and providing support during emergencies and crises, such as mental health crises, family problems, or other traumatic events.
- **Assessment:** Conducting assessments to identify a student's specific needs, which may involve evaluating their mental health, social history, and other factors impacting their performance.
- **Advocacy:** Advocating for students' rights and best interests, particularly for those with special needs or those facing challenges like homelessness, bullying, or abuse.

**Services to Families:**

- **Family Support:** Working with parents and families to address problems in the home that may affect a child's school adjustment and learning.
- **Resource Coordination:** Connecting families with essential community resources, such as healthcare, housing, food assistance, or mental health agencies.
- **Education:** Assisting parents in understanding school policies, special education services (like IEPs and Section 504 plans), and their rights.

**Collaboration with School Staff:**

- **Consultation:** Providing essential information and consultation to teachers, administrators, and other school personnel to help them better understand the factors (cultural, economic, social, etc.) affecting a student's behavior and performance.
- **Intervention Strategies:** Collaborating with staff to develop and implement behavioral and academic intervention strategies.
- **Staff Development:** Conducting training and workshops for school staff on topics such as mental health, child abuse and neglect, and behavior management.
- **Team Participation:** Serving on multidisciplinary teams to address student needs, including special education meetings, attendance improvement plans, and school safety committees.

**Community Liaison:**

- **Outreach:** Obtaining and coordinating community resources to meet the needs of students and their families.
- **Collaboration:** Working with social services, mental health agencies, and other community partners to ensure comprehensive support for students.
- **Program Development:** Helping to develop and implement new programs and policies that address student needs, such as those related to truancy, drop-out prevention, or special education.

**<u>School Social Worker, New Haven Public Schools</u> 1998-2000**

- Developed, implemented treatment plans for IEP's, school Social Work
- Assessments.
- .
- Conducted clinical interviews with students and family members.
- Created a parent support group
- Educated staff on student's special needs and DCF Protocol.
- Researched standardized assessment tools.
- Consulted with school staff, families and community agencies to help meet children's special needs.
- Participated in the Crisis Intervention Team

**<u>School Social Worker, Boys Village</u> 1996- 1997**

- Provided individual family and specialized group therapy services.
- Assisted in completing evaluations for school planning and placement team
- Created and maintained individualized service plans
- Handled daily crisis intervention
- Collaborated with a variety of community providers.
- Developed and implemented therapeutic curriculum for specialty groups

**<u>Clinician- In-Home Services Program, Boys Village 1995- 1996</u>**

- Provided in-home psychotherapeutic services to families
- Wrote psychosocial assessments.
- Supervised three member team as a Case Manager,
- Coordinated and collaborated with a variety of community providers
- Program Counselor, Marrakech 1992- 1995
- Implement behavioral programs
- Handled crisis and family intervention
- Served as a Case Manager

**MILITARY EXPERIENCE**

U.S. Army National Guard 1984-2002
Enlisted Medic, Specialist 1984-1988
Communications Officer, 2nd and 1st Luitenant 1988-2002

**EDUCATION**

Sixth Year Professional Diploma in Educational Leadership and Connecticut certification as an Intermediate Administrator (092 endorsement), Southern Connecticut State University, New Haven, CT , August 2009.

SIFI Certification to be a field Instructor for Master Level Social Work Students from SCSU, New Haven, CT and Fordham University, New York.

Post Master's Degree Certificate in Advanced Practice with Children and Adolescents, Springfield College School of Social Work, Springfield, Mass December 2002

Masters of Social Work, Fordham University, May 1994

Bachelor of Social Work, Southern Connecticut State University, December 1991

# Nadine Macklin

## EDUCATION

**Sacred Heart University**
Intermediate Administrator Certification program | Completed Spring 2010
Educational Leadership

**University of Connecticut**
Master of Arts | Obtained May 2002
Special Education

**University of Connecticut**
Bachelor of Science | Obtained May 2001
English and Education

## CERTIFICATIONS

CT Intermediate Administration and Supervision 092
CT Comprehensive Special Education 165, K-12

## PROFESSIONAL EXPERIENCE

**MILFORD PUBLIC SCHOOLS**
Instructional Supervisor of Pupil Personnel Services (July 1, 2024 – Present)

- Supervise and evaluate special education and related staff
- Provide support to the 8 elementary schools in the district including specialized programs and prekindergarten.
- Lead Pupil Personnel Services department meetings
- Case Manage and facilitate PPTs for students attending Approved Private Special Education Programs
- Support students and families transitioning from the public school to an Approved Private Special Education Program
- Support staff with CT-SEDS implementation
- Liaison for Food2Kids non profit organization

**GROTON PUBLIC SCHOOLS**
Supervisor of Pupil Personnel Services (August 2016 – June 30, 2024)

- Supervise and evaluate special education and related staff
- Supervised the 9 preschool/prekindergarten classrooms in district
- Maintained and collaborated with early childhood staff to maintain NAEYC accreditation
- Served as the Superintendent's liaison and Co-Chair of the Education Work Group for our local School Readiness Council
- Lead Pupil Personnel Services department meetings
- Facilitate PPTs for students attending Approved Private Special Education Programs, Birth to Three initial and determination PPTs, preschool PPTs, and out of district magnet students on my caseload.
- Support students and families transitions from the public school to an Approved Private Special Education Program/Out Placement
- Support staff with CT-SEDS implementation

# Nadine Macklin

**STAMFORD PUBLIC SCHOOLS**
Extended School Year Head Teacher (2014, 2015, and 2016 Summer Sessions)

- Create class assignments based on enrollment
- Coordinate the appropriate transportation requirements for all students attending.
- Hire staff; certified and support staff members
- Oversee Kronos attendance system; ensure substitute coverage is secured when the need arises

IEP Compliance Teacher
Elementary Schools: Roxbury, Toquam, Springdale, and Stark and Cloonan Middle School
(August 2013 – June 2016)

- Schedule, generate and mail invitation to all PPTs at my designated schools
- Ensure all reports have been completed and drafts sent to families for initial/reevaluation PPTs
- Facilitate PPTs for each building
- Support staff with IEPdirect
- Ensure all necessary components of the IEP are completed prior to finalization
- Work in conjunction with building administrators, District Special Education Administrators, and attorneys when appropriate.
- Communicate with families and support them during the PPT process.

Newfield Elementary School
Individual Learning Needs Coach (August 2010 – June 2013)

- Collect, analyze, and present student progress data to teachers
- Conduct classroom observations and provide feedback to teachers and inform the development of a student's intervention plan.
- Develop student intervention plans
- Monitor student progress and made data informed decisions at the end of each intervention period.
- Provide data and necessary information for School Improvement Plan
- Served on School Data Team

Special Education Teacher/Inclusion Facilitator (August 2002 – June 2010)

- Collaborate with general education teacher in the development of curricular modifications for students with moderate to severe disabilities
- Work with para educators on the implementation of curricular modifications, accommodations, and strategy.
- Conduct evaluations, develop, and implement IEPs
- Maintain student records and write reports on student academic progress for students on my caseload.
- Meet with parents/guardians to discuss their child's progress
- Consult with regular education teacher and related service providers

# Nadine Macklin

## DEVELOPMENT AND TRAININGS

2024 Physical and Psychological Management Training (PMT)
2023-2024 Master Class Science of Reading -Literacy Leadership team member
CT SEDS IEP Quality Training (2022)
UCONN Prek-3 Leadership Program (2019-2021 extended due to COVID-19 interruption)
CSDE/SERC PPT Leadership Institute (2019-2020)
CES Administrator Aspirant Program (2011-2012)
Leadership Associates Program Conference Orlando, Florida (2009)



# AMY E. RIZZO

EDUCATIONAL LEADER

## PROFILE

- A dedicated and passionate educational leader currently serving as Principal of John F. Kennedy Elementary School in Milford, CT
- Committed to fostering a positive learning community, supporting teacher growth and development, and enhancing student achievement and social emotional learning.

## EDUCATION

**May 2022 | University of Connecticut, UCAPP**

- 6th Year Degree in Educational Administration
  GPA 4.08

**August 2009| ARC Program**
**Library Media Specialist**

- PK-12 LMS Certification

**May 2003| Fairfield University**

- Master of Arts in Curriculum and Instruction
  GPA 3.85

**May 2001| James Madison University**

- Bachelor of Arts in English & Secondary Education
  GPA 3.75, Magna Cum Laude

## EXPERIENCE

**Principal & Lead Learner, John F. Kennedy Elementary School | 2023 - present Milford Public Schools**

- Leads school-wide instructional vision to foster a culture of continuous learning among staff and students
- Leads school improvement plan to ensure progress for all learners
- Oversees implementation of curriculum, staff development, and student experience
- Mentor and coach teachers to implement best instructional practices and promote an engaging school culture
- Collaborate with families and the school community to strengthen partnerships and enhance student outcomes
- Actively model reflective leadership and professional growth, fostering an environment where every learner thrives

**Teacher Leader for Professional Learning | 2021 - present**
**Milford Public Schools**

Leads the continuous development of responsive professional learning planning between school and district level administrators in support of High Quality Instruction

Coordinated, Facilitated, or Led Districtwide Initiatives including:

- Milford New Teacher Academy
- TEAM Program
- HQI Live!
- PK-12 Mastery Based Diploma Experience
- Professional Development & Evaluation Committee (PDEC)
- School based labsites
- Training staff and administrators for labsite facilitation
- MPS Full Day Professional Learning (Election Day/March)

Supported or Participated in:

- Acceleration Network Improvement Community (NIC)
- "Lifting HQI" Across Elementary Schools
- Instructional Coaching PL with Lyn Nevens
- Literacy PL with Barb Golub & Gary Peterson
- Building Thinking Classrooms with Peter Liljedahl
- Restorative Practices Training
- Intentional Play with E.A. Aschenbrenner
- SBA/NGSS Testing
- Student Assistance Team Planning (SAT)
- Frontline Talent Management for Teacher Evaluation

## SKILLS & DISPOSITIONS

Instructional Leadership

Interpersonal Relationship Building

Passion for Teaching & Learning

Reflective and Responsive Practices

Learner-Centered Approach

Enthusiastic Collaborator

Growth Mindset

## CONTACTS

**Teacher Leader for Instructional Technology | 2019 - 2021**
**Milford Public Schools**

Provided district instructional technology professional learning in support of HQI/VOL/DRF for adult learners across PK-12 and all disciplines
Additional Accomplishments:

- Technology support for remote learning through Covid-19
- Developed bi-weekly "Technology Tips" for staff
- Provided Distance Learning Update to BOE Nov. 2020
- PDEC Team Revisions of PL/TEPE Plan 2020
- Training and Support for SBA/NGSS
- TEAM Reviewer
- TEAM Mentor training

**Library Media Specialist| 2016 - 2019**
**Mathewson Elementary School**
**Milford Public Schools**

Performed all functions of the Library Media Specialist Role K-5 instruction and library management.
Additional accomplishments:

- Curriculum writing team
- Professional Learning & Technology Support for Staff
- Created and Maintained Learning Commons Website
- Member of the PDEC Committee

**Library Media Specialist | 2013 - 2016**
**Stratfield Elementary School**
**Fairfield Public Schools**

Performed all functions of the Library Media Specialist Role including K-5 skills-based, content-area aligned instruction, technology support, library management. and school-wide reading initiatives. Additional accomplishments:

- School Leadership Team
- Instructional Rounds Facilitator
- Collaborator to support technology integration into classroom instruction
- Instructional Coaching & Leadership Training
- CES Administrative Aspirant Program
- Facilitated Monthly Grade Level Meetings

**Classroom Teacher, English Language Arts | 2002- 2013**
**Tomlinson Middle School**
**Fairfield Public Schools**

Performed all functions of classroom teacher including instruction, assessment, & parent engagement.
Additional accomplishments:

- Grade Level Team Leader
- TC Workshop Model Trained
- Response to Intervention (RTI) Team
- Standards-based Curriculum Development
- District Assessment Development Team
- Gifted Enrichment Program Teacher
- Created District-Wide Digital Literacy Portfolios & Student Led Literacy Conferences

# Donna Stuart

---

## EDUCATION:

**The Graduate Institute,** Bethany, CT; August 2011-August 2013 **Master of Arts, Thinking and Learning**
**Southern CT State University,** New Haven, CT; August 1981-June 1985 **Bachelor of Science, Early Childhood Education**

## EXPERIENCE:

**Milford Board of Education,** Milford, CT **Classroom Teacher,** August 2006 – Present
**Milford Board of Education,** Milford, CT **Substitute Teacher,** September 2003-August 2006

- Develop and implement engaging lesson plans that meet state and district curriculum standards
- Utilize a variety of instructional methods and teaching strategies to accommodate diverse learning styles
- Deliver lessons in a comprehensive manner using visual, audio, and other interactive tools
- Provide individualized instruction and support to students who need extra help
- Integrate technology into lessons to enhance learning experiences
- Plan and execute educational activities, including in-class projects and outdoor events
- Establish and enforce clear rules and procedures to maintain a safe and orderly classroom environment
- Manage student behavior effectively by promoting a respectful and positive atmosphere
- Organize and manage the physical layout of the classroom to support learning
- Create, administer, and grade assignments, tests, and projects to evaluate student progress
- Maintain accurate and timely records of student attendance, grades, and incidents
- Track and document student academic progress and report it to parents and administrators
- Conduct parent-teacher conferences to discuss student development and progress
- Engage in effective and professional communication with students, parents, and school staff
- Collaborate with other teachers and specialists to improve instructional practices and support student achievement

**The Stuart Household,** Milford, CT **Stay At Home Mom,** November 1997-August 2006

**Parlux Fragrances Inc.,** Orange, CT **Sales Administration Coordinator,** May 1996-February 1997

- Administrative support to the Sales Administration Director and the Sales Department
- General administration for all reports, general sales coordination, and sales force commission reconciliation and implementation

**Beiersdorf Inc.,** Norwalk, CT **Sales and Marketing Assistant,** September 1993-May 1996

- Primary administrative support to the Vice President of Sales, Vice President of Marketing, and Manager Sales Administration & Corporate Travel
- General administration for all reports, spreadsheet creation and update, sales force bonus preparation, and broker commission reconciliation and implementation
- National Sales Meeting preparation/coordination

**Block & Nardizzi,** Stamford, CT **Office Manager/Administrative Personal Assistant,** Jan. 1991-Sept. 1993

- Administrative Assistant to Chief Executive Officer and President
- Managed fast-paced office of forty-five employees
- Directly responsible for reception area/receptionist
- Worked directly with vendors
- Personnel Administrator, Personal Shopper/Party Planner/Meeting Coordinator (client and all company functions)
- Coordinated annual indoor golf charity event

**Fitness Systems,** Bridgeport, CT **Administrative Assistant,** January 1990-January 1991

- Sole administrative support to fitness management staff
- Responsibilities included purchasing, production, reception, scheduling and data/word processing

**The Stratford Club,** Stratford, CT **Administrative Director, Senior Manager, Nursery Director, Aerobics Director, Membership Director, Front Desk Manager, and Activities/Program Director,** March 1981-October 1989

- Personnel Supervisor - handled all facets of personnel (interviews, reviews, training, etc.)
- Responsibilities included preparing administrative, financial and inventory reports, scheduling payroll, purchasing, contract auditing, data/word processing, accounting and public relations
- Wrote weekly bulletin for each department in addition to staff monthlies

## AWARDS & ACCOMPLISHMENTS

Milford Public Schools District Teacher of the Year - 2017
John F. Kennedy Teacher of the Year - 2017
Connecticut Kid Governor Teacher/Mentor - 2017
Meadowside Teacher of the Year - 2014

# Tara Truscello

ttruscello@milforded.org

Special Education Teacher

## EXPERIENCE

### Special Education Teacher

*Milford Public Schools Resource Teacher, August 2018-Present*

- Case manager for students with a wide variety of disabilities such as dyslexia, learning disabilities, ADHD, [redacted], intellectual disabilities and physical disabilities.
- Creating IEPs for individualized instruction based on students needs.
- Collaborate with classroom teachers to create academic and behavior plans.
- Monitor and collaborate with paraprofessionals to meet the needs of students.
- Perform standardized assessments to qualify students for special education services.
- Work collaboratively with the school based PPS team to create appropriate learning environments for students.

*Milford Public Schools HQI Lead Teacher, July 2024*

- Participated as a lead teacher for the summer HQI district professional development.
- Co-taught a upcoming 5/6th grade math class with IEPed and typical students.
- Participated in discourse around teacher moves and decision making.
- Provided small group instruction for students who required additional support.

*Milford Public Schools Extended School Day Coordinator, 2019-2022*

- Reviewed data and collaborated to make selections for students to participate in the program.
- Lead teachers in creation and implementation of plans to support the extended school day classes.
- Communicated with parents about participation and progress during the program.
- Collected and organized student data for the program.

## EDUCATION

University of New England
- Certificate of Advanced Studies
  - Aug. 2019- May. 2021

University of New England
- Master of Education- Inclusion Education
  - Jan. 2014- Aug. 2015

Southern Connecticut State University
- Bachelor of Science- Special and Elementar Education Collaborative
  - Sept. 2003- June 2008

## CERTIFICATIONS

Connecticut Provisional Educator
- April 24, 2025 - April 25, 2035
  - Endorsement #s 013 and 165

Connecticut Provisional Educator
- April 26, 2017 - April 25, 2025
  - Endorsement #s 013 and 165

Orton Gillingham Classroom Educator
- June 2017 - Present

## RECOGNITIONS

John F. Kennedy Teacher of the Year
- 2025 School Year

*Greenwich Public Schools, December 2014 - June 2018*

- Case manager for students with a wide variety of disabilities.
- Creating IEPs for individualized instruction based on students' needs.
- Collaborate with classroom teachers to create academic and behavior plans.
- Perform standardized assessments.
- Work collaboratively with the school-based PPS team.

## Summer School Special Education Teacher

*Milford Public Schools June 2019- August 2024*

- Provided tutoring to address student IEP goals and objectives.
- Collect data to track student maintenance of goals and objectives fro the summer.

*Greenwich Public Schools December 2014- February 2016*

- Creating lessons for students to maintain mastered goals from the school year.
- Creating flexible scheduling.
- Transitioning new students into the summer school location.

## Paraprofessional

*Greenwich Public Schools August 2010- December 2014*

- Teaching a 1:1 student to use an augmentative device.
- Assisting students in building daily living skills.
- Promoting socialization for a nonverbal student.

## ADDITIONAL EXPERIENCE

Connecticut Behavioral Health

*Wallingford, CT*

- September 2014 – April 2017
  - 1:1 experience with a multiply disabled 11-year-old
  - Socialization within his community
  - Focusing on elopement, tantrums, and stereotypy

**LETTERS OF RECOMMENDATION UPON REQUEST**

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**PREHEARING CONFERENCE MEMO**

VIA E-MAIL

Date: August 18, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Robert [redacted]
[redacted]
Shelton, CT 06484
[redacted]verizon.net

Ms Karen [redacted]
[redacted]
Milford, CT 06461
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

A prehearing conference in the above-referenced matter was held on **July 29, 2025**.

It was determined that the hearing was requested **June 12, 2025** and that the Complaint was subsequently amended on **July 29, 2025** and the new decision date is **October 10, 2025.**

Issues were determined to be:

1. Did the District commit procedural violations amounting to a denial of FAPE for the 2023-24 school year?

2. Did the District fail to implement the IEP of the Student for the 2023-24 school year?

3. Did the District fail to provide the Student with an appropriate program for the 2024-25 school year?

4. Did the District commit procedural violations amounting to a denial of FAPE for the 2024-25 school year?

5. Did the District fail to implement the IEP of the Student for the 2024-25 school year?

6. If the District has committed any violations, should an outplacement at Woodhouse Academy or Hope Academy be ordered?

Hearing dates were set for **September 24, 2025; October 17, 2025; October 21, 2025; October 23, 2025; October 27, 2025 and November 4. 2025**. It was later determined that the hearings would be virtual.

.

**Student Name**: [redacted]
**Date of Birth**: [redacted]
**School**: John F. Kennedy Elementary School
**Address of School**: 404 West Avenue, Milford, CT 06461
**Point of Contact for School District**: Jennifer Stewart, Director of Pupil Personnel Services

**Parent(s):**

**Parent 1 Name**: Robert [redacted]
**Address**: [redacted]
**Phone Number**: [redacted]

**Parent 2 Name**: Karen [redacted]
**Address**: [redacted]
**Phone Number**: [redacted]

# Due Process Complaint: In Re: [redacted] ("[redacted]

I am formally requesting a due process hearing based on Milford Public Schools' ongoing and significant failure to provide my son, [redacted] ("[redacted] with the Free Appropriate Public Education (FAPE) to which he is entitled under the Individuals with Disabilities Education Act (IDEA). This request arises from a sustained and well-documented pattern of procedural and substantive violations — including the denial of critical services, failure to address his individualized emotional and behavioral needs, exclusion from meaningful IEP planning, and retaliation against protected parental advocacy.

Despite repeated efforts to resolve these issues collaboratively, the district has engaged in a troubling pattern of misconduct, including inappropriate disciplinary actions, emotional mistreatment by staff, and a systemic lack of transparency. These failures have had a serious and lasting negative impact on [redacted] well-being, educational progress, and psychological safety.

Given the district's demonstrated inability to provide [redacted] with FAPE in accordance with federal law, we are now seeking immediate, legally enforceable remedies — including an out-of-district placement fully funded by the Milford Public Schools and a formal determination that the district has violated its obligations under IDEA.

# Statement of Facts

[redacted] educational experience within the Milford School District has been characterized by a troubling decline in appropriate support, culminating in what appears to be a clear and documented pattern of adverse actions following parental attempts to secure proper services and accountability. The factual chronology is critical to understanding the district's failures:

## I. Initial Misrepresentation, Unmet Needs, and Reactive Interventions (January - September 2023)

1. **January 26, 2023:** Ms. Adinolfi and Ms. Giannattasio, representatives of the Milford School District, explicitly stated that the [redacted] program at Mathewson school would "not be appropriate" and was "not recommended" for [redacted] They further asserted that [redacted] "currently has and will continue to have access to everything he needs." This assertion is directly contradicted by the district's later attempts to place [redacted] in this very program, suggesting either a misdiagnosis of needs or a later strategic shift in response to parental advocacy.
2. **March 4, 2023:** A communication from [redacted] teacher revealed significant issues: [redacted] had missed half of his learning sessions over the last month. More critically, the teacher documented [redacted] stating that he was her "worst student" and that "she (the teacher) hates him." This alarming statement by [redacted] directly indicates a profoundly damaging teacher-student relationship and an environment detrimental to his emotional well-being and learning.
3. **April 18, 2023:** Ms. Adinolfi, [redacted] special education teacher, sent a communication confirming a deeply distressing incident. She reported that [redacted] said she no longer liked him, cried the entire time, asked if being kept from lunch was his "punishment," and cried for a significant 30 minutes. This self-reported incident by Ms. Adinolfi demonstrates her inability to manage [redacted] emotional distress or provide appropriate intervention for a student with a disability.
4. **April 27, 2023:** At a PPT meeting, [redacted] parents raised their "growing concern" that [redacted] needs were not being met, advocating for a different approach given the failure of previous behavioral intervention plans and increased time with the school psychologist. Parents specifically complained about his special education teacher, Ms. Adinolfi, and how she handled things with [redacted] specifically citing the 30-minute crying incident with no intervention.
5. **May 1, 2023:** Parents sent a communication indicating they would be working on a detailed communication regarding their recent concerns from the PPT meeting.
6. **May 1, 2023:** In immediate response to the parents' expressed concerns at the PPT, the district reacted by implementing a "ticket system." This was a reactive measure, initiated after parental complaints, rather than a proactive, individualized solution based on comprehensive assessment.
7. **May 2, 2023:** Parents sent a detailed communication regarding the PPT meeting and the issues they had with his special education teacher, Charlotte Adinolfi, outlining how their son was being handled. The team reacted instead of being proactive, implementing a ticket system.
8. **May 5, 2023:** Interim Principal Brenda Anziano replied, stating: "We agree that our communication needs to improve in order to keep you more informed about [redacted] progress." She confirmed they reacted and implemented a token system. She also promised to establish a weekly communication plan to communicate his successes and challenges.
9. **May 5, 2023:** In the same communication, Ms. Anziano stated, "Mrs. Aspinwell has been out for two days. I have checked on [redacted] both days and he is doing great! Earning a lot

of tickets and completing his work." This statement implies positive progress was being made shortly after the parents' complaints, potentially to mitigate concern.

10. **May 20, 2023:** Parents sent a communication expressing dissatisfaction that the promised weekly communication from the school psychologist, Ms. Davis, had not materialized.
11. **May 20, 2023:** Parents reported inappropriate conduct [redacted] experienced from his special education teacher, Ms. Adinolfi. Based on what [redacted] told them, he relayed that Ms. Adinolfi said to him: "Do not go home and tell your daddy that I was eating peanut butter and apple in class ever again!" Parents reported that they no longer felt safe with [redacted] being around her any longer.
12. **May 24, 2023:** Brenda Anziano responded to the report regarding Ms. Adinolfi's conduct by deflecting responsibility and shifting blame onto [redacted] characterizing his legitimate responses as misbehavior. This effectively excused the teacher's inappropriate actions and minimized [redacted] concerns.
13. **May 29, 2023:** Parents formally replied, stating, "[redacted] mom and I feel it would not be in his best interests to continue with Ms. Adinolfi as his Special Education teacher, And as previously shared, we do not feel comfortable with Ms. Adinolfi around our son and cannot be held responsible if we do not trust what we are being told."
14. **July 19 - August 2, 2023:** During communications with Special Education Supervisor Andrea Giannattasio regarding a change in [redacted] special education teacher for Fall 2023, parents outlined further details about Ms. Adinolfi making [redacted] cry in class and why it happened: "Regarding the crying incident. [redacted] then opened up and informed us that he was working on his math, which he does struggle with and needs help in. He went to Ms. Adinolfi to ask for help on a hard math problem that he was struggling with. He informed us that she was busy looking on her cell phone. When he asked for help, instead of helping [redacted] he informed us that Ms. Adinolfi grabbed his math work out of his hand and gave him a book and kept repeatedly insisting for him to read repeating the same phrase, "just keep reading" And this is why [redacted] was crying. He informed us that he was very upset because he just needed help with his math."
15. **May 8 - June 8, 2023:** The communication logs received during this period, outlining progress and behaviors, were "extremely successful and very helpful" to the parents.
16. **September 1, 2023:** A communication from the new special education teacher revealed the complete removal of the previously very successful ticket system with no alternative plan in place. Parents currently assert that the ticket system was removed in retaliation for their previous complaints about the prior special education teacher. In addition, despite previously admitting their communications needed to improve regarding [redacted] progress, they also dismantled and pulled the communication logs, ending the promised weekly updates. Parents currently assert this appears to be a retaliatory move for reporting and complaining about his teachers.
17. **September 29, 2023:** A communication from BCBA Courtney Carrano stated: "I wanted to update you on my observations as well as the data taken on [redacted] He has made a nice transition back to school. During my observations, [redacted] did not exhibit any behaviors that his peers did not also exhibit nor did they occur more frequently than his peers. The data taken day to day by the school staff also support this. I will continue to monitor [redacted] behavior and collaborate with the school team in order to maintain low rates of behavior." Parents currently assert this statement turned out to be false as [redacted] behaviors, according to the team, later escalated substantially, and there was no

collaboration with the school team to maintain low rates of behaviors as promised. Parents currently assert they left [redacted] vulnerable and started accusing him of things he did not even do in retaliation for parents reporting and complaining about his teachers. This approach also demonstrated a deeply concerning and reactive mindset — one that chose to observe [redacted] without support to see what problems might arise, rather than taking proactive steps to ensure his success. This left [redacted] needlessly vulnerable and further illustrates the district's ongoing pattern of responding only after problems escalate, rather than maintaining effective supports or preventing foreseeable setbacks.

## II. Punitive Isolation, Shaming, and Escalating Emotional Harm (November 2023 - April 2025)

18. **Behavioral and Punitive Measures (2023–2024):** One incident involved [redacted] repeating inappropriate content shown to him by another classmate on a school Chromebook during class. Instead of addressing the supervision failure, the district punished [redacted] by isolating him and requiring him to use the nurse's bathroom for the remainder of the year. Parents raised concerns about the lack of monitoring and website blocking, especially given [redacted] [redacted] and [redacted] The district responded only after the fact — promising to block websites and monitor students more closely — a reactive measure that failed to address the harm already caused. Despite [redacted] expressing that he wanted to be like the other children and use the regular bathroom, the district outright denied this request rather than consider how to support him appropriately. This action was an overly restrictive and inappropriate disciplinary measure.
19. **March 2024:** At a parent-teacher conference, behaviors such as fidgeting with items on walls and accidentally ripping one page in a book were reported. Parents offered to replace the book, but received no response. Instead of keeping the successful ticket system in place, parents assert the school chose to leave him vulnerable.
20. **March 2024:** The teacher stated, "We would also express that when we use the term 'behavior' it is not a negative situation, but actions that we address to help shape and reinforce appropriate behaviors. As a reference, behavior, as defined by the BIP, is 'Behavior(s) which are presenting as problematic to the student's learning and which the planning and placement team has identified to reduce or extinguish.'" They also claimed that when there are "big behaviors," they contact both parents, which parents state is not true.
21. **March 2024:** Parents currently assert that the behaviors reported are manifestations of [redacted] disability.
22. **April 15, 2024:** Parents stated, "we do realize this and understand [redacted] is different than the rest of the General ed classmates. It's just the way it is. This doesn't make him a bad person. We understand this may be frustrating at times for his teachers." They also requested weekly updates.
23. **May 13, 2024:** After not hearing back for a month, parents reached out regarding updates and stated, "As per our request below, we would appreciate if you could please send us a written update on [redacted] progress. Including his math, academic, and overall progress. We requested this every few weeks and a big help to us to hear from the team as a way to

help support [redacted] In addition, [redacted] had said that he would like to start using the regular boys restroom again like all the other children. He feels left out."

24. **May 10, 2024:** The school responded with a favorable update regarding his behaviors and progress.
25. **May 15, 2024:** Parents reached out as [redacted] reported that he asked to use the regular bathroom and Ms. Truscello said to him the reason he cannot use the regular bathroom is because he "can't be trusted." Parents documented this.
26. **May 17, 2024:** Ms. Dougherty reported that [redacted] made a self-harm comment. The school failed to give parents a copy of the C-SSRS at that time. This lack of response was concerning.
27. **May 17, 2024:** When parents questioned his progress, they received a response: “Nothing is at a standstill and I provided you with the current goals and objectives he is working on. He is making progress with these goals at this time. I would not say he is at a 'standstill', as you called it, but these goals we created are for a year's worth of learning, are specific to his learning needs and at this time he is making progress towards mastering them.”
28. **May 22, 2024:** [redacted] reported that Ms. Truscello continued to tell him he "can’t be trusted" and "to not go home and tell his dad." Parents documented this.
29. **May 27, 2024:** [redacted] reported that he asked his classroom teacher, Ms. Curria, if he could use the regular bathroom, and she told him he "can never use it again" and threatened to send him to the principal’s office if he did. Parents documented this.
30. **June 3, 2024:** Parents reported that Ms. Curria told [redacted] "Ms. Curria is mean." When asked what happened, [redacted] said Ms. Curria came up to him and said, "[redacted] do you 2nd grade math!" when he was in fourth grade. Parents assert this comment caused him low self-esteem and was damaging to him, marking the beginning of a documented pattern of what we believe to be emotional maltreatment and neglect of [redacted] social-emotional needs. Parents currently assert this was retaliation for previously reporting what Ms. Curria said to him.

## III. Pressured Placement Change and Continued Obstruction (May - August 2024)

31. **May 30, 2024:** On Thursday, May 30, 2024, parents received a communication from Amy Rizzo, school principal, insisting on holding a meeting regarding [redacted] programming and placement on Monday, June 3rd. Parents note that [redacted] programming and placement had already been thoroughly discussed at the February 2024 PPT meeting. This communication also failed to provide the legally required 5 school days' notice.
32. **May 30, 2024:** Parents currently believe this meeting to change his programming, based on **baseless allegations about work becoming increasingly difficult,** was fueled solely by retaliation for reporting inappropriate behavior conducted by several of his teachers. They questioned how everything was appropriate in February, but not a week before school ended.
33. **June 3, 4, & 5, 2024:** Ms. Rizzo and her team consistently pressured parents for a PPT meeting regarding [redacted] beginning on May 30th and continuing relentlessly on June 3rd, June 4th, and June 5th.

34. **June 2024:** Parents never received any responses back from the incidents they reported in May through June.
35. **June 2024:** After back and forth, parents were informed the school wanted to discuss placing [redacted] in the Mathewson program ([redacted] program) they previously stated was "not recommended nor appropriate." This abrupt shift, made without any data-driven justification, suggests that the district was reacting to a crisis rather than thoughtfully planning for [redacted] long-term educational needs.
36. **June 10, 2024:** When parents had questions regarding their motives about the meeting, the school responded, "We have been sharing the increase in behaviors we have seen with [redacted] through the emails since the parent-teacher conferences in March. We have repeatedly asked for meetings with you to discuss these behaviors. You have repeatedly declined meeting with us." Parents state this was not true; they consistently asked for these communications to back up her claims, but she refused and never provided them.
37. **June 10, 2024:** conflicting statements from district staff raised serious concerns about the accuracy of the district's assessment of [redacted] needs and the adequacy of their educational response. On that date, Ms. Rizzo stated in a communication that "as previously stated, our communication about an increase in behaviors since the February PPT due to work becoming increasingly difficult resulted in the team considering options to better support [redacted] This statement is inaccurate. The parents had repeatedly requested documentation of these prior communications, which Ms. Rizzo failed or refused to provide.
38. **June 10, 2024:** Moreover, the district's assertion that [redacted] academic work had become "increasingly difficult" directly contradicts a May 16, 2024 email from his special education teacher, Ms. Truscello, who assured the parents that "nothing is at a standstill." She confirmed that [redacted] is actively working toward his current IEP goals, is making progress, and that the goals in place are appropriately designed for a full year of instruction and tailored to his individual needs. If [redacted] is indeed making meaningful progress toward appropriately designed goals, the suggestion that his academic demands have become unmanageable — to the point of considering a change in placement — calls into question the accuracy of the district's evaluation and the appropriateness of its recommendations. Conversely, if the district genuinely believes [redacted] is struggling due to increased academic and behavioral demands, its refusal to recommend academic instruction as part of his Extended School Year (ESY) services is both inconsistent and negligent. These conflicting narratives — one indicating stability and progress, the other implying decline and unmet needs — reveal a significant lack of coherence in the district's assessment and planning. Taken together, these contradictions underscore the district's failure to adequately address [redacted] evolving educational and behavioral needs, constituting a denial of his right to a Free Appropriate Public Education (FAPE) under the Individuals with Disabilities Education Act (IDEA).
39. **July 13, 2024:** Parents received a response stating, "I think we can agree that we all want him to have a successful 5th grade year."
40. **July 13, 2024:** Parents asked for answers to all their questions and concerns. The school failed to and continually refused to provide them. Parents also asked, "What makes you think throwing [redacted] out of JFK and tossing him into the [redacted] Program at Mathewson in a self-contained classroom (That is what this PPT meeting is about, isn't it?) where you're going to have a lot more behaviors, a lot more nonverbal students and a lot more

students who are much more below his level than he is, is going to be appropriate for him and provide him with a successful 5th grade year? What gives you that idea? Please address these questions via email."

41. **August 2, 2024:** The school responded in a separate communication that it was all a "misunderstanding and miscommunication," when parents assert it clearly wasn't.
42. **August 9, 2024:** Parents responded, outlining questions and concerns to address, including contradictory statements about meeting dates: On June 5th, the school wrote: "we will hold this meeting in the fall"; on June 10th, they wrote: "Our staff will not be available to meet this summer for a PPT," and "we will be reconvening a PPT in the fall"; then on July 10th, they wrote: "We hope to schedule a PPT in September"; then on August 2nd, "out of the clear blue sky," they insisted on holding this PPT meeting in August during parents' summer vacation with [redacted] This demonstrated contradictory and inconsistent scheduling.
43. **August 9, 2024:** Ms. Stewart refused and never responded to the parents' outline of contradictory scheduling.

## IV. Obstruction of Records, Escalating Emotional Harm, and Hostile Interactions (August 2024 - March 2025)

44. **August 16 - September 10, 2024:** Parents received a communication from Jennifer Stewart "backpedaling" about holding a meeting. There was back and forth, and parents repeatedly requested to have all of their questions and concerns answered. The school refused.
45. **September 5, 2024:** Parents made a formal FERPA request for [redacted] records.
46. **September 10, 2024:** Parents wrote: "I received a VM from the school nurse Jacqueline this morning that she dropped my Son's records off at the Milford Department of Health. Then I received a call from the Milford Department of Health, that the records are there for pick up. Why would she do that and send them there? Makes absolutely no sense. I made a FERPA request in the past. The school nurse never dropped off my sons records at the department of health. Please have the school nurse pick up my son's file from the Department of Health and bring them back so they could be with all the other documents when you have them ready."
47. **September 11, 2024:** Jennifer Stewart emailed, "I will have the medical records sent to the PPS office. Do you prefer to pick up the records at the PPS office or JFK?"
48. **September 11, 2024:** Parents assert that [redacted] mother was not required to sign a release for records, while the father was made to do so at the Department of Health, despite Jennifer Stewart previously stating she would have the records sent to the PPS office. Communication between the father and Ms. Stewart reflects ongoing concerns about inconsistencies in record handling. In an email exchange, the father requested alternative delivery options for the records sent directly to his residence, but Ms. Stewart reiterated that the records would be available for pickup at PPS or JFK. The father also highlighted that [redacted] mother was never contacted by the school nurse regarding a hand-delivery of her FERPA-requested records to the Department of Health, raising concerns about differential treatment. Then, on **September 15, 2024**, Stewart **contradicted her earlier statement**, claiming that the **PPS office did not have the medical records** and that the **health office had sent the father a release form to sign**

**before he could obtain them**. However, when the father contacted the health office directly, he **confirmed that no such form had ever been sent**. This contradiction, combined with the unnecessary requirement imposed on the father while [redacted] mother was able to receive records without signing a release, further **supports the parents' assertion that Ms. Stewart's actions were obstructive and retaliatory**.

49. **September 16, 2024:** Parents emailed Ms. Stewart and the team about Ms. Truscello yelling at [redacted] as he reported to them. Parents kindly requested that she be kind to him and treat him with respect.
50. **September 18, 2024:** Parents sent another communication to the school outlining what [redacted] told them: how Ms. Truscello was blaming him for things he did not do and he reported to them that she was "mean and a witch," and threatened to send him to Mathewson permanently! Parents asked that she cease and desist from making any more comments to [redacted] and requested to have Ms. Quinn work with him so he could be away from Ms. Truscello. This statement deeply frightened him.
51. **September 25, 2024:** Parents received a communication from Ms. Koosa claiming [redacted] was now pushing students in the back with a scooter and misbehaving, claiming he was not completing work and mimicked staff and made faces, etc. Parents currently believe the staff were triggering his behaviors in retaliation for parents reporting the staff's behavior towards him and complaining about staff. Parents state these behaviors were completely out of character for [redacted] Parents spoke with [redacted] who said he accidentally bumped into a classmate in gym, felt overwhelmed, asked for a break, and was denied.
52. **On September 30, 2024** On September 30, 2024, parents received a voicemail indicating [redacted] had made another self-harm comment, directly after reporting ongoing mistreatment from his teachers. Despite this serious concern and the parents' efforts to outline [redacted] emotional challenges, the school failed to provide a copy of the Columbia-Suicide Severity Rating Scale (C-SSRS) or any meaningful follow-up. This communication also included a cease and desist order related to what parents believed constituted emotional abuse. [redacted] disclosed that he was forced to call home against his will on four occasions, leaving voicemails for both parents and being instructed to say things he had not done. In one of these calls, a teacher can be heard in the background telling [redacted] to say, "No, that you put your hands on another child." Because [redacted] has [redacted] he repeated the statement rather than expressing his own experience. These calls had no legitimate educational or therapeutic purpose and appeared to be used as punishment for minor behavioral incidents. The district neither obtained parental consent nor included this practice in any structured behavior plan, raising serious legal and ethical concerns. Parents assert that this treatment was not in line with any positive behavioral intervention strategy, as required under IDEA, but instead constituted emotional abuse in retaliation for their reports, with staff targeting [redacted]
53. **October 24, 2024:** Parents received a communication from Amy Rizzo riddled with what parents describe as "baseless allegations against [redacted] in response to their reported incidents. Instead of addressing the concerns raised, the district responded by portraying [redacted] in a negative light, further exacerbating his struggles.
54. **October 30, 2024:** Parents replied, pointing out Ms. Rizzo's inconsistencies and falsehoods.

55. **September 30 - October 28, 2024:** Parents describe ongoing conversations about medical records with Jennifer Stewart, in which she was, in their view, being dishonest and refused to answer questions honestly.
56. **October 16, 2024:** Jennifer Stewart insisted on holding a PPT meeting, but this followed a claim that the previous attempt to transfer [redacted] out of his current program was a "misunderstanding and miscommunication," which parents dispute. Parents assert that the school **fabricated** an excuse to hold the meeting. They requested that the team address their questions and concerns before setting a date, but the school refused to provide transparency or respond to their inquiries beforehand..
57. **October 23, 2024:** Parents responded, emphasizing discrepancies in how medical records were handled for [redacted] mother versus his father. Despite Jennifer Stewart initially stating that the father's records would be transferred to the PPS office or mailed to him, she later **falsely claimed** that he **needed to sign a release and pick them up from the Department of Health**—a requirement that was **never actually necessary**. [redacted] mother was able to receive her records **without this demand**. Additionally, on **September 23rd, Ms. Stewart falsely claimed** that [redacted] mother had **not yet made a request for medical records**, even though she had **submitted an identical FERPA request on September 6th**. This contradiction was further highlighted when, on **October 21st, [redacted] mother directly refuted Ms. Stewart's claim**, stating she had **already made the request but had not received her records, and asked that they be mailed to her immediately**. Parents argued that these shifting requirements and false statements were **intentionally obstructive and retaliatory**, unnecessarily creating difficulties for the father while allowing [redacted] mother to bypass the same demands. Additionally, they rejected accusations that they had refused anything, reiterating their **long-standing requests for transparency, answers to their concerns, and cooperation**—requests that had gone ignored since August. Given **Ms. Stewart's inconsistent explanations, misleading claims, and refusal to engage in good faith**, parents asserted that her actions **created unreasonable obstacles for the father** and were **not in [redacted] best interest**.
58. **October 26, 2024:** Parents sent a communication to Ms. Rizzo requesting information regarding the inappropriate staff behavior of forcing [redacted] to call home against his will.
59. **November 6, 2024:** Despite multiple follow-ups, a formal FERPA request, and assurances that the data would be provided, the requested information regarding [redacted] was never sent. Jennifer Stewart repeatedly failed to fulfill her commitment, withholding the data entirely and failing to respond.
60. **November 19, 2024:** On multiple occasions, parents reached out to the school team and Ms. Rizzo to clarify which staff member was responsible for forcing [redacted] to call home against his will. Parents received what they describe as a "dismissive response" from Ms. Rizzo. Ms. Rizzo's response attempts to minimize the seriousness of the concerns by reframing the staff's actions as supportive rather than coercive, despite clear evidence that [redacted] who has [redacted] was repeating what he was instructed to say rather than expressing his own experience. She dismisses the impact of these incidents and fails to acknowledge the emotional distress caused by the school's handling of the situation. Parents responded accordingly on November 20, 2024.

61. **Detailed Accounts of Emotional Maltreatment**: By fall 2024, [redacted] emotional distress escalated significantly due to interactions with his special education teacher, **Ms. Truscello**, as detailed in communications from September 16th and 18th. He frequently came home crying, recounting instances where she yelled at him and threatened him with permanent placement at Mathewson, which deeply frightened him. [redacted] also reported being unfairly blamed for incidents he did not cause, intensifying his feelings of distress and isolation. Despite being made aware of these escalating concerns, the district failed to take appropriate corrective action or investigate. This period also saw [redacted] subjected to the distressing disciplinary practice of being **forced to call home against his will** on four separate occasions, as reported on September 30th. These calls, lacking any legitimate educational or therapeutic purpose, served solely as punishment for minor behavioral incidents and were implemented without parental consent or inclusion in a structured behavior plan, raising serious legal and ethical concerns. Instead of addressing the issues, the district responded by portraying [redacted] negatively, as seen in the October 24th communication, further exacerbating his struggles. A cease-and-desist letter eventually halted what we believe to be emotional abuse, but significant emotional damage had already occurred, reflecting a systemic disregard for [redacted] emotional well-being despite clear warning signs.
62. **Self-Harm Comments and Lack of Response (Spring – Fall 2024)** shortly after [redacted] reported troubling comments from his teachers, he made a self-harm statement at school. While the district reportedly administered the C-SSRS, they failed to provide a copy or follow up meaningfully with the family. This same pattern repeated in fall 2024, including the incident on September 30, when [redacted] again reported mistreatment and made another self-harm comment. Despite the serious emotional risk, the district again failed to share the C-SSRS or take any meaningful steps to address [redacted] emotional needs. During this period, [redacted] began reporting daily crying episodes and feelings of being unfairly blamed for incidents he did not cause, further underscoring the emotional toll of the district's inaction and mistreatment.
63. **Throughout the Fall of 2024**: Parents continued to request documentation and clarification from the district regarding various incidents and [redacted] records, as exemplified by their formal FERPA request on September 5th, subsequent communication on September 10th regarding medical records, and ongoing discussions documented between September 30th and October 28th. The district frequently failed to provide requested records and documentation, forcing parents to follow up multiple times, including the unfulfilled request on November 6th. When records were finally received, they were often incomplete, leading parents to question the district's transparency and honesty.
64. **March 2025:** A parent PPT meeting was requested to address long-standing, unanswered concerns. The meeting quickly became hostile, with the father frequently interrupted, cut off mid-sentence, and prevented from asking critical questions. The district refused to address key concerns, dismissed them as irrelevant, and actively sidestepped accountability. When the father persisted in seeking answers, district staff—including Ms. Stewart—raised their voices, became confrontational, and threatened to terminate the meeting entirely. Records of this meeting serve as direct evidence of the district's conduct, capturing the interruptions, dismissals, raised voices, and factual inconsistencies in statements made by staff. The behaviors exhibited—dismissiveness, obstruction,

deflection, and outright refusal to answer questions—directly hindered the father's ability to advocate for [redacted] educational needs. Parents were repeatedly accused of "misinterpreting" district communications, despite quoting them verbatim. When attempting to reference prior communications—which were directly relevant—Ms. Stewart attempted to shut down the discussion, stating, "Do you have any other questions that do not pertain to emails?" This deliberate avoidance of accountability and refusal to engage in transparent discussion made it impossible to advocate effectively for [redacted]

## V. Continued Procedural Violations, Outplacement Denial, and Documentation Issues (December 2024 - April 2025)

65. **December 10, 2024:** Parents sent a communication to the team and district to request outplacement for [redacted] asserting they have failed to meet his needs and violated his FAPE.
66. **December 10, 2024:** Communications with the district showed the school administration repeatedly misrepresented the situation by falsely claiming that the parents refused multiple meeting requests while failing to address their ongoing concerns and requests for transparency. Their responses deflected accountability, disregarded the impact of restrictive placement decisions, and failed to provide the requested documentation, undermining trust in the process.
67. **December 10, 2024:** The school unilaterally scheduled [redacted] annual PPT meeting without parental input, disregarding their role in determining a mutually agreed-upon date. The response pressured parents to accept the meeting time while misrepresenting the school's willingness to engage and failing to acknowledge their request for transparency.
68. **December 12, 2024:** After initially requesting access to records, the school completely ignored the request, forcing a follow-up to obtain the documentation. This continued failure to provide critical records, including those related to the C-SSRS assessment, obstructed the right to access essential information regarding [redacted] well-being.
69. **January 16, 2025:** Despite repeated parental requests for separate meetings to discuss [redacted] outplacement and annual review, the District disregarded this input and unilaterally scheduled a combined meeting. The failure to acknowledge the parents' availability and proposed dates demonstrates a lack of collaboration and transparency.
70. **January 16, 2025:** The District insisted on combining the meetings for administrative convenience, ignoring the distinct nature of these discussions. This decision violated the parents' legal rights under IDEA to have these matters addressed independently.

### Request for Documentation and Procedural Violations (2024 – 2025)

71. The District repeatedly ignored requests for documentation, requiring multiple follow-ups to obtain records—often met with silence. In December 2024, parents formally requested an outplacement starting in 6th grade and asked for separate meetings to discuss outplacement and the annual review. The District refused and combined the meetings. Despite assurances of a substantial discussion about outplacement, no meaningful conversation took place.

72. At the conclusion of the annual PPT meeting on January 16, 2025, the district stated its intent to place [redacted] in the Harborside program heavily suggesting predetermination. Ten days later, we received a finalized IEP and a second PPT notice that retroactively added "transition planning" language, which had not been present in the original December notice. This post-hoc change constituted a procedural violation.
73. In September 2024, we submitted FERPA and FOIA requests for records and emails related to [redacted] education. In January 2025, I had to again request copies of the Columbia assessments. The district responded by falsely claiming that all documentation had already been provided. However, after we challenged this, additional records were produced — a pattern that repeated itself and revealed a disturbing lack of transparency and accountability in the district's handling of essential documentation.
74. Furthermore, the district promised a "substantial discussion" with respect to the request for outplacement. There was "absolutely no substantial discussion whatsoever."
75. **August 2024 onwards:** Since August 2024, Ms. Stewart repeatedly acknowledged the existence of data regarding [redacted] academic and behavioral performance and assured parents it would be provided. Despite multiple formal requests and continued follow-up, this data was not delivered as promised. Instead, the District consistently claimed that all records had already been provided—statements later proven false when missing documents, including the May 17, 2024 Columbia Risk Assessment, were only produced after repeated good-faith efforts. This ongoing pattern of denial, delay, and misinformation reflects a clear failure to comply with access to information and has impeded parents' ability to make informed decisions.
76. **January 20 - 28, 2025:** This correspondence outlines parents' formal disagreement with the district's denial of outplacement for [redacted] and documents ongoing concerns regarding the district's failure to meet his educational and emotional needs. Despite repeated requests and documented incidents of emotional harm, including two self-harm statements, the district has taken a reactive approach and failed to provide a proactive, supportive environment. Parents reaffirmed their request for an out-of-district placement beginning September 2025.
77. **January 29 - March 6, 2025:** These communications reveal a clear pattern of the district's failure to respond directly, transparently, and in a timely manner to critical concerns about [redacted] IEP. Despite repeated requests, the district has not provided any documentation of alleged outreach to schedule a PPT meeting, nor have they explained or substantiated the increase in paraeducator support prior to the January 16 meeting. Instead, they've avoided questions, responded inconsistently, and failed to address serious concerns raised months earlier about [redacted] emotional well-being. This ongoing lack of accountability and meaningful engagement has disrupted [redacted] support and denied full participation in the IEP process. The district only claimed they reached out "last spring" (May of 2024) for a PPT regarding an increase in paraeducator support in response to parents' inquiry on September 18, 2024, requesting [redacted] spend more time with his paraeducator. The district reached out in May of 2024 to switch placement to a previously deemed "not recommended and not appropriate" [redacted] program starting in 5th grade.
78. **January 29, 2025:** Both parents requested an Independent Educational Evaluation (IEE). The District's response constituted significant procedural violations, as they sidestepped the father, falsely stated the mother had sole educational decision-making authority when

she does not, and unilaterally interpreted a court order, which they have no right to do. Furthermore, the District failed to provide the promised list of IEE providers, and did not initiate their own due process hearing to justify denying the request. This represents a direct contravention of IDEA procedural safeguards. When these grave concerns were raised with the State's Bureau of Special Education through a formal complaint (Complaint Report 25-0409), the Bureau's response was equally concerning and indicative of a lack of impartial oversight. While the Bureau explicitly stated it lacked authority to interpret parenting plans, it paradoxically accepted the District's unilateral interpretation and found no violation, thereby enabling the District's illegal bypass of due process requirements. Moreover, despite being the complainant and a legal custodial parent, I was never interviewed during the Bureau's investigation, raising serious questions about the fairness and integrity of their fact-finding process. Repeated requests for written clarification and documentation of these critical inconsistencies were met with refusals, with the Bureau opting only for verbal communication, which undermines principles of transparency and accountability. This demonstrates a systemic failure within the administrative review process to address the District's fundamental procedural violations, thereby necessitating this impartial due process hearing to ensure [redacted] rights are protected under IDEA.

79. **March 10, 2025:** A formal written complaint was submitted to the district, outlining serious procedural violations following the March 6th PPT meeting. Despite the passage of over two months, no written response or acknowledgment from the district has been received. This unreasonable delay, combined with repeated refusals to address concerns via email since August 2024, demonstrates a clear failure to engage in meaningful, good-faith communication, directly violating IDEA rights.
80. **March 31, 2025:** A formal request was submitted for the district to remove an improper prefatory statement in the parent/student input section of the IEP. Jennifer Stewart, the Director of Pupil Personnel, refused to remove it, falsely claiming for a second time that the mother had the authority to make educational decisions. This demonstrates ongoing misinformation and a refusal to properly document parental input.
81. **March - April 2025:** Parents repeatedly sought clarification from the district about their failure to provide timely written notice that transition planning would be discussed at the January 16 PPT meeting—a clear violation of procedural safeguards. Despite claims from Ms. Stewart that a revised invitation had been sent, it was only created retroactively after the IEP was finalized, with the transition box checked on the day of the meeting. The district's conflicting explanations, refusal to answer direct questions, and retroactive document changes reveal a troubling pattern of non-transparency and procedural evasion, denying meaningful participation in a critical part of [redacted] educational planning and violating procedural safeguards.
82. **April 8, 2025:** Parents submitted two formal communications detailing unresolved procedural concerns, including the retroactive alteration of IEP notices, unexplained discrepancies in behavioral incident logs, and vague or contradictory explanations regarding [redacted] alleged conduct. Despite the gravity of these concerns, the district failed to respond substantively or correct the inconsistencies. Of particular concern is the manipulation of data in incident logs—entries were added months after the fact, relevant records were omitted without explanation, and [redacted] name was replaced with

ambiguous pronouns, which obscured the identity of the student referenced and compromised accountability.

83. **83. March 10, 2025 – Present: Ongoing Failure to Comply with Records Request** On March 10, 2025, a formal records request was submitted under the Freedom of Information Act (FOIA). As of the date of this complaint—well beyond the 45-day statutory deadline—the district has failed to produce a complete or legally sufficient response. Key records remain outstanding, and the district has not provided a definitive timeline for compliance. This is part of a documented pattern. In response to a prior FERPA request, the district provided 84 pages that were entirely redacted, 198 pages of duplicated content, and 113 blank pages. This raises serious concerns regarding the district's adherence to its obligations under federal records access laws.As a result of the continued failure to comply, a formal FOIA complaint has been filed with the appropriate oversight body. The district's conduct reflects a sustained lack of compliance with federal requirements and has impeded access to educational records relevant to the due process proceedings.
84. **Throughout 2024-2025:** Despite being aware of [redacted] sensory regulation needs, the district failed to implement a sensory diet, which could have meaningfully helped him manage focus and behavior. This neglect is yet another example of the district's failure to proactively address [redacted] unique needs.
85. **January 2025 (Annual PPT):** At the time, the IEP explicitly marked "No" for ESY eligibility, despite no documented discussion or evaluation of [redacted] ESY needs. If ESY truly wasn't discussed, then the district had no basis to make that determination at all—meaning they either arbitrarily denied services without proper review or failed to follow the required process. The district later attempted to retroactively correct this error by producing a revised IEP that states "Yes" for ESY eligibility, but this does not erase the original procedural violation. Their delay caused financial hardship and scheduling conflicts for the family, further demonstrating a lack of procedural integrity and transparency.
86. **January 2025 (Post Annual PPT):** Based on the district's documented decision in January that ESY was not required, parents made financial commitments and enrolled [redacted] in summer camp, relying on their official stance. Now, after failing to discuss ESY at the appropriate time, the district is attempting to reverse its position, disregarding the financial hardship and scheduling conflicts their actions have created. Their failure to follow proper procedures has placed an undue burden on our family, further demonstrating their lack of procedural integrity and transparency in educational planning.
87. **January 2025 (Post Annual PPT):** The district's four-month delay in properly addressing ESY represents a serious violation of timely decision-making, which IDEA requires to ensure students receive appropriate services without disruption. This delay not only denied meaningful parental participation but also potentially prevented [redacted] from receiving necessary summer supports, which could directly impact his educational progress.
88. **May 4, 2023:** We received a communication from the district which stated: "We agree that our communication needs to improve in order to keep you more informed about [redacted] progress." This acknowledgment is critical, as it reflects the district's admission of communication failures regarding [redacted] progress. Despite this agreement, the district has continued to fail in maintaining clear and consistent communication. This

failure has exacerbated the issues surrounding [redacted] educational planning and the denial of FAPE. The district's inability to follow through on its commitment has contributed to a persistent lack of transparency and an ongoing failure to address the educational and emotional needs we have repeatedly raised.

**VI. Ongoing Procedural Irregularities in PPT Notices and Documentation (March – May 2025)**

This section outlines multiple procedural inconsistencies and omissions regarding Planning and Placement Team (PPT) notices for [redacted] specifically surrounding meetings scheduled in April and May 2025. These inconsistencies raise significant concerns about transparency, accuracy, and compliance with notification requirements under the Individuals with Disabilities Education Act (IDEA) and Connecticut state law.

## A. Dual Notices Issued on March 31, 2025

**89.** On March 31, 2025, we received two separate PPT meeting notices, issued nine minutes apart, for the same PPT meeting scheduled on April 10, 2025. These notices were only posted on the CT-SEDS website, which itself raises accessibility and timely notice concerns.

**90.** The first notice, timestamped 2:42 PM, listed the following participants:

- Sara Collette – Instructional Supervisor, Special Education (Middle School)
- Sarah Stanley – Special Education Teacher
- [redacted] – Student
- Nadine Macklin – Instructional Supervisor, Special Education

**91.** The second notice, timestamped 2:51 PM, showed the following significant changes:

- Sara Collette’s title was changed, removing the “Middle School” designation; she is now listed only as "Instructional Supervisor, Special Education"
- Sarah Stanley’s role changed, now listed as “Special Education Teacher (Harborside Representative)”
- [redacted] the student, was completely removed from the notice
- Nadine Macklin was also removed from the list of participants

**92.** These rapid, unexplained changes to both the participant list and their roles within minutes of each other are concerning and confusing, and they undermine the consistency and credibility of the documentation. Furthermore, the first PPT notice (2:42 PM) is completely omitted from the CT-SEDS system, despite having been received and clearly timestamped. This suggests either a deletion or failure to archive an official record, which is a violation of proper documentation protocol and potentially a breach of FERPA record-keeping regulations.

## B. CT-SEDS Upload on April 28, 2025: May 6, 2025 PPT Meeting

**93.** On April 28, 2025, a new notice was uploaded to the CT-SEDS portal indicating a PPT meeting scheduled for May 6, 2025. This new notice contains additional changes:

- Jennifer Stewart, previously listed on prior documentation, has now been removed with no explanation.
- Nadine Macklin, who was removed in the second March 31 notice, has now been added back.
- Sarah Stanley's designation has changed again, now listed as: "Special Education Teacher (Daily Living Middle School Program Representative)," which differs from her earlier "Harborside Representative" title.

**93a.** That same day, on April 28, 2025, we sent a written notice to the district, clearly stating that we did not consent to the proposed placement and objected to the scheduled meeting.

**93b.** Despite this clear and direct communication, the district failed to acknowledge the parents' notice or amend their meeting plans accordingly. Instead, the PPT remained scheduled on CT-SEDS as if consent had been granted, indicating a disregard for parental input and procedural requirements under IDEA.

**93c.** In addition, the district failed to provide proper written notice of both the April 10 and May 6 PPT meetings in accordance with federal and state regulations. The notices were only uploaded to CT-SEDS without sending physical or electronic written notification to the parents. This practice violates 34 C.F.R. § 300.503 and Connecticut state law, which require timely and accessible written notice of PPT meetings to allow for meaningful parental participation.

**93d.** On the same day, Jennifer Stewart responded by stating:

"During [redacted] annual review, the PPT did not discuss whether or not [redacted] was eligible for Extended School Year services... Just a reminder: [redacted] Extended School Year (ESY) services have not yet been planned."

This admission contradicts the finalized IEP, which already indicated "No" for ESY services. If the matter was never discussed, it was a violation of parental participation rights to finalize that determination without parental input. The district's stated intention to hold a retroactive meeting to determine ESY eligibility—months after finalizing the IEP—demonstrates an improper attempt to cure prior procedural violations rather than engage in lawful planning. Moreover, Stewart's email indicated that the district would proceed with the May 6 PPT unless the parents proposed an alternate date, despite having already received the parents' written objection. This amounts to a predetermined action and shows a disregard for procedural safeguards under IDEA.

## C. Summary of Procedural Irregularities

**94.** Issuance of two conflicting PPT notices on the same date with unexplained personnel and role changes
**95.** Removal of the student ([redacted] from the second PPT notice without justification

**96.** Omission of the 2:42 PM March 31 notice from the CT-SEDS system entirely
**97.** Continuous shifting of staff titles and program affiliations without clarification
**98.** Lack of clarity or documentation explaining removal of Jennifer Stewart
**99.** District proceeded with plans for a PPT meeting after receiving clear written notice of parental non-consent
**100.** Failure to provide proper written notice of the April 10 and May 6 PPT meetings in violation of IDEA and state law
**101.** Improper attempt to retroactively discuss and revise ESY eligibility after it was finalized in the IEP without parental input

These discrepancies not only violate the procedural safeguards guaranteed under IDEA but also impair the parents' ability to prepare meaningfully for the PPT meetings. They raise serious concerns about transparency, legal compliance, and the school district's overall documentation and notification practices.

**Procedural Violations and Denial of Parental Participation in the Development of [redacted] IEP**

**Failure to Incorporate Parent Input into the IEP**

On May 29, 2025, we submitted a written request explicitly requiring that our full parent input statement be inserted directly and verbatim into the "Parent and/or Student Input" section of [redacted] IEP. This request was necessary to ensure that our concerns—including the context surrounding our non-participation in the May 21, 2025 PPT meeting—were accurately documented in the IEP itself. We clearly stated that simply attaching an email to the student's file was not acceptable and that the input must be included without edits.

Despite this, the district failed to comply with our request. Ms. Stewart responded on June 4, 2025, stating only that "the email will be added to the file"—a response that did not meet our legal request. We followed up with a formal demand for written confirmation and a copy of the fully updated IEP, requiring a response by June 9, 2025 (7 business days from our original May 29 letter). As of today, the district has failed to provide the updated IEP as specifically requested and required. This ongoing failure to comply with our specific and legally mandated request for accurate IEP documentation constitutes a further and continuing procedural violation.

This failure to properly document parental input violates IDEA's requirements for meaningful parental participation. Parent concerns are not optional; they must be reflected in the IEP itself—not stored separately—so that transparency and full participation are ensured in the special education process.

**Misrepresentation of Parent Participation & Predetermination of Services**
Before May 21, 2025, we had formally and repeatedly notified the district that we did not consent to the proposed placement at Harborside Middle School, and that we would not attend

further PPT meetings about that placement. We made this position clear in our April 28, 2025 letter and again in follow-up emails on May 14 and May 16. We explicitly informed the district that we intended to resolve ongoing issues—including placement and ESY eligibility—through due process, not additional meetings.

Despite this, the district proceeded to hold a PPT meeting on May 21, 2025, and recorded in the IEP notes that "Ms. [redacted] and Mr. [redacted] did not attend the PPT," omitting all relevant context. This documentation misleadingly suggests disinterest or disengagement, when in fact we had already explained our non-attendance and provided clear legal reasoning. This misrepresentation directly undermines the transparency and integrity of the IEP process. Compounding this issue, the IEP already included a decision of "No" for Extended School Year (ESY) services at the time of that meeting—even though the district admitted that ESY eligibility had never been discussed by the IEP team. This constitutes clear predetermination in violation of IDEA, which requires such determinations to be made by the full team with parental involvement. The district's later attempt to retroactively "convene" a discussion on ESY cannot cure the initial procedural violation. While the district later revised the IEP to reflect ESY eligibility, this retroactive correction came only after our objections were raised and does not negate the initial procedural failure or its impact on [redacted] right to timely and appropriate services.

**Failure to Maintain Accurate Historical Parent Input**
In addition to the district's failure to integrate our May 29, 2025 statement, it also failed to carry over prior parent input from earlier IEPs, despite our explicit request. This omission erased critical historical context and disregarded longstanding parental concerns that remain unresolved. The IEP must function as a living document that reflects the full scope of team input, including a complete record of parental concerns across time.

**Conclusion: Pattern of Procedural Noncompliance**
The district has engaged in a persistent pattern of procedural noncompliance, including:
- Misrepresentation of parent participation in the IEP record;
- Denial of meaningful opportunity for parental input;
- Predetermination of placement and services;
- Failure to include previously submitted parent input; and
- Attempted retroactive correction of procedural violations.

These procedural violations, taken together, have significantly impeded our ability to participate meaningfully in [redacted] educational planning and have resulted in a denial of a Free Appropriate Public Education (FAPE) as required under IDEA.

**Improper School Interference with Parental Rights and Retaliation**

In early June 2025, school personnel unjustifiably inserted themselves into a private parental matter regarding my son's yearbook, resulting in emotional distress to my child and a direct

infringement on my parental rights. Despite my son expressing a clear desire to bring the yearbook home with me during my scheduled parenting time, his teacher confiscated it and stated it would go home with his mother—based on a preemptive email request made a full week earlier by the other parent. I formally requested the yearbook at school and was denied, even though the school later claimed it was not their decision where the yearbook would go.

On May 27, 2025, I reviewed email correspondence between [redacted] mother, Karen [redacted] and his teacher, Ms. Stuart, in which Ms. Stuart explicitly acknowledged that she would hold [redacted] yearbook at school for Karen to retrieve. This confirms that the teacher had prearranged a plan to honor one parent's request by withholding the yearbook from the other, despite it being during the father's scheduled parenting time. However, when I later raised concerns, Principal Amy Rizzo claimed that "Mrs. Stuart encouraged [redacted] and other students to keep their yearbooks at school yesterday so that they would have them available for today's yearbook signing." This statement directly contradicts Ms. Stuart's prior communication and raises serious concerns about the school's honesty, neutrality, and handling of sensitive family matters. The inconsistency suggests an effort to obscure the school's role in enforcing one parent's request over the other, contrary to the child's stated wishes and the principles of equitable parental involvement.

My son was also inappropriately involved by the principal during this interaction, who attempted to pressure him to comply with a predetermined plan, despite his visible distress. I raised concerns professionally; yet shortly afterward, the district's Director of Security, Mr. Nielsen, sent me a retaliatory email implying that my behavior was disruptive—without citing any documented incident or providing a factual basis. This message came after I had informed the principal that I intended to file for due process, underscoring its retaliatory nature.

Furthermore, Mr. Nielsen made these accusations without contacting me for my account of the events or conducting any fair inquiry—a profound denial of basic due process. His vague allegations, coupled with threats of potential "access restrictions," created a hostile and intimidating environment wholly inconsistent with professional or lawful conduct. These actions were not isolated but part of a broader pattern of retaliation, intimidation, and unequal treatment that has followed my protected advocacy for my child, in violation of both the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act.

## The District's Unreliable and Contradictory Assessment of [redacted] Behavioral and Social-Emotional Needs

The District's approach to assessing and reporting [redacted] behavioral and social-emotional progress has been alarmingly inconsistent and unprofessional, raising serious questions about the school's capacity to accurately understand and meet his needs within the current environment. This fundamental flaw in assessment directly impedes the provision of a Free Appropriate Public Education (FAPE).

During the school year, progress reports concerning [redacted] presented a bewilderingly contradictory picture. On one hand, he was described in glowing terms: "a sweet, kind and enthusiastic boy," a "pleasure to have in my fifth grade classroom," who "enjoys sharing his

answers to our social emotional questions," and whose "classmates are very supportive and caring towards him." These positive affirmations paint a picture of a well-adjusted and engaged student.

Yet, juxtaposed immediately with these positive descriptors were equally strong, but vaguely defined, negative observations. [redacted] was simultaneously depicted as demonstrating "refusal to listen to adults," leading to a stated "safety issue" for himself and his classmates. He was noted for "inappropriate interactions with his classmates," an "increased negative attitude," and being "very disrespectful to those around him who are trying to support him." These concerning labels, particularly "safety issue" and "disrespectful," were presented without any specific, objective examples of the behavior itself. The reports offered no details on what constituted "inappropriate interactions" or how his "refusal to listen" manifested, leaving the District's claims unsubstantiated and impossible to verify or address effectively. Furthermore, despite these serious concerns, the school's proposed interventions were limited to vague "reminders and discussions," failing to outline specific, individualized strategies or professional support being implemented to address behaviors explicitly labeled as a "safety issue."

The unreliability of these assessments was thrown into even sharper relief by [redacted] final report card for the school year. Received on June 11, 2025, this final report offers an overwhelmingly positive and unqualified assessment: "[redacted] is a wonderful boy, and I am happy to have had him in my class. I know you will be very successful in middle school." The dramatic and unexplained shift from significant behavioral concerns (including stated safety risks and disrespect towards adults) to such unequivocal praise, without any documented interventions or measurable progress noted, undermines the integrity of the District's entire evaluation process. It demonstrates a profound lack of consistency and professionalism in how [redacted] needs are identified, monitored, and reported.

This pattern of inconsistent and unreliable assessment by the District directly impacts its ability to provide [redacted] with FAPE. If the school cannot accurately and objectively identify his challenges, document his progress, and implement targeted, data-driven interventions, it cannot genuinely meet his unique needs. This fundamental flaw in assessment contributes significantly to the unsuitability of the current public school environment for [redacted] highlighting the necessity of outplacement to ensure he receives a consistent, professionally evaluated, and appropriate education.

# Summary of Concerns and Violations

The Milford School District has unequivocally failed to provide [redacted] with a Free Appropriate Public Education (FAPE) and has committed several, material procedural violations under the Individuals with Disabilities Education Act (IDEA), directly impacting [redacted] educational benefit and the parents' ability to participate meaningfully in the IEP process.

### A. Denial of FAPE – Substantive Harms

The district's actions and inactions have directly resulted in a lack of meaningful educational benefit for [redacted] causing emotional distress, regression, and impeding his academic and social-emotional development.

**Failure to Address Emotional and Behavioral Needs Appropriately:**

- **Teacher Misconduct and Emotional Harm:** Ms. Adinolfi's documented verbal abuse ("worst student," "hates him," "doesn't like him anymore") and punitive actions (keeping him from lunch, grabbing his work, instructing him to "just keep reading" while on her phone) caused significant emotional distress and interfered with his learning environment (**Points 2, 3, 4, 14**). Ms. Curria's "2nd grade math!" comment (**Point 30**) similarly caused low self-esteem. Ms. Truscello's repeated yelling, blaming, and threats of permanent placement at Mathewson deeply frightened [redacted] and caused him to come home crying (**Point 50**). The district's failure to adequately address this misconduct and its dismissive responses (e.g., Ms. Anziano attempting to "flip the script" without denying the teacher's conduct - **Point 12**; Ms. Rizzo minimizing forced calls - **Point 60**) demonstrate a profound lack of understanding of, or disregard for, [redacted] emotional vulnerability and the impact of staff behavior on a student with a disability.
- **Inappropriate Behavioral Interventions and Shaming:** The district's approach to [redacted] behaviors has been punitive and counterproductive. The isolation to the nurse's station for the remainder of the year and denial of regular bathroom access (**Point 18**) constitutes an overly restrictive placement change without proper process. Teachers repeatedly telling [redacted] he "can't be trusted" (**Points 25, 28, 29**) are shaming tactics, not therapeutic interventions, directly violating principles of positive behavioral supports.
- **Forced Coercion and Emotional Abuse:** [redacted] being "forced to call home against his will" on four separate occasions and "instructed to say things he did not do" (**Points 52, 61**) is a serious concern of emotional abuse and directly contrary to any positive behavioral support strategy. The district did not obtain parental consent or include this practice in a structured behavior plan, raising serious legal and ethical concerns. The district's subsequent attempt to "minimize the seriousness" (**Point 60**) of these incidents demonstrates a complete failure of responsibility and accountability.
- **Neglect of Self-Harm Statements:** The repeated failure to provide the C-SSRS after [redacted] self-harm comments (**Points 26, 52, 62**) is a serious procedural violation and demonstrates a profound disregard for [redacted] safety and mental health needs, leaving him vulnerable and unsupported. This lack of response was concerning, particularly as these comments occurred after he reported continuing mistreatment.
- **Failure to Implement Sensory Diet:** The district's failure to implement a sensory diet, despite being aware of [redacted] sensory regulation needs, demonstrates a neglect to proactively address his unique needs and contribute to his overall well-being and ability to manage focus and behavior (**Point 84**).

**Inadequate Educational Benefit and Progress:**

- The district's claims of "increasingly difficult" work leading to escalating behaviors (**Points 36, 37**) directly contradict their own prior positive academic updates (**Point 27**) that [redacted] was "making progress towards mastering" his IEP goals. This inconsistency

undermines the credibility of the district's assessment of [redacted] academic needs and suggests a pretext for changing his placement.

- The abrupt and unilateral dismantling of the highly successful ticket system and discontinuation of communication logs (**Point 16**) directly removed effective supports and vital parental oversight, impeding [redacted] progress and the district's ability to monitor his needs. This lack of proactive support directly contributed to [redacted] reported escalation of behaviors.
- The complete lack of a support plan for [redacted] during the BCBA's baseline data collection in September 2023, ignoring previously proven effective strategies, left him vulnerable and demonstrated a reactive, rather than proactive, approach to his needs (**Point 17**).
- The district's failure to recommend academic services as part of [redacted] Extended School Year (ESY) programming, despite claiming growing academic difficulties in May 2024, further reinforces their failure to provide adequate support and appropriate planning (**Point 85**).
- The continued reports of [redacted] missing learning sessions (**Point 2**) and the alleged triggering of "out-of-character" behaviors (**Point 51**) demonstrate an environment not conducive to learning and a failure to provide robust academic and social-emotional support aligned with FAPE.

## B. Denial of FAPE – Procedural Violations (Materiality and Impact)

Numerous procedural violations have occurred, which are not merely technical infractions but have materially interfered with [redacted] right to FAPE and his parents' right to meaningful participation in the IEP process.

**Failure to Provide Records and Violations of Parental Access Rights:**

- Jennifer Stewart's repeated refusal to provide requested data, including the Columbia Risk Assessment (Points 59, 68, 75), despite multiple formal requests and assurances that "all records had already been provided," significantly obstructed and delayed parental access to critical information, impeding timely decision-making. This obstruction directly impacted parental ability to make informed decisions about [redacted] education and well-being.
- The discriminatory demand for the father to sign an unnecessary release form, while not making the same demand of the mother (**Points 48, 57**), is a clear act of discriminatory practice, creating undue burden on a parent exercising their rights.
- The failure to meet deadlines for providing a complete response to record requests (**Point 83**), including outstanding meeting notes and a clear timeline for fulfillment, demonstrates a systemic failure in upholding transparency and procedural safeguards.
- The district has failed to maintain accurate, consistent, and transparent documentation of incidents involving [redacted] as evidenced by conflicting log entries, delayed disclosures, vague language in place of [redacted] name, and the absence of supporting materials (**Point 82**). This undermines trust in the integrity of the documentation and suggests possible fabrication or exaggeration of events.

- **Omission of Official Records from CT-SEDS:** The complete omission of a formal PPT notice (March 31, 2025, 2:42 PM) from the CT-SEDS system, despite having been officially sent and received, represents a clear failure to maintain proper educational records and ensure accurate archiving, directly impacting transparency and accountability (**Point 92**).

**Denial of Meaningful Parental Participation:**

- **Unilateral Scheduling of PPTs and Inadequate Notice:** The district unilaterally scheduled [redacted] annual PPT meeting without parental input (**Point 67**), and repeatedly pressured parents to meet (**Point 33**), violating their right to a mutually agreed-upon time. The insistence on a meeting with less than 5 school days' notice (**Point 31**) is a direct procedural violation.
- **Combined PPT Meetings and Lack of Substantial Discussion:** The district disregarded repeated parental requests to hold separate meetings for outplacement and annual review, instead unilaterally scheduling a combined meeting (**Points 69, 70**). This decision ignored the distinct nature of these discussions and violated the parents' legal rights under IDEA to have them addressed independently. Furthermore, the district promised a "substantial discussion" regarding outplacement at the January 16 PPT but failed to deliver any such discussion (**Point 74**).
- **Failure to Provide Proper Notice for Transition and Retroactive Documentation:** The district failed to provide timely written notice that transition planning would be discussed at the January 16 PPT, and later retroactively altered documents to cover this violation (**Points 72, 81**). This prevented meaningful parental input on a legally required component of the IEP.
- **Improper IEP Documentation:** Jennifer Stewart's refusal to remove an improper prefatory statement in the parent/student input section of the IEP, falsely claiming the mother had sole educational decision-making authority (**Point 80**), constitutes a clear procedural violation that misrepresents parental input and undermines their role.
- **Hostile PPT Environment:** The hostile atmosphere at the March 2025 PPT meeting, characterized by interruptions, dismissals of concerns, raised voices, and threats to terminate the meeting (**Point 64**), directly hindered the father's ability to advocate effectively and denied meaningful parental participation. The refusal to engage in transparent discussion and the accusations of "misinterpreting" communications further highlight this obstruction.
- **Failure to Address ESY Services Appropriately:** The district's arbitrary marking of 'No' for ESY eligibility without documented discussion or evaluation of his needs at the January 2025 PPT constitutes a significant procedural violation (**Point 85**). Their subsequent attempt to retroactively correct this error by proposing a new meeting does not erase the initial violation and has created financial hardship and scheduling conflicts for the family, **demonstrating** a lack of procedural integrity and transparency (**Points 86, 87**).
- Additionally, on April 28, 2025, the district acknowledged in writing that [redacted] ESY eligibility had not been discussed during his annual review and proposed a new PPT meeting for May 6, 2025, to retroactively address the matter. However, [redacted] finalized IEP already listed "No" for ESY services—an official determination that should not have

been made without parental input. The district's stated intention to hold a meeting after the IEP was completed, in order to revisit a key eligibility decision, reflects an improper attempt to cure an earlier procedural violation. This retroactive approach does not comply with IDEA's requirements for timely and participatory planning. Moreover, the parents explicitly rejected the proposed May 6 meeting in writing, stating that no further PPTs were warranted and that any unresolved matters would be addressed through due process. Despite this clear objection, the district proceeded to maintain the meeting in CT-SEDS and implied it would move forward regardless of consent. This conduct demonstrates a disregard for parental input and violates the procedural safeguards required by IDEA.

- **Inconsistent PPT Notices and Documentation:** The issuance of multiple conflicting PPT notices for the same meeting, rapid and unexplained changes to participant lists and roles (including the removal of the student's name), and continuous shifting of staff titles without clarification (**Points 89, 90, 91, 93, 94, 95, 97, 98, 99**) directly undermine the parents' ability to understand who will be at the meeting and what roles they will play, thereby impairing meaningful preparation and participation in the IEP process.

**Failure to Respond to Complaints and Lack of Transparency:**

- The district consistently refused to answer parental questions and concerns via email (**Points 34, 43, 44, 56, 59, 63, 64, 66, 69, 71, 73, 77**), demonstrating a pattern of non-responsiveness and undermining the collaborative spirit of IDEA.
- The failure to provide a written response or acknowledgment to a formal written complaint within two months (**Point 79**) is a clear procedural violation and demonstrates a systemic failure to engage in good-faith communication and accountability.
- The district's shifting and inconsistent explanations regarding incident logs, missing entries, and belated surfacing of allegations (**Points 76, 77**) demonstrate a severe lack of transparency and undermine the accuracy and reliability of [redacted] official records.
- The initial acknowledgment of communication shortcomings in May 2023 (**Point 88**) is a critical admission, yet the district has consistently failed to follow through on its commitment, exacerbating issues surrounding [redacted] educational planning and FAPE denial.

**Denial of Independent Educational Evaluation (IEE):**

- The district's sidestepping of the father's IEE request by falsely claiming the mother had sole educational decision-making authority (**Point 78**), coupled with their failure to provide a list of providers or file for due process to challenge the IEE, is a direct and egregious violation of a parent's right to an independent assessment. This denied [redacted] the opportunity for an independent assessment of his needs and reflects a pattern of overriding parental rights.

**Unilateral Change of Placement:**

- The punitive isolation of [redacted] to the nurse's station and the denial of access to the regular bathroom for the remainder of the year (**Point 18**) constituted a significant change in his educational placement and environment without proper notice, PPT meeting, or

parental consent, a clear procedural violation that fundamentally altered his access to the general education environment. This action was taken only after the fact, despite concerns about lack of monitoring and website blocking.

## C. Systemic Pattern of Reactive, Negligent, and Retaliatory Conduct

The issues detailed above expose a pervasive and deliberate pattern of neglect, retaliation, and legal noncompliance by Milford Public Schools. This is not a matter of accidental mistakes or bureaucratic disorganization — it is a systemic failure to meet [redacted] educational, emotional, and behavioral needs as required under the Individuals with Disabilities Education Act (IDEA). The district has repeatedly acted only after harm occurred, rather than proactively providing the supports necessary to prevent it, as the law mandates.

**Parents currently assert that the evidence strongly suggests a pervasive pattern of retaliation by the Milford School District against [redacted] and his parents for their consistent and diligent advocacy on his behalf. This retaliation has manifested as:**

- **Teacher Misconduct and Shaming:** Ms. Adinolfi's statement ("Do not go home and tell your daddy that I was eating peanut butter and apple in class ever again!") immediately following parental complaints (**Point 11**), Ms. Curria's humiliating "2nd grade math!" comment (**Point 30**) after previous reports against her, and Ms. Truscello's repeated yelling, blaming, and threats of permanent placement at Mathewson (**Point 50**) are direct examples of actions **currently asserted by parents as retaliation** designed to punish [redacted] for his parents' actions and to induce fear. Ms. Truscello's repeated admonitions to "not go home and tell his dad" (**Point 28**) are also indicative of an attempt to conceal inappropriate interactions.
- **Systemic Program Changes and Undermining Support:** The abrupt and unilateral removal of the highly successful ticket system and communication logs (**Point 16**) directly after complaints about Ms. Adinolfi, and the sudden, aggressive push for a placement in the Mathewson [redacted] program (previously deemed inappropriate) (**Points 32, 35**), are **currently asserted by parents as adverse actions** taken in response to protected parental activity. The district's fabricated explanations for this shift (**Points 36, 37**) and dismissal of concerns by attributing changes to a "miscommunication and misunderstanding" (**Point 41**) further support a retaliatory motive.
- **Discriminatory Treatment in Record Requests:** Jennifer Stewart's discriminatory demand for the father to sign an unnecessary release form for records, while not requiring the same from the mother (**Points 48, 57**), is **currently asserted by parents as a clear act of retaliation** against a specific parent advocate, designed to create obstacles and deny equal access to information.
- **Forced Coercion and Fabricated Allegations:** The alleged triggering of new, "out-of-character" behaviors (**Point 51**) after parental complaints, coupled with [redacted] being forced to make false phone calls home (**Points 52, 61**), are **currently asserted by parents as severe forms of retaliation** designed to create a false, negative narrative about [redacted] behavior and to deter further advocacy. Ms. Rizzo's unfounded allegations (**Point 53**) against [redacted] in response to parental reports further solidify this pattern. The

district's subsequent portrayal of [redacted] in a negative light exacerbated his struggles (**Point 53**).
- **Obstruction of Information and Communication:** The consistent refusal to provide records, answer questions, and respond to formal complaints (**Points 34, 43, 44, 56, 59, 63, 64, 66, 69, 71, 73, 77, 79**) serves to impede parental oversight and participation, and is **currently asserted by parents as a punitive response** to persistent advocacy. The retroactive creation/alteration of documents (**Points 72, 75, 81**) is a deliberate attempt to cover up procedural failures in response to scrutiny.

**Hostile PPT Environment and Discrediting Tactics:** The district's conduct at the March 2025 PPT, including interruptions, dismissals, raised voices, and attempts to discredit the father's valid concerns by accusing him of "misinterpreting" communications and trying to limit discussion to only non-email related topics (**Point 64**), are **asserted by parents as retaliatory tactics** aimed at silencing and frustrating parental advocacy. The subsequent ignoring of the father's email outlining concerns further demonstrates a lack of accountability following this hostile interaction (**Point 64**).

The district's escalating violations — including delayed and incomplete responses, falsified and inconsistent documentation, exclusion of parental participation, retaliation against advocacy, and the failure to implement established supports — reflect a deeply rooted disregard for IDEA's procedural safeguards and substantive requirements. The district's actions have caused [redacted] significant and lasting harm. Immediate, decisive intervention is required to address these ongoing violations and to ensure [redacted] receives the Free Appropriate Public Education (FAPE) to which he is legally entitled.

Central to these violations is the district's repeated failure to implement [redacted] Individualized Education Program (IEP) as required by law. Although [redacted] IEP appears appropriate on paper, and we do not dispute its content, Milford Public Schools has repeatedly failed to implement it as required. This failure has resulted in both procedural and substantive violations of the IDEA, resulting in denial of a Free Appropriate Public Education (FAPE) and harm to [redacted] educational and emotional development. Failure to implement the IEP includes, but is not limited to, denial of mandated services, lack of appropriate accommodations, emotional mistreatment, and any conduct that undermines [redacted] access to FAPE. These violations encompass failure to deliver mandated services, disregard for [redacted] individualized emotional and behavioral needs, and infringements on my rights as a parent — including exclusion from meaningful participation in the IEP process and retaliation for protected advocacy efforts. These documented actions reflect a systemic failure to provide [redacted] with the education he is entitled to under federal law. This hearing must therefore address not only the district's failure to implement the IEP, but also its broader noncompliance with IDEA's legal and procedural safeguards, and the resulting harm to [redacted] educational and emotional well-being.

**Requested Relief**

We request an out-of-district placement as the central and necessary remedy for the district's ongoing failure to provide [redacted] with a Free Appropriate Public Education (FAPE) as required under the Individuals with Disabilities Education Act (IDEA).

- **Outplacement:** An order for an appropriate out-of-district placement for [redacted] beginning in 6th grade, as the current placement has failed to meet his educational, behavioral, and emotional needs. We specifically request consideration of the following placement options:
  1. Woodhouse Academy
  2. Hope Academy
  3. Any other appropriate outplacement that can meet [redacted] unique needs.

  We further request that the Milford School District fully fund all tuition and transportation costs associated with the selected placement. The district has demonstrated a clear and ongoing inability to provide [redacted] with FAPE within its current structure, as evidenced by a documented pattern of misconduct, retaliation, and inadequate support.

- **Compliance with IDEA Following Outplacement:** A directive ensuring that the Milford School District complies with all procedural and substantive IDEA requirements related to [redacted] transition to and continued education in the out-of-district placement. This includes appropriate transition planning, meaningful parental participation in the development and review of [redacted] IEP at the new placement, and full adherence to all procedural safeguards to ensure his rights remain fully protected.
- **Finding of FAPE Violation:** A formal determination that the Milford School District has failed to provide [redacted] with FAPE, in violation of IDEA, due to persistent procedural violations, retaliatory actions, and failure to meet his individualized educational needs.

**Conclusion**

The Milford School District's actions demonstrate a systematic and profound failure to provide [redacted] with FAPE. This failure is evidenced by substantive inadequacies in addressing his emotional and behavioral needs, a clear and documented pattern of material procedural violations that have undermined parental rights, and a disturbing trajectory of direct retaliation against a vulnerable student and his advocating family. The district's consistent lack of transparency, refusal to engage in good-faith communication, and the harm inflicted upon [redacted] necessitate the full scope of the requested relief to safeguard his legal right to a Free Appropriate Public Education and to ensure accountability for these egregious IDEA violations.

Amended Complaint dated: July 29, 2025

Respectfully

Robert [redacted]

**STATE OF CONNECTICUT**
**DEPARTMENT OF EDUCATION**
**SPECIAL EDUCATION DUE PROCESS HEARING**

In the Matter of:

Robert [redacted] Pro Se
v.
Milford BOE

Case No. 25-0686

October 3, 2025

VIA E-MAIL

To:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Robert [redacted]
[redacted]verizon.net

**MOTION FOR RECONSIDERATION: RULING ISSUED PREMATURELY AND BASED ON AN INCOMPLETE RECORD**

## Introduction

The Father respectfully submits this Motion for Reconsideration of the Hearing Officer's ruling dated October 3, 2025, denying the Motion for Recusal.

This request is based on procedural error: the Hearing Officer issued a ruling before considering rebuttal evidence that the Father had already noticed and was in the process of submitting. The Father's intent to file rebuttal evidence was communicated directly to the Hearing Officer and opposing counsel in writing on September 30, 2025 (see Exhibit C). On October 1, 2025, the Father also submitted a separate request for the transcript and stated that, after reviewing notes, he and his son's mother had identified additional concerns that they intended to raise in a supplemental statement once the transcript was received (see Exhibit B). That notice was distinct from the rebuttal already in progress. Despite having actual notice of the rebuttal, the Hearing Officer issued a ruling at 10:02 AM on October 3, 2025 (see Exhibits F and G), before the Father's rebuttal was filed at 10:17 AM (see Exhibits A and H).

## Grounds for Reconsideration

This motion is based on a procedural error: the Hearing Officer issued a final decision on the Motion for Recusal despite having actual notice that the Father intended to file a rebuttal to the District's objection.

- On September 29, 2025, the Father submitted the original Motion for Recusal.
- Later that day, at 3:18 PM, the District notified all parties of its intent to submit an objection by the end of the following day (see Exhibit D, page 2).
- On September 30 at 12:16 PM, the District followed up, stating it was awaiting the transcript from the September 24 hearing and anticipated submitting its objection "tomorrow" (see Exhibit D, page 1).
- The District ultimately submitted its objection on October 1 at 4:51 PM — two full days after its initial notice (see Exhibit E).
- On September 30, the Father sent an email to all parties, including the Hearing Officer, stating his intent to submit a rebuttal (see Exhibit C, page 1).
- On October 1, the Father again emailed all parties, including the Hearing Officer, formally requesting the transcript and stating that, after reviewing notes, he and his son's mother had identified additional concerns that they intended to raise in a supplemental statement once the transcript was received (see Exhibit B).
- On October 3 at exactly 10:02 AM, the Hearing Officer issued a ruling denying the Motion for Recusal (see Exhibits F and G).
- The Father submitted his rebuttal at 10:17 AM — without having seen the Hearing Officer's ruling at that time, as he was finalizing the rebuttal prior to its submission (see Exhibits A and H).

The rebuttal evidence was material and necessary because it directly exposed the District's objection as relying on factual misrepresentations and failing to rebut the core evidence of procedural prejudice and the clear appearance of bias against the pro se party. Specifically, the rebuttal clarified that the District's objection omitted key context regarding statements made during the hearing that supported the Father's concerns about impartiality. This evidence went to the heart of the recusal issue and, if considered, could have materially affected the outcome.

This timeline demonstrates that the Hearing Officer allowed the District two full days to prepare and submit its objection, waited for it, and clearly reviewed it before issuing a ruling just over 24 hours later. In contrast, despite having actual notice that the Father's rebuttal was forthcoming, the Hearing Officer issued a decision before receiving and considering it.

Even if the District argues the rebuttal was not yet filed, the Father had given explicit notice of intent to file, and the Hearing Officer should have awaited its submission before ruling.

This sequence creates a clear appearance of procedural imbalance and raises concerns about the fairness of the process. The decision was issued prematurely, based on an incomplete record, and deprived the Father of a meaningful opportunity to be heard — a core principle of due process. By waiting for and considering the District's objection while issuing the ruling before the Father's rebuttal was considered, the process created an appearance of unequal treatment and raised concerns about the impartiality of the proceeding.

## Legal Basis for Reconsideration

Connecticut Agencies Regulations § 10-76h-8 permits a party to request that a hearing officer take action consistent with relevant statutes and regulations. A motion for reconsideration is the proper vehicle when a party believes the hearing officer made an error of fact or law, or when new evidence materially affects the outcome.

This motion is based on error of procedure and new evidence that materially affects the outcome, both of which are grounds for reconsideration under § 10-76h-8.

Issuing a ruling before the record was complete constitutes both an error of procedure and "other good cause" under § 10-76h-8, because it deprived the Father of a fair opportunity to be heard and resulted in a decision based on an incomplete record.

Here, the Father respectfully submits that the ruling of October 3, 2025 was issued prematurely, before rebuttal evidence was considered, and therefore reconsideration is warranted.

## Relief Requested

The Father respectfully requests that the Hearing Officer:

1. Vacate or reconsider the ruling on the Motion for Recusal;
2. Review and consider the rebuttal submitted on October 3, 2025 (see Exhibit A);
3. Acknowledge the transcript request and the Father's notice, on October 1, that additional concerns had been identified and would be raised in a supplemental statement once the transcript was received (see Exhibit B);
4. Take notice of the record evidence — specifically, the rebuttal transmission timestamp and the ruling issuance timestamp — which demonstrate that the rebuttal was submitted shortly after the ruling was issued;
5. Issue a revised ruling that reflects the full record, including the Father's response.

## Conclusion

The Father submits this motion to preserve the integrity of the hearing process and ensure that all parties are afforded a fair opportunity to be heard. The procedural timeline — including prior notice, active engagement, and prompt submission — supports reconsideration of the ruling. Fundamental fairness requires that both parties be given equal opportunity to present their case before a neutral arbiter, and issuing a ruling before the Father's rebuttal was considered is inconsistent with that principle. Reconsideration is not only a matter of fairness to the parties, but necessary to uphold the integrity of the hearing process itself.

**Respectfully submitted,**
Robert [redacted]
Pro Se Parent
October 3, 2025

## Attached Exhibit List

- Exhibit A: Rebuttal submitted October 3, 2025
- Exhibit B: Transcript request email dated October 1, 2025
- Exhibit C: September 30 email stating intent to file rebuttal
- Exhibit D: District emails dated September 29 and September 30 regarding objection timeline
  - Includes:
    - September 29 email at 3:18 PM stating intent to submit objection by end of next day
    - September 30 email at 12:16 PM stating transcript was pending and objection would be submitted "tomorrow"
- Exhibit E: District's objection submission timestamp (October 1, 2025 at 4:51 PM)
- Exhibit F: Hearing Officer's ruling denying Motion for Recusal (October 3, 2025 at 10:02 AM)

- Exhibit H: Email transmitting rebuttal at 10:17 AM on October 3, 2025
- Exhibit G: Email from Hearing Officer showing issuance of ruling at 10:02 AM on October 3, 2025

Exhibit A

STATE OF CONNECTICUT DEPARTMENT OF EDUCATION In Re: Student with a Disability Case No.: BOE 25-0686

REPLY TO MILFORD BOARD OF EDUCATION'S OBJECTION TO THE MOTION FOR RECUSAL OF HEARING OFFICER KENNEDY

Robert [redacted] appearing pro se, states as follows:

The District's Objection relies on mischaracterizations of the record and seeks to deflect from the central issue: whether the cumulative conduct of Hearing Officer Kennedy (Hearing Officer) has created an objective appearance of bias and procedural unfairness sufficient to warrant recusal. The Motion for Recusal is not based on mere disagreement with rulings, but on documented inconsistencies, procedural disadvantage, and conduct that undermines the fairness of the hearing.

The following clarifications and arguments are provided in support of the Motion:

## I. Rebuttal of "Forum Shopping" Accusation and Factual Misrepresentations

### A. The Prior Recusal Was Offered, Not Sought

The District inaccurately asserts that the Father engaged in "forum shopping" by seeking to remove a second Hearing Officer. However, the District's own Exhibit A (emails concerning Hearing Officer Ho) confirms that the Father did not request recusal. Instead, Hearing Officer Ho voluntarily offered to recuse herself in light of concerns raised about procedural restrictions, including her statement:

"I don't want you to use legal words because you're not lawyers."

This directive was not a neutral caution, but an instruction that treated the Parents differently based solely on their pro se status, which unjustly restricted their advocacy and denied them equal footing in the hearing process. The Father's acceptance of the voluntary recusal was a good-faith resolution of a situation that impaired meaningful participation—not an attempt to shop for a different decision-maker. The District's attempt to reframe a voluntary recusal as a strategic maneuver is contradicted by its own exhibit and reflects a selective reading of the record. It is unclear how the District can claim the Father sought recusal when its own exhibit shows that Hearing Officer Ho initiated the offer to step down. There is no motion, no request, and no demand from the Father in the record. The District's characterization is not supported by the evidence it submitted.

### B. Direct Response to Forum Shopping Allegation

The District's objection goes further by alleging that the Father is attempting to "forum shop." This accusation is unfounded. The Motion to Recuse is grounded in documented conduct that occurred during the hearing—specifically, shifting procedural standards, denial of witness questioning, and a procedurally disproportionate threat to dismiss. These events could not have

been anticipated prior to Hearing Officer Kennedy's appointment and are not part of any strategic maneuver. Raising concerns about bias based on the record is not forum shopping—it is the exercise of a procedural safeguard guaranteed under Conn. Agencies Regs. § 10-76h-8(f)(1). The Father is not seeking a different hearing officer for advantage, but rather to preserve the integrity of the process and ensure a fair and impartial hearing.

**C. Incorrect Account of Prehearing Attendance**

The District incorrectly states that both Parents attended the prehearing conference on July 29, 2025. However, an email sent by Karen [redacted] to Hearing Officer Kennedy at 11:44 a.m. on that day confirms that she was unable to attend. **(Please see attached Exhibit D)** Attorney Rosen was copied on this email, which means the District was directly informed of her absence. The record is clear: only one Parent (the Father) was present. This misrepresentation further undermines the credibility of the District's objection.

## II. The Disproportionate Threat and Its Chilling Effect on Advocacy

The District attempts to frame Hearing Officer Kennedy's threat of dismissal as a necessary effort to restore order. This framing overlooks both the context and the severity of the threatened sanction.

**A. Threat of Dismissal Was Procedurally Disproportionate**

During the first hearing session, the Father attempted to raise legitimate procedural concerns and sought clarification regarding exhibit submission deadlines—concerns based directly on the Hearing Officer's prior written instructions. The Father was responding to the Hearing Officer's interpretation of the rule and attempted to reference the written guidance that had been provided via email. As the Father began to explain that the Hearing Officer's comment contradicted the email, he was cut off mid-sentence. When he tried to clarify by stating, "But we received an email," the Hearing Officer interrupted again. The Father then respectfully stated, "Sir, I'm being cut off," in an effort to continue explaining the discrepancy. Instead of engaging with these concerns, the Hearing Officer issued a summary threat to dismiss the entire case with prejudice.

The Father repeatedly had to remind the Hearing Officer not to cut him off while asserting his procedural right to be heard. The threat of summary dismissal, issued in response to a good-faith inquiry about exhibit deadlines, was disproportionate and discouraged further participation.

The hearing transcript confirms that the Father's statements were respectful and focused on procedural clarification, as shown by his remarks:

"I'm not being unruly, sir. Sorry you feel that way," and "I don't feel you should be threatening to dismiss a case, sir."

This exchange reflects a breakdown in the fairness of the process and impeded the *pro se* party's ability to participate meaningfully in the hearing.

The District's objection misrepresents this exchange by claiming the Father interrupted the Hearing Officer while he was attempting to explain procedures. In reality, the transcript shows the Father was responding to a sudden threat of dismissal and referencing the Hearing Officer's own written guidance. The Father stated:

"We do have an email" and "I'm being cut off, sir,"

while attempting to clarify the exhibit submission rule. These remarks were not interruptions, but procedural advocacy in direct response to an abrupt shift in expectations that disadvantaged the Parents. The District's portrayal omits this context and reframes respectful engagement as unruly conduct.

Such a threat—delivered in response to a procedural clarification request—was disproportionate and discouraging. It inhibited further advocacy and raised an objectively reasonable concern about retaliatory action against the *pro se* party. It created an atmosphere in which the Father had to choose between silence or risking dismissal—a choice no party should face in a due process hearing. The District's assertion that the Hearing Officer showed patience before issuing his warning is contradicted by the transcript, which reflects that the Father was cut off while raising procedural concerns and threatened with dismissal without any prior disruptive conduct.

## III. Shifting Procedural Rules Created Uneven and Prejudicial Treatment

The Father was disadvantaged for complying with the Hearing Officer's own written instructions—while the District was granted a *de facto* procedural advantage.

### A. Hearing Officer's Written Rule Was Clear and Specific

In its objection, the District quoted the following procedural rule:

"At least five business days prior to a hearing date scheduled, each party shall disclose to the other party all documentary evidence, including evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing. A hearing officer may bar any party that fails to comply with this requirement from introducing such evaluations or recommendations at the hearing. Witness lists shall be exchanged by the parties and provided to the hearing officer no later than 5 business days prior to the scheduled hearing date."

However, this quoted language does not match the written instruction provided to the parties by Hearing Officer Kennedy. In his email, the Hearing Officer stated:

"You should submit exhibits and witness lists at least five business days before a hearing in which you wish to submit the exhibits or provide the testimony. (This usually means a week, but keep in mind that Columbus Day would push back the deadline for the following hearing one more day.)"

This distinction is critical. The District's quoted rule implies a blanket deadline tied to the first scheduled hearing date. In contrast, the Hearing Officer's instruction clearly ties the deadline to the specific hearing date on which the party intends to use the exhibits or testimony. The Hearing Officer's phrasing — "a hearing in which you wish to submit" — indicates that deadlines are session-specific, applying to each hearing date individually, not fixed to the start of the hearing.

The Parents relied on the Hearing Officer's written instruction in good faith, planning to submit their exhibits five business days before their own presentation date. There was no communication stating that exhibits needed to be submitted prior to the District's case-in-chief or in order to be used during cross-examination. The Hearing Officer's later retroactive application of the District's broader interpretation contradicted his own guidance and limited the Parents' opportunity to present their case.

**B. Detailed Timeline Shows Procedural Imbalance**

The District began its case on September 24, 2025, and submitted exhibits on September 17 (five business days before). The Parents were expected to begin presenting their case on October 27. Following the same five-day rule, their exhibit deadline was October 20. If the Parents had submitted their exhibits on September 17, as the District insisted, the District would have had over a month to prepare rebuttal, while the Parents would have had only five business days to respond to the District's exhibits—an unbalanced procedural outcome.

The District's assertion that the Father "made clear" he was not going to provide his exhibits or witness list at least five business days prior to the commencement of the hearing is a mischaracterization of the record. The District was scheduled to begin presenting its case on September 24, 2025. In an email submitted as Exhibit A in the original recusal motion, the District stated:

"The District expects that it will require three days to present its case. However, we expect to receive the Complainants' exhibits at least five days prior to September 24, pursuant to 34 C.F.R. Sec. 300.512 and Regs. Conn. State Agencies Sec. 10-76h-12."

Based on this, the District's presentation dates were September 24, October 17, and October 21. This confirms that the hearing was structured across multiple sessions, and supports the interpretation that exhibit deadlines should correspond to the specific session in which the evidence would be used.

The Parents were expected to begin presenting on October 27, making October 20 the correct deadline for their exhibit submission, in accordance with the Hearing Officer's directive. The District submitted its exhibits on September 17, five business days before its first hearing date. If the Parents had submitted their exhibits on September 17 as the District insisted, the District would have had nearly a month to prepare for the Parents' case, while the Parents would have had only five business days to prepare in response to the District's exhibits. This would have created a significant procedural imbalance and constrained the Parents' ability to mount their case.

Such a disparity would have compromised the Parents' ability to respond meaningfully to the District's case and would have undermined the principle of balanced participation. The Father's position was consistent with both the Hearing Officer's guidance and the applicable regulations, and the District's objection distorts the timeline and misrepresents his actions. The selective enforcement of disclosure expectations—favoring the District's timeline while limiting the Parents' participation—contributes to a reasonable perception of unequal procedural treatment that underlies this motion for recusal.

### C. Retroactive Shift in Disclosure Standard

Despite this imbalance, the Hearing Officer retroactively shifted the standard. The Father was barred from using his exhibits during cross-examination and from recalling witnesses. The Hearing Officer later described the disclosure expectation as an "attorney courtesy," contradicting the earlier written standard and applying it retroactively in a manner that disadvantaged the Parents. This shift significantly impaired the Father's ability to present his case and contributed to a reasonable perception of unequal procedural treatment.

## IV. Unexplained Rulings Undermined Procedural Fairness

### A. Denial of Witness Questioning Was Summary and Unexplained

The District's objection is silent on one of the clearest examples of procedural concern: the Hearing Officer's denial of the Father's request to recall a witness and introduce relevant exhibits during cross-examination. The ruling was made without explanation and is recorded in the transcript as a single word: "Nope." When the Father sought clarification in writing (Exhibit C, previously submitted with the original Motion for Recusal), no response was provided. The District's failure to address this incident only underscores its significance. It exemplifies unexplained procedural decisions that raise concerns about consistency and fairness, and contributes to the overall appearance of partiality.

## V. Conclusion

The legal standard for recusal is whether an objective observer, fully informed of the facts, would harbor **serious doubt that justice can be done** without recusal. That standard is clearly met here. The Hearing Officer has issued contradictory procedural guidance, imposed prejudicial sanctions based on retroactive standards, threatened dismissal in response to good-faith procedural inquiries, and arbitrarily denied witness questioning without explanation. The District's objection fails to rebut these core examples of procedural unfairness — including the Hearing Officer's unexplained denial of witness recall — further reinforcing the appearance of bias. The cumulative impact of this conduct is not minor error—it resulted in procedural conditions that impaired the ability of a *pro se* party to fully participate. Recusal is not a remedy for disagreement—it is a safeguard against the erosion of impartiality, and that safeguard is warranted here. While the District argues that recusal may cause delay, efficiency cannot outweigh fairness. The IDEA's stay-put protections ensure that no harm will result from a temporary delay, while the harm of proceeding under the appearance of bias is irreparable. An objective observer would reasonably question whether justice could be done absent recusal. Any

temporary delay is minimal compared to the permanent prejudice of a hearing conducted under even the appearance of bias. A hearing without impartiality is no hearing at all.

WHEREFORE, the Father, Robert [redacted] respectfully requests that:

the Milford Board of Education’s Objection to the Motion for Recusal be DENIED; and the Motion for Recusal of Hearing Officer Kennedy be GRANTED.

Respectfully submitted,

Robert [redacted] (Pro Se)

Exhibit D

Exhibit A

# Prehearing 7/29/25

From: Karen [redacted] ([redacted]yahoo.com)

To: plkennedyesq@aol.com; [redacted]verizon.net; hrosen@berchemmoses.com

Date: Tuesday, July 29, 2025 at 11:44 AM EDT

To Hearing Officer Kennedy,

I would like to introduce myself as I was unable to attend the prehearing this morning. My name is Karen [redacted] Mother. Mr. [redacted] and I spoke about what was discussed at the prehearing. The following hearing dates 9/24/25, 10/17/25, 10/21/25, 10/23/25, 10/27/25 and 11/4/25 will not work for my demanding schedule as I work a full time job. I need the dates to be spread out more and possibly half days via zoom. I also need to be present at every hearing.

I appreciate your cooperation in this matter.

Karen [redacted]

Exhibit B

# Request for Hearing Transcript – Case No. 25-0686

From: Robert ([redacted]verizon.net)
To: plkennedyesq@aol.com
Cc: [redacted]yahoo.com; hrosen@berchemmoses.com; dueprocess.sde@ct.gov
Date: Wednesday, October 1, 2025 at 09:49 AM EDT

Dear Hearing Officer Kennedy, Counsel, and Due Process Unit,

I am writing to formally request a copy of the transcript from the due process hearing held on September 24, 2025, for Case No. 25-0686.

As you are aware, I have submitted a Motion for Recusal. After reviewing our notes, my son's mother and I have identified additional concerns that we intend to raise in a supplemental statement. To do so accurately and responsibly, we require access to the full transcript of the proceedings.

Please advise on the process for obtaining the transcript and how it will be provided. We would appreciate your prompt guidance so we may proceed accordingly.

Thank you for your attention to this matter.

Respectfully submitted,

Robert [redacted]

Exhibit C

# RE: Motion for Recusal – Case No. BOE 25-0686

From: Robert ([redacted]verizon.net)
To: hrosen@berchemmoses.com; plkennedyesq@aol.com; [redacted]yahoo.com
Cc: dueprocess.sde@ct.gov
Date: Tuesday, September 30, 2025 at 12:41 PM EDT

Good afternoon,

I am writing to confirm that I intend to submit a formal rebuttal after reviewing the District's objection in full.

Respectfully submitted

Robert [redacted]

On Tue, Sep 30, 2025 at 12:16 PM, Herbert Z. Rosen <hrosen@berchemmoses.com> wrote:

> Good Afternoon,
>
> The Milford Board of Education is waiting on receiving the transcript from the September 24, 2025 due process hearing before finalizing its objection. We expect to receive it today, but we anticipate that our objection will not be ready for submission until tomorrow.
>
> Respectfully submitted,
> Herbie Rosen

BERCHEM MOSES PC

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460

(203) 783-1200 ● www.berchemmoses.com

hrosen@berchemmoses.com

Rated by Super Lawyers 2025 visit SuperLawyers.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

Exhibit C

**From:** Herbert Z. Rosen
**Sent:** Monday, September 29, 2025 3:18 PM
**To:** 'Robert' <[redacted]verizon.net>; plkennedyesq@aol.com; Karen [redacted]
<[redacted]yahoo.com>
**Cc:** DueProcess SDE <dueprocess.sde@ct.gov>
**Subject:** RE: Motion for Recusal – Case No. BOE 25-0686

Good Afternoon,

The Milford Board of Education intends to submit an objection to Mr. [redacted] motion for recusal. We plan to submit our objection by the end of tomorrow.

Respectfully submitted,
Herbie Rosen

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460
(203) 783-1200 • www.berchemmoses.com
hrosen@berchemmoses.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

**From:** Robert <[redacted]verizon.net>
**Sent:** Monday, September 29, 2025 12:30 PM
**To:** plkennedyesq@aol.com
**Cc:** Herbert Z. Rosen <hrosen@berchemmoses.com>; DueProcess SDE <dueprocess.sde@ct.gov>
**Subject:** Motion for Recusal – Case No. BOE 25-0686

Dear Hearing Officer Kennedy, Counsel, and Due Process Unit,

Attached please find my Motion for Recusal in Case No. BOE 25-0686, submitted pursuant to Conn. Agencies Regs. § 10-76h-8(f)(1). The motion, including supporting exhibits, is included in PDF format.

Respectfully,

Robert [redacted]

-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests that you wire or otherwise transfer funds to any party, you must confirm the request and any corresponding

instructions via telephone before you initiate any wire or other transfer. PLEASE CONFIRM BY CALLING THE ORIGINATOR OF THE EMAIL, USING PREVIOUSLY KNOWN CONTACT INFORMATION, PRIOR TO WIRING OR OTHERWISE TRANSFERRING FUNDS.

Exhibit D

## RE: Motion for Recusal – Case No. BOE 25-0686

From: Herbert Z. Rosen (hrosen@berchemmoses.com)
To: [redacted]verizon.net; plkennedyesq@aol.com; [redacted]yahoo.com
Cc: dueprocess.sde@ct.gov
Date: Tuesday, September 30, 2025 at 12:16 PM EDT

Good Afternoon,

The Milford Board of Education is waiting on receiving the transcript from the September 24, 2025 due process hearing before finalizing its objection. We expect to receive it today, but we anticipate that our objection will not be ready for submission until tomorrow.

Respectfully submitted,
Herbie Rosen

BERCHEM MOSES PC

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460
(203) 783-1200 • www.berchemmoses.com
hrosen@berchemmoses.com

Rated by Super Lawyers 2025
visit SuperLawyers.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

**From:** Herbert Z. Rosen
**Sent:** Monday, September 29, 2025 3:18 PM
**To:** 'Robert' <[redacted]verizon.net>; plkennedyesq@aol.com; Karen [redacted]
<[redacted]yahoo.com>
**Cc:** DueProcess SDE <dueprocess.sde@ct.gov>
**Subject:** RE: Motion for Recusal – Case No. BOE 25-0686

Exhibit D

Good Afternoon,

The Milford Board of Education intends to submit an objection to Mr. [redacted] motion for recusal. We plan to submit our objection by the end of tomorrow.

Respectfully submitted,

Herbie Rosen

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460

(203) 783-1200 • www.berchemmoses.com

hrosen@berchemmoses.com

Rated by
Super Lawyers
2025
visit SuperLawyers.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

**From:** Robert <[redacted]verizon.net>
**Sent:** Monday, September 29, 2025 12:30 PM
**To:** plkennedyesq@aol.com
**Cc:** Herbert Z. Rosen <hrosen@berchemmoses.com>; DueProcess SDE <dueprocess.sde@ct.gov>
**Subject:** Motion for Recusal – Case No. BOE 25-0686

Dear Hearing Officer Kennedy, Counsel, and Due Process Unit,

Attached please find my Motion for Recusal in Case No. BOE 25-0686, submitted pursuant to Conn. Agencies Regs. § 10-76h-8(f)(1). The motion, including supporting exhibits, is included in PDF format.

Respectfully,

Robert [redacted]

> -- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests that you wire or otherwise transfer funds to any party, you must confirm the request and any corresponding instructions via telephone before you initiate any wire or other transfer. PLEASE CONFIRM BY CALLING THE ORIGINATOR OF THE EMAIL, USING PREVIOUSLY KNOWN CONTACT INFORMATION, PRIOR TO WIRING OR OTHERWISE TRANSFERRING FUNDS.

Exhibit E

RE: Motion for Recusal – Case No. BOE 25-0686

From: Herbert Z. Rosen (hrosen@berchemmoses.com)
To: [redacted]verizon.net; plkennedyesq@aol.com; [redacted]yahoo.com
Cc: dueprocess.sde@ct.gov
Date: Wednesday, October 1, 2025 at 04:51 PM EDT

Good Afternoon,

On behalf of the Milford Board of Education, please find attached an Objection to the Motion to Recuse.

Respectfully submitted,
Herbert Rosen


BERCHEM MOSES PC

**Herbert Z. Rosen**
**Berchem Moses PC**

75 Broad Street Milford, CT 06460
(203) 783-1200 • www.berchemmoses.com
hrosen@berchemmoses.com



Rated by Super Lawyers 2025 visit SuperLawyers.com

CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.


**From:** Robert <[redacted]verizon.net>
**Sent:** Monday, September 29, 2025 12:30 PM
**To:** plkennedyesq@aol.com
**Cc:** Herbert Z. Rosen <hrosen@berchemmoses.com>; DueProcess SDE <dueprocess.sde@ct.gov>
**Subject:** Motion for Recusal – Case No. BOE 25-0686

Dear Hearing Officer Kennedy, Counsel, and Due Process Unit,

Attached please find my Motion for Recusal in Case No. BOE 25-0686, submitted pursuant to Conn. Agencies Regs. § 10-76h-8(f)(1). The motion, including supporting exhibits, is included in PDF format.

Respectfully,

Robert [redacted]

-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests that you wire or otherwise transfer funds to any party, you must confirm the request and any corresponding instructions via telephone before you initiate any wire or other transfer. PLEASE CONFIRM BY CALLING THE ORIGINATOR OF THE EMAIL, USING PREVIOUSLY KNOWN CONTACT INFORMATION, PRIOR TO WIRING OR OTHERWISE TRANSFERRING FUNDS.

Milford BOE Objection to Motion to Recuse, Case No. 25-0686.pdf
1.7 MB

Exhibit F

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING RE MOTION FOR RECUSAL**

VIA E-MAIL

Date: October 3, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:

Mr Robert [redacted]
[redacted]verizon.net

Ms Karen [redacted]
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:

Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

This ruling is directed to the Motion for Recusal filed by the Father in the above-captioned case on September 29, 2025.

The motion asserts three grounds for recusal. The first is that, when the Father became unruly and insisted on talking over the Hearing Officer, he was reminded that his case could be dismissed with prejudice as a sanction.[1] Thereafter, the Father's conduct improved somewhat and the hearing was able to continue without any dismissal needing to be issued. The administrative hearing process could not function if hearing officers did not use the tools at their disposal to curb the disruptive behavior of pro se litigants (or attorneys).

The other two grounds are mere disagreements with procedural rulings. The undersigned Hearing Officer ruled that the Father was not required to file exhibits until five business days prior to the hearing in which he intended to use them, including using them for purposes of cross-examination. The Father apparently disagrees with the second part of the preceding sentence.[2] When the Father was limited in his ability to cross-examine the District's witness because he not filed the exhibits that he needed to, he indicated that he would recall the witness for his own case. The undersigned Hearing Officer indicated that the District would not be required to produce a witness, with its attendant disruption of the school system, based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them.

[1] It should be noted that administrative hearing officers, unlike judges, do not have contempt powers.

[2] The District disagrees with the first part.

Disagreement with procedural rulings or other matters involving the conduct of hearings is not grounds for recusal, it is grounds for appeal. If the ultimate ruling is not in the Parents' favor, they can file an administrative appeal with the appropriate court.[3] The Father has not alleged that the undersigned Hearing Officer has any personal of financial interest in the outcome of this case or has any friends or relatives involved in it. If there is no true conflict of interest, a demand for recusal is not proper based on mere disagreement with rulings.

Finally, it appears that the Father filed a recusal motion against a prior hearing officer in this case. Moving to disqualify one hearing officer after another until a litigant cherry-picks the one that he wants undermines the integrity of the process. Recusal also has a disruptive effect, particularly in a case, such as this one, where the evidentiary hearing has begun. As a new hearing officer could not make credibility determinations on a cold transcript, the hearing would need to start from scratch. Allowing recusal on specious grounds under such circumstances would allow a party to reboot a case that was not going well, further undermining the integrity of the process.

Therefore, the Motion for Recusal is denied.

[3] As can the District if the ruling is not in the District's favor.

Exhibit G

## [redacted] vs Milford BOE 25-0686

From: plkennedyesq@aol.com (plkennedyesq@aol.com)
To: [redacted]verizon.net; [redacted]yahoo.com; hrosen@berchemmoses.com
Cc: dueprocess.sde@ct.gov
Date: Friday, October 3, 2025 at 10:02 AM EDT

Mr [redacted] Ms [redacted] & Attorney Rosen,

Attached please find my ruling on the Motion for Recusal.

Patrick L. Kennedy
Hearing Officer

Ruling re recusal--[redacted] vs Milford.doc
33 kB

Exhibit H

# Re: Motion for Recusal – Case No. BOE 25-0686

From: Robert ([redacted]verizon.net)
To: hrosen@berchemmoses.com; plkennedyesq@aol.com; [redacted]yahoo.com
Cc: dueprocess.sde@ct.gov
Date: Friday, October 3, 2025 at 10:17 AM EDT

Good Morning

Please see attached Rebuttal to the Districts Objection

Respectfully Submitted

Robert [redacted]

> On Tuesday, September 30, 2025 at 12:41:03 PM EDT, Robert <[redacted]verizon.net> wrote:
>
> Good afternoon,
>
> I am writing to confirm that I intend to submit a formal rebuttal after reviewing the District's objection in full.
>
> Respectfully submitted
>
> Robert [redacted]
>
> On Tue, Sep 30, 2025 at 12:16 PM, Herbert Z. Rosen <hrosen@berchemmoses.com> wrote:
>
> > Good Afternoon,
> >
> > The Milford Board of Education is waiting on receiving the transcript from the September 24, 2025 due process hearing before finalizing its objection. We expect to receive it today, but we anticipate that our objection will not be ready for submission until tomorrow.
> >
> > Respectfully submitted,
> >
> > Herbie Rosen
> >
> > BERCHEM MOSES PC
> >
> > **Herbert Z. Rosen**
> > **Berchem Moses PC**
> > 75 Broad Street Milford, CT 06460
> > (203) 783-1200 • www.berchemmoses.com
> > hrosen@berchemmoses.com

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING RE MOTION FOR RECUSAL**

VIA E-MAIL

Date: October 3, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Robert [redacted]
[redacted]
[redacted]verizon.net

Ms Karen [redacted]
[redacted]
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

This ruling is directed to the Motion for Recusal filed by the Father in the above-captioned case on September 29, 2025.

The motion asserts three grounds for recusal. The first is that, when the Father became unruly and insisted on talking over the Hearing Officer, he was reminded that his case could be dismissed with prejudice as a sanction.[1] Thereafter, the Father's conduct improved somewhat and the hearing was able to continue without any dismissal needing to be issued. The administrative hearing process could not function if hearing officers did not use the tools at their disposal to curb the disruptive behavior of pro se litigants (or attorneys).

The other two grounds are mere disagreements with procedural rulings. The undersigned Hearing Officer ruled that the Father was not required to file exhibits until five business days prior to the hearing in which he intended to use them, including using them for purposes of cross-examination. The Father apparently disagrees with the second part of the preceding sentence.[2] When the Father was limited in his ability to cross-examine the District's witness because he not filed the exhibits that he needed to, he indicated that he would recall the witness for his own case. The undersigned Hearing Officer indicated that the District would not be required to produce a witness, with its attendant disruption of the school system, based on the Father's deliberate, bad-faith refusal to file the exhibits that he needed at the time that he needed them.

---

[1] It should be noted that administrative hearing officers, unlike judges, do not have contempt powers.

[2] The District disagrees with the first part.

Disagreement with procedural rulings or other matters involving the conduct of hearings is not grounds for recusal, it is grounds for appeal. If the ultimate ruling is not in the Parents' favor, they can file an administrative appeal with the appropriate court.[3] The Father has not alleged that the undersigned Hearing Officer has any personal of financial interest in the outcome of this case or has any friends or relatives involved in it. If there is no true conflict of interest, a demand for recusal is not proper based on mere disagreement with rulings.

Finally, it appears that the Father filed a recusal motion against a prior hearing officer in this case. Moving to disqualify one hearing officer after another until a litigant cherry-picks the one that he wants undermines the integrity of the process. Recusal also has a disruptive effect, particularly in a case, such as this one, where the evidentiary hearing has begun. As a new hearing officer could not make credibility determinations on a cold transcript, the hearing would need to start from scratch. Allowing recusal on specious grounds under such circumstances would allow a party to reboot a case that was not going well, further undermining the integrity of the process.

Therefore, the Motion for Recusal is denied.

[3] As can the District if the ruling is not in the District's favor.

**CONNECTICUT STATE DEPARTMENT OF EDUCATION**
**RULING ON MOTION FOR RECONSIDERATION**

VIA E-MAIL

Date: October 5, 2025

**Re: [redacted] vs Milford BOE**

Case No.: 25-0686

To:
Mr Robert [redacted]
[redacted]
[redacted]verizon.net

Ms Karen [redacted]
[redacted]yahoo.com

Herbert Rosen, Esq
Berchem Moses PC
75 Broad Street
Milford, CT 06460
hrosen@berchemmoses.com

From:
Patrick L. Kennedy, Hearing Officer
P.O. Box 8078
Manchester, CT 06040-0078
(860) 644-6522
plkennedyesq@aol.com

The Motion for Reconsideration of the denial of the Motion for Recusal filed by the Father dated October 3, 2025 is denied.